UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                           :

UNITED STATES OF AMERICA          :

                                           :

   - v. -                              :          21 Cr. 478 (ER)

                                           :

TREVOR MILTON,                 :

                                           :

                     Defendant.     :

                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<br>

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

<br>

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

<br><br>

Jordan Estes
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.   THE DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT SHOULD BE DENIED ............... 4

   A.   Applicable Law.................................................................................................. 4

      1.   Motion to Dismiss.................................................................................. 4

      2.   Vagueness .............................................................................................. 6

   B.   The Indictment Provides the Defendant Fair Notice ......................................... 7

   C.   The Indictment Alleges the Requisite Connection to a Security ...................... 12

   D.   The Indictment Alleges that the Object of the Scheme Was Money Or Property ........ 14

   E.   The Indictment Alleges Materiality ................................................................. 19

   F.   The Indictment Properly Alleges Scheme Liability.......................................... 24

   G.   Count Two of the Indictment Is Not Vague..................................................... 27

II.  THE DEFENDANT'S MOTION FOR A BILL OF PARTICULARS SHOULD BE DENIED ............... 31

   A.   Applicable Law................................................................................................ 32

   B.   Discussion....................................................................................................... 36

III. THE DEFENDANT'S MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT SHOULD BE DENIED ............................................................................................................ 40

   A.   Applicable Law................................................................................................ 40

   B.   Discussion....................................................................................................... 42

IV.  THE DEFENDANT'S MOTION FOR THE PRODUCTION OF BRADY SHOULD BE DENIED......... 45

   A.   The Government is Not Required to Identify Brady Material in its Discovery Productions ............................................................................................... 46

   B.   The Government is Not Required to Take Possession of and Review Additional Materials Solely in the Possession of the SEC ................................. 50

V.   THE DEFENDANT'S MOTION FOR AN EVIDENTIARY HEARING ON FILTER TEAM PROTOCOLS SHOULD BE DENIED........................................................................................... 59

   A.   Relevant Facts................................................................................................. 59

   B.   Applicable Law................................................................................................ 59

   C.   Discussion....................................................................................................... 63

CONCLUSION...................................................................................................................... 66

## TABLE OF AUTHORITIES

### Cases

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ....................................................... 4

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) .................. 24

*Costello v. United States*, 350 U.S. 359 (1956) ................................................................................ 4

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .................................................................................................................................... 24

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006) ............................................................................... 31

*Fountain v. United States*, 357 F.3d 250 (2d Cir. 2004) ............................................................... 15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ....................................................................... 28

*Hamling v. United States*, 418 U.S. 87 (1974) ................................................................................ 5

*Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239 (S.D.N.Y. 1988) ...................................... 11

*Hemphill v. United States*, 392 F.2d 45 (8th Cir. 1968) ............................................................... 34

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................................ 31

*In re Ames Dept. Stores Inc. Stock Litig.*, 991 F.2d 953 (2d Cir.1993) .................................... 8, 13

*In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) ....................... 19

*In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ............................................................................................................ 61

*In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903 (N.D. Cal. 2020) .............................................. 8

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ........................................................ 23

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ........................................................................ 16, 18

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) .............................................. 26

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ................................................................................. 25, 26

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ............................................................................. 6, 7

*Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............. 20

*Merrill Lynch, Pierce, Fenner, & Smith v. Dabit*, 547 U.S. 71 (2006) .................................... 7, 13

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................................ 24

*Parker v. Levy*, 417 U.S. 733 (1974) ............................................................................................ 28

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) .................................................................................................................................................... 10

*Porcelli v. United States*, 404 F.3d 157 (2d Cir. 2005) ............................................................... 17

*Puddu v. 6D Glob. Techs., Inc.*, No. 15 Civ. 8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ...................................................................................................................... 27

*Ross v. A.H. Robins Co.*, 607 F.2d 545 (2d Cir. 1979) ................................................... 8

*Russell v. United States*, 369 U.S. 749 (1962) ............................................................. 5

*SEC v. Pirate Inv. LLC*, 580 F.3d 233 (4th Cir. 2009) .................................................. 9

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013).......................................................... 12

*SEC v. Sequential Brands Group, Inc.*, No. 20 Civ. 10471 (JPO), 2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) ..................................................................................................... 27

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007)..... 51, 54

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) .................................... 8, 12

*SEC v. Zandford*, 535 U.S. 813 (2002) ......................................................................... 7

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)…………………………………19

*United States v. Abdallah*, 840 F. Supp. 2d 584 (E.D.N.Y. 2012) .............................. 17

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ........................................... 13, 21

*United States v. Amer*, 110 F.3d 873 (2d Cir. 1997)................................................. 30

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ............................................. 23

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ............................................ 52

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y. 2020) ............................. 7, 22

*United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2021 WL 4120539 (S.D.N.Y. Sept. 9, 2021) . 62

*United States v. Balde*, 943 F.3d 90 (2d Cir. 2019) ....................................... 21, 22, 25

*United States v. Barford*, No. 03 Cr. 434, 2004 WL 5645086 (E.D. Mo. Apr. 23, 2004)............ 17

*United States v. Bejasa*, 904 F.2d 137 (2d Cir. 1990) ............................................... 37

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003)......................... 35, 38

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)........................................... 20

*United States v. Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000)............................. 41

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015)............................................... 16

*United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020)... 37, 40

*United States v. Blaszczak*, 308 F.Supp.3d 736 (S.D.N.Y. 2018).............................. 51, 54, 58, 61

*United States v. Blau*, 159 F.3d 68 (2d Cir. 1998)...................................................... 63

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016)...................................... 40

*United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013)

.................................................................................................................................. 39

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ........................................................ 32, 33

*United States v. Bout*, 731 F.3d 233 (2d Cir. 2013).................................................................... 22

*United States v. Brooks*, 966 F. 2d 1500 (D.C. Cir. 1992) ......................................................... 56

*United States v. Brown*, 555 F.2d 336 (2d Cir. 1977).................................................................. 9

*United States v. Butler*, 351 F. Supp. 121 (S.D.N.Y. 2004) ...................................................... 41

*United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446 (S.D.N.Y. Apr. 14, 2020)... 58

*United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015).. 61

*United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, (S.D.N.Y. Feb. 9, 2018) .............. 51

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005)..................................................... 41

*United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y. 2019)............................................. 51, 54

*United States v. Coscia*, 100 F. Supp. 3d 653 (N.D. Ill. 2015)............................................... 29, 30

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) ..................................................... 31

*United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310 (S.D.N.Y. Sept. 24, 2009).... 33, 39, 40

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994).................................................. 19

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)................................................. 34

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ...................................................... passim

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ................................................. 5

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) ................................................. 62

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006)................................................. 50

*United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021) ................................................................. 16

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001).................................................. 35

*United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010)...................................... 54

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) ......................................................... 4, 11

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) .......................................................... 16

*United States v. Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ............................................. 51, 56

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016).............................................................. 6

*United States v. Hatfield*, 724 F. Supp. 2d 321 (E.D.N.Y. 2010)................................................. 15

*United States v. Healey*, 860 F. Supp. 2d 262 (S.D.N.Y. 2012)................................................... 46

*United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004).............................................................. 17

*United States v. Heimann*, 705 F.2d 662 (2d Cir. 1983)..................................................................... 43

*United States v. Helmsley*, 726 F. Supp. 929 (S.D.N.Y. 1989) ...................................................... 63

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ........................................... 33, 35, 40

*United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871 (S.D.N.Y. Jan. 21, 2016)........ 62

*United States v. Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014)......................................................... 7

*United States v. Ingredient Technology Corp.*, 698 F.2d 88 (2d Cir. 1983).................................. 9

*United States v. Kazarian*, 2012 WL 1810214, (S.D.N.Y. May 18, 2012) ............................. 33, 40

*United States v. Lanier*, 520 U.S. 259 (1997)....................................................................... 8

*United States v. Leonard*, 350 F. App'x 480 (2d Cir. 2009)............................................................ 58

*United States v. Leonelli,* 428 F. Supp. 880 (S.D.N.Y. 1977) ....................................................... 34

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) ..................................................................... 58

*United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013).... 34, 39

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ..................................................................... 20

*United States v. Lumiere*, No. 16. Cr. 483, 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) ......... 62

*United States v. Mahabub*, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ........................... 34, 35

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ................................................................. 15

*United States v. Mahaffy*, No. 05 Cr. 613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006) ...... 15, 16

*United States v. Males*, 459 F.3d 154 (2d Cir. 2006)....................................................................... 17

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ........................................... 33, 36

*United States v. Marrero*, 904 F.2d 251 (5th Cir. 1990) ................................................................. 46

*United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ......................................... 51, 56

*United States v. Maxwell*, 534 F. Supp. 3d 299 (S.D.N.Y. 2021)................................................... 41

*United States v. McDonough*, 56 F.3d 381 (2d Cir. 1995) ............................................................. 24

*United States v. Melvin*, 143 F. Supp. 3d 1354 (N.D. Ga. 2015)..................................................... 29

*United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) .. 51, 55, 56, 59

*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990)............................................................. 6

*United States v. Mitlof*, 165 F. Supp. 2d at 569 (S.D.N.Y. 2001)..................................... 34, 36, 38

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ................................................. 41

*United States v. Motz*, 652 F. Supp. 2d 284 (E.D.N.Y. 2009) ................................................. 15, 29

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)..................................................................... 41

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ........................................ 33, 40

*United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993) ....................................................... 28

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) ................................................. 13, 27

*United States v. Ohle*, No. 08 Cr. 1109 (JSR), 2011 WL 651849 (S.D.N.Y. Feb. 7, 2011).. 46, 47, 48

*United States v. Parnas*, No. 19. Cr. 725 (JPO), 2021 WL 2981567 (S.D.N.Y. July 14, 2021) . 46, 50

*United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017)...... 63

*United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021).................................................. 19

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006)............................................... 43

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ..................................................... 50

*United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) .... 50, 51, 54

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003)................................... 34

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451 (S.D.N.Y. 2011) .. 46, 47

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) .................................................... 6

*United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ................................................................................................................. 35, 40

*United States v. Scarpa*, 913 F.3d 993 (2d Cir. 1990)................................................... 41

*United States v. Schneiderman*, 968 F.2d 1564 (2d Cir. 1992) ...................................... 28

*United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019).. 63

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991)................................................ 19

*United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027 (D. Nev. 2006)...................... 63

*United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) 62, 63

*United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009) .......................................... 49

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................... 41, 43

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ...................................... 12, 21

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ................................................. 55

*United States v. Stewart*, 513 F.2d 957 (2d Cir. 1975) ................................................. 59

*United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. Jan. 19, 2016)................................. 32

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ................................................. 5

*United States v. Tannenbaum*, 934 F.2d 8 (2d Cir. 1991) ...................................................... 9

*United States v. Thomas*, 981 F. Supp. 2d 229 (S.D.N.Y. 2013) .................................................. 48

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ........................................................ 32, 34, 40

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................................. 33, 40

*United States v. Tuzman*, 301 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................ 32, 37, 39, 40

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ............................................................... 5

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ...................................................... 32

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) ....................................................... 20

*United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ......... 39

*United States v. Williams*, 504 U.S. 36 (1992) ................................................................ 5

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) .................................................... 5

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ........................................................ 61

Village of Hoffman Estates v. Flipside, 455 U.S. 489 (1982) ...................................... 28

## Statutes

18 U.S.C. § 1348 ...................................................................................................... 14

18 U.S.C. §§ 1341 .................................................................................................... 16

8 U.S.C. §§ 1343 ..................................................................................................... 16

## Other Authorities

S. Rep. No. 107-146 (2002) ..................................................................................... 16

## PRELIMINARY STATEMENT

As alleged in the Indictment, Trevor Milton engaged in a scheme to defraud retail and other investors in Nikola Corporation ("Nikola") by making false and misleading statements regarding Nikola's product and technology development. Milton seeks to dismiss the Indictment for a host of reasons, none of which has merit. Milton's other pretrial motions likewise find little support in fact or law. For the reasons that follow, the motions should be denied in their entirety.

*First*, Milton's vagueness challenges are premature and meritless, because a person of ordinary intelligence would understand that it is against the law to lie to investors in order to induce them to purchase stock.

*Second*, Milton's motions to dismiss improperly ask the Court to adjudicate factual issues that should be resolved by a jury at trial. The Indictment tracks the relevant statutory language for securities fraud and wire fraud, and accordingly, Milton's motions to dismiss are meritless.

*Third*, a bill of particulars is not warranted because the 48-page Indictment, extensive discovery, and various pre-trial disclosures provide Milton sufficient information to prepare his defense.

*Fourth*, Milton's motion to strike surplusage is premature and meritless, because the allegations in the Indictment are relevant to the charged crimes and not unduly prejudicial.

*Fifth*, Milton's motion to compel the Government to itemize *Brady* material in its discovery has no basis in law and should be denied. Likewise, Milton's request that the Government search the files of the United States Securities and Exchange Commission ("SEC") is baseless because the Government has already obtained materials from the SEC, the SEC is not part of the

prosecution team in this case, and Milton already has the essential facts which would enable him to call witnesses and take advantage of potentially exculpatory information.

*Sixth*, Milton's motion for an evidentiary hearing on the Government's filter team protocols is little more than a fishing expedition. Because Milton has failed to demonstrate an entitlement to a hearing, the motion should be denied.

## **BACKGROUND**

On July 28, 2021, a grand jury sitting in this district charged Milton with engaging in a scheme to induce investors—particularly individual, non-professional or "retail" investors—to invest in the company Milton founded, led, and in substantial part owned, Nikola, based on false and misleading statements made by Milton directly to the investing public through social media and television, print, and podcast interviews. (Dkt. No. 1 ("Indictment") ¶ 1). As alleged in the Indictment, Milton made false and misleading statements regarding nearly all aspects of Nikola's business, which was to design and manufacture zero-emission battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen station infrastructure. (Indictment ¶¶ 2, 6). These claims, which are described in detail in the Indictment, included:

- false and misleading statements that Nikola had early success in creating a "fully functioning" semi-truck prototype known as the "Nikola One";

- false and misleading statements that Nikola had engineered and built an electric- and hydrogen-powered pickup truck known as "the Badger" from the "ground up" using Nikola's parts and technology;

- false and misleading statements that Nikola was producing hydrogen and was doing so at a reduced cost;

- false and misleading statements that Nikola had developed batteries and other important components in-house; and

- false and misleading claims that reservations made for the future delivery of Nikola's semi-trucks were binding orders representing billions in revenue.

(Indictment ¶ 2).

Milton made these false and misleading statements regarding Nikola's products and capabilities to induce retail investors to purchase Nikola stock. Among the retail investors who ultimately invested in Nikola were investors who had no prior experience in the stock market and had begun trading during the COVID-19 pandemic to replace or supplement lost income or to occupy their time while in lockdown. The value of Nikola's stock, including stock held by retail investors, plummeted after certain of Milton's statements were revealed to be false and misleading. (Indictment ¶ 3).

Milton was motivated to engage in the fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur. Indeed, during the course of the fraud, Milton saw the market value of his interest in Nikola rise substantially. On or about March 3, 2020, when Nikola announced that it would go public by merging with a publicly traded special-purpose acquisition company ("SPAC") based in New York, Nikola claimed an enterprise value of approximately $3.324 billion, implying that the Nikola stock that Milton would hold upon completion of the merger, through an entity called "M&M Residual," had a value of approximately $844 million. At opening on or about June 9, 2020, after the merger was complete, and when Nikola's stock peaked in the wake of announcements by Milton about the Badger, the market value of Milton's stock was at least approximately $8.5 billion. (Indictment ¶ 4).

Based on this scheme, the grand jury charged Milton with one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2 ("Count One"),

one count of securities fraud in violation of 18 U.S.C. §§ 1348 and 2 ("Count Two"), and one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 ("Count Three").

## ARGUMENT

### I.    The Defendant's Motions to Dismiss the Indictment Should Be Denied

On December 15, 2021, the Defendant filed six motions to dismiss various counts of the Indictment, as follows: (i) a motion to dismiss Counts One and Two of the Indictment for lack of fair notice ("Mot. #1," ECF 40), (ii) a motion to dismiss Counts One and Two of the Indictment for failure to allege a connection to a security ("Mot. #2," ECF 42), (iii) a motion to dismiss Counts Two and Three of the Indictment for failure to allege that the object of the scheme was money or property ("Mot. #3," ECF 44), (iv) a motion to dismiss all counts of the Indictment for failure to allege materiality ("Mot. #4," ECF 47), (v) a motion to dismiss the charges of scheme liability in Count One of the Indictment ("Mot. #5," ECF 49), and (vi) a motion to dismiss Count Two of the Indictment for vagueness ("Mot. #6," ECF 51).

For the reasons that follow, the motions to dismiss are meritless.

### A.    Applicable Law

#### 1.    Motion to Dismiss

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 365 (1956). The dismissal of an indictment is an "'extraordinary remedy' reserved only for

extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted)

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Rule 7(c) (alterations omitted)). To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted). Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Yannotti*, 541 F.3d at 127.

Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Stringer*, 730 F.3d at 124-25; *Yannotti*, 541 F.3d at 127. Moreover, it is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *See United States v. Williams*, 504 U.S. 36, 54 (1992). To that end, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements

of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*

### 2.    Vagueness

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (internal quotation marks omitted). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id.* (internal quotation marks omitted). Under the fair notice prong, the question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* (internal quotation marks omitted).

Because vagueness challenges are "as applied," courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (internal quotation marks and citation omitted)).

### B.      The Indictment Provides the Defendant Fair Notice

Milton first argues that Counts One and Two of the Indictment should be dismissed because he was not on fair notice that his modern methods of communicating to investors—on social media and in podcast interviews—could give rise to securities fraud liability. (Mot. #1). Milton also argues that he was not on fair notice that falsehoods related to a public company's products can result in criminal liability. Milton's arguments are premature and meritless. As the Executive Chairman (and largest shareholder) of a public company, he repeatedly lied to the public about the capabilities of Nikola's products. There can be no serious question that this conduct is criminal, and accordingly, this motion should be denied.

As a threshold matter, Milton's "fair notice" challenge is premature. A void-for-vagueness challenge like this one is inherently fact-specific and cannot be decided without a developed record. *Maynard*, 486 U.S. at 361. Accordingly, the law requires as-applied void-for-vagueness challenges to be raised after trial. *See United States v. Avenatti*, 432 F. Supp. 3d 354, 366 (S.D.N.Y. 2020); *United States v. Hoskins*, 73 F. Supp. 3d 154, 166-67 (D. Conn. 2014).

In any event, if the claim were properly raised now, it would fail on the merits. Milton argues that he was not on notice that his statements on social media and in podcast interviews could constitute fraud "in connection with the purchase or sale of a security." (Mot. #1 at 9-10). However, the Supreme Court has long made clear that the language "in connection with" should be construed broadly and encompasses circumstances in which a victim is defrauded into purchasing a security. *See Merrill Lynch, Pierce, Fenner, & Smith v. Dabit*, 547 U.S. 71, 85 (2006); *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002) (explaining that the statute should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes") (internal quotation marks omitted). The Second Circuit has similarly held that "statements directed

7

to the general public which affect the public's interest in the corporation's stock are made in connection with sales or purchases of that stock." *In re Ames Dept. Stores Inc. Stock Litig.*, 991 F.2d 953, 966 (2d Cir.1993) (citing *Ross v. A.H. Robins Co.*, 607 F.2d 545 (2d Cir. 1979)); *see also SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir. 1968) (en banc) ("Rule 10b–5 is violated whenever assertions are made . . . in a manner reasonably calculated to influence the investing public . . . ."). That is precisely what happened here: as alleged in the Indictment, Milton made false statements to the investing public on social media and podcasts in an effort to induce victim investors into purchasing Nikola stock. (Indictment ¶¶ 1-2, 22). These allegations plainly constitute fraud "in connection with the purchase or sale of a security."

Milton claims that he lacked fair notice because his false statements were on media that differed from media of communication in older securities fraud cases. (Mot. #1 at 9). But as of April 15, 2020, at least one court—in a decision involving Milton's electric truck rival, Elon Musk—found that tweets could give rise to securities fraud liability. *See In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 922 (N.D. Cal. 2020) (tweets by Elon Musk could be false or misleading statement). And in any event, the fact that communication methods are evolving does not mean that the defendant did not have fair notice that he could not lie to investors. No statute can ever specify all the various factual scenarios in which it may be violated. *See United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[D]ue process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." (citation and internal quotation marks omitted)). Thus, "it is immaterial" whether, when Milton violated the statutes at issue, "'there [was] no

litigated fact pattern precisely in point."' *United States v. Tannenbaum*, 934 F.2d 8, 12 (2d Cir. 1991) (quoting *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 96 (2d Cir. 1983) (quoting *United States v. Brown*, 555 F.2d 336, 339-40 (2d Cir. 1977))).

The Fourth Circuit's decision in *SEC v. Pirate Inv. LLC*, 580 F.3d 233 (4th Cir. 2009), is instructive in this regard. There, appellants had disseminated a false stock tip over email. Although the misrepresentations were sent over email, the Court found that the "in connection with" requirements was satisfied because the appellants knew that the email recipients would rely on them in making investment decisions. *Id.* at 251. Thus the medium itself did not matter; what mattered was that the communications targeted investors. *Id.* at 251. Because the Indictment clearly alleges that Milton's false statements targeted investors (*see* Indictment ¶¶ 1-2), this argument provides no basis for dismissal.

Milton's argument that he lacked fair notice for the false statements he made before Nikola went public is also meritless. As alleged in the Indictment, Milton engaged in a scheme to defraud that started in November 2019, when Nikola began negotiations to go public through a combination with VectoIQ Acquisition Corporation ("VectoIQ"). (Indictment ¶¶ 14, 22). To be sure, Nikola stock could not be traded until March 2020, when investors could effectively trade in Nikola by trading under the VectoIQ ticker. (Indictment ¶¶ 15-16). But Milton's statements were part of a *scheme* to defraud that began when it became clear that Nikola would soon be a publicly-traded company. Milton's statements gave a false and misleading impression of the development of Nikola's products and technology, driving demand for the stock among retail investors before they could trade, and then causing the stock to trade at artificially high prices once Nikola went public. (Indictment ¶¶ 22, 80). Moreover, the false statements Milton made in the months before

9

Nikola went public were then repeated and reaffirmed by Milton after the company became publicly-traded. (Indictment ¶¶ 45, 50-54, 57, 66-69, 78).

Milton also argues that he had no notice that statements he made "years earlier" could lead to charges that he defrauded investors after the company went public. (Mot. #1 at 12). In doing so, he cites the allegations in the Indictment describing Milton's December 2016 statements on the Nikola One, which include his statement that the Nikola One was "fully functioning." (Mot. #1 at 12 (citing Indictment ¶¶ 32-33)). Contrary to Milton's argument, the Indictment does not allege that those statements, standing alone, constitute securities fraud. Instead, the Indictment alleges that those statements were made newly relevant in 2020 when Milton began promoting a false narrative that Nikola had been a first-mover in the zero-emissions trucking business in 2016 when it debuted the Nikola One. (Indictment ¶ 27).

Milton relies on a single, civil case, *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021), to support his argument that statements he made before Nikola went public are not actionable as securities fraud. But it is distinguishable. There, the Court found that statements made 39 months before the relevant investment were immaterial given "intervening events and disclosures," and thus could not "significantly alter[] the total mix of information." *Id.* at 101 (internal quotation marks omitted). In contrast here, as alleged in the Indictment, Milton's statements were made in the *months* leading up to Nikola's debut as a public company, and Milton repeated many of those same falsehoods after the company went public. Milton cannot reasonable argue that he lacked notice that he could be liable for securities fraud for statements he made as Nikola's public debut became imminent.

Nor can Milton seriously argue that he lacked notice that he could be liable for securities fraud for statements he made after March 3, 2020, when it was announced that Nikola would combine with VectoIQ. (Mot. #1 at 14-15). As alleged in the Indictment, after it was announced that Nikola would go public through a combination with VectoIQ, investors could effectively invest in Nikola by investing in VectoIQ stock, which was already publicly traded and would convert into Nikola stock upon completion of the combination. (Indictment ¶¶ 15-16). In fact, on the eve of the combination announcement, Milton emailed a Nikola board member that they needed to get "retail investors on our side" because that "prevents the stock short selling." (Indictment ¶ 24). Thus, as the Indictment makes clear, as of March 2020, Milton was focusing his statements on retail investors. His fair notice claim in this regard is wholly unsupported by the facts or the law.

Milton also argues that he was not on fair notice that "statements of product promotion" could be made "'in connection with' securities or the purchase or sale of said securities." (Mot. #1 at 17). In making this argument, Milton principally relies on a single civil case, *Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239 (S.D.N.Y. 1988), in which the court found that a civil complaint, citing misrepresentations in advertising materials, did not properly plead securities fraud under civil pleading standards. (*See* Mot. #1 at 17-20). But this is not a civil case, and those standards do not apply. Here, the Indictment does not allege that Milton's statements targeted consumers; rather, it alleges that Milton's statements targeted retail and other investors. (Indictment ¶¶ 22, 24, 25). Because these allegations must be taken as true at this stage, *Goldberg*, 756 F.2d at 950, this fair notice argument fails as well.

11

Finally, Milton's argument that his conduct should be regulated solely by the Federal Trade Commission should be swiftly rejected. (Mot. #1 at 21-24). "Congress has the power to impose both criminal and civil sanctions for the same conduct." *SEC v. Razmilovic*, 738 F.3d 14, 37 (2d Cir. 2013). To that end, civil regulators routinely bring parallel enforcement actions to criminal cases, as the SEC did here. Accordingly, the fact—assuming its accuracy—that Milton's conduct could be regulated by the FTC says nothing about whether his conduct is also a violation of federal criminal law.

In sum, the Indictment plainly alleges that Milton made false statements "in a manner reasonably calculated to influence the investing public." *Texas Gulf Sulphur Co.,* 401 F.2d at 862. Accordingly, Milton's motion to dismiss for lack of fair notice should be denied.

### C.        The Indictment Alleges the Requisite Connection to a Security

Milton next argues that Count One and Two should be dismissed because Counts One and Two do not contain sufficient factual allegations which, if proven, would establish that Milton's statements were "in connection with" a security. (Mot. #2). Under the legal standards governing motions to dismiss indictments, Milton's argument is without merit and should be denied.

As required by Fed. R. Crim. P. 7(c), Counts One and Two of the Indictment track the relevant statutory language, state the approximate time and place of the crime, and thereby provide adequate notice to the defendant of the charges against him. *See United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). This alone is fatal to Milton's claim.

Indeed, Milton does not argue that the Indictment does not track the statutory language. Instead, he rehashes many of the arguments in his motion to dismiss for lack of fair notice, claiming that the allegations in the Indictment do not show the requisite connection to a security. (Mot. #2 at 7-13). But as discussed above, *see supra* Part I.B, the "in connection with" prong is construed

12

broadly to include public statements that "affect the public's interest in the corporation's stock." *In re Ames Dept. Stores Inc. Stock Litig.*, 991 F.2d at 966; *see also United States v. Nouri*, 711 F.3d 129, 143 (2d Cir. 2013) ("The Supreme Court has repeatedly held that Rule 10b–5's requirement that a fraud be 'in connection with' the purchase or sale of a security is easily satisfied."). The Supreme Court has also made clear that "in connection with" covers efforts to defraud a victim into purchasing securities. *See Merrill Lynch, Pierce, Fenner, & Smith*, 547 U.S. at 85.

The allegations in the Indictment squarely fit in these categories. Specifically, the Indictment alleges:

> TREVOR MILTON, the defendant, sought to fraudulently induce retail and other investors to purchase Nikola's stock by making false and misleading statements about Nikola's products and milestones on social media and in television and podcast interviews. MILTON's false and misleading claims were intended to drive demand for Nikola's stock among retail investors, including at times when early strategic investors and other sophisticated investors were selling their stock, which might otherwise tend to cause the stock price to decrease.

(Indictment ¶ 22; *see also id.* ¶ 82 (alleging that Milton engaged in a scheme defraud "in connection with the purchase and sale of securities"); *id.* ¶ 84 (same)).

Milton's efforts to sidestep these allegations impermissibly ask the Court to look beyond the Indictment and consider evidence attached to a declaration submitted by Milton's attorneys. (Mot. #2 at 14). But drawing inferences on matters beyond the face of the indictment amounts to an inquiry into the sufficiency of the evidence, and is "not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998) (reversing dismissal of an indictment when the district court "looked beyond the face of the

indictment and drew inferences as to the proof that would be introduced by the government at trial" to satisfy an element of the charge; a technically sufficient indictment "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial"); *see also Dawkins*, 999 F.3d at 780 ("[A]t the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial" (quotation marks and footnotes omitted)). Accordingly, there is no basis to dismiss Counts One or Two for failure to allege fraud "in connection with the purchase or sale of a security."

**D.      The Indictment Alleges that the Object of the Scheme Was Money Or Property**

Equally unavailing is Milton's argument that Counts Two and Three of the Indictment should be dismissed for failure to allege that the object of the scheme was money or property. (Mot. #3). Because these counts track the statutory language of the relevant statutes, and in doing so, state that the object of the scheme was money or property, this motion should be denied. In addition, Count Two of the Indictment charges Milton with violating both subsections of 18 U.S.C. § 1348, one of which does not does not require proof that the scheme involved money or property, and accordingly, Milton's argument has no bearing on the validity of that part of the Indictment.

Section 1348 of Title 18 provides that:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud any person in connection with any commodity for future delivery, ... or any security of an issuer with a class of securities registered under section 12 of the [Exchange Act] or that is required to file reports under section 15(d) of the [Exchange Act]; or
> >
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of ... any security of an issuer with a class of securities registered under section 12

> of the [Exchange Act] or that is required to file reports
> under section 15(d) of the [Exchange Act];

shall be fined under this title, or imprisoned not more than 25 years,
or both.

The Government need only prove one of Section 1348's subsections. *United States v. Mahaffy*, No. 05 Cr. 613, 2006 WL 2224518, at *12 (E.D.N.Y. Aug. 2, 2006). To establish a violation of Section 1348(1), the government must prove three elements: (1) fraudulent intent, (2) a scheme or artifice to defraud, and (3) nexus with a covered security. *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) (citing *United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009)). Alternatively, to establish a violation of Section 1348(2), the government must prove "(1) a scheme or artifice; (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property; while possessing (3) fraudulent intent." *United States v. Hatfield*, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010) (internal quotation marks omitted). Because Section 1348(1) contains no requirement that the scheme involve money or property, Milton's arguments provide no basis for dismissal of this prong of Count Two.

Nor do Milton's arguments provide a basis for dismissal of Count Three or the Section 1348(2) prong of Count Two. Both require proof that money or property was the object of the scheme to defraud. *See Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (quoting 18 U.S.C. § 1343); *Hatfield*, 724 F. Supp. 2d at 324. The statutory language for Counts Two and Three both make this allegation, and for this reason alone, dismissal is not warranted. (*See* Indictment ¶¶ 84, 86).

In any event, the Indictment goes beyond the statutory language. It alleges that Milton "sought to fraudulently induce retail and other investors to purchase Nikola's stock by making

false and misleading statements about Nikola's products and milestones" (Indictment ¶ 22), and that Milton did so to "keep[] Nikola's stock price high" and "increase and support Nikola's stock price" (Indictment ¶¶ 23, 26). As alleged in the Indictment, the increased stock price benefited Milton because he owned, through an entity called "M&M Residual," approximately 25.4% of the company. (Indictment ¶ 18). When Nikola's stock price peaked in the wake of certain statements by Milton, the market value of Milton's stock was worth at least approximately $8.5 million. (Indictment ¶ 4). The Indictment further alleges that after certain of Milton's falsehoods were revealed to the market, Nikola's stock price plummeted, resulting in "substantial losses, in some cases totaling in the tens or hundreds of thousands of dollars." (Indictment ¶ 80).

These allegations are more than sufficient to establish that the object of the scheme was money or property. "The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343).[1] The "essential elements" of wire fraud are therefore "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quotation marks omitted). To satisfy the money or property element, it is sufficient to prove that the defendant intended to deprive the victim of money or property, even if the defendant did not him or herself obtain the property. *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020); *United States v. Gatto*, 986 F.3d 104, 125 (2d Cir. 2021); *United States v. Males*, 459

---

[1] Because the text and legislative history of 18 U.S.C. § 1348 show that it was modeled after the mail and wire fraud statutes, *see* S. Rep. No. 107-146, at 20 (2002), courts apply those precedents in construing § 1348. *See Mahaffy*, 2006 WL 2224518, at *11.

16

F.3d 154, 158 (2d Cir. 2006); *Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir. 2005); *United States v. Hedaithy*, 392 F.3d 580, 602 n.21 (3d Cir. 2004).

A scheme intended to induce investors to purchase stock at increased prices is, of course, a scheme to deprive another of money or property. *See United States v. Abdallah*, 840 F. Supp. 2d 584, 608 (E.D.N.Y. 2012) (scheme to manipulate stock prices and cause others to purchase at higher prices satisfies money or property element); *United States v. Barford*, No. 03 Cr. 434, 2004 WL 5645086, at *14 (E.D. Mo. Apr. 23, 2004) ("to act to artificially inflate the value of a publicly traded company, as alleged, is to act to defraud those who own and invest in such stock"). Indeed, Milton does not argue otherwise in his motion. Rather, he suggests that "the alleged misstatements were not made to induce the purchase or sale of a security," and thus that "[a]ny augmentation in the value of Nikola's stock…would be *incidental* to the allegedly fraudulent conduct, rather than the requisite *object of* such conduct."). (Mot. #3 at 12). But contrary to Milton's assertions, the Indictment alleges clearly that Milton engaged in a fraudulent scheme to induce "investors to purchase Nikola stock, and thereby to increase and support Nikola's stock price." (Indictment ¶ 26; *see also, e.g.*, *id.* ¶¶ 3, 22, 23, 64, 71, 80, 81). Even more, the Indictment alleges that an inflated stock price would increase the value of Milton's own holdings, and allow him ultimately, provided the scheme succeeded, to sell his own stock at increased prices. (*See id.* ¶¶ 4, 18-21).

In an effort to circumvent these clear allegations, Milton asserts, *ipse dixit*, that only "statements about Nikola's financial performance and its key performance metrics" can provide the basis of a property fraud scheme and that "the alleged misstatements are insufficiently related to the value of Nikola's stock." (Mot. #3 at 12). Milton cites no authority for the proposition that misleading statements about a company's products cannot defraud an investor and there is none.

17

In any case, Milton is asking the Court "to evaluate the adequacy of the facts to satisfy the elements of the charged offense." *Dawkins*, 999 F.3d at 780. As the Second Circuit has made clear, "[t]hat is something we do after trial." *Id.*

Milton next cites the Supreme Court's decision in *Kelly v. United States,* 140 S. Ct. 1565 (2020), to support his assertion that "[f]or an alleged scheme to defraud based upon misstatements related to product promotion, the *object* of the deprivation must necessarily relate to the product being promoted." (Mot. #3 at 12). But *Kelly* has nothing to do with product promotion or fraud against investors. As the Second Circuit recently explained, "[i]n *Kelly*, better known as the 'Bridgegate' case, state officials devised a scheme to punish the mayor of Fort Lee, New Jersey, for declining to endorse the incumbent New Jersey governor in his reelection bid." *Gatto*, 986 F.3d at 115 (citing *Kelly*, 140 S. Ct. at 1568). "To do so, politically appointed Port Authority officials closed traffic lanes that led from Fort Lee to the George Washington Bridge for four days under the guise that they were conducting a traffic study." *Id.* (citing *Kelly*, 140 S. Ct. at 1568). The Supreme Court held that a scheme to reallocate the George Washington Bridge's access lanes was not property fraud, "[b]ecause the officials' only goal was political retaliation—to create a headache for the Fort Lee mayor—and the officials were indifferent about the unintended additional costs of carrying out the plan." *Gatto*, 986 F.3d at 116 (citing *Kelly*, 140 S. Ct. at 1574). *Kelly* says nothing whatsoever about any required connection between the content of a misrepresentation and the object of a fraud scheme, nor is it at all clear what Milton means by "the *object* of the deprivation" or its "relat[ion] to the product being promoted" (Mot. #3 at 12). The Indictment alleges that an object of the scheme was money or property. (Indictment ¶¶ 84, 86; *see also, e.g.*, *id.* ¶ 26). Nothing more is required. *See Gatto*, 986 F.3d at 116 ("property need only be

'*an* object' of their scheme, *Kelly*, 140 S. Ct. at 1572 (emphasis added), not the sole or primary goal").

Finally, to the extent that Milton suggests that the Government must allege or prove that Milton successfully inflated the price of Nikola stock or that Milton was able successfully to profit from his scheme, he is simply wrong on the law. *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (for fraud conviction, "[t]he scheme to defraud need not have been successful or complete" and "the victims of the scheme need not have been injured"); *see also United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021) ("To prove a scheme to defraud, '[i]t need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm.'" (quoting *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991))). The Indictment sufficiently alleges that money or property was the object of Milton's scheme.

### E.    The Indictment Alleges Materiality

Milton next asks the Court to dismiss the Indictment for failure to allege materiality. (Mot. #4). In doing so, the defendant asks the Court to decide as a matter of law an intensely fact-bound inquiry that, under well settled law, falls within the province of the jury. This motion, too, should be denied.

In the securities fraud context, a fact is material if it is one that would have been significant to a reasonable investor's investment decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). In assessing materiality, statements must be "taken together and in context." *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). In the wire fraud context, "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision making body to which it was addressed." *United States*

*v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (quotation marks and citation omitted). Materiality determinations are an "inherently fact-specific finding." *Basic v. Levinson*, 485 U.S. 224, 236 (1988).

Materiality determinations are mixed questions of law and fact that are particularly well suited for jury resolution. *See United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991))). Indeed, "only [w]here the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,'" may a court find "the misstatements immaterial as a matter of law." *Litvak*, 808 F.3d at 175 (citation omitted); *see also Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) ("The Second Circuit has repeatedly stated that 'materiality is a mixed question of law and fact,' which should not be decided on a motion to dismiss unless the alleged misstatements or omissions are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" (citations omitted)).

Here, Milton raises three arguments regarding materiality: (1) that the Indictment is deficient because it fails to refer to a "reasonable investor," (2) that the Indictment fails to allege facts showing that any particular statement by Milton significantly altered the total mix of information to investors, and (3) that certain statements in the Indictment constitute puffery. (Mot. #4 at 16-21). Each of these arguments is meritless.

20

As to Milton's first argument, the Indictment easily satisfies the minimal requirements necessary to survive a motion to dismiss, in that each count "track[s] the languages of the statute[s] charged" and "state[s] the time and place (in approximate terms) of the alleged crime." *Stavroulakis*, 952 F.2d at 693 (quotation marks and citation omitted). That is all that is required for an indictment to be legally valid. *See Alfonso*, 143 F.3d at 776 ("It is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." (internal quotation marks and citation omitted)).

Milton takes issue with the fact that the phrase "reasonable investor" is not contained in the Indictment. The premise of this argument—that an indictment, in addition to tracking the charged statute, must contain certain words consistent with case law's interpretation of the statute's scope—is wrong.

In *United States v. Balde*, 943 F.3d 90 (2d Cir. 2019), the Second Circuit made this very point. Addressing a claim that a conviction for possession of a firearm by an alien unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), should be reversed because the indictment failed to allege knowledge of being unlawfully in the United States, which the Supreme Court had recently held was required for conviction, the Second Circuit observed that "it is difficult to understand how an *indictment* that tracks the exact language of the statute, and that expressly charges that the defendant violated it, fails on its face to charge that the defendant

21

committed a federal crime."[2] *Balde*, 943 F.3d at 90 (emphasis in original); *see also United States v. Bout*, 731 F.3d 233, 240-41 (2d Cir. 2013) (rejecting argument that indictment was insufficient for failure to use language specific to the concept of "murder," where indictment tracked language of the statute); *Avenatti*, 432 F. Supp. 3d at 362 (rejecting argument that indictment charging honest services fraud must refer to a "bribe" or "kickback" because case law has limited honest services fraud to bribery and kickback schemes). In short, where the indictment tracks the relevant securities fraud statutes, there is no requirement that the indictment also use the specific words "reasonable investor." The defendant cites nothing to the contrary.

Milton next argues that the facts in the Indictment do not show that Milton's statements significantly altered the total mix of information in a meaningful way, and in doing so, he points to a declaration submitted by Milton's attorney that shows Milton's statements along with other statements by Nikola and its executives. (Mot. #4 at 17). But this argument again asks the Court to draw conclusions properly left to a jury. For example, Milton asks the Court to conclude that Milton was "speaking in future tense" in a June 11, 2020 podcast and that "listeners accurately understood Mr. Milton." (Mot. #4 at 18). In that podcast, as alleged in the Indictment, Milton stated: "when we produce hydrogen, we produce it on freeways," and, when asked whether Nikola makes hydrogen on site, Milton responded, "We do. We make it on site." (Indictment ¶ 67). Milton can certainly argue that these present-tense statements were understood by investors to be forward-

---

[2] Although the defendant in *Balde* framed his argument as going to the jurisdiction of the court, the argument raised was the same advanced here—that the failure to include language reflecting case law interpretation of a statute in addition to tracking the statute "means that the indictment does not charge a federal crime." 2019 WL 5938025, at *9.

looking, but this Court is not the appropriate audience. That is what trial is for. *See Dawkins*, 999 F.3d at 780.

Milton's arguments in this regard—supported primarily if not entirely with citation to civil litigation—boil down to an effort to have the Court grant summary judgment, which "does not exist in federal criminal procedure." *Dawkins*, 999 F.3d at 780.

Finally, Milton argues that certain statements in the Indictment are non-actionable puffery. (Mot. #4 at 21). It is entirely unclear what Milton means by "nonactionable" in this context. The Grand Jury returned an Indictment charging Milton with defrauding investors. It is for the jury to determine whether Milton's statements were material, and for this reason alone, this argument should be rejected. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (affirming jury determination that statements did not constitute puffery); *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (reversing judgment of acquittal because jury could have found that statements were material misrepresentations rather than puffery).

Even if it were appropriate at this stage to consider the factual allegations in the Indictment, which it is not, it is clear that a jury could—and should—find that the statements highlighted by Milton in his brief were material. Milton takes issue with the Indictment's citation to Milton's description of the Badger as a "real truck" that could "whoop" a competitor. (Mot. #4 at 21). Milton asks the Court to find these statements immaterial as a matter of law. But in doing so, Milton leaves out the rest of his own statements in that interview, including his statement that the Badger was built to be a "true vehicle," that it was based on "billions of dollars of knowledge," and that it would be "fully functioning" at its unveiling, and his later June 1, 2020 statement that the Badger was in fact "fully functioning." (Indictment ¶ 50). These statements, taken together, convey that

23

the Badger was a functioning truck, a fact that could be tested against record evidence. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005) (statement was non-puffery because "a finder of fact could test [it] against record evidence"); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statement is not puffery if it is a misrepresentation of an existing fact). They are a far cry from the generalizations that have been held to be "non-actionable puffery," even in the civil context. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statement that defendant "would 'continue to reposition and strengthen [its] franchises with a focus on financial discipline' " was non-actionable puffery).

For all of these reasons, Milton's fourth motion to dismiss should be denied.

### F.      The Indictment Properly Alleges Scheme Liability

Milton's fifth motion argues that the Court should strike the allegations of scheme liability from Count One of the Indictment ("Mot. #5"). This motion is equally meritless.

Here, Count One charges the defendant with violating the securities fraud laws in three alternative ways: (i) by "employing devices, schemes, and artifices to defraud," as prohibited by 17 C.F.R. 240.10b-5(a), (ii) by making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as prohibited by 17 C.F.R. 240.10b-5(b), and (iii) by engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, as prohibited by 17 C.F.R. 240.10b-5(c). (Indictment ¶ 82). Under well-established law, this count is properly pled in the conjunctive. *United States v. McDonough,* 56 F.3d 381, 390 (2d Cir. 1995) ("Where there are several ways to violate a criminal statute…federal

pleading requires . . . that an indictment charge in the conjunctive to inform the accused fully of the charges." (quotation marks, brackets, and citations omitted)).

Relying on civil cases, Milton argues that the allegations of "scheme liability" under subsection (a) of 17 C.F.R. 240.10b-5 should be dismissed because the Indictment fails to allege facts supporting the "scheme liability" theory. Again, Milton is improperly seeking summary judgment in a criminal case. *See Dawkins*, 999 F.3d at 780. Because Count One of the Indictment tracks the relevant statutory language, there is no basis for dismissal. *See Balde*, 943 F.3d at 90.

Beyond that, Milton's allegations fail on the merits. Milton argues that conduct consisting of misrepresentations and omissions cannot give rise to scheme liability under subsection (a) of 17 C.F.R. 240.10b-5, because such conduct falls under the rubric of subsection (b) of 17 C.F.R. 240.10b-5. (Mot. #5 at 7).

In doing so, Milton principally relies on a series of outdated cases, all of which predate the Supreme Court's recent decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019). In *Lorenzo*, the Supreme Court held that the dissemination of false or misleading statements with intent to defraud could give rise to "scheme liability" under subsection (a) of 17 C.F.R. 240.10b-5. *Lorenzo*, 139 S. Ct. at 1100. In doing so, the Court reasoned that the "dissemination of false or misleading material is easily an 'artful stratagem' or a 'plan,' 'devised' to defraud an investor under subsection (a)." *Id.* at 1101. The Court also rejected the premise that the subsections of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct." *Id.* at 1102. Rather, the Court found that there was "considerable overlap" among the subsections, such that the same conduct could violate more than one subsection. *Id.* As the Court explained, such an approach was in

25

keeping with Congress' intent "to root out all manner of fraud in the securities industry." *Id.* at 1104.

Nor are Milton's attempts to distinguish *Lorenzo* at all convincing. Milton claims that Lorenzo "engaged in additional fraudulent acts," such as sending out emails containing misstatements, signing those emails, and inviting recipients to call with question. (Mot. #5 at 9 (citing *Lorenzo*, 139 S. Ct. at 1099)). To the extent that conduct such as sending emails constituted additional acts, the Indictment alleges similar actions and more by Milton. (*See, e.g.*, Indictment ¶ 1 ("MILTON's scheme targeted individual, non-professional investors – so-called "retail investors" – by making false and misleading statements directly to the investing public through social media and television, print, and podcast interviews."; *id.* ¶ 22 (same)). And, in any case, it is clear that anyone who devises a scheme or plan to mislead—whether by false statements or otherwise—may be liable under subsections (a) and (c) of Rule 10b-5. *Lorenzo*, 139 S. Ct. at 1100-03.

Significantly, Milton does not rely on a single case that post-dates *Lorenzo*.[3] Instead, he references a series of post-*Lorenzo* cases in a footnote (Mot. #5 at 10), all of which are contrary to

---

[3] In any event, the pre-*Lorenzo* cases upon which Milton relies do not support his argument. For example, Milton cites *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) for the proposition that "'a claim under Rule 10b-5(a) and (c)' does not lie where 'the sole basis for [scheme liability] is alleged misrepresentations or omissions.'" (Mot. #5 at 7). But in the context of a civil case, *Lentell* merely held that claims arising solely out of misrepresentations did not allege a *market manipulation claim* under Rule 10b-5(a) or 10b-5(c), and thus could not escape the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at 177-78. Milton points to no such case in the criminal context, where the PSLRA does not

his argument. For example, in *Puddu v. 6D Glob. Techs., Inc.*, the court determined that, "[i]n line with the reasoning in *Lorenzo*, [there is] no basis to conclude that a plaintiff may not establish, in a scheme liability claim, the existence of a 'manipulative or deceptive act' by pointing to alleged misrepresentations or omissions." No. 15 Civ. 8061 (AJN), 2021 WL 1198566, at *11 (S.D.N.Y. Mar. 30, 2021). Similarly, in *SEC v. Sequential Brands Group, Inc.*, the Court explained that "*Lorenzo* instructs that a plaintiff may make out a scheme liability claim by identifying manipulative or deceptive acts grounded in alleged misrepresentations or omissions." No. 20 Civ. 10471 (JPO), 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021).

The same is true here. Following *Lorenzo*, it is clear that scheme liability under Rule 10b-5(a) can be premised on misstatements and omissions. For this reason, too, Milton's fifth motion should be denied.

### G. Count Two of the Indictment Is Not Vague

Milton's sixth motion ("Mot. #6") argues that Count Two should be dismissed because 18 U.S.C. § 1348(1)[4] is unconstitutionally vague as applied to the allegations in the Indictment. This vagueness challenge is premature and should be denied.

---

apply. Indeed, in criminal cases, the Second Circuit has recognized that "scheme" liability can be based upon a pattern of misrepresentations. *See United States v. Nouri*, 711 F.3d 129, 141 (2d Cir. 2013) ("As for the *scheme to defraud based on fraudulent and misleading representations*, the elements were essentially the same, including whether the misrepresentations were material, were made in connection with the purchase or sale of a security, and were made with scienter.") (emphasis added) (citations omitted).

[4] Milton's sixth motion does not seek dismissal of the Section 1348(2) charge in Count Two on the basis of vagueness. However, Milton raised a vagueness to that prong of Count Two in his first motion.

As discussed in Part I.A.2, *supra*, courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *Milani*, 739 F. Supp. at 218. Therefore, Milton's motion should be denied as premature.

Milton's vagueness challenge is also meritless. Milton claims that Section 1348(1) is unconstitutionally vague, as applied, because it requires only that fraudulent conduct be "in connection with" any security. (Mot. #6 at 7).

A two-part test is used to evaluate claims of vagueness "as-applied": "[A] court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited'; and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) (*citing United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Because the statute is judged on an as-applied basis, a defendant whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness. *See Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 495 n. 7 (1982); *Parker v. Levy*, 417 U.S. 733, 756 (1974). Put differently, the as-applied analysis examines the defendant's conduct and does not look to any hypothetical array of potential conduct upon which a statute may touch. *See United States v. Coonan*, 938 F.2d 1553, 1562 (2d Cir. 1991) ("In the absence of first amendment considerations, vagueness challenges must be evaluated based on the particular application of the statute and not on the ground that the statute may conceivably be applied unconstitutionally to others in situations not before the Court." (internal citation, brackets, quotation marks omitted)).

Milton's argument is premised on the distinction between the requirements in Section 1348(2) and the requirements in Section 1348(1). (Mot. #6 at 7-11). Specifically, Milton notes that

28

(1) Section 1348(2) requires the fraudulent conduct to be "in connection with the *purchase or sale*" of a security, whereas Section 1348(1), requires only that the fraudulent conduct be "in connection with" any security, and (2) Section 1348(2) contains "by means of" language specifying the method by which a violation must occur. (Mot. #6 at 7-11). Milton argues that the omission of these words from Section 1348(1) makes that subsection unconstitutionally vague as applied to him. (Mot. #6 at 9-11). But as one court recognized in rejecting a vagueness challenge to Section 1348(1), "[t]he statute's language is intentionally broad because Congress sought to create a mechanism by which prosecutors could combat the myriad of ever-evolving securities fraud schemes." *Motz*, 652 F. Supp. 2d at 295. Indeed, the requisite elements of Section 1348 are straightforward, as several courts have noted in rejecting vagueness challenges to the statute. *See Motz*, 652 F. Supp. 2d at 295; *United States v. Melvin*, 143 F. Supp. 3d 1354, 1372 (N.D. Ga. 2015) (describing the elements of Section 1348(1) and 1348(2) as "equally straightforward" and finding "no evidence that the statute creates a trap for the unwary or that it permits arbitrary enforcement" (internal quotation marks omitted)); *United States v. Coscia*, 100 F. Supp. 3d 653, 661 (N.D. Ill. 2015) (finding the indictment's allegations consistent with the language of Section 1348 and declining to find the indictment "fails to provide a person of ordinary intelligence fair notice of the conduct that it prohibits" (quotation omitted)).

Moreover, there can be no serious dispute that the Indictment alleges conduct in connection with the "purchase or sale" of a security and specifies the means by which the fraud was conducted. The first paragraph of the Indictment plainly alleges that Milton "engaged in a scheme to defraud investors by inducing them to purchase shares in Nikola Corporation…through false and misleading statements regarding Nikola's product and technology development." (Indictment ¶ 1).

29

Section 1348(1) is thus not impermissibly vague as applied to Milton, and he cannot contest the vagueness of the statute as applied to other individuals. *See United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997) ("a challenger who engages in some conduct that is clearly proscribed [by the challenged statute] cannot complain of the vagueness of the law as applied to the conduct of others") (internal quotation and citation omitted).

Milton contends that the omission of the "purchase or sale" language has allowed the Government to charge him based on fraudulent statements made in 2016, long before the purchase or sale of any Nikola stock. (Mot. #6 at 9-10). But this argument misapprehends the allegations in the Indictment. As the Indictment makes clear, Milton has been charged with a securities fraud scheme beginning in November 2019. (Indictment ¶ 1). During the course of that scheme, Milton induced retail and other investors to purchase Nikola stock through false and misleading statements about Nikola's products and technology. (Indictment ¶ 1). As part of the scheme, in 2020, Milton promoted a false and misleading narrative that Nikola had been a first-mover in the zero-emissions trucking business when it launched the Nikola One in 2016. (Indictment ¶¶ 27-40). Thus in 2020, Milton embraced and reiterated his earlier statements about the Nikola One, making them newly relevant to retail investors. (Indictment ¶¶ 27-40). This scheme, as alleged in the Indictment, plainly falls within the ambit of Section 1348(1). *See Coscia*, 100 F. Supp. 3d at 661 (rejecting vagueness challenge where allegations in the indictment were consistent with the statute).

As to the lack of "by means of" language, Milton entirely fails to explain how the absence of this phrase affected his fair notice or encouraged arbitrary enforcement. The Supreme Court has made clear that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian*

*Law Project*, 561 U.S. 1, 18-19 (2010) (alteration in original). Rather, the defendant must prove that *his* prosecution arose from arbitrary enforcement. This inquiry, which must take place after trial and on the basis of a fully developed factual records, "involve[s] determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances." *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006).

Milton cannot claim that an impermissibly vague statute has resulted in arbitrary enforcement because his conduct falls well within the provision's prohibited conduct: as the Executive Chairman of a public company, he made false and misleading statements to investors to induce them to purchase Nikola stock. This behavior clearly falls within the confines of the conduct prohibited by the statute. Accordingly, Milton "cannot challenge any allegedly arbitrary enforcement that could hypothetically be suffered by [others]." *See United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) (rejecting vagueness challenge to the anti-spoofing statute).

## II.     The Defendant's Motion for a Bill of Particulars Should Be Denied

Milton's seventh motion ("Mot. #7," ECF 54) seeks a bill of particulars. To be sure, Milton, like all defendants, is entitled to sufficient information to understand the charges against him, to prepare a defense, and to protect against double jeopardy. However, the Government has provided such information, and much more, in the Indictment, extensive discovery, and various pretrial filings, including this memorandum. Milton will also receive trial exhibits, a witness list, and Jencks Act material reasonably in advance of trial. Milton has not shown that a bill of particulars is warranted.

**A.    Applicable Law**

The proper purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added). Accordingly, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted).

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. Courts routinely deny requests for a bill of particulars where the Government has provided, through the charging instrument and discovery, sufficient information for the defendant to prepare his defense. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam); *see also Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars where defendants had "been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence, and exhaustive supporting affidavits") (internal citation omitted); *United States v. Tuzman*, 301 F. Supp. 3d 430, 452-53 (S.D.N.Y. 2017) (denying request for bill of particulars in market manipulation case, where "the Government has also provided a wealth of information in discovery, including a spreadsheet that 'detail[s] thousands of [trades]'"); *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. Jan. 19, 2016) (Dkt. 64, at 20-22) (denying request for a bill of particulars in an insider trading case where the information already proffered was sufficient to enable the defendant to prepare for trial); *United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL

32

3154310, at *3-4 (S.D.N.Y. Sept. 24, 2009) (in accounting fraud case, denying request for particulars identifying all fraudulent transactions, payments, and statements made in furtherance of charged scheme where Government had furnished more than a million pages of discovery and, by letter, identified a series of fraudulent transactions and payments); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States v. Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

To be sure, the Government's provision of "mountains of documents to defense counsel" is no substitute for a bill of particulars where one would otherwise be required, *Bortnovsky*, 820 F.2d at 575; *see also United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000). But the provision of voluminous discovery in combination with guidance to defense counsel about what is most relevant can vitiate a need for further particulars. *See, e.g.*, *United States v. Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012); *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery). Nor does the volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense

33

sufficient time in which to conduct the review in advance of trial. *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013).

Because "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States v. Leonelli,* 428 F. Supp. 880, 882 (S.D.N.Y. 1977), "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001); *see also United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).

A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968)). The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34). *See also United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States v. Gibson*, 175 F. Supp. 2d 532,

34

537 (S.D.N.Y. 2001)); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *Henry*, 861 F. Supp. at 1197 ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the Indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197. *See also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). Moreover, the Government's provision of particulars is tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him]

35

and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

### B.    Discussion

Applying these principles, Milton is not entitled to a bill of particulars. The 48-page, detailed Indictment, along with the production of extensive discovery, in electronic form and accompanied by a detailed index, provide more than sufficient information to assist Milton in his preparation for trial.

Milton first argues that he is entitled to a bill of particulars requesting each misstatement by Milton that the Government intends to use at trial. (Mot. #7 at 6). But the Government is not required to identify each statement that is alleged to be false and misleading. "[W]heres, whens and with whoms" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569. Indeed, requests for bills of particulars specifying the specific content of alleged misrepresentations are regularly denied, particularly where, as here, the indictment "catalogs a number of falsehoods and omissions with great specificity." *Mandell*, 710 F. Supp. 2d at 385.

Here the Indictment identifies five categories of misrepresentations made to investors, identifies specific statements that are alleged to be false and misleading, and identifies specific dates when misstatements were made. (*See* Indictment ¶¶ 2, 26-79). While the Indictment does not identify every statement that is alleged to be false, it does allege several examples of misrepresentations by subject matter. The Indictment also alleges the primary media used by the defendant to perpetrate the fraud on investors: television and podcast interviews, and social media. (*See id.* ¶¶ 24-25). The allegations in the Indictment are more than sufficient to advise the defendant of the nature of the charged fraud scheme.

Beyond that, in an effort to aid the defense in reviewing the discovery and preparing for trial, the Government directed the defense to certain Bates numbers in the discovery containing statements made by the defendant on television programs, podcasts, and on social media websites. (*See* Declaration of Bradley Bondi in Support of Motion for Bill of Particulars ("Bondi Bill of Particulars Decl.") (ECF 53), Exhibit B). The Government also directed the defense to search warrant affidavits in the discovery that detail many of the misstatements that make up the Government's case. (*See id.*) In addition, before Milton was even charged in this case, the Government identified for Milton's counsel certain false and misleading statements that were the subject of the Government's investigation. As such, the Government has "provided multiple tools to allow [the defendant] to prepare his defense." *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020).

Milton also claims that a bill of particulars is warranted because the Government has failed to allege how Milton's misstatements were "in connection with" the purchase or sale of a security. (Mot. #7 at 10-12). But contrary to Milton's assertions, the Indictment makes clear that Milton's fraudulent scheme induced "individual, non-professional investors – so called 'retail investors'" to purchase stock in Nikola and VectoIQ. (Indictment ¶¶ 1, 16-17, 22-25, 80). The Government is not required to allege "particularized trade information" in an indictment or provide it in response to a request for a bill of particulars. *See United States v. Tuzman*, 301 F. Supp. 3d 430, 452 (S.D.N.Y. 2017). Additionally, at this time, the Government is under no obligation to identify the defendant's victims or the Government's anticipated witnesses. *See generally United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990) (government not required to furnish the names of witnesses). That being said, the Government identified for the defendant trading data for investors

who traded in Nikola stock. (*See* Bondi Bill of Particulars Decl., Ex. B). From that data, the defendant can ascertain the names of investors who traded in Nikola stock during the relevant period in the Indictment, and also assess the number of purchases of securities that were made during the relevant time period.

Not satisfied with the guidance the Government has provided to date, Milton demands that the Government identify, among other things, the "precise content of each and every statement that the government contends was a material misstatement made by Mr. Milton"; "[t]he basis on which the government contends each Alleged Misstatement is false or misleading"; "[t]he basis on which the government contends each Alleged Misstatement is material"; "[t]he basis on which the government contends each Alleged Misstatement was made 'in connection with' securities or the purchase or sale of securities"; the retail investors who were induced to purchase on account of the misstatement; and the relevant securities transactions by those investors. (Mot. #7 at 20). This request is a patent effort to force the government to preview its entire case for the defense. *See Mitlof*, 165 F. Supp. 2d at 569 ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories"); *Bellomo*, 263 F. Supp. 2d at 580 ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

Simply put, the Government is not required to furnish an inventory of every act it plans to prove was committed in furtherance of the fraud. This remains true even in cases of significantly

greater duration and complexity. *See, e.g.*, *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013) (in case involving largest Ponzi scheme in U.S. history (Madoff), which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction).

Courts have applied the foregoing principles consistently in securities fraud cases. *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (denying bill of particulars request for disclosure of "trade-level detail," including an exhaustive list of manipulative trades because the information was "the very type of evidentiary minutiae that is not appropriate in a bill of particulars" (internal quotation marks omitted)); *Tuzman*, 301 F. Supp. 3d at 452-53 (denying request for bill of particulars seeking "particularized trade information"); *Levy*, 2013 WL 664712, at *13 (denying a bill of particulars where indictment described "the types of material misrepresentations and omissions that [the defendant] allegedly made"; "the extent of [the defendant's] financial commitment to the target companies"; and "[the defendant's] participation in the manipulation of the target companies' stock").

Milton's reliance on *Bortnovsky* and *Nachamie*, both insurance fraud cases, does not help his request. In *Bortnovsky*, the Government refused to identify at any point before trial which of 15 burglaries were alleged to have been fabricated and thus the subject of fraudulent insurance

39

claims. 820 F.2d at 575. *See also United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) (affirming denial of bill of particulars in Madoff case, including because the case "present[ed] none of the concerns identified in … *Bortnovsky*"). And, in *Nachamie*, the Government refused to identify which of the 200,000 pages in discovery it "intend[ed] to rely on in its case-in-chief at trial." 91 F. Supp. 2d at 575-76. In other words, the Government there refused to provide an exhibit list, which the Government intends to do here. Although the district court in *Nachamie* granted the defendant's request for certain particulars, relying on *Bortnovsky*, the district court denied other defense requests. *See Nachamie*, 91 F. Supp. 2d at 575-76.

In sum, given the detailed nature of the Indictment, the extensive discovery that has been produced, the Government's disclosures to date, and the additional disclosures that the Government has agreed to provide the defendant in advance of trial, there is no basis to grant Milton's request for a bill of particulars. *See, e.g., Blakstad*, 2020 WL 5992347, at *11; *Torres*, 901 F.2d at 234; *Tuzman*, 301 F. Supp. 3d at 452-53; *D'Amico*, 734 F. Supp. 2d at 335; *Cuti*, 2009 WL 3154310, at *3-4; *Samsonov*, 2009 WL 176721, at *4; *Trippe*, 171 F. Supp. 2d at 240; *Henry*, 861 F. Supp. at 1197-97-98; *Kazarian*, 2012 WL 1810214, at *25; *Mandell*, 710 F. Supp. 2d at 385.

## III.     The Defendant's Motion to Strike Surplusage from the Indictment Should Be Denied

Milton's eighth motion ("Mot. #8," ECF 56) argues that various allegations in the Indictment should be stricken because they create undue prejudice against him. Milton's motion is premature and meritless.

### A.     Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, it has long been the policy of courts within the Southern District

to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (internal quotation marks, alterations, and citations omitted). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial." *United States v. Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (internal quotation marks omitted); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *Scarpa*, 913 F.3d at 1013). "Given this exacting standard, such motions [to strike] are rarely granted." *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005).

In setting forth allegations in a charging instrument, the Government is not limited to an enumeration of the bare elements of a crime; instead, a charging instrument may be used to provide background to the charged criminal conduct, to describe the circumstances, means, and methods, of an offense, and to describe evidence that is otherwise admissible at trial. *United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 99). Where there is any doubt about the connection between the allegations and the evidence that will be admitted at trial, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467; *see also United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021). As multiple courts have concluded, "'[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *United States v. Smith*, 985 F. Supp. 2d 547, 612 (S.D.N.Y. 2014) (brackets in original) (quoting *United States v. Butler*, 351 F. Supp. 121, 124 (S.D.N.Y. 2004)).

41

### B.    Discussion

Milton asks the Court to strike five categories of allegations in the Indictment as surplusage. Because the allegations are relevant to the charged crimes and not unduly prejudicial, Milton's motion should be denied. And in any event, it should be denied as premature.

First, Milton argues that allegations in the overview section about retail investors' lack of experience, and in particular, that the COVID pandemic prompted their trading, should be stricken. (Mot. #8 at 2). But this lack of experience is highly relevant given the nature of Milton's misrepresentations. Milton's falsehoods were not in SEC filings or diligence materials prepared for institutional investors; they were on social media and in podcast interviews—media targeting less sophisticated retail investors.

Nor is there anything particularly prejudicial about a reference to the COVID pandemic. The world has been living with the pandemic for nearly two years now, and many of the key events in the case happened during the height of the pandemic in 2020. Given the timing of the fraud here, it would simply be impractical to strike any reference to the pandemic from the trial.

Milton next claims that the Court should strike various references to retail investors because they are an effort to "inflame jurors by referencing differences in wealth and class distinctions." (Mot. #8 at 5). But as alleged in the Indictment, Milton told a Nikola board member of his plan to direct public statements to retail investors: "need to make sure we are getting *retail investors* on our side. That is what prevents the stock short selling. This is super important to me." (Indictment ¶ 24 (emphasis added)). Because the focus on retail investors came from Milton himself, allegations regarding retail investors are highly relevant, and there is no undue prejudice.

Milton also takes issue with the allegations in the Indictment regarding victim losses, and in particular, that some losses came from retirement savings. (Mot. #8 at 4). However, "when the

contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence." *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983). As such, evidence of retail investors' losses is relevant and admissible. And in any event, because the Government has not yet determined what testimony it will present in this regard at trial, striking any such portion of the Indictment at this juncture is premature. *See Smith*, 985 F. Supp. 2d at 612.

Likewise, the allegation in the Indictment regarding Milton's aspiration to be in Forbes's 100 richest people is relevant and admissible to prove Milton's motive and intent to commit this fraud. As alleged in the Indictment, Milton owned at least approximately 25% of Nikola, and thus his wealth was tied to Nikola's stock price. (Indictment ¶¶ 4, 18). Aside from an annual salary of $1, Milton's compensation was also tied entirely to the stock price. (Indictment ¶ 21). Milton's desire to increase his wealth is thus highly relevant, because it explains why Milton would be fixated on increasing the stock price. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (finding no abuse of discretion in admission of compensation evidence to prove motive).

Milton next challenges the allegations in the Indictment related to special purpose acquisition companies ("SPACs"), arguing that it creates an implication that it is improper to go public in this manner. (Mot. #8 at 7). But the language in the Indictment regarding SPACs is necessary background information to the crime, because Nikola became publicly traded through its combination with a SPAC. (Indictment ¶¶ 15-16). As explained in the Indictment, because Nikola went public in this manner, investors could essentially invest in Nikola as of March 3, 2020, by investing in VectoIQ Acquisition Corp. ("VectoIQ"), the blank check company with which Nikola combined. (Indictment ¶¶ 13-16). In addition, going public in this fashion enabled Milton to speak directly to investors at a time when there would ordinarily be a "quiet period." (Indictment

43

¶ 25). It is undisputable that Milton found the absence of a quiet period to be important. For example, in a podcast, he noted that given the lack of a quiet period, he could "communicate with the market," instead of "bankers . . . trying to tell people what your company is like." (Indictment ¶ 25). As Milton put it, the SPAC was advantageous because "I wanted to be in control, I wanted to be in communication with the public about what we are, who we are, how our company — our business model is so successful." (Indictment ¶ 25).

Given Milton's own statements, the allegations regarding SPACs are highly relevant. Moreover, to the extent Milton is concerned with an implication that the SPAC process is improper or unlawful, the Government would have no objection to an appropriate limiting instruction noting that there is nothing improper about going public through a SPAC.

Milton next argues that allegations regarding Milton's stock "lock-up" period should be stricken as surplusage. (Mot. #8 at 8). However, in Milton's other motions, he himself has cited the six-month lock-up period in an effort to undercut the Government's theory that Milton intended to increase Nikola's stock price. (*See* Mot. #3 at 4-5). To the extent Milton intends to claim the six-month lock-up period shows his *lack* of intent to defraud, it is certainly relevant that Milton did not want a lock-up at all, and in fact negotiated down the initial agreement of a one-year lock-up. (Indictment ¶¶ 19-20). As such, this evidence is relevant and admissible.

Finally, Milton asks the Court to strike the allegation in the Indictment that institutional investors were purchasing Nikola stock at lower prices than retail investors. (Mot. #8 at 9). But this evidence is relevant to show that Milton's fraudulent statements artificially inflated the stock price. Institutional investors had a more accurate and complete picture of Nikola because they invested after receiving material in due diligence that was not available to regular investors.

(Indictment ¶¶ 14, 17). It is highly relevant to the materiality of Milton's statements that those institutional investors—who relied on due diligence materials provided by the company—purchased Nikola stock at one price, whereas retail investors—who relied on Milton's false statements—purchased Nikola stock at a significantly higher price.

For the foregoing reasons, Milton's motion to strike surplusage from the Indictment should be denied in its entirety.

## IV.     The Defendant's Motion for the Production of Brady Should Be Denied

The defendant's ninth motion ("Mot. #9," ECF 59), seeks an order (i) compelling the Government to identify *Brady* material in its discovery productions, and (ii) compelling the Government to review the entirety of the SEC's files for *Brady* materials. But as reflected in Exhibit C to the Declaration of Bradley Bondi in support of this motion ("Bondi Brady Decl.," ECF 58), the Government identified for the defendant excerpts from the interviews of 57 individuals that contain material potentially covered by *Brady*. If potential *Brady* material exists within the other discovery materials, the Government has discharged its obligation by producing such material to the defense.

Milton's request that the Government review the SEC's files for *Brady* material is equally meritless. The SEC conducted a separate, parallel investigation and is thus not part of the prosecution team for *Brady* purposes. Requiring the Government to search the SEC's files would impose a nearly insurmountable obligation on the Government to review information and data, most of which may be attorney work product, in the possession of an entirely independent entity. And in any event, as a courtesy to assist in preparation for trial, the Government obtained from the SEC and produced all documents that the SEC obtained through subpoenas or requests to third

45

parties, and the Government obtained the only two sets of contemporaneous interview notes prepared by the SEC, disclosed relevant *Brady* material from them, and will produce the balance of them on the deadline set for Section 3500 material. Under these circumstances, any references to potentially exculpatory information in the SEC's files has almost certainly already been turned over to the Government, which in turn promptly produced material to Milton.

Accordingly, these requests should be denied.

### A.    The Government is Not Required to Identify Brady Material in its Discovery Productions

Milton argues that the Government is required to identify any *Brady* material in its discovery productions for the defense. However, Milton fails to cite a single case in this District where the Court required such an itemization of *Brady* material. Rather, courts in this District recognize that "[i]n the *Brady* context, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that larger mass is enormous . . . ." *United States v. Parnas*, No. 19. Cr. 725 (JPO), 2021 WL 2981567, at *6 (S.D.N.Y. July 14, 2021) (quoting *United States v. Healey*, 860 F. Supp. 2d 262, 269 (S.D.N.Y. 2012)); *see also, e.g.*, *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 457 (S.D.N.Y. 2011) ("The Government is under no general obligation to identify or sort *Brady* material within even an extremely voluminous disclosure[.]"); *United States v. Ohle* ("*Ohle I*"), No. 08 Cr. 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011) (While "'the Government may not properly conceal exculpatory evidence from a defendant, [the rule] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case.'" (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990))); *United States v. Calk*, 19 Cr. 366 (LGS) (Transcript of conference dated July 2, 2020, at 34 ("I'm

going to rule and deny the [defendant's] motion to compel further identification of *Brady* materials from this most recent batch of . . . documents . . . . The practice in this district is not to compel the government to do that, and the government seems to have been acting in good faith in trying to be helpful with regards to *Brady* material, and I don't think there's any reason to deviate from the usual practice in this circuit.")).

For example, in *United States v. Ohle*, the Second Circuit rejected the arguments that the defendant presses here. *See United States v. Ohle* ("*Ohle II*"), 441 F. App'x 798, 804 (2d Cir. 2011) (summary order). In that case, the district court considered at length a defense argument that materials presented to the defense in discovery (in connection with the related *Daugerdas* case) had not been adequately disclosed under *Brady* because they were not identified within the Government's voluminous productions. *See Ohle I*, 2011 WL 651849, at *3. The district court squarely rejected this argument, holding that "as a general rule, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence," *id.* at *4, and that although "the Government may not properly conceal exculpatory evidence from a defendant, [*Brady*] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case." *Id.* (internal quotation marks omitted). On appeal, the Second Circuit rejected the same arguments, citing the district court's "thoughtful and meticulous opinion." *Ohle II*, 441 F. App'x at 804.

Consistent with *Ohle II*, courts in this District recognize that "prosecutors may satisfy their *Brady* obligations through . . . disclosures of exculpatory or impeachment materials within large productions of documents or files." *Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 455. Absent "prosecutorial misconduct—bad faith or deliberate efforts to knowingly hide *Brady* material,"

even "voluminous" disclosures will be held to satisfy *Brady*. *Id.*; *see also Ohle I*, 2011 WL 651849, at *4 (noting possibility of *Brady* violation if Government "deliberately hid" documents or "purposefully confounded" defendant). Courts have thus rejected demands for *Brady* identification where the Government takes steps to facilitate defense review of the Government's productions, such as providing searchable electronic productions, indices, and metadata. *See Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 457; *Ohle I*, 2011 WL 651849, at *4. That makes good sense for several reasons. Upon the production of discovery, the Government and the defendant have the same access to potential *Brady* material. But the defendant is in a far better position to evaluate whether material is helpful to his defense. The fact that Milton highlighted materials he views as exculpatory in his moving papers shows that he is in the best position to identify what he views as *Brady* within the discovery productions. Indeed, under the framework advanced by Milton, the Government would need to correctly identify all of the potential defenses and then potentially keep re-reviewing discovery materials that have been produced to identify new *Brady* each time a defendant identifies a potential new defense. Such a system would be unworkable and is not supported by the case law.

None of the cases cited by Milton supports Milton's request that the Government comb through the discovery to identify every potential piece of *Brady* material. For instance, in *United States v. Thomas*, 981 F. Supp. 2d 229 (S.D.N.Y. 2013), which is the only case cited in Milton's motion from this District, the Court did not require the Government to identify all *Brady* in its Rule 16 discovery productions. Rather, it faulted the Government for failing to disclose certain *Brady* information until a sidebar at trial. *Id.* at 239-40. In another case cited by Milton, *United States v. Skilling*, the Fifth Circuit rejected the defendant's "unsupported assertion of improper

48

conduct on the part of the Government" in connection with voluminous discovery. 554 F.3d 529, 577 (5th Cir. 2009). The Court further rejected the notion that the Government should have "scoured the open file in search of exculpatory information to provide to him," noting that "the government was in no better position to locate any potentially exculpatory evidence than was Skilling." *Id.* In doing so, the Court recognized that the Government had produced discovery that was "electronic and searchable"; had "created indices"; and had provided a set of hot documents important to the case. *Id.* Under the circumstances, and given the absence of evidence of bad faith by the Government, Court found no *Brady* violation.

Similarly here, the Government's Rule 16 productions have been electronic and searchable, and have been accompanied by indices. Beyond that, the Government identified a set of witness statements with information potentially favorable to the defense. (*See* Bondi Brady Decl., Ex. C). The defense's suggestion that the Government has refused to "identify *any* [*Brady*] evidence in connection with the hundreds of interviews it conducted" is simply inaccurate. (Mot. #9 at 7). This is more than sufficient to satisfy the Government's *Brady* obligations. *See Skilling*, 554 F.3d at 577. Milton also faults the Government for not identifying as *Brady* a power point presentation that was produced in discovery. (Mot. #9 at 8; Bondi Brady Decl., Ex. D). Milton, nonetheless, has the presentation, has been able to make his own assessment of it, and has been provided excerpts of witness interviews that are referenced in the presentation. Thus, the Government discharged its *Brady* obligations.

Milton's reliance on the Rule 5(f) Order does not help his cause. (Mot. #9 at 6).To be sure, the order requires the Government to turn over all material information "favorable to an accused" "promptly after its existence becomes known to the Government." (*See* Rule 5(f) Order, ECF 10).

49

Here, the Government has done so, by completing its production of Rule 16 material and separately disclosing any potential *Brady* material contained in witness statements. But there is nothing in the Rule that requires the Government to identify *Brady* material within the Rule 16 materials it has produced. Nor is there any suggestion in the Due Process Protection Act that it was intended to change the Government's obligation with respect to identification of *Brady* material. Notably, none of the cases cited by Milton invoke Rule 5(f) as a basis for requiring the identification of *Brady* material. And since the revisions to Rule 5, courts in this District have continued to hold that the Government is not required to direct the defendant to *Brady* material in a discovery production. *See Parnas*, 2021 WL 2981567, at *6.

**B.** **The Government is Not Required to Take Possession of and Review Additional Materials Solely in the Possession of the SEC**

The Government does not have a duty to request, obtain, and review materials that are solely in the possession of the SEC. A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency only where the Government conducts a "joint investigation" with that agency. *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd, United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, J.) (holding that the Government and the New York Stock Exchange, even if it were a state actor, did not conduct a joint investigation related to the policies of the New York Stock Exchange).

Although the Second Circuit has not spoken directly to the question, the majority of district courts have concluded that, standing alone, joint fact gathering is not sufficient to trigger an

50

extension of the Government's *Brady* obligations.[5] Instead, "[a] number of factors are relevant in determining whether the prosecution conducted a 'joint investigation,' including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018); *see also United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in some joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *accord SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *Rigas*, 2008 WL 144824, at *2 (finding that parallel civil and criminal investigations were not "joint"). Asking the Government to review the entire investigative file of

---

[5] In two cases, judges in this District have concluded that certain types of joint fact gathering may trigger a limited obligation on the Government to review the files of another agency. In *United States v. Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012), Judge Rakoff ordered the Government to review for *Brady* SEC documents memorializing witness interviews that were conducted jointly by the SEC and the Government. In so doing, however, Judge Rakoff made clear that his finding did "not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation" such that they would need to be reviewed for *Brady*. *Id.* at 495. In *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), Judge Gardephe ordered the Government to review a narrow subset of SEC memoranda relating to cooperating witnesses. *Id.* at 462. In neither case did the court conclude that joint fact gathering would give rise to an obligation by the Government to review the SEC's entire investigative file.

a parallel investigating agency merely because the agencies sought to maximize the efficiencies of investigation would "inappropriately require [the Court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

Applying these precedents, Milton's request that the Government search the SEC's files for *Brady* material should be denied. As a threshold matter, the motion itself does not specify what materials Milton seeks that are in the possession of the SEC and have not been produced to him. Although under no legal obligation to gather any materials from the SEC, the Government obtained certain materials that could contain facts not in the Government's possession. Specifically, in the course of its investigation, the Government has interviewed approximately 163 individuals. (Bondi Brady Decl., Ex. C at 4).[6] The SEC participated in the interviews of approximately 71 individuals. Of those interviews, law enforcement agents took notes in the interviews of 69 individuals, and SEC attorneys took notes in two interviews. The Government obtained the notes from those two interviews, reviewed those notes and the notes of the case agents from the combined interviews of 163 individuals, and produced the potentially exculpatory materials from them to the defendant. The balance of these notes will be produced as Jencks Act material well in advance of trial. The Government also obtained all document productions made by third parties to the SEC in connection with its investigation, and has produced those materials as discovery. On the other hand, the Government has not reviewed the SEC's internal work product and mental impressions relating to their investigation, such as the SEC's interview summaries, internal SEC emails,

---

[6] The Government has conducted one additional interview since the letter attached to the Bondi Brady Declaration.

52

internal SEC instant messenger chats, SEC attorneys' text messages, SEC action memoranda, or drafts of civil complaints.[7]

Thus, Milton's motion is moot to the extent it seeks interview notes or materials produced by third parties to the SEC. To the extent Milton's request is a broader one—for the Government to review the work product and internal communications of the SEC—it should be denied for two reasons: (1) the Government did not conduct a joint investigation with the SEC and therefore is not in possession of such internal work product, and (2), to the extent any of that internal work product contains something that is arguably exculpatory, the essential facts have already been furnished to Milton through the Government's production of discovery and excerpts of witness notes.

First, the Government did not conduct its investigation jointly with the SEC and therefore it is not in "possession" of the SEC's files. Many aspects of the Government's investigation were conducted without any involvement of the SEC whatsoever. The SEC played no role in the development of the Government's prosecutorial strategy or charging decisions; it was not involved in presenting the case to the grand jury; it did not participate in the execution of search warrants; it did not obtain materials produced to the Government pursuant to grand jury subpoenas; it did not attend dozens of the Government's interviews; and it has not accompanied the Government to

---

[7] For instance, based on conversations with SEC attorneys, the Government understands that while the SEC did not take notes during any of the interviews conducted in parallel with the Government, SEC attorneys did in some instances later prepare attorney work product based on the interviews, consisting of approximately 34 memoranda with SEC attorneys' mental impressions and key takeaways from the interviews. Similarly, the Government understands that the SEC has other internal communications among attorneys, such as instant messages, that relate to these interviews. As one would expect, the Government has not reviewed or obtained any of these internal SEC communications or work product.

court. *See Collins*, 409 F. Supp. 3d at 242 (citing such factors in support of a finding that the SEC and the USAO did not conduct a joint investigation).

In support of his argument, Milton notes that the that the United States Attorney's Office ("USAO") and the SEC filed charges on the same day, held a joint press conference, and conducted joint interviews. (Mot. #9 at 10-11). That the USAO and the SEC filed charges on the same day, however, says nothing about the way they conducted their investigations. Conducting joint interviews reflects only a typical and unsurprising degree of coordination. Avoiding this type of overlap would require witnesses to sit for multiple interviews and subpoena recipients to produce documents to multiple agencies. Combining interviews thus promotes efficiency for all parties involved in an investigation. In part for this reason, several judges in this District have held that such practices are indicative of parallel as opposed to joint investigations. *See United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3.

Moreover, the USAO and the SEC did not conduct all interviews jointly. (Bondi Brady Decl., Ex. C at 4). The investigation involved interviews of approximately 162 individuals. (*Id.*). The interviews of approximately 91 individuals were conducted by agents and/or the USAO without the presence of someone from the SEC, and the interviews of approximately 71 individuals were conducted jointly with the SEC. (*Id.*). These separate interviews establish that the USAO and SEC did not coordinate all fact-finding efforts. *See Blaszczak*, 308 F. Supp. 3d at 742 (finding it relevant that the SEC was not present at some interviews); *Collins*, 409 F. Supp. 3d at 241 (same).

The balance of the *Blaszczak* and *Middendorf* factors also weigh against Milton's argument. As Judge Kaplan explained in *Blaszczak*:

> Although [the SEC] interviewed witnesses and gathered facts alongside the USAO, it was not present at some prosecution contacts and interviews, did not review documents gathered only by the prosecution, and did not 'develop[] prosecutorial strategy.' Representatives of the SEC have not accompanied the USAO to court proceedings in this case. Neither the Commission nor the USAO recommended action to the other or had any role in the other's decision making process. The USAO has not even seen the SEC's action memorandum.

308 F. Supp. 3d at 742 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)); *see Middendorf*, 2018 WL 3956494, at *5 (relying on the *Blaszczak* factors and finding no joint investigation where "the SEC was not involved in [the Government's] grand jury presentation, has not reviewed documents gathered by the Government or shared the fruits of its investigation with the Government, and did not participate in the overall development of prosecutorial strategy. And beyond conducting joint interviews, the Government and SEC have not coordinated their separate fact-finding efforts"). The facts here compel a similar outcome. The Government did not disclose documents obtained from grand jury subpoenas to the SEC, and the SEC was not involved in the Government's grand jury presentation. The USAO and the SEC made independent decisions about what charges/claims they intended to bring. Indeed, the SEC's charges are broader than those in the criminal case, because they are based in part on false and misleading statements that the total cost of ownership ("TCO") of Nikola's trucks would be cheaper than diesel trucks. (*See SEC v. Milton*, No. 21 Civ. 06445 (AKH), Compl. ¶¶ 148-53). Nor did the USAO or the SEC direct one another to take any particular investigative actions. Instead, each agency took the appropriate respective prosecutorial and regulatory enforcement action it deemed necessary.

The cases upon which Milton relies do not support imposing the broad discovery obligations the defendant requests here. In *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y.

2012), Judge Rakoff instructed the Government to review for *Brady* only SEC memoranda from witness interviews conducted with the Government.[8] *Gupta*, unlike more recent cases to consider the issue, focused almost exclusively on the fact that interviews were conducted together, and not on the other factors considered by courts. *Compare Gupta*, 848 F. Supp. 2d at 494 ("when it comes to *Brady* disclosures, the relevant contest is one of fact-gathering, not charging determinations or otherwise"), *with Middendorf*, 2018 WL 3956494, at *4 (considering, among other things, charging determinations). In reaching its limited decision, *Gupta* explicitly relied on the fact that the Government could easily access the requested materials. *See Gupta*, 848 F. Supp. 2d at 495 (citing *United States v. Brooks*, 966 F. 2d 1500, 1503 (D.C. Cir. 1992) (holding that prosecutor must search files "particularly when files can be searched 'without any difficulty'")). That is obviously not true with respect to Milton's request that the Government review "*all* of the SEC's files." (Mot. #9 at 11). Moreover, *Gupta* makes clear that not "all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation." *Id.* Rather, *Gupta* held that the Government's obligation to review for *Brady* extends only to "documents arising from those joint efforts" to "investigate the facts of a case together." *Id.* Accordingly, Milton's overbroad request runs afoul of even *Gupta*.

In *United States v. Martoma*, 990 F. Supp. 2d 458, 460-62 (S.D.N.Y. 2014), the defendant requested that the Government review even less material than in *Gupta*. *See Martoma*, 990 F. Supp. 2d at 459 (defendant requested that the Government review notes of communications between the SEC and attorneys for two cooperating witnesses in the sole possession of the SEC).

---

[8] Based on discussions with the SEC, the Government understands that the approximately 34 SEC memoranda that the SEC prepared following witness interviews, which contain the SEC's work product and mental impressions, are similar to the memoranda at issue in *Gupta*.

With this narrow request in mind, Judge Gardephe conducted an analysis of the Government's and the SEC's investigations, ultimately finding that there was a "joint investigation" because (1) the two agencies conferred about their investigations and (2) jointly conducted interviews; (3) the SEC provided the Government with documents it obtained as part of its investigation; and (4) the two agencies "coordinated their efforts in conducting depositions of SAC Capital and its employees." *Id.* at 461. As a result, Judge Gardephe held that the Government was obligated to "produce to Defendant communications from the SEC to the doctors' counsel, or to [the cooperating witnesses] directly, that (1) threaten criminal prosecution of either [witness] if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if he implicates Martoma." *Id.* at 462.

The Government respectfully submits that *Martoma* was not intended to extend *Gupta* to all materials in the SEC's custody or control, or to contradict *Goffer*, *Rigas*, or *Stanard*, and must be limited to its unusual facts. If *Martoma* were extended to support Milton's request here, the exception would swallow the rule, and any jointly-conducted interviews or document-sharing between the SEC and the Government would require the Government to search the entire SEC investigative file, including emails, chat messages, draft memoranda, and draft charging instruments. No court has ever so held. That result would diverge wildly from the rationale of *Gupta*, and cannot be what *Martoma* intended. In fact, Martoma's narrow request related to communications between the SEC—a *civil* regulator—and Government witnesses in connection with the possibility of *criminal* prosecution, which was an outcome that was exclusively in the control of the Government, not the SEC. *Martoma* is therefore properly read to simply provide a safeguard in an unusual situation to ensure that no promises or representations about a putative *criminal* prosecution are relayed to witnesses by the SEC, a *civil* regulator. Thus, to the extent that

Milton relies on *Martoma* to support his request for the Government to search the entire investigative file of the SEC, such reliance is misplaced. Indeed, cases since *Gupta* and *Martoma* have rejected requests for internal SEC work product. *See Blaszczak*, 308 F. Supp. 3d at 742 (denying the defendant's motion to require the Government to review the SEC's "action memorandum and any similar work product"); *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *10 (S.D.N.Y. Apr. 14, 2020) (rejecting a motion for the "SEC's internal deliberative documents," citing among other things that the Government had already committed to collecting testimony, witness statements, and transcripts from the SEC).

Second, because the Government either took the notes of witness interviews or obtained them from the SEC, and has obtained and produced all records produced by third parties to the SEC, the Government has already disclosed the necessary essential facts to enable Milton to call witnesses and take advantage of exculpatory information. It is not necessary to delve into the SEC's internal work product, which would be an enormous undertaking, would take significant resources of the USAO and SEC, and would invade the SEC's work product privilege. The Government is not required to disclose materials "to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *United States v. Leonard*, 350 F. App'x 480, 482 (2d Cir. 2009) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)) (government did not wrongfully withhold *Brady* material when it failed to turn over an SEC memorandum that concluded the defendant's misstatement was not material because the defendant was already aware of the essential facts). Thus even if the SEC's internal work product contains references to statements of witnesses made during interviews conducted by the USAO – for instance, a summary

58

of a witness's expected testimony in a memorandum or a discussion of a witness statement in an instant message or email – the Government has already satisfied its *Brady* obligation regarding the witnesses' statements because "[k]knowledge of the identity of a potential witness, and 'the essential facts which would enable' a defendant 'to call the witness and thus take advantage of any exculpatory testimony that he might furnish,' is sufficient to discharge the Government's *Brady* obligation." *Middendorf*, 2018 WL 3956494, at \*4 (quoting *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975)). To the extent interviewed witnesses made statements that are potentially exculpatory, the Government has informed Milton of the witnesses' identities and the essential facts about which they could testify when it produced excerpts of notes from interviews containing potentially exculpatory information. *Brady* requires nothing more from the Government. *Id.*

Therefore, for the reasons explained above, the Government has already collected materials from the SEC as a courtesy, and to the extent Milton seeks additional materials, he is not entitled to them. His motion should thus be denied.

## V.     The Defendant's Motion for an Evidentiary Hearing on Filter Team Protocols Should Be Denied

Milton's tenth motion ("Mot. #10," ECF 62) seeks an evidentiary hearing on the Government's filter team protocols. This request is nothing more than a fishing expedition and should be denied.

### A.     Relevant Facts

On or about January 27, 2021, the Government obtained search warrants for two of Milton's email accounts, Milton's iCloud account, and Milton's LinkedIn account. After receiving data in response to the warrants, a filter team applied search terms—including terms for email contact information and phone numbers as appropriate—derived from (i) a list of attorneys and

59

law firms representing Milton provided by Nikola and (ii) header information obtained from Milton's personal email account obtained from Google pursuant to an order obtained under 18 U.S.C. § 2703(d). (*See* Declaration of Robert Frenchman in Support of the Motion for a Hearing on Filter Team Protocols ("Frenchman Decl.," ECF 61), Ex. D).

The filter team then segregated all records that it had identified using those search terms, and variations on them, so that the prosecution team could not access them. After the filter team ran additional privilege terms in the non-privileged materials, the non-privileged materials were released to the prosecution team. On two occasions in June and July 2021, a prosecution team member identified what appeared to be a potentially privileged document, and as is the Government's practice, the prosecution team paused its review and informed the filter team, which ran additional searches and segregated potentially privileged materials.

On September 2, 2021, the Government produced discovery to Milton, including search warrant returns from the January 27, 2021 warrants. Because the returns were for Milton's own accounts, the Government produced the entirety of the returns to Milton, in the format provided by Google and Apple, which as a result included the potentially privileged communications that were segregated and inaccessible to the prosecution team. During a telephone call on September 27, 2021, the Government explained to defense counsel that the Government had produced the entirety of the search warrant returns to the defendant, including the documents that been segregated as potentially privileged such that the prosecution team could not access them. The Government intends to produce a subset of those returns, consisting of only the material it has marked responsive, as soon as its responsiveness review is complete. Because the potentially privileged communications are segregated from the trial team and its case agents, the Government

is not reviewing those documents for responsiveness and does not expect the responsive set to contain any potentially privileged communications.

After speaking to the Government on September 27, 2021, on October 1, 2021, counsel for Milton wrote a letter to the supervisor of the filter team asking for information about the filter team's protocol. In response to the letter from defense counsel, on October 12, 2021, the Government sent Milton a list of the search terms applied in filtering potentially privileged material from the search warrants. (*See* Frenchman Decl., Ex. D). On October 26, 2021, defense counsel sent the Government a letter with additional attorney names and contact information. (*See* Frenchman Decl., Ex. E). In response, the prosecution team paused its review and informed the filter team.[9] The filter team then segregated as potentially privileged documents relating to those additional attorneys and law firms, and the prosecution team does not have access to them. None of these documents had been identified as responsive to the search warrants.

## B.    Applicable Law

"The use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications." *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, *8 (S.D.N.Y. Oct. 9, 2020); *United States v. Ceglia*, No. 12 Cr.876 (VSB), 2015 WL 1499194, *1 (S.D.N.Y. Mar. 30, 2015)); *see also, e.g.*, *United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("[T]he Government established an effective firewall to prevent disclosures to the Government's trial

---

[9] While not required under the law, if the Court requests, the filter team can provide information to the Court on its process and the clawback of information in June, July, and October 2021. The Government also intends to disclose to the defendant information about the clawed back records.

attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009). Indeed, the applicability of the out-of-circuit precedents criticizing filter teams, which were cited by the defendant, has been rejected in this District. *See United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2021 WL 4120539, at *4 (S.D.N.Y. Sept. 9, 2021) (approving of the use of filter teams and distinguishing non-binding precedents from outside the circuit).

Inadvertent disclosure of potentially privileged information to the prosecution team is not alone a basis for relief. *See United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (after-the-fact notice of potentially privileged documents did not render an earlier search invalid); *United States v. Dupree*, 781 F. Supp. 2d 115, 163 (E.D.N.Y. 2011) ("the mere fact that the government obtained privileged information does not mean it violated defendants' Sixth Amendment rights"). In order to be entitled to a hearing "to determine whether the prosecution was tainted by exposure to privileged information . . . [d]efendants have the burden of showing a 'factual relationship' between the privileged information and the prosecution." *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (denying a hearing where potentially privileged search warrant returns were inadvertently provided to the trial team). In other words, a defendant is required to show that privileged materials have an "apparent bearing on what are likely to be the issues in the case" and would "give the Government [an] unfair 'tactical advantage' and insight into Defendants' 'means of defeating the charges.'" *Id.* (citation omitted). It is the defendant's burden to "show 'a distinct, as opposed to speculative, possibility of taint.'" *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016), *aff'd*, 725 F. App'x 58, 61 (2d Cir. 2018) (quoting

62

*United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989)). "Failure to show the requisite factual relationship is sufficient to end the inquiry." *Sharma*, 2019 WL 3802223, at \*5 (quoting *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998)) (brackets omitted).

Where privileged material passes to the prosecution team, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial,' not to order wholesale suppression." *Lumiere*, 2016 WL 7188149, at \*6 (quoting *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1047 (D. Nev. 2006)); *see also United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at \*2 (S.D.N.Y. Oct. 18, 2019) (same); *United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at \*6 (S.D.N.Y. Aug. 8, 2017) (same).

### C.     Discussion

Milton's motion to hold a hearing to "probe the government" (Mot. #10 at 2), about potential alleged deficiencies in the filter team's review is based on speculative claims of taint and incorrect factual assumptions.

As a preliminary matter, Milton is not entitled to a hearing based on his request to see the filter team's review protocol or have questioned answers about the makeup of the filter team and the "security features" used to protect potentially privileged documents. The Government already gave Milton an overview of the way the filter team works, and he is not entitled to the filter team's review protocol. *See United States v. Weigand*, 482 F. Supp. 3d 224, 246 (S.D.N.Y. 2020), as corrected (Sept. 2, 2020) ("Under these circumstances, a 'taint protocol' is not 'material to preparing the defense' and so does not fall within the scope of Rule 16(a)(1)(E)."). Milton has not cited any authority for the position that he is entitled to the filter team's review protocol, let alone that he is entitled to a hearing about it. The filter team has already segregated the materials related

63

to the attorneys identified by Milton. If Milton believes there are additional potentially privileged materials that have not been screened out, the proper remedy is to require Milton to produce to the Government a list of attorneys. In fact, in this case, the Government produced the list of attorneys, law firms and search terms that it used to segregate the potentially privileged materials to the defense. The defense then supplemented that list with additional attorneys, which the filter team then used to segregate any documents relating to those attorneys.

Additionally, Milton has not established the possibility that the prosecution is tainted so as to entitle him to a hearing. From the outset, the Government utilized a filter team to review search warrant returns for potentially privileged information. The trial team does not have, and has never had, access to these complete search warrant returns that were produced to Milton in discovery. Rather, after receiving the returns, the filter team used search terms drawn from several sources to identify potentially privileged material. While Milton claims there are over 1,000 privileged documents in the search warrant returns (which represent less than 2% of the approximately 79,000 documents in the returns), those materials are not in the possession of the prosecution team. Rather, the filter team screened the materials from the raw returns. Significantly, the three examples of privileged communications cited in Milton's motion (*see* Mot. #10 at 5), were all screened out by the filter team and were never made available to the trial team.

Milton's identification of additional attorney names on October 26, 2021, and the filter team's subsequent claw back of documents is not a reason to hold a hearing. To the extent potentially privileged documents were available to members of the prosecution team, it was inadvertent. The defendant has not set forth any facts demonstrating that there was an intentional

64

intrusion of the attorney-client privilege or that the materials have been used by the prosecution team.

Milton's suggestion that the search warrant returns available to the prosecution contain attorney work product materials is mere speculation. The search terms used by the filter team would have identified documents, such as memoranda, naming any of the attorneys the filter team screened for. While the Government does not know the names of all of Milton's private investigators because Milton has not provided the names, the filter team's searches would have identified any communication that involved one of Milton's attorneys and a private investigator. In other words, for work product or private investigators' materials to get through the filter team's screening, it would need to be in emails with Milton that do not copy or even name an attorney or law firm. There is an easy solution for this objection: require Milton to provide investigators' names, cell phones, and email addresses to the filter team.

To be entitled to a hearing, Milton needs to demonstrate that the allegedly privileged materials have an apparent bearing on what are likely to be the issues in the case, and that the intrusion was intention. Milton's entirely speculative claims of taint make no such showing here, and accordingly, there is no basis to "sanction[] such a far-flung fishing expedition." *United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989) (Walker, D.J.).

65

## CONCLUSION

For the reasons set forth above, the defendant's motions should be denied in their entirety.

Dated:  New York, New York
January 14, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:    _s/_____
Jordan Estes
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2543/1947/2421