M6TKMILC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          21 CR 478 (ER)

TREVOR MILTON,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        June 29, 2022
                                        10:35 a.m.
Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
NICOLAS ROOS
MATTHEW D. PODOLSKY
JORDAN ESTES
     Assistant United States Attorneys

MARC L. MUKASEY
BRADLEY J. BONDI
TORREY KAUFMAN YOUNG
     Attorneys for Defendant

M6TKMILC

(Case called)

MR. ROOS:  Good morning, your Honor.  Nick Roos, Jordan Estes, and Matt Podolsky, for the government.

THE COURT:  Good morning.

MR. MUKASEY:  Hi, Judge.  Marc Mukasey, Brad Bondi, and Torrey Young, for the defendant, Trevor Milton, who is seated at counsel table.

THE COURT:  Good morning to you all.

This matter is on for a status conference.  There are a number of issues that we need to discuss.  I guess we should start with the superseding indictment.

We can arraign Mr. Milton now on the superseding indictment, if everyone is agreed.

MR. MUKASEY:  I think that's fine.

MR. ROOS:  That's obviously fine with us.

THE COURT:  Okay.  By the way, you don't have to stand; you can remain seated.  Just please speak directly into the microphone.

Mr. Mukasey, have you and your client received a copy of the superseding indictment?

MR. MUKASEY:  Yes, sir.

THE COURT:  Do you wish a public reading?

MR. MUKASEY:  No.  We waive it, Judge.

THE COURT:  How does Mr. Milton plead, guilty or not guilty?

M6TKMILC

MR. MUKASEY:  Not guilty.

THE DEFENDANT:  Not guilty.  Sorry about that.

THE COURT:  That's quite all right.

Let's talk about the superseder and the trial date. As the parties are aware, we're currently scheduled for trial on July 18.  Let me begin by asking you, Mr. Roos, tell me about the superseding indictment.  What is this new count?

MR. ROOS:  Yes, your Honor.

So, the superseding indictment adds Count Four, which is a wire fraud count.  Here is a sort of description of the facts relevant to this count:  So, as part of a SPAC transaction, which has been a part of the whole case, the defendant agreed to a stock-share lockup.  So the majority of his shares, he couldn't sell until a period in the future — six months, it ultimately ended up being.  During that locked-up period, the defendant tried to convert some of his locked-up shares to present day value in the form of trading locked-up stock options for property.  And so in April 2020, the defendant contacted an individual, who I think is now in the public filings, Peter Hicks, about purchasing land in exchange -- it's a $20 million ranch property, and so purchasing the land in exchange for $7.5 million and stock options.

And so the victim in this scheme said, well, I'm not sure about stock options, can you tell me more?  The defendant

M6TKMILC

had a phone call approximately an hour long with Mr. Hicks trying to convince him to do the deal.  On that phone call, the defendant made a series of misrepresentations, the same types of misrepresentations alleged in the indictment, misrepresentations about reservations and the firmness or binding nature of orders, misrepresentations about hydrogen, about the hydrogen stations that were going up.

Afterwards, the victim agreed to the transaction.  So the defendant acquired this property, this ranch, and the victim got the cash and then also the stock options. Ultimately, however, because the stock was inflated due to the defendant's misrepresentations, by the time the lockup expired and the victim could exercise the options, they were worthless. So he didn't get the money.

The victim then reached out to the defendant and said, what the heck, and so they had some discussions, and the evidence will show that as part of those discussions, the defendant said, sorry, but what I can do is give you a little extra money by selling you some additional shares at a below-market price, which you can then sell and recoup and get the money back.  The government alleges that's a form of lulling.  Basically, after the wire fraud was committed and after the scheme was exposed, in order to prevent the victim from doing whatever he would do, the defendant lulled him by basically giving him like a million dollars in money.

M6TKMILC

So, that's the wire fraud scheme.

Let me say a few things about this scheme.

First, the representations and the nature of the proof the government was going to put in to prove the falsity of the representations are nearly identical to the evidence that was already coming in.  It's the same types of misrepresentations that were going to the broad investing public; it's the same set of proof, meaning like engineers who would say those things aren't true.  In fact, some of the language that the defendant used is literally almost identical.

The second point is, this scheme adds probably about two witnesses.  It's the Peter Hicks and maybe his son.  And the additional proof is roughly -- it's a phone call, which is partially recorded, it's about a 30-minute recording — some of that may be played, probably not all of it — and there's about 70 pages of emails.

So it's a relatively limited set of materials, and, candidly, the government was going to put this evidence in anyways because, in our view, it's also proof, direct proof, of the charged schemes in Counts One through Three.  So that's a description of Count Four.

THE COURT:  Who was going to be the actual purchaser of the property?

MR. ROOS:  The Defendant.

THE COURT:  Mr. Milton personally?

M6TKMILC

MR. ROOS:  Correct.  I think maybe through like an LLC, but that's right, not the company, in case that wasn't clear.

THE COURT:  Okay.

So, Mr. Mukasey?

MR. MUKASEY:  Judge, thank you.

I think Mr. Roos has done a nice job of explaining why this count is completely unlike Counts One, Two, and Three, in quality and in kind.

If I can summarize some of the briefing that we did for you, Judge, this is far from a cosmetic kind of change. We're talking here about a parcel of land in Utah, we're talking about a deal that was done between Utah and Massachusetts, where the, quote-unquote, victim, about whom I'll speak more, lives.  We're talking about a transaction that is the subject of a litigation in Utah that we focused on recently.  We're talking about a tape recording of the conversation between Mr. Milton and the alleged victim that was recorded illegally.  If I am correct, this Court was involved in granting some immunity related to that illegal tape recording.

The potential issues raised by that, I think, speak for itself, and it's, from our point of view, a heck of a lot more than simply two additional witnesses.  There are motions that can be directed to this and that we think will be, and

M6TKMILC

should be, directed to this.  We need to investigate the case, and among other changes, this expands the scope of the indictment by six months, which raises issues that I think speak to what the proof will be on Counts One, Two, and Three. I think it's the government's position that on Counts One, Two, and Three, the proof stops at September of 2020, and under the new Count Four, we're moving into 2021.

We're talking about a private land transaction in Count Four.  For the past year since this indictment was returned, we've been talking about public statements made over social media to affect public markets and public investors. This is a completely private transaction.

There is discovery that we are trying to get our hands on and have our hands somewhat around, and we think will have to be produced to the government under Rule 16, our reciprocal obligation, that will demonstrate that this is not a simple as the government, nor as narrow as the government looks at it, including a potential advice-of-counsel defense with respect to what Mr. Roos calls lulling, that is, the time period over which this extended.

We also think — and I'm hesitant to bring this up, but I think I have to — there is potentially a venue issue in here. I don't want to beat that horse deader than it is already, but I think we have an obligation to look at it, and we have at least one email provided by the government from the,

M6TKMILC

quote-unquote, victim's lawyer suggesting that he doesn't see any connection with the Southern District of New York.

Judge — and I'm going to fall on my sword here — it was me who was beating this Court's door down for a speedy trial. I recognize the irony inherent in asking for an adjournment, and I would not ask for an adjournment if I did not think this was truly a different count, a curveball from left field, to mix my baseball metaphors, that changes our defense. It requires a pivot in our trial strategy. We have been focused extensively on public statements, in public markets, through social media. Now we're talking about a private land transaction in Utah.

THE COURT: I take it that that transaction did not go through, and that's why there's a civil litigation?

MR. MUKASEY: No, it did go through, it did go through. And --

THE COURT: So, Mr. Milton purchased that property?

MR. MUKASEY: He did purchase the property.

The litigation in Utah — and neither myself, nor Mr. Bondi are at all involved in that — it is essentially the alleged victim claiming that he was defrauded in a land transaction. There's no discussion about the fair market value that he received. He received cash, as I understand it. I think he's trying to bootstrap a criminal case into his civil litigation and take advantage of that, and possibly use the

M6TKMILC

U.S. Attorney's Office to help him for his own reasons in a civil litigation. We would literally — this is quoted in the case law all the time, you never want 404(b) evidence to create a trial within a trial. This would literally be the victim's civil trial in this trial.

THE COURT: Just so that I understand, the transaction or the dispute in Utah, Mr. Milton offered to buy a piece of property with cash and Nicola stock, made representations about the value of the stock, the transaction closed, and, thereafter, the seller learned that the Nicola stock that he received as partial payment was not worth what it was represented to be, or even what its market value was, because of misrepresentations that Mr. Milton had made to the public. Is that --

MR. ROOS: That's right, your Honor. And just to be clear about the representations, these are both representations -- all the representations were generally the same, what was public and what was made to Mr. Hicks. Mr. Hicks both received the public representations by the defendant that he was making on various -- to the public that are a part of Counts One through Three of the indictment, and then also had the separate private phone call.

THE COURT: I guess I get the misrepresentations that Mr. Milton allegedly made to the purported victim are similar, perhaps, to the misrepresentations that he purportedly made to

M6TKMILC

the public concerning the value of Nicola.  Nicola -- the trial that we were going to start on July 18 was about trucks, and this trial is about a ranch, and so why are you tacking this on?

MR. ROOS:  It's not -- the trial would not be about a ranch because neither side was making representations about the ranch.  What the defendant was doing was he was making representations about the value of the stock.  And so, in terms of what the contested issue will be, it will be whether or not the statements the defendant was making publicly, that Mr. Hicks was receiving, were false, and whether the statements on the phone call, which were the same types of statements — again, about the stock, not about the ranch — were true or false.

And so, the litigation is not going to be about the property value or the minutia of property law.  It's all going to be about the truth or falsity of the representations, which is the exact same issue as would be in the trial.

Just to be clear, Mr. Hicks is not like an institutional investor or somebody who would have access to, you know, nonpublic information about the company; he's just like the retail investors described in the original indictment, in that he's just a member of the public who's receiving the same types of information.  The only difference is he also gets a phone call where he gets the same type of information.

M6TKMILC

And so --

THE COURT: So why not make him a witness? Why carry his water? Put him on the stand, tell him -- have him tell the jury what Mr. Milton purportedly told him and how it's similar to the representations that he made to the market.

MR. ROOS: So, your Honor, he was going to be a witness no matter what, and I think the defense knew it. Their letter acknowledges, before we superseded, they were planning to do a 404(b) motion on it, and that's because it's highly probative of the scheme, of the falsity, of the mens rea elements here. And so, in our view, Count Four really is just adding a witness who is going to testify on this.

MR. MUKASEY: Your Honor, if I may, here's an interesting contradiction in what Mr. Roos is saying: The theory of Counts One through Three is that Mr. Milton was trying to artificially inflate, or prop up, the price of Nicola stock. In a land deal, obviously, the buyer wants to decrease and lower the amount that he's paying. So you're talking about a scheme to inflate, and then on a property deal, he wants to pay the lowest amount.

We think, Judge, that it doesn't stop at the completion of the deal. It is Mr. Hicks, the alleged victim, who continues to seek more out of Mr. Milton, as after the land transaction closes and he comes back and he wants more, and it becomes a whole new set of negotiations, so it's not simply

M6TKMILC

give me cash in stock and I will give you a land deal and game over. There's a whole series and what the government calls lulling that we have, frankly, a strong defense to, which may involve, as Mr. Bondi's letter alluded to, an advice-of-counsel defense.

So this is not a straight-up you give me this, and I will give you that.

THE COURT: Why is it more than that, though, Mr. Mukasey? I get that they're sort of perhaps substantively different, but what does this really add? What additional burdens do you now need to carry?

MR. MUKASEY: Well, it requires a pivot, in my opinion, in our trial strategy, because we've been dealing for a year now with a case very focused on the public markets, very focused on what the government calls retail investors, investors who are sitting home during the COVID lockdown and trading stock, and representations made publicly about that stock, how they were made, why they were made, and the accuracy of them, the intent behind them, and the materiality behind them. It's, fundamentally, different from a private one-on-one transaction in which Mr. Milton was illegally recorded buying a piece of property — not selling stock to the world — buying a piece of property that is located in Utah, that we think the victim had some ulterior motives about.

THE COURT: Let me ask you about that. Were you aware

M6TKMILC

that — I'm forgetting who it is, Mr. Hilton? — Mr. Hilton was going to be called as a witness at the trial --

MR. ROOS:  Hicks.

THE COURT:  -- of Mr. Milton?

MR. MUKASEY:  About two weeks ago, and I am going to get my dates a little wrong, but we got 3500 material that contained an audio recording and the names of two witnesses, Peter Hicks, the buyer, Lucas Hicks, his son.  We were told eventually that that would be 404(b) evidence.  We were prepared to move to keep it out because it is a different time, different kind of scam, if you will, different subject matter. We looked into a little bit about Peter Hicks and saw that this was not as simple as meets the eye.  We thought, okay, if this ever happened, we would have to get an expert witness to opine on the real estate transaction and the fairness thereof, because part of what we think is that this Hicks guy was up to no good in his dealings with Mr. Milton, for reasons that I think we'll keep to ourselves at the moment, that I'm not sure the government is even aware of.

Then we got the government's proposed requests to charge, which contained a footnote, saying while we think it's 404(b), we're adding an additional count.  So my reaction was, there's more to this than meets the eye, and it's an additional potential 20 years' term of imprisonment.  So we are obligated and compelled to look into it and not simply to accept it --

M6TKMILC

look, I think under 404(b), you would have kept it out — that's my view — because it is a side show compared to Counts One, Two, and Three.  It doesn't provide background, it's not offered for what I think is a lawful 404(b) --

THE COURT:  Yes, but it's not unusual, Mr. Mukasey, in cases involving these types of financial fraud, for the government to proffer, and for courts let in, evidence of purchases that were made with the proceeds of that illegal activity.  So, again, I don't mean to adjudicate a point that's not before me, but it's not so unusual for those types of transactions to be presented at a trial.

MR. MUKASEY:  I agree -- I hear you, and I'm not saying this is an outrage.  What I am saying is, it needs time to be dug into deeper, possibly with expert witnesses, certainly with respect to more discovery related to this alleged victim.  And there were continued dealings between this alleged victim and Mr. Milton that the government calls lulling — I'm not quite sure what that is or what they were supposedly lulled into — but at some point, a law firm was advising Mr. Milton in terms of how to deal with Mr. Hicks.

So there's more here than simply two witnesses and seven pieces of paper.  We already have collected a few dozen documents that we think relate to this.  It may actually open the government's eyes about it.

Again, Judge, you know as well as anybody that when

M6TKMILC

you're preparing for a trial about subject A, and it becomes a

trial about subject A and subject B, you've got to reevaluate.

THE COURT:  Let me ask, Mr. Roos, can you provide any

further insight into the language of the superseding indictment

that Mr. Milton engaged in conduct designed to lull the

sellers?

MR. ROOS:  Certainly, your Honor.  So, let me start

with that.

The superseding indictment, in the to-wit clause,

mentions that.  And what that relates to is that after the

defendant's scheme was exposed, following a short seller report

and the stock price going down and his resignation from the

company, Mr. Hicks reached out to the defendant and said,

basically, what gives, my options are worthless, my stock

options are worthless, and attempted to negotiate something

that didn't go anywhere.  And then the evidence will show — and

this is all just in emails — that the defendant said, well,

listen, I'm not going to fix your stock options, but — and keep

in mind this is a period when the defendant is under

investigation — but I will offer to sell you a little stock at

a discount so that basically you get a small — relatively small

compared to the losses — payout.

And our contention is that was an act, what's

described in the case law, around fraud as lulling, basically

trying to incentivize the victim not to do what he ultimately

M6TKMILC

does, which is file a lawsuit.

THE COURT:  To what extent, if any, if you know, or if you are in a position to say, was Mr. Hicks aware of the investigation of Mr. Milton?

MR. ROOS:  So, your Honor, he was aware of the short seller report, which was pretty public.  There was no indictment at that point, and at least as far as I think we know at this time, he wasn't aware of a government criminal investigation.  To be candid with the Court, I don't know the facts about whether he knew about the SEC investigation, which I think the company disclosed fairly quickly.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  I think he smelled a government investigation, he certainly read a report that speculated that there would be a government investigation, and I think, frankly, he took advantage of Mr. Milton, and is trying to take advantage of this proceeding, to leverage himself in the civil litigation.

MR. ROOS:  And so, your Honor, if I may, frankly, I think that's probably a helpful fact for us if he knew about the investigation, but, in any event, I want to address two points made by Mr. Mukasey a minute ago.

The first is sort of the perceived complication around this count, and I want to correct a few things.

First, Mr. Mukasey said there's some sort of

contradiction in our indictment because Mr. Milton would be incentivized to buy the property at a lower price, but keep the stock up, and sort of presents it as sort of there's some sort of incoherence there. It's not the case.

This is a transaction. The property is worth $20 million. I want to buy the property, Mr. Milton wants to buy the property, so he says 7.5 million in cash, the rest in stock. By keeping the value of the stock up, that means each share is worth more, which means he has to pay less shares. So, like, it's basically like each dollar is worth more. When the stock devalues, that means either the options are worthless or it requires more stock in order to hit that -- the $20 million mark. So that's why it's totally consistent to have as a scheme where he's trying to inflate the value because that means each share he's paying out to the victim is worth more.

Now, there was a lot of discussion around experts, lulling, the validity of the illegal recording, and, look, it's actually very simple — this is a transaction to sell stock where he made false statements, which are, as I've said before, the exact same as what we're already alleging on the document. For example, on the recording, you hear false statements about the roots that have been set up at hydrogen production and whether land had been acquired, there were false statements about reservations, which are nearly identical to those alleged

M6TKMILC

in the original indictment at paragraph 77.

So, the issues -- actually, maybe they've got issues for cross, it sounds like maybe they've got some ideas for cross, but these are just cross points. This idea of, like, don't you have an incentive to make money, aren't you suing him, didn't you illegally record, those are all cross points. This is not a trial within a trial.

And then let me make a second sort of big-picture point about this. As we've said, this is one to two government witnesses. It's the same representations. We're going to have to prove these representations were lies no matter what in the trial. They've had the discovery for well over a month before the trial date. They knew about the superseder approximately four weeks before the trial. They've known about the civil suit since March. And so there's plenty of time to prepare. Certainly --

THE COURT: They've known since two months ago?

MR. ROOS: I'm sorry, they've known about the civil suit since March.

MR. MUKASEY: That's just wrong.

THE COURT: Let him finish, Mr. Mukasey.

MR. ROOS: And then in terms of preparation, we've said that if they have additional motions in limine, if they have -- your Honor has already ruled on venue in this case, but if they want to make another venue motion, we'll certainly

consent to any type of motions.  We even offer that Mr. Hicks could testify later in the case.  But an adjournment of the length proposed -- really any adjournment, but particularly the length proposed by the defense is going to be problematic for a number of reasons, not just the general public interest in a speedy trial and the fact that they fought very hard for the date, and we've relied on it and produced our exhibits, our 3500, our witness lists, but, more generally, I think late August presents some real logistical hurdles both in terms of we've tried to reach out to witnesses to figure out people's travel schedules, we're still looking to that, but from experience, I think we know people travel in late August, they bring their kids to school in early September, people have vacation plans around Labor Day.  It's going to make witness issues difficult; it's going to make jury selection very difficult.  I imagine we'll need a pretty substantial jury pool if we were to go with the defense date.

So --

THE COURT:  But that would be true even if we used your date, right?  Because how long do you anticipate this trial to take?

MR. ROOS:  So, your Honor, in the voir dire, we propose that your Honor tell the jury five weeks, but based on where we're at right now, I think we are hoping to put the whole case in, after talking with defense counsel, in three to

M6TKMILC

four, which means we start July 18th, we'll be done middle of August, the jurors will enjoy their Labor Day and can take their kids to school.  And, you know, listen, we tried to be flexible and accommodate and offer -- we don't think it's necessary, but that if your Honor wanted to give them a week adjournment, we think we can move people around, and that will still get the trial concluded before the holidays and kids are back to school, but we just think -- in addition to what the parties have already done in this case, I think there's real logistical hurdles to moving this thing a month.  Frankly, it's not necessary.  These aren't new issues.  We still have, I think, three weeks before the trial.  We can litigate all these things.  There's no reason to push it off that long.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  Thank you, Judge.

Our client is facing a daunting amount of time in prison, if convicted.  This new count, brought in at what is functionally, in terms of the discovery and the trial prep, the eleventh hour, places him in substantially more jeopardy.

The first words out of Mr. Roos' mouth — and I should say, by the way, we have been communicating and conferring with the government in what I would consider an extremely amicable way, and I commend them for that, it's really helpful — the first words out of Mr. Roos' mouth is this is a $20 million piece of property.  No, it's not.  We've done a little bit of

M6TKMILC

investigation so far in the couple of days that we've had this. We think the seller got it for about $6.5 million, and his request for $20 million was perhaps his own scam that he was running.  The actual value of the property is critical in this case, for somebody who thinks he was ripped off and who the government is going to claim was ripped off.

An expert witness, if not a testifier, at least someone who can consult with us — which leads me to the next point -- is necessary, which leads me to the next point, which is we have an obligation to investigate this.  We're not involved in the civil suit.  I personally didn't know of any civil suit, and if I were to keep up with every civil suit filed against Mr. Milton, I wouldn't have time to do my job. This is filed in Utah.  It's never even been answered, as far as I can tell.  I'm no civil litigation guru, but I don't think that there's been an answer filed.  So, the fact that there was a lawsuit pending in Utah was of no moment to us preparing for this criminal trial.

I come back to the point that the theory of prosecution of Count Four is fundamentally different than the theory of prosecution of Counts One, Two, and Three, so we need some time to pivot and get ready to attack all four counts.

THE COURT:  So let me --

MR. MUKASEY:  Including some motion practice, Judge.

THE COURT:  Let me tell you where I'm sort of coming

M6TKMILC

down on this.

Obviously, Mr. Milton has been pushing for a trial date for some time, and they have pressed forward with motions in limine and subpoenas. So, I only get the sense that they are working very hard, and have been working very hard, to push forward to trial.

So when they come in, his team, defense team, and tell me, look, we want to get to trial, but now we need this additional time because of this additional count, I'm going to give that a lot of credibility because, besides the fact that they're experienced trial counsel, they're the ones that wanted to go to trial as soon as possible. And while, certainly, this case is important to both sides and to the public, it's Mr. Milton's liberty that is at stake. So, I will grant an adjournment, but we need to talk about that because of the issues that Mr. Roos suggested, the difficulty in starting a trial in August.

We actually have been in touch with the jury folks here in the Southern District, and they have already let us know that the jurors that they've been reaching out to, the responses that they have gotten, not surprisingly, suggest that people are going to be taking time off in late August and will be taking kids back to college, et cetera. So, there are a lot of issues that that raises concerning our ability to sit a jury.

So, that suggests one of two things — either we give Mr. Milton a shorter period of time or we push this trial back into September, after Labor Day, or everybody comes back.  I'm happy to do either, but, Mr. Mukasey, do you have a view, as you sit here?

MR. MUKASEY:  Judge, if it pleases the Court, I'd like to confer with my client for three or four minutes?

THE COURT:  That's fine, that's fine.  You can take the time now.

MR. MUKASEY:  Thank you, sir.

(Pause)

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  Thank you, Judge.

If it pleases the Court, we would respectfully request the earliest possible trial after Labor Day, in September.

THE COURT:  What's the second full week?

THE DEPUTY CLERK:  The second full week? September 12.

THE COURT:  So we'll put it down for September 12 for jury selection and trial.

And, with that, there's a deadline of this Friday for responses to the motions in limine, et cetera.  In light of that, if folks want another few days, another week, to respond to those, I'm happy to give you that week.

MR. MUKASEY:  Thank you.  I think a week is perfect.

M6TKMILC

THE COURT:  So, then, that takes care of that.

MR. ROOS:  Your Honor, on one thing there, obviously, this is going to require quite an adjustment for the government.  We've now disclosed all our 3500, our exhibits, our witness list.  The defense disclosures are due this Friday.  And so we're fine with giving them the week -- the extra week on the motions in limine, but we'd ask that they file their stuff, I guess, next week, whenever the oppositions are due.

MR. MUKASEY:  That's completely fair and fine, and we'll do so.

THE COURT:  Very well.

The other thing -- there are a couple of other things.  The other thing I want to make sure we discuss is I got a letter from the government yesterday concerning speedy trial.  I read the letter.  It seems fine and right to me.  Have you folks had an opportunity to digest it?

MR. MUKASEY:  We have, Judge.  I don't want to be difficult.  The retroactive application, I think, was of some interest to us, but we don't oppose.

THE COURT:  Very well.  So then I will enter the government's proposed order.

And I take it there is no objection to now extending the exclusion to September -- what was it, 13?

THE DEPUTY CLERK:  September 12.

THE COURT:  -- September 12.

M6TKMILC

Any objection, Mr. Mukasey?

MR. MUKASEY:  No objection.

THE COURT:  Very well.

So speedy trial will be extended through September 12. I find that Mr. Milton's interests in having this additional time to investigate the government's new count, Count Four, outweigh the interests of the public in a speedy trial, and so that time will be excluded.

What else do we need to do today?  Those were my two big things, or three big things.

MR. ROOS:  Nothing else for us, your Honor.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  That's all for us.  Thank you, Judge.

THE COURT:  Okay.

In that event, we are adjourned.  Everyone, please stay well.

* * *