M9d2Mil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                21 CR 478 (ER)

TREVOR MILTON,

              Defendant.

------------------------------x
                         New York, N.Y.

                         September 13, 2022
                         9:00 a.m.

Before:

                  HON. EDGARDO RAMOS,

                       District Judge

APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

M9d2Mil1

(Trial resumed; jury not present)

THE COURT:  Good morning, all.

MR. ROOS:  Good morning.

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

Last night we received I think it is about a 27-, maybe 28-page PowerPoint deck that defense counsel intends to use in opening.  We have objections to several of the slides in it, and we thought it made sense to just deal with those with your Honor before the jury comes in rather than break in in Mr. Mukasey's opening.

THE COURT:  Yes.  So I think I have them.  1 of 29. And there is Mr. Worthen on the first page.

MR. ROOS:  So I am happy to flag the pages that we find objectionable.  I don't want to cut off Mr. Mukasey if he wants to say anything initially.

MR. MUKASEY:  I don't want to preempt Mr. Roos.  I just want to say that --

THE COURT:  Could you stand closer to the microphone?

MR. MUKASEY:  Certainly.

What seems like 29 pages is probably a lot less because some of those are sort of like video that would change from sort of one screen to another, and we just laid it out as on a slide-by-slide basis.

THE COURT:  Okay.

M9d2Mil1

MR. MUKASEY:  I have a good-faith belief that every document in there falls into one of two categories——one, it will be admitted in evidence, and I understand that I go that far at my peril; second, it is simply a visual depiction of something that I will be saying out of my mouth.  It's not evidence.  It is simply meant as a visual aid to what I am saying.

Let me give you an example.  I think one of the objectionable exhibits, probably the most objectionable exhibit, and we did meet and confer about this, is a photograph in there of what looks like cars flying.  And we are going to of course argue in this case that much of what Mr. Milton said and did and showed in video, in audio, in podcasts, on the website, was nothing more than completely innocent marketing, common in the industry.  That is an example of marketing your product in the automobile industry.  It is going to be on the screen this morning, subject to your Honor's ruling, for about two and a half seconds.

THE COURT:  I am looking at a slide that has cars being held up in the air by balloons.  Is that the one?

MR. MUKASEY:  That's the one.

THE COURT:  Okay.

Mr. Roos.

MR. ROOS:  I will start there.  I don't know if that's the first objection.  But, your Honor, you know, a lot of this

seems like improper argument to us.  Not only are some of these things exhibits that we will object to and we are not certain will come into evidence, but this itself is just a piece of evidence that you could imagine maybe an expert or some witness opining about, about the nature of advertising in the auto industry, but it's not even marked as a defense Exhibit.  It's a YouTube clip.  You can see they are telling the jury this stuff exists out there and then it is an ad they plan to show.  It seems totally impermissible.  We would object if it was actually offered in the case.  It's not just a form of outlining what the evidence will show to the jury.  It's putting a piece of evidence that is inadmissible before them.  So we don't see a valid basis for this.

If the point is people in advertising do all sorts of crazy things, that can just be made to the jury without impermissibly putting evidence in front of them that's not going to come in.

THE COURT:  Is this an actual ad that was used by Nikola?

MR. MUKASEY:  No, it's not.  It's an ad that was used by another company standard in the industry, by Ford.  It's not coming into evidence.  It's not marked as evidence.  I don't intend to put it in evidence.  And the only reason we put the YouTube site there was so the government didn't think we sort of created it on our own.

M9d2Mil1

MR. ROOS:  That makes it, I think, doubly impermissible, because the idea that it's standard in the industry, that it's an ad from Ford, but they are not going to put it into evidence deprives us of even the opportunity to inquire about it.

MR. MUKASEY:  It's literally, Judge, just a demonstration for two seconds that car companies do interesting advertising.

THE COURT:  Well, you know, my view of these things is anything that is in an opening, if you are going to use demonstratives, any noncontroversial piece of evidence that is likely to come in I think is fair game.  But if this is not going to be coming in, then I'm not going to allow it.

MR. MUKASEY:  If we were to elicit testimony that marketing in the car industry takes various forms through one of their witnesses or one of ours, would the Court reconsider?  Because, frankly, I didn't expect this to be such a big deal.  We are not suggesting that it's proof of anything.  It's literally a visual depiction of what's going to come out of my mouth.

THE COURT:  I understand.  But, I mean, when doing an opening, demonstratives are perhaps a little more fraught because they may constitute evidence that is not going to come in, and therefore unless the parties are relatively sure that it will be coming into evidence, then I think it is not

M9d2Mil1

appropriate to put in.

MR. MUKASEY:  Fair enough, Judge.

MR. ROOS:  The next one, your Honor, is the next page.

THE COURT:  The picture?

MR. ROOS:  It's the headline to a press release.  It's the press release that Nikola issued after the Hindenburg Report.

THE COURT:  Okay.

MR. ROOS:  So obviously there is a Defense Exhibit sticker on this.  The issue is we don't understand the relevant purpose, relevant nonhearsay purpose for the admission of this document.  We are going to object to it when they try to admit it.  It is basically a statement by the company after the fact and so that is our objection.  We don't think it should be in the opening, given the litigation that's likely to happen around it.

THE COURT:  Mr. Mukasey.

MR. MUKASEY:  Judge, to us this is nothing more than a part of the story here, right?  The Hindenburg Report comes out on September 10.  The company, Nikola, its management rallies behind Mr. Milton and calls the Hindenburg Report a hack job, an assault on Mr. Milton, and they issue this press release. Five days later, they get a grand jury subpoena and everything changes.  So to us, this is a critical part of the story.  It's the pivot point for why the employees and management of Nikola

went from supporting Mr. Milton to turning on Mr. Milton.  It's going to come in, we think, for that purpose.

THE COURT:  What's the pivot point, the Hindenburg Report or the subpoena?

MR. MUKASEY:  The subpoena.  The company defended, through that press release, Mr. Milton after the Hindenburg Report came out and said it's just a short-seller hack job. Then they got grand jury subpoenas and then the management turned on Mr. Milton.  So that's the reason that we put this in.  It's the beginning of the defense of Mr. Milton, which is then curtailed by the grand jury subpoena.  It's just a part of the story that happened four days after the Hindenburg Report.

THE COURT:  Now, is this a document that you are going to try to put into evidence?

MR. MUKASEY:  Very likely.

MR. ROOS:  Your Honor, what Mr. Mukasey just outlined to me sounds like introducing extrinsic evidence for impeachment purposes of these witnesses, saying they have a reason to change their story.  It's not a valid basis to admit it.

And I want to flag that if they introduce this and they introduce the subpoena documents, in our view, it opens the door to several other subsequent statements also made by the company, specifically, a subsequent press release in which they admitted all the various wrongdoings, and also an

admission with the SEC, a document filed by the SEC that they agreed to.

So I raise this because I think this is a fraught issue. I think there is going to be further discussion, litigation on it. I think it's inappropriate in opening, and I want to flag that, in our view, it really will own the door to a lot of other things they maybe don't want. So I think now is not the appropriate time to put this and a later slide, which is the grand jury subpoena, in front of the jury.

THE COURT: I'm sorry. There is an actual grand jury subpoena as part of this deck?

MR. MUKASEY: There is, and we intend to introduce that, again, to go to the credibility of the witnesses. We think it is going to be a point that each witness says -- each management witness says, We had Mr. Milton's back essentially, we got a grand jury subpoena and we flipped, and that's the story. It's not, like, unlike very many criminal cases. We got a grand jury subpoena and we flipped.

THE COURT: Mr. Roos.

MR. ROOS: Your Honor, certainly I imagine he will have plenty of opportunity to make that point on cross-examination. I still don't understand why -- the valid legal basis for actually introducing the grand jury subpoena, which is what's in the slide deck.

THE COURT: So you are objecting to both.

M9d2Mil1

MR. ROOS:  Correct.

THE COURT:  Are those the final two slides that you are objecting to?

MR. ROOS:  The -- no, these are not the only objections, if that's what your Honor is asking.  In terms of where the grand jury subpoena is in this -- sorry.  Our version doesn't have page numbers on it.

THE COURT:  DX 1109?

MR. ROOS:  Correct, your Honor, it's the fourth from the end of the deck.

THE COURT:  Okay.  The DOJ subpoena.

Mr. Mukasey, so I guess the story that you want to tell is, once they got the subpoena, Nikola management began cooperating and providing information against Mr. Milton.

MR. MUKASEY:  Correct, correct, and it's almost a juxtaposition to their initial reaction, which is that press release, "We defend Mr. Milton, we stand behind him, this is an attack."  Five days later, we get a grand jury subpoena, and we throw him under the bus.

THE COURT:  Again, my view, and it's a simple one, you can tell that story, but not necessarily through documents which may not come in.  So why don't you take those out.

MR. MUKASEY:  Meaning the grand jury subpoena and the headline.

THE COURT:  The press release.

MR. MUKASEY:  No problem, Judge.

MR. ROOS:  Your Honor, the next one is, there is a page that looks like this, that's a full transcript.

THE COURT:  Yes, the transcript one, the full transcript, yes.  What is that?

MR. MUKASEY:  That's a visual depiction, and we can probably blunt out -- can we cross out the words or gray out the words?  That's a visual depiction of part of our defense. Again, just what's going to come out of my mouth is that the government took lots of podcasts, lots of interviews, lots of tweets and cherrypicked pieces out of it, without looking at the whole thing in context.  And if you cherry-pick pieces out of it, you can make anybody look bad.  That's a visual depiction of what I am going to say.

THE COURT:  Mr. Roos, this is a document that's likely to come in, is it not?

MR. ROOS:  There are two issues with this, your Honor. The first is that this is actually a fake transcript.  This is not even one of the real transcripts.

MR. MUKASEY:  And it's less prejudicial.  It is just a demonstrative.

MR. ROOS:  Here is how it is prejudicial.  If you look, your Honor, you see four little spots where it looks like maybe half the line has been highlighted.  There is no government exhibit like this, so it is a fake exhibit.

M9d2Mil1

MR. MUKASEY:  It's not an exhibit.

MR. ROOS:  It's a fake transcript that's supposed to look like an exhibit, with fake highlighting to suggest that the government is cherry-picking four lines in what is a 98-page transcript.  So that's the real issue here.  You can't put fake evidence in a deck.  It's not a demonstrative.

MR. MUKASEY:  It's not evidence, and if they want to shove it up my nose in closing argument because I didn't prove what I said I was going to prove, they can do that.  But I have never heard of any rule.  And the government does it all the time.  I have never heard of any rule where everything you show in an opening must be admissible.  There is certain noncontroversial visual depictions that nobody's pretending are going to come into evidence.  This is a visual depiction of what I would call cherry-picking for lack of a better term.  If he wants us to make it so that it's a generic transcript and generic depiction, I bet we could probably do that if we had five minutes.

THE COURT:  Is there any transcript in the case that's this many pages and that has these few excerpts that will be read into evidence?

MR. ROOS:  There are certainly transcripts and, again, the parties are still, I think, working through which portion -- I know your Honor said the transcripts are presumptively admissible.  Many of the transcripts have parts

M9d2Mil1

about, you know, the defendant's family, his personal history, stuff that should be redacted in those big ones, and so some of them are longer than this.  But there is not a single transcript where it is this long with such sparse -- imagine what this would even look like.  They play like three words or something.

MR. MUKASEY:  I'm happy to show you what it's going to look like, first of all.  But second of all, I'm between a rock and a hard place now, right?  Because if I use a real transcript then, you know, it's prejudicial for some reason and if I don't use a real transcript, well, it's not going to come into evidence.  So I'm damned if I do, damned if I don't.  That actually, I am told, is DX 47.

THE COURT:  This is an actual exhibit.

MR. MUKASEY:  And if he wants it to be sort of a fake depiction of a transcript, we will try to do that.  I'm not trying to prejudice his case.

MR. ROOS:  I'm saying to make his argument without a slide.  I can't read what this says, what this is actually, but I know there is no government exhibit with such sparse highlighting, and this seems like totally improper argument for the jury.

THE COURT:  Totally improper.

MR. ROOS:  Improper.

THE COURT:  Why would he not be allowed to say:  The

government is going to rely on certain interviews that Mr. Milton gave and you will only -- they will only put into evidence, very limited portions of those interviews.

MR. ROOS:  Your Honor, I would not object to him saying that.  The issue really is the slide, which is, it tells the jury, here, this is either -- there are two worlds to this it is either not a real transcript, in which case they are putting in something that looks like evidence that is deceptive and it's never going to come in or it's a real transcript that I guess the highlighting's been changed on it or something, either way, it gives a false impression to the jury, and one that's improper.  The argument, we have no objection.  He should feel free to argue that the transcripts are selectively highlighted or cherry-picked or whatever the argument is.

THE COURT:  Is this an actual defense exhibit and are these the actual excerpts that the government has indicated that they would put into evidence.

MR. ROOS:  These are definitely not our exhibits.

MR. MUKASEY:  This is DX 47.  It's something we are going to offer that we thought the Court mentioned last Thursday was presumptively admissible.  I could, if it pleases the government, turn this into sort of a generic item, which is literally just demonstrative.  I just thought it was a better way than putting up a cherry tree and having somebody picking. I thought we are just going to have a transcript and pull some

M9d2Mil1

words out of it.  It's pretty harmless, and they are putting in, you know, 35 transcripts.  I don't think it's going to kill them.

THE COURT:  First of all, if this was an actual transcript with the government's actual excerpts, then I think you would have the better of the argument.  But apparently this is not.  This is not an actual transcript with the government's actual excerpts or designations and, accordingly, I'm not going to let you use it.

MR. MUKASEY:  How about if we made it look generic, Judge?

THE COURT:  Then that would be even worse because then it would be something that's not even going into evidence.  You can make all these arguments, Mr. Mukasey, just not in this fashion.

MR. MUKASEY:  My graphic design skills are getting killed right now.  My oral advocacy is okay, but my graphic design is getting killed.

THE COURT:  By the way, that's garden variety criminal trials.  Not all trials have demonstratives in their openings, and for good reason.

MR. ROOS:  I think one of my colleagues said he had a trial before Judge Gardephe where he just precluded all of them because of that issue.

We just have one more slide, your Honor, which is the

Nikola stock price.  It's close to the end.

MR. MUKASEY:  It looks like a flat EKG.

THE COURT:  Yes.

MR. ROOS:  This is, I guess, an exhibit from -- that they intend to try to admit through their expert.  We are going to object to the exhibit's admission at the time the expert testifies for various expert-related reasons in terms of the methodology, the selection of dates, etc.

THE COURT:  Who is the expert?  Is this Kurfess.

MR. ROOS:  This is Ferrell, the defense expert.  So that's the issue.  We think the exhibit is objectionable, and we should just reserve until the expert actually testifies.

MR. MUKASEY:  What Mr. Roos said is classic cross-examination.  Your Honor has said that Professor Ferrell's testimony is coming in.  We expect this to come in through Dr. Ferrell.  We expect it to be offered. That's why it is in.

THE COURT:  If this is an exhibit that's going to be coming in or likely to be coming in, then I would allow it.

That's it?

MR. ROOS:  That's it, your Honor.  Thank you.

THE COURT:  Anything more?

MR. MUKASEY:  Nothing.  Thank you.

THE COURT:  Okay.  We have still got about ten minutes.  Hopefully the jury will be on time, but until then

M9d2Mil1

you are free to do as you wish.

(Recess)

MR. PODOLSKY:  Your Honor, we have one issue that relates to the testimony of the first witness.  It may make sense to take it up now if we have time.

THE COURT:  Okay.  Is the defense ready to.

MR. CARUSO:  I am, Judge.

THE COURT:  What's the issue?

MR. PODOLSKY:  Your Honor, I understand, as I think your Honor is aware, there is a video of a truck rolling down the hill.  It's actually two videos.  The first is a commercial that was made by Phillips.  It has a very brief portion of the Nikola One truck.  The second, there is a video that was made by Nikola that took some of the outtakes and put it into what's generally been called the in-motion video and was posted by --

THE COURT:  "In motion"?

MR. PODOLSKY:  Yes, "in motion."

During our direct examination of the first witness, we are going to talk about both of these videos.  My plan, frankly, to save time is to offer and show the second video, frankly, the more important one.  I understand the defense intends to offer the first video, which is fine.  We are not going to object to that admission.  We are going to talk about it.

However, I understand they wish to interrupt my direct

M9d2Mil1

examination, offer the video while I am asking questions of the witness, which I think it would be wholly improper. They are welcome to cross-examine him, show this video, ask questions about it. I want to head this off now because I think it would be improper and a waste of the jury's time to butt in and suggest they are now going to examine the witness and show videos.

MR. CARUSO: Your Honor --

THE COURT: Mr. Caruso, why don't you get close to a microphone.

MR. CARUSO: Pardon me. I'm going to turn around. If the dispute is solely, if today's dispute or this morning's dispute is solely one of timing, I think we can be flexible about that. But here's the point. We are offering this and some other evidence for completeness. Rule 106 says that we are entitled to show completeness at the same time that the government offers its proof. That was the rationale for saying whichever witness is on the stand, if any, when the government offers this portion, we can simultaneously or immediately following offer the other -- the other portion to complete it.

Now, if the Court would prefer that we wait until our -- later in the -- until we start our cross, we can do that, at least with respect to these documents, these materials today. Am I correct about that, Mr. Mukasey?

But the timing issue is likely to come up over and

over in this trial, and I repeat Rule 106 allows us to put in completing evidence at the same time.

THE COURT: Do I understand, Mr. Podolsky, that the government will be putting in the commercial, including the outtakes?

MR. PODOLSKY: So it's two videos, your Honor. One is a commercial that's separate. We actually don't plan to offer that. We plan to just talk about it. There is a video that's sort of the outtakes turned into what looks like a promotional video. That's what we plan to offer it in its entirety today.

THE COURT: Okay. You can wait until your cross-examination, Mr. Caruso.

MR. CARUSO: Okay. Thank you. I just predict this will be a recurring issue. I wanted to flag it without being too over the top about it at the moment.

THE COURT: Understood.

MR. PODOLSKY: On that, your Honor, we don't have to resolve this now because it's in the abstract, but I think that's sort of our point. The defense has not told us what particular lines or videos they think would be required to show the jury under the rule of completeness. There are going to be a lot of videos in this trial. This trial is going to last multiple weeks. If we have to pause while we are trying to examine our witnesses and give a presentation that the jury can understand because the defense wishes to play some

contextualizing video, I think not only would that be improper, but we aren't prepared to do it because they haven't told us what they want to do.

MR. CARUSO:  All of that is underway and will be done. We all understand the need to make this in-court process run quickly and smoothly.

THE COURT:  Okay.

Mr. Bondi.

MR. BONDI:  Your Honor, hi.  I think I might have a simple solution to this issue, and a good example is the podcast that the government intends to play.  For one of the witnesses today, Ms. Fretheim, they have identified five podcasts, and they are planning to play excerpts of those five podcasts with her.

It's like an e-mail, your Honor.  If the government were to admit an e-mail and say we are only going to admit paragraph 1, 7, and 9, we are only going to admit attachment 1, 4, and 7, what we suggest, your Honor, is the following, which I think is consistent with Rule 106, if they move to offer clips of the videos in or parts of the transcript, your Honor, I would object under the rule of completeness and say, your Honor, we move to admit the entire video into evidence under the rule of completeness.

I don't intend, your Honor, to play the entire video, nor do I intend to play multiple clips with one particular

M9d2Mil1

witness.  It may be a later witness.  But if they are introducing part of a podcast in with one witness, the whole video should come in because the podcast, it wasn't a situation, your Honor, where you could sort of click and move and the listeners didn't listen to minute 5, 7, 9, and 13, just like they wouldn't read paragraphs 1, 7, and 9 of an e-mail.  So the whole podcast should be admitted.

And what I would suggest, your Honor, is we would move to admit the entire podcast any time they try to admit an excerpt in and then we reserve the right, your Honor, in judicial economy, to play, during cross, certain parts of a podcast to ask questions either of that witness or a later witness.

If the government on the other hand is going to object to the whole podcast coming in, which they shouldn't under the rule of completeness, what that would force us to do, your Honor, is on one of these early witnesses to then play every single excerpt of that podcast that we think the government might be playing through its trial or that we think might need to come in through the trial.

The simple point is, admit the whole transcript, admit the whole audio of any podcast, and then that allows us to cross-examine, and it doesn't waste the Court's time.

THE COURT:  The jury is lined up outside the door.  We are going to bring them in.  Let's get ready.

M9d2Mil1

(Continued on next page)

M9d2Mil1

(Jury present)

THE COURT:  Everyone please be seated.

Ladies and gentlemen of the jury, good morning.  I trust you all had a pleasant evening.  I'm sorry about this morning.  It won't happen again.  We are getting started just a couple of minutes late.  However, I want you to know that we were out here and we were working, trying to make things as efficient -- so that things happen as efficiently for you as possible.

You were sworn in yesterday.  That means that you are now a jury, and there is no higher function in our legal system.  From now on, whenever you enter or leave the courtroom as a jury, the parties and the audience will rise, the same as they do for me, because you are every bit as important to this process as any judge.

Let me reintroduce you to some of the people who are here in the courtroom.  Again, my deputy is Ms. Jazmin Rivera, and my law clerk is Ms. Alexis Alvarez.  You will get to know them very well, more so Ms. Rivera.  If you have any questions or difficulties, feel free to consult either of them.  Ms. Alvarez will also help me to research any legal issues that may come up during the trial.

We have a court reporter.  In fact, we have two, as you saw yesterday.  They will be tag-teaming throughout the day, and their job is to take down everything that is said at

M9d2Mil1

the trial so there is a verbatim record of what happened.

I want to give you some preliminary instructions now about the law that applies to this trial.

First, the role of the judge and the jury.  In the American system of justice, the judge and the jury have separate roles.  My job is to instruct you as to the law that governs the case.  I will give you some instructions now and others from time to time during the trial.  At the end of the trial, I will give you detailed instructions about the law you will need to apply when you deliberate.  Your job as jurors is to determine the facts based on the evidence presented at the trial.  You are the only triers of fact and your decisions on the factual issues will determine the outcome of the case.

You must not take anything that I may say or do during the trial as indicating what my opinion is or what your verdict should be.  It is not my job to even have such an opinion.  And if I did, it should not influence you in any way.

With respect to the evidence is, you must pay close attention to all of the evidence presented.  Evidence consists of the testimony of the witnesses, exhibits that are received as evidence, and stipulations agreed to by the attorneys.  A stipulation is simply an agreement between the lawyers about facts or testimony.

Certain things are not evidence in the case, and you must not consider them as evidence.  For example, statements

and arguments by the lawyers are not evidence.  They are simply arguments in which they will tell you what they think the evidence proves and how they think you should analyze the evidence.  My statements are not evidence either.  Questions by the lawyers are not evidence.  Only the answers given by the witnesses are evidence.  For example, if a witness is asked: It was raining that day, wasn't it?  And the witness says:  No, it wasn't.  Then based on that question and answer, there is no evidence in the case that it was raining that day, no matter how convinced the lawyer sounded when he or she was asking the question.

Third, objections to questions are not evidence.  The lawyers are obligated to make an objection when they believe evidence is being offered for an improper purpose under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.  If the objection is sustained, ignore the question and any answer that may have been given.  If it is overruled, treat the answer like any other.

Any testimony that I exclude or strike or tell you to disregard is not evidence, and you must not consider it.  If I instruct you that some evidence is only to be considered for a certain purpose, then you must follow that instruction.

And finally, of course anything that you may see or hear outside the courtroom is not evidence and should be

disregarded by you.

In deciding the facts of the case, you will have to decide the credibility of witnesses, that is, how truthful and believable they are. Now, how do you decide what to believe and what not to believe? Well, you are going to listen to the witnesses, observe them, and then decide just as you would decide such questions every day in your ordinary life. Did they know what they were talking about? Were they honest, open, and truthful? Did they have a reason to falsify, exaggerate, or distort their testimony? Is there any reason to think they might be mistaken about what they are telling you? How did their testimony square with all of the other evidence in the case? So what the witness says, the way the witness says it, and the rest of the evidence in the case will play important roles in your reaching a judgment as to whether or not you can accept the witness's testimony as reliable.

As the trial proceeds, as you will see, you may have an impression of a witness or a subject, but you must not allow these impressions to become fixed or hardened because if you do, in a sense you prevent consideration of the testimony of other witnesses or other evidence that may be presented after the witness you heard. This would be unfair to one side or the other. A case can be presented only step by step, witness by witness, until all of the evidence is before you. So please remember that there may be another side to any witness's story

and there may be more to come on any particular issue.  You should not reach any conclusions until you have all of the evidence before you.

Finally, let me say a few words about trial procedure. The trial has five parts.

First, each side will have the opportunity to make opening statements to you and they will do that shortly.  As I have told you already, these statements are not evidence. Their purpose is to give you an idea in advance of the evidence that the lawyers expect -- what the lawyers expect you to hear from the witnesses.  The government has the burden of proof, so it will go first.  The defendant has no burden of proof and does not have to do anything at this trial, so the defendant does not have to give an opening statement.  But if he does, the defendant's lawyers will go next.

Second, after the opening statements, you will hear the testimony of the witnesses.  The government's witnesses go first.  Each witness will first give direct testimony and then he or she may be cross-examined by the other side.  Following the government's case, the defendant may, but need not, present witnesses and other evidence.  If the defendant does present witnesses, those witnesses will be examined and cross-examined just as the government's witnesses were.

Third, after all of the evidence has been received, each side will have an opportunity to make closing arguments.

These arguments also are not themselves evidence.

Fourth, after these arguments or summations, as they are called, I will give you detailed instructions as to the law that applies and controls in this case, and you must follow those instructions.  These instructions to the jury are referred to as the jury charge.

Fifth and most importantly, after the jury charge, you will go to the jury room to deliberate and discuss the evidence in order to decide the facts and render a verdict.

Now, if you wish, you may take notes.  Ms. Rivera will provide you with pads and pens for that purpose.  But if you do take notes, you must leave them in the jury room when you go home for the night.  And remember, any notes you take are for your own personal use and they are not to be relied on by anyone else.  It is completely up to you whether you want to take notes or not.  Let me remind you that we have a court reporter that will be taking down every word that is said throughout the trial, so you don't need to take notes.  When you deliberate, however, you should discuss what the evidence was and not what one juror's or another's notes do or do not say.

With that, we will begin with the government's opening statement.

Mr. Roos.

MR. ROOS:  Thank you, your Honor.

This is Trevor Milton, and he committed fraud.  He repeatedly lied to investors about his company and he made a billion dollars by doing so.  He started a company that was supposed to make zero emission trucks, and he lied about all of the important parts of the business.  He lied about what they had actually done.  He said the trucks worked when they didn't.  He said they were making fuel when they weren't.  He said they had secured billions of dollars in contracts when they hadn't.  He lied to investors again and again and again.  He did it to make his company seem more successful than it was.  He lied to dupe innocent investors into buying his company's stock, so the stock price would go up, all so he could profit big time.  And in that way at least, the defendant was successful because, on the backs of those innocent investors taken in by his lies, he became a billionaire virtually overnight.  That's who Trevor Milton is.  That's why we are here today.

When you tell investors you have perfected a technology that you know isn't finished, when you tell them your business is doing things that it isn't, when you tell them you already made sales that you only hope to make, that's a crime.  It's called securities fraud and wire fraud.  So we are here today to hold the defendant accountable for his crimes.

So this morning, I am going to talk for a few minutes about what we expect you will see in this trial.

First, I'm going to tell you what we expect the

evidence will show, and then I will tell you a little bit about the types of evidence that you will see.  So let me tell you what the evidence will show that Trevor Milton did, and why don't we go back to the beginning.  So six years ago, the defendant started a company in his basement in Utah.  He named it Nikola Motor Company.  Nikola was supposed to make semi trucks that ran on hydrogen gas.  Semi trucks——and you probably know this——are those big 18-wheel trucks you would see maybe on the highway, hopefully not on the streets of New York.

The idea is that these big trucks wouldn't run on diesel or gasoline.  Instead, they would be zero emission.  So it's not a bad idea if you can actually do it, but achieving this was a tall order.  The defendant needed to invent the trucks, he needed to manufacture them, he needed to build hydrogen fueling stations across the country to fuel these trucks, he needed to make hydrogen, and then he had to find customers to buy the trucks.  He needed to do all these things without fully functioning trucks, stations to fuel them, and contracts to sell the trucks, the defendant's business would fail.

Now, not long after launching his company, Milton held a big public event.  It was called the unveiling.  He showed off a large white 18-wheel truck, and he announced it was fully functioning.  He said it ran on batteries and hydrogen and stenciled on the side of the truck H2, hydrogen.

But the defendant, he was lying.  The defendant's company hadn't created a fully functioning hydrogen truck.  The truck on the stage didn't work.  It was missing major parts, like gears and motors.  It didn't have a hydrogen supply.  It had no hydrogen power.  They had to plug it into the wall to get the lights to come on.  And here's the real kicker.  It couldn't drive.  The defendant's employees, they had to tow this thing up on stage the night before.  This truck, by the way, never drove, but that didn't stop the defendant.

About a year after holding that bogus unveiling, the defendant, he doubled down.  He posted a video on the Internet saying the truck was in motion.  And it shows that same truck driving down a road at a pretty fast clip and tons of people saw this.  Okay?  That was also part of the defendant's fraud.  Here's what you are going to learn.  You are going to learn this truck, it wasn't actually driving.  It couldn't.  The truck driving down the road was not actually driving.  In order to make this video, they towed the truck to the top of a hill, they released the brakes, and they rolled the truck down the hill.  That's right.  So they put it to the top, and they rolled the truck down the hill.  Then the defendant, well, he posted that video on the Internet to make people think the truck could drive.

Now, you are going to hear at some point later the defendant's company was able to make early-stage model trucks

that people would sometimes drive.  You will probably see some photos or videos of some of these early example trucks parked in a parking lot or driving on a short road.

And some of them were made to look like they could drive.  Some of them did.  But in terms of actually making the trucks, it takes time to develop trucks to make the technology work, to bring them to market, to mass produce them, to set up the stations for them.  And there is no guarantee of success.

The defendant, he didn't want to wait, so he took his company public, and he got his company's stock listed on a stock exchange before the company had made any money, before it actually had any real product to sell, and then he sold his stock to ordinary investors.  That is when the defendant's lies really started to take off.

The defendant had lied in the past.  He lied about that first truck.  But once he was able to take money from regular people, he saw an opportunity to cash in.  And so what did he do?  He went to the places where all of us ordinary investors were listening and he lied directly to them.  He targeted them.  He went on Twitter.  He said tons of things that weren't true on Twitter.  He booked himself on mainstream television and podcast appearances.  And then he flooded the airwaves with false and misleading things on those interviews and podcasts.  He told lies to get investors to part with their money, to buy his company's stock.  Milton knew that the more

people who wanted to invest, the more valuable his stock would become, and the richer that would make him.

Now, Milton lied about all the important parts of the business.  Trucks, fuel, sales.  And he focused on the things that would really matter to regular investors, the people buying his stock.  And when you listen to all of this, keep in mind, this wasn't just one lie.  It wasn't a one-time thing.  He did it over and over and over again.

So let me tell you a little bit about the lies that he told investors.  There are four big categories I'm going to tell you about.  Okay?

First, the defendant continued to lie about the first truck I already told you about.  That's the one that he said was fully functioning, that was actually towed up on stage and then towed up on a hill and released.

After the defendant's company went public, a former employee blew the whistle to the press.  An article ran that called the defendant on the false claim, the lie that the truck was fully functioning.

Now, Milton, he could have fessed up.  He could have admitted that he jumped the gun at the unveiling, but he didn't.  He doubled down on his lies.  Instead of telling the truth, he lied again.  He said again, everything in the truck worked.  They just didn't drive, he said, for safety reasons.  He told this new lie because he didn't want to get caught in

that original lie.

All right.  Here's the second type of lie.  Milton lied about the fuel for these big trucks.  He said his company was producing hydrogen, but it wasn't.  He said they could make cheap hydrogen fuel to fuel the trucks, but he couldn't.  He said they had permits and land for hydrogen stations but they didn't.  It was all lies.  Not an ounce of hydrogen was ever produced by the defendant and his company.

The third category of lie, the defendant lied about the orders for his trucks.  Milton claimed that his company had a billion dollars in contracts.  He claimed the company had binding contracts.  He said they were real.  He said signed on the dotted line.  Billions of dollars in orders, guaranteed money.  He lied about that, too.  The reality was that 95 percent of the reservations were just expressions of interest, but were reservations that could be canceled at any time.

All right.  Fourth type of lie.  The defendant lied about a new truck he was unveiling.  It was a pickup truck.  He called it the Badger.  Milton said that his company had built the Badger truck but really just had plans.  He said they had been working on it for years, but really when he announced it, all he had was sketches.  He said it had been built from the ground up, from scratch, using Nikola's in-house parts and technology.

(Continued on next page)

MR. ROOS:  But really, the example trucks the defendant was making to show the press were made from Ford F-150 parts, and the actual trucks were being made by General Motors with General Motors technology just with a little Nikola branding on top.

So the defendant lied about the trucks, he lied about the fuel, he lied about the sales.  He repeated these core lies about the business over, and over, and over again, and he knew the things that he was saying weren't true.  Engineers, who you will hear from, worked for him and told him the truth about the technology, but he still lied.

Others tried and failed to control him.  The executives at Milton's company who worked for him went to him and told him what he was doing was wrong.  They warned him.  They said you have to stop, you need to be accurate, but they couldn't control him, and he wouldn't and he didn't stop lying.

Now that I've told you about the defendant's lies, let me say a little bit more about the people he targeted and hurt.  The defendant targeted ordinary investors, regular people who have day jobs and can't spend their days reading thousands of pages of financial documents, people who are new to investing, people who are trying to grow their savings in their spare time, people who invest at places like Fidelity or PD Ameritrade or Robinhood in their accounts.  And the defendant knew where to find his victims.  That's why he told his lies on

Twitter, Facebook, the internet, YouTube, podcasts.  And as I said, the defendant targeted ordinary people because he believed that if they bought his stock, the stock price would go up.

The defendant was obsessed with stock price.  He checked it constantly.  He desperately wanted it to increase, he was really upset when it dropped.  Why did he care so much?  Because his entire net worth was based on the stock.  If the stock tripled, he was worth three times the amount of money.  That meant going from millionaire to billionaire.

Milton continued this fraud on ordinary investors until a whistleblower came forward.  People started to investigate.  The defendant's web of lies was exposed and everything came crashing down.  That's what the evidence will show.  That's how the defendant committed securities fraud and wire fraud.

Those, though, weren't the defendant's only crimes.  There was more.  He committed another fraud against a man he was buying a property from in Utah.  Let me tell you a little bit about that.

Milton's victim owned thousands of acres of pristine wilderness in Utah, a ranch the size of lower Manhattan.  You're going to hear that the defendant really wanted to buy that piece of property, and the man who owned it, he was willing to sell it.  The problem, though, was that the property

cost millions of dollars.  Milton had already spent much of his free cash on things like private airplanes and a vacation home in the Caribbean.

So what did he do?  He convinced the ranch owner to take half the money in the stocks in the defendant's company.  So what does that look like?  He said here's the price, take half of that in stock.  Now the ranch owner, he wasn't so sure about this stock deal.  After all, the defendant's company didn't have any income and it didn't seem so real.  So Milton convinced him by lying to him.  He told the same lies that he had told to investors.  He said the company was a sure thing.  He lied about the hydrogen, he lied about the reservations, he lied about the technology.  So the defendant was able to con him.  Milton got that multimillion dollar ranch.  The seller on the other hand, well, the stock he was given, getting ended up being worthless.  And because he lied to get that land in Utah, Milton is separately charged with wire fraud.

Now, what will the evidence in this case be?  You'll hear from witnesses, you'll see documents, and you'll listen to the defendant's own words on TV, on podcasts, Twitter, Facebook, you're going to hear and see all of that.  You're going to hear and see firsthand the lies, false statements, misrepresentations by the defendant.  These will be in evidence.  You'll hear how convincing he is, you'll see how easy it was for investors to fall for his lies.  You'll hear

from those victims, from investors around the country who trusted the defendant, who listened to his words, who invested after hearing the defendant's lies, who lost money after the truth was revealed and the stock price went down.

Finally, you'll hear from people who worked for the defendant at his company.  These witnesses will give you an inside view of what was actually happening.  You'll see how different it was from what the defendant was saying and what he was claiming to investors.

Now, the trial is going to go for a few weeks, not all the evidence is going to come in at once, it won't come in the same order that the defendant committed his crimes.  You're going to see it witness by witness, document by document, one piece at a time.  The defendant's crimes went on for months, and so no one witness or single text message or single document will tell you the whole story.  But at the end of the trial, after you've heard all the testimony, seen all the evidence, you'll see the full picture and know the reason for all the lies, it's because Trevor Milton was committing securities fraud and wire fraud in order to pump his company's stock so that he'd get rich.

Now, before we get to that point, we ask you to do three things.  First, pay close attention to the evidence; second, listen to Judge Ramos' instructions on the law; and third, use your common sense, the same common sense that you

use in your everyday lives.  If you do those three things, you'll reach the only verdict consistent with the evidence, the law, and your common sense, that Trevor Milton is guilty.

THE COURT:  Thank you, Mr. Roos.  Before we proceed, I see a number of people standing in the back.  There are seats in this section if you wish to use them.

With that, Mr. Mukasey, does Mr. Milton intend to make an opening statement?

MR. MUKASEY:  We do, your Honor.

This is a prosecution by distortion, a distortion of Trevor Milton's words, a distortion of Trevor Milton's meaning, a distortion of Trevor Milton's intentions.  The government says that Trevor misrepresented the facts when he spoke about Nikola.  That's a distortion.  The truth is that all of the facts were fully and accurately disclosed to anyone who wanted to invest in Nikola.  The government says that Trevor intended to commit fraud on investors when he spoke about Nikola. That's also a distortion.  The truth is that Trevor had every reason to believe that what he was saying was at all times truth and accurate.

The government says that Trevor's statements were significant and important to investors.  That's another distortion.  The truth is, Trevor's statements were not significant or important, were not material when you look at the whole context and the whole mix of information that was out

there, and the people who bought Nikola's stock got exactly what they bargained for.

Now, the government's witnesses will try to rewrite history into a complete distortion, but the truth is that every one of them want something out of this case, and they're willing to testify for the government in order to get it. Ladies and gentlemen, the government's case is a grotesque distortion of the truth. The truth is Trevor Milton never intended to deceive anyone. The truth is that he always had a good-faith belief that what he was saying was truthful and was accurate. The truth is no crimes were committed here. That's why Trevor pleaded not guilty in this case. That's him saying the government's case is a distortion, I did not commit any crimes, I'm innocent.

Ladies and gentlemen of the jury, let me take a quick second, since it was a while since we met yesterday, for me to introduce myself and the team. I'm Marc Mukasey. Over here is Brad Bondi, Torrey Young, Ken Caruso, and this, of course, is Trevor Milton. And I want to tell you a little bit about Trevor because he's not a New York City guy and he's not a big corporate guy. The truth is Trevor grew up out west, his dad worked for the railroad and that's how he became interested in energy and transportation and that's how Nikola was born.

Now, obviously, starting any kind of company is a huge deal. Starting a company that's going to build big clean

energy trucks, that's like taking it to a whole other level. That kind of thing requires you to literally take your ideas, put together a plan, raise money, hire a team, connect customers, hang in there through thick and thin, and let's just say common sense will tell you that to start a company that's going to build giant zero emission trucks, you need guts, you need faith, you need determination, you need energy, you need belief, and you probably need a little bit of crazy, and Trevor had all those things, including a little bit of crazy.

But Trevor also knew full well he could not build this company by himself. He knew what he didn't know. So he wanted a great team around him, a team that was in it with him for the long-term, a team that was in it with him through thick and thin, because this kind of thing does not happen overnight.

So Trevor hired the best and the brightest. He hired experienced executives to run the company, topnotch engineers to design the trucks and the fueling stations, super smart business guys to help him with the finances, and experienced lawyers and great accountants on a marketing team that helped him tell the world about Nikola's goals and Nikola's plans. And what did these people all have in common? They all shared Trevor's belief in Nikola, they all shared his faith in Nikola.

So this was not one of those fake it till you make it, pump and dump, take the money and run kind of cases. Nikola was the real deal. Trevor and the team delivered a real

company based on real plans, using real technology, supported by real engineering data with real financials that were approved by real accountants, and together they developed real working trucks that were being tested out on the track.  Nikola is the real deal.

Even though they weren't yet producing trucks to be sold, and even though they hadn't yet produced hydrogen stations, even though they weren't bringing in money yet, Trevor had delivered a company that was worth a lot of money, it had a great business model, a strong team, smart plans, working prototype trucks and a really bright future, and in June of 2020, as you heard, Nikola went public on the stock market.

Now, you're going to see every step of the way — something the government didn't tell you — Nikola made full disclosure about its plans, its products, its finances, its goals to anyone who wanted to invest, and Nikola also made disclosure of all the risks of investing in a new company that was still developing trucks and still working on its hydrogen plants.  All the risks were fully disclosed to anyone and everyone who wanted to invest.  They were posted on the Nikola website and they were posted on a government website, on the SEC website that's specifically designed to protect investors. So let me say it again.  Anyone who wanted to invest in Nikola had immediate access to all the important information about the

company.  There were no secrets here.

So members of the jury, like, why are we here?  Well, you heard the government say that Trevor was concerned about Nikola's stock price.  Guess what, that's totally true.  And there's not a darn thing that's wrong with that.  Everyone in every company is concerned about stock price.

And it turns out that Trevor was right to be concerned about the stock price because, in September of 2020, Nikola's stock price was attacked.  That's why we're here.  Nikola was attacked by stock market players called short sellers.  Now most investors want their stock to go up.  Short sellers want stock prices to go down.  They make money when stock prices go down, and in this case, the short sellers made a big secret bet that Nikola's stock would go down.  But it gets worse because they tried to push Nikola's stock price down, they tried to force it down by publishing what they called a report, but it was really just an article that was intended to kill Nikola's stock price so the short sellers could make money.  Think of it as short and distort.

Now, when this article came out, Nikola and its leadership team stood up for Trevor.  They stood up big time for him.  They defended him.  They said this distorted report was a hit job, they said it was an attack on Trevor, they said it was an attack by people who were just trying to make money for themselves by killing Nikola's stock price, and they were

right, it was a hit job and it was an attack on Trevor. So Nikola's leadership team prepared to stand up, fight back, and support Trevor.

Then things changed, like overnight, things changed, and they changed for one reason and one reason only, they changed because these prosecutors showed up. These prosecutors handed a subpoena to the Nikola company and they started asking questions to Trevor's team and they asked questions over, and over, and over again for days, and weeks, and months. And lo and behold, the distortion started.

Trevor's team, all those people who worked with Trevor and advised Trevor and mentored Trevor and watched on TV and clapped for Trevor and shared responsibility with Trevor and defended Trevor. They all turned on Trevor, they abandoned Trevor, and they went to the government and pointed at Trevor and said don't blame me, blame Trevor, let me keep my job and I'll testify against Trevor. And one of them is actually using this case to try to squeeze money out of Trevor. That's how this distortion began.

The distortion continued with these interviews and tweets and podcasts that the government is going to show you during this case. As you listen to that evidence, keep this in mind, it's pretty obvious that if you put up hundreds of posts and you give hours and hours of interviews and you make thousands of statements, anybody can make you look bad if they

pull a little bit out of here and a little bit out of there, two minutes out of 20-minute podcasts, a few tweets out of a long, long line of tweets, a few stray lines from a random podcast.  That's not fraud, that's just word games and cherrypicking, that's just distortion.

But for the government to actually prove this case to you beyond a reasonable doubt, it's not enough just to say Trevor was out there on podcasts talking about Nikola, it's not enough to say Trevor made a lot of money and it's not enough to say Trevor bought a piece of land.  The government has to prove beyond a reasonable doubt that Trevor went out there with the intention to deceive investors, that he went out there with an intent to defraud.

But if you look past the distortions, if you look at all the circumstances, if you look at everything in context, if you look at everything that impacted and influenced Trevor's state of mind at the time, the evidence is going to show that he never intended to deceive anyone and that he had a good-faith belief at all times that he was being truthful and accurate when he spoke about Nikola.

So let us ask you to watch a few things as the evidence unfolds during this trial.

The first thing we're going to ask you to watch for as the government presents their evidence is why Trevor was out there on social media in the first place.  Was he out there

trying to rip people off like Mr. Roos said?  That's a total distortion.  See, what the government didn't tell you is that Trevor was out there because Nikola's team put him out there. What the government didn't tell you is that Nikola had a whole social media team and a whole marketing plan for Trevor, and what the government didn't tell you is that a lot of other Nikola executives were also out there in the media promoting the company.  Trevor wasn't some bad boy renegade rebel out there on some criminal mischief, he was out there because all of Nikola's leaders were out there because it was part of the company's marketing plan and it was totally innocent.

Now the next thing we're going to ask you to watch for as the evidence comes in is where Trevor made his statements. Where social media and TV and podcasts is platforms for committing fraud?  That's a distortion.  Common sense tells you that if you want to commit a fraud, you would do it in secret, in hiding where nobody could see it, behind people's backs on the sly in secrecy.  But that's not what Trevor was doing. Trevor was out there on Twitter, he was giving interviews, he was on TV, he was speaking about Nikola in the most public way possible where anybody — the government, the hydrogen scientists, the truck experts — could fact check him in two seconds.  Nobody who wanted to commit a fraud would do it that way.  Trevor was out in public, the evidence will show, because he had nothing to hide.

Now, another thing you want to watch for is what Trevor was saying in the interviews that the government is going to play for you.  Was he out there targeting investors?  Was he trying to get their money?  That's a gross distortion of what you're going to see.  Trevor was out there to get people excited about Nikola's plans and its design and its vision for clean energy trucks.  He was out there to tell them about cutting edge, cool, even badass designs that they were putting out there.  This is what Nikola was doing and this is what Nikola was designing with its partners.  That's why Trevor gave interviews to truck guys and to CNN.  That's why Trevor spoke to podcasts about Tesla and he spoke to CNBC.  He went anywhere and everywhere the team asked him to go.  He was out there because he believed in Nikola, he was flatout stoked about what it was doing and he wanted to tell the world about it.

The next thing to watch for is how Trevor was speaking.  Was he lying about Nikola's capabilities?  You're going to see that's another distortion.  The evidence is going to show that when Trevor spoke about Nikola, he was speaking about his business model, its business plan, not what was happening right there, right then, at that very moment.  The whole company's marketing style was about the future of trucking.  So when Trevor said Nikola is producing hydrogen or Nikola's truck will whoop your truck, everyone knew he didn't mean it right there, right then at that second, he was talking

about a plan.

And I suggest as you listen to the evidence, you think about it like this, think about a mother or a father who says, we got a 5-year-old kid, that kid is going to Harvard.  Nobody really believes that 5-year-old kid is attending Harvard University right now, we're talking about optimism and expectation for the future.  Nobody takes it literally like a 5-year-old is going to Harvard right now.  That kid's going to Harvard.  That's optimism, that's love, that's good faith.  She's not trying to defraud anybody by saying that, that's just a government distortion.

Now, a major thing we want you to watch for as you see the government's witnesses come in is who influenced and who impacted Trevor's statements.  Was it a bunch of corrupt colleagues and coconspirators?  Absolutely not.  We don't think anybody at Nikola committed a crime, not Trevor and not anybody else.  The evidence is going to show that Trevor's statements were influenced and impacted by an excellent and ethical management team.  The board of directors, the legal team, the marketing team, all these people shared responsibility to make sure that Nikola's communications with investors were truthful and accurate and never became misleading.

And they knew full well Trevor was going on TV and going on podcasts and they were the ones who scheduled him to go on.  But did they ever tell Trevor he was going too far or

crossing a line or misleading investors?  Not even once.  It was the total opposite.  Trevor was getting pats on the back and good vibes and positive feedback.  He would go on TV and they would say great job, Trevor.  He would go on a podcast and they would say terrific work, Trevor.

Now, of course, when these Nikola witnesses come into this courtroom, they're going to tell you a distorted story about how upset they were when Trevor was tweeting, but the evidence will show that the leadership team at that time gave Trevor green lights, maybe once in a while a yellow light, but they didn't give him red lights.  That's a distortion.  So in Trevor's mind, what he was saying and doing was just fine and certainly not illegal.

Now, let me be straight up with you.  Trevor didn't always have the most professional way with words.  When he went out there, he spoke about Nikola.  Did he speak the same way the executives and the lawyers and the accountants and the engineers and the finance people spoke?  Definitely not. Trevor was always Trevor, speaking in his own passion, in his own voice, saying things his own way in his own style.

But here's the key point.  What he said was always based on the company's business model, what the leadership team told him and what he believed to be true.  Was he perfect in how he described things?  Absolutely not.  Did he have a good-faith basis for what he said?  Absolutely yes.

Now the government says they're going to prove that Trevor was super focused on the stock price. And again, I say to that, so what? First of all, of course the CEO is going to be focused on the stock price. There is nothing sinister about that. But when you listen to the evidence about the stock price, let me suggest you think of it kind of this way: Nikola was like Trevor's baby, his child. He created it, he nurtured it, he raised it with the help and assistance and a lot of smart people like aunts and uncles and grandparents who help you raise a kid, people he trusted, and he gave his kid his constant attention.

After about four or five years, he put that kid out in public. The kid went into society, into the public, and that's scary and exciting and nerve racking, and like any parent, Trevor was really high and really happy when the kid did well and it hurt his soul when the kid wasn't doing well.

Trevor got feisty when someone attacked his kid or made false accusations about his kid, so he was up and down. That was Trevor's relationship to the stock price, like a parent's relationship to a little kid. Not motivated by greed or fraud or deceit, but motivated by trying to love and support and protect this amazing thing that he created.

Now, the government told you about this truck that was rolled down a hill. That's a double distortion. Distortion No. 1, that was a promotional video that was made way before

Nikola went public.  The truth is, by the time public investors were buying Nikola's stock, they could see this working prototype.  The old one who rolled down the hill, that was irrelevant.  Distortion No. 2, as far as I know, it's not a federal crime to use special effects in a car commercial.

And just a quick word about this ranch deal, this real estate deal that Mr. Roos mentioned.  I want to spend a second on that because here's what you're going to see:  The name of the guy who did the ranch deal with Trevor was Peter Hicks.  Peter Hicks is not some innocent victim in this case.  That may be the biggest distortion in this trial.  Peter Hicks, plain and simple, is a man who wants money.  That's why he's coming to testify against Trevor.

Hicks sold Trevor a ranch and got eight and a half million dollars from Trevor, but he wanted more.  So he did another deal with Trevor and he got another $1.5 million, but he wanted more.  And when the short seller report came out, he wanted more.  And when this case got filed against Trevor, Peter Hicks wanted more.  And now he has his own case going against Trevor back in Utah because he wants more, and if he can help the government here by testifying, he'll stand to make even more in his Utah case.

A fancy lawyer might say Peter Hicks has a blatant financial interest in the outcome of this case.  The way I'm going to say it is he's testifying because he wants money.

That guy will be a one-man distortion of the truth-finding process in this case. So there's no way the government's going to prove Trevor intended to defraud anyone. That's not even enough. They also have to show that his statements were significant and material, important to investors.

Now the government says Trevor's interviews and podcasts were somehow designed to inflate Nikola stock price, but you're going to see that's a distortion of what actually happened in the stock market. The evidence is going to show that on the days when Trevor made those supposedly material, supposedly important, supposedly false statements, the stock price didn't even go up or down. The stock market didn't think Trevor's statements were important, and that's not going to be surprising when you see the full context of information in which the statements were made. Everybody got what they bargained for.

Ladies and gentlemen, sit back and think about this for a minute. We're here in a prosecution in a federal criminal courtroom, a prosecution about podcasts and an indictment about interviews, a trial about tweets. I mean, really? Those platforms were not instruments of fraud. That may be the ultimate distortion here. Those were Trevor's platforms for entertainment and for engagement, exactly what 50 people in this courtroom said yesterday during jury selection. They used social media for engagement and entertainment.

That's why zillions of people around the world use it.  That's why Trevor used it.  There was no crime here.

Ladies and gentlemen, in closing up, I want to say we're not going to play tit for tat with everything the government says, we're not going to swat down everything they say the minute they say it, and we may not even respond to some things they say at all, and I'll give you a good example.

The government's first witness, he's going to talk about stuff from like six years ago, before the company ever offered a single share of stock to the public.  He'll be talking about a thing of the past that's totally irrelevant.  You're also going to hear that that first witness, he has about, I don't know, 600,000 cold green reasons for coming here to testify against Trevor.

Now, remember, it's the government's burden to prove this case to each and every one of you beyond a reasonable doubt.  Beyond a reasonable doubt is the highest standard we have in the law because is the most serious kind of case that we have in the law.  Every time you ever heard a jury say not guilty in your life, it's because the government couldn't reach that high standard.

So as the judge told you this morning, Trevor is presumed innocent.  The presumption of innocence means you have to presume Trevor is innocent as he sits here right now in this courtroom and all during the trial when everybody is

testifying, and you have to presume he's innocent when you go back and you start your deliberations at the end of the case. And, ladies and gentlemen, the presumption of innocence is something that cannot be distorted, not by words taken out of context, not by witnesses who want money, and not by showing film from some old TV commercial.

The truth is, Trevor Milton did not intend to deceive or defraud anyone. The truth is, he acted in good faith. His meanings and his words and his intentions have been distorted. That's why, at the end of the case, we'll ask you to return a verdict that clarifies these ugly distortions, a verdict that's crystal clear on every count, Trevor Milton is not guilty.

THE COURT: Thank you, Mr. Mukasey. Ladies and gentlemen, before I ask the government to call their first witness, we're going to be handing out some notebooks for you.

While that happens, I also just wanted to let you know, should you notice that there are Plexiglass cubes around the podium that the lawyers will be using and around the witness stand, these items are vestiges from the time that we were conducting trials during the pandemic. During that time when the witness was on the witness stand and when the lawyer was at the podium, only they could remove their masks, and there are HEPA filters in both of these cubes and everyone else was fully masked. Unfortunately, we couldn't get them off in time and so we'll just have to deal with these Plexiglass

cubes.  It may be at some point during the trial we'll be able to get them off, otherwise, please, just ignore them.

Will the government please call their first witness.

MR. PODOLSKY:  Yes, your Honor.  The government calls Paul Lackey.

Your Honor, with your permission, may I inquire using the podium that's next to the table?

THE COURT:  Yes, I don't know if you want to stand that close to the jury, but sure.

PAUL LACKEY,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Sir, you may be seated.  Please, when you speak, speak directly into the microphone and please begin by stating your first name and your last name, and spelling your first name and your last name.

THE WITNESS:  My name is Paul Lackey, that's spelled P-a-u-l L-a-c-k-e-y.

MR. PODOLSKY:  May I proceed, your Honor?

THE COURT:  Mr. Podolsky.

DIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Good morning, Mr. Lackey.  What do you do for a living?

A.  I'm an engineer.

Q.  Where do you work?

M9DCmil2                          Lackey - direct

A.   I work for a company called EVDrive.

Q.   What kind of company is that?

A.   We're a company that focuses on electric vehicles and technology surrounding electric vehicles.

Q.   Where are you based?

A.   We're based out of Portland, Oregon.

Q.   Are you familiar with a company called Nikola?

A.   Yes, I am.

Q.   How are you familiar with Nikola?

A.   Several years ago, we worked with them on the development of a prototype vehicle.

Q.   What kind of company is Nikola?

A.   They're involved with heavy-duty trucks, kind of your classic semi trucks.

Q.   Do you know who started that company?

A.   It was founded by Trevor Milton.

Q.   How do you know him?

A.   I worked with him, you know, during this time.

Q.   Now, you mentioned a prototype.  Can you explain what project you worked on with Mr. Milton?

A.   So the project that we worked on, it became known as the Nikola One.  It was a class 8 semi truck, what you would call like an 18-wheeler that was designed to run off of electric power and natural gas.

Q.   And when did you work on that gas?

A.   Starting in 2015.

Q.   Now, did you personally work on building that truck?

A.   Yes, I did.

Q.   And did you work directly with Mr. Milton on it?

A.   Yes, I did.

Q.   Do you see Mr. Milton in the courtroom today?

A.   Yes, I do.

Q.   Can you identify him by describing where he is sitting and an article of clothing he is wearing.

A.   He's in the corner with the gray suit.

        MR. PODOLSKY:  Your Honor, may the record reflect the witness has identified Trevor Milton.

        THE COURT:  The record will so reflect.

Q.   Now, let me ask you just a few basic questions about the truck that you worked on.

        I think you used the term class 8 semi truck.  Did I hear that correctly?

A.   That's correct.

Q.   Can you explain what that means?

A.   Those are basically the biggest trucks that you see on the road.  You might call them an 18-wheeler or a semi truck.  It's your tractor trailer that you see going down the road and hauling freight.

Q.   And on a most general level, was there something new or different about the Nikola One from trucks that were

M9DCmil2                          Lackey - direct

traditionally on the market?

A.  Yes, this one was designed -- it was a hybrid electric truck, basically.

Q.  Based on your conversations with Mr. Milton, what was the purpose of building that particular truck, the Nikola One prototype?

A.  So this was basically a prototype that would be like a proof of concept to show you could build this truck and they plan to bring this to production and sell it on the market.

THE COURT:  I'm sorry, Mr. Lackey.  Could I bother you to bring the microphone closer to you.  Bring it down, it's flexible.

THE WITNESS:  Is that better?

THE COURT:  A little better.  If you can stay closer to the microphone.

MR. PODOLSKY:  Thank you, your Honor.

Q.  Now, did there come a time when that Nikola One truck was unveiled publicly?

A.  Yes.

Q.  Approximately when was that?

A.  December of 2016.

Q.  Did you work on getting the truck ready for that event?

A.  Yes, I did.

Q.  At the time of that event, was the truck functional?

A.  No, it was not.

Q.  Why not?

A.  It wasn't finished, there was a lot of things that hadn't been, you know, installed.  Some components were not available and, you know, hadn't been put together, wasn't finished.

Q.  Now, did you watch that unveiling event?

A.  Yes, I did.

Q.  Who spoke at it?

A.  Primarily Mr. Milton.

Q.  What, if anything, did he say about whether that truck was functional at the time of the event?

        MR. CARUSO:  Objection.

        THE COURT:  Overruled.

A.  So in several cases, he either stated or implied that the truck was functioning.

Q.  Was that true?

        MR. CARUSO:  Objection.  Objection.

        THE COURT:  Overruled.

Q.  Could you please repeat what, if anything, did Mr. Milton say about whether the truck was functional at the time of the event?

A.  He made several statements and implications that the truck was functional at that time.

Q.  Was that true?

A.  It was not.

Q.  Now, did there come a time when you helped blow the whistle

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

on the fact that Mr. Milton lied about the functionality of the truck?

MR. CARUSO:  Form.

THE COURT:  Overruled.

A.  Yes, there was.

Q.  We'll get into the details of that later, but why did you do that?

A.  I thought that it was something that people needed to know. It was information that I have I thought would be helpful for people who were interested in the company.

Q.  Before we get to that, let's back up and talk a bit about your background.

You mentioned that you're an engineer.  Can you describe your training.

A.  I received my degree in renewable energy engineering from the Oregon Institute of Technology in 2012.

Q.  Have you been an engineer since 2012?

A.  Yes, I have.

Q.  What types of products do you focus on in your engineering work?

A.  We focus on electric vehicles and technology associated with electric vehicles.

Q.  And can you describe, at a high level, some of the projects that you worked on before the Nikola One.

A.  There were several projects we had worked on.  We worked on

an electric ETV, that's kind of like a side-by-side off-road vehicle. We've done some trucks for the mining industry and things of that nature.

Q. Now let me ask some questions about Nikola.

First of all, did it have another name when you first met Mr. Milton?

A. Yes, it did.

Q. What was it called?

A. At the time, it was known as BLUGENTECH.

Q. Was it a public or a private company at the time that you worked for Nikola?

A. It was private.

Q. And where was it based?

A. Salt Lake City, Utah.

Q. Who ran the company?

A. It was run primarily by Trevor Milton.

Q. And at that time, had it brought any products to market?

A. No, it had not.

Q. Now how did you first come in contact with Trevor Milton?

A. He reached out to our company. He saw some press releases we had done for some of our previous projects, and he reached out to our company and proposed that we work with him on his project.

Q. Mr. Lackey, I'll just ask that you make sure to speak slowly so that we can make it out and I promise to do the same

as best I can.

Q.  You said Mr. Milton reached out to you regarding what project?

A.  The prototype for this hybrid truck that I described.

Q.  Before we get into that particular prototype, let's talk a little bit more about how these kinds of trucks work.

So I believe you said that the truck would be powered by electric motors.  Did I understand that correctly?

A.  Yeah, the ultimate power would be electric motors turning the wheels.

Q.  So how was that different than a traditional semi truck?

A.  So a traditional semi truck will have an engine that burns a fuel, usually diesel, and that will directly turn through a gearbox, but it will turn the wheels from the spinning motion of that engine.

Q.  So if there is no diesel, what is actually powering the motors in the truck?

A.  So in this case, it was intended to be a hybrid vehicle. So the motors would get electricity from a battery through an inverter and that battery would be kept at an appropriate state of charge by a generator that was running off of a turbine that would burn natural gas.

Q.  You mentioned inverter, I'll come back to that in a moment. But can you explain what the turbine you referenced was?

A.  Sure.  So the turbine is -- basically, it would burn

natural gas and spin at a high rate of speed.  That would feed a generator, which is like a motor in reverse.  That generator would output electricity, go through some power electronics, and keep electricity in the battery for the motors to use.

Q.  And so to be clear, what would ultimately fuel that turbine?

A.  Natural gas.

Q.  Are you familiar with the term zero emissions?

A.  Yes, I am.

Q.  What does that mean?

A.  That means that you have a vehicle that doesn't produce any harmful emissions that are usually focused on carbon dioxide, but there are other emissions, as well.

Q.  Is a natural gas turbine considered zero emissions?

A.  No, it is not.

Q.  Why not?

A.  The natural gas, when you burn natural gas, it creates carbon dioxide emissions.

Q.  So once the batteries are charged in a truck, how do you turn that into actual power to move and control the truck?

A.  So the battery will output direct current, motors require alternating current to spin.  So there is a device called an inverter.  The inverter will take electricity from the battery and a computer on board, they call it the vehicle control unit. It will command the inverter to tell the motors to output some

kind of torque and it will convert the direct current to alternating current, which will cause the motors to spin.

Q. Just to be clear, once the power goes to the inverter, what's the next step?

A. From the inverter, it goes to the motor.

Q. Are you familiar with the term eAxle?

A. Yes, I am.

Q. What is that?

A. So that's kind of a reference to a unit that would have a motor or two motors, often the case, and then a series of gears that reduce the speed of the motors to an appropriate amount for the vehicle to move and then it outputs it directly to the wheels so it's all in one unit where the wheels are.

Q. Is that a component or device that was designed to be part of the Nikola One truck?

A. Yes.

Q. And just so that we can make sure that we understand it, where does the power come from that goes to the eAxle component?

A. It goes from the battery, through the inverter, to the eAxle.

Q. And then what happens next, what comes out of the eAxle?

A. Rotating force.  It spins the wheels directly.

Q. Now I want to talk about a few other systems in a truck like this.

Q. Do any of the parts that we discussed generate heat?

A. Yes, they do.

Q. Which parts?

A. So the battery generates heat, the inverters generate heat, the motors and gears in the eAxle, they generate heat, and then the turbine actually generates quite a bit of heat.

Q. Does the heat need to be controlled for a truck to work?

A. Yes, it does.

Q. Why is that?

A. So if any of those components are not cooled, they can, you know, get too hot for their operating, they can melt and they can malfunction, and the turbine also has to be run at a very -- in a very narrow temperature window for it to run efficiently.

Q. So how does one control heat in a truck like this?

A. So you have basically a cooling system. You're going to have -- in many cases, you'll have water and antifreeze going through the components. You'll have oil, systems that are cooling and a bunch of heat exchanges that will go into radiators, fans will blow the heat away like you would have in a car, but bigger and much more complex.

Q. A few other terms. You mentioned vehicle control unit. What is that?

A. That's basically a computer that runs the vehicle. So it will take inputs from the drivers, such as throttle position

and so forth.  It will monitor all the systems on the truck and it will make decisions based on that, you know, whether it, you know, how much power to command from the motors based on the input from the driver.

Q.  Just a few others.  We've talked about how to power the motors and drive the truck.  What about the cab where the driver sits, how is that structure powered?

A.  That would be, you know, so the motors run at kind of a high voltage and then you have a lower voltage, usually 12 volts or 24 volts that will run the components that are inside the cabin.

Q.  Where in a working truck, working electric truck, ultimately, where does the power for the cab come from?

A.  That has to come through the batteries and be converted down to the lower voltage to run those accessories.

Q.  Maybe one more term for now.  Have you heard of the term human machine interface or HMI?

A.  Sure.

Q.  What is that?

A.  That, you know, it's basically what it sounds like.  It's all the things that the driver will use to interface with the truck.  So, you know, screens in the dash, there may be some buttons, there's some stuff on the dash, and also the feedback from the truck.  It will tell you the state of charge and the speed and the power that's being commanded and so forth.

Q.  So if you were in a sort of traditional passenger car, is there a human machine interface or HMI on it?

A.  Yeah, it would be all the stuff on the dashboard.

Q.  All right.  With that lesson in mind, let's go back to the Nikola One.

So going back to 2015, what was your company EVDrive first hired to do by Mr. Milton?

A.  So the first thing that we were brought on to do was something called a phase zero.

Q.  What is that?

A.  A phase zero is basically when a company would first contact us, they would pay a relatively small engineering retainer, and we would use that to spend a few weeks looking into the project, you know, just from a high-level feasibility standpoint.  Is it theoretically possible to, you know, to design and build what's being asked to do; would a battery of the size that's needed be able to fit; is there a motor available that would have enough power for this.  So it's kind of feasibility to see if it's technically possible to do.

Q.  Did you do that work for the Nikola One truck that Mr. Milton had proposed?

A.  Yes, we did.

Q.  And what was your conclusion?

A.  At the end of the phase zero, we concluded that it would be technically possible and feasible to build it.

Q.   Does a positive outcome to a feasibility study like that mean that a truck could actually be built, engineered, or produced?

A.   There is no guarantee, especially for something on the scale and the scope, you know, it's technically possible, but you don't know whether it's going to be -- whether you're going to be able to do it.

Q.   What happened after the phase zero feasibility study was complete?

A.   So after we did the phase zero, we basically negotiated a contract with BLUGENTECH to work on developing and building -- designing, developing, and building a prototype truck.

Q.   Just quickly, can you explain how that contract worked, what were you required to do?

A.   So unlike some of our previous contracts, in this case, we were really just hired to spend one year doing -- spending half of our time working on the truck and doing as much as we could.

Q.   Now were you responsible for building or designing the entire truck?

A.   No.

Q.   What parts did you focus on during that one-year contract?

A.   We were focusing mostly on the drive train, you know, the things that would make it an electric truck.  So not building the truck from the ground up, but things that would make it electric, the cooling and stuff like that.

M9DCmil2                          Lackey - direct

Q.   Approximately when did that contract start up?

A.   I believe it started in May of 2015 and it went for one your until May of 2016.

Q.   Where was the truck itself actually being built?

A.   So we were building many of the components at our shop in Portland, the rest of the truck was down in Salt Lake City at Nikola headquarters.

Q.   You said you weren't responsible for all of the parts of the truck.  Who else was working on this truck, generally speaking?

A.   Yeah, there was another company that was brought on to work on the turbine and, you know, another company was going to do the fueling system.  That ultimately was done in house, but there were a couple other companies.  Another company was doing the cab, the body of the truck.

Q.   So from your perspective or from your work, what had been accomplished in May 2016 at the conclusion of your one-year contract?

A.   So some but not all of the components had been built, but very little work had gone into actually starting to put the truck together and testing it.

Q.   So what happened when that contract ended?

A.   So one of the stipulations in the contract --

          MR. MUKASEY:  Objection.  Not responsive.  What happened when the contract ended.

M9DCmil2                         Lackey - direct

THE COURT:  Sustained.  Ask him another question, Mr. Podolsky.

Q.  Why don't you start with approximately when did the contract end?

A.  So the contract was slated to end in May, but one of the stipulations of the contract was that we would take several trips to go to Salt Lake City to do some work on site.  Towards the end of that contract, they weren't ready for us to come for the last trip, so we agreed with them that we would, you know, even though the contract ended in May, we would go back in August to finish up, you know, a few things.

Q.  So just to understand the timing here.  By the time the contract ended in May 2016, had you made any trips to Salt Lake City?

A.  We had made a couple of trips.

Q.  And between May and August 2016, did you work on the truck?

A.  No.

MR. PODOLSKY:  Your Honor, I'm prepared to move now to August 2016, but I do notice it's about 11:00.  Would you like to take a break now?

THE COURT:  It is 11 o'clock, so we will take our first break, ladies and gentlemen.  It will be 20 minutes.  Please be prepared to come out 20 minutes after the hour so we can get started.  Please don't discuss the case.

(Continued on next page)

M9DCmil2                    Lackey - direct

(Jury not present)

THE COURT:  Mr. Lackey, you may step down.

Anything for me?

MR. ROOS:  No, your Honor.

MR. MUKASEY:  Nothing.

THE COURT:  Don't be late.  20 minutes.

(Recess)

M9d2Mil3                        Lackey – Direct

(Jury present)

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

BY MR. PODOLSKY:

Q.  Mr. Lackey, let's turn to August 2016.

And why don't we pull up for the witness what's been marked for identification as Government Exhibit 800.

Mr. Lackey, do you recognize that document?

A.  Yes, I do.

Q.  What is it?

A.  It's a press release.

Q.  And what's the date on it?

A.  August 1, 2016.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 800.

MR. CARUSO:  No objection.

THE COURT:  800 will be received.

(Government's Exhibit 800 received in evidence)

MR. PODOLSKY:  May we publish, your Honor?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  Now that everyone can see this document, Mr. Lackey, what are we looking at?

A.  This is a press release about the Nikola One.

Q.  And what is the date on it?

M9d2Mil3                        Lackey - Direct

A.   August 1, 2016.

Q.   Where were you when you first saw this press release?

A.   I was in Portland.

Q.   Was it -- approximately when did you see it?

A.   I believe it was on the day that it was published.

Q.   Did you have any role in drafting this press release?

A.   No, I did not.

Q.   Mr. Charalambous, could we blow up the picture at the top.

        Mr. Lackey, what is this picture?

A.   This is a computer rendering of the Nikola One prototype.

Q.   As of August 1, 2016, did a truck like this exist?

A.   No.

Q.   We are going to come back to the rendering in a moment, but let's go back to the press release and maybe blow up the middle portion there, Mr. Charalambous.  Thank you.

        Could you just read the headline of the press release?

A.   It says, "Nikola One truck achieves zero emissions."

Q.   If you don't mind why don't you read the first line of the press release after it says "Salt Lake City, Utah, August 1, 2016."

A.   It says, "Nikola Motor Company's advanced R & D team has achieved 100 percent zero emissions on the Nikola One commercial class 8 truck."

Q.   Now, based on your work on the Nikola One, was it a zero emissions truck?

M9d2Mil3                         Lackey - Direct

A.   Not at this time, no.

Q.   Why not?

A.   Because it was designed to run off of a natural gas turbine that does create emissions.

Q.   Now, based on your work with Mr. Milton, did you come to learn how he planned to make a zero emissions truck?

A.   Yes, I did.

Q.   How was that?

A.   So the plan was to replace the turbine and the generator with a hydrogen fuel cell.

Q.   What is a hydrogen fuel cell?

A.   So a hydrogen fuel cell is a device that takes hydrogen and it directly creates electricity from the hydrogen gas.

Q.   Is that a zero emissions process?

A.   Yes, it is.

Q.   Now, at any time was the Nikola One prototype that you worked on a hydrogen-based truck?

A.   No, it was not.

Q.   Did it have a hydrogen fuel cell?

A.   No.

Q.   If we go back to the rendering for a moment, do you see next to the wheel there is a stencil that says H2?  Do you see that?

A.   Yes.

Q.   What is H2?

A.   H2 is the formula for hydrogen gas.

Q.   And then it's a little smaller, but can you read the stencil near the back?

A.   Yes.  It says "H2 zero emission hydrogen electric."

Q.   Was the Nikola One a hydrogen zero emissions -- excuse me a zero emissions hydrogen electric truck?

A.   Not at this time.

Q.   Was it ever?

A.   No.

Q.   Okay.  Let's look back at the press release and go to the bottom of the first page.  Do you see that there is a quote from Milton at the bottom?

A.   Yes.

Q.   What does it say, Mr. Lackey?

A.   It says, "'Imagine what this could do for the air in every city in America.  We knew our emissions would be low, but to have the ability to achieve true zero emissions is revolutionary for the worldwide trucking industry,'" Milton added."

Q.   Had you ever before this time had a conversation with Mr. Milton about building a zero emissions truck?

A.   Yes.

Q.   Approximately when was that?

A.   That was in March of 2015 during our phase zero study.

Q.   Where were you during that conversation?

M9d2Mil3                      Lackey - Direct

A.   It was in the Portland area.  We were in a car returning from a trip to a subcontractor.

Q.   If you could just slow down just a bit.

So I think you said you were in a car.  Did I understand that?

A.   Yes, correct.

Q.   And who was there?

A.   I was there, Mr. Milton was there, and then the two co-founders of EVDrive, Steve Tice and Bob Simpson were in the car.

Q.   And how did that conversation start to the best of your recollection?

A.   So we were returning from a trip and everyone was in pretty high spirits.  The presentation had gone well, and we were getting into a lot of kind of details about how the project could go.  And Mr. Simpson is somebody who likes to think about all the options, and so he brought up the idea of whether it would be possible or desirable to make the truck be battery only so that it was zero emissions.

Q.   Battery only, as opposed to what?

A.   So as opposed to a hybrid which has the natural gas turbine.

Q.   And how did Mr. Milton respond to that proposal?

A.   He was very dismissive of it and he said, and pardon my language, he said:  I don't give a shit about the environment.

I just want to make money.

Q. Why does that still stick with you seven years later?

A. I was shocked by the kind of the vulgarity and that statement, you know, I was kind of a wide-eyed idealist and --

MR. CARUSO: Objection.

THE COURT: Overruled.

A. At this time all of the projects I was thinking about I was thinking from a climate change standpoint, and it was just surprising to hear that.

Q. If we go back to the press release, Mr. Charalambous, can you pull up the middle section again with the headline and subheadline. Thank you.

Do you see underneath the headline "Nikola One truck achieves zero emissions" it reads, "Working electric truck prototype to be unveiled on December 2 in Salt Lake City"?

A. Yes, I do.

Q. So if this was, this press release was August 1, 2016, about how long until this promised unveiling?

A. I think it is about four months if my math is right.

Q. And you see it says, "Working electric truck prototype"?

A. Yes.

Q. When had you last been to Salt Lake City before seeing this press release?

A. I believe it was in spring of 2016.

Q. And what was the state of the truck that spring?

A.   You know, I would describe it as barely started.  We had some components that we had delivered.  They were sitting in the warehouse still on the pallets we had delivered them on and basically no work had been done on the truck to that point.

Q.   So what was your reaction to seeing the announcement saying that the truck would be working by December 2016?

A.   It seemed surprising to me.  I thought perhaps they had done a tremendous amount of work on it during the summer when we weren't involved.

Q.   So let me take that down.

     Now, did you go to Salt Lake City in August of 2016?

A.   Yes, I did.

Q.   And had Nikola made the progress on the Nikola One truck that you had assumed?

A.   When I got there, I was surprised at how little progress had been done since I had been there before.

Q.   Can you describe the state of the truck when you got there in August 2016?

A.   So at this point the truck was just two frame rails that were sitting on their wheels, but nothing else was done on the truck at all.

Q.   Did it appear that the truck was actually being worked on at that time?

A.   It was not.  You know, the kind of the warehouse portion of the building where it was worked on was usually empty and, you

M9d2Mil3                          Lackey - Direct

know, basic tools that were needed for our work that we were doing there on that trip were not there.  We had to send people to the hardware store to get tools.

Q.  So actually why don't we pull up for Mr. Lackey what's been marked for identification as Government Exhibit 1218.

Mr. Lackey, do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  It's a photograph.

Q.  Who took this photograph?

A.  I did.

Q.  Approximately when?

A.  August 2016.

Q.  And what's in the photograph?

A.  It's an image of the Nikola truck prototype in the state that it was in August.

Q.  Does this photograph accurately depict the state of the truck at that time?

A.  Yes, it does.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1218.

MR. CARUSO:  No objection.

THE COURT:  1218 will be received.

(Government's Exhibit 1218 received in evidence)

MR. PODOLSKY:  May we publish it?

M9d2Mil3                         Lackey – Direct

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  Now that that's on the screen, Mr. Lackey, can you explain to the jury what we are looking at in this photograph?

A.  So what we are looking at here is the truck prototype as it existed at the time.  We are looking from the back of it and you can just see there are two sets of wheels.  You can't quite see the second set in the back, and then another set in the front with some suspension related to that.

Q.  And just so we can clarify, who took this photograph?

A.  I did.

Q.  Approximately when?

A.  In August 2016.

Q.  So what else was needed to go from what we see in this photograph to a finished truck?

A.  Almost everything.  You know, you would need the battery to be completed, installed, and tested.  You would need the eAxles that we described before, those would need to be built, those would need to be installed and tested.  The turbine, the generator, the power electronics associated with it would need to be installed and tested.  The inverters needed to be installed and programmed and hooked up.  The body, the cab, all the accessories, a number of power converters that were used to lower the voltage for the accessories were all needed there. The cooling system still had a lot of design to go into it that

needed to be put together, installed, tested, and so forth --

Q.  So what did you --

A.  -- and a lot of software.  Sorry.

Q.  Thank you, Mr. Lackey.

What did you do on this trip in August 2016?

A.  If my memory serves me, we were working on getting the motors running for the radiator fans.

Q.  And what happened when you were done with that project?

A.  We returned to Portland.

Q.  So approximately when did you go back to Portland?

A.  In August of 2016.

Q.  At that point did you have any agreement to do further work on this truck?

A.  No.

Q.  Did you hear from Mr. Milton again?

A.  Yes, we did.

Q.  About how long after that?

A.  It was very shortly after this.

Q.  And can you just explain what did he contact you about?

A.  So he reached out to our company and asked us if we would like to sign a second contract, an additional contract to come back to Salt Lake City and work on the truck in the lead-up to the unveiling.

Q.  Why don't we pull up for Mr. Lackey what's been marked for identification as Government Exhibit 1108.

Mr. Lackey, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It's a proposed contract.

MR. PODOLSKY:   Your Honor, the government offers Government Exhibit 1108.

MR. CARUSO:   No objection.

THE COURT:   1108 will be received.

(Government's Exhibit 1108 received in evidence)

MR. PODOLSKY:   If we can publish to the jury?   Thank you?

THE COURT:   You may.

BY MR. PODOLSKY:

Q.   All right.   Now that we can all see this, Mr. Lackey, what are we looking at in Government Exhibit 1108?

A.   This is a proposed contract between Nikola and EVDrive.

Q.   Who sent this contract to EVDrive?

A.   It was sent by Mr. Milton.

Q.   We will zoom in so we can actually read a few portions, but do you see how there is -- some of the contract is in red and crossed out or underlined?

A.   Yes, I do.

Q.   What does that reflect?

A.   That reflects changes that EVDrive requested to the contract as originally written.

Q.  So why don't we try to look at those.  Mr. Charalambous, if you can pull up paragraph 1.1.

Why don't we start this way.  Mr. Lackey, what does this paragraph reflect?

A.  This reflects what we would be asked to work on during the course of this contract.

Q.  All right.  Why don't you -- if you don't mind, just read it.

A.  It says:  "Services.  The company engaged consultant to provide electrical engineering services, particularly by providing two of its employees (Bob Simpson and Paul Lackey (the 'EVDrive Employee') to work and consult for company at company's facility in Salt Lake City, Utah.  Consultant has specialized knowledge and experience in electric/hybrid electric drive systems and components and the EVDrive employees will work under the direction of the CEO of the company, Trevor Milton."

Q.  Just pause for a moment, Mr. Lackey.  If you are able to, can you now read the rest of that sentence in its original form before the changes?

A.  Sure.  As originally written it writes -- it reads, "EVDrive employees will work under the direction of the CEO of the company, Trevor Milton, to complete all required work related to the company's class 8 truck electric drive and battery management system (the 'System') within the time period

specified herein."

Q.   And how did EVDrive change that language?

A.   We changed it to say, "The EVDrive employees will work under the direction of the CEO of the company, Trevor Milton, to work towards completion of work related to the company's class 8 truck electric drive and battery management system (the 'System') within the time period specified herein."

Q.   Could you explain that change?  What was the purpose behind it?

A.   So we had just been on site in Salt Lake City and seen the state of the truck, and in our professional judgment we didn't believe that it would be possible to finish the truck in the time that was remaining before the unveiling and we were not willing to basically take the legal responsibility of signing the contract that stipulated that we would finish that.

Q.   For example, in the second paragraph, do you see that there is a line struck out?

A.   Yes.

Q.   Pull that up.

     So what language did EVDrive delete?

A.   We removed the sentence that said, "Consultant will devote whatever time is necessary to complete work on the system by no later than November 30, 2016."

Q.   And what was the purpose of removing that sentence?

A.   Again, it was to remove the legal obligation to do

something that we believed would not be possible.

Q.  Did EVDrive ultimately sign a contract to work on the Nikola One truck in the fall of 2016?

A.  Yes, we did.

Q.  Did it reflect the changes that EVDrive had made in this document?

A.  Yes, it did.

Q.  All right.  So let's take that down and talk about the work.

So when did you go back to Salt Lake City after signing that contract?

A.  It was around the beginning of October 8, 2016.

Q.  And had progress been made on the truck between August 2016 and October 2016?

A.  Very little progress had been made.  The radiators were mounted, but other than that, the truck looked the same as in August.

Q.  Did you work on the truck between October 2016 and the beginning of December 2016?

A.  Yes, I did.

Q.  Was that a full-time job?

A.  Yes, it was.

Q.  Was Mr. Milton present while the truck was being built?

A.  Yes, he was.

Q.  Was he -- did you keep him up to date -- did you and others

keep him up to date on the progress of the truck?

A.  Yes, we did.

Q.  And can you just describe, was he actually himself physically working on the truck?

A.  He did not do any work, really, himself on the truck.

Q.  So what was he doing when you observed him while you were working on the truck?

A.  So he would spend time in his office.  I don't know what he did there.  But a lot of times he would lead tours of people, you know, wearing suits walking through the warehouse and showed the truck that was being worked on.

Q.  Did you hear the conversations he was having?

A.  Yes, I did.

            MR. CARUSO:  Objection.

            THE COURT:  Overruled.

Q.  And do you remember any of those conversations?

A.  I remember many, many misstatements about --

            MR. CARUSO:  Objection.

            THE COURT:  Overruled.

A.  I remember many misstatements about the progress and the technology.

Q.  By whom?

A.  By Mr. Milton.

Q.  Can you give an example of any of the things that you remember him saying?

A.  He was fond of saying that -- you know, he would say, you know, this truck that we are working on is 2000 horsepower. The next one we are going to have to turn the power down because we have been testing it and it's shredding tires.

Q.  And why did you find that to be a misstatement as you described it?

A.  Because there was no truck that had ever been built, no test, no shredded tires.

Q.  Now, based on the time that you spent at Nikola during the fall of 2016, and your conversations with Mr. Milton, did you understand whether Nikola at the time had any social media accounts?

A.  Yes, they did.

Q.  And again, based on your work there at the time and conversations with Mr. Milton, who did you understand was operating those social media accounts at the time?

A.  I understood it to be operated by Trevor Milton.

Q.  Why don't -- just give me one moment.

        Your Honor, at this time I'm going to read a portion of a stipulation into the record, if that's okay.

        THE COURT:  Very well.

Q.  Mr. Charalambous, can we bring up Government Exhibit S5.

        At the top it reads, "Stipulation regarding Twitter records," and then it has some introductory language.  "It is hereby stipulated and agreed by and between the United States

M9d2Mil3                    Lackey - Direct

of America," and so on, that and I'm going to skip down to paragraph 3.  "Government Exhibits 501 through 577 are authentic copies of tweets posted at the dates and times indicated on the exhibits.  The times on all of the tweets is in eastern time.  The number next to the symbol that's on the screen refers to the number of times a tweet has been re-tweeted by Twitter users.  The number next to the heart symbol on the screen refers to the number of times a tweet has been liked or favorited by Twitter users."

"It is further stipulated that no party will raise any objection under Federal Rule of Evidence 901 or 1003 with respect to any exhibit referenced above."

At this time, your Honor, the government offers Government Exhibit S5.

MR. CARUSO:  No objection.

THE COURT:  It will be received.

(Government's Exhibit S5 received in evidence)

BY MR. PODOLSKY:

Q.  With that in mind, let's pull up for the witness what's been marked for identification as Government Exhibit 562.

Do you recognize this document, Mr. Lackey?

A.  Yes, I do.

Q.  What type of document is it?

A.  It's a series of tweets.

MR. PODOLSKY:  Your Honor, the government offers

Government Exhibit 562.

MR. CARUSO:  May I have a moment, your Honor?

THE COURT:  You may.

MR. CARUSO:  No objection.

THE COURT:  562 will be received.

(Government's Exhibit 562 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  Mr. Lackey, what does Government Exhibit 562 depict?

A.  It's a series of three tweets.

Q.  So starting at the top of the three tweets, what account tweeted the top text?

A.  That was the official Nikola Motor Twitter account.

Q.  And to be clear, based on your work at Nikola at the time, who did you understand was operating that account?

A.  I understood it to be operated by Mr. Milton.

Q.  And what is the date of this tweet?

A.  October 14, 2016.

Q.  And what is the content of the tweet?

A.  It says, "Only 47 days away from the Nikola Motor One electric semi unveiling.  Live stream on our website for those not able to attend in person."

Q.  If we could pull up the second two tweets, Mr. Charalambous.

Mr. Lackey, do you see that there is a response by another Twitter user that includes the text "design unveiling or a functional prototype?"

A.   Yes, I do.

Q.   And how did the Nikola Motor Company Twitter account respond?

A.   It said, "Functioning.  Fully built truck at event."

Q.   And what was the date on which that tweet was posted?

A.   October 16, 2016.

Q.   Now, did there come a time during your work in the fall of 2016 when it became clear that the Nikola One would not be functional by the time of the unveiling?

        MR. CARUSO:  Object to the form of the question.

        THE COURT:  Overruled.

A.   Yes, there was.

Q.   Approximately when was that clear to you?

A.   You know, very early on in October we started talking about what we would finish and what we would not finish.

Q.   And when you say "we," who would you discuss that topic with?

A.   That would be in meetings with the engineers, e-mails and so forth.

Q.   And were those discussions held with Mr. Milton as well?

A.   In many cases, yes.

Q.   So what parts were discussed that should be worked on

M9d2Mil3                    Lackey - Direct

versus not finished by the unveiling?

A.  So the focus was going to be on things that were visible, you know, things that you could see, so, you know, anything that was externally visible.

So, you know, just as an example, the eAxles, the housings for the eAxles would have to be installed because there was something that was visible, the body would have to be installed, screens would have to be installed, and stuff like that.

Q.  Can we just focus you on one of the things you said.  Can you explain your comment about the eAxle.

A.  Sure.  So the eAxle, as I mentioned before, it contains motors and gears and, you know, a bunch of other things like bearings and seals and so forth and all of that would be encased in a large aluminum housing.  So, you know, you have the housing that would go into the truck, but inside of it was a half a dozen gears and two motors and things of that nature.

Q.  So what had to be finished by the unveiling and what didn't have to, according to the discussions that you referenced before?

A.  The housings would have to be available and installed into the truck.

Q.  Why is that?

A.  Because if they weren't, then the truck would have giant holes where they were supposed to be.

Q.  Okay.  We are going to come back to that, but let's talk
generally about the state of the truck by the unveiling.

So first let me just ask you, were you physically
present at the unveiling?

A.  I was not.  I left and went home the day before.

Q.  Why did you do that?

A.  I had family obligations.

Q.  Now by the -- first of all, where was the truck during the
unveiling physically?

A.  It was in the warehouse section of the Nikola headquarters
in Salt Lake City.

Q.  By the time that you left the day before, was the truck in
place for where it would be during the unveiling?

A.  Yes, it had been pulled up on to the stage.

Q.  How did it get up there?

A.  If I remember, it was pulled up by a winch.

Q.  What's a winch?

A.  A winch is like a little electric motor with a cable on it
that, you know, you use to pull stuff, you know, something you
might see on a tow truck or something.

Q.  Why did it have to be pulled into place by a winch?

A.  Because it had no power of its own.

Q.  So let's talk about the power in the truck.  At that time,
what was the status of the natural gas turbine?

A.  The natural gas turbine had been delivered and installed

M9d2Mil3                    Lackey - Direct

into the truck, but it -- it hadn't been turned on at least at
our location.  I don't know if the contractor had ever turned
it on and tested, it but it wasn't turned on and tested at our
location.

Q.   What do you mean by installed?

A.   So bolted into the truck, basically.

Q.   Was it connected to anything?

A.   No, because the generator and the power electronics weren't
present for that.

Q.   So could it provide any power to the batteries?

A.   No, it could not.

Q.   Could you tell that the turbine was not connected just by
looking at the truck?

A.   It would be very difficult.  The location of the turbine,
it was kind of like in front of the back wheels but behind the
battery in a place where you couldn't really see what was going
on in there.

Q.   So speaking of the batteries, what was their status at the
time of the unveiling?

A.   So the batteries, the modules had been installed into their
housings and some of the connections had been made, but they
were not, you know, connected together and they weren't tested
or anything.  I don't believe the battery management software
was finished, although the boards were present.

Q.   What is the battery management software?

A.   So, you know, when you have a battery for an electric vehicle, every cell in there has to be monitored to make sure that it is the correct voltage, the correct temperature, and so forth.  If something gets out of spec, then it will, you know, cut power to the motors and so forth.  So there are some circuit boards that go into there that have to be programmed to work with a specific battery that you have designed.

Q.   Can a truck work without that system?

A.   No, it would destroy the battery.

Q.   Were the truck batteries able to power anything in the truck?

A.   Not at that time, no.

Q.   You mentioned I think the word "inverter" earlier.  Can you remind us what that is?

A.   So the inverter is a device that takes the direct current from the battery and at a high level it converts it into alternating current that the motor needs, but it takes a command from the vehicle controller, the vehicle control unit that tells it how much power to command from the motors.

Q.   And what was the status of the inverters by the time of the unveiling?

A.   So the inverters were off-the-shelf items.  So they had been installed in the truck, but they weren't connected to anything, and they hadn't been programmed to work with the motors that were intended to be used in the truck.

M9d2Mil3                    Lackey - Direct

Q.  Now coming back to the eAxle or motor housings, can you

describe the state of them at the time of the unveiling?

A.  So the eAxles had been delivered not long before the

unveiling and they were installed into the truck but empty,

with no components inside of them.

Q.  So to understand that, let's pull up for Mr. Lackey

Government Exhibit -- marked for identification as Government

Exhibit 1216.

        Mr. Lackey, what is this exhibit?

A.  It's a photograph.

Q.  Who took it?

A.  I did.

Q.  Approximately when?

A.  This would be in late November 2016.

        MR. PODOLSKY:  Your Honor, the government offers

Government Exhibit 1216.

        MR. CARUSO:  No objection.

        THE COURT:  1216 will be received.

        (Government's Exhibit 1216 received in evidence)

        MR. PODOLSKY:  May we publish it?

        THE COURT:  You may.

BY MR. PODOLSKY:

Q.  All right.  Mr. Lackey, now that we can all see this, can

you describe what we see in this photograph?

A.  So the large item that is being suspended above the truck

is the housing for one of the eAxles.

Q.   And by the way, who took this picture?

A.   I did.

Q.   Approximately when?

A.   Late November 2016.

Q.   And what's happening in this picture?  What is it depicting?

A.   This is the process of installing the empty motor -- empty eAxle housing into the truck.

Q.   So what's inside that silver item?

A.   There is nothing inside.

Q.   And what should be in there?

A.   So there should be two motor cores, probably a dozen gears that would make a double two-speed reduction, a number of seals, bearings, shafts, and things of that nature.

Q.   Mr. Charalambous, can we put up for the witness what's been marked for identification as Government Exhibit 1217.

Do you recognize this exhibit, Mr. Lackey?

A.   Yes, I do.

Q.   What is it?

A.   It is a rendering of the components that would go into the eAxle that was created during the development.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1217.

MR. CARUSO:  Lack of foundation based on that

M9d2Mil3                        Lackey - Direct

testimony.

THE COURT:  Overruled.

(Government's Exhibit 1217 received in evidence)

MR. PODOLSKY:  May we publish, your Honor?

THE COURT:  You may.

MR. PODOLSKY:  Actually, Mr. Charalambous, why don't you pull up 1216 and 1217 next to each other.

Q.  All right, Mr. Lackey.  So we have looked at the exhibit on the right.  What's the picture on the left?

A.  So this is a computer rendering of the components that would go into the eAxles.

Q.  So can you just explain its relationship to the photograph on the right, Government Exhibit 1216?

A.  So if you look at the rendering, you can see what looks like kind of two ears, yeah, those two areas, those would -- you know, the one on the right would correspond to that protrusion with the black cover.  Correct, yes.

Q.  And what are those -- I think you called them ears.  What are they?

A.  Those are the motor cores, there is two of them.

Q.  What do they do?

A.  Those are the actual electric motors that would spin and output power through the gears to the wheels.

Q.  Are you familiar with the term "stater"?

A.  Yes.

M9d2Mil3                          Lackey - Direct

Q.  What is that?

A.  So a motor consists of two major components, and the stater is the portion of the motor that is stationery, it doesn't spin.

Q.  So were the two motors, were those actually inside of the motor core depicted in 1216?

A.  No, they were not.

Q.  And what are all the rest of the machinery sort of in between the motors in Government Exhibit 1217?

A.  So most of those are gears.  There is a number of gears. It's kind of a complex system.  There is also some bearings, some seals, and so forth, but it's probably a dozen gears or so.

Q.  And what do they do?

A.  So the motors spin too fast for the truck, and so the gears basically slow them down and increase the force of them as it does so, so that the motor can spin at a certain speed and have the truck drive at an appropriate speed.  In this case there were actually two gear reductions, one for each motor, and they were intended to be a two-speed system that would shift without clutches.

Q.  Can a truck drive without all of those items inside the motor core, excuse me, the eAxle?

A.  No.

Q.  Were any of those items inside the eAxle depicted on the

M9d2Mil3                    Lackey - Direct

right?

A.   No, they were not.

Q.   Were they ever inside there?

A.   I never saw them inside.

Q.   Let me, just to understand this, if you had all those parts, could you just sort of stuff them inside the metal box and it's ready to go?

A.   It's a lot more complicated than this, than that.  This was an extremely complicated gearbox and one that, you know, we had never done before, one of this complexity.  You would have to go through and see if everything fits, make sure that all the intricate oil channels that do the cooling work, you would have to make sure that nothing would grind.  And even once you have it together, like I mentioned before, this was a clutchless two-speed system that needed some very intricate software to be able to work.  So just, you know, getting this thing up and running before it is ready to actually attempt to power the truck was a huge undertaking.

             (Continued on next page)

BY MR. PODOLSKY:

Q.  Had any of the things that you just described been done by the time of the unveiling?

A.  No.

MR. PODOLSKY:  We can take those pictures down, talk quickly about a few other systems.

Q.  You mentioned a cooling system earlier.  What was the status of that by the time of the unveiling?

A.  So we had most of the components.  The design was kind of done at a high level, but that was one of the systems that was probably the farthest from completion.  We hadn't really made hardly any progress on getting that up and running.

Q.  So can you just explain, high level, what needed to be done to get that system into place.

A.  We had to figure out where all the different cooling circuits go.  There would have to be ones that go to the turbine, a different one to go to the battery, another one for the motors and power electronics and so forth.  It needed a number of pumps and valves and so forth to make it all work. It was a very complicated system.

Q.  Was that done by the time of the unveiling?

A.  No, it was not.

Q.  You mentioned earlier the vehicle control unit.  What was the status of that by the time of the unveiling?

A.  So there was a contractor there with us who was working on

software for the then, you know, it was not finished or tested or anything like that.

Q. Finally, the human machine interface, the screens, what was their status by the time of the unveiling?

A. Those also were not completed.

Q. Could you turn on the truck and drive it under its own power by the time of the unveiling?

A. No.

Q. Could it be controlled?

A. No.

Q. Was it a functioning truck?

A. No, it was not.

Q. Let's talk about the unveiling then. Where did it take place?

A. It took place at Nikola's headquarters in Salt Lake City.

Q. When was that?

A. I believe it was December 1st, 2016.

Q. Did it last just one day or more than one day?

A. The main unveiling was one day and then the next day I understand there was kind of a question and answer, kind of breakout session.

Q. You mentioned that you were not physically present. Did you watch the unveiling?

A. Yes, I did.

Q. How did you do that?

A.    I streamed it on the internet.

Q.    Was that live?

A.    Yes, it was.

Q.    So focusing now on the first day of the unveiling, about how long was that event?

A.    I think it was about 45 minutes, probably.

THE COURT:  Did you say four to five or 45?

THE WITNESS:  45.  Sorry.

THE COURT:  Thank you.

MR. PODOLSKY:  Your Honor, at this time, I'm going to, with your permission, read a portion of what's been marked for identification as Government Exhibit S2.

THE COURT:  Okay.

MR. PODOLSKY:  The portion reads:  Government Exhibits 400-A, 400-B, 400-C, 400-D, and 400-E are authentic copies of portions of a December 1st, 2016, video posted to the Nikola YouTube page, titled Nikola One, Semi Electric Truck Unveiling, official video.  Government Exhibit 400-T is an accurate transcript of those recordings.

At this time, your Honor, the government offers Government Exhibits 400-A, B, C, D, E, and T.

THE COURT:  Any objection?

MR. CARUSO:  One moment, please.  Your Honor, we have no objection to this exhibit.  This raises the completeness issue, which we had some discussion --

THE COURT:  Do we need to discuss this at sidebar now, Mr. Caruso?

MR. CARUSO:  No, we resolved it before the jury came. I believe we have a protocol agreed.  It if there is doubt or --

THE COURT:  Mr. Caruso, no arguments before the jury.

MR. CARUSO:  I didn't mean that.  As far as I know, we have an agreement.

MR. PODOLSKY:  May those exhibits be received, your Honor?

THE COURT:  They will be received.

(Government's Exhibits 400-A, 400-B, 400-C, 400-D, and 400-E received in evidence)

MR. PODOLSKY:  Your Honor, may I point out that the jurors have binders under their seats containing transcripts, including 400-T.

THE COURT:  Okay.

Q.  So what I would like to do is, Mr. Lackey, watch a few portions of the unveiling, not the whole thing, and you can follow along with the clips in Government Exhibit 400-T, which should be a tab in the transcript binder.

MR. PODOLSKY:  With that in mind, Mr. Charalambous, if you can pull up Government Exhibit 400-A.  If you don't mind playing just a second or two just to show the beginning.

(Video played)

M9DCmil4                          Lackey - direct

BY MR. PODOLSKY:

Q.   Just to orient us, Mr. Lackey, what is the video in
Government Exhibit 400-A?

A.   This is a video of the livestream of the unveiling.

Q.   Can you describe for the jury, physically, where this is?

A.   This is at the -- at Nikola headquarters in Salt Lake City.

          MR. PODOLSKY:  What I'd like to do, if you can help
me, Mr. Charalambous, just skip ahead to 3 minutes and 50
seconds in which in the transcript at 400-T is the top of
page 5.

Q.   First, Mr. Lackey, who is depicted on the screen here?

A.   That's Kevin Lynk.

Q.   So why don't we play it and we can listen or read along as
we choose.

          (Video played)

Q.   Before I go on, Mr. Lackey, what's behind Mr. Milton in
this clip?

A.   That was the prototype, Nikola One, under a covering.

Q.   And bottom line, when Mr. Milton was talking here at the
unveiling, was that truck finished?

A.   No, it was not.

Q.   Was it tested?

A.   No, it was not.

Q.   Could it drive?

A.   No.

M9DCmil4                        Lackey – direct

MR. PODOLSKY:  Let's switch ahead to Government Exhibit 400-B.  Why don't we play that clip.

(Video played)

If it's helpful, we can look at the transcript on page 6 of 400-T.

Q.  Do you see Mr. Milton, you heard him say, you'll see it up on the screens, our fully functioning screens, really incredible.  Do you see that?

A.  Yes.

Q.  Were the screens in the truck fully functioning at that time?

A.  No, they were not receiving commands from the truck or any information from the truck.

Q.  Skipping down to line 19, do you see that Mr. Milton said this thing fully functions and works, which is really incredible.

Was that an accurate description of the Nikola One at that time?

A.  That was not an accurate statement.

Q.  Why not?

A.  The truck was not fully functional and not complete.

Q.  And he says on line 15, you can look, 14 to 15, I don't want someone to end up doing something and driving the truck off the stage.

Could someone have turned on that truck and driven it

M9DCmil4                        Lackey - direct

around?

A.   No.

          MR. PODOLSKY:  Why don't we go to the next part,
Government Exhibit 400-C, the unveiling.  We can play it.

          (Video played)

Q.   Mr. Lackey, do you see that the lights at the front of the
truck are on?

A.   Yes, I do.

Q.   How did those work at the time?

A.   So there was a small 12-volt battery like you would have in
your car, and because we didn't have the power electronics to
feed that from the battery or anything like that, under the
stage, there was just a power supply that you would plug into
the wall that would charge that battery so they could run those
lights as long as they needed to run.  During the time the
truck was spinning on stage, that was unplugged so that the
stage -- the cord wouldn't get all wound up, but the battery,
the kind of car battery had enough power in it to run the
lights for a couple minutes while that happened.

Q.   So to be clear, were the lights or screens in the truck
powered by the truck's actual batteries?

A.   No.

Q.   Ultimately, what were they powered by?

A.   They were from a power supply that was plugged into the
wall.

M9DCmil4                          Lackey - direct

MR. PODOLSKY:  We can go ahead and watch the clip.

(Video played)

Q.  What you see in front of you, was this stencil on the truck at the time?

A.  Yes, it was.

Q.  Can you read what it says?

A.  It says H2, and then it says Zero Emission Hydrogen Electric.

Q.  Was the truck that was on the stage a zero emission hydrogen electric truck?

A.  No.

Q.  Why not?

A.  It was designed to run off of a natural gas turbine.

Q.  Was a natural gas turbine in the truck?

A.  Yes.

MR. PODOLSKY:  Why don't we go ahead and see the rest of it.

(Video played)

Why don't we continue with the next portion, Government Exhibit 400-D.

(Video played)

Q.  Before we continue, Mr. Lackey, just focusing in there, did you hear Mr. Milton say we have a little chain on the front to keep people from hitting the controls because they do work?

A.  Yes.

Q.   Were the controls in the truck operational?

A.   No, they were not.

Q.   Did you hear him say, but you'll be able to see all the screens actually lit up and working, did you hear him say that?

A.   Yes, I did.

Q.   Were the screens in the truck taking any information from the truck?

A.   No, they were not.

Q.   Were they controlling the truck?

A.   No, they were not.

         MR. PODOLSKY:  Why don't we play one more portion of the unveiling, Government Exhibit 400-E.

         (Video played)

Q.   Mr. Lackey, did you hear Mr. Milton say this is not a pusher?

A.   Yes.

Q.   Do you know what a pusher is?

A.   A pusher would be a vehicle that has to be pushed because it can't function under its own power.

Q.   And was Nikola One a pusher?

A.   Yes, we had to push it.  It was not able to function under its own power.

Q.   How did it get up on the stage?

A.   We pulled it up.  I guess it was a puller.

         MR. PODOLSKY:  We can take that down,

M9DCmil4                           Lackey – direct

Mr. Charalambous.

Q.  Let me ask you this, what was your reaction at the time that you watched this to Mr. Milton saying that the truck was fully functional?

MR. CARUSO:  I object.  Conclusory.  What was your reaction, that's improper.

THE COURT:  Overruled.

A.  So I was sad and disappointed that he had done a major misrepresentation of the work that we had done.

Q.  Did you believe that it was a misrepresentation at the time that you heard it?

A.  Absolutely.

MR. PODOLSKY:  Let's put up for the witness what's been marked for identification as Government Exhibit 1.

Q.  Do you recognize this exhibit, Mr. Lackey?

A.  Yes, I do.

Q.  What type of document is it?

A.  It's a text message.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1.

MR. CARUSO:  No objection.

THE COURT:  1 will be received.

(Government's Exhibit 1 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Mr. Charalambous, could you just blow up the top half of the image.

Q.  Mr. Lackey, what are we looking at?

A.  This is a text message.

Q.  Between whom?

A.  It was between me and a Nikola employee.

Q.  And whose text message was in blue?

A.  That was me.

Q.  And when did you send that top text message?

A.  I think it was the day after the unveiling.

Q.  Do you see at the top it says Friday, December 2nd, 2016?

A.  Yes.

Q.  And what did you write?

A.  I wrote:  Watched the show last night.  Was disappointed, but not surprised that Trevor told The Big Lie.

Q.  First of all, what show were you referring to in this text?

A.  The unveiling of the Nikola One prototype that we just watched.

Q.  Do you see that you wrote that Trevor told The Big Lie and you capitalized "The Big Lie"?

A.  Yes.

Q.  What was that in reference to?

A.  That was a reference to the idea that this was a functional and completed truck.

Q.  And how did the Nikola engineer respond?

M9DCmil4                        Lackey - direct

A.   He said yeah, I wasn't surprised either.

           MR. PODOLSKY:  We can take that down.

Q.   Now I think you mentioned earlier that the unveiling took place over more than one day; is that correct?

A.   Yes, I believe so.

Q.   The videos that we just watched, when did those happen in the course of the event?

A.   The videos that we just watched, that was in the evening of December 1.

Q.   What happened on the second day?

A.   I think it was basically kind of like a Q&A, a more intimate setting that people could ask questions and so forth.

Q.   Was that also something that you could watch online?

A.   I can't remember if it was streamed live, but it was ultimately put online.

Q.   Have you watched that video?

A.   Yes, I have.

Q.   Let me just ask a couple questions about it.

           Did anyone, other than Mr. Milton, speak at the Q&A event?

A.   Yes.

Q.   We saw Kevin Lynk earlier in the videos we looked at.  Do you recall that?

A.   Yes.

Q.   Did Mr. Lynk also speak at the Q&A, the second day session?

A.   Yes, he did.

Q.   What, if anything, did he say about the natural gas turbine on the second day?

A.   He said something to the effect that the truck on the stage was run off of a natural gas turbine.

Q.   Now, did Mr. Milton also participate in those Q&A sessions?

A.   Yes, he did.

Q.   Did he or anyone else in that video clarify that the truck did not actually work?

A.   I don't believe so.

Q.   That it hadn't been finished?

A.   No.

Q.   That it was missing parts?

A.   No.

        MR. PODOLSKY:  Your Honor, I'm going to read, with your permission, one other paragraph from Government Exhibit S2.

        THE COURT:  Go on.

        MR. PODOLSKY:  Paragraph 2 reads:  Government Exhibits 401-A and 401-B are authentic copies of portions of a December 2nd, 2016, video posted to YouTube by CNET Cars Road Show, titled Inside the Nikola One Hydrogen Electric Semi Truck, and Government Exhibit 401-T is an accurate transcript of those records.

        Government offers Government Exhibits 401-A, B, and T.

M9DCmil4                      Lackey - direct

MR. CARUSO:  Your Honor, I think we should approach on the completeness issue so there is no question.

THE COURT:  Very well.

(Continued on next page)

(At the sidebar)

MR. CARUSO:  So what we intend to do, and I think it's agreed or so ruled, we're going to put in the entirety of 400 and 401.  We're not going to publish the entirety, but for completeness, we want that in the record and we're going to publish, use portions for our completeness.  So what we plan to do today is to offer the full exhibit, the full podcast, telecast, video, whatever you want to call it, and then we will put in our portions for completeness, but not today, not with this witness.

THE COURT:  Okay.

MR. CARUSO:  I think that's what we said this morning. I just want to have a good record.

MR. PODOLSKY:  If at some other time on cross examination they wish to offer those documents under the Rule of Completeness or under any other theory, they're welcome to do that.

MR. CARUSO:  I just wanted to make sure.

THE COURT:  So what I understood happened this morning, I don't know that the government agreed to this, which is why I was a little --

MR. CARUSO:  Okay.  Forgive me.  I didn't mean to be argumentative.  Believe me, I will be, I didn't mean it then.

THE COURT:  Is that the government, you offered that there will be various segments of various of government

exhibits that you would want to put in under the Rule of Completeness, you want the entirety of that exhibit in, you want segments of those exhibits in under the Rule of Completeness, but you would not ask to do it in the moment?

MR. CARUSO:  Precisely.

THE COURT:  I did not understand the government to agree that all of the entirety of those exhibits would be allowed.  That was --

MR. PODOLSKY:  That's exactly right.  And just to clarify, not to waste the jury's time, I think we should have this later.  One is a completeness argument and the other is suggesting more things are coming in is relevant to materiality.  Those are two different things.  They can take the clips as they come, we're not going to exclude them from offering for completeness.

THE COURT:  But we understand is there is no agreement?

MR. CARUSO:  Just a second.  I thought we understood the following:  Before this witness departs, we're going to offer, in their entirety, the exhibits that the government is now offering in portions.

THE COURT:  Yes.

MR. CARUSO:  And then some other day, we're going to read our portions in for our completeness.

THE COURT:  Right.  You're going to request permission

M9DCmil4                         Lackey - direct

to read those in.

          MR. CARUSO:  Some other day.

          MR. MUKASEY:  Snippets.

          (Continued on next page)

M9DCmil4                    Lackey – direct

(In open court)

MR. PODOLSKY:  We offered Government Exhibit 401–A and B and T.

MR. CARUSO:  Consistent with the ruling, no objection.

THE COURT:  Those exhibits will be received.

(Government's Exhibits 401–A, 401–B, 401–T received in evidence)

MR. PODOLSKY:  Why don't we pull up Government Exhibit 401–A.  Again, if people would like, it's included in the transcript at binder 401–T.

Mr. Charalambous, if we could start playing the clip just briefly and I'll ask you to pause it.

(Video played)

Q.  Do you see this starts with a screen that says Road Show, Mr. Lackey?

A.  Yes.

Q.  Do you recognize this video?

A.  Yes, I do.

Q.  What is it?

A.  This is an interview between Mr. Milton and a reporter.

Q.  When did this take place?

A.  I believe it was the night of the reveal.

MR. PODOLSKY:  Why don't we start playing the video.

(Video played)

Q.  Mr. Lackey, first of all, just looking at the screen for a

M9DCmil4                    Lackey - direct

moment, where is this video taking place?

A.   It's inside the cab of the Nikola One prototype.

Q.   And based on what you can see through the windshield there,
where is this, what's happening?

A.   This is at the unveiling, basically on the stage.

Q.   And who is the person on the left in the video in the green
sweater?

A.   That's a reporter named Emmy Hall.

Q.   And who's on the right?

A.   Mr. Milton.

Q.   Now, you heard — and this is on the transcript at line 2 —
the reporter say we are in a very, very special truck, the
Nikola One, America's first or probably the world's first
hydrogen electric semi truck, and then Mr. Milton responded
yeah.  Do you see that in the transcript?

A.   Yes, I do.

Q.   Was the Nikola One an hydrogen electric semi truck?

A.   No, it was not.

Q.   What was it?

A.   It was a natural-gas powered, hydrogen electric semi truck.

          MR. PODOLSKY:  Why don't we continue playing.

          (Video played)

Q.   Mr. Lackey, you see the reporter asked, so how long have
you been working on this, because this is a fully functioning
truck, right, that we're sitting in.  So how long have you guys

been working on this, and Mr. Milton responded, years in secrecy, it's been very hard, and so on.  Do you see that?

A.  Yes, I do.

Q.  Was that a fully functioning truck that they were sitting in at the time?

A.  No, it was not.

MR. PODOLSKY:  Let's keep going.

(Video played)

Q.  So you heard a few references to "pusher" in there; is that correct?

A.  Yes, I did.

Q.  And Mr. Milton says, this isn't just a pusher like a lot of vehicles that they unveil or vehicles that don't actually function, and then continuing at line 6, it's a fully functioning vehicle, which is really incredible.  Is that accurate?

A.  No, I would describe it as a pusher.

Q.  And again on lines 9 to 10.  I mean, this is a fully functioning vehicle.  Is that accurate?

A.  No.

Q.  Do you see how, in this still, there are some pictures of the screens?

A.  Yes.

Q.  And you recall that Mr. Milton was --

MR. PODOLSKY:  Maybe we can bring it back just a

M9DCmil4                    Lackey - direct

little bit, even a little bit before that.

Q.  Do you see how Mr. Milton is kind of playing with the screens on there?

A.  Yes.

Q.  Did those screens actually carry information to and from the truck?

A.  No.

Q.  Were they fully functional?

A.  No, they were not.

MR. PODOLSKY:  Why don't we stick with those screens for a minute and pull up Government Exhibit 1208 for Mr. Lackey.

Q.  Mr. Lackey, do you recognize this exhibit?

A.  Yes, I do.

Q.  What is it?

A.  It's a close-up of one of the screens taken from that video.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1208.

THE COURT:  Any objection?

MR. CARUSO:  *Voir dire*?

MR. PODOLSKY:  Your Honor, on what topic?  He identified the video and the picture.

THE COURT:  We'll see.

VOIR DIRE EXAMINATION

M9DCmil4                        Lackey - direct

BY MR. CARUSO:

Q.  You didn't take this picture, did you?

A.  Did I take the picture?

Q.  That's what I'm asking you.

A.  No.

Q.  You weren't even there, were you?

A.  No.

          MR. CARUSO:  Objection.

          THE COURT:  Is this a close-up of what's on the video?

          THE WITNESS:  Yes.

          THE COURT:  Overruled.

          MR. PODOLSKY:  Thank you, your Honor.

          (Government's Exhibit 1208 received in evidence)

          MR. PODOLSKY:  May we publish?

          THE COURT:  You may.

BY MR. PODOLSKY:

Q.  Mr. Lackey, what is this exhibit, Government Exhibit 1208?

A.  So it's a close-up from the video of one of the screens in the truck.

          MR. PODOLSKY:  Let's help us understand what's going on here.  Let's pull up for Mr. Lackey what's been marked for identification as Government Exhibit 1210.

Q.  Mr. Lackey, do you recognize this exhibit?

A.  Yes, I do.

Q.  What is it?

M9DCmil4                       Lackey – direct

A.   It's a photograph.

Q.   Of what?

A.   Of the interior of the Nikola One prototype.

         MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1210.

         MR. CARUSO:  I'm sorry, Judge.  I don't think this is a portion of the video.  The witness hasn't said that.

         THE COURT:  The witness has identified it as what he recognizes it to be.  You want to put some timeframe on it, Mr. Podolsky.

         MR. PODOLSKY:  Sure.

Q.   Mr. Lackey, at what time does this photograph depict the Nikola One?

A.   I believe it was the day before the show.

Q.   Does it accurately depict the state of the Nikola One the day before the show?

A.   Yes, it does.

         MR. PODOLSKY:  Your Honor, the government renews its offer.

         MR. CARUSO:  *Voir dire.*

         THE COURT:  Okay.

VOIR DIRE EXAMINATION

BY MR. CARUSO:

Q.   Mr. Lackey, you didn't take this photo, did you?

A.   I was present the day before the unveiling.

M9DCmil4                        Lackey - direct

Q.  Can you answer my question?

A.  No, I did not.

          MR. CARUSO:  Objection.

          THE COURT:  Overruled.

          (Government's Exhibit 1210 received in evidence)

          MR. PODOLSKY:  May we publish?

          THE COURT:  You may.

          MR. PODOLSKY:  Mr. Charalambous, can we pull up
Government Exhibit 1208 and 1210 both on the screen, side by
side.

BY MR. PODOLSKY:

Q.  So looking at 1210, which is on the left, can you explain
to the jury what that photograph is?

A.  This is the interior of the Nikola One shortly before the
unveiling.

Q.  Actually, do you see that there is a person sort of right
at the top of the steering wheel there outside the truck, do
you recognize who that is?

A.  Yes, I do.

Q.  Who is that?

A.  Mr. Milton.

Q.  Now, can you explain to the jury, the exhibit on the right,
1208, which screen is that in the picture on the left, if any?

A.  It would be the -- kind of the bright white screen that you
could see through the steering wheel.

M9DCmil4                          Lackey - direct

Q.   Is that screen taking any information, displaying any
information from the truck?

A.   No.

Q.   What is it showing?

A.   It basically shows kind of a mockup of the truck driving
through traffic and some, you know, some statistics about the
truck.

Q.   Do you see, kind of in big white letters in Government
Exhibit 1208, it says 7:30, Friday, December 2nd?

A.   Yes.

Q.   Do you recognize what that is?

A.   Yes, that's basically, you know, for those of you that have
used, like, a Windows computer, that's the lock screen when a
Windows computer is locked, and it just shows the wallpaper of
the computer along with the time and date and so forth.

Q.   So is this a static image?

A.   Yes, it is.

Q.   Can you just describe what you see on the left-hand side of
where the screen is in white, what is that showing?

A.   Again, for those who use Windows computers, that would be
when you're setting up a screen to -- like if you're doing a
Power Point presentation or something, you're setting up the
screen to clone a laptop or computer or whatever.

          MR. PODOLSKY:  Let's go back to the interview, the
Road Show interview, and turn to the second portion, Government

M9DCmil4                        Lackey – direct

Exhibit 401-B.  We can just play the whole --

(Video played)

Q.  Mr. Lackey, did you hear Mr. Milton, I think more than once, say we did it?

A.  Yes.

Q.  Had Mr. Milton or Nikola made a hydrogen electric truck at this time?

A.  They had not.

Q.  Had they make a working truck at this time?

A.  They had not.

Q.  Was this truck ready to be converted into manufacturing?

A.  No.

MR. PODOLSKY:  We can take that down.

Your Honor, I'm happy to take a break now or get started, but this is a natural starting point.

THE COURT:  Keep going.

MR. PODOLSKY:  Thank you, your Honor.

Q.  Now, Mr. Lackey, did you do any more work for Nikola after the unveiling?

A.  No, I did not.

Q.  Now, focusing on 2017, did there come a time when you contacted a journalist?

A.  Yes.

Q.  Approximately, when was that?

A.  It was around fall of 2017, maybe in August or so.

M9DCmil4                          Lackey – direct

Q.   And who did you contact?

A.   Fred Lambert.

Q.   Who is that?

A.   He's the editor of Electrack.  It's kind of a web blog, but focuses on electric vehicle technology.

Q.   Why did you reach out to Mr. Lambert at that time?

A.   At this point, it had become clear to me that not only had the truck been misrepresented, but there were no further attempts to try and right that or whatever.  I thought that it was important for people to know that and Mr. Lambert was somebody who kind of was on the electric vehicle beat, so I reached out to him.

Q.   Did Mr. Lambert end up publishing a story based on what you told him?

A.   No.

        MR. PODOLSKY:  Let's pull up what's been marked for identification as Government Exhibit 563.

Q.   Mr. Lackey, what type of document is this?

A.   It is a tweet.

Q.   From what account?

A.   From the official Nikola Motor account.

Q.   What's the date on it?

A.   October 6, 2017.

        MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 563.

MR. CARUSO:  One moment, please, your Honor.  No objection.

THE COURT:  563 will be received.

(Government's Exhibit 563 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

Q.  Mr. Lackey, what are we looking at in Government Exhibit 563?

A.  This is a tweet from the official Nikola Motor account.

Q.  Do you see a date on the tweet?

A.  Yes, it's October 6, 2017.

Q.  What is the text of the tweet?

A.  It says, you may or may not see the Nikola truck moving in a commercial soon.

Q.  Did you see this tweet at or around the time it was posted?

A.  Yes, I did.

Q.  And what truck did you understand this to be referring to?

A.  I understood it to be referring to the Nikola One prototype that we had worked on.

Q.  What, if anything, did you do in response to seeing this tweet?

A.  So I was surprised and a little skeptical.

MR. CARUSO:  Objection.  Objection.

THE COURT:  Sustained.

Q.  What did you do after you saw this tweet?

A.  I reached out to a former Nikola employee and asked if the truck had been completed.

Q.  Why did you do that?

A.  I was skeptical that it could have been done in the timeframe without our involvement.

MR. CARUSO:  Your Honor, may I object on the ground of relevance?

THE COURT:  You may and it's overruled.

Q.  Now what did you learn from the individual that you contacted?

A.  He told me that no further work had been done since the unveiling.

Q.  Now, what, if anything, did you do after hearing that?

A.  I made another attempt to reach out to another reporter.

Q.  Who did you reach out to this time?

A.  I reached out to Emmy Hall from CNET.

Q.  Have we seen Ms. Hall today?

A.  Yes, she was the one who interviewed Mr. Milton, the video that we watched.

Q.  Why did you decide to reach out to Ms. Hall at that time?

A.  So I felt that this was an escalation of what I considered to be a deception.  Since Ms. Hall had been, you know, frankly lied to, I wanted to give her --

MR. CARUSO:  Objection.

THE COURT:  Overruled.

M9DCmil4                         Lackey - direct

A.   I wanted to give her the option to set the record straight.

Q.   And what, in substance, did you tell her at that time?

A.   I told her that the truck that was unveiled in 2016 was not completed and not functioning.

Q.   Now did she publish anything in response to what you told her at that time?

A.   No, she did not.

Q.   Now, you see this Government Exhibit 563 references that you may or may not see the Nikola truck moving in a commercial soon.  Do you see that?

A.   Yes.

Q.   Did there come a time where you saw a commercial with the Nikola One in it?

A.   Yes.

Q.   Approximately, when was that?

A.   It was early 2018.

Q.   And how did you see that?

A.   I saw it on Nikola's social media.

Q.   Can you just describe what you saw in that commercial.

A.   The commercial, it was, I think, for Phillips.  It showed the Nikola One kind of creeping up to a stop sign and a truck driver came out and conversed with the ghost of truckers past.

Q.   Was any other footage of the Nikola One made public at or around that time?

A.   Yes.

M9DCmil4                         Lackey – direct

MR. PODOLSKY:  Let's pull up for the witness what's been marked for identification as Government Exhibit 564.

Q.  Mr. Lackey, do you recognize this exhibit?

A.  Yes, I do.

Q.  What type of exhibit is it?

A.  It is a tweet.

Q.  From what account?

A.  From the official Nikola Motor account.

Q.  What's the date on it?

A.  January 25, 2018.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 564.

MR. CARUSO:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 564 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

Q.  Mr. Lackey, now that we can see this, what type of document is this?

A.  It's a tweet.

Q.  And what account posted it?

A.  The official Nikola Motor account.

Q.  What's the date at the bottom?

A.  January 25, 2018.

Q.  If you don't mind, would you just read the text at the top,

M9DCmil4                          Lackey - direct

the content of the tweet.

A.   Sure.  It says:  Behold, the Nikola One in motion. Preproduction units to hit fleets in 2019 for testing.  The Nikola hydrogen electric trucks will take on any semi truck and outperform them in every category; weight, acceleration, stopping, safety and features — all with 500 to 1,000 mile range.

Q.   Do you see below the text, there is an image?

A.   Yes, I do.

Q.   What is that?

A.   It's an image, kind of a still image from a video of the Nikola One semi truck.

        MR. PODOLSKY:  At this time, your Honor, with permission, I'll read another paragraph, a stipulation, Government Exhibit S2.

        THE COURT:  Very well.

        MR. PODOLSKY:  That paragraph reads:  Government Exhibit 402 is an authentic copy of a January 25th, 2018, video posted to the Nikola YouTube page, titled Nikola One Electric Semi Truck In Motion.

        Your Honor, the government offers Government Exhibit 402.

        MR. CARUSO:  No objection, Judge.

        THE COURT:  It will be received.

        (Government's Exhibit 402 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Why don't we start playing it just to bring up the image.

Q.  Before we launch the video, Mr. Lackey, do you recognize this?

A.  Yes, I do.

Q.  What is it?

A.  It's a video.

Q.  And what is the video of?

A.  It's a video of the Nikola One prototype traveling down a desert road.

MR. PODOLSKY:  I don't know if it's possible, but can you pull up Government Exhibit 564 next to it?  Thank you.

Q.  What would happen if you clicked on an image of the truck in the Twitter exhibit on the right?

A.  It would play the video that's on the left.

MR. PODOLSKY:  You can take down 564 and pull up the video and why don't we just watch it.

(Video played)

Q.  Mr. Lackey, how did this video differ from the Phillips commercial?

MR. CARUSO:  Objection.  There is no foundation for that.

THE COURT:  Ask some more questions, Mr. Podolsky.

M9DCmil4                        Lackey - direct

Objection sustained.

Q.   Mr. Lackey, did you watch the Phillips commercial at or around the time it was posted?

A.   Yes, I did.

Q.   Did you also watch this video that we have just watched, Government Exhibit 402, at or around that time?

A.   Yes, I did.

Q.   Did you observe any differences between the videos?

A.   Yes, I did.

Q.   What were they?

A.   So the footage of the -- the footage in the Phillips commercial was very minimal.  It just showed a brief second of the truck traveling very slowly.  You couldn't see behind it or anything whereas the second video showed extensive footage of the vehicle traveling at a high rate of speed and from, like, aerial angles that you could see the whole truck and things behind it.

Q.   So when you saw this video, Government Exhibit 402, what was your understanding at that time of whether the truck was moving under its own power?

A.   I understood that the truck was unable to move under its own power.

Q.   So did you know, at the time that you watched this video, how it was made to look like it was driving down the road?

A.   I did not know.

M9DCmil4                         Lackey – direct

Q. Did there come a time after that in 2018 that you contacted another reporter?

A. Yes.

Q. Who was that?

A. I reached out to a reporter at Bloomberg. I don't recall the name.

Q. And in substance, what information did you share?

A. I told them that the truck that was unveiled in 2016 was misrepresented as being a completed and functioning truck.

Q. Now at that time in 2018 after you provided that information, was an article published?

A. No, there was not.

Q. What did you do after that?

A. I just decided to move on and I made no further attempts at that time.

Q. Did there come another time where you did reengage with these matters at Nikola?

A. Yes, there was.

Q. About how much later was that after 2018?

A. It was about two years later. It was in the middle of 2020.

Q. And what happened, if anything, that caused you to return to this topic?

A. So at this time, Nikola had become a publicly traded company.

Q.  And why did that cause you to return to these issues?

A.  So I felt like this was an important story, you know, I had tried several times to get the story out and after my first attempts didn't really go anywhere, I kind of told myself, you know, investors will do their research, I hope.  But after the company went public, now it was open for anybody to invest in it and, you know, I knew that your typical everyday investor had nothing to go on other than the public statements by the company.  So I felt like it was very important for them to know that the company had a history and, you know, Mr. Milton had a history of saying false statements.

MR. CARUSO:  I object.  I move to strike.  His feelings don't matter one bit.  They're totally irrelevant.

THE COURT:  It is now 12:50, ladies and gentlemen, so we'll take our second break.  It will be 20 minutes.  Please be prepared to come out 10 minutes after the hour.  Don't discuss the case.

(Continued on next page)

(Jury note present)

THE COURT:  Mr. Lackey, you may step down.  Folks can be seated.

I don't know if you all have LiveNote, but the question was, why did you return to these issues, and he proceeded to state why he returned to those issues, ending with, so I felt like it was very important for them to know that the company had a history and, you know, Mr. Milton had a history of saying false statements.

For the record, this is not a final version of the transcript, but it is accurate, from my recollection.

MR. CARUSO:  If the answer could be read in full, I'll tell you where my objection begins.

THE COURT:  Very well.  So I felt like this was an important story, you know, I had tried several times to get the story out and after my first attempts didn't really go anywhere, I kind of told myself, you know, investors will do their research, I hope.  But after the company went public, now it is open for anybody to invest in it and, you know, I knew that your typical everyday investor had nothing to go on other than the public statements by the company.

MR. CARUSO:  Not quite the way I remember it, but I still move to strike because the entire answer is predicated by "my feeling."  That's not testimony.  Feelings don't matter.  They're irrelevant.  What the witness said, what the witness

did, that's relevant.  His feelings don't matter.

MR. PODOLSKY:  They are absolutely relevant and the person who made them relevant was the defense.  Mr. Mukasey opened on the fact that this witness's motivation is to lie on the stand for $600,000.  That 100 percent opened the door to his motivation for bringing these issues, why he brought them previously.  So they have exactly put his mental state at issue in this trial.

THE COURT:  I don't know what the $600,000 is all about.

MR. PODOLSKY:  I can explain it, your Honor.  Later in the story, and this is why this is important, he joins up with some people who had a short interest in the company and so he was able to make -- he'll explain it, but he made approximately $600,000 from his interest in that short position.

THE COURT:  Okay.  The objection is overruled.  Don't be late, folks.

(Recess)

M9d2Mil5                        Lackey - Direct

(Jury not present)

THE COURT:  Do you anticipate that the direct will be finished this afternoon.

MR. PODOLSKY:  We were just discussing, your Honor, it will either be concluded at the end of the day or just a little bit before.  We don't expect -- we certainly don't expect another witness today.

THE COURT:  Okay.  And depending on how close to the end the direct goes, I may not require you to start cross.

MR. CARUSO:  Very well.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, there was an objection pending when we broke.  The objection has been overruled.

MR. PODOLSKY:  Thank you, your Honor.

BY MR. PODOLSKY:

Q.  Mr. Lackey, when we broke, I think you were explaining why you reached out to a reporter in 2020.  Can you please finish your explanation?

A.  Yes.  So as I was saying, I felt that, you know, with the company having gone public, you know, this greatly enlarged the number of people who would be investing in it.  And, you know, the new potential investors were people who didn't really have any way to do --

MR. CARUSO:  Objection.  How does he know what these people had a way to do?

THE COURT:  Overruled.

A.  You know, in my view, they were unlikely to have a way of knowing -- of doing research on the company and have to rely on public statements, and I thought it was important for them to have the information that the founder of the company had a history of making incorrect statements.

Q.  Now, had you become aware or were you aware from public information of whether Nikola had made other working prototypes since the Nikola One?

M9d2Mil5                          Lackey - Direct

A.   Yes.

Q.   Why did you nonetheless think it was important to relay this information about the Nikola One prototype?

A.   So my thinking was that, you know, a company or a person that had a history of making false statements may make them in the future and that it would be important for people to know that.

Q.   Now, who did you reach out to in 2020?

A.   I reached out to a reporter at Bloomberg named Ed Ludlow.

Q.   And what, in substance, did you tell Mr. Ludlow?

A.   I told him basically that the truck in 2015 had been, you know, misstated as being functional and complete but was not.

Q.   Did Mr. Ludlow publish an article?

A.   Yes, he did.

Q.   Approximately when was that?

A.   I think it was middle of June 2020.

Q.   Did you receive any compensation of any kind for providing that information?

A.   No, I did not.

Q.   Did you have any financial interest or motivation in providing that information at that time?

A.   No, I did not.

         MR. PODOLSKY:   Your Honor, at this time I will, with your permission, read into evidence a portion of Government Exhibit S3.

THE COURT:  Very well.

MR. PODOLSKY:  Mr. Charalambous, why don't we pull it up so we can follow along.

This stipulation, after the introductory language, again, reads in paragraph 1, "Government Exhibit 700 is an authentic copy of an article, which includes excerpts of an interview with Trevor Milton, published online and posted on Twitter by Bloomberg.com on June 17, 2020."

First of all, your Honor, the government offers Government Exhibit S3.

THE COURT:  Any objection?

MR. CARUSO:  Yes.  May we approach?

THE COURT:  Yes.

(Continued on next page)

(At the sidebar)

THE COURT:  Is S3 a stipulation?

MR. PODOLSKY:  Yes, your Honor.

THE COURT:  That's what was offered S3.

MR. CARUSO:  Oh.  I didn't have an objection to the stip.  It's leading to 700.

THE COURT:  Let's talk about that.  That's why we are here.

MR. CARUSO:  Overanxious.

You are going to offer 700?

MR. PODOLSKY:  I am.

MR. CARUSO:  All right.  It's hearsay.  It's a news article that appears in Bloomberg.  News articles are by definition hearsay.  Even though Milton's statements within the article are statements of a party opponent, there is a higher level of hearsay whenever the reporter is not on the stand. The reporter is essentially saying this is true.  This is what Mr. Milton told.  Me there are a ton of cases.  It's hearsay.

MR. PODOLSKY:  Your Honor, this is not hearsay because it's not being offered by the truth.  It's being offered because, the testimony will continue, Mr. Milton reacted to the contents of this article.  It's not being offered for the truth.  It's being offered because, you will see, for the context of Mr. Milton's statements.

By the way, for example, Judge Oetken ruled on this

very issue in the *Parnas* case.

MR. CARUSO:  I actually understand it can be offered for a nonhearsay purpose for the effect on the reader, for the effect on Mr. Milton.  However, I object to that on two grounds.  First, it's unnecessary to show this article because the government is also going to show the entire interview between Milton and Ludlow, and therefore that is much better, less prejudicial because it's what the people actually said.

MR. MUKASEY:  The audiotape.

MR. CARUSO:  The audiotape, sorry.

So the reporter's reportage of what was said is not direct evidence.  If they are going to play the entirety, then we don't object to that.

I have an alternative argument if your Honor doesn't buy that.

THE COURT:  Keep going.

MR. CARUSO:  If the article is going to come in, then it should be redacted so that only the headline is in because otherwise none of this detail is relevant.  But I think the proper offer, if it's going to be offered not for the truth but to show why Mr. Milton wrote in reaction to this, then let's just play the recording of the whole interview.  That's the least prejudicial to everybody.

MR. PODOLSKY:  He didn't write in reaction to the recording.  He had tweets where he actually linked directly

M9d2Mil5                        Lackey - Direct

back to this article.  That's what he reacted to, number one.

Number two, the only possible ground that this should be admitted is under 403, and it is not just the least prejudicial.

THE COURT:  This should be not admitted?

MR. PODOLSKY:  Not admitted is under 40.

The rule is not whatever is least prejudicial to the defendant, it's whether the probative value is outweighed by the risk of unfair prejudice and --

THE COURT:  In any event, it's not being offered for the truth.  So when admitted, I can give a limiting instruction however you wish.

MR. CARUSO:  I do wish.  But I still want to go at this, because your Honor has power and discretion to redact, order a document redacted to avoid prejudice to the defendant, clearly has that power.  The only thing they need for this purpose is the headline, "Nikola founder exaggerated the capability of his debut truck."  All of the rest of it is unnecessary, and they are unnecessarily prejudicial.  That gives them what they need.

THE COURT:  I think the government is entitled to determine what it is that they need in their direct case.  So, again, I'm going to admit the exhibit, indicate that at least some certain portions are not being offered for the truth.

MR. CARUSO:  None of it is being offered for the

truth.

THE COURT:  Are there quotations, direct quotations?

MR. PODOLSKY:  There are quotations of Mr. Milton.  I have no objection if he wants to give an instruction that this is being offered -- because it is a newspaper article it's not being offered for the truth of the contents.  That's fine.

THE COURT:  That's fine.

MR. CARUSO:  Judge, wait.  None of this can come in for the truth.  It's hearsay.

THE COURT:  No.  Everyone understands that.

MR. CARUSO:  None.

MR. PODOLSKY:  I'm not objecting to that.

MR. CARUSO:  Okay.  Sorry.  I have to change my hearing aid battery.

You are going to give the limiting instruction?

THE COURT:  Yes.

MR. PODOLSKY:  I'm going to do S3, and then offer them.

(Continued on next page)

(In open court)

MR. CARUSO:  I will withdraw the objection to S3.

THE COURT:  Very well.  So the objection to the introduction of the S -- Government Exhibit S3, which is a stipulation, is withdrawn.

Mr. Podolsky.

MR. PODOLSKY:  May that be entered into evidence, your Honor?

THE COURT:  Yes, and it will be received.

(Government's Exhibit S3 received in evidence)

MR. PODOLSKY:  Thank you.

With that in mind, let me now offer into evidence what's been marked as Government Exhibit 700 based on the colloquy that we just had.

THE COURT:  Very well.  Ladies and gentlemen, Government Exhibit 700, as you will see, is a copy of an article that appeared in a magazine.  It is not being offered for the truth of what is reported in the article.  It is being offered to show its effect on the minds of certain readers. Okay?  So whatever is in the article is not being offered because it is true.  Okay?

(Government's Exhibit 700 received in evidence)

MR. PODOLSKY:  Thank you, your Honor.  And may we publish Government Exhibit 700?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  Mr. Lackey, do you recognize the document that's on the screen now?

A.  Yes, I do.

Q.  What is it?

A.  It's a news article.

Q.  And how do you recognize this particular article?

A.  This was the article that was published by Bloomberg after my discussions with Mr. Ludlow.

Q.  Just quickly to orient us in time, Mr. Charalambous, can you just pull up the bottom half so we can see the date?

        Mr. Lackey, do you see the date that the article was published?

A.  Yes, I do.

Q.  What does it say there?

A.  June 17, 2020.

Q.  And what is the headline of this article?

A.  It says, "Nikola founder exaggerated the capability of his debut truck."

Q.  And you see those two bullet points below that?

A.  Yes, I do.

Q.  What do those say?

A.  The first one says, "The Nikola One revealed in 2016 was inoperable, missing parts."

        The second one says, "'I never deceived anyone,'

Trevor Milton says in an interview."

Q.  Okay.  Mr. Charalambous, can you pull up maybe the bottom, the text at the bottom of page 1 and maybe the first two paragraphs, first full paragraph on page 2.  Maybe include the paragraph below that, Mr. Charalambous, if you don't mind.

All right, Mr. Lackey, do you see that the article begins, "After half an hour of promotional videos and big promises, Nikola Corp.'s 13-foot-tall prototype marked atop a rotating stage began to spin"?

A.  Yes.

Q.  What did you understand that was a description of?

A.  I understood that to be a description of the unveiling of the Nikola One prototype in 2016.

Q.  Did we watch that earlier today?

A.  Yes, we did.

Q.  And then the article continues, "The dramatic music reached a crescendo, lights flicked on, and a partially translucent white sheet lifted off the Nikola One.  Founder Trevor Milton walked up to applause, put his hands on his side, and admired the big rig."  Do you see that?

A.  Yes, I do.

Q.  Then do you see there is a quotation from Mr. Milton?

A.  Yes.

Q.  What does he say in this article?

A.  He says, "Oh, that thing is so awesome.  We've been waiting

so long to show this to the world, you have no idea.  It's hard to even contain my emotion about this."

Q.  Do you understand that to be a quotation from the unveiling that we watched?

A.  Yes, I do.

Q.  All right.  And then in this last paragraph, do you see it continues, at least of the selection, "Milton then made several comments to the crowd at the December 2016 event suggesting the Nikola One was drivable.  The statements alarmed people familiar with the truck's capability, who told Bloomberg News recently that it was inoperable and missing key components to power itself."  Do you see that?

A.  Yes, I do.

Q.  Did you provide that information to Mr. Ludlow?

A.  Yes, I did.

Q.  "On Wednesday, Milton said key parts were taken out of the vehicle for safety reasons and that it never drove under its own power."

Do you recall removing parts from a truck before the unveiling?

A.  No.

Q.  All right.  Why don't we take this down and pull up for the witness what's been marked for identification as Government Exhibit 532.

All right.  Mr. Lackey, what type of document is this?

M9d2Mil5                    Lackey – Direct

A.    This is a set of tweets.

Q.    And what account sent the tweets?

A.    Trevor Milton's account.

Q.    What's the date on it?

A.    It was June 17, 2020.

        MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 532.

        MR. CARUSO:  No objection.

        THE COURT:  It will be received.

        (Government's Exhibit 532 received in evidence)

        MR. PODOLSKY:  May we publish?

        THE COURT:  You may.

BY MR. PODOLSKY:

Q.    All right.  Mr. Lackey, what are we looking at in this Exhibit 532?

A.    This is two tweets from Trevor Milton's Twitter account.

Q.    Do you see the date on those tweets?

A.    Yes, I do.

Q.    And time, can you just read the date and time?

A.    So this was at 4:24 p.m. on June 17, 2020.

Q.    We could pull it back up.  But do you recall in relation to the Bloomberg Ed Ludlow article when these were published, posted, I should say?

A.    Yes, this was the same day.

Q.    Can you just read these two tweets together?

M9d2Mil5                      Lackey - Direct

A.   It says, "This is sad.  Ed Ludlow should be let go.  He will never set foot in my buildings or events Nikola puts on. No one in Bloomberg either.  His editor was even on the phone to hear my responses.  Release the whole interview since it was recorded.  People will see you for the deceiver you are. Everyone at the event knew that we didn't drive it because it wasn't safe, although it could be driven if we wanted to with safety and time put into it without the fuel cell.  The truck built could have been driven with testing."

Q.   So, first of all, could the truck that was built at the time of the unveiling been driven?

A.   No.

Q.   Do you see that Mr. Milton wrote "release the whole interview since it was recorded"?

A.   Yes.

Q.   "People will see you for the deceiver you are."  Do you see that?

A.   Yes, I do.

Q.   Are you aware of whether Bloomberg did ultimately release that interview?

A.   They did at a later stage.

         MR. PODOLSKY:  Let me, your Honor, if I may, read a portion of Government Exhibit S2 into the record.

         THE COURT:  Very well.

         MR. PODOLSKY:  This is paragraph 14, and it reads,

"Government Exhibits 413-A, 413-B, and 413-C are authentic copies of portions of a June 17, 2020 interview of Trevor Milton by Ed Ludlow and Craig Trudell of Bloomberg, and Government Exhibit 413-T is an accurate transcript of those recordings."

Your Honor, pursuant to that stipulation we offer Government Exhibits 413-A, B, C, and T.

THE COURT:  Any objection?

MR. CARUSO:  Yes.  Cumulative.  They've got the article.  They don't need this as well.

THE COURT:  Overruled.

(Government's Exhibits 413-A, 413-B, 413-C, 413-T received in evidence)

BY MR. PODOLSKY:

Q.  Mr. Charalambous, if you can cue up 413-A and, again, if helpful, we can follow along with the transcript, which is at 413-T.

Mr. Charalambous, if you can just play a second so we can just hear the voice.

(Audio played)

Q.  Do you recognize who was speaking there?

A.  Yes, I do.

Q.  Who is that?

A.  That's Ed Ludlow.

Q.  All right.  Why don't we play the first question and answer

here.

(Audio played)

MR. PODOLSKY:  Pause there.

Q.  Let's go through this answer together, starting, we can use the transcript, page 2/line 9.  Do you see, Mr. Milton explains, "We did have the turbine, we had all the batteries," and then he says, "We had all the components in it to make that truck run, including eAxles."

At the time of the unveiling did the truck, the Nikola One, have all of the components in it to make it run?

A.  No, it did not.

Q.  Did it have the complete eAxles in it?

A.  No, it did not.

Q.  What were they missing?

A.  They were missing all of the internal components.

Q.  And then if you go down to line 19, Mr. Milton says "and could it have driven?  Yes, but it was not safe."  Was that an accurate statement?

A.  No.

Q.  Why not?

A.  It could not be driven and we had not reached the point where you would start evaluating safety.

Q.  If we go to page 3, the end of this answer, do you see where Mr. Milton said, "If those, if those electric motors or controllers took off, you would not be able to stop a, you

M9d2Mil5                        Lackey – Direct

know, a truck that size."  Do you see that?

A.  Yes, I do.

Q.  So I want to understand that.

Were the electric motors in the truck at all in the unveiling?

A.  No, they were not.

Q.  What about the controllers?  What was their status?

A.  The controllers were in the vehicle, but they were not hooked up to the motors and they were not programmed to run the motors.

Q.  Could the controller -- excuse me, electric motors or controllers take off in the truck at the unveiling?

A.  No, they could not.

Q.  All right.  Let's go back to the recording and we can keep going for a little bit longer.

MR. CARUSO:  May we approach, your Honor, please?

THE COURT:  Okay.

(Continued on next page)

(At the sidebar)

MR. CARUSO:  If your Honor please, I should have raised this with the first portion of the audio that was played, but I will raise it now.  We don't object to the accuracy of 413-T.

THE COURT:  Okay.

MR. CARUSO:  But we do object and will object to the accuracy of some transcripts that are going to be used when various audios or videos are played.  So I think from the start it will be appropriate for your Honor to give standard instructions to the jury that what you hear is the evidence, what you see is the evidence, what you read in the transcript is merely an aid.

THE COURT:  Are you looking to put in any of the transcripts as evidence?

MR. PODOLSKY:  Your Honor, we have offered them as evidence and the reason we did that is the defense stipulated to their accuracy and that they were admissible.

MR. CARUSO:  On this one, on this one, yes.  Look. There is going to be other -- we have -- there are other transcripts as to which we have some objections or haven't reviewed them for objections and I just want to preserve this point.  We don't object -- as I said at the start of this sidebar, we don't object to the accuracy of Government Exhibit 413-T.

M9d2Mil5                        Lackey - Direct

THE COURT:  I think I put it in evidence.

MR. CARUSO:  Yes, you did.  But I think your Honor should -- the jury should hear consistently.

THE COURT:  Well, except that it is in evidence so they can use it.  I'm not going to give them an instruction now about some future transcript that is not going to be in evidence, but I take your point.

MR. CARUSO:  I thought if we waited it might highlight the problem.  I would have thought even the government doesn't want that to happen.

MR. PODOLSKY:  Your Honor, we provided these transcripts a long time ago.  If they have objections to them, they should let us know.  We are happy to take them up.  I'm not sure why they are doing this right now when we are trying to examine the witness.

MR. CARUSO:  Because the jury is listening to an audio.  It seems to me the jury should be told from the beginning.  Otherwise it highlights it.

THE COURT:  But understand, I'm not going to say that now because this transcript is in evidence.

MR. CARUSO:  Okay.

THE COURT:  Okay?

MR. CARUSO:  All right.

(Continued on next page)

(In open court)

THE COURT:  Mr. Podolsky, you may continue.

BY MR. PODOLSKY:

Q.  I think where you left off, if we are using the transcript, it was page 3 in the middle.

Mr. Charalambous, can you continue the recording, please?

(Audio played)

MR. PODOLSKY:  Pause right there, and take a look at page 3, starting at line 12.

Mr. Lackey, do you see Mr. Milton said, "It was capable, it had -- everything was there, it was totally capable."  Do you see that?

A.  Yes, I do.

Q.  Was that an accurate statement?

A.  I would say no.

Q.  Why not?

A.  Because the truck had not been completed.  It had not been tested.  There were many components either incomplete or missing.

Q.  Why don't we continue, Mr. Charalambous.

(Audio played)

Q.  We won't go through every line here but, Mr. Lackey, if we use the transcript at page 4, Mr. Milton said, "A pusher is a vehicle that could not be -- a pusher is a vehicle that can't

M9d2Mil5                        Lackey – Direct

be driven."  Could the Nikola One be driven?

A.  No, it could not.

Q.  Line six, "had all the components to be driven."  Was that accurate?

A.  No.

Q.  And then at line 15, "So, you know, it's not a pusher because that thing can actually drive."  Is that accurate?

A.  No.

Q.  "It has the full eAxles."  Was that accurate?

A.  No, it was not.

Q.  What were the eAxles missing?

A.  The eAxles were missing all of the internal components as well as the software to make them work.

Q.  All right.  And just finally, line 22, "It had everything in it to be able to drive."  Is that accurate?

A.  No.

Q.  Let's return to the recording and we can play it to the end of this portion.

          (Audio played)

Q.  Top of that page, page 6, line 1, "It was totally functional, you could drive it."  True or false?

A.  That's false.

Q.  "Every single component in that vehicle was made to drive. It had real eAxles, real electric motors, real batteries, real everything in there that even today could be driven if we had

to."  Could that truck be driven?

A.  No.

Q.  All right.  Why don't we move ahead to Government Exhibit 413-B, and we can continue with the same transcript.
Mr. Charalambous, we can just play this part to the end.

        (Audio played)

Q.  All right.  We will go through this quickly, page 7/line 6.
"Every part on there functioned.  We could have driven it as a turbine/electric truck exactly as we promised."  True or false?

A.  False.

Q.  Line 16, "It could have fully been driven on battery alone, with no issue whatsoever."  Were the batteries hooked up to anything?

A.  They were not hooked up.

Q.  Could it have fully been driven on battery alone with no issue whatsoever?

A.  Not without being finished.

Q.  "Everything in that truck functioned, and you can ask every engineer at Nikola.  Not a single person, not a single engineer at Nikola would tell you that those parts were not functionable, if we just, you know, in a few weeks of safety, or, you know, a few months of safety testing to make sure that they were good."  Do you see that?

A.  Yes, I do.

Q.  Are you an engineer?

M9d2Mil5                          Lackey – Direct

A.   Yes, I am.

Q.   Now, you weren't a Nikola employee, were you?

A.   I was not.  I was a contractor.

Q.   Did you work for Nikola?

A.   I did contract work for them, yes.

Q.   And did you work at Nikola?

A.   Yes, I did.

Q.   Would you say that everything on that truck functioned?

A.   No, I would not.

Q.   Would you say that everything on that truck could function with just a few weeks of safety testing?

A.   Absolutely not.

Q.   Was every part on there functional?

A.   No, it was not.

Q.   Was the reason it wasn't driven because it wasn't safe to drive?

A.   No.

Q.   Why do you say that?

A.   The truck was not finished.  We had not -- we had not reached the point where you would start to evaluate safety.

Q.   Let's listen to the last clip here, Government Exhibit 413-C, and again we can continue with the transcript.

          (Audio played)

Q.   Just a couple.  Before the motor core, the eAxles were put into the truck, were the gears and motors installed and then

M9d2Mil5                    Lackey - Direct

taken out?

A.  No, they were not.

Q.  And we will just focus on one sentence here, page 10/line 4, "It was like, it was completely done, those parts were taken out for safety."  Is that true or false?

A.  That's false.

Q.  We can take down transcript and recording and go back to the reactions to this article.

Let's pull up for the witness what's been marked for identification as Government Exhibit 535.  Mr. Lackey, do you recognize this exhibit?

A.  Yes, I do.

Q.  What is it?

A.  It's a set of tweets.

Q.  From what account?

A.  From Trevor Milton's account.

Q.  And what's the date?

A.  The date is June 17, 2020.

MR. PODOLSKY:  All right.  At this time, your Honor, the government offers Government Exhibit 535.

MR. CARUSO:  No objection.

THE COURT:  535 will be received.

(Government's Exhibit 535 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.   Okay, Mr. Lackey.  What are we looking at in Government Exhibit 535?

A.   We are looking at two tweets sent from Trevor Milton's Twitter account.

Q.   On what day?

A.   On June 17, 2020.

Q.   Just to help us here, do you recall what day the article by Mr. Ludlow was published that we have been discussing?

A.   It was the same day.

Q.   Could you just go ahead and read what Mr. Milton wrote?

A.   Sure.  It says, "He ruined Bloomberg's good name.  I don't back down and happy to take this fight on.  The funny part is, he won't hurt me.  He hurt himself for this hack job of an article.  There were no gears and motors missing you jackjob.  They were sitting on the tables to show the audience in person.  Why would we have them in the truck if we weren't going to drive it?  You blew any chance of any interview again."

Q.   Do you see the reference again to no gears and motors missing?

A.   Yes.

Q.   Were those ever installed in the truck?

A.   No, they were not.

Q.   And do you see there is a link at the bottom of this?

A.   Yes.

M9d2Mil5                        Lackey - Direct

Q.   Do you know what that's to?

A.   That's a link to Mr. Ludlow's article.

Q.   Now, were these the only tweets that you read of Mr. Milton's after that article was published?

A.   No.

Q.   Did you read these and other tweets at or around the time they were posted?

A.   Yes, I did.

Q.   What, if anything, did you do in reaction to reading these tweets?

A.   I made the decision to create an anonymous Twitter account.

Q.   And what was the name of that Twitter account?

A.   It was Nikola Insider.

Q.   Why did you do that?

A.   So when I saw these responses and what I viewed to be just a doubling down with additional falsehoods, I wanted to add some context and tell as much of the story as I could.

Q.   Let's put up just for the witness——we can sort of do them in succession——Government Exhibits 578, 579, 580 and 581.

         Mr. Lackey, do you recognize these exhibits?

A.   Yes, I do.

Q.   What are they?

A.   They are tweets.

Q.   By whom?

A.   They were ones that I wrote through my anonymous account.

M9d2Mil5                          Lackey - Direct

MR. PODOLSKY:  Your Honor, the government offers Government Exhibits 578, 579, 580 and 581.

MR. CARUSO:  Yes, we object and would like to approach.

THE COURT:  Very well.

(Continued on next page)

M9d2Mil5                      Lackey - Direct

(At the sidebar)

MR. CARUSO:  Starting with 578, that's the first one, right?  Yes, this is hearsay and it cannot come in to show the effect on Mr. Milton because there is no foundational showing that this came to Mr. Milton's attention.

MR. PODOLSKY:  Two responses.  First, it is independently admissible for two reasons, your Honor.

One, again, to rebut the accusation that this witness is making this testimony up on the stand after he had a motive to lie, it shows what he was saying at the time prior to that motive arising, number one.

Number two, we will, on Mr. Caruso's hearsay point, be happy to offer it subject to connection later in the case that Mr. Milton responded to the Nikola Insider account and actually took screenshots and so on.

MR. CARUSO:  There is nothing in this document that rebuts a charge of recent fabrication, nothing.  I will be describing in detail all the systems and I will compare it to what Trevor said.

THE COURT:  The more, I think, compelling argument that they make is that Mr. Mukasey opened on Mr. Lackey's credibility and these tweets——I haven't examined them——tend to rebut or are proper rebuttal to that argument.

MR. CARUSO:  Yes, but I don't think they are when you look at the content.

THE COURT:  Okay.

MR. CARUSO:  It's very brief.  "I will be describing in detail all the systems on the Nikola One and the state they were in on December 1, 2016.  We will compare this to what Trevor said at the time and what he is saying now."

There is nothing in there about rebutting the charge.  There is nothing in there that serves to rebut the charge of recent fabrication.

THE COURT:  It's not recent fabrication.  This is credibility.

MR. PODOLSKY:  Correct.  So each one of these tweets show that he made these accusations and he had no motive to lie, no bias.  He made this prior to any association with these short sellers, anything like that, and this is consistent with what he is saying on the stand.  Mr. Mukasey opened on the notion that he's got a financial interest in this case and they are allowed to rebut.

MR. CARUSO:  You have my argument and if you make a ruling, just let me look at the rest of them and see if there is any objection.  Do you want to rule on that one first?

THE COURT:  I think they are all of a piece.

MR. CARUSO:  I think they are.  No foundation, doesn't rebut a charge of recent fabrication.

And if I can speak directly to counsel --

MR. PODOLSKY:  Sure.

M9d2Mil5                          Lackey - Direct

MR. CARUSO:  -- we had discussed the redaction of this one line.  Did you do that?

MR. PODOLSKY:  No, as I said we would give you a chance to object.  It's not in the front of the jury.  We think that's perfectly admissible.

MR. CARUSO:  Assuming 579 comes in for the purposes that have been discussed, we nevertheless think that the Court should order the redaction of this language, "Milton is a congenital liar."  That's just name calling.  That's not anything the Court would allow this witness to say in testimony one way or the other.  So why should he say it in a prior statement?

MR. MUKASEY:  It doesn't rebut a claim of fabrication.

MR. PODOLSKY:  There is no 403 issue.  The man is actually on the stand.  He called him a liar many times.  Frankly, you could use it to cross-examine him and say he is overstating or saying he is congenital in lying about these particular things.

MR. CARUSO:  It's over the top, Judge.  You would not allow this in if you asked him a question, and therefore it shouldn't come in in this format.

THE COURT:  I don't know that he's called him a liar on the stand in so many words, but he has certainly indicated that Mr. Milton has a history of making false statements.  This is along the same lines, so I don't think it is -- under 403, I

don't think it is unduly prejudicial.

MR. CARUSO:  Okay.  Now let me just look at the others.  580, we would have the same objection.  581, we would have the same objection.

THE COURT:  Okay.

MR. CARUSO:  Now is the court taking these subject to connection?

THE COURT:  Well, I mean, pursuant to -- on the argument that Mr. Trevor Milton never saw this.  Do you know whether in fact he ever saw this or reacted to this?

MR. PODOLSKY:  So two things.  I think there will be evidence later.  I don't know if we could -- I don't remember.  Do you remember which screenshot it was?  I also don't remember which of these tweets there will be the screenshot of, but there will be evidence that he reacted to this account.  But I do want to make clear, as I understood our colloquy, this is being offered relevant to his credibility and bias and therefore doesn't need later connection.

MR. CARUSO:  So these exhibits are not coming in for the truth, they are coming in on the issue of credibility and bias.  Will the court instruct the jury they are not coming in for the truth?

THE COURT:  I don't think that that's what they are saying.  They are saying that these exhibits are admissible as fair argument, fair response to Mr. Milton's --

MR. CARUSO:  Credibility argument.

THE COURT:  Yes.

MR. CARUSO:  Does that cover it?

MR. MUKASEY:  Yeah, I don't really disagree.  I just think the concept of calling somebody a liar does not rebut a claim of recent fabrication and is of a kind and a degree different than what he said on the stand.  On the stand he has said the motor wasn't functioning, the inverter wasn't there, the parts weren't working.  This is an opinion about Milton's character, so I do think it's different.

MR. PODOLSKY:  An opinion that was formed prior to the motive to lie or the bias——Mr. Mukasey opened on that——establishing that he had that opinion before.

MR. MUKASEY:  Irrespective of that, I understand you can rebut a claim of recent fabrication and I recognized when I was standing up there that I could be opening the door to that.  But "congenital liar" is not "the motors weren't working" or "the parts weren't working" or "the eAxle isn't working."  The "congenital liar" is like "you are an ass."  It doesn't speak to anything.

MR. PODOLSKY:  I just don't see the 403 issue.

MR. MUKASEY:  That's the 403 issue.

THE COURT:  I understand, and I don't think it's beyond the pale.  I don't know that the government needs it, but I don't think it meets the threshold pursuant to which I

would not allow it in under 403.

MR. MUKASEY:  Thank you, Judge.

MR. CARUSO:  Okay.  Thank, Judge.

(Continued on next page)

THE COURT:  The objection is overruled and the exhibits will be admitted.

(Government's Exhibits 578, 579, 580, 581 received in evidence)

MR. PODOLSKY:  Thank you, your Honor.  Let's start with Government Exhibit 579, if we could pull that up for everyone, Mr. Charalambous.

BY MR. PODOLSKY:

Q.  Mr. Lackey, do you recognize this exhibit?

A.  Yes, I do.

Q.  What is it?

A.  It's a tweet.

Q.  Who wrote that tweet?

A.  I did under my anonymous account.

Q.  When did you write that?

A.  I wrote it on June 18, 2020.

Q.  So about how long after the tweets that Mr. Milton wrote reacting to or in response to the Ed Ludlow article did you publish this?

A.  This was the next day.

Q.  Why did you do that?

A.  As I sort of alluded to before, with the public responses that I saw from Mr. Milton, you know, I saw that he was kind of doubling down and saying more things that I considered to be untrue, so I wanted to get more of the facts out as best as I

could.

Q. So focusing on the text, what did you write?

A. I said:  Coming soon, the facts about the Nikola One development from an insider who was there.  Spoiler alert, Trevor Milton is a congenital liar.  Perhaps you doubt that I am really an insider.  Reader, I was there.

Q. Do you see the image below that?

A. Yes.

Q. What is it?

A. It's an image of the cab of the Nikola One prototype.

Q. Who took that picture?

A. I did.

Q. Do you recognize the individuals who are in it?

A. Yes, I do.

Q. Who is it?

A. On the left, it's Mr. Milton.

Q. Why did you include this photograph  in this post?

A. That's a way of basically showing evidence that I really had been there at the time.

        MR. PODOLSKY:  Why don't we tick through the other ones.  If we can pull up Government Exhibit 578, please.

Q. What's the date on this exhibit, Mr. Lackey?

A. This one is also June 18, 2020.

Q. Did you write this?

A. Yes, I did.

Q.   What did you write?

A.   I wrote, I will be describing in detail all the systems on the Nikola One and the state that they were in on December 1, 2016.  We will compare this to what Trevor said at the time and what he is saying now.

MR. PODOLSKY:  Let's go to Government Exhibit 580, please.  Maybe just blow up the top for a moment.

Q.   Did you write this tweet, Mr. Lackey?

A.   Yes, I did.

Q.   What did you write?

A.   This was the state of the Nikola One three months before the reveal.  You might think "that's not enough time to build a functioning truck for a company with a dozen employees and no experience building vehicles."  Reader, you would be correct.

MR. PODOLSKY:  Now let's look at the photograph for a moment.

Q.   Mr. Lackey, I know it's maybe a bit small on the screen, but what is that photograph?

A.   This was a photograph of the Nikola One in August 2016.

Q.   Have we looked at this earlier today?

A.   Yes, we have.

Q.   Why did you include it in your post?

A.   Again, just to add context to what the state of the truck was.

MR. PODOLSKY:  Let's just look at the last one,

Government Exhibit 581.

Q. Do you see the top is the same post from Government Exhibit 579; is that correct, Mr. Lackey?

A. Yes.

Q. Why don't we then look below.

MR. PODOLSKY: Mr. Charalambous, can you pull up the responses.

Q. Is this portion responses by other Twitter users and yourself?

A. Yes, it is.

Q. Do you see another Twitter user wrote, how much longer are you going to make us wait?

A. Yes.

Q. How did you respond?

A. I said I kind of lost my nerve a little, to be honest. I wrote a long, in-depth article about my experience, but I'm afraid to post it. If Trevor figures out who I am, then I would be screwed. I don't have a full-time lawyer on tap like he does.

Q. Then you see there is a response?

A. Leak it to Business Insider? Yes.

Q. How did you respond?

A. I said, I mean, I already told Bloomberg. (Yes, I am Ed's primary source.)

Q. Why did you post that?

M9DCmil6                         Lackey – direct

A.   I don't know.  It was a true statement, I suppose.

MR. PODOLSKY:  Why don't we take this down.

Q.   Now, did there come a time when other whistleblowers contacted you?

A.   Yes, there was.

Q.   Approximately when did that happen?

A.   It was late July 2020.

Q.   And how were you contacted?

A.   I was contacted through the direct messaging system of my anonymous Twitter account.

Q.   What, if anything, did those other individuals propose to you?

A.   So they explained to me that they had been working on -- working on a submission that they plan to send to the Securities and Exchange Commission as a whistleblower complaint, and they proposed that I would basically join their team, you know, with the information that I had and contribute to that complaint.

Q.   And what entity would that complaint be about?

A.   About Nikola Motor.

Q.   Now you mentioned an SEC whistleblower complaint.  Can you explain what your understanding of that is?

A.   So my understanding is that the Securities and Exchange Commission, which is kind of the regulatory body that regulates publicly traded companies, they have a system by which people

who have observed wrongdoing can make a submission to them and they will evaluate the claims made and look into it and decide whether they wish to take some action, some civil action against the company.

Q.  Is there any financial component to doing that?

A.  Yes, there is.

Q.  Can you explain your understanding of that.

A.  So basically, the way that the whistleblower program works is that if they look at the submission and they decide that there's merit to it, they basically will take an action, maybe sue or settle with the company, and there may be fines that are collected.  And the law is written such that the SEC will share proceeds of those fines with the people that sent in the report if they deem that it was helpful to their case.

Q.  Did you agree to help with this project or whistleblower submission?

A.  Yes, I did.

Q.  Why did you do that?

A.  There was several reasons.  I could name probably three reasons.

         First of all, in meeting with the other whistleblowers, I came to the understanding that there was further wrongdoing that had been done by Mr. Milton.  Secondly, after my experience with Mr. Ludlow's article, I saw that it had really turned into kind of just an argument between the

reporter and Mr. Milton, and I thought that if the government regulators were involved, they would have the resources and motive to figure out what was true. And then, of course, there was also a financial incentive to do so.

Q. Let me come back to the whistleblower SEC report in a moment.

Did there come a later time when anyone else joined that group you were working with?

A. Yes, there was.

Q. Who was that?

A. It was a group called Hindenburg Research.

Q. What is Hindenburg Research, to your understanding?

A. So Hindenburg Research, it's basically an organization that will do research on publicly funded companies, and if they see something that, you know, if they discover something over the course of their research where they feel that it, you know, speaks badly of the company, they will write a report and they'll take out a short position in the company, which basically just means that if the stock price drops, they will make profit from that and then they release the report.

Q. Did Hindenburg Research join the group that you were working with?

A. Yes, they did.

Q. From your perspective, why did you join with Hindenburg Research to do this work?

A.  So they were doing a lot of research that didn't really overlap very much with the things that we knew.  They were looking into financial statements and stuff that I don't know the first thing about.  So it seemed like it would be a good team-up, basically.

Q.  Up to the point that Hindenburg Research became part of your group, had you made any money or had any financial incentive for the information that you had disclosed publicly to the newspaper or online?

A.  No.

Q.  Now you mentioned that Hindenburg Research took out a short position.  Did I understand that correctly?

A.  That's correct.

Q.  So in what situation would that position become profitable?

A.  So if they released their report and the stock price of Nikola fell, then they would stand to gain money.

Q.  Once you joined with them, did you have any interest in that short position?

A.  Yes, I did, as a percentage.

Q.  Why did you agree to do that?

A.  It seemed like the right thing do and there was a financial incentive to do so.

Q.  Now, did that group, the people who you were working with, publish a report regarding Trevor Milton and Nikola Motor?

A.  Yes, they did.

M9DCmil6                          Lackey – direct

Q.   Approximately when was that?

A.   It was early September of 2020.

          MR. PODOLSKY:  At this time, your Honor, with your
permission, I will read into the record what's been marked for
identification as Government Exhibit S4.

          THE COURT:  Very well.

          MR. PODOLSKY:  At the very top, it begins, it is
hereby stipulated and agreed, and I'll skip down to the
substantive paragraphs.

          1.   On September 10, 2020, at approximately 8:06 a.m.
eastern time, Hindenburg Research published an online report
regarding Nikola Corporation ("Nikola").  At the time
Hindenburg Research published the report, it held a short
position in shares of Nikola.

          2.   The Hindenburg Research report claimed that Trevor
Milton and Nikola made deceptive and misleading public
statements about the functionality of the Nikola One, Nikola's
production of in-house parts, Nikola's production of hydrogen,
and reservation for Nikola's trucks.

          It is further stipulated and agreed that this
stipulation may be received into evidence at trial.

          Your Honor, the government offers Government
Exhibit S4.

          MR. CARUSO:  No objection.

          THE COURT:  It will be received.

(Government's Exhibit S4 received in evidence)

BY MR. PODOLSKY:

Q.  Now, Mr. Lackey, did that report contain information about the Nikola One?

A.  Yes, it did.

Q.  At a high level, what kind of information did it contain?

MR. CARUSO:  Objection.  We have a stipulation to exclude this evidence.  That's the upshot or the purpose of the stipulation.

THE COURT:  No argument before the jury, Mr. Caruso. Do you want to speak at sidebar?

MR. CARUSO:  Yes.

MR. PODOLSKY:  Your Honor, I'll ask a new question, if that's all right.

THE COURT:  Very well.  That question is withdrawn.

Q.  Did you hear me read in the stipulation that the report claimed that Trevor Milton and Nikola made deceptive and misleading public statements about the functionality of the Nikola One?

A.  Yes.

MR. PODOLSKY:  Let's focus for a moment on the video of the truck going across the desert, and pull up Government Exhibit 402 again.

Q.  What, if anything, did you do regarding this video to prepare for that report?

A.   So I wanted to find out how they had done that because I had received information previously that I knew that it couldn't drive itself.  So I reached out to a former employee and asked him how it was achieved to make this video of the truck moving at a high rate of speed.

Q.   What did you learn?

          MR. CARUSO:  Objection.  Hearsay.

          MR. PODOLSKY:  Not offered for the truth, your Honor.

          THE COURT:  Very well.  Overruled.

Q.   What were you told?

A.   I was told that the truck was taken to the top of a long hill --

          MR. CARUSO:  Judge, objection.  The government says they're not offering it for the truth --

          THE COURT:  Mr. Caruso, if you want to speak at sidebar, I'm happy to speak at sidebar.  Please don't argue in front of the jury.

          (Continued on next page)

M9DCmil6                              Lackey - direct

(At the sidebar)

THE COURT:  Why don't you tell me what's going on.

MR. PODOLSKY:  This is all part of explaining his efforts relating to this short seller position that, as we discussed, is at issue.  He's going to explain that he heard that the truck was going down the hill.  He went to corroborate that in research and that project.  Frankly, I don't think the dispute is in dispute, but I'm going to go back to where it was said this happened and that's essentially where the testimony is going to go.

THE COURT:  Why isn't it hearsay?

MR. PODOLSKY:  This particular statement?  This statement has been offered to -- it doesn't make sense that he went and found the hill, examined it couldn't be done and that's the avenue to go research that.  That's the reason I'm offering this statement.  There is no personal prejudice, there is no dispute over this.

MR. MUKASEY:  Allow me to say yes, that if that is your purpose, you can ask him what did you do to learn more, I called this employee.  After you called the employee and you called and asked him about the commercial and after you spoke to him, where did you go, what did you do.  Eliciting a conversation is hearsay.  You can get what you need without eliciting a wildly prejudicial conversation.

THE COURT:  I don't know if it is wildly prejudicial,

M9DCmil6                        Lackey - direct

but it does appear to be hearsay and you can do it the way Mr. Mukasey has suggested. It's also true that all of this is going to come out before the jury. I think it's probably already out before the jury. So you're highlighting it, maybe that's the purpose of your objections, but it is strictly speaking hearsay. So why don't you work around it.

MR. PODOLSKY: My concern, your Honor, is just if the question, if I take Mr. Mukasey's script, it's did you talk to someone, yes. What did you do, I went to the hill. Why did you go to a hill.

THE COURT: Did you talk to someone, who did you talk to, why did you talk to him, who is he.

MR. MUKASEY: What was the topic, he told me how it was filmed.

MR. PODOLSKY: That's all I'm trying to get to, how was this filmed.

MR. MUKASEY: What did you say to him, what did he say to you.

MR. PODOLSKY: The question is putting the words of another person. I can avoid --

THE COURT: That's the issue.

MR. MUKASEY: The topics of conversation are not hearsay, back and forth is.

MR. PODOLSKY: I don't know that this was necessary, but understood.

(In open court)

BY MR. PODOLSKY:

Q.   Mr. Lackey, when you were preparing for your work for the Hindenburg report, did you inquire from employees of Nikola as to how this video was made?

A.   Yes, I did.

Q.   Did you come to any understanding or view as to how this video was made?

A.   Yes, I did.

Q.   What was your understanding?

A.   My understanding was that the truck was towed to the top of a long hill with kind of a shallow slope and allowed to coast down the hill under the influence of gravity, and that it was filmed with camera angles to make it look like it was traveling at a high rate of speed down level ground.

Q.   What, if anything, did you do to corroborate that suspicion?

A.   So what I wanted to do is I wanted to positively identify the place where the video was taken.  So I looked through both this video and the other Phillips commercial that had footage from the same shoot and looked for landmarks, looked for a long, straight road, looked for signs that were visible in the video that I could find basically on Google Street View, and I was able to definitively identify the location where the video had been shot.  Then I went and looked at the terrain on a map

to see if there was, indeed, a hill there, and I did find that there was a section of road approximately two miles long that had a consistent 3-percent grade.  Then, a little bit later, I actually sent a friend to go drive to the top of that hill and put his truck in neutral to see if it was possible to coast down the hill and achieve a high rate of speed and found that, yes, it was.

MR. PODOLSKY:  So why don't we play just a little bit of the video.

(Video played)

Q.  So what is your understanding as to what was causing that truck to move down the road?

A.  It was coasting down the road under the influence of gravity.

MR. PODOLSKY:  On this, why don't we turn back for a moment to the interview between Mr. Milton and Ed Ludlow, why don't we use the transcript 413-T.  We can look at the top of page 3.

Q.  Mr. Lackey, do you see that, starting at line 1, if you look at a prior page, Mr. Milton's statement, he said it just wasn't safe to drive.  We did do a demonstration with it for the video to where we were able to, you know, we just let it coast down a road for -- because it just wasn't safe to drive.

Do you see that?

A.  Yes, I do.

Q.  Could that truck have been driven at all?

A.  No.

MR. PODOLSKY:  Let's pull up for the witness what's been marked for identification as Government Exhibits 1111, 1112, and 1113.

Q.  Mr. Lackey, do you recognize those exhibits?

A.  Yes, I do.

Q.  What are they?

A.  They are a Facebook post.  I only have one of them on the screen, 1113.

MR. PODOLSKY:  We can show them again.

A.  Oh, yeah.  It's just different comments.  Yes.  Sorry. It's just a Facebook post.

Q.  On what account?

A.  On the official Nikola Motor company account.

Q.  Have you seen these on the account before?

A.  Yes, I have.

Q.  Do these exhibits accurately reflect the available Nikola Facebook page as you accessed it?

A.  Yes, they do.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibits 1111, 1112, and 1113.

MR. CARUSO:  Hearsay.  Cumulative.

THE COURT:  See you at sidebar.

(Continued on next page)

M9DCmil6                         Lackey – direct

(At the sidebar)

MR. CARUSO:  So the photograph and the top of this exhibit, we've seen before.

THE COURT:  Yes.

MR. CARUSO:  More than once.  The rest of this is nonsense from some guy who says he's a trucker and this is never going to work.  So what?  It's hearsay.  Even if it's not offered for hearsay purpose, whose mind is this affecting, what's going on here?

MR. PODOLSKY:  Two things, your Honor.  One, the jury has not seen that this was also posted on Facebook.  More importantly, we're not offering it for the truth of what that person has said.  If Mr. Caruso read down, the Nikola Motor account makes statements in response to those questions and that is what we are offering.

MR. CARUSO:  Which are utterly bland and irrelevant.

THE COURT:  But Nikola makes statements, okay.

MR. CARUSO:  So cumulative.  This guy says it's not going to work and then they say they operate at 20 percent to 30 percent without government help, funds.  It's not for everyone, but if you are in it to make money, then this is the way to go.

It's pointless and it's cumulative, I believe.

THE COURT:  I don't know it's cumulative if this is a Facebook post.  So this one I think would come in.  You want to

go ahead.  We haven't seen any Facebook posts yet and I think there will be some testimony about --

MR. CARUSO:  The other ones are a piece of 1112.  It's substantially identical, some guy talking about what he thinks and then the company writes some bland statement back.

MR. ROOS:  The bland statement being that the truck's driving.

MR. CARUSO:  Same concept.

THE COURT:  I'm going to let these in.

MR. MUKASEY:  I'm sorry to double team.

MR. CARUSO:  I need all the help I can get.

MR. MUKASEY:  There's been no suggestion that by 2018, this witness has any knowledge about who controls the Nikola Motor Facebook account.  He did say that back in 2015, he thought that Trevor was in control of the account.  This may very well have been a response by the company itself, which would have nothing to do, that part is truly irrelevant, it's not connected to Mr. Milton.

MR. PODOLSKY:  Number 1, there will be a lot more evidence that he controlled the media accounts.  Even if the defense showed this wasn't Mr. Milton, it would still be relevant.  It is what the company said and, by the way, directly relevant to Mr. Milton's state of mind when he makes the statements in 2020, because he says two things in there, like the truck wasn't safe, that's why it wasn't operating

under its own power, this post says it was safe.

THE COURT:  Will there be more testimony about Mr. Milton controlling the various social media accounts, including Facebook?

MR. PODOLSKY:  Yes.

THE COURT:  So I'll let it in subject to connection.

(Continued on next page)

M9DCmil6                         Lackey - direct

                (In open court)

                MR. PODOLSKY:  Government offers Government Exhibits

1111, 1112, and 1113 subject to connection.

                THE COURT:  Subject to connection, they will be

received.

                (Government's Exhibits 1111, 1112, 1113 received in

evidence)

                MR. PODOLSKY:  Thank you, your Honor.  May we publish

Government Exhibit 1112?

                THE COURT:  You may.

BY MR. PODOLSKY:

Q.   Mr. Lackey, what are we looking at here?

A.   This is a Facebook post from the official Nikola Motor

Facebook account.

Q.   Do you see the date on this post?

A.   Yes, I do.  It's January 25, 2018.

Q.   Is that the same day that the video we just looked at in

Government Exhibit 402 was posted to Twitter?

A.   Yes, it is.

Q.   And do you recognize the image on the left side of this

post?

A.   Yes, I do.

Q.   What is that?

A.   That's a still image from the video that we watched before.

Q.   I want to look at the comments.

M9DCmil6                        Lackey - direct

MR. PODOLSKY:  First of all, why don't we blow up the text of the post, Mr. Charalambous.

Q.  Do you see at the top, there's a post by Nikola Motor company?

A.  Yes.

Q.  And it begins:  Behold, the 1,000 HP zero emission Nikola semi truck in motion?

A.  Yes.

Q.  Is this the same content we saw in the Twitter posts?

A.  Yes, it's basically the same post.

Q.  Do you see below that there are some comments in response?

A.  Yes, I do.

Q.  And you see that another user wrote, with that variable speed control, how do you control the massive torque under adverse conditions.  Empty I slip on dry RR crossings — railroad crossings, I assume — or loose sand or gravel with 475/1650 torque.  ABS stability control, traction control.

Do you see that?

A.  Yes, I do.

MR. PODOLSKY:  Why don't we pull up the response at the very bottom, Mr. Charalambous.

Q.  Do you see at the very bottom there is a response that starts, Richard Kelli Davis?

A.  Yes.

Q.  Is that a response from Nikola Motor company?

A.  Yes, it is.

Q.  What does it say?

A.  It says, Richard Kelli Davis, it is a lot of work, but we were able to pull it off.  It handles like a sports car, but is safe.

Q.  Did the Nikola One, when you worked on it, handle like a sports car?

A.  No.

        MR. CARUSO:  Objection.  Disconnect between the timeframes.

        THE COURT:  Overruled.

Q.  Why not?

A.  It was not complete and we weren't at the point where we could evaluate how it handled.

        MR. PODOLSKY:  We can take this down.

Q.  Now, did Nikola's stock price decrease after the report we discussed was published online?

A.  Yes, it did.

Q.  Did you make any money as a result of your interest in Hindenburg Research's short position?

A.  Yes, I did.

Q.  Approximately how much?

A.  Approximately $600,000.

Q.  Do you still have any short or other investment, interest, position in Nikola's stock?

M9DCmil6                            Lackey - direct

A.   I do not and I have not since that time.

Q.   So do you stand to benefit if Nikola's stock price goes up or down now?

A.   No, I do not.

Q.   From your perspective, do you stand to benefit in some way from the outcome of this trial?

A.   No, I do not.

Q.   Now let's go back to the SEC whistleblower report that you discussed.  Did your group ultimately file that?

A.   Yes, we did.

Q.   To be clear, with what agency?

A.   The Securities and Exchange Commission.

Q.   Generally, did that report contain the same types of information we discussed today?

A.   Yes, very similar information.

Q.   To your understanding, might the Securities and Exchange Commission still provide some form of reward for that submission?

A.   They may.

Q.   To your understanding, does the Securities and Exchange Commission have any role in this case, this prosecution?

A.   Not that I know of.

Q.   Did you file any kind of whistleblower report with the Department of Justice or the U.S. Attorney's Office?

A.   No, I did not.

Q.   Do you have any kind of agreement with the Department of Justice or U.S. Attorney's Office?

A.   No, I do not.

Q.   Do you stand to benefit financially in any way from the outcome of this case?

A.   I don't believe so.

Q.   Then why are you testifying today?

A.   I think it's the right thing to do.  I've been asked to tell the truth and that's what I'm here to do.

          MR. PODOLSKY:  Let's look at just a couple more things.

          I'm going to read, with your Honor's permission, a paragraph from S2.

          THE COURT:  Very well.

          MR. PODOLSKY:  And this is paragraph 15.

          Government Exhibits 414-A and 414-B are authentic copies of portions of a June 19, 2020, interview of Trevor Milton on CNN's The First Move, and Government Exhibit 414-T is an accurate transcript of those recordings.

          Your Honor, the government offers Government Exhibit 414-B at this time and 414-T.

          THE COURT:  Any objection?

          MR. CARUSO:  No objection.

          THE COURT:  They will be received.

          (Government's Exhibits 414-B, 414-T received in

evidence)

MR. PODOLSKY:  Once again, if you will turn to the transcript of 414-T, and start actually on page 2 at line 21. Mr. Charalambous, if you could just play this clip.

(Video played)

Q.  Mr. Lackey, let me point to line 16 on page 3 of this transcript.

Do you see that Mr. Milton said all of the parts functioned.

Was that true or false of the Nikola One at the unveiling?

A.  That was false.

Q.  The batteries, you had motors, you had the eAxles, you had inverters, you had everything there.

Is that true or false?

A.  That's false.  Not everything was there.

Q.  And lastly, before we move on, do you see the top, line 6, we actually recorded the whole interview and we're going to post it out there for everyone to actually listen to.

Do you see that?

A.  Yes.

Q.  Did we listen to Mr. Milton's interview with Mr. Ludlow today?

A.  Yes, we did.

Q.  Finally, at the bottom, you see Mr. Milton said, instead

of, you know, taking a risk and possibly hurting or killing someone, we decided to make the truck inoperable on the stage and we never, you know, we never took it out on the road because it just wasn't safe.

Do you see that?

A.   Yes, I do.

Q.   Did you or any other engineer decide to make the truck inoperable?

A.   No.

Q.   How do you know that?

A.   In order to make a truck inoperable, you have to first make it operable, and that was never done.

MR. PODOLSKY:  Take that one down.

Your Honor, I'm going to read one more paragraph from Government Exhibit S2.

THE COURT:  Very well.

MR. PODOLSKY:  This was paragraph 16 and it reads:

Government Exhibits 415-A and 415-B are authentic copies of portions of a June 26, 2020, interview of Trevor Milton on CNBC's Fast Money Special Edition, and Government Exhibit 415-T is an accurate transcript of those recordings.

Your Honor, the government offers Government Exhibits 415-B and T.

THE COURT:  Any objection?

MR. CARUSO:  One moment, please.  No objection.

M9DCmil6                        Lackey - direct

THE COURT:  They will be received.

(Government's Exhibits 415-B, 415-T received in evidence)

MR. PODOLSKY:  Before we listen to the recording.

Q.  Mr. Lackey, the date, June 26, 2020, was that before or after Nikola went public?

A.  That was after they went public.

MR. PODOLSKY:  Let's pull up the clip, 415-B.  If helpful, we can follow along in the transcript, 415-T.  This is actually going to begin on the transcript on page 5 under the stars.

THE COURT:  How long will the clip take?

MR. PODOLSKY:  This is brief, your Honor.  I think we can play the clip in time and --

THE COURT:  Very well.

MR. PODOLSKY:  Mr. Charalambous, if you could play the clip.

(Video played)

Q.  Mr. Lackey, did you hear Mr. Milton say in that interview every part of the truck was functional?

A.  Yes.

Q.  True or false?

A.  That's false.

Q.  It was all operable, true or false?

A.  False.

M9DCmil6                    Lackey - direct

Q.   It wasn't really that safe, like, it could have killed someone in the audience.

Could that truck have been driven?

A.   No.

Q.   All the parts were there, though.  Is that true or false?

A.   That is false.

Q.   Bottom line, was that truck finished at the time of the unveiling?

A.   No, it was not.

Q.   Was it a functional truck?

A.   No, it was not.

Q.   To your understanding, had it ever been a functional truck?

A.   From my understanding, it never has.

MR. PODOLSKY:  Your Honor, I think that's an appropriate --

THE COURT:  It's 2:40 now.  Ladies and gentlemen, we'll gather again tomorrow morning.  Please endeavor to be in the jury room no later than 9:15 or so.  We'll make sure the same mistake is not made tomorrow morning.  In the meantime, have a wonderful evening, be safe getting home.  Do not discuss the case or read anything about the case.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Lackey, you can step down.  Everyone can be seated.

Any issues for me to deal with at this time?  Mr. Mukasey.

MR. MUKASEY:  Thanks, Judge.  Two quick things.  Number 1, I'm sure your Honor doesn't need to admonish the government that now that the witness has been turned over for cross, there should be no more communication.

MR. PODOLSKY:  I didn't rest.

THE COURT:  He hasn't finished with the --

MR. MUKASEY:  My understanding was he was finished.  I'm sorry.

THE COURT:  But I assume they understand that once he's done with direct examination, they will not be speaking with him substantively about his cross.

MR. MUKASEY:  Yes.  Thank you, Judge.

Secondly, just to keep things moving efficiently, because sometimes things do get a little clunky with the exhibits and the transcripts, we're going to work with the government tonight to try to avoid that as much as possible for tomorrow and going forward.  One of the ways that we can really get ahead of the game and make sure everything comes out smoothly in front of the jury is to know which witnesses are coming tomorrow in what order and which witnesses are coming

the next day.  That would be of great help in terms of us counter-designating and avoiding these sidebars.

THE COURT:  I was under the impression that the government has already provided you with that information, the witnesses that they will be calling and the assumed order, but is that not the case?

MR. PODOLSKY:  Yes, your Honor.  What we told the defense is we will give them witnesses by the close of business each day.  For this week, we told them the whole week.  We've been sort of ironing out our order.  So by the close of business today, we'll give them the exact order for tomorrow, but they know who the next three witnesses are.

THE COURT:  You might want to consider giving them the order, as well.

MR. PODOLSKY:  And we will, your Honor.

THE COURT:  Anything else?

MR. MUKASEY:  I'm good.

THE COURT:  Anything else from you?

(Pause)

We'll see you tomorrow morn at 9:00.  Don't be late.

(Adjourned to September 14, 2022 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                        Page

 PAUL LACKEY

Direct By Mr. Podolsky . . . . . . . . . . . . .69


                        GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 800    . . . . . . . . . . . . . . . . . . . . . .86

 1218    . . . . . . . . . . . . . . . . . . . . .93

 1108    . . . . . . . . . . . . . . . . . . . . .96

 S5    . . . . . . . . . . . . . . . . . . . . . 102

 562    . . . . . . . . . . . . . . . . . . . . . 103

 1216    . . . . . . . . . . . . . . . . . . . . . 109

 1217    . . . . . . . . . . . . . . . . . . . . . 111

 400-A, 400-B, 400-C, 400-D, and 400-E   . . . 117

 1    . . . . . . . . . . . . . . . . . . . . . . 123

 401-A, 401-B, 401-T   . . . . . . . . . . . . . 131

 1208    . . . . . . . . . . . . . . . . . . . . . 135

 1210    . . . . . . . . . . . . . . . . . . . . . 137

 563    . . . . . . . . . . . . . . . . . . . . . 141

 564    . . . . . . . . . . . . . . . . . . . . . 144

 402    . . . . . . . . . . . . . . . . . . . . . 145

 S3    . . . . . . . . . . . . . . . . . . . . . 160

 700    . . . . . . . . . . . . . . . . . . . . . 160

 532    . . . . . . . . . . . . . . . . . . . . . 164

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

413-A, 413-B, 413-C, 413-T . . . . . . . . . 166

535    . . . . . . . . . . . . . . . . . . . 175

578, 579, 580, 581 . . . . . . . . . . . . . 185

S4 . . . . . . . . . . . . . . . . . . . . . 194

1111, 1112, 1113 . . . . . . . . . . . . . . 204

414-B, 414-T . . . . . . . . . . . . . . . . 208

415-B, 415-T . . . . . . . . . . . . . . . . 211