M9ECmil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                    21 CR 478 (ER)

TREVOR MILTON,

          Defendant.

------------------------------x

                             New York, N.Y.

                             September 14, 2022
                             9:00 a.m.

Before:

                 HON. EDGARDO RAMOS,

                       District Judge

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

M9ECmil1

(Trial resumed; jury not present)

THE COURT:  Are we ready to go?

MS. ESTES:  Yes, your Honor.

THE COURT:  So as far as I know, there is at least one thing that we should discuss this morning.  I did receive the government's letter from yesterday evening concerning a particular podcast that apparently the government wants to put in certain excerpts, the defense wants to put in the balance, and the government objects to for fairly limited areas that are discussed in the podcast.

Have the parties met and conferred concerning this, and is there any further agreement, Ms. Estes?

MS. ESTES:  Your Honor, my understanding is they don't intend to actually play those excerpts, but our position is that they should not be admitted full stop because if they're admitted, they can go back to the jury and they could review them.

THE COURT:  Mr. Mukasey, did you intend to play the excerpts identified by the government?

MR. MUKASEY:  I'm going to lateral this one to Mr. Bondi, it's his witness.

THE COURT:  Mr. Bondi.

MR. BONDI:  Good morning, your Honor.  Ms. Estes' motions surprised us because we're not planning to play any of those excerpts for the jury.  However, your Honor, we do think

the entire podcast should come into evidence, including those excerpts, and the reason why, your Honor, it's just like an email.  If the government were to admit an email and they don't like a personal reference in an email, they couldn't redact that personal reference and say no, no, that's a self-serving reference here.  They can't redact paragraphs, they can't redact parts of the podcast.  But, your Honor, we're not planning to play any of those excerpts for the jury.  So that answers that question.  But the entire podcast, with everything unredacted, should come in.

MS. ESTES:  Your Honor, respectfully, we redact portions of documents all the time.  Each portion of a document has to have a theory of admissibility under the rules of evidence.  The portions we highlighted last night, there is no evidentiary basis to admit them.  They're simply not relevant. There is also reasons to exclude them and that they could be prejudicial to the government because they are designed to elicit sympathy for the defendant.

MR. BONDI:  Your Honor, those were public statements and podcasts with, I think, one exception, these podcasts never even had a transcript up.  So people, the purported retail investors who listened to these podcasts, they listened to them all, they listened to everything.

What Mr. Milton was talking about and all the different events and everything is relevant, it puts into

context that this was not entirely a podcast relating to subjects the government wants to put on.  From us, your Honor, it goes to what the investors heard, it goes to the total mix, it puts into context everything.

Again, your Honor, we're not trying to draw any sympathy by playing parts of a podcast for the jury.  We're not going to argue about these parts, we're not going to say anything about the personal parts that Ms. Estes said, we're not going to argue in closing about those parts or anything.

From an evidentiary matter, your Honor, the podcasts were public, those were the podcasts that were listened to by people, by the public, and they listened to them all.  They didn't skip over the parts that Ms. Estes doesn't like.

MS. ESTES:  Your Honor, just one final point on that. Under Mr. Bondi's theory, any piece of information anywhere on the internet about the company would be relevant because an investor could have seen it.  I believe defense did object to many Facebook exhibits, for example, yesterday.  Under Mr. Bondi's theory, they have no basis to object --

MR. BONDI:  No, your Honor my theory --

THE COURT:  Let her finish, Mr. Bondi.

MR. BONDI:  I'm sorry.

MS. ESTES:  Your Honor, respectfully, these are things about Mr. Milton's personal life.  They have nothing to do with the company, they have nothing to do with anything an investor

M9ECmil1

would look at when deciding whether or not to invest in the company.  They are only things that are designed to elicit sympathy.  These are classic things that are precluded in trial, after trial, after trial.

THE COURT:  What about the WeWork references?

MS. ESTES:  Your Honor, we submit that's a false exculpatory statement by the defendant.  If he wants to get up on the stand and testify about why his company is not WeWork, he's certainly allowed to do that, but he should not be allowed to sidestep cross examination by admitting his testimony through podcasts.

THE COURT:  Now let me ask, I'm not putting the defense on the spot, but is Mr. Milton going to testify so far as you know or have you made a determination?

MR. MUKASEY:  I can't say we've made a determination one way or the other.

THE COURT:  Very well.  There are some, the very first few lines on page 3 concerning his background, I don't see how that's eliciting sympathy or anything of that nature, where he grew up, et cetera.  Then halfway through page 4, when he starts talking about his father, perhaps, that comes up.  Certainly I agree with government that just because Mr. Milton said something somewhere at some time does not mean that this jury gets to hear it.  But because it's not going to be played now, because I haven't examined these other excerpts closely,

I'm going to defer decision on it. I'll let you know later this morning.

I also note that, apparently, it's a 108-page transcript. The government is asking to redact about eight or nine pages. So it's not a lot that they're asking to redact. So that's that.

Anything else that the parties wish to raise?

MR. PODOLSKY: Two items, your Honor.

First, we decided not to ask any more questions of this witness on direct examination. We have not spoken to him overnight, so the record is clear, other than to tell him to show up this morning. I can say we have no further questions or we can start with cross, however your Honor would like.

THE COURT: Why don't we make the record clear, stand up, say we have no further questions, and we'll go straight to cross examination.

MR. PODOLSKY: Great. One other item. We were sent some transcripts, snippets that the defense intends to use during cross examination. We have no objection to them being used as demonstratives based on our quick review, but we really haven't had a chance to test the accuracy. So we would object if they try to offer the transcripts into evidence at this time.

THE COURT: I have no idea what he's talking about, but do you intend to offer those snippets into evidence?

MR. CARUSO:  Yes.

THE COURT:  What are they?

MR. CARUSO:  They're completeness clips from the audio and visual exhibits that the government put into evidence yesterday.

MR. PODOLSKY:  Two separate issues.  That might be their theory of admissibility, but what we got were four transcripts.  Two, on our review, are portions of audio or video that we played yesterday that have not been offered into evidence yet, there are other portions.  Two are transcripts of videos or audio that were not played yesterday.  We simply haven't had an opportunity to go through all those video and audio and make sure these are accurate.

I will say we have reviewed some of the defense's transcripts that they have recently sent us.  There are mistakes in them, misattributions and so on.  Based on our review, after they were sent at 11:45 last night, these look okay enough to put in front of the jury, we're not objecting to using them as a demonstrative today.  We just want to hold an objection for now about them actually going into evidence until we can assure they're accurate.

THE COURT:  That's what we can do, Mr. Caruso.  You can use them in cross examination, you can offer them, I suppose, and defer decision on whether or not they'll be admitted until some later time.

M9ECmil1

MR. CARUSO:  That's fine, Judge.

THE COURT:  Anything else?

MR. PODOLSKY:  No, your Honor.

THE COURT:  Anything from you folks?

MR. MUKASEY:  No, your Honor.

THE COURT:  Hopefully we'll get started at 9:30.

(Pause)

Folks, the jury is here.  Can we get Mr. Lackey on the stand.

I was provided some misinformation, all the jury is not here, but hopefully this person will be in momentarily.

(Pause)

The jury will be coming out momentarily.

(Continued on next page)

(Jury present)

THE COURT:  Everyone please be seated.  Ladies and gentlemen of the jury, good morning.  I trust you all had a pleasant evening.

I want to reemphasize one thing.  There is no one in this room that wants to get this trial completed as quickly and as efficiently as possible.  I will make sure that everywhere on this side of the jury box is working as hard as we can, to make sure that the evidence is presented to you thoroughly and efficiently, but we need your help, and please, please do endeavor to get here on time so that we can get you in here and out of here on time.

With that, Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.  The government has no further questions for Mr. Lackey at this time.

THE COURT:  Very well.  Cross examination.

MR. CARUSO:  Yes, your Honor.

May I proceed, your Honor?

THE COURT:  Before you do — Mr. Lackey, you are reminded that you are still under oath.

THE WITNESS:  Yes, your Honor.

 PAUL LACKEY, resumed.

CROSS-EXAMINATION

BY MR. CARUSO:

Q.  I'm not trying to use my knowledge to make money.  I'm not

trying to use my knowledge to make money.  Those are your words, aren't they?

A.  They may be.

MR. CARUSO:  Your Honor, we would like to refresh the witness's recollection, please.

THE COURT:  Let me ask you, is there a microphone on that podium like there was yesterday?

MR. CARUSO:  I don't see one.

THE COURT:  There was a microphone on the podium yesterday.  Is there one that's available?

MR. ROOS:  It's this one, your Honor.  I don't think it will stretch that far.  Yesterday, the podium was right here where I was sitting.

THE COURT:  I understand.  Do we have a long enough cord?

MR. ROOS:  I don't think these will.  If we want to move the podium, we can move our cart and then use that one on that end and stick the podium right there.

THE COURT:  Would that work for now, Mr. Caruso?

MR. ROOS:  I'm happy to lift the podium.

MR. CARUSO:  I'm sorry.  What was it?

THE COURT:  Would it suit your purposes to put the podium on this side of the government's table?

MR. CARUSO:  I'd prefer to be in front of the jury like the government was.

M9ECmil1                    Lackey - cross

THE COURT:  Do we have the handheld mic?

THE DEPUTY CLERK:  Yes, we do.

THE COURT:  I don't believe you have to hold the mic,
Mr. Caruso, but do endeavor to keep your voice up so that the
court reporter can take everything down.

MR. CARUSO:  I will do that, Judge.

BY MR. CARUSO:

Q.  I'm not trying to use my knowledge to make money.  And you
said you're not sure if those were your exact words; correct?

A.  I don't recall.

MR. CARUSO:  Shall we show the witness defense exhibit
5003, please.

THE COURT:  Just the witness?

MR. CARUSO:  Just the witness.  I'm refreshing the
witness's recollection.

MR. ROOS:  Can we have a copy, your Honor?

MR. CARUSO:  Government can use my copy.

Q.  Have you read that, sir?

A.  Yes, I have.

Q.  Does that refresh your recollection?

A.  Yes, it does.

Q.  Can you read it out again, because I don't have it in front
of me now.  I gave my copy to the being government.

A.  It says I am not trying to use my knowledge to make money.

MR. PODOLSKY:  Objection.

M9ECmil1                        Lackey – cross

THE COURT:  Your objection is what?

MR. PODOLSKY:  He's reading from a document not in evidence, your Honor.

THE COURT:  Sustained.

Q.  Those were your words, you read them on June 18, 2020; correct?

A.  I believe it's July 18.

Q.  You're right.  July 18.  Even closer to the recovery of money that you made; right?

A.  Excuse me?  I can't hear you.

Q.  I'll try it again.  I'm not trying to use my knowledge to make money.  But that's exactly what you did, wasn't it?

A.  I was not trying to use it to make money.

Q.  But you did use it to make money, didn't you?

A.  I was not trying to use it to make money.

Q.  But you did use it to make $600,000 off of Nikola stock, didn't you?

A.  I did ultimately receive that money.

Q.  And you're still trying to use your knowledge to get even more money, aren't you?

A.  No, I am not.

Q.  You are a whistleblower to the SEC, right?

A.  I have submitted a whistleblower complaint.

Q.  And you want some more money from that, don't you?

A.  It will remain to be seen whether I receive any money from

that or not.

Q. But I asked you what you want. You want some more money, don't you?

A. I wouldn't mind it.

Q. So, so far, so far, you got $600,000 off of Nikola stock; correct?

A. Correct.

Q. It's not a bad payday, is it?

A. Absolutely not.

Q. Now, you're part of a whistleblower group; correct?

A. Correct.

Q. And you and these other whistleblowers, you have a lawyer representing you on this SEC claim; correct?

A. Yes.

Q. And that lawyer was sitting in this courtroom yesterday listening to your testimony; right?

A. I don't want to get into conversations that I had with my lawyer, please.

MR. CARUSO: Your Honor, please, I asked whether the lawyer was in the courtroom.

THE COURT: Can you answer that question, Mr. Lackey?

A. Yes, he was.

Q. And he's here today, isn't he?

A. Yes, he is.

Q. Now, you identified Mr. Milton across the room yesterday.

M9ECmil1                    Lackey - cross

Would you identify that lawyer, please.

A.   He's sitting right there.

Q.   Sitting in the first row; right?

A.   Yes.

Q.   And did you speak to him yesterday during your breaks in testimony?

A.   I don't want to get into conversations with my lawyer.

Q.   It's a yes or no question, Mr. Lackey.

A.   Yes, I did.

Q.   Did you speak to him after your testimony last night?

A.   Yes, I did.

Q.   Did you speak to him before your testimony this morning?

A.   Yes, I did.

Q.   You discussed your testimony; right?

          MR. PODOLSKY:  Objection, your Honor.

          THE COURT:  Sustained.

          MR. CARUSO:  On what ground?

          THE COURT:  You're asking about the substance.  Ask another question, Mr. Caruso.

Q.   Now, this lawyer also has a stake in the whistleblower claim; correct?

          MR. PODOLSKY:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   If there's a recovery in this SEC whistleblower claim, you're going to get part of it; right?

A.   That has been set up.

Q.   So that's a yes; right?

A.   Correct.  Potentially, if they deem me as somebody who should get it.

Q.   Who else will get part of it?

A.   I can't say who made another submission.

Q.   You can't say the people who are in your group?

A.   Excuse me?

Q.   The people who are in your so-called group, they're going to share in the recovery, as well; correct?

A.   If there was an award given by the SEC, then yes, they would share.

Q.   So would your lawyer; right?

         MR. PODOLSKY:  Objection, your Honor.

         THE COURT:  Sustained.

Q.   Now, let me get the timing straight.  Your lawyer sent a letter to the SEC making your whistleblower claim; correct?

A.   Yes.

Q.   And he sent that letter not only on your behalf, but on behalf of the other members of your group; correct?

A.   Yes.

Q.   One of the people in that group was a man named Nate Anderson; correct?

A.   That is correct.

Q.   Now, Mr. Anderson, he was also in the courtroom yesterday

listening to your testimony; right?

A.   I did not see him, but I have been told that he may have been here.

Q.   Then he left.  He's not here now; right?

A.   I don't see him.

Q.   He's not here for cross, he's only here for the direct; right?

         MR. PODOLSKY:  Objection, your Honor.  Asked and answered.

         THE COURT:  Sustained.

Q.   Now, Nate Anderson just happens to be the author of this so-called Hindenburg report; correct?

A.   That is correct.

Q.   So on September 9, 2020 -- one moment, please.

         On September 9, 2020, the two of you, along with the others in your group, filed the whistleblower claim; correct?  I'm asking you about the date, September 9.

A.   I don't remember the precise date, but it was early September.

         (Continued on next page)

MR. CARUSO:  Can we please refresh the witness's recollection, show the witness.

MR. PODOLSKY:  Your Honor, can we identify for the record what we are showing the witness?

THE COURT:  Can you identify what you are showing Mr. Lackey?

MR. CARUSO:  All right.  For the record, it is a 3500 number but it is cut off.  I will get it for the record.

BY MR. CARUSO:

Q.  That letter was sent on September 9, correct?

A.  That's what it says, yes.

Q.  And that was a single letter submitted to the SEC by your lawyer on behalf of you and the other members of your so-called whistleblower group, correct?

A.  That's my understanding.

Q.  The very next day, September 10, your co-whistleblower, Mr. Anderson, released this so-called Hindenburg Report, correct?

A.  I believe it was then.

Q.  And the very next day, September 11, your lawyer contacted the U.S. Attorney's office, including counsel here, Mr. Podolsky, offering to assist them, right?

A.  Excuse me.  What's the question?

MR. CARUSO:  May I have the question read back for the witness, please.

M9e2Mil2                         Lackey - Cross

THE COURT:  Do endeavor to stay close to the microphone, Mr. Caruso.

MR. CARUSO:  I will, your Honor.

(Record read)

A.  He may have.

MR. CARUSO:  Can we show the witness?  I want to get the date, please.

THE COURT:  Do you want to ask him a question, Mr. Caruso.

MR. CARUSO:  Yes.

BY MR. CARUSO:

Q.  Do you have that in front of you the date, September 11.

A.  Yes.  I'm looking at an e-mail sent on September 11.

Q.  And in that e-mail your lawyer offered to assist the prosecutors, correct?

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Sustained.

The question before you, Mr. Lackey, is by looking at that e-mail, does it remind you or does it refresh your recollection, that your lawyer contacted the U.S. Attorney's office on that day?

THE WITNESS:  Yes.  This is the first time I have seen this e-mail; but, yes, I am seeing that he sent it on that day.

BY MR. CARUSO:

Q.  Okay.  There is no doubt in your mind -- leave that

document aside.  There is no question in your mind that your lawyer offered to have you and your co-whistleblowers assist the government in its prosecution, correct?

A.  Sure.

Q.  And after that offer, you did in fact assist the U.S. Attorney in this case, right?

A.  I have been helping every way I can.

Q.  You had meetings with the prosecutors, correct?

A.  Yes, I have.

Q.  You had meetings with federal agents, correct?

A.  Yes, I have.

Q.  They asked you questions, yes?

A.  Yes, they have.

Q.  You answered -- you gave answers, right?

A.  Yes, I did.

Q.  And in fact, your testimony here yesterday and today is part of that cooperation with the government, correct?

A.  I have been asked to come and state the facts truthfully, and that's what I am doing.

Q.  It's part of your cooperation with the government --

        MR. PODOLSKY:  Objection, your Honor.  Asked and answered.

        THE COURT:  Sustained.

BY MR. CARUSO:

Q.  Now, you can get money as a whistleblower if the SEC brings

a case and wins it and recovers money, correct?

A.   That's my understanding.

Q.   Now, has no one told you that if the government wins in this case, that will make it easier for the SEC to win its case?

A.   That sounds reasonable, but no one's told me that.

Q.   Now, I think you have testified that this Hindenburg group is part of your SEC whistleblower group, correct?

A.   Yes.

Q.   Now, who first contacted you to join this whistleblower group?

A.   I was reached out to by one of the other whistleblowers.

Q.   Name.

A.   His name was Mike Shrout.

Q.   Did Hindenburg contact you later?

A.   No.

Q.   Did you contact Hindenburg later?

A.   No, I did not.

Q.   How did you come into contact with Hindenburg?

A.   It was brought from another member of the whistleblower group.

Q.   I'm sorry.  It was brought what?

A.   It was brought to me by another member of the whistleblower group.

Q.   And his name was?

A.   I don't recall who brought it.

Q.   And after you came into contact with Mr. Anderson or perhaps others at Hindenburg, you gave information to them, correct?

A.   We collaborated on the shared information.

Q.   You gave some information to them, correct?

A.   Yes.

Q.   And that information found its way into the Hindenburg Report, correct?

A.   Yes.

Q.   And Hindenburg had a short position in Nikola stock, correct?

A.   That is correct.

Q.   Meaning that if the price went down, Hindenburg would make money, correct?

A.   Yes.

Q.   Now, you testified yesterday that you had a, quote, a percentage of Hindenburg's short position.  Do you remember that?

A.   Yes, I testified to that yesterday.

Q.   What was the percentage?

A.   I don't recall.

Q.   Approximately, what was the percentage?

A.   I know how much of the percentage of the whistleblower, but I don't know any of the mechanisms of how that worked behind

the scenes.  I honestly do not.

Q.  I asked you what your percentage was.  Right?  There is a whole short position of Hindenburg --

A.  I do not know.

Q.  So your $600,000, you are not sure how that translates into a percentage of the Hindenburg position?  Is that what you are saying?

A.  No, I don't.

Q.  How much did Hindenburg make?

        MR. PODOLSKY:  Objection, your Honor.  Relevance.

        THE COURT:  Overruled.

A.  I do not know how much they made.  I never asked.  I wasn't interested.

Q.  But they made a lot more than the 600,000 that you made, right.

A.  I would presume so.  I have no idea.

Q.  Now, this percentage that you had, did you purchase that from Hindenburg?

A.  What do you mean by purchase that?

Q.  The word "purchase," it's a word in common usage.  Do you know the word "purchase"?  The word "buy" is a synonym.

A.  Did I buy it?  I don't understand that it way, but I'm not sure --

Q.  Okay.  You obtained a percentage of Hindenburg's short position, right?

M9e2Mil2                            Lackey - Cross

A.   Sure, yeah.

Q.   Did they give it to you as a gift?

A.   No.  It was not a gift.

Q.   Did you purchase it?

A.   I guess you could say that.

Q.   How did you purchase it?

A.   I don't know.

Q.   Did you pay cash for it?

A.   No.

Q.   What did you transfer to Hindenburg in order to get your percentage?

A.   I guess it would be information.

Q.   So, in other words, you gave information and they gave you a percentage of their short position.  Is that what your testimony is?

A.   Yes.  That sounds reasonable.

Q.   I'm sorry?

A.   That sounds reasonable.

Q.   Well, does it sound accurate?

A.   Sure.  I never thought of it that way, to be honest, but sure.

Q.   And did they pay you anything else for your information?

A.   No, they did not.

Q.   Just a share of their short position, right?

A.   Nothing else.

Q.   And that proved to be worth $600,000 to you, right?

A.   That's what I received.

Q.   $600,000, sir, is a life-changing amount of money, isn't it?

A.   I'm not sure it's a lot of money in this room, but it was a blessing to me.

Q.   I said it was life changing for you.

A.   My life is very similar to how it was before.

Q.   It's a lot of money for you, right?

A.   It was a lot of money for me.

Q.   Forgive me if I have asked you this, but how much did Nate Anderson make?

A.   And I told you I don't know.

Q.   A lot more than you did?

        MR. PODOLSKY:  Objection, your Honor.  Asked and answered.

        THE COURT:  Sustained.

BY MR. CARUSO:

Q.   Now, let me direct your attention to the year 2015.

A.   2015 did you say?

Q.   I did.

A.   I can't hear you.

Q.   In 2015, you were employed by a company called EVDrive, correct?

A.   That's correct.

Q.   And then you worked as a contractor at Nikola, correct?

A.   That's correct.

Q.   And that work began in May of 2015, correct?

A.   The contract began.  We did some preliminary work, as I testified yesterday, a few months prior to that, but the main contract began in May of 2015.

Q.   That's more than seven years ago, correct?

A.   Yes.

Q.   And that contract ran to May 2016, right?

A.   Yes, it did.

Q.   So that's more than six years ago, right?

A.   Yes.

Q.   And during that time period, Nikola was a privately owned company, correct?

A.   Yes, it was.

Q.   Their shares weren't traded on any stock exchange, were they?

A.   No, they were not.

Q.   And then after that contract ended, you returned to Nikola for some more work in August of 2016, correct?

A.   That's correct.

Q.   And that work ran through November 30 or December 1 of 2016, right?

A.   Yeah.  Let me correct.  The work began in October, not August, but it went from the beginning of October to the end of

November 2016.

Q.  So six years ago, right?

A.  Roughly.

Q.  And at that time, again, Nikola was a privately owned company, correct?

A.  Yes, it was.

Q.  Its stock was not sold to the public, correct?

A.  Correct.

Q.  Now, sorry, the answer was that's correct?

A.  Yes.

Q.  Now, in 2020, you set up what you have described yesterday as, quote, an anonymous Twitter account, correct?

A.  It was anonymous at the time.

Q.  Actually, your use of the word "anonymous" isn't quite accurate, is it?

A.  Perhaps pseudonymous would be better.

Q.  Pseudonymous, meaning you used a pseudonym?

A.  Yes.

Q.  Pseudonym is a fancy word for a fake name, right?

A.  Sure.

Q.  So in fact, you posed as somebody called Nikola Insider, correct?

A.  Correct.

Q.  And you tweeted up a storm on that account, didn't you?

A.  I sent a few.

Q.   Sent and received about 2,000 tweets, didn't you?  Sorry.
Is there an answer?

A.   I don't know, but sure.

Q.   2,000 sound about right?

A.   Sure.

Q.   In fact, sir, at that time, you weren't a Nikola insider at
all, were you?

A.   I wouldn't read too much into the name, sir.

Q.   But you weren't a Nikola insider, were you?

A.   I was not a current Nikola insider.

Q.   You were not an employee of the Nikola at the time?

A.   As I made very clear on the account, I was not.

Q.   The answer is:  That's correct, I was not an employee at
the time, right?

          MR. PODOLSKY:  Objection.  Argumentative.

          THE COURT:  Sustained.

BY MR. CARUSO:

Q.   In fact, you were never an employee of Nikola, were you?

A.   I was never an employee, but I was a contractor.

Q.   And in fact, as of June 2020, when you claimed to be a
Nikola insider, you hadn't even been inside a Nikola building
since 2016, had you?

A.   That was one of the first things that I said on that
account.

Q.   So the answer is yes?

A.  Yes.

Q.  You hadn't worked with Nikola at all after November 30, 2016, correct?

A.  Correct.

Q.  You hadn't talked to Mr. Milton since December 1, 2016, correct?

A.  That is correct.

Q.  Four and a half years later when you started talking about being an insider, right?

A.  What was that last word?  I didn't catch it.

Q.  I will withdraw it.

Now, any inside information that you may claim to have had ended on December 16 -- December 1, 2016, correct?

A.  That is correct.

Q.  And you claimed -- when you claimed to be a Nikola insider, you had had nothing to do with Nikola in 2017, correct?

A.  Correct.

Q.  And nothing to do with Nikola in 2018, correct?

A.  Correct.

Q.  And nothing to do with Nikola in 2019, correct?

A.  That's right.

Q.  So as of June 2020, it sounds to me like you were actually a Nikola outsider, correct?

A.  I was outside of Nikola.  Thank you.

Q.  Now, in June of 2020, the shares of Nikola were trading on

NASDAQ, correct?

A.   That's right.

Q.   And NASDAQ is the name of a stock exchange, right?

A.   That's right.

Q.   Nikola's stock was identified by the symbol NKLA, right?

A.   That's right.

Q.   So if you look up what's going on on NASDAQ and you wanted to find out about Nikola the symbol, so called, was NKLA, right?

A.   That's right.

Q.   Can we call up Government Exhibit 579, please, for the entire courtroom.

Now, this is one of your tweets -- I'm sorry, gentlemen.  I don't have a screen.  If you don't mind I will look over your shoulder.

This is one of your Nikola Insider tweets, correct?

A.   Yes, it is.

Q.   What's the date on it?  Can you see it?  Because I can't read it from this far away.

A.   June 18, 2020.

Q.   Now, this tweet has a hashtag at the left, it's at the bottom left now, NKLA, correct?

A.   Yes, it does.

Q.   And I believe we have already established that that is Nikola's symbol on the stock exchange, right?

A.   That's right.

Q.   Just look to the right of that.  There is another hashtag, NKLAQ, correct?

A.   That's right.

Q.   And that's something that you wrote through this tweet, correct?

A.   Yes, it is.

Q.   Now, Mr. Lackey, isn't it a fact that when a NASDAQ symbol contains the letter Q, that indicates that the company is bankrupt.

A.   I think that's about right.  I know that people use that commonly to kind of have skepticism for a company, but I believe that's how that works.

Q.   It means bankruptcy, right?

A.   Okay.

Q.   Was that a yes?

A.   I don't doubt that.

Q.   But in fact in June 2020 Nikola was not bankrupt, was it?

A.   No, it was not.

Q.   And you knew it wasn't bankrupt, correct?

A.   Yes, I did.

Q.   So you added the Q in your tweets to attack Nikola, didn't you?

A.   No.

Q.   You added the Q in your tweets to attack Mr. Milton, didn't

you?

A.  No, I did not.

Q.  You added it to hurt Mr. Milton, didn't you?

A.  No, I did not.

Q.  So did you add it to help him?

A.  No, I did not.

Q.  And bankruptcy will certainly drive down the stock price, correct?

A.  Yes, it would.

Q.  And that would be much to your advantage, wouldn't it?

A.  I had no financial stake in the company.

Q.  Let's just put it this way --

A.  Can't hear you.

Q.  Let's put it this way.  The company goes bankrupt, the stock price goes down, right?

A.  Yes.

Q.  Yesterday you testified about a car ride you had with Mr. Milton and I think some of your colleagues from EVDrive --

A.  Yes.

Q.  -- in which, according to your testimony, Mr. Milton said "I don't give a shit about the environment.  I just want to make money.

"Q  Why does that still stick with you seven years later?

"A  I was shocked by the kind of vulgarity in that statement. I was kind of a wide-eyed it idealist."  You were shocked by

that statement?

A.   Absolutely.

Q.   The vulgarity shocked you.

A.   Sorry?

Q.   The vulgarity shocked you, yes?

A.   The vulgarity, the audacity.  It was a shocking statement in my mind.

Q.   Certainly that was because at least in part the vulgarity, right?

A.   Yes.

Q.   You think that shouldn't be used in business, vulgarity shouldn't be used in business settings, is that correct?

A.   It was a brash statement that I wasn't expecting.

Q.   Let's show the witness Exhibit 5007, please.

When you have it, sir, let me know.  I'm going to ask you some foundational questions.

A.   Okay.

Q.   So is this a tweet which you sent on September?

THE COURT:  We can't see it.

A.   I don't see it.

Q.   You don't see it?

A.   It's not up.

MR. CARUSO:  Well, sorry.  I thought he said he had it.

Q.   Showing you what's been marked as Defendant's Exhibit 5007,

and I ask you, sir, whether this is a tweet that you sent on your Nikola Insider account on September 12, 2020?

A.  It looks like it.

Q.  Can you read it to the jury, please?

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Sustained.

MR. CARUSO:  Your Honor, I would like -- one moment.

(Counsel confer)

MR. CARUSO:  Judge, we offer 5007 into evidence.

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Let's talk at the sidebar.

(Continued on next page)

(At the sidebar)

MR. CARUSO:  So the man yesterday posed as a mister goody two-shoes.  "I'm shocked" when my client said "shit."  He is not above it.  "Holy fucking shit."  It goes to his credibility.  He is such a nice, goody two-shoes Boy Scout.

MR. PODOLSKY:  Can we stay quieter, please?

Number one, this exhibit, which obviously intend to introduce, was not produced in discovery.

Number two, it is a --

MR. ROOS:  Or to us, period.  We have never seen it before.

MR. PODOLSKY:  So let's get to the substance.  I mean, that argument is absurd.  The man testified under oath on examination that he was shocked that Trevor Milton would say "I don't give a shit about the environment, I only care about making money."  They now seek to impeach him with a statement on Twitter that says "holy fucking shit."  The relevance of this is -- vanishing would be an overstatement.  This does not impeach his testimony whatsoever and it should not be admitted.

MR. CARUSO:  I think I have stated the relevance.  It undermines his goody two-shoes approach to all this.

THE COURT:  I get what you are trying to do.  My reading of his testimony is that he was shocked by the vulgarity and by the substance of Mr. Milton, a person who is in a car with a bunch of people from an electronic vehicle

company, saying that he doesn't care about the environment.  So I see what you are trying to do.  I think it is a bit much of a stretch and, more importantly, it's never been turned over.  The government's never seen it, so I'm not going to allow it.

MR. MUKASEY:  May I propose an alternative?  First of all, these are public tweets.  Right?  We can Google them.  If they haven't looked at their own witness's tweets, that's not on us.

Perhaps the way to do this, to address the concerns, is to say, you know, you testified yesterday that you were shocked that he used vulgarity and made certain statements.  Isn't it a fact that you have used vulgarity in your tweets.

THE COURT:  That's fine.

MR. MUKASEY:  In fact you have said "holy fucking shit" or he doesn't have to go that far.

MR. CARUSO:  I would like to go that far.  That's the point.

MR. MUKASEY:  But he said we can't.  So let's try to get what we can.

THE COURT:  I mean, you can't put in that document.

MR. CARUSO:  But can I read it out?

MR. MUKASEY:  "Isn't it a fact that you said this?"

THE COURT:  You can say:  Isn't it a fact that you have used language like that.

MR. CARUSO:  Including, and then I'm going to read the

M9e2Mil2                          Lackey - Cross

words.

MR. ROOS:  You can't read.

THE COURT:  You can't read from the document.

MR. CARUSO:  Okay.  I will say, in fact, you said "holy fucking shit."

MR. MUKASEY:  "You used the words."

THE COURT:  You know how to do this, Mr. Caruso.

MR. CARUSO:  There is a bit of nuance here which I am trying to . . .

THE COURT:  I know.

(Continued on next page)

(In open court)

BY MR. CARUSO:

Q.  So you were shocked about the vulgarity, I think you said that, but in fact you have used similar vulgarities in your tweets, yes?

A.  Yes, I have.

Q.  And in fact --

A.  I can't hear you.

Q.  -- you are not above using the term "holy fucking shit," correct?

A.  Correct.

Q.  In a business setting, right?

A.  Business setting?  No.

Q.  In a tweet setting?

A.  Tweet setting, sure.

Q.  But that's not business to you?

A.  No.

Q.  Even though you made $600,000, it's not business to you?

A.  I did not set up this Twitter account with any expectation of ever making any money.

Q.  But you got money, didn't you?

        MR. PODOLSKY:  Objection, your Honor.

Q.  I'm not asking you about your expectation when you started it.

        MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Overruled.

A.  You asked if it was a business thing.  I did not view it as a business thing, so no.

Q.  It became a business thing, correct?

A.  I did get some money from it.

Q.  Indeed, you did.

MR. CARUSO:  All right.  Now, your Honor, we are going to move now to play some -- excuse me, to use some materials to complete some of the exhibits that the government put in yesterday.

THE COURT:  Okay?  Have you spoken with the government about what you intend to put in.

MR. CARUSO:  I believe this was -- yes.  I believe the answer was yes.  There was a discussion this morning about not admitting the transcripts yet.

THE COURT:  Why don't you show the government what you want to put in and we will go from there.

(Counsel confer)

BY MR. CARUSO:

Q.  All right, so, can we please have, Mr. Chris, we have called day one, clip nine, please.

(Video played)

MR. PODOLSKY:  Your Honor, we don't object to this, but can we just have an exhibit number and offer it into evidence before we play these?

THE COURT:  Very well.

MR. MUKASEY:  It's 463, Judge, and we offer it.

THE COURT:  Any objection?

MR. PODOLSKY:  No, your Honor.

THE COURT:  463, defendant's exhibit, will be received.

MR. CARUSO:  Thank you, Judge.

(Defendant's Exhibit 463 received in evidence)

BY MR. CARUSO:

Q.  Mr. Lackey, let me ask a few questions to orient the jury here.

We just saw a clip of some portion of what's been called the day one unveiling, correct?

A.  Yes.

Q.  And we also saw some clips of this day one unveiling yesterday when you gave direct testimony, correct?

A.  Yes.

Q.  So you saw there that Mr. Milton called up to the stage certain people who were working on this development of Nikola One, correct?

A.  That's correct.

Q.  They were from Ryder?

A.  Yes.

Q.  They were from Meritor.

A.  Yes.

M9e2Mil2                         Lackey - Cross

Q.   They were from Pratt Miller, correct?

A.   Correct.

Q.   Those are all companies that have to do with automotive parts and automotive design, etc., correct?

A.   That's right.

Q.   Your company was EVDrive, correct?

A.   That's right.

Q.   Your company wasn't called up to the stage, was it?

A.   We were considered part of the core team.

Q.   I said your company wasn't called up to the stage, was it?

A.   No, but the founder of our company was called up when he called up the Nikola team.

Q.   Say that again.  Or have it read, please.

        THE COURT:  Why don't you repeat your answer, Mr. Lackey.

        THE WITNESS:  The founder of our company was called up to the stage when Trevor called up the core Nikola team.

        MR. CARUSO:  May we have clip seven, Mr. Chris.

        (Video played)

BY MR. CARUSO:

Q.   So you heard that clip about the Nikola Two, correct?

A.   Yes.

Q.   So there was a Nikola One that you were working on, correct?

A.   Yes.

Q.   And there was going to be a Nikola Two, correct?

A.   Correct.

Q.   In other words, the vehicle that you testified about yesterday was not going -- was not the end of the process of design at Nikola, correct?

A.   At the time the plan was to bring both to production in parallel.

Q.   So there was going to be One and then later Two?

A.   Yes.

Q.   Now, I would like to move to day two, clip three, if we can please state the exhibit number on the record.

        MR. CARUSO:  And while we are doing that, may I continue to ask a few questions, your Honor?

        THE COURT:  You may.

Q.   So, Mr. Lackey, I think you testified that -- anyway, let's testify today, there was a day one of this unveiling, correct?

A.   Yes.

Q.   And there was a day two of the unveiling, right?

A.   Correct.

Q.   And day one was the promotional event, right?

A.   That's how I would characterize it.

Q.   And then day two was more informational, would you say that?

A.   It was billed as a question-and-answer.

Q.   We are going to look at some of that.  I just wanted to

distinguish between promotional event and then day two.

So let's play that, please.

MR. PODOLSKY:  Objection, your Honor.  That's not a question.

THE COURT:  Overruled.

MR. MUKASEY:  For the record, this is DX 1019.

MR. PODOLSKY:  We have no objection if it's being offered into evidence.

THE COURT:  DX 1019 will be admitted.

(Defendant's Exhibit 1019 received in evidence)

THE COURT:  Is that second clip in evidence?  The second clip?

MR. MUKASEY:  Yes, Judge.  The second clip was also part of DX 463.

THE COURT:  Okay.

MR. CARUSO:  Can we play that, Mr. Chris, number three?  Can we play it with sound?

A.   There is no sound.

Q.   I'm sorry.  I realize that.

(Pause)

MR. CARUSO:  We have some tech problems, Judge, so we are going to move on to the next clip.

THE COURT:  Very well.

MR. CARUSO:  Mr. Chris, would you please play clip number four.

MR. PODOLSKY:  Is this the same exhibit?

MR. CARUSO:  Same exhibit.

(Pause)

MR. CARUSO:  If the Court allows, we will skip the clips of what I am calling day two.  Perhaps we can come back to it after ironing this out and I will move on to the next exhibit, please.

THE COURT:  That would be wonderful.

MR. CARUSO:  Thank you.  I'm sorry to take up everybody's time.

All right.  Government Exhibit 413, please.  I'm going to offer -- sorry.  We are offering this to complete Government Exhibit 413, the Bloomberg interview, and we are going to offer portions of Defense Exhibit 1015.

If you could please play clip number five, sir.

(Audio played)

MR. CARUSO:  Now let's play clip number three, please.

MR. PODOLSKY:  Your Honor, we don't object to the admission, but we do think this should be received into evidence in order to play them to the jury.

THE COURT:  I believe this is a government exhibit. Did you say that?

MR. CARUSO:  No.  I'm sorry.  Mr. Podolsky is correct. This is Defense Exhibit 1015, which I now move into evidence.

MR. PODOLSKY:  No objection.

M9e2Mil2                        Lackey - Cross

THE COURT:  It will be received.

(Defendant's Exhibit 1015 received in evidence)

(Audio played)

MR. CARUSO:  Now if you would play clip number four, please.

(Audio played)

BY MR. CARUSO:

Q.  So, Mr. Lackey, you heard Mr. Milton say that it was the Nikola Two that was the first one driven under power, correct?

A.  Correct.

Q.  He said that to a reporter, correct?

A.  Yes.

Q.  That reporter, just to refresh recollections here, that's a reporter named Ludlow, correct?

A.  Yes.

Q.  He works for Bloomberg, or at least did then, right?

A.  Yes.

Q.  There is no claim there that Nikola One was driven under power, correct?

A.  No.

Q.  Now, I believe you testified yesterday -- withdrawn.

A.  Can't hear you.

Q.  Okay.  I will try better, harder.

We saw a video yesterday of the Nikola truck going along the road, yeah?

A.   Yes.

Q.   And I believe you testified that the source -- excuse me. Withdrawn.

I believe you testified that that video originated as a commercial for a company called Phillips, correct?

A.   That video was recut with outtakes for a filming for a Phillips commercial.

Q.   Phillips is a company that's in the auto parts -- automotive parts industry, right?

A.   Sure.

Q.   And that Phillips commercial was -- well, it was the origin of what we saw yesterday, yeah?

A.   No, it was not.

Q.   The original footage was done for Phillips, let's just keep it with that.

A.   There was very little overlap in the footage.  The footage that was shown the next day in Nikola's promotional video was very different from the Phillips commercial.

Q.   But there was --

A.   It was filmed the same day at the same time, but it was very different.

Q.   But there was a commercial made for Phillips, right?

A.   There was a commercial made for Phillips.

MR. CARUSO:  Your Honor, we would like to play that for completeness, Defense Exhibit 467.

M9e2Mil2                         Lackey - Cross

          MR. PODOLSKY:  Your Honor, may we approach very

briefly on one matter?

          THE COURT:  Sure.

          (Continued on next page)

(At the sidebar)

MR. PODOLSKY:  Two items, and this is just so I don't have to keep jumping up, interrupting the colloquy here.

Number one, if the defense is going to offer an exhibit, they need to identify the exhibit, offer it into evidence, and we will object or not object, so it can be received and they can play it.  So every time he shouts "clip whatever," we don't know what it is, and the jury is hearing something not in evidence.

MR. CARUSO:  He is right.  I'm sorry.  I will do better.

MR. PODOLSKY:  Number two, just a sort of general objection that every time he offers something, he says "for completeness."  That's his commentary.  It's not a lead for anything about a question.  He can just say "we offer into evidence X, we will object or not object, and then he can play it without the commentary.

MR. CARUSO:  I will try.  If I mess up, tell me.  Okay?

(Continued on next page)

(In open court)

THE COURT:  So any objection to the admission of the exhibit, Mr. Podolsky?

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 467 received in evidence)

(Video played)

BY MR. CARUSO:

Q.  You have seen that before, right.

A.  Yes, I have.

Q.  Yeah.  So just to put a finer point on it, that 90 at the end, this commercial -- as far as you know, this commercial was made to observe Phillips' 90th year anniversary in business, right?

A.  I suppose.

MR. CARUSO:  Your Honor, let me confer here with Mr. Milton.

(Counsel confer)

MR. CARUSO:  Thank you, your Honor.  I have no further questions at this time.

THE COURT:  Redirect.

(Continued on next page)

MR. PODOLSKY:  May I proceed your Honor.

THE COURT:  You may.

REDIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Good morning, Mr. Lackey.

A.  Good morning.

Q.  Can I ask, how old you are?

A.  I'm 42 years old.

Q.  Have you ever used curse words?

A.  Yes, I have.

Q.  Have you used them in personal text messages?

A.  Absolutely.

Q.  Personal communications?

A.  Absolutely.

Q.  Twitter?

A.  Absolutely.

Q.  You're familiar with various curse words, they don't shock you generally, do they?

A.  No, they do not.

Q.  Have you ever said, I don't give a shit about the environment, I only want to make money?

A.  Have I said that?

Q.  Yeah.

A.  No.

Q.  Why not?

M9ECmil3                      Lackey - redirect

A.   Well, first of all, I do care about the environment.

Q.   So why were you shocked when Mr. Milton said that?

A.   I think that most people would understand that when it comes to vulgarity, and the impact of vulgarity context is very important, so the day I heard the statement was actually the first day that I ever met Mr. Milton, and at that time he was presenting himself as a high-ranking executive at Worthington Industries, which is a large multibillion dollar corporation, and from that context, I found the statement shocking.

Q.   Now setting aside the vulgarity, did you find the content of the statement shocking?

A.   Yes, I did.

Q.   Why is that?

A.   Up till then, I had kind of assumed that we were doing this stuff to help climate change.

Q.   Now, do you recall some questions about your Nikola Insider account?

A.   Yes.

Q.   And your real name isn't Nikola Insider, is it?

A.   No, it is not.

Q.   Do you think most people would understand that your name isn't Nikola Insider?

A.   Yes, I think they would.

Q.   Why did you use that name for your Twitter account?

A.   I was trying to think of a Twitter handle and I had some

information that hadn't been shared publicly and it seemed reasonable at the time.

MR. PODOLSKY:  Why don't we put back up for everyone Government Exhibit 579.

Q.  Now, at the top of this exhibit, is it the first post on the Nikola Insider account?

A.  I believe it is.

Q.  And then you see the third paragraph says:  Perhaps you doubt that I am really an insider.  Reader, I was there.

Do you see that?

A.  Yes.

Q.  Why did you write that?

A.  Because I had been there during the period of the time that I was going to present information concerning the Nikola One.

Q.  Did you think it was accurate to call yourself an insider with respect to the facts about the Nikola One?

A.  Absolutely.  Perhaps I should have called myself an ex-insider.

Q.  And the picture below, did you take that picture?

A.  Yes, I did.

Q.  Where was that picture taken?

A.  That was taken at Nikola headquarters in Salt Lake City.

Q.  What's the picture of?

A.  It's a picture of the day that the cabin of the Nikola One was delivered to the facility.

Q.  Did you have direct knowledge of what was going on with the truck as is depicted in that picture?

A.  Yes, I did.

Q.  Now, you had some questions about, I think they're called hashtags, the portions at the bottom of the text?

A.  Yes.

Q.  And defense counsel asked you about the hashtag, #NKLAQ. Do you see that?

A.  Yes.

Q.  Why did you use that particular nomenclature in this tweet?

A.  So I was pretty new to the whole thing at the time, but my understanding was that, in general, for a publicly traded company, if it was at all controversial, the people who were supportive of the company would use the hashtag of the stock ticker and people who were skeptical of the company would use the hashtag with the Q at the end.

So this was my first tweet, as you mentioned, and I didn't have any followers, but I wanted to get this story out, like, it was an important story.  I wanted to get it out, so I wanted it to be seen by people.  So I put these two hashtags, as well as the spelled out the Nikola name in order to have more people see it.  I wanted both supporters and people who were skeptical to see the tweet.

Q.  Now, did you think that by writing NKLA with a Q afterwards, that going to cause the company to just go

M9ECmil3                          Lackey - redirect

bankrupt?

A.  No, absolutely not.

Q.  Do you see at the bottom of the tweet, the date is June 18th, 2020, do you see that?

A.  Yes.

Q.  How long after Mr. Ludlow's article came out was this posted, do you recall?

A.  I believe it was the next morning.

Q.  You reached out to Mr. Ludlow, I believe you testified; correct?

A.  Yes, I did.

Q.  Did you ask him for money or anything like that?

A.  No, I did not.

Q.  Did you get any money from that?

A.  No, I did not.

Q.  At this time, had you received any money from publicizing the facts as you knew them?

A.  No, I had not.

Q.  At this point, had any other whistleblowers reached out to you?

A.  No, they had not.

Q.  Have you been in touch with or working with Hindenburg Research at this point?

A.  No, and I did not know they existed.

Q.  Had you heard of them?

A.  I had not.

Q.  To the best of your recollection, about when did you first hear of them?

A.  It was, I believe, in August.

Q.  So at some point after August, you entered into some arrangement with them where you would get a benefit or an interest in their short position; is that right?

A.  That's right.

Q.  Before that, did you have any interest in Nikola stock whatsoever?

A.  No.

Q.  So when you posted this tweet, MKLAQ, did you post it because you thought that some entity who you never heard of might contact you later and give you a short interest in this company?

A.  No.  To be honest, at the time, I wasn't familiar with the concept of short selling.

Q.  When did you learn about that?

A.  In August.

Q.  Let me ask you a few more questions about that.

You recall being asked a number of questions at the beginning of your cross examination about the $600,000 that you made?

A.  Yes.

Q.  I believe you said it was a blessing for you; right?

A.   It was.

Q.   About when did you receive that money?

A.   It was maybe October or late September 2020.

Q.   So about how long ago?

A.   About two years ago.

Q.   Have you invested in Nikola in long or short positions since then?

A.   No, I have not.

Q.   Do you stand to benefit in any way if Nikola stock goes up or down after today?

A.   No, I do not.

Q.   Now, let's just follow up on that for a moment.

        You said that you first heard about Hindenburg Research and short selling in August.

        MR. PODOLSKY:  Let's pull up Government Exhibit 700. We can blow up the headline.

Q.   Do you recognize this, Mr. Lackey?

A.   Yes, I do.

Q.   Do you see that the headline is:  "Nikola founder Exaggerated the Capability of his Debut Truck."

A.   Yes.

Q.   I believe you testified on direct examination that you provided the information for this article; right?

A.   Yes, I did.  I believe it was corroborated by others --

        MR. CARUSO:  Objection.  Move to strike.

THE COURT:  Sustained.

Q.  Did you provide the information for this article?

A.  Yes, I did.

Q.  When you did that, had you heard of short selling or Hindenburg Research?

A.  No, I had not.

MR. PODOLSKY:  Why don't we pull up Government Exhibit 1, and blow up the top.

Q.  Who wrote the top text message?

A.  I did.

Q.  When did you write that?

A.  December 2, 2016.

Q.  So about how long, if we can try to do the math, before you got involved with these other whistleblowers did you write this text message?

A.  I guess three and a half years, if I'm doing the math right.

Q.  And how long after you watched the unveiling did you write this text message?

A.  It was the next day.

Q.  What did you write?

A.  I wrote:  "Watched the show last night.  Was disappointed, but not surprised that Trevor told The Big Lie."

Q.  Did anyone pay you to write this text message?

A.  No.

Q.   Why did you write it?

A.   Because I was disappointed and wanted to share that with a friend.

MR. PODOLSKY:  Your Honor, are we going to take a break at 11:00 today?

THE COURT:  We're going to break right now.

Ladies and gentlemen, it's 11 o'clock, 20 minutes. Please be prepared to come out 20 after the hour.  Do not discuss the case.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Lackey, you may step down.  Folks can be seated.

Anything that we need to discuss now from the government?

MR. ROOS:  No, your Honor.

THE COURT:  From defense?

MR. MUKASEY:  No, your Honor.

THE COURT:  20 minutes.  Don't be late.

(Recess)

THE COURT:  Mr. Podolsky is here.  Mr. Caruso, you wanted to put something on the record.

MR. CARUSO:  Yes.  We have now fixed the audio problem.

THE COURT:  Okay.

MR. CARUSO:  So we'd like to play those clips.

THE COURT:  Okay.

MR. CARUSO:  What I'm going to suggest, of course your Honor will have his own view, is that we essentially reopen the cross, play that, and then there can be redirect about that.

THE COURT:  We can do it either way.  Mr. Podolsky, if you want to finish your redirect, you can do that.  I will allow them to play those portions.

MR. PODOLSKY:  Can I just ask, is this just a matter of playing the portions or are there questions for the witness?

M9ECmil3                      Lackey - redirect

MR. CARUSO:  There will be a very few questions for the witness, yes.

MR. PODOLSKY:  Okay.  Why don't we do this, I'll say that I don't have questions at this time, Mr. Caruso can play these videos, and then I may have a few more questions on redirect that go to both parts of the cross examination.

THE COURT:  That's fine.  That works.

Mr. Caruso, we now have a microphone for you at the podium.  Please don't wander too far off.

MR. CARUSO:  Thank you.  I'll try.

(Continued on next page)

(Jury present)

THE COURT:  Everyone please be seated.

Mr. Podolsky.

MR. PODOLSKY:  Nothing further at this time, your Honor.

THE COURT:  Mr. Caruso, any recross?

MR. CARUSO:  Thank you, your Honor.

If, your Honor, please, I will ask just one line of questioning on recross and then we'll move on to the materials as to which there was an audio file.

RECROSS EXAMINATION

BY MR. CARUSO:

Q.  Mr. Lackey, I believe you testified just now that Government Exhibit 579, where you used the hashtag NKLAQ, was your first tweet; right?

A.  I believe it was.

Q.  First tweet on that account; correct?

A.  I believe so.

Q.  In fact, you have had a Twitter account since February of 2011; right?

A.  Yes.

Q.  So you, in fact, at that time, June of 2020, it's fair to say that you were an experienced Twitter user, yes?

A.  Yes, I was.

MR. CARUSO:  Now, if your Honor, please, this is

Defendant's Exhibit 1019, and we're going to play some of these video clips.

THE COURT:  Very well.

(Video played)

Q.  So, Mr. Lackey, the Nikola One vehicle that you worked on was a prototype; right?

A.  Yes, it was.

Q.  And as we just heard Mr. Milton say, there's a big difference between a prototype and a production vehicle; correct?

A.  That's correct.

Q.  And Mr. Milton, he didn't have enough time by December 1 to get this to production; correct?

A.  That's not -- yes, that's correct.

MR. CARUSO:  Same exhibit, what we are internally calling clip 4, please.

(Video played)

Q.  So as of December 1, 2016, the vehicle that you saw had not been tested; correct?

A.  That's correct.

Q.  And we just heard Mr. Milton say it was to be tested in the future; correct?

A.  He said a very specific type of testing, DOT compliance testing.

Q.  That would be done in the future; right?

A.   That's correct.

MR. CARUSO:  Clip 5, please.

Q.   The man who we saw there was from Meritor; correct?

A.   Yes, he was.

Q.   Meritor was one of the companies that Mr. Milton described as a partner in this effort; correct?

A.   Correct.

MR. CARUSO:  Clip 9, please.  Again, same exhibit.

(Video played)

Q.   Now, as of December 2016, there's no question that there was going to be a next revision of the frame, was there?

A.   They were saying that they were planning to do so.

MR. CARUSO:  Clip 14, please.

(Video played)

Q.   Who is that speaking?

A.   That's Kevin Lynk.

Q.   He was the chief engineer; correct?

A.   That was his title.

Q.   And you heard him say that they scrapped everything; correct?

A.   Yes, he said that.

Q.   Moved on to a redesign; right?

A.   That's what he said.

Q.   And it's also true, isn't it?

A.   I wouldn't use the word scrapped, but that's his

prerogative.

MR. CARUSO:  Clip 16, please.

(Video played)

MR. CARUSO:  Clip 17, please.

(Video played)

Q.  You heard him say zero emissions is the way to the future; right?

A.  Yes.

MR. CARUSO:  Clip 20, please.

(Video played)

Q.  Mr. Lackey, as of December 1, 2016, your understanding was that the Nikola One vehicle was a prototype; right?

A.  Correct.

Q.  The audience was told that it was a prototype; right?

A.  Correct.

Q.  And the audience was told that there would be a next wave of partners; correct?

A.  Correct.

Q.  And that those partners would come in to get to production; right?

A.  Correct.

Q.  So that was all in the future, going to happen after December 1, 2016; correct?

A.  That's right.

Q.  And all of that development after that date, you had

nothing to do with, did you?

A.   That's correct.

MR. CARUSO:  Clip 21, please.

(Video played)

Q.   Mr. Lackey, isn't it a fact that as of December 1, 2016, Nikola had years of work ahead of it to get to production; correct?

A.   Yes, they did.

Q.   And you didn't participate in any of that work, did you?

A.   No, I did not.

MR. CARUSO:  Thank you.  Let me talk to Mr. Mukasey, first.  I think I'm done.

(Pause)

Nothing further, Judge.

THE COURT:  Any redirect?

MR. PODOLSKY:  Yes, your Honor.

Mr. Charalambous, can we pull up Exhibit 1019.  I believe that's the video we were just looking at.

Before we play it, I would also like to offer a demonstrative, the defense exhibit, 9000-T, their transcript.

THE COURT:  Any objection?

MR. CARUSO:  I think so.

THE COURT:  Sidebar?

MR. CARUSO:  Please.

(Continued on next page)

(At the sidebar)

MR. CARUSO:  I'm sorry.  You're offering a document that, this morning, you said you didn't want?

MR. PODOLSKY:  No, I offered it as a demonstrative, exactly as I previewed.

THE COURT:  So they want the jury to be able to read along from your transcript without putting it into evidence.

MR. CARUSO:  Okay.

MS. YOUNG:  They have copies.

MR. PODOLSKY:  Okay.

(Continued on next page)

(In open court)

MR. PODOLSKY:  Your Honor, we offer defense's transcript, Defendant's Exhibit 9000-T, as a demonstrative.

THE COURT:  Ladies and gentlemen, what that means is simply that the transcript that you'll be asked to read from will not be put into evidence.  You'll have it as an aid as you listen to the video.

MR. PODOLSKY:  Before we play it, I believe you may have copies of it under your seats or somewhere around there. This will just be the very first page of that.

Mr. Charalambous, we'll play what I think they called the first clip.

Before we start it, let me ask a few questions.

REDIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Do you recall watching this clip a few moments ago?

A.  Yes.

Q.  I want to make sure we're clear.  This is the second day of the unveiling?

A.  Yes.

Q.  So the portion where the truck was actually unveiled and Mr. Milton made the statements that we went through in detail yesterday, when were those in relation?

A.  That was the prior evening.

MR. PODOLSKY:  Let me see if we can iron out some

technical difficulties here for one moment.

(Pause)

So I think we've worked it out, we'll just play the very first clip.

(Video played)

Q. Mr. Lackey, you heard Mr. Milton describe the changes that will go from the vehicle that was behind him to when it's fully mass produced; is that right?

A. Yes.

Q. And you've actually watched, physically, you've watched the whole video, haven't you?

A. Yes, I have.

Q. Can you point us to the part that Mr. Milton explains that one of the changes they have to make is to actually make the truck work?

A. He did not bring that up.

Q. Can you point to where he said in this that, actually, the truck behind him was missing parts entirely?

A. That also did not come up.

Q. Can you point to the part where he said this thing does not function?

A. No.

Q. In fact, if you look at the transcript, there's no line numbers, but about in the middle, he said, who cares about the little things that don't -- that are not perfect.

Was it only the little things in the truck that weren't perfect?

A.   No.  I wouldn't be sitting here if that were the case.

Q.   Actually, at the bottom of that page, I think at the end of the clip we just listened to, he said:  So real quick, some of the changes on the truck, you'll notice back in the back, you see those massive motor gearboxes, they're incredible, it's the only ones like in — I think he meant it — in the world. There's no other motor gearboxes like it.  They're a full-on locomotive style.  It's a single -- essentially, it's a dual speed, but a single between low and high.  So there is only two speeds on that motor gearbox.  In production, the motor gearbox will be about 50 percent of that size.

He said that; right?

A.   That's what he said, yes.

Q.   Did he point out that those gearboxes were actually completely empty?

A.   No, he did not.

Q.   If you made a gearbox half the size, but still empty, would that work?

A.   No.

Q.   Now, you pointed out that the truck didn't function at all to several reporters over time; is that right?

A.   Yes.

Q.   I think you testified that the first time was in 2017; is

that correct?

A.  Yes, it was.

Q.  And why did you do it at that time?

        MR. CARUSO:  Objection.

        THE COURT:  Overruled.

A.  I thought it was an important story for people to know.

Q.  And I believe you testified, as well, that you spoke to a different reporter in 2018; is that correct?

A.  Yes.

Q.  And again, why did you do that?

        MR. CARUSO:  Same objection, your Honor.  This is beyond the scope.

        THE COURT:  Overruled.

A.  Same answer.  I still thought it was an important story.

Q.  And then after that, I believe you testified that there were two years where you put it aside; is that right?

A.  Yes.

Q.  Why is that?

A.  The things that had prevented the articles from coming out did not seem like things that were likely to go away in the near future.

        MR. CARUSO:  Objection. Move to strike.

        THE COURT:  Overruled.

Q.  Now, you brought it back up again in 2020.  Was that your testimony?

A.  Yes.

Q.  Why, after two years, did you -- by the way, who did you contact at that time?

A.  Ed Ludlow at Bloomberg.

Q.  At that time, did you have any interest in the company?

A.  No, I did not.

Q.  Can you explain then why you brought up to Mr. Ludlow the facts that we've gone through, that the truck wasn't functioning?

MR. CARUSO:  Objection.

THE COURT:  Overruled.

A.  I had believed that the stakes had risen dramatically and that it was worth another try.

Q.  Why had they risen dramatically, in your mind?

A.  Because the investment in the company had been opened up to the general public.

Q.  Do you recall getting any questions on cross examination about whether or not the truck functioned?

A.  Yes -- no, actually.  No, I don't think they asked about that.

Q.  So to be clear, do you recall any questions about whether or not it functioned?

A.  No, I don't think so.

Q.  Did it function, ever?

A.  No, it did not.

Q.  Did it fully function?

A.  No, it did not.

Q.  Did it drive?

A.  No, it did not.

MR. PODOLSKY:  Nothing further, your Honor.

THE COURT:  Anything more, Mr. Caruso?

MR. CARUSO:  Just one moment.  Nothing further, your Honor.

THE COURT:  Mr. Lackey, you may step down.

THE WITNESS:  Thank you, your Honor.

(Witness excused)

THE COURT:  Government, call your next witness.

MS. ESTES:  Government calls Elizabeth Fretheim.

ELIZABETH FRETHEIM,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  You may be seated.  Please, when you speak, speak directly into the microphone.  Please begin by stating your first name and your last name, and spelling your first name and your last name.

THE WITNESS:  Elizabeth Fretheim.  Elizabeth is E-l-i-z-a-b-e-t-h, Fretheim is F-r-e-t-h-e-i-m.

THE COURT:  Ms. Estes.

MS. ESTES:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. ESTES:

Q.   Good morning, Ms. Fretheim.

A.   Good morning.

Q.   Where do you currently work?

A.   Nikola Corporation.

Q.   How long have you worked at Nikola?

A.   Since May of -- excuse me.  March of 2019.  So about three and a half years.

Q.   When you started at Nikola in March 2019, what was your position?

A.   Head of business development.

Q.   What's your position now at the company?

A.   Head of sustainability.

Q.   How would you describe Nikola's business?

A.   So we are focused on class 8, heavy-duty, zero-emission freight trucks and the supporting energy infrastructure.

Q.   Ms. Fretheim, when you say class 8 trucks, what do you mean by that?

A.   They're basically the heaviest freight trucks that you'll see out on the road.

Q.   And you also mentioned energy infrastructure, what do you mean by that?

A.   So right now, there isn't a lot of fueling or charging infrastructure for these trucks out there, so we are involved in putting up that infrastructure.

Q.   How is Nikola involved in that specifically?

A.   So we have two different types of trucks.  We have a battery electric truck and we have a hydrogen fuel cell electric truck.  On the battery side, we're mostly just assisting the customers and figuring out how to put up charging infrastructure.  We do have some chargers to assist for demonstrations, things like that, but we're not building the chargers.  On the hydrogen fuel cell side, we plan to be involved in the whole ecosystem, from generating the hydrogen through dispensing it at fuel stations.

Q.   Ms. Fretheim, we'll come back to that in just a minute.

First when you started at Nikola in your role as head of business development, what were your duties and responsibilities?

A.   My main responsibility was to work with customers and to sell our trucks to them.

THE COURT:  Could you stop for a moment.  We need to take a quick break.  Actually, can the jury please stand and we'll take a quick break.

(Continued on next page)

M9ECmil3                          Fretheim - direct

(Jury not present)

THE COURT:  Everyone can be seated.  One of our jurors appeared to have a physical issue to deal with.  Appeared.

MR. ROOS:  Your Honor, is it okay for Ms. Fretheim to stay in the witness box or would you like her to step down?

THE COURT:  You can step down if you wish.  I don't know how long it's going to be.  We'll get a report as soon as we can.

MR. PODOLSKY:  Your Honor, may I make a record on one matter?

THE COURT:  Yes.  What do you wish to say, Mr. Podolsky?

MR. PODOLSKY:  This is, again, just for the record, I believe your Honor overruled the objections on this, but I noted that we had an agreement prior to when a jury came in that I would basically give up the remainder of my redirect so that Mr. Caruso could essentially reopen his cross.  He then attempted, after our agreement, to limit the scope of my re-redirect to what he had just done.  I want to make sure the record is clear that I was well within the scope that we had agreed with the Court we would do.

THE COURT:  I don't know if you want to put anything on the record, Mr. Caruso, but in my view, it was not beyond the scope.  There was a broad-based attack on Mr. Lackey's credibility and you were addressing that issue.

M9ECmil3                         Fretheim - direct

          MR. CARUSO:  He won the point, didn't he?

          THE COURT:  He did.

          (Pause)

          Can we get Ms. Fretheim.  It appears the crisis has passed.

          MS. ESTES:  Yes, your Honor.

          (Continued on next page)

THE COURT:  Ms. Estes.

MS. ESTES:  Thank you, your Honor.

BY MS. ESTES:

Q.  Ms. Fretheim, I will just repeat my last question.

When you started in July your role as head of business development, what were your duties and responsibilities?

A.  My primary duty was to sell our trucks to our customers.

Q.  What sort of customers was Nikola targeting when you started?

A.  Fleet customers, so basically companies with trucks.

Q.  Had Nikola delivered any trucks when you stared working at the company?

A.  We had not.

Q.  Did Nikola have reservations for any of its trucks?

A.  Yes, we did.

Q.  Generally speaking, were those binding reservations?

A.  Most were not.

Q.  Ms. Fretheim, is Nikola a public or private company?

A.  It's a public company.

Q.  When did Nikola become a public company?

A.  In June of 2020.

Q.  And when you started the company, who was the chief executive officer of the company?

A.  Trevor Milton.

Q.  And when the company went public, did his role change?

A.   Yes.

Q.   How so?

A.   He became executive chairman of our board.

Q.   When you say "board," what do you mean by that?

A.   That's a group of individuals that guides and oversees the company.

Q.   What does it mean to be executive chairman of the board?

A.   You are kind of the head of the board.

Q.   As the executive chairman of the board, did Mr. Milton report to anyone?

A.   No.

Q.   Was that the highest position in the company?

MR. BONDI:   Objection.

THE COURT:   Overruled.

A.   Yes.

Q.   When Mr. Milton was executive chairman, did he make public statements about the company?

A.   Yes, he did.

Q.   On what sort of media?

A.   News stories, television interviews, social media.

Q.   Ms. Fretheim, did you have any role in preparing him for his public statements?

A.   No.

Q.   Did you listen to any of his public statements?

A.   Yes, I did.

Q.   Did you have any concerns about his public statements?

A.   Yes, I did.

Q.   What were your concerns?

A.   I mean, they were far-reaching, I guess.  Some of them just -- I was concerned about how our customers would take them, I thought some things that he said were unprofessional, to areas where I thought he was inaccurate in what he was saying.

Q.   Why were you concerned with him being inaccurate?

A.   A few reasons.  One, I didn't want to have to contradict our executive chairman to our customers, I was concerned that it opened us up to liability with investors, and that we could potentially be in contravention of SEC rules.

          THE COURT:  Ms. Fretheim could I ask you to keep your voice up, please.

          THE WITNESS:  Yes.  I'm sorry.

          THE COURT:  Thank you.

BY MS. ESTES:

Q.   Ms. Fretheim, when you said you were worried it would open you up to liability with investors, what did you mean by that?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.   If investors took -- if potential investors took us at our word of what he was saying was accurate, they could make investment decisions based on that and then come back if they

M9e2Mil4                          Fretheim - Direct

found out that it wasn't true.

Q.  Ms. Fretheim, you also mentioned that you were worried the statements were in contravention of SEC rules.  What did you mean by that?

A.  I mean, as a public company, we need to be very careful about what we say publicly and make sure that it's accurate, especially if it's material to the company.

Q.  Ms. Fretheim, why as a public company does it matter that what you are saying is accurate?

A.  I think for all those reasons.  You don't want investors to make investment decisions based on inaccurate information and you don't want to open yourself up to liability.

Q.  Ms. Fretheim, as to your concerns, did it matter that Mr. Milton was the executive chairman of the company?

A.  Yes, absolutely.

Q.  How did that matter?

A.  I mean, people have an expectation that the executive chairman is accurate in what he says.

          MR. BONDI:  Objection, your Honor.  Foundation.  Move to strike.

          THE COURT:  Sustained as to foundation.

BY MS. ESTES:

Q.  Ms. Fretheim, in your view, were you worried that the executive chairman was saying inaccurate things about the company?

M9e2Mil4                        Fretheim - Direct

A.   Yes.

Q.   Why were you worried?

A.   I mean, I was just worried that it would come back to us either in civil litigation from investors or, again, being in contravention of SEC rules.

Q.   Ms. Fretheim, I want to step back a little bit and talk about the company when you joined in 2019.

How would you describe Nikola's revenue at the time you joined the company?

A.   We were pre-revenue at the time.

Q.   What does it mean to be a pre-revenue company?

A.   We hadn't sold any trucks.

Q.   Did there come a point in time when you learned that Nikola was moving towards becoming a public company?

A.   Yes.

Q.   When was that approximately?

A.   It was approximately early 2020.

Q.   What is the purpose of going public?

A.   One of the main purposes is to raise funds to continue the operation of the company.

Q.   As a pre-revenue company, is it important to raise money?

A.   Yes.

Q.   Why?

A.   Because you want to be able to fund your operations through to when you can make revenue.

Q.   How did Nikola ultimately go public?

A.   We went public through what is called a SPAC, or special purpose acquisition company.  So there is a company that is already listed on the stock exchange.  We basically merge with them in order to go public.

Q.   Ms. Fretheim, does a special purpose acquisition company generally have any business of its own?

          MR. BONDI:  Objection, leading.

          THE COURT:  Overruled.

A.   Generally not.

Q.   So what happens after a SPAC merges with another company?

          MR. BONDI:  Objection, foundation.

          THE COURT:  Sustained as to foundation.

Q.   Ms. Fretheim, in your various roles at Nikola, did you become familiar with the process of going public through a SPAC?

A.   At a high level.

Q.   So Ms. Fretheim, at a high level, what happens after a SPAC combines with another company?

          MR. BONDI:  Objection.  Foundation.

          THE COURT:  Overruled.

A.   So their shares became our shares, basically.

Q.   What SPAC did Nikola ultimately merge with?

A.   VectoIQ.

Q.   Did VectoIQ shares trade on a particular exchange?

M9e2Mil4                    Fretheim - Direct

A.  On the NASDAQ.

Q.  Where is the NASDAQ based?

A.  New York.

Q.  So what happened when the combination between Nikola and VectoIQ was completed?

A.  Well, we were public at that point.

Q.  So what happened to VectoIQ shares?

A.  They became Nikola shares.

Q.  And so at that point were Nikola shares trading on a stock exchange?

A.  Yes.

Q.  And was that the NASDAQ?

A.  Yes.

Q.  Now, Ms. Fretheim, in your various roles at Nikola, have you become familiar with the trucks that Nikola's been working on?

A.  Yes.

Q.  Mr. Charalambous, can you pull up for the witness Government Exhibit 1204.

        Ms. Fretheim, do you recognize what's on the screen there?

A.  Yes, I do.

Q.  What is that?

A.  That is the Nikola One.

Q.  Is that a fair and accurate depiction of the Nikola One?

M9e2Mil4                    Fretheim - Direct

A.   Yes.

MS. ESTES:  Your Honor, we offer Government Exhibit 1204.

THE COURT:  Any objection?

MR. BONDI:  No objection.

THE COURT:  1204 will be received.

(Government's Exhibit 1204 received in evidence)

MS. ESTES:  May we publish?

THE COURT:  You may.

BY MS. ESTES:

Q.   Ms. Fretheim, now that the jury can see this, what are we looking at here?

A.   We are looking at the Nikola One truck that was unveiled in 2016.  It's a prototype for a sleeper hydrogen fuel cell truck.

Q.   When you began working at Nikola, where was this truck located?

A.   In a warehouse.

Q.   Was any further work being done on the truck when you started at the company in 2019?

A.   Not to my knowledge.

Q.   When Nikola went public in June 2020, had any Nikola Ones been massed produced or sold?

A.   No.

Q.   You mentioned that the Nikola One is a sleeper.  What does that mean?

A.   So it's supposed to be for longer haul operations, where there is a sleeping quarters behind the driver, so the driver can sleep there on their break.

Q.   Mr. Charalambous, you can take that down and if we could pull up for the witness Government Exhibit 1206.

Ms. Fretheim, do you recognize what's on the screen there?

A.   Yes.

Q.   What is that?

A.   That is the Nikola Two.

Q.   Is that a fair and accurate depiction of the Nikola Two?

A.   Yes.

MS. ESTES:   Your Honor, we offer Government Exhibit 1206.

THE COURT:   Any objection?

MR. BONDI:   No objection.

THE COURT:   1206 will be received.

(Government's Exhibit 1206 received in evidence)

BY MS. ESTES:

Q.   Mr. Charalambous, can you publish?

So Ms. Fretheim, now that the jury can see this, what kind of semi truck is the Nikola Two?

A.   So that is a day cab hydrogen fuel cell truck.

Q.   What is a day cab?

A.   So it means there is not a sleeping quarters in the truck.

M9e2Mil4                     Fretheim - Direct

It's generally used for shorter haul, local, or regional routes.

Q.   Is this a prototype?

A.   Yes.

Q.   Approximately when was this prototype built?

A.   In 2019.

Q.   Did Nikola build one prototype or more than one of the Nikola Two?

A.   We had two of these.

Q.   Could the Nikola Two prototypes drive?

A.   Yes.

Q.   Were the prototypes ready for sale?

A.   No.

Q.   When Nikola went public in June 2020, had the company mass produced or sold any Nikola Twos?

A.   No.

Q.   Mr. Charalambous, can you take that down and pull up for the witness Government Exhibit 1200.

        Ms. Fretheim, do you recognize what's on the screen there?

A.   Yes.

Q.   What is that?

A.   That is a Nikola Tre.

Q.   Is that a fair and accurate depiction of the Nikola Tre?

A.   Yes.

MS. ESTES:  Your Honor, we offer Government Exhibit 1200.

THE COURT:  Any objection?

MR. BONDI:  No objection.

THE COURT:  1200 will be received.

(Government's Exhibit 1200 received in evidence)

BY MR. PODOLSKY:

Q.  Mr. Charalambous, can we please publish?

Ms. Fretheim, now that the jury can see, this what kind of semi truck is the Nikola Tre?

A.  So that is one of our battery electric day cab semi trucks. It's a European sleeper, which means it has a small bed behind the driver area, but in North America it would be used as a day cab.

Q.  When Nikola went public in June 2020, had the company mass produced or sold any Nikola Tres?

A.  No.

Q.  Mr. Charalambous, you can take that down.

Ms. Fretheim, was Nikola marketing its hydrogen fuel cell trucks to customers as sort of a package?

MR. BONDI:  Objection, form.

THE COURT:  Overruled.

A.  Yes.

Q.  Could you explain that?

A.  Yes.  So rather than only buying a truck, we were selling

it in a bundled lease price that included the truck, the service, maintenance, and the fuel.

Q. And when you say the fuel, what are you referring to?

A. The hydrogen.

Q. What was the purpose of selling a bundled lease with the truck, the hydrogen fuel, and the service?

A. There were a couple of reasons. One was to provide some cost certainty to our customers for new technology, fluctuation in the hydrogen prices, things like that; and then secondly, as we were investing and putting up hydrogen fueling stations, we would be more guaranteed of a return on that investment.

Q. And at this point was there any sort of hydrogen station network across the country?

A. Not really, especially for heavy duty trucks.

Q. And how did that factor in to Nikola's decision to offer a bundled lease?

A. I think it was important because we needed to make sure that when our customers put the trucks on the road, they would have access to the fuel they needed to operate the trucks.

Q. Ms. Fretheim, are you familiar with the term "total cost of ownership"?

A. Yes.

Q. What does that mean?

A. So it's really the total cost to purchase, own, operate, maintain, and dispose of a vehicle.

Q.   What was Nikola's goal in terms of total cost of ownership for a hydrogen fuel cell truck?

A.   We wanted to be at parity with diesel or conventional technologies.

Q.   Why did Nikola want to be at parity with diesel?

A.   Because it is important for the customers.  Trucking tends to be a fairly low margin business, and so it is difficult for them to have increased cost.

Q.   And just to be clear, when you say parity with diesel, what do you mean by that?

A.   That the costs are equal.

Q.   So if Nikola's trucks cost more than diesel, what would be the concern there?

A.   That customers would have a difficult time transitioning larger volumes of trucks.

Q.   And if customers had a difficult time transitioning to these Nikola trucks, how would that affect Nikola's business?

A.   It would probably put us out of business.

Q.   Now, Ms. Fretheim, on the hydrogen stations, how important was building hydrogen stations to Nikola's business model?

A.   It was very important.

Q.   Why was it very important?

A.   So that our customers would have access to fuel to operate the trucks.

Q.   In 2020, when Nikola went public, what was Nikola's plan in

terms of a hydrogen station network?

A.   So our plan at that time was to build stations where we had the generation of the hydrogen on site or co-located with the fuel stations, the dispensing of the fuel.

Q.   So when you say generate hydrogen on site and co-locate it with stations, what do you mean by that specifically?

A.   Basically the two would be on the same property next to each other.

Q.   How did Nikola plan to generate the hydrogen?

A.   At that time we were focused on electrolysis to generate the hydrogen.

Q.   What is electrolysis?

A.   So it's basically a system that will take electricity to break water into its components, so hydrogen and oxygen, and then we can take the hydrogen off and use that to fuel the trucks.

Q.   What sort of equipment is used to perform electrolysis?

A.   There is an electrolyzer, so you have whatever is generating the electricity and that goes into an electrolyzer.

Q.   And was Nikola planning to do the electrolysis itself or would somebody else be doing that?

A.   Our plan at that time was to do it ourselves.

Q.   Where was Nikola -- how was Nikola planning to get the energy needed for the electrolysis?

A.   We were looking at potentially co-located or adjacent

renewable energy opportunities or from a grid.

Q.   And why was Nikola looking at renewable energy?

A.   We were very focused on being a clean or green company and so we wanted to find the lowest carbon intensity generation.

Q.   Ms. Fretheim, in terms of the cost of producing hydrogen through electrolysis, is there any particular factor that is significant?

MR. BONDI:   Objection, foundation.

THE COURT:   Overruled.

A.   Sorry.   Will you repeat that one more time?

Q.   In terms of the costs of producing hydrogen through electrolysis, is there any particular factor that is significant?

A.   The electricity is a large input.

Q.   Why is electricity a large input to hydrogen production cost?

A.   Because you need a fair amount of it to break the water into its components.

Q.   Did Nikola have any sort of target cost with respect to the price of electricity?

A.   I believe at that time we were looking to get electricity at about 3.5 cents kilowatt hour.

Q.   That was the target?

A.   Yes.

Q.   Ms. Fretheim, was obtaining electricity at this price point

important to Nikola's business?

A.  Yes.

Q.  Why was it important?

A.  Because hydrogen or fuel is one of the largest costs for a trucking company, and so in order to get that diesel parity that we talked about without increased costs, we needed to ensure that the hydrogen was at a price point that we could -- that would allow us to achieve that parity.

Q.  Mr. Charalambous, can you pull up Government Exhibit 1202 for the witness?

        Ms. Fretheim, do you recognize this?

A.  Yes.

Q.  What is this?

A.  This is a hydrogen dispensing station that we have at our headquarters in Phoenix.

Q.  Is that a fair and accurate depiction of that dispensing station?

A.  Yes.

        MS. ESTES:  Your Honor, we offer Government Exhibit 1202.

        THE COURT:  Any objection?

        MR. BONDI:  Yes, your Honor.  Time frame, foundation.

        THE COURT:  Can you ask those questions, Ms. Estes?

BY MS. ESTES:

Q.  Ms. Fretheim, are you familiar with what the hydrogen

M9e2Mil4                          Fretheim - Direct

dispensing station at your headquarters looked like?

A.   Yes.

Q.   And are you familiar with what it looked like in 2020?

A.   Yes.

Q.   And is this picture in general how it looked like in 2020 and in other years?

A.   From my recollection, yes.

          MS. ESTES:  Your Honor, we renew our offer of Government Exhibit 1202.

          MR. BONDI:  No objection, your Honor.

          THE COURT:  It will be received.

          (Government's Exhibit 1202 received in evidence)

BY MS. ESTES:

Q.   Ms. Fretheim, now that the jury can see this, can you describe what they are looking at there.

A.   So if you see the white box kind of in the center underneath the canopy, that is the dispensing station, so similar to what you would see at a gas station to fuel your car.

Q.   And where is this located again?

A.   At our headquarters in Phoenix.

Q.   How, at this point in time, when this actually -- strike that.

          When the company went public in June 2020, was Nikola producing any hydrogen?

A.   No.

Q.   Was Nikola dispensing hydrogen at this station?

A.   Yes.

Q.   Where was Nikola getting the hydrogen that it dispensed at this station?

A.   We were buying it from producers.

Q.   Mr. Charalambous, can you take that down and pull up for the witness Government Exhibit 1201.

        Ms. Fretheim, do you recognize this?

A.   Yes.

Q.   What does this picture show?

A.   This is a hydrogen tanker at our headquarters delivering hydrogen.

Q.   Is this a fair and accurate depiction of a tanker at your headquarters delivering hydrogen?

A.   Yes.

Q.   And Ms. Fretheim, in 2020, did you see hydrogen tankers at your headquarters delivering hydrogen?

A.   Yes.

        MS. ESTES:  Your Honor, we offer Government Exhibit 1201.

        THE COURT:  Any objection?

        MR. BONDI:  No objection.

        THE COURT:  1201 will be received.

        (Government's Exhibit 1201 received in evidence)

BY MS. ESTES:

Q.  Mr. Charalambous, can you please publish.

So Ms. Fretheim, now that the jury can see this, what is on the left side of the screen there?

A.  On the left side of the screen, so if you see where those two little lights are, that's the dispensing station that we just looked at.

Q.  Is that what's circled there on that photograph now on the screen?

A.  Yes, correct.

Q.  And then what is on the right side of the screen?

A.  On the right side of the screen is the hydrogen tanker.

Q.  Can you see the name on the hydrogen tanker there?

A.  Yes, Air Liquide.

Q.  How did a hydrogen tanker like this actually transmit fuel to the dispensing station?

A.  I believe what it does is it connects to the kind of silver box that you can see open kind of to the middle left of the screen, and then it goes underneath to some storage.

Q.  And what are those yellow structures there?

A.  They are just what you call bollards.  They are like security to prevent someone from backing a truck into the unit.

Q.  Ms. Fretheim, when Nikola went public in June 2020, did Nikola have any other stations other than this hydrogen dispensing station?

A.   No.

Q.   Had Nikola started building any hydrogen production stations?

A.   None to my knowledge.

Q.   Had it purchased any land for hydrogen production stations?

A.   Not to my knowledge.

Q.   Had Nikola produced any hydrogen when the company went public?

A.   Not to my knowledge.

Q.   Mr. Charalambous, you can take that down.

     Ms. Fretheim, after the company went public, were you following statements about the company in the media?

A.   Yes.

Q.   Whose statements were you following?

A.   Pretty much anybody in our company that was making statements.

Q.   Ms. Fretheim, you testified earlier about concerns with Mr. Milton's statements in particular.  Did you raise your concerns within the company?

A.   Yes, I did.

Q.   Mr. Charalambous, can you pull up for the witness Government Exhibit 263.

     Ms. Fretheim, do you recognize these e-mails?

A.   I do.

Q.   Who were the parties in this e-mail exchange?

A.   Mark Russell, who was our president and CEO at the time, and myself.

Q.   And what's the subject there?

A.   Trevor's podcast.

Q.   What's the date of the e-mail?

A.   July 21 of 2020.

          MS. ESTES:   your Honor we offer Government Exhibit 263.

          THE COURT:  Any objection?

          MR. BONDI:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 263 received in evidence)

BY MS. ESTES:

Q.   Ms. Fretheim, now that the jury can see this, again, who is Mark Russell?

A.   He was our president and CEO.

Q.   And Mr. Charalambous, let's go to the bottom e-mail, if you can zoom in on that.

          Ms. Fretheim, what's the date of this e-mail?

A.   July 19, 2020.

Q.   And it appears to be an e-mail from yourself to yourself. Why did you send this e-mail?

A.   I had raised some concerns to our marketing team about the podcast and they asked me to outline what my concerns were.

Q.   What podcast is this referring to?

A.   The TeslaCharts podcast.

Q.   So looking at this e-mail here, what does the left column represent?

A.   Those are my concerns.

Q.   And what does the right column represent?

A.   That's where they could find them in the podcast.

Q.   Ms. Fretheim, what's the date of the e-mail, again, here? What day of the week?

A.   Sunday.

Q.   Why did you send this on a Sunday?

A.   Because I was concerned about what was said and potential repercussions.

Q.   All right.  Mr. Charalambous, can you zoom out of that and let's go to the e-mail right above it in the chain.

         Ms. Fretheim, who did you send this list of concerns to here?

A.   I sent them to Mark Russell.

Q.   Why did you send your concerns to Mark Russell?

A.   He was our president and CEO, and so I wanted to make sure he was aware of them and could take action as necessary.

Q.   Mr. Charalambous, can we actually pull up S2, a stipulation, and turn to paragraph 23 in it.

         So, your Honor, I will read this portion of the stipulation for the record:

         "Government Exhibits 422-A, 422-B, 422-C, 422-D,

422-E, 422-F, and 422-G are authentic copies of portions of a July 17, 2020, interview of Trevor Milton on the TeslaCharts podcast, which is also known as the Chartcast with TC and Georgia podcast, and Government Exhibit 422-T is an accurate transcript of those recordings."

At this point, pursuant to the stipulation, your Honor, I would offer these government exhibits into evidence.

THE COURT:  Any objection?

MR. BONDI:  No objection.

THE COURT:  They will be received.

(Government's Exhibits 422-A, 422-B, 422-C, 422-D, 422-E, 422-F, 422-G, 422-T received in evidence)

BY MS. ESTES:

Q.  Mr. Charalambous, can you take that down and can we pull up Government Exhibit 422-A and the transcript 422-T.

And Ms. Fretheim, you should have a binder in front of you with the transcript in it, and also these are part of the binders that the jury has as well.

Ms. Fretheim, are you at the right page in your binder?

A.  Yes.

Q.  So it should -- we are going to start with 422-A and this is going to be page 2.  Mr. Charalambous, can we start this clip 48 seconds in, at line 11.

(Audio played)

Q.  So, Ms. Fretheim, in that clip, the podcast host just said this should not be considered for investment advice.  Did that have any effect on your concerns over this podcast?

A.  No.

Q.  Why not?

A.  Because we still need to be accurate in what we are saying.

Q.  Mr. Charalambous, can you keep playing the clip?

(Audio played)

Q.  Ms. Fretheim, did you hear the host describe the audience for this particular podcast?

A.  Yes.

Q.  And how did the host describe the audience?

A.  As predominantly skeptical investors.

Q.  Mr. Charalambous, can we pull up Government Exhibit 263 again, and let's highlight the first concern there; and then let's go to Government Exhibit 422-B, and I would like to start 50 seconds into the clip, and this is going to correspond with page 4/line 2 of the transcript binder.

(Audio played)

Q.  If you can pause right there, Ms. Fretheim, whose voice is that on the podcast?

A.  It is Trevor Milton's.

Q.  Mr. Charalambous, can you go back again and start at 48 seconds in?

(Audio played)

Q.  Ms. Fretheim, the concern listed in your e-mail is costs of hydrogen below $3 a kilogram.  So what about that clip that we just listened to concerned you?

A.  To my knowledge we have not proven that we could get to that price point.

Q.  With respect to hydrogen?

A.  Yes.

Q.  And at that point had Nikola actually produced any hydrogen?

A.  We had not.

Q.  Had Nikola built any hydrogen stations?

A.  No.

Q.  Did Nikola have any electricity contracts for hydrogen stations?

A.  Not to my knowledge.

Q.  Mr. Charalambous, can you highlight the portion of the transcript where Mr. Milton says, "And by that we've been able to reduce, we've been able to chop the cost of hydrogen from $16 a kilogram down to, we're, we're down below $3 a kilogram on our hydrogen now."

        Ms. Fretheim, do you understand that statement to be about the future?

A.  No.

Q.  Why not?

A.  It --

MR. BONDI:  Objection, your Honor.  Foundation.

THE COURT:  Overruled.

A.  He says that "we're"—the conjugation of "we are"—"down below $3."

Q.  So what did you understand that to mean?

A.  That we had already achieved that price point for hydrogen.

Q.  And at this point in July 2020, had Nikola achieved that price point for hydrogen?

A.  Not to my knowledge.

Q.  Was the cost of hydrogen important to Nikola's business model?

A.  Yes.

Q.  Why was it important?

A.  To ensure that we could generate hydrogen that would be at a price point to facilitate the parity with diesel.

Q.  So if Nikola had actually achieved this cost, would that have been important?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Mr. Charalambous, can we go back to Government Exhibit 263, and if we can highlight the fourth and fifth concerns there. And I would like to play the clip that corresponds with those concerns.  It's Government Exhibit 422-D, and this is going to correspond with page 12/line 1 of the transcript.

(Audio played)

Q.  Ms. Fretheim, the concern you list in your e-mail is "standardizing the stations is how we lower the cost of H2." What was your concern with the statements we just heard on the podcast?

A.  That at that time, to my knowledge, we didn't have a standard station.

Q.  And one of the other concerns is that the costs of the station went from 50 to 60 million to 14 million.  What was your concern there?

A.  To my knowledge we were not at that price point.

Q.  Had Nikola built a hydrogen station for $14 million?

A.  We had not.

Q.  Had Nikola built any hydrogen station?

A.  No.

Q.  Mr. Charalambous -- actually, you've got it zoomed in right there.

So, Ms. Fretheim, it says, "But originally when we first started, the stations were going to be 50 to 60 million, and now we're down to, you know, 14, 14 million bucks."  In your mind, is that a statement about the future?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Is that a statement about Nikola's business plan?

M9e2Mil4                         Fretheim - Direct

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Why not?

A.  Because it says that "we," "we're down to," so "we are down to."

Q.  Mr. Charalambous, can you take that down, and let's go back to Government Exhibit 263 and highlight the sixth and seventh concerns here.

Ms. Fretheim, before we get to the clip, the concern there references load balance.  What is load balance?

A.  So at a high level, and I'm not an expert at this, but if the grid has excess energy, that, you know, you could put it into an electrolyzer and basically store the energy as hydrogen.

Q.  And when you say energy, are you referring to electricity?

A.  Yes.

Q.  What about grid balance that's also referenced there?

MR. BONDI:  Objection.  May we approach?

THE COURT:  Sure.

(Continued on next page)

M9e2Mil4                     Fretheim - Direct

(At the sidebar)

MR. MUKASEY:  First of all, there is a foundational objection.  Second of all, this is now the third time we are going through, she is reading Milton's words and interpreting them in her mind what he was meaning.  Now, this case is about what investors understood him to mean, not what she thought he was saying and the tense that he was using.  Her understanding of Milton's intention is obviously beyond her knowledge but is also irrelevant.  We are talking about investors who understood.

MS. ESTES:  Your Honor, first of all, I have been asking what her understanding is, not what Mr. Milton is thinking.

Second of all I believe in the opening statement Mr. Mukasey said everybody knew exactly what Mr. Milton meant.  I think when he said that, he is basically opening up the interpretation to everybody in the company.  And I would say in particular here Ms. Fretheim listed out her concerns about these particular statements, and her concerns are based on the tense here, that it sounds like they are saying something has been accomplished when it hasn't been.

THE COURT:  I think what is happening also is that she is going through, Ms. Estes is going through with Ms. Fretheim Ms. Fretheim's notes.  You wrote this.  What did you mean by that?  So I think that's perfectly appropriate.

I do have some concerns about the foundation of some of this, you know, her technical knowledge. I know that she is the director of sustainability. I think that's her current title. Earlier I sustained an objection when she was talking about SEC basic requirements. So you may want to ask, you know -- again, do what you want, but establish her *bona fides* with respect to her knowledge on some of these issues.

MS. ESTES: Okay.

MR. BONDI: Your Honor, some of these questions regarding grids, grid balances, that sort of stuff is into expert testimony. She's already said to the government in their interviews that she is not in the weeds on this issue.

MR. MUKASEY: Ambiguity is our friend. That's okay.

MR. PODOLSKY: That's a perfectly acceptable area for cross-examination. She is explaining why she raised these issues, which is a key issue in the case.

MS. ESTES: Right. These are her words. She is the one who said low downs. That's what I'm asking her, what she understood.

THE COURT: Understood.

MR. MUKASEY: Out of curiosity, what's time is the next break?

THE COURT: 12:50.

(Continued on next page)

(In open court)

BY MS. ESTES:

Q.  Going back to your e-mail there when you said grid balance, what were you referring to there?

A.  So the utility grid is constantly trying to balance supply and demand, so making sure that they have enough electricity generation for the needs of their customers but not too much, if possible.

Q.  And Ms. Fretheim, in your role as head of business development and then head of ESG and sustainability, have you been familiar on a high level with Nikola's hydrogen station plans?

A.  Yes.

Q.  And are you familiar with the status of whether Nikola has electricity contracts for hydrogen stations?

MR. BONDI:  Objection.  Time frame.

Q.  Were you familiar in 2020?

A.  I believe so.

Q.  Were you familiar with the status of the dispensing station in 2020?

A.  Yes, on a high level for sure.

Q.  And were you familiar with whether Nikola had purchased land for hydrogen stations in 2020?

A.  I believe so.

Q.  And Ms. Fretheim, did you need to know all of these things

in connection with your role where you are speaking to fleet customers about Nikola's business?

A.   Yes.

Q.   All right, Mr. Charalambous, can we skip ahead to 2:18 in this clip, and this is going to correspond with page 14/line 12 of the transcript.

(Audio played)

Q.   So Ms. Fretheim, the concern listed in your e-mail is "figured out how to stabilize the load balance."  What was your concern with the statements we just heard from Mr. Milton?

A.   I think that we figured it out in theory, but had not proven it yet.

Q.   So at this point did Nikola have any electrolyzers that were connected to the grid?

MR. BONDI:  Objection.  Time frame.

Q.   In 2020.

A.   No, not to my knowledge.

Q.   Was Nikola obtaining any electricity for hydrogen production at this point?

A.   Not to my knowledge.

Q.   Was Nikola producing any hydrogen at this point?

A.   No.

Q.   Looking at the transcript there, Mr. Charalambous, if you could pull up lines 10 through 15.

So, Ms. Fretheim, there Mr. Milton says "and that's

what we did.  We spent years and years doing this, and we figured out how to stabilize the load balance."

In your mind, is that a statement about the future?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Why not?

A.  Because he says "that's what we did."

Q.  Mr. Charalambous, you can take that down.

Let's go back to Government Exhibit 263, and if we could highlight the concerns that start with "tap directly into federal lines" and then the two concerns under that.

And if we could turn to Government Exhibit 422-E and that corresponds with page 22/line 11 of the transcript binder.

(Audio played)

Q.  Mr. Charalambous, if you can pause there.

So, Ms. Fretheim, there Mr. Milton just said "we tap directly into main federal transition lines."  What do you understand that to be referring to?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  That we would connect, basically connect into federal electricity transmission lines.

Q.  And so what was your concern with that statement?

A.  That I had been on a call with another -- with one of the

federal utilities where they said that would not be possible.

MR. BONDI:  Objection.  Move to strike.  Hearsay.

THE COURT:  Overruled.  Do you want to put a time frame on that, Ms. Estes?

Q.  Ms. Fretheim, generally speaking, when was the call you were referring to?

A.  I want to say -- I don't recall exactly, but I believe it was maybe March or April of 2020.

Q.  So at this point in July of 2020, had Nikola tapped into any federal transmission lines for electricity?

A.  No.

Q.  Mr. Charalambous, if you can take that down and if you could pull up the part of the transcript that says "we contract directly with groups."  And, sorry, also the part down to the line about Tennessee Valley Authority.

Ms. Fretheim, what is Tennessee Valley Authority?

A.  That is one of the federal utilities.

Q.  To your knowledge, had Nikola contracted with Tennessee Valley Authority as of July 2020?

A.  No.

Q.  Mr. Charalambous, you can take that down and if we could keep playing the same clip.

(Audio played)

Q.  Mr. Charalambous, can you pause there.

Ms. Fretheim, there Mr. Milton said, "All of our

hydrogen's produced on the freeways."  Was Nikola producing any hydrogen on the freeway at this point?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Was Nikola producing any hydrogen at all?

A.  No.

THE COURT:  Ms. Estes, it is now 12:50 so we are going to take our second break.  It will be 20 minutes, ladies and gentlemen.  We will get back together at ten minutes after the hour.  Please do be prepared to come back at that time.  Until then, please do not discuss the case.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present).

THE COURT:  Ms. Fretheim, you may step down.

Anything that the parties wish to discuss?

MR. ROOS:  One matter, your Honor, after Ms. Fretheim steps down.

(Witness not present)

THE COURT:  Mr. Roos.

MR. ROOS:  Yes, your Honor.  Thank you.

So during the cross of Mr. Lackey, I think there were several questions, many of which resulted in sustained objections, related to Mr. Lackey having his attorney, which of course he has a constitutional right to have, in the courtroom, implying there was something wrong with that, that somehow he had done something wrong because he had his attorney.  We think it is totally improper.  We think probably it actually would have been appropriate at the time for the Court to give some sort of curative instructions.  We are not going to ask for that now, but I just want to flag since all of these witnesses have attorneys, with the exception of a few victims, that if there is further cross like that, we think it would be appropriate for the Court at the time to just tell the jury it's totally proper and permissible for witnesses to have their own lawyers and for those lawyers to attend the court.

THE COURT:  Mr. Caruso?

MR. CARUSO:  I think the questioning with respect

to --

THE COURT:  You've got to walk back toward the microphone.

MR. CARUSO:  With respect to Mr. Lackey, I think this is moot or academic, yes?

THE COURT:  Yes.

MR. ROOS:  We are not asking for Mr. Lackey.  I am just saying you should not be turning around and saying can you identify the lawyers for the witness in the back.

MR. CARUSO:  I think that contention is vastly overbroad.  We could do that.  But more to the point, more to the point, let's leave Mr. Lackey aside, I'm not aware of any other witnesses where someone is going to try to cross-examine them about that.

THE COURT:  Okay.

MR. CARUSO:  With respect to Nikola, I think it is highly relevant to the witnesses' credibility that they all happen to have the same lawyer in the course of their cooperation.  But this is a fight that I think should be left for another day.

THE COURT:  And certainly not a fight to be had in front of the jury.

MR. CARUSO:  Correct.  So I think this is to be determined.

THE COURT:  Okay.

MR. ROOS:  So --

MR. CARUSO:  We have all laid down our markers.

THE COURT:  Actually, I don't know that it's a fight that should have already been fought if it was going to be fought, but that's neither here nor there are.

MR. ROOS:  So we certainly are happy to put something in on this.  I just want -- just in case Ms. Fretheim is on cross, I want -- my understanding of this is that they will not start crossing her about having the same witness as other Nikola -- sorry, the same attorney as other Nikola witnesses, at least until this Court -- the Court has an opportunity to rule on the issue.

THE COURT:  It sounds like Mr. Caruso said that's not going to happen.

Mr. Bondi, are you going to tell us something different?

MR. CARUSO:  Your Honor, I'm going to yield to Mr. Bondi, but I did say that this would come up in certain ways with the Nikola witnesses.

Now over to Mr. Bondi.

MR. BONDI:  Your Honor, it's a perfectly appropriate line of cross-examination to ask if she is represented by the same lawyers that other witnesses are or that the company is. Those lines of crosses are appropriate lines of crosses to indicate bias and other issues.

M9e2Mil4                         Fretheim - Direct

MR. ROOS:  Your Honor, I think that's wildly prejudicial.  I don't know the relevance of it.

THE COURT:  I don't know that it's wildly prejudicial. I don't know that it's prejudicial at all.  And I don't see anything that's inappropriate about it for the defense to point out that the Nikola employees, if that's what it's going to be, are represented by the same counsel, nor do I think, by the way, that the jury would care about that one way or the other. They will think it's probably perfectly normal.

MR. ROOS:  I think just to make sure the jury doesn't have any sort of misimpression, it would be appropriate for the Court to give an instruction so the jury is aware it is perfectly common and normal for witnesses who work for the same company to have the same lawyers.

THE COURT:  Mr. Bondi.

MR. BONDI:  I don't think an instruction, your Honor, is going to be needed for that.

MR. ROOS:  If they don't want to give a misleading impression to the jury --

THE COURT:  Let's see what they ask and then I will determine whether an instruction is necessary.

MR. ROOS:  I mean, your Honor, I think we still think this is not an appropriate line of cross-examination for them, but I also just want to point out, while we are laying down markers, that there are, I think, several defense witnesses who

also sort of would be susceptible to the same type of cross.

THE COURT:  So there you have it.  Okay.

MR. ROOS:  Thanks.

THE COURT:  Don't be late.  Ten after.

(Recess)

(Jury present)

THE COURT:  Everyone, please be seated.

Ms. Estes.

MS. ESTES:  Thank you, your Honor.  Mr. Charalambous, let's pick back up with Government Exhibit 422-E.

This is going to be, Ms. Fretheim, page 22, line 11 of your transcript binder.

(Audio played)

BY MS. ESTES:

Q.  Ms. Fretheim, Mr. Milton just said all of our hydrogen is produced on the freeways.  Was Nikola producing any hydrogen at this point in July 2020?

A.  No.

Q.  Had Nikola built any stations along the freeways in July 2020?

A.  No.

Q.  Had Nikola built any stations at all?

A.  No.

MS. ESTES:  Mr. Charalambous, can you keep playing that clip.

(Audio played)

Q.  So Ms. Fretheim, one of your concerns listed there was preplanned station locations and buying them up.  Why was that a concern of yours?

MR. MUKASEY:  Objection.  Form.

THE COURT:  Overruled.

A.  Because we weren't buying any properties, to my knowledge, at that point.

Q.  Ms. Fretheim, in the bottom section there, Mr. Milton says, and we are gobbling up the best locations right now.

So at that point in July 2020, was Nikola buying any station locations?

A.  No.

Q.  And in your view, is this statement a statement about a future plan?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

MS. ESTES:  Mr. Charalambous, can we keep playing the clip.

(Audio played)

Q.  Ms. Fretheim, another one of your concerns there was pulling energy from two cents to four cents.  Why was that a concern of yours?

A.  Because, to my knowledge, we didn't have a contract to do that.

Q.  And when you say a contract, what sort of contract are you referring to?

A.  Having a contract with a federal utility.

Q.  For electricity?

A.  For electricity, yes.

Q.  Did Nikola have any electricity contracts at this point in July 2020.

A.  No, not to my knowledge.

Q.  Was there any guarantee that Nikola could get electricity at this rate?

MR. BONDI:  Objection.

THE COURT:  Overruled.

Q.  Ms. Fretheim, you can answer, was there any guarantee that Nikola could get electricity at this rate?

A.  No.

Q.  Would it have been significant if Nikola could get electricity at a rate like this?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Why would that matter?

A.  Again, it would be so that we could ensure the cost of hydrogen was competitive with diesel.

MS. ESTES:  Mr. Charalambous, if you could go back to Government Exhibit 263, and if you could highlight the concern that says already contracting with power companies and have the exact cost for customers.

Ms. Fretheim, if you could go to page 24 in your transcript binder, it's going to be line 6.

Mr. Charalambous, if you could play clip 422-F.

(Audio played)

Q. Ms. Fretheim, what was your concern about Mr. Milton's statements there?

A. That we did not have contracts with the power companies.

Q. So at that point in July 2020, you had no such contracts?

A. Not to my knowledge.

Q. Did Nikola have exact costs for customers?

A. No.

Q. Ms. Fretheim, that statement, we have exact costs for our customers, is that, in your mind, a statement about the future?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A. No.

MS. ESTES:  Mr. Charalambous, if we can go back to Government Exhibit 263 and highlight the concern that says, have 20-year electricity contracts in major locations.  If we could then play the clip, it corresponds with page 24, line 15 in the transcript binder, and this is going to be 422-G.

(Audio played)

Q. Ms. Fretheim, Mr. Milton said we only look at areas where we can get this electricity for sub, you know, sub three or four cents per kilowatt hour, guaranteed 24 hours a day, and we've been able do that.

Was that true at this point in July 2020?

A.   No.

Q.   Ms. Fretheim, that statement, in your mind, is that a statement about the future?

A.   No.

         MR. BONDI:  Objection.

         THE COURT:  Overruled.

Q.   Why not?

A.   Because he says we've been able to do that.  We have already done it, basically.

Q.   And to be clear, had Nikola already done that?

A.   No.

         MS. ESTES:  Mr. Charalambous, can you keep playing the clip.

         (Audio played)

Q.   Ms. Fretheim, your concern listed there is have 20-year electricity contracts in major locations.  What were you concerned with?

A.   That we didn't have any contracts.

         MS. ESTES:  Mr. Charalambous, you can take that down.

Q.   Ms. Fretheim, at the time of this podcast, what was Mr. Milton's position in the company?

A.   He was the executive chairman.

Q.   Did that have any effect on your level of concern about the podcast?

A.   Yes.

Q.  How so?

A.  Just as the head of our board, the head of the company, that we need to be truthful and accurate in what we're saying publicly.

Q.  And why, in your mind, does the head of your company need to be truthful and accurate in public statements?

A.  Because people will rely on those statements as true.

Q.  And when you say people, who are you referring to specifically?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Customers, investors, and the SEC.

MS. ESTES:  Mr. Charalambous, can you pull up for the witness Government Exhibit 56.

Q.  Ms. Fretheim, do you recognize these messages?

A.  Yes.

Q.  Who are the parties to these messages?

A.  Kim Brady, who is our chief financial officer; myself; Britton Worthen; and Mark Russell, who is president and CEO.

Q.  What's the date of the messages there?

A.  July 19th, 2020.

MS. ESTES:  Your Honor, we offer Government Exhibit 56.

MR. BONDI:  No objection, your Honor.

THE COURT:  It will be received.

M9ECmil5                          Fretheim - direct

(Government's Exhibit 56 received in evidence)

Q.  Ms. Fretheim, now that the jury can see these messages, can you read the first message you sent to Mr. Brady, Mr. Worthen, and Mr. Russell on July 19th.

A.  Hi all.  I am really worried about what some of what Trevor says on his latest podcast.  In particular about contracts with utilities, getting power straight from federal lines, cost of stations, that we've already purchased land for stations and on.  I asked the marketing team to remove references to it until it is properly reviewed by the right people.

Q.  Ms. Fretheim, why did you send this text message?

A.  Because I was very concerned about what he had said publicly.

Q.  In the bottom of the message there, you say I asked the marketing team to remove references to it.  Why did you say that there?

A.  I had initially contacted our marketing team because we had put references on it, to that podcast on some of our social media and they indicated they wanted to make sure that they got our executive approval to remove those first.

Q.  Why did you want the marketing team to remove them?

A.  Because I was concerned about the accuracy.  If we referenced them on our social media, it was like we were saying it was true.

MS. ESTES:  Mr. Charalambous, can you take that down

M9ECmil5                          Fretheim - direct

and pull up for the witness Government Exhibit 261.

Q.   Ms. Fretheim, do you recognize this email?

A.   Yes.

Q.   Who are the parties to this email?

A.   Myself; Vince Caramella, who is our head of marketing; Nicole Rose, who is head of our public relations; and Stephanie Fleck, who I believe is our social media.

Q.   What's the date of this email?

A.   July 20th, 2020.

MS. ESTES:  Your Honor, we offer Government Exhibit 261.

MR. BONDI:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 261 received in evidence)

Q.   Ms. Fretheim, now that the jury can see this email, I just want to walk through who the people on it are again.

So first, who is Vince Caramella?

A.   He is head of marketing.

Q.   Who is Nicole Rose?

A.   She is public relations.

Q.   Who is Stephanie Fleck?

A.   She is our social media.

Q.   Can you read what you said in the email there?

A.   This is rough, but below are things I wish he wouldn't -- sorry.  This is rough, but below are things I just wish he

wouldn't say to things that are more concerning.

MS. ESTES:  Mr. Charalambous, can you zoom out.

Q.  Ms. Fretheim, what did you send to the marketing team there?

A.  My list of concerns from the podcast.

Q.  Are these the same concerns we looked at earlier?

A.  Yes.

Q.  Why did you send this to the marketing team?

A.  I was asked to send it to them after I asked for references to be removed.

MS. ESTES:  Mr. Charalambous, can you take this down and pull up for the witness Government Exhibit 260.

Q.  Ms. Fretheim, do you recognize these emails?

A.  Yes.

Q.  Who are the parties to the emails?

A.  Myself and Pablo Koziner, who was, at the time, our president of energy.

Q.  What's the subject there?

A.  Trevor's podcast.

MS. ESTES:  Your Honor, we offer Government Exhibit 260.

MR. BONDI:  No objection, your Honor.

THE COURT:  260 will be received.

(Government's Exhibit 260 received in evidence)

MS. ESTES:  Mr. Charalambous, can you focus on the

M9ECmil5 - CORRECTED      Fretheim - Direct

bottom email of this exhibit.

Q.  Ms. Fretheim, is this your same list of concerns here?

A.  Yes.

MS. ESTES:  Mr. Charalambous, can you zoom out of that and zoom into the emails above it.

Q.  Ms. Fretheim, why did you send your list of concerns to Pablo Koziner?

A.  He had asked me to after we had our conversation.

MS. ESTES:  Mr. Charalambous, can you zoom out of that and zoom into the 1:56 p.m. email.

Q.  Ms. Fretheim, Mr. Koziner says, have you shared this with Mark.

Who did you understand him to be referring to?

A.  Mark Russell.

MS. ESTES:  Mr. Charalambous, can we now zoom into the 1:59 p.m. email.

Q.  Ms. Fretheim, there you said, not the full list yet.  I did with Britton, but he hasn't listened to it yet.

Who is the Britton you're referring to there?

A.  Britton Worthen, our chief officer.

Q.  And at the end, you are saying, am I overreacting.

Why did you say that in your email to Mr. Koziner?

A.  Because I'm not in every conversation.  I could have been missing something.  As well, he came from a large public company, and so I wanted to get his take on it.

MS. ESTES:  Mr. Charalambous -- there it is right there.

Q.  Ms. Fretheim, looking at Mr. Koziner's 3:24 email, could you read how he responds to you?

A.  I did not listen to it.  Based on your comments below, you are probably not overreacting.

MS. ESTES:  Mr. Charalambous, we can take that down.

Q.  Ms. Fretheim, do you know if the podcast was ever taken down from Nikola's social media?

A.  I don't believe it was.

Q.  Did you have any involvement in that decision, for the podcast to not be taken down?

A.  No.

Q.  Ms. Fretheim, we looked at documents where you shared your concerns with Mark Russell, Kim Brady, Britton Worthen, the marketing team, Pablo Koziner.  Did you share your concerns with Mr. Milton directly?

A.  I did not.

Q.  Why not?

A.  Mark, who was my boss at the time, and Kim had indicated they were talking to him about it, so I was letting that process take -- run its course.

Q.  Is there any other reason you didn't go to Mr. Milton directly?

A.  Like, we had had conversations in the past about other

concerns and I didn't think those were very fruitful.  So in my mind, he had a good relationship with Mark and Mark had the best opportunity to convince him that we needed to change how we were speaking publicly.

Q.  Based on your past conversations with Mr. Milton that were not fruitful, what did you think would happen if you went to him directly?

MR. BONDI:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Ms. Fretheim, was there any other reason why you didn't go to him directly?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I mean, Trevor has a very strong personality and I just didn't think he would listen to what I had to say.

MR. BONDI:  Objection.  Move to strike.

THE COURT:  Overruled.

Q.  Ms. Fretheim, I want to switch gears a little bit and go back to the reservations for the trucks that you mentioned earlier in your testimony.

So when you came to Nikola in March 2019, did Nikola have reservations for the trucks?

A.  Yes.

Q.  And when the company went public in June 2020, approximately how many reservations did Nikola have for the

M9ECmil5                          Fretheim - Direct

trucks?

A.   Like a little over 14,000.

Q.   What would you say those reservations represented?

A.   I would say --

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.   Most of them were more expressions of interest.

Q.   Generally speaking, were the reservations binding?

          MR. BONDI:  Objection.

          THE COURT:  If she knows.

          MR. BONDI:  Objection, your Honor.  Calls for a legal

conclusion.

          THE COURT:  Overruled.

A.   Most of them, to my knowledge, were not binding.

Q.   Ms. Fretheim, were you familiar with these reservations in

your role as head of business development?

A.   I mean, I was familiar with the list of reservations, yeah,

and several companies that were on them.

Q.   And were you involved in marketing trucks to customers in

your role as head of business development?

A.   Yes.

Q.   In that context, did you have to have some familiarity with

the reservations for the trucks?

A.   Yes.

Q.   Ms. Fretheim, to your understanding, was there any

guarantee the reservations could turn into binding orders?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

MS. ESTES:  Mr. Charalambous, could you pull up for the witness Government Exhibit 290.

Q.  Ms. Fretheim, do you recognize what's on the screen there?

A.  Yes.

Q.  What is that?

A.  It was a presentation put together for investors.

Q.  Who were you involved in putting this together?

A.  Some of the slides.

Q.  Ms. Fretheim, what's the timeframe for this presentation?

A.  June of 2019.

MS. ESTES:  Your Honor, we offer Government Exhibit 290.

MR. BONDI:  Objection, your Honor.  It says draft.

THE COURT:  Is that the only objection?

MR. BONDI:  Foundation, authenticity, it says draft.

THE COURT:  Overruled.

(Government's Exhibit 290 received in evidence)

MS. ESTES:  Mr. Charalambous, can you please publish that.

Mr. Charalambous, let's go to page 3 of the presentation.

Q.  Ms. Fretheim, what are we looking at on this page here?

A.  It's a breakdown of the reservations that we had by truck model and then by geography.

Q.  What percentage of the reservations were for the Nikola One truck?

A.  78 percent.

Q.  And I believe you testified earlier that when you started the company, the company was not working on the Nikola One; is that right?

A.  No, not to my knowledge, not as it stands.

Q.  Ms. Fretheim, what's the percentage of reservations for the Nikola Two?

A.  6 percent.

Q.  What's the percentage of reservations for the Nikola Tre?

A.  16 percent.

Q.  When the company went public in June 2020, which of these three trucks was the farthest from production?

A.  The Nikola One.

Q.  And what, if anything, was the significance of the fact that the Nikola One was the farthest from production?

A.  That we had so many -- such a large percentage of the reservations were for the Nikola One.

Q.  So what did that mean, practically speaking?

A.  That near term -- I mean, we were still working on a sleeper truck version, but that those customers would be -- to

realize those reservations was further out.

Q.  You mean further out in time?

A.  Right.

Q.  So how far away from production was the Nikola One in 2020 when the company went public?

          MR. BONDI:  Objection.  Foundation.

          THE COURT:  If she knows.  You want to lay some additional foundation, Ms. Estes.

          MS. ESTES:  Yes, your Honor.

Q.  Ms. Fretheim, in your role as head of business development, did you have to have an understanding of the timeline of Nikola's trucks?

A.  Yes.

Q.  Did you need to have that understanding so you could meet the market for customers?

A.  Yes.

Q.  So in 2020 when the company went public, approximately how far away was the Nikola One from production?

A.  I believe at that time, a sleeper truck was 2024.

Q.  And had Nikola communicated to any of the reservation holders that there wouldn't be a sleeper truck like the Nikola One until 2024?

A.  Not most of them, no.

          MS. ESTES:  Mr. Charalambous, can you take that down. Can we pull up for -- actually, let's go back to S2, the

stipulation, Mr. Charalambous.  Can we go to the paragraph that corresponds with 427.

Your Honor, at this point, I'll read another paragraph from S2 into the record.

It says Government Exhibits 427-A, 427-B, 427-C, 427D, and 427-E are authentic copies of portions of an August 5, 2020, interview of Trevor Milton on Cheddar TV, and Government Exhibit 427-T is an accurate transcript of those recordings.

At this time, your Honor, we would offer Government Exhibits 427-A through E, as well as 427-T.

MR. BONDI:  No objection, your Honor.

THE COURT:  Those exhibits will be received.

(Government's Exhibits 427-A, 427-B, 427-C, 427D, 427-E, 427-T received in evidence)

Q.  Ms. Fretheim, if you could turn in your transcript binder to 427, and specifically to page 1, line 21.

MS. ESTES:  Mr. Charalambous, if you could pull up Government Exhibit 427-B, that clip.

(Video played)

Q.  Ms. Fretheim, there, Mr. Milton says it's like a five-year backlog of production.

Is that how you would describe what the reservations were?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   If the reservations were converted to orders, it could be a five-year backlog.

Q.   And at this point in 2020, was there any guarantee they'd be converted into orders?

          MR. BONDI:   Objection.

          THE COURT:   Overruled.

A.   No.

Q.   And was there any guarantee, as to the Nikola One orders in particular, that they'd be converted to orders?

A.   No.

Q.   And if those reservations were converted to orders, what was the timeframe Nikola was looking at there?

          MR. BONDI:   Objection, your Honor.

          THE COURT:   Overruled.

A.   The timeframe for having a Nikola One or sleeper truck available, is that the question?

Q.   Yes.

A.   I believe, at that time, it was 2024.

          MS. ESTES:   Mr. Charalambous, you can take that down. If we can pull up Government Exhibit 270.

Q.   Ms. Fretheim, do you recognize this email?

A.   Yes.

Q.   Who are the parties to this email?

A.   I sent it to myself, so just me.

Q.   What's the date of the email there?

A.   August 2nd, 2020.

Q.   What's the subject of the email?

A.   TM concerns.

            MS. ESTES:  Your Honor, we offer Government
Exhibit 270.

            MR. BONDI:  Your Honor, may we approach?

            THE COURT:  Yes.

            (Continued on next page)

(At the sidebar)

THE COURT:  This has not been shown to the jury; correct?

MS. ESTES:  No, your Honor.

MR. BONDI:  Your Honor, this email was sent to herself.  It's classic hearsay.  She's sending something to herself.  It's not a business record, she's sending them to her personal Gmail account, so it wouldn't come in under the business record exception.  It's hearsay.

MS. ESTES:  Your Honor, we're not offering it for the truth.  Rather, we're offering it to show that she's sort of raising concerns or had concerns about these issues at the time the podcast came out.  I believe defense opened the door again to this in their opening when they said nobody at the company had any concerns with Mr. Milton until that grand jury subpoena from the Department of Justice came.  This is in August 2020, well before the subpoena.

THE COURT:  Are these the same concerns that are listed in the other exhibits that are in evidence?

MS. ESTES:  Many of them are the same ones, a different podcast, but he tells the same misstatements multiple times.

MR. BONDI:  Your Honor, there is no evidence that she's sent this email to anyone.  So Ms. Estes says we're putting it in evidence to show that she raised concerns.  She's

offering it exactly for the truth here.  These are concerns about different podcasts.  She sent it to herself.  If she communicated these concerns with someone else, different situation.  She sent this to herself, to her Gmail account.  It's hearsay and it doesn't come in.

THE COURT:  This is essentially a diary.  So why is this --

MS. ESTES:  Your Honor, I think, regardless, it would come in on redirect.  I think it's a prior consistent statement.  To the extent that the concerns is that people's credibility --

THE COURT:  Well, then, let's see if they open the door to that.  As of now, it's not coming in.

(Continued on next page)

M9ECmil5                          Fretheim - Direct

          (In open court)

BY MS. ESTES:

Q.  Ms. Fretheim, did you have concerns with any other of

Mr. Milton's podcasts that you listened to in 2020?

          MR. BONDI:  Your Honor, may we approach again please.

          (Continued on next page)

M9ECmil5                          Fretheim - Direct

(At the sidebar)

MR. BONDI:  Your Honor, they continue to put this document on the screen for the witness so that she can read from it.

MS. ESTES:  I apologize.  I didn't mean to.

THE COURT:  She's moved on to another podcast.

MS. ESTES:  There are three new podcasts.  I was going to ask about them.  We don't need to have the document on the screen, we'll take it down.  I imagine if she doesn't remember her specific concerns, we will refresh her recollection with the document.

MR. BONDI:  She's looking at the documents.

(Continued on next page)

(In open court)

THE COURT:  For the record, the objection to the prior exhibit is sustained.

BY MS. ESTES:

Q.  Ms. Fretheim, did you have any concerns with any other of Mr. Milton's podcasts?

MR. BONDI:  Your Honor, objection.  Same issue that we raised here at sidebar.

THE COURT:  Overruled.

Q.  Ms. Fretheim, did you have concerns with any other podcast by Mr. Milton?

A.  Yes.

Q.  Do you remember the names of the podcasts?

A.  Sorry.  I don't see them anymore.

Q.  Do you remember them or -- do you remember the names?

A.  I believe one was Baron's Round Table, there was a Stock Cast.  Sorry, I don't remember the exact names.

MS. ESTES:  Mr. Charalambous, to refresh the witness's recollection, can you put up Government's Exhibit 270 for the witness only.

MR. BONDI:  Objection, your Honor.  Improper refreshment.

THE COURT:  Why don't you ask her if there is a document that would refresh her recollection.

Q.  Ms. Fretheim, is there a document that would refresh your

recollection on what podcasts you were concerned with?

A.   Yes, I believe I sent myself an email.

        MS. ESTES:  Mr. Charalambous, can you pull up Government Exhibit 270 for the witness.

Q.   Ms. Fretheim, I'll give you a moment to read it.

        MS. ESTES:  Mr. Charalambous, can you take that down.

Q.   Ms. Fretheim, does that refresh your recollection on what podcasts you were concerned with?

A.   Yes.

Q.   What podcasts were you concerned with?

A.   So there was the Stock Cast, the Baron's Round Table, and I think it was This Week with Jason Kanalakis.

Q.   Ms. Fretheim, did you send yourself an email because you were concerned with these podcasts?

A.   Yes.

Q.   Why did you do that?

A.   Just so that I would have record of what I was concerned about, if it came up.

        MS. ESTES:  Mr. Charalambous, can you pull up S2.  If we could go to the paragraph that corresponds with Government Exhibit 425.

        Your Honor, I'll read this portion of the stipulation now.  It says:  Government Exhibits 425-A, 425-B, 425-C, 425-D, 425-E, 425-F, 425-G, 425-H, and 425-I are authentic copies of portions of a July 31, 2020, interview of Trevor Milton on This

Week in Startups Podcast, and Government Exhibit 425-T is an accurate transcript of those recordings.

At this time, we would offer Government Exhibits 425-A through I, as well as 425-T.

THE COURT:  Any objection?

MR. BONDI:  No objection.

THE COURT:  They will be received.

(Government's Exhibits 425-A, 425-B, 425-C, 425-D, 425-E, 425-F, 425-G, 425-H, 425-I, 425-T received in evidence)

Q.  Ms. Fretheim, if you could turn in your transcript binder to 425.  If you could go to page 2, line 21.

MS. ESTES:  Mr. Charalambous, if could you pull up Government Exhibit 425-D and play that clip.

(Video played)

Mr. Charalambous, can you zoom into the part of the transcript there that corresponds with the part of the transcript lines 17 through 24.

Q.  Ms. Fretheim, there, Mr. Milton says, now what we did is we've been able to drive hydrogen down to under four dollars a kilogram, we're about three dollars a kilogram of hydrogen now.

At this point, in July 2020, was Nikola producing hydrogen for under four dollars a kilogram?

A.  No.

Q.  Was it producing it for three dollars a kilogram?

A.  No.

Q.  Ms. Fretheim, in your mind, is this a statement about the future?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Ms. Fretheim, is this one of the other podcasts you were concerned with that summer?

A.  Yes, I believe so.

Q.  Why were you concerned about this podcast?

A.  Well, it was repeating some of the same inaccuracies from the prior podcasts, but then the same topic, but then different numbers again.

Q.  Did it concern you that Mr. Milton was repeating those inaccuracies?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Why did that concern you?

A.  Because, again, we needed to be accurate in what we were saying.

MS. ESTES:  Mr. Charalambous, can we keep playing the rest of the clip here.

(Video played)

Mr. Charalambous, can we go to page 4 of this transcript and zoom into lines 17 through 19.

Q.   Ms. Fretheim, there, Mr. Milton said we developed a first ever standard hydrogen station that can be produced in the thousands.

At this point, had Nikola standardized a hydrogen production station?

A.   No, not to my knowledge.

MS. ESTES:   Mr. Charalambous, can you take that down and can we go to the part of the transcript that's page 5, lines 2 through 4.

Q.   Ms. Fretheim, there Mr. Milton says a big, huge station for semi trucks, it would be 50.   Now we've got it down below 15.

What do you understand him to be referring to there with those numbers?

A.   The development of a hydrogen generation and fueling station.

Q.   What do the numbers refer to specifically?

A.   The cost.

Q.   And is that 50 million?

A.   Yes, and 15 million.

Q.   And at this point, had Nikola built a hydrogen production station for below $15 million?

A.   No.

Q.   Ms. Fretheim, in your mind, is this statement about the future?

MR. BONDI:   Objection.

THE COURT:  Overruled.

A.  No.

Q.  Is this statement about Nikola's business plan?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

MS. ESTES:  Mr. Charalambous, can we take that one down, and if we could pull up 425-F.

Ms. Fretheim, this is going to correspond with page 6, line 9, that same transcript.

(Video played)

Q.  Ms. Fretheim, did anything about Mr. Milton's statement that there were billions and billions of dollars in orders concern you?

A.  Yes.

Q.  What concerned you there?

A.  That we didn't have contracts.

Q.  So in your mind, was this statement true?

A.  No.

Q.  Would it be significant if Nikola had billions of dollars in binding contracts?

A.  Yes.

MR. BONDI:  Objection.

THE COURT:  Overruled.

MR. BONDI:  May we approach, your Honor.

(At the sidebar)

THE COURT:  Mr. Bondi.

MR. BONDI:  I'm going to turn it over.

MR. MUKASEY:  Obviously there is a rhythm going here of did you find this true, did you find this significant.  One of the elements of charges here is falsity.  That's a jury determination, not a witness determination.  Another element of the charge is materiality.  That's a jury determination, not a witness determination.

By asking these questions, she's really giving the ultimate answer they want the jury to give, and I think that her view of truth of the falsity is irrelevant.  The jury's view is important.  This has happened a number of times now.  We objected every time, but these are elements they have to establish, not conclusions that she should be giving to the jury.

MS. ESTES:  Your Honor, this is a very complicated company.  There are lots of moving parts.  There is a hydrogen piece, there is a trucking piece.  The jury needs to understand if he is talking about something that's essentially to the company's business or if it's something that's kind of on the periphery that does not matter.  A reasonable investor, we're not asking for what an investor would do, what they're going to think of this.  We are asking for, from her perspective as the head of business development, was this significant in terms of

the company, and that is absolutely something we're entitled to ask.  We are entitled to elicit truth, and we're hearing from company insiders about what things are important from the company is certainly relevant, something the jury is entitled to hear.

MR. MUKASEY:  Her deeming the truth is not relevant. The government has the burden to prove that, in fact, what you were saying was not true or it was.  Her opinion about that is not relevant, it's what the jury is supposed to determine.  She can ask about if certain facts were happening at the time in the company, and Ms. Fretheim can say -- but it's one question too far.

MS. ESTES:  Your Honor, we are entitled to ask witnesses if this statement is true or false based on your knowledge of what you were doing in the company.

THE COURT:  In the way I see it, the company at the time, in the moment, needed to make a determination or were making determinations based on Mr. Milton's statements.  They were entitled to come to certain conclusions about what he was saying because of their positions, because of their responsibilities, as Ms. Fretheim has testified to the customers, to the SEC, et cetera.  And I think Ms. Estes has been careful to say, in your mind, was this accurate and the truth or not.  Obviously, and Ms. Fretheim has also testified, as well, that, she did not have complete visibility over the

entire company.  I assume that the cross examination will be exactly that or at least in large part that, but they are entitled to elicit the facts, what was happening at the company in the time that Mr. Milton was making these statements.

MR. MUKASEY:  Totally understood with respect to the facts of what was happening, but her opinion about the truth of this statement is completely irrelevant.  It's irrelevant, it has nothing to do with the function of the company, it has nothing to do with the function of her job, it doesn't have anything to do with anything other than trying --

THE COURT:  Think about what you just said.  Her determination as to whether or not he's telling the truth, it's important to her job, it's important to the company.  Of course it is, it absolutely is.

MR. MUKASEY:  Ask what she did after she read this, did she raise it with her bosses, did she raise it with Mr. Milton, I understand that.  Her opinion of the truth or falsity is really what I've objected to.

THE COURT:  The appropriate absolute next question is why did you do that.  That's clearly what the government is entitled to probe.

MR. CARUSO:  Sorry, one more point.  Perhaps the Court can make that clear to the jury, an instruction now that says this evidence is intended to show the understanding or views of the witness on why she did something later.  It's not to show

that this was, in fact, false.

THE COURT:  I'm not going to do that now.  I don't know that I like that formulation.  But if you folks want to get together and put an instruction together for later, I'm happy to consider it.

(Continued on next page)

(In open court)

MS. ESTES:  May I proceed, your Honor?

THE COURT:  You may.

BY MS. ESTES:

Q.  Ms. Fretheim, I'll repeat the question I just asked you.
Would it be significant if Nikola had billions of dollars in
binding contracts?

A.  Yes.

Q.  Why?

A.  Because it would have demonstrated interest in our products
and probably would have been very interesting to some
investors.

Q.  Ms. Fretheim, with respect to this podcast, did you have
any involvement in preparing Mr. Milton for the podcast?

A.  No.

Q.  Did you give him any talking points for the podcast?

A.  Not to my recollection.

Q.  Were you asked to approve his statements after the
podcasts?

A.  No.

MS. ESTES:  Mr. Charalambous, you can take that down.

If we could pull up S2 again.  Mr. Charalambous, can
you turn to the paragraph related to Government Exhibit 424.

I'll read this into the record.  It says Government
Exhibits 424-A, 424-B, 424-C, 424-D, 424-E, 424-F, and 424-G

are all authentic copies of portions of a July 31, 2020,
interview of Trevor Milton on the Stock Cast with Alex Cutler
Podcast, and Government Exhibit 424-T is an accurate transcript
of those recordings.

Your Honor, at this time, we'd offer Government
Exhibits 424-A through G, as well as 424-T.

(Continued on next page)

THE COURT:  Any objection?

MR. BONDI:  None.

THE COURT:  They will come in.

(Government's Exhibits 424-A through G, 424-T received in evidence)

BY MS. ESTES:

Q.  Ms. Fretheim, can you turn to GX 424 in your transcript binder.  We are going to play a clip that corresponds with page 2/line 19.

Mr. Charalambous, can you play Government Exhibit 424-B.

(Audio played)

Q.  Ms. Fretheim, is this one of the podcasts that you were concerned with the summer of July 2020?

A.  Yes.

Q.  And were you concerned with one of these statements that we just listened to in particular?

A.  That we had a very clear path to build our 700 stations.

Q.  Why did that concern you?

A.  Because to my knowledge we did not have a clear path.

Q.  And just to be clear, 700 stations, what does that refer to specifically?

A.  Hydrogen generation and dispensing stations in the U.S.

Q.  Mr. Charalambous, can we now pull up Government Exhibit 424-D, and let's go to page 3/line 11 in the transcript binder.

(Audio played)

Q.  Mr. Charalambous, can you zoom in to lines 11 through 18 there.

So, Ms. Fretheim, here Mr. Milton says "hydrogen was sixteen dollars a kilogram.  Now we have hydrogen down below four dollars and we are close to three dollars a kilogram."  At this point was Nikola producing any hydrogen at any price point?

A.  No.

Q.  And in your mind, is this a statement about the future?

A.  No.

Q.  Mr. Charalambous, you could take that down.

Mr. Charalambous, if we could now go back to S2 and to the paragraph that corresponds with Government Exhibit 426.  I will read this paragraph into the record.  "Government Exhibits 426-A and 426-B are authentic copies of portions of an August 1, 2020 interview of Trevor Milton on Fox Business's Barron's Roundtable and Government Exhibit 426-T is an accurate transcript of those recordings."

Your Honor, at this time we would offer 426-A and B as well as 426-T.

THE COURT:  Any objection?

MR. BONDI:  None, your Honor.

THE COURT:  They will be received.

(Government's Exhibits 426-A, 426-B, 426-T received in

evidence)

BY MS. ESTES:

Q.  Ms. Fretheim can you turn to 426-T in your transcript binder.

And Mr. Charalambous, let's play Government Exhibit 426-A.

(Video played)

Q.  Ms. Fretheim, was this one of the podcasts you were concerned with in the summer of 2020?

A.  Yes.

Q.  Mr. Charalambous, if you could zoom in to page 3 of the transcript/lines 2 through 10.

So Ms. Fretheim, there, Mr. Milton says, "It is the first time in history that has been able to be done.  So, it went from about 16 dollars a kilogram, we're down below four dollars a kilogram."  In your mind, was this a statement about the future?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Why not?

A.  Because he says that it has been able to be done and "we're down now below four dollars."

Q.  Ms. Fretheim, why did this statement concern you?

A.  Because in my opinion we had not proven that we could get

there.

Q.  Ms. Fretheim, how did you feel when you heard these statements on the podcast from the executive chairman of your company?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  To be honest, it made me kind of sick to my stomach.

Q.  Why did it make you sick to your stomach?

A.  Because of the repercussions, potential repercussions from it.

Q.  When you say repercussions, what do you mean by that?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Everything from having to have those conversations with customers through potential legal ramifications either with investors or the SEC.

MS. ESTES:  One moment, your Honor.

(Counsel confer)

MS. ESTES:  Your Honor, I have no further questions for this witness.

THE COURT:  Occasion.

MR. BONDI:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. BONDI:

Q.  Good afternoon, Ms. Fretheim.

A.   Good afternoon.

Q.   Ms. Fretheim, you first started at Nikola in March 2019, right?

A.   Correct.

Q.   And you reported to Mark Russell.

A.   Yes.

Q.   And Mark Russell was president at the time.

A.   Correct.

Q.   And Mr. Russell became Nikola's chief executive officer when Nikola went public in June of 2020, right?

A.   Correct.

Q.   And in 2020, you interacted regularly with CEO Mark Russell.

A.   Yes.

Q.   And Mr. Russell is still the CEO of Nikola today.

A.   He is.

Q.   And you continued to report to Mr. Russell until roughly September 2020, right?

A.   I believe so.

Q.   And Mr. Russell served in leadership roles prior to joining Nikola at a public company called Worthington Industries, isn't that right?

A.   Yes.

Q.   Worthington Industries is a public company, right?

A.   To my understanding, yes.

Q.   It files filings for investors with the SEC.

A.   I have never read them, but I would assume so.

Q.   And you are aware, too, that Mr. Russell is a lawyer by

training, correct?

A.   Yes, by education, I believe so.

Q.   He earned a law degree in fact, right?

A.   I believe so, yes.

Q.   Admitted to the bar.

A.   That I do not know.

Q.   Okay.  And you are aware that he was a practicing lawyer

before becoming a corporate executive.

        MS. ESTES:  Objection.  Relevance?

        THE COURT:  Overruled.

A.   I can't recall.

Q.   Now, somewhere in September 2020 or so you began to report

to somebody named Pablo Koziner, right?

A.   Yes, correct.

Q.   And we saw Mr. Koziner's name in one of those e-mails,

right?

A.   Yes.

Q.   Mr. Koziner is the president of Nikola Energy and

Commercial, right?

A.   At that time, yes.

Q.   And Mr. Koziner is also a lawyer by training.

A.   Yes.

Q.  He earned a law degree.

A.  Yes.

Q.  He was admitted to the bar.

A.  I believe so.

Q.  He practiced law.

A.  Yes, I believe so.

Q.  And prior to joining Nikola, Mr. Koziner was an executive at a company called Caterpillar, right?

A.  Yes.

Q.  And Caterpillar is a public company.

A.  Yes.

Q.  It files information for investors with the SEC.

A.  Again, I've never read them, but I assume so.

Q.  Now, another name that came up in these e-mails was someone named Britton Worthen.  Do you remember that?

A.  Yes.

Q.  And since you have been with the company, you have interacted regularly with Britton Worthen.

A.  I wouldn't say regularly.

Q.  Well, Ms. Fretheim, that's exactly what you told the government when you were interviewed on February 4, 2020, right?

A.  I can't recall.

Q.  Well, you were in fact interviewed by the government in February of 2020, isn't that correct?

M9e2Mil6                          Fretheim - Cross

A.   In February of 2020?

Q.   Excuse me.  You were interviewed by the government in February of 2022.  Excuse me.

A.   February, I believe so, yes.

Q.   And you were admonished at the beginning of that interview by the government to tell the truth.

A.   Yes.

Q.   And isn't it a fact that you -- the government was taking notes during that interview.

A.   I never saw them, but -- so I don't know.

Q.   And isn't it a fact that you told the government that you interacted regularly with senior leadership, including Mr. Worthen?

A.   I can't recall exactly.

Q.   Would it refresh your recollection if I showed you those notes?

         Chris, do you think we can pull up the notes from her interview from February 4, 2022?

         And if you look, Ms. Fretheim, just to yourself and read to yourself page 1, paragraph 5, lines 1 through 2.  Do you see that?

A.   Yes.

Q.   If you can just read that to yourself.

A.   Yes.

Q.   Ms. Fretheim, does that refresh your recollection that you

told the government that you interacted regularly with Britton

Worthen?

A.  Yes, I would say.

Q.  Okay.  And Mr. Worthen is a lawyer.

A.  Yes.

Q.  In fact, Mr. Worthen has served as the chief legal officer

of the company since 2015.

A.  I don't know for sure when he joined the company.

Q.  He was chief legal officer when you joined the company,

though, right?

A.  Correct.

Q.  And he had been there a while before you joined.

A.  To my understanding, yes.

Q.  And he still serves to this day as the chief legal officer

of the company.

A.  Yes.

Q.  And when you had a legal question affecting the company,

you went to Mr. Worthen, right?

A.  Yes.

Q.  There was another name mentioned that the government didn't

ask you about and I want to ask you about.  Since you have been

with the company, you interacted regularly with Kim Brady,

right?

A.  Yes.

Q.  And Mr. Brady is the chief financial officer of the

company.

A.  Correct.

Q.  That means one of his jobs is to oversee Nikola's filings with the Securities and Exchange Commission.

A.  That's my understanding.

Q.  And in fact, Mr. Brady signs those filings with the Securities and Exchange Commission, right?

A.  That's my understanding.

Q.  And so does Mr. Russell, the CEO.

A.  I believe so.

Q.  You never reported directly to Trevor Milton, did you?

A.  No.

Q.  And you interacted with Trevor only sporadically, correct?

A.  Correct.

Q.  And that interaction was when Trevor sought you out for a conversation.

A.  No.

Q.  Ms. Fretheim, that wasn't what you told the company's lawyers when they interviewed you on October 26, 2020, was it?

A.  I don't recall the context of it.

Q.  Okay.  Why don't we bring -- would it help if I refresh your recollection from the government's notes of the readouts from the company's interview of you?

A.  Certainly.

Q.  Chris, would you please pull up those notes.

M9e2Mil6                         Fretheim - Cross

Ms. Fretheim, I just ask that you read to yourself page 1, third black bullet point, fifth white small bullet point that's highlighted for you.  Just read that to yourself.

A.   Yes.

Q.   Does that refresh your recollection that your interaction with Trevor was only when he sought you out for a conversation?

A.   No.

Q.   Isn't it a fact, though, that your interactions with Mr. Milton, Trevor, were only sporadic?

A.   Yes.

Q.   When you first were interviewed by the government in February of 2022 -- excuse me, February of 2021, you told him that Trevor Milton was a visionary, right?

MS. ESTES:  Objection.  Hearsay.

THE COURT:  Overruled.

A.   I don't recall.

Q.   Ms. Fretheim, the government took notes during that interview, isn't that right, and you were admonished at the start of that interview to tell the truth.  Would it refresh your recollection if I showed you the notes from that interview?

Chris, would you please pull up the notes from the government's interview in February 2021.

And Ms. Fretheim, if you would just read to yourself page 3, paragraph 5, lines 3 to 4.

And Ms. Fretheim, if you could, since the court reporter is taking notes, if you could just answer verbally. I apologize. I should have said that earlier.

If you could read those notes to yourself.

A. Yes.

Q. Does that refresh your recollection that you told the government when they first interviewed you that Trevor Milton was a visionary?

A. I probably did.

Q. And Ms. Fretheim, you were interviewed four more times after that with the government, right?

A. I don't remember exactly, but probably.

Q. And during those interviews, Ms. Estes was there, right?

A. I believe so, yes.

Q. Mr. Podolsky was there?

A. At some of the interviews, I believe.

Q. And Mr. Roos was there?

A. At some of them, I believe.

Q. And there were government agents there from the United States postal inspection unit?

A. I believe in the early interviews.

Q. There were even people there from the SEC, right?

A. In the early interviews.

Q. A crowded room.

About how many hours have you spent with the

government?

A.   I couldn't tell you off the top of my head.

Q.   If you had to guess, more than ten, more than 20?

A.   Including the early interviews?

Q.   Yes, ma'am.

A.   Maybe 20.

Q.   20 hours.

          Ms. Fretheim, the government asked you about an interview Trevor gave to the TeslaCharts podcast.  Do you remember that?

A.   Yes.

Q.   And that podcast was released in late July 2020, right?

A.   Yes.

Q.   And the podcasters were two people with the pseudonyms TC and Georgia Orwell, right?

A.   I'm not sure what Georgia's last name was, but TC and Georgia from my recollection.

Q.   And the government played a few clips of that podcast for you, right?

A.   Yes.

Q.   But they didn't play the whole thing, did they, Ms. Fretheim?

A.   Did the government play the whole thing for me?

Q.   Yes, ma'am.

A.   No.

MR. BONDI:  Your Honor, under the rule of completeness, I move to admit the entire TeslaCharts podcast of July 19, 2020, which we have marked for identification as Defense Exhibit 496, into evidence.  And in the interest of time, your Honor, I'm not planning to play all of it, just a few clips that the government is aware of.

MS. ESTES:  Objection, your Honor.  This was the subject of the letter last night.

THE COURT:  Let's talk at sidebar.

(Continued on next page)

(At the sidebar)

THE COURT:  I just wanted some guidance because I think what I determined this morning was that, based on the representation, that the entire podcast would not be played.

MR. BONDI:  Correct, your Honor.

THE COURT:  And that you would -- therefore, that those four disputed segments would not go before the jury today, that I would defer on whether they would be redacted, but that otherwise we could continue.  So I guess what I am asking is what do I tell the jury?  Because I don't want to tell them denied or, you know, overruled because it's something in the middle most likely.

MR. ROOS:  Redacted version?

MS. ESTES:  I think you could say a redacted version or we could admit it and then redact it.  I think our concern is when it goes back to the jury we would want the redactions in place.

THE COURT:  So I can say that the exhibit will be admitted and I don't have to tell them anything more than that.

MR. MUKASEY:  Yeah, because once admitted, it will be admitted with the redactions.

THE COURT:  Okay.  Thank you.

(Continued on next page)

(In open court)

THE COURT:  The exhibit will be admitted.

(Defendant's Exhibit 496 received in evidence)

MR. BONDI:  Your Honor, I similarly move to admit Defense Exhibit 47, which is a transcript of that podcast subject to the same discussion, your Honor.

THE COURT:  Any objection to that?

MS. ESTES:  Your Honor, I think we would like to admit this as a demonstrative as with the other defense exhibit this morning, and if that's the case, then no objection.

THE COURT:  So why don't we for the time being admit it as a demonstrative or allow it to be used as a demonstrative.

MR. BONDI:  Fair enough, your Honor.  Thank you.

Your Honor, the parties have also reached a stipulation which has been marked as DX S6, and with your Honor's permission I would like to read part of that stipulation into the record.

THE COURT:  Very well.

MR. BONDI:  Following "it is hereby stipulated and agreed," it reads, "Nikola posted the following videos and articles to its social media pages on the dates listed below and were publicly accessible through at least September 2020," and on that list is 7/19, 2020 is the published date and the title is "Interview of Trevor Milton on the TeslaCharts with TC

and Georgia podcast."

Your Honor, with the Court's permission, we would like to play a clip from that podcast.

THE COURT:  Very well.

BY MR. BONDI:

Q.  Chris, would you please play the first clip.

(Audio played)

Q.  Ms. Fretheim, did you hear the podcaster say "not investment advice," "nothing should be considered investment advice," excuse me?

A.  Yes.

Q.  Now, the podcast was released on July 19, 2020, right?

A.  Yes.

Q.  And Nikola posted this podcast to the company's social media.

A.  Yes, I believe so.

Q.  Nikola sent out a tweet with a link to the podcast.

A.  I'm not sure exactly who sent the tweet, but it was on our social -- on our Twitter to my recollection.

Q.  The company sent out the tweet.  It came from the company's Twitter account, right?

A.  It did come from the company's account, but I'm not sure who wrote the tweet.

Q.  And you first saw the link to the podcast on Nikola's Twitter feed, right?

M9e2Mil6                        Fretheim - Cross

A.  No.

Q.  Ms. Fretheim, that's not what you told the government, right?

A.  I did see it on the -- on the social, but I was first sent the link from a colleague.

Q.  And then that took you to the link on the company's social media, right?

A.  So the link in the e-mail from my colleague took me directly to the podcast, but then I saw -- subsequently saw it on our social, yes.

Q.  Thank you.

Now, you listened to the entire podcast after it was released, right?

A.  Yes.

Q.  And that podcast was about 99 minutes long, right?

A.  I can't recall exactly, but it was long.

Q.  And the interviewers, TC and Georgia Orwell, asked Trevor many different questions about the company, right?

A.  Yes.

Q.  And you thought some of what Trevor said was too blustery for your liking, right?

A.  Some of it was too blustery, yes.

Q.  I want to understand a bit about your knowledge of the matters discussed during the podcast.  Ms. Fretheim, you are not an engineer, right?

A.   Correct.

Q.   And at the time of the podcast, there were many engineers in the company.

A.   Yes.

Q.   There are many engineers right now in the company, right?

A.   Yes.

Q.   And at the time you had a limited knowledge of battery technology, right?

A.   At high level.

Q.   And your knowledge -- you were not involved much with the Badger pickup truck, right?

A.   No.

Q.   And you were not in the weeds on hydrogen pricing, right?

A.   That would be accurate.

Q.   And you were not in the weeds on the hydrogen modeling that Nikola was using.

A.   Correct.

Q.   You were not in the weeds on the hydrogen stations.

A.   Correct.

Q.   So after you listened to this TeslaCharts podcast that was posted on the company's social media, you sent a text message to CEO Mark Russell, Chief Legal Officer Britton Worthen and Chief Financial Officer Kim Brady, all three of them, raising your concerns about the TeslaCharts podcast, right?

A.   Correct.

Q.  And just so everyone is clear here, all three of these individuals are still at the company, right?

A.  Yes.

Q.  And just so everyone is clear here, you aren't suggesting any of these three individuals engaged in any misconduct with this podcast, are you?

A.  No.

Q.  And you were clear it was CEO Russell, Chief Legal Officer Worthen, Chief Financial Officer Brady, that Nikola had posted the TeslaCharts podcast to Nikola's Twitter feed, correct?

A.  Yes, in subsequent days.

Q.  And you were also clear with the CEO, with the chief legal officer, and with the chief financial officer that the TeslaCharts podcast would stay live on Nikola's Twitter account unless they instructed that it would be removed.

A.  Yes.

Q.  And you didn't follow up to see if that podcast got removed, did you?

A.  Initially I did, but not later on.

Q.  That's not exactly what you told the government, though, on February 4, 2022, was it?

A.  I can't recall.

Q.  Why don't we bring up those notes to help refresh your recollection.

        Chris, can you bring up the 3500 material from that

interview, please.

If you could read to yourself page 15 paragraph 8, lines 1 through 3 to yourself.  Do you see that?

A.  Yes, sorry.

Q.  Does that refresh your recollection that you did not follow up about removing it?

A.  Not in later times, not after the initial discussions.

Q.  Okay.  And as of September 2020, the podcast still was on Nikola's social media feeds, right?

A.  I believe so.

Q.  Let's talk about your interactions specifically with Mr. Russell, the chief executive officer, relating to this TeslaCharts podcast.

In addition to that joint text message to all three of the executives, the one we were just talking about, you also sent a private, separate text message to Mr. Russell to follow up about the TeslaCharts podcast, right?

A.  I can't recall.  You said text message?

Q.  Yes, ma'am.

A.  I can't recall.

Q.  Would it refresh your recollection if I showed you a document?

A.  Yes, please.

Q.  Sure.

Chris, can you pull up DX 1225, please, to help the

witness.

If you could just, Ms. Fretheim, read that to yourself, please.

A.   Yes.

Q.   Ms. Fretheim, does that refresh your recollection that following your joint text message, you sent a separate text message to Mr. Russell following up about the TeslaCharts podcast?

A.   Yes.

Q.   And you again sent Mr. Russell a link to that podcast, right?

A.   In that same text message?  I can't recall.  I believe I did send him a link.

Q.   Okay.  And you also told Mr. Russell that you had not been in all the conversations.

A.   I can't recall if I said that to Mr. Russell.

Q.   You told Mr. Russell that you could be wrong.  Right?  Is that a "yes," ma'am?

A.   Yes, I think I did -- I just can't recall if it was Mr. Russell or Mr. Koziner.

Q.   You told a number of people you could be wrong, though, right?

A.   Yes.

Q.   And in addition to the group text, the individual text which you just saw, and also you also e-mailed CEO Mark

Russell, too, right?

A. Yes.

Q. And then in that e-mail to Mr. Russell, you also listed all of your concerns about that podcast, right?

A. For the first half of it, I did.

Q. And Mr. Russell thanked you for raising these issues, right?

A. Yes.

Q. And he told you that finance and legal are following up, right?

A. Yes.

Q. And he thanked you for watching out for our name, reputation, because it's Nikola's greatest asset, right?

A. I believe those were his words, yes.

Q. Now, in addition to the group text, the individual text to Mr. Russell, and the e-mail to Mr. Russell, you also had a personal conversation with Mr. Russell, your boss, about the podcast.

A. Yes.

Q. So just so I'm clear, you contacted Mark Russell, CEO of the company, a lawyer by training, chief executive officer, no fewer than four separate times about the TeslaCharts podcast, right?

A. Yes, I believe so.

Q. And you reported directly to Mr. Russell?

A.   Yes.

Q.   But to your knowledge Mr. Russell never directed the marketing team to take down the podcast, correct?

A.   Not to my knowledge.

Q.   Now, picking up on the statement about finance and legal are following up, I would like to ask you about your interactions with Chief Legal Officer Britton Worthen.  After the group text to CEO Mark Russell, to CFO Kim Brady, and to Chief Legal Officer Worthen, you separately sent an e-mail to Mr. Worthen listing your concerns, right?

A.   Yes.

Q.   And Mr. Worthen is the chief legal officer for Nikola, right?

A.   Correct.

Q.   He's the head lawyer.

A.   Correct.

Q.   And in your e-mail, you guided Mr. Worthen --

          MS. ESTES:  Objection.  Could we have a sidebar, your Honor?

          THE COURT:  Sure.

          (Continued on next page)

(At the sidebar)

THE COURT:  Yes.

MS. ESTES:  Your Honor, I think we are wading directly into privilege issues that Nikola is claiming privilege over conversations between Ms. Fretheim and Mr. Worthen and Mr. Bondi is asking about legal advice here.

MR. ROOS:  And your Honor ruled on.

THE COURT:  But we haven't gotten that close yet.  He is asking about did you have communications with --

MS. ESTES:  I think --

THE COURT:  -- Mr. Worthen.

MS. ESTES:  -- he started to say and he guide -- he's described her communications to Mr. Worthen, which why I then objected, because it sounds like he was going too far.

MR. PODOLSKY:  He asked about the content of the e-mail.

MR. BONDI:  Your Honor, the answer is simple.  The government produced that e-mail to us SDNY_R001_0003263811.

THE COURT:  So you are saying they waived the privilege with respect to this communication?

MR. BONDI:  Yes, sir.

MS. ESTES:  Can I see the e-mail?

MR. BONDI:  It is on our list as DX 1229.  It is on our exhibit list.

THE COURT:  I was looking at my watch because it was

M9e2Mil6                      Fretheim – Cross

close.   It's end of the day.   Why don't I send the jury home.

              (Continued on next page)

M9e2Mil6                      Fretheim - Cross

(In open court)

THE COURT:  Ladies and gentlemen, it is 2:40, so it is the end of the day.  We will end it now.  Please be safe getting home.  Have a wonderful evening.  Please endeavor to be in the jury room no later than 9:15 tomorrow morning so that we can get you started on time at 9:30.  Until then, do not discuss the case, do not read anything about the case or see anything on -- that you may see on the media about the case.  Be well.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Ms. Fretheim, you may step down, and everyone can be seated.

MR. BONDI:  Your Honor may we approach briefly on an issue, please?  I was --

THE COURT:  What did you say?

MR. BONDI:  I'm asking if I could approach briefly on an issue, please.

(Continued on next page)

(At the sidebar)

MR. BONDI:  Your Honor, company counsel is here and her individual counsel is here.  I know they have been interacting with a number of different witnesses and stuff, and we would just ask for an instruction that she not meet with them to discuss her testimony.

MS. ESTES:  With company counsel?

MR. BONDI:  With company or her individual counsel.

MS. ESTES:  Your Honor, she should certainly be able to discuss her testimony with counsel.

MR. BONDI:  But company counsel are one and the same.

THE COURT:  Company counsel?  I actually have not had this situation before, but she has lawyer, she can speak with her lawyer about anything.

MR. BONDI:  But her lawyer is represents multiple witnesses.  Her lawyer is the company counsel.  During the middle of a cross?  I would ask that there be an instruction.

THE COURT:  Her lawyer is her lawyer.

MS. ESTES:  Right.

THE COURT:  Even if he represents or she represents, I don't know, other people.  So I'm not going to give that particular instruction.

Are there two, is there like a co-counsel and a --

MS. ESTES:  I don't understand her to have two.

MR. BONDI:  It's one and the same.

MS. ESTES:  Just company counsel.

THE COURT:  I'm going to let her speak with her lawyer if she wishes.  Anything else?  That was it.

MR. BONDI:  That's it.

(Continued on next page)

(In open court)

THE COURT:  So there is the issue of whether or not a particular e-mail was produced and not clawed back.  Do the parties have an answer?

MS. ESTES:  Your Honor, if we may just have some time to look at the e-mail and confer.

THE COURT:  I'm going to be back here at 3:30, so do you want to join us then?

MR. ROOS:  If defense counsel would either give us a copy of what this is or give us both the Nikola control number and the government control number, that would be helpful in expediting it.

MR. BONDI:  Your Honor, that's -- they have a copy. They should.  It's DX 1229.  It is SDNY_R001_0003263811, an e-mail that the government produced to us.  They have waived it.  They haven't clawed it back to our knowledge.

MR. ROOS:  Just to be clear, I'm sure we will argue about this more, the government doesn't have the ability to waive Nikola's privilege.  So if we produced it, that's not determinative.  It's really Nikola's privilege to assert or not.

THE COURT:  I believe that Nikola's counsel will be here at 3:30, so we can -- actually because there is going to be a lot to discuss, do folks mind coming back at 3:20, because I do have some matters in the afternoon.

MS. ESTES:  That's fine, your Honor.

MR. MUKASEY:  We may not bring back the whole group at 3:20 if that's okay.

THE COURT:  That's fine.  It can be just you as long as there is someone here.  And Mr. Milton hopefully, unless he waives.  And if Nikola's counsel and Kirkland & Ellis's counsel is here, if I could also ask you to be back, Mr. Allen, is that you?

MR. ALLEN:  Yes.

THE COURT:  You are through a prism there in the plexiglass.  So can you be back at 3:20 as well?

MR. ALLEN:  Yes, your Honor.

MR. CARUSO:  Your Honor, I just want say I need to excuse myself tomorrow morning for an appearance in state court about an hour.  I will be back as soon as I can and I will just unobtrusively come in.

THE COURT:  That's fine.

(Continued on next page)

THE COURT: So I guess we'll be on three docket sheets this afternoon. There are two miscellaneous matters that I think, Mr. Allen, you're here on both of them?

MR. ALLEN: That's correct, your Honor.

THE COURT: And the criminal matter concerning Mr. Milton. So why don't we deal with the email first because that may be the easiest and quickest to deal with.

What can the parties report?

MR. BONDI: Your Honor, the government produced this email, number 1. Number 2, is the government asked Ms. Fretheim during their interviews about this email, number 2. Number 3, your Honor, they introduced in their direct an email to Mr. Worthen, Mr. Russell, and Mr. Brady, raising issues and concerns about this podcast. Excuse me, your Honor, it was a text. Thank you.

And so the email that we're planning to introduce is a one-way email of Ms. Fretheim raising her concerns to Mr. Worthen. We are not, your Honor, at all going to ask about any of the communications that she had with Mr. Worthen, other than the fact that she raised the concerns in an email with Mr. Worthen.

MR. ROOS: I'm sorry for trying to interrupt. I think, actually, we provided the email to counsel for Nikola. I'll let Mr. Allen speak, but it sounds like they're not asserting privilege over that. Obviously, we have concerns,

I'm sure they have concerns about further inquiry into the conversation, but in terms of the email, I think it's a moot issue. So we don't have a standing objection, at least to the question that was asked.

THE COURT: It sounds like, Mr. Bondi, you indicated that you only elicited the fact Ms. Fretheim sent this email to counsel and raising the issue and leave it at that.

MR. BONDI: And introduce the email itself into evidence, your Honor.

THE COURT: Mr. Allen, do you confirm that the company is not asserting privilege as to that email?

MR. ALLEN: That's correct, your Honor. Just for the record, the email that I understand to be at issue is marked as Defendant's Exhibit 1229.

THE COURT: So that is resolved. You gentlemen are welcome to stay or not.

MR. ROOS: Maybe we'll sit in the audience for this one.

THE COURT: Wherever you're comfortable.

(Adjourned to September 15, 2022 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                    Page

 PAUL LACKEY

Cross By Mr. Caruso  . . . . . . . . . . . . . 225

Redirect By Mr. Podolsky . . . . . . . . . . . 265

Recross By Mr. Caruso  . . . . . . . . . . . . 276

Redirect By Mr. Podolsky . . . . . . . . . . . 282

 ELIZABETH FRETHEIM

Direct By Ms. Estes  . . . . . . . . . . . . . 288

Cross By Mr. Bondi . . . . . . . . . . . . . . 370

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1204    . . . . . . . . . . . . . . . . . . . 299

 1206    . . . . . . . . . . . . . . . . . . . 300

 1200    . . . . . . . . . . . . . . . . . . . 302

 1202    . . . . . . . . . . . . . . . . . . . 308

 1201    . . . . . . . . . . . . . . . . . . . 309

 263     . . . . . . . . . . . . . . . . . . . 312

 422-A, 422-B, 422-C, 422-D, 422-E,  . . . . . 314

          422-F, 422-G, 422-T

 56  . . . . . . . . . . . . . . . . . . . . . 338

 261     . . . . . . . . . . . . . . . . . . . 339

 260     . . . . . . . . . . . . . . . . . . . 340

 290     . . . . . . . . . . . . . . . . . . . 345

 427-A, 427-B, 427-C, 427D, 427-E, 427-T  . . 348

425-A, 425-B, 425-C, 425-D, 425-E,  . . . . . 357

425-F, 425-G, 425-H, 425-I,

425-T

424-A through G, 424-T . . . . . . . . . . . 367

426-A, 426-B, 426-T  . . . . . . . . . . . . 368

DEFENDANT EXHIBITS

Exhibit No.                              Received

463   . . . . . . . . . . . . . . . . . . . . 255

1019   . . . . . . . . . . . . . . . . . . . 258

1015   . . . . . . . . . . . . . . . . . . . 260

467   . . . . . . . . . . . . . . . . . . . . 264

496   . . . . . . . . . . . . . . . . . . . . 382