M9f2Mil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                          21 CR 478 (ER)

TREVOR MILTON,

          Defendant.

------------------------------x

                       New York, N.Y.

                       September 15, 2022
                       9:00 a.m.

Before:

                HON. EDGARDO RAMOS,

                       District Judge

                   APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

M9f2Mil1

(Trial resumed; jury not present)

THE COURT:  It's 9:00.  Good morning, everyone.

MR. ROOS:  Good morning.

THE COURT:  I did receive the government's letter from yesterday evening concerning texts between various Nikola employees that they seek to admit on various bases. Mr. Mukasey, I don't know who from the defense team wants to address the letter, if you are ready to do so now, or we can discuss it later.

MR. MUKASEY:  Judge, I don't think it affects this witness, and I understand Mr. Bondi put in a letter an hour or so ago.  I don't know if the Court's reviewed it.

MR. ROOS:  20 minutes ago.

MR. MUKASEY:  20 minutes ago, whatever.  I don't think it's going to affect this witness, I think, if the Court wants to digest the letter we put in and we take it up at the next break or before the next witness.

THE COURT:  No, I have not seen Mr. Bondi's letter so we won't discuss this now.

On the government's request concerning the TeslaCharts interview, I have reviewed the portions, the four portions that they want redacted.  That motion is largely granted with the following two exceptions.  I will allow, at page 3/lines 9 through 17 and lines 21 through 25.  The motion is otherwise granted.  And these segments simply discuss Mr. Milton

M9f2Mil1

discussing his biography.

Is there anything else that the parties wish to raise?

MS. ESTES:  Yes, your Honor, one thing that we expect to come up with the witness this morning.

So defense and the government have actually been working very well together.  They have been sending us exhibits they intend to introduce through Ms. Fretheim and we are largely not going to object to the exhibits they intend to introduce, but there are a few that we are concerned about.

In particular, there are e-mails where Ms. Fretheim is not on the e-mail.  We just don't think she is going to have any basis of knowledge to talk about an e-mail she is not on. She is not the right person to be asked about that e-mail.  And one of them in particular is an e-mail sent from Mr. Milton. And so if the defense wants to offer a statement from Mr. Milton, that would be hearsay, so we would object to that on that additional basis.

THE COURT:  Are there -- the other e-mails, how many others are there that you object to?

MS. ESTES:  I think there were about two or three. It's not a large amount.

THE COURT:  And are there other individuals on those e-mails that will be testifying?

MS. ESTES:  Yes, your Honor, for instance, I'm looking at Defense Exhibit 1580.  It's an e-mail from Mr. Milton to

Nicole Rose, Matt Peterson, Stephanie Fleck, and Vince Caramella.  At least one other person on the e-mail will be testifying at the trial.

THE COURT:  Okay.

MR. BONDI:  Your Honor, I wish to explore with the witness whether she is aware of the discussions and the content, whether she is copied on the e-mail or not.  We believe that the e-mail is a business record.  It comes in under 806(6).

However, your Honor, just to streamline things, I will just ask the witness about the content, not bringing up anything that Mr. Milton said, but what was said to him by other witnesses.  I am allowed to explore whether she is aware of what other witnesses were telling Mr. Milton at the time because she was interacting with those witnesses, too.  And what we don't want to have is she leaves the stand, another witness says I told her about the e-mail I sent, and then we have got to call her back up.

THE COURT:  I agree with much of what you said.  I just don't think that -- you can absolutely raise with her what she knew about what discussions were taking place, but that doesn't make that e-mail admissible.  So you can show her the e-mail, you can ask her about the substance, but I don't think that the e-mail itself would be admissible.

MR. BONDI:  Understood, your Honor.  Thank you.

Your Honor, one other matter if I may just raise, too, and this was a matter I raised a bit at sidebar before we left to adjourn for the day.  I intend to ask Ms. Fretheim at the start whether she talked to anyone about her testimony.  I intend to ask her who she talked to, how long she talked to them, who was there, those sorts of things.

I will not, your Honor, ask her what she talked about with her lawyer.  If she talked to people who were not lawyers and other employees, I think that's fair game to explore.

The fact that she met with or talked to lawyers between yesterday and today is also, I think, fair game to explore the fact of that, not the discussions themselves.

MS. ESTES:  Your Honor, we are certainly fine with those questions.  We would request that if Mr. Bondi does that -- I think it could create a misleading impression that that's somehow not appropriate, so if your Honor would give some sort of very brief instruction explaining that this sort of thing is very normal, we would appreciate that.

THE COURT:  Okay.  And I take it, Mr. Bondi, that the questions you seek to ask are how many times did you meet with individuals in preparation for her testimony that, type of thing.

MR. BONDI:  I'm going to ask her:  Since you took the stand yesterday, did you talk to anyone about your testimony.  Yes.  Who did you talk to?  I talked to so-and-so at the

company.  What did you say?  What did he say?  What did they talk about?  What did you talk about about your testimony with somebody at the company.  If she says I talked to my lawyers, who was there?  Did you meet in person?  How long did you talk?  That's it.  And I'm going to say, Ms. Fretheim, without getting into what you talked about with your lawyers and who said what, how long did you talk to them?  How long did you meet with them?  If she went and prepared with her lawyers for five hours last night, I think that's relevant.

MS. ESTES:  Your Honor, if Ms. Fretheim did meet with her lawyers last night, I think that's appropriate.  I think it would be appropriate for the Court to instruct the jury to some extent so that they are not misled by this line of questioning.

And then, you know, on the questions about speaking with people from the company, I think that is totally fine as long as it is clear that if he is asking what you said to somebody at the company, that it's not a company attorney.

MR. BONDI:  Your Honor, I will make clear that it is not an attorney or I will say who was it.

And, your Honor, I don't think an instruction is going to be necessary.  This is a typical question that one would ask, and I think it is fair to explore.

And, your Honor, she met with somebody who is also the company attorney and her attorney.  I'm allowed to ask her.  That person is also the attorney for the company, right?

MS. ESTES:  Your Honor, I think it is clear from what Mr. Bondi is saying that he intends to spend a lot of time on something that I think is going to be prejudicial and going to confuse the jury.  I think limited questions might be okay, but if it is really going down this rabbit hole, as Mr. Bondi suggests, we would object under 403.

MR. BONDI:  Less than two minutes, your Honor.

THE COURT:  Okay.  We will see how it goes.  I believe my standard jury instructions do have at least a paragraph discussing you have heard testimony that individuals met with attorneys in preparation for trial; that is perfectly appropriate and normal.  So there will be an instruction to the jury certainly by the time of the jury charge.

MS. ESTES:  Yes, your Honor.  I think because the testimony will happen today, I think it is also appropriate to give the jury a brief preview --

THE COURT:  We will see how those two minutes play out, and if I think it is appropriate to give an instruction at that time, I will.  It will be very brief.  Essentially what I just said.  Okay?

Anything else?

MR. PODOLSKY:  This is not an issue to resolve now.  I just want to put on people's radar, I think a week from Monday, so the 26th, is a Jewish holiday.  I think your Honor had mentioned that the Court would be off.  I think, depending upon

the level of observance, some people take Monday and Tuesday. I have no sense of whether this is an issue for any of the jurors, but I wanted to sort of raise it because I think we will ultimately have to decide the schedule for that week, and I don't know if we have to figure out who might be implicated by that.

THE COURT:  I'm happy to be guided by the attorneys. I profess a complete ignorance of the Jewish holidays and which ones are a day off and which ones are not, which ones are two days.  So you tell me what happens and I am happy to -- particularly the jury, accommodate the jury.

MR. PODOLSKY:  I think the reason I raise it is I can't tell, frankly, if anyone observes, but we may just need to know if anyone does, so we can figure out whether we need to take just one day or two days off.  That's the issue.

MR. MUKASEY:  Just a housekeeping matter.  Mr. Caruso is covering a matter for me in state court.  He may wander in in the middle.  I don't know if -- the Court said earlier that he didn't want people coming in and out.  We can have him sit in the gallery when he comes in until the 20-minute break.

THE COURT:  That's fine.  I'm sure he will be very unobtrusive when he comes in.

MR. MUKASEY:  Thank you.

THE COURT:  Anything else?

MS. ESTES:  No, your Honor.

M9f2Mil1

THE COURT:  Okay.  Then hopefully we will be able to start at 9:30.

(Recess)

THE COURT:  I understand that the jury is here and I further understand that that information has been confirmed, so can we get the witness in, please?

MS. ESTES:  Yes, your Honor.

THE COURT:  Also Ms. Rivera reports that one of the jurors does observe Rosh Hashanah and she will only be out the one day, the Monday, not both days.

MR. PODOLSKY:  Thank you, your Honor.  We will discuss with the defense and have a proposal for the schedule.

THE COURT:  Very well.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen of the jury, good morning.

JURORS:  Good morning.

THE COURT:  I trust all had a pleasant evening.  Thank you, as always, for being prompt.

We will now continue with the cross-examination of Ms. Fretheim.

Ms. Fretheim, you are reminded that you are still under oath.

ELIZABETH FRETHEIM, resumed.

CROSS-EXAMINATION

BY MR. BONDI:

Q.  Good morning, Ms. Fretheim.  Since you testified yesterday, have you discussed your testimony with anyone?

A.  No.

Q.  Not even lawyers?

A.  No.

Q.  I think we left off with talking about Chief Legal Officer Worthen.  After the group text we talked about yesterday with CEO Russell, Chief Financial Officer Worthen, and -- excuse me Chief Financial Officer Brady, Chief Legal Officer Worthen, you separately listed an e-mail -- excuse me, you separately sent an e-mail to Mr. Worthen listing your concerns, right?

A.  Yes.

Q.   I would like to show you what's been marked as DX 1229.

Ms. Fretheim, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's my e-mail to Britton regarding my concerns.

MR. BONDI:  Your Honor, at this time I would like to offer into evidence DX 1229.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1229 received in evidence)

BY MR. BONDI:

Q.   Ms. Fretheim, just, again, Mr. Worthen is the chief legal officer of Nikola, right?

A.   Correct.

Q.   He is the head lawyer.

A.   Correct.

Q.   And in your e-mail, you guided Mr. Worthen to the time stamps of your specific concerns in the 99-minute podcast, the TeslaCharts podcast, right?

A.   Yes.

Q.   And then after this e-mail, you also spoke with Chief Legal Officer Worthen to make sure he received your e-mail, right?

A.   Yes, I did.

Q.   And after Mr. Worthen listened to the TeslaCharts podcast, you had a second conversation with the chief lawyer of the

company, Mr. Worthen.

A.   Sorry, will you repeat that?  You said after I had the initial conversation?

Q.   Yes, ma'am.  After Mr. Worthen listened to the TeslaCharts podcast, you had a second conversation with Mr. Worthen, correct?

A.   I believe so.

Q.   So just to be clear, you contacted Mr. Worthen, who is the chief lawyer of the entire company, no fewer than four separate times about the TeslaCharts podcast, right?

A.   Yes, I believe that's correct.

Q.   But to your knowledge, Mr. Worthen never directed the marketing team to take down the TeslaCharts podcast, correct?

          MS. ESTES:  Objection.

A.   I don't know if he did.

Q.   And to your knowledge, Mr. Worthen never directed the management team --

          MS. ESTES:  Objection.

Q.   -- to take down the TeslaCharts podcast.

          THE COURT:  Overruled.

A.   I don't know if he did.

Q.   On the morning of July 20, the next morning after that TeslaCharts podcast, you also reached out to the Nikola's chief marketing officer, Vince Caramella, right?

A.   He is the global lead of marketing, correct.

Q.   He is somebody you would call a C suite executive, right?

A.   No.

Q.   Is he on the top floor of Nikola?

A.   No.

Q.   Okay.  Is he someone important in the company?

A.   Yes.

Q.   And that same morning, the same time you reached out to Mr. Caramella, you also reached out to Nicole Rose who also works with him in the marketing department, right?

A.   Correct.

Q.   Did Ms. Rose tell you that she had told Mr. Caramella that there was more context around each of the items in this list, meaning your list?

          MS. ESTES:  Objection, hearsay, calls for hearsay.

          THE COURT:  Sustained.

BY MR. BONDI:

Q.   Did Ms. Rose tell you that she told Mr. Caramella --

          MS. ESTES:  Objection, hearsay.

          THE COURT:  Sustained.

BY MR. BONDI:

Q.   Ms. Rose didn't agree with you, did she?

A.   I don't recall that.

Q.   And Mr. Caramella didn't agree with you, did he?

A.   I wouldn't characterize it that way, no.

Q.   Well, did Mr. Caramella tell you that he told Mr. Milton --

          MS. ESTES:  Objection.  Hearsay.

          THE COURT:  Sustained.  You can let him finish the
question.

BY MR. BONDI:

Q.  Did Mr. Caramella tell you that he had told Trevor Milton
before your e-mail that it was one of his best interviews so
far?

          MS. ESTES:  Objection.  Hearsay.

          THE COURT:  Sustained.

BY MR. BONDI:

Q.  Even on this podcast, the TeslaCharts podcast, you heard
Trevor talk about utility rates in California during that
podcast, right?

A.  Sorry.  Ask that one more time.

Q.  During the TeslaCharts podcast, you heard Mr. Milton talk
about utility rates in California during that podcast, right?

A.  I can't recall if they were specific to California.

Q.  But you were concerned about what he was saying about
utility companies, right?

A.  Yes.

Q.  Trevor delayed his appearance on the TeslaCharts podcast so
that he could prepare for it, isn't that right?

A.  I don't know.

Q.  Prior to the podcast, the podcast that you listed all those
concerns, Trevor asked Nikola to hire a full-time researcher,

isn't that right?

A.   I don't know.

Q.   Trevor wanted that researcher to provide certain data.

A.   And I wasn't involved in that.

Q.   Some of that data was utility companies, involved utility companies.

          MS. ESTES:   Objection.   Calls for speculation.

          THE COURT:   Sustained.

BY MR. BONDI:

Q.   I would like to show you what's been marked as Defense Exhibit 1419 -- bring it up on the screen -- which is a July 14 e-mail from Jai Singh at the research firm Rystad to Trevor Milton and Joe Pike, and attached to this e-mail are two attachments which we have marked for identification as Defense Exhibit 1420 and 1421.

          Ms. Fretheim, Joe Pike is the head of human resources at Nikola, right?

A.   Correct.

Q.   He is involved in hiring people for Nikola, right?

A.   Yes, correct.

Q.   And this e-mail was sent to him at his Nikola e-mail address, right?

A.   Yes, correct.

Q.   And Trevor Milton is the executive chairman or was the executive chairman at the time of Nikola, right?

A.   Yes.

Q.   And this went to his Nikola e-mail address.

MS. ESTES:  Objection.  He is asking questions about a document not in evidence.

MR. BONDI:  Just laying the foundation, your Honor.

THE COURT:  Overruled.

BY MR. BONDI:

Q.   And this went to Trevor Milton's e-mail at Nikola, right?

A.   Yes, correct.

MR. BONDI:  Your Honor, the defense offers Defense Exhibit 1419, 1420 and 1421 marked for identification.  We offer those into evidence, your Honor.

MS. ESTES:  Objection.

THE COURT:  Sustained.

BY MR. BONDI:

Q.   Let's talk a bit more about the TeslaCharts podcast.

MR. BONDI:  Your Honor, I believe the parties have reached an agreement and we would like to play a clip from that, Defense Exhibit 496.

THE COURT:  Very well.

MR. BONDI:  Excuse me, your Honor.  I would like to offer Defense Exhibit 496 for identification and offer it into evidence.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 496 received in evidence)

MR. BONDI:  Chris, could you please play 496.

(Audio played)

BY MR. BONDI:

Q.  Ms. Fretheim, did you hear Trevor Milton say:  We hope to have those stations up and running within about, you know, 18 months or so?

A.  Yes.

Q.  And you heard Trevor say that:  We anticipate two years from the time you kick off the station from the time it comes online.  It's two years?

A.  Yes, I believe he said that.

Q.  And you heard Trevor say in that TeslaCharts podcast from July 2020 that:  So we're about 18 months away from having those stations come online for the first two routes for Anheuser-Busch, right?

A.  Yes, more or less.

Q.  18 months, two years, right?

A.  Yes.

Q.  And he mentioned a station in Phoenix, right?

A.  Yes.

Q.  And he said that that station wasn't producing hydrogen, right?

A.  He did.

Q.  So if the station in Phoenix is not producing hydrogen and

the other stations that will produce hydrogen are two years
away, where is he say they are producing hydrogen in those
clips?

A.   In those particular clips he did not say we were producing
hydrogen anywhere.

Q.   And that was part of the same podcast, right?

A.   Yes.

Q.   Context matters, doesn't it, Ms. Fretheim?

A.   Yes.

Q.   Now, Ms. Fretheim, the government showed you yesterday a
draft presentation from 2019, and I just want to pull up so
everyone can see again GX 290, please.

         You see, Ms. Fretheim, it is stamped in big red in the
top left corner there "draft."  Do you see that?

A.   Yes.

Q.   And so this was a draft presentation from June 2019, right?

A.   Yes.

Q.   And Nikola was a private company then, right?

A.   Yes.

Q.   And Ms. Fretheim, there have been plenty of public
presentations since this time period, right?

A.   Similar to this one?

Q.   There have been plenty of public presentations since this
time period, right?

A.   Yes.

Q.  And there are final presentations since this one, too, right?

A.  Yes, I believe so.

Q.  I would like to show you one of those presentations, what's been marked as Defense Exhibit 37 for identification.

MR. BONDI:  Your Honor, the parties have reached a stipulation regarding this particular document, and that stipulation is GX S6.  And just for the record, your Honor, I read a stipulation yesterday that was also the same stipulation, and I believe I misidentified it as DX S6 and just for the record it is GX S6, and with your Honor's permission, I would like to read part of that stipulation into the record.

THE COURT:  Very well.

MR. BONDI:  It starts with, "It is hereby stipulated and agreed Nikola posted analyst day presentations to its website on March 3, 2020, and April 6, 2020.  It is further stipulated that no party will raise any objection under the Federal Rules of Evidence 901 with respect to any exhibit referenced above or any portion of Nikola's website or any Nikola press release, any Nikola analyst day presentation, or any filing with the SEC by Nikola."

Pursuant to that stipulation, your Honor, the defense offers into evidence DX 37.

THE COURT:  Pursuant to stipulation, it will be received.

(Defendant's Exhibit 37 received in evidence)

MR. BONDI:  Chris, would you please show this exhibit to the jury.

Q.  Ms. Fretheim, this is a presentation titled "analyst day presentation," right?

A.  Yes.

Q.  It is dated April 6, 2020.

A.  Yes.

Q.  Almost a full year after that draft presentation, right?

A.  Yes.

Q.  And this was a presentation for investors, right?

A.  My understanding, yes.

Q.  Let's turn to page 5 of that presentation, and you see that Nikola's key leadership is included on this page, right?

A.  Yes.

Q.  You see Trevor Milton.  Can you pull that up?  And you see next Mark Russell, right?

A.  Yes.

Q.  And Mark Russell became CEO, chief executive officer, when Nikola went public a couple of months later.

A.  Yes.

Q.  And he is still CEO today?

A.  Yes.

Q.  You also see Kim Brady, we talked about him earlier.  He is still the CFO of the company, right?

A.   Yes.

Q.   And there is another face on here.  I thought we would put faces to names here.  This is Steve Girsky, right?

A.   Yes.

Q.   At the time he was the CEO of VectoIQ, right?

A.   Yes.

Q.   And that was the company that Nikola merged into in June of 2020 to become public, right?

A.   Into -- I would say with, merged with.

Q.   Okay.

A.   But yes.

Q.   And Steve Girsky is chairman of Nikola today?

A.   Chairman of our board, yes.

Q.   Chairman of the board.

     Let's turn to page 9 of this slide deck and it is titled "powered by a unique strategy."  Do you see that?

A.   Yes.

Q.   And if you look at the box in the upper left-hand corner titled "key Nikola facts," right?

A.   Yes.

Q.   It says "facts."

     And it says one of those facts is "plus 14,000 FCEV truck reservations to date."  Do you see that?

A.   Yes.

Q.   And what is an FCEV truck, just so everyone understands?

M9f2Mil1                        Fretheim - Cross

A.   That's the fuel cell electric vehicle.

Q.   And that's the Nikola Two is a fuel cell electric vehicle, right?

A.   The Nikola One, the Nikola Two, and the Nikola Tre are all fuel cell.

Q.   Thanks for clarifying that.

This has also a squiggly line and has a 10B sales value, do you see that?

A.   Yes.

Q.   And B stands for billion, right?

A.   Yes.

Q.   This is saying 10 billion dollars in sales value, right?

A.   Yes.  The squiggly line is approximately.

Q.   Approximately.  Thank you.

And this was something that was put out by the company for investors?

A.   Yes.

Q.   Posted on the website.

A.   It's my understanding, yes.

Q.   For everyone to see.

A.   Yes.

Q.   Including Trevor Milton.

A.   Yes.

Q.   It also says here "demand" -- excuse me "with robust demand for newly introduced BEV truck."  Right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   What was the newly introduced BEV truck?

A.   What was it?

Q.   Uh-huh.

A.   It was the Nikola Tre battery electric vehicle.

Q.   And we saw a picture in your direct of that one, right, that's kind of the stand up truck you said had the European sleeper cab, I think you said?

A.   Yes, correct.

Q.   Okay.  Thank you.  Now let's turn to page 25 of this presentation for investors.

     This one is titled "H2 station unit economics," right?

A.   Yes.

Q.   I don't want to get too far in the weeds because I know you are not with respect to hydrogen, but H2 stands for hydrogen, right?

A.   Yes.

Q.   If you talk a look at the chart on the right-hand side, it's titled "actual cost to produce hydrogen," right?

A.   No.

Q.   No?

A.   It's titled "annual."

Q.   I'm sorry my eyesight is getting poor and I'm having to look off the government's monitor there.  "Annual cost to produce hydrogen," right?

A.   Correct.

Q.   On the bottom line it says "cost per kilogram" and it says "excl depreciation."  That means excluding depreciation, right?

A.   Yes, correct.

Q.   And that's the cost to produce hydrogen?

A.   Yes.

Q.   And it says $2.47, right?

A.   Yes.

Q.   And this was a presentation that was posted on April 6, 2020, for everyone to see.

A.   Yes, correct.

Q.   Including investors.

A.   Correct.

Q.   Including Trevor Milton.

A.   Yes.

Q.   Ms. Fretheim, yesterday during your direct testimony you said you were worried about Trevor's statements potentially being in contravention of SEC rules.

A.   Yes.

Q.   Could we take a look at some SEC filings here.

        Ms. Fretheim, Nikola went public in June 2020, right?

A.   Yes, correct.

Q.   And as part of that process to become a public company, Nikola filed what was known as an S1 registration statement with the Securities and Exchange Commission for investors on

June 15, 2020, right?

A.   Yes, I believe that's the date.

Q.   And, Ms. Fretheim, I'm going to show you what's been marked for identification as Defense Exhibit 734.

MR. BONDI:   Your Honor, the parties have reached a stipulation concerning this SEC document and, with your Honor's permission, I would like to read part of the stipulation, GX S6, in the record.

THE COURT:   Very well.

MR. BONDI:   Following "It is hereby stipulated and agreed," paragraph 6 of the stipulation reads, "Nikola files regulatory documents with the United States Securities and Exchange Commission ("SEC") and makes copies of those SEC filings publicly available to the investors" -- excuse me, "publicly available in the investors section of Nikola's website.  The SEC filings on Nikola's website are authentic copies of the filings Nikola makes with the SEC.  It is further stipulated that no party will raise any objection under Federal Rule of Evidence 901 with respect to any exhibit referenced above or any portion of Nikola's website, any Nikola press release, any Nikola analyst day presentation, or any filing with the SEC by Nikola."

Your Honor, with that stipulation, the defense offers Defense Exhibit 734 into evidence.  And, your Honor -- excuse me.  Your Honor, I offer 734 into evidence.

THE COURT:  Pursuant to stipulation, it will be received.

(Defendant's Exhibit 734 received in evidence)

MR. BONDI:  Your Honor, may I publish for the jury?

THE COURT:  You may.

MR. BONDI:  Chris, will you please pull up the front cover of this SEC filing for investors.

Q.  I want to ask and make sure we level set here who is on this document.

First of all, Britton Worthen is identified on the cover page, isn't he?  You see that?

A.  Yes.

Q.  And Britton Worthen is the chief legal officer of Nikola?

A.  Yes.

Q.  Esquire means he is a lawyer, too, right?

A.  I believe so, yes.

Q.  Also on this front page, it lists a reference to Pillsbury Winthrop Shaw Pittman, LLP.  Can we zoom in on that front page?

And Pillsbury Winthrop Shaw, LLP, was the company's lawyers that reviewed this document that got filed with the SEC and put on Nikola's website, right?

A.  I was not involved in that, but I would assume so.

Q.  Okay.  First lawyer listed is Stanley Pierson, right?

A.  Yes.

Q.  Did you have any interactions with Mr. Pierson?

A.   No.

Q.   The second lawyer is Gabriella Lombardi, Esq.  Have you seen that?

A.   Yes.

Q.   Have you had any interactions with Ms. Lombardi?

A.   Only recently.

Q.   Only recently.  Okay.  Let's go to the last page of this SEC document that was filed and put on the website.

     Mark Russell signed this SEC filing, didn't he?  Do you see that?

A.   Yes.

Q.   With his title president, chief executive officer, and director?

A.   Yes.

Q.   He had all three titles when Nikola went public?

A.   Yes, I believe so.

Q.   Still does.

A.   Not today.

Q.   He is still chief executive officer?

A.   He is chief -- yes, he is still chief executive officer. We have a different president.

Q.   And he is still a member of the board of directors, right?

A.   Correct.

Q.   And signed by Kim Brady, right, the CFO.  We talked about him quite a bit.

M9f2Mil1                     Fretheim - Cross

A.  Yes.

Q.  It is also signed, the third signature there is by Trevor Milton, the executive chairman.

A.  Yes.

Q.  And you see they are all dated June 15, 2015.

Sophia Jin, she is a member of the board of directors, right?

A.  She was at the time.

Q.  Was at the time.  Right.

Michael Mansuetti, he was a member of the board of directors at the time, right?

A.  Yes.

Q.  Gerrit Marx, another member of the board of directors?

A.  Yes.

Q.  Lonnie Stalsberg, he was a member of the board of directors at the time, right?

A.  I believe so.

Q.  Dewitt Thompson, he is a member of the board of directors, right?

A.  Yes.

Q.  Jeff Ubben, he is another member of the board of directors?

A.  He was at that time.

Q.  Ms. Fretheim, are you familiar with a company called Ernst & Young?

A.  Yes.

M9f2Mil1                       Fretheim - Cross

Q.   EY, right?

A.   Yes.

Q.   EY is a big company, right?

A.   It's my understanding.

Q.   They are an auditing firm, right?

A.   It's my understanding.

Q.   An independent auditing firm, right?

A.   Independent from Nikola?

Q.   Yes.

A.   Yes.

Q.   Independent from Nikola, right?

     One of the top accounting firms in the world, right?

A.   I wouldn't know.

Q.   They are referred to as a Big Four accounting firm, right?

A.   It's been a long time since I have looked at accounting firms.

Q.   And Nikola -- excuse me, and Nikola's auditors, their independent auditors, were Ernst & Young, right?

A.   I believe so, but I couldn't say for sure.

Q.   And they still are, right?

A.   I believe so.

Q.   Let's turn to the page with the auditor please, Chris. This is super fine print, so I'm going to try to ask Chris to zoom in as best he can here, and I just want to read for you and make sure I am reading this right, if you could read along

M9f2Mil1                    Fretheim - Cross

with me, this is an audit opinion accompanying the S-1, right? And it says -- right?  Ms. Fretheim, sorry?

A.   Yes.

Q.   Thank you.  Sorry.

"We conducted our audits in accordance with the standards of the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements, whether due to error or fraud."  Do you see that?

A.   Yes.

(Continue on next page)

BY MR. BONDI:

Q. And it also says that Ernst & Young plans and performs its edits to "obtain reasonable assurance" that the financial statements are free of material misstatements; right?

A. Yes.

Q. And that includes whether the material misstatement in the financial statement was due to error or fraud, it says; correct?

A. Yes.

Q. And it says here that Ernst & Young concluded that the financial statements presented fairly, in all material respects, Nikola's financial position.

Do you see that?

A. Yes.

Q. And this was signed by Ernst & Young.

MR. BONDI:  Let's pull up the signature page so everyone could see that, please.

Q. That's signed by Ernst & Young LLP, the independent auditors; right?

A. Yes.

Q. Let's go to page 12 of the registration statement that Nikola filed with the Securities and Exchange Commission for investors that it posted on its website.  I would like to read with you, just make sure I'm reading it right, what it says on page 12.

M9FCmil2                        Fretheim - cross

As of December 31, 2019, we had reservations for 14,000 Nikola Two FCEV trucks, all of which are subject to cancellation by the customer until the customer enters into a lease agreement.

Do you see that?

A.   Yes.

Q.   That's 14,000 semi truck reservations; right?

A.   Yes.

Q.   For the Nikola Two FCEV truck; right?

A.   Not all of them were for the Nikola Two.

Q.   That's what it says; right?

A.   Yes.

Q.   And it's your understanding that CEO Mark Russell and CFO Kim Brady had no concerns about publicly reporting that 14,000 number in 2020; right?

MS. ESTES:  Objection.

THE COURT:  Sustained.

MR. BONDI:  Your Honor, may I approach, please.

THE COURT:  Sure.

(Continued on next page)

M9FCmil2                          Fretheim - cross

(At the sidebar)

MR. BONDI:  Your Honor, she was interviewed by the government, February 4th, 2022, and the government's note says MR, KB did not have any concern of 14,000 reservation number, your Honor.

MS. ESTES:  Your Honor, Mr. Bondi just asked what Ms. Fretheim knew about the state of mind of Mark Russell and Kim Brady, it's calling for speculation.  It doesn't matter if it's in an interview somewhere, it doesn't make it admissible.  He could possibly ask if she discussed it with him, although I think that might be hearsay.

MR. BONDI:  How about if I ask if it was her understanding?

THE COURT:  I think that was the question.

MR. MUKASEY:  May I have one moment.

MR. BONDI:  Can I ask if she was told by them if they had any concern?

MS. ESTES:  That's hearsay.  They're going to testify, so --

MR. BONDI:  Fair enough.  We'll move on.

(Continued on next page)

(In open court)

Q.  Ms. Fretheim, going back to this document, it was publicly reported for investors in a document signed by Mark Russell, the CEO, and Kim Brady, the CFO, that Nikola had 14,000 reservations; right?

A.  Yes.

MR. BONDI:  We can take this document down, Chris. Thanks.

Q.  Ms. Fretheim, you testified on direct that your role in 2020 was related to business development; right?

A.  Yes.

Q.  And since 2019 when you joined the company, you've given interviews to promote Nikola and its products; right?

A.  Yes.

Q.  And in those interviews on behalf of Nikola, you've used the term "clean sheet" in those interviews; right?

A.  I believe so, yes.

Q.  "Clean sheet" was a standard term used at Nikola to describe the semi trucks; right?

A.  I believe so, yes.

Q.  And that's what you were describing, the design of Nikola's semi trucks; right?

A.  Yes.

Q.  And, in fact, Nikola's semi trucks, in fact, were built using a clean-sheet design; right?

A.   I'm sorry.  Did you say they were built or were not?

Q.   They were built.  They were built using a clean-sheet design; right?

A.   The Nikola One and Nikola Two, to my understanding.

Q.   Okay.  The Nikola One and the Nikola Two; right?

A.   Yes.

Q.   And Ms. Fretheim, the government showed a picture of the Nikola One earlier.  The Nikola One alpha prototype was in the company's showroom; right?  Excuse me.  It was in the headquarters; right?

A.   Eventually it moved there, yes.

Q.   It moved there.  When you started at Nikola, it was in the headquarters, right, in the showroom?

A.   No, it was in a warehouse.

Q.   And when did it get to the headquarters?

A.   I couldn't remember exactly.  Probably sometime in the summer of 2019, or fall.

Q.   Sitting in the lobby of Nikola; right?

A.   Yes.

Q.   And that one you said was built using the clean-sheet design; right?

A.   To my understanding.  I wasn't at the company at the time.

Q.   And Nikola had a marketing plan to promote the company and its products in 2019 and 2020; right?

A.   I guess I would ask for a definition of marketing plan.

Q.   Have you ever used the term at the company,

"marketing plan"?

A.   Yes.

Q.   And so did Nikola have a marketing plan to promote the

company and its products in 2019 and 2020?

A.   Yes.

Q.   And the product you were promoting was the Nikola Two;

right?

A.   Initially, yes.

Q.   What else were you promoting?

A.   We transitioned to the Tre of the battery electric truck.

Q.   Ms. Fretheim, since you've been at the company in 2019,

which was before the company became public, have you ever

promoted the Nikola One?

A.   Not as it stood, no.

Q.   Not as it stood.

A.   We promoted a sleeper truck.

Q.   Sleeper truck?

A.   Yes.

Q.   And that would be like the Nikola Two, the sleeper cab?

A.   I don't believe we've termed it that way either.  Just as a

sleeper.

Q.   Like an evolution on the design; right?

A.   Yes.

Q.   That's the one you were projecting would come out in 2024,

a couple years from now; right?

A.   Yes.

Q.   It would come out for production in 2024; right?

A.   I believe that was the timeframe, yes.

Q.   In 2019 and 2020, the company tracked interviews that were given by executives and the board members; right?

A.   I would assume so, yes.

Q.   Well, let's get into that.  The marketing department circulated a monthly email highlighting the media appearances; right?

A.   In 2019 and 2020?  To be honest, I can't recall.

Q.   Let me show you a document that maybe will hopefully refresh your recollection.  I'd like to show you what's been marked for identification as Defendant's Exhibit 1255.

          MR. BONDI:  Chris, if could you just show it to the witness, please.

Q.   Do you recognize this as an email that you and others received from Stephanie Fleck on August 13, 2020?  Do you see that?

          MS. ESTES:  Objection.

          THE COURT:  Overruled as to that question.

          MS. ESTES:  May we approach, your Honor?

          THE COURT:  You may.

          (Continued on next page)

M9FCmil2                          Fretheim - cross

(At the sidebar)

MR. PODOLSKY:  The preceding question, was do you remember seeing these emails, she said I don't remember, he put this up to refresh.  Next question is, does this refresh your recollection, not reading the email to the jury that is not in evidence, and is only being used to refresh the recollection.  That's the basis for the recollection.

MR. BONDI:  I'll just move it into evidence then and you have no objection to the document being moved?

MS. ESTES:  She's on this email?

MR. BONDI:  Yes.

(Continued on next page)

(In open court)

MR. BONDI:  Your Honor, I offer Defendant's Exhibit 1255 marked for identification.  I move that into evidence, your Honor.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1255 received in evidence)

MR. BONDI:  Chris, can we show this exhibit to the jury.

Q.  Ms. Fretheim, this was an email sent by Stephanie Fleck; right?

A.  Yes.

Q.  And I want to just go through some of the names here that she sent this email to.

This email went to Trevor Milton?

A.  Yes.

Q.  Went to Mark Russell, the CEO?

A.  Yes.

Q.  It went to Kim Brady, the CFO?

A.  Yes.

Q.  Went to Britton Worthen, the chief legal officer; right?

A.  Yes.

Q.  Joe Pike, he was the head of HR, we talked about him; right?

A.  Yes.

M9FCmil2                          Fretheim - cross

Q.   Alain Hadorn?

A.   Yes.

Q.   Who is he?

A.   At the time, he was our project -- product manager, I believe.

Q.   Michael Erickson?

A.   Another colleague.  I don't remember, at the time, if he was still leading our Powersports.

Q.   Andrew Christian?

A.   Also on our Powersports, I believe, at that time.

Q.   Dane Davis?

A.   Was our chief technical officer.

Q.   Kevin Lynk?

A.   Was our chief engineer.

Q.   Umran Ashraf?

A.   He was, at the time -- I'm trying to remember if he was still on Powersports or had moved to truck engineering.

Q.   Bill Cherry?

A.   Again, I believe he was still at Powersports at the time.

Q.   Isaac Sloan?

A.   Was head of our IT.

Q.   And Isaac Sloan was involved in the infotainment system on the Nikola trucks; right?

A.   Yes, correct.

Q.   He designed the infotainment system for the trucks?

A.   I believe so, yes, or was lead of it.

Q.   Jordan Darling?

A.   Was on Powersports.

Q.   Stasy Pasterick?

A.   Was our controller.

Q.   Vince Caramella?

A.   Our head of marketing.

Q.   Damon Owens?

A.   Was on the marketing team.

Q.   Jace Croshaw?

A.   Also on the marketing team.

Q.   Nicole Rose?

A.   Our public relations lead.

Q.   And what's the RE line on this email, the subject, please?

A.   The subject, July social, traditional, events reporting, and paid digital efforts & One Sheet.

Q.   This chart, I'd like to look at page 7 of Defendant's Exhibit 1255 if we could.

          MR. BONDI:  This is going to test my eye skills, so I'll ask, Chris, if you might be able to zoom in a little bit on this.  I want to get the whole page.  Chris, if you can zoom out a little bit.

Q.   This chart has a list of media appearances by executives and directors; right?

A.   Yes.

Q.   And this email we talked about is dated August 13th, 2020; right?

A.   I believe it did.

Q.   I want to go through the media appearances, if we can, with Trevor Milton.  They're on here; right?

A.   Yes.

Q.   If we can go through them just one by one if we could. Let's start with the first one.  Ms. Fretheim, can you read that one, please.

A.   Sorry.  Which first one?  On the right-hand side?

Q.   Can you read the first media appearance that Mr. Milton was on there?

A.   The first one I'm seeing is CNN Market Now, article.

Q.   Ms. Fretheim, if you could read the next one, please.

A.   Tesla Charts, article, Trevor Milton.

Q.   And that's the podcast you sent the email about; right?

A.   Yes, I believe so.  Yes.

Q.   And there are some other people listed on here giving interviews; right?  But there are a couple more interviews on here by Mr. Milton.  Here you see a CNBC Make It interview; right?

A.   Yes.

Q.   You see on the right, a Transport Topic article; right?

A.   Yes.

Q.   You see Barron's Roundtable.  We talked about that

yesterday; right?

A.   Yes.

Q.   We talked about Transport Topics yesterday, right, the podcast on the left-hand side.  That just got highlighted, do you see that?

A.   I don't remember talking about that one yesterday.

Q.   And Ms. Fretheim, you have an interview listed on here; right?

A.   Yes.

Q.   And can you read what that says?

A.   The NACFE, which stands for North American Counsel for Freight Efficiency.

THE COURT:  I'm sorry.  For what, Ms. Fretheim, North American Counsel for what?

THE WITNESS:  Freight Efficiency.

THE COURT:  Thank you.

Q.   There are some other interviews on here, if you scroll down, right, in August?

A.   Yes.

Q.   August 7th, right.  And that's an interview you gave with the Atlantic Counsel of Energy; right?

A.   Yes.

Q.   In that interview, Ms. Fretheim, isn't it a fact that you said we're designing from a clean sheet; right?

A.   I don't recall that interview directly.

M9FCmil2                          Fretheim - cross

MR. BONDI:  Chris, can we pull up the transcript, just for the witness so we can refresh her recollection, DX966, please.  Chris, could you help the witness by highlighting, please.

Q.  Ms. Fretheim, does that refresh your recollection that you said that we are designing from a clean sheet?

A.  Yes, I believe so.

Q.  And that clean-sheet design, you said allows us to really leapfrog forward in technology; right?

A.  Yes.

MR. BONDI:  We can take that down.

Q.  Ms. Fretheim, that was an interview that you gave publicly; right?

A.  I can't recall if it was public or just to a select group.

Q.  It was available on the internet?

A.  I can't recall.

Q.  And all those people on the email, including Trevor, were informed that you gave that interview; right?

A.  I would agree with that.

Q.  Ms. Fretheim, you've also used "clean sheet" in other interviews; right?

A.  I believe so.

Q.  You used it in a May 17, 2019 public conference sponsored by FreightWaves; right?

A.  I can't recall specifically, but --

MR. BONDI:  Chris, can we pull up the transcript from DX965, please.  Just for the witness, please, and just highlight.

Q.  Ms. Fretheim, does that refresh your recollection that you used the term "clean sheet" in an interview -- on public statements at a conference sponsored by FreightWaves on May 17th, 2019?

A.  Sorry, are they going to highlight the verbiage or --

MR. BONDI:  Chris, can you highlight, please.

Your Honor, having some technical difficulties, your Honor.  I apologize.

Why don't we take that down.  We'll move ahead.

Q.  Ms. Fretheim, you've also used the term publicly "ground up" in interviews to describe Nikola's semi trucks, too; right?

A.  Yes, I believe so.

Q.  And you used it in that FreightWaves conference; right?

A.  The FreightWaves that we were just looking at?

Q.  Yes, ma'am.

A.  I don't recall specifically.

Q.  But you do recall using that term publicly; right?

A.  Yes.

Q.  Ms. Fretheim, the government played yesterday, for the jury, a few short clips from a podcast called the StockCast, which was released on July 31st, 2020.  You clicked a link to that podcast; right?

A.   When I listened to it, yes.

Q.   And it took you to a page with a disclaimer; right?

A.   I can't recall.

Q.   You don't remember that there was a disclaimer on the website?

A.   No, I don't.

         MR. BONDI:   Chris, could you please pull up DX-1571, please.

Q.   Would it refresh your recollection, Ms. Fretheim, if I showed you the web page?

         MR. BONDI:   Chris, if you could highlight the disclaimer here.

A.   I don't remember reading the disclaimer.

Q.   You don't doubt that it had a disclaimer; right?

A.   No.

Q.   Now the podcast was 35 minutes long or so; right?

A.   Appears to be, yes.

Q.   And the government didn't play everything Trevor said on that podcast, did they?

A.   No.

         MR. BONDI:   Your Honor, under the Rule of Completeness, I would move to admit the entire StockCast podcast of July 31st, 2020, which we've marked for identification as DX-500 into evidence.

         Your Honor, I'm not planning to play anything for the

jury now, but I'd like to move it into evidence.

THE COURT:  Any objection?

MS. ESTES:  No, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 500 received in evidence)

MR. BONDI:  Your Honor, I also offer into evidence Defendant's Exhibit 500-T, which is a transcript of that podcast, subject to the government reviewing it for accuracy.

THE COURT:  Any objection?

MS. ESTES:  Your Honor, we're fine with admitting it as a demonstrative.

THE COURT:  Meaning not into evidence?

MS. ESTES:  Until we confirm, yes, your Honor.

THE COURT:  Very well.  It will be admitted as a demonstrative for current purposes.

(Defendant's Exhibit 500-T received in evidence)

Q.  Moving ahead.  Yesterday, I heard you talk about Barron's Roundtable from August 1st, 2020, and the government played a few clips from that interview from August 1st, 2020; right?

A.  Yes.

Q.  And we saw in that exhibit with the marketing appearances, media appearances, that was one of the interviews that Trevor did that was on that list a few minutes ago; right?

A.  I believe so.

Q.  And this was an interview that was posted to the company's

social media?

A.   I can't recall.

Q.   And the government didn't play everything Trevor said on that podcast yesterday, did they?

A.   No.

          MR. BONDI:  Your Honor, under the Rule of Completeness, I move to admit the entire Barron's Roundtable interview of August 1st, 2020, which we've marked for identification as DX-502 into evidence so the jury can listen to it later.

          THE COURT:  Any objection?

          MS. ESTES:  No, your Honor.

          THE COURT:  It will be received.

          (Defendant's Exhibit 502 received in evidence)

          MR. BONDI:  Your Honor, similarly, I also move to admit Defendant's Exhibit 502-T, which is a transcript of the Barron's Roundtable interview, subject to the government confirming the accuracy.

          MS. ESTES:  Yes, your Honor, as a demonstrative for now, no objection.

          THE COURT:  It will be admitted as a demonstrative, for use as a demonstrative for current purposes.

          (Defendant's Exhibit 502-T received in evidence)

          MR. BONDI:  Your Honor, the parties also have reached a stipulation, which has been marked as GXS6.  With your

Honor's permission, I would like to read part of that stipulation into evidence.

THE COURT:  Very well.

MR. BONDI:  After the predicate language about the parties stipulating, paragraph 4 reads, in pertinent part, Nikola retains a publicly accessible YouTube page.  The following videos were posted to Nikola's YouTube page on the dates listed below and were publicly accessible through at least September 2020.

Your Honor, on that list is 8/1/2020, Nikola Motor company — Trevor Milton featured on Barron's Roundtable.

Q.   Just some other housekeeping, Ms. Fretheim.

Ms. Fretheim the government played in its direct a few clips from an interview with Cheddar TV, an online entertainment channel; right?

A.   Yes, I believe so.

Q.   That Cheddar TV interview with Trevor was August 5th, 2020; is that right?

A.   I can't recall exactly.  Probably.

Q.   This interview was posted to the company's social media; right?

A.   I can't recall.

Q.   And the government, yesterday, didn't play everything Trevor said on that podcast, did they?

A.   No.

MR. BONDI:  Your Honor, under the Rule of Completeness, I move to admit the entire Cheddar TV interview of August 5th, 2020, which we've marked for identification as Defendant's Exhibit 503 into evidence so the jury can listen to it later.

MS. ESTES:  Your Honor, may we have a sidebar?

THE COURT:  Sure.

(Continued on next page)

(At the sidebar)

MR. PODOLSKY:  Your Honor, we let this go the first two times, but he's doing it every time.  Not only is it advocacy, it's wrong.  It's not the reason it comes in.  So I would like him to stop doing it.

THE COURT:  You're being a little dramatic.

MR. BONDI:  I'll stop.

(Continued on next page)

(In open court)

MR. BONDI:  Your Honor, I move to admit the Cheddar TV entire interview of August 5th, 2020 into evidence, which we've marked as Defendant's Exhibit 503.

THE COURT:  Any objection?

MS. ESTES:  No, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 503 received in evidence)

MR. BONDI:  Similar, your Honor, I'd move to admit Defendant's Exhibit 503-T, which is a transcript of that Cheddar TV interview.

THE COURT:  It will be received as a demonstrative for now.

(Defendant's Exhibit 503-T received in evidence)

MR. BONDI:  Your Honor, the parties have reached a stipulation, which has been marked as GXS6.  And with your Honor's permission, I would like to read part of that stipulation into the record.

THE COURT:  Very well.

MR. BONDI:  After the predicate language about the parties agreeing, paragraph 4 reads:  "Nikola maintains a publicly accessible YouTube page.  The following videos were posted to Nikola's YouTube page on the dates listed below and were publicly accessible through at least September 2020."

And on that list is 8/5/2020, Nikola Motor company —

M9FCmil2                          Fretheim - cross

Trevor Milton featured on Cheddar TV.

Q.   One more podcast.  Ms. Fretheim, the government also played, in its direct, a few short clips excerpted from a podcast called This Week in Startups.

          Do you remember that?

A.   Yes.

Q.   And that podcast was an hour and fifteen minutes long; right?

A.   I can't recall exactly.

Q.   And this podcast was posted to the company's social media?

A.   I can't recall.

Q.   And the government didn't play the entire podcast, did they?

A.   No.

          MR. BONDI:  Your Honor, I offer into evidence Defendant's Exhibit 501, which is the entire podcast of This Week in Startups.

          THE COURT:  Any objection?

          MS. ESTES:  No, your Honor.

          THE COURT:  It will be received.

          (Defendant's Exhibit 501 received in evidence)

          MR. BONDI:  I also offer into evidence Defendant's Exhibit 501-T, which is a transcript of This Week in Startups podcast.

          THE COURT:  It will be received as a demonstrative for

now.

(Defendant's Exhibit 501-T received in evidence)

MR. BONDI:  Your Honor, the parties reached a stipulation again with that, which has been marked as GXS6. And with your permission, your Honor, I'd like to read part of that stipulation into the record.

THE COURT:  Very well.

MR. BONDI:  After the predicate language about the parties agreeing, Nikola maintains a publicly accessible YouTube page.  The following videos were posted to Nikola's YouTube page on the dates listed below and were publicly accessible through at least September 2020.

And on that list is 7/31/2020, interview of Trevor Milton on This Week in Startups podcast.

Q.  Ms. Fretheim, on direct, you mentioned something called the fleet customers; right?

A.  Yes.

Q.  What are fleet customers?

A.  They're companies that have trucks.

Q.  Like trucking companies, they already have trucks on the road?

A.  Yes, for some of them.  Some of them are companies that have a primary business, but also have trucks.  So I wouldn't characterize them as trucking companies.

Q.  I want to ask you about some of those reservations.

M9FCmil2                          Fretheim - cross

Q.   You interacted with many of these fleet customers; right?

A.   Yes.

Q.   And you interacted with customers that were described as having large orders; right?

A.   One that had a large order, yes.

Q.   Are you familiar with a fleet customer, U.S. Xpress?

A.   Yes.

Q.   And U.S. Xpress had truck reservations with Nikola; right?

A.   Yes.

Q.   U.S. Xpress signed an agreement in June 2016 to order 5,000 semi trucks from Nikola; correct?

A.   I had not seen that agreement.

Q.   You haven't seen that agreement?

A.   No, sir.

Q.   Ms. Fretheim, I'd like to show you what's been marked for identification as Government Exhibit 278.

         Ms. Fretheim, do you recognize this document as a lease agreement between Nikola and U.S. Xpress?

         MS. ESTES:  Your Honor, may we have a sidebar?

         THE COURT:  Sure.

         (Continued on next page)

(At the sidebar)

THE COURT:  I take it she hasn't seen this document.

MS. ESTES:  Yes.  Mr. Bondi just asked if she had ever seen it and she said I haven't seen it, and now he's showing her and asking if she recognizes it.

THE COURT:  I assume the answer is going to be no.

MS. ESTES:  The way he asked the question, it sounded confusing.  She's already said no that she's never seen the document.

MR. BONDI:  Your Honor, it's a business record.  We'll just move to admit it.

THE COURT:  Will you object to it?

MS. ESTES:  We don't object to it coming into evidence generally.

(Continued on next page)

(In open court)

MR. BONDI:  Your Honor, I'd like to offer into evidence Government Exhibit 278.

THE COURT:  Any objection?

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 278 received in evidence)

MR. BONDI:  Chris, will you please pull up this exhibit.

Q.  If you turn to the first page, the document has a quantity of 5,000 trucks; right?

A.  Yes.

Q.  And U.S. Xpress had an order for 5,000 trucks; right?

A.  It was not characterized to me as an order.

Q.  And you've never seen this document before, right, you just said that?

A.  Not to my recollection.

MR. BONDI:  Can we go to the last page of this document.

Q.  It's signed by some people there.  Can you read the signatures, they're a little fuzzy.  It was signed by someone at U.S. Xpress; right?

A.  Yes, appears so.

Q.  Can you read that signature?

A.  Not really, but I would assume it's Max Fuller.

M9FCmil2                        Fretheim - cross

Q.   Who is Max Fuller?

A.   The CEO at U.S. Xpress.

Q.   And you see the lessor here on the right, it's signed () by Blugentech LLC d/b/a Nikola Motor Company.

        Do you see that?

A.   Yes.

Q.   And Blugentech was a prior name for Nikola Motor company?

A.   My understanding, yes.

Q.   Who's it signed by?

A.   Trevor Milton.

Q.   As of February 2021, first time you spoke to the government, U.S. Xpress had not canceled this agreement; right?

        MS. ESTES:  Objection, your Honor.  Can we have a sidebar?

        THE COURT:  Okay.

        (Continued on next page)

(At the sidebar)

MS. ESTES:  Your Honor, we're now wading into the issues of the status of the company after September 2020.

THE COURT:  I'm sorry?

MS. ESTES:  We're now wading into the issues of the status of the company in September of 2020 when Mr. Milton was gone from the company, and if we start getting into these questions, we're going to have to prove up what was going on with U.S. Xpress at the time.  I think if we called a witness, they would say there was actually now a binding contract here, that 5,000 agreement is not something they intend to go forward with.  Asking all these questions about what's going on after Mr. Milton left the company is going to lead to additional evidence we're going to have to bring in, and it's not relevant to the representations Mr. Milton was making in the summer of 2020.

I'm just flagging for your Honor, this is the issue we raised before trial.  Mr. Bondi is wading right into these issues and, frankly, they're not doing good for him because if we introduce things about the status of the company after Mr. Milton left, it's going to mostly show that things have not been accomplished.

MR. BONDI:  Your Honor, first of all, the indictment count is for 1st of March through March 31st, 2021.  I was couching my questions to be very careful, I said the time you

spoke to the government, read it as February 2021, I was trying to -- because she told the government that they had to cancel these reservations as of February 2021, and so I'm very mindful of the line and I'm not going past March of 2021, which is what the indictment goes to.

MS. ESTES:  Your Honor, the line should be September 2020 when Mr. Milton left the company.  After that, the indictment goes to that later period, not based on any misrepresentations Mr. Milton is making about the status of the company after he leaves.  In fact, he's not even making factual misrepresentations in that later period, he's resolving a transaction from Peter Hicks in connection with the real estate transaction.  So after September 2020, there is no relevance to the charges and the indictment is going to create a huge sideshow.

MR. BONDI:  Regarding public stock, your Honor.  If Mr. Hicks had a transaction with Mr. Milton involving public stocks, public information, what was going on with the company.

THE COURT:  Here's my concern, this document is in evidence, you're asking a couple questions about the representation being made, I don't know what the evidence is going to be, but if the government is correct that this is what this document says, there is context, and this context is going to be that was it a done deal or whatever it's going to be, and my concern is that I'm going to have to give the government the

M9FCmil2                        Fretheim - cross

opportunity to prove that up.

MS. ESTES:  And, your Honor, one other thing.  I think if Mr. Bondi goes there, it's going to absolutely open the defense up to us introducing the company's disclosures, what they were saying, that Mr. Milton's statements weren't true in SEC filings.

MR. BONDI:  I don't think I've gone there yet, so I think we can solve the problem if I don't go there now.

(Continued on next page)

(In open court)

MR. BONDI:  Chris, you can take down the document.

Q.  Ms. Fretheim, you're familiar with a fleet company called Ryder; right?

A.  Yes.

Q.  And Ryder had an order for 1,500 trucks from Nikola; right?

A.  Had a reservation for 1,500 trucks.

Q.  Ms. Fretheim, I'd like to show you what's been marked for identification as Defendant's Exhibit 2627.  Do you recognize this document?

A.  I don't believe I've seen it before, no.

MR. BONDI:  Your Honor, the defense offers Defendant's Exhibit 27 into evidence.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 27 received in evidence)

MR. BONDI:  Chris, let's show the document, please.

May I publish to the jury, your Honor?

THE COURT:  You may.

MR. BONDI:  Thank you.

Q.  Ms. Fretheim, do you see there, what's it titled, please?

A.  Purchase Order Agreement for Nikola One.

Q.  And what's the company involved there, can you see in the first paragraph there?

A.  Ryder Truck Rental Inc.

Q.   And if you turn to the front page, the number of trucks,
can you read what that says?

A.   Buyer agrees to issue a purchase order for 1,500 trucks.

          MR. BONDI:   Chris, you can take that down.

Q.   Ms. Fretheim, you're familiar with a company called
Anheuser-Busch; right?

A.   Yes.

Q.   Beer company?

A.   Yes.

Q.   And they're also a fleet customer of Nikola; right?

A.   Yes.

Q.   And you personally interacted with Anheuser-Busch; right?

A.   Yes.

Q.   And as of September 2020, Anheuser-Busch still had a
reservation for 800 trucks; correct?

A.   Up to 800 trucks.

Q.   Up to 800 trucks, right.

          I'd like to show you what's been marked for
identification as Defendant's Exhibit 29.

          Ms. Fretheim, do you recognize this document?

A.   Yes.

Q.   And what is in the title there?

A.   Master Agreement, Tractors.

Q.   This is with Anheuser-Busch; right?

A.   Yes, correct.

Q.   And Nikola.

MR. BONDI:   Could we go to the last page, please.

Q.   Can you see the signatures on that page?

A.   Yes.

Q.   Who signed for Nikola?

A.   Trevor Milton.

Q.   Who signed for Anheuser-Busch?

A.   Ingrid De Ryck and Fred Sedalla, maybe.

Q.   If you look at the first page of that agreement, it says the agreement is for 800 trucks, right, do you see that?

A.   Yes, the estimate was for 800 trucks.

MR. BONDI:   Chris, briefly, if we could go back real quick to DX-27, please.   Just go to the last page, please.

Q.   I want to ask you about the people that signed this document.   This was the Ryder truck agreement we talked about earlier.   Who's Scott Perry?

A.   It looks like he was the VP of supply and management.

Q.   And who signed for Blugentech, which became Nikola?

A.   Trevor Milton.

MR. BONDI:   We can take that down.

Q.   Ms. Fretheim, in 2020, Nikola projected that it would earn about $750,000 in revenue per vehicle over the vehicle's lifetime; right?

A.   I believe that's close to correct.

Q.   Ms. Fretheim, that's what you told the government; right?

A.   That it was $750,000 per vehicle?

Q.   Yes, ma'am.

A.   Yesterday, that's what I said?

Q.   Ms. Fretheim, you were interviewed by the government on February 4th, 2021.  Do you remember that?

A.   I remember being interviewed, yes.

Q.   And there was agents there from the government?

A.   Yes.

Q.   And they were taking notes?

A.   To my understanding, yes.

Q.   And you were admonished to tell the truth?

A.   Yes.

Q.   And isn't it true that you told the agents that the model is $750,000 per vehicle over its lifetime; correct?

A.   I can't recall exactly, but --

         MR. BONDI:  Chris, can you pull up, please, the document to see if that refreshes Ms. Fretheim's recollection, please.

A.   It seems correct.

Q.   Does that refresh your recollection that you told the government that the model is $750,000 per vehicle over its lifetime?

A.   Yes.

Q.   Now the government put up a photo of the Nikola Two.  I just have a few more questions about that.

MR. BONDI:  If we can bring up the photo, Chris, it's GX-1206.

Q.  That's the photo of the Nikola Two; right?

A.  Yes.

Q.  Where was that photo taken?

A.  In St. Louis.

Q.  What was going on in St. Louis at that time?

A.  We were doing a demonstration beer run for Anheuser-Busch.

Q.  Ms. Fretheim, you were there; right?

A.  Yes.

Q.  And Ms. Fretheim, that's a hydrogen fuel cell electric vehicle; right?

A.  Correct.

Q.  When was this event, you said?

A.  I believe late 2019.

Q.  November of 2019, roughly?  Okay.

And this truck was really driving on the streets of St. Louis; right?

A.  Yes.

Q.  Using a fuel cell?

A.  I believe so.

Q.  A hydrogen fuel cell?

A.  Yes, I believe so.

Q.  You believe so?

A.  I can't -- it can also run only on battery and I can't

M9FCmil2                          Fretheim - cross

confirm if the fuel cell was operating at that time.

Q.  But it could operate, though; right?

A.  Yes.

Q.  And this event was to deliver beer for Anheuser-Busch using a Nikola Two fuel cell electric vehicle to the St. Louis Blues game; right?

A.  Yes, I believe so.

Q.  And Blues, is that a hockey game?

A.  I'm going to embarrass myself as a Canadian, but I believe so.

Q.  I'm embarrassed myself.  In general, I don't know either. I think it was a hockey game.

MR. BONDI:  Your Honor, the parties have reached a stipulation, which has been marked as GXS6.  And with your Honor's permission, I'd like to read part of that stipulation into the record.

THE COURT:  Very well.

MR. BONDI:  After the pertinent stipulation part, it reads, in pertinent part, at paragraph 4:  Nikola maintains a publicly accessible YouTube page --

THE COURT:  Slow down, please.

MR. BONDI:  I'm sorry, your Honor.

Paragraph 4 reads, in pertinent part:  "Nikola maintains a publicly accessible YouTube page.  The following videos were posted to Nikola's YouTube page on the dates listed

below and were publicly accessible through at least September 2020."

On that list is 11/22/2019, Nikola Motor company — zero emission beer delivery with Anheuser-Busch and BYD.

The stipulation goes on to say:  "It is further stipulated that no party will raise any objection under Federal Rule of Evidence 901 with respect to any exhibit referenced above or any portion of Nikola's website, any Nikola press release, any Nikola analyst day presentation, or any filing by the SEC with the SEC by Nikola."

Your Honor, pursuant to that stipulation, the defense offers GX-403-A into evidence.

THE COURT:  Pursuant to stipulation, it will be received.

(Government's Exhibit 403-A received in evidence)

MR. BONDI:  Chris, will you please play the clip for the jury.

(Video played)

Q.  Ms. Fretheim, just so no one is confused here, that Nikola truck was really driving on the roads of St. Louis; right?

A.  Yes, correct.

Q.  And that was November 2019?

A.  Yes, I believe so.

Q.  Seven months before Nikola went public?

A.  Yes.

Q. Long after the Nikola reveal; right? Sorry. Long after the 2016 Nikola One reveal; right?

A. Yes.

Q. Long after the Phillips commercial in 2018; right?

A. I'm not familiar with the Phillips commercial.

Q. You don't use that commercial in your marketing, do you?

A. Not to my recollection.

Q. I'd like to also show you what's been marked Defendant's Exhibit 1563 for identification.

MR. BONDI: Your Honor, I'd like to move this into evidence, DX-1563.

MR. PODOLSKY: Do you have a copy?

MR. BONDI: Can you pull up the video, please.

Q. Ms. Fretheim, did you see the video play on your screen?

A. Yes.

Q. And have you seen that video before?

A. Yes.

Q. And that's posted to Nikola's YouTube page; right?

A. I can't recall for sure.

Q. That's a video that you've seen and it was put out by Nikola; right?

A. Yes.

MR. BONDI: Your Honor, I'd like to offer into evidence DX-1563.

MS. ESTES: No objection.

M9FCmil2                          Fretheim - redirect

THE COURT:  It will be received.

(Defendant's Exhibit 1563 received in evidence)

MR. BONDI:  Chris, will you please play this video.

Q.  Ms. Fretheim, what did we see on that video?

A.  That was a Nikola Two running on, I believe, the Exponent test track.

Q.  It was really driving; right?

A.  Yes.

Q.  And it was posted to Nikola's social media; right?

A.  I can't recall exactly, but I believe so.

Q.  You've seen it before?

A.  Yes.

Q.  A real truck?

A.  A real Nikola Two, that truck, yes.

Q.  And really driving?

A.  Yes.

MR. BONDI:  No further questions, your Honor.

THE COURT:  Redirect?

MS. ESTES:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.  Good morning, Ms. Fretheim.

A.  Good morning.

Q.  Ms. Fretheim, do you recall being shown a document involving Ryder on cross examination just then?

A.   Yes.

Q.   Was that a document you had ever seen before?

A.   No.

          MS. ESTES:  Mr. Charalambous, can you pull up Defendant's Exhibit 27.  Mr. Charalambous, can you zoom into the first paragraph there.  Let's go to the paragraph with number 1 by it.

Q.   Ms. Fretheim, could you read this paragraph for the jury.

A.   Buyer agrees to issue a purchase order for 1,500 trucks (the "ordered trucks"), the form of which is attached hereto as Exhibit A.  The purchase order will entitle buyer to a priority reservation based upon the time the purchase order is (1) signed by buyer and delivered to seller and (2) payment is made to seller in the amount of $1 per truck ordered (the "purchase order payment").

Q.   Ms. Fretheim, you testified on direct examination about some reservations.  In the second sentence there, this document relates to a priority reservation; is that right?

A.   By what I see on the document, yes.

Q.   What is the deposit that had to be put down for that reservation?

A.   $1 per truck.

Q.   Ms. Fretheim, did there come a point when Nikola refunded all reservations for its trucks?

A.   Yes.

Q.   When was that, approximately?

A.   I believe late 2019 into 2020.

          MS. ESTES:  Mr. Charalambous, can you zoom into paragraph 3 of this document.

Q.   Ms. Fretheim, can you read the first sentence of paragraph 3 there.

A.   If buyer decides not to go through with its purchase order prior to making the 50 percent truck payment, buyer is entitled to a 100 percent refund of all money paid toward the ordered trucks.

          MS. ESTES:  Mr. Charalambous, can you take that down and then pull up paragraph 8.

Q.   Ms. Fretheim, can you read that sentence.

A.   Seller reserves the right to cancel any orders at any time, in which case a full refund will be made to buyer.

          MS. ESTES:  Mr. Charalambous, can you take that down and put up paragraph 9.

Q.   Ms. Fretheim, this sentence says that the seller agrees to allocate 100,000 gallons of compressed natural gas for each truck.

          In 2020, was Nikola making a truck that would run on compressed natural gas?

A.   No.

          MS. ESTES:  Mr. Charalambous, can you pull up paragraph 15.

Q.   Ms. Fretheim, defense didn't show you this paragraph, did they?

A.   No.

Q.   Can you read this paragraph.

A.   Either party can cancel this transaction at any time, for any reason, without penalty.  Buyer shall be entitled to a full refund if buyer opts to cancel the purchase order.

MS. ESTES:  Mr. Charalambous, can you take that one down and can you pull up Government Exhibit 278.

Q.   Ms. Fretheim, do you remember being asked on cross examination about the contract with U.S. Xpress or the agreement with U.S. Xpress?

A.   Yes.

Q.   Is that what you see on the screen here?

A.   Yes.

MS. ESTES:  Mr. Charalambous, can you zoom into the first paragraph there, paragraph number 1.

Q.   Ms. Fretheim, can you read that paragraph.

A.   Lessee hereby issues a lease order for 5,000 trucks.  The lease order will entitle lessee to a priority reservation based upon the time the lease order is (1) signed by lessee and delivered to lessor and (2) payment is made to lessor in the amount of $1 per truck ordered, or $5,000 (the "lease order payment").

Q.   Ms. Fretheim, this also references that priority

reservation; right?

A.   Yes.

Q.   What's the deposit per truck for this reservation?

A.   $1.

          MS. ESTES:   Mr. Charalambous, can you zoom out of that and let's zoom into paragraph 3.

Q.   Ms. Fretheim, can you read the first sentence there.

A.   If lessee decides not to go through with its lease order prior to making the 50 percent truck price, lessee is entitled to a 100 percent refund of all money paid toward the trucks.

          MS. ESTES:   Mr. Charalambous, can you take that down and can you pull up paragraph 8.

Q.   Ms. Fretheim, can you read that one?

A.   Lessor reserves the right to cancel any orders at any time in which case a full refund will be made to the lessee.

          MS. ESTES:   Mr. Charalambous, can you take that down and pull up paragraph 9.

Q.   Ms. Fretheim, again, this paragraph references compressed natural gas for each truck.   In 2020, was Nikola making any trucks that would run on compressed natural gas?

A.   No.

          MS. ESTES:   Mr. Charalambous, can you take that down and pull up paragraph 15.

Q.   Ms. Fretheim, again, defense counsel didn't show you this paragraph, did he?

A.   No.

Q.   Can you read this paragraph.

A.   Either party can cancel this transaction at any time, for any reason, without penalty.  Lessee shall be entitled to a full refund if lessee opts to cancel the purchase order.

          THE COURT:  Ms. Estes, it's now 11 o'clock, so we will break for the morning, our first break.

          Ladies and gentlemen please be prepared to come out 20 minutes after the hour.  Do not discuss the case.

          (Continued on next page)

(Jury not present)

THE COURT:  Ms. Fretheim, you may step down.

Folks can be seated.

Anything that we need to discuss right now?

MR. ROOS:  Your Honor, the next witness I expect is the one that will have the emails and texts that we sent the letter in on, so I imagine we'll get to his direct before the next break.

THE COURT:  I haven't read defense counsel's letter yet, so why don't we come back at 15 after instead of 20 after.

MR. ROOS:  No problem.

(Recess)

(Continued on next page)

(Jury not present)

THE COURT:  I have read Mr. Bondi's letter.  I have read Mr. Roos's letter of yesterday.  I think the exhibits are admissible, certainly at least under the second of the bases, which is to say that Mr. Mukasey in his opening did call into question the credibility of the various Nikola employees that will be testifying and, as indicated in Mr. Roos's letter, he said that each of those employees had previously supported Mr. Milton, the company received the subpoena, and things changed overnight and that each of them have a reason to tailor their testimony.  So for that reason alone, I think they come in.  It was an interesting argument, though, but the argument that as executive -- chairman of the board, rather, that the employees were not his agents, I haven't had an opportunity to think about it a great deal, but I think it's probably wrong, but I don't know.  But I'm happy to let you make your case, Mr. Caruso.

MR. CARUSO:  Well, if your Honor is going to admit these exhibits on a door-opening theory, then I have the following point to make.

THE COURT:  You have a what?

MR. CARUSO:  I have the following point I would like to make.

THE COURT:  Sure.

MR. CARUSO:  Okay.  Normally this type of evidence is

admissible on redirect.  The government says you opened the door to it in the opening, and therefore they are entitled to put this in on direct.  The theory there on the door opening they want -- I believe the phrase is take the sting out of our cross-examination.

They can put this evidence in on direct in order to remove the sting from our cross, make it look like they were not hiding anything on direct.  It's rehabilitation evidence in advance, and that's not impermissible.  However, I think that that should place certain limits on the redirect.  It's one thing for the government to rehabilitate in advance on direct and then we do cross and they do rehabilitation again.  I think that's inappropriate and unfair, and if they want to put this in, they can put it in once, they can either put this in on their direct, but not again.  They can rehabilitate in advance or they can rehabilitate afterwards, but they shouldn't be allowed to do it twice.  I'm not saying it should be a blanket rule, but that should be the general rule as we go forward in this trial.

THE COURT:  I'm not going to establish that general rule.

Mr. Roos, did you want to respond?

MR. ROOS:  I agree with your Honor.  I think -- I'm going to put these exhibits in on direct because I think that's the appropriate time.  Depending on what happens on cross, I

will -- the redirect, if there is one, will respond to the points on cross. So if it's a credibility attack, we will respond appropriately. If it is not a credibility attack on cross, and it's a substantive points about the vehicle or whatever it may be, we will respond in that way.

THE COURT: Okay.

MR. ROOS: I did want to follow up on the sort of interesting point about whether the chairman of the board has an agency relationship with the employees. I think we can establish that as a legal matter based on precedent, but I also want to just, for the record, make the point—and I think we will lay a foundation for this—the defendant was interacting directly with his people, like was having conversations with them, giving directions. So I think your Honor could find a factual basis for the employee exception to the hearsay rule without needing to find that there was an agency relationship between the chairman and employees lower down.

THE COURT: Can we get Ms. Fretheim back?

MR. CARUSO: If your Honor please, I just want to understand the basis for the Court's ruling. Your ruling on the door-opening issue and not the 801(d)(2)(D) issue, is that correct?

THE COURT: Again, as I indicated, I believe that you are probably wrong on the 801(d)(2)(D) issue, but I don't think I need to get there. But I am finding that it is clearly

admissible on the basis that Mr. Mukasey opened the door in his opening.

MR. CARUSO:  Right.

Just to lay down a marker, I think that there is an important distinction on June 3 when Mr. Milton ceases to be an employee.  So if and when those documents come up, we may want a sidebar.

THE COURT:  Very well.  But my understanding is that all of these documents were during the time that Mr. Milton was there.

MR. CARUSO:  We --

THE COURT:  We will talk after.  We have a witness on the stand.

MR. CARUSO:  Thank you.

(Continued on next page)

(Jury present)

THE COURT:  Ms. Estes.

MS. ESTES:  Thank you, your Honor.

BY MS. ESTES:

Q.  Mr. Charalambous, can you pull up Government Exhibit 278 again.  Mr. Charalambous, can you zoom in to the title of the document and the first paragraph below that.

All right.  Ms. Fretheim, just to reorient you, this is what we were looking at a moment ago before the break, is that right?

A.  Yes.

Q.  And what's the date of this agreement here?

A.  June 10, 2016.

Q.  And if you could zoom out of that, Mr. Charalambous, and let's go back to paragraph 9.

And Ms. Fretheim, this is the paragraph that shows that this is an agreement for CNG trucks, is that right?

A.  Yes.

Q.  And this is a paragraph defense counsel didn't show you, is that right?

A.  Yes, correct.

Q.  All right.  Mr. Charalambous, can you zoom out of that? And could you go to paragraph 6, and if we could zoom into that.

Ms. Fretheim, what does the last sentence there say as

to the estimated delivery time for these trucks?

A.   The "estimated delivery time is around 36 months, but may be more or less."

Q.   And so you just read earlier that this agreement was dated June 2016, is that right?

A.   Yes.

Q.   Were any trucks delivered to US Xpress by June 2019?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.   Not to my knowledge.

Q.   Were any trucks delivered to US Xpress by June 2020?

A.   Not to my knowledge.

Q.   Was Nikola making a CNG truck in 2020?

A.   No.

Q.   Mr. Charalambous, can you take that down and can you go to paragraph 9 on the third page of the document.

          Ms. Fretheim, in this paragraph on the second part of it there it says, "Lessor will have at least 50 stations operational before delivery of trucks to lessee."  Do you see that there?

A.   Yes.

Q.   And in 2020, did Nikola have any fueling stations that were operational to fuel trucks?

A.   No.

Q.   Was Nikola building any fueling stations related to CNG

trucks?

A.   Not to my knowledge.

Q.   Mr. Charalambous, you can take that down, and if you can pull up 15 again.

         Ms. Fretheim, this paragraph says that "either party can cancel the transaction at any time," right?

A.   Yes.

Q.   "For any reason" right?

A.   Yes.

Q.   "Without penalty," right?

A.   Yes.

Q.   "And the lessee shall be entitled to a full refund," right?

A.   Yes.

Q.   And that was of a deposit of $1 per truck, right?

A.   Yes.

Q.   Mr. Charalambous, can you take that down and pull up Defense Exhibit 734 which is in evidence and can you go to page 20 of this document and can you zoom into the very bottom paragraph and the header right above it.

         Ms. Fretheim, can you read the header there?

A.   "Reservations for our trucks are cancellable."

Q.   And Ms. Fretheim, is that accurate to the best of your knowledge?

A.   Yes.

Q.   Mr. Charalambous, can you go to the next page, page 21.

Actually, let's go back to page 20, and if we could zoom in to the bottom right there and then the top of page 21.

So Ms. Fretheim, in the first paragraph there, this SEC filing says that the reservations are subject to cancellation by the customer.  Is that right?

A.  Yes.

Q.  And it says "all of which" is that right?

A.  Yes.

Q.  And that is in reference to 14,000 reservations?

A.  That would be how I read it, yes.

Q.  And the last sentence of that paragraph there, Mr. Charalambous, can you highlight it?  It starts with "because."

Ms. Fretheim, can you read that sentence?

A.  "Because all of our reservations are cancellable, it is possible that a significant number of customers who submitted reservations for our trucks may cancel those reservations."

Q.  Mr. Charalambous, can you highlight the first -- that next paragraph there.

Ms. Fretheim, can you read this sentence?

A.  "Given the anticipated lead times between customer reservation and delivery of our trucks, there is a heightened risk that customers that have made reservations may not ultimately take delivery of vehicles due to potential changes in customer preferences, competitive developments, and other

factors."

Q.   And where it says "lead times between customer reservation and delivery of our trucks," what do you understand that to mean?

A.   Basically the difference between the two, the amount of time between them making the reservation and us delivering the trucks.

Q.   For example in the US Xpress agreement we just looked at, the reservation was made in 2016, is that right?

A.   Yes.

Q.   And I believe you testified on direct that no sleeper trucks would be ready until 2024 or so, is that right?

A.   That's my recollection.

Q.   So is that what we are talking about here, the difference between those dates?

A.   That would be an example, yes.

Q.   All right.  Mr. Charalambous, can you zoom in to the last paragraph there of that section.  It starts with "while we currently have."

     Ms. Fretheim, can you read this paragraph?

A.   "While we currently have a contract with Anheuser-Busch, LLC," or otherwise known as "("AB") to lease up to 800 Nikola Two FCEV trucks, if we are unable to deliver our trucks according to the vehicle specifications and delivery timelines set forth in the contract, AB has the right to cancel its order

for trucks.  Moreover, the AB contract specifies lease terms and rental rates that may be hard for us to meet depending on our ability to develop our trucks and hydrogen network according to current design parameters and cost estimates.  Any of these adverse actions related to the AB order could harm our financial condition, business, prospects, and operating results."

Q.  Mr. Charalambous, can you zoom out of there, and if we can go back to page 20 and zoom in to just the very bottom header there and the last sentence on that page.

Mr. Charalambous, if you could also pull up side by side here, if possible, Government Exhibit 425-F with that zoomed in part.

Mr. Charalambous, once you have it zoomed in, let's play from about the middle of the clip of 425-F.

One moment.

It looks like the audio is not working actually. Let's just go right to the transcript.  Mr. Charalambous, instead, can you pull up 425-T, and if you could go to page 7 of the transcript and zoom in to lines 8 through 17 there. Mr. Charalambous, can you keep zooming down there?  I think it actually may be the next page of the transcript.

So, Ms. Fretheim, do you remember looking at this podcast and seeing this transcript on your direct examination?

A.  Yes.

Q.   And there, Mr. Milton says, "Yeah, billions and billions of dollars with contracts."

A.   Yes.

Q.   "So I want to be clear about that 'cause a lot of people have thought it's just like a noncommittal thing.  It's not.  These are like sign-on-the-dotted-line, billions and billions and billions and billions of dollars in orders."

         Ms. Fretheim, is that consistent with the SEC filing, DX 734?

         MR. BONDI:  Objection, your Honor.

         THE COURT:  Overruled.

Q.   Is that consistent with the SEC filing right there which says "reservations for our trucks are" --

         MR. BONDI:  Objection, your Honor.

         THE COURT:  Overruled.

Q.   Is that consistent with the SEC filing there that says, "Reservations for our trucks are cancellable"?

A.   Not in my opinion.

Q.   Mr. Charalambous, you can take that down.

         MS. ESTES:  Your Honor, one moment.  We are trying to work out some technical difficulties with the audio.

         THE COURT:  Okay.

         (Pause)

Q.   Mr. Charalambous, let's actually, now that we have the audio working, can we pull up 425-F again and just play through

the middle of that clip.

(Audio played)

Q.  Ms. Fretheim, were Mr. Milton's statements there consistent with the SEC filings that we looked at?

A.  No.

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

BY MS. ESTES:

Q.  Mr. Charalambous, can you now pull up what's in evidence as Government Exhibit 403-A.

Ms. Fretheim, do you recall being asked on cross-examination about the Nikola Two?

A.  Yes.

Q.  And you were shown a video of the Nikola Two on that beer run, do you recall that?

A.  Yes.

Q.  Mr. Charalambous, can you also pull up 403-T.

Your Honor, at this time we would offer 403-T as a demonstrative, which is the transcript that corresponds with 403-A, which is in evidence.

THE COURT:  Okay.

Q.  All right, Mr. Charalambous, can we watch this clip again?

(Video played)

Q.  And Mr. Charalambous, can you zoom in to the transcript there, where Mr. Milton is talking about zero emission.  It

should be that whole first paragraph there.

So Ms. Fretheim, in this clip we just watched, Mr. Milton said, "The hydrogen is produced through zero-emission methods."  At this point in time where was Nikola getting its hydrogen from?

MR. BONDI:  Objection, your Honor.  May we approach?

THE COURT:  Okay.

(Continued on next page)

(At the sidebar)

MR. BONDI:  Your Honor, the video says the hydrogen is produced.  He doesn't say Nikola is producing.  He says the hydrogen is produced, using zero-emission methods.  I see where Ms. Estes is going.  She is trying to link that to say they say in that video that Nikola is producing hydrogen.  That's not what he says and, your Honor, I think this is highly prejudicial and confusing to the jury for her to try and link that back to say that's him saying Nikola is producing hydrogen.  He says the hydrogen is produced.  It was a fact.  Hydrogen is produced in a zero-emission method.  That's how it is produced.

MS. ESTES:  Your Honor, we are not planning to suggest that Nikola is producing the hydrogen.  In fact, I just asked her where was Nikola getting the hydrogen from, to make clear what we are trying to establish is that it is a lie that it was produced through zero-emission methods because it was not.  They were buying it from companies who didn't use renewable energy to produce the hydrogen.  So it's another false statement of Mr. Milton.  We are just trying to establish that.

MR. BONDI:  Your Honor, there is no foundation whatsoever about where the hydrogen came from for that semi truck.  Moreover, if you remember on direct, your Honor -- cross, she said I don't remember if it was running on hydrogen or battery here.  So she is not going to remember where the

hydrogen came from for the fuel cell in the truck.  She doesn't know.  And so this is entirely to try to suggest a misstatement, which the government has never alleged a misstatement about him in that Anheuser-Busch delivery.

MS. ESTES:  Your Honor, I think if the defense puts a misstatement in evidence, we are certainly entitled to try to prove that it's a false statement.  And here we will see if Ms. Fretheim knows, but I think if she knows where the hydrogen is coming from, she will know whether the company produces it through zero emission methods.  If she doesn't, I think another witness at the company will, but I think we are entitled to inquire.

THE COURT:  So just can you is explain for me, so you are saying that Mr. Milton has indicated on this transcript that it was a zero-emission event, and you are saying that the hydrogen that was used in that truck came from a source that was not a zero-emission producer.

MS. ESTES:  Yes, your Honor.  So there are sort of two components to zero emission, and Nikola has promoted both.  One is that their trucks are zero emission if you count what the truck is doing from the tail pipe.  The other is that the production of hydrogen, which is used in electrolysis, their goal is to also get that zero emission, and the way to do that is by using only wind energy, by using solar energy.  If they are getting energy, for instance, from the grid, then you are

M9f2Mil3                        Fretheim - Redirect

not in this sort of green energy category.  So --

THE COURT:  Okay.  And your evidence is that, in connection with this exhibit or this video, the hydrogen that was used was us not zero emission

MS. ESTES:  Yes.  It was not produced through zero emissions.

MR. BONDI:  Your Honor, this is entirely an opinion about what constitutes zero emission.  There are multiple people that says hydrogen is zero emission, period, as a fuel source it is zero emission, period, because it burns clean, period.  There are all sorts of definitions about what is green hydrogen, gray hydrogen, and all sorts of stuff here, your Honor which is just going to be confusing to the jury that they are trying to do.

Moreover, I ask -- we are going to object on foundation grounds that unless she knows exactly where the hydrogen came from, she shouldn't be able to talk about where the hydrogen came from for the truck.

THE COURT:  We don't know what she knows, but they are entitled to inquire.

MR. BONDI:  Your Honor, one other thing, if I may, at sidebar which my colleague Mr. Caruso is going to cover.

THE COURT:  Yes.

MR. CARUSO:  Sorry.  I believe that one line of questioning that the government has shown so far with this

witness is improper and that is to ask this witness whether --
her understanding that the SEC filings were false.  It was one
thing yesterday to allow the government to elicit this
witness's views as to whether Mr. Milton's statements were
false because that informed this witness's mind and showed the
basis for her making complaints about Mr. Milton's accuracy and
sending those complaints up the chain of command.  Fine.

It's an entirely different matter, and irrelevant,
whether this witness thinks that the SEC filings are true.
That is for the jury.  The witness's understanding of the
truthfulness of the SEC filings did not inform her subsequent
actions.  This is just asking the witness, well, what do you
think?  Do you think these SEC filings are accurate?  I think
that goes --

THE COURT:  I don't think those were the questions.

MR. CARUSO:  I think there was one line --

MR. BONDI:  It goes to the ultimate question for the
jury and it's also a legal opinion and she is not even a
lawyer.

MS. ESTES:  I asked her, I think, whether the -- they
had these reservations and whether they can be canceled, and in
her role as head of business development she has an
understanding of that.

MR. CARUSO:  Yes, but I think there was a further
question, I heard it, does that show -- are the SEC filings

correct.  That goes too far.

MS. ESTES:  If I do it again, I could say "to your understanding."

MR. CARUSO:  That doesn't matter.

MS. ESTES:  It's a question about effect in the filings.

THE COURT:  But what I recall from that line of questioning was that Mr. Bondi provided her with certain snippets from the filing.

MR. CARUSO:  Yes.

THE COURT:  And Ms. Estes showed her other snippets from the filing --

MR. CARUSO:  Yes.

THE COURT:  -- and compared them to the actual contracts that were entered into.  I thought it was entirely appropriate.  I didn't hear -- there was no objection, by the way.

MR. CARUSO:  Sorry.  May I?

THE COURT:  Yes.  Go ahead.

MR. CARUSO:  What you recounted I also heard and there is no objection to that, but I believe that there was a question further and Mr. Bondi did object and the Court overruled it, that do you think in substance, I can't remember the exact words, do you believe that the SEC filings were accurate?  That goes too far because this witness's

understanding or opinion about the accuracy or not of the SEC filings is not relevant.  It didn't inform her subsequent actions.

MS. ESTES:  Your Honor, I have moved on from the SEC filings.  There were no objections at the time.  I think it's fine for her, if asked about a factual finding, to say whether that fact is true or false.  But regardless, we have kind of moved on at this point.

MR. CARUSO:  If you moved on, you have moved on, but I have raised this because I thought you were going to continue to ask about that.

THE COURT:  Okay.

MR. CARUSO:  If we pop up and object that is maybe one of the grounds, and I will try to flag it.

THE COURT:  Very well.

MR. CARUSO:  Thank you.

(Continued on next page)

(In open court)

MS. ESTES:  May I proceed, your Honor?

THE COURT:  You may.

BY MS. ESTES:

Q.  Ms. Fretheim, going back to the transcript there the highlighted line says the hydrogen is produced through zero emission methods.  At this point in time was Nikola producing its own hydrogen?

A.  No.

Q.  Where was Nikola getting its hydrogen from?

A.  From standard producers.

Q.  And to your understanding, were those standard producers using zero emission methods to produce the hydrogen?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  I actually can't confirm.

Q.  All right.  Mr. Charalambous, can you take that down and if you could pull up Defense Exhibit 37.

Ms. Fretheim, do you recall being asked questions about this document on cross-examination?

A.  Yes.

Q.  And Mr. Charalambous, can we go to page 3 of the document. Can you zoom into the top portion there?  Right about there.

Ms. Fretheim, can you read what the heading of this section is?

A.   "Forward-looking statements."

Q.   And Ms. Fretheim, could you read the first sentence of that, this paragraph here?

A.   "This presentation includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995."

Q.   Let's look at the second sentence there.  Can you read the second sentence?

A.   "Forward-looking statements generally are accompanied by words such as 'believe,' 'may,' 'will,' 'estimate,' 'continue,' 'anticipate,' 'intend,' 'expect,' 'should,' 'would,' 'plan,' 'predict,' 'potential,' 'seem,' 'seek,' 'future,' 'outlook' and similar expressions that predict or indicate future events or trends or that are not statements of historical matters."

Q.   In the next sentence there, does this also say that forward-looking statements include statements regarding estimates and forecasts of revenue and other financial and performance metrics?

A.   Yes.

Q.   And if we could go to the second paragraph on this page, if you can zoom into that, Mr. Charalambous, what's the heading of that paragraph there?

A.   "Use of projections."

Q.   What's the first sentence of that paragraph say?

A.   "This presentation contained projected financial information with respect to Nikola."

Q.   All right.  Mr. Charalambous, can you take that -- can we go to page 25 of this document and can you zoom into sort of the top half of the document there.

Ms. Fretheim, on the left there it says "hydrogen station key assumptions."  What do you understand the word "assumption" to mean?

A.   It was what we anticipated or wanted to get electricity -- or those were -- those were our -- I can't use the same word. It's what we wanted to -- it's what we had in our model for our projections.

Q.   So is that a target cost you were hoping to achieve?

A.   Yes.

Q.   To be clear, had Nikola achieved any of the cost in this paragraph here?

MR. BONDI:  Objection.

THE COURT:  Overruled.

Q.   The electricity cost specifically.

A.   I don't believe we had any contracts at that point.

Q.   And Ms. Fretheim, we looked at that page before, the described forward-looking statements.  To your understanding, are these assumptions something that fit into that category?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   In my opinion, yes.

Q.   Mr. Charalambous, could we go to page 5 of this document?
Actually I think it is going to be page 9.  And could you zoom
into the box on the left there.  And Mr. Charalambous, can you
also pull up Government Exhibit 425T side by side.  Let's go to
page 7, the next page there.

          So, Ms. Fretheim, we have looked at this transcript
where Mr. Milton describes billions of dollars with contracts
and on the left here in this Nikola presentation for investors
it says "14,000 FCEV truck reservations."  In your
understanding, are those different things?

A.   Yes.

Q.   How so?

A.   So the reservations I would say are not guaranteed.  As we
looked at, they were cancelable.  On the right-hand side, when
you say "signed on the dotted line," to me, my interpretation
is those are contracted orders.

Q.   And, Ms. Fretheim, I believe yesterday you testified that
you were concerned with Mr. Milton's statements in the podcast.
Why were you concerned?

A.   Because to my knowledge they were inaccurate.

Q.   All right.  Mr. Charalambous, can you take that down.

          Ms. Fretheim, do you recall yesterday Mr. Bondi asking
you at the end of the day about how you found out about the
TeslaCharts podcast?

A.   Yes.

Q.   And I believe you testified that somebody had alerted you to it, is that right?

A.   Yes.

Q.   Mr. Charalambous, can you pull up for the witness Government Exhibit 311.

          Ms. Fretheim, do you recognize this?

A.   Yes.

Q.   Who were the parties to the e-mails there?

          MR. BONDI:  Objection, your Honor, may I approach.

          THE COURT:  Okay.

          (Continued on next page)

(At the sidebar)

THE COURT:  Is this a document that's in evidence?

MS. ESTES:  No, your Honor.  I was about to offer it.

THE COURT:  Okay.

MR. BONDI:  Your Honor, to preview our objection why we are objecting is this is not a document that we believe was generated in the normal course of business and we do not believe that it constitutes a business record, and therefore we object on hearsay grounds.  This is an employee, lower level employee e-mailing her about concerns, and we don't think this constitutes or falls under the business record exception and is hearsay.

MS. ESTES:  Your Honor, we are not offering it for the truth.  We are offering it to show sort of how she was alerted to the podcast and show that other people in the company were raising issues with the podcast.  Mr. Bondi in fact inquired about this yesterday.  This document is very similar to the other documents that are already in evidence, the ones where her concerns were raised with Mr. Russell and Mr. Worthen which we didn't object to today when Mr. Bondi offered it.  This is the exact same sort of document.

THE COURT:  I'm sorry.  So this is a document from a Nikola employee to Ms. Fretheim.

MS. ESTES:  To Ms. Fretheim.

MR. BONDI:  Your Honor, we did not inquire about this

document.  We object because it's not a business record.  If she wants to enter it not for the truth, I think it should have limiting instructions so the jury doesn't get confused.  I think that these are true statements by an employee that is not even on their witness list.

THE COURT:  Why isn't it a business record.

MR. BONDI:  It's not generated in the normal course of business.  It is from a different employee.  It is not part of his duties or anything.  He is raising some concerns to her in a direct message.  It's not a business record.  Just because it's an e-mail doesn't mean it's a business record.

THE COURT:  If it's an -- I don't know that -- are you arguing that it is a business record or no?

MS. ESTES:  Your Honor, like every e-mail, I don't think every e-mail is a business -- I think every e-mail is a business record, but within the e-mail you have to have a basis to admit the text of the e-mail.  This -- the text of the e-mail is not being offered for the truth.

THE COURT:  Okay.

MR. BONDI:  Then there should be an instruction.

THE COURT:  I will give an instruction.

MR. BONDI:  Okay.  Thank you.

(Continued on next page)

(In open court)

MS. ESTES:  May I proceed, your Honor?

THE COURT:  You may.

BY MS. ESTES:

Q.  Ms. Fretheim, do you recognize this e-mail?

A.  Yes.

Q.  Who are the parties to the e-mail?

A.  Andrew Christian and myself.

Q.  Who is Andrew Christian?

A.  One of my colleagues who was with Power Sports at the time.

Q.  And what is the date of the e-mail?

A.  Sunday, July 19, 2020.

Q.  And what's the subject of the e-mail there?

A.  He was forwarding Trevor infrastructure podcast.

MS. ESTES:  Your Honor, we offer Government Exhibit 311.

MR. BONDI:  Objection per our discussion at sidebar, your Honor.

THE COURT:  Per our discussion, the objection is overruled.

Ladies and gentlemen, this exhibit is being produced not for the truth of what is in the e-mail, but rather to see whether -- the extent to which it may have triggered some action on the part of the reader.  Okay?  So it's not being offered because what's in the e-mail is true.

M9f2Mil3                    Fretheim - Redirect

(Government's Exhibit 311 received in evidence)

THE COURT:  Ms. Estes.

MS. ESTES:  Thank you, your Honor.

Q.  Mr. Charalambous, can you zoom out of that and can we zoom into the bottom e-mail there.

Ms. Fretheim, looking at the bottom e-mail, is this an e-mail that you are copied on or no?

A.  No.

Q.  And so was this e-mail forwarded to you by Mr. Christian?

A.  Yes.

(Continued on next page)

BY MS. ESTES:

Q.  I just want to ask you about the names on the bottom email there.  First, who is Dale Prows?

A.  One of my colleagues.  I believe at the time he was head of our hydrogen infrastructure.

Q.  Head of hydrogen infrastructure.  And who's the next person listed there?

A.  Carl Rivkin.

Q.  And who's the next person listed there?

A.  Prasad Joshi.

Q.  First Carl Rivkin, what did he do at Nikola?

A.  He was on the hydrogen team.

Q.  What about Prasad Joshi?

A.  Also on the hydrogen team.

Q.  And who is Curt Hill?

A.  On the hydrogen team.

Q.  What about Ray Hobbs?

A.  Also on the hydrogen team.

Q.  Ms. Fretheim, can you read the first sentence there in that email there from Mr. Christian.

A.  I would encourage you to listen to Trevor's podcast with TeslaCharts.

Q.  Can you read the second sentence there.

A.  Trevor discussed several-infrastructure related topics that we should take note of.

MS. ESTES:  Can you zoom out of this, Mr. Charalambous.  Can you zoom into the top email.

Q.  Ms. Fretheim, did you have a conversation with Mr. Christian before he forwarded this email to you?

A.  Not to my recollection.

Q.  Is this the email that alerted you to the TeslaCharts podcast?

A.  Yes.

Q.  Had you and Mr. Christian had conversations before about Mr. Milton's public statements?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  I can't really -- I can't recall specifically.

Q.  Ms. Fretheim, on cross examination, you were asked some questions about the number of times you reached out to Mark Russell about the TeslaCharts podcast.  Do you remember that?

A.  Yes.

Q.  You had reached out to him on a Sunday; is that right?

A.  Yes.

MS. ESTES:  Mr. Charalambous, can you take this down and pull up Government Exhibit 263.  Can you go to the last page there.  Can you zoom into it.

Q.  Ms. Fretheim, why did you reach out to Mr. Russell multiple times about this podcast?

MR. BONDI:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  Both, I wanted to understand his take on it and ensure that we were taking action, if necessary.

Q.  And Ms. Fretheim, on cross examination, you were asked some questions about the Nikola Two.  Do you recall that?

A.  Yes.

Q.  And that was a prototype that the company had made; right?

A.  Yes.

Q.  It was able to drive; right?

A.  Yes.

Q.  And that was a milestone for the company; right?

A.  Yes.

Q.  The fact that the Nikola Two could drive, did that change any of your concerns about Mr. Milton's statements on this podcast?

A.  No.

Q.  Why not?

A.  Because a lot of these were not in relation specifically to the Nikola Two.

Q.  And if Nikola has success in one area of the company, does that mean it can't be accurate with respect to other areas of the company?

MR. BONDI:  Objection, your Honor.

THE COURT:  Sustained.  Sustained as to form.

Q.  Ms. Fretheim, does the company need to be accurate in terms

M9FCmil4                        Fretheim - redirect

of --

MR. BONDI:  Objection.

THE COURT:  Finish your question.

Q.  Ms. Fretheim, Nikola has a number of different parts of the company; right?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  By parts, do you mean focus areas?

Q.  Yes.

A.  Yes.

Q.  I'm sorry.  That was a bad question let me rephrase it.

Nikola focuses on building semi-trucks; is that right?

A.  Yes.

Q.  I think you testified Nikola is also an energy infrastructure company; is that right?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  Yes.

Q.  And in its public statements, does the company need to be accurate about every aspect of the company?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  And when you're speaking on behalf of the company, do you try to be accurate about every part of the company?

A.   Yes.

Q.   Now, Ms. Fretheim, I believe you were -- defense played you a small clip from the TeslaCharts podcast.  Do you recall that?

A.   Yes.

Q.   How long was this podcast?

A.   I believe we were saying it was about 90 minutes.

Q.   And it looks like some of your concerns start at the 11-minute mark; is that right?

A.   Yes.

Q.   And then you list out about 24 concerns here; right?

A.   It looks about right.  I haven't counted them.

Q.   But these are concerns with many different portions of the podcast; is that right?

A.   Yes.

Q.   And the statements that were played to you on cross, do those change your concerns about all of these other portions of the podcast?

         MR. BONDI:  Objection.

         THE COURT:  Overruled.

A.   No.

Q.   And does a public company have to be accurate in all of its public statements?

         MR. BONDI:  Objection.

         THE COURT:  Asked and answered.  Sustained.

         MS. ESTES:  One moment, your Honor.

Q.  Ms. Fretheim, with respect to this podcast and all of these concerns, did you believe Mr. Milton made some inaccurate statements in the podcast?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

MS. ESTES:  Nothing further, your Honor.

THE COURT:  Anything more, Mr. Bondi?

MR. BONDI:  Very briefly, your Honor.

First, a housekeeping matter.  I understand that I may not have offered DX-29 into evidence.  I want to offer it now, which is the Anheuser-Busch agreement.

THE COURT:  Evidence of what?

MR. BONDI:  I'd like to offer DX-29 into evidence.  I don't believe there was an objection to it from the government.

MS. ESTES:  That's correct.

THE COURT:  It will be received.

(Defendant's Exhibit 29 received in evidence)

MR. BONDI:  Thank you, your Honor.

RECROSS EXAMINATION

BY MR. BONDI:

Q.  You trusted CEO Mark Russell to take action if necessary; correct?

A.  Yes.

Q.  Ms. Fretheim, we talked about contracts with Ryder and

U.S. Xpress, and you indicated you had seen those contracts before today; right?

A.   Yes.

Q.   And those contracts are not public documents; correct?

A.   Not to my knowledge.

Q.   But the analyst day presentation that we looked at is a public document for investors; correct?

A.   Yes, I believe so.

Q.   And the SEC filings are public documents for investors; correct?

A.   Yes.

Q.   Ms. Fretheim, you had fairly regular conversations with Anheuser-Busch; correct?

A.   Fairly regular.

Q.   You've had fairly regular conversations with Anheuser-Busch; correct?

A.   It's been a while now, but initially, yes.

Q.   And you had fairly regular conversations with U.S. Xpress; correct?

A.   I wouldn't call those regular, no.

Q.   Ms. Fretheim, that isn't what you told the government, though, on February 4th, 2021, is it?

A.   I don't recall specifically.

Q.   Would it help if I showed the notes from the government's interview of you on February 4th, 2021?

M9FCmil4                          Fretheim - recross

A.  Yes, please.

MR. BONDI:  Chris, would you please bring up 3517, go to page 5, paragraph 1, lines 8 through 9, please.

Q.  Could you read that for yourself, please.

A.  Yes.

Q.  Ms. Fretheim, does that refresh your recollection that you had fairly regular conversations with U.S. Xpress?

A.  I don't recall using that term.

Q.  The government was taking notes during their interview of you; right?

A.  Yes.

Q.  Do you think the government got that wrong?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Ms. Fretheim, Anheuser-Busch had 800 reservations; right?

A.  Up to, yes.

Q.  Up to.  And U.S. Xpress had 5,000 reservations; right?

A.  That was my understanding.

Q.  And as of September 2020, they were still very interested in fulfilling those reservations; right?

A.  Yes.

MR. BONDI:  I have no further questions, your Honor.

THE COURT:  Anything else?

MS. ESTES:  No, your Honor.

THE COURT:  Ms. Fretheim, you may step down.

M9FCmil4                          Babiarz – direct

(Witness excused)

Government, please call your next witness.

MR. ROOS:  Thank you, your Honor.  The government calls Brendan Babiarz.

THE COURT:  Mr. Babiarz, please step up to the witness stand and raise your right hand.

BRENDAN BABIARZ,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Sir, you may be seated.  Please, when you speak, speak directly into the microphone and please begin by stating your first name and your last name, and spelling your first name and your last name.

THE WITNESS:  Yes.  My name is Brendan B-r-e-n-d-a-n, last name Babiarz, B-a-b-i-a-r-z.

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ROOS:

Q.  Good morning.

A.  Good morning.

Q.  Where do you work?

A.  Currently work for a company called Super Seed.

Q.  What's Super Seed?

A.  It is a company I cofounded with another partner of mine --

THE COURT:  I'm sorry, Mr. Babiarz.  I am having difficulty hearing you.  Can you get closer to the microphone.

THE WITNESS:  Yes.

Q.  Did you ever work at a company called Nikola?

A.  I did, yes.

Q.  When did you start working at Nikola?

A.  Roughly November 2017.

Q.  What was your job at Nikola?

A.  I worked in the design studio as a designer.

Q.  What sort of responsibilities did you have as a designer?

A.  I was primarily in charge of doing the aesthetic design of interior and exterior of the consumer side of the vehicles.

Q.  So in terms of the consumer vehicles, when you worked at Nikola, what were the particular vehicles that you worked on?

A.  I worked on the Nikola NZT, the Nikola Wave, and the Nikola Badger.

Q.  So let's take the first two, the Wave and the NZT.  What are those?

A.  The NZT is an all-electric off-road specific vehicle, kind of like a four-by-four side-by-side.  And the Nikola Wave is a personal watercraft, all electric, similar toy a jet ski.

Q.  Did you do any design work on a pickup truck?

A.  I did, yes.

Q.  What was that called, what was that vehicle called?

A.  Called the Nikola Badger.

M9FCmil4                        Babiarz - direct

Q.   That's the third vehicle you just referred to?

A.   That's correct.

Q.   When were you first involved in working on a pickup truck at Nikola?

A.   It was late 2018, around November, I believe.

Q.   So just walk us through how you got involved in that.

A.   Yes.  So I was asked by Trevor Milton to start some concept sketches for a pickup truck program.

Q.   What do you mean by a concept sketch?

A.   So digital rendering, hand drawn on a computer of what the truck exterior could look like.

        MR. ROOS:  Let's take a look at Government Exhibit 905 for the witness.

Q.   Mr. Babiarz, do you see, the exhibit is going to be up on your screen, you also have a binder right to your left if that's easier for you.

A.   Thank you.

        MR. ROOS:  For the witness, why don't we flip to the next page.

Q.   Mr. Babiarz, do you recognize this document?

A.   I do, yes.

Q.   What is it?

A.   This is an email of a PDF of my sketches sent to Trevor.

        MR. ROOS:  The government offers Exhibit 905.

        MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 905 received in evidence)

MR. ROOS:  May we publish it to the jury?

THE COURT:  You may.

MR. ROOS:  Let's publish the first page to the jury.

Q.  So Mr. Babiarz, for the jury, can you explain to them what we're looking at on the first page?

A.  Yes.  This is just an email transpired between myself and Trevor on Thursday, November 1st, 2018.

Q.  And was this the email you were referring to a moment ago with the sketches?

A.  It is, yes.

Q.  Are these those sketches?

MR. ROOS:  Let's look at the sketches.  Can we see page 2.

Q.  Are these those sketches?

A.  They are, yes.

Q.  Of the pickup truck?

A.  Correct.

Q.  Just describe for us what goes into making a sketch like this.

A.  It's purely conceptual.  So it's starting out with the basic dimensions of what the vehicle could be.  Sometimes you start with engineering package, but in this case, it's all done by hand from scratch.

Q.  So you start by literally sketching this thing out, like a

sketch?

A.   That is correct.

Q.   This looks like a little different than something you would draw with like a pen or pencil.  How do you get to this phase?

A.   This is all done, drawn digitally on a computer.

Q.   So you sketch it by hand and then it goes into a computer?

A.   Yep, and then sketching it into a computer, correct.

Q.   What type of a system do you use on a computer to make something like this?

A.   Something like this would be a platform like Photo Shop.

Q.   Do you remember any sort of response from Mr. Milton after you sent this email?

A.   Not directly, no.  We met in person about it.

Q.   What do you recall of that?

A.   He accepted the sketches at that time and we went over the details of it and that was about it.

Q.   Did he give you any kind of followup or anything?

A.   Just to make minor tweaks to the design here or there, but that was about it at the time.

Q.   Now when was the next time you heard about the pickup truck?

A.   It was I believe when there was a tweet put out by Trevor with these sketches enclosed.

        MR. ROOS:  We can take down this exhibit, Ms. Wolfson. Why don't we look at Government Exhibit 502, which the

M9FCmil4                        Babiarz – direct

government offers pursuant to stipulation S5.

THE COURT:  Very well.  Pursuant to stipulation, it will be received.

(Government's Exhibit 502 received in evidence)

MR. ROOS:  May we publish it to the jury?

THE COURT:  You may.

Q.  Mr. Babiarz, what are we looking at here?

A.  This is a tweet by Trevor.

Q.  And so why don't you start, actually, by just telling us the date on the tweet.

A.  This is November 22, 2019.

Q.  So about a year after you sent those sketches?

A.  Correct.

Q.  Do you recognize the images?

A.  I do.

Q.  What are they?

A.  Those are the exact sketches from my email, previously shown.

Q.  Why don't you read the tweet by Trevor Milton.

A.  Okay.  It says hey @ElonMusk, we don't build cars or trucks, but I'm happy to donate this truck design if your team wants to hit a broader market.  My team designed it just in case and I'm happy to let you build it since we won't.  Let me know and we can talk.

Q.  What was your reaction upon seeing this tweet?

A.   I was initially kind of surprised.

Q.   Why is that?

A.   These are intellectual property of the company, specifically very confidential sketches.  It's not normal to hand that off to another company.

Q.   I'm sorry.  I didn't hear the last part.

A.   It's not inherently normal to obviously put this on social media and hand it to another company.

Q.   Now, at this point, since the sketch you had done in 2019, had you done any work on the pickup truck concept?

A.   No.

Q.   Are you aware of anyone else who was working on the pickup truck in 2018 or 2019?

A.   Not to my knowledge, no.

Q.   To your knowledge, at this point in November 2019, was there a pickup truck program at Nikola?

A.   Not at this point, no.

Q.   It was just sketches, to the best of your knowledge?

A.   My understanding, yes.

Q.   When was the next time you heard about the Nikola doing a pickup truck?

A.   Shortly before we announced we were actually going to start the pickup program.

Q.   So there was an announcement?

A.   There was, yes.

Q.   When do you recall that being?

A.   The following year, I believe, in 2020.

          MR. ROOS:  Ms. Wolfson, can we take down the prior

exhibit, and why don't we take a look at Government Exhibit 801

for the witness.

Q.   Do you recognize this?

A.   I do.

Q.   What is it?

A.   This is a press release announcing the Nikola Badger.

          MR. ROOS:  Government offers Exhibit 801.

          MS. YOUNG:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 801 received in evidence)

          MR. ROOS:  Thank you, your Honor.  May we publish it?

          THE COURT:  You may.

Q.   Mr. Babiarz, so now that the jury can see it, can you

describe for them what we're looking at.

A.   Yes.  This appears to be the main front page of a press

release from Nikola regarding the Nikola Badger.

Q.   And what's the vehicle that's pictured at the top?

A.   That is a rendering of the Nikola Badger.

Q.   And how do you make a rendering?

A.   This specific rendering is done over a cad file with

computer grid graphics, so CGI overtop.

Q.   Can you describe to us what that means in layman's terms, a

M9FCmil4                              Babiarz – direct

cad file?

A.  It's a 3D software file that you build.  So, essentially, this truck is all built in the computer.

Q.  Does that mean the truck is actually built?

A.  No.

Q.  It's common to do renderings of vehicles like this; right?

A.  Very common, yes.

Q.  What's the difference between having a rendering like this and actually building a truck?

A.  This is purely digital versus having a physical truck.

Q.  Between the time Trevor Milton tweeted your sketch in November and when Nikola announced this truck publicly in February, had you done any work on the project?

A.  No.

Q.  Were you aware of any work being done on it by anyone else?

A.  Just a few days prior to this, yes.

        MR. ROOS:  So let's go back to the press release.  You can zoom out of the picture.  If we scroll down a little -- sorry.  Scroll back up to the first page.  Let's look at the bullets.  Can we zoom in on those.

Q.  Mr. Babiarz, do you see the first bullet says, will be available in FCEV (fuel-cell electric) or BEV (battery-electric).  Do you see that?

A.  I do.

Q.  What do those things mean, FCEV and BEV?

A.   So those are the types of drivetrains that the vehicle would come in, so options, one being a fuel-cell electric and one being a battery-electric.

Q.   And so when you say one being a fuel-cell electric, what does that actually mean for the truck?

A.   It is an electric drivetrain powered by a hydrogen fuel cell.

Q.   So one of these -- one version of the pickup truck would have a hydrogen fuel cell on it?

A.   Correct.

Q.   And the other version is BEV.  What does that mean?

A.   That is just a battery-electric vehicle.

Q.   So this press release is saying that Nikola is building a fuel cell and a battery version of this pickup truck?

A.   That is correct.

Q.   The third bullet down says, let's highlight it, electric 0-60 mph in approximately 2.9 seconds.  Do you see that?

A.   I do.

Q.   Do you know what that refers to?

A.   The overall acceleration of the vehicle.

Q.   Explain that, when it says zero to 60 mph in 2.9 seconds.

A.   Essentially, the vehicle can get up to 60 miles an hour in three seconds.

Q.   That seems fast.  Do you know where that number came from?

A.   I don't, no.

Q.  So two bullets down, it says Badger can generate over 906 horsepower, 980 pounds of torque, and estimated 600-mile range. Do you see that bullet?

A.  I do.

Q.  What do those numbers mean?

            MS. YOUNG:  Objection.  Foundation.

            THE COURT:  Overruled.

A.  So those are the overall specs of the vehicle, the overall horsepower, the torque, and the range of the battery.

Q.  So for those of us who ride the subway on their way to work, what do those mean in terms of a pickup truck?

A.  So rather strong horsepower, so a lot of power to the actual motors and then a rather long range.

Q.  Did you have any involvement in coming up with these specs or specifications in the press release?

A.  I did not, no.

Q.  Do you have any idea where they came from?

A.  I don't.

            MR. ROOS:  Let's take this down for a moment and let's look at a tweet.

            Government offers exhibit 505 pursuant to stipulation S5.

            THE COURT:  Pursuant to stipulation, it will be received.

            (Government's Exhibit 505 received in evidence)

MR. ROOS:  May we publish it to the jury?

THE COURT:  You may.

Q.  Mr. Babiarz, this is a tweet; right?

A.  Correct.

Q.  And would you mind reading for the jury both the tweet and the reply.

A.  I can.  Paul Holland at TeslaCharts.  This thing eats cybertrucks for breakfast.  TBH — or to be honest — the specs sheet looks ridiculously exaggerated, but they have the looks right.  And Trevor responds, specs are dead on, actually.  To be demonstrated at Nikola World in September.

Q.  What do you understand specs to refer to in this text?

A.  The overall horsepower, torque, and range of the truck.

Q.  Trevor Milton says the specs are dead on.  Do you know where those specs came from?

A.  I do not.

Q.  Can you get specs like this from a sketch or a rendering?

A.  No.

MR. ROOS:  Let's go back to Government Exhibit 801, which is in evidence and can be published to everyone.  Let's go to the second page.  Halfway down the second page, there's a quote by Trevor Milton, let's zoom in on that.

Q.  Mr. Babiarz, do you see that?

A.  I do.

Q.  It says, "Nikola has billions worth of technology in our

semi-truck program, so why not build it into a pickup truck?"
Said Trevor Milton, CEO, Nikola Corporation. "I have been
working on this pickup truck program for years and believe the
market is now ready for something that can handle a full day's
worth of work without running out of energy."

Let me ask you a couple of questions about this.

The first sentence says Nikola has billions worth of
technology in our semi-truck program, so why not build it into
the pickup truck.

Do you see that?

A.   I do.

Q.   To your knowledge, was technology from the semi-truck
program put into the pickup truck?

MS. YOUNG:  Objection.  Foundation.

THE COURT:  Overruled.

A.   To my understanding, the high-level technology, yes.
Overall components, I'm not aware of.

Q.   When you say high-level technology, what do you mean?

A.   What was developed into the eAxles or motors of the company
and different batteries and stuff like that, but we built
specific ones for this truck.

Q.   Now, this part where it says I've been working on this
pickup truck program for years.  Do you know what that's a
reference to?

A.   I assume the current pickup truck program with the Badger.

M9FCmil4                      Babiarz – direct

MS. YOUNG:  Objection.

THE COURT:  Overruled.

Q.  It says I've been working on the pickup truck program for years, and this is February of 2020.  Do you know what work had been done for years prior to February of 2020?

A.  Other than my sketches and those renderings, no.

MR. ROOS:  Let's take this down.

Q.  You later got more involved in the pickup truck program; right?

A.  I did, yes.

Q.  We're going to talk about that in a minute, but before we do, did you ever see any evidence that, other than the sketches you did, there was work done on the pickup truck program prior to the Badger's announcement?

A.  Those overall renderings that were in the press release.

Q.  So just the renderings and the sketches?

A.  Correct.

Q.  Let's take a step back.  How long, as far as you know from your experience, does it typically take to design, engineer, and build a truck?

A.  Hard to say, but minimally, I would say two years.

Q.  And then you said minimally two years.  Can it go beyond that?

A.  Absolutely.

Q.  Give us a range.

A.   Two to four years.

         MR. ROOS:   We can put this back up.

Q.   Do you recall when the announcement says the Badger would
be unveiled?

A.   I believe it was September of 2020.

Q.   So seven months from the date of the announcement?

A.   Yes.

Q.   And at this point, as far as you know, there were only
sketches and renderings?

A.   To my knowledge, yes.

Q.   After the announcement in February 2020, did you get more
involved in working on the Badger pickup truck?

A.   I did.

Q.   How did that come about?

         MR. ROOS:   We can take down the exhibit.

A.   I was asked by Trevor to help lead the design with an
outside company.

Q.   After he asked you to help lead the design, what happened
next?

A.   So the announcement was made and then the following week,
we took a trip out to Italy to meet with a company.

Q.   Why did you go to Italy?

A.   To work with a company called ITAL Design Group for an
initial proposal.

Q.   What's ITAL Design Group?

A.   They're an outside agency, primarily in vehicle design. They're owned by the Volkswagen group.

Q.   Who went on the trip?

A.   Myself, Trevor, his assistant, Matt, Jason Roycht, Tony Eaton and my boss at the time, Eric Hill.

Q.   What happened in Italy with ITAL Design Group?

A.   We had an initial meeting with them to talk about the overall proposal of building two trucks and going over the initial design renderings that we posted the week prior.

THE COURT:  Mr. Babiarz, I'm sorry, but you're trailing off at the end of your comments.  Maintain your voice up, please.

THE WITNESS:  Absolutely.  Sorry.

Q.   Let me then ask you a few followup questions about your trip to visit ITAL Design.

When you got there, did you learn how much work had been done on the pickup truck program?

A.   Yes.

Q.   Where did things stand at that point, what had been done?

A.   Primarily, the initial surfacing or cad work of the exterior and portions of the interior of the truck.

Q.   So when you say cad work, those are those computer renderings you're talking about?

A.   Yes.  So it's three softwares building actual surfaces in a computer.

M9FCmil4                          Babiarz – direct

Q.  Had they built any parts of an actual truck?

A.  Physical, no.

Q.  And what part of the design of the truck was ITAL Design working on?

A.  That's what we call the top half, which is the exterior of the body and the interior.  It could also be called the cab of the vehicle.

Q.  So just so we understand, if we saw a pickup truck on the street, what part of the pickup truck is the top or the cab?

A.  It's the cab, the bed, and all of the interior.

Q.  So the part we climb into is the top?

A.  Everything that a consumer interacts with.

Q.  What's the other part of it, what's the bottom part?

A.  Primarily called a chassis.

Q.  Define that in sort of a layman's term.

A.  It's your basic frame, your suspension points, so on, so forth.

Q.  So it's sort of that metal piece of the bottom, has the wheels in it, stuff like that?

A.  In simple terms, yes.

Q.  So at this point, you're visiting ITAL Design in February?

A.  Yes.

Q.  And it sounds like you're relatively square-one for these trucks that are being unveiled in September; is that right?

        MS. YOUNG:  Objection.

M9FCmil4                        Babiarz – direct

THE COURT:  Overruled.

A.  We were at the beginning of the project, yes.

Q.  Let me show you a text message.

MR. ROOS:  Just for the witness, Government Exhibit 9.

Q.  Mr. Babiarz, do you recognize these text messages?

A.  I do, yes.

Q.  Who are you texting with?

A.  Jordan Darling.

Q.  And what's his role at Nikola?

A.  At the time, he was the vice president of Powersports.

Q.  And what was his involvement in the Badger?

A.  He was not really involved.

Q.  Well, why, then, were you communicating with him about it?

A.  He was in charge of the NZT program at the time.

Q.  And people from Powersports were working on the Badger?

A.  Using some components from the NZT.

MR. ROOS:  The government offers Exhibit 9.

MS. YOUNG:  Objection.  401, 403, foundation, and speculation.

THE COURT:  Overruled.

(Government's Exhibit 9 received in evidence)

MR. ROOS:  May we publish it?

THE COURT:  You may.

Q.  Mr. Babiarz, now that everyone can see this, what are we looking at?

A.   This is a text message between myself and Jordan Darling on February 17th, 2020.

Q.   So February 17th, 2020, that's a week after the Badger announcement; right?

A.   Yes.

Q.   And where were you at this time, one week later?

A.   We were currently over in Italy.

Q.   And you were communicating with Jordan Darling?

A.   I was.

Q.   Now here's what I would like to do, I would like to read through these text messages together.  So why don't you read -- they're all texts by you.  So why don't you read them and then I'll ask you some questions.

A.    I think Trevor is realizing how impossible these Badger builds are for September.  I then follow up by saying, he thinks we are going to take NZT, chop it up and make that work.  It was three models, one fully working for video and two show only, one fuel cell and one battery.  Now he's just doing two and considering doing metal bodies, which would be dope, if we can.

        Could you scroll a little bit.

        Then I finish by saying, but delivery of one in July and one in August, to us, July would be a commission for video.

Q.   So let me ask you some questions about this.

        You say, I think Trevor is realizing how impossible

M9FCmil4                          Babiarz - direct

these Badger builds are for September.

          What were you referring to there?

A.  So we were in a meeting with a large group of us at ITAL
Design going over what a timeline could look like for these
projects, and it was going to be pretty lengthy to reach
September.

Q.  Meaning you wouldn't be able to do it by September?

A.  The goal was to reach it by September, yes.

Q.  But why did you say it was impossible?

A.  Just everything lining up with supply chain, COVID,
batteries, so on, so forth.

Q.  Now the next message, you say he thinks we are going to
take NZT and chop it up and make that work.  What was that a
reference to?

A.  So the original plan was to use our NZT platform.  So the
frame, some of the motors and components to build these
prototypes over.

Q.  And was it ultimately possible to use the NZT?

A.  Some of its components, but not all.

Q.  Why not?

A.  Different dimensions, set up completely different, one is
built for off-road, this would be an on-road vehicle, et
cetera.

Q.  After the Italy trip, did you talk about a plan for
constructing these vehicles with Trevor Milton?

M9FCmil4                          Babiarz - direct

A.   Yes.

Q.   Who was involved in that discussion?

A.   Initially, it was myself, Ron Johnson, Michael Erickson, and Jerry.

          MR. ROOS:  Ms. Wolfson, we can take down the exhibit.

Q.   You said, yourself, Ron Johnson, Trevor Milton, and Michael Erickson?

A.   Correct.

Q.   Two other individuals you named, Ron Johnson, what was his role at the company?

A.   He was head engineer and head of chassis development at the time.

Q.   What about Michael Erickson?

A.   Michael Erickson, mainly management role was president of Powersports.

Q.   So what did you discuss?

A.   What were our options to be able to build two completely working Badgers by September.

Q.   Sorry.  What your options were to do two Badgers by September?

A.   Correct.

Q.   What did Trevor Milton say?

A.   I don't recall exactly what he said.

Q.   Do you remember the general substance?

A.   We had generally agreed to, at leaving that meeting, to use

Ford F-150s as a primary donor of the vehicle, but also

redesigning our complete design over --

Q.  Let me ask you some questions about that.

You said we had agreed to use Ford F-150s.  What do

you mean?

A.  So an existing truck called F-150, specifically Raptor.  We

used those as what we call a donor vehicle and/or a surrogate

vehicle.

Q.  So what is a donor or surrogate vehicle?

A.  That is a vehicle you use for some of its components to

help build prototypes.

Q.  So if you're using a Ford F-150 Raptor as a donor vehicle

to construct these trucks, what are the parts of the Ford truck

that might end up in the Badger?

A.  In this case, we used some of the initial frame and

mounting points.  We ended up using what is called the body in

white, which is the structure underneath the body, mainly for

structural integrity to be able to drive these vehicles within

the timeframe we had.

Q.  Do you know if the top and bottom of the Badger truck were

being based on the Ford Raptor donor vehicles?

A.  There was parts from both, yes.

Q.  And so did Nikola buy Ford Raptor donor vehicles?

A.  We did.

Q.  Do you know if Trevor Milton knew Nikola was going to use

M9FCmil4                        Babiarz - direct

donor vehicles?

A.  Yes.

        MS. YOUNG:  Objection.

        THE COURT:  Overruled.

Q.  How do you know he knew that?

A.  He was in the meeting with myself, Ron, and Michael where we agreed to do that.

Q.  Now, the February announcement that we looked at announced a fuel cell and battery version of the Badger truck; right?

A.  That's correct.

Q.  Did there come a time where the plan for the show vehicles that Nikola was building changed?

A.  Yes.

Q.  And what changed?

A.  We had decided early on that we would just be building two battery-electric prototypes.

Q.  So you would not be building a hydrogen-powered one?

A.  No.

Q.  Was that decision announced publicly?

A.  It was not, to my knowledge.

        MR. ROOS:  Let's take a look at an exhibit.  Can we please show the witness Government Exhibit 227.

Q.  Mr. Babiarz, do you recognize this document?

A.  I do.

Q.  Is that an email that you received?

M9FCmil4                        Babiarz – direct

A.   Yes.

          MR. ROOS:  Government offers Exhibit 227.

          MS. YOUNG:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 227 received in evidence)

          MR. ROOS:  May we publish it to the jury?

          THE COURT:  You may.

Q.   Let's start at the top.  Who's the email from?

A.   It is from Trevor Milton.

Q.   What's the date on it?

A.   March 7th, 2020.

Q.   So a little less than a month after the Badger
announcement?

A.   Correct.

Q.   In terms of who it's addressed to, let's start with who at
Nikola is it addressed to?

A.   It looks like myself and Ron Johnson.

Q.   And then you don't need to read the names of all the other
people on there, but they all work for a specific company?

A.   Yes, ITAL Design Group.

Q.   I'm going to ask you to read the email.  Why don't we start
with the first paragraph.  Can we zoom in on that.

A.   It says, we will only build these show trucks with the BEV
version only.  This will make it much more simple so we don't
have to build one battery-electric and one fuel-cell electric.

Q.   What's your understanding of this?

A.   This is saying we are going to build both prototypes as a battery-electric version only.

Q.   When you say us, Trevor Milton sent this email; right?

A.   He did.

Q.   So he's saying we're only going to build these show trucks with battery version?

A.   Correct.

        MR. ROOS:   Let's zoom out of this and zoom into the next paragraph.

Q.   Would you mind reading that.

A.   It says we will till -- I assume he means fill -- build a hydrogen filling receptacle in the truck, but other than that, we won't put anything hydrogen related in these first two trucks, fuel cell, tanks, et cetera.  This will allow us to make the same truck 2X and use the same tools without having variation and meet our timelines.

Q.   So the first sentence says we will till build in a hydrogen filling receptacle in the truck.

        So what is a hydrogen filling receptacle?

A.   That is where you fill the vehicle with hydrogen similar to where a gas cap is on a normal truck.

Q.   So the idea is you would sort of put like a hydrogen filling thing into the receptacle there?

A.   Exactly.

Q.  So the email, do you understand the email to say we're still going to put that on the show vehicle?

A.  Yes.

Q.  After this comma, it says, we won't put anything hydrogen related in these first two trucks; fuel cells, tanks, et cetera.

What did you understand that to mean?

A.  We would not be putting a hydrogen fuel cell drivetrain in either of the trucks.

Q.  So it will have a receptacle, but it won't actually have a fuel cell?

A.  Correct.

MR. ROOS:  Let's zoom out of this and zoom into the last paragraph.

Q.  And why don't you read it.

A.  It says, even though we won't be putting the fuel cell into the display trucks, I want to give you the dimensions of the fuel cell so hopefully you could package the funk in the area for the fuel cell to make it easier to future package for it.

Q.  What does that mean?

A.  Essentially, given the actual dimensions and cad, again, a digital version of the fuel cell to be able to place it and make sure it fits within the vehicle for future development.

Q.  Now I want to circle back to something.  You said that ITAL Design was going to build the top half of the pickup

truck; right?

A.  Correct.

Q.  And the bottom half was going to be built by someone else?

A.  In part, some of Nikola and some of another company called Technosports.

Q.  Did these companies, that is ITAL Design and Technosports, ever come up with schedules for building these parts of the pickup truck?

A.  Yes.

Q.  We'll dig into that a little bit in a minute, but bottom line, when were these companies estimating that they would finish?

A.  Originally, we still tried to keep the September timeline.

Q.  Did that change?

A.  It didn't.

Q.  What was ultimately the completion date timeline?

A.  December.

Q.  December 2020?

A.  Correct.

Q.  And so the trucks would not actually be built until December 2020?

A.  And complete a few weeks prior to December, yes.

Q.  They wouldn't be completely built until a few weeks prior to December 2020?

A.  Correct.

M9FCmil4                         Babiarz - direct

Q.  Let's look at the ITAL Design timeline.

          MR. ROOS:  Could we please show the witness Government

Exhibit 232, please, Ms. Wolfson.

Q.  Mr. Babiarz, do you recognize this email?

A.  I do.

Q.  Same email that you received?

A.  Yes.

          MR. ROOS:  The government offers 232.

          MS. YOUNG:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 232 received in evidence)

          MR. ROOS:  May we publish it?

          THE COURT:  You may.

Q.  Mr. Babiarz, who is this email from and to?

A.  This is from Michael Erickson to a group of us that were

working on the program at Nikola.

Q.  It's addressed to Trevor Milton; right?

A.  Correct.

Q.  And then some other folks are copied?

A.  Yes.

Q.  What's the date on it?

A.  It is March 30th, 2020.

          MR. ROOS:  Can we please highlight the first sentence

of the second paragraph.

Q.  Would you read that, Mr. Babiarz.

A.    IDG is using what they refer to as, in quotes, show car technology that limits the durability primarily of the interior and, therefore, functional limits of the vehicle primarily because they are not doing FDM simulation due to timing.

Q.    So IDG is using what they refer to as show car technology that limits the durability and, therefore, functional limits the vehicle.  Who is IDG?

A.    ITAL Design Group.

Q.    Now the third bullet.  Let's take off the highlighting there and look at the third bullet down.

        MR. ROOS:  Can we zoom in on that.  Thank you.

Q.    Mr. Babiarz, would you read that.

A.    Yes.  Donor vehicle production years can range from 2015 to 2020, as long as they have the same specs, need common steering column part number, adjustability functions.

Q.    So donor production years, what's that a reference to?

A.    The Ford F-150s that we purchased.

Q.    So the email here is referring to what production years the Ford trucks that were being bought would be; is that right?

A.    That is correct.

        MR. ROOS:  Why don't we turn to the next page, which is an attachment to this email.

        Your Honor, looking at the time, do you want me to start on the attachment or take a break?

        THE COURT:  We can take a break now.  It's almost

M9FCmil4                          Babiarz - direct

50 minutes after the hour, so we'll get back together at 10 after the hour.  Until then, please do not discuss the case.

(Continued on next page)

M9FCmil4                          Babiarz – direct

(Jury not present)

THE COURT:  Mr. Babiarz, you may step down.  Folks can be seated.

Anything to raise, Mr. Roos?

MR. ROOS:  Just looking at my colleagues, I think the answer is no.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  Not at the moment, Judge.

THE COURT:  Okay.  Ten after.

(Recess)

(Continued on next page)

M9f2Mil5 - CORRECTED     Babiarz - Direct

(Jury present)

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

BY MR. ROOS:

Q.  Ms. Wolfson, could we please put Government Exhibit 232 back up on the screen.  Why don't we go back to the first page.

Mr. Babiarz, we were looking at the first page of this e-mail from Michael Erickson to Trevor Milton, copying you and some other folks.

Let's just looking at the first sentence of the e-mail.  Can we zoom in on that, just the first sentence.

It says, "I have attached the updated technical specification document we received from IDG today."

And remind us who IDG is?

A.  ITAL Design Group.

Q.  ITAL Design Group?

A.  Yes.

Q.  And there is an attachment to this e-mail?

A.  There is, yes.

Q.  Let's look at the attachment, then, which is on page 3, it begins.

This is the attachment to that e-mail?

A.  Yes.

Q.  I want to go to -- why don't we, just for the jury, flip through so we can see each of the pages.

Case 1:21-cr-00478-ER   Document 220   Filed 10/21/22   Page 145 of 205   547
M9f2Mil5                    Babiarz - Direct

And let me just ask you, these images we are looking at, what are those?

A.   Those are renderings and/or explanation drawings.

Q.   So not actual pictures?

A.   No.

Q.   These are the renderings and sketches you were describing earlier in your testimony?

A.   That's correct.

Q.   This is how the truck should appear in the future.

A.   Yes.

Q.   Okay.  And then why don't we go to, sorry, page 6 of the exhibit and can we zoom in on that.  It is frozen?

I just wanted to stop on this page for a second. Mr. Babiarz, you testified about the top half and the bottom half of the vehicles.  Is that what we are looking at here?

A.   Correct.

Q.   And which part was IDG or ITAL Design going to work on.

A.   The upper half highlighted in green.

Q.   And the bottom part was the part that you said Technosports was the outside vendor on, right?

A.   Yes, they were later contracted for that, correct.

Q.   Okay.  Then let's go to what is page 10 of the exhibit, another few pages in on the attachment.  Great.  And can you read the header on the top of this page.

A.   Yes.  "OM63005 EE overall activities (on first show car)."

Q.   So what does this sort of chart tell -- what does it tell us?

A.   This was the initial proposed timeline from IDG prior to us agreeing on the overall timing of the vehicle.

Q.   Can you explain for the jury how we were supposed to read this thing?

A.   Yes.  So at the top, those are the weeks, the number of weeks for the program and then all the milestones along those weeks.

Q.   Okay.  So this e-mail to which this is attached was sent on March 30, right?

A.   That is correct.

Q.   And so let's assume the project began on that date, the date this was sent.  A month later, how would you read this, where the status would be?

A.   You would be at week 4, where engineering is being done.

Q.   Okay.  And what does engineering mean?

A.   That's overall, all digital still, but still doing the overall packaging and designing of the vehicle to be built after that.

Q.   So as of a month later, April 30, would the truck be built yet?

A.   No.

Q.   And then another month later, where would that put us on the schedule?

A.   Week 8 and still in the engineering phase.

Q.   Okay.  So what would the status be as of two months later, that is, May 30?

A.   Similar, still all digital, nothing produced at that time.

Q.   A truck would not have been built yet.

A.   No.

Q.   You see week 11, where it says "engineering freeze"?

A.   Correct.

Q.   What does "engineering freeze" mean?

A.   So that is when all engineering is done and we move over to making tools and/or molds and other components to start the vehicle construction.

Q.   You used two terms that I want to ask you what they mean.  So tools, what do you mean by make a tool?

A.   So a tool is a part that you make similar to -- another word for it is a mold that then you pull a part from.

Q.   So if I was making a truck and I wanted to make the door for the truck, how do you go about making that?

A.   You would make an overall tooling, which is mainly done in stamping, and you would make that first and then pull parts off of that.

Q.   And why do you make a tool?

A.   You need a consistent surface to be able to build a number of these over and over again.

Q.   So first you do the engineering, then you make the tools or

the mold to make the parts, then you make the parts, is that right?

A.   That's correct.

Q.   So at the end of the week 11, that would put us roughly at the third week in June, right?  Is that right?

A.   That's correct.

Q.   By the third week in June, what, if any, parts of the truck would be built?

A.   According to this, no parts.

Q.   Now, you see where it says on here support assembly?

A.   Yes.

Q.   What does that mean?

A.   That is when we begin the assembly from all of the different components of the vehicles.

Q.   All right.  And do you see where it says component testing?

A.   Yes.

Q.   What does component testing mean?

A.   Those are testing different components prior to the full assembly.  An example could be headlights or tail lights being a component level item.

Q.   So starting around week 12, so the end of June, right --

A.   Okay.

Q.   -- you would start testing things like light -- like the parts, like lights?

A.   Correct.

Q.  Would any truck be built at that point?

A.  Not a full truck, no.

Q.  Then after that, starting around week 15, it says bench preparation.  What does that mean?

A.  Again, same thing, mainly on the electronic side, testing the usability of some components.

Q.  So testing of the parts?

A.  Correct.

Q.  And then it says assembly on vehicle starting around I guess maybe week 18?

A.  Yes.

Q.  What does that mean?

A.  That is when we actually start constructing the vehicle with all of its components.

Q.  And so no one -- just to be clear, that would put you around roughly August, right?

A.  Yes.

Q.  And so just to be clear, no one is building the truck until August at the earliest under this schedule, right?

A.  Putting it together, no.

Q.  Now, this particular schedule, under this timeline, it says show car delivery from Italy.  Do you see where it says that?

A.  I do.

Q.  Week 22.

A.  Yes.

Q.  Now, under this schedule, week 22 would be mid September 2020, is that right?

A.  Yes.

Q.  Did there come a time when ITAL Design -- where the plan with ITAL Design changed?

A.  Yes.

Q.  And did the schedule change in any way?

A.  It did.

Q.  How did the schedule change?

A.  We shifted later into December delivery.

Q.  So ITAL Design shipped it later.  From --

A.  Yes.

Q.  -- September, it was more in December.

A.  Correct.

Q.  This says show car delivery.  Did that change so that the whole show car -- let me ask -- withdraw the question.

        Did the plan end up being that the whole show car would be delivered from Italy?

A.  In this proposal, that was the original plan.  That did change.

Q.  How did it change?

A.  We agreed that ITAL Design Group would just ship the upper bodies from Italy to the U.S., where we would then begin assembly here.

Q.  When under the final plan was ITAL Design to ship the top

part of the vehicle?

A.  Originally sometime in late October.

Q.  And then your testimony is that after that the vehicle would be assembled in the United States?

A.  That's correct.

Q.  So when under the plan was the vehicle going to be fully built?

A.  Sometime in early to mid November.

Q.  Okay.  Let's look at one more page of this document.  Can we go to page 14.

        Mr. Babiarz, what is this document or this page of this document?

A.  This is a RASIC chart.

Q.  Do you know what the acronym RASIC stands for?

A.  The first view, so it's basically a responsibilities chart, so it is responsible, approval, and support.

Q.  And that's -- if we look really closely, we see some letters RSA?

A.  Yes.

Q.  So R stands for responsible, S stands for support, A stands for approval?

A.  Yes.

Q.  And so what does responsible mean?

A.  That is the party that is going to lead that component.

Q.  So starting at the top, according to this, who is

responsible for the design of the pickup truck?

A.   ITAL Design.

Q.   Who is responsible for the vehicle integration?

A.   Nikola.

Q.   What is vehicle integration?

A.   That is bringing the vehicle up into a driving state with all of its electronics and different systems.

Q.   So putting all the parts together?

A.   Essentially, yes.

Q.   Who was responsible according to this for the upper body exterior?

A.   ITAL Design.

Q.   Who was responsible for the upper body interior?

A.   The majority is ITAL Design.

Q.   Now, under the upper body interior and exterior, there is a reference to use of materials from the donor vehicle.  What's that a reference to?

A.   Those are the F150 raptors that we purchased.

Q.   So these ITAL design components are coming from those Ford F150 Raptors?

A.   If referenced, yes.

Q.   Who is responsible for lower body chassis according to this?

A.   That it would be Technosports.

Q.   And there is a reference to power train on here.  What's a

power train?

A.   That's the overall motors and bodies, etc., of the vehicle.

Q.   Who is responsible for the power train?

A.   A joint between Nikola and Bosch.

Q.   Do you know why there was a mix or joint?

A.   To my understanding they were partnered on the drive trains.

Q.   All right.  And then the last thing on here, electrical engineering, what's electrical engineering?

A.   Overall wiring and integration of all electrical components.

Q.   Who is responsible for those components?

A.   It's a mix between Technosports, Bosch, and ITAL Design.

Q.   So most of these show trucks are being made by ITAL Design, Technosports, or Bosch, is that right?

A.   Yes.

          MS. YOUNG:  Objection.

Q.   Why so many outsourced?

          MS. YOUNG:  Objection.

          THE COURT:  Overruled.

          MS. YOUNG:  Foundation.

          THE COURT:  Overruled.

A.   At the time it was a small team and the main focus at Nikola was on the semi trucks.

Q.   So just to be clear, your answer, the reason so much was

M9f2Mil5                        Babiarz - Direct

outsourced was because Nikola had a small team?

A.  For this program, yes.

Q.  Are you familiar with -- let me ask you one more question.

Under this, what parts of the Badger, if any, came from Nikola's semi truck program?

A.  I can't say.  I don't know.

Q.  You don't know of any parts?

A.  No.

Q.  Are you familiar with the term "ground up construction" of a vehicle?

A.  Yes.

Q.  What is ground up construction?

A.  Essentially starting from scratch, building every component, and it's all owned by you.

Q.  Is this a generally known term or a phrase?

A.  In the automotive industry, yes.

Q.  How about the phrase clean sheet vehicle?  Do you know that?

A.  Yes.

Q.  What does that refer to?

A.  Essentially the same thing.

Q.  Sort of like clean sheet, ground up means roughly the same.

A.  Yes.

Q.  Can you give an example of some clean sheet vehicles?

A.  Sure.  For example, Tesla model 3 or model Y, any of their

Case 1:21-cr-00478-ER   Document 220   Filed 10/21/22   Page 155 of 205   557

M9f2Mil5                        Babiarz - Direct

vehicles.

Q. I'm sorry which Tesla models?

A. Either model 3, model Y. Pretty much all of their vehicles are ground up builds.

Q. What makes those Tesla cars or trucks ground up.

MS. YOUNG: Objection.

THE COURT: Overruled.

A. They were all developed by that company from scratch.

Q. So it's all Tesla parts and they built it all from the ground up?

A. With themselves and outside partners, yes.

Q. Was the Nikola Badger as it was being constructed built from the ground up?

A. As it was being constructed, no.

Q. Why not?

A. These prototypes as talked about were built on donor vehicles which were Ford vehicles.

Q. And so was the Nikola Badger a clean sheet vehicle?

A. In this instance, no.

Q. Why not?

A. Again, using components from outside of our own that we had no partnership or relation to.

Q. And, sorry, you just said you were using -- it was not a clean sheet because you were using components from outside OEMs, what does OEM refer to?

(212) 805-0300

A.  An original equipment manufacturer similar to Ford, GM, Toyota, etc.

Q.  So an outside OEM is like one of those big auto makers?

A.  Yes.

Q.  Now, did there come a time when Trevor Milton made -- sorry, we can take this document down.  We are going to move on.  Thank you.

Did there come a time where Trevor Milton made an announcement about an unveiling of the Badger truck?

A.  Yes.

MR. ROOS:  The government now offers Exhibit 517 pursuant to stipulation S5.

THE COURT:  Pursuant to stipulation it will be received.

(Government's Exhibit 517 received in evidence)

MR. ROOS:  May we publish it?

THE COURT:  You may.

Q.  What are we looking at here?

A.  This is a tweet from Trevor Milton on June 7, 2020.

Q.  And you can either read or if you want to describe what the tweet is about?

A.  Yes.  It this an overall tweet.  It states "Nikola World 2020.  Badger World to be announced Monday June 29.  Badger reservations open same day.  Deposit holders will have dibs on tickets for #NikolaWorld2020, Phoenix, Arizona.  The Badger

will dominate ICE trucks live.  Be there to see it.  Follow by"
the ticker of Nikola.

Q.   Sorry, that last part, "$NKLA," what is that?

A.   That is Nikola's ticker.

Q.   What do you mean by that?

A.   Its symbol on the stock exchange.

Q.   Did you see this tweet around that time?

A.   I did.

Q.   How did you react to it?

A.   It took me a little bit by surprise.

Q.   Why is that?

A.   We were still developing obviously the trucks and the
timing was obviously not adding up so we didn't have a
definitive date.

Q.   Why don't we take this down and take a look at Government
Exhibit 25 just for the witness.

        Mr. Babiarz, do you recognize this document?

A.   I do, yes.

Q.   What is it?

A.   This is a text message between myself and Michael Erickson.

Q.   And I think you already told us who Michael Erickson is.
What was his role on the Badger program, if any?

A.   He was the overall project lead on the management of the
project.

Q.   Was Michael Erickson -- I think I neglected to ask you

earlier, so you are a designer, right?

A.   That's correct.

Q.   And what kind of role at Nikola does Ron Johnson have?

A.   He is an engineer.

Q.   And then Michael Erickson, you said he is a project manager.  What kind of role is that?

A.   He is overall management, business.

Q.   So is he a technical person like an engineer or designer?

A.   No.

Q.   But he is still involved with the Badger program.

A.   That is correct.

Q.   Okay.  Got it.

         All right.  And so you recognize these as your text messages?

A.   I do.

         MR. ROOS:  Your Honor, the government offers Exhibit 25.

         MS. YOUNG:  No objection.

         THE COURT:  It will be received.

         (Government's Exhibit 25 received in evidence)

         MR. ROOS:  May we publish them to the jury.

         THE COURT:  You may.

BY MR. ROOS:

Q.   Mr. Babiarz, now that the jury can see the texts, I would like to read through these together.  So why don't we do this.

You read the messages that you texted and I will read the messages that Michael Erickson texted.  Okay?

A.  Sounds good.

Q.  So I think you are up first.

Let me say one other thing.  I may interrupt you at some points just to ask you what you understood things to mean or what you meant.  Okay?

A.  Okay.

Q.  So go ahead.

A.  So I sent a text to Michael saying, "Oh, no," followed by a screenshot of the tweet we just looked at.

Q.  And the -- these text messages, what date are these on?

A.  These are on June 7.

Q.  How does that compare to the date of the tweet?

A.  I believe it is the same day.

Q.  Okay.  So in response, Michael Erickson writes to you "yeah, saw that.  Tried to talk to him last week about battery/timing and he didn't want to give me a minute.  I'm coordinating with Vince now and will reach out to Trevor."

So before I continue, this part where it says "tried to talk to him last week about battery/timing and he didn't give me a minute," who did you understand Michael Erickson to be referring to?

MS. YOUNG:  Objection.

THE COURT:  Overruled.

A.   Trevor.

Q.   Okay.  You can zoom out and the next message is also from Michael Erickson, and he says, "Trevor tomorrow"?

A.   And then I say, "Okay."

Q.   Michael Erickson then texts you, "I texted Trevor a while ago and have been in touch with Vince, Jason Roycht, Dane, Kevin . . . also texted Trevor's tweet to Jeff and Annarita as FYI and that, as previously noted, Trevor will be aggressive."

     In this message do you see the reference to Annarita?

A.   Yes.

Q.   Who was that?

A.   She was the project lead from ITAL Design Group.

Q.   And if we can go to the next page, line 7, Erickson texts you again, "Trevor has not texted back btw."  What does "btw" mean?

A.   "by the way."

Q.   Okay.  Go ahead.

A.   I say, "Yeah, I was afraid of this.  I mean, we committed to CES, but nothing sooner."

Q.   All right.  So you text "I mean, we committed to CES, but nothing sooner."  What's CES?

A.   That is a tech show out in Las Vegas that happens around January.

Q.   January of the following year.

A.   Correct.

Q.   So further out.

A.   Yes.

Q.   And you wrote you were afraid of this.  What were you referring to there?

A.   Pushing the timeline.

Q.   Pushing the timeline to earlier?

A.   Yeah, to be more aggressive.

Q.   Okay.  Now in response, Michael Erickson texts you "and that is a stretch at this point . . . not sure what wild hair drove this one.  Concerned our buddy Dave got Trevor revved up."  Then he writes, "Guess we have until June 29 to figure it out."  This reference to June 29, do you know what that was a reference to?

A.   Inside the tweet when the announcement would be made about the Badger.

Q.   Why don't you go ahead and read yours?

A.   I said, "I told Trevor on Thursday we are at best six to eight weeks from any tooling starting."

Q.   Okay.  So let's talk about that text message.  You write "I told Trevor on Thursday we are at best six to eight weeks from any tooling starting."  What does "tooling starting" mean?

A.   Again, the making of the molds to be able to make parts from.

Q.   So you told Trevor Milton that you were six to eight weeks from even starting the molds for making the parts to build the

truck.

A.   Correct.

Q.   And you said that on around June 7?

A.   Yes.

Q.   Okay.  Michael Erickson texts back to you "I know . . . haha.  Trevor doesn't let facts or details get n the way of a good story."  You can read your message.

A.   I say, "Yes, I guess I was hoping the going public part would make him more methodical and careful, but I guess not."

Q.   So you text, "Yeah, I guess I was hoping the going public part would make him more methodical and careful."  When you say "going public part," what are you referring to?

A.   When Nikola went public.

Q.   And then you say "but guess not."  What are you referring to there?

A.   The aggressiveness of putting out a tweet like he did.

Q.   Okay.  And so this text message is on June 7.  Had you already gone public at that point?

A.   I believe so.

Q.   The last message Michael Erickson writes to you "ha, me too.  Guess he's over it already and needs his next fix."

All right.  I want to show you another text message. Can we please show the witness Government Exhibit 27.

Do you recognize this document?

A.   I do.

Q.   What is it?

A.   Text between myself and Ryan May.

Q.   And who is Ryan May?

A.   He heads up the software department at Nikola.

Q.   And what, if any, was his involvement with the Nikola Badger?

A.   His team helped with the HMI or infotainment of the screens inside the truck, and then he was also involved with the reservations due to it being on the website.

          MR. ROOS:  The government offers Exhibit 27.

          THE COURT:  Any objection?

          MS. YOUNG:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 27 received in evidence)

          MR. ROOS:  May we publish it to the jury?

          THE COURT:  You may.

BY MR. ROOS:

Q.   So, Mr. Babiarz, I would like to do the same thing with these text messages as we did with the last ones, which is that you will read your messages and this time I will read the messages for Ryan May.

A.   Okay.

Q.   First let me just ask you, what's the date on this?

A.   This is June 8, 2020.

Q.   And do you remember when that is in relation to the Badger

announcement tweet that we were just looking at?

A.   The day after.

Q.   Okay.  So why don't we read through it.  We will start with your message, your first two messages.

A.   Yes.  I say, "Well, Trevor may have boosted the share price with the Badger announcement" followed by a screenshot of Nikola's share price at that time.

Q.   Okay.  So you write "Trevor may have boosted the share price with Badger announcement," and then you send this screenshot.  What is this screenshot?

A.   This is a screenshot of Nikola's share price at that time.

Q.   And so when you said, "Trevor may have boosted the share price," what share price were you referring to?

A.   Nikola's.

Q.   And which Badger announcement were you referring to?

A.   The tweet the day before.

Q.   The one about timing --

A.   Yes, about the June 29, yes.

Q.   Ryan May writes, "Not a chance.  He will see it that way, though."  And then he writes the next one.  "We're getting pumped."  Go ahead.

A.   I then say, "All articles see it that way.  There's already like five articles about it."

Q.   What were you referring to there when you say, "All the articles see it that way"?

A.  There was a bunch of articles that day——if not that day or the day following——about his announcement on Twitter.

Q.  Okay.  And then --

A.  I said, "But, yeah, you're right."

Q.  Let's turn the page.  Ryan May writes, "I only saw one on market open.  I think it's mostly just something to report on. Having Nikola World isn't worth 20 percent.  That may be a small piece of it, but it feels like we're getting pumped." Okay.  Now yours.

A.  Yup.  And I say, "Yeah, Iveco bought in more, it looks like."

Q.  All right.  And why don't you read your next message.

A.  I say, "But like the Badger announcement is the false statement that would make people want to pump in.  But the one to benefit is Trevor and he can't sell."

Q.  Sitting here today, what's your understanding of your last tweet here?

A.  Yeah, so I initially thought that this stock price was going up based on the Twitter announcement he had.  The sense of false statement was that we were still in flux about the timing of when that would be.

Q.  And so why don't we put this line 9 text, can we put it side by side with Government Exhibit 517, which is in evidence.

So Mr. Babiarz, in your text message where you say, "The Badger announcement is the false statement that would make

people want to pump in," are you referring to this Badger

announcement that Trevor Milton tweeted?

A.  Correct.

Q.  All right.  We can take those down.

On June 8 -- June 7, June 8, 2020, in the announcement

we just looked at, what was the status of the vehicle

development at that point?

A.  Initial engineering.

Q.  And by that you mean the engineering work, but no physical

truck had been built.

A.  Correct.

Q.  So the vehicles had not already been built at that point?

A.  No.

Q.  I want to show you a tweet.

MR. ROOS:  The government offers Government Exhibit

518 pursuant to stipulation S5.

THE COURT:  Pursuant to stipulation, it will be

received.

(Government's Exhibit 518 received in evidence)

MR. ROOS:  May we publish it to the jury?

THE COURT:  You may.

BY MR. ROOS:

Q.  Let's put it on the screen for the jury.  Mr. Babiarz, I'm

going to ask you to keep reading for everyone.  Would you read

the text messages -- sorry, the tweets?

A.   Yes.  So Zach at TeslaTested said "@NikolaTrevor, love the truck concept.  When will the first prototype be produced?" Trevor responds with "already," and then says, "It's a secret but it's amazing.  I'll show content here soon."

Q.   All right.  So Trevor Milton says, "Already.  It's a secret."

Mr. Babiarz, as of June 8, 2020, had Nikola already built a prototype of the Badger?

A.   No.

Q.   It had the design and was doing engineering.  You don't consider that a prototype?

A.   No.

Q.   Why not?

A.   There was no physical truck at the time.

Q.   Now, if we could just put Government Exhibit 517 back up.

Mr. Babiarz, this is the tweet we have looked at a few times, and do you see where it says Badger reservations will open on June 29?

A.   Yes.

Q.   Do you recall whether Nikola started to take Badger reservations on June 29?

A.   I believe we did, yes.

Q.   Okay.  Let's look at another exhibit, a video.  First can we bring up Government Exhibit S2 which is a stipulation that is in evidence, I think.  It's a stipulation.  I will just read

a portion of it.  Can we go to page 4 and zoom in on paragraph 19.  I will read it:

"Government Exhibit 418-A is an authentic copy of a portion of a June 30, 2020, interview of Trevor Milton on Fox Business Mornings with Maria, and Government Exhibit 418-T is an accurate transcript of that recording."

Your Honor, may I just have a moment to confer with defense counsel?

THE COURT:  Yes.

(Counsel confer)

MR. ROOS:  Your Honor, I just conferred with defense counsel, and we are just going to offer for now this transcript as a demonstrative.

THE COURT:  Very well.  Okay.

MR. ROOS:  So the government offers Exhibit 418-A and 418-T as a demonstrative.  Just so the record is clear 418-A as an Exhibit; 418-T as a demonstrative.

THE COURT:  Any objection to 418-A?

MS. YOUNG:  No.

THE COURT:  It will be received.

(Government's Exhibit 418-A received in evidence)

MR. ROOS:  May we publish 418-A?

THE COURT:  You may.

MR. ROOS:  Ms. Wolfson, let's play 418-A from the start to the 56 second mark.

M9f2Mil5                       Babiarz - Direct

Ladies and gentlemen of the jury, you have transcript binders in this case as an aid, and this is in the 418-T tab. You can start from the beginning of that tab if you want to read it.

We can stop it there at the 56 mark.

BY MR. ROOS:

Q.   Mr. Babiarz -- and you, by the way, I think also have in your binder, if it's helpful to you, the transcript of this. Did you hear the part where the host said "buy before you can see it" and then made a reference to prototypes?

A.   Yes.

Q.   And then did you hear the part during the interview where Mr. Milton said, "We've got five months now until everyone gets to see the Badger and we do have prototypes."  Did you hear that?

A.   Yes.

Q.   Now, as of June 30, 2020, did Nikola have prototypes?

A.   No.

Q.   Okay.  We can take that down for now.  We are going to come back to this video.

Now, both the tweet and that video just now reference reservations, and I think I asked you, did Nikola start taking reservations?

A.   Yes.

Q.   Do you know how that went?

A.   Initially, yes.

Q.   How did it go initially?

A.   It was slow, not what I think everyone expected.

Q.   What's your understanding of how many trucks Nikola would need to sell to make this successful?

A.   That I don't know.

Q.   But your understanding is the number was lower than what people were hoping for?

A.   Yes.

Q.   Let's take a look at Government Exhibit 45 just for the witness.  Do you recognize these texts?

A.   Yes.

Q.   Who are they with?

A.   Ryan May.

Q.   And Ryan May, you testified, was involved with the Badger program?

A.   Yes.

Q.   Specifically, was he involved with reservations?

A.   From the website, yes.

          MR. ROOS:  Okay.  The government offers Exhibit 45.

          MS. YOUNG:  Objection.  401, 403, foundation.

          THE COURT:  Overruled.

          (Government's Exhibit 45 received in evidence)

          MR. ROOS:  May we publish it to the jury?

          THE COURT:  You may.

BY MR. ROOS:

Q.  At this time for the jury, Mr. Babiarz, what are we looking at here?

A.  This is a text message between myself and Ryan May.

Q.  Okay.  And what's the date on it?

A.  June 30, 2020.

Q.  And how does that relate to the day reservations were being taken?

A.  This is the day after.

Q.  So same drill.  You will read the role of you, I will read the messages for Ryan May.

A.  Okay.

Q.  I will stop you at some points to ask you some questions.  Okay?

A.  Yes.

Q.  Go ahead.

A.  I text Ryan and say, "Did it stay up or did it slow down today with orders?

Q.  Ryan May wrote, "Definitely down."

A.  And I say, "yeah, not sure how he plans to get tens of thousands."

Q.  And in your text message here where you say "not sure how he plans to get tens of thousands," who is the "he"?

A.  I was referring to Trevor.

Q.  And when you write "tens of thousands," what are you

referring to?

A.   The number of reservations.

Q.   Okay.  Ryan May responds to you, "We've got like 300 today, so not terrible.  We'll see if it keeps up.  We probably have 30ish days before we have to show those numbers to an OEM."

And remind us what an OEM is.

A.   An original equipment manufacturer.

Q.   And go ahead and read your response.

A.   And I say, "Yeah, but if it's not bursting through these first couple days, then it won't like jump until Trevor says something like who we are working with or they see it working."

Q.   So in this message you say, "If it's not bursting through these first couple days," what's the "it's"?

A.   Reservation numbers.

Q.   If reservation numbers are not bursting through these first few days?

A.   Meaning if we don't get a lot in the first few days.

Q.   Okay.  And at the end of this message, you say, "It won't jump until Trevor says something like," and at the end you say "they see it working."  What did you mean by "they see it working"?

A.   Until the public can see a working prototype.

Q.   At that point did you have a working prototype?

A.   No.

Q.   All right.  Ryan May responds, "I think Trevor will make

some material revelations between now and December that could boost things.  Who knows?  I did hear they were expecting to hit 200k reservations between now and the end of the year."

A.  And I say, "No idea how the hell they'll do that."

Q.  Go ahead.

A.  Followed by, "If we had a vehicle on the market that people knew we could do it, sure.

Q.  Ryan May responds, "I think they were just expecting it to happen," and then the crying laughing emoji.

A.  And I say, "Yeah, no way."

Q.  Ryan writes, "If we had a vehicle to even show, I'd say we have a decent chance."  What did you understand him to mean when he said "if we had a vehicle to even show"?

A.  If we had a physical working prototype.

Q.  Which you did not at that point?

A.  We did not.

Q.  Okay.  Go ahead.

A.  I say, "Well, that's why I think they are going to shoot all this Discovery Channel stuff in Europe during the building, but I'm like, guys, we are building these over Fords.  We can't show most of it."

Q.  So I'm going to break this down.  You text Ryan May, "Well, that's why I think they are going to shoot all this Discovery Channel stuff in Europe during the builds."  What were you referring to there?

A.   It was originally planned to show the public some of the process of the builds during the time of the prototypes.

Q.   And why the Discovery Channel?

A.   To my understanding, it was a connection with an outside party, the Diesel Brothers, that were connected to the Discovery Channel at that time.

Q.   How were the Diesel Brothers involved in this?

A.   To be honest, I don't know exactly other than they were brought in with Trevor to help reservations.

Q.   I should have probably asked who are the Diesel Brothers?

A.   They are two gentlemen, one is Dave Sparks, and they own a company called Diesel Brothers, which is they build diesel trucks on Discovery Channel.

Q.   So they are television personalities.

A.   In simple terms, yes.

Q.   On the Discovery Channel?

A.   Yes.

Q.   So you say, "Well that's why I think they are going to shoot all this Discovery Channel stuff."  Who is the "they" in that part of the sentence?

A.   I was referring to Trevor and the Diesel Brothers.

Q.   And then you write, "But I'm like, guys, we are building these over Fords.  We can't show most of it."  What did you mean by that?

A.   So if we were to go over and film the process of these

prototypes, you would see that they are built on Ford components.

Q.  Okay.  Let me show another exhibit just for the witness, Government Exhibit 50.

Do you recognize this?

A.  Yes.

Q.  Is this a text message from about two days later to Ryan May?

A.  Yes.

MR. ROOS:  Government offers Exhibit 50.

MS. YOUNG:  Objection.

THE COURT:  Overruled.

(Government's Exhibit 50 received in evidence)

MR. ROOS:  May we publish it for the jury?

THE COURT:  You may.

BY MR. ROOS:

Q.  And Mr. Babiarz, what's the date on this?

A.  July 2, 2020.

Q.  Can you read your message to Ryan May?

A.  Yes.  I apologize for my language, but "He's taking Discovery Channel to film Badger building in Italy.  I'm like you can't.  It's a Ford body.  You will totally fuck us."

Q.  So in this message you write, "He's taking Discovery Channel to film Badger building in Italy."  Who is he?

A.  Trevor.

Q.  And you write, "I'm like you can't.  It's a Ford body."
What were you referring to there?

A.  Underneath the panels of the Badger, it was a Ford
component.

Q.  And you write, now I apologize for my language, "You will
totally fuck us."  What did you mean by that?

A.  The public would then see what we were building these
prototypes on and cause a lot of confusion.

Q.  Okay.

        Now, did you ever have a conversation with Trevor
Milton about the idea of bringing Discovery Channel to Italy?

A.  Briefly about taking photos of some of the components
during the build.

Q.  Did you tell him that it was a bad idea to do the full
video?

A.  We never discussed doing a full video to my knowledge, no.

Q.  Do you know did, ultimately, then, after that, did they end
up doing Discovery Channel filming in Italy?

A.  My understanding, no, they did not.

Q.  Okay.  Now, let me actually show you another text message.

        Can we show the witness Government Exhibit 53.

        Mr. Babiarz, do you recognize these?

A.  I do.

Q.  And who are you communicating with?

A.  Jace Croshaw.

M9f2Mil5                         Babiarz – Direct

Q.   And who is Jace Croshaw?

A.   He is a member of the marketing team at Nikola.

            (Continued on next page)

BY MR. ROOS:

Q.  What's the date on this?

A.  This is July 8th, 2020.

MR. ROOS:  Government offers Exhibit 53.

MS. YOUNG:  Objection.

THE COURT:  Overruled.

(Government's Exhibit 53 received in evidence)

MR. ROOS:  May we publish this to the jury?

THE COURT:  You may.

Q.  Mr. Babiarz, this is about five days after the last text message you read about filming; right?

A.  Yes.

Q.  Why don't we read through this.  I'll ask you to read your text and I'll read Jace Croshaw's texts.

A.  Michael and I are trying to put timing together for them to go to Italy on Badgers, but they won't be ready until end of September or October right before they ship.

Q.  When you texted here that they won't be ready until end of September or October right before they ship, what were you referring to?

A.  The upper bodies of the vehicles.

Q.  The upper bodies of the Badger vehicles wouldn't be done until that point?

A.  Correct.

Q.  Just to be clear, the whole truck wouldn't be done until

M9FCmil6                        Babiarz - direct

after that; right?

A.   That's correct.

Q.   Jace responds to you, good idea.  Then he writes, can't they film the building of the trucks and not the end product.  And then he texts, will they be in the states having work done, too, in Detroit?

A.   I said no, because they are half Ford's.  That's the last thing we want people seeing.

Q.   When you say they are half Ford's, that's the last thing we want people seeing, what were you referring to?

A.   The donor vehicle components that we used to build these.

Q.   You didn't want people seeing the donor vehicle components of the Badger vehicles?

A.   Correct.

Q.   Jace responds to you, got you.  Excellent point.  And then can you read your message.

A.   Trying to explain that to Trevor because if we get caught showing any of that, it will be bad.  We would have to wait until the majority of the upper body frame is covered and our panels and interior is majority in.  The last thing we do week before shipping here is upholstery.

Q.   Few questions about this.  Trying to explain that to Trevor because if we get caught showing any of that, it will be bad.  So trying to explain that point to Trevor, is that what you're referring to?

A.  Correct.

Q.  And you write, if we get caught, it will be bad.  What did you mean by that?

A.  Same thing, showing the confusion of these vehicles being built with Ford components.

Q.  Then you write, we would have to wait until majority of the upper body frame is covered and our panels, and interior is majority in.

Why would you have to wait until the majority of the panels and the interior were in?

A.  At that point, all they would see is the components we made uniquely for the Badger and the Ford components would be underneath as a structure.

Q.  So once this upper body was done, if you did an inspection of the vehicle, would you be able to see the Ford parts inside?

A.  No, not on the upper body.

Q.  Now, one more question on that.  You mentioned trying to explain this to Trevor.  Did you keep Trevor Milton updated on the status of the construction of the Badger truck?

A.  Yes, between myself and Michael Erickson, we did.

MR. ROOS:  Let's look at Government Exhibit 52, just for the witness.

Q.  Who are you texting with here?

A.  Ryan May.

MR. ROOS:  Government offers Exhibit 52.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 52 received in evidence)

Q.  These are more texts with Ryan May.  What's the date on them?

A.  July 7th, 2020.

Q.  Let's read through them.

A.  I said to Ryan, he's crashing the stock, I hope he realizes this.  The dates he put -- the dates he put to show Badger stuff is totally inaccurate.  Then people call him out because he is showing sketches of a drinking fountain after he said trucks were almost done.

Q.  So when you write the dates he put to show Badger stuff is totally inaccurate, what were you referring to there?

A.  Pictures of progress of the vehicle during prototype phase.

Q.  Now this part here about sketches of a drinking fountain -- let's come back to that, actually.

I'll read Ryan May's response.  He's an idiot.  He thinks he's helping, definitely doing the opposite.  He just needs to stay quiet for the next six months and let marketing prepare his tweets.

A.  And I respond, the company should be tweeting, not him.  He tweets like five times a day.

Q.  Ryan May responds, and when he has nothing to tweet, he makes crap up.

M9FCmil6                         Babiarz – direct

A.   And I say, but like he tweeted about deleting a tweet.

Q.   Ryan May writes, middle of October, shots of the truck in the wild.  Also, who did those fountain renderings?  Super lame.

A.   And I respond, IDG.  And they used Lamborghini switch and someone called us out for copying them, good thing they own it, but it hurts us.

Q.   Why don't you read your last message.

A.   I says, yeah, I got updated timing on the Badger today.  It won't even arrive in pieces to Phoenix before calendar week 44, almost the first week of November.

Q.   So July 7th, 2020, you got updated timing on the Badger; is that right?

A.   Around that date, yes.

Q.   When you say it won't even arrive in pieces until before week 44, which is almost the first week of November, what does that mean?

A.   Meaning the parts, the whole upper body would not arrive in the United States until week 44, calendar week 44.

Q.   So circling back to something on the topic of Ford trucks, do you recall a conversation with Trevor Milton about the steering wheel in the Badger truck?

A.   I do, yes.

Q.   And let's look at the email on that.

            MR. ROOS:  Can we show the witness Government

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Exhibit 264.

Q. Do you recognize this email?

A. Yes.

MR. ROOS:  Government offers exhibit 264.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 264 received in evidence)

MR. ROOS:  May we publish it to the jury?

THE COURT:  You may.

Q. Mr. Babiarz, I would like to read through this email chain. Why don't we start with the first email, which is from you at the very bottom of the first page and goes up to the second page.

A. Okay.

Q. Actually, before we read any of this, who's on this email chain, who are the people?

A. It is myself, Trevor, and Michael.

Q. So, sorry, I'm going to ask you to read a bunch of this. Will you read your email from July 28th, 2020.

A. I say hey, Trevor, IDG has recently brought something to my attention regarding the steering wheel.  That, in my opinion, is an issue that I would like to have your opinion on to confirm.  The original scope was agreed to use the donor vehicle steering wheel structure and design a new wheel around

it so it could be safe to drive and not just an aesthetic show car wheel.  So they made minor adjustments to the design over a month ago in cad data to fit the original design he liked over top of this scan of the Ford steering wheel.  All is good and agreed upon.  However, this week, they brought to my attention that their shop has now said this is not possible and in order to make it drivable/safe, we need to carry over almost the entire wheel and only make slight modifications to it, mainly buttons.  I have attached a PDF showing these options, but I have also consulted with Michael and others, and everyone agrees it is way too similar to the Ford and could be damaging if people realize this.  I would like to push back on IDG to stick with the original agreed plan.  If not, they must engineer this wheel to be safe and match design with no additional expense because it falls in scope.  Please review this and call me if it is easier to explain.  Let me know your thoughts.  Thank you.

Q.  So let's walk through this.  The original scope was agreed to use the donor vehicle steering wheel structure and design a new wheel around it.  What does that mean?

A.  We would use the internals of the Ford F-150 steering wheel for safety, and then re-skin it to look like ours.

Q.  So the inside of the steering wheel is by Ford, but you put a skin on the outside so it looks like Nikola?

A.  Correct.

M9FCmil6                         Babiarz - direct

Q.   What was the problem that then happened?

A.   They were not able to make enough adjustments to the

steering wheel and keep its structural integrity to look like

our design.

Q.   So what was ITAL Design's proposal then?

A.   They originally just wanted to keep most of the wheel and

just change the buttons.  We then agreed, we completely

redesigned it and made our own for that component.

Q.   So I want to talk about that, what ITAL Design's proposal

was to you.

A.   Okay.

Q.   Under their proposal, you would have been able to see that

it was a Ford steering wheel; is that right?

A.   Yes.

Q.   And then you wrote, it is way too similar to the Ford and

could be damaging if people realize this.

        What did you mean by that?

A.   Causing confusion that we would either be working with Ford

or that why do we have a Ford steering wheel in our truck.

        MR. ROOS:  Let's go back to the first page, so later

in the email chain.

Q.   Michael Erickson responds, and then I want to read Trevor

Milton's response.  Would you read that.

A.   At the top?

Q.   Yes.

A.   It looks too similar.  We can't have it look that close.  I am open to suggestions.  Trevor.

Q.   When Trevor Milton wrote it looks too similar, we can't have it look that close, what did you understand the "it" to be referring to?

A.   The steering wheel.

Q.   And I think you said it, but just to be clear for the record, did the ultimate steering wheel in the Badger look like the Ford one?

A.   It did not.

          MR. ROOS:  We can take that down.

Q.   A few minutes ago, you mentioned that Trevor Milton wanted something to show of the Badger; is that right?

A.   Correct.

Q.   And can you explain what you were talking about there?

A.   He wanted photos of the development of some of the components of the vehicle to show.

Q.   To show to who?

A.   It was, to my understanding, that he would be either tweeting them or putting them out publicly for people to see.

          MR. ROOS:  Let's show the witness Government Exhibit 69, please.

Q.   Do you recognize this email?

A.   This text message, yes.

Q.   I'm sorry.  Text message.  Thank you.

MR. ROOS:  Government offers exhibit 69.

MS. YOUNG:  Objection.

THE COURT:  Overruled.

(Government's Exhibit 69 received in evidence)

MR. ROOS:  May we publish to the jury?

THE COURT:  You may.

Q.  So let me ask, first of all, what's the date on this?

A.  August 21st, 2020.

Q.  And there are three people on this text message chain; right?

A.  Correct.

Q.  Who are the three people?

A.  Myself, Michael Erickson, and Annarita from ITAL Design.

Q.  So I will read the messages and then ask you some questions.

So Annarita texts, I am still checking, but I have a feeling that there is no significant part assembled in the interiors yet, definitely nothing that can be shown.  I will give you a confirmation later on.

What was the context of this?

A.  This was Annarita over in Italy telling myself and Michael, based on what we would ask of her to show us anything that was done, that there was nothing at that time.

Q.  And as of August 21st, 2020, had the Badger vehicles been built?

A.   No.

Q.   Was there already a prototype at that point?

A.   No.

Q.   Do you see the third line here, is that a tweet?

        MR. ROOS:  Maybe we can zoom in on it.

A.   That is a screenshot of a tweet, yes.

Q.   And do you see Michael Erickson's response below that?

A.   Yes.

Q.   We likely don't need full assemblies, but if we can get pictures of parts or components, trims, et cetera.

        Did you get some pictures of parts or components?

A.   Yes.

Q.   But it wasn't possible to take a full picture of the truck at that point; right?

A.   No.

Q.   And that's because there wasn't a fully-built truck?

A.   At that time, no.

        MR. ROOS:  You can take that down.

        The government offers Exhibit 554 pursuant to stipulation S5.

        THE COURT:  Pursuant to stipulation, it will be received.

        (Government's Exhibit 554 received in evidence)

        MR. ROOS:  May we publish it?

        THE COURT:  You may.

M9FCmil6                         Babiarz - direct

Q.   Mr. Babiarz, who are these tweets from?

A.   The top is from Trevor.

Q.   And I'd like to ask you to read through the three tweets here.

A.   Okay.  So Trevor tweets, first sightings of the #NikolaBadger, and the first time we have ever released images of the build.  Want more?  Keep an eye out every couple weeks as we release more leading up to #NikolaWorld 2020.  Then there are two pictures.

Q.   What are those pictures of?

A.   The one on the left is the back of the front seat and the one on the right is a portion of the center console.

Q.   At this point on August 24th, 2020, were these in a car or a truck?

A.   No.

Q.   Why not?

A.   It was still just components.

Q.   Can you keep reading the tweet exchange.

A.   Yes.  lol no frame?  Followed by three emojis.  Trevor responds, no, raw frames would giveaway manufacturing techniques to the other OEMs.  But we will show finished frames/interiors leading up to Nikola World.  Keep an eye out.

Q.   Mr. Babiarz, what would raw frames give away if they were tweeted out?

         MS. YOUNG:  Objection.

THE COURT:  Overruled.

A.  In general terms, if you showed a frame, you would then show potentially your IP of the frame.

Q.  And in this context, if Trevor Milton had tweeted out the raw frame of the Badger upper body.  What could that have given away?

A.  The upper body, it would give away that the underside is from a Ford donor vehicle.

MR. ROOS:  We can take this down.

Q.  By the way, on the subject of tweets, since we're on the topic, did Trevor Milton ever run any of his tweets about the Badger by you before he posted them?

A.  Other than asking for photos for this one, no.

Q.  How about after he tweeted, did he ever ask you if his tweets were right or accurate?

A.  No.

Q.  Did you ever give him press comments or talking points?

A.  No.

Q.  Did he ever talk to you before or after about what he was going to say on television or on podcasts about the Badger truck?

A.  No.

Q.  I want to change topics.  You read a text message of yours earlier that mentioned a water fountain.  Do you remember that?

A.  I do.

M9FCmil6                          Babiarz – direct

Q.  So you testified earlier that Trevor Milton announced two types of Badger trucks; right?

A.  That's correct.

Q.  What were those two types?

A.  A fuel-cell electric vehicle and a battery-electric vehicle.

Q.  And by fuel-cell electric vehicle, you mean hydrogen powered?

A.  Yes, a hydrogen fuel cell, correct.

MR. ROOS:  At this time, I'll read a portion of a stipulation.  Can we put up S2, line 22.

Government Exhibits 421-A, 421-B, 421-C, and 421-D are authentic copies of portions of a July 14, 2020, interview of Trevor Milton by observer.com, which was posted on YouTube, and Government Exhibit 421-T is an accurate transcript of those recordings.

The government now offers 421-A through D, and will offer for this time 421-T just as a demonstrative.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  Those will be received.

(Government's Exhibits 421-A, 421-B, 421-C, 421-D received in evidence)

MR. ROOS:  So why don't we play 421-A, please.

(Video played)

Q.  Mr. Babiarz, so on this July 14th, 2020 interview, did you hear Mr. Milton say, we do have a hydrogen pickup truck coming out called the Badger, it is probably one of the most anticipated automotive reveals in history.  Did you hear him say that?

A.  Yes.

Q.  Did you also hear him say, it is a hydrogen electric pickup truck that can go much further than the Tesla truck.  Did you hear that?

A.  Yes.

Q.  Now, by July 2020, what was your understanding about whether Nikola was building a prototype hydrogen Badger truck?

A.  We were not.

Q.  Now, was there a time, if ever, that Trevor Milton said anything about the Badger prototype and hydrogen that concerned you?

A.  Yes.

Q.  What did he say?

A.  To be exact, I don't know, but there was a tweet regarding a water fountain that was coming from the offputs of the hydrogen fuel cell.

        MR. ROOS:  The government offers Government Exhibits 539, 540, and 541 pursuant to a stipulation.

        THE COURT:  Pursuant to the stipulation, they will be received.

M9FCmil6                          Babiarz - direct

(Government's Exhibits 539, 540, 541 received in evidence)

MR. ROOS:  Let's start by publishing Government Exhibit 539.

Q.  Mr. Babiarz, would you read these tweets by Trevor Milton.

A.  Yes.  Getting questions about what we do with all the water coming out of our hydrogen trucks.  Well, we will use most of it for our windshield washer fluid and then some for pure driver drinking water.  Yes, you heard that right, we will have a drinking fountain in our truck.

Using the hydrogen byproduct water for the drivers to have nice cold, clean, pure drinking water.  The rest is re-used at our facility when they arrive for H2 production recycling.

Q.  And that was June 25th, 2020; right?

A.  Correct.

MR. ROOS:  Can we put up Government Exhibit 540 now.

Q.  Mr. Babiarz, I'll read the tweets by Muskovites_Unite and if you would read Trevor Milton's tweets.  Okay?

A.  Yes.

Q.  So Muskovites_Unite tweets on the same day, also, that is for a small vehicle that gets 60 mpge, not a truck.  A truck would be at least four times this amount.  So 80 to 100 gallons of water per stop to empty out.

A.  We use most of it for our windshield washer fluid and

little bit for clean, pure drinking water.  The rest is used at our facility when they arrive for H2 production recycling.

Q.  Muskovites_Unite responds, so it will be transported back to your hydrogen production facility and reused to make more hydrogen?

A.  Yes, only excess water.  Few gallons usually, but depends on heat outside.  Sometimes it can fill up, others, it will be depleted.  We recycle the water to either windshield washer fluid, drinking fountain, or back to station for H2 production again.

        MR. ROOS:  Let's look at Government Exhibit 541, please.

Q.  Did you read this?

A.  Yes.  It says hey @SodaStreamUSA, we offer an in-vehicle drinking fountain with our #NikolaBadger hydrogen pickup and semi truck.  Wondering if we should partner up to offer in-vehicle soda machines.  Sounds fascinating, a bit messy, but I am sure the engineers can figure out how to keep it clean.

Q.  Before you sent out those tweets, had you ever heard anything about the Badger having a water fountain?

A.  Not prior to his announcement, no.

Q.  You were the lead designer on the upper body for the Badger; right?

A.  That's correct.

Q.  And how did you react to these tweets?

A.   I was surprised.

MR. ROOS:  Let's play another interview.  Can we please see Government Exhibit S2 at line 17.

Government Exhibit 416-A is an authentic copy of a portion of a June 29, 2020, interview of Trevor Milton on Fox Businesses' the Claman countdown, and Government Exhibit 416-T is an accurate transcript of that recording.

The government offers 416-A per the stipulation and 416-T as a demonstrative.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  416-A will be received.

(Government's Exhibit 416-A received in evidence)

MR. ROOS:  May we play it for the jury?

THE COURT:  You may.

(Video played)

Q.   Did you hear Trevor Milton mention the water fountain there?

A.   Yes.

Q.   And he said it applies to the hydrogen truck?

A.   That's correct.

MR. ROOS:  Let's put up one more clip.  Can we have back up the June 30th Fox interview with Maria Bartiromo, which is in evidence as 418-A, and let's play it from the 1-minute, 3-second mark to the 3-minute, 18-second mark.

M9FCmil6                          Babiarz - direct

(Video played)

Q.  So had you actually built the Nikola Badger at that point?

A.  No.

Q.  Did you hear the part about the water fountain and the windshield washer fluid?

A.  Yes.

Q.  Did you hear the part where he said, one of the cool things is that you can literally drink the water right out of it, it's what we do, it's from all the hydrogen that comes out of the vehicle, the byproduct is just water.  We take that water, we clean it, we put it in the windshield washer fluid if your windshield washer fluid's low.  All the excess is cleaned, it's sent through a chiller so you can have ice cold, clean water as you're driving down the road.

Do you know if you can actually drink water from a hydrogen fuel cell?

A.  I don't.  Not my expertise.

Q.  What was your reaction upon hearing this?

A.  Sounded a bit odd, and also we were at the time where we froze the design.  So adding something like this was going to be difficult.

MR. ROOS:  Let's show the witness Government Exhibit 47.

Q.  Do you recognize these text messages?

A.  Yes.

MR. ROOS:  Government offers exhibit 47.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 47 received in evidence)

Q.  Why don't we read through these.  You can do yours and I'll read Michael Erickson's.

Let me ask you first, what's the date on these?

A.  July 2nd, 2020.

Q.  So this is around those water fountain statements that we just listened to and read; right?

A.  Correct.

Q.  Go ahead.

A.  What did Trevor say about this ridiculous water fountain? Does he want an espresso machine, too.

Q.  Michael Erickson liked.  Liked stop jerking us around, ha ha.  Then he wrote, he hasn't respond to my email.  Then Michael Erickson disliked what did Trevor say about this ridiculous water fountain.  Does he want to add an espresso machine, too.  Then Michael Erickson laughed at what did Trevor say about this ridiculous water fountain, does he want to add an espresso machine, too.  Then Michael Erickson texted, I'd like that.  Coffee emoji.

A.  I said, of course.  Too busy getting into fights.

Q.  Who were you referring to there?

A.  Trevor.

Q.   Michael Erickson wrote, priorities.

A.   I said, huh.  They start interior parts end of next week, so everything is frozen by then.

Q.   What did you mean by that?

A.   We were just beginning the construction of the components, so to be able to add a new design feature like this, shouldn't be doing it at that stage.

Q.   Michael Erickson responds, that's my biggest concern... timing.

A.   I say, yeah, no more changes or additions.  Plus, like I mentioned last night, we can't get caught lying about it being a hydrogen truck.

Q.   When you said we can't get caught lying about it being a hydrogen truck.  What were you referring to, what statement?

A.   The fact that we were putting a water fountain in a prototype that was just a battery-electric vehicle.

Q.   I'm sorry.  That was just battery-electric?

A.   Correct.

Q.   That implied that it was a hydrogen truck?

          MS. YOUNG:  Objection.

          THE COURT:  Overruled.

A.   Sorry.  Say that again.

Q.   Your belief was that that implied that it was a hydrogen truck?

A.   Having a water fountain based on Trevor's statements, yes.

M9FCmil6                           Babiarz – direct

Q.  And you viewed that as lying?

A.  I did.

          MR. ROOS:  Can we please show the witness Government Exhibit 51.

Q.  Do you recognize these text messages?

A.  Yes.

          MR. ROOS:  Government offers Exhibit 51.

          MS. YOUNG:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 51 received in evidence)

          MR. ROOS:  May we publish to the jury?

          THE COURT:  You may.

Q.  These are more texts with Michael Erickson a few days later; right?

A.  Correct.

Q.  Why don't we read through them.

A.  I say, he can't be serious, followed by a screenshot from Twitter.

          MR. ROOS:  Let's zoom in on that screenshot.  You know what, actually, government offers Exhibit 550 pursuant to a stipulation.

          THE COURT:  Pursuant to stipulation, it will be received.

          (Government's Exhibit 550 received in evidence)

          MR. ROOS:  Why don't we put 550 next to it.

Q.  This is the tweet that you screenshotted?

A.  Yes.

Q.  And you wrote, he can't be serious; right?

A.  Correct.

Q.  And then Michael Erickson writes in line 3, I sent him a text asking how he intends to display this at Nikola World, he hasn't responded.

A.  And I respond, but he's going to have to say it comes in both versions, we can't lie and say one is a hydrogen.

Q.  What did you mean, we can't lie and say one of it is a hydrogen?

A.  At this point, the public did not know that we were building two battery-electric versions only.

Q.  Did the Badger vehicles end up having a water fountain in them?

A.  They both did, yes.

Q.  Were those water fountains fueled or filled by hydrogen fuel cell?

A.  No.

Q.  Where did the water come from?

A.  They were built as prototype assemblies similar to a water cooler, so we had a water tank that was filled with fresh water that then was filtered out through the dash.

Q.  To your knowledge, did Trevor Milton ever clarify where the water was coming from on these?

M9FCmil6                         Babiarz – direct

A.  To my knowledge, no.

Q.  So just to be clear, you testified earlier that Trevor Milton said the water was a byproduct of hydrogen, but this was just a tank?

A.  Correct.

Q.  I was about to switch gears, but I see we have --

THE COURT:  It's almost 2:40, ladies and gentlemen. That brings us to the end of the day, so we will see you again tomorrow morning.  Please do try to be in the jury room by no later than 9:15.  Until then, be safe getting home.  Do not discuss the case, do not read anything about the case in any sort of media.  Be well.

(Continued on next page)

M9FCmil6                        Babiarz – direct

(Jury not present)

THE COURT:  Mr. Babiarz, you may step down.

Everyone can be seated.

Anything anyone wants to bring up?  Mr. Roos.

MR. ROOS:  Not from us, your Honor.

THE COURT:  Mr. Mukasey.

MR. MUKASEY:  I don't think so, Judge.

THE COURT:  Any idea how much longer Mr. Babiarz will be on direct?

MR. ROOS:  Honestly, your Honor, I think I have about five minutes of direct.

THE COURT:  Very well.

MR. BONDI:  Your Honor, I do have one thing.  It would be great if we can know the witnesses for tomorrow for planning purposes.

MR. ROOS:  I think we already told them because we're moving a little slower than we anticipated, but the next one is Dale Prows.  If we are able to get to the one witness after that, it will be Mark Russell.

THE COURT:  Thank you.  Have a goodnight, everyone.

(Adjourned to September 16, 2022 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                        Page

 ELIZABETH FRETHEIM

Cross By Mr. Bondi . . . . . . . . . . . . . . . 412

Redirect By Ms. Estes  . . . . . . . . . . . . . 472

Recross By Mr. Bondi . . . . . . . . . . . . . . 512

 BRENDAN BABIARZ

Direct By Mr. Roos . . . . . . . . . . . . . . . 515

                    GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 278   . . . . . . . . . . . . . . . . . . . . . 459

 403-A  . . . . . . . . . . . . . . . . . . . . 470

 311   . . . . . . . . . . . . . . . . . . . . . 506

 905   . . . . . . . . . . . . . . . . . . . . . 518

 502   . . . . . . . . . . . . . . . . . . . . . 520

 801   . . . . . . . . . . . . . . . . . . . . . 522

 505   . . . . . . . . . . . . . . . . . . . . . 525

 9   . . . . . . . . . . . . . . . . . . . . . . 532

 227   . . . . . . . . . . . . . . . . . . . . . 538

 232   . . . . . . . . . . . . . . . . . . . . . 542

 517   . . . . . . . . . . . . . . . . . . . . . 558

 25   . . . . . . . . . . . . . . . . . . . . . . 560

 27   . . . . . . . . . . . . . . . . . . . . . . 565

 518   . . . . . . . . . . . . . . . . . . . . . 568

 418-A  . . . . . . . . . . . . . . . . . . . . 570

45    . . . . . . . . . . . . . . . . . . . . . . . 572

50    . . . . . . . . . . . . . . . . . . . . . 577

53    . . . . . . . . . . . . . . . . . . . . . 580

52    . . . . . . . . . . . . . . . . . . . . . 583

264    . . . . . . . . . . . . . . . . . . . . 585

69    . . . . . . . . . . . . . . . . . . . . . 589

554    . . . . . . . . . . . . . . . . . . . . 590

421-A, 421-B, 421-C, 421-D   . . . . . . . . . 593

539, 540, 541    . . . . . . . . . . . . . . . 595

416-A    . . . . . . . . . . . . . . . . . . . 597

47    . . . . . . . . . . . . . . . . . . . . . 599

51    . . . . . . . . . . . . . . . . . . . . . 601

550    . . . . . . . . . . . . . . . . . . . . 601

DEFENDANT EXHIBITS

Exhibit No.                                Received

1229    . . . . . . . . . . . . . . . . . . . 413

496    . . . . . . . . . . . . . . . . . . . . 419

37    . . . . . . . . . . . . . . . . . . . . . 422

734    . . . . . . . . . . . . . . . . . . . . 428

1255    . . . . . . . . . . . . . . . . . . . 441

500    . . . . . . . . . . . . . . . . . . . . 449

500-T    . . . . . . . . . . . . . . . . . . . 449

502    . . . . . . . . . . . . . . . . . . . . 450

502-T    . . . . . . . . . . . . . . . . . . . 450

503    . . . . . . . . . . . . . . . . . . . . 454

503-T . . . . . . . . . . . . . . . . . . . 454

501 . . . . . . . . . . . . . . . . . . . 455

501-T . . . . . . . . . . . . . . . . . . 456

27 . . . . . . . . . . . . . . . . . . . . 464

1563 . . . . . . . . . . . . . . . . . . . 472

29 . . . . . . . . . . . . . . . . . . . . 512