M9g2Mil1                        `

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                      21 CR 478 (ER)

TREVOR MILTON,

              Defendant.

------------------------------x

                                New York, N.Y.

                                September 16, 2022
                                9:00 a.m.

Before:

                  HON. EDGARDO RAMOS,

                                District Judge


                       APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

M9g2Mil1

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  Counsel, good morning.

First of all, I would like to introduce Laura Londoño, who has replaces Alexis.

COUNSEL:  Good morning.

THE COURT:  She comes to us from the Sixth Circuit.  She just finished a clerkship there.

I did get Mr. Podolsky's letter yesterday advising me that the government's, I guess, third witness today will not be available, but we anticipate that we might still take up the whole of the day with the two witnesses that are coming.

MR. PODOLSKY:  Your Honor, I think it is highly -- far more likely that this will not even be an issue because we won't finish early anyway just with the two witnesses we have, but we did want to alert your Honor so that there was no surprise after we learned about Mr. Russell's personal circumstances.

THE COURT:  It won't be a problem, in any event.

Is there anything that the parties wish to raise?

MR. MUKASEY:  No, Judge.

MR. PODOLSKY:  Your Honor, I think I put it in that letter, but just so you are not surprised, Mr. Babiarz's remaining direct will be longer than the five minutes that we had suggested.

THE COURT:  Okay.  All right.  Anything else?

MR. PODOLSKY:  No.

THE COURT:  Okay.  So we will see you at 9:25.

(Recess)

MR. ROOS:  Your Honor, the witness is in the hall.  We can put him on the stand whenever you want.

THE COURT:  Why don't you bring him in.  The jury is here.  Unfortunately, their breakfast also recently got back there, so . . .

MR. ROOS:  We wouldn't want to rush them through the danish.

THE COURT:  We want a happy jury.

(Pause)

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen of the jury, good morning.  Thank you, as always, for being so prompt.  I did want to point out, but some of you already noticed, Ms. Alexis Alvarez is no longer with us.  She has moved on to a new job.  But she has been replaced by Laura Londoño.  She and Jasmine will be working with you throughout the remainder of the trial.

We will now continue with the direct examination of Mr. Babiarz.  Sir, you are reminded that you are still under oath.

THE WITNESS:  Yes.

MR. ROOS:  Thank you, your Honor.

Just first, as a housekeeping matter, the government offers Government Exhibits 416, 418, 421, which are the full recordings.  We played portions of those recordings yesterday, and we are offering the full recordings now.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  Very well.  They will be received.

(Government's Exhibits 416, 418, 421 received in evidence)

BRENDAN BABIARZ, resumed
DIRECT EXAMINATION (continued)
BY MR. ROOS:
Q.  Good morning, Mr. Babiarz.  I want to pick up where we left

off yesterday afternoon.  I want to talk about the schedule for building the Badger trucks.

Can you remind us, under the revised schedule with ITAL Design when would the top part of the Badger pickup truck be delivered from Italy?

A.   Roughly sometime mid October.

Q.   You said a different company called Technosports was making the chassis, is that right?

A.   That's correct.

Q.   What's the chassis?

A.   The overall frame, suspension points, etc., of the vehicle.

Q.   Was that company's production of the chassis on a similar schedule?

A.   Yes.

Q.   Can we please show the witness what's been marked for identification as Government Exhibit 229.

Mr. Babiarz, who is this e-mail from?

A.   It is from Ron Johnson.

Q.   And did you receive it?

A.   Yes.

MR. ROOS:  The government offers Government Exhibit 229.

MS. YOUNG:  No objection.

MR. ROOS:  May we published it?

THE COURT:  It will be received and you may publish

M9g2Mil1                      Babiarz - Direct

it.

          MR. ROOS:  Thank you.

          (Government's Exhibit 229 received in evidence)

BY MR. ROOS:

Q.  Mr. Babiarz, these three or four columns with the dates, what are we looking at there?

A.  That is the overall timeline to build the chassis.

Q.  By Technosports, is that right?

A.  That's correct.

Q.  And so under this schedule, as stated in the e-mail, when does it say Technosports will receive the surrogate vehicles?

A.  4/1 --

Q.  So that would be -- sorry.  Go ahead and finish your answer.

A.  4/1/2020.

Q.  So April 1, 2020?

A.  Correct.

Q.  And when it says surrogate vehicles, what do you understand that to mean?

A.  The donor vehicles and/or the Ford F150s.

Q.  So the chassis was also being made with the Ford F150?

A.  Portions of it, yes.

Q.  Looking lower, when it says -- when does it say the assembly of one rolling chassis will be complete?

A.  August 20, 2020.

M9g2Mil1                          Babiarz - Direct

Q.   And when would the chassis be shipped?

A.   September 18, 2020.

Q.   Now, do you recall if this schedule was revised at some point?

A.   It was.

Q.   Let me show, just for the witness, Government Exhibit 315 and its attachment, which is 316.

        Mr. Babiarz, did you receive this e-mail?

A.   I did.

        MR. ROOS:   The government offers 315 and its attachment, 316.

        MS. YOUNG:   No objection.

        THE COURT:   It will be received.

        (Government's Exhibits 315, 316 received in evidence)

        MR. ROOS:   Thank you, your Honor.   May we publish it?

        THE COURT:   You may.

BY MR. ROOS:

Q.   So why don't we start by looking at the e-mail.   And Mr. Babiarz, what is the date on the e-mail?

A.   June 30, 2020.

Q.   Okay.   And then look at the attachment to it.

A.   Yup.

Q.   Is that an updated schedule for Technosports' work?

A.   Yes, on the right-hand side.

Q.   And according to this, when would Technosports deliver its

M9g2Mil1                        Babiarz - Direct

part of the Badger truck?

A.   It looks like that would be October 12, 2020.  October 16. The 12th is the start.

Q.   Now, when was the earliest the actual Badger would be built?

A.   In completion, the first one was built about the mid of November.

Q.   I'm sorry, when in November?

A.   Mid November.

Q.   So we can take this down.

       So the chassis was being made, you said, with a Ford F150 parts.

A.   Correct.

Q.   And Ford F150 is that the same as a Ford Raptor?

A.   Yes.

Q.   Can we show now the witness Government Exhibit 1230 for identification.

       Mr. Babiarz, do you recognize this image?

A.   I do.

Q.   What is it?

A.   This is a Ford F150 raptor.

       MR. ROOS:  The government offers 1230.

       MS. YOUNG:  No objection.

       THE COURT:  It will be received.

       (Government's Exhibit 1230 received in evidence)

M9g2Mil1                        Babiarz - Direct

MR. ROOS:  May we publish it to the jury?

THE COURT:  You may.

BY MR. ROOS:

Q.  So, Mr. Babiarz, since the jury is now looking at it, can you just tell us again what we are looking at here?

A.  Yes, this is Ford's F150 Raptor edition.

Q.  And this is what the donor vehicle was for the Badger trucks, is that right?

A.  That is correct.

Q.  We can take this down for a moment and come back to it. Let me show you another exhibit.  Can we show the witness Government Exhibit 291.

Mr. Babiarz, do you recognize the image on the front?

A.  I do.

Q.  What is it?

A.  It's a rendering of a Nikola Badger.

Q.  Do you see the writing in red?

A.  I do.

Q.  What does that say?

A.  "AVT/JD Innovations/Technosports."

Q.  What is JD Innovations/Technosports?

A.  I only know Technosports.  I don't know what JD Innovations are.

Q.  What is Technosports?

A.  They are the firm that we hired to develop the chassis for

these vehicles.

Q.  Got it.

        MR. ROOS:  The government offers 291.

        MS. YOUNG:  No objection.

        THE COURT:  It will be received.

        (Government's Exhibit 291 received in evidence)

        MR. ROOS:  May we publish it?

        THE COURT:  You may.

BY MR. ROOS:

Q.  So, Mr. Babiarz, again, what are we looking at the front here?

A.  A rendering of a Nikola Badger.

Q.  Why don't we just click through the pages, let's go to the second and then the third and the fourth.

        Mr. Babiarz, the third and the fourth pages, are those versions of the Technosports schedule?

A.  That is correct.

Q.  Now let's go to the fifth page.  And what are we looking at here?

A.  This is the chassis of the Ford F150 Raptor.

Q.  Can we put side by side this exhibit next to 1230.

        Mr. Babiarz, is the chassis on the left a part of the truck on the right?

A.  Yes.

Q.  Okay.  Thank you.  We can take down 12:30, and let's stay

on page 5 for a second.

Was it this chassis that was being used for the Badger?

A.   This specific one I'm not sure, but, yes, a Ford F150 chassis.

Q.   And now let's go to page 6.  Does this show the proposed modifications to that chassis?

A.   Yes.

Q.   So ultimately the chassis was being built --

MS. YOUNG:  Objection, leading.

THE COURT:  Overruled.

BY MR. ROOS:

Q.   So ultimately the chassis was being built with this Ford donor vehicle.

A.   That is correct.

Q.   Would you consider the chassis ground up?

A.   No.

MS. YOUNG:  Objection.

THE COURT:  Overruled.

Q.   Why not?

A.   Because we were using some components that we did not develop.

Q.   Okay.  We can take this down.

Let's shift gears.  Yesterday you mentioned to us a term "OEM."  What's OEM?

M9g2Mil1                         Babiarz - Direct

A.   It's original equipment manufacturer.

Q.   What are some examples of an OEM?

A.   Ford, General Motors, Toyota.

Q.   And I think that some of the materials we looked at, it said Nikola might partner with an OEM.  Did you see that yesterday?

A.   That is correct.

Q.   Did Nikola end up partnering with an OEM?

A.   Yes.

Q.   Which one?

A.   General Motors.

Q.   Do you remember approximately when Nikola and General Motors announced partnership?

A.   I believe it was early September.

Q.   And at that time had Nikola finished building the Badger vehicle?

A.   No.

Q.   Were the trucks fully built?

A.   No.

Q.   So under the deal with General Motors, what platform or base was GM's version of these Badger trucks going --

            MS. YOUNG:  Objection.  Foundation.

            THE COURT:  Overruled.

Q.   I can ask you the question again.

A.   Yup.  Go ahead.

M9g2Mil1                         Babiarz - Direct

Q.   Sorry, and let me just clarify, early September of what year was the --

A.   2020, I believe.

Q.   2020, all right.

So my question was, what platform or base was General Motors' version of these Badger --

MS. YOUNG:  Objection.  May we approach?

THE COURT:  Sure.

(Continued on next page)

M9g2Mil1                    Babiarz - Direct

(At the sidebar)

MR. MUKASEY:  If I may, your Honor, the government has not established that this witness knows thing one about the merger or the deal in combination with GM.  GM combination was a wildly complicated, lawyered combination that was done at the highest levels of the company.  This guy draws sketches.  He knows it's a GM deal because it was widely publicized.  But asking questions about GM's take on the Badger and what GM's specs were going to be and how GM was going to be involved with the Badger and how the Badger was going to be adapted or evolved by GM, there is no foundation for it.  He drew a sketch of the Badger.

THE COURT:  Those are two different things, though, the design and build of the Badger and the deal.  So --

MR. MUKASEY:  Right.  My objection is to the foundation in terms of the deal.

MR. ROOS:  Understood.  I can narrow this issue considerably.  I'm not going to ask Mr. Babiarz about the deal itself.  I'm going to ask him about his understanding of the truck that was going to be built by GM afterwards.

I'm happy to ask a question or two to lay more of a foundation.  He would testify that he had some involvement, once that GM deal was announced, in determining how that truck would be constructed.  I'm not going to ask him many questions on this.  This is really just two or three questions.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

MR. MUKASEY:  I believe we will keep objecting unless there is a proper foundation laid, because his knowledge of sketches of the Badger is a wide leap from what was going to happen at GM, and I don't think he knows what was going to happen at GM.

MR. ROOS:  I will just ask him if he had any involvement, any knowledge of when GM was going to construct its vehicle, how it was going to be built.  If he says he has some knowledge, I will ask the next question.

THE COURT:  I thought he was part of the design team for this thing.

MR. ROOS:  He was the lead designer.

MR. MUKASEY:  Not once it got to GM.  We can try --

THE COURT:  Did he continue his involvement?

MR. ROOS:  Minimally.  I mean, the GM deal blows up.

MR. MUKASEY:  What's going on here, really, is the attempt to take a guy who draws sketches and turn him into an expert about this thing.  Because his knowledge is so limited that the cross-examination of him will end up being "you didn't know this, you didn't know this, you didn't know the other thing."

THE COURT:  Maybe I am just wrong, but he has been described by the government as a lead designer.  I suspect—I may be wrong, see what Mr. Roos says—that as lead designer he doesn't just draw sketches; that he works with them, he

understands what the guts of the thing are going to be maybe not in some great detail, but he works hand in hand with the mechanical engineers over there.  Am I wrong about that?

MR. ROOS:  You are absolutely right, your Honor.  And like I said, my direct on this is actually really limited.  I was only planning on spending like a minute on this.  So I will lay a foundational question, I will ask the question I just asked.  I don't think it's actually going to go much further than that.

THE COURT:  Okay.

(Continued on next page)

(In open court)

MR. ROOS:  May I proceed, your Honor?

THE COURT:  You may.

BY MR. ROOS:

Q.  Mr. Babiarz, a moment ago you mentioned that at some point a partnership was announced between General Motors and Nikola on the Badger, is that right?

A.  Correct.

Q.  After that, did you learn anything about how that Badger would be constructed, the one that GM would make?

A.  Yes.

Q.  And in what context did you learn about that?

A.  We had in the beginning meetings with General Motors' team and the Nikola team.

Q.  So what platform or base was General Motors' version of these Badger trucks going to be built on?

A.  It was the same platform that they were using on their new Hummer EV platform.

Q.  So what does that mean?  What was their new Hummer EV platform?

A.  They had recently released, I believe it was this year, a Hummer EV——it is an electric pickup truck——and we were going to be using the skateboard and/or the chassis drive chain components from their vehicle.

Q.  Basically you take the chassis of the Badger EV and put the

M9g2Mil1                        Babiarz - Direct

Badger on top of it?

MS. YOUNG:  Objection leading.

THE COURT:  Overruled.

A.  In simple terms, yes.

Q.  So fair to say that was not going to be a ground-up Nikola truck, right?

A.  Ground-up Nikola?  No.

Q.  Now, did Nikola end up finishing those two Badger show vehicles that it had been working on?

A.  We did, yes.

Q.  When were they fully built?

A.  Mid November.

Q.  Let me show you now, just for the witness, Government Exhibit 1220.

What is this?

A.  This is the Nikola Badger in the lobby at Nikola headquarters in Phoenix.

MR. ROOS:  The government offers 1220.

THE COURT:  Can I just ask him to repeat what he said at the end there?  I didn't hear.

THE WITNESS:  Yup.  This is the Nikola Badger inside the lobby of Nikola's headquarters in Phoenix, Arizona.

MR. ROOS:  The government offers 1220.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

M9g2Mil1                    Babiarz - Direct

            (Government's Exhibit 1220 received in evidence)

BY MR. ROOS:

Q.  Mr. Babiarz, was this vehicle in Nikola's lobby when Trevor
Milton was employed by the company?

A.  No.

Q.  Can it legally -- can it drive?

A.  It can drive, yes.

Q.  Can it legally drive on a road?

A.  No.

Q.  Why not?

A.  It's a closed-course prototype.

Q.  Just from looking at it, are you able to tell that a donor
vehicle was used?

A.  No.

Q.  What would you need to do to identify a part that
originated from Ford?

A.  You would have to disassemble the whole vehicle.

Q.  What do you mean by that?

A.  Remove the cab, remove the bed, and you would potentially
see portions of the chassis from Ford.

Q.  And just from looking at it, can you tell when it was
built?

A.  No.

Q.  Just from looking at it, can you tell the timing of when
the prototype was complete?

M9g2Mil1                         Babiarz - Direct

A.   No.

Q.   And just from looking at this, are you able to determine whether this can achieve the specifications that Trevor Milton announced?

A.   Some, but not all, no.

Q.   Let me show you two more pictures.  Can we please show the witness Government Exhibit 1214 and 1215.

      Do you recognize these images?

A.   I do.

Q.   What are they?

A.   They are pictures of the Nikola Badger prototype.

      MR. ROOS:  Government offers 1214 and 1215.

      MS. YOUNG:  No objection.

      THE COURT:  They will be received.

      (Government's Exhibits 1214, 1215 received in evidence)

BY MR. ROOS:

Q.   Mr. Babiarz --

      MR. ROOS:  May we publish them to the jury, your Honor?

      THE COURT:  You may.

      MR. ROOS:  Thank you.

BY MR. ROOS:

Q.   Two images up on the screen.  The one on the left, 1214, what are we looking at there?

A.  We are looking at the charge port to the vehicle.

Q.  What type of charge port?

A.  This is a high-voltage charge port for an electric vehicle.

Q.  And what are we looking at on the right side, Government Exhibit 1215?

A.  This is a hydrogen receptacle.

Q.  So what's the difference between these two?

A.  They are how you essentially power either version of a fuel cell electric vehicle or an electric vehicle.

Q.  Does the battery charge port work?

A.  It does.

Q.  Does the hydrogen receptacle work?

A.  It does not.

Q.  Is it connected to anything?

A.  It is not.

Q.  Is there a water fountain on this truck?

A.  There is.

Q.  So there is a hydrogen fuel port, there is a water fountain.  Is there a hydrogen fuel cell?

A.  There is not.

Q.  Was there ever any hydrogen in these trucks?

A.  No.

Q.  Do you know if these were ever tested to see if they could hit the specifications that Trevor Milton announced?

A.  They were tested, but not to any specific specifications.

Q.   Were these trucks ever manufactured or produced?

A.   Other than these two, no.

Q.   After Trevor Milton left Nikola, what happened to the
Badger pickup program?

A.   We essentially stopped it altogether.

Q.   Canceled it.

A.   Correct.

          MR. ROOS:  No further questions.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. YOUNG:

Q.   Good morning, Mr. Babiarz.

A.   Good morning.

Q.   I want to take a step back and direct your attention to
your responsibilities at Nikola.  A lot of things have been
discussed yesterday and today.

          You are not a mechanical engineer?

A.   I am not.

Q.   Not an electrical engineer?

A.   I am not.

Q.   Not a thermal engineer?

A.   No.

Q.   Ergonomics engineer?

A.   No.

Q.   Suspension engineer?

A.   No.

Q.   In fact, you are not any kind of engineer at all.

A.   That is correct.

Q.   And you didn't handle physical construction of any vehicles at Nikola, correct?

A.   Physical, no.

Q.   And you weren't aware that the engineering department performed computer simulations on the Badger.

            MR. ROOS:  Objection.  States a fact not in evidence.

            THE COURT:  Sorry?

            MR. ROOS:  It states a fact not in evidence.

            THE COURT:  Overruled.

Q.   Because you are not in the engineering department, correct?

A.   I'm not an engineer, no.

Q.   And there were no requirements for the engineers to provide you with updates?

A.   Not that I'm aware of, no.

Q.   And there are no requirements for Ron Johnson to tell you what he was doing on the Badger?

A.   To keep me up to date on the timeline he was, yes.

Q.   And you didn't report to the global head of the electrical system or the control system, did you?

A.   I did not report to them, no.

Q.   And they didn't report to you.

A.   They did not.

Q.   Because you are on the creative side.

A.   That is correct.

Q.   You are a designer.

A.   Yes.

Q.   And as a Nikola designer, you were not tasked with creating simulation models or receiving the models, correct?

A.   No.

Q.   But you have won design awards, right?

A.   I have.

Q.   And in the course of your career, you have designed yogurt containers?

A.   I have in the past, yes.

Q.   Dog beds?

A.   Sure.

Q.   Basketball clothes?

A.   Yup.

Q.   And at Nikola, your job was to draw sketches or designs?

A.   That is correct.

Q.   That included the designs for the off-road ATV?

A.   Yes.

Q.   And for the Wav, the jet ski?

A.   Yes.

Q.   And then the Badger?

A.   That is correct.

Q.   Which was your first road vehicle, right, your first pickup

M9g2Mil1                     Babiarz - Cross

truck?

A.  That is correct.

Q.  And as a vehicle designer, your concern is about how a product looks, right?

A.  For the most part, yes.

Q.  And how it feels?

A.  Correct.

Q.  So that's both for the interior of the car?

A.  Interior and exterior, yes.

Q.  So, another word for that might be the aesthetic?

A.  Yes.

Q.  And your design process, you sketch first, right?

A.  We do.

Q.  By hand?

A.  Yes.

Q.  With a pencil?

A.  Correct.

Q.  Clean sheet of paper?

A.  Yes.

Q.  And I think we have some video of that to show you in a few minutes.

But then the next step in the process, after you sketch by hand, you make a digital, correct?

A.  We do sketch digitally next, correct.

Q.  And that's in Photoshop?

M9g2Mil1                        Babiarz - Cross

A.   Primarily.

Q.   So you started at Nikola in 2017, right?

A.   That is correct.

Q.   I would like to understand the structure and organization at Nikola in the 2019 to 2020 time frame while you were there.

A.   Okay.

Q.   You were not a manager?

A.   I was in the marketing side in 2020.

Q.   What date in 2020?

A.   I don't have an exact date.

Q.   Were you a department head?

A.   I was not.

Q.   Were you a C level, C suite executive?

A.   I am not, no.

Q.   Were you on the board?

A.   I was not.

Q.   And in terms of your interactions with Trevor, you weren't Trevor's assistant.

A.   I was not.

Q.   And you were not a direct report to Trevor.

A.   Only on certain projects, but no.

Q.   And you had no kind of standing, regular meetings with Trevor?

A.   In the exception of the Nikola Badger, no.

Q.   And in fact, after providing the sketch of the Badger in

2018, you did not testify to any other interactions with Trevor until early 2020 yesterday, correct?

A.  That is correct.

Q.  And in terms of your role with the Badger, you were not responsible for invoices, like that Technosports invoice that we saw a few moments ago, correct?

A.  No.

Q.  Not responsible for the Badger budget.

A.  No.

Q.  The millions of dollars spent building the Badger truck, correct, that was not in your responsibility, scope?

A.  Just ensuring it didn't go over scope.

Q.  Not responsible for the Badger engineering?

A.  No.

Q.  Not responsible for the chassis engineering?

A.  No.

Q.  Not responsible for suspension engineering?

A.  No.

Q.  Now I want to show you some government exhibits that were highlighted yesterday.  Chris, could you please pull up GX 502. That is already in evidence.

Those are your renderings in Trevor's tweet, correct?

A.  That is correct.

Q.  And that tweet is to @ElonMusk, correct?

A.  Yes.

M9g2Mil1                          Babiarz - Cross

Q.   The head of Tesla, right?

A.   Correct.

Q.   Another car company?

A.   That is correct.

Q.   Active on social media.

A.   I would agree.

Q.   Yup.

And this is after Tesla had released their design of the pickup truck, right?

A.   I believe so, yes.

Q.   And that's called a Cybertruck?

A.   That is correct.

Q.   And then Trevor tweeted your design.

A.   He did.

Q.   And it's understood that, according to this tweet, Nikola would need someone else to build the design, right?

A.   Yes, according to this, yes.

(Continued on next page).

BY MS. YOUNG:

Q.  And that's in part because Nikola was focused on big-rig semi trucks and not, as it says here, cars or trucks, meaning pickup trucks?

A.  That is correct.

Q.  And you understood this tweet to be some kind of entertainment; right?

A.  At the time, yes.

Q.  So day one, first time Badger is released out into the world, Trevor referenced needing someone to build the Badger; correct?

A.  That is correct.

        MS. YOUNG:  Chris, could you please pull up GX-801, also in evidence.

Q.  Do you recognize this as the February 2020 press release of the Badger; right?

A.  Yes.

        MS. YOUNG:  If we could please go to page 2 and highlight.

Q.  The Badger will be built in conjunction with another OEM; correct.

A.  I see that, yes.

Q.  Utilizing their certified parts and manufacturing facilities; right?

A.  Yes.

M9GCmil2                         Babiarz - cross

Q.  Like the GM Hummer; correct?

A.  Correct.

Q.  So now from day two, Nikola is acknowledging the need for an outside OEM, right, to build it?

A.  Yes.

Q.  And to using their parts; right?

A.  That is correct.

        MS. YOUNG:  Can we go to page 3 of the press release, the top of the page 9.

Q.  Nikola Badger will make its first appearance at Nikola World in Phoenix; correct?

A.  Yes.

Q.  And prototypes will be available for select customers and media to ride in at Nikola World; right?

A.  That was the plan, yes.

Q.  And just to be clear, Nikola World, because that's been thrown around a lot, that was a big kind of marketing event for the company; right?

A.  Yes, it was an unveiling show.

Q.  There is lights and tickets; right?

A.  Correct.

Q.  Cameras, music?

A.  Yes.

Q.  And it's not a dealership opportunity, this is just to display the vehicles; right?

M9GCmil2                        Babiarz - cross

A.   To my understanding, yes.

Q.   Now, if we also could go further down on this page where it says estimated specification, and there is an asterisk; right?

A.   I see the asterisk, yes.

Q.   And there were other people in the company to provide those specifications for this press release; correct?

A.   That is correct, not me.

        MS. YOUNG:  Chris, if you could please pull up GX-232, also in evidence.

Q.   You testified on direct that this is the ITAL Design for the Nikola partner in Italy, their plan for the design of the Badger prototype; correct?

A.   Correct, initial proposal from them.

        MS. YOUNG:  Could we please turn to page 8.

Q.   This page details the interior design decisions; right?

A.   Yes.

Q.   Just to highlight a few, isn't it true that the Badger prototype design entailed a new frunk?

        And for those of us not familiar with a frunk, is that a front trunk?

A.   That is correct.

Q.   And the reason there even is a front trunk on this is because the engine for a normal pickup truck that's not electric would be there, but now there is new space in the vehicle; is that right?

A.   That is correct.

Q.   And there is also new shape to the handle mechanism?

A.   Correct.

Q.   And new door panels, and new center console, and new dashboard, new foam and new fabric on the seats; right?

A.   All correct, yes.

Q.   And I believe we saw photos, actually, of those seats yesterday; correct?

A.   Yes.

Q.   And they were completely functioning and adjustable; right?

A.   They were.

Q.   And then air vents will do air diffusion.  Now they won't be adjustable, but that's because this is a prototype; right?

A.   Exactly, yes.

Q.   A display.  But the plan for the future, for the production vehicle would be that air vents work correctly?

A.   To be a sellable vehicle, yes.

Q.   To be a sold vehicle; right?

A.   Yes.

Q.   So these were kind of the requests, the direction given by Nikola to its partner in Italy to build the prototype; correct?

A.   That is correct.

Q.   And this is just the interior, there is a whole set of decisions for the exterior; correct?

A.   Yes.

Q.  And then a whole set of new changes and decisions for the chassis, the underpart; right?

A.  Correct.

Q.  And by the way, ITAL Design, they don't mass produce vehicles, they're not an OEM; right?

A.  No, they do low-quantity production.

THE COURT:  I'm sorry.  They do what?

THE WITNESS:  Low-quantity production.

THE COURT:  Thank you.

Q.  Meaning like a shop that kind of helps build prototypes?

A.  Essentially, yes.

Q.  Design models; right?

A.  And driving, yes.

Q.  So we've been using the word "prototype" quite a bit while discussing the Badger.  By prototype, you're talking about kind of the first design concept; right?

A.  Yes, it's a loose term.  In most cases, it's called a show car.  Ours, in this case, was a show car, but working, so a prototype.

Q.  So there's some flexibility in all of these terms; right?

A.  Person to person, yes.

Q.  And here, for the Badger, the show car or the prototypes, they were being built to show at Nikola World; right?

A.  That was the goal, yes.

Q.  To be trucks in the Nikola product line in the future?

A.  Correct.

Q.  And for Nikola World, which was at a date set in the future?

A.  Correct.

Q.  And ultimately, to put this in consumer driveways in the future?

A.  Correct.

Q.  And just to be clear, in February 2020 with the press release announcing the Badger, there was never any intention for Nikola to build those trucks sitting in driveways?

A.  According to the press release, no.

Q.  And Trevor referred to them as show cars because he thought of -- or you understood him to think of Nikola World as a big show, a big event?

A.  "Show car" is just an automotive term for an initial prototype.

Q.  Now I want to direct your attention to some of the kind of display aspects of the Badger.

A.  Okay.

Q.  You testified that the Badger prototypes did not have a hydrogen fuel cell inside; correct?

A.  Correct.

Q.  Now, that decision was made openly; correct?

A.  I would say yes.

Q.  An email with seven people on it, correct, we looked at it

yesterday?

A.  Correct.

        MS. YOUNG:  Chris, could you actually pull up that email, GX-227.

Q.  The design took into account the future insertion of the hydrogen fuel cell; right?

A.  Correct.

Q.  And that would be in the production vehicles?

A.  Yes.

Q.  And so, the planning here related to the prototype, what would be on display; right?

A.  Uh-huh.

Q.  To show future options; right?

A.  Yes.

Q.  The same way manufacturers sometimes give options for interior design or color of paint, these are options on the truck for the future; right?

A.  That is correct.

Q.  And you understood Trevor's original plan was to build the hydrogen fuel cell into the Badger; correct?

A.  Yes.

Q.  And that is why the hydrogen port was placed on the display truck; correct?

A.  Yes, it was a way to show the consumer what it would look like.

Q.   So the hydrogen fuel cell receptacle on both trucks was for display?

A.   Display only, yes.

Q.   You were asked a lot of questions yesterday about a truck being built; right?

A.   Correct.

Q.   And you used "built" two different ways; correct?

A.   Sorry.  I don't understand the question.

MR. ROOS:  Objection.  Misstates the testimony, I think.

THE COURT:  Overruled.  Ask another question.  He doesn't understand the question.

Q.   You testified that this truck is all built in the computer, right, that was in reference to the 3D software file?

A.   Correct.

Q.   And then there's the physical build; correct?

A.   Yes.

Q.   So two different ways the truck can be built; right?

A.   Physical and digital, yes.

Q.   And also, with respect to the parts, the parts can exist before they're assembled; correct?

A.   That is correct.

Q.   And with respect to show car, it could be working, functional, prototype, they could have different meanings; correct?

A.   Yes.

Q.   You testified yesterday that you had familiarity with Tesla and its ground-up vehicles; correct?

A.   Yes.

Q.   You never worked at Tesla?

A.   I did not.

Q.   But Tesla's vehicles are built from the ground up?

A.   My understanding of the term, yes.

Q.   Are you aware that the Tesla roadster was made on the Lotus chassis?

A.   Yes.

THE COURT:   I'm sorry.   Did you answer?

A.   The original one, yes.

Q.   But the Tesla vehicles are ground up?

A.   Their next models, to my understanding, are, yes.

Q.   Yesterday, you read a number of text threads and role played with Mr. Roos, you and Michael Erickson, you and Jordan Darling, and you and Ryan May; correct?

A.   Correct.

Q.   And in terms of who these people are, these other people, Erickson, Darling, and Ryan May, you had worked previously with Jordan Darling; right?

A.   I did, yes.

Q.   Went to college with him?

A.   I did.

Q.  Social interactions with him outside of work?

A.  Yes.

Q.  Safe to say, he's a buddy of yours?

A.  He's a friend, yes.

Q.  Same with Ryan May?

A.  Yes, he's a friend outside of work, as well.

Q.  And those texts that you were reading, that's not you drafting like official company policy; right?

A.  No.

Q.  You were blowing off some steam; right?

A.  Yeah, just texts between co-workers.

Q.  Speculating about things you didn't have insight to?

A.  Yes.

Q.  Expressing your thoughts?

A.  In most cases, yes.

Q.  And you didn't send any of those to Trevor; right?

A.  No.

Q.  You were asked a number of times on direct about when the Badger was physically built, and that was November 2020; correct?

A.  Correct.

Q.  So getting from your piece of paper to November 2020, I'm going to ask you a few questions.  Okay?

A.  Okay.

Q.  So Trevor asked you to prepare a pickup truck design;

M9GCmil2                         Babiarz – cross

right?

A.   Yes.

Q.   And you drew the first picture of what became the Badger?

A.   That is correct.

Q.   And that was in late November 2018; right?

A.   Yes.

Q.   The company was private at that point?

A.   Yes.

Q.   So not trading on the stock exchange?

A.   Correct.

Q.   No public investors?

A.   No.

Q.   And then you sent to Trevor three or four design options; right?

A.   I sent a few options, yes.

Q.   And that was after spending three to four days sketching; right?

A.   Yeah, under a week, correct.

Q.   And that was your design, you drew it?

A.   Correct.

Q.   It had your original ideas?

A.   It did.

Q.   The original taillights?

A.   Correct.

Q.   Front lights?

M9GCmil2                      Babiarz - cross

A.   Yes.

Q.   And the United States Government names you as an inventor on a patent for your design of parts of the Badger; correct?

A.   Yes.

Q.   And a patent is an exclusive legal right to something you created?

A.   To my understanding, I believe it's the company, but I'm not sure.

Q.   But you're named as the inventor; right?

A.   I am.

Q.   And then a year after you sketched the Badger in 2018, Trevor tweeted @ElonMusk your pickup design; right?

A.   Yes.

Q.   And that was in 2019?

A.   The pickup sketch was in 2018.

Q.   The tweet was in 2019; right?

A.   Yes.

Q.   And you weren't expecting Trevor to just show your drawings to the world at that time; right?

A.   I was not.

Q.   He didn't ask you to tweak it beforehand?

A.   No.

Q.   Or review it again?

A.   No.

Q.   So safe to say, it came as a surprise to you?

A.   It did.

Q.   You understood that there was a response that your design was better looking than the cybertruck; right?

A.   I did see comments of that, yes.

Q.   People liked your design; right?

A.   From what I saw, yes.

Q.   And so then Trevor had one of Nikola's partners, ITAL Design, take those drawings and further develop the design; right?

A.   That is correct.

Q.   So they were designing off of your sketch; right?

A.   That is correct.

Q.   And significant work was done off of that sketch; yes?

A.   There was significant 3D work done on the computer, yes.

Q.   That work involved math; right?

A.   It's still in a design studio, I wouldn't say math.

Q.   Geometry involved in a computer-assisted design?

A.   Yes.

Q.   Is geometry math?

A.   If you put it that way, yes.

Q.   And from that cad data, things like aerodynamics can be looked at; right?

A.   Initial studies, yes.

Q.   And then computer-generated imagery, or CGI, can kind of be layered on top of that; right?

A.   That is correct.

Q.   Now, some designers use clay models after sketching; right?

A.   Most automotive, yes.

Q.   But ITAL doesn't use clay models; right?

A.   Not in their case, no.

Q.   They went straight to digital, it was faster that way?

A.   That is correct.

Q.   Then you and others from Nikola went to Italy in February 2020; correct?

A.   Yes.

Q.   And you discussed next steps to build two versions of the pickup truck?

A.   Two prototypes, yes.

Q.   And the ideal was to build those two working prototype trucks to be shown at Nikola World?

A.   That was the goal.

Q.   And at that point, Nikola World was scheduled for September 2020; right?

A.   Yes.

Q.   Do you recall when Nikola World was moved to December of 2020?

A.   I don't recall the exact date, no.

Q.   It had to do with the worldwide pandemic that we were all experiencing; correct?

A.   That was part of the reason.  The other reason was shortage

and overall timing of the schedule.

Q.   And so when the Badger was built by November 2020, that would have been before the new December 2020 Nikola World date; correct?

A.   That is correct.

Q.   And then after the two prototypes were to be shown at Nikola World, you understood that Nikola was going to rebuild everything with an OEM partner; right?

A.   Based on our meeting with GM, yes.

Q.   I actually want to take a step back to the other partner, the one in Michigan, Technosports.

A.   Okay.

Q.   Ron Johnson, an engineer at Nikola, introduced you and Trevor to that partner; right?

A.   That is correct.

Q.   And Technosports had experience in building working prototypes; yes?

A.   Yes.

Q.   And Technosports suggested the use of a surrogate vehicle; correct?

A.   In conjunction with Ron Johnson, yes.

Q.   So it was not Trevor's idea?

A.   Not initially, no.

Q.   And we used surrogate vehicle and donor vehicle.  I just want to make sure we understand what that means.  That means

M9GCmil2                          Babiarz - cross

that parts of it were taken for purposes of designing the prototype; correct?

A.   Correct.

Q.   And those parts are taken apart; correct?

A.   In some cases, yes.

Q.   And in some cases, they're reshapen?

A.   Correct.

Q.   Some cases, they're stretched?

A.   Yes.

Q.   Some cases, they're broken apart; right?

A.   Yes.

Q.   And you understand that to be standard, like a standard option in vehicle development; right?

A.   You usually start with some type of donor vehicle, yes.

Q.   And for the Badger, the decision was made to use a Ford donor vehicle; right?

A.   Correct.

Q.   And Ron Johnson used to work at Ford; right?

A.   To my understanding, yes.

Q.   And the Ford donor vehicle had similar geometry to the Badger; is that right?

A.   Overall dimensions, yes.

Q.   Now Trevor's initial plan was to use Nikola's NZT, its off-road vehicle?

A.   That was the original plan, yes.

Q.   But it would need to be stretched too much and broken apart too much; right?

A.   Yeah, the overall geometry just didn't line up and it was too difficult for the timeline.

Q.   So then Ron Johnson proposed using Ford, his former employer's chassis instead?

A.   I believe in conjunction with Technosports, they offered the Ford as the option, yes.

Q.   Because it had a more similar wheel base and more similar dimensions; right?

A.   Yes, and it had similar specs to what we wanted ours to be.

Q.   But then Nikola had to modify it; right?

A.   I believe, yes.

Q.   A lot?

A.   Yes.

Q.   Was 95 percent is what you estimate?

A.   Hard to say, but I would say at least over 80, yes.

Q.   Do you recall meeting with the government to prepare for your testimony?

A.   I did meet with the government multiple times, yes.

Q.   So would it help to refresh your recollection regarding how much Nikola had to modify it?

         MR. ROOS:  Objection.  Question is vague.

         THE COURT:  Did you want to show him a document, Ms. Young.

M9GCmil2                         Babiarz - cross

MS. YOUNG:  Sure.  Chris could you pull up 3502-002 at 5 for the witness.

Q.  Does that refresh your recollection?

A.  It does.

Q.  So you estimate that Nikola had to modify it 95 percent?

A.  My estimation, yes.

Q.  So Nikola went with the Michigan partner, Technosports' experience and advice, right, with using the donor vehicle?

A.  Yes, we went with their expertise on that, yes.

Q.  Because it was a faster approach; right?

A.  Primarily, yes.

Q.  And it was, again, not Trevor's idea; yes?

A.  He agreed, but not his initial idea, no.

MS. YOUNG:  At this time, the defense would like to play some additional clips of GX-418, which has already been offered in full.

THE COURT:  Okay.

(Video played)

Q.  Now, yesterday you testified to the reservations for the Badger; right?

A.  Yes.

Q.  And you're aware that making a reservation for the Badger gave individuals kind of VIP access to this big Nikola marketing event; correct?

A.  Depending on which reservation, yes.

M9GCmil2                        Babiarz - cross

Q.   But that was, in part, a reservation option; right?

A.   It was.

          MS. YOUNG:   I'd like to now play additional clips from
GX-421, which is also already in evidence in full.

          THE COURT:   Very well.

          (Video played)

Q.   So those last clips, Mr. Babiarz, that was Mr. Milton
describing the future plan to production vehicles; correct?

A.   Correct.

Q.   Very different from the two prototype vehicles being built
with Technosports and ITAL Design; right?

A.   Correct.

Q.   You came to Nikola in 2017 as a freelance designer with
Free Form Factory; is that right?

A.   Correct.

Q.   And Free Form was acquired by Nikola; right?

A.   Correct.

Q.   As part of that acquisition, you received some Nikola
stock; correct?

A.   I did.

Q.   And have you obtained additional Nikola stock since that
acquisition?

A.   I was given a stock package, yes.

Q.   When?

A.   Hard to say.  When it was given by Trevor himself.

M9GCmil2                          Babiarz - cross

        MR. ROOS:  Objection, your Honor.  Can we have a sidebar?

        THE COURT:  Okay.

        (Continued on next page)

(At the sidebar)

THE COURT:  So now you're talking about his compensation package; correct?

MR. ROOS:  So no objection to asking him about the shares he was given when he came to the company or the compensation that the company gave him, we already have litigated and we thought we had an agreement from the defense on was they weren't going to try to suggest that Trevor Milton gifted this guy a bunch of stock, and that's what the last question was.  So we move to strike it and we ask they don't do anything more.

MS. YOUNG:  Your Honor, the door was opened when they introduced tweets regarding his focus on the -- he had an interest in the stocks and his stock when -- texts regarding Mr. Babiarz's interest and focus on the stock price.

THE COURT:  I'm sorry.  Whose interest in the stock price.

MS. YOUNG:  Mr. Babiarz's.  It was introduced several times when he was -- he owns stock in part because of his initial transaction when he was joining the company and even more stock once he was gifted stock.

THE COURT:  So there was an agreement that you would not go into the fact that Mr. Babiarz was gifted stock from Mr. Milton; correct?

MS. YOUNG:  Correct.

THE COURT:  I understood that the government opened the door by suggesting or by pointing in a text to his interests in the stock price.

MS. YOUNG:  Correct.

MR. ROOS:  They can certainly do their cross saying the reason you were interested in the stock price is because you had stock, you started with stock, you got more stock, your compensation was tied to the company.  There's absolutely no reason why they need to suggest to the jury that Trevor Milton gifted stock.  That had not opened the door by having Mr. Babiarz read his text messages about status of the stock price, and its impermissible under Rule 403.

THE COURT:  I agree that, based on my understanding of the agreement, that the government didn't open the door by proposing those texts.  But I heard what he said in response to your question, it wasn't clear to me that the stock was a gift from Mr. Milton.  He could have done it in his capacity.

Did he gift him that stock while he was still there?

MS. YOUNG:  Yes.

THE COURT:  While Mr. Milton was still there?

MS. YOUNG:  Yes.

THE COURT:  So in his capacity as CEO or chairman of the board, I don't think you've been prejudiced in any way as a result of that because I didn't understand it to be an actual gift from Mr. Milton, other than a grant of stock to an

M9GCmil2                          Babiarz – cross

employee of the company.  So I don't believe he opened the door, I don't believe you've been prejudiced, and you should move on.

          MS. YOUNG:  Yes, your Honor.

          (Continued on next page)

M9GCmil2                         Babiarz - cross

(In open court)

BY MS. YOUNG:

Q.  So when Nikola went public in June 2020, you owned Nikola stock; correct?

A.  Correct.

Q.  And you watched Nikola's stock price, didn't you?

A.  I did.

Q.  Because it was of personal interest to you; right?

A.  I was working for the company, it was exciting, yes.

Q.  And it was exciting for you to be part of Nikola when it goes public, to go from a startup to a public company; right?

A.  It's a bill milestone, yes.

Q.  And you weren't doing anything wrong by focusing on the stock price; right?

A.  To my knowledge, no.

Q.  And this process of going from a startup to a public company, you called it an awesome journey; right?

A.  I don't know about those exact words, but yeah, I would agree.

Q.  Are you aware of what kind of suspension the Badger has?

A.  I am not.

Q.  So you're not aware that the Badger has an independent suspension?

MR. ROOS:  Objection.  Foundation.  He said he doesn't know.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

THE COURT:  Overruled.

A.  No.

Q.  Are you aware of the Ford Raptor's suspension being solid axle, not independent suspension?

A.  Not my expertise, no.

MS. YOUNG:  Chris, if you could please pull up GX-1220 and GX-1230 side by side.

Q.  So are you aware that the suspension choice impacts a number of design changes?

A.  It does.

Q.  So I'd like to walk through some of those now with you.

The suspension changes the amount of air between the tire and the rim around it; right?

A.  Correct.

Q.  So in the Badger, in blue, we see a lot more of a gap above the tire; correct?

A.  Based on this image, that's hard to say.

Q.  And the suspension also impacts the front, same tire change; right?

A.  Yes, overall ride height, yes.

Q.  And the Badger has a different front grill; correct?

A.  It does.

Q.  And it has a different front hood; correct?

A.  It does.

Q.  And it has different side door ridging and dynamics;

correct?

A. Yes.

Q. And different window integration; right?

A. The overall window is carryover, but that surrounding, it is not.

Q. So on the blue Badger, you see kind of a triangle, diagonal running down the back window; correct?

A. That is unique to the Badger, yes.

Q. Unique to the Badger, right.

And then the rear windows are different, too; correct?

A. Again, overall housing, yes. Glass, no.

Q. So when you say glass, it's truly just that had they made glass from sand, it would have been unique to the Badger's own building of glass or they could have bought glass or they could have gotten glass from a Raptor; right?

A. Correct.

Q. And here, they got it from the Raptor?

A. Correct.

Q. But the design, how it was integrated into the vehicle, it was unique to the Badger; right?

A. Correct.

Q. And the rear lights?

A. Also unique.

Q. And inside of the bed, I know you can't see it from this photograph, but inside the bed of the pickup truck is different

in the Badger; correct?

A. All unique, correct.

Q. Now you have a Facebook account; right?

A. I do.

Q. And you use that to kind of engage with people?

A. True.

Q. For entertainment?

A. Yes.

Q. And in 2019 and 2020, you posted things publicly on Facebook; right?

A. I can't say. I don't post much on Facebook.

Q. Do you recall sharing Nikola videos?

A. I believe I've shared a few of our postings, yes.

Q. The Nikola video for analysts interested in investing in Nikola; right?

A. I can't say.

Q. Do you recall posting a video when the company went public on the NKLA ticker on NASDAQ?

A. I believe so, yes.

Q. Do you recall posting a Nikola marketing video that you appeared in?

A. I don't recall, no.

        MS. YOUNG: Chris, could you please pull up for the witness what has been marked for identification as DX-5012.

Q. Do you recognize this?

M9GCmil2                         Babiarz - cross

A.   I do.

Q.   Is this a true and accurate video of the Nikola YouTube marketing that you appear in?

A.   This is a Nikola video, yes.

         MS. YOUNG:  At this time, I would like to offer into evidence -- and Chris, I believe you actually pulled up 1585, so I would like to offer into evidence DX-1585.

         MR. ROOS:  Can we have a proffer of relevance of this marketing video.

         THE COURT:  Let's talk at sidebar.

         (Continued on next page)

(At the sidebar)

MS. YOUNG:  Your Honor, the video contains about two 30-second clips of Mr. Babiarz actually doing a design sketch of the Badger, you see the hand sketch and you see a physical image, and then at the end --

THE COURT:  I'm sorry.  I didn't see a physical image of a drawing.  Was there one?  There may have been.

MS. YOUNG:  It will be cued to him doing the drawing of the Badger and then it will show the computer aspect, which he's described, and at the very end, it will show him looking at a Badger rendering that is posted in the inside of the Nikola headquarters.  We're not playing the entirety of the clip in any way.

MR. ROOS:  Maybe we can show him the part where he's drawing and confirm he's actually drawing the Badger.  If that's the case, then we won't object to its admission.

THE COURT:  I'll allow it.

(Continued on next page)

(In open court)

MS. YOUNG:  Your Honor, may I confirm that DX-1585 has been moved into evidence?

MR. ROOS:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1585 received in evidence)

MS. YOUNG:  Chris, can you play, with sound, DX-1585.

(Video played)

MS. YOUNG:  And then the final clip, Chris.

(Video played)

Q.  Mr. Babiarz, that was you, right, in the video?

A.  Correct.

Q.  Standing in front of the Badger?

A.  In front of the renderings on the wall, yes.

Q.  Admiring your design?

A.  For the sake of the marketing video, yes.

MS. YOUNG:  May I just confer with cocounsel.

(Pause)

Nothing further.

THE COURT:  Any redirect?

MR. ROOS:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. ROOS:

Q.  So how did that marketing video come about to be made?

A.  Our production team that we hired needed a video mainly for

the HR department to show what it's like to work at Nikola.

Q.   Was that the sketch you did back in 2018?

A.   It was not.

Q.   How did that come about?

A.   It was recreated for the marketing video.

Q.   So the thing was kind of like made up for the video?

A.   Correct.

Q.   So on cross examination, do you remember seeing the tweet that Trevor Milton made at the end of 2019, the tweet @ElonMusk?

A.   Yes.

Q.   And do you remember seeing the press release that he tweeted in February 2020?

A.   Yes.

Q.   Have you seen any other tweets, did defense counsel show you any other tweets?

A.   They did not.

Q.   Did she show you any of the tweets in which Trevor Milton said it was already done?

A.   No.

Q.   What about the tweets where he said it was built?

A.   No.

Q.   What about any of the statements, did she show you any statements where he said it was ground up?

A.   I don't believe so, no.

Q.   Did she talk about any of the statements where he said it was a clean sheet?

A.   No.

Q.   How about any of the statements where he said they have prototypes?

A.   Other than the video, no.

Q.   Those were all after those two documents they showed you; right?

A.   Correct.

Q.   And when all those were said, the things we looked at on direct examination, you didn't have a prototype built at that point; right?

A.   No.

Q.   By the way, you were asked about sort of the design process, what defense counsel said, you started on a clean sheet of paper.  I just want to clarify, when you've been using the term "clean sheet," are you referring to a clean sheet of paper or something different?

A.   No, just a general term.

Q.   It's a general term.  What does it mean?

A.   Starting from scratch.

Q.   So in terms of starting from scratch -- and by the way, the Badger was not a start from scratch; right?

A.   The design, yes, the rest, no.

Q.   The prototypes were not?

A.  No.

Q.  You were asked questions, speaking of starting from scratch, about Tesla, right, and you were asked about a Lotus body; do you remember that?

A.  Yes, the original roadster.

Q.  The original roadster.  I just want to clarify, when you described Tesla, think I you described two Tesla vehicles as ground up vehicles.  Were you talking about that one or different vehicles?

A.  No, they're later vehicles.  I believe I said the Model 3 and the Model Y.

Q.  So the use of a Lotus actually would not be a ground up one; right?

A.  Correct.

Q.  Now, it's not unusual to -- I mean, it doesn't always happen, but it's not unusual, I think you said, to use a donor vehicle; right?

A.  It is not unusual, no.

Q.  When auto makers use donor vehicles, would you say it's usual to call them ground up vehicles?

A.  Initial prototypes, hard to say.  When they go to production, yes, most are ground up.

Q.  And that's assuming they haven't used the prototype as a donor vehicle; right?

A.  I wouldn't necessarily say that, no.

Q.  Sorry.  My question wasn't clear.

When a donor vehicle is used, that's not a ground up vehicle; right?

A.  If you were to use it for production, no.  If you're using it to develop a prototype, it's usually based off the last generation.  I would still say, at some point, it's ground up.

Q.  But the Nikola One, because it used Ford, in your view, was not ground up?

A.  No, because the Ford is not our vehicle.

Q.  Now, you were asked about building and whether having a rendering, a computer, was a built truck; do you remember that?

A.  I do.

Q.  Now, a rendering doesn't mean the truck can actually drive; right?

A.  No.

Q.  So when you talk about a built truck that can drive, is that a reference to a rendering?

A.  No.

Q.  How about when you talk about a built prototype, is that a reference to a rendering?

A.  No.

Q.  Now, I want to look at Government Exhibit -- actually, before I go there.

You were asked some questions about an invention, right, that you're the inventor on some patents?

A.   Correct.

Q.   Do you remember that?

A.   Yes.

Q.   Do you know what patents for the Badger you're an inventor on?

A.   Not specifically.  I believe one is for the front end of the vehicle and one is for the lights.

Q.   If I showed you the patents, would it help refresh your recollection?

A.   It would.

     MR. ROOS:  Can we show just the witness 1589 and 1590.

Q.   So on 1589, do you see on the left side where it says 54?

A.   Yes.

Q.   And then do you see the words right next to it?

A.   Yes.

Q.   And on 1590, do you see the 54 and the words written next to it?

A.   Yes.

Q.   Does that help to refresh your recollection about what the patents were for?

A.   Yes.

     MR. ROOS:  We can take these down.

Q.   Now, with your recollection refreshed, what were the patents for?

A.   One was for the front end of the vehicle, the grill and the

lights surrounding.  The other was for the tailgate and the taillight surroundings.

Q.  So the grill and the lights and the tailgate?

A.  Correct.

MR. ROOS:  So why don't we bring up, let's use the Ford one, Government Exhibit 1230.  Actually, let's use 1220.

Q.  Can you describe here where the grill and tail and the lights are?

A.  Yes.  So the very front end of the vehicle on the far left and the very rear end of the vehicle on the far right.

Q.  Do you remember when you or the company got those patents?

A.  Shortly before I left the company.

Q.  So when was that?

A.  2021.

Q.  So after Trevor Milton left the company?

A.  Yes.

Q.  Now besides the patents for the lights and the front and the back, are you aware of any other patents on the Badger?

A.  I believe there was more submitted.  I don't know that they were granted.

Q.  I want to be clear about the patents you have.

Are you aware of different types of patents?

A.  Yes.

Q.  And what are the two types you're aware of?

A.  Design and utility.

Q.  And what's the difference?

A.  Design is solely focused on the aesthetic look of something and making sure someone can't copy.  Utility is more of a technology, something innovative and like a mechanism, so on, so forth.

Q.  What type of patents are the ones we've been talking about?

A.  These are specifically design patents.

Q.  So they're not patents over the technology?

A.  No.

Q.  And so, these design patents, they don't exist while Trevor Milton was at the company; right?

A.  No.

Q.  So it was only after the fact that Nikola did some patenting and just on the designs?

A.  To my knowledge, yes.

Q.  Speaking of designs, look at Government Exhibit 232, flip through it, stop at the one that says 2 of 2 there.

        Do you remember being asked some questions about this?

A.  I believe it was the interiors, but yes.

        MR. ROOS:  I'm sorry.  The next one.  The interiors, right.

Q.  So you were asked some questions about this.  I think you were asked that the Badger show vehicle, according to this, would have a new steering wheel; right?

A.  I believe it was the frunk and the body panels.

M9GCmil2                          Babiarz - redirect

Q.  The body panels, the frunk.  You had some questions about air vents; right?

A.  Right.

Q.  These are all things that wrap around the outside of the vehicle, right, or the interior; right?

A.  Correct.

Q.  The things that cover up, for instance, the frame; right?

A.  Yes.

Q.  The frame, that is a Ford frame, right, with modifications?

A.  Yes.

Q.  And none of these things, the metal door handles, the air vents, the frunk are parts that help it drive; right?

A.  Other than the steering wheel, no.

Q.  The steering wheel helps it drive because you're going like this, it doesn't make it go fast?

A.  Sure.

Q.  Wasn't the steering wheel originally going to be a Ford part, also?

A.  It was originally the mechanism underneath, yes.

Q.  Do you remember being asked some questions about things being done in the future, future language?

A.  Yes.

Q.  When Trevor Milton said something was already done, did you interpret that as the future?

A.  No.

MR. ROOS:  No further questions.

THE COURT:  Anything further?

MS. YOUNG:  Nothing further.

THE COURT:  Very well.  It's about ten minutes before the hour.  Before we get to the next witness, why don't we take our break now.  So please do be prepared to come out at approximately 10 minutes after the hour.  Do not discuss the case.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Babiarz, you may step down.

(Witness excused)

And folks can be seated.

Any issues to discuss from the government?

MR. ROOS:  No.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  No, sir.

THE COURT:  Ten after the hour.  Don't be late.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Government, please call your next witness.

MS. ESTES:  Yes, your Honor.  The government calls Dale Prows.

DALE PROWS,

    called as a witness by the government,

    having been duly sworn, testified as follows:

THE COURT:  Ms. Estes.

DIRECT EXAMINATION

BY MS. ESTES:

Q.  Good morning, Mr. Prows.

A.  Good morning.

Q.  What's your educational background?

A.  I have a finance degree from Brigham Young University.

Q.  Where do you currently work?

A.  Nikola.

Q.  How long have you worked at Nikola?

A.  About three and a half years.

Q.  When you first started at Nikola, what did you do?

A.  When I was first hired, I was head of the hydrogen supply chain.

Q.  And what is "supply chain"?

A.  Supply chain deals with the acquisition of raw materials and supplies and services that are needed to deliver a finished product for a customer.

Q.  Before Nikola, did you have experience in the supply chain?

A.  Yes.

Q.  Approximately how many years' experience?

A.  Approximately 15 years.

Q.  And what did you do after you were head of supply chain at Nikola?

A.  I was assigned to take responsibility for the hydrogen infrastructure development.

Q.  When did you start in that position?

A.  Approximately November of 2019.

Q.  What were you doing in that position?

A.  I was responsible for the technology development and the installation of the hydrogen production and hydrogen refueling.

Q.  And were you working with a team of people in that position?

A.  Yes.

Q.  Approximately how many people?

A.  Seven.

Q.  And were you the head of that team?

A.  Yes.

Q.  Who did you report to in that position?

A.  Mark Russell, our CEO.

Q.  How long were you in that position at Nikola?

A.  Until December of 2020, so roughly 13 months.

Q.  And what's your current position at Nikola?

A.  I am currently head of strategic projects for Nikola.

Q.  Ms. Wolfson, can you pull up for the witness what's marked as Government Exhibit 281?

Mr. Prows, do you recognize what's on the screen there?

A.  Yes.

Q.  What is that?

A.  This is a presentation that was prepared for investors.

Q.  What's the date of the presentation?

A.  April 6, 2020.

MS. ESTES:  Your Honor, we offer Government Exhibit 281.

MR. BONDI:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 281 received in evidence)

BY MS. ESTES:

Q.  Mr. Prows, now that the jury can see the presentation, I want to walk through some pieces of it.

So if we could first go to page 3 of the presentation and, Ms. Wolfson, if you could just zoom into that, the top portion of the presentation there.

Mr. Prows, what does that first header say there?

A.  "Forward-looking statements."

Q.  And the first line, could you read that, the beginning part of the first line there?

A.   "This presentation includes certain statements that are not historical facts, but are forward-looking statements for the purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995."

Q.   And Mr. Prows, what is your general understanding of what that means?

MR. BONDI:   Objection.

THE COURT:   Overruled.

A.   So this is making it clear that the information that's being presented are not actual historical facts, but they are forward-looking projections.

Q.   Ms. Wolfson, can we go to page 20 of the presentation.

Mr. Prows, I just want to walk through this slide here.  First, the title is "Nikola's advantage:  Bundled FCEV offering."  What does FCEV refer to?

A.   Fuel cell electric vehicle.

Q.   And what is a bundled fuel cell offering?

A.   A bundled offering is referring to the fact that we were wanting to present a combination of solutions for our customers, which would include the truck, the hydrogen fuel for the truck, and also the maintenance of the truck all bundled together in one package.

Q.   And what's your understanding of why Nikola was presenting the truck, the fuel, and the maintenance all together?

A.   It's new technology, and in order to reduce the risk for a

M9g2Mil3                          Prows - Direct

customer to take on this new technology, we wanted to de-risk that as much as possible to increase the adoption of the technology in the marketplace.

Q.  And how does the bundled lease decrease the risk for the customer?

A.  If a customer doesn't have to take responsibility for the maintenance of a new technology vehicle, it makes it less risky for them.  And also thinking of it in terms of the hydrogen that's available for refueling, they don't have to worry about where they are going to get their fuel to run their trucks.

Q.  Because they know they can get it from Nikola?

A.  Correct.

Q.  Ms. Wolfson, can you zoom in to the right side of this slide here where it says "total cost of ownership certainty."

Mr. Prows, what does total cost of ownership mean?

A.  Total cost of ownership refers to the entire cost that is associated with owning and operating and maintaining a vehicle.

Q.  This last line there says, "Nikola's bundled lease offers operators complete cost predictability at cost parity with diesel."

What does parity with diesel refer to?

A.  Parity with diesel refers to the costs associated with operating a diesel truck fleet, and parity would mean that the new technology that we are offering would be on par with that or roughly the same.

Q.   Was it important that Nikola achieve parity with diesel?

A.   I believe so.

Q.   Why?

A.   It helps with the adoption of the technology and the volume of sale of the vehicles.

Q.   And when you say it helps with the adoption of the technology, what do you mean by that?

A.   Just in order for a customer to be able to take on a new technology, for them to be able to incorporate that into their day-to-day operations.

Q.   And so do you mean if it's the same cost as diesel, it's easier to switch over?  Is that fair?

A.   Correct.

Q.   Ms. Wolfson, could you go to page 23 of the presentation.

Mr. Prows, generally speaking, what does this slide cover here?

A.   This slide is representing the supply chain associated with the hydrogen stations.

Q.   Mr. Prows, when you joined Nikola, what was Nikola's general plan with respect to hydrogen stations?

A.   The plan was for us to make this a completely zero emission solution for our customers, meaning that at the very beginning of the supply chain that we would start the process with clean energy being created through solar power and using the sun's energy to be able to generate electricity; then taking that

solar power and using it to produce hydrogen through a process called electrolysis; and then taking that hydrogen from the electrolysis process and storing it in storage tanks; and then being able to compress it up to a high enough pressure that would enable it us to refuel the trucks at a fast rate.

Q.  Ms. Wolfson, can you zoom into the bottom graphic there.

So, Mr. Prows, you just sort of gave an overview of the plan.  What does this graphic represent in that context?

A.  Well, on the far left side it represents the solar panels where the electricity would be produced through the sun's energy.

Q.  And what about the next graphic there?

A.  The next graphic is the electrolysis process that's used to convert -- or to extract the hydrogen from water using electricity.

Q.  What was the plan for who would perform the electrolysis?

A.  Nikola.

Q.  What sort of equipment is used to perform electrolysis?

A.  There is quite a few pieces of equipment, but the major components of it would be on the front end there would be an electrolyzer that would take the water and receive electricity into the electrolyzer, where the hydrogen is split off from the water molecule.  The hydrogen is then captured and put into a tank.  The tank is then -- the tank is then taking the hydrogen and then cleaning it up with a different piece of equipment, a

scrubber type of piece of equipment.  And then from there it goes into storage tanks that would be used to store and then compress the hydrogen to higher pressures.  And then from there it would go into a dispensing station where the hydrogen is fueled on to the trucks.

Q.  Mr. Prows, with respect to storage, do any sort of precautions need to be taken in storing hydrogen?

A.  Yes.

Q.  What are those?

A.  So there are a lot of fittings that handle the high pressure gas, and I want to make sure that those fittings are constructed in a very reliable and responsible way so that there is not leakage of that gas from those fittings.  The tanks themselves need to be constructed in a very specific way that would enable them to be safe handling the pressures and gases that are being put in the tanks.  And then, in addition to that, there would also be safety equipment that would be -- like, sensors, sniffers that would smell for hydrogen leaks and that there would be alarms that would go off if it detected any kind of leaks.  And then in addition to that, there would also be the construction of the building would be done in a way where the hydrogen gas could not be trapped.  One of the biggest risks of safety concerns would be if the hydrogen gas gets trapped and then ignited it could create an explosion.  So a lot of precautions are taken to make sure that the -- if

there is a hydrogen gas leak, that it would leak into the atmosphere and not be trapped inside of a building or underneath a canopy.

Q.  So that there is not an explosion?

A.  Correct.

Q.  Mr. Prows, looking at this graphic here again, the second graphic says, "On-site conversion of electricity to hydrogen." What does on-site conversion refer to?

A.  What we were trying to convey there is that the hydrogen would be produced at the same location where we would be dispensing the hydrogen on to the trucks or refueling the trucks.

Q.  So at these same stations, fueling stations?

A.  Correct.

Q.  And at the time that Nikola came up with this plan, was there a network of hydrogen fueling stations across the country?

A.  Not for heavy duty trucks.

Q.  So how important was it that Nikola build hydrogen fueling stations?

A.  Very important.

Q.  Why was it very important?

A.  In order for our customers to be comfortable buying our trucks and operating our trucks in their fleets, they needed to have assurance that they would be able to refuel their trucks

along the routes that they were delivering their goods.

Q.  Ms. Wolfson, can you zoom out of that and let's go to the next slide here.

Mr. Prows, I want to ask you about the chart on the right there.  Ms. Wolfson, can you zoom into that.

Here, Mr. Prows, the title is "projected total station capex."  What does capex mean?

A.  Capex refers to the capital expenditures that are needed to acquire equipment in the production process.

Q.  And does that just mean the cost for acquiring the equipment?

A.  Yes.

Q.  And where it says "projected," why does it say "projected" there?

A.  These were projections based on the best assumptions that we had at the time when we reached full scale and maturity and we had not achieved that at this point.

Q.  So the total station capex here is listed at 16,610,000. So is that a projection?

A.  Yes, it is.

Q.  Had Nikola built a hydrogen station at this price point?

A.  No.

Q.  Had Nikola built a hydrogen production station at any price point?

A.  No.

Q.   Let's go to the next slide here.  And Ms. Wolfson can you zoom in just to the top half here.

Mr. Prows, the title of this slide is "H2 station unit economics" and then "hydrogen station key assumptions."  I guess first question, as head of hydrogen infrastructure, were you generally familiar with the assumptions that Nikola was using for hydrogen cost?

A.   Yes.

Q.   So looking at the assumptions here, the first one says, ".035 kilowatt hours of electricity."  First, what kind of unit of measure is that there?

A.   So kilowatt hours is a unit of measure capturing the amount of energy that is being provided.

Q.   And the number there, .035, was that something Nikola had achieved or was it a goal for the future?

A.   We had not achieved it.  It was a goal for the future.

Q.   And is that why it says "assumption" at the top there?

A.   Yes.

Q.   And Mr. Prows, before you got to Nikola, had you had experience in energy markets?

A.   Yes.

Q.   Can you describe that very briefly?

A.   Yes.  I worked in the aluminum industry for a number of years in Chicago and was involved in acquiring very large quantities of aluminum, and aluminum production is very, very

M9g2Mil3                        Prows - Direct

energy intensive.

Q.  And Mr. Prows, in your role at Nikola, did you have discussions with utilities about obtaining electricity prices?

A.  Yes.

Q.  So could Nikola just go to a utility and sign up for a price of electricity of 3.5 cents a kilowatt hour?

A.  No.

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A.  No.

Q.  Why not?

A.  3.5 cents per kilowatt hour is a very aggressive price for the acquisition of electricity.

Q.  Mr. Prows, are you familiar with retail electricity rate, that term?

A.  Yes.

Q.  What does that mean?

A.  Retail electricity rates are the rates that residential customers would pay for the acquisition of electricity.

Q.  And could you get a retail rate at -- in the 3.5 cents kilowatt hour range?

A.  No.

Q.  In practice, what does this mean in terms of trying to get a rate like this for Nikola?

A.  Well, the -- in practice, what we were planning to do is to

M9g2Mil3                        Prows - Direct

present a case to the electric utilities that would be attractive for them, a solution where Nikola would buy power from them during the times of the day when they had an abundance of power supply; specifically, during the peak hours of a sunny day, the solar production that takes place with solar panels provides an enormous amount of electricity, so much so that in many cases the utilities have an excess of electricity during those certain hours of the day.  But electricity doesn't store very well, and so during other parts of the day, when people come home from work and they are flipping on their air conditioners and there is a lot of demand in the late afternoon, the heat of the day, there is a shortage -- oftentimes a shortage of electricity supply.  And so we were offering a solution with the utilities that would be a situation where the utilities could provide very cheap power for us during certain parts of the day, and when they had a lot of demand for electricity at other parts of the day, that we would allow them to interrupt us, we would essentially either curtail or shut down our operations during those peak hours of the day.  And it seems that it's a logical explanation and solution that would enable the utilities to offer Nikola a very attractive electricity rate.

Q.  And so Mr. Prows, was this part of a negotiation that Nikola was having with various utilities?

A.  Yes.

Q.   And in June 2020, when Nikola went public, had Nikola actually entered into any contracts with electricity providers?

A.   No.

Q.   So it hadn't -- it was hoping to negotiate this rate, but it hadn't done it yet, is that fair?

A.   Correct.

Q.   Looking back at what's on the screen here, the box on the right says "annual cost to produce hydrogen."  What is that referring to there, Mr. Prows?

A.   That's referring to the annual cost to produce hydrogen in our production process.

Q.   And is this also a projection?

A.   It is.

Q.   And is this annual cost based on the electricity rate assumption on the left there?

A.   It is, yes.

Q.   Ms. Wolfson, can we go to the next slide here.

     Mr. Prows, what is that picture on the right of the slide there?

A.   That is a picture of the hydrogen refueling station that we have at our corporate headquarters in Phoenix, Arizona.

Q.   And what kind of station was that?

A.   It was a refueling station where we were refueling trucks with and vehicles with hydrogen but with no production of hydrogen.

Q.  So where was Nikola getting the hydrogen that it was using to fuel trucks?

A.  We were getting it from one of the industrial gas companies, specifically a company called Air Liquide.

Q.  So Nikola was buying it?

A.  Yes.

Q.  Mr. Prows, how would you describe the functionality of this dispensing station at headquarters?

MR. BONDI:  Objection.  Time frame.

Q.  During 2020.

MR. BONDI:  Objection.  Time frame again.

BY MS. ESTES:

Q.  Mr. Prows, from about March 2020 to July 2020, how would you describe the functionality of the demo station at headquarters?

A.  Very unreliable.

Q.  What do you mean by that?

A.  The up time, or the percentage of time that the station was functional and able to refuel hydrogen on to a vehicle was less than 50 percent.

Q.  And on a high level, what was contributing to the problem with the up time here?

A.  At a high level it would be problems with compression and cooling of the hydrogen.

Q.  And when you say cooling, what do you mean by that?

M9g2Mil3                         Prows - Direct

A.   The hydrogen gets hot when it is going through the refueling process.  The equipment gets hot and it needs to be cooled.  And the cooling equipment was insufficient.

Q.   Ms. Wolfson, you can take that down.

Mr. Prows, I want to turn back to that station in a moment.  Ms. Wolfson, you can take down the full exhibit. Thank you.

But first I kind of want to -- I want to step back a little bit and I would ask you to describe the various steps in the process that you would need to build a hydrogen production station.  Can you walk through those?

A.   Sure.

Again, at the front end of the process, there is electricity that's provided into the facility, large amounts of electricity.  And then the electricity goes into an electrolyzer, a piece of equipment that has water in it.  There is a membrane that enables the hydrogen to be stripped from the water molecule.  And then from there the hydrogen is captured, it is cleaned up through a scrubber, and then it is moved into a series of tanks that enable the hydrogen to be compressed. So there are compressors that are involved in that process to increase the pressure of the gas from basically ambient temperatures up to very high pressures of 10,000 PSI that would enable us to refuel the trucks at the rates that we were wanting to achieve.

Q.   Mr. Prows, Nikola wanted to build hydrogen production stations, is that right?

A.   Yes.

Q.   And so what are the steps that Nikola would need to take to get to a hydrogen production station?

A.   Well, again, on the front end, there would be the need to acquire electricity at an affordable rate, and then beyond that there would need to be land that would need to be acquired, either acquired or put under control through a lease.  And from there, there would be quite a bit of engineering work that would need to be done to prepare documents that would be submitted to the city or the area of jurisdiction.  And in that process, the city would evaluate that, go through a permitting process that oftentimes takes a considerable number of months, and then once the permitting process has been completed, there would -- and by the way, this city, the civilians in the city would oftentimes be contacted and allowed to comment as to whether or not there would be an allowance of production of hydrogen in their community in that particular space.  And then from there, there would need to be more engineering drawings that would be done, very detailed drawings, electrical and other types of engineering work.  And then from there, there would need to be contractors that would be hired and contracted with to construct the facility.  And then you go through the commissioning process to make sure that the equipment was

operating the way that it was intended.

Q.  Mr. Prows, I want to ask you about a few of the steps in that process there.  First, why is the first step to contract with an electricity provider?

A.  Well, it is very important to acquire the electricity at a rate that would be consistent with our plans and our goals of being able to achieve the economics overall to produce the hydrogen because electricity represents about 65 to 70 percent of the overall cost of producing hydrogen.

Q.  So what would happen if Nikola couldn't get a particular electricity rate at a location it was interested in?

A.  Well, it would make it very challenging to provide an overall solution for our customers that would be affordable for them, and it would make it very difficult for us to achieve our sales, our truck sales volume targets as well as the hydrogen sales -- the sale of hydrogen gas in those bundled contracts.

Q.  Mr. Prows, you also mentioned permitting.  Approximately how long could the permitting process take?

A.  It really depends, but, you know, it could be anywhere from six months to several years.  In some cases you would never get a permit if the community objected.

Q.  And in 2020, did Nikola plan to partner with any other company in building stations?

A.  Yes.

Q.  What company?

A.   Nel.

Q.   What kind of company is Nel?

A.   Nel is a company in Norway that is in the business of producing electrolyzers and also hydrogen dispensers.

Q.   Was Nel involved in the dispensing station at Nikola's headquarters?

A.   Yes.

Q.   Ms. Wolfson, can you please pull up for the witness what's marked as Government Exhibit 432.

And Ms. Wolfson, still just for the witness, could you go to about one minute 44 seconds in.  Can you play a short little clip for the witness?

(Video played)

Q.   Mr. Prows, do you recognize what's on the screen there?

A.   Yes.

Q.   And what is that?

A.   This is Mark Russell, our CEO, who was describing the refueling process that would take place at our hydrogen refueling station at our corporate headquarters in Phoenix.

Q.   And was this part of an analyst day video for investors?

A.   I believe so.

MS. ESTES:  Your Honor, we offer Government Exhibit 432.

MR. BONDI:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 432 received in evidence)

BY MS. ESTES:

Q.  Ms. Wolfson, can you please publish this and then let's play it from about there.

MR. BONDI:  Your Honor, if the government could move it back a bit, because I think the segment starts a bit earlier.

MS. ESTES:  That's fine, your Honor.  We can move it back a few seconds.

MR. BONDI:  Ms. Estes, when he walks out the door, please.

MS. ESTES:  Your Honor, we are just trying to move things along.

THE COURT:  Just put it wherever you want.

MS. ESTES:  All right.  We will start it right here.

(Video played)

BY MS. ESTES:

Q.  Mr. Prows, where are you in this video on the screen here?

A.  I am at the refueling station at the headquarters in Phoenix.

Q.  Ms. Wolfson, can you keep playing it?

(Video played)

MS. ESTES:  Mr. Prows, I think we just heard you say "one of our goals is to get a fueling time that's equal to or less than diesel of 15 minutes."  Why did you use the term

M9g2Mil3                     Prows - Direct

"goal" there.

A.   Because it had not been achieved yet.

Q.   And what is the significance of getting to a fueling time of 15 minutes?

A.   Well, time is money for our fleet customers, and if they are having to spend significantly more time refueling their trucks than what they are used to doing with a diesel truck, it makes it that much more challenging for them to buy the trucks and to adopt that new technology.

Q.   And so at this point in time, in 2020, approximately how long would it take to fuel a truck at the dispensing station?

A.   If the truck came in empty, it would take over an hour.

Q.   All right.  Ms. Wolfson, can you keep playing a few more seconds of the clip.

          (Video played)

Q.   Could you pause, Ms. Wolfson.

          Mr. Prows, did you actually fueling the truck here?

A.   No.

Q.   How long would it have taken you to actually fuel the truck?

A.   Again, if the truck came in empty, it would take over an hour.

Q.   And you wouldn't want to have a video with you fueling a truck for an hour for investors, would you, Mr. Prows?

A.   No.

M9g2Mil3                          Prows - Direct

Q.  Ms. Wolfson, can you take that down there.

Now, Mr. Prows, I think you said earlier Nikola was hoping to get certain types of electricity for these hydrogen stations.  Is that right?

A.  Yes.

Q.  And can you remind the jury what types of electricity was Nikola hoping to get?

A.  It was electricity produced through solar panels, energy from the sun.

Q.  And why was Nikola hoping to get energy like that?

A.  We wanted the solution to be zero emissions from beginning to end, and having electricity coming from solar panels would be considered a clean way or a zero emissions way to produce electricity.

Q.  Ms. Wolfson, can you pull up what's in evidence as Government Exhibit 403-A.

Your Honor, one moment.  It seems like we are having problems with our display here.

(Pause)

THE COURT:  Can you move to another area, Ms. Estes.

MS. ESTES:  Your Honor, unfortunately all of my next things involve exhibits.

THE COURT:  Okay.

MS. ESTES:  Your Honor, I'm hearing that it's something with the wires with the computer system here.

M9g2Mil3                    Prows - Direct

THE COURT:  Okay.  Why don't we take a short break, ladies and gentlemen, and we will get you out as soon as we are ready to go.

MS. ESTES:  Apologies.

THE COURT:  Don't discuss the case.

(Continued on next page)

M9g2Mil3                        Prows - Direct

(Jury not present)

THE COURT:  Mr. Prows, you may step down if you wish.

(Pause)

MS. ESTES:  Your Honor, one of the wires was loose and our paralegal has fixed it now.

THE COURT:  I will feel more comfortable when I hear from Mr. Charalambous.

MR. CHARALAMBOUS:  Yes.

THE COURT:  Okay.  Let's get the jury.

(Continued on next page)

M9g2Mil3                          Prows - Direct

(Jury present)

THE COURT:  Ladies and gentlemen, thank you for your patience.

Ms. Estes.

MS. ESTES:  Thank you, your Honor.

Ms. Wolfson, can you pull up Government Exhibit 403-A which is in evidence and 403-T.

Ms. Wolfson, can you play 403-A.

(Video played)

MS. ESTES:  Apologies.  I think that was the wrong clip.

(Video played)

BY MS. ESTES:

Q.  Can you pause it there, Ms. Wolfson?

Mr. Prows, do you recognize the truck on the screen there?

A.  Yes.

Q.  And what truck is that?

A.  That's a Nikola fuel cell electric vehicle.

Q.  And Ms. Wolfson, can you zoom in to the transcript there, starting on line 5.

So there, Mr. Prows, Mr. Milton said, "Inside of the trailer is Bud Light, and we'll be delivering it today, completely zero-emission from beginning to end."  And he says, "The hydrogen is produced through zero-emission methods."

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Q.   Where was Nikola getting the hydrogen at the time this video was filmed?

A.   At our corporate headquarters it was coming from Air Liquide, a third-party company.

Q.   And to your understanding, was Air Liquide producing hydrogen through zero-emission methods?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   No.

Q.   So is the statement accurate?

A.   Correct.

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

Q.   Correct, as in it is inaccurate?

A.   Let me be clearer.  To my knowledge, Air Liquide was not producing hydrogen with zero emissions.

Q.   All right, Ms. Wolfson, you can take that down.  And Ms. Wolfson can you pull up Government Exhibit 230 for the witness.

Mr. Prows, do you recognize this document?

A.   Yes.

Q.   And who are the parties to the e-mail you see?

A.   This was an e-mail to Tony Epperson, with copies to Mark Russell, Kim Brady, Trevor Milton, and Travis Milton.

Q.   Who sent the e-mail?

A.   I did.

Q.   And what is the subject of the e-mail?

A.   Board of director presentation.

        MS. ESTES:  Your Honor, we offer Government Exhibit 230.

        MR. BONDI:  No objection.

        THE COURT:  It will be received.

        (Government's Exhibit 230 received in evidence)

BY MS. ESTES:

Q.   Mr. Prows, now that the jury can see this, I just want to go through it again.  So you said the subject is board of directors presentation.  What was the purpose of this e-mail?

A.   The purpose of this e-mail was to provide content for slides that would be prepared for presentation to the board of directors.

Q.   And what's the date of the e-mail?

A.   March 21, 2020.

Q.   And on the CC line there, it says Mark Russell.  Who is he?

A.   Nikola's CEO.

Q.   And Kim Brady, who is he?

A.   Nikola's CFO.

Q.   And then it says Trevor Milton, you see that there?

A.   Yes.

Q.   And then it says Travis Milton.  Who is Travis Milton?

A.   Travis Milton is an employee, was an employee of Nikola.

M9g2Mil3                         Prows - Direct

Q.   And what about Tony Epperson?

A.   Tony Epperson was also an employee of Nikola.

Q.   Ms. Wolfson, can you zoom out of that and zoom into the second paragraph here.

So Mr. Prows, I just want to ask you a few questions about this right here.  So could you read the sentence by number one there.

A.   "We are working to find a site to co-locate our R & D center with an eight-ton per day commercial station in the Phoenix area, but we need to find a low-cost source of power to support the station.  See below regarding our electricity rate negotiations."

Q.   So when you say you were working to find a site, what were you referring to there?

A.   We were looking to find a site that would enable us to have both a research and development facility, co-located meaning at the same place, with a hydrogen refueling station for our customers' trucks.

Q.   And would that be a production station or a dispensing only station?

A.   Production.

Q.   All right.  And so then you say "we need to find a low cost source of power."  Why did you need to find a low-cost source of power to support that station?

A.   Well, again, the cost of producing hydrogen is very

M9g2Mil3                        Prows - Direct

dependent on electricity supply, electricity representing 65 to 70 percent of the cost to produce hydrogen.  So acquiring electricity at a low cost is very important.

Q.  And so at this point in March 2020, had you entered into any contracts to acquire electricity at that low cost?

A.  No.

(Continued on next page)

BY MS. ESTES:

Q.  Looking at that next sentence there, it says we are also working to find a site in the Los Angeles area, but finding a low cost source of power in this area is also a priority.

What were you referring to there?

A.  In the discussions that we had with various utilities in California, specifically in the Los Angeles area, it looked like acquiring electricity at the low rates we were looking for was very challenging.

Q.  I'll follow up in a moment with that, Mr. Prows.

Number 3, what is that sentence referring to where it says we are also evaluating the costs associated with installing a one ton per day electrolyzer at our headquarters?

A.  We had previously acquired an electrolyzer from Nel.  It was stored at a warehouse in Phoenix, not currently being used. So we were evaluating the possibility, the feasibility of being able to install one of those one-ton-per-day electrolyzers at our corporate headquarters, in conjunction with our refueling station that was already there.

Q.  You said the electrolyzer was stored at a warehouse in Phoenix; is that right?

A.  Correct.

Q.  In March of 2020, had that electrolyzer ever been used?

A.  No.

Q.  What about by September of 2020, had the electrolyzer ever

been used?

A.   No.

MS. ESTES:  Ms. Wolfson, can you go down to paragraph 3 here and zoom into that entire section.

Q.   Mr. Prows, why were you sending an update on electricity rate negotiations to the people on this email?

A.   I was asked to provide content for the board of directors meeting that was coming, and I felt that electricity supply and an update on our electricity rate negotiations was a very important topic for the board to understand.

Q.   Mr. Milton was copied on the email there.  Were you generally keeping him apprized of electricity rate negotiations?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   Yes, but not terribly frequently.  I was keeping him informed, though, yes.

Q.   The first paragraph says, we are negotiating with Pinnacle West, who owns APS, and 33 percent of the Palo Verde nuclear plant.  What is APS?

A.   APS is an acronym that stands for Arizona Public Service, it's one of the two very large utility, electric suppliers in the Phoenix market.

Q.   The second sentence there says, we have proposed buying interruptible power for less than 2 cents per kilowatt hour

delivered to a fueling station along interstate 10.

At that point, what were you referring to there when you say we had proposed buying interruptible power?

A.  We had been having conversations with representatives from APS to acquire low-cost electricity in the area that they provide electricity.

Q.  Had Nikola entered into any contracts with APS at this point in March 2020 about low-cost electricity?

A.  No.

Q.  What about by September 2020, had Nikola entered into any contracts with APS at that point?

A.  No.

Q.  Going to the paragraph No. 2 there, it says we are in negotiations with Hanwha, First Solar, Nexera, AES, and Exelon to provide solar or other power supply in various geographies.

What kind of companies are Hanwha, First Solar, and the other ones listed there?

A.  They are energy companies and are -- most of them are very involved in solar power production.

Q.  And then the next sentence there says, we are evaluating virtual PPA's and on-site solar generation options.

What's a virtual PPA?

A.  A PPA stands for power purchase agreement.  Essentially, the virtual part of this is the idea of acquiring the electricity in one geographic location but using it in a

different geographic location.

Q.   What about on-site solar generation, what does that refer to?

A.   On-site is referring to the same location where we would be dispensing the hydrogen into our customers' trucks, and we were looking at the possibility of producing electricity at that same location where we would be dispensing the hydrogen onto the trucks.

Q.   And so the next sentence there says, virtual PPA's are problematic because there is a volume mismatch.

What are you referring to there?

A.   The way that this works in the energy markets is that if you acquire a certain volume of energy in one geographic location and use it in another, if the volumes are different, it becomes difficult to, not impossible, but difficult to be able to match up the pricing from one geography to another.

Q.   And then the next sentence says, on-site solar generation is problematic because this isn't a feasible option in densely populated areas.

What were you referring to there?

A.   In order to produce the volume of electricity that we needed in order to produce the quantity of hydrogen that we needed, we would need to build very large solar farms.  For example, each of our production stations was intended to be 8 tons per day of hydrogen production, and in order to generate

enough electricity for that volume of hydrogen production through solar power, it would require roughly 100 acres of solar farm to be able to produce that volume of electricity. And in a densely populated area like Los Angeles, it would be difficult to find 100 acres close to a hydrogen refueling station that would be convenient for our customers right along the freeways. Even if you could find that size of land, it would be very expensive. So it just became not very feasible to do that.

Q. Was Los Angeles an area that Nikola was looking to set up a hydrogen production station?

A. Yes.

Q. Why was Nikola interested in Los Angeles in particular?

A. One of our launch customers is a company called Anheuser-Busch, and they have a brewery located in the Los Angeles area.

        MS. ESTES: Ms. Wolfson, could you go to the next page in paragraph 3 there. Let's zoom into that.

Q. Mr. Prows, the first sentence there says, we are also in negotiations with LADWP, SCE, and PG&E utilities in California.

        So what are those acronyms referencing there?

A. So LADWP stands for Los Angeles Department of Water and Power, SCE is Southern California Edison, and PG&E is Pacific Gas and Electric.

Q. The next sentence there says transmission and distribution

costs are a minimum of 7 cents per kilowatt hour.

What are you referring to there?

A.  There are three major components to the cost of producing and distributing electricity to an end location.  One is the generation of the electricity, which we talked about solar power being one of those that Nikola was targeting.  In addition to that, once you produced the electricity, it then needs to be transmitted through high-tension and high-voltage power lines.  Then, once it gets to a local area, then there are distribution costs taking that electricity and distributing to individual homes and businesses.  Each of those components are real costs.  And the transmission and distribution costs, the T&D as the industry calls it, is two of those three components.  And just two of those three components in California we were finding was going to be 7 cents per kilowatt hour, which was, alone, just between those two components, was double the target that we were shooting for.

Q.  The target that Nikola was shooting for, was that going to include all three components or something else?

A.  No, the three-and-a-half cent per-kilowatt-hour target that Nikola had was including all three components.

Q.  And so this 7 cents, which is only two components, would that have been an issue for Nikola?

A.  Yes.

Q.  Why?

A.  It would just be too expensive, not feasible economically
to adopt that kind of solution.

Q.  This is referring to utilities in California.  Was
California a place that Nikola was looking to, to build
hydrogen fueling stations?

A.  Yes.

Q.  Why was that?

A.  Well, again, because we had a launch customer with
Anheuser-Busch brewery in Los Angeles, but there are also other
incentives that the California government is providing for zero
emission solutions in order to clean up their air quality.  And
so, we were looking to target the California market to take
advantage of those financial incentives that the state was
providing.

        MS. ESTES:  Ms. Wolfson, can you zoom out of that and
zoom into paragraph 4.

Q.  Mr. Prows, can you read the first sentence there.

A.  We are evaluating the feasibility of liquefying hydrogen
and distributing it to our fueling stations.

Q.  What is liquefying hydrogen mean?

A.  So when we produce -- the plan, up until this point, was
using the electrolyzers to produce gaseous hydrogen, and to use
gaseous hydrogen to refuel our trucks.  And one of the other
options that we were evaluating was the possibility of taking
this gaseous hydrogen and using a technology to liquefy,

basically compressing it to a point where the gas turns into a liquid. And the advantage in doing that is to be able to transport the hydrogen much farther distances and more economically than what we could do by transmitting gaseous hydrogen.

Q. So you said the advantage was transporting things economically. Is that why Nikola started looking to liquefaction as an option here?

A. Yes, but also because of the reliability aspect of the production process.

Q. Could you explain that?

A. So we were having significant difficulty just with the hydrogen refueling stations at our headquarters and having it be reliable and operating as frequently as we would like it to. We had found that one of the issues was the compression equipment was problematic in getting the gas compressed to those very high pressures that we needed to get the trucks refueled quickly. So we felt that liquefying the hydrogen would not only improve the transportation, but it would also potentially improve the reliability of the equipment because the liquefaction of hydrogen is a tried and proven technology, it's been around a hundred years, and there is equipment that is used for a very long time by very large industrial companies that enables the hydrogen to be liquefied and for the reliability of that equipment to be very high, in the high

90 percent -- higher than 95 percent.

Q. So just to put it in simple terms, if you moved to liquefying hydrogen, the station might work more than it did before; is that fair?

A. That's correct.

MS. ESTES: Ms. Wolfson, can you zoom into the next paragraph with 1 right there.

Q. So Mr. Prows, in the first instance here, you say electricity rates can be a lot lower than on-site production, less than 2 cents, because the facilities can be located in remote areas, co-located with solar farms.

What are you referring to there?

A. So we were looking at the possibility of being able to acquire electricity outside of California. California electricity rates tend to be very high, relatively speaking. Our thought here was that if we could acquire electricity near a nuclear plant in the Phoenix area, the West Phoenix, really the deserts of West Phoenix, that there would be an opportunity for us to acquire the electricity in those very low-cost areas where the land is cheap, the electricity would be cheap, and then potentially, if we could liquefy the hydrogen at that location, it would make it affordable for us to be able to transport it into California for dispensing into the trucks.

Q. So just so I make sure I understand here, Mr. Prows, was the plan to liquefy hydrogen at a remote location and then

transport it to dispensing-only stations?

MR. BONDI:  Objection, your Honor.  Leading.

THE COURT:  Overruled.

A.  Correct.

Q.  And how did that differ from Nikola's original plan?

A.  Well, Nikola's original plan was to produce the hydrogen on site at the refueling station, and also to have solar farms or solar power production co-located at that same site to producing electricity.

Q.  Mr. Prows, can you read the sentence there, number 2.

A.  The liquefaction production process is much more reliable than on-site production (i.e., 97 percent versus less than 50 percent in the earlier years) and the technology has been hardened by over 50 years of experience.

Q.  Is that what you were referring to there in terms of reliability?

A.  Correct.

MS. ESTES:  Ms. Wolfson, can you go down to paragraph 4.

Q.  Mr. Prows, can you read what it says next to paragraph 4.

A.  Permitting fueling stations that are merely dispensing hydrogen will be much more simple and less costly than permitting on-site production of hydrogen.

Q.  And why was that, Mr. Prows?

A.  Well, the production of hydrogen is a very different set of

equipment and a very different production process than just dispensing the hydrogen onto a truck.  The manufacturing process, it's basically a manufacturing process versus just a dispensing process, and we felt that getting approval from the communities and from the permitting process would be much easier to just get a permit to dispense hydrogen rather than actually having a full-blown manufacturing facility in a residential community, potentially.

MS. ESTES:  Ms. Wolfson, can you take that down and pull up for the witness Government Exhibit 228.

Q.  Mr. Prows, do you recognize that email on the screen there?

A.  Yes.

Q.  And focusing sort of on the middle email of the screen, who are the parties to that email?

A.  So this is an email to Trevor Milton, with a copy to Mark Russell, Travis Milton, and Kim Brady.

Q.  What's the subject of the email?

A.  Subject is Air Liquide answer.

MS. ESTES:  Your Honor, we offer Government Exhibit 228.

MR. BONDI:  One moment, your Honor.

Your Honor, may we approach on this?

THE COURT:  Sure.

(Continued on next page)

(At the sidebar)

MR. BONDI: Your Honor, we object under Rule 403. The reason why is there is some statements in here about Mr. Milton about keeping these liquefaction discussions quiet from the market and internally as much as possible here. What the government is trying to imply here is he's talking about the stock market or that sort of thing. There were concerns about competitors and all sorts of other issues here. This is going to confuse the jury. This is entirely prejudicial because this goes to corporate strategy and other issues here. And we don't have a problem with the first part of this email, but the statements that they're trying to object to Mr. Milton are really misleading to what they were talking about here.

MS. ESTES: Your Honor, that's certainly something Mr. Bondi can explore with the witness on cross examination, but this is an email from Mr. Milton, he says to keep discussions quiet from the market. This is directly relevant to the case, it is probative to the things he's saying. The jury is absolutely entitled to see this.

MR. BONDI: It's a totally different issue than what the government is making it out to be, and this is going to get into a confusing, long sideshow about corporate strategy and confidentiality discussions and confidential agreements. It's going to prolong a long trial.

THE COURT: I disagree. I'll allow it.

(In open court)

THE COURT:  228 will be received.

(Government's Exhibit 228 received in evidence)

MS. ESTES:  Thank you, your Honor.

Ms. Wolfson, can we publish and zoom into the middle of the email on the page there.

Q.  Mr. Prows, just looking at this email here now that the jury can see it, who's this email from?

A.  It's from me.

Q.  And what's the subject there?

A.  Air Liquide answer.

Q.  What's the date of the email?

A.  March 17, 2020.

Q.  Who's the email to?

A.  Trevor Milton with copies to Mark Russell, Travis Milton, and Kim Brady.

MS. ESTES:  Ms. Wolfson, let's actually start with the second page here.  Now let's go to the email from 11:16 p.m. from Mr. Milton, just zoom into that.

Q.  Mr. Prows, can you read the first paragraph on the screen here in that email from Mr. Milton.

A.  Yes.  I had a discussion with Air Liquide on liquefaction equipment.  After coming back, they said they believed they could get the equipment down to $2.5 million per ton, per day.

Q.  And when Mr. Milton says liquefaction equipment, what do

you understand him to be referring to?

A.   This would be the equipment that would be needed to take the gaseous hydrogen from a gaseous form to get it into a liquid form.

Q.   And Mr. Prows, in general, what sort of capital expenditure would it take to build a liquefaction station?

A.   From the work we had done, it appeared it was going to cost about $150 million to build a 60-ton-per-day facility.

Q.   So a substantial capital expenditure; is that fair?

A.   Yes.

         MR. BONDI:  Objection.  Leading.

         THE COURT:  Sustained.

Q.   How would you describe the capital expenditure, Mr. Prows?

A.   Very expensive.

         MS. ESTES:  Ms. Wolfson, can we go to the email above that from 2:41 p.m. from Mr. Prows.

Q.   Mr. Prows, can you just read that first paragraph of your email there to Mr. Milton.

A.   Thanks, Trevor.  Interesting numbers.  The other issue that makes this option compelling is the reliability.  Linde told us they can guarantee 97 percent uptime with liquefaction whereas we're struggling to get 50 percent up time with our headquarter station and we're not even producing hydrogen.

Q.   When you say 50 percent up time with our headquarter station, what is that referring to?

A.   That refers to the percentage of the time the station is actually functional and able to dispense hydrogen onto the trucks.

MS. ESTES:  Ms. Wolfson, can you go to the first page of the email and zoom in to the 9:23 a.m. email from Mr. Milton.

Q.   Mr. Prows, can you read the first paragraph there from Mr. Milton.

A.   I am getting very good data back on this liquefaction. Unless you go mega scale, it doesn't work, but if you do, it seems to pan out pretty well.  That is our model, mega scale.

Q.   When Mr. Milton says mega scale, what do you understand him to mean?

A.   This would be the liquefaction of hydrogen in very large volumes.

Q.   Can you read the second paragraph there.

A.   I have a few friends working on the cost breakdown for us on a station and should have that by week's end.  Keep these liquefaction discussions quiet from the market and internally, as well, as much as possible.

Q.   Mr. Prows, what's the date of the email there?

A.   March 17th, 2020.

Q.   And at this point, had Nikola announced that it was going public through a combination with VectoIQ?

A.   Yes.

            MR. BONDI:  Objection.

            THE COURT:  Overruled.

Q.  When Mr. Milton says keep these liquefaction discussions quiet from the market, what do you understand him to be referring to?

A.  I believe he was referring to not talking to anybody externally from Nikola about the liquefaction concept.

Q.  And Mr. Milton also says, and internally, as well, as much as possible.  What do you understand that to be referring to?

A.  I believe he wanted to keep the conversations to a very close number of people, a few number of people within the company.

Q.  And when Mr. Milton said quiet from the market, specifically, what did you understand the market to mean?

            MR. BONDI:  Objection.  Asked and answered.

            THE COURT:  Sustained.

            MS. ESTES:  Ms. Wolfson, let's take that down. Ms. Wolfson, can you pull up for the witness Government Exhibit 250.

Q.  Mr. Prows, do you recognize the email on your screen there?

A.  Yes.

Q.  Who's it from?

A.  From me.

Q.  And who are the parties on the email?

A.  This is to Carl Rivkin, Curt Hill, Ray Hobbs, Joe Joshi,

and Andy Christian.

Q.   And who are they?

A.   They are Nikola employees who reported to me.

Q.   What's the subject of the email?

A.   Liquefaction cost model.

          MS. ESTES:  Your Honor, we offer Government Exhibit 250.

          MR. BONDI:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 250 received in evidence)

          MS. ESTES:  Ms. Wolfson, can you also actually pull up for the witness 250-A.

Q.   Mr. Prows, the first email, 250, it references an attachment entitled liquefaction versus gaseous model and costs.  Looking at 250-A, do you recognize that document as the attachment?

A.   Yes.

          MS. ESTES:  Your Honor, we offer 250-A, as well.

          MR. BONDI:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 250-A received in evidence)

          MS. ESTES:  Ms. Wolfson, can you take down the attachment for now.  I just want to go back to 250 and zoom into the top half there.

          Actually, Ms. Wolfson, let's zoom into the bottom

paragraph first.

Q.  Mr. Prows, can you read that paragraph from you to Joe Kiessig there.

A.  Joe, sorry I missed your call today, but I got your voicemail message.  Our team went through the assumptions again with Dhillon today and made some additional changes.  I'll go through it one more time with Dhillon tomorrow to make sure we are aligned.  Can we review this with Kim at 3:30 so we're prepared for our meeting with Trevor and Mark at 5:00.  I just sent meeting invitations for both of these meetings.  Thanks.

MS. ESTES:  Ms. Wolfson, can you now go to the first paragraph of this email.

Q.  Mr. Prows, so the first sentence here says, please see the attached file, which we presented to the executive team today, primarily the summary page.

Who are you referring to there?

A.  The executive team that we met with was Trevor, Milton, Mark Russell, and Kim Brady.

Q.  Was that the meeting that was referenced in the email below that we just looked at?

A.  Yes.

Q.  What was the purpose of this meeting with the executive team?

A.  The purpose of the meeting was to address two topics.  One was the reliability issues that we were experiencing and the

costs that would be needed in order to improve the reliability of the equipment.  Secondly, it was to evaluate or at least to discuss the opportunity or the option to liquefy hydrogen as a way to not only improve the reliability, but also the economics.

Q.  And when you say the reliability, are you referring to the reliability of the hydrogen station?

A.  No, not necessarily.  It was really more -- using the hydrogen station at headquarters as a benchmark or a reference point, but ultimately, what we were driving for was being able to improve the reliability of the hydrogen refueling stations for our customers.

MS. ESTES:  Ms. Wolfson, let's go to the attachment, 250-A.  If you could zoom into the top half of the attachment. Ms. Wolfson, can we make it any bigger or is that as big as it gets?  Great.

Q.  Mr. Prows, what is this attachment here?

A.  This attachment is a financial summary of the costs in three different scenarios.

Q.  So I want to walk through each of those scenarios.

First, what does the column that says base station per financial model refer to?

A.  This column references the costs that we had disclosed in our financial documents to investors showing what we were targeting to achieve with respect to the production and

dispensing of hydrogen to the vehicles.

Q.   And what's the target costs listed there?

A.   $2.72 per kilogram.

Q.   What does the next column reference there?

A.   The next column references what we believed as a hydrogen infrastructure team to be the costs that we would need to incur to improve the reliability of the hydrogen dispensing stations.

Q.   And what's the cost listed there?

A.   $8.68 per kilogram.

Q.   When you say it was the cost needed to improve reliability of the stations, what do you mean by that?

A.   Well, in order to improve the reliability, we felt that the two areas that were problematic was the compression, compressor equipment, and the compressors seem to be just not performing well for that application.  So in order to improve the reliability, we needed -- instead of one compressor, we needed a redundant set of compressors to be able to improve that reliability so that if one compressor went down, we would have the ability to continue to compress and dispense the hydrogen.

Q.   And what about, were there any other reasons that costs here changed from $2.72 to $8.68?

          MR. BONDI:  Objection.  Leading.

          THE COURT:  Overruled.

A.   Yes.  One of the other significant issues or differences here is the cost of electricity.  In the revised base case

station in the second column there, we were reflecting electricity input costs that were significantly higher than the target we had been shooting for in the financial model for our investors.

Q.   Why were these electricity input costs significantly higher in this scenario?

A.   Because we were having difficulty getting the utilities to buy into our pitch that would enable us to have a win-win situation with them.

Q.   Mr. Prows, the last column there says H2 production and liquefaction.  What does that represent?

A.   That represents the production of hydrogen at a remote location and the liquefaction of that hydrogen at a remote location, and then transporting the liquid hydrogen to a refueling station only in a heavily, densely populated area like Los Angeles.

Q.   So what was the purpose of this meeting with respect to laying out the scenario for liquefaction?

A.   Well, again, I think that there were two primary points that we wanted to drive home.  One is that the reliability of the equipment is an issue, and that there are significant costs associated with improving the reliability.  And number 2, that the liquefaction of the hydrogen is potentially a solution to that reliability problem, but also being able to transport the hydrogen much farther distances economically than we would if

we were just transporting gaseous hydrogen.

Q.  Mr. Prows, I want to now go through the cost component section there.  The first one says electricity.  What's the cost listed for base station there?

A.  $2.14 per kilogram.

Q.  And what about for revised base station?

A.  $6.73 per kilogram.

Q.  What about CapEx, what's listed there for base station?

A.  $0.25 per kilogram.

Q.  What about revised base station?

A.  $0.68 per kilogram.

Q.  What about maintenance, what's the cost for base station?

A.  $0.22 per kilogram.

Q.  And for revised base station?

A.  $0.81 per kilogram.

Q.  What is that a reference to there, maintenance?

A.  Maintenance is the maintenance of the equipment that is used to produce and dispense the hydrogen.

Q.  What about personnel, what's the cost for base station?

A.  $0.04 per kilogram.

Q.  And what about for revised base station?

A.  $0.29 per kilogram.

Q.  And what's personnel referencing there?

A.  That's the number of people that would be needed to operate and maintain the station.

MS. ESTES:  Ms. Wolfson, can you zoom out of that part and zoom into sort of the next section down there.

Q.  So Mr. Prows, that number 1 there, can you read what it says next to it.

A.  Increase due to higher electricity cost assumption.  Per hydrogen H2 hydrogen team, $0.11, best rate available in California.

Q.  Is this the reason for the increase in electricity costs?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you go to the number 2 there.

Q.  Mr. Prows, can you read that.

A.  CapEx for gas use hydrogen team scenario needs to be increased significantly to achieve target uptime and to mitigate risk of equipment failure.

Q.  Is this the reason for the increase in CapEx costs?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you take that down and go to box number 3 there.

Q.  Mr. Prows, can you read that.

A.  Hydrogen team anticipates increased maintenance costs on gaseous station to achieve reasonable uptime.

Q.  Is this the reason for the increased maintenance costs?

A.  Yes.

MS. ESTES:  Ms. Wolfson, if you can take that down and

go to number 4.

Q.  Mr. Prows, can you read that.

A.  Each station will need to be staffed with a hydrogen engineer/technical support.

Q.  Is this the reason for the increased personnel costs?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you zoom into the bar chart there that says cost components per kilogram of hydrogen delivered.

Q.  Mr. Prows, what does this represent?

A.  This is a graphical representation of the numbers that we looked at earlier at the top of this attachment, and it breaks down the individual costs, stacks them together, and shows the total cost that we projected for the increased reliability versus the base station that we put in the financial model, and then the far right column does the same thing, but comparing it with hydrogen production and liquefaction.

Q.  So just to be clear, so the first bar over there, what does that represent?

A.  The one on the left?

Q.  Yes.

A.  That represents the financial projections that we put in our investor deck.

Q.  What about the bar in the middle, what does that represent?

A.  That represents the costs that the hydrogen infrastructure

development team had projected that would be needed in order to produce and dispense hydrogen in a reliable way with much uptime.

Q.   What about on the right there, what does that bar represent?

A.   That represents the production of hydrogen in a remote location, getting low-cost electricity, and then liquefying the hydrogen and then transporting the hydrogen to a refueling station.

Q.   Mr. Prows, on the middle column there, and I guess in all of them, what is the light blue part of it, what does that represent?

A.   The light blue represents the CapEx, or the capital expenditures, the money that would need to be spent in order to acquire the equipment.

Q.   And what about the sort of largest part of the bar there that says, I think it says 673 in the middle column?

A.   I'm sorry.  I thought that was the light blue.  That's what I was explaining.

MS. ESTES:  Ms. Wolfson, can you take that down.  If we could go to -- sorry.  Let's go back to that exhibit.  I just want to go to the chart below that section that says key assumptions.

Q.   Mr. Prows, where it says cost assumptions here, in the base station model, what the electricity cost assumption there?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

A.   3.5 cents per kilowatt hour.

Q.   What is the hydrogen team base station, what's the

electricity cost?

A.   $0.11 per kilowatt hour.

Q.   And in the total CapEx, what's the base station cost?

A.   $16.6 million.

Q.   What about the hydrogen team base station?

A.   $35.7 million.

Q.   And then liquefaction, what's the CapEx there?

A.   $319.8 million.

          MS. ESTES:  Ms. Wolfson, can you now zoom into the

very bottom of the page that says key takeaways.

Q.   Mr. Prows, can you read the first key takeaway there.

A.   Liquefaction plant located near APS/Palo Verde would allow

for Nikola to procure electricity prices at $21.70 per megawatt

hour.  The cost of producing hydrogen is far lower than on-site

production.  Hydrogen team does not believe $35 per megawatt

hour will be achievable in California.

Q.   And by the way, when it has megawatt hour, how does that

compare to kilowatt hour?

A.   A megawatt hour is a thousand kilowatt hours.

Q.   So what is your understanding of what this key takeaway

means here?

A.   So the point of this is that we felt that it would be much

more achievable to acquire electricity at rates that would be

more attractive for Nikola than it would be to try to acquire electricity in, say, metro areas of California at much higher rates.

Q. Just so that's clear, when you say acquire electricity at the favorable rate, do you mean in a remote location, is that what you're referring to?

A. Yeah, the --

        MR. BONDI:  Objection.  Leading.

        THE COURT:  Overruled.

A. The remote location that I was referring to here is with APS in the deserts of Arizona, Palo Verde refers to the nuclear power plant, which is also located in the deserts of California.  We felt it would be much more likely for us to be able to achieve low-cost electricity in that area than it would be in a heavily, densely populated area like California.

        MS. ESTES:  Ms. Wolfson, can you highlight the fourth key takeaway there.

Q. Mr. Prows, can you read that key takeaway.

A. Hydrogen team does not believe current base station model cost efficiency/reliability is achievable.  Stations will require significantly more CapEx and maintenance in order to achieve uptime.

Q. And so what does that mean there, Mr. Prows?

A. Well, we're just highlighting the point that we didn't believe that it would be achievable or realistic for us to be

able to deliver, produce, and dispense hydrogen at the rates, the prices that we had communicated in our base station model, which was communicated to the investors.

MS. ESTES:  Ms. Wolfson, can you zoom out of that and just zoom back to the top, the box there.

Q.  Mr. Prows, if the cost per kilogram of hydrogen was $8.68, what would that mean in terms of Nikola's business model for --

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  It would make it very difficult for us to sell trucks to our customers and it would make it difficult for Nikola to drive the volume of truck sales and the volume of hydrogen sales that we had planned on.

Q.  Mr. Prows, how long was this meeting with Mr. Milton and the other members of the executive team?

A.  Roughly 45 minutes.

Q.  And were they asking questions in this meeting?

A.  Yes.

Q.  Who was asking questions?

A.  I believe all three of the executives, Trevor Milton, Mark Russell, and Kim Brady were asking questions.

Q.  And do you remember Mr. Milton's reaction in the meeting, anything he said?

A.  I remember Trevor making a comment that he felt that the liquefaction of hydrogen seemed to be a very interesting option

for us and that we should continue to pursue that.

Q.   And did Nikola continue pursuing this option after that?

A.   Yes.

          MS. ESTES:  Ms. Wolfson, you can take that down.

Ms. Wolfson, can you pull up for the witness Government

Exhibit 231.

Q.   Mr. Prows, do you recognize this email?

A.   Yes.

Q.   And who are the parties to this email?

A.   This is an email from Trevor Milton to me with a copy to

Mark Russell, Kim Brady, Christian Appel, and that's it.

Q.   And what's the subject of the email?

A.   Electrolyzer cost estimate for headquarters.

          MS. ESTES:  Your Honor, we offer Government

Exhibit 231.

          MR. BONDI:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 231 received in evidence)

          MS. ESTES:  Ms. Wolfson, can you zoom into the top two

emails here.

Q.   Mr. Prows, looking at your 1:07 p.m. email on March 25th,

2020, what, in general, is this email about?

A.   In general, this is identifying an opportunity that we were

evaluating to use one of the electrolyzers that was in the

warehouse in Phoenix that we had acquired from Nel and

installing it at our corporate headquarters to supplement the hydrogen dispensing facility that is already there, and we were laying out what we had determined would be the costs of installing that equipment at the headquarters.

Q.   And what is the overall cost estimate there?

A.   $13.1 million.

Q.   And where it says number 4 there, it will take five to six months to get the site permitted for hydrogen production.  What is that a reference to there?

A.   We had received a permit to dispense hydrogen at the corporate headquarters, but in order to produce hydrogen at that same location, we would need a separate permit and we felt that it would take five to six months to get the hydrogen permitted -- hydrogen production permitted.

Q.   And the top email there from Mr. Milton, he says, I think we wait now until we have a clear direction from Nel about us moving forward.

         What do you understand him to be referring to there?

A.   We were having significant difficulty with the reliability of the hydrogen dispensing equipment that we had acquired from Nel and were operating -- or had installed at the corporate headquarters.  We were having a lot of discussion with Nel about those concerns and we were also having discussions with Nel about the possibility of us acquiring or putting together a deal that would include five production -- sorry.  The

equipment for five dispensing stations.

Q.  Mr. Prows, I want to turn to that deal in just a moment, but first, after this email Mr. Milton sent where he said, I think we wait until we have a clear direction from Nel, did Nikola move forward with installing a one ton electric electrolyzer at headquarters?

A.  No.

Q.  Did Nikola move forward with permitting headquarters to produce hydrogen?

A.  No.

        MS. ESTES:  Ms. Wolfson, you can take that one down.

        THE COURT:  Ms. Estes, it's now ten minutes before the hour, so we'll take our second break.  We'll reconvene at 10 minutes after the hour.  Please do not discuss the case.

        (Continued on next page)

(Jury not present)

THE COURT:  Mr. Prows, you may step down.

Folks can be seated.

Anything to discuss, Mr. Roos?

MR. ROOS:  No, your Honor.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  No, Judge.  Thanks.

THE COURT:  Okay.  Ten after.

(Recess)

(Continued on next page)

M9g2Mil5                        Prows - Direct

            (Jury present)

                THE COURT:  Ms. Estes.

                MS. ESTES:  Thank you, your Honor.

BY MS. ESTES:

Q.  Mr. Prows, do you recall before the break mentioning

negotiations with Nel over some hydrogen stations?

A.  Yes.

Q.  What were you referring to there?

A.  We were having difficulty getting the cost of the hydrogen

refueling stations down to the target that we were working

toward, and one of the ideas that surfaced in our negotiations

was the possibility of combining five stations together so that

there was more volume associated with the installation of the

stations, rather than just one.  So we were having discussions

with Nel about the possibility of doing that and what the cost

would look like under that scenario.

Q.  And would that be for five production stations or

dispensing stations?

A.  Both.

Q.  And who was involved in those discussions with Nel?

A.  Primarily me and Kim Brady and Mark Russell and Trevor

Milton.

Q.  Did there come a point when Nikola came to some sort of

agreement with Nel?

A.  We did reach an agreement with them, we thought, in one of

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

M9g2Mil5                    Prows - Direct

the meetings that we had with them.  And I followed up the next day with an e-mail to capture the key points of what I thought we had agreed to, and they immediately rejected.  So we did not reach an agreement ultimately.

Q.  And Mr. Prows, I should have asked you before, what time frame are we talking about here?  What year?

A.  I don't remember for sure.  I think it was 2020, but . . .

Q.  All right.  I think I can probably show you something in a minute to refresh you.

But what ultimately happened in terms of the negotiations with Nel?

A.  On the five-station deal that we were pursuing, we never did reach agreement.  It essentially became a dead issue.

Q.  And so what happened then?

A.  We were looking for other ways to get the reliability of the equipment where we needed it to be and to get the costs down where we needed them to be, and we were looking at a lot of different angles to do that.

Q.  Did Nikola ultimately enter into a purchase order with Nel?

A.  Yes.

Q.  And what was that for?

A.  That was for electrolyzer equipment only.

Q.  And who negotiated that outcome to your understanding?

A.  Trevor Milton.

Q.  What was your reaction to the purchase order?

M9g2Mil5                    Prows - Direct

A.   I was quite opposed to it.

Q.   Why was that?

A.   I felt that the relationship that we had with Nel was not good.  The performance of Nel's equipment was not good.  It was unreliable with the equipment that we had installed from them for the dispenser at the headquarters.  And I felt that as a company that they did not have Nikola's interests at heart.

Q.   Ms. Wolfson, can you pull up for the witness what's marked as Government Exhibit 238.

     Mr. Prows, do you recognize the e-mail there?

A.   Yes.

Q.   Who were the parties to the e-mail on your screen?

A.   This was from me to Mark Russell with a copy to Kim Brady.

Q.   And what's the subject there?

A.   Nel.

Q.   And is this about that purchase order we were discussing?

A.   Yes.

     MS. ESTES:  Your Honor, we offer Government Exhibit 238.

     MR. BONDI:  No objection.

     THE COURT:  It will be received.

     (Government's Exhibit 238 received in evidence)

BY MS. ESTES:

Q.   All right.  Ms. Wolfson, can you zoom in to the top half of the e-mail here.

M9g2Mil5                    Prows - Direct

Sorry, Ms. Wolfson, can you zoom out so we can get the date in it, too.

So Mr. Prows, what's the date of the e-mail here?

A.  May 31, 2020.

Q.  And in the first paragraph of the e-mail there, I want to ask you a little bit about that.  First you say "Mark, I'll call you tomorrow to discuss this situation with Trevor and Nel."  What were you referring to there?

A.  I was referring to the purchase order that Trevor had negotiated with Nel for the electrolyzers.

Q.  And in the next sentence you refer to a 43-page document that you combed through.  What is that a reference to?

A.  This was a draft of the purchase order that Nel had created for the $30 million worth of electrolyzer equipment.

Q.  And then you next say, "I've drafted the following e-mail to Trevor, but I'd like to get your input on this before I send it.  Trevor probably doesn't want to hear it, but I am not in favor of doing this deal with Nel."

What did you mean by that?

A.  Well, again, I was opposed to the idea of awarding Nel a $30 million contract for a variety of reasons, including the fact that I felt that their performance was poor.  They had not treated us well as a customer, and furthermore that we were not ready for $30 million worth of equipment to be purchased.

Q.  And when you say you weren't ready for $30 million worth of

M9g2Mil5                          Prows - Direct

equipment, what do you mean by that?

A.   Well, we had not acquired any land.  We had not even filed
for permitting to get electrolyzer equipment installed, and
that process would take many months, potentially years, to
accomplish.

Q.   And when you say land, are you referring to land for a
hydrogen production station?

A.   Correct.

Q.   All right.  Mr. Prows, in that e-mail you say, "Trevor
probably doesn't want to hear it."  What did you mean by that?

A.   Well, I got the sense that Trevor was wanting to put
together an arrangement with Nel where we could demonstrate to
the public that we were moving forward.

         MR. BONDI:  Objection, your Honor.  Move to strike.
This is speculation.

         THE COURT:  Overruled.

A.   Thought that we wanted to show the marketplace, that we
were moving forward with Nel and with our plans to install
hydrogen production equipment.

Q.   And Ms. Wolfson, can we go to the second page of this
e-mail here?  And can you zoom in to the bottom there, the
bottom e-mail from Mr. Milton.

         Mr. Prows, there Mr. Milton says, "I just got this
from Nel.  Let's take a look.  If acceptable, I would like to
get this news out on Monday leading up to the merger."  What

M9g2Mil5                        Prows - Direct

did you understand him to mean there?

MR. BONDI:  Objection.  Foundation.

THE COURT:  Overruled.

A.  Again, I think that it's my understanding that Trevor wanted to put this deal together with Nel so that we could make an announcement to the marketplace about our arrangement with Nel moving forward with hydrogen production before we went public the coming Monday.

Q.  And Ms. Wolfson, can you go back to the first e-mail here, the one from Mr. Prows.  Let's zoom back in to that.

Mr. Prows, I just want to go through some of the concerns you list there.

So number one.  Can you read that concern?

A.  "Nel has proven time and time again that they are not a risk-sharing partner."

Q.  What did you mean by that?

A.  You know, as a start-up company, we needed suppliers who were willing to take some risk with us, and I just felt that Nel's behavior and decisions over the previous months had indicated that they were not willing to take risks, that they just wanted to provide a product and get paid for it.

Q.  And number three, can you read the first sentence of that concern there?

A.  "Nel's track record in the market in terms of reliability and cost of maintenance is dismal."

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                          Prows - Direct

Q.   And number four, can you read that one?

A.   "It seems ludicrous that Nel insists on us buying more stations when they can't even make our demo station run even after a full year of pathetic efforts."

Q.   What did you mean by that?

A.   Our hydrogen refueling station at the headquarters was not performing well.  It wasn't capable of dispensing hydrogen into trucks or any vehicle for most of the time.

Q.   Can you read that first sentence of the concern number five there?

A.   Jon has literally black mailed us into doing this deal by threatening not to sign the merger documents.

Q.   Who is Jon a reference to there?

A.   Jon Løkke is the CEO of Nel.

Q.   And can you read the next sentence there?

A.   "Even though Jon has now signed the documents, it appears that he did so with a promise from Trevor that he would get a purchase order signed and announced before the merger closes."

Q.   Mr. Prows, can you read concern number six there, the first sentence?

A.   "Doing the deal with Nel this way, *i.e.*, electrolyzers only, and doing it in a rush, will end up costing us millions of dollars."

Q.   And why do you say that there?

A.   We had -- again, we were just not ready for five stations

M9g2Mil5                        Prows - Direct

worth of electrolyzers.  You know, it was, in my opinion, getting the cart before the horse.  And even though there is a lead time on producing the electrolyzers, this would be way ahead of our skis, so to speak, about the timing and the sequence of events that needed to take place.

Q.  And Mr. Prows, does this five-station plan have anything to do with liquefaction that we looked at earlier?

A.  No.

Q.  So this would be the on-site gaseous production that was the original plan?

A.  Correct.  It could be, though, a situation where the electrolyzers could be used at a hydrogen production hub that's away from the refueling stations, and so I suppose in that context it could be related to the liquefaction ID.

Q.  And Mr. Prows, can you read number eight there?

A.  "We don't have PPAs or sites selected yet.  We are literally getting the cart before the horse."

Q.  And when you say PPAs or sites selected yet, what are you referring to there?

A.  PPAs are power purchase agreements and sites selected would be the dispensing locations or the place where we would produce the hydrogen.

Q.  So at this point in May 2020, did Nikola have any power purchase agreements?

A.  No.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                        Prows - Direct

Q.  And any sites for hydrogen production stations?

A.  No.

Q.  And then, Mr. Prows, what do I see at the bottom of the e-mail there, where it starts "Trevor."  What is that?

A.  This is the language that I was proposing for Mark to give me feedback on in preparation for me responding to Trevor's request for me to respond to the purchase order from Nel.

Q.  And did you ultimately e-mail Mr. Milton?

A.  I don't recall.

Q.  Ms. Wolfson, why don't we take that down and we will pull up Government Exhibit 239 for the witness.

        Mr. Prows, do you recognize this?

A.  Yes.

Q.  Who is this e-mail to?

A.  To Trevor Milton.

Q.  Who is it from?

A.  From me.

Q.  And what's the subject?

A.  Nel purchase order.

        MS. ESTES:  Your Honor, we would offer Government Exhibit 239.

        MR. BONDI:  No objection.

        THE COURT:  It will be received.

        (Government's Exhibit 239 received in evidence)

BY MS. ESTES:

M9g2Mil5                        Prows - Direct

Q.  Ms. Wolfson, can you zoom in to sort of the top half of the e-mail here, including the header.  Thank you.

Mr. Prows, now that the jury can see this, what's the date of the e-mail?

A.  May 31, 2020.

Q.  And this is from you to Mr. Milton, copying others?

A.  Yes.

Q.  And, you know, I just asked you if you remember e-mailing Trevor about this.  Does this refresh you on whether you did in fact e-mail Trevor?

A.  Yes.

Q.  So looking at the e-mail there, could you read, I guess, the first couple of sentences you say to Mr. Milton.

A.  "Trevor, thanks for including me in this evaluation of the Nel proposed purchase order.  Here's my input on the risks and gaps that I see in this purchase order as drafted."

Q.  And what is the concern listed there in number one?

A.  "Overall, the purchase order is very one-sided, as noted below."

Q.  What does that mean?

A.  What I meant by that was that it felt like the purchase order was written in a way that favored Nel and not Nikola.

Q.  All right.  And number two there, you say, "There is an entire section in the PO that identifies 14 major deviations from our engineering specifications."  What were you referring

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                    Prows - Direct

to there?

A.   So we, Nikola, had developed engineering specifications for the production of hydrogen, and the purchase order as Nel had drafted and sent to us was basically deviating from at least 14 of those specifications that we had identified for them.

Q.   And going down to the number four that says, "Their equipment is not engineered to operate at temperatures above 104 degrees," what does that refer to there?

A.   That refers to the engineering spec, that the purchase order said that specifically that it would not operate above temperatures at 104 degrees.

Q.   Was that an issue for Nikola?

A.   Yes, very much so.

Q.   Why?

A.   The -- if you have ever been to Phoenix, you know that in the summertime the temperature outside consistently exceeds 104 degrees.

Q.   Ms. Wolfson, if you could go to the second page there.

     Mr. Prows, what's listed next to the 18 at the top there?

A.   "The first set of electrolyzers, *i.e.*, six tons, will not be shipped until fourth quarter of 2021 and the other sets will not be shipped until first quarter 2022, second quarter 2022, third quarter 2022, and fourth quarter 2022 respectively."

Q.   And what did you mean by that?

M9g2Mil5                    Prows - Direct

A.   That the purchase orders -- the purchase order would define when the electrolyzers would be shipped and that we don't need them now, so why issue the purchase order now?

Q.   All right.  And Ms. Wolfson, can you take that down and pull up for the witness Government Exhibit 240.

         Mr. Prows, do you recognize this?

A.   Yes.

Q.   And who are the parties to this e-mail?

A.   This is an e-mail from me to Trevor Milton with copies to Mark Russell, Kim Brady, Joe Joshi and Britton Worthen.

Q.   What's the subject?

A.   Nel purchase order.

         MS. ESTES:  Your Honor, we offer Government Exhibit 240.

         MR. BONDI:  No objection.

         THE COURT:  It will be received.

         (Government's Exhibit 240 received in evidence)

BY MS. ESTES:

Q.   Ms. Wolfson, can you zoom into the two e-mails in the middle of the page.

         Mr. Prows, I want to focus you on the 11/10 e-mail at the bottom there.  You say, "I've also estimated in the attached file that each of the five eight-ton stations will cost $27.3 million."

         What did you mean by that there?

M9g2Mil5                          Prows - Direct

A.   We were struggling to find ways to get the cost of the stations down to the $16.6 million target that we had communicated to the investors in the presentations.  And the estimates that I had put together, that our team had put together based on discussions with Nel and with others was that the cost of those stations would be $27.3 million rather than the target of 16.6 million.

Q.   In the e-mail above, Mr. Milton says, "Yes, let's have a call immediately in the morning.  I'm confused and need to get caught up.  Need your advice."  Did you in fact have a call with Mr. Milton after this?

A.   I believe so.

Q.   And did you share your concerns with him on the call?

A.   Yes.

Q.   After your call with Mr. Milton, what happened in terms of this purchase order of electrolyzers with Nel?

A.   It was issued to Nel.

Q.   So Nikola went forward with the purchase order?

A.   Yes.

Q.   Ms. Wolfson, can you take that down and pull up Government Exhibit 803.

          Mr. Prows, do you recognize what's on the screen there?

A.   Yes.

Q.   And what is that?

M9g2Mil5                     Prows - Direct

A.   This is a press release that Nikola published to the

marketplace regarding the purchase order that was issued to Nel

for $30 million worth of electrolyzers.

          MS. ESTES:  Your Honor, we would offer Government

Exhibit 803.

          MR. BONDI:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 803 received in evidence)

BY MS. ESTES:

Q.   Mr. Prows, now that the jury can see this, can you read the

headline of the press release there.

A.   "Nikola orders enough electrolyzers from Nel to produce

40,000 kilograms of hydrogen per day."

Q.   And what's the date of the press release there?

A.   June 3, 2020.

Q.   And Mr. Prows, can you read the first sentence of the press

release?

A.   "Nikola Corporation, who becomes publicly traded on June 4,

2020 on the NASDAQ, signed a purchase order with Nel ASA for 85

megawatt alkaline electrolyzers supporting five of the word's

first eight-ton-per-day hydrogen fueling stations.  Together,

these electrolyzers may produce over 40,000 kilograms of

hydrogen each day."

Q.   So, Mr. Prows, this press release was issued the day before

Nikola became a publicly trade company, is that right?

M9g2Mil5                     Prows - Direct

A.  Yes.

Q.  All right, Ms. Wolfson, you can take that down.

            MS. ESTES:  Your Honor, at this time we would offer
Government Exhibit 514, which is subject to the stipulation S5.

            THE COURT:  Very well.  It will be received subject
to -- pursuant to stipulation, rather.

            (Government's Exhibit 514 received in evidence)

BY MS. ESTES:

Q.  Ms. Wolfson, can you publish that?

            Mr. Prows, do you recognize what's on the screen
there?

A.  Yes.

Q.  What is that?

A.  It's a tweet from Trevor announcing the purchase order that
was issued to Nel for the electrolyzers.

Q.  Ms. Wolfson, you can take that down.

            Now, Mr. Prows, in your role as head of hydrogen
infrastructure, were you ever involved in preparing Mr. Milton
for public statements about hydrogen?

A.  No.

Q.  Did you ever have any involvement in securing him media
appearances to talk about hydrogen?

A.  No.

Q.  Did you ever draft any talking points for him for media
appearances?

M9g2Mil5                    Prows - Direct

A.   No.

Q.   Were you ever asked to review his statements about hydrogen production for accuracy?

A.   No.

Q.   Ms. Wolfson, can you pull up S2 and if you could turn to the paragraph that corresponds with Government Exhibit 406.

So, your Honor, I will read this now.  It says, "Government Exhibits, 406-A, 406-B, 406-C, 406-D, and 406-E are authentic copies of portions of a March 12, 2020, interview of Trevor Milton on the Transport Topics Roadshow podcast, and Government Exhibit 406-T is an accurate transcript of those recordings."

At this time we would offer Government Exhibits 406-A through E, as well as Government Exhibit 406, which is the full copy of that recording, and then 406-T as well.

THE COURT:  Any objection?

MR. BONDI:  No objection.

THE COURT:  It will be received.

(Government's Exhibits 406, 406-A through E, 406-T received in evidence)

BY MS. ESTES:

Q.   Ms. Wolfson, can you pull up Government Exhibit 406-T to start.

Mr. Prows, can you read the title of the podcast on the top of the screen there?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                    Prows - Direct

A.   "Transport Topics Roadshow podcast interview with Trevor
Milton."

Q.   And what's the date of the podcast?

A.   March 12, 2020.

Q.   Ms. Wolfson, can we go to Government Exhibit 406-D, and
this should be in the transcript binders.  Mr. Prows, I believe
you should have a binder in front of you, if you would rather
look there.

A.   I can see it on the screen, though?

Q.   You should be on the screen.

A.   Okay.

Q.   And Ms. Wolfson -- so this will be page 1/line 12 --
actually I think it is page 12/line 1 of the transcript.

It is actually page 2, page 2/line 12.  So,
Ms. Wolfson, can you play the clip corresponding with that.

          (Audio played)

BY MS. ESTES:

Q.   Ms. Wolfson, can you go back up into the transcript, it
should be line 4 through 7.  Sorry, Ms. Wolfson, page 3/line 4,
4 through 7.

          So, Mr. Prows, we just heard -- actually, whose voice
was that on the podcast?

A.   Trevor Milton.

Q.   All right.  So we just heard Mr. Milton say up until Nikola
came in the market, hydrogen was around $16 a kilogram, U.S.

M9g2Mil5                        Prows - Direct

dollars.  Now Nikola is producing it well below $4 a kilogram.
Was that true in March 2020?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Was Nikola producing any hydrogen in March 2020?

A.  No.

Q.  And, Mr. Prows, in your view, is this a statement about the
future?

A.  No.

MR. BONDI:  Objection.

THE COURT:  Overruled.

Q.  Why not?

A.  Because he used the word "now."

Q.  Mr. Prows, would achieving a hydrogen cost of this price
point be significant for Nikola?

A.  Yes, very much so.

Q.  Why?

A.  It would enable us to hit our targets and would enable us
to sell vehicles and to sell hydrogen fuel.

Q.  All right.  Ms. Wolfson, let's take this one down, and if
you could pull up for the witness Government Exhibit 292.

Mr. Prows, do you recognize that?

A.  Yes.

Q.  Who are the parties to this e-mail?

M9g2Mil5                          Prows - Direct

A.   This is an e-mail from me to Joe Joshi.

Q.   And who is Joe Joshi?

A.   Joe was one of the engineers who reported to me.

Q.   What's the date of the e-mail?

A.   June 25, 2020.

Q.   And what's the subject?

A.   Hydrogen supply for Arizona facility.

Q.   And is there an attachment to the e-mail listed as well?

A.   Yes, there is.

Q.   Your Honor, we would offer Government Exhibit 292.

          MR. BONDI:  One moment.

          (Pause)

          MR. BONDI:  No objection, your Honor.  Thank you.

          THE COURT:  Very well.  It will be received.

          (Government's Exhibit 292 received in evidence)

BY MS. ESTES:

Q.   All right.  Ms. Wolfson, can you zoom in to the top e-mail there.

          Mr. Prows, can you read what that e-mail says?

A.   "Joe, please see the attached agreement with Air Liquide for hydrogen supply for headquarters.  I would like you to manage this hydrogen supply and relationship for headquarters. Thanks."

Q.   What were you referring to there?

A.   I was referring to the agreement that we had with

M9g2Mil5                        Prows - Direct

Air Liquide for hydrogen supply to our headquarters and was

wanting Joe to take responsibility for the relationship with

Air Liquide and the supply of hydrogen that they would provide

for us to that location.

Q.  Ms. Wolfson, can you zoom out of that and go to the second

page here, third page.  And can you zoom in to the top half of

that.

Mr. Prows, what are we looking at here?

A.  This is an agreement between Nikola and Air Liquide, who

was a hydrogen supplier.

Q.  So what is the agreement for?

A.  Hydrogen, gaseous hydrogen.

Q.  And Ms. Wolfson, can you zoom in to the first paragraph

there and the box below it.

Mr. Prows, can you read that first paragraph there?

A.  "Supplier agrees to sell to customer and customer agrees to

purchase from supplier, subject to the terms and conditions of

this agreement and any exhibits, riders or addenda hereto,

customer's requirements for the specific term described in

section 2 below for the products described in the table below

and on any exhibit, rider, or addendum (referred to separately

and collectively as 'products') at the facility below; (b) the

product shall be for customer's own use and not for resale,

unless the parties agree to a resale addendum, customer shall

not transfill product into other containers unless the parties

M9g2Mil5                    Prows - Direct

execute a transfill addendum; (c) the facility, products, prices, and facility fees (which are referred to individually and collectively as the 'prices') are as follows."

Q.   And what is the product listed there?

A.   Gaseous hydrogen.

Q.   What is the price listed there?

A.   $14.76 per kilogram.

Q.   Is that the price Nikola was paying for gaseous hydrogen from Air Liquide in 2020?

          MR. BONDI:  Objection, your Honor.

          THE COURT:  Overruled.

A.   Yes.

Q.   And Ms. Wolfson, can you go to paragraph two of this agreement?

          Mr. Prows, what's the term of the agreement listed there?

A.   12 months.

Q.   And when does the term start?

A.   November 28, 2019.

Q.   So just to be clear, this was an agreement for 2020 for the purchase of hydrogen at $14 a kilogram?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.   Yes.

Q.   And Ms. Wolfson, can you zoom in to the signature block

M9g2Mil5                    Prows - Direct

below.

Q.   Mr. Prows, who signed the agreement?

A.   Bob Boyd.

Q.   And what is the date listed there?

A.   November 6, 2020.

Q.   And what was Bob Boyd's role in Nikola?

A.   He was the head of hydrogen supply.

Q.   Ms. Wolfson, can you take that down and can you pull up S2 again, and can we go to the paragraph that corresponds with 410.

So, your Honor, I will read this into the record.  It says, "Government Exhibits 410A and 410B are authentic copies of portions of a June 4, 2020, interview of Trevor Milton on Yahoo! Finance The First Trade Show and Government Exhibit 410-T is an accurate transcript of those recordings."

So at this time we would offer 410-A and B as well as 410 itself, the full transcript -- or the full podcast and 410T, the transcript.

THE COURT:  Any objection?

MR. BONDI:  One moment, your Honor.

MR. CARUSO:  Can we approach, your Honor, please.

THE COURT:  Sure.

(Counsel confer)

MR. BONDI:  No objection, your Honor.

(Government's Exhibits 410, 410-A, 410-B, 410-T

M9g2Mil5                    Prows - Direct

received in evidence)

MS. ESTES:  Ms. Wolfson, can you pull up 410-B and the transcript which will be page 2/line 11.

(Audio played)

BY MS. ESTES:

Q.  Ms. Wolfson, can you go back to the part of the transcript that's lines 11 through 14.

So, Mr. Prows, there Mr. Milton said, "When we first started, hydrogen was $16 a kilogram.  We can now produce it for well under $4 a kilogram."

Was that true in June 2020?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  No.

Q.  And in fact we just looked at an agreement where Nikola was purchasing hydrogen for over $14 a kilogram --

MR. BONDI:  Objection, your Honor, leading.

THE COURT:  Overruled.

A.  That's correct.

Q.  And Mr. Prows, Mr. Milton's statements there, in your mind, are those statements about the future?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  No.

Q.  Why not?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                        Prows - Direct

A.  Because he used the word "now."

Q.  Mr. Prows, are you on Twitter?  Sorry.  I didn't quite hear that?

A.  No.

Q.  Have you ever seen some of Mr. Milton's tweets?

A.  Yes, I have.

Q.  Ms. Wolfson, or actually, your Honor, we would offer Government Exhibits 503, 520, 527, 543, and 553 pursuant to stipulation S5.

        THE COURT:  Pursuant to stipulation, they will be received.

        (Government's Exhibits 503, 520, 527, 543, 553 received in evidence)

BY MS. ESTES:

Q.  Ms. Wolfson, can you pull up Government Exhibit 503.

        Mr. Prows, can you read Mr. Milton's tweet here?

A.  "Hydrogen costs have plummeted through Nikola Motor's efforts and not other OEMs.  Our costs are below $3 per kilogram.  Diesel parity is $4 per kilogram.  Game is over for diesel.  Tesla at 100 billion.  It's time for lazy executives of large OEMs to be replaced with innovative CEOs who support each other."

Q.  Mr. Prows, what's the date of that tweet?

A.  January 23, 2020.

Q.  Is that tweet true?

M9g2Mil5                    Prows - Direct

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  And, Mr. Prows, just to be clear, were you ever asked to review Mr. Milton's tweets for accuracy?

A.  No.

Q.  Ms. Wolfson, can you pull up Government Exhibit 520.

Mr. Prows, I want to focus you in on the bottom tweet there.  Can you read that tweet from Mr. Milton?

A.  "It wasn't the physics.  It was the cost of stations and energy, both of which Nikola has solved.  Clean energy under 4 per kilowatt hour makes diesel obsolete."

Q.  Mr. Prows, what's the date of this tweet?

A.  June 9, 2020.

Q.  And Mr. Prows, in your view at that point had Nikola solved the costs of stations and energy?

A.  No.

Q.  Was Nikola getting any clean energy for under 4 cents a kilowatt hour?

A.  No.

Q.  And just on the question of solving the cost, why hadn't Nikola solved the cost at that point?

A.  We hadn't built anything yet.

Q.  And did Nikola have any electricity contracts at that point?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                    Prows - Direct

A.  No.

Q.  Ms. Wolfson, let's take that down and pull up -- let's actually go back to S2, the stipulation.  And can you turn to the paragraph that corresponds with 409.

So this paragraph of the stipulation says, "Government Exhibit 409A is an authentic copy of a portion of a June 4, 2020, interview of Trevor Milton on the Tesla Daily podcast and Government Exhibit 409-T is an accurate transcript of that recording."

So, your Honor, we will offer 409-A as well as 409 the full podcast, and 409-T the transcript.

THE COURT:  Any objection?

MR. BONDI:  No, your Honor.

THE COURT:  They will be received.

(Government's Exhibits 409, 409-A, 409-T received in evidence)

BY MS. ESTES:

Q.  Ms. Wolfson, can you turn to the next page of the transcript and can you play the clip.

(Video played)

Q.  Mr. Prows, was Nikola producing or pulling any energy out for under four cents a kilowatt hour?

A.  No.

Q.  Mr. Milton there says "we are doing it behind the grid." What do you understand that to be referring to?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                          Prows - Direct

A.   This would be referring to production of electricity outside of the local utilities' grid.  So on a particular side it would be the idea of having either solar panels or, you know, windmills or something that produces electricity beyond the electrical grid.

Q.   And at this point in June 2020 was Nikola getting any electricity from solar panels?

A.   No.

Q.   Was Nikola getting any electricity from wind power?

A.   No, not directly.

Q.   So, Mr. Prows, in your view is this statement on this podcast true?

A.   No.

Q.   All right, Ms. Wolfson.  Let's take that down and pull up Government Exhibit 527.

        Mr. Prows, can you read this tweet?

A.   Yes.  "We have stations going up in Canada and they use clean energy for our solar -- for our hydrogen.  Solar, wind, and hydro give us $4 per kilogram hydrogen."

Q.   Mr. Prows, what's the date of this tweet?

A.   June 9, 2020.

Q.   Did Nikola have any stations going up in Canada in June 2020?

A.   No.

Q.   Was Nikola getting any solar, wind, or hydroelectricity

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9g2Mil5                          Prows - Direct

that would give you $4 a kilogram of hydrogen?

A.  No.

Q.  All right.  Ms. Wolfson, let's take that down and pull up Government Exhibit 543.

Mr. Prows, focusing you on the bottom tweet there, what's the date?

A.  June 27, 2020.

Q.  Can you read Mr. Milton's tweet.

A.  "It's lower now, which is awesome.  Nikola Motor now has it below $4 per kilogram, which is cheaper than diesel.  Working on sub $2.50 per kilogram now.  Exited for a Europe market introduction."

Q.  Ms. Wolfson, can you zoom out of that?  We should probably look at the top tweet for context.  What does the top tweet there say, Mr. Prows?

A.  "Hydrogen fuel prices could be as low as gas in five years."

Q.  So in the bottom tweet when Mr. Milton says "it's lower now," what is the "it" you understand him to be referring to?

A.  Hydrogen fuel prices.

Q.  And Mr. Prows, is the statement in Mr. Milton's tweet true?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  In your mind is that a statement about the future?

M9g2Mil5                    Prows - Direct

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Why not?

A.  Because he used the word "now."

Q.  And I guess just to be clear, why do you view Mr. Milton's statement in the tweet as not true?

A.  Because Nikola had not produced any hydrogen at that point. We didn't have any electricity contracts that would enable that to happen.  We just didn't have -- it wasn't done yet.

Q.  Ms. Wolfson, can you pull that down and pull up Government Exhibit 553.

Mr. Prows, looking at the bottom tweet there, what's the date of that tweet?

A.  August 13, 2020.

Q.  And can you read that tweet.

A.  "We currently make our own green hydrogen for under $4 per kilogram.  We are open to others down the road, but we have our first stations going up and need to focus on completing ours first.  Then we can work with others as we expand."

Q.  Mr. Prows, do you view that tweet as true?

A.  No.

Q.  Why not?

A.  Because he used the word "currently."

Q.  So at this point in August 2020, was Nikola making its own

M9g2Mil5                          Prows – Direct

green hydrogen for under $4 a kilogram?

A.   No.

Q.   Was Nikola generating any hydrogen at all?

A.   No.

Q.   And just to be clear, as of September 2020, was Nikola generating any hydrogen?

A.   No.

Q.   And as of September 2020, did Nikola have any electricity contracts?

A.   No.

            (Continued on next page)

M9GCmil6                        Prows - direct

BY MS. ESTES:

Q.   Did Nikola have any land for hydrogen stations?

A.   No.

Q.   Had Nikola permitted any hydrogen production stations?

A.   No.

          MS. ESTES:  Ms. Wolfson, let's take that one down.  If you could go back to S2, the stipulation.  If we could turn to the paragraph that corresponds with 412.

          This one says, Government Exhibits 412-A, 412-B, 412-C, 412-D, 412-E, 412-F, and 412-G are authentic copies of portions of a June 11th, 2020, interview of Trevor Milton on the Autoline After Hours YouTube page and podcast, and Government Exhibit 412-T is an accurate transcript of those recordings.

          Your Honor, at this time, we'd offer 412-A through G, as well as 412, the full podcast, and 412-T, the transcript.

          MR. BONDI:  No objection.

          THE COURT:  They will be received.

          (Government's Exhibits 412, 412-A, 412-B, 412-C, 412-D, 412-E, 412-F, 412-G, 412-T received in evidence)

          MS. ESTES:  Ms. Wilson, if you could turn to 412-B, and this will correspond with page 1, line 18 of the transcript binder.

          (Video played)

          Ms. Wolfson, can you pause it there.  Can we go back

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9GCmil6                        Prows - direct

up.

Q.   Mr. Prows, there, Mr. Milton says today our hydrogen costs are less than 4.  Is that true or not?

A.   No.

Q.   In your mind, is that a statement about the future?

A.   No.

Q.   Why not?

A.   Because he used the word "today".

          MS. ESTES:  Ms. Wolfson, let's keep playing that clip.

          (Video played)

          Ms. Wolfson, can you pause it there.

Q.   Mr. Prows, at this point in June 2020, was Nikola producing any hydrogen on the freeways?

A.   No.

Q.   Had Nikola purchased any land along the freeways for hydrogen production?

A.   No.

          MS. ESTES:  Ms. Wolfson, let's keep playing the clip.

          (Video played)

          Ms. Wolfson, can you pause it there.

Q.   Mr. Prows, Mr. Milton talked about tapping into federal grid lines.  What is your understanding of what he's referring to there?

A.   In order to transport electricity from state to state, it's regulated by the federal government.

Q.  Was Nikola tapping into any federal grid lines in June 2020?

A.  No.

Q.  And Mr. Milton says our cost of electricity is between three and four cents per kilowatt hour for zero emission, 100 percent electricity.

Was Nikola getting electricity at three or four cents a kilowatt hour?

A.  No.

Q.  Was Nikola getting any zero emission electricity?

A.  No.

MS. ESTES:  Ms. Wolfson, let's keep playing.

(Video played)

Can you pause it there.

Q.  Mr. Prows, was Nikola getting any electricity from the federal grid in June 2020?

A.  No.

Q.  Going back to what Mr. Milton had said before about getting electricity at three or four cents a kilowatt hour, would that have been significant if Nikola had achieved a contract for that sort of rate?

A.  Yes.

Q.  Why would that matter?

A.  Because it would prove that we had delivered on our business model and our cost structure that we had communicated

to investors.

MS. ESTES:  Ms. Wolfson, can you keep playing the clip.

(Video played)

Ms. Wolfson, can you pause it there.

Q.  Mr. Prows, was Nikola making any electricity through electrolysis in June 2020?

A.  No.

Q.  And could Nikola guarantee that it was using clean energy 100 percent of the time in June 2020?

A.  No.

MS. ESTES:  Ms. Wolfson, let's keep playing it.

(Video played)

Can you pause it there.  Ms. Wolfson, can you go up a little bit.

Q.  Mr. Prows, there Mr. Milton says, and we can produce it all 24 hours of the day, never paying peak rates, never buying dirty energy, all zero emission.

In your mind, is that true?

A.  No.

Q.  Why not?

A.  We had not done it at that point.

Q.  And then the host there says, you make it on site, and Mr. Milton says we do, we make it on site.  And then the host says, you make it on site at the station, Mr. Milton says yes.

Was that true?

A.  No.

Q.  Were you making any hydrogen on site at the dispensing station at headquarters?

A.  No.

MS. ESTES:  Ms. Wolfson, let's go to 412-C.  This is going to be page 6, line 13 of the transcript.

(Video played)

Q.  Mr. Prows, there Mr. Milton said we can fill a whole entire semi truck in 15 minutes with hydrogen.

At this point in June of 2020, could Nikola do that?

A.  No.

Q.  In fact, we listened to that or saw that analyst day video where you were in earlier and you talked about it as a goal; is that right?

A.  Yes.

Q.  In your mind, is your statement about it being a goal different from what Mr. Milton is saying here?

A.  Yes, it's different.

Q.  How so?

A.  Our goal was to achieve refueling in 15 minutes, but we had not done it and this statement says that we have done it.

Q.  Mr. Prows, in statements from a public company, is it important to distinguish between goals and achievements?

A.  Yes.

Q.  Why?

A.  Because as a public company, investors are relying on the information that's provided to determine whether or not they're going to make the investment or not.

MS. ESTES:  Ms. Wolfson, let's go to 412-D, that's page 7, line 2.

(Video played)

Q.  Mr. Prows, that statement from Mr. Milton, was that true?

A.  No.

Q.  Why not?

A.  We had not built any stations at that point and were actually struggling to get the cost down to $15 million even on paper.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 240 next to that transcript there.  If you could zoom into the email in the middle, the one from Mr. Prows at 11:10 p.m.

Q.  Mr. Prows, in fact, a couple weeks before that podcast, what did you tell Mr. Milton the stations would likely cost?

A.  $27.3 million.

MS. ESTES:  Ms. Wolfson, let's take that down.  Can you pull up the transcript for 412-T again, page 7, line 2.  If you could zoom into lines 7 through 9.

Q.  Mr. Prows, Mr. Milton's statement, when we started, they were $40 million apiece, and we've got them down to $15 million

M9GCmil6                        Prows - direct

now.

In your mind, is that a statement about the future?

A.  No.

Q.  Why not?

A.  Because he used the word "now".

MS. ESTES:  Ms. Wolfson, let's take that down and if you could pull up Government Exhibit 701.

MR. BONDI:  May we approach, your Honor?

THE COURT:  Very well.

(Continued on next page)

M9GCmil6                       Prows - direct

(At the sidebar)

MR. CARUSO:  This is a newspaper article.  It's classic hearsay.  It's got hearsay within hearsay.  The lower level is a statement of a party opponent, but the upper level is a statement by the reporter.  When the reporter repeats what the party opponent says, that's the reporter's out-of-court declaration that this is what the other declarant told me.  Pure hearsay.  Tons of cases, Second Circuit and everywhere else, newspaper articles are inadmissible.

MS. ESTES:  Your Honor, we're not offering it for the truth.  In fact, we're going to say that Mr. Milton's statements in the article are false.  So we're not offering it for the truth, we're offering it because it describes an interview with Mr. Milton where he made statements and those statements were then disseminated to the public and investors, but we're certainly not offering it for the truth.

THE COURT:  I'll give an instruction to the jury.

MR. CARUSO:  The gist of the instruction would be what?

THE COURT:  It's being offered not for the truth.

MR. BONDI:  Your Honor, the idea of not being offered for the truth, they are offering it for the truth that he said that statement, and that's hearsay.  That is exactly what the hearsay rules prohibit.  They're offering it for the truth that he made that statement to the reporter that was reported in an

article.

MR. CARUSO:  This doesn't satisfy the upper level. This newspaper article contains, by repeating what Mr. Milton said, it contains the implicit declaration Mr. Milton really said this to me.  That's the truth part, and the newspaper article doesn't satisfy that, even if the lower part does.

MS. ESTES:  Your Honor, I believe the stipulation they agreed to was an interview with Mr. Milton.

MR. CARUSO:  Yes, I was very careful to reserve my rights on hearsay, very careful.

MS. ESTES:  But you stipulated it was an interview with Mr. Milton.

MR. BONDI:  Doesn't mean he said it.

MR. CARUSO:  I preserved my hearsay rights, I absolutely did.  This is the very subject of a discussion, I said I'll stipulate to the authenticity, not the hearsay.

MR. BONDI:  Do we know the reporter got it right?

MR. CARUSO:  That's the point, that top half, the upper level of the hearsay within hearsay is not satisfied until unless the journalist is on the witness stand to say yes, that man told me that.  Classic.

THE COURT:  What did he say?

MS. ESTES:  He said something very similar to what he said in all these other things.  So it seems like it's probably likely it was him because he talks about hydrogen per kilogram.

MR. CARUSO:  That's not the hearsay rule.  You have to have a declarant on the stand.  Just because he said it before doesn't make it any -- it's still hearsay.  And the fact that some other evidence is similar doesn't make this --

THE COURT:  No.  No.  No.  The gravamen of my question is do you need this Irish Times article.

MS. ESTES:  Your Honor, what I would say on the article is the defense has made a lot about the government picking Mr. Milton's statements and that we're picking out tiny things.  So we think it's significant that actually, in fact, he has just flooded the media in many different forms with these statements, so we're not cherrypicking, we're providing the jury with all of this.

MR. CARUSO:  It just doesn't meet my point, doesn't meet my argument.  Unless the journalist/declarant is on the stand, this is hearsay no matter what Mr. Milton said, no matter how many times he said it.

THE COURT:  If it's not being offered for the truth --

MR. CARUSO:  But it is.  I'm sorry.  I interrupted you.

THE COURT:  Quite all right.

MR. CARUSO:  Get a little anxious.  Sorry.

MS. ESTES:  Your Honor, I can move on from this one for now and we can take it up Monday.  I'm happy to go to the next thing.

M9GCmil6                          Prows - direct

THE COURT:  That's fine.  Let's do that.

MR. CARUSO:  That's fine.  Let me say that all of these newspaper articles suffer from the same flaw.

THE COURT:  How many newspaper articles are you looking --

MR. CARUSO:  Five or six.

THE COURT:  Okay.

MS. ESTES:  I was only going to offer this one with this witness.

THE COURT:  With this witness.

MR. CARUSO:  They all suffer from the same flaw and I can give you the citations.

THE COURT:  Give them the citations, too, and you can give me some citations.

MR. CARUSO:  Not now, when we get back to the office.

THE COURT:  Yes.

(Continued on next page)

(In open court)

MS. ESTES:  Ms. Wolfson, can we pull up Government Exhibit 422-T, which is in evidence, as well as 422-D, one of the clips from that.

Q.  Mr. Prows, if you're looking at your binder, the clip I'm going to play is going to correspond with page 14, line 12 of the binder.

MS. ESTES:  Ms. Wolfson, if you could skip to about 2 minutes and 18 seconds into the clip.  It's page 14, line 12 of the transcript.

(Audio played)

Ms. Wolfson, can you pause it.

Q.  Mr. Prows, there, Mr. Milton was referring to load balance. What's your understanding of what that means?

A.  Load balancing, as it relates to discussions with the utilities, means to provide energy for the electrical grid during the heavy demand periods, the peak periods, and to be able to take energy from them during the excess generation periods.

Q.  Mr. Prows, in July 2020, did Nikola have any contracts with utilities?

A.  No.

Q.  And was Nikola actually getting any electricity for electrolyzers from utilities?

A.  No.

Q.  Was Nikola actually doing any load balancing at a hydrogen production station?

A.  No.

MS. ESTES:  Ms. Wolfson, if you could keep playing a little more of that clip.

(Audio played)

Ms. Wolfson, can you pause there.

Q.  Mr. Prows, there, Mr. Milton references permitting electrolyzers for headquarters.

In July 2020, was Nikola actually engaged in the process of trying to permit electrolyzers with the city?

A.  No.

Q.  And Mr. Milton characterized the demo station as the most advanced hydrogen fueling station in the world, is that how you would characterize it?

A.  No.

MS. ESTES:  Ms. Wolfson, if we could go to 422-E. This will be page 22, line 11 of the transcript.  If you could play that clip, Ms. Wolfson.

(Audio played)

Q.  Mr. Prows, Mr. Milton said we're gobbling up the best locations right now.

In July 2020, was Nikola purchasing any land for hydrogen production stations?

A.  No.

M9GCmil6                          Prows - direct

Q.   And Mr. Milton said we can pull energy out from two cents to four cents a kilowatt hour all day long.  Was Nikola getting any electricity at those price points in July 2020?

A.   No.

          MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 311, which is in evidence.

Q.   Mr. Prows, before we get to this document, on the land, was Nikola acquiring any leases for land in July 2020?

A.   No.

Q.   Did Nikola, in any way, have any land for hydrogen production stations in July 2020?

A.   No.

Q.   What about September 2020?

A.   No.

          MS. ESTES:  Ms. Wolfson, can you zoom into the bottom email here, including the header.

Q.   Mr. Prows, do you recognize this email?

A.   Yes.

Q.   Who's the email from?

A.   Andrew Christian.

Q.   Who is he?

A.   Andy was one of the employees on my infrastructure development team.

Q.   Are you copied on this email here?

A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Q.   What's the subject of the email?

A.   Trevor/infrastructure podcast.

Q.   Can you read the first paragraph in the email Mr. Christian sends.

A.   Dale and team, I would encourage you to listen to Trevor's podcast with TeslaCharts.  Trevor discussed several infrastructure-related topics that we should take note of.  The podcast is lengthy, 1 hour, 39 minutes, but feel free to skip directly to the infrastructure portion at 25:15.

Q.   Mr. Prows, did you listen to the podcast after getting this email from Mr. Christian?

A.   No.

Q.   And did you discuss Mr. Christian's concerns about the podcast in the email?

A.   Yes.

Q.   And what did you discuss with Mr. Christian?

A.   That some of the statements were inaccurate.

Q.   And how did you feel when you learned Mr. Milton was making inaccurate statements on a podcast?

A.   I was concerned.

Q.   Why were you concerned?

A.   Because it felt like we were misrepresenting the truth and the facts in terms of how far along Nikola was in our development.

Q.   Mr. Prows, did you raise this issue with anybody after

receiving this email from Mr. Christian?

A. Yes.

Q. Who did you raise it with?

A. I rose it with Pablo Koziner.

MR. BONDI: Objection hearsay.

THE COURT: Overruled.

A. And also with Kim Brady.

Q. Who is Pablo Koziner?

A. Pablo was the president of energy and commercial for Nikola.

Q. And who's Kim Brady?

A. Nikola's CFO.

Q. Why did you raise this issue with Mr. Koziner, Mr. Brady?

A. I had a meeting scheduled with Pablo right after I received this email from Andy, Andy Christian. I was concerned enough about it that I incorporated that into part of my discussion with him. That was why I talked to Pablo.

Q. What about Mr. Brady, why did you talk to him?

A. So I also had a previously scheduled meeting with Kim Brady to talk about some other things, and also addressed my concerns with Kim.

Q. Did you raise it with Mr. Milton?

A. No.

Q. Why not?

A. I felt that it would be more appropriate for me to follow

M9GCmil6                         Prows - direct

the lines of authority in the company.

Q.  And who did you report to in the company?

A.  Mark Russell.

MS. ESTES:  Ms. Wolfson, let's take that down.  Can you pull up Government Exhibit 313 for the witness.

Q.  Mr. Prows, do you recognize this?

A.  Yes.

Q.  Who are the parties to this email?

A.  This is an email from me to Andy Christian, with copies to Carl Rivkin, Joe Joshi, Curt Hill, and Ray Hobbs.

Q.  What's the subject there?

A.  Trevor/infrastructure podcast.

MS. ESTES:  Your Honor, we offer Government Exhibit 313.

MR. BONDI:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 313 received in evidence)

MS. ESTES:  Ms. Wolfson, can you zoom into the top half or so of the email.

Q.  Mr. Prows, is the email at the bottom there the same email we were looking at earlier from Mr. Christian?

A.  Yes.

Q.  What's your response there?

A.  I said, wow, thanks for sharing, Andy.

Q.  Why did you say that to Mr. Christian?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

A.  I was very surprised and disappointed to see that those were the statements that were made in the podcast.

MS. ESTES:  Ms. Wolfson, you can take that down. Ms. Wolfson, can you pull up Government Exhibit 521.  Can you pull up Government Exhibit 292 side by side.  Ms. Wolfson, on 292, if you could go to the second page, third page, and if you could zoom into the box on that page.

Q.  Mr. Prows, just looking at this here, we heard a lot of podcasts and saw a lot of tweets where Mr. Milton talked about getting the costs of hydrogen below $4 a kilogram.  Do you recall that?

A.  Yes.

Q.  Is this one of those tweets on the screen there?

A.  Yes.

Q.  And then we also looked at this agreement earlier with Air Liquide about the supply of hydrogen; is that right?

A.  Yes.

Q.  And that was the supply of hydrogen in 2020; right?

A.  Yes.

Q.  And looking at the agreement with Air Liquide, how much was Nikola actually paying for hydrogen in 2020?

A.  $14.76 per kilogram.

Q.  Mr. Prows, having seen all those tweets and listened to the podcasts, are you concerned with what Mr. Milton was saying about the price of hydrogen?

M9GCmil6                        Prows - direct

A.   Yes.

Q.   Why is that?

A.   I felt like it was misrepresenting where we were as a company at that point in time.

          MS. ESTES:  Nothing further, your Honor.

          THE COURT:  Ladies and gentlemen, it's now seven minutes before the time that we generally break, but it is Friday afternoon, so we're going to cheat just a little bit today and end the week now.  Have a wonderful weekend.  We'll get together again Monday morning.  Please do endeavor to be in the jury room no later than 9:15 or so.

          In the meantime, do not discuss the case, do not read anything about the case, do not see anything on television about the case or the internet or radio or otherwise.  Okay. Have a wonderful weekend.

          (Continued on next page)

(Jury not present)

THE COURT:  Mr. Prows, you may step down.

Any issues to raise at this time from the government?

MR. ROOS:  Not from the government, your Honor.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  As soon as the witness leaves, is that okay, Judge?

THE COURT:  Yes.  Mr. Prows, do you mind stepping out of the courtroom.  Thank you so much.

MR. MUKASEY:  Judge, of course we trust the government will have no communication with the witness now that they've turned him over.  They've been extremely helpful in terms of -- I'm sorry.  We trust the government won't have any communication with the witness now that they've turned him over for cross, and I want to say they've been quite helpful in terms of giving us the lineup in advance so we can prep and keep things moving along efficiently.  We know Mr. Russell is coming on Monday following the cross of Mr. Prows, and if we can just get maybe Monday afternoon and Tuesday, that would be terrific.

THE COURT:  I'm sorry.  If could you can get what?

MR. MUKASEY:  The witnesses for Monday and Tuesday, that would be great.

THE COURT:  It sounds like Monday will be filled, but get them the subsequent witnesses.

M9GCmil6                        Prows - direct

MR. PODOLSKY:  We'll be in touch with them, your Honor.

THE COURT:  Very well.  And I suppose I'll be getting some notes from you folks over the weekend.

MR. ROOS:  Your Honor, one other matter.

THE COURT:  Yes.

MR. ROOS:  Peter, as you know, is a paralegal who has appeared before your Honor on several occasions.

THE COURT:  Yes, he has.

MR. ROOS:  He has been really an asset to the U.S. Attorney's Office, a great paralegal, and today is his last day.

THE COURT:  No.

MR. ROOS:  He he's leaving us.  We hope he comes back sometime soon.  So this is his goodbye to you and the trial.

THE COURT:  Mr. Charalambous, thank you so much for your wonderful efficiency with the technical equipment.  It's been a great use to the Court.  And good luck to you, sir.

MR. CHARALAMBOUS:  Thank you very much.

MR. ROOS:  Thank you, your Honor.

THE COURT:  Have a good afternoon and a wonderful weekend.

(Adjourned to September 19, 2022 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                          Page

 BRENDAN BABIARZ

Direct By Mr. Roos . . . . . . . . . . . . . . 611

Cross By Ms. Young . . . . . . . . . . . . . . 629

Redirect By Mr. Roos . . . . . . . . . . . . . 665

 DALE PROWS

Direct By Ms. Estes . . . . . . . . . . . . . 676

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 416, 418, 421  . . . . . . . . . . . . . . . 611

 229   . . . . . . . . . . . . . . . . . . . 613

 315, 316  . . . . . . . . . . . . . . . . . 614

 1230   . . . . . . . . . . . . . . . . . . . 615

 291   . . . . . . . . . . . . . . . . . . . 617

 1220   . . . . . . . . . . . . . . . . . . . 626

 1214, 1215  . . . . . . . . . . . . . . . . 627

 281   . . . . . . . . . . . . . . . . . . . 678

 432   . . . . . . . . . . . . . . . . . . . 695

 230   . . . . . . . . . . . . . . . . . . . 702

 228   . . . . . . . . . . . . . . . . . . . 717

 250   . . . . . . . . . . . . . . . . . . . 721

 250-A  . . . . . . . . . . . . . . . . . . . 721

 231   . . . . . . . . . . . . . . . . . . . 733

 238   . . . . . . . . . . . . . . . . . . . 739

239 . . . . . . . . . . . . . . . . . . . . . 745

240 . . . . . . . . . . . . . . . . . . . . 748

803 . . . . . . . . . . . . . . . . . . . . 750

514 . . . . . . . . . . . . . . . . . . . . 751

406, 406-A through E, 406-T . . . . . . . . 752

292 . . . . . . . . . . . . . . . . . . . . 755

410, 410-A, 410-B, 410-T . . . . . . . . . . 758

503, 520, 527, 543, 553 . . . . . . . . . . 760

[Exhibits]*[received] . . . . . . . . . . . . 762

412, 412-A, 412-B, 412-C, 412-D, 412-E, . . . 767

          412-F, 412-G, 412-T

313 . . . . . . . . . . . . . . . . . . . . 783

DEFENDANT EXHIBITS

Exhibit No.                              Received

 1585 . . . . . . . . . . . . . . . . . . . 665