M9JCmil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                     21 CR 478 (ER)

TREVOR MILTON,

          Defendant.

------------------------------x

                                New York, N.Y.

                                September 19, 2022
                                9:00 a.m.

Before:

                HON. EDGARDO RAMOS,

                              District Judge

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

M9JCmil1

(Trial resumed; jury not present)

THE COURT:  It's 9 o'clock.  I received last night, starting at about 11:30, 250 pages of submissions by the government.  I understand that with respect to the bulk of that paperwork, that the defense is not looking at least to proffer the press release today.

MR. CARUSO:  That's correct, your Honor.  We don't anticipate that we will raise this issue today.

THE COURT:  Okay.

MR. ROOS:  The issue is, I sort of wanted to give your Honor an opportunity to read it, although I'll send a letter that's relatively short, it's the exhibits which, obviously, your Honor wants to look at for a little longer.

The next issue is the next witness is Mark Russell and we, in the event your Honor rules that the defense is precluded from using the September 14th press release, that's fine, that's what we're asking for, one of our requests, but if your Honor admits it and says that opens the door to the government's submission of the prior consistent statements, we need at least an opportunity to speak to the witness about that.  So that's why we really need a ruling before the witness is on cross.  We don't need to do it right now, just to be clear, but before he's on cross.

THE COURT:  Let me ask now, is the defense telling me that they are not going to offer the press release at all or

M9JCmil1

they're not going to offer it through Mr. Russell?

MR. CARUSO:  At this time, we do not anticipate offering that exhibit with that witness.

THE COURT:  Okay.

MR. ROOS:  I think, then, that may narrow the issue somewhat.  If they intend to question the witness about it, that would still trigger sort of our open-the-door prior-consistent-statement portion of our letter.

THE COURT:  I don't know what they're going to ask about that, they are certainly entitled to press him on credibility issues.  I don't know how that's going to play out.

MR. ROOS:  So I guess the question is, it sounds like your Honor would prefer to, in the event they question him but don't offer the document, we can take up the prior-consistent point at that point.

THE COURT:  Yes.

MR. CARUSO:  Your Honor, thank you.  I think Mr. Mukasey wanted to add something, perhaps, I'm not sure.

MR. MUKASEY:  Everything Mr. Caruso said is correct, we don't plan on introducing it at least today.  Obviously, we don't know what the direct is going to sound like, and we're going to have to make a decision on the fly, but I don't think that decision is going to have to be made today.

THE COURT:  Obviously, understanding that the government may seek to, in the event that certain information

comes in, the government may seek to counter that with these our documents.

MR. MUKASEY:  Yes, and we take issue with whether or not those other documents are admissible, whether any doors are opened, we can fight that battle when it's time to fight it.  I don't think that all of recorded human history comes in if we mention a press release.  The government's already put a bunch of press releases in evidence and they have more on their exhibit list and they've come in without objection as business records, but again, this is a discussion for another day.

THE COURT:  Okay.

MR. ROOS:  It's a total miss, right?

MR. CARUSO:  Let's not argue this now.

MR. ROOS:  I'm kidding.  I'm kidding.

MR. CARUSO:  Thank you.

THE COURT:  Very well.  Now, on the issue of the newspaper articles, Mr. Caruso, did you receive the government's letter?  Did you have an opportunity to --

MR. CARUSO:  I did.  I did receive it and while I understand their legal theory, I don't think it fits the facts of this case, adoptive admissions.  For example, and I'll ask Chris to call up exhibit 271, before that, with respect to Government Exhibit 703 and Government Exhibit 705, the government says that Mr. Milton somehow adopted that and the facts don't establish that.  Those two exhibits were not posted

M9JCmil1

on the Nikola website, as I understand it, and I don't see any basis on which there is an argument as a matter of fact that Mr. Milton adopted it.

Chris, would you show the Judge and counsel 271, please.

I'll give the Court just a moment to read this.

THE COURT:  If you meant to put it on this screen, it's not up there.

MR. CARUSO:  271 is the one the government pointed to. This is what the government says works the adoption, I believe, if I'm reading the letter -- the defendant told Brady not to communicate with the investor, 271.  That is what Mr. Roos is relying on; correct?

MR. ROOS:  Yes.

MR. CARUSO:  If your Honor has had an opportunity to read this?

THE COURT:  I have.

MR. CARUSO:  This is exactly the opposite of an adoption by Mr. Milton, this is a repudiation.  He didn't adopt what was in 703 or 705, he said don't communicate with this -- your Honor can read it.  This is the opposite of an adoption, it's a repudiation.

THE COURT:  I don't know that it's a repudiation. It's a repudiation of the individual, not necessarily of the article.

M9JCmil1

MR. CARUSO:  I believe the phrase is "inextricably intertwined."

THE COURT:  Maybe.  Mr. Roos.

MR. ROOS:  So, your Honor, the defendant sat for several interviews.  He sat for two interviews, one of CleanTechnica, one of the Observer.  Those result in the articles that were published and are marked as 703 and 705.  Subsequently, an investor, named Paul Sinclair, emailed the links to those emails to Kim Brady, and if we scroll down on this email, we can see it, on the next page, one more.

So there, your Honor, you can see, Observer and CleanTechnica.  So those were the articles that were emailed and the investor has some concerns about the accuracy there.  This email was then forwarded along to the defendant and rather than say, oh, I didn't say that, we should correct that, I didn't mean that, which is in the article, he says that the sender, that is this investor, Paul Sinclair, is giving him a hard time and he blocked him.

The government's argument is that because the defendant sat for these interviews that resulted in the articles, he had awareness of the articles and then he was presented with potential inaccuracies in the articles and did not seek to clarify, correct, refute, amend, really just acquiesce, that's an adoptive admission under the cases we cited in our letter and these are plainly admissible.

MR. CARUSO:  Judge, that's far too overbroad.  There is nothing in this.  If Chris can go to the top of it again, please, where Mr. Milton is writing it, there is nothing in that language that could reasonably be construed as an adoption on the contrary.

Now this is a preliminary question for the Court sitting as a fact finder.  There is nothing in there that can reasonably be construed as an adoption, it's the opposite.  It's not realistic to think the man is going to say, don't communicate with me -- with this guy, he's been harassing me and, by the way, the following portions of what he said are false.  It's not realistic.  It's, go away, get rid of this guy, I don't want to deal with him.  It's not an adoption.

THE COURT:  Let's take the easy case first.  I guess the other two articles were posted on Nikola social media, and therefore those are adopted.

MR. CARUSO:  I don't think so.  They were adopted by Nikola, but they were not adopted by the defendant.  These are being offered against the defendant.  The relevant rules says the statement was made by -- sorry.  The statement is offered against an opposing party and is one the party manifested that it adopted or believed to be true.  Mr. Milton's a party, never did that, Nikola did, but Nikola's not a party.  This is being offered against Mr. Milton, not the company.  The language of that is very specific, the party, it doesn't say the party or

his agent or his company.

THE COURT:  Mr. Roos.

MR. ROOS:  The language is not so narrow.  Mr. Caruso is construing this as if there is a requirement that the defendant expressly adopt the statement later on, the cases say otherwise.  There is no requirement that you expressly adopt.  In fact, that's why the cases recognize that the affirmative adoption of the statement or what's effectively acquiescence by being aware of the statement and then not repudiating or refuting or seeking to correct, so there's no requirement.  The fact that the defendant is the boss of this company that posted it on its social media, the fact that he sat for the interviews, so, obviously, has awareness of them, are all bases to find that they're an adoptive admission.

MR. CARUSO:  I'm not going to an argument that says he didn't expressly adopt it.  That's not what I'm saying.  I'm saying he, the defendant, didn't adopt anything where there was express or implied.  Nikola may have, but he didn't.  This is being offered against the defendant, not the company.

THE COURT:  And he was the chairman of the board of the company.  I find that those two articles were adopted.  I find that the other two, 03 and 05, I do not believe that this email constitutes an adoption, implied or otherwise.  I think it would be asking too much of any individual to have to specifically respond to every email that comes in, and I don't

know how many emails they get over the course of the day or in response to any article, but I don't think that this email — in which he says, block this guy, I don't want to deal with him anymore — constitutes an adoption of those two statements in those articles.  So unless you have some other basis for them, those two will not come in.

MR. CARUSO:  Thank you, your Honor.

MR. ROOS:  Your Honor, we do have a secondary basis, which is the last paragraph of our letter, which is that those two articles not be offered for their truth, but instead for the effect on the listener.  Specifically, because they are articles that an investor cites to Kim Brady and then ultimately that gets forwarded to the defendant, they're a relevant piece of evidence.  Again, not being offered for its truth, but it's important context in order for the jury to understand what they're talking about in an email which goes to the defendant's knowledge that he is, in fact, making false statements.

MR. CARUSO:  Your Honor, now we're back where we started at sidebar on Friday.  This is being necessarily offered for the truth, because when you put in the entire article, it's a declaration out of court by the reporter — Mr. Milton said this to me.  That makes it offering for the truth.  That's what I laid out in my letter, I cited some cases.  The government's current argument doesn't meet that

point.  The article itself is necessarily hearsay unless they're going to call the journalist.

THE COURT:  Who's the reader that you're looking to argue this article effected?

MR. ROOS:  Well, there are really three here, but at a minimum, Kim Brady, who receives the email from the investor with the links and the identified false statements, and ultimately the defendant, Mr. Milton, who has the email forwarded to him and responds by saying, don't communicate with this guy.

MR. CARUSO:  It doesn't meet my point.  We're back where we started at Friday.  The article is hearsay because the journalist is declaring, out of court, Mr. Milton said these things to me, and we can't test that unless the journalist is on the stand.

MR. ROOS:  The difference, your Honor, is we're not offering it to prove -- for this limited purpose, we're not offering to prove that the defendant actually made those statements to the journalist.

MR. CARUSO:  But then it's not relevant.  What's the point if it's not -- Judge, this is really just -- I've said my piece.  This is hearsay.

THE COURT:  I'm not allowing those two articles.

MR. CARUSO:  Thank you, Judge.

THE COURT:  We did have a juror call, she drives from

M9JCmil1

Westchester.  She said she may not be able to get here by 9:00, of course we don't need her by 9:00 necessarily, but she was being very conscientious on what her status is.  Hopefully she'll be here on time, but there is that one issue.

Is there anything else the parties wish to raise this morning?

MR. ROOS:  No.

MR. MUKASEY:  No, Judge.

THE COURT:  Okay.  9:30.

MR. MUKASEY:  Judge, hang out one second, I just want to confer with the government.

THE COURT:  Okay.

(Pause)

MR. MUKASEY:  Your Honor, there is one more issue, which I've conferred with the government about in good faith. Mr. Russell, who's going to be the next witness, the CEO of Nikola, has mentioned in 3500 material, and apparently in prep sessions with the government, that he believes Mr. Milton's heros are folks that are active on social media like the Kardashian's — first time I've ever said that in court — and Donald Trump.  And we think that testimony about Milton's heros, true or not, is irrelevant, and in this case particularly inflammatory.  Ms. Estes informs me that she doesn't intend to elicit that, but it tends to pop out of the witness's mouth.  I would like to stop that reference to

Kardashian's or Trump from popping out of the witness's mouth. And if Ms. Estes needs to lead the witness around that, she's not going to get an objection from me. I don't think that Mr. Milton's heroes, at least in that respect, are relevant in any way, and I think that for 403 reasons, which I don't need to explain, mentioning either of those reality TV stars is appropriate in the trial.

THE COURT: Ms. Estes.

MS. ESTES: Your Honor, so, Mr. Milton's heroes in this regard are actually directly relevant because he modeled his social media campaign to retail investors after the Kardashian's, after Elon Musk, after Donald Trump. We understand that some of this, especially with regard to Mr. Trump just may be unnecessary. So I was not planning to elicit this, and I will, in fact, instruct him not say anything about it, but I do think if it pops out, it's something that is not prejudicial given all the other charges in the case. So I want to flag that it is something we certainly will instruct him not to address these issues, but if it comes out, I don't think there is -- the prejudice will be minimal.

THE COURT: Tell him not to say it.

MS. ESTES: Okay.

MR. MUKASEY: Thank you, your Honor.

THE COURT: The Westchester commuter has apparently made it into the building.

M9JCmil1

Who's on the stand currently?

MS. ESTES:  Mr. Prows.

THE COURT:  Is he on direct or cross?

MS. ESTES:  He's on cross.  We turned him over to cross at the end of the day.

THE COURT:  Okay.

(Recess)

THE COURT:  Can we get Mr. Prows in, please.

(Witness present)

(Continued on next page)

(Jury present)

THE COURT:  Everyone, please be seated.  Ladies and gentlemen, good morning.  I trust you all had a very pleasant weekend.  The last weekend of the summer, sorry to say, and thank you for always being on time and for letting us know when you might have difficulties getting here on time.

We will now continue with the cross examination of Mr. Prows.

Mr. Prows, you are reminded that you are still under oath.

DALE PROWS, resumed.

CROSS-EXAMINATION

BY MR. BONDI:

Q.  Good morning, Mr. Prows.

A.  Good morning.

Q.  You and I have never met, have we?

A.  No.

Q.  We never talked?

A.  No.

Q.  Since you left the witness stand on Friday, have you discussed in any way anything related to your testimony with anyone?

A.  Only with my wife.

Q.  Mr. Prows, you joined Nikola in April 2019; right?

A.  Yes.

M9JCmil1                           Prows - cross

Q.   And Jesse Schneider was the VP of hydrogen and fuel cell technologies at the time you joined Nikola; right?

A.   I believe so.

Q.   And he had about 40 people working for him; right?

A.   I believe so.

Q.   And in 2019 and 2020, you were responsible for overseeing the development of Nikola's hydrogen production?

A.   Yes.  I started with hydrogen supply chain and then in the latter part of 2019, I took responsibility for the hydrogen infrastructure development team.

Q.   And you had about seven people working with you?

A.   Correct.

Q.   So there are about 50 people in the company working on hydrogen-related issues; right?

A.   I believe so.

Q.   I'd like to talk a few minutes about your relationship with the executives at Nikola.  Let's talk first about CEO Mark Russell.

        Mark Russell hired you to Nikola; right?

A.   Yes.

Q.   He was the president of Nikola at the time in 2019 when you joined?

A.   I believe so.

Q.   And then he became CEO of Nikola when the company went public in June 2020?

A.   Yes.

Q.   And you and CEO Russell have been personal friends for many years?

A.   Yes.

Q.   You've been to his house?

A.   Yes.

Q.   You know his family?

A.   Yes.

Q.   He knows your family?

A.   Yes.

Q.   And you go back many years to your time together in Chicago; right?

A.   Yes.

Q.   You worked with Mr. Russell at Worthington Industries?

A.   I was a contractor, yes.

Q.   And Worthington Industries is a publicly traded company; right?

A.   Yes.

Q.   And Mr. Russell was an executive there?

A.   I believe so.

Q.   And before Mr. Russell went into the corporate world, you know he was a corporate lawyer in private practice; right?

A.   I believe so, but I'm not positive.

Q.   You know him as someone who knows the law?

A.   I don't know.

Q.   He knows the SEC rules?

A.   I don't know.

Q.   Focusing on 2020, Mr. Russell signed all of Nikola's investor documents; right?

A.   I don't know.

Q.   You don't know?

A.   No.

Q.   And he speaks on the company's official quarterly investor calls; right?

A.   I believe so.

Q.   And he goes on television?

A.   I don't know.

Q.   You've never seen Mr. Russell on television in 2020?

A.   No.

Q.   And he's in the company's marketing videos; right?

A.   I believe so.

Q.   Well, he was in a video with you, right, that the government played for you on direct?

A.   He was in a video with me on the refueling of the truck, yes.

Q.   Where you simulated the refueling; right?

A.   Correct.

Q.   You weren't actually refueling then?

A.   Correct.

Q.   Mr. Russell talks with investors, too; right?

M9JCmil1                        Prows - cross

A.   I don't know.

Q.   You don't know?

During the 2020 timeframe, Mr. Russell's office was located on the third floor of Nikola; right?

A.   Yes.

Q.   And that's where the executives are located; right?

A.   Yes.

Q.   But he was an approachable executive, right, he was kind of a door's always open kind of guy; right?

A.   I don't know.

Q.   You don't know if your friend had a door's always open kind of policy?

MS. ESTES:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.   Can you restate the question, please.

Q.   Sure.  Do you know if your friend, Mark Russell, the CEO of the company, the guy you reported to, was an approachable guy?

A.   I don't know.

Q.   Mr. Russell is someone you trust with corporate matters; correct?

A.   It depends on the corporate matter.

Q.   Well, he's a seasoned executive; right?

A.   I believe so.

Q.   He's someone you relied on when you had a problem; right?

A.   Not necessarily.

Q.  He's someone, in your experience, who would not allow

misstatements to be made; right?

A.  I don't know.

Q.  You don't know?

        Mr. Prows, are you suggesting for a moment that

Mr. Russell engaged in any misconduct in this matter?

        MS. ESTES:  Objection.  Misstates the testimony.

        THE COURT:  Sustained.

Q.  Mr. Russell was someone, in your experience, who would make

sure investors had accurate information, wouldn't you agree?

A.  I don't know.

Q.  You also knew Kim Brady before you joined Nikola; right?

A.  Yes.

Q.  And Mr. Brady is the chief financial officer of Nikola?

A.  Yes.

Q.  And you and he are personal friends, too?

A.  Yes.

Q.  Your family socialized together?

A.  Yes.

Q.  And CFO Brady holds a number of professional licenses;

right?

A.  I don't know.

Q.  Are you aware that he's a chief financial adviser?  Excuse

me.  A certified financial adviser?

A.  No.

Q.  You're not aware of that?

A.  No.

Q.  He worked in investment banking.  Are you aware of that?

A.  Yes.

Q.  And he knows the SEC rules?

A.  I don't know.

Q.  And he signed, in 2020, all of Nikola's investor documents?

A.  I don't know.

Q.  He spoke in 2020 on the company's official quarterly
investor calls?

A.  Some of them, yes.

Q.  And he was involved in forecasting for the company; right?

A.  I believe so.

Q.  And in the modeling?

A.  I believe so.

Q.  And he's in the company's marketing videos, too?

A.  I don't know.

Q.  Well, he was in that video that the government played for
you on direct with Mr. Russell; right?

A.  Not that I recall.

Q.  We can get to that in a moment.

        He talks with investors; right?

A.  Yes.

Q.  And he meets with investors?

A.  Yes.

M9JCmil1                        Prows - cross

Q.   He's someone you would trust with corporate matters?

A.   Some, yes.

Q.   He's a seasoned executive?

A.   Yes.

Q.   He's someone you relied upon when you had a problem?

A.   Not necessarily.

Q.   Well, he's someone, in your experience, who would not allow misstatements to be made; right?

A.   It depends.

Q.   Mr. Prows, you're not suggesting for a moment that Mr. Brady engaged in any misconduct, are you?

        MS. ESTES:   Objection.   Misstates the testimony.

        THE COURT:   Sustained.

Q.   Let's move on to chief legal officer Britton Worthen.

        Mr. Worthen appeared on some of the emails the government showed you on Friday, and Mr. Worthen is the head lawyer at Nikola; right?

A.   Yes.

Q.   And as the chief legal officer, he's part of what's known as the C-Suite?

A.   Yes.

Q.   His office is also on the third floor; right?

A.   Yes.

Q.   And in 2020, his office was immediately next to Trevor Milton; right?

M9JCmil1                        Prows - cross

A.   I believe so.

Q.   And right down the hall was Mark Russell, the CEO?

A.   Yes.

Q.   And right down the hall was Kim Brady, the CFO?

A.   Yes.

Q.   Now Mr. Worthen has a team of lawyers at the company working with him; right?

A.   I believe so.

Q.   And he has outside law firms, too?

A.   I don't know.

Q.   Well, he used the outside law firm Pillsbury Winthrop Shaw Pittman for the SEC filings; right?

A.   I don't know.

Q.   And the company has the law firm Kirkland & Ellis; right?

A.   Yes.

Q.   That's the law firm that's currently representing the company right now; right?

A.   I believe so.

Q.   And that's the same law firm that's representing you today; right?

A.   Yes.

Q.   In fact, they're sitting in the back of the courtroom; right?

A.   I don't see them.

Q.   Mr. Allen?

M9JCmil1                        Prows - cross

A.   Oh, there he is.

Q.   Yeah, there he is.

        Mr. Worthen knows the law; right?

A.   I don't know.

Q.   Well, he's a lawyer; right?

A.   Yes.

Q.   And he's practiced securities law for 15 years before joining Nikola?

A.   I don't know.

Q.   He knows the SEC rules?

        MS. ESTES:  Objection.  Calls for speculation.

        THE COURT:  Overruled.  If you know.

A.   Can you restate the question, please.

Q.   Mr. Worthen knows the SEC rules; right?

A.   I don't know.

Q.   Mr. Worthen reviews all the press releases in 2020 before they went out?

A.   I don't know.

Q.   He negotiates and reviews major contracts that you've been involved in?

A.   Some of them.

Q.   He reviews all of Nikola's investor documents?

A.   I don't know.

Q.   He even participates in the company's quarterly investor calls; right?

A.  I don't know.

Q.  Is he someone you trust with corporate legal matters?

A.  Some, yes.

Q.  Is he someone you relied upon when you had a problem?

A.  No.

Q.  He's not someone who allowed misstatements to be made, is he?

A.  I don't know.

Q.  You're aware that a public company like Nikola has to submit certain filings for investors with the SEC; right?

A.  Yes.

Q.  And those filings are public filings meant for investors?

A.  I believe so.

Q.  And Nikola has those filings on its website, as well?

A.  I don't know.

Q.  Are you aware that there's an investor section of Nikola's website?

A.  Yes.

Q.  And you have no reason to doubt the accuracy, in 2020, of any other filings by the company; right?

A.  Sorry.  Can you say that again, please.

Q.  Sure.  You have no reason to doubt the accuracy, in 2020, of the investor documents filed by the company; correct?

A.  Correct.

Q.  Up through September 2020; correct?

A.  Correct.

Q.  In fact, the information in Nikola's investor documents is rock solid; isn't that right?

A.  I don't know.

Q.  Well, Mr. Prows, you remember giving an interview with the company's lawyers from Kirkland & Ellis on October 26th, 2020, don't you?

A.  No.

Q.  Would it refresh your recollection if I showed you some notes that the government took of the readout of your interview with Kirkland & Ellis on October 26th, 2020?

A.  It might.

MR. BONDI:  Will you pull up, please.  Chris, if you could highlight, please, page 7, paragraph 4, lines 1 and 2.

Q.  Mr. Prows, does that refresh your recollection that you told the company's lawyers that the investor documents are rock solid?

A.  No.

Q.  So Mr. Prows, let's move off from that and I'd like to ask you some questions about two of the documents that the company filed for investors in the summer of 2020.

I'm showing you what's been marked as Defendant's Exhibit 734, which, your Honor, has already been admitted into evidence.

Mr. Prows, this is Nikola's June 15th, 2020 public

filing for investors with the SEC.  If you see the cover page there, Mr. Worthen is identified on the cover page as the chief legal officer.

Do you see that?

A.  Yes.

Q.  And this was a document, public, for anyone to see; right?

A.  As far as I know.

MR. BONDI:  Chris, will you please turn to the signature pages of this document.

Q.  Do you see Mr. Russell signed this; right?

A.  Yes.

Q.  Mr. Brady signed this, the CFO?

A.  Yes.

Q.  Mr. Milton signed it?

A.  Yes.

Q.  And the rest of the board of directors at the time?

A.  I don't know.

Q.  Well, do you see the directors --

MR. BONDI:  Chris, if you want to scroll down for Mr. Prows.

Q.  Does it appear to you that the board of directors signed this?

A.  It appears, but I don't know all of the directors of the board.

Q.  Fair enough.  Let's put that aside for a second and we'll

come back to it.

Now I'm showing you a document that has not been admitted yet into evidence, but it's marked as Defendant's 736 for identification, and this document is Nikola's July 17th, 2020 prospectus for investors.

MR. BONDI:  Your Honor, the parties have reached a stipulation, which has been marked as GXS6.  With your Honor's permission, I would like to read part of that stipulation into the record.

THE COURT:  Very well.

MR. BONDI:  Paragraph 6 of that stipulation reads: Nikola files regulatory documents with the Securities and Exchange Commission (SEC) and makes copies of those SEC filings publicly available in the investors' section of Nikola's website.  The SEC filings on Nikola's website are authentic copies of the filings Nikola makes with the SEC.

Your Honor, the defense offers Defendant's Exhibit 736 into evidence.

THE COURT:  Any objection?

MS. ESTES:  No objection.

THE COURT:  736 will be received.

(Defendant's Exhibit 736 received in evidence)

MR. BONDI:  May I publish to the jury, your Honor?

THE COURT:  You may.

MR. BONDI:  Chris.

Q.   And this document was public for everyone to see; right, Mr. Prows?

A.   I don't know.

Q.   And this document was on Nikola's website for the public to see in 2020?

A.   I don't know.

Q.   And if you note, the date in this document is July 17th, 2020.

     Do you see that?

A.   I do see that.

Q.   And that was two days before the TeslaCharts podcast that the government played on Friday; right?

A.   I don't know.

Q.   Nikola told investors to look to its public filings with the SEC; right?

A.   I don't know.

Q.   Trevor Milton told investors to look at Nikola's filings with the SEC; right?

A.   I don't know.

     MR. BONDI:   Chris, could you pull up, to refresh the witness, DX-598, please, and turn to pages 482 and 483, and just for the witness, please.  Can you highlight the phrase that starts with, "Actually, you can see how..."

     We're having some technical difficulties.  We'll come back to that.

Chris, let's go back to DX-734, which was Nikola's June 15th, 2020 SEC filing.  Let's also look at DX-736, which is the document we just entered from July 17th, 2020.  Let's look at these documents side by side, these are the investor documents.  Let's go to page 4 of both documents here.

Q.  Mr. Prows, could you read the highlighted section there on both documents.

A.  The key differentiator of our business model is our planned network of hydrogen fueling stations.

Q.  Mr. Prows, "planned" indicates that something is expected to happen in the future; right?

A.  Correct.

Q.  And you see, Mr. Prows, that language appears in both of the documents for investors?

A.  Correct.

        MR. BONDI:  Let's go to page 8 of each of these documents, too.

Q.  Could you read the highlighted portion of both of these documents to the jury.

A.  Due to our bundled lease model for our fuel cell electric vehicle trucks, our revenues will also depend on the sale of hydrogen fuel at our planned hydrogen fueling stations, which we do not expect to be operational until 2022 or later.

Q.  So Mr. Prows, the hydrogen stations not being operational until 2022 or later indicated that the stations would be

operational in the future; right?

A.   Correct.

Q.   And that same language appears in both of these documents on Nikola's website; right?

A.   Yes.

        MR. BONDI:   Let's turn to page 12 of the document in another part.

Q.   Can you read what's highlighted there on page 12, please.

A.   Our plan to build a network of hydrogen fueling stations in the United States will require significant cash investments and management resources and may not meet our expectations with respect to additional sales of our fuel cell electric vehicle trucks.  This planned construction of hydrogen stations is essential to persuaded customers to pay a higher premium for our trucks.  While we have constructed a prototype station, we have very limited experience in the actual provision of our refueling solutions.

Q.   Do you have any problem with any of those statements, Mr. Prows?

A.   No.

Q.   And "planned" indicates something is expected to happen in the future; right?

A.   Yes.

Q.   And that same language appears on the July 17th document; right?

M9JCmil1                        Prows - cross

A.   Yes.

Q.   The document that came out just two days before the podcast that the government played; right?

A.   I don't know.

        MR. BONDI:   Let's stay on page 12 while we're at it and let's go to the part that starts with "As a key component..."

Q.   Do you see that?

A.   Yes.

Q.   Could you read that, please.

A.   As a key component of our business model, we intend to establish a series of hydrogen fueling stations, and we intend to include the cost of hydrogen in the purchase price of our trucks.  We intend to produce the hydrogen needed for these stations on site through electrolysis.  To the extent we are unable to produce the hydrogen, we may be unable to establish these fueling stations and severely limit the usefulness of our trucks, or, if we are still able to establish these stations, we may be forced to sell hydrogen at a loss in order to maintain our commitments.  We believe that this hydrogen incentive will be a significant driver for purchases of our trucks and, therefore, the failure to establish and roll out these hydrogen fueling stations, in accordance with our expectations, would materially adversely affect our business.

Q.   Mr. Prows, that word "intend" indicates something's going

to happen in the future; right?

A.  Yes.

MR. BONDI:  Let's go to page 79 of this document.

Q.  Where it says, first stations to support customers with dedicated -- and I'll read that for you.

That says, initially, our fueling and charging stations will be built to support carefully selected fleet customers who have dedicated routes along major interstate corridors.  For example, we have chosen AB as a launch customer, construction of an eight-ton pilot station accessible to AB's brewery in Van Ness, California, is expected to begin in the fourth quarter of 2020 and be completed by the fourth quarter of 2022.

Now this is in 2020, this is being said.

"First stations" indicates that Nikola did not have any existing stations; right?

A.  Sorry.  Say that again, please.

Q.  The reference "the first stations" means that there weren't already existing hydrogen stations for customers; right?

A.  Correct.

Q.  And "will be built" indicates something's about to happen in the future?

A.  Yes.

Q.  And it even goes on to say, "expected to begin in the fourth quarter of 2020," right?

A.   Yes.

Q.   "And be completed by the fourth quarter of 2022."

         Do you see that?

A.   I do see that.

Q.   All these are talking about the future; right?

A.   Yes.

Q.   And just to close the loop on this, this language appears in both of these company filings for investors; right?

A.   It appears so.

Q.   Mr. Prows, I want to look at a presentation Nikola prepared for investors that the government showed you last week, and it has been admitted into evidence as GX-281.  It was also admitted earlier, your Honor, as DX-37.  It's an April 6th, 2020 analyst presentation that Nikola posted to its website; right?

A.   I'm not sure if it was published to the website.

         MR. BONDI:  I think we have a stipulation for that, which I won't read again.

         If you could turn to page 24, please, of this document.

Q.   It says, hydrogen fueling stations will be built one at a time along dedicated routes based on customer need and network optimization.

         Do you see that?

A.   Yes.

Q.   "Will be built" indicates something's going to happen in the future; right?

A.   Yes.

Q.   So Nikola was publicly stating in 2020 that Nikola was not producing hydrogen; correct?

A.   I don't know if it specifically says that.

Q.   "Will be built"?

A.   That's different than not producing hydrogen.

Q.   Let's get into that, then.

     Mr. Prows, the fact that Nikola wasn't producing hydrogen wasn't a secret in the company; right?

A.   Correct.

Q.   And it wasn't a secret outside the company, either, was it?

A.   I don't know.

Q.   Well, no one told you to keep it a secret; right?

A.   Correct.

Q.   That would be a tough thing to keep a secret; right?

A.   I don't know.

Q.   Well, the planned fueling stations are expected to be between seven and ten acres in size; right?

A.   At one time, that was the thinking, yes.

Q.   What was the thinking in 2020 for the size of these stations?

A.   I would say it was up in the air.

Q.   Ballpark range, size?

A.   Anywhere from three to ten acres.

Q.   Okay.  Three to ten acres, these are big.

     And you testified on Friday that if you use solar, like in the Arizona desert or Utah desert, you'd need a solar farm, too; right?

A.   Yes.

Q.   And I think you testified that that would be 100 acres in size; right?

A.   Potentially.

Q.   And there are precautions, you said, in storing hydrogen; right?

A.   Yes.

Q.   Because hydrogen is flammable?

A.   Yes.

Q.   Very explosive?

A.   Potentially.

Q.   And hydrogen needs safety measures to prevent an explosion; isn't that true?

A.   Yes.

Q.   And you would need space to bring in the trucks; right?

A.   Yes.

Q.   It's got to be big enough to fit a semi truck, right, that's a big, big monster; right?

A.   Yes.

          (Continued on next page)

Q. So you said the smallest footprint in 2020 was three to seven acres, right?

A. No.

Q. Excuse me. Seven -- three to ten acres, right?

A. Yes.

Q. Thank you.

So you can't hide a hydrogen station, right?

A. I don't know.

Q. Well, you can't pull a veil over it to prevent someone from seeing it, right?

A. I don't know.

Q. There's no David Copperfield style of make the Statue of Liberty disappear with a hydrogen station, right? Nikola didn't have a magic department to prevent hydrogen stations to disappear, right?

A. Not that I know of.

Q. OK. So it would be pretty obvious if Nikola had hydrogen stations, right?

A. I don't know.

Q. Seven to ten -- excuse me, three to ten acres?

A. I don't know.

Q. And common sense tells you you would not want to have a hydrogen fueling station without trucks to use them, right?

A. Right.

Q. There wasn't a plan to build the hydrogen station, store

hydrogen for years and years until the trucks finally came out, right?

MS. ESTES:  Objection.  Form.

THE COURT:  Overruled.

A.  Not that I know of.

Q.  Not that you know of.

Well, let's go to Defendant's Exhibit 734, please, and let's bring up page 7.  This is that document that the company filed for investors, put on the website, June 15, 2020, filing.

And if we could go to the part that starts with "we believe," can you read that, please.

A.  "We believe that we will continue to incur operating and net losses each quarter until at least the time we begin significant deliveries of our trucks, which is not expected to begin until 2021 for our Nikola Tre BEV and 2023 for our Nikola Two fuel cell electric vehicle and may occur later."

Q.  Just to remind everyone, the Nikola BEV, that was the battery electric European-style truck, the one that's not vertical, right?

A.  I believe so.

Q.  And the Nikola Two FCEV means fuel cell electric vehicle, right?

A.  Yes.

Q.  So here's the company saying we're not even going to have trucks out until 2023 or later that will use hydrogen, right?

A.   That's correct.

Q.   Now, before we get off these filings, the government asked you about a beer delivery for Anheuser-Busch in November 2019. Do you remember that?

A.   Yes.

Q.   Were you in St. Louis for that delivery?

A.   No.

Q.   No, you were not, right?

A.   Correct.

Q.   You testified that the hydrogen at Nikola's corporate headquarters came from a supplier called Air Liquide.  Do you remember that?

A.   Yes.

Q.   And you testified, to your knowledge, that Air Liquide was not producing hydrogen with zero emissions.  Do you remember saying that?

A.   Yes.

Q.   Mr. Prows, the beer delivery that you weren't present for took place in St. Louis, right?

A.   I believe so.

Q.   And St. Louis is 1,400 miles away from Phoenix, right?

A.   I don't know.

Q.   That's a long way away, though, right?

A.   I don't know.

Q.   How did the -- how did Nikola's truck get from Phoenix to

St. Louis?

A.  I don't know.

Q.  It was trailered, right?

A.  I don't know.

Q.  OK.  But the hydrogen to fuel the truck in St. Louis did not come from the corporate headquarters in Phoenix, isn't that true?

A.  I don't know.

Q.  You don't know?

A.  I don't.

Q.  Then why did you testify about Air Liquide not producing hydrogen with zero emissions at the corporate headquarters?

MS. ESTES:  Objection.  Argumentative.

THE COURT:  Sustained.

Q.  Mr. Prows, you didn't order the hydrogen that was used in that fuel truck -- that was used in that truck in St. Louis, did you?

A.  Not directly, no.

Q.  No.  Someone named Melissa Gamboni handled that, right?

A.  I don't know.

Q.  Do you know who did?

A.  No.

Q.  So you don't know for sure where that hydrogen came from, do you?

A.  No, not for sure.

Q.  Not for sure.

And you weren't even at that beer delivery event, were you?

MS. ESTES:  Objection.  Asked and answered.

THE COURT:  Sustained.

MR. BONDI:  Now, Chris, let's go back to the July 17, 2020, filing for investors with the SEC, and let's look at page 82 of that filing, please.  Could you highlight the part that says first ever zero emission beer run.

Q.  Do you see that?

A.  Yes.

Q.  Mr. Prows, could you read that, please, for the jury.

A.  "In November 2019, Nikola completed AB's first ever zero-emissions beer-run."

Q.  You see where it says "zero emissions?"

A.  Yes.

Q.  I'd like to shift to another topic that the government covered for you on Friday.  The government asked you some questions about the TeslaCharts podcast from July 19, two days after this filing, and I have a few questions about them.

Your Honor, the entire audio has already been admitted into evidence as Defense Exhibit 496.  And, your Honor, with the Court's permission, I'd like to play part of what the government played of that transcript, and I would also like to show the transcript, which is DX 47.

M9JHMil2                           Prows - Cross

THE COURT:  OK.

MR. BONDI:  Chris, could you please play the first clip for the jury.

(Audio played, Defense Exhibit 47, lines 39:08-40:21)

BY MR. BONDI:

Q.  Mr. Prows, did you hear Trevor Milton say 18 months or so?

A.  Yes.

Q.  He was talking about the future, right?

A.  I believe so.

Q.  That, obviously, means the stations are not up and running at the time he's speaking here, were they?

A.  Not those two stations, no.

Q.  He says it takes a lot longer to build other stations besides the demonstration station in Phoenix, right?

A.  For those two stations, yes.

Q.  And he says from the time you kick off a station till the time it actually comes online after permitting is two years. You see that?

A.  Yes, for those two stations he's referring to.

Q.  And that -- these statements from Mr. Milton about the time frame, that sounds pretty close to what we just read in Nikola's public filings with the SEC, isn't that right?

A.  Yes.

Q.  I'd like to shift to another topic, which is the cost of hydrogen.  I'm showing you DX 37, which is also DX 281, which

has been admitted, an April 6, 2020, analyst day presentation. I'd like to go to the page that's hydrogen station key assumptions, please.

Chris, if you wouldn't mind, please, kind of blowing up that top portion there so the jury can see it, the whole section. I want to make sure they have everything.

Do you see it says 3.5 cents per kilowatt-hour for electricity, right?

A. Yes.

Q. And that was something that was modeled internally at the company, right?

A. Yes.

Q. Let's go back a bit. And you see it says Nikola -- with that, Nikola expected the cost to producing hydrogen to be $2.47 a kilowatt, right?

A. No.

Q. $2.47 kilogram, excuse me.

A. Yes.

Q. Thank you.

And $2.47 a kilogram is under $4, right?

A. As a projection, yes.

Q. So Nikola was modeling that it would be able to produce hydrogen in 2020 for $2.47 a kilogram, right?

A. Yes.

Q. And that's what Nikola was saying publicly, right?

A.   As far as I know.

Q.   And this document was on the website, right?

A.   I don't know.

Q.   You and your colleagues helped prepare this presentation, isn't that right, Mr. Prows?

A.   Depends on how you define "colleagues."

Q.   People you work with.

A.   Yes.

Q.   The people you worked with and you helped prepare this presentation, right?

A.   I did not help prepare this.

Q.   You did not help prepare it?

A.   No.

Q.   People that worked at your direction helped prepare it, right?

A.   No.

Q.   OK.  I'm showing you what's been marked for identification as Defense Exhibit 34 and 35.

You could bring it up for the witness to see, please, Chris.

You recognize Defense Exhibit 34 as an email you sent to Trevor Milton on June 9, 2020, right?

A.   Looks like it's dated June 12, but yes.

Q.   Excuse me, June 12.  Thank you.

And you recognize Defense Exhibit 35, the attachment,

as a spreadsheet to that email, right?

Chris, can you just show him that attachment, there.

A.   Yes.

Q.   And you sent this from your Nikola email account, right?

A.   Yes.

Q.   To Trevor Milton's Nikola email account, right?

A.   Yes.

MR. BONDI:  Your Honor, the defense offers into evidence Defense Exhibit 34 and 35.

MS. ESTES:  No objection.

THE COURT:  They will be received.

(Defendant's Exhibits 34 and 35 received in evidence)

MR. BONDI:  Your Honor, may I publish?

THE COURT:  You may.

MR. BONDI:  Chris, can you bring it up for the jury, please.

BY MR. BONDI:

Q.   This is an email you sent to Trevor Milton on June 12, 2020, where you stated, "Here's the gaseous cost model," correct?

A.   Yes.

Q.   So Trevor received this spreadsheet that's attached to this if you sent it, right?

A.   I don't know.

Q.   Do you have any reason to doubt that he didn't get this

email from you?

A.   Some reason, I suppose.

MR. BONDI:   OK.   Chris, can you bring up the spreadsheet which is marked "Revenue Model Assumptions," and if you could pull up cells D38 and F38, please.

Q.   Mr. Prows, do you see that it says $2.47 per kilogram, right?

A.   Yes.

Q.   So this spreadsheet that you emailed to Trevor Milton on June 12, 2020, was projecting a production cost for hydrogen of $2.47 per kilogram, correct?

A.   In a projection, yes.

Q.   Correct, Mr. Prows?

A.   That was a number that I took from -- from the financial projections.

Q.   Well, there's a lot of backup from this spreadsheet, right?

A.   Yes.

Q.   Who worked on this spreadsheet?

A.   A lot of people.

Q.   A lot of people.

And that's the same number -- that $2.47 is the same number we just saw in the Analyst Day presentation posted to the company's website, right?

A.   I don't know.

MR. BONDI:   Well, let's pull up the Analyst Day

presentation, please.  Chris, can we do a split screen maybe?

Q.  Mr. Prows, the $2.47 number in the Analyst Day presentation posted to Nikola's website is the same number that's in your spreadsheet that says $2.47 per kilogram, right?

A.  The numbers appear to be the same, but there's an awful lot involved in that Excel spreadsheet.  It's very complicated.

Q.  It was very complicated, right?

A.  Yes.

Q.  But the bottom line's still the same, right?

A.  I don't know.

Q.  $2.47 bottom line still the same, right?

A.  The two numbers are the same, yes, but there's a lot more that goes into it than that.

Q.  And both of those numbers represent the cost to produce hydrogen, the cost per kilogram, right?

A.  They both reference the cost to produce hydrogen, yes.

Q.  OK.  Thank you.

Now I'd like to ask you about quotes that the company was receiving from third-party suppliers.

In addition to your internal projections, you also received quotes from third parties that Nikola could partner with for hydrogen production, correct?

A.  During this time frame, I don't recall.

Q.  Let's see if we can refresh your recollection.

Let's pull up Defense Exhibit 1412 and 1429 for the

witness to see first, please.

I'm showing you the documents that have been identified for identification as Defense Exhibits 1412 and 1429.  And Defense Exhibit 1412 is an email that you sent to Mr. Koziner, CFO Kim Brady, and CFO Mark Russell on July 22, 2020.

Do you see that?

A.  Yes.

Q.  And Defense Exhibit 1429 is attached to that email, and it's a presentation.  And you sent that with your email, right?

A.  I believe so.

Q.  And you sent these from your Nikola work email, correct?

A.  Yes.

Q.  To your fellow workers and management at Nikola, right?

A.  Yes.

MR. BONDI:  Your Honor, defense offers Defense Exhibit 1412 and 1429 into evidence.

MS. ESTES:  Objection.

THE COURT:  Come to sidebar.

(Continued on next page)

M9JHMil2                          Prows - Cross

(At sidebar)

MS. ESTES:  Your Honor, this is an email.  It's not to Mr. Milton.  He's not copied on it.  So he's offering it, I think, for the truth of the matter asserted.  So it's hearsay. There can be no relevance effect on Mr. Milton because he's not copied on the email.

MR. BONDI:  Your Honor, first of all, this is a business record.  He sent it from his work email as part of his job at Nikola to the executives at Nikola, and I'm going to explore, because we believe Mr. Milton was well aware of this. He reported to people who then also reported to Mr. Milton. This is a document that's a business record created in his email, sent to the executives as part of his normal course of duties.  It clearly comes in as a business record.

THE COURT:  Why is it not a business record?

MS. ESTES:  Your Honor, not every email is a business record.  There has to be a separate basis within the email for admitting what's in the email.

MR. BONDI:  He said he sent this as part of his normal work at Nikola.  I could ask additional foundation questions, but he was doing this as part of his job at Nikola.  This is a classic "generated in the ordinary course of business" document.  It's a business record, it's clear.

MS. ESTES:  Your Honor, that may be true for the presentation.  I think that's a separate issue, but the email

M9JHMil2                         Prows - Cross

itself has hearsay within it.  Not every email is a business record, otherwise every email would come in in every case.

MR. BONDI:  This is an e-mail that comes in as a business record.  It's -- part of it is transmitted in the document.  The document is clearly a business record.  It's relevant.

MR. MUKASEY:  His job is to report to his supervisors what he's doing.

MR. BONDI:  Yes.

THE COURT:  Disagree.  It's not coming in.  The email will not come in.

MR. BONDI:  And the attachment, your Honor?

MS. ESTES:  I think that's fine.

MR. BONDI:  OK.  Thank you.

(Continued on next page)

(In open court; jurors present)

THE COURT:  The objection is sustained in part; overruled in part.

MR. BONDI:  Your Honor, may I publish -- excuse me. The defense offers 1429, the attachment, into evidence.

THE COURT:  That objection is -- yes, you may.

(Defendant's Exhibit 1429 received in evidence)

MR. BONDI:  OK.  And may I publish?

THE COURT:  Yes.

MR. BONDI:  Chris, could you please pull up just the attachment, please, and let's turn to page 7 of the document.

BY MR. BONDI:

Q.  Mr. Prows, you see there the 3.8 -- 3.08 kilograms for wholesale hydrogen?  Do you see that?

A.  $3.08 per kilogram, yes.

Q.  Mr. Prows, in July of 2020, Mitsubishi quoted Nikola a cost of $3.08 per kilogram for wholesale hydrogen, isn't that correct?

A.  I don't believe this was a quote.  I think it was an indicative price.

Q.  I'm sorry.  An indicative price?

A.  Yes.

Q.  It meant that's what they could get you, right?

A.  Sorry?

Q.  It meant that's what they could offer to you?

A.   Again, I don't know.  I think it was -- this was not a formal quote, if I remember correctly, and it was not a firm contract.

Q.   OK.  I didn't ask about the firm contract.  I just asked if this was what Mitsubishi had quoted you.

A.   I do not believe so.

Q.   OK.  Well, $3.08 a kilogram to produce hydrogen is less than $4, though, right?

A.   It is.

Q.   And so if Mitsubishi had delivered on this indicative price of $3.08 per kilogram, that meant it would have been delivering under $4 a kilogram for hydrogen, right?

A.   Yes.  However, this only deals with the hydrogen.  It does not deal with the dispensing of the hydrogen onto the truck.

Q.   That's just to produce hydrogen, right?

A.   That's just to produce hydrogen.  So you're comparing apples and oranges.

Q.   Nope, I'm asking about production, producing hydrogen, right?

            MS. ESTES:  Objection.

A.   But the other numbers that we were talking about included dispensing hydrogen as well.

Q.   Well, let's go to some other documents here.

            Your Honor, I'd like to show the witness Defense Exhibit 209 and 210.

This is an email that you sent from your Nikola email account to Mark Russell, Kim Brady, Mark Keith, and Pablo Koziner.  Do you see that?

A.  Yes.

Q.  And you sent that in the ordinary course of your duties at Nikola, right?

A.  Yes.

Q.  And Mark Russell, you reported to Mark Russell, correct?

A.  At this point in time, I believe I was reporting to Pablo.

Q.  And Pablo Koziner is on this email too, right?

A.  Yes.

MR. BONDI:  Let's show the witness the attachment, please.

Q.  The attachment is a document that you helped create, right?

A.  I don't recall.

Q.  Well, let's go to the -- before I offer this, I want to just show some more and lay some foundation.

If you go to page 3, Chris, and if you go to the second to last bullet there, you see it says, "Six-month process," right?

A.  I see that.

Q.  OK.  And you see the title, it says "Electrolyzer RFP Process"?

A.  Yes.

Q.  And this was part of a six-month process, and you're

reporting on what happened with what you learned from that six-month process, right?

A.   Yes.

MR. BONDI:  Defense offers Defense Exhibit 209 and 210 into evidence.

MS. ESTES:  Objection.

THE COURT:  Same as before?

MS. ESTES:  No, your Honor, time frame.

THE COURT:  OK.  Mr. Bondi.

MR. BONDI:  Your Honor, it's in the time frame, but I think we might need to approach, then.

THE COURT:  OK.

(Continued on next page)

(At sidebar)

MR. BONDI:  Your Honor, the reason why I asked the witness about six months, the document clearly reports on a six-month effort to go out to RFPs to different hydrogen production companies to get quotes for the prices to produce hydrogen.  It was a culmination of six months.

Now, what Ms. Estes is going to say is this happened, this was sent after Mr. Milton left the company.  It was sent nine days after he left the company, your Honor.  It was still in September of 2020, which according to the indictment, it says September 2020.  And so it's within the time period of the initial indictment and even the current indictment.  It's nine days after he left the company, and it clearly reflects efforts going back six months.  It says it on the document.  That's why I asked so many questions as a predicate for you.

THE COURT:  Six months going back or six months going forward?

MR. BONDI:  Six months going back.  It was the culmination of a six month RFP process that began when Mr. Milton was at the company.

MS. ESTES:  Your Honor, this postdates his involvement in the company.  He would have never seen this document because it was sent and put together after he left.

I'm not opposed to Mr. Bondi asking about the RFP process that happened that summer, but I think the document

M9JHMil2                        Prows - Cross

itself and the email are irrelevant given the time frame.

MR. BONDI:  Your Honor, the email was sent, again, nine days after he left the company, and it references this six-month RFP process that Mr. Milton was aware of that happened during his tenure at the company.

THE COURT:  You can ask him about the process, but the document's not coming in.

MR. BONDI:  Neither?

THE COURT:  Correct.

MR. BONDI:  All right.  Thank you.

(Continued on next page)

(In open court; jurors present)

BY MR. BONDI:

Q.  Mr. Prows, who is Joe Joshi?

A.  Joe Joshi was an engineer who was part of the infrastructure development team.

MR. BONDI:  Excuse me.  Chris, can you take down the document.  Thank you.

Q.  And Joe Joshi led an effort to seek RFPs from different companies to get quotes to see what it could take to produce hydrogen, right?

A.  Correct.

Q.  As a result of that process, companies submitted proposals, right?

A.  Yes.

Q.  And that process began when?  In the spring of 2020, right?

A.  I believe so.

Q.  As part of the RFP process, these company sign what was known as NDAs, right?

A.  Nondisclosure agreements, yes.

Q.  What's a nondisclosure agreement, just in layman's terms?

A.  It's an agreement to keep information confidential between two or more parties.

Q.  And that was a two-way street, too, between the company that signed it and Nikola, right?

A.  I believe so.

Q.  Because these companies wouldn't want Nikola to give the precise numbers of what the quotes were coming in, right?

A.  Outside of Nikola, correct.

Q.  Part of the reason for doing this is you were looking for alternatives to Nel, right?

A.  Yes.

Q.  You didn't like Nel?

A.  I didn't like how they behaved.

Q.  Yeah, and we'll get to that in a moment.

As a result of these quotes, Hytron quoted Nikola $3.16 per kilogram to produce hydrogen if the company worked with Hytron, right?

A.  I don't know.

MR. BONDI:  Chris, let's see if we can refresh the witness' recollection.  Pull up page 4, please.

Q.  Does it refresh your recollection, Mr. Prows, that Hytron quoted $3.16 a kilogram to produce hydrogen?

A.  Yes, only to produce hydrogen, but not to dispense it.

Q.  Only to produce, right.

And Cummins quoted $3.50 per kilogram to produce hydrogen, correct?

A.  Yes, to produce but not to dispense.

Q.  Plug Power quoted $2.37 to produce hydrogen?

A.  Yes, to produce, but not to dispense.

Q.  Nel quoted $2.66 kilogram to produce hydrogen, right?

M9JHMil2                         Prows - Cross

A.   No.

Q.   All right.  What did Nel quote?

A.   These were numbers that we pulled from other documents and information we had on our previous agreements with Nel.

Q.   And isn't it true Siemens quoted $2.46 per kilogram to produce hydrogen?

A.   Yes, to produce, but not dispense.

Q.   And isn't it true Thyssenkrupp quoted Nikola $2.60 to produce hydrogen?

A.   Yes, to produce, but not to dispense.

Q.   All of these quotes are less than $4 a kilogram to produce hydrogen, correct?

A.   Yes, to produce, but not to dispense.

Q.   And even all of them are less than three except one, right?

A.   Yes, to produce, but not to dispense.

Q.   So in September 2020, as of September -- excuse me.  Strike that.  We can go off this document.

Mr. Prows, in 2020, you personally thought that Trevor Milton's statements that Nikola could produce or obtain hydrogen for less than $4 a kilogram was conservative, correct?

A.   Could you restate the question, please.

Q.   Sure.

In 2020 you personally thought that Trevor Milton's statement that Nikola could produce or obtain hydrogen for less than $4 a kilogram was conservative, correct?

A.   No.

Q.   Mr. Prows, you were interviewed by the company's attorneys in October 2020, isn't that correct?

A.   I believe so.

Q.   And those attorneys read their notes to the government, and you were admonished during that interview to tell the truth, isn't that correct?

A.   Yes.

Q.   And, Mr. Prows, isn't it not that you said to the company's attorneys "his target price is $2.70 a kilogram and thinks it's totally achievable at scale, and he," meaning you, "has no concerns about it.  He doesn't know why Mr. Milton said below $4 when that seems conservative to him," meaning you.

Do you remember saying that?

A.   I don't.

MR. BONDI:  Chris, could you please pull up the notes from that interview and see if we can refresh Mr. Prows' recollection.

Q.   Mr. Prows, if you could read those notes, which are the government's notes of the readout of your interview by the law firm Kirkland & Ellis.  Can you read those to yourself.

A.   To myself or out loud?

Q.   To yourself, please.

Mr. Prows, does that refresh your recollection that you thought $4 a kilogram was conservative?

A.   No.

Q.   Do you think the government got that wrong?

        MS. ESTES:  Objection.

        THE COURT:  Sustained.

Q.   Your target price in 2020 was $2.70 a kilogram, right?

A.   I don't know.

Q.   Would you please read those same notes.

        MS. ESTES:  Your Honor, objection.  He just said he
doesn't know, not he doesn't recall.

        THE COURT:  Sustained.

Q.   You believed your target price was achievable at scale,
correct?

A.   Which target price?

Q.   The target price to produce hydrogen.

A.   Which was what?

Q.   What was your target price in 2020 to produce hydrogen?

A.   I don't recall because it was an all-in price to produce
and dispense hydrogen.

Q.   I'm asking about just producing hydrogen.

        What was your target price to produce hydrogen?

A.   I don't know.

Q.   Was it $2.70?

A.   I don't know.

Q.   Was it under $3?

A.   I don't know.

Q.  Was it under $4?

A.  Probably.

Q.  And you had no concern with that price, did you, that target price?

A.  I don't know what the target price was.

Q.  Mr. Prows, you believed even in 2020 that Nikola could get hydrogen into the truck for as little as $2 a kilogram, isn't that right?

A.  No.

Q.  Mr. Prows, that's not what you told the company's lawyers, was it?

A.  I don't know.

        MR. BONDI:  Chris, could you pull up the interview notes from October 26, 2020, that were read out to the government.

Q.  Mr. Prows, could you please read what's highlighted.

A.  "Prows" --

Q.  To yourself, I think, your Honor.

        Does that refresh your recollection that you thought you could put hydrogen into a truck for as little as $2 a kilogram?

A.  No.

Q.  The company's lawyers interviewed you for three hours, right?

A.  I don't know.

Q.  Do you remember approximately how long?

A.  Approximately three hours.

Q.  OK.  And how many lawyers from the company were there?

A.  I don't know.

Q.  More than two?

A.  I believe so.

Q.  There were about five, right?

A.  Seems right.

Q.  And they were taking notes, right?

A.  I believe so.

Q.  OK.  Let's talk about the cost of electricity now.

        The cost of electricity is a factor in determining the cost to produce hydrogen, right?

A.  Yes.

Q.  In fact, it's the biggest factor, right?

A.  Yes.

Q.  So a great way to get the cost of hydrogen production down would be to get the cost of electricity down, right?

A.  Yes.

Q.  And Nikola's hydrogen plan was always to obtain cheap electricity, right?

A.  Yes.

Q.  And that's what you and your colleagues were out for, trying to find cheap electricity around the country, right?

A.  Yes.

Q.   In fact, Mr. Prows, Nikola projected as early as 2017, even before you started working at Nikola, that Nikola could obtain electricity at 3.5 cents per kilowatt-hour or less?

MS. ESTES:  Objection.  Foundation.

THE COURT:  Sustained.

Q.   Mr. Prows, when you joined the company, isn't it true that Nikola believed that it could obtain electricity on an aggregate basis nationwide for $3 and five -- 3.5 cents a kilowatt-hour, right?

A.   I don't know what you mean by "aggregate."

Q.   The 3.5 cents a kilowatt-hour in that presentation that was posted to the website, what did that mean?  What did that stand for?

A.   That would have represented a blended average of electricity pricing across the country.

Q.   So you were estimating a blended average of $3 -- excuse me, 3.5 cents a kilowatt-hour for the cost of electricity, right?

A.   That's what the company was projecting, yes.

Q.   And that would have translated in producing hydrogen, producing hydrogen, for under $4 a kilogram, right?

A.   With other assumptions, yes.

Q.   I'm showing you what's been marked for identification as Defense Exhibit 206.  This is an email dated August 26, 2020, from Mark Keith to Jason Roycht, copying you, Pablo Koziner,

and others at Nikola.  And this email was sent from Mr. Keith's Nikola email account, right?

A.  Yes.

Q.  And it was sent to your email account, right?

A.  Yes.

Q.  And this was received as part of your ordinary course of work at Nikola, right?

A.  Yes.

MR. BONDI:  Your Honor, defense offers DX 206 into evidence.

MS. ESTES:  Objection.

THE COURT:  Let's talk at sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  What's the objection?

MS. ESTES:  Hearsay, your Honor.  Mr. Milton is not copied on this email, so there's no basis to know that he ever saw it, and these are statements from other people that are just not admissible.  They're hearsay.

MR. BONDI:  Your Honor, I'm offering it for nonhearsay purposes, the effect on the listener, namely, Mr. Prows.  And also, your Honor, it would be a business record under 803(6).  But we're not offering it for the truth.  We're offering it for the fact that he got it, and it's a business record.

THE COURT:  What was the effect?

MS. ESTES:  How is the fact that he got it relevant?

MR. BONDI:  Because it shows that Mr. Keith said to Mr. Prows that it was OK to use 3.5 cents a kilowatt-hour, and that serves as the basis for the reason why he was using 3.5 cents a kilowatt-hour.  It provides notice to him.  Not offered for the truth, but it's still a business record anyway, your Honor.

MS. ESTES:  Your Honor, I certainly think Mr. Bondi can ask Mr. Prows questions about these issues, but I don't see how the document itself is admissible.

MR. BONDI:  It's a company email, a company document in the normal course of his business, your Honor.  It's a classic business record.

M9JHMil2                        Prows - Cross

THE COURT:  You can ask him about it.  The record itself will not come in.

(Continued on next page)

(In open court; jurors present)

MR. BONDI:  Chris, take down this document for a moment, please.  We'll come back to it.

BY MR. BONDI:

Q.  Mr. Prows, Mark Keith was, in August 2020, the global head of power solutions, right?

A.  I believe so.

Q.  And Jason Roycht at the time was vice president of technology, development, and strategy, right?

A.  I don't know.

Q.  Do you know what Mr. Roycht did at the company?

A.  Not exactly.

Q.  OK.  Did he work with you on some hydrogen issues?

A.  Some issues, yes.

Q.  Mr. Prows, isn't it true that Mr. Keith informed you that it was OK to use 3.5 cents per kilowatt-hour in August of 2020?

A.  Not that I recall.

MR. BONDI:  Like to pull up DX -- for the witness DX 205 -- 206, go to page 1, paragraph 3, lines 1 through 3.

Q.  Could you read that to yourself.

A.  OK.

Q.  Mr. Prows, does that refresh your recollection that Mr. Keith told you in August of 2020 that it was OK to use 3.5 cents a kilowatt-hour for the cost of electricity?

A.  No.  This email's to Jason.

Q.   You're on the email, right?

A.   I was on the email, yes.

Q.   Do you read your emails?

A.   I do.

Q.   Do you remember reading this email?

A.   No.

Q.   Mr. Prows, isn't it true that Mr. Keith thought it was OK to use 3.5 cents a kilowatt-hour for the cost of electricity?

          MS. ESTES:  Objection.

          THE COURT:  Sustained.

Q.   Mr. Prows, there were people in the company in the summer of 2020 that were indicating that it was OK to use 3.5 cents a kilowatt-hour for the cost of electricity to produce hydrogen, correct?

          MS. ESTES:  Objection.  Calls for hearsay.

          THE COURT:  Sustained.

Q.   In 2020 the Arizona Public Services commission quoted Nikola three cents per kilowatt-hour, isn't that true?

A.   Not that I recall.

Q.   In 2020, Mr. Prows, I'd like -- you were interviewed by the Kirkland & Ellis on October 26, 2020.  Remember the five lawyers in the room?

A.   I don't know if that was the exact date, but, yes, I know which interview you're talking about.

Q.   And they were taking notes, right?

A.   As far as I know.

Q.   And isn't it true, Mr. Prows, that you told them that Nikola has a quote from APS in writing to provide electricity at three cents per kilowatt-hour in APS service territory?

A.   I don't recall.

MR. BONDI:   Chris, can we pull up the document to refresh the witness' recollection, please.

Q.   Mr. Prows, could you please read that to yourself.

A.   OK.

Q.   Does that refresh your recollection, Mr. Prows?

A.   Not of the exact conversation, no.

Q.   OK.   But do you remember APS providing a quote for three cents per kilowatt-hour in 2020?

MS. ESTES:   Objection.   Time frame.

MR. BONDI:   In 2020.

MS. ESTES:   More specific.

Q.   Prior to September 2020.

A.   I don't recall the time frame.

Q.   Do you recall a quote from APS?

A.   They gave us verbal indications.   I don't think we ever got a written quote from APS.

Q.   That's not what you told the company's lawyers, though, when they interviewed you?

A.   I don't recall.

Q.   Could you review that line again, please, from the

interview notes.

MS. ESTES:  Objection.  Asked and answered.

MR. BONDI:  It's a different question, your Honor.

THE COURT:  Overruled.

Q.  Could you read that line from the interview notes.

A.  Yes.

Q.  Does that refresh your recollection that you told them the quote was in writing?

A.  Unfortunately, no.

Q.  Put aside, then, whether it's in writing or verbal.

Did Nikola receive a quote from APS for under three cents a kilowatt-hour?

A.  There were discussions with APS about acquiring electricity for less than three cents, but I don't recall the specifics of that.

Q.  Because other people were involved?

A.  Other people were involved, but I was always directly involved in these conversations, negotiations with APS.

Q.  And chief legal officer Britton Worthen was also involved, right?

A.  I don't believe so.

Q.  Shifting to another company, Hanwha is a large solar company based in Korea, right?

A.  Sorry.  Say that again, please.

Q.  Hanwha, have you ever heard of the company Hanwha?

A.  Yes.

Q.  It's a large solar company based in Korea, right?

A.  I believe so.

Q.  And Hanwha was also an investor in Nikola, isn't that right?

A.  I believe so.

Q.  And Hanwha even had a representative on Nikola's board of directors in 2020, isn't that correct?

A.  I don't recall the time frame.

MR. BONDI:  OK.  Let's pull up, Chris, 734, which has already been admitted, and let's home in on the date.  Can you highlight the date on the front page.

Q.  Mr. Prows, can you read the date there?

A.  I don't see the date.  Oh, there it is.  June 15.

Q.  June 15.

And, Chris, can you go to the last page of this document, please, where the signatures are, and can you highlight the signature of Sophie Jin.  Sophie Jin.

Do you see that, Mr. Prows?

A.  Yes.

Q.  Ms. Jin was from Hanwha, right?

A.  Yes.

Q.  And she was a director as of June 15, 2020, right?

A.  Yes.

Q.  And in June -- excuse me, and in 2020, while Mr. Milton was

at the company, serving on the board with Ms. Jin, isn't it true that Hanwha indicated that it could provide Nikola with electricity at 1.8 cents per kilowatt-hour in Arizona in the future, by the end of 2021?

A.   I don't know.  I didn't attend the board meetings.

Q.   OK.  I'm not asking about what happened in the board meeting.  I'm asking if you're aware that Hanwha indicated in 2020 that it could provide Nikola with electricity at 1.8 cents a kilowatt-hour in Arizona by the end of 2021?

A.   I heard that that was a possibility.

Q.   And you told that to the company lawyers when they interviewed you, isn't that right?

A.   I don't recall.

     MR. BONDI:  Chris, could you please pull up the notes from that interview.

Q.   Mr. Prows, read that sentence from those notes that were read -- that were taken by the government of the readout of your interview with Kirkland & Ellis.  If you could read to yourself, please.

     Does that refresh your recollection that Hanwha in 2021 verbally said it could provide the company electricity at 1.8 cents a kilowatt-hour in Arizona in the end of 2021?

A.   Yes, but only under certain conditions.

Q.   But it does refresh your recollection?

A.   Yes.

Q.  Mr. Prows, you've heard the term "get behind the grid,"
right?

A.  Yes.

Q.  What does that mean?

A.  It means producing electricity outside of the local
utility.

Q.  And that's a term regularly used within Nikola, right, in
2020?

A.  I don't know if it was regularly used, but, yes, it was
talked about.

Q.  You've used the term, right?

A.  Occasionally.

Q.  Mr. Russell's used the term, right?

A.  Not that I recall.

Q.  Mr. Koziner's used the term?

A.  Not that I recall.

Q.  OK.  Others have used the term, though, right?

A.  I don't know.

Q.  I'm showing you what's been marked for identification as
DX 1646.

        You recognize this document as an email that you sent
on June 25, 2020, right?

A.  I don't recall this email.

Q.  Let's put that aside, then.

        You've used the term "behind the meter," right?

A.   I have.

Q.   And you've used the term "solar behind the meter," right?

A.   Yes.

Q.   And solar behind the meter would get you to two cents, right?

A.   I don't think that we would -- it depends on the circumstances, but I don't think so.

           MR. BONDI:   Chris, can you put back up that email, please, see if we can refresh Mr. Prows' recollection.

Q.   Does that refresh your recollection that solar behind the meter will get you to two cents?

A.   No.

Q.   Nikola was also exploring tapping into federal lines, right?

A.   There was some discussion about that.

Q.   Who was involved in that discussion?

A.   Mark Russell, and that's all I remember.

Q.   What does it mean to tap into the federal line?

A.   The idea is to tap into a transmission, an electrical transmission line, that transports electricity from state to state.

Q.   And one of those federal transmission lines that you were exploring tapping into was the Western Area Power Administration, right?

A.   We had talked about that idea, yes.

Q.   You had talked with the Western Area Power Administration directly, right?

A.   Not that I recall.

Q.   Mr. Prows, I'm showing you what's been marked as Defense Exhibit 1228.

          Do you recognize this document as an email dated June 4, 2020, from Mr. Koziner to CEO Mark Russell, copying you and others at Nikola, correct?

A.   Correct.

Q.   And this was sent to your Nikola account?

A.   Yes.

Q.   And this was sent as part of your job at Nikola?

A.   Yes.

          MR. BONDI:  Your Honor, I'd offer Defense Exhibit 1228 into evidence.

          MS. ESTES:  Objection.

          THE COURT:  Sustained.

          MS. ESTES:  Hearsay.

          MR. BONDI:  I'm sorry, your Honor, I didn't hear you.

          THE COURT:  Sustained.  I'm sorry.

          MR. BONDI:  Oh.

Q.   Mr. Koziner, isn't it true -- excuse me.  You can remove that document.

          Mr. Prows, isn't it true that Mr. Koziner told CEO Mark Russell that he was in talks with WAPA, the Western Area

Public Administration, about tapping into the federal lines?

MS. ESTES:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q.  Are you aware that there were discussions with Mr. Koziner and the western area public authority about tapping into the federal lines?

A.  Not that I recall.

Q.  Earlier you said that hydrogen can be produced through a process called "electrolysis," right?

A.  Yes.

Q.  And producing hydrogen from electrolysis has been done for over 90 years, right?

A.  I don't know.

Q.  Well, it's been done longer than you and I have been alive, right?

A.  As far as I know, yes.

Q.  And in order to produce hydrogen through electrolysis, you need what's known as an electrolyzer, right?

A.  Yes.

Q.  And that's a big piece of equipment, right?

A.  Relatively speaking, yes.

Q.  Now, Nikola purchased its electrolyzer from a company called Nel, right?

A.  Yes.

Q.  And you talked about Nel on Friday, right?  It's that

M9JHMil2                          Prows - Cross

Norwegian hydrogen production company, right?  And Nel's been around for over 90 years?

A.  I don't know how long they've been around.

Q.  Nel is well-known in the hydrogen industry, right?

A.  I believe so.

Q.  It's the world's largest hydrogen production company, right?

A.  I don't know.

Q.  Excuse me?

A.  I don't know.

Q.  Nel makes the equipment to make hydrogen?

A.  Yes.

Q.  Nel makes electrolyzers?

A.  Yes.

Q.  And an electrolyzer is a piece of equipment that zaps water, essentially, to make hydrogen, to split the molecules, right?

A.  Yes.

Q.  OK.  Nel also builds hydrogen stations, too, correct?

A.  They try to, yes.

Q.  They built hydrogen stations around the globe, right?

A.  I don't know.

Q.  Let's talk about your -- Nikola's relationship with Nel.

        The first contact between Nikola and Nel was way back in 2016, right?

A.   I don't know when it was.

Q.   Regardless, it went back longer than when you arrived at the company in April of 2019, right?

A.   Correct.

Q.   And Nikola partnered with Nel to help with Nikola's business plan for hydrogen production, correct?

A.   I don't know.

         MR. BONDI:   Chris, would you please bring up, then, Defense Exhibit 37, which we've seen before.  It is the April 6 Analyst Day presentation.  This is already admitted into evidence.

Q.   Mr. Prows, could you read the highlighted text starting on Bates No., looks like, 87 that starts with "on a path."  Could you read that, please.

A.   "On a path to effectively scale green energy storage to ultimately transform transportation fueling landscape. Partnered with Nel to develop first in kind hydrogen station infrastructure."

Q.   And so Nikola was partnering with Nel here for its hydrogen infrastructure, right?

A.   Yes.

         (Continued on next page)

BY MR. BONDI:

Q.   And let's move two pages later in that document.  Would you read the text right there that's highlighted, please, under 2018.

A.   Signed hydrogen station development agreement with Nel.

Q.   And 2018 is two years before the company went public; right?

A.   Roughly, yes.

Q.   And in 2018 is when the company ordered electrolyzers from Nel; right?

A.   I don't know when they were ordered.

Q.   Before you got to the company, though, in 2019?

A.   Yes.

        MR. BONDI:  Would you move two pages forward in that document.

        THE COURT:  Before we do, it's 11 o'clock, Mr. Bondi, so we're going to take our first break.

        20 minutes, ladies and gentlemen.  Do not discuss the case.

        (Continued on next page)

M9JCmil3                          Prows - cross

(Jury not present)

THE COURT:  Mr. Prows, you may step down.

Everyone can be seated.

Any issues to raise, Mr. Roos?

MR. ROOS:  I think my colleague has one after the witness is out of earshot.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.  We were not objecting to this in the moment, frankly to move things along, but I do want to plant a flag about improper modes of refreshing recollection.  Specifically, the lawyer should not be instructing the jury about the content about items that are not in evidence, telling them what notes are and who took them.  He shouldn't be telling the witness that either, for that matter.  So we will start objecting if that continues.

THE COURT:  I did notice that, Mr. Bondi.  Arguably, it could be prejudicial to this side.  If you keep highlighting that these are the government's notes or the notes of lawyers, you say that they're not accurate, et cetera.  You can simply refresh his recollection without reading -- and you read from the document directly on a couple of occasions and I was frankly surprised there wasn't an objection, but it is what it is.

MR. BONDI:  I'll be mindful, your Honor.  Thank you.

Anything else?

M9JCmil3                           Prows - cross

MR. PODOLSKY:  Nothing more, your Honor.

THE COURT:  Anything on this side?

MR. MUKASEY:  No, Judge.

THE COURT:  Okay.  20 minutes.

(Recess)

THE COURT:  Mr. Caruso indicated he had an issue to raise.  Mr. Caruso, let me ask you two questions.  One, is it something that has to do with the witness currently on the stand?

MR. CARUSO:  No, Judge.

THE COURT:  And two, will it take a minute or less?

MR. CARUSO:  No, let's do it later.

THE COURT:  We'll wait.  Can we bring Mr. Prows back in.

MR. ROOS:  The mystery is killing me, though.

THE COURT:  Maybe he'll reveal it for you.

(Continued on next page)

(Jury present)

THE COURT:  Everyone, be seated.

Mr. Bondi.

MR. BONDI:  Thank you, your Honor.

BY MR. BONDI:

Q.  Mr. Prows, before we get back into the documents here, how many times have you been interviewed by the government?

A.  I don't recall.

Q.  Seven times, does that sound right?

A.  That sounds like a lot.

Q.  If you had to guess, how many times?

A.  Two or three.

Q.  Do you remember being interviewed on February 3rd, 2021?

A.  No.

Q.  Do you remember being interviewed in early 2021?

A.  I don't remember the timeframe.

MR. BONDI:  Chris, do you think we can bring up all the dates of the notes to refresh the recollection of the witness.

MS. ESTES:  Objection.

THE COURT:  Overruled.

MR. BONDI:  And bring up the first one, Chris.  And can you bring up the second set of notes, please.  And can you bring up the third set of notes, please.

THE COURT:  Mr. Prows, are you seeing anything?

THE WITNESS:  I'm not.

THE COURT:  I'm not seeing anything.

MR. BONDI:  Your Honor, I have hard copies of these.

THE COURT:  That would be easier.

MR. BONDI:  May I approach the witness?

THE COURT:  You may.

Q.  Mr. Prows, if you wouldn't mind just reading through those notes and I'm going to ask you simply if you remember how many times you were interviewed by the government.

THE COURT:  Could I ask a question, Mr. Bondi.  By the government, do you mean the U.S. Attorney's Office?

MR. BONDI:  Yes, your Honor, the United States Attorney's Office.  Thank you for clarifying.

A.  Okay.

Q.  Mr. Prows, does that refresh your recollection that you were interviewed by the government, U.S. Attorney's Office seven times?

A.  No.

Q.  How many times do you remember being interviewed then?

A.  Two or three.

MR. BONDI:  Your Honor, may I collect my notes from the witness?

THE COURT:  You may.

MR. BONDI:  Chris, I'd like to pull up GX-803, which is already in evidence, and publish for the jury, please.

Q.  Mr. Prows, you remember you talked about that on Friday, that's the press release for the purchase of the electrolyzers from Nel.  Do you remember that?

A.  Yes.

Q.  Around June of 2020, around the time Nikola went public, the Nikola's board of directors approved the purchase of these electrolyzers; correct?

A.  I don't know.

Q.  You don't know what, if it was the board or the timing or what?

A.  The board.

Q.  But you remember they were purchased in June of 2020; right?

A.  There was a purchase order issued, yes.

Q.  And Nikola ordered these electrolyzers from Nel for its first stations coming online, right, this was to be used in the first stations; right?

A.  Either that or at a hydrogen production hub.

Q.  And the first stations that would come online would be for Anheuser-Busch; right?

A.  Potentially.

Q.  Potentially?  That was the plan in June of 2020; right?

A.  There would need to be stations to support Anheuser-Busch, yes.

Q.  And that wasn't going to be for another two years; right?

A.   It would take about that long, yes, at least.

Q.   And Mr. Prows, this press release was up on Nikola's website through at least September 2020; right?

A.   I don't know.

Q.   Mr. Prows, are you aware that Nikola's legal team reviewed this press release before it went out?

A.   No.

Q.   I'd like to show you what's been marked as Defendant's Exhibit 1646 for identification.  If you see, this is an email thread, and at the top of the email, you see it's from Nicole Rose to Trevor Milton, CEO Russell, chief legal officer Worthen, Kim Brady, and Vince Caramella.

     Do you see that?

A.   Yes.

Q.   And these are people who were part of Nikola; right?

A.   Yes.

Q.   And you received this email; right?

A.   Yes.

     MR. BONDI:  Your Honor, for Defendant's Exhibit 1646 into evidence.

     MS. ESTES:  No objection.

     THE COURT:  It will be received.

     (Defendant's Exhibit 1646 received in evidence)

     MR. BONDI:  And publish to the jury.

     THE COURT:  You may.

Q.  Mr. Prows, if you would please read the email from CEO Mark Russell on May 30th, 2020, at 6:09 p.m., please.

A.  Can you start a draft PR for our agreement with Nel to purchase 40 tons of electrolyzer capacity?  Assuming all is in order with PO proposal from Nel (Trevor has and will forward) we will want to release ASAP.

Q.  And PR is press release; right?

A.  As far as I know.

Q.  So Mr. Russell wanted to get this press release out; right?

A.  I don't know.

Q.  And if you review the email from Vince Caramella, who is the global head of marketing; right?

A.  Yes.

Q.  On June 1st of 2020 at 11:13, Mr. Prows, Vince Caramella is asking you to, quote, validate and/or provide answers.

        Do you see that?

A.  Yes.

Q.  He was seeking your input in that press release; right?

A.  Yes.

Q.  And you gave it; right?

A.  I don't know.

Q.  You don't know?  Or you don't remember?

A.  I don't remember.

        MR. BONDI:  Let's go back to the press release, please.

Q.  Mr. Prows, you're not suggesting there's anything wrong
with this press release, are you?

A.  You mean in terms of the facts that are being presented?

Q.  In terms of what's in there, is there anything wrong in
this press release?

A.  I'd have to read it very, very carefully to determine if
there's anything wrong with it.

Q.  Sitting here today, you don't know of anything wrong with
this press release that Mr. Caramella asked you to review
that's been on Nikola's website, do you?

A.  At this point, I'm not aware of any misrepresentations that
were made with that.

Q.  Now let's go back and look at this press release,
Mr. Prows.  You see it announces Nikola Corporation, who
becomes publicly traded on June 4, 2020 on the NASDAQ, signed a
purchase order with Nel ASA, and it has Nel's ticker symbol,
for an 85-megawatt alkaline electrolyzers -- excuse me.  For
85-megawatt alkaline electrolyzers supporting five of the
world's first 8-ton per day hydrogen fueling stations.  Do you
see that?

A.  Yes.

Q.  Anything wrong with that?

A.  I don't know about the 85-megawatt alkaline electrolyzers.

Q.  What do you mean, you don't remember what the size was?

A.  I don't know how the 85-megawatt alkaline electrolyzers

relates to the purchase order that was issued for Nel.

Q.  And you see it has a $30 million value; right?  That was the value that was in the purchase order; right?

A.  Yes.

Q.  And it says it will support the five initial stations; right?

A.  Yes.

Q.  And you see there's a quote from Trevor Milton there, do you see that?

A.  Yes.

Q.  And he says, we are building the largest hydrogen network in the world and I couldn't be prouder to have Nel part of it.

Do you see that?

A.  Yes.

Q.  You'd agree that Nikola was building the largest hydrogen network in the world; right?

A.  I don't know.

Q.  You don't know what you were doing at Nikola in June of 2020?

A.  I did.

Q.  And the plan was to build the largest hydrogen network in the world, was it not?

A.  I don't know.  I don't know what other companies are doing.

Q.  And Mr. Milton says these electrolyzers will support five heavy-duty hydrogen stations which will cover multiple states

and trucking routes.

Do you see that?

A.  Yes.

Q.  Do you have any problem with that statement, Mr. Prows?

A.  No.

Q.  And he says the future of clean trucking is here, the fleets are lining up to be part of the transition for Nikola; right?

A.  I see that.

Q.  And in this press release that was reviewed by CEO Mark Russell, chief legal officer Britton Worthen and others, he uses the word "here."  Do you see that?

A.  Yes.

Q.  You testified on Friday that you had concerns when Trevor used the word "now" in a podcast, but you don't have a problem with the word "here" here, do you?

A.  I do.

Q.  You do.  Did you go express that opinion at the time this press release came out?

A.  I did not.

Q.  Did you see it when it came out?

A.  Not that I recall.

Q.  But you were asked to review it by Vince Caramella; right?

A.  That's what the email had asked, yes.

Q.  And Mr. Worthen, the chief legal officer, was copied on

this press release; right?

A.   Yes.

MR. BONDI:   Now, Chris, if you'd go to the bottom of that press release.

Q.   You see the contact person there is Nicole Rose.  Do you see that name?

A.   Yes.

Q.   And who is Ms. Rose?

A.   Nicole is part of the marketing team at Nikola.

Q.   And if you look to the next page, there's another contact information for Ms. Robar; right?

A.   Yes.

Q.   Are you familiar with who Ms. Robar is?

A.   Vaguely.

Q.   She's an outside PR person for the company?

A.   I believe so.

Q.   So the time you started at Nikola in 2019 through this time in 2020, Nikola had spent millions of dollars on its plan for its future hydrogen network; right?

A.   I believe so.

MR. BONDI:   I'd like to go off of this document and move on to another topic here related to this.

Q.   Nikola signed an order to purchase these 40 electrolyzers within days of going public; right?

A.   Yes.

Q.   The government spent a lot of time talking about that on
Friday with you; right?

A.   Yes.

Q.   The purchase order was the result of many months of
negotiations with Nel; right?

A.   No.

Q.   Well, the negotiations started in February of that same
year; isn't that right?

A.   For a five-station deal, yes.

Q.   Negotiations started in February of that year with Nel to
purchase electrolyzers; correct?

A.   Electrolyzers and a lot of other equipment, yes, combined.

Q.   I'm showing you what's been marked as Defendant's
Exhibit 32 and 33 for identification.  And you recognize this
email dated from May 29, 2020 as being from you to Trevor
Milton with copies to CEO Mark Russell, CFO Kim Brady, and
chief legal officer Britton Worthen; correct?

A.   Yes.

Q.   And this is something you received on your Nikola email
account; right?

A.   Yes.

Q.   Actually, you sent it from your Nikola email account;
right?

A.   Yes.

Q.   And this is part of your normal duties at Nikola; right?

M9JCmil3                        Prows - cross

A.   Yes.

Q.   This was in the ordinary course of business; correct?

A.   Yes.

Q.   And there's a spreadsheet to this?

        MR. BONDI:  Can you go to the spreadsheet to this,
Chris.

Q.   This is a spreadsheet that you or your team created?

A.   I don't recall it specifically.

Q.   But do you remember the spreadsheet?

A.   No.

Q.   Do you remember sending this email?

A.   I'd have to look at it again.

Q.   Let's go back to the email.  Mr. Prows, do you have any
doubt that you sent this email?

A.   No.

        MR. BONDI:  Your Honor, I'd like to offer into
evidence Defendant's Exhibits 32 and 33..

        MS. ESTES:  No objection.

        THE COURT:  They will be received.

        (Defendant's Exhibits 32, 33 received in evidence)

        MR. BONDI:  May I publish to the jury, your Honor?

        THE COURT:  You may.

Q.   I was very curious about this and I wanted to ask you some
questions.  You wrote here to Trevor, as you probably know, Jon
is refusing to sign the merger documents until we agree to a

five-station deal with his terms, which include a commitment for us to pay $1.4 million per year, per station for maintenance, i.e., $21 million for five stations over three years, versus our latest offer of $700,000, and then you reference, see cell D6 in the attached file.

Do you see that?

A.  Yes.

Q.  So Mr. Prows, Nel's CEO refused to provide permission for Nikola to go public through the merger if Nikola didn't sign the purchase order; right?

A.  Yes.

Q.  And the reason why Nel's CEO had that power was Nel was an investor in Nikola; right?

A.  I believe so.

Q.  And you described in this email here, Nel's conduct is an attempt to hold Nikola hostage.

Do you see that?

A.  Yes.

Q.  And if Nel didn't sign off, the merger wouldn't have gone through; right?

A.  As far as I know, yes.

MR. BONDI:  Chris, could you take down this document for a moment.

Q.  And you had concerns with this deal with Nel; right?

A.  Yes.

Q.   That's an understatement; right?

A.   Yes.

Q.   We heard about those concerns.  And Jon mentioned in this email is Jon Løkke, the CEO of Nel; right?

A.   Yes.

Q.   You didn't like John Løkke's behavior, did you?

A.   No.

Q.   You didn't like him, did you?

A.   Personally, I think he's a decent guy, but professionally, no.

MR. BONDI:  Let's look at GX-238, which is already admitted into evidence, and let's look at the highlighted text.

Q.   The government didn't ask you about that, so I wanted to ask you about that.

Furthermore, I'm unclear about my role at this point, you write, because I feel emasculated by the way these negotiations have been handled, i.e., Jon has made me out to be incompetent because I am allegedly nontechnical and unable to grasp the challenge of handling immature supply chains.  Trevor seems to have bought into Jon's arguments.

Do you see that?

A.   Yes.

Q.   That's pretty strong words, isn't it, emasculated?

A.   It is.

Q.   You were pretty upset?

A.  I was.

Q.  And you felt emasculated by the way these negotiations with Nel were handled?

A.  Yes.

Q.  You had strong feelings about Nel?

A.  Yes.

Q.  About Jon Løkke?

A.  Yes.

Q.  You didn't like what Nel was doing with its dispensing equipment; right?

A.  Correct.

Q.  And electrolyzers, just to be clear, are to produce hydrogen, you didn't like what they were doing on the dispensing side; right?

A.  Correct.

Q.  And you believed Nel's CEO made you out to be incompetent?

A.  Yes.

Q.  You were angry?

A.  Angry is a strong word.

Q.  Those are strong words, you were angry?

A.  No.

Q.  You felt that Trevor bought into Mr. Løkke's thought; right?

A.  It appeared to me so.

Q.  You were pretty upset at Trevor Milton; right?

A.  Yes.

Q.  You're still upset at Trevor Milton, aren't you?

A.  No.

Q.  You didn't like Trevor at this time, did you?

A.  Yes.

Q.  Yes, you didn't like him?

A.  I liked him.

Q.  Oh, you liked him, okay, but you were just upset?

A.  Yes.

Q.  Now, there's another section I want to ask you about that you weren't asked about, and that's point 5 of this email.

You write, Jon has literally blackmailed us into doing this deal by threatening not to sign the merger documents; right?

A.  Yes.

Q.  See that, and that's what we talked about earlier. Mr. Løkke was applying pressure to get the electrolyzer purchase done before the merger; right?

A.  Yes.

Q.  There was another paragraph that I wanted to ask you about of this email the government showed you, and if you go to point 18, you say the first set of electrolyzers, i.e., six tons, will not be shipped until 4Q21.  That's the fourth quarter of 2021; right?

A.  Yes.

Q.  So here in June of 2020, you're saying the first set won't be coming until fourth quarter of 2021, year and a half later; right?

A.  Yes.

Q.  And you say, and the other sets will not be shipped until 1Q22, 2Q22, 3Q22, and 4Q22 respectively; right?

A.  Yes.

Q.  And you were concerned about that shipping schedule; right?

A.  Not so much about the shipping schedule.

Q.  Well, you say this may be too early for us, but it also may be too late for us, depending on our needs; right?

A.  Yes.

Q.  Because you don't know when the stations might be ready to be rolled out and the electrolyzers from Nel aren't there?

A.  Or they would be acquired way too early.

Q.  But here you say, it could have been one or the other; right?

A.  I did say that.

Q.  You were concerned the electrolyzers might not be there for the first station rollout with Anheuser-Busch; right?

A.  Say again.

Q.  You were concerned the electrolyzers might not arrive for the first station's rollout; right?

A.  I was not concerned about that.

Q.  But you were concerned about the timing here, are you not?

A.   Yes.

Q.   Too late, you say; right?

A.   It does say too late, but I think the real concern I had was that they would be way too early.

Q.   CEO Mark Russell didn't call off the deal with Nel, did he?

A.   No.

Q.   He didn't agree with you, did he?

A.   I don't know.

Q.   And CFO Kim Brady, he didn't call off the deal with Nel, did he?

A.   No.

Q.   In fact, CEO Mark Russell pushed to get the deal done we saw in that other email; right?

A.   I don't know.

Q.   In fact, CEO Mark Russell pushed to get the PR out from that other email, right, press release?

A.   He was encouraging that, yes.

Q.   Now, the government showed you, on Friday, a document, GX-292, which was a purchase order to Air Liquide for the hydrogen to use at the demonstration station; right?  Do you remember that?

A.   It wasn't a purchase order, it was a contract.

Q.   Contract to purchase hydrogen for the demonstration station; right?

A.   Yes.

Q.  You'd get a volume discount if you purchased hydrogen at scale; right?

A.  I don't know.

Q.  Well, let me just sort of simplify it so maybe I could understand.  If I go buy beer at 7-Eleven, I'm going to pay more for that beer than if I go buy a big case at Costco; right?

A.  I don't know.  I don't drink beer.

Q.  If you buy things in bulk, you get a discount; right, Mr. Prows?

A.  Usually.

Q.  And in this case, you were expecting to order hydrogen in massive amounts for your network of stations; right?

A.  No, we were planning to produce our own.

Q.  Produce your own, right, that's good.

So Mr. Prows, that contract to purchase that hydrogen for the demonstration station, that didn't factor into those models you all were doing internally about what you were projecting to produce hydrogen; correct?

A.  I don't think so.

Q.  Now let's talk about the stations, the big hydrogen stations, the ones you said were three to ten acres, big ol' stations; right?

A.  Yes.

Q.  And the solar one is going to be even bigger; right?

M9JCmil3                        Prows - cross

A.   Yes.

Q.   Nikola's business plan is to have hydrogen -- excuse me.
Let me rephrase that.

In 2020, Nikola's business plan was to have hydrogen
fueling stations along the routes where its customers
ultimately would have the trucks; right?

A.   Yes.

Q.   And the idea is to sell a route to a customer and then have
the hydrogen stations operable around the same time Nikola
delivers the trucks to the customer; right?

A.   Yes.

Q.   You want to try to get that timing down, you don't want to
have the station way too early; right?

A.   Yes.

Q.   And in order to build these hydrogen stations in the
network, Nikola would need to acquire land to build the
station; right?

A.   Or lease it, yes.

Q.   Or lease the land; right?  Or partner with other people
that already have locations; right?

A.   Yes.

Q.   And Nikola was looking at various locations around the
country in the summer of 2020; isn't that right?

A.   I don't think we were looking at any specific locations at
that point in time.

Q.   You weren't looking at locations, for instance, in Van
Ness, California for Anheuser-Busch?

A.   Yes, we were.  We were looking at the possibility of
building a station at Anheuser-Busch's brewery in Van Ness.

Q.   And you were in talks to do that, right, there was even a
Google map and you were locating where on that map you were
going to put the station; right?

A.   Yes.

Q.   Already identified.  You were looking at stations in
Fairfield, California; right?  Potential locations, I mean.

A.   No specific locations in Fairfield, but generally, yes.

Q.   Generally.  And Palm Springs?

A.   Yes, generally.

Q.   Barstow, California?

A.   Yes.

Q.   Wheeler Ridge, California, does that sound familiar?

A.   It does.

Q.   And you were looking at a location there?

A.   No specific sites in those locations.

Q.   Sacramento?

A.   Again, generally, but not specific.

Q.   Banta, California?

A.   Yes.

Q.   Miramar, California?

A.   Yes.

Q.  Santa Clarita, California?

A.  Very generally, yes.

Q.  And a place called Coyote, California?

A.  Very generally, yes.

Q.  And you had people talking to people around about potential locations; correct?

A.  No.

Q.  You weren't talking about potential locations with other people?

A.  No, not at that time.

Q.  In 2020?

A.  No.

Q.  Nikola was considering partnering with companies for stations to produce hydrogen in 2020; right?

A.  Yes.

Q.  Including one example would be Windtech Energy for a project in Riverside, California; right?

A.  Yes.

Q.  Mr. Koziner was part of that effort, wasn't he?

A.  Yes.

Q.  And isn't it true, also, Mr. Prows, that the company was negotiating with TravelCenters of America in 2020 to partner at their locations; correct?

A.  Yes.

Q.  And TravelCenters of America have locations all throughout

M9JCmil3                    Prows - cross

the United States and Canada; right?

A.   I don't know about Canada.

Q.   And Mr. Milton even sent term sheets while he was at the company to TravelCenters of America; correct?

A.   I don't know.

Q.   I'm showing you what's been marked as Defendant's Exhibit 1557, 1558, and 1559.

          MR. BONDI:  Your Honor, under 803.15, the defense offers Defendant's Exhibits 1557, 1558, and 1559 into evidence.

          MS. ESTES:  Objection.

          THE COURT:  Let's talk at sidebar.

          (Continued on next page)

(At the sidebar)

MR. CARUSO:  Your Honor, we're offering this under 803.15, which does not exactly come up every day, if the Court wants to take a look at it.

THE COURT:  Doesn't this have to do with mortgages and deeds and stuff?

MR. CARUSO:  It's broader than that.  Cases say it involves contracts because contracts affect legal rights of people.  You often hear this phrase, a contract is not hearsay.  That's because a contract doesn't assert anything as a fact, it simply establishes legal rights between people, so there's nothing offered for the truth.  It's sometimes called a *res gestae*.  So you have here a document that creates legal rights, it affects an interest in property, namely contract rights, and this document is not hearsay because it affects an interest in property.

THE COURT:  I saw an email.

MR. CARUSO:  Yes, under that is a draft contract.

MR. BONDI:  It's a contract and term sheets.  Your Honor, this ultimately ended up being signed into a document after Mr. Milton left, I don't want to go to after he left, but the negotiations started directly with TravelCenters of America with him.  Your Honor, there is case law in the Southern District, I'll refer your Honor to *Silverstein v. Smith Barney, Inc.*, 2002 WL 1343748, Southern District June 2002, and it was

affirmed in an appendix by the Second Circuit.  This is an interest in a contract, your Honor.

MS. ESTES:  Your Honor, I think the witness already testified he wasn't aware of any contract at TravelCenters. This is something we certainly disagree with its legal analysis.  In any event, this witness appears to have no knowledge of this contract, so this seems like something we can take up another day.  He's not on the cover email that Mr. Bondi just showed, there is no basis to show this witness this document, which we think should not come in.

MR. BONDI:  Your Honor, the contract negotiation documents here, the term sheets and the contracts come in under 803.15, I would like to explore with the witness that.  This was part of the witness's role here at the company, and I want to ask him what he knows, if he knows about the terms.  I want to go through the contract with him, your Honor.  I don't have many questions, but they're important questions for this witness and I don't want to have to introduce the document through another witness and have to call him back, your Honor.

MS. ESTES:  Your Honor, I think we can go back to what Mr. Bondi asked the witness, but I believe he said he did not know about any contract with TravelCenters.  So I think he has no foundation to talk about this and --

THE COURT:  I'll let him explore some more without offering the document, see what he knows, if he knows anything.

M9JCmil3                          Prows - cross

We'll take it up and we'll see what he says.

MR. BONDI:  Can I, your Honor, introduce the document and ask him if he recognizes the document?

MS. ESTES:  Your Honor, we don't think the document is admissible under this rule they're talking about and we would like the opportunity to brief it.

THE COURT:  Have you seen the document?

MS. ESTES:  Just a little bit on the screen here.

MR. BONDI:  It's been on our exhibit list.

MS. ESTES:  It is a draft contract, it's not a final contract, and I think that would be a distinction under the rule and we would like the opportunity to brief it.  In particular, again, this witness has not seen the document, he said he doesn't know it.  There is no reason to introduce it now.

MR. BONDI:  He's going to leave and the company is not accepting service.

MR. PODOLSKY:  He testified he has no knowledge of this document.  What are you going to ask him, to give his opinion?

THE COURT:  We'll see if he knows.  If he knows nothing, then he knows nothing.

(Continued on next page)

(In open court)

MR. BONDI:  May I proceed, your Honor?

THE COURT:  You may.

BY MR. BONDI:

Q.  Mr. Prows, are you aware of negotiations that were taking place in 2020 between TravelCenters of America and Trevor Milton?

MS. ESTES:  Objection.  Timeframe.

MR. BONDI:  I'll give you the specific timeframe, your Honor.

Q.  March 19th, 2020.  In or around March 19th of 2020.

A.  Partially.

Q.  And are you aware that there were term sheets exchanged between Nikola and TravelCenters of America?

A.  No.

Q.  Are you aware that there were term sheets sent by Nikola to TravelCenters of America?

A.  No.

Q.  Are you aware there were discussions between Trevor Milton and TravelCenters of America about locating Nikola's hydrogen production network at the TravelCenters of America locations?

A.  Yes.

Q.  But you were not involved in those negotiations?

A.  Not with Trevor.

Q.  And that upset you, didn't it?

A.  No.

Q.  Let's go to another topic here.  In 2020, while Trevor was still at the company, Nikola was considering partnering with British Petroleum to locate Nikola's hydrogen network on British Petroleum stations around the country in Canada; isn't that correct?

A.  Yes.

            (Continued on next page)

Q.  And British Petroleum, BP, spent quite a bit of time evaluating Nikola, right?

A.  Yes.

Q.  You were part of that when they did diligence, right?

A.  Yes.

Q.  You gave BP a tour of your demonstration station?

A.  I believe so.

Q.  And Nikola -- excuse me, and BP was quite complimentary of Nikola?

A.  I don't know.

Q.  Isn't it true that BP evaluated Nikola as being three to five years ahead of its competitors?

A.  I don't know.

Q.  Isn't it true that they thought that Nikola's superior technology gave it a clear first-mover advantage?

A.  I don't know.

Q.  But British Petroleum was pretty excited about a deal with Nikola, right?

A.  I don't know.

Q.  You weren't completely involved in all those negotiations, were you?

A.  No.

          MR. BONDI:  Briefly, before we go off this point, if you could bring up what's been admitted into evidence as Exhibit 801.  And, Chris, if you could just highlight the

bullet down starting with "Nikola's currently planning."

Q.  Mr. Prows, this is a press release that was admitted earlier in the trial.  It's dated February 10, 2020.  You see "Nikola's currently planning 700 stations to give North America hydrogen coverage."

Do you see that?

A.  Yes.

Q.  OK.  This was a press release that was reviewed by the general counsel, isn't that correct?

A.  I don't know.

Q.  Do you have any reason to doubt that Nikola was planning a 700-station network in North America?

A.  No.

Q.  Because you were part of those plans?

A.  Yes.

Q.  And North America includes United States and Canada, right?

A.  Yes.

Q.  Let's go back to another government exhibit that's GX 240 that you talked about on Friday with the government.  I just want to highlight one of the sentences here that Trevor writes to you.  He says, "I'm confused and need to get caught up. Need your advice.  Call you in the morning."

You see that?

A.  Yes.

Q.  Trevor is seeking advice from you in May of 2020, right?

A.   In this email it appears that way, yes.

Q.   Yeah.  He's seeking -- and because your email about the proposed purchase with Nikola had confused him, right?

Excuse me -- strike that.

Because your email about the proposed purchase order with Nel had confused him according to this email, right?

A.   It appears that way.

Q.   And you thank him in your email for including you, if you scroll down.  Do you see that?

A.   Yes.

Q.   OK.  He trusted you to give him your opinions?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.   Mr. Prows, you're not a shy person, are you?

A.   No.

Q.   You aren't afraid to express your opinions to anyone?

A.   I am afraid sometimes.

Q.   Mr. Prows, at no point while Trevor Milton was at the company did you ever tell him that any of his tweets were wrong, did you?

A.   No.

Q.   At no point while Trevor Milton was at the company did you ever tell him that any of his interviews had any misstatements, did you?

A.   No.

M9JHMil4                         Prows - Cross

Q.   And, of course, you didn't because you didn't follow him on social media, did you?

A.   I did not.

Q.   But others at Nikola did, right?

A.   I believe so.

Q.   The executives did?

A.   I don't know.

Q.   The lawyers did?

A.   I don't know.

Q.   And the whole marketing department followed him?

A.   I don't know.

Q.   Since you joined the company in April of 2019, Nikola had a marketing department, right?

A.   Yes.

Q.   A top-notch marketing department, you would say, right?

A.   Yes.

Q.   It includes Vince Caramella?

A.   Yes.

Q.   Nicole Rose?

A.   Yes.

Q.   And she's the one that was on the press release for the electrolyzer, right?

A.   Yes.

Q.   And Ms. Rose does a good job, doesn't she?

A.   I believe so, generally.

Q.   And Stephanie Fleck?

A.   I don't know what Stephanie's capabilities are.

Q.   No, I'm asking is she in the marketing department?  Sorry.

A.   Oh, yes, she is.

Q.   You don't think of her much on the marketing side, is that it?

A.   No, I just don't know what she does very much.

Q.   Somebody named Jace Croshaw is in the marketing department?

A.   Yes.

Q.   Damon Owens?

A.   Yes.

Q.   Then there's that outside PR agent named Colleen Robar, right?

A.   Yes.

          MR. BONDI:  Chris, would you pull up a still of one of the interviews the government played for Mr. Prows during his direct.  Wrong one.

          This is GX 410-8, Mr. Roos.

Q.   OK.  Mr. Prows, you see that big "N" in the background there?

A.   Yes.

Q.   That was shot at Nikola's studio, correct?

A.   I don't know.

Q.   Nikola has a studio, right?

A.   I don't know.

Q. It's at the headquarters?

A. I don't know.

Q. You haven't seen a studio on the third floor at the headquarters?

A. No.

MR. BONDI: You can take that down, Chris.

Q. Nikola's marketing department tracked the interviews of Trevor Milton, isn't that correct?

A. I don't know.

Q. And the marketing department regularly sent out emails to the entire management team listing both past and upcoming media appearances, right?

A. I don't know.

MR. BONDI: Let's pull up 1255, which is already admitted into evidence, please.

Q. Mr. Prows, can you take a look at this email.

Now, it went to a bunch of people. And, Mr. Prows, you're not on it, but you see Mark Russell's on it.

MS. ESTES: Objection.

MR. BONDI: I'm getting there, your Honor.

THE COURT: Ask a question, Mr. Bondi.

Q. Andy Christian is on this email, right?

MS. ESTES: Objection. This isn't in evidence.

MR. BONDI: It is in evidence.

MS. ESTES: OK.

MR. BONDI:  It is in evidence as Defense Exhibit 1255. It's been admitted, your Honor.

THE COURT:  If it's in evidence, you may inquire.

MR. BONDI:  OK.

Q.  You see Andy Christian on this email, right?

A.  Yes.

Q.  And Andy Christian is one of your direct reports?

A.  He was at one time, but I don't know if he was on this particular date.

Q.  OK.  Was he your direct report in 2020?

A.  Yes.

Q.  And this email was sent in 2020, right?

A.  Yes.

Q.  Do you have any doubt that any of these people on this email knew that Nikola wasn't producing hydrogen?

A.  No.

Q.  Let's look at the attachment here that went to your report, direct report, Andy Christian.  And we're going to ask some questions about Mr. Christian here in a second, but let's go to the attachment.

You see listed here is Transport Topics podcast on July 28.  Do you see that?

A.  Yes.

Q.  And that was one of the podcasts the government played for you on Friday, right?

A.  Yes.

Q.  OK.  And you see also listed as TeslaCharts podcast from July 19, right?

A.  Yes.

Q.  And that was one of the podcasts the government played with you on Friday, right?

A.  I believe so.

Q.  All right.  Mr. Prows -- you can take that down.

Mr. Prows, you testified on direct that you didn't listen to any of the podcasts at the time in 2020, right?

A.  Correct.

Q.  So when did you first hear them?

A.  I don't remember.

Q.  Who played them for you?

A.  I don't recall.

Q.  Did the government, somebody from the government, play them for you?

A.  I don't recall.

Q.  You don't recall when you first heard the podcasts?

MS. ESTES:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  Around what was the date when you first listened to the podcasts?

A.  I don't know.

Q.  It was after 2020, right?

M9JHMil4                        Prows - Cross

A.   I don't know.

Q.   Did the government play you the podcasts during their seven interviews with you?

A.   I don't recall.

        MS. ESTES:  Objection.

        THE COURT:  Overruled.

Q.   You don't recall if the government played those podcasts for you?

A.   I don't recall.

Q.   OK.  Government met with you the day before you testified, right, last Thursday?

A.   Oh, last Thursday?

Q.   Yeah, day before you testified.

A.   Yes.

Q.   The morning that you testified, right?

A.   Yes.

Q.   And they met with you some other times, too?

A.   Yes.

Q.   Do you remember the government playing any podcasts for you when you met with them?

A.   Yes.

Q.   When?

A.   I don't recall the exact dates.

Q.   Did they play all the podcasts for you?

A.   I don't know.

M9JHMil4                        Prows - Cross

Q.  Did they play clips from the podcasts for you?

A.  From some of them, yes.

Q.  They didn't play the whole podcast; they provided clips?

        MS. ESTES:  Objection.

        THE COURT:  Overruled.

A.  They didn't play the entire podcast.

Q.  They didn't play the entire podcasts?

        MS. ESTES:  Objection.  Asked and answered.

        THE COURT:  Sustained.

Q.  Did they direct you to portions of the podcast?

A.  They brought up specific portions of the podcasts.

Q.  They're the ones, then, that directed you to those specific portions of the podcast, right?

A.  Yes.

Q.  Now, before we get into the podcasts and what you might not have listened to --

        MS. ESTES:  Objection, the commentary.

        THE COURT:  Sustained.

        MR. BONDI:  I'll withdraw, your Honor.

Q.  I have some questions for you, before we get into the podcasts, about grammar.

        Mr. Prows, it's not unusual to use present tense when describing Nikola's business model, right?

A.  I think that is unusual.

Q.  OK.  Nikola wasn't building hydrogen fueling stations to

support its trucks in 2019, were they?

A.  No.

Q.  I'm showing you what's been marked as Defense Exhibit 1592 for identification.  It's an email sent from your Nikola email address to a number of people, including CFO Kim Brady, Mark Russell, and Trevor Milton, and it includes an attachment.

I'd like to -- defense offers 1592 into evidence.  The attachment's marked with it, 1592.  It's marked as one document.

Could you pull up the attachment, Chris.

We sent this to you.

MS. ESTES:  Objection.  Relevance.

THE COURT:  Overruled.

MR. BONDI:  Your Honor, I offer 1592 into evidence.

THE COURT:  It will be received.

(Defendant's Exhibit 1592 received in evidence)

MR. BONDI:  May I publish for the jury?

THE COURT:  Sure.

BY MR. BONDI:

Q.  OK.  Before we get to the attachment here, I just want to set the stage.

Nikola was -- excuse me.  Strike that.

Nel, the Norwegian company, was an investor in Nikola?

A.  I believe so.

Q.  This email entitled "Five 8-T RFQ for Nel," right?

A.   Yes.

Q.   What's an RFQ?

A.   Request for quote.

Q.   And what's going on here?  You had requested a quote from Nel?

A.   I don't recall.

Q.   OK.  Let's see if we can get to the substance of this.

You see on the front page you say, "Hello, everyone," and you're sending this to Mark Russell, Kim Brady, Trevor Milton, and others.  Do you see that?

A.   Yes.

Q.   And this is dated November 23, 2019, right?

A.   Yes.

Q.   "Please see the attached draft RFQ for Nel on the five 8T hydrogen fueling stations."  Do you see that?

A.   Yes.

Q.   And you said, "I'd like to send this to Nel on Monday, November 25, 2019," right?

A.   Yes.

Q.   This was an RFQ that you were putting together for Nel?

A.   Yes.

Q.   And you say, "So please provide your feedback before then if possible," right?

A.   Yes.

Q.   OK.  Now let's look at the first page of the request for

quote that you put together, and I want to just focus your attention on some of the words here.

Mr. Prows, I'm going to show you the whole document here, and you can look at the whole document, but I just want to look at some of the words.

"In addition to building zero-emission heavy-duty trucks, we are also building hydrogen fueling stations to support these vehicles and our customers," right?

A.   Yes.

Q.   You use the present tense "are also building," right?

A.   I think that's future tense, myself.

Q.   "Are also building," but -- "are also building."  You weren't building at the time.  That was your business plan to build, right?

A.   Yeah, that's probably a play on words, I suppose, but --

Q.   Yeah.

A.   It's we will be building.

Q.   Then when you look at the larger context of this, you say: We plan to build about 700 stations in the U.S. and in Europe by 2018.  Do you see that?

A.   Yes.

Q.   So, Mr. Prows, it's fair to say even though you used the "we are building" the hydrogen stations back in 2019, before you'd ever built any of them, in the context of this, you're talking about the future?

A.   Correct.

Q.   You're talking about the business plan?

A.   Yes.

Q.   Context matters, doesn't it, Mr. Prows?

A.   It does.

Q.   OK.  Now, we talked a second ago about Andy Christian.

And, Chris, would you go back to Government Exhibit 313 that was admitted into evidence on Friday.

Mr. Prows, we talked about Andy Christian received all of the media appearances in that email we just looked at.  You remember that?

A.   Yes.

Q.   And Andy Christian is one of the people who reported to you in 2020, right?

A.   During a portion of the year, yes.

Q.   At this time he was reporting to you, summer of 2020?

A.   As of that date, yes.

Q.   Yes.

And Andy was included in that email referencing the TeslaCharts podcast, right?

A.   Yes.

Q.   And, Mr. Prows, I want you to look at the email Mr. Christian wrote to you.  He says:  "I think it's important for us to understand the strategic messages Trevor is putting out to the public so we can get behind his vision and the

challenges to our ongoing infrastructure strategy."

You see that?

A.  Yes.

Q.  He uses the word "vision."  Do you see that?

A.  Yes.

Q.  And he uses the word "strategy," right?

A.  Yes, strategy, yes.

Q.  So it appears from this email Mr. Christian thought that podcast was talking about Trevor's vision?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Let's look at what else Mr. Christian says here.  He says, "We are kicking off the eight-ton stations with two different routes with Anheuser-Busch."

Do you see that?

A.  Yes.

Q.  He uses a present tense there, right, "we are kicking off"?

MS. ESTES:  Objection.

THE COURT:  Overruled.

Q.  You see that?

A.  I see the statement.

Q.  And he says, "It will take us two years to kick off the stations.  We are 18 months away from opening a station for Anheuser-Busch," right?

A.  That's what it says.

Q.   And that's what Mr. Christian here is interpreting from the podcast that he listened to?

MS. ESTES:   Objection.

THE COURT:   Sustained.

Q.   The time frame was 18 months to two years, isn't that a fact?

A.   I think that's aggressive, in California especially.

Q.   But that was the plan, correct?

A.   No.

Q.   That wasn't the company's plan?

A.   We didn't have any concrete plans.

Q.   The goal wasn't to kick off a station in two years, Mr. Prows?  We talked about that.

A.   It would take at least that long.

Q.   At least that long.  OK.

Mr. Prows, the reference to kicking off the eight-ton stations, you weren't terribly concerned with that statement, were you?

A.   I was concerned.

Q.   That's not what you told the government when the government first interviewed you on February 3, 2021, isn't that right?

A.   I don't recall.

Q.   And the government was taking notes during that interview, isn't that right?

A.   As far as I know.

Q.   There were agents there from the U.S. government taking notes?

A.   As far as I know.

Q.   And you were admonished to tell the truth?

A.   Yes.

Q.   Mr. Prows, isn't it true that you said that you weren't terribly concerned with the statement "we are kicking off the eight-ton stations"?

A.   I don't recall.

          MR. BONDI:  Chris, why don't we pull up the notes that the government took of this interview.

          MS. ESTES:  Objection.  Objection.

          THE COURT:  Sustained.

Q.   Mr. Christian's email also talks about we tap -- by the way, let me back up for a second.

          Mr. Christian is interpreting the podcast here, right? That's what you understood?

A.   Correct.

Q.   And Mr. Christian writes, "We tap directly into federal transmission lines," right?

A.   Yes.

Q.   He said:  All of our hydrogen is produced along the freeway, not the cities.  You see that?

A.   Yes.

Q.   And he says:  We can pull 4 cents a kilowatt all day long,

right?

A.  Yes.

Q.  "We are looking at 70-90 percent clean energy on what we were looking at for our business model."  Do you see that?

A.  Yes.

Q.  Mr. Christian here in this email said "for our business model," right?

A.  He did.

Q.  And that's what he was interpreting from the podcast that he heard at that time?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Mr. Prows, the reference to tapping directly into the federal transmission lines, you weren't -- you were generally not terribly concerned about that, were you?

A.  I was.

Q.  Mr. Prows, that's not what you told the government on February 3, 2021, was it?

A.  I don't remember.

Q.  Would the notes refresh your recollection?

A.  It might.

MR. BONDI:  Chris, can you pull up the notes from the government's interview, just for the witness, please.

Q.  Could you read those to yourself, please.

A.  OK.

Q.   Does that refresh your recollection that you were generally not terribly concerned about the reference to tapping into federal transmission lines?

A.   No.

Q.   Now, Mr. Christian's email was characterized by Ms. Estes as raising concerns, but nowhere does Mr. Christian's email mention the word "concern," does it?

         Let's pull up the email, please, Chris, for him to take a look.

A.   I don't see the word "concern."

Q.   He doesn't say anything about fraud?

A.   No, I don't see that.

Q.   He doesn't say, Oh, my God, let's call federal prosecutors?

A.   No, I don't see that.

Q.   He understood Trevor was talking about the business model, right?

         MS. ESTES:   Objection.

         THE COURT:   Sustained.

Q.   Now, you responded to the email, "Wow.  Thanks for sharing, Andy," right?

A.   Yes.

Q.   Because you were pushing Nikola to move away from Nel?

A.   I don't see the connection between this podcast and any interest I would have in moving away from Nel.

Q.   Well, this was just about a month or so after the situation

that you described as being emasculated with Nel, correct?

A.  Yes.

Q.  And in this email, Mr. Christian's talking about using electrolyzers from Nel, right?

A.  Yes.

Q.  And you were upset about Nikola continuing to work with Nel?

A.  Yes, that's true.

Q.  And that was why you wrote "Wow," right?

A.  No.

Q.  Wasn't part of it?

A.  Perhaps part of it.

Q.  Part of it.

Now, in 2020, Mr. Koziner -- excuse me, we can set that aside for a second, Chris.  Sorry.

You testified on Friday that you talked to Pablo Koziner and Kim Brady about the TeslaCharts podcast.  Do you remember that?

A.  Yes.

Q.  And Mr. Koziner was president of Nikola energy at the time?

A.  Yes.

Q.  And he was the former corporate executive from Caterpillar, right?

A.  I believe so.

Q.  And he practiced law, right?

A.   I don't know.

Q.   OK.  Mr. Prows, there aren't any emails from your meetings with Mr. Koziner or Mr. Brady, are there?

A.   Not that I'm aware of.

Q.   And there are no notes?

A.   Not that I'm aware of.

Q.   There's no texts?

A.   Not that I'm aware of.

Q.   There's no diary entry?

A.   Not that I'm aware of.

Q.   And, Mr. Prows, you keep a diary, correct?

A.   I'm not sure how you define a diary.

Q.   Do you keep a book where you write down notes of what happens during your day?

A.   Partially, yes.

Q.   And there are no notes in that diary relating to your meeting that you supposedly had with Mr. Koziner and Mr. Brady, right?

A.   Not that I'm aware of.

Q.   And you testified that you never listened to the Nikola podcast -- excuse me, the TeslaCharts podcast at the time you had these meetings, right?

A.   Correct.

Q.   So for the conversations with Mr. Koziner and Mr. Brady, you were only basing your thoughts on Mr. Christian's email,

right?

A.   Yes.

Q.   That's all you had?

A.   Well, and a discussion I had with Elizabeth at that time, too.

Q.   OK.  You didn't forward Mr. Koziner or Mr. Brady's email -- excuse me.

You didn't forward Mr. Christian's email to Mr. Koziner or Mr. Brady either?

A.   Not that I recall.

Q.   You didn't bother listening to the podcast, did you?

A.   I did not.

Q.   And your conversation with Mr. Brady about the podcast lasted only a few minutes, right?

A.   It was longer than a few minutes.

Q.   And then you moved on to other topics?

A.   Yes.

Q.   And you didn't talk to Mark Russell, your friend and CEO, about the podcast, did you?

A.   Not that I recall.

Q.   Now I'd like to turn to the podcast.  And you've never listened to the entire podcast, have you, the podcasts, any of these podcasts, have you?

A.   Correct.

Q.   Never listened to the entirety of any of these podcasts?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Let's turn to one of the podcasts the government played, and the government played Transport Topics podcast of March 12, 2020.

And, your Honor, that podcast has been marked for identification as Defense Exhibit 478.  The defense offers that podcast into evidence.  But at this time, your Honor, I only want to play a snippet of this podcast and use the transcript which is marked as Defendant's Exhibit 478-T.

THE COURT:  Any objection?

MS. ESTES:  No, your Honor.

MR. BONDI:  I would offer it into evidence, your Honor.

THE COURT:  Very well.  It will be received.

MR. BONDI:  Your Honor, the parties offers a stipulation, too, which has been marked as GX 66, and with your permission, I'd like to read part of that stipulation into the record.

THE COURT:  Sure.

MR. BONDI:  Paragraph 4 reads in pertinent part after the parties agree, that Nikola posted the following videos and articles to its social media pages on the dates listed below and were publicly accessible through at least September 2020. And then one of the podcasts listed is March 12, 2020,

interview of Trevor Milton on the Transport Topics RoadShow

podcast.

Your Honor, may I play the clip from that, please?

THE COURT:  You may.

MR. BONDI:  Chris.

(Audio played, Defense Exhibit 478-T, lines

10:03-11:16)

BY MR. BONDI:

Q.  Now, Mr. Prows, did the government play the question for

you on Friday?

A.  Which question?

Q.  The question that Mr. Cleaver asked when he says, "Tell us

a little about the hydrogen fueling network that you envision

at Nikola and how you'll get there?"

A.  Yes.

Q.  The government played the question on Friday?

A.  Yes.

Q.  OK.  You heard the question is how you envision, right?

A.  Yes.

Q.  And how you'll get there, right?

A.  Yes.

Q.  That's future tense, right, Mr. Prows?  He's talking about

the -- the questioner is talking about the future, right?

A.  Yes.

Q.  OK.  Let's go to another podcast the defendant played,

Autoline After Hours.  It was June 11, 2020.

It's already been admitted, your Honor, into evidence previously as Defense Exhibit 487 in its entirety.  The government played clips.  I'd like to play some additional clips from that, your Honor.

THE COURT:  Very well.

MR. BONDI:  If I can use the transcript also, which is -- and offer the transcript into evidence, DX 487-T.

THE COURT:  Are you offering the transcript?

MR. BONDI:  Yes, your Honor.

THE COURT:  Any objection to the transcript?

MS. ESTES:  Just as a demonstrative, your Honor.

THE COURT:  Well, it will be received as a demonstrative.

(Defendant's Exhibit 487-T, as demonstrative, received in evidence)

MR. BONDI:  Fair enough, your Honor.

Chris, could you please play clip No. 1, please.

(Audio played, Defense Exhibit 487-T, lines 27:20-28:10)

BY MR. BONDI:

Q.  Mr. Prows, when you met with the government, did they play that clip for you?

A.  Not that I recall.

Q.  You hear the questioner ask, so how is cross country

trucking going to work out, right?

A. Yes.

Q. That's future, right, "is going to work out"?

A. Yes.

Q. And Trevor responds, "There is no network," right? You see that?

A. I see that, but it's referring to Tesla's network, I suppose.

Q. And it refers to it's very expensive. Well, let's talk more about that, then. Let's go down.

     "Very expensive," do you see that?

A. Yes.

     MR. BONDI: OK. Chris, can we play another clip from Autoline.

     (Audio played, Defense Exhibit 487-T, lines 34:01-35:23)

BY MR. BONDI:

Q. Mr. Prows, you heard the interviewer ask how many hydrogen stations do you need across the U.S. eventually? Do you see that?

A. Yes.

Q. That's future tense, right?

A. Yes.

Q. And when he talks about the deal with Anheuser-Busch, he says, "It's a real contract," Mr. Milton, right?

A.  Yes.

Q.  But he also clarifies that Anheuser-Busch can get out of it
if Nikola doesn't deliver.  Do you see that?

A.  Yes.

        MR. BONDI:  Chris, let's play clip No. 4.  Skip to
clip No. 4, and we'll play two more.

        (Video played, Defense Exhibit 487-T, lines
47:15-47:19)

Q.  Mr. Prows, did you hear Mr. Milton on that clip say, "We
are two years out before the hydrogen comes online"?

A.  Yes.

Q.  Did the government play that clip when they met with you?

A.  Not that I recall.

        MR. BONDI:  No further questions, your Honor.

        THE COURT:  Redirect.

        MS. ESTES:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.  Good afternoon, Mr. Prows.

A.  Hello.

Q.  Mr. Prows, you recall Mr. Bondi asking you some questions
about Nikola's hydrogen cost model on cross-examination?

A.  Yes.

Q.  Can you explain for the jury, what is a model in this
context?

A.   A model is a -- in this context is a financial set of numbers that enables you to change different assumptions and to see how the changes in those assumptions impact the outcomes.

Q.   And in using a model, are these assumptions things Nikola has actually obtained through contracts or things Nikola is hoping to obtain?

A.   Hoping to attain.

MS. ESTES:  Ms. Wolfson, can you pull up DX 34.  Can you zoom in to the top there.

Q.   So, Mr. Prows, was this the email with the model that you saw on cross-examination there?

A.   Yes.

Q.   And what's the date of this email?

A.   June 12, 2020.

MS. ESTES:  Ms. Wolfson, can you pull up DX 35.

Q.   Mr. Prows, do you see that on the screen there?  Is that the model you were looking at on cross-examination?

A.   Yes.

MS. ESTES:  Ms. Wolfson, is it possible to zoom into it a little bit?

Q.   Mr. Prows, I think you testified earlier that this was -- the modeling is complicated, is that right?

A.   Yes, very much so.

Q.   Are there different scenarios that are played out in the hydrogen cost model?

A.  Yes.

Q.  And are there different tabs at the bottom that represent some of those different scenarios?

A.  Yes.

Q.  Mr. Prows, is this one of the pieces of the financial model for the Van Nuys station?

A.  Yes.

Q.  And were there different scenarios used in connection with certain stations as compared to others?

A.  Yes.

Q.  And in different scenarios, was the cost of producing hydrogen different?

A.  Yes.

Q.  For example, if it was a station involving California, could the cost be higher?

A.  Yes.

Q.  And why would the cost be higher in California?

A.  Because the cost of electricity is higher and other input costs are higher.

        MS. ESTES:  All right.  Ms. Wolfson, can you take that down and can you pull up Government Exhibit 250-A.
Ms. Wolfson, if you could zoom in to the top half of this one.

Q.  Mr. Prows, do you recall testifying about this document on direct examination?

A.  Yes.

Q.  Was this a document that you and the hydrogen team went over with Mr. Milton?

A.  Yes.

Q.  I think you testified on direct examination that the left column there where it says 2.72, that was the original cost that had been in the financial model for Nikola, is that right?

A.  Yes.

Q.  Can you remind jury, what does the cost in the middle represent, the 8.68?

A.  That represents the cost that we believed was more realistic at this point in time given the fact that we needed to have redundant equipment in order to improve the reliability and the uptime of the stations.

Q.  So, Mr. Prows, just so we're clear, this cost of 8.68 was a cost that was presented to Mr. Milton in June 2020, is that right?

A.  Yes.

Q.  And that was presented by the hydrogen team to Mr. Milton and other executives, is that right?

A.  Yes.

Q.  And just to be clear, all of these costs, there was no guarantee that Nikola could get any of these costs, is that right?

A.  That's correct.

Q.  These were all just projections about what Nikola might be

able to obtain in the future, is that right?

A. Yes.

        MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q. Mr. Prows, in June 2020 did Nikola actually have any hydrogen production stations in place?

A. No.

Q. Had it purchased any land for hydrogen production stations?

A. No.

Q. Did it have any electricity contracts in place?

A. No.

Q. So was there any way to actually determine what Nikola's cost per kilogram to produce hydrogen was without these contracts in place?

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A. No.

Q. And, Mr. Prows, we looked at these financial models here. In your view, is it important to distinguish between what is a model and what is a price that has been achieved?

A. Yes.

Q. Why is that important?

A. Well, there's a very big difference between a projection and a model versus what you actually are able to accomplish in real life.

Q.   Is that because you can't guarantee that what you'll actually get in the projection will come true?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   Correct.

Q.   Now, Mr. Prows, Mr. Bondi asked you about various negotiations Nikola was involved in in the summer of 2020.  Do you recall that?

A.   Yes.

Q.   There was some questioning about negotiations with Mitsubishi.  Do you recall that?

A.   Yes.

MS. ESTES:  Ms. Wolfson, can you pull up Defense Exhibit 1429.  Can you go to the next page, Ms. Wolfson.  The next page, the next page, the next page, the next one, next one.  This one.  All right.  Could you zoom in, Ms. Wolfson.

Q.   Now, Mr. Prows, on cross-examination Mr. Bondi asked you some questions about the $3 price represented there.  Do you recall that?

A.   Yes.

Q.   I think you said that that was a cost for production but not dispensing, is that right?

A.   Correct.

Q.   And defense counsel didn't give you a chance to explain, but can you explain what you meant by that?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.  There are significant costs associated with dispensing hydrogen in addition to the cost of producing hydrogen, and so this is just looking at one piece of the entire chain of costs that are involved in delivering hydrogen into a truck.

Q.  OK.  So the $3 right there wouldn't represent the whole cost.  That would be production, and then you have to add dispensing on top of that, is that right?

A.  Correct.

Q.  Was there any guarantee that summer that Nikola could get this $3 cost from Mitsubishi?

A.  Sorry.  Say again.

Q.  Was there any guarantee that Nikola could eventually get this $3 cost of hydrogen for production?

A.  No guarantees, no.

Q.  Did Nikola have any contracts with Mitsubishi at this point?

A.  No.

Q.  By September 2020 had Nikola entered into any contract with Mitsubishi?

A.  No.

MR. BONDI:  Objection.  Foundation.

THE COURT:  Overruled.

A.  No.

MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q.  Mr. Prows, I think you were also asked some questions on cross about the RFP process.  Do you recall that?

A.  Yes.

Q.  You were asked about some information provided by Plug Power, I think was one of the entities.  Do you recall that?

A.  Yes.

Q.  Siemens, do you recall that?

A.  Yes.

Q.  What kind of entities are those?

A.  These are entities that are producers of electrolyzer equipment, among other things.

Q.  And so what was the quotes that Mr. Bondi was asking you about on cross-examination?  What did those represent?

A.  Those were quotes for the production of hydrogen and had nothing to do with the dispensing of the hydrogen into the trucks.

Q.  And so, again, the dispensing would be an extra cost on top of that, is that right?

A.  Correct.

Q.  And by September 2020, did Nikola have any agreements with Plug Power?

A.  No.

Q.   Any agreements with Siemens?

A.   No.

Q.   Any agreements with Hytron, I think was another one?

A.   No.

Q.   What about Thyssenkrupp?

A.   No.

Q.   Any agreements with any entities that were involved in the RFP process about producing hydrogen?

A.   No.  And Nel is excluded from that because we didn't include them in the RFP process because we had already received -- we'd already had contracts with them.

Q.   Mr. Prows, switching gears a little bit.  I believe Mr. Bondi also asked you a little bit about electricity costs on cross-examination.  Do you recall that?

A.   Yes.

Q.   I believe he asked you about some negotiations with Hanwha. Do you recall that?

A.   Yes.

Q.   And he mentioned an electricity rate of 1.8 cents a kilowatt-hour.  Do you recall that?

A.   Yes.

Q.   Mr. Prows, do you recall whether that rate included transmission and distribution costs for the electricity?

A.   It would not have included transmission and distribution because it was a behind-the-meter type of discussion.

Q.  So for behind-the-meter type discussions, would you then need to add on the transmission and distribution costs to the cost of electricity?

A.  No, because it would be on-site.

Q.  It would be on-site.

I think you testified earlier, were there problems with doing solar production on-site at stations in densely populated areas?

A.  Yes.

Q.  What was the problem with that?

A.  The acreage that would be required to install a solar farm that would be capable of producing the quantities of electricity that we would need in order to produce the volume of hydrogen that we were targeting, that acreage would be very significant and not very realistic to acquire that kind of land in a metropolitan area.

Q.  So the rate that was being discussed with Hanwha, that wasn't something you could get in Los Angeles, is that right?

A.  Correct.

Q.  That wasn't something you could get near Van Nuys, is that right?

A.  Correct.

Q.  And just to be clear, had Nikola entered into any contracts with Hanwha for an electricity rate that summer?

A.  No.

THE COURT:  Ms. Estes, it's 12:50, so we'll take our second break.

Ladies and gentlemen, 20 minutes.  Be prepared to come out at ten minutes after the hour.  Do not discuss the case.

(Jury excused)

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Prows, you may step down.

You folks can be seated.

(Witness temporarily excused)

THE COURT:  Mr. Caruso, you wish to raise an issue?

MR. CARUSO:  I do, your Honor.  Thank you.

I would like to revert briefly to the argument that we had and rulings the Court made before the jury came out this morning with respect to Government Exhibit 701, which the Court admitted, and Government Exhibit 704, which the Court admitted. These, again, are two of the newspaper articles.  And I believe, if I heard the Court, if I remember correctly, the Court ruled -- I made the point that the supposed adoption of the newspaper articles by placing them on the Nikola website may have been an adoption by Nikola, but it was not an adoption by the party opponent here, the party Mr. Milton, and the Court then made a reference to the fact, well, Mr. Milton was the chairman of the company.

But I would like to point out, and I think it makes a material difference, as a matter of law, on June 3, Mr. Milton ceased to be an employee of Nikola.  He became solely a director.  Both of these exhibits postdate June 3, and at that time, there was no agency relationship between Mr. Milton and Nikola.  As a matter of law, a director and his company have no agency relationship.  And I cited cases on this previously when

we briefed this back in July, including a case called *Zornoza*, 519 F.Supp.3d 715, 734, which in turn relies on the Restatement (Third) of Agency, Section 1.01, comment F, as in frank, subdivision (2).  There is no agency relationship between a director and his company.  There is, of course, or at least can be, an agency relationship between an employee and his company, but that ceased on June 3 as a matter of fact, which means the agency ceased on June 3 as a matter of law.

MS. ESTES:  Your Honor, I think there's a distinction here in that Mr. Milton was actually the executive chairman of the company at the time, not just a member of the board of directors.  Mr. Russell actually reported to him, and Mr. Milton has made that clear in public statements.  We have one that we plan to introduce as an exhibit.  But because he was executive chairman, he was still in charge of the company. He was somebody they reported to.  There was absolutely an agency relationship.

MR. CARUSO:  Your Honor, he was not an employee of the company.  They will not be able to prove that.  He was not an employee.  If they want to try to prove that as a foundational fact, then they ought to try to do so.  But he ceased being an employee on June 3 as a matter of fact, and as a matter of law, therefore, the agency relationship ended.

THE COURT:  If you want to submit any case law to me, I'm happy to review it, but as things stand now, those articles

do come in.

MR. CARUSO:  Thank you, Judge.

THE COURT:  Yes.  Don't be late.

MR. ROOS:  Your Honor, one other thing --

THE COURT:  Yes.

MR. ROOS:  -- which we don't have to deal with now, but Mr. Bondi was playing portions of recordings by saying, "Chris, please play the next clip," and both in terms of the trial record, for what the jury's going to look at, and also for an appellate record, that doesn't do enough because we don't -- as I understand it, the transcript does not contain the recording.  It just says "video played," and so when you then ask a witness a question, for instance, like "Was that true?" or "Did you hear that?" the transcript doesn't reflect what the witness heard.

So we'd ask that either defense counsel do as the government has done, which is put a sub-exhibit on it, like call it Defense Exhibit 1-A, or else say this is the time range on the video recording.

MR. BONDI:  Your Honor, I apologize for my sloppiness on that front.  With the Court's indulgence, at the break I will speak with the court reporter with the government present, and we can give the specific page numbers of the transcript to get that for the record.

THE COURT:  That would be helpful.

MR. BONDI:  Thank you, your Honor.

THE COURT:  It could also happen at the end of the day, but you should get that information to the court reporter.

MR. BONDI:  Yes, your Honor.  Appreciate it.

(Recess)

(Continued next page)

M9JCmil5

(Jury not present)

MR. ROOS:  Your Honor, there is one issue, which is Defendant's Exhibit 487, which was showed to the witness and the transcript, T, doesn't appear to have been produced to us. We just asked them for it and still don't have a copy.

MS. YOUNG:  We're doing it.

THE COURT:  Which exhibit is that?

MR. ROOS:  It's their transcript of the podcast that Mr. Bondi put up on the screen.

THE COURT:  Which?

MR. ROOS:  Well, it was labeled clip, so --

THE COURT:  But there was a podcast about truckers and how much they --

MR. ROOS:  It's the four-box one.

MR. BONDI:  Your Honor, I believe or at least I thought we had shared that transcript with the government.  My team here is pulling it together and making sure they get a copy ASAP.

If you remember, your Honor, the government put it in as a demonstrative anyway subject to them checking for accuracy.  So to the extent they find anything that's a typo or anything, we'll absolutely correct it.

THE COURT:  Okay.

MR. ROOS:  I think the issue is Ms. Estes intends to cross on it.

M9JCmil5

MR. BONDI:  Your Honor, I've been informed by my team that we used the transcript from Autoline that the government produced, SDNY Bates stamped.  So it's your transcript that we used.

MR. ROOS:  So I think Mr. Bondi is referring to draft transcripts that are produced as part of discovery, which are not necessarily the transcripts that are in any way authentic or accurate.  So, again, this is why we need them to produce the transcripts if they're going to use them.

MR. BONDI:  We'll produce back their transcript to them.

THE COURT:  But that was a draft, according to Mr. Roos.  Did you notice anything that was inaccurate in the transcript, Mr. Roos?

MR. ROOS:  This one and another one, among other things.  On a humorous, point they spelled parody parity.  So I think that's the reason why we need these produced ahead of time.

THE COURT:  Can we get Mr. Prows.

Parody, p-a-r-o-d-y, not p-a-r-i-t-y.

MR. ROOS:  Correct.

THE COURT:  Can we get Mr. Prows, please.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M9JCmil5                        Prows - redirect

(Jury present)

THE COURT:  Please be seated.

Ms. Estes.

MS. ESTES:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.  We were talking about Hanwha and negotiations with them.
Do you recall that?

A.  Yes.

Q.  Just to be clear, was there any signed contract with Hanwha
in the summer of 2020?

A.  No.

MR. BONDI:  Objection.  Foundation.

THE COURT:  Overruled.

A.  No.

Q.  Any contract signed with Hanwha by September of 2020?

MR. BONDI:  Objection, foundation.

THE COURT:  Overruled.

A.  No.

Q.  Mr. Prows, you recall also being asked on cross examination
about APS?

A.  Yes.

Q.  And was Nikola involved in negotiations with APS that
summer about electricity?

A.  Yes.

Q.   How would you describe the state of the negotiations that summer?

A.   I would describe them as rocky, but progressing.

Q.   When you say rocky, what do you mean?

A.   Well, we were asking for a very low electricity rate, and we seemed to have some difficulty in getting them to sort of catch the vision of what it was that we were offering for them, and yet, we were able to make some progress along the way.

Q.   So to be clear, you were discussing a rate with them, but especially things were rocky.  Was there any guarantee you would get that rate?

         MR. BONDI:  Objection.

         THE COURT:  Overruled.

A.   No.

Q.   And by September 2020, did Nikola have any sort of contract with APS?

A.   No.

Q.   Mr. Prows, you recall being asked on cross about locations where Nikola was looking at stations?  Do you recall that?

A.   Yes.

Q.   Mr. Bondi asked you about Van Ness, Palm Springs, Barstow. Do you recall that?

A.   Yes.

Q.   Had Nikola purchased any land for hydrogen stations in the summer of 2020?

A.   No.

Q.   And had Nikola leased any land for hydrogen stations that summer?

A.   No.

Q.   And in particular, with California, were there any issues with building hydrogen production stations in any of those locations?

A.   Yes.

Q.   What was that?

A.   The cost of electricity was significant and was a hurdle for us to overcome.

Q.   When you say it was a hurdle, what do you mean?

A.   The cost of electricity was quite a bit higher than our target price for our business model.

Q.   And what would that mean in terms of the cost of hydrogen, ultimately?

A.   A high cost of hydrogen would make it difficult to sell our trucks and difficult to sell the hydrogen, as well.

          MS. ESTES:  Ms. Wolfson, can you pull up Defendant's Exhibit 736.

Q.   Mr. Prows, do you recall being asked about this SEC filing on cross examination?

A.   Yes.

          MS. ESTES:  Ms. Wolfson, can you go to page 18 of this.  Ms. Wolfson, can you zoom into the middle paragraph

there.

Q.  Mr. Prows, do you recall being asked about this filing and the company's use of the word "planned"?  Do you recall that?

A.  Yes.

Q.  And I think we reviewed some other parts of it, as well.

Were the statements in the filing regarding hydrogen stations generally about the future, in your opinion?

A.  Yes.

Q.  And Mr. Prows, is it important to distinguish between what the company intends to achieve in the future and what actually has been accomplished?

A.  Yes.

Q.  Why is that important?

A.  Actually accomplishing something is very different than planning it.  Experience is the best teacher and it shows the actual results.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 553 side by side here.  Can you zoom into Mr. Milton's tweet there.

Q.  Mr. Prows, this is a tweet we looked at on your direct examination.  Mr. Milton says we currently make our own green H2 for under $4 a kilogram.

How would you compare that statement to the statements we looked at in the SEC filings by the company?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I think the primary difference is that the document on the left uses the word "planned," whereas the tweet uses the word "currently."

Q.  In your mind, what does the word "currently" signify?

A.  It signifies something that we are doing now.

Q.  And was it true that in August 2020, Nikola was making its own green hydrogen for under $4 a kilogram?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

MS. ESTES:  Ms. Wolfson, you can take that down. Ms. Wolfson, can you pull up Government Exhibit 406-T and 406-D, the clip that accompanies that.  Ms. Wolfson, if you could turn to page 3 here.  Could we zoom into lines 4 through 7.

Q.  Mr. Prows, on cross examination, do you recall Mr. Bondi asking you about the Transport Topics podcast?

A.  Yes.

Q.  And do you recall him asking you about the question by the person doing the interview about what Nikola envisioned as to its hydrogen stations?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you now play the clip here that was the answer to the question.

(Audio played)

Q.  Mr. Prows, there was a bit of a gap between the question and the response we see on the screen here.  Did you hear that, Mr. Prows?

A.  Yes.

Q.  And Mr. Prows, Mr. Milton's response on the screen here, now Nikola is producing it well below $4 a kilogram.  In your mind, is that a statement about the future?

A.  No.

Q.  Is that a statement about a plan the company was envisioning?

A.  No.

MS. ESTES:  Ms. Wolfson, you can take that down.

Your Honor, at this time, I'd offer Government Exhibit 701, the topic of discussion this morning.

THE COURT:  Very well.  Over defense objection, it will be received.

(Government's Exhibit 701 received in evidence)

MS. ESTES:  Ms. Wolfson, can you please display that for the witness.

Q.  Mr. Prows, do you see an article on your screen there?

A.  Yes.

Q.  And what's the title of the article there?

A.  Nikola Motor Takes a Big-Money Punt on the Hydrogen Future.

Q.  Can you see the top, what publication this comes from?

A.   The Irish Times.

Q.   What's the date of the article there?

A.   June 18th, 2020.

MS. ESTES:  Ms. Wolfson, can we go to the fifth page of this article.  Ms. Wolfson, can you zoom into the bottom two paragraphs there.

Q.   Mr. Prows, could you read the sentence that starts with "Milton also disagrees..."  Could you read that for the jury.

A.   Milton also disagrees with concerns that hydrogen infrastructure is too expensive is.

Q.   Could you read the quote below that.

A.   If you're going to turn battery-electric trucks around quickly and you need, say, a one megawatt charger?  Those are not cheap; they're millions of bucks apiece.  We can now produce hydrogen for between $2 and $4 a kilogram.  We're now cheaper than diesel to operate per-mile and we're almost at parity with a battery-electric per-mile, and ultimately, that's game over for diesel.

Q.   Mr. Prows, is that true in June 2020 that Nikola was producing hydrogen for between $2 and $4 per kilogram?

A.   No.

Q.   And the statement that we can now produce hydrogen for between $2 and $4 per kilogram, in your mind, is that a statement about the future?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Why not?

A.  Because he used the word "now."

MS. ESTES:  Ms. Wolfson, let's take that down.

Your Honor, at this time, I'd like to offer Government Exhibits 521, 525, and 531, which are additional tweets pursuant to the stipulation.

THE COURT:  Pursuant to stipulation, they will be received.

(Government's Exhibits 521, 525, 531 received in evidence)

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 521 for the witness.

Q.  Mr. Prows, what's the date of this tweet exchange here?

A.  June 9th, 2020.

Q.  And let's look at Mr. Milton's tweet on the bottom there. Can you read his tweet?

A.  We are now below $4 per kilogram, which is the lowest in the world.  We started at $16 and now we're at $4.  We plan on reducing that again.  The key is to order tons of equipment, scale it, and buy clean energy cheap.

Q.  Mr. Prows, in June 2020, was Nikola producing any hydrogen below $4 a kilogram?

A.  No.

Q.  And in 2020, was Nikola, in fact, purchasing hydrogen for a little over $14 a kilogram?

A.  Yes.

MS. ESTES:  Ms. Wolfson, let's take that down and pull up Government Exhibit 525.

Q.  Mr. Prows, what's the date of the tweet at the bottom there?

A.  June 9th, 2020.

Q.  And can you read that tweet.

A.  We are already under $4, working on $3.

Q.  Mr. Prows, in your view, is the statement, "We are already under $4..." a statement about the future?

A.  No.

Q.  Why not?

A.  Because he used the word "already."

MS. ESTES:  Ms. Wolfson, let's take that down and pull up Government Exhibit 531.

Q.  Mr. Prows, what's the date on that tweet exchange there?

A.  June 16th, 2020.

Q.  And can you read Mr. Milton's tweet at the bottom there?

A.  We are less than $4 per kilogram now.  FYI.  Nikola changed hydrogen forever, driving it down from $16 to under $4, along with our partners Nel.

Q.  Mr. Prows, in your view, is this a statement about the future?

A.   No.

Q.   Was this statement true in June 2020?

A.   No.

          MS. ESTES:  Ms. Wolfson, you can take that down.

Q.   Now, Mr. Prows, Mr. Bondi showed you those statements in the SEC filings.  We talked about that; right?

A.   Yes.

Q.   That talked about Nikola's plan to build hydrogen stations. Do you recall that?

A.   Yes.

Q.   And that was about Nikola's plans in the future?

A.   Yes.

Q.   And the company was careful to make clear that these were plans for the future; is that right?

A.   I believe so.

Q.   And Mr. Prows, I think you testified on direct about your concerns with Mr. Milton's statements and these podcasts and the tweets.  Do you recall that?

A.   Yes.

Q.   Do Nikola's public disclosures about the hydrogen stations change your level of concern about Mr. Milton's misstatements in these podcasts and tweets?

          MR. BONDI:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   Mr. Prows, despite the SEC filings, do you remain concerned

about the podcasts and tweets?

MR. BONDI:  Objection, your Honor.  Same.

THE COURT:  Overruled.

A.  Can you restate the question, please.

Q.  Despite Nikola's SEC filings, do you remain concerned about Mr. Milton's podcasts and tweets?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Why is that?

A.  Because the statements are talking about things that have already happened rather than things that are to come in the future.

Q.  Mr. Prows, in your mind, is it important that all statements by a public company are accurate?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Why is that important?

A.  Investors make financial decisions based on statements that are made by public companies, so it's important, I believe, for those statements to be accurate.

MS. ESTES:  Nothing further, your Honor.

THE COURT:  Anything more, Mr. Bondi?

MR. BONDI:  Briefly, your Honor.

Chris, if we can pull up the exhibit with the analyst day presentation. Sorry. I don't have the number.

RECROSS EXAMINATION

BY MR. BONDI:

Q. Mr. Prows, we talked about that a little while earlier and I just want to go back to this here. Let's go to the page that's referencing the hydrogen model.

MR. BONDI: Chris, can you go to that page, please.

Q. You see the $2.47 there; right?

A. Yes.

Q. And this was what Nikola was saying publicly it thought it could achieve in 2020; right?

A. I don't think we said we could achieve in 2020. We were projecting in 2020 that that's what we could --

Q. That's what your modeling was projecting?

A. Yes.

Q. And a lot went into that modeling; right?

A. I believe so.

Q. And you used a word about blended; right? Was that a blended amount?

A. That probably would have been an average cost of hydrogen across the country.

Q. So that means some states and some places could be higher, some places would be lower, but on average, that's what you were projecting, $2.47 a kilogram; right?

A.   Correct.

Q.   Now, Ms. Estes spent a lot of time talking about California and LA; right?  And LA and California has the highest electricity cost in all of the nation; right?

A.   I don't know.

Q.   One of the highest; right?

A.   Yes.

        MR. BONDI:  Let's go back to 250, please, which has been admitted.  Government Exhibit 250, please, and the attachment, 250-A.

Q.   Can you read the box at number 6 there out loud, please.

A.   Cost of electricity inclusive of gaseous production cost at $21.70 per megawatt hour and station operation cost of $150 per megawatt hour.

Q.   Can you explain what that means?

A.   The assumption here was that we would be acquiring electricity at $21.70 per megawatt hour to produce the hydrogen and then to dispense the hydrogen would be $150 per megawatt hour.

Q.   And we've been talking megawatts, kilowatts, everything else.  What does that translate to in kilowatts?

A.   You divide these numbers by a thousand.  So it would be 2.17 cents per kilowatt and .15.

Q.   So here in this presentation, you're saying two cents a kilowatt hour; right?

A.   2.17 cents, yes.

Q.   Now, Mr. Prows, the heavily populated, difficult, expensive areas like LA, Nikola had a plan to deal with that; right?

A.   We were working on plans, yes.

Q.   And one of those plans involved liquefaction; right?

A.   Yes.

Q.   And isn't it true, Mr. Prows, you believed you could reach your target price through transferring hydrogen through liquefaction to LA?

A.   No.

Q.   No?  What were you projecting in liquefaction cost in 2020, just to produce hydrogen?

A.   I don't know what the production cost of hydrogen component is broken out of that entire model.

Q.   It was less than $4; right?

A.   I don't know.

Q.   Mr. Prows, Ms. Estes put up a number of tweets on the screen a few minutes ago.  Did you see any of those tweets in 2020?

A.   I don't recall.

Q.   When was the first time you saw those tweets?

A.   I don't remember.

Q.   Was it when the government showed it to you?

A.   I don't remember.

Q.   Was it during one of the government's seven interviews with

M9JCmil5                        Prows - recross

you?

A.  I don't recall.

Q.  Now those tweets were from the summer of 2020; right?

A.  Yes.

MR. BONDI:  And Chris, very briefly, if you could play what I believe is the Autoline clip, June 11, 2020, around the same time period of those tweets.  If you could play lines 47, 15, through 47, 19, and we could just pull up the audio.

(Video played)

Q.  Mr. Prows, two years before hydrogen comes online; right?

A.  Yes.

Q.  And that's a true statement; correct?

A.  I think it would be at least that long.

Q.  You have no reason to disagree with that statement, though, do you?

A.  Yes.

MR. BONDI:  No further questions.

THE COURT:  Anything else, Ms. Estes?

MS. ESTES:  No, your Honor.

THE COURT:  Mr. Prows, you may step down.

(Witness excused)

Government, you can call your next witness.

MS. ESTES:  Your Honor, the government calls Mark Russell.

THE COURT:  Sir, step up into the box and remain

standing.

 MARK RUSSELL,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

          THE COURT:  Sir, you may be seated.  You're a little
tall for the box, I apologize for that, but please, when you
speak, speak directly into the microphone and please begin by
stating your first name and your last name, and spelling your
first name and your last name.

          THE WITNESS:  Mark, M-a-r-k, Russell, R-u-s-s-e-l-l.

          THE COURT:  Ms. Estes.

DIRECT EXAMINATION

BY MS. ESTES:

Q.  Good afternoon, Mr. Russell.

A.  Good afternoon.

Q.  Where do you work?

A.  At Nikola Corporation.

Q.  What's your position there?

A.  I'm the chief executive officer, the CEO.

Q.  How long have you worked at Nikola?

A.  Since February of 2019.

Q.  When you started at the company, who was the CEO?

A.  Trevor Milton.

Q.  What was your position when you started at the company?

A.  I was the president.

Q.   Who did you report to then?

A.   To Trevor Milton.

Q.   Before coming to Nikola, did you have conversations with Mr. Milton about joining the company?

A.   I did.

Q.   What did you discuss with him, on a high level?

A.   What my position would be with the company and what the future would be.

Q.   What did you discuss with him with respect to what your position would be at the company?

A.   Well, I was joining as president, but I was unwilling to join unless we had an agreement that when we became publicly traded, I would become the CEO.

Q.   And why did you want that agreement before joining the company?

A.   I felt that I would be the better CEO once we became publicly traded.

Q.   Why did you think you would be a better CEO?

A.   Trevor did not have public executive experience and he was prone to exaggeration in making public statements.

          MR. MUKASEY:  Objection.  Move to strike.

          THE COURT:  Overruled.

Q.   When you say he was prone to exaggeration in public statements, what do you mean by that?

A.   In situations where he was trying to persuade somebody, he

would sometimes exaggerate, sometimes misstate facts.

Q. Why would that matter if Nikola was a public company?

A. Public companies have to be very careful about their statements being true and correct.

Q. And why do public companies have to be careful about their statements?

A. Because investors have to be able to rely on those.

Q. When did Nikola go public?

A. In June of 2020.

Q. Did your position change when the company went public?

A. I became the CEO.

Q. What was Mr. Milton's position when the company went public?

A. He became the executive chairman of the board.

Q. What does it mean to be executive chairman of the board?

A. Well, the normal chairman position is not an executive of the company, he's just a board member and leads the board. If you're the executive chairman, then you're still the top executive of the company.

Q. So what was the significance of him becoming the executive chairman of the board versus chairman?

A. I still reported to him and that was not the deal we had arranged.

THE COURT: I'm sorry, Mr. Russell. Can I ask you to get closer to the microphone or move the microphone closer to

you.

Q.  Mr. Russell, can you just repeat your last answer there.
What was the significance of him being executive chairman
versus regular chairman of the board?

A.  He was still the day-to-day chief executive of the company.

Q.  Who did you report to when you were CEO of the company and
he was executive chairman?

A.  To Trevor Milton.

Q.  So he was your boss?

A.  Yes.

Q.  Did he have the ability to override your decisions?

A.  Yes.

Q.  Before Nikola became a public company, did you have
conversations with Mr. Milton about the need to be accurate in
public statements?

A.  Yes.

Q.  What kind of conversations?

A.  I explained to him that since he was the executive
chairman --

          MR. MUKASEY:  Your Honor, can we have a timeframe on
this, please.

A.  This is prior to June 3rd of 2020.

Q.  Yes.  So in the months before June 3rd, 2020, can you
describe the conversations you had with Mr. Milton about public
statements?

A.   I explained to him that as the top executive officer of the company, anything he says in public would be the equivalent of a press release or a securities filing.  And then I would remind him that we would have very careful process about those kinds of things and that he would need to take the same precaution.

Q.   And when you say you had a careful process with regard to those kinds of things, what do you mean?

A.   Anything that we made a public statement about would have to be reviewed by lawyers and accountants, finance and legal, and typically all the senior executives of the company would review it, as well.

Q.   Mr. Russell, how would you describe the volume of Mr. Milton's public statements after the company went public?

A.   It was high.

Q.   Were they higher than they were before the company went public?

A.   He was always very --

        MR. MUKASEY:  Objection.  Foundation.

        THE COURT:  Overruled.

A.   He was always very active in making public statements and representing the company publicly, but he went on what he called a blitz following the listing.

Q.   Mr. Russell, after the company went public, did you have additional conversations with Mr. Milton about his public

M9JCmil5                         Russell - direct

statements?

A.  Yes.

Q.  Could you describe those conversations at a high level.

        MR. MUKASEY:  I'm going to object to the term at "a high level."  If she wants to ask about a specific conversation, she should do that.

        THE COURT:  Overruled.

A.  He would say or do something that I would see and I might have concerns about it and we would talk about it.  I would remind him that his public statements were the same as a press release or a securities filing and he should be more careful.

Q.  Were you concerned with his public statements after the company went public?

A.  Yes.

Q.  Why were you concerned?

A.  Because he was prone to exaggeration and misstatements.

Q.  Mr. Russell, as CEO of Nikola, did you speak to the public?

A.  I did.

Q.  Did you try to be accurate in your public statements?

A.  I did.

Q.  Why was that?

A.  Because it's important.  Any executive officer of the company speaking to the public is the same as a press release or a filing.

Q.  Mr. Russell, aside from your concern about Mr. Milton's

public statements, did you have any concerns about anything else about Mr. Milton's behavior in the public period?

A.   Can you be more specific.

Q.   Did you and Mr. Milton ever discuss the stock price of the company?

A.   Yes.

Q.   And how would you describe your conversations about the stock price of the company?

A.   Well, the stock price in the initial trading was very volatile.  It went up and down a lot, but generally up, and he was very excited when it would go up.

Q.   Was there anything about your conversations with Mr. Milton, the stock price, that concerned you?

A.   Yeah, he was very focused on the stock price from day-to-day and was very excited when it went up dramatically, and that concerned me.

Q.   Why did that concern you?

A.   Because I felt that the most important thing we could do is build value for the long-term, which would be executing on a business plan, and that short-term price swings were not healthy.

Q.   Did you and Mr. Milton ever have conversations about what type of investors were influencing Nikola's stock price?

A.   We did.

Q.   What did you discuss about that?

M9JCmil5                         Russell – direct

MR. MUKASEY:  Timeframe, please, Judge.

Q.  After the company went public?

A.  We had discussions both before and after.  But you want after?

Q.  Yes, let's talk about after.

A.  After we went public, we would talk about the fact that the volatility in our stock was coming from retail investors, individuals who were trading from their own account.  I reminded him that we worked very hard and carefully in the previous year or two to establish an investor base that consisted of institutional investors.  These are large institutions who invest aggregated money and typically hold for longer periods of time, sometimes very long periods of time and they were the ones that I was after.  He would say that he brings the retail investors and I would say I don't really want them.

Q.  Mr. Russell, did you and Mr. Milton ever discuss how to communicate with retail investors?

A.  Yes.

Q.  What would he say about that?

A.  He would say that he was a very effective communicator and was able to utilize social media and other mediums to be able to communicate with the average investor.

Q.  Mr. Russell, a few months after the company went public, did there come a time when a short seller report was published

about Nikola?

A.  Yes.

Q.  And did the report allege that Mr. Milton made misstatements?

A.  Yes.

Q.  After the report, did you speak to the board of directors at Nikola about your concerns with Mr. Milton's public statements?

A.  Yes.

Q.  At a high level, what did you say to the board?

        MR. MUKASEY:  Objection.  Hearsay.

        THE COURT:  Sustained.

Q.  Mr. Russell, what happened after your conversation with the board about Mr. Milton's public statements?

A.  Prior to the short seller report or after?

Q.  After the short seller report with respect to Mr. Milton's position in the company, what happened after you spoke to the board?

A.  The board met following the short seller report with the executive officers several times, actually.  And then the board met with Mr. Milton excused, with me and the other executive officers.  And then the board met without any executive officers, as well.  There were several sessions.

Q.  And what was the result of those board sessions?

A.  When Trevor was excused from the first discussion, I told

M9JCmil5                          Russell - direct

the board that --

MR. MUKASEY:  Objection.

THE COURT:  Sustained.

Q.  Mr. Russell, let's just focus on what happened as a result of the board's discussions.

A.  Trevor resigned.

Q.  Mr. Russell, I now want to step back a little bit.

Could you describe for the jury your educational background.

A.  I have a bachelor's degree and a law degree.

Q.  Are you currently practicing law?

A.  No.

Q.  What did you do before you started working at Nikola?

A.  I was working for a company called Worthington Industries.

Q.  What kind of company is Worthington?

A.  It's a diversified manufacturing company, publicly traded.

Q.  Approximately when did you work at Worthington?

A.  From 2007 to 2018.

Q.  What were you doing at Worthington?

A.  I was initially the president of Worthington Steel, which is an operating subsidiary, and then I became president of Worthington Industries Incorporated.

Q.  Did there come a time when you were at Worthington when you met Mr. Milton?

A.  Yes.

M9JCmil5                          Russell - direct

Q.   When was that, approximately?

A.   Would have been, oh, gosh, 2014, maybe 2015.

Q.   How did you meet him?

A.   One of the businesses I was responsible for made pressure cylinders, and they had a new customer, a company called DHybrid.  And I noticed that every report, the business with DHybrid increased.  I eventually asked the people around the business, who is that, and they said it's a small startup that's rapidly growing, it's out west, and they're all a bunch of young people.  And I said that sounds very interesting, I think I'd like to meet him.  So on a west coast trip, we stopped and that's when I met Trevor.

Q.   So what kind of business was DHybrid?

A.   They were buying pressure cylinders from us that held natural gas and they were using them to create a fuel system for a heavy truck.  They would provide the actual system that delivered fuel into the engine.

Q.   And after you met Mr. Milton, what happened next between Worthington and DHybrid?

A.   After some discussions, we eventually acquired DHybrid.

Q.   What was Milton's role after Worthington acquired DHybrid?

A.   He became, briefly, an employee of Worthington.

Q.   How long did he work at Worthington?

A.   Not very long.  A couple months, as I recall.

Q.   What happened after that?

A.   He quit to found Nikola.

Q.   When did you first learn about Nikola?

A.   He walked into my office and said, look, I'm not cut out for the corporate life and my real dream was not to do natural gas fuel systems, but I want to build a truck of the future, and now I've got a little bit of capital, and I think I'm going to go do that.  He said if you're smart, you'll back me, but either way, I quit.

Q.   Did there come a point where Worthington invested in Nikola?

A.   Yes, we were a seed investor in Nikola.  Worthington was a seed investor in Nikola.

Q.   What does it mean to be a seed investor?

A.   The initial investment.

Q.   Did you have discussions with Mr. Milton about Nikola before investing?

A.   Yes.

Q.   What did he tell you about the company?

A.   He explained to me the business plan that they were going to design and build a hybrid drive truck that would use a natural gas turbine driving electric motors at the wheels.

Q.   What stage of the company was Nikola at this point?

A.   It was just a basement startup.

Q.   Did you recommend that Worthington invest in Nikola?

A.   I did.

Q.   Why did you do that?

A.   It was an intriguing idea.  At the time, there was a difference in the price between natural gas and diesel fuel. Natural gas was cheaper and it was lower carbon, so it seemed like it had a lot of potential.

Q.   After Worthington's investment with Nikola, what was your relationship with Nikola?

A.   I represented Worthington to the company, just watched over its investment.

Q.   Did you attend the unveiling of Nikola's prototype truck?

A.   I did.

Q.   What was the name of that truck?

A.   The Nikola One.

Q.   Did you have any role in preparing for the unveiling?

A.   No.

Q.   To be clear, you were at Worthington at the time of the unveiling?

A.   Yes.

Q.   Did you have any knowledge of what Mr. Milton would say at the unveiling?

A.   No.

Q.   Mr. Russell, had you seen the prototype before the unveiling?

A.   Yes.

Q.   Where had you seen it?

A.   I saw it in a stage of construction at a workshop in Detroit and I may have seen it once in the warehouse in Salt Lake City.

Q.   Did you have any conversations with Mr. Milton about the capabilities of the prototype before the unveiling?

A.   By capabilities, what do you mean?

Q.   About the status of the prototype?

A.   Oh, yes.

Q.   What did you discuss in that regard?

A.   During the construction of the prototype, I became concerned about the cost of the truck short of its production because of the cost of the turbine.  Trevor said he had an angle on a lower-cost turbine, which we checked out together. Following that, I told him I didn't think that that turbine was going to work and the turbine that would work would be too expensive.  So I said that I wouldn't recommend that Worthington further invest.

Q.   Why would you say that?

A.   Because I didn't see the economic return there based on how expensive that turbine would be.

Q.   Did there come a time that you learned that Nikola was pivoting away from a turbine?

A.   Yeah, after I told him that Worthington would not further invest, I didn't hear from him for some period of time.  Then, when I did hear from him again, he said that he was pivoting

M9JCmil5                        Russell - direct

the company to -- from natural gas to hydrogen and from a

turbine to a fuel cell.

Q.  Mr. Russell, before the unveiling, did you have any

conversations with Mr. Milton about whether there would be a

hydrogen fuel cell in the truck?

A.  No, not that I recall.

Q.  After you came to work at Nikola, did you learn what the

capabilities of the prototype were at the time of the

unveiling?

A.  Yes.

Q.  What did you learn?

          MR. MUKASEY:  Objection.  Hearsay.

          THE COURT:  Overruled.

          MR. MUKASEY:  Unless she establishes who he learned it

from.

          THE COURT:  Overruled.

A.  I learned that the truck would not have the turbine

installed.

Q.  And did it have a hydrogen fuel cell installed from what

you learned?

A.  No, it also did not have a fuel cell.

          MS. ESTES:  Ms. Wolfson, can you pull up Government

Exhibit 400-B, which is in evidence.  Can you play the clip

there.

          (Video played)

Q.  Mr. Russell, based on what you know about this prototype from your later time at Nikola, do you have an understanding of whether the truck could have driven off the stage at the unveiling?

A.  I believe it could not.  I guess it's possible it could have driven under battery power alone.

Q.  Did it have a hydrogen fuel cell at the time of the unveiling?

A.  No.

Q.  Mr. Russell, based on your understanding that it didn't have a hydrogen fuel cell, do you believe the statements that it could be driven off stage are accurate?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  Based on what I know now, no.

MS. ESTES:  Ms. Wolfson, you can take that down.

Q.  Mr. Russell, did there come a time when you left Worthington?

A.  Yes, in 2018.

Q.  Why did you leave Worthington?

A.  I already retired.

Q.  Did you have a job lined up when you left Worthington?

A.  Not immediately, no.

Q.  What happened next in terms of your employment?

A.  I had some discussions with some private equity companies

and began discussions with Trevor about potentially joining
Nikola.

Q.   How many discussions did you have with Mr. Milton about
joining Nikola?

A.   A number, from September of 2018 through January of 2019.

Q.   So over the course of a few months?

A.   Yes.

Q.   At the time you were having discussions with Mr. Milton,
where was Nikola in terms of revenue?

A.   Pre-revenue.

Q.   What does it mean to be pre-revenue?

A.   It means you're not selling the products yet and all the
money you're spending is coming from investors.

          MS. ESTES:  Mr. Russell, if you don't mind, if you
could just slow down a little bit and continue to speak in the
microphone, that would be great.

Q.   At the time you were having these discussions with
Mr. Milton, where was Nikola in terms of fundraising?

A.   I believe that was -- give me the timeframe again.

Q.   When you were having your discussions with Mr. Milton about
joining the company.

A.   I believe that was still in the C-round of fundraising.

Q.   And what does that mean?

A.   The rounds of fundraising typically are C, which is the
beginning, and then A, B, C, D, and so on.

Q.   At the time you were having these discussions with Mr. Milton, were you discussing taking the company public one day?

A.   Yes.

Q.   Why was that the goal?

A.   The company was growing rapidly and I was very interested in the business model, I felt it had tremendous potential, and if we were going to fulfill that potential, we would need to continue to raise capital, probably through D-round and maybe beyond, and some day we would need to tap the public markets to be able to raise capital for the growth.

(Continued on next page)

Q.   And, Mr. Russell, I believe you testified earlier that at the time you were having these discussions with Mr. Milton, you were already discussing what your role would be when the company went public, is that right?

A.   Yes.

Q.   And what did you tell Mr. Milton you wanted if the company went public?

A.   I told him that I would not join the company unless, when we were a public company, I could be the CEO.

Q.   And why didn't you want to join unless you could be CEO?

A.   For the reasons I mentioned before.  I felt that I was qualified to be -- to be the CEO, and then I was concerned about his public statements.

Q.   Mr. Russell, in your experience, is it important for a public company's CEO to be truthful in public statements?

          MR. MUKASEY:  Asked and answered.

          THE COURT:  Sustained.

Q.   Mr. Russell, you testified earlier that Mr. Milton discussed remaining on the board when the company went public.  Do you recall that?

A.   That's one of my other conditions that I be allowed to join the board, yes.

Q.   OK.  Sorry.  Let me rephrase the question.

          Actually, first, you said one of the conditions was that you would be allowed to join the board, is that right?

A.   I would be the CEO when we became publicly traded, and then I would have a board seat.

Q.   Can you explain what the board of directors is.

A.   The board is group of people that advise the executive officers of the company, and they approve certain important decisions.

Q.   And in your discussions with Mr. Milton, did you discuss what his position would be after the company went public?

A.   Yeah.  I said when we go public, I'll be the CEO, and you'll still be on the board.  And if you remain the largest shareholder, you'll probably be the chairman.

Q.   Did you ever have discussions with him at this time about being executive chairman when the company went public?

A.   No.  That didn't even cross my mind.  I presumed he thought the same thing I did, which we were talking about a nonexecutive chairman position.

Q.   Would it have mattered to you if he mentioned wanting to be the executive chairman?

         MR. MUKASEY:  Objection.  Speculation.

         THE COURT:  Sustained.

Q.   Mr. Russell, would you have come to the company if you knew Mr. Milton would be executive chairman one way?

         MR. MUKASEY:  Same objection.

         THE COURT:  Overruled.

A.   No.

Q.  Why not?

A.  Because the executive chairman still is the de facto chief executive, and that was totally against what I was bargaining for, which was the right to be the chief executive after we publicly traded.

Q.  Was it important to you that you not report directly to Mr. Milton?

A.  Only as a member of the board or as its chair.  Either of those would have been acceptable to me.

Q.  Why didn't you want to report directly to Mr. Milton as executive chairman?

A.  Because I wanted to be the chief executive officer for purposes of leading the company and making public statements.

Q.  Mr. Russell, you mentioned that you wanted to be CEO because you had some concerns about Mr. Milton's tendency to exaggerate.

Why did you join Nikola despite Mr. Milton's tendency to exaggerate?

A.  Because it was the best business idea I've come across in my career.

Q.  Mr. Russell, when you joined the company, did you believe you had put structures in place to deal with Mr. Milton's tendency to exaggerate?

        MR. MUKASEY:  Leading.

        THE COURT:  Overruled.

A.   I believe that prior to being publicly traded, we were dealing with more sophisticated investors and a different standard.  And then once we were publicly traded, I would be chief executive, and then I wouldn't have to worry because he wouldn't be in a position to be making statements.

THE COURT:  I'm sorry.  Can you repeat that, sir.  I didn't hear you, that last part.

THE WITNESS:  Once we were publicly traded, I would be the chief executive, and he wouldn't be in a position to be making public statements as the top executive of the company.

Q.   And was that important to you?

A.   Yes.

Q.   Mr. Russell, are you familiar with an entity called T & M?

A.   Yes.

Q.   What is that?

A.   That's an entity that holds shares in Nikola owned by Trevor Milton and myself.

Q.   When was T & M formed, approximately?

A.   At the time I joined the company in January/February of 2019.

Q.   What was the purpose of forming T & M?

A.   For both of us to be able to contribute stock and to be able to pull it back out according to the rules that we established for the company.

Q.   What was the purpose of Mr. Milton contributing stock into

this joint entity?

A.  He said that if I joined the company, he would put his shares of stock in there.  He would give me the upside on a portion of his shares, which meant that he would put shares of his stock into T & M, some of his shares, and that the value from that point on would accrue to me on those shares.

Q.  Did you and Mr. Milton have any agreement with respect to the voting rights of these shares in T & M?

A.  Yeah, that was his condition.  He said I'll do this, but I would like to keep the right to vote all the shares in T & M for three years, which I agreed to.

Q.  What was the significance of that?

A.  That allowed him to vote all the shares, including the ones that I contributed.

Q.  Mr. Russell, who was the largest shareholder in Nikola when you joined the company?

A.  Trevor Milton.

Q.  What's the significance of that?

A.  That makes him the most influential shareholder, and also he was the chief executive, so --

Q.  So what does that mean?

A.  That means he had an -- he had extraordinary control.

Q.  Mr. Russell, when you joined the company and became the president, what were your duties and responsibilities?

A.  I was responsible for day-to-day operations, building the

factory, building out the team, continuing to grow the company.

Q.   And what was Mr. Milton doing as CEO?

A.   He retained the top executive functions, all the C-suite reported to him, and then certain functions reported to him also, like design and public relations, things like that.

Q.   Mr. Russell, I'm sorry.  I have a hard time hearing you. Did you say the C-suite reported to him?

A.   Yeah, the C-suite still reported to him and certain functions he retained as well, for example, design and public relations.

Q.   And when you say the "C-suite reported to him," who's the C-suite?

A.   That's the chief financial officer, the chief legal officer, and the chief human resources officer.

Q.   And you say -- you said he also retained some functions like design and public relations?

A.   Yes.  And I think a few others as well.  To tell you exactly, I could -- if you showed me an organizational chart from that time, I could tell you exactly who reported to who.

Q.   Mr. Russell, did you and Mr. Milton have conversations about the status of Nikola's products and technology when you were president?

A.   Yes.

Q.   How often did you talk to him?

A.   Daily, multiple times a day usually.

Q.  Where were your desks located in relation to each other?

A.  We were in a warehouse in Chandler, Arizona, at that time, and our desks were right next to each other.

Q.  How big was the company when you joined it in 2019?

A.  In terms of employees?

Q.  Yes.

A.  I think we were over 100 by then, but we were not in the hundreds at that point, I don't think.

Q.  Was Nikola engaged in any sort of fundraising when you joined the company?

A.  Always as a pre-revenue startup, you have to fundraise all the time.

Q.  Why do you have to fundraise all the time?

A.  Because the only money you have is what you raise from investors.  You don't have revenue from your customers yet.

Q.  How was Nikola raising money when you joined the company?

A.  From institutional investors and strategic investors.

Q.  Did Nikola ever have a meeting with SoftBank about investing?

A.  Yes.

Q.  What kind of company is SoftBank?

A.  SoftBank is an institutional investor, a fund.

Q.  And approximately when was the meeting with SoftBank?

A.  Well, I don't recall.  It was late, late '19 maybe or very early '20, I would guess.

Q.  What was the purpose of the meeting with SoftBank?

A.  To pitch them on investing in Nikola.

Q.  Who from Nikola was at the meeting?

A.  Myself; Kim Brady, the CFO; and Trevor Milton.

Q.  Could you describe the meeting with SoftBank.

A.  We had a deck of slides that we were presenting about Nikola.

Q.  And what happened at the meeting?

A.  We were presenting the slides.  At one point Trevor became active in presenting the slides.

Q.  Who started presenting the slides?

A.  Kim Brady and myself.

Q.  And what happened when Mr. Milton started presenting the slides?

A.  He -- he made his own comments, of course.

Q.  How would you describe his comments?

A.  He was selling.

Q.  When you say "he was selling," what do you mean by that?

A.  I think he felt that the slides were insufficient to be persuasive, and so he -- he started going a little bit off the slides, talking about all the potential of the company.

          MR. MUKASEY:  Objection.  Move to strike as to what he thinks Mr. Milton thought.

          THE COURT:  Overruled.

Q.  Mr. Russell, did you have a discussion with Mr. Milton

M9JHMil6                        Russell - Direct

immediately after that meeting with SoftBank?

A.  Yes.

Q.  Where was the discussion?

A.  On the sidewalk outside the office.

Q.  Who was involved in that discussion?

A.  Kim Brady, myself, Trevor, and our bankers.

Q.  What happened in that discussion on the sidewalk?

A.  Trevor was upset with the bankers because they were in the meeting trying to get us back on the slide deck.

Q.  What do you recall Mr. Milton saying to the bankers?

A.  That they don't know how to sell.

Q.  How did the bankers respond?

A.  The bankers said --

        MR. MUKASEY:  Objection.

        THE COURT:  Overruled.

A.  The bankers said that, hey, we do this for a living, and this is how we do it.  And we're telling you that the way you're doing it is not the way you do it.

Q.  Did you respond in that meeting on the sidewalk?

A.  In a limited way, yes.

Q.  Did you have a later conversation with Mr. Milton about the meeting with SoftBank?

A.  Yeah.  On the way home, Kim Brady and Trevor and I had a conversation about that conversation where we said that we don't want to fire the bankers and that we agreed with them.

We didn't want to disagree with them, you know, in front of them, but we agreed with them.  And we thought -- we both said we thought it would be a better idea if he did not attend these meetings in the future.

Q.  Mr. Russell, I just want to make sure I understand who some of the "theys" are there.

So who said that they agreed with the bankers?

A.  Kim and I both agreed with the bankers when the bankers told Trevor that the way he was doing it was not the right way to do it.

Q.  And what did you say about meetings with investors, institutional investors, in the future?

A.  I said, I agree with the bankers.  I think it would be better if you don't get involved in these investor presentations going forward.

Q.  Mr. Russell, did there come a point when -- actually, let me step back.

Why did you not want Mr. Milton involved in investor presentations going forward?

A.  Because his modus operandi in that presentation is not what institutional investors are looking for.

Q.  And what's his modus operandi?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  He was very excited about the company, and he was prone to

M9JHMil6                        Russell - Direct

exaggeration.

Q.  Mr. Russell, did there come a point when Nikola began moving towards becoming a public company?

A.  Yes.

Q.  When was that, approximately?

A.  In the fall of 2019, we began having discussions about going public.

Q.  What was the purpose of taking the company public?

A.  To give us more access to greater sources of capital.

Q.  What happened in the fall of 2019 that it started Nikola in the process towards going public?

A.  We had met executives from a company called VectoIQ.

Q.  What kind of company is VectoIQ?

A.  They're a special purpose acquisition company.

Q.  What does that mean?

A.  A SPAC, or special purpose acquisition company, is a company formed just to hold cash until it can find an operating company to acquire.

Q.  Is a SPAC a publicly traded company?

A.  Yeah, that's the purpose, to allow the company that they acquire to become publicly traded by merging with it.

Q.  Where was VectoIQ based?

A.  In New York, I believe.

Q.  Mr. Russell, are you familiar with the term "initial public offering"?

A.  Yes.

Q.  What does that mean?

A.  That's a method of going public where you don't merge with a SPAC or any other company.  You just list your stock directly on an exchange.

Q.  Is there any advantage to going public through a SPAC versus going public through an initial public offering?

A.  Merging with a SPAC is typically quicker, and then there are less regulations that apply.

Q.  What was that last part?  Can you repeat that.

A.  And there are less regulations that apply.

Q.  When you say "there are less regulations," what do you mean by that?

A.  Your ability to make certain statements is broader when you're under a SPAC than it is in an IPO.

Q.  When you say "your ability," do you mean the company's ability or something else?

A.  Yeah, the company's ability.

Q.  Mr. Russell, did VectoIQ's shares trade on a particular exchange?

A.  They did.

Q.  What exchange?

A.  The NASDAQ.

Q.  Where's the NASDAQ based?

A.  Here in New York.

Q.   After VectoIQ first approached Nikola, what happened next in terms of discussions with VectoIQ about a potential acquisition?

A.   They quickly became very interested and assembled a due diligence team and began conducting due diligence on Nikola.

Q.   What do you mean by "due diligence"?

A.   Due diligence is what you do before you finalize a transaction to make sure that everything is as it appears to be and you check all the details.

Q.   Mr. Russell, how do the materials available to, for instance, VectoIQ in due diligence compare to materials later available to public investors in Nikola?

A.   In that due diligence process, they had much greater access than a public investor would have.

          MS. ESTES:   Ms. Wolfson, can you pull up Government Exhibit 802 for the witness.

Q.   Mr. Russell, do you recognize what's on the screen there?

A.   Yes.

Q.   What is it?

A.   It looks like the press release we issued on the 3rd of March in 2020.

Q.   And what was the press release about, generally?

A.   The fact that we were going to move with VectoIQ and be listed on the NASDAQ.

          MS. ESTES:   Your Honor, we offer Government

Exhibit 802.

MR. MUKASEY:  No objection if it's pursuant to stip.

THE COURT:  802 will be received.

(Government's Exhibit 802 received in evidence)

MS. ESTES:  Ms. Wolfson, could you please publish and then zoom in to that top portion of that press release.  Ms. Wolfson, I'm sorry, can you zoom out and get the date in there.  Great.

BY MS. ESTES:

Q.  Mr. Russell, what's the date of the press release here?

A.  March 3, 2020.

Q.  Can you read the headline there.

A.  "Nikola Corporation, a Global Leader in Zero Emissions Transportation Solutions to be Listed on NASDAQ through a Merger with VectoIQ."

Q.  Mr. Russell, the fourth line down there says pro forma enterprise value of the merger is approximately 3.3 billion.  Can you explain what that means.

A.  That would be the number of shares outstanding times the price at which we were proposing to list at, plus any debt in this case.

Q.  What was the price Nikola was proposing to list at?

A.  Ten dollars a share.

MS. ESTES:  Ms. Wolfson, can you highlight the next bullet there.

Q.   Mr. Russell, where this bullet says, "Transaction includes a $525 million fully committed common stock PIPE," what is that a reference to?

A.   A PIPE refers to a private investment in public equity. These were other, typically, institutional investors who agreed to invest along with VectoIQ at the time of the merger.

Q.   And it also says -- it says $10 a share is there.  What does that mean?

A.   That's the price that we were proposing to offer the company at.

Q.   And the PIPE investors that invested at $10 a share, did they also have access to due diligence materials?

A.   They did.

Q.   What does it mean that the common stock was valued at $10 a share?

A.   That means that when we first started trading, they would trade at $10.

Q.   So is that the price that VectoIQ had valued it at after due diligence?

A.   And -- yeah, and the PIPE investors together.  That was their collective judgment as to what the company was worth at that point.

Q.   Mr. Russell, after this announcement, could you trade Nikola stock on the NASDAQ or could you trade any proxy for it?

A.   No, you couldn't trade Nikola stock until we merged.  Once

we made this announcement, you could trade VectoIQ stock as a proxy for what Nikola would be, assuming that the merger happened.

Q.  Did Nikola and VectoIQ ultimately combine?

A.  It did.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 804.

Q.  Mr. Russell, do you recognize that?

A.  I do.

Q.  What is this?

A.  This is an announcement of the closing of the merger.

MS. ESTES:  Your Honor, we offer Government Exhibit 804.

MR. MUKASEY:  No objection.

THE COURT:  804 will be received.

(Government's Exhibit 804 received in evidence)

BY MS. ESTES:

Q.  Mr. Russell, now that the jury can see this, what's the date of this press release there?

A.  June 3, 2020.

Q.  Can you read the headline there.

A.  "Nikola and VectoIQ Acquisition Corp. Announce Closing of Business Combination."

Q.  So after this was the Nikola stock publicly traded on the NASDAQ?

A.  It was.

MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Ms. Wolfson, actually, can we go back to Government Exhibit 802.  Can you zoom in to the top portion there, including the bullet points.

Ms. Wolfson, can you zoom out of that and zoom into the first half of the document there.

Q.  All right.  Mr. Russell, I'm going to ask you about the third bullet point there.  Could you read that third bullet point.

A.  "Nikola has more than 14,000 preorders, representing more than 10 billion in potential revenue and two and a half years of production."

Q.  Why does the press release say "preorders" there?

A.  Because those weren't actual orders at that point.

Q.  What were they?

A.  They were preorders or reservations.  They were indications of interest.  People had said we're interested.  This is what we think we might want to buy.  You know, we would -- we would try to get it as specific as we could, but it wasn't -- wasn't an actual order.

Q.  Were their reservations binding?

A.  No.

MR. MUKASEY:  Objection.  Foundation.  May I voir dire

M9JHMil6                          Russell – Direct

the witness, Judge?

            THE COURT:  Let's talk at sidebar.

            (Continued on next page)

M9JHMil6                        Russell - Direct

(At sidebar)

MR. MUKASEY:  Two issues, your Honor.  Number one, question calls for a legal conclusion, but number two -- as to what's binding and what isn't.

Number two, this witness was not present at the company for, I think, almost all of these 14,000.  The circumstances under which they were booked, ordered, leased, papered over are -- if he knows at all, it's based on hearsay, and no foundation has been laid for what he knows about these orders.

MS. ESTES:  Your Honor, Mr. Russell was the CEO of the company.  He knows about all of these things that are in the company's SEC filings.  He's briefed on all of them in the course of his work.  He certainly is a witness who can talk about whether the reservations here are binding in his understanding.  He's signed SEC documents that talk about these reservations and the status of them.

THE COURT:  I don't imagine that she would have any difficulty spending 15 minutes going through with Mr. Russell all of these various points that you just made.  You could try to lay some more foundation, but I don't think you'll have difficulty doing that.

With respect to the preorders, it's not as a matter of law.  It's a matter of fact.  Either they are or they're not cancelable by their terms, and I assume that he knows the

M9JHMil6                    Russell - Direct

answer to that.

MR. MUKASEY:  Cancelable is different from binding. Binding is legal.

MS. ESTES:  I can ask, in your understanding, are they binding, if that?

MR. CARUSO:  I think it would be correct for the government to ask those questions in terms of the witness' understanding.  I also think that the term "binding" is inappropriate because it calls for a legal conclusion, something that your Honor's going to have to rule on later. What this witness could understand, the facts, could they be canceled, under what circumstances, etc., but "binding" goes too far.

MS. ESTES:  Your Honor, "binding" is a term people use in everyday language.  In fact, I think they're so concerned with the term because Mr. Milton uses it in podcasts.  And I think we're certainly entitled, given his use of the term, to ask witnesses of their understanding of whether these reservations were binding.

THE COURT:  My working assumption is that the jury is laboring under no delusion that these are highly technical legal terms, that these terms are being used in the ordinary course using -- and that they have an ordinary meaning.  So I'm not -- I don't think, based on everything that I've heard and know about the case, that in her asking that question she was

asking for legal conclusions.  So if that was going to be your voir dire, I'm not going to allow that.

MR. MUKASEY:  I was going to go to -- my voir dire was not going to go to the legal issue.  It was going to go to the basis for his knowledge about these 14,000 orders since they happened well before he got to the company.  And the response that he was briefed on it is just another way of saying it's hearsay.

THE COURT:  You can try to lay some additional foundation.  I think it's perfectly appropriate.  He is the CEO of the company.  He has expressed his -- put on the record his experience as an executive in a public company.  He's talked about the importance of the press releases and SEC filings being accurate.  We can beat this horse some more or not, but based on what I've heard, I think it's perfectly appropriate. But if you want to ask some additional questions, you can.

MS. ESTES:  Thank you, your Honor.

(Continued on next page)

M9JHMil6                          Russell - Direct

(In open court; jurors present)

THE COURT:  You may proceed.

MS. ESTES:  Thank you, your Honor.

BY MS. ESTES:

Q.  Mr. Russell, during the course of your work as president and then CEO of the company, have you become generally familiar with reservations for Nikola trucks?

A.  Yes.

Q.  And have you had to sign SEC filings where Nikola describes the status of the reservations on its trucks?

A.  Yes.

Q.  And in your understanding, are these reservations generally binding?

A.  No.

Q.  Mr. Russell, was there any guarantee that these reservations could convert to binding orders?

A.  No.

Q.  Mr. Russell, so in this announcement you called them "preorders," and you discussed potential revenue.  Why does the press release say "potential revenue"?

A.  For multiple reasons.  One, they can be canceled; and, two, the purchase price had not been established.

Q.  And, Mr. Russell, was it, in your mind, important to be clear that these reservations could be canceled and that the revenue was only potential?

A.   Yes.

Q.   Why was that important?

A.   Because that's the fact.

Q.   Mr. Russell, are you familiar in general with reservations from the company Ryder?

A.   Yes.

Q.   And was it your understanding that those reservations were binding orders?

A.   Ryder was an unusual situation because we also have had an arrangement with them for service and support.

Q.   And did Nikola ultimately terminate the relationship with Ryder for service and support?

           MR. MUKASEY:  Objection.  Leading.

           THE COURT:  Overruled.

A.   The arrangement with Ryder was reconfigured because Ryder retracted their reservation for trucks.

Q.   They retracted their reservation for trucks?

A.   Yes.

Q.   And, Mr. Russell, are you familiar with reservations made by US Xpress?

A.   Yes.

Q.   And were those reservations binding orders?

A.   No.

           MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q.  Mr. Russell, did Nikola's negotiations with VectoIQ about the potential combination involve discussions about what the board of directors would look like if the company merged?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you pull up for the witness Government Exhibit 218, and if you could zoom in to that top portion there.

Q.  Mr. Russell, do you recognize this email?

A.  I do.

Q.  Who are the parties to the email at the top there?

A.  Email from Trevor to Jeff Ubben, Kim Brady, and myself.

Q.  What's the date of the email?

A.  January 13, 2020.

Q.  And what's the subject of the email?

A.  To keep this an option, we are getting questions about board construct.  See below.

Q.  Was this an email about the composition of the board?

A.  Yes.

MS. ESTES:  Your Honor, we offer Government Exhibit 218.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 218 received in evidence)

BY MS. ESTES:

Q.  All right., Mr. Russell, now that the jury can see this,

M9JHMil6                        Russell - Direct

what's the date of the email at the top there?

A.   January 13, 2020.

Q.   And it's from Mr. Milton to Jeff Ubben.  Who is Jeff Ubben?

A.   Jeff Ubben was a member of the Nikola board and a fund executive.

        MS. ESTES:  And, Ms. Wolfson, if you could zoom out of that, and if we could go to the second page of this document. And if you could zoom in to the 11:25 a.m. email from Steve Girsky.

Q.   Mr. Russell, who is Steve Girsky?

A.   Steve Girsky at this point was the CEO of VectoIQ.

Q.   And the first sentence of Mr. Girsky's email there says: "Issue on governance has come up.  Trevor's father on the board.  No board members with public company experience."

        What is your understanding of what Mr. Girsky is referring to when he says "Trevor's father on the board"?

A.   Trevor's father was on the board of directors at that time.

Q.   What was your understanding as to why that was an issue with governance?

A.   Because of the family relationship, it represented a conflict.

Q.   Mr. Girsky also says "no board members with public company experience."  What was your understanding of why that was an issue with governance?

A.   Because we were going to be a public company, and none of

the independent board members had experience with public

company board membership.

Q.  And why is it important to have public company experience?

A.  Per confidence from the investing public.

            MS. ESTES:  Ms. Wolfson, can you go to the first page

here, and if you could zoom in to the bottom email from

Mr. Milton at 11:59 a.m.

Q.  Mr. Russell, who's that email from Mr. Milton to?

A.  To Jeff Ubben, Kim Brady, and myself.

Q.  Could you read the first couple of sentences of that email.

A.  "Jeff, I'm not sure I want to change the board structure

right now.  It is good to get to know these people, but as of

now, we have had tons of success with great people we all

trust, so I don't want to change a good thing that is working."

            MS. ESTES:  Ms. Wolfson, can you zoom out of that, and

can you zoom in to Mr. Ubben's 1:17 p.m. email above that.

Q.  Mr. Russell, there Mr. Ubben says, "Trevor, please

understand this will not fly as a public company.  Governance

is a gating item to attract new investors to a public company."

            What's your understanding of what Mr. Ubben is talking

about that when he talks about governance being a gating item?

A.  My understanding is that he was talking about having a

board that was seen as independent and capable of guiding the

management team.

            MS. ESTES:  Ms. Wolfson, can you zoom out of that, and

can we zoom in to the top email for Mr. Milton.

Ms. Wolfson, can you -- actually, can you zoom in to the first paragraph there.

Q.  Mr. Russell, can you read this paragraph.

A.  "Jeff, I understand the importance of having great people on the board.  I am not arguing that, but the outcome of the company is more important than the board which governs it.  The most important is that I fully control the board at all times and have people who work well with my personality.  I have had a bad board member in the past and refuse to ever go down that road again."

Q.  Mr. Russell, had you ever have discussions with Mr. Milton about him controlling the board?

A.  Yes.

Q.  What did you discuss with him in that regard?

MR. MUKASEY:  Time and place, please?

Q.  Had you had discussions with Mr. Milton in the time when there were negotiations about going public about controlling the board?

A.  Yes.

Q.  What did you discuss with him?

A.  He said it was important to him that he retains control of the board and has confidence in the individual board members that sit on the board.  And I explained to him that I agreed with Jeff that we needed a board that would be seen as

independent and capable of serving as a public company board.

MS. ESTES:  Ms. Wolfson, can you zoom out of that, and can you zoom in to the second paragraph there for Mr. Milton.

Q.  Mr. Russell, can you read that paragraph.

A.  "No one sees the future like I do, and if you get too many world-class brilliant people on the board, you will end up fighting over everything, as they think they are the smartest in the room every time.  There are many examples of failed boards stacked with great people as there are from weak governance (Uber, Snap, etc.) out there."

MS. ESTES:  Ms. Wolfson, can you zoom out of that, and can you zoom in to the next paragraph.

Q.  Mr. Russell, can you read the first sentence there.

A.  "Some great boards have derailed their founder because they think they are that much smarter than he is."

Q.  Mr. Russell, did you ever have any conversations with Mr. Milton about boards derailing their founder or anything like that?

A.  Yes.

Q.  What did you discuss with him?

A.  He would talk about people telling him that he has to watch out for making a board that might not be -- work well with him.

MS. ESTES:  All right.  Ms. Wolfson, let's take that down.

Q.  Mr. Russell, switching gears a little bit, did there come a

M9JHMil6                          Russell - Direct

time when Mr. Milton began discussing a pickup truck with you?

A.  Yes.

Q.  Was this before Nikola announced that it would go public through a combination with VectoIQ?

A.  Yes.

Q.  Could you describe the first conversation you had with Mr. Milton about a pickup truck.

A.  Tesla had unveiled a prototype of a pickup truck called the Cybertruck, and we both thought that it was ugly.

Q.  Now, what did Mr. Milton say about the Cybertruck specifically?

A.  That it was ugly, and he could do one that was much better.

Q.  Before the Cybertruck announcement from Tesla, had you and Mr. Milton discussed the pickup truck?

A.  No.

        MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 502, which is in evidence.

Q.  Mr. Russell, what are we looking at here?

A.  This is a tweet from Trevor showing a rendering for a pickup truck.

Q.  Mr. Russell, in the tweet Mr. Milton says:  "My team designed it just in case, and I'm happy to let you build it, because we won't."

        What do you understand him to be referring to there?

A.  In those discussions about the fact that the Cybertruck was

ugly and we could do something better, he said we should build one.  And I said we have no business doing that, and it would take incredible amounts of capital and other resources, and we just don't have that.  We haven't raised money to do that, so we won't be doing that.

Q.  Mr. Russell, when you said "it would take incredible amounts of capital," what do you mean by that?

A.  More capital than we had raised.

Q.  How much capital would it take to build a pickup truck?

A.  Typically, a new vehicle program requires billions of dollars of investment.

MS. ESTES:  All right.  Ms. Wolfson, let's take that down.

Q.  After Mr. Milton's tweet, what was the response to his tweet?

A.  It generated a fair amount of excitement.

Q.  And did you and Mr. Milton have further discussions about building a pickup truck after the excitement from his tweet?

A.  He said:  Look how many people are excited and interested in this.  We should really think about building it.  And then he talked about ways that he felt like he could generate demand for a pickup truck that was built along the lines that he had come up with in the rendering.

Q.  And when you say he talked about ways he could generate demand, what did he say about that?

A.   He had a relationship with some television personalities that had a reality show on the Discovery Channel.

Q.   What did you say to Mr. Milton in response after he, you know, renewed this discussion about the pickup truck?

A.   I said if you have the demand, you still have to be able to develop the vehicle and build it, and that still requires capital and other resources that we don't have.  And we haven't raised our capital based on any business plan like that.  So if we -- if we were ever to think about building a pickup truck, we'd have to find a partner.

Q.   And why do you think you'd have to find a partner?

A.   To provide the billions in capital and the other resources we'd need to do it.

         MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 220 for the witness.

Q.   Mr. Russell, do you recognize this email here?

A.   Yes.

Q.   Who are the parties to the email?

A.   This is from Trevor to the Nikola board and the executive officers.

Q.   What's the date of the email?

A.   February 9, 2020.

Q.   What's the subject of the email?

A.   Badger pickup release, V2.

         MS. ESTES:  Your Honor, we offer Government

Exhibit 220.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 220 received in evidence)

BY MS. ESTES:

Q.  Mr. Russell, now that the jury can see this, who is William Milton on the cc line there?

A.  That's Trevor's father.

Q.  What about De Thompson?

A.  Another board member.

Q.  Lon Salsberg?

A.  Another board member.

Q.  Gerrit Marx?

A.  Another board member.

Q.  Mike Mansuetti?

A.  Another board member.

Q.  Sophia Jin?

A.  Another board member.

Q.  What's the date here?

A.  February 9, 2020.

Q.  What's the time at the top?

A.  Looks like 11:50:43 p.m.

Q.  What's the subject there?

A.  Badger pickup list.

MS. ESTES:  Ms. Wolfson, can you zoom out of that, and

can we zoom in to the top paragraph there.

Actually, Ms. Wolfson, can you zoom into the top two paragraphs.  Sorry about that.

Q.  All right.  Mr. Russell, can you read the first sentence there.

A.  "I have some very exciting news for you."

Q.  What is your understanding of what this news refers to there?

A.  He was proposing to publicly announce that we were going to build a pickup truck called -- and call it the Badger.

MS. ESTES:  Ms. Wolfson, can you go to page 4 of this document here.

Q.  Mr. Russell, what do you see there?

A.  That's a draft of the press release to announce the Badger.

Q.  Do you know who drafted the press release?

A.  Our public relations team and Trevor.

Q.  Did you have any involvement in drafting the press release?

A.  I did see it, yes.

MS. ESTES:  All right.  Ms. Wolfson, you can take that down, and can we pull up Government Exhibit 801 in evidence.

Q.  Mr. Russell, what do you see here?

A.  I think that's the actual press release.

Q.  What's the date of this release here?

A.  February 10, 2020.

Q.  Is that the day after the email we just looked at there?

M9JHMil6                    Russell - Direct

A.  Yes.

Q.  At the time of the announcement of the Badger, where was the Badger in terms of development?

A.  It was just renderings, drawings and digital pictures.

          MS. ESTES:  All right.  We'll turn back to the Badger in a little bit.  You can take that down, Ms. Wolfson.

          THE COURT:  Ms. Estes, it is now 2:40.

          That brings us to the end of the day, ladies and gentlemen.  So we will reconvene again tomorrow at 9:30.  Please do endeavor to be in the jury room by 9:15 or so.  Until then, be safe getting home.  Do not discuss the case.  Do not see anything about the case or listen to anything about the case.

          Have a good night.

          (Jury excused)

          (Continued on next page)

(Jury not present)

THE COURT:  Mr. Russell, you may step down, and folks can be seated.

(Witness temporarily excused)

THE COURT:  I just wanted to close the circle on Exhibit 701.  Mr. Caruso --

MR. CARUSO:  Yes.

THE COURT:  -- pointed out that apparently Mr. Milton was no longer an employee of Nikola in June of 2020.  Again, I'm still learning some things about the case.  It sounded curious to me because he resigned in September 2020 after the release of the Hindenburg report.

But in any event, agency does not require necessarily an employee-employer relationship, and so far as I know, even though he may have resigned or quit or ceased being an employee in June of 2020, he continued working with the company.  He continued making the trucks and the Badger something that he wanted to bring about.  He continued speaking with the company.  A very brief review of the initial indictment indicates that he continued giving interviews and engaging in podcasts in July and through July.  There was discussion this morning that he was very involved in responding to the Hindenburg report and drafting the press release which was issued several days after the Hindenburg report.  So, clearly, he was still very, very much involved with the company even if he wasn't an employee,

M9JHMil6

and the same analysis would apply.

And in that regard, I just want to read a sentence from the government's letter which is document 178 on the docket:  "Adoption or acquiescence may be manifested in any appropriate manner, and the admissibility of such evidence is afforded 'generous treatment.'" I'm citing the *Stafford* case, *U.S. v. Stafford*, reported at 422 F.App'x 63, 65, a Second Circuit case from 2011.

Unless there's anything else you wanted to put on the record, Mr. Caruso --

MR. CARUSO:  There is, your Honor, and I promise I will be really brief.

THE COURT:  OK.

MR. CARUSO:  Even assuming that an agency relationship can arise outside of an employment context, which I think is largely inconsistent with 801(d)(2)(D), but even assuming that, if the government wants to show an agency arising out of de facto control, they have to prove a much stronger case than what they've put in here.  The basis of 801 is that the statements of the employees are admissible normally against the employer.  That covers 99 percent of the cases.

The government is trying to shoehorn this case into the other 1 percent where there's de facto control and the statements of one employee are admissible against another employee.  Co-employees normally do not -- are not agents of

M9JHMil6

each other.  So to shoehorn this into that 1 percent of de facto control, they haven't shown remotely enough.

The case they rely on called *Zagen*.  It's in their papers.  The evidence showed that a defendant there owned 98 percent of the stock of the company, which Mr. Milton did not; individually controlled almost every aspect of his business, including design, production, advertising, finances; had ultimate decision-making power with respect to all corporate activities, including personnel decisions.  There's no such record in this case.

And I think the Court doesn't have to look any further than Government Exhibit 237, if I remember the number correctly.  This is the one where Mr. Milton says to the board: I need your permission and approval to buy electrolyzers.  Now, that is the best document that I know of that shows that Mr. Milton did not control all these decisions.

And there's more, but all I'm saying -- well, not all I'm saying.  What I am saying is if they want to -- if the government wants to shoehorn its case into this de facto control exception, this 1 percent where the statements of an employee are admissible against another employee, they've got to show a lot more under the Second Circuit case law than what they've shown today.

MR. PODOLSKY:  Actually, it's incredible that we're still arguing about it.  The witness who just left the stand,

M9JHMil6

who was the CEO, testified under oath that he reported to Trevor Milton when Trevor Milton was the executive chairman, and Trevor Milton retained his executive functions.

Now, just to close the loop here, this is a July 14, 2020, interview with Trevor Milton. It's Government Exhibit 421-T. Interviewer says to Mr. Milton: "You stepped down from a CEO job and became the chairman. Is that a proposal from your new board?"

And it goes on, and Mr. Milton's response is: "No. Well, actually, I stepped up. I always laugh about that, but the executive chairman's the most powerful person in the whole company, because they control the board and the CEO reports to them."

I mean, the record in this case is absolutely replete with the defendant's control over the company. We just looked at emails where he talks about how he needs to control even the board. So I think, actually, the record is incredibly strong in this case, as we just heard about in the last few minutes of testimony today.

THE COURT: Very well.

MR. CARUSO: Judge --

THE COURT: So you have my decision. You've made your record. Is there anything else that we should discuss this afternoon?

Mr. Mukasey?

MR. MUKASEY:  Judge, we really would like to know who the witnesses are coming after Mr. Russell.  We know of possibly one, but this is, obviously, a very complicated case with tons of documents.  We need to be able to prep.  We know of possibly one.  We'd like to know the others that are coming Tuesday, Wednesday, Thursday.

THE COURT:  Tell them who's coming this week.

MR. PODOLSKY:  The witnesses we know are coming next, which, given the length of this testimony, probably won't happen tomorrow but will be either Scott Damman or Stephanie Amzallag.  It will be -- the only reason it's a question is it just depends on travel plans.  We can't tell how long they're going to go with Mr. Russell, but those will be the next two witnesses.  We're just not sure which of those will go before the other.

THE COURT:  OK.

MR. CARUSO:  May I ask the specific question, and that is, whether the government believes it will call one of these so-called retail investors this week?

MS. ESTES:  Yes, your Honor, we do.  We expect to call two retail investors this week.

MR. CARUSO:  In that case may I confer before I raise something with the Court?

THE COURT:  Sure.

(Counsel confer)

M9JHMil6

MR. CARUSO:  I have nothing further on that point, your Honor.

THE COURT:  Anything further?

MR. PODOLSKY:  Just talking about trial schedule. We've talked to the defense about this and sort of polled our own team.  We are going to ask for both Monday and Tuesday of next week off for holiday observance.  So that would be the 26th and 27th.

And then looking ahead, the following Wednesday, I believe it's October 5, is also a holiday.  So we just wanted to give warning about that.  I understand the defense recognizes that and doesn't object.

MR. MUKASEY:  Subject to the Court's approval, we don't mind if two days are off for the holidays if that's what's necessary.

THE COURT:  Well, as I indicated earlier, I have suffered from an abject ignorance of the Jewish holidays and whether it's a one-day or a two-day.  I was led to believe that it was a one-day holiday, but if you're telling me you want the two-day holiday --

MR. PODOLSKY:  There's different levels of observance.

MR. MUKASEY:  This leads into a whole other conversation about how you define the holiday and how long you like to celebrate and what your parents think of you, and all that kind of thing.

M9JHMil6

MR. PODOLSKY:  That's right.

THE COURT:  As there appears to be agreement amongst the parties, I will not stand in the way.  So next Monday, Tuesday?

MR. PODOLSKY:  That's right.  I should just say, your Honor, I think in general the schedule that we've -- we're still on track, I think, for the length of the trial.

THE COURT:  Really?

MR. PODOLSKY:  So just to provide that assurance.

THE COURT:  OK.

MR. MUKASEY:  Thank you, Judge.

THE COURT:  Have a good night, folks.

(Adjourned to September 20, 2022, at 9 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

DALE PROWS

Cross By Mr. Bondi . . . . . . . . . . . . . . . 803

Redirect By Ms. Estes . . . . . . . . . . . . . 924

Redirect By Ms. Estes . . . . . . . . . . . . . 941

Recross By Mr. Bondi . . . . . . . . . . . . . . 952

 MARK RUSSELL

Direct By Ms. Estes . . . . . . . . . . . . . . 956

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 701    . . . . . . . . . . . . . . . . . . . . 946

 521, 525, 531   . . . . . . . . . . . . . . . . 948

 802    . . . . . . . . . . . . . . . . . . . . 987

 804    . . . . . . . . . . . . . . . . . . . . 989

 218    . . . . . . . . . . . . . . . . . . . . 997

 220    . . . . . . . . . . . . . . . . . . . . .1005

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 736    . . . . . . . . . . . . . . . . . . . . 816

 34 and 35   . . . . . . . . . . . . . . . . . . 833

 1429    . . . . . . . . . . . . . . . . . . . . 839

 1646    . . . . . . . . . . . . . . . . . . . . 874

 32, 33    . . . . . . . . . . . . . . . . . . . 881

 1592    . . . . . . . . . . . . . . . . . . . . 908

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

487-T, as demonstrative,   . . . . . . . . . 922