M9KHMil1_Corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                      21 Cr. 478 (ER)

TREVOR MILTON,

          Defendant.

------------------------------x

                           New York, N.Y.

                           September 20, 2022
                           9:00 a.m.

Before:

              HON. EDGARDO RAMOS,

                    District Judge

                APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

(Trial resumed; jury note present)

THE COURT:  It's 9 a.m., everyone.

MS. ESTES:  Good morning, your Honor.

THE COURT:  I was telling my clerk it's getting to be like Christmas around here.  I get up every morning and wait to see what the government put under the tree.

So we have two letters:  One concerning Mr. Russell's testimony, and I don't know whether you folks have had an opportunity to read that and respond.

MR. CARUSO:  I have.  This is with respect to the proffered testimony that Mr. Russell is going to say that he threatened to resign.  Is that what we're talking about now, your Honor?

THE COURT:  Apparently, there's that and various other communications with, I think, at least one board member, etc.

MR. CARUSO:  Let me leave those other communications aside for a moment and discuss this testimony that Mr. Russell threatened to resign.  We're not going to object to that, but I want to explain why, because I would like to lay down a marker.

We're not objecting based on a bright-line rule which we're going to ask the Court to apply later, and that is 801(d)(1)(B).  When evidence is offered to rebut a charge of recent fabrication, there's a strict temporal limit.  The statement must have been made before the motive to falsify arose, then it's admissible.  But if it was made after the

M9KHMil1

motive to falsify arose, then it is inadmissible.  This is well established in the *Tome* case.  I'll just read one sentence or two:  "The common law rule for more than a century" --

THE COURT:  Slow down, please.

MR. CARUSO:  Yes, sorry.

"The common law rule for more than a century was that a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible if the statement had been made before the alleged fabrication, influence, or motive came into being, but it was inadmissible if it was made afterwards.  The question here is whether 801(d)(1)(B) embodies this temporal requirement.  We hold that it does."

So we're going to live with that.  September 19 was the service of the subpoena, and in our view, that's the bright-line temporal date.  Statements made, arguably prior to consistent statements made, before that date are admissible like the earlier September statement by Mr. Russell, "I threatened to resign," but statements made after that date are not admissible.  That's like the Kirkland & Ellis report made in November.  That's the 10k filed in, I believe it was, November.  That's the SEC settlement filed much later, I think, in early 2021.  Those postdate the motive to falsify, and therefore, they are not admissible under (d)(1)(B).

But because the statement at issue today, threatening

M9KHMil1

to resign earlier in September, does predate, we're going to live by that rule, and we're going to ask the Court to apply that rule as we go on and when the government offers this other later material which is inadmissible because it was stated, the statements were made after the subpoena, after the motive to falsify came into being.

MR. ROOS:  So two things:  First, we might agree if we were still living in 2013, but in 2014 the rule was amended to remove that temporal requirement as recognized in the 2020 decision by the Second Circuit in *Purcell*.  So under subpart (ii) of the rule, gives any party offer prior consistent statements broad latitude to introduce such statements.  If they are prior and consistent, there's no temporal requirement attached to it.  So the case, the much older Supreme Court case cited by counsel, is just not applicable.  That's the legal point.

The factual point is it can't be the rule that just because a subpoena is served on that particular date that's the cutoff date.  There has to be -- there has to be more, I think, even if they wanted to that to be the temporal date, to show that that's when the witness started changing his story.  And there's just no factual basis for that.

THE COURT:  Go ahead.

MR. ROOS:  So to make that point, your Honor, in the opening statement Mr. Mukasey said that the witnesses started

M9KHMil1

changing their stories after meeting with the government over and over and over again. That, obviously, did not happen the day the subpoena was served. Didn't happen for many months later. So, plainly, we should be able to offer, even under this temporal limitation argument, evidence that comes in that predates those meetings.

MR. CARUSO: Judge, I should have anticipated this, but I guess I'll do it as rebuttal.

The 2014 amendment to this rule has absolutely nothing to do with this case. This case arises under little (i), not (ii). Sorry, not sure how else to explain it. A statement that meets the following conditions is not hearsay: It's consistent with the declarant's testimony and is offered (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying. That is the subdivision that applies here, not the next one, which the government seems strangely to rely on, is consistent with the declarant's testimony and is offered to rehabilitate the declarant's credibility as a witness when attacked on another ground, when attacked on a ground other than recent fabrication.

We're not attacking on a ground other than recent fabrication. We're attacking on the ground of recent fabrication, and that means the temporal limit applies. We are under little (i), not (ii), and --

M9KHMil1

THE COURT:  I guess, Mr. Caruso, my concern is even if I agree with you that the 2014 amendment doesn't apply, you're asking me to create this bright-line rule, as you described it, that the subpoena had some legal import that prevents me from considering statements made after it was served that per se precludes consideration of whether or not there was a consistent statement made, and I don't think that I can do that or that I should do that.

MR. CARUSO:  Judge, I'm not asking you to create anything.

THE COURT:  Yes, you did.  You said you want me to draw a bright-line rule that when the subpoena was issued, nothing that was said after that can be considered a prior consistent statement.

MR. CARUSO:  Then let me rephrase it.  I'd like your Honor to apply the bright-line rule that the Supreme Court ruled in *Tome*.  I read it out.  I'm not going to read it again.  If the statement was made before the motive to fabricate arose, it's admissible.  If the statement was made afterward, it's not.

It's not my bright-line rule, and I'm sorry if I made it sound like I was asking for something new.  This comes from the *Tome* case, which despite what Mr. Roos says, remains good law.  The Second Circuit keeps applying it under little (i), which applies here.  It's a bright-line rule.  There's nothing

M9KHMil1

original or creative about it.  It goes back *Tome*, it to goes back to *Wigmore*, according to this article -- according to this case.  So it's a bright-line rule and (ii) doesn't apply.

Now, having said that, September 19, could there be some wiggle room on September 20 or 23rd?  I don't know.  Maybe.  But I'm not aware of the testimony that's going to fall into that time category, that time frame that might be a little gray.  Right now what we're faced with is a very clear distinction between pre-subpoena and post-subpoena.  The statement by Russell supposedly to the effect "I'm going to resign from the board" predates September 19.  No question about that.  The Kirkland & Ellis report, the revised 10-K, or whatever the phrase it, amended 10-K, and the SEC settlement indisputably occurred well afterwards.

It's a red herring to say that, you know, maybe there's a little bit of gray area in the 20th or 21st of September.  My point is, with the evidence that we're faced with now, we see very plainly what's pre-September 19, pre-subpoena, and we see very plainly what's post-subpoena.  And the bright line temporal rule comes into -- from *Tome*.

THE COURT:  I mean, that's certainly -- the temporal aspect of the rule has a lot of sort of logical force.

MR. CARUSO:  Indeed.

THE COURT:  And as you suggested, I don't know that we're talking about anything that may be implicated here.  I

M9KHMil1

mean, I don't know how far past September 19 the government is looking to introduce statements as prior consistent statements. Maybe none.

MR. CARUSO:  But we do know that, Judge.  Their letter says that they want to go into -- they want to introduce the Kirkland & Ellis report.  Sorry I can't lay my hands on it right now, but I think it's something like November.  And they want to introduce the amended 10-K, if that's the right phrase, which is 2021.  And they want to introduce the SEC settlement that related factual assertions.  That's 2021.  That is well after, well after, the motive to fabricate arose.  Indeed, I think it's well after the government started interviewing these people.

MR. PODOLSKY:  Actually, the government didn't interview Mr. Russell, for instance, and many of these folks until after those.  So the Kirkland & Ellis investigation, the 10-K filing are prior to the government meeting with these witnesses.

Again, there's no reason why the service of the subpoena, which, by the way, I don't think is even a fact that's in evidence, should be the point where the motivation to lie occurs.  If anything, if their theory was even ripe, it would be once the government started meeting with these witnesses.  That's what they opened on.  So it's totally permissible under the rule regardless of --

M9KHMil1

THE COURT:  I think they opened on the subpoena.

MR. CARUSO:  Yes, we did.

THE COURT:  But your point is taken.

MR. CARUSO:  We certainly opened on the subpoena.  And anybody with half a brain, especially people who are lawyers, like Mr. Russell and other people, they know what it means to have a subpoena.  They know that the government's waiting, coming around the corner.  The idea that the bright line is written, if that's the word, when the government starts to interview is preposterous.  It arises -- the motive to fabricate rises when a subpoena is served, especially if the witness is a lawyer and knows darn well what a subpoena means.

Mr. Bondi asked me to remind the Court that we filed a letter brief on this today.  I think the Court referred to that when your Honor said that he has two letters, one from the government and one from us, but for the record, we filed a letter on this today.

I think I've made our position clear now, and it is the subpoena, in the mind of the witness, that gave him the motive to fabricate because he's a lawyer.  He knows, oops, here come the feds.  Doesn't matter that the feds took a couple months later to actually show up.

MR. PODOLSKY:  So, your Honor, I'll let their theory speak for itself.  This is what they opened on.  It's in the transcript at page 58.  After the subpoena was -- Nikola

received its subpoena and after the government "asked questions to Trevor's team and asked questions over and over and over again for days and weeks and months," Nikola's management, and then another quote, "all turned on Trevor, they abandoned Trevor, and they went to the government and pointed at Trevor and said: Don't blame me. Blame Trevor. Let me keep my job, and I'll testify against Trevor."

So, look, that's what they opened on. That's what they told the jury. They can't unring that bell. That's their theory, and I think we're entitled to rebut it and show why it does not match the facts.

MR. CARUSO: This is obtuse. We opened on the subpoena. Mr. Podolsky read the word "subpoena." We opened on the subpoena.

THE COURT: Well, first of all, it's not evidence, right, and so I'm not bound by, necessarily, what was opened on.

MR. CARUSO: That's true.

THE COURT: Although it does allow the government to have to wait until after cross-examination to put in certain evidence. So what you opened on, whether it was the subpoena or the interviews, I don't think is of any particular moment in terms of the analysis about what can come in. I'm certainly not going to draw a bright-line rule or determine as a matter of law that once a subpoena is issued, there is an incentive to

M9KHMil1

change your testimony.  I just don't think there's any basis for doing that.

So I think that we'll just have to take it one statement at a time and see what happens.  However, I think it is the case, as the government indicated in its letter of today, that certain statements that were made, for example, to the board by Mr. Russell, can come in as nonhearsay for any number of different theories.

MR. CARUSO:  Well, let us not debate any number of different theories.  I think I'll go back to where I started.  We don't have an objection to the Russell testimony regarding -- his supposed testimony regarding resigning from the board, and our reason for that is the bright-line rule of *Tome*.  If your Honor thinks there are other reasons, it almost doesn't matter.

I'm going to pass over to Mr. Mukasey.

THE COURT:  I don't think that the government discussed the Kirkland report in this letter that I received.

MR. CARUSO:  It's the prior letter.  It's the letter dated yesterday which came in on Sunday night at about 11:59.

MR. MUKASEY:  Judge, if I could just note what I think would be the ramifications, and I obviously agree with Mr. Caruso's legal analysis.  I also don't disagree with what your Honor is saying about statements prior to the subpoena that Mr. Russell allegedly made to the board theoretically

M9KHMil1

could come in after cross, if the cross necessitates that, for his rehabilitation.

In addition to the legal reasons stated in *Tome*, if the government were permitted to put in all the supposed consistent statements postdating the subpoena, including the Kirkland & Ellis report, including the amended 10-K, including whatever other subsequent remedial actions were taken by Nikola, we'd really turn this thing into a wild circus, because now you're talking about putting Kirkland & Ellis lawyers on the witness stand to talk about interviews they did and them getting cross-examined about why they told the company to cooperate and the kind of interviews they did, and when they interviewed Russell, they interviewed 50 people. They collected -- now you're talking about not a trial within a trial, a massive complex trial within a trial.

So I've never heard of the case -- the reason I opened the way I opened is because in every criminal trial that all of us have ever had when a cooperator gets arrested, if you will, and flips and testifies against his coconspirator or another defendant -- that's essentially what happened here, right? Nikola got a grand jury subpoena and Kirkland flipped them, and Kirkland said here's the best way to protect the company: Throw Milton under the bus and cooperate with the government. That's all we're saying. That's not unusual. It's not novel. It doesn't open the door to a, you know, yearlong $75 million

M9KHMil1

Kirkland report and all the interviews they did.  Those aren't prior consistent statements.  That's Kirkland's advice to Nikola for how to stay safe.  That really is not a prior consistent statement of Russell or anybody else.

I know your Honor wants to play it kind of moment by moment, which is absolutely fine with us.  I'm just thinking about what might happen down in the future if an entire internal investigation report comes in, to say nothing of the fact that I don't think there's an evidentiary basis, but I've said my piece.

MR. CARUSO:  Just for clarity, the government letter of September 18, which is ECF 177, says that they want to offer November 12, 2020, Kirkland & Ellis report.  They want to offer a February 25, 2021, Nikola 10-K.  They want to offer the December 1, 2021, Nikola and SEC agreement to settle.  So that's clearly stated ECF 177.  Those are the three items that long postdate the subpoena or the interviews or anything else.

And just one word.  I think it's hyphenated, so it's one word, building on what Mr. Mukasey said.  Talk about self-serving.  This is an internal investigation by the outside counsel that's trying to save the counsel.  Talk about self-serving.  Classic hearsay that the Court should exclude.

THE COURT:  I guess, technically speaking, an internal investigation by outside counsel, even if hired by the company, is not necessarily self-serving necessarily.  But you'll have

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9KHMil1

your arguments.

MR. PODOLSKY:  I just want to clarify a few things for the record because there's been a lot of imprecision thrown around.

THE COURT:  There's been a lot of?

MR. PODOLSKY:  Imprecision thrown around.

I just want to be clear.  Mr. Mukasey can argue all he wants that these folks are -- to the jury that these folks are cooperating with the government.  But let's be clear.  There's no cooperation agreement.  No one was arrested.  There is no allegation of wrongdoing by Mr. Russell or anyone else.  So that's just not consistent with the facts, and I don't think we should be throwing around in court that way.  That's No. 1.

No. 2, let's clear --

MR. CARUSO:  May I be heard?

MR. PODOLSKY:  Let's be clear about the timeline here. What the defense opened on -- we didn't ask them to say this, but what they opened on was Nikola got a subpoena.  The executives then met over and over and over again with the government, and following those meetings, they changed their story to serve the government's interests.  That was the opening.

MR. MUKASEY:  That's not what I said.

THE COURT:  Let him finish.

MR. PODOLSKY:  You know what?  We don't have to debate

what you said.  It's in the transcript.  There was a court reporter.  I will direct you to the transcript at page 58. It's also quoted in our letter that we submitted last night. You can just look at the transcript, Mr. Mukasey.  That's what he said in his opening.

So here's the timeline.  There was a press release that Mr. Mukasey -- Mr. Mukasey wants to offer through the witness and which Nikola sort of distanced itself, disagrees with the Hindenburg report in large measure.  I think the testimony will show that that was directed by Mr. Milton. There was then an internal investigation done, and the company concluded actually Mr. Milton did make a number of statements. After that, the government met with these witnesses.

What Mr. Mukasey would like to do is say, well, it helps us that the company initially disagreed with the Hindenburg report, so we would like to offer that.  But the government should not be able to offer evidence that rebuts our claim that these witnesses fabricated their story for some reason after meeting with the government.  There is no 403 issue here, and it directly rebuts the defendant's arguments that they've already made to the jury.  They've already said this to the jury.  It's already a part of the record, and the government is entitled to rebut it with evidence that is directly responsive.

And I'll say *Purcell*, the Second Circuit case in 2020

makes clear that evidence of prior statements that puts in context and explains the prior statements of the witness is admissible under the Rules of Evidence.

We're completely open to discussing which parts of these matters come in, but if the defense wants to offer the initial press release by the company, it is not only permissible, it's appropriate and really necessary for the government to also put in the clarifying statements that the company made.

MR. MUKASEY:  We're not offering the press release.

THE COURT:  OK.  That makes my life a lot easier.

MR. CARUSO:  Judge, I'm sorry.  I have just two quick things.

While we're on the subject of imprecision, counsel says it was no cooperation agreement.  Nikola's SEC filing say we're cooperating.  The SEC filings say we're cooperating.

THE COURT:  I think he was making a more technical argument that there is no individual or entity that is facing the possibility of a criminal liability.

MR. MUKASEY:  I'm sorry for interrupting.  The SEC filings, their filings in the fall of 2020, disclose, Nikola's filings disclose, they are under investigation and the possibility of additional charges remains, and they're cooperating and have engaged with the government.

Now, Mr. Podolsky's right, there is no formal

M9KHMil1

cooperation agreement the way we understand it in this courthouse.  There's no 5K letter coming or anything like that.  But Nikola does disclose that they are -- layperson they're being cooperative with the government.  So he's right and we're right.  They are working with the government.  They are not, however, under some sort of contractual agreement and expecting a 5K.

MR. CARUSO:  Judge, this *Purcell* case -- one last thing.

THE COURT:  Yes.

MR. CARUSO:  I know I keep saying that.

The *Purcell* case doesn't apply here because it's a 801(d)(2)(B)(ii) case.  This is a single (i) case.  To the extent that the *Purcell* case says anything on point, it supports what we say where the defendant didn't suggest that the accuracy of the testimony was marred by a recent fabrication or a recently created motive or influence.  Therefore, that's where the temporal line applies.  Temporal line does not apply under (ii).  This is not a (ii) case.

THE COURT:  I think we don't need to resolve that because you're not objecting to Mr. Russell's testimony about his statements to the board, nor are you offering the press release.  So I think we're good.

MR. MUKASEY:  His statements to the board I guess we're more curious about, and I guess we'll have to hear it.

I'm not sure that -- is there documentary evidence about that or he's giving testimonial evidence about that?  I'm not sure yet.  We may object to the way that comes in.  I just can't predict at the moment.

MS. ESTES:  Your Honor, I don't expect there to be documents about that.  He will testify about what he said to the board in the meeting.

MR. MUKASEY:  May I have one moment to confer?

THE COURT:  Sure.

MR. MUKASEY:  I know we're running up against the jury time.

THE COURT:  Yes, and I need to go get my judge clothes.

MR. MUKASEY:  I think that we're safe to proceed, as if it were my decision.

THE COURT:  OK.

MR. MUKASEY:  But I think we're safe to proceed.

(Recess)

MS. ESTES:  Your Honor, may I preempt one thing before the witness comes out?  He was having trouble.  I know it was hard to hear him in the box.  I wonder if we can take a moment to see if he can get the microphone.

THE COURT:  Yes, get him in here.  He's very tall.

MS. ESTES:  Yes, I think that was the problem.

THE COURT:  Mr. Russell, why don't you see if you can

M9KHMil1

make yourself a little more comfortable in there.  Maybe move the chair.  I know that chair's difficult to move.

(Continued on next page)

(Jury present)

THE COURT:  Everyone please be seated.

Ladies and gentlemen, good morning.  I trust you all had a pleasant evening.  We will now continue with the direct examination of Mr. Russell.

Mr. Russell, you are reminded that you are still under oath.

Ms. Estes.

MARK RUSSELL, resumed.

DIRECT EXAMINATION CONTINUED

BY MS. ESTES:

Q.  Good morning, Mr. Russell.

A.  Good morning.

Q.  Mr. Russell -- sorry, take a minute to fix the mic.  You're OK?  All right.

Mr. Russell, do you recall me asking you about the Badger pickup truck yesterday?

A.  I believe so.

MS. ESTES:  And, Ms. Wolfson, can you pull up Government Exhibit 220 again, and if you could just zoom in to the top half here.

Q.  Mr. Russell, is this the email we looked at yesterday about the Badger press release announcement?

A.  Yes, I recognize this document.

Q.  What's the date of this document?

M9KHMil1                      Russell - Direct

A.  February 9 of '20.

            MS. ESTES:  All right.  Let's take that down.  And,
Ms. Wolfson, can you pull up Defense Exhibit 167 for the
witness.

Q.  Mr. Russell, do you recognize this email?

A.  Yes.

Q.  Who are the parties to the email?

A.  That's from Kim Brady to Trevor Milton, myself, and Britton
Worthen.

Q.  What's the date of the email?

A.  February 9, 2020.

Q.  And what's the subject of the email?

A.  "Please review and modify or approve."

            MS. ESTES:  Your Honor, we offer Defense Exhibit 167.

            MR. MUKASEY:  No objection.

            THE COURT:  It will be received.

            (Defendant's Exhibit 167 received in evidence)

            MS. ESTES:  Ms. Wolfson, now that the jury can see
this, can you zoom in to the top part of the document.

            Actually, Ms. Wolfson, let's just get the whole top
half of the email.  Thank you.

BY MS. ESTES:

Q.  Mr. Russell, now that the jury can see this document, can
you read the subject line there.

A.  "Re:  Please review and modify or approve."

                SOUTHERN DISTRICT REPORTERS, P.C.

                       (212) 805-0300

M9KHMil1                    Russell - Direct

Q.   And what's your understanding of what that refers to?

A.   An attached document which is a press release.

Q.   Who is this email from?

A.   From Kim Brady.

Q.   And are you copied on the email, Mr. Russell?

A.   Yes.  Yes.

Q.   All right.  Mr. Russell, a few questions about the text of the email here.

         So the first bullet says:  "The timing of the press release?  Why tomorrow?  Is the timing the announcement to put pressure on FCA?"

         What's your understanding of what that refers to there?

A.   He was asking if the urgency in making the announcement was to put pressure on Fiat Chrysler.

Q.   And how is Fiat Chrysler involved here?

A.   We were in discussions with FCA about them potentially partnering with us to build the Badger.

Q.   And did Nikola ultimately partner with Fiat Chrysler?

A.   No.

Q.   All right.  So going down a little bit in this email, the third bullet there says:  PIPE investors will likely be surprised and be concerned with the following."  First, can you remind the jury who the PIPE investors are?

A.   Those are the people who came in at the time of the merger

with the SPAC, VectoIQ.  They were additional investors.

Q.  The first bullet there says, "Distraction from the BEV and FCEV truck programs."

What is your understanding of what that means?

A.  An additional program would put additional strain on everyone because of the additional dilution of our focus.

Q.  Sorry, Mr. Russell, I didn't catch that last part.  What'd you say?

A.  The dilution of our focus.

Q.  And how would this pickup program dilute your focus?

A.  It's a major undertaking.  A vehicle program requires lots of money, lots of people, lots of time.

Q.  Was this something you were concerned about, Mr. Russell?

A.  Yes.

Q.  What's -- can you read the next bullet there.

A.  "The strain on management's bandwidth."

Q.  What do you understand Mr. Brady to be referring to there?

A.  The strain on leadership time as well.  We'd have another program we'd have to watch over and manage.

Q.  Can you read the next bullet there.

A.  "Additional capital and risks to execute the new pickup truck program."

Q.  What do you understand that to be referring to?

A.  A vehicle program like this is expensive and it's risky, especially when it involves new technology like we were

M9KHMil1                      Russell - Direct

proposing to use.

Q.   Why is a program like this risky?

A.   Sometimes it's not received in the market like you think it will, and if you're using new technology, sometimes the new technology doesn't work out like you think.

Q.   Can you read the next bullet there.

A.   "Manufacturing capacity for a light-duty pickup truck."

Q.   What is your understanding of what that refers to?

A.   We were in the process of building a manufacturing facility for a heavy-duty truck, and we had no accommodation to build light duty.  So we would need an additional manufacturing facility.

Q.   So would that cost money?

A.   Yes.

Q.   Approximately how much would it cost to build a new manufacturing facility?

A.   Depends on the size and the scope, but hundreds of millions at least.

Q.   Could you read the next bullet there.

A.   "Likely criticism that Nikola hasn't even started serial production of BEV and FCEV, yet we keep announcing new products."

Q.   What do you understand that to be referring to?

A.   That we were still trying to get to serial production of our initial heavy-duty trucks, and here we are announcing yet

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9KHMil1                         Russell - Direct

additional products.

Q.  Mr. Russell, did you have any of the same concerns listed out here?

A.  Yes.

Q.  Did you have all of the same concerns listed out here?

MR. MUKASEY:  Objection to the leading.

THE COURT:  Overruled.

A.  Yeah, I was concerned about all of these things, yes.

Q.  Mr. Russell, I think we looked at the press release yesterday that came out the next day.  Do you recall that?

A.  Yes.

Q.  So despite these concerns, how was it that this Badger program was announced?

A.  You know, they were discussed in the board meeting that was held to -- whether or not to approve it, and in the end, it passed.

Q.  Mr. Russell, did you vote for it to pass?

A.  I did.

Q.  And why'd you vote for it to pass?

A.  I disagreed with it, but after following the discussion at the board level, it was clear that it was going to go through. So, typically, those -- if you look at all the votes from our board, I think they're all unanimous.

MR. MUKASEY:  Objection.  Move to strike.

THE COURT:  Overruled.

M9KHMil1                    Russell - Direct

Q.  And why are board votes typically unanimous?

A.  Typically, the concept is you disagree behind closed doors, but you present a united front externally.

Q.  What's the purpose of that?

A.  To keep everybody unified and focused.

        MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q.  Now, Mr. Russell, on the Badger, did there come a time when Nikola got farther along in negotiations with a potential partner?

A.  Yes.

Q.  And what potential partner was that?

A.  General Motors was the one we selected in the end.

Q.  Were you involved in those negotiations?

A.  I was.

Q.  Was Mr. Milton involved in those negotiations?

A.  He was.

        MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 274 for the witness.

Q.  Mr. Russell, do you recognize the email here?

A.  I do.

Q.  Who are the parties to the email?

A.  It's from Trevor Milton to Kim Brady, myself, and Britton Worthen.

Q.  What's the date of the email there?

M9KHMil1                        Russell - Direct

A.  August 25, 2020.

Q.  Is that after the company had gone public?

A.  Yes.

Q.  And what's the subject of the email there?

A.  Badger model as of 8/25/20.

MS. ESTES:  Your Honor, at this time we offer Government Exhibit 274.

MR. MUKASEY:  No objection, Judge.

THE COURT:  It will be received.

(Government's Exhibit 274 received in evidence)

MS. ESTES:  Ms. Wolfson, can you zoom in to the top half of the email there now that the jury can see it.

BY MS. ESTES:

Q.  So, Mr. Russell, now that the jury can see this document, who's the top email from there?

A.  It's from Trevor to Kim Brady, myself, and Britton Worthen.

Q.  And the date is August 25, 2020.  At that point in time, where was Nikola in terms of the negotiations with GM over the Badger?

A.  It was becoming final, close to final.

MS. ESTES:  Ms. Wolfson, can you zoom out of that email, and can you zoom in to the email at the bottom for Mr. Brady.  All right.

Q.  Mr. Russell, I'm going to ask you a few things about Mr. Brady's email there.  First, can you read the first

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

sentence of his email.

A.   "The projected cumulative net losses and cumulative cash flow for 2022 to 2026, five-year period, related to the Badger are as follows:  Net loss from 2022 to 2026, 3.2 billion. Cumulative cash flow from 2022 to 2026, negative 4.6 billion."

Q.   Where it says "projected cumulative net loss, negative 3.2 billion," what is your understanding of what that means?

A.   That's, in this model, based on the assumptions that were entered at this point, the projected accounting loss would be 3.2 billion.

Q.   And how would you describe that kind of loss?

A.   Massive.

Q.   What about where it says "cumulative cash flow from 2022 to 2026"?  First, what does cash flow refer to?

A.   That's the actual cash, negative or positive.  The first figure is just accounting earnings, which includes noncash items.

Q.   And so is that negative 4.6 billion?

A.   Yes.

Q.   And what's the significance of that?

A.   That's a lot of money.

Q.   Mr. Russell, what's your understanding of the purpose of Mr. Brady's email here?

          MR. MUKASEY:  Objection.

          THE COURT:  Overruled.

A.  He was putting together an analysis for the board to review in connection with their meeting to consider whether or not to approve the deal.

Q.  And can you read the next sentence there that starts with "to put this in context."

A.  "To put this in context, the total cumulative net loss for Tesla for 2007 to 2019, a 13-year period, was only 7 billion. Based on the current deal structure with GM, we are projecting massive losses for the company, which will not be sustainable."

Q.  When Mr. Brady says we are projecting massive losses which will not be sustainable, what do you understand him to mean?

A.  I think he's saying that that amount of loss wouldn't be sustainable for us at this point.

Q.  When you say not sustainable, what -- in practice what does that mean?

A.  That means he thinks it would be very difficult to raise that amount of cash to cover that.

        MS. ESTES:  All right.  Ms. Wolfson, can you take off the highlighting there.

Q.  So looking at Mr. Brady's next bullets below, can you read that, the first couple of questions he has there.

A.  "What are we really trying to accomplish with the Badger? Should we be in the consumer product space, and why?"

Q.  When he says "should we be in the consumer product space," what do you understand that to refer to there?

A.   Our heavy-duty trucks would be sold directly to businesses.
Passenger vehicles are sold direct to consumers.

Q.   When you came to the company, Nikola, was there discussions
about Nikola going into the consumer product space?

A.   Only in recreational vehicles and watercraft.

Q.   But not in the pickup space?

A.   No, not in passenger vehicles, no.

          MS. ESTES:   Ms. Wolfson, can you go to the next page
there, and can you zoom in to the top half of that.

Q.   Mr. Russell, could you read the first bullet at the top
there.

A.   "If projection volume ends up being higher, it will only
increase or losses, since the unit economics is negative."

          THE COURT:   I'm sorry, Mr. Russell, when you read,
could you read a little slower and louder.

A.   "If projection volume ends up being higher, it will only
increase our losses, since the unit economics is negative."

Q.   What is your understanding of what that means?

A.   We will be losing each unit.  So if you make more, you lose
more.

Q.   Can you read the third bullet there.

A.   "The GM deal, as structured, is all one-sided.  GM wins and
Nikola loses.  GM bears no risks, and Nikola takes all the
risks."

Q.   And when Mr. Brady says the GM deal is all one-sided, what

do you understand that to refer to?

MR. MUKASEY:  Objection, Judge.  It's plain English.
The document speaks for itself.

THE COURT:  Overruled.

A.  We had made concessions at the end of the negotiations that
made it so that GM had very little risk in the deal, and we
bore the bulk of it.

Q.  So the next question there says, "Are we willing to pay
essentially 2.9 billion to GM to help us manufacture the
Badger?"

What is your understanding of what Mr. Brady means
when I says pay "2.9 billion to GM" there?

A.  We were going to be giving them stock, and we were going to
pay them cash also.

Q.  And that was the 2.9 billion you refer to there?

A.  Yeah.

Q.  All right.  Skipping down a few bullet points, it says:
When we said that we would not commercialize the Badger without
having an OEM partner, we were stating that we don't want to
spend Capex for the Badger.

What do you understand that to refer to there?

A.  From the beginning when we were talking about whether or
not we would do this and Trevor would say we should do this, I
would say:  We can't do it.  We haven't raised the money on it.
It's not part of our current business plan.  If you think we

must do it, then we need a partner.  And the partner will provide the people, the resources, the manufacturing facility, and the capital.  So in this case, at the very end of the negotiations, we had conceded even the capital.  So --

MS. ESTES:  Ms. Wolfson, can you highlight the second to last bullet there.

Q.  Mr. Russell, can you read that bullet.

A.  "If the projected net losses for the Badger is realistic, we will likely be putting the company in insolvency."

Q.  What does that mean, Mr. Russell, to put the company in insolvency?

A.  Based on the numbers that were in the assumptions of the analysis he had attached to this, the more we made, the more we would lose, and you can't build a business based on something that just loses money.

MS. ESTES:  Ms. Wolfson, can you go back to the first page of this email here, and can you zoom in to the email from Mr. Milton at the top.

Q.  All right.  Mr. Russell, Mr. Milton says, "The key is we need to charge more."

What is your understanding of what the "charge more" refers to?

A.  He had a presumed selling price, which, of course, is just a placeholder, an estimate.

Q.  Is there any concern with raising the selling price for a

vehicle?

A. Well, if we raise the price, then, obviously, you can reduce your losses and even make money. That was Trevor's point. But there's something called price elasticity, which is usually if you raise the price of something, you sell less. And in covering fixed costs, selling less means you might lose more, too. So it's two different variables that affect each other.

Q. So raising the price might not solve the problem?

A. It might not. If you reduce the volume, it might not solve the problem.

MS. ESTES: Ms. Wolfson, you can take that down.

Q. Mr. Russell, were you in favor of doing this deal with GM?

A. No.

Q. Why not?

A. I felt that the terms were too lopsided and for the other reasons that Kim listed in his email.

Q. Did you have conversations with Mr. Milton about doing this deal with GM?

A. Yes.

Q. And what did you discuss with Mr. Milton?

MR. MUKASEY: Objection. Time, place?

Q. Mr. Russell, in around the time frame of August 2020, did you have conversations with Mr. Milton about doing this deal?

A. Yes.

Q.  What did you discuss with him?

A.  The same points that were in Kim's email and the economics.

Q.  And did you discuss this deal with other board members in the email as well?

A.  I did.

Q.  Did any board members express concern with the deal?

A.  They did.

Q.  Did the board ultimately approve the deal with GM?

A.  Yes.

Q.  Was the vote unanimous?

A.  Yes.

Q.  And how was it that this deal went through the board?

        MR. MUKASEY:  Objection.  Asked and answered.

        THE COURT:  Sustained as to the form of the question.

Q.  Mr. Russell, what is your understanding of why the board passed this deal with GM?

        MR. MUKASEY:  Objection.  Asked and answered.

        THE COURT:  Overruled.

A.  Trevor was very much in favor of it, and he's the executive chairman and the largest shareholder.

Q.  What's the significance of him being the largest shareholder?

A.  Well, the board is supposed to be representing the shareholders.  So him, being the largest shareholder, makes him the most powerful voice in the room, as well as the top

executive of the company.

Q.   All right.  Mr. Russell, shifting gears a little bit, I want to go back to the time before Nikola went public.

You had testified yesterday that before you came to Nikola, you and Mr. Milton had discussions about you becoming CEO when the company went public.  Do you recall that?

A.   Yes.

Q.   And I believe you testified that the initial discussions were that Mr. Milton would just be on the board after that, is that right?

A.   Board member and probably the chairman, yeah.

Q.   And then after Nikola began moving towards going public with this merger with VectoIQ, did you and Mr. Milton have additional discussions about what his role would be when the company went public?

A.   We did.

Q.   And what were you discussing at that time in 2020?

A.   As we got closer to the merger with VectoIQ, which happened in June 3 of 2020, Trevor said:  I'm not sure that the company's ready for me to step away.  I'm not sure that you're ready to take charge.  I think I should -- I should remain -- I should remain in day-to-day charge here.  And I said:  Trevor, that wasn't our deal.  And he said:  Well, you're -- he's just not ready.  I'm just not ready.  I don't feel good about it.

So he started advocating to various board members that

he should remain in charge day to day.  He said I'm not --
you're still going to be the CEO, but I'm going to be the
executive chairman, not just the chairman.

Q.  How did you feel about Mr. Milton's proposal that he be
executive chairman?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  That was not the deal, and it was part of the essence of
the reason I came.

Q.  When you say "it was part of the essence of the reason I
came," what do you mean by that?

A.  I didn't agree to join the company until he had agreed that
I would be the CEO and the top executive when we were publicly
traded.

Q.  Mr. Russell, did you do anything to try to change this
proposal from Mr. Milton?

A.  Yeah, I argued against it and did my best to persuade
people otherwise.

Q.  Then what ultimately happened?

A.  He became the executive chairman.

MS. ESTES:  Ms. Wolfson, can you pull up Government
Exhibit 421-C, which is in evidence.

Can we just play this clip for the jury.

(Video played)

Q.  Mr. Russell, do you agree with Mr. Milton's statement that

the executive chairman is the most powerful person in the whole company?

A.  Yes, especially in this case when he's the largest shareholder.

          MS. ESTES:  Ms. Wolfson, you can take that down.

Q.  Now, Mr. Russell, in connection with going public through this combination with VectoIQ, were there discussions about Mr. Milton's ability to sell some of his shares?

A.  Yes.

Q.  What was discussed in that regard?

A.  Trevor proposed that he be allowed to sell some of his shares at the time we went public, along with the shares that were being sold to the SPAC and to the PIPE, because he had been so concentrated in the company for so long and responsible for getting it to that point.

Q.  And what was the result of those discussions?

A.  He was allowed to sell 7 million shares at the time we listed.

Q.  And how much were those shares worth?

A.  $70 million.

Q.  Now, Mr. Russell, in the period before Nikola went public in June 2020, did you have discussions with Mr. Milton about what it means to be the leader of a public company?

A.  Yes.

Q.  What sort of things did you discuss with him?

A.   I was focused on making sure that his public statements were as vetted and true and correct as our press releases and our securities filings.

Q.   When you say you were focused on making sure they were vetted, what do you mean by that?

A.   I knew that he was going to be out there advocating for the company as the top executive and as the spokesperson, and I knew he was active on social media.  So I was concerned and reminded him that anything he says is the equivalent of a press release or a filing.  And he saw how careful we were with those, and he should take the same precautions.

Q.   And, Mr. Russell, did Mr. Milton then vet his public statements with you before making them on Twitter or podcasts?

A.   No.

Q.   To your understanding, did he vet those public statements with other executives at the company?

A.   I wouldn't have knowledge of all of that, but to my knowledge, no.

         MR. MUKASEY:  Objection.  Move to strike.

         THE COURT:  Overruled.

         MR. MUKASEY:  Judge, may we approach, then --

         THE COURT:  Sure.

         MR. MUKASEY:  -- to have that last answer read back?

         (Continued on next page)

(At sidebar)

MR. MUKASEY:  Can you just read that back that question.

(Record read)

MR. MUKASEY:  We've got to strike that.  I wouldn't have knowledge, but to my knowledge, we have to strike that.

MS. ESTES:  I think he's being precise.  He has knowledge, but not completely.

MR. MUKASEY:  That's not what he said.

THE COURT:  He said "to my knowledge, no," and I think that's probably appropriate.  There's nothing -- he's just saying what he knows or doesn't know.  I wouldn't have -- to my knowledge, no, he didn't vet these with other board members. I'm not going to strike that.

MR. MUKASEY:  Just read it one more time.

(Record read)

THE COURT:  So strike the first part.

MR. MUKASEY:  OK.

THE COURT:  To my knowledge, no.

MR. MUKASEY:  Fine.  Just sounded crazy to me.

(Continued on next page)

(In open court; jurors present)

BY MS. ESTES:

Q.  Mr. Russell, when you were having these conversations with Mr. Milton before the company went public, did you have any conversations with him about why public statements are different in the context of a public company?

A.  Yes.

Q.  What did you discuss in that regard?

A.  Well, that does go back to our initial discussions about me joining the company that when you're public, it's a higher standard.  Before you're a public company, you're raising money from what are called accredited investors who are very sophisticated, but once you're public, the standard becomes higher based on the laws and regulations of the Securities and Exchange Commission.

Q.  What's your understanding of why the standard is higher when you're public?

A.  Because people have to be able to trade stock with limited information, and these are people who may not be as sophisticated and have as many resources.  Therefore, they have to be able to rely on the public statements of the company.

THE COURT:  I'm sorry, Mr. Russell, can you please keep your voice up.

THE WITNESS:  Sorry.  I'm far enough away from this thing, then I'm far from the mic.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9KHMil1                          Russell - Direct

THE COURT:  I apologize for the --

THE WITNESS:  I'll try to keep leaning forward.

THE COURT:  Yes, please.

THE WITNESS:  Apologize for my long legs.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

BY MS. ESTES:

Q.  Mr. Russell, just because it was hard to hear, can you just repeat what you said about why the standard is higher for a public company.

A.  The court reporter didn't get it?  Did you want me to say exactly the same thing?  I probably can't.

THE COURT:  You can say it in different words.  Just repeat your answer.

A.  The reason it's a higher standard when you're a public company is because you're dealing with individual investors who are less sophisticated and have less resources, and they need to be able to rely on the public statements of the company, including those that come from the executives.

MS. ESTES:  Ms. Wolfson, can you pull up for the witness Government Exhibit 20.

Q.  Mr. Russell, do you recognize these text messages here?

A.  I do.

Q.  Who are the parties to these text messages?

A.  De Thompson and myself.

Q.  What's the date of these messages here?

A.  It looks like the first one is the 19th of April of 2020.

Q.  And what's the general subject matter of the messages?

A.  Statements by Trevor and the stock price.

MS. ESTES:  Your Honor, we offer Government Exhibit 20.

MR. MUKASEY:  Objection.  Hearsay.

THE COURT:  Overruled.  It will be received.

(Government's Exhibit 20 received in evidence)

MR. MUKASEY:  Judge, if I may, one of the recipients is not an employee.

THE COURT:  Overruled.

Q.  Mr. Russell, who is Mr. Thompson?

A.  He was a member of the Nikola board.

Q.  The first message there from Mr. Thompson says, is this public knowledge through the filings, and then there appears to be a screenshot in the message there.  What is that a screenshot of?

A.  A tweet from Trevor to an individual -- responding to an individual.

Q.  Just to sort of orient the jury here, this is April 19th, 2020.  Where is this in terms of Nikola going public?

A.  We had announced the combination with VectoIQ, but it's not yet closed.

Q.  Mr. Russell, can you read the message at line 3 here from you to Mr. Thompson.

A.  Not sure, but timing looks good for merger.  It is definitely not.  We are trying hard to help him understand what it means to be an executive of a public company.  Still have work to do, as you can see.

Q.  Mr. Russell, when you said we are trying to help him

understand what it means to be an executive of a public

company, who is the "him" you're referring to there?

A.   Trevor.

Q.   Why did you say this to Mr. Thompson?

A.   Because that's what I was doing at that time.

Q.   Then you also say, still have work to do, as you can see.
What did you mean by that?

A.   The language in his tweet is a good example of something
that wouldn't have passed muster if it had been reviewed by
legal and finance and --

         MR. MUKASEY:  Objection.  Move to strike.

         THE COURT:  Overruled.

         MS. ESTES:  Ms. Wolfson, I'd like to look at the
message at number 4, but I think it goes to the next page.
Thank you.

Q.   Mr. Russell, can you read that message from Mr. Thompson
there.

A.   Well, he has more to risk than anyone.  I would tell him to
turn off those accounts until he gets the money, don't even
read them.  Not that it matters now, but he should delete, if
all possible.

Q.   When Mr. Thompson says I would tell him to turn off those
accounts, what do you understand those accounts to refer to?

A.   I believe he was referring to social media accounts.

Q.   Mr. Russell, can you read your text message there at line

number 5.

A.  I have advised him several times to get off social media or, at the very least, let Britton prescreen anything he posts.

Q.  Again, the "him" referenced here, who is that?

A.  That's Trevor Milton.

Q.  And when you say let Britton prescreen anything he posts, what are you talking about there?

A.  Britton was our general counsel and our chief legal officer, and I believed he should have prescreened things like this, at least through Britton.

Q.  Can you read the last message there from Mr. Thompson.

A.  Can only imagine.  So sad he can't figure it out.  Hope this won't delay you guys.  Guessing the SEC doesn't take CEOs front running their process very lightly.

Q.  Mr. Russell, at this time, were you on social media?

A.  No.

Q.  Do you have a Twitter account?

A.  No.

Q.  A Facebook account?

A.  No.

Q.  Did you follow Mr. Milton on social media?

A.  No.

Q.  How would you learn what he was doing on social media, generally?

A.  Typically in this way, someone would send me a screenshot

or a link.

MS. ESTES:  Ms. Wolfson, can you take this down and let's pull up for the witness Government Exhibit 22.

Q.  Sorry, Mr. Russell.  One last question on that last document.

You had sent a text saying you advised him to have Mr. Worthen prescreen his tweets.  Do you have an understanding of whether Mr. Worthen was prescreening his tweets?

A.  Not to my knowledge.

Q.  Looking at the document on the screen there, Mr. Russell, do you recognize these text messages here?

A.  I do.

Q.  Who are the parties to these messages?

A.  Steven Girsky and myself.

Q.  Who is Steven Girsky?

A.  He was the CEO of VectoIQ and became the chairman -- eventually became the chairman of Nikola.

Q.  What's the date of the messages here?

A.  April 29th, 2020.

Q.  And what's the general subject of the messages here?

A.  Trevor's tweets about the Badger.

MS. ESTES:  Your Honor, we offer Government Exhibit 22.

MR. MUKASEY:  Objection.  Hearsay.  May we approach?

THE COURT:  You may.

(At the sidebar)

MR. MUKASEY:  Judge, the last exhibit, which I think was GX-20, was between Mr. Russell and a board member, not an employee, not falling under the scope of 801(d)(2)(D).  This one is even more egregious.  This one is between Mr. Russell and somebody outside of Nikola, the CEO of VectoIQ, Steve Girsky.  This is premerger.  This is a pure out-of-court statement offered for the truth.  It's hearsay, it does not fall under the 801(d)(2)(D) exception

MS. ESTES:  Your Honor, we also briefed these prior statements by Mr. Russell.  I think it's been very clear that Mr. Mukasey opened the door to that in opening.  This is a prior consistent statement about their conversations with Mr. Milton this time.

MR. MUKASEY:  I said nothing in opening about anything that Mark Russell tweeted, and I'm not going to attack what he tweeted, and I haven't attacked what he tweeted.  There has been no door opened.  This is a hearsay statement.

THE COURT:  But it's a statement by Mr. Russell, which is a prior consistent statement.  I'm going to allow it.

MR. MUKASEY:  Consistent with what?  I haven't attacked anything, his tweets or his statements.

THE COURT:  You did in the opening.  I may be wrong, but I don't think you distinguished as between his written statements, his oral statements, his tweeted statements, or his

M9KCmil2                    Russell - direct

texted statements.  You attacked his credibility.

            MR. MUKASEY:  Thank you.

            (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

(In open court)

THE COURT:  The objection is overruled.  The exhibit will be admitted.

(Government's Exhibit 22 received in evidence)

MS. ESTES:  Ms. Wolfson, can you please publish.

Q.  Mr. Russell, now that the jury can see the messages here, what's the date of the text messages?

A.  April 29th of '20.

Q.  Could you read the top message from Mr. Girsky.

A.  Trevor pretty active on Twitter Re: Badger.

Q.  Can you remind the jury, who was Girsky?

A.  He was the CEO of VectoIQ and a prospective board member of Nikola.

Q.  When Mr. Girsky says, Trevor pretty active on Twitter Re: Badger, what do you understand him to be referring to there?

MR. MUKASEY:  Objection, it speaks for itself.

THE COURT:  Overruled.

A.  Trevor was tweeting about the Badger regularly.

Q.  Could you read your text message response there.

A.  Wish he wouldn't.  Can't convince him to stop that.

Q.  Why do you say that?

A.  Because I was trying actively to convince him to stop doing that.

Q.  Mr. Russell, aside from your conversations with Mr. Milton,

have other steps at the company been taken to try to control
Mr. Milton's social media usage?

A.   At times, yes.

Q.   When you say at times, what are you referring to there?

A.   Well, we would try to persuade him and we would take other
steps as we could come up with ideas.

          MS. ESTES:   Ms. Wolfson, you can take that down.

Q.   Mr. Russell, was there ever any ideas in terms of passwords
to Mr. Milton?

A.   Yes.

Q.   Could you describe that?

A.   Somebody had the idea we could just change the passwords
for the company account so that he couldn't tweet on behalf of
the company.  I understand that we did change the passwords.

Q.   And then what happened after that?

A.   He instructed one of the employees who was in charge of
passwords to give him the new password.

Q.   Aside from the password efforts, were there other efforts
to try to rein in his social media usage?

A.   Lots of conversations, individual and sometimes in a group.
And then we did some training, some media training.

Q.   Did he attend the media training?

A.   No.

Q.   Did you invite him to attend the media training?

A.   Yes.

M9KCmil2                        Russell - direct

Q.  Mr. Russell, switching gears slightly, did you and Mr. Milton have discussions about what your salaries would be when the company went public?

A.  Yes.

Q.  What was discussed in that regard?

A.  When we were looking to look forward to the listing, I said I would like to be paid no cash, just a symbolic salary of one dollar, and no bonus, and I would like to take compensation as Nikola stock.

Q.  And why did you want to do that?

A.  I wanted as much stock in Nikola as I could possibly get.

Q.  How did Mr. Milton respond to that?

A.  He thought it was a great idea.

Q.  And so what ultimately happened with your salaries?

A.  He said I want to do the same.  And then when we talked to the other people who would be named executive officers in the securities filings, they all said we'll all do the same, we'll all take a dollar salary.

Q.  How did the compensation structure then work in practice?

A.  Some, instead of a salary, we did a dollar salary and then we got two tranches of stock each.  One was an amount of stock that was valued at about what our market salary would have been in stock, but it was not immediately vested, we had to stay three years in order to get that.  It was called a cliff vest and after the third year, it vested, so that was a retention

tool. And then the other tranche, which was approximating a bonus, that was also a three-year vested, and also with that one, we had to hit certain price targets for the stock to show we had built value over time in the three-year period.

Q. Mr. Russell, switching gears again, I want to ask you a little bit about hydrogen stations.

When Nikola went public in June 2020, did Nikola have any hydrogen production stations?

A. No.

Q. And in general, was there a network of hydrogen production stations across the country?

A. No.

Q. How important were hydrogen stations to Nikola's business model?

A. Essential.

Q. Why are they essential?

A. You can't sell a truck that runs on hydrogen if it doesn't have any place to get fuel.

Q. Had Nikola purchased any land for hydrogen production stations when the company went public?

A. We did have a dispensing station on the land we purchased for the headquarters.

Q. When you say dispensing station, what do you mean by that?

A. It stored hydrogen and dispensed it into our vehicles.

Q. What about for hydrogen production stations, had Nikola

purchased any land for those when the company went public?

A.  No.

Q.  Had Nikola entered into any electricity contracts for hydrogen production stations when the company went public?

A.  No.

Q.  Had Nikola produced any hydrogen when the company went public?

A.  No.

Q.  You said there was a dispensing station at headquarters; is that right?

A.  Correct.

Q.  Did Nikola partner with anybody to build that dispensing station?

A.  Yeah, we partnered with a Norwegian-based company called Nel, N-e-l.

Q.  What kind of company is Nel?

A.  They specialize in hydrogen electrolysis equipment.

Q.  Aside from that dispensing station at headquarters, was Nikola in discussions about building other stations with Nel in 2020?

A.  Yes.

Q.  Were there discussions about building out five stations with Nel?

A.  Yeah, an initial tranche of five stations, yes.

          MS. ESTES:  Ms. Wolfson, can you pull up for the

witness Government Exhibit 237.

Q.   Mr. Russell, do you recognize this email?

A.   I do.

Q.   Who's the email from?

A.   From Trevor.

Q.   What's date of the email?

A.   May 30th, '20.

Q.   Who is the email to, generally?

A.   To the Nikola board and the executive officers.

Q.   What's the subject of the email?

A.   Board approval.

        MS. ESTES:   Your Honor, we offer Government Exhibit 237.

        MR. MUKASEY:   No objection.

        THE COURT:   It will be received.

        (Government's Exhibit 237 received in evidence)

        MS. ESTES:   Ms. Wolfson, can you zoom into the top half of the email there.

Q.   Mr. Russell, the email is dated May 30th, 2020.   Where was Nikola in terms of going public at the time this email was sent?

A.   It was within days.   We were going to be publicly listed on June 3rd.

Q.   Can you read Mr. Milton's first couple of sentences here in the email.

A.   I'm going to ask you to approve a large purchase order.  It is the electrolyzers for our stations.  There are a few reasons why it is coming quickly for approval.  I would like to get it tomorrow from the board.

Q.   Mr. Russell, in terms of timing for board approval, what sort of turnaround is this, a one-day turnaround, how would you describe it?

A.   That's unusual.

Q.   What is more of a typical turnaround for this sort of thing?

A.   Well, typically, large permissions were granted as part of a group of things at the board meeting that happened every quarter.  And for things that came up in between board meetings, we tried to give them as much advance notice as we could.

         MS. ESTES:  Ms. Wolfson, can we zoom out of that part and could you zoom into the bottom half of the email there, starting with second major point.

Q.   Mr. Russell, could you read that paragraph there.

A.   Second major point, IPO.  I am getting ready to go on a media blitz and the most critical item in our business model is that we don't have stations.  I would like to announce this on Monday as huge news.  This will help our stock, create a much stronger following and base layers of investors, and it will also will ease the criticism I am going to get going into

interviews.  I believe our PIPE and SPAC will be very happy to hear we are moving forward on our stations and not delaying.

Q.  Mr. Russell, there Mr. Milton says he's getting ready to go on a media blitz.  What's your understanding of what that refers to there?

A.  That once we were public, he was intending to be out there and be very active promoting the company and advocating for it.

Q.  And then he says the most critical item in our business models that we don't have stations.  What do you understand him to be referring to there?

A.  We could show really good progress on the trucks, we had made prototypes that were working, we were making progress on the factory, but we hadn't yet started on physical stations.

Q.  Then Mr. Milton says this will help our stock, create much stronger following and base layers of investors.  What do you understand him to be referring to there?

A.  Attracting other investors that were not in the PIPE and the SPAC, which are -- typically, the institutional investors were in the PIPE and the SPAC.

        MS. ESTES:  Ms. Wolfson, you can take that down.

Q.  Now, Mr. Russell, on Nikola's hydrogen stations, what was the original plan with respect to where hydrogen would be produced for these fueling stations?

A.  Our original thought was to produce the hydrogen at the station.  That would be the most cost effective.

Q.   Did there come a time when Nikola began considering another option for this on-site production?

A.   As we continued to negotiate for electricity supply, it became clear there was going to be a large geographic area across the country and around the world where you wouldn't be able to get an electricity price that you would need to make the hydrogen cost effectively.

Q.   So given this problem with achieving electricity prices in certain places, what did Nikola start considering?

A.   We started considering making larger locations to make larger amounts of hydrogen and move the hydrogen to a station rather than make it on site.

Q.   Is it fair to describe that as a hub and spoke model?

A.   Yes.

Q.   And was this hub and spoke model under active discussion in the summer of 2020?

A.   Yes.

Q.   Now, Mr. Russell, when the company went public in June 2020, how would you describe the volume of Mr. Milton's public statements?

A.   High.

Q.   Were you involved in preparing him for his public statements when the company went public?

A.   No.

Q.   Were you involved in booking him on media appearances?

A.   No.

Q.   Did you prepare talking points for him?

A.   No.

Q.   Did he ask you, after public statements, to check them for accuracy?

A.   No.

Q.   Did you prepare any of his tweets?

A.   No.

Q.   Did he ever ask you to review his tweets for accuracy?

A.   No.

          MS. ESTES:   Ms. Wolfson, can you pull up Government Exhibit 520, which is in evidence.

Q.   Mr. Russell, what's the date on the bottom tweet there?

A.   June 9th, '20.

Q.   And where was that in terms of Nikola going public?

A.   We had just gone public on the 3rd of June.

Q.   Can you read Mr. Milton's tweet there.

A.   It wasn't the physics, it was the cost of stations and energy, both of which Nikola has solved.  The clean energy under 4 per kilowatt makes diesel obsolete.

Q.   Mr. Russell, in the summer of 2020, was Nikola producing hydrogen?

A.   No.

Q.   Had Nikola solved the cost of energy in June 2020, in your view?

M9KCmil2                        Russell - direct

A.   We were working hard on it, but we hadn't solved it yet.

Q.   And why was it your view that you hadn't solved it yet?

A.   We didn't have the agreements in place and we didn't have the physical stations in place at that point.

Q.   Without that in place, was there any guarantee that Nikola could actually get hydrogen at this price point?

A.   Never guarantee until you actually approve it.

Q.   Would getting hydrogen at this price point be significant?

A.   Yeah, very.  The market price at this point for hydrogen dispensed to vehicles was, you know, four times that.

         MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 521.

Q.   Mr. Russell, what's the date of Mr. Milton's tweet at the bottom there?

A.   June 9th of '20.

Q.   Can you read his tweet there.

A.   We are now below $4 per kilogram, which is the lowest in the world.  We started at 16 and now are at 4.  We plan on reducing that again.  The key is to order tons of equipment, scale it, and buy clean energy cheap.

Q.   Mr. Russell, was it true that in June 2020, Nikola was now below $4 a kilogram?

A.   We had models that showed, you know, showed you how to get there, but no, we weren't producing any hydrogen at that point.

Q.   And in your view, Mr. Russell, is this a statement about

M9KCmil2                         Russell - direct

the future or about something that's been accomplished?

A.   It says the -- uses the word "now."

Q.   And Mr. Russell, in your view, is it important to distinguish between future plans and things that have been accomplished?

A.   You know, press releases and filings, we were very careful about that, yes.

Q.   Why was the company very careful about that?

A.   Because investors rely on these statements.

Q.   Mr. Russell, for a pre-revenue company, is it particularly important to distinguish between what's been accomplished and what's a future plan?

A.   I think it's important for every company, but when you're pre-revenue, you don't have -- you don't have revenue and profit and loss, which is often how companies are -- a prime way the companies are measured.  So in pre-revenue, you're just being measure bid your accomplishment of your milestones, your progress towards getting to revenue.

          MS. ESTES:  Ms. Wolfson, let's take that down.  Can we pull up Government Exhibit 29 for the witness.

Q.   Mr. Russell, do you recognize the messages there?

A.   I do.

Q.   What is the date of the top message there?

A.   June 8th of '20.

Q.   Who are the parties to these messages?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

A.   Myself and Matt Peterson.

Q.   What's the general subject of these messages?

A.   Trevor's public statements.

          MS. ESTES:  Your Honor, we offer Government
Exhibit 29.

          THE COURT:  Any objection?

          MR. MUKASEY:  May I just have one moment, Judge?

          THE COURT:  Yes.

          MR. MUKASEY:  We're going to object on hearsay grounds
and 403 grounds as to pieces of this.

          THE COURT:  Overruled.

          (Government's Exhibit 29 received in evidence)

Q.   Mr. Russell, now that the jury can see these messages, who
is Matt Peterson?

A.   He was Trevor's executive assistant.

Q.   Could you read the first message from Mr. Peterson there.

A.   He sure causes so much turmoil among the staff when he
makes announcements like this without anyone have input.

Q.   Mr. Russell, do you have any understanding of what
Mr. Peterson's referring to there when he says, when he makes
announcements like this without anyone have input?

          MR. MUKASEY:  Objection.  Foundation.

          THE COURT:  Overruled.

A.   He was referring to something that Trevor had just posted
about the Badger.

MS. ESTES:  Ms. Wolfson, actually, can we take this down for just a moment and can you pull up --

Your Honor, at this time, we'd offer Government Exhibit 519, which is pursuant to stipulation.

THE COURT:  Very well.  Pursuant to stipulation, it will be received.

(Government's Exhibit 519 received in evidence)

MS. ESTES:  Ms. Wolfson, can you pull up 29 again, side by side with 519.  Can you zoom into 29, the messages.

Q.  Mr. Russell, can you read Mr. Milton's tweet on the right there.

A.  We open up reservations for the most badass zero --

THE COURT:  I'm sorry, Mr. Russell.  Can I ask you to slow down.

A.  We open up reservations for the most badass zero emission truck on June 29th.  See the Nikola Motor Badger in person at Nikola World 2020 this year.  You'll get to see a real operating truck, not a fake show truck.  Expect stamped metal panels, functioning interior with HVAC, 4x4, et cetera.

Q.  What is the date of the tweet there?

A.  It's June 8th, '20.

Q.  What's the time of the tweet?

A.  10:25 a.m.

Q.  Going back to Mr. Peterson's first message there, what's the time of the message there?

M9KCmil2                    Russell - direct

A.   It's also June 8th, 2020 at 12:44, just a couple hours later.

Q.   So a couple of hours after the tweet there?

A.   Yeah.

Q.   So Mr. Russell, you reply yes, and Mr. Peterson says, you can sense the frustration on this one much higher than previous blindsides.  What do you understand him to be referring to there when he says previous blindsides?

A.   That Trevor would announce things like this without consulting people.

Q.   Without consulting people at Nikola?

A.   Correct.

Q.   Mr. Russell, can you read your response at 1:32 p.m. there.

A.   $27 billion in market cap should have everyone feeling some pressure.

Q.   What were you referring to there?

A.   At that point, we had only been public for five days and our market cap had gone from in the $3 billion range to $27 billion in, you know, five days.

Q.   Why did you say, should have everyone feeling some pressure?

A.   Well, five days before that, the institutional investors in the PIPE and the SPAC had valued us at $3 billion and suddenly the broader market was saying we were worth $27 billion.

Q.   Can you read Mr. Peterson's response there.

A.   Ha, this is setting up for a massive dive, one for the history books to a level more befitting our status of revenue.

Q.   When Mr. Peterson says this is setting up for a massive dive, what do you understand him to be talking about there?

A.   Just that it went up so far so fast, the niri version, force of gravity, whatever you want to call it, believed it would go back down.

Q.   And where he says to a level more befitting our status of revenue, what do you understand that to be referring to?

A.   Well, we were still pre-revenue at this point and we had made a lot of good progress, and such that the market and the PIPE and the SPAC transaction valued us in the billions, but this was almost 10X that.

Q.   When you say 10X, you mean ten times that?

A.   Ten times, almost.

          MS. ESTES:   Ms. Wolfson, can you take that down.  Can we pull up for the witness Government Exhibit 30.

Q.   Mr. Russell, do you recognize the messages there?

A.   I do.

Q.   Who are the parties to these messages?

A.   Michael Erickson, Kim Brady, and myself.

Q.   Who is Michael Erickson?

A.   Michael Erickson is responsible for the Powersports business, the recreational vehicles.

Q.   Did he have any involvement in the Badger?

A.   Yes, that was going -- was coming under his responsibility at that time, as well.

MS. ESTES:  Your Honor, we offer Government Exhibit 30.

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

(Government's Exhibit 30 received in evidence)

Q.   Mr. Russell, now that the jury can see these messages, what's the date of the message there?

A.   June 8th of '20.

Q.   Can you read the first message from Mr. Erickson.

A.   I've been trying to reach Trevor last night and today since I started seeing the social media posts.  All this is news to me.  And I texted him again during this meeting.  I'll let him know the "production ready" statements are different than our plan and are causing strife with the team.  And have already referenced the 2020 timing.  For Powersports, we all know that is the lessor priority at best.  Let me know if you'd like to discuss further today.

Q.   Mr. Russell, when Mr. Erickson says, I'll let him know the "production ready" statements are different than our plan, what do you understand him to be referring to there?

A.   In the timeframe that he had indicated in his tweet -- Trevor had indicated in his tweet, there's -- it wasn't possible to have a vehicle that would be production ready in

that timeframe.

Q.  Then, Mr. Russell, can you read your response to Mr. Erickson.

A.  Kim and I just had a discussion with Trevor in timing. Thanks for clarifying with him regarding "production ready."

Q.  What did you and Mr. Brady discuss with Mr. Milton in this context?

A.  That it wasn't accurate to say it would be production ready in this timeframe, that what we had would not be production ready by the date he had indicated in his tweet.

        MS. ESTES:  Ms. Wolfson, let's take that down and can we pull up Government Exhibit 54 for the witness.

Q.  Mr. Russell, do you recognize these messages?

A.  Yes.

Q.  Who are the parties to these messages?

A.  Kim Brady and myself.

Q.  What's the date of the message at the top there?

A.  July 10th of '20.

Q.  What's the general subject matter of the messages?

A.  A statement by the CEO of Rivian that Kim believed was directed at Trevor.

        MS. ESTES:  Your Honor, we offer Government Exhibit 54.

        MR. MUKASEY:  No objection.

        THE COURT:  It will be received.

(Government's Exhibit 54 received in evidence)

Q.  Mr. Russell, now that the jury can see these messages, could you read the first message there from Mr. Brady.

A.  I think Rivian CEO was taking a jab at Trevor.  He stated we let our actions speak for itself and not our words or tweets.

Q.  What is Rivian?

A.  Rivian is an electric vehicle startup that -- their first vehicle was a pickup truck.

Q.  What is your understanding of why we let our actions speak for itself and not our words or tweets would be a jab at Trevor?

A.  At that point, Trevor was very active, of course, on various media, including social media, and Rivian was not as active.

Q.  Could you read your message at the third line down to Mr. Brady.

A.  Trevor does not see Rivian as an example of someone accomplishing something likely similar in terms of valuation, and accomplishing more in terms of capital raising and partnerships with zero hype.

Q.  Had you had discussions with Mr. Milton about Rivian?

A.  Yes.

Q.  What did you discuss with him about Rivian?

A.  I cited Rivian as an example of being successful in raising

capital and growing the business without an aggressive social media and other campaign.

Q.   And how did Mr. Milton respond to that?

A.   He disagreed.

Q.   Could you read the next message from you to Kim Brady?

A.   He thinks his way is the only way or at least the best way.

Q.   And who is the "he" you're referring to there?

A.   Trevor.

Q.   Going down to your seventh message there, could you read that message from you to Mr. Brady.

A.   I wish Trevor would take a lesson from Scaringe though. Trevor's style works for retail investors, speculating with a few dollars they should probably put in a 401K index fund. Scaringe works with investors like BlackRock and Amazon.

Q.   Who is Scaringe?

A.   The CEO of Rivian.

Q.   When you said Trevor's style works for retail investors speculating with a few dollars, what were you referring to there?

A.   He had a large following of retail investors and individuals, and they clearly were buying stock.

         MS. ESTES:  Ms. Wolfson, you can take that down.

Q.   Now, Mr. Russell, after the company went public in June 2020, were you continuing to have conversations with Mr. Milton about his public statements?

A.   Yes, anytime that, you know, anytime that the -- it seemed appropriate.

Q.   And what sort of things were you discussing with him in this timeframe after the company went public?

A.   We had wide-ranging discussions, of course.

Q.   What, if anything, were you discussing with him in terms of accuracy at this point?

A.   Same topics.

Q.   And when you say the same topics, are you referring back to your statements about public statements being the equivalent of a press release?

A.   Exactly.

Q.   Mr. Russell, how would you describe the stock price after the company went public?

A.   Volatile.

Q.   Did you have discussions with Mr. Milton about the stock price after the company went public?

A.   Yes.

Q.   What did you discuss with him in that regard?

A.   We had a difference in philosophy.  I would say our most important investors are the institutional investors who are the base.  They buy and hold for long periods of time.  Some of the ones who had bought our stock had a whole period that was measured in more than a decade, whereas the retail investors that he was excited about and focused on, you know, sometimes

M9KCmil2                        Russell - direct

bought or sold in the same week or day.  I said we don't need that.  The volatility is actually unhealthy.  He disagreed.  He believed that what we were seeing was a major change in capital market structure and it was a good thing and it would be the democratization of the capital markets, individuals could invest themselves directly and they wouldn't have to go through fund managers and intermediaries to do so.

Q.  Mr. Russell, did you have any conversations about how Mr. Milton could communicate with those retail investors or individuals?

A.  Yes, I wasn't against his use of social media per se, just that he would follow the process and discipline that we did with press releases and filings.

Q.  By vetting those statements?

A.  Correct.

Q.  Did he agree to vet those statements?

A.  No.

Q.  Now, Mr. Russell, going back to the stock price itself, did you follow the company's stock price after it went public?

A.  Of course.

Q.  Is it normal for executives to follow the stock price?

A.  Yes.

Q.  Was there anything different about the way Mr. Milton followed the stock price, in your view?

A.  Yes.

Q.   What was that?

A.   Perspective.  I was looking for stock price appreciation over a period of years and Trevor was focused on a day-to-day.

Q.   Did you notice anything about how the stock price affected his mood?

A.   He was very excited when it would go up.

Q.   What if it went down?

A.   He was very concerned and wanted to do something about it.

Q.   And when you say he wanted to do something about it, what do you mean by that?

A.   He, when it would go down, sometimes he would call or text me and say the stock price is down, what are we going to do about it.

Q.   When he said that, what would you understand him to be referring to?

A.   That the stock price going down that day.

Q.   When he said what are we going to do about it, what did you understand him to be referring to there?

A.   He was focused on something that could make it immediately turn around and my typical response would be, we need to execute on a business plan so that it will go up over time and be able to stay there.

Q.   And what sort of things would he discuss about making the stock price turn around?

          MR. MUKASEY:  Objection.  Vague.

THE COURT:  Overruled.

A.  Well, he knew that when we could make announcements about substantial progress, that would help the stock price even with institutional investors.  So he was hoping that we could get more things done than we could announce.

Q.  Mr. Russell, did anything about Mr. Milton's focus on the stock price concern you?

A.  Yes.

Q.  What concerned you?

A.  Just the philosophical difference between focusing on the stock price over a period of years versus days and weeks.

Q.  Did you have any discussions with him about this?

A.  Yes, I would tell him not to pay attention to it and to focus on a longer term.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 425-C, which I believe is in evidence.  Could you play this clip for the witness.

(Video played)

Q.  Mr. Russell, is that consistent with your discussions with Mr. Milton about what type of investors were investing in Nikola?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you pull up 425-G.  Can you play this one for the witness.

(Video played)

Q.   Mr. Russell, did you and Mr. Milton ever discuss how the Badger could affect retail investors?

A.   Yes.

Q.   What did you discuss in that regard?

A.   He believed that the Badger, being a retail product, would also excite those people interested in the Badger to invest in the stock.

Q.   Mr. Russell, on that video we just watched there, Mr. Milton mentioned Robinhood.  What is Robinhood?

A.   Robinhood is a social media platform that allows individuals to directly invest in stocks.

Q.   Did you and Mr. Milton ever discuss Robinhood?

A.   Yes.

Q.   What did you discuss about Robinhood?

A.   That it was symbolic for the kind of investors he was targeting.  He would sometimes say the Robinhood wing of the market or the Robinhood investors.

          MS. ESTES:  Ms. Wolfson, can you pull up for the witness Government Exhibit 61.

Q.   Mr. Russell, do you recognize the messages here?

A.   I do.

Q.   Who are the parties to these messages?

A.   De Thompson and myself.

Q.   What's the date of the message at the top there?

A.   July 24th of '20.

Q.   What's the general subject matter?

A.   The stock price and Trevor's view of it.

          MS. ESTES:   Your Honor, we offer Government

Exhibit 61.

          MR. MUKASEY:   Objection.

          THE COURT:   Overruled.

          (Government's Exhibit 61 received in evidence)

Q.   Mr. Russell, now that the jury can see these messages, the
date there, July 24th, where is that in terms of Nikola going
public?

A.   We went public on June 3rd and this is July 24th.

Q.   Focusing on Mr. Thompson's message at the top, he says hope
Trevor doesn't explode on short-term stock decline.  What do
you understand that to be referring to there?

A.   I think immediately prior to this message we -- I think the
price had gone up significantly.  So that's why he says
amazing, but then he says hope Trevor doesn't explode on
short-term stock decline, because, obviously, it went up that
rapidly, it might go down rapidly, also.

Q.   And when he says hope Trevor doesn't explode, what do you
understand that to be referring to there?

A.   I think stress out.

Q.   And then looking a little farther down in the message
there, Mr. Thompson says, watching him during the board
meeting, he is clearly obsessed with Twitter and price, it

can't be good for him.  Were you at the board meeting that Mr. Thompson references there?

A.  Yes.  That was our first board meeting after becoming public.

Q.  What do you recall Mr. Milton saying at the board meeting about Twitter and price?

A.  He was talking about his ability to communicate through social media and reach out to retail investors and how that was help driving the stock price up.

Q.  Mr. Russell, could you read your message below to Mr. Thompson.

A.  Agree.  Trying hard to help him develop/keep perspective.

Q.  What did you mean by that?

A.  What we were talking about previously, the longer term perspective rather than focused on the short-term price.

Q.  Can you read your message at the bottom there.

A.  He's generally not a very cooperative student.

Q.  What did you mean by that?

A.  I never did persuade him.

MS. ESTES:  Ms. Wolfson, you can take that down, and can you pull up for the witness Government Exhibit 71.

Q.  Mr. Russell, do you recognize these messages here?

A.  Yes.

Q.  Who are the parties to these messages?

A.  Trevor and myself.

Q.   What's the date of the message at the top?

A.   August 24th of '20.

          MS. ESTES:  Your Honor, we offer Government

Exhibit 71.

          MR. MUKASEY:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 71 received in evidence)

Q.   Mr. Russell, could you read the top message there from

Mr. Milton.

A.   We need to talk strategy ASAP.  This continual stock

decline is going to erode any confidence in our stock.  We have

to do something, Mark.  We can't just sit here and watch its

collapse.

Q.   When you say we have to do something, Mark, what do you

understand him to be talking about there?

A.   Strategically, he felt we had to do something to make the

stock price go back up.

Q.   Your response there says calling in 15 minutes.  Did you

discuss with Mr. Milton after these texts?

A.   Yes.

Q.   Do you recall your conversation after these texts?

A.   Yes.

Q.   What did you discuss?

A.   That what we could do is execute as well and as fast as we

can on our business plan, and as soon as we execute something,

we can announce it, and that we didn't need a change in strategy, we just needed to continue to execute.

MS. ESTES:  Ms. Wolfson, you can take that down.

Q.  Mr. Russell, did you notice anything about Mr. Milton's lifestyle changing as the company was going public?

A.  What do you mean by lifestyle?

Q.  His purchases.

A.  Yes.

Q.  What did you notice about that?

A.  He purchased some real estate and he purchased some aircraft.

Q.  Did you have discussions with him about these purchases?

A.  Yes.

Q.  What sort of real estate did he purchase?

A.  To my knowledge, ranch land in Utah and in Wyoming.

Q.  And what about aircraft, what kind of aircraft did he purchase?

A.  What timeframe are we talking?

Q.  Summer of 2020.

A.  At that point, he was purchasing -- in the spring and summer of 2020, he was focused on purchasing jet aircraft.

Q.  Were you having any discussions with Mr. Milton about these purchases?

A.  Yeah.

Q.  What sort of things would you discuss?

A.   I felt they were beautiful properties and beautiful airplanes, but he should wait.

Q.   Why did you think he should wait?

A.   Because we weren't even -- when he was first looking at some of these things, we were not even publicly traded yet.

Q.   And when he was making these purchases, did the company have any revenue?

A.   No.

Q.   And was that significant to you?

A.   Yes.

Q.   Why?

A.   Well, that's an important milestone for any startup company, is to get to the point where you have revenue coming in.

          MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 56, which is in evidence.

Q.   Mr. Russell, do you recall these messages here?

A.   I do.

Q.   Can you read the top message from Ms. Fretheim there.

A.   Hi all.  I am really worried about some of what Trevor says on his latest podcast, in particular about contracts with utilities, getting power straight from federal lines, cost of stations, that we have already purchased land for stations and on.  I asked the marketing team to remove references to it until it is properly reviewed by the right people.

Q.  Mr. Russell, do you recall getting this message from Ms. Fretheim?

A.  Yes.

Q.  What was your reaction to this message?

A.  My initial reaction was that it was good to have Elizabeth Fretheim on the team, people who were watching, trying to watch what Trevor says.

MS. ESTES:  Ms. Wolfson, can you now pull up Government Exhibit 83 for the witness.  Can you zoom into that little --

Q.  Mr. Russell, do you recognize the messages here?

A.  Yes.

Q.  Who are the parties to these messages?

A.  Elizabeth Fretheim and myself.

Q.  What's the topic of these messages?

A.  The podcast.

MS. ESTES:  Your Honor, we offer Government Exhibit 83.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 83 received in evidence)

Q.  Mr. Russell, can you read the top message from Ms. Fretheim there.

A.  Did you have a chance to listen to the podcast?  Vince asked me for a list of my concerns and the times in the

podcast, he said them if you want that to spare you 1.5 hours. It will still be about 30 minutes.

Q.   What was your response there?

A.   Not likely that I will listen to the whole podcast.

Q.   Why did you say that, Mr. Russell?

A.   I didn't typically listen to things like that in their entirety or at all.

Q.   And why is that?

A.   The sheer volume.

Q.   What's the next message you sent to Ms. Fretheim, Mr. Russell?

A.   Do you have any -- do you have other concerns, additional to the statements you cited.

Q.   And why did you ask Ms. Fretheim for other concerns?

A.   Since I wasn't going to have time to listen to the whole podcast and she had already done so, I wanted to make sure I had everything she was concerned about that was listed so I could forward it to the right people.

Q.   What does Ms. Fretheim say after that?

A.   You can use -- excuse me.  You can use my list and forward to the ones you may want to hear.  The list includes things I just wish he wouldn't say to things he should not be saying.

Q.   And the "he" there, who do you understand her to be referring to?

A.   Trevor.

Q.   And then what's Ms. Fretheim's next message there?

A.   Sadly, several -- I assume that's referring to my question about additional concerns.  I just need to log on to my laptop and I'll send it.

Q.   And if you go down to the tenth message there, what did she send to you there?

A.   I just remembered you don't have Twitter, so you can listen to it here.

Q.   What's the link she sends you?

A.   It's to a TeslaCharts website.

Q.   So not to a link on Nikola's website?

A.   No.

          MS. ESTES:  Ms. Wolfson, can you take that down.  Can you pull up Government Exhibit 263, which is in evidence.  Can you flip to the last page here.

Q.   Mr. Russell, do you recognize the email on this page?

A.   Yes.

Q.   And what is this?

A.   This is an email from Elizabeth with the annotation of that podcast.

          MS. ESTES:  Ms. Wolfson, can you go to the page before that now.  Can you zoom into the bottom two emails.

Q.   Mr. Russell, after Ms. Fretheim says below are my concerns and the time in the podcast you'll want to go to, what's your response at the top there?

A.  I had told her that finance and legal are following up.  Do you have similar notes for the other half of the time.

Q.  When you say finance and legal, who are you referring to there?

A.  Britton Worthen and Kim Brady.

MS. ESTES:  Ms. Wolfson, can you take that down and pull up for the witness Government Exhibit 314.  Can you zoom into the top part there.

Q.  Mr. Russell, do you recognize this email?

A.  Yes.

Q.  Who are the parties to the email at the top there?

A.  It's from me to Britton Worthen and Kim Brady.

Q.  And what's the subject of this one?

A.  I'm forwarding the information from Elizabeth Fretheim to them.

MS. ESTES:  Your Honor, we offer Government Exhibit 314.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 314 received in evidence)

Q.  Mr. Russell, now that the jury can see this, why did you send this email to Mr. Worthen and Mr. Brady?

A.  So that they could be informed as to the contents of the podcast.

MS. ESTES:  Ms. Wolfson, can you take that down and

pull up Government Exhibit 263 again.  Can you zoom into the top couple of messages there.

Q.  Mr. Russell, can you read the last message that you sent to Ms. Fretheim.

A.  Thanks for watching out for our name/reputation.  It is our greatest asset in the end.

Q.  Why do you say that?

A.  Because she was now, you know, listening and watching things that Trevor was communicating and doing her best to make sure that everything was accurate.

MS. ESTES:  Ms. Wolfson, can you take that down.

Q.  Mr. Russell, did you ask that podcast be taken down from any of Nikola's social media?

A.  I was not aware that it was -- that it was on Nikola's social media.

Q.  Did you talk to Mr. Milton about the podcast afterwards?

A.  Likely, but I don't recall a specific conversation, no.

Q.  In general in this time period, were you having conversations with Mr. Milton about his public statements?

A.  At times, the volume was high.  He would typically post or tweet multiple times a day and sometimes have multiple interviews or, you know, conversations with public figures.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 422-B, which is the podcast.

Mr. Russell, I believe you have a binder in front of

you.  It should have a tab for 422.

            Ms. Wolfson, can you also pull up 422-T.  If you could go to page 4.

            Mr. Russell, if it's not in there, we can actually just use the transcript on the screen here.

            THE WITNESS:  It's not in the binder.  I can see it here.

            MS. ESTES:  Ms. Wolfson, can you play this clip, starting about 50 seconds in, which should correspond with page 4, line 2 of the transcript in the binder.

            (Audio played)

Q.  Mr. Russell, in the summer of 2020, was Nikola producing any hydrogen?

A.  No.

Q.  Had Nikola gotten the price of hydrogen down from $16 a kilogram to below $3 a kilogram?

A.  No.

Q.  Mr. Russell, in your view, are Mr. Milton's statements there true?

A.  No.

            MS. ESTES:  Ms. Wolfson, can we go to 422-D.  This will be page 12 of the transcript, line 1.

            Actually, Ms. Wolfson, can we go back to page 1 here.

Q.  Mr. Russell, just to orient the jury here, what's the name of the podcast at the top there?

A.   The TeslaCharts Podcast.

Q.   What's the date?

A.   July 17th of 2020.

Q.   Is it your understanding this is the podcast that is the subject of the emails we were just looking at?

A.   Yes.

          MS. ESTES:  Ms. Wolfson, let's go back to page 12, line 1.  If you could play this.

          (Audio played)

Q.   Mr. Russell, I believe you testified earlier today that in the summer of 2020, Nikola was starting to discuss a hub and spoke model for hydrogen stations.  Do you recall that?

A.   Yes.

Q.   So in July 2020, had Nikola standardized a hydrogen production station?

A.   We were working with Nel on a standard design for hydrogen station, yes, but we hadn't finalized that.

Q.   Had Nikola built any hydrogen production station in the summer of 2020?

A.   No.

Q.   Had Nikola built a hydrogen production station for 14 million bucks?

A.   No.

Q.   And so, Mr. Russell, Mr. Milton's statement, that the statements were going to be 50 to 60 million, now we're down to

M9KCmil2                    Russell - direct

14 million bucks, in your view, is that statement accurate?

A.  No, that was just a target, we hadn't done it yet.

MS. ESTES:  Ms. Wolfson, if we could now go to 422-E.

THE COURT:  Actually, Ms. Estes, it's now 11 o'clock, so we'll take our first break.

Ladies and gentlemen, 20 minutes.  Do not discuss the case.

(Continued on next page)

THE COURT:  Mr. Russell, you may step down.

Everyone can be seated.

The question -- you're going to have a witness later this week who's in a wheelchair.  Let me -- are you planning to use any exhibits with this witness?

MS. ESTES:  Yes, your Honor.  We're planning to play him some podcasts or interviews.  Maybe we could move a screen so -- there are some screens here we could turn.

THE COURT:  That was the question, because I see that our tech person is here because they were planning on putting the person over here.

MS. ESTES:  OK.

THE COURT:  I thought that that would not be appropriate because the jury would not be able to see the witness.  So I wanted to put the person here, just in front of the witness box.

And can we make that happen?  Can we have a screen?

OK.  We're told yes.  So you just really need to let us know when the person is going to be testifying.  OK?

MS. ESTES:  Yes, your Honor.  I expect it to be Thursday.

THE COURT:  Anything else to raise right now?

MR. PODOLSKY:  Not for us, your Honor.

THE COURT:  OK.  Don't be late.

(Recess)

M9KHMil3                         Russell - Direct

THE COURT:  OK.  Let's get the jury.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

(Jury present)

THE COURT:  Everyone can be seated.

Ms. Estes.

MS. ESTES:  Thank you, your Honor.

Ms. Wolfson, can you pull up 422-E from that same podcast.  Can we pull up the transcript, page 22, line 11.

(Audio played)

MS. ESTES:  Ms. Wolfson, could you stop it there.

Q.  Mr. Russell, in the summer of 2020, had Nikola tapped into any federal transmission lines?

A.  No.

Q.  When Mr. Milton refers to "federal transmission lines," what do you understand him to be talking about there?

A.  Those are transmission lines that were built by the federal government to take mostly hydropower away from federally owned dams to markets.

Q.  Mr. Milton also said we contract directly with groups, and he referenced the Tennessee Valley Authority.  Did Nikola have any contracts with Tennessee Valley Authority in the summer of 2020?

A.  No.

MS. ESTES:  Ms. Wolfson, could you keep playing the clip.

(Audio played)

MS. ESTES:  Ms. Wolfson, pause it there.

Q.  Mr. Russell, in the summer of 2020, was Nikola producing any hydrogen on the freeways?

A.  No.

Q.  Mr. Milton also referenced behind the meter where you're not dealing with the utility.  Did Nikola have any contracts with any entities to go behind the meter to get electricity in the summer of 2020?

A.  No.

          MS. ESTES:  Ms. Wolfson, let's keep playing.

          (Audio played)

Q.  Mr. Russell, in the summer of 2020, had Nikola bought any locations for hydrogen production stations?

A.  No.

Q.  Had Nikola leased any locations for hydrogen production stations?

A.  No.

Q.  Mr. Milton also referenced pulling energy out from 2 cents to 4 cents a kilowatt-hour.  Was Nikola getting any electricity at those price points in the summer of 2020?

A.  No.

Q.  Did Nikola have any electricity contracts in the summer of 2020?

A.  No.

Q.  And, Mr. Russell, would getting electricity at one of these price points be significant?

A.   Yes.

Q.   Why is that?

A.   That would allow you to produce hydrogen cost competitively with diesel.

Q.   Mr. Russell, was there any guarantee Nikola could get electricity at these price points?

A.   No.

Q.   Mr. Russell, in hindsight, do you wish this podcast had been taken -- any links to this podcast been taken down from Nikola's social media?

          MR. MUKASEY:  Objection.

          THE COURT:  Overruled.

A.   Is this the TeslaCharts podcast?

          MS. ESTES:  Ms. Wolfson, can you go back to the first page of the transcript there.

A.   Yeah.  Like I said, I didn't know, when I first was informed about it, that there was any link to it anywhere on Nikola's website.

Q.   Did you later learn that it was linked to Nikola's website?

A.   Yeah.  I think Elizabeth Fretheim referenced it in one of her notes.

Q.   And, Mr. Russell, sitting here now, having listened to the podcast, do you wish Nikola had taken it down from the website in 2020?

A.   If it wasn't accurate, we should have taken it down, yeah,

or deleted the link, rather.  It wasn't -- it wasn't reproduced there.  It was just a link.

MS. ESTES:  All right.  Ms. Wolfson, can you take that down.

Q.  Mr. Russell, in the summer of 2020, did Mr. Milton generally tell you when he was making media appearances?

A.  No.

Q.  Did you prep him for media appearances?

A.  No.

Q.  Did you have any involvement in approving his public statements after the fact?

A.  No.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 406-D and the transcript that corresponds with that.

Q.  Mr. Russell, first looking at the transcript here, what's the name of the podcast you see there?

A.  Transport Topics RoadShow podcast.

Q.  What's the date of the podcast?

A.  March 12 of 2020.

MS. ESTES:  Ms. Wolfson, can we go to 406-D, and that's going to be page 2, line 12, of the transcript.

(Audio played)

MS. ESTES:  Ms. Wolfson, you can pause it there.

Q.  Mr. Russell, in March 2020 was Nikola producing hydrogen for below $4 a kilogram?

A.  No.

Q.  Would that have been significant if Nikola was doing that?

A.  Yeah, that was our -- our target was to get below $4.  That would be very significant.

Q.  Why was that?  Why would hitting that target be significant?

A.  That was on average a prevailing price of diesel fuel.

Q.  Mr. Russell, why would it be important for Nikola to achieve a price that was the equivalent of diesel fuel?

A.  Well, if you can transition the hauling of freight from polluting diesel fuel to clean hydrogen and there's no cost penalty to do that, who wouldn't do that?

Q.  When you say "cost penalty," what are you referring to there?

A.  It's not more expensive.  If we got it to be where it was the same cost for the equivalent amount of diesel fuel, then who wouldn't do that?

Q.  So if the cost of hydrogen was higher than diesel fuel, what would be the concern there?

A.  Then you would have to rely on people wanting to help the environment or regulations or subsidies.  So that making it cost equivalent or better was a really important goal.  Still is.

Q.  Mr. Russell, before Mr. Milton left the company in September 2020, were you aware of this podcast?  Had you

listened to it?

A.   I don't think so.

Q.   Did you prepare Mr. Milton for this podcast in any way?

A.   Not that I recall.

Q.   Did you recall encouraging him to do this podcast?

A.   No.

         MS. ESTES:   Ms. Wolfson, can you pull up S-2, the stipulation.  Can you turn to the paragraph relating to 407. I'll read this into the record.  It says:

         Government Exhibit 407-A, 407-B, 407-C, 407-D, 407-E, and 407-F are authentic copies of a portion of April 20, 2020, interview of Trevor Milton on the Truck Show Podcast, and Government Exhibit 407-T is an accurate transcription of these recordings.

         At this time I'd offer 407-A through E -- sorry, A through F, as well as 407-T.

         MR. MUKASEY:   No objection.  They will be received.

         (Government's Exhibits 407-A through 407-F and 407-T received in evidence)

         MS. ESTES:   Ms. Wolfson, can we turn to 407-E, and this will be page 7 of the transcript.

         Actually, Ms. Wolfson, let's stay on page 1 start.

Q.   Mr. Russell, what's the name of the podcast referenced there?

A.   It's the Truck Show Podcast.

Q.   What's the date of the podcast?

A.   April 20, '20.

          MS. ESTES:  Ms. Wolfson, can we go to page 7.  And so let's play the clip there, and it starts at line 21.

          (Audio played)

          MS. ESTES:  Pause it there.

Q.   Mr. Russell, I think we just looked at the date of this podcast of April 2020.  In April 2020, had Nikola built a Badger?

A.   No.

Q.   Was there any Badger that could drive 700 miles in a real environment?

A.   No.

Q.   Had you listened to this podcast before Mr. Milton left the company in September 2020?

A.   Not that I recall.

Q.   Did you prepare him for this podcast in any way?

A.   No.

Q.   Did you approve of this podcast after the fact in any way?

A.   No.

          MS. ESTES:  Ms. Wolfson, can you take that down and put up Government Exhibit 409-A, which is in evidence.  Can you pull up the transcript as well, 409-T.

Q.   Mr. Russell, what's the date of this podcast here?

A.   June 3 of '20.

Q.   What's the name of this one?

A.   Tesla Daily Podcast.

MS. ESTES:  All right.  Ms. Wolfson, let's play the clip.

(Audio played)

Q.   Mr. Russell, was Nikola getting hydrogen at 4 cents a kilowatt-hour in June 2020 -- sorry, getting electricity?

A.   Yeah, electricity.  I think he's referring to electricity, would have been referring to electricity there.  And the answer is no.

Q.   Was Nikola getting any electricity behind the grid in June 2020?

A.   No.

Q.   Had you seen this interview of Mr. Milton before Mr. Milton left the company in September 2020?

A.   Not that I recall.

Q.   Did you prepare him for this interview in any way?

A.   No.

Q.   Were you asked to review it for accuracy after the fact?

A.   No.

MS. ESTES:  Ms. Wolfson, let's pull up Government Exhibit 410-B and 410-T.

Q.   Mr. Russell, what's the date of the podcast there?

A.   June 4 of '20.

Q.   What's the name of the top?

M9KHMil3                    Russell - Direct

A.  Yahoo Finance.

MS. ESTES:  Ms. Wolfson, let's go to the next page and play 410-B, which corresponds with line 11 there.

(Audio played)

MS. ESTES:  Pause it there.

Q.  Mr. Russell, in June 2020, was Nikola producing hydrogen below $4 a kilogram?

A.  No.

Q.  Had you seen this interview before Mr. Milton left the company in September 2020?

A.  Not that I recall.

Q.  Did you prepare him for this interview?

A.  No.

Q.  Did you review it for accuracy?

A.  No.

MS. ESTES:  Ms. Wolfson, let's take that down and pull up Government Exhibit 412-B.

Q.  Mr. Russell, what's the name of this clip on the right there?

A.  Autoline After Hours.

Q.  What's the date of this one?

A.  June 11 of '20.

MS. ESTES:  All right.  Ms. Wolfson, let's go to the transcript, and this will be line 18, and let's play this clip.

(Video played)

MS. ESTES:  Ms. Wolfson, let's pause it there.

Ms. Wolfson, can you go back to page 1 of the transcript.

Q.  Mr. Russell, Mr. Milton says, "Today our hydrogen costs are less than $4."  On June 12, 2020, was that true?

A.  No.

Q.  Why not?

A.  We weren't producing hydrogen at that point.

Q.  Had you seen this interview before Mr. Milton left the company in September 2020?

A.  Not that I recall.

Q.  Did you prepare him for this interview?

A.  No.

Q.  Did you review it for accuracy?

A.  No.

MS. ESTES:  Ms. Wolfson, can you pull up S-2, and can you go to the paragraph that corresponds with 420.  So I'll read this into the record now.  It says:

Government Exhibits 420-A, 420-B, 420-C, 420-D, 420-E are authentic copies of portions of July 3, 2020, interview of Trevor Milton on the Hitting the Mark Podcast.  And Government Exhibit 420T is an accurate transcript of those recordings.

So, your Honor, I would offer 420-A through E, as well as 420, which I believe is the full podcast, and 420-T.

MR. MUKASEY:  No objection.

THE COURT:  They'll be received.

(Government's Exhibits 420, 420-A through 420-E, and 420-T received in evidence)

MS. ESTES:  Ms. Wolfson, can we pull up the transcript as well as 420-C.

Q.  Mr. Russell, what's the name of this podcast?

A.  Hitting the Mark podcast.

Q.  What's the date?

A.  July 3 of '20.

MS. ESTES:  Ms. Wolfson, let's go to page 2 of the transcript.  Let's play the clip.

(Audio played)

Q.  Mr. Russell, in July 2020, had Nikola done full production of a zero-emission truck?

A.  No.

Q.  Had you heard this podcast before Mr. Milton left the company?

A.  No.

Q.  Did you prepare him for this podcast?

A.  No.

Q.  Did you review it for accuracy?

A.  No.

MS. ESTES:  Ms. Wolfson, let's take that down and pull up 421-B and the transcript.

Q.  Mr. Russell, what's the name of this one?

M9KHMil3                        Russell - Direct

A.   It's the Observer.

Q.   What's the date of this one?

A.   July 14 of '20.

          MS. ESTES:  Ms. Wolfson, can you go to page 3 here.
All right.  Let's play the clip that should start on line 7.

          (Video played)

          MS. ESTES:  Pause it there.

Q.   Mr. Russell, in July 2020, was Nikola getting hydrogen from
wind farms or solar farms?

A.   No.

Q.   And was Nikola producing it for under $4 a kilogram?

A.   No.

Q.   Had you seen this interview before Mr. Milton left the
company?

A.   Not that I recall.

Q.   Did you prepare him for it?

A.   No.

Q.   Did you review it for accuracy?

A.   No.

          MS. ESTES:  All right.  Ms. Wolfson, let's take that
down and pull up 424-D, which is in evidence.

Q.   Mr. Russell, what's the name of this one?

A.   StockCast.

Q.   What's the date?

A.   July 31 of '20.

M9KHMil3                    Russell - Direct

MS. ESTES:  Ms. Wolfson, can you go to page 3 here. Let's play the clip.

(Audio played)

MS. ESTES:  Ms. Wolfson, you can pause.

Q.  Mr. Russell, was it true or false that Nikola had hydrogen below $4 a kilogram in July 2020?

A.  False.

Q.  Had you heard this interview before Mr. Milton left the company?

A.  Not that I recall.

Q.  Did you prepare him for this interview?

A.  No.

Q.  Did you review it for accuracy after the fact?

A.  No.

MS. ESTES:  Ms. Wolfson, let's go to 425-F, which is in evidence, and 425-T as well.

Q.  Mr. Russell, what's the name of this one?

A.  This Week in Startups.

Q.  What's the date of this one?

A.  July 31, '20.

MS. ESTES:  Ms. Wolfson, let's go to page 6.  Let's play the clip.

(Video played)

Q.  Mr. Russell, in July 2020, did Nikola have billions of dollars' worth of signed contracts?

A.  No.

Q.  And would that have been significant?

A.  Yes.

Q.  Why?

A.  We had -- with the exception of Anheuser-Busch, what we had were reservations or preorders, which were nonbinding.

Q.  And why would it be significant to have binding contracts?

A.  Just more likely to come to pass.

Q.  Mr. Russell, as to this interview, had you seen it before Mr. Milton left the company?

A.  Not that I recall.

Q.  Did you prepare him for it?

A.  No.

Q.  Were you asked to review it for accuracy?

A.  No.

          MS. ESTES:  Ms. Wolfson, let's pull up S-2 again, and can we go to the paragraph that corresponds with 428.  I'll read this now into the record:

          Government Exhibit 428-A is an authentic copy of a portion of an August 24, 2020, interview of Trevor Milton on the TD Ameritrade Network podcast, and Government Exhibit 428-T is an accurate transcript of the recording.

          Your Honor, so we'd offer Government Exhibit 428-A and 428-T, as well as 428, the full portion.

          MR. MUKASEY:  No objection.

M9KHMil3                    Russell - Direct

THE COURT:  They'll be received.

(Government's Exhibits 428, 428-A and 428-T received in evidence)

BY MS. ESTES:

Q.  Mr. Russell, what's the date of this podcast?

A.  August 24 of '20.

Q.  What's the name?

A.  The TD Ameritrade Network Podcast.

MS. ESTES:  Ms. Wolfson, let's go to the transcript and play the clip.

(Audio played)

MS. ESTES:  Ms. Wolfson, pause it there.

Q.  Mr. Russell, in August 2020, had Nikola built a hydrogen production station for $14 million?

A.  No.

Q.  Were you aware of this -- or had you seen this interview or heard this interview before Mr. Milton left the company?

A.  Not that I recall.

Q.  Did you prepare him for this interview?

A.  No.

Q.  Were you asked to review this interview for accuracy?

A.  No.

MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q.  Now, Mr. Russell, you've testified that you hadn't seen or

heard a lot of these interviews until after Mr. Milton left the company.  How do you feel now, sitting here listening to these interviews by Mr. Milton?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  I wish he would have been more careful about what he said.

Q.  And why do you wish that?

A.  Because a lot of it wasn't strictly accurate.

Q.  And as the executive chairman of a public company, is it important to be strictly accurate?

A.  Yes.

Q.  Why is that?

A.  Your public statements are relied on by investors, and they're the same as press release or a filing.

Q.  Mr. Russell, as the CEO of Nikola, were you involved in reviewing filings that Nikola made with the Securities and Exchange Commission?

A.  Yes.

Q.  What was your involvement with those filings?

A.  I reviewed drafts, and certain documents I signed.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 318.

Q.  Mr. Russell, do you recognize this?

A.  Yes.

Q.  What is this document?

A.  This was our Form S-1 that we filed.

Q.  Is that something you filed with the Securities and Exchange Commission?

A.  It is.

Q.  Can you see the date on it?

A.  Yes.  July 17 of '20.

MS. ESTES:  Your Honor, we offer Government Exhibit 318.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 318 received in evidence)

BY MS. ESTES:

Q.  Mr. Russell, now that the jury can see this document, what is a Form S-1?

A.  It's a registration statement for the sale of securities.

Q.  Is this something that's available to the investing public?

A.  Yeah, anybody can see it.

Q.  Where would this be publicly available?

A.  You could see it on the SEC website or there are various private parties that also reproduce it.

Q.  Did Nikola also have links to this on its own website?

A.  Yeah, we had links to this.

MS. ESTES:  Ms. Wolfson, can you go to page 7.

Q.  Mr. Russell, what's the title of this page here?

A.  "Forward-looking Statements."

MS. ESTES:  Ms. Wolfson, can you zoom in to the top portion there.

Q.  Mr. Russell, can you read what this says here.

A.  "This prospectus and any accompanying prospectus supplement contain forward-looking statements that involve risks and uncertainties.  These statements relate to future periods, future events, or our future operating or financial plans or performance.  When used in this prospectus, the words 'anticipate,' 'believe,' 'continue,' 'could,' 'estimate,' 'expect,' 'intends,' 'project,' 'forecast,' 'may,' 'might,' 'plan,' 'possible,' 'potential,' 'predict,' 'project,' 'should,' 'seeks,' 'scheduled,' or 'will' and similar expressions are intended to identify forward-looking statements and include but are not limited to."

Q.  Mr. Russell, do Nikola's filings with the SEC include forward-looking statements?

A.  Yes.

Q.  And what's the purpose of including language like this in an SEC filing?

A.  To make sure that investors who are reading our filings understand that we make forward-looking statements, and there are certain uncertainties and risks that are related to those.

MS. ESTES:  All right.  Ms. Wolfson, can we zoom out of that page and zoom in to page 85.

Ms. Wolfson, can you zoom in to the section on

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

hydrogen stations there.

Q.   So, Mr. Russell, directing your attention to this part of the S-1, the first sentence says:  "In addition to building heavy-duty zero-emission trucks, Nikola is also developing fueling and charging stations."

Why does the SEC filing here use that type of language?

A.   Because that's what we were doing.  We were developing those at that time.

Q.   Then later in that same paragraph it says, "Over the next eight to ten years, Nikola intends to collaborate with strategic partners to build up to 700 fueling and charging stations."

Why does it have that sort of time frame in there?

A.   Because that was our intent, that over that kind of time frame, we intended to build a network that would include up to 700 stations.

Q.   Mr. Russell, is it important for a public company to put in language about what time frame milestones will be achieved?

A.   Yeah.

Q.   Why is that?

A.   To make it true and accurate.

MS. ESTES:  Ms. Wolfson, could you highlight the first sentence in the next paragraph there.

Q.   Mr. Russell, do you see any forward-looking statements in

that sentence there?

A.  Yeah, "will normally."

Q.  And what's the purpose of using that sort of language in the SEC filing?

A.  To make it clear that we hadn't done that yet, and there may be other types of things that we do.

Q.  Mr. Russell, why is it important for investors to know whether or not Nikola is producing hydrogen?

A.  So they can understand what stage we're at in our business plan, executing it.

Q.  Would producing hydrogen have been a milestone for the company?

A.  Yes.

Q.  Why is that?

A.  Because we hadn't produced hydrogen at this point.

        MS. ESTES:  All right.  Ms. Wolfson, let's take that down.

Q.  Mr. Russell, listening to those interviews and podcasts for Mr. Milton, did you have any concerns over the statements he made in the podcasts and interviews?

A.  Yes.

        MR. MUKASEY:  Asked and answered.

        THE COURT:  Overruled.

Q.  What was your concern?

A.  That they don't follow the -- the discipline that we,

obviously, followed in the filings.

Q.   And the fact that you were disciplined in your filings, does that change the level of concern you had over the executive chairman of your company making these statements in interviews and podcasts?

A.   No.

Q.   Why is that?

A.   He shouldn't have said it that way.

Q.   Does a public company need to be accurate in all of its statements to the public?

A.   Yeah, as best -- as best we can.

Q.   Why is that?

A.   So that investors can rely on it.

Q.   Mr. Russell, how would you describe your relationship with Mr. Milton in the summer of 2020?

A.   It began to be strained.

Q.   Why did it become strained?

A.   Well, first of all, right before we went public on June 3, he had changed the deal on the leadership and remained the top executive, unlike we had agreed.  And then the reason that I was -- that I had bargained for that structure was because of the risk of him making statements like this as the top executive, and then that started to come to pass.  And then there were other issues.  I didn't -- I felt that the Badger was too big of a risk and too expensive of a thing for us to be

doing and too much of a distraction and reduced the odds that we could successfully execute on the base business model, and he continued to push that.

So our relationship became increasingly strained. I tried my best to restrain him on all of those points, and he continued to disagree, and that just made it more difficult for us to collaborate.

Q.   Mr. Russell, were you having conversations with others in the company about your concerns about Mr. Milton's statements?

A.   Typically, only Mr. Brady and Mr. Worthen.

Q.   Did there come a point when you and Mr. Brady and Mr. Worthen spoke to Mr. Milton?

A.   Yeah, we spoke to him often individually and occasionally as a group. At one point that summer we decided, having made our best efforts individually and not succeeding, that maybe we should try meeting with him together and be very direct and forceful. We jokingly referred to it as an intervention. And we did have a meeting in Briton's office where we each told him, in the presence of all of us, that we thought that this trend, this track, couldn't continue, and that we needed to make some significant changes.

Q.   How long was this meeting in Mr. Worthen's office, the intervention?

A.   I don't recall the exact time, but it was, you know, several hours.

Q.   And when, approximately, was this meeting?

A.   I don't remember the exact date as well.  I believe it would have been in July or August, maybe early August.

Q.   Of 2020?

A.   Of 2020, yeah.

Q.   And what do you remember saying to Mr. Milton in this intervention?

A.   That, you know, he refused to modulate and submit his public statements to some form of discipline and control, and that we continued to move on various paths of focus that I don't think we could sustain, and that we needed a change.

Q.   What do you remember Mr. Brady saying to him in the intervention?

A.   Essentially, the same thing.

Q.   And what about Mr. Worthen?

A.   Essentially, the same thing.

Q.   How did he respond?

A.   He expressed emotional hurt.  He reacted emotionally about it.

          (Continued on next page)

BY MS. ESTES:

Q.  Did you have another conversation with Mr. Milton after the intervention?

A.  Yeah, we did have a conversation at my office either immediately following or the day following he came into my office and said, you know, the real issue here is do you support me, you know, do you -- are you still on my team, you need to decide whose side you're on.

Q.  How did you respond?

A.  I did my best to explain to him that it wasn't an issue of taking sides, I'm not taking a side against you, I'm trying to help you.  This is -- I honestly believe that this is essential for, you know, this team to be able to continue.

Q.  Why did you believe it was essential?

A.  Because we couldn't sustain this track that we were on.

Q.  What do you mean?

A.  We couldn't keep going that way, something would have to give.

Q.  Just to be clear, when you say we couldn't keep going that way, are you referring to his public statements or something else?

A.  Yeah, all of it.

Q.  Did Mr. Milton's behavior change after the intervention meeting?

A.  No.

Q.   Now, Mr. Russell, I believe you testified earlier that you reported to Mr. Milton; is that right?

A.   Yeah, he was my direct report.

Q.   Aside from the intervention, was there anything else you considered doing in response to these issues?

A.   Well, obviously, I, you know, individually considered whether I would need to resign at some point, and then eventually I discussed that with Mr. Brady and Mr. Worthen.

Q.   Why did you start considering resigning?

A.   Because nothing else -- I mean, I tried everything that I knew to try and could think of, and that when I started discussing that with Britton and Kim, Britton Worthen and Kim Brady, we all, you know, we all said the same thing, we'd done everything we could think of and everything we could try.  None of it was working and we had to consider whether or not we should resign.

Q.   Was there any concern with resigning?

A.   Yeah, that would have created a crisis for the company if executive officers resigned.

Q.   Mr. Russell, did there come a time when a short seller released a report about the company?

A.   Yeah, it was not long after that.

Q.   Did the report discuss some of Mr. Milton's statements that we've talked about?

A.   Yes.

M9KCmil4                        Russell - direct

Q.   How did you find out about the report?

A.   A call -- somebody would have sent me a link.  Yeah, somebody sent me a link.

Q.   Did you read the report after you learned about it?

A.   Yeah, I pulled it up and quickly read it.

Q.   Did you discuss it with Mr. Milton?

A.   Yes.

Q.   What did you discuss with Mr. Milton?

A.   Some of the substance of the report.  He expressed that he was willing to fight, and I said to him, well, you'll always fight.  And he said I don't know, but this one feels different.

Q.   Mr. Russell, did there come a time when Nikola's board of directors met to discuss the Hindenburg report?

A.   Yeah, shortly afterward, there was an emergency meeting of the board.

Q.   Was Mr. Milton asked to excuse himself from part of the discussion?

A.   Yeah, I think there was actually even more than one meeting.  And then I don't know which meeting it was, but these were all happening very rapidly, but at one meeting he was asked to excuse himself, and then there was a discussion just the board and the remaining executive officers.

Q.   Who was part of that meeting from the executive office side?

A.   The members of the board, Kim Brady, myself, Britton

Worthen, and I believe Joe Pike.

Q. What did you say in that meeting with the board?

A. I told the board that I could no longer continue as the company was currently structured, and that if we were going to continue as currently structured with Trevor as executive chairman, then I was tendering my resignation.

Q. What happened after that?

A. Britton Worthen and Kim Brady and I believe Joe Pike said the same thing.

Q. Mr. Russell, why did you say that if the company wasn't restructured, you would tender your resignation?

A. Because that was, you know, it was -- this is our last option and that was -- we -- it was time.

Q. Did there come a time after that where the board met without your presence?

A. Yeah, at that point, we were excused and the board had a discussion just with the board members, except myself.  And then following that, Mr. Girsky called me and said that the board agreed to start negotiating with Trevor for his exit.

Q. Did Mr. Milton, in fact, exit the company after that?

A. Yes.

        MS. ESTES:  One moment, your Honor.

        (Pause)

        Nothing further, your Honor.

        THE COURT:  Cross examination.

CROSS-EXAMINATION

BY MR. MUKASEY:

Q.  Good afternoon, Mr. Russell.

A.  Good afternoon.

Q.  Mr. Russell, Ms. Estes showed you some tweets, Government Exhibit 521, 520, some of which discussed the cost of hydrogen, tweets by Trevor Milton.

    Do you recall those?

A.  Yes.

Q.  And he said things, and I'm reading from 521, were now below $4 per kilogram, which is the lowest in the world, we started at 16, and now we're at 4.

    Do you recall that?

A.  Yes.

Q.  And she played you some podcasts about going behind the grid, going behind the meter, tapping into federal lines.

    Do you recall all that?

A.  Yes.

Q.  It is true that Nikola had models for their hydrogen stations and hydrogen production; correct?

A.  Correct.

Q.  And it is true, and I think you said that we had models that showed we could get done hydrogen at $4 per kilogram; right?

A.  Correct.

Q. And you had models that contemplated going behind the meter and tapping into the grid; right?

A. Yes.

Q. And you had models and, in fact, targets for hydrogen station building on various bases of land; right?

A. Yes.

Q. And in particular, reducing the cost of hydrogen from $16 a kilogram to $4 a kilogram, and even lower than $4 a kilogram was consistent with your models; right?

A. Correct.

Q. Now yesterday, you made some mention early on in your tenure about the Nikola One, and I think you said you had been at the Salt Lake City facility, the early days of Nikola, and seen an alpha prototype of the N One; is that right?

A. Yeah, I saw the N One prototype under construction at Pratt & Miller in Detroit. It was maybe 50 percent complete when I saw it that day. And then I saw it near the complete condition, much more complete, I don't know what the percentage was, in the warehouse in Salt Lake City sometime after that.

Q. And you attended the reveal in December 2016; right?

A. I did.

Q. And before we get to the reveal, when you saw the Nikola One in Detroit or in Salt Lake, it seemed to you like a typical alpha prototype; correct?

A. Yeah, an operating alpha prototype, yes.

Q.   And when you went to the reveal, you saw what was sort of a big light show and promotional show by Trevor; right?

A.   Yes.

Q.   And Trevor was actually pretty talented in terms of promotion, wouldn't you say?

A.   Gifted.

Q.   Gifted.  And you learned around that time that the Nikola One or the focus of Trevor's company was going to shift from this turbine that you talked about to fuel cell technology; right?

A.   Yeah, that happened before the unveiling.

Q.   And you knew a little bit about fuel cell technology, a little bit; right?

A.   I did.

Q.   And you actually started thinking this hydrogen fuel cell truck idea might work?

A.   I did.

Q.   And when you started at Nikola in 2019, I think you used the term pivoted, they had pivoted from the Nikola One prototype?

A.   Yeah, the prototype that was under construction in Detroit was going to be natural gas fueled and --

Q.   And that, by the time you started in February 2019, that wasn't relevant anymore; correct?

A.   Correct.

M9KCmil4                        Russell - cross

Q.   It was not relevant to the then current condition of the company in 2019?

A.   Correct, we had produced hydrogen fuel prototypes by then.

Q.   And the Nikola One that you saw at the reveal was a historical artifact to you?

A.   Yes.

Q.   I don't know if you've become familiar with this In Motion video, which people talk about rolling a truck down a hill. I'm not sure if you're familiar with it.

A.   I am.

Q.   That was also the Nikola One; correct?

A.   Correct.

Q.   And by the time you got to Nikola in 2019, you were already moving on or the company was already moving on to the Nikola Two; correct?

A.   Correct, yes.  We were working on multiple prototypes of the Nikola Two at that point.

Q.   Now, you had known Trevor four, five, six years at the time you started at Nikola about 2014 to 2019, something like that?

A.   Correct, yes.

Q.   20 years younger than you?

A.   Approximately, yeah.

Q.   And follows then that he had less experience in the business world than you did?

A.   Yes.

M9KCmil4                         Russell - cross

Q. Certainly he had less experience in the public financial market than you did?

A. Yes.

Q. And less experience than Kim Brady did?

A. Yes.

Q. Less experience than Steve Girsky did?

A. Yes.

Q. And less experience with the kind of ins and outs of public finance and the laws that go along with that than Britton Worthen did?

A. Yes.

Q. Now, fair to say that you came to view yourself as a mentor to Trevor either right before you started and certainly when you started?

A. Yeah, I saw him as having great capability and I did my best to try to help him.

Q. And when you say you did your best to try to help him, you tried to help him learn what you thought he needed to learn to operate what would be a public company; right?

A. Yes.

Q. And fair to say that you found him to be an extraordinarily gifted person in creative thinking and idea generation?

A. Yes.

Q. He had an entrepreneurial spirit that you admired?

A. Yes, extraordinary.

Q.  When you say he's extraordinary, can you tell us a little bit about that?

A.  Extraordinarily courageous.  I don't know anyone anybody else who would have founded Nikola in their basement at that time with that business model.

Q.  And when you talk about the basement, you're talking about Trevor and a few of his buddies starting in the basement and eventually building Nikola into what it is today?

A.  Yes.

Q.  And you came to view him as a bit of a visionary?

A.  Very creative, yes.

Q.  You recall the Coolidge groundbreaking ceremony?

A.  I do.

Q.  I don't think the government went through this, but there are various locations that Nikola operates in now; right?

A.  Yes.

Q.  There is Chandler, Arizona; correct?

A.  I know chandler is the old warehouse.  So we are in -- Phoenix is the headquarters, and R&D, Coolidge, Arizona is the manufacturing facility in the western hemisphere and then Ulm, Germany is the manufacturing facility for Europe.

Q.  So you're in the U.S. and Europe?

A.  Yes.

Q.  And you spoke at the Coolidge groundbreaking ceremony; right?

A.  I did.

Q.  And it's true that Trevor was the source of many, if not most of the ideas in the execution that drove Nikola when he was there; right?

A.  Yes.

Q.  And based on your observations, we talked about your daily interaction with him, when Trevor gave an order, requested somebody to do something, he kind of thought that it was done after that; correct?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  Can you repeat it.

Q.  When Trevor gave an order and a request for somebody to do something, he sort of treated it like it was done after that; right?

A.  He assumed it would be done, yeah.

Q.  And you and Trevor talked, as you mentioned on your direct examination, about how things might work when the company went public and you became the CEO; right?

A.  Correct.

Q.  And fair to say that you and Trevor both understood that his style didn't exactly match the typical style of a public company corporate executive?

MS. ESTES:  Objection.  Calls for speculation.

THE COURT:  Overruled.

M9KCmil4                        Russell - cross

A.   Yes.

Q.   I'm told about a -- I've read about a time when Trevor called you from a highway --

          MS. ESTES:  Objection on the commentary.

          THE COURT:  Let's listen to the question.

Q.   Was there a time when Trevor called you from the highway on Thanksgiving?

A.   Yes.

Q.   Tell the ladies and gentlemen of the jury what Trevor was doing when he called you from the highway on Thanksgiving.

A.   He was interviewing truckers at truck stops along the interstate highway.

Q.   He was actually sitting at a truck stop in the Dakotas; right?

A.   Yes, he was.

          MS. ESTES:  Objection.

          THE COURT:  Overruled.

Q.   On Thanksgiving, interviewing truckers in contemplation of building Nikola; correct?

A.   Correct.

Q.   Unusual for a public company executive.  Can we agree on that?

A.   I was impressed.

Q.   Would you also say that Trevor was emotionally tied in a big way to Nikola?

A.  Yes.

Q.  And when various tweeters and trolls and people online took shots at him, he took that personally; right?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  He seemed it to me.

Q.  And part of the reason that you all agreed for you to become CEO when the company went public was because Trevor recognized he wasn't really the right guy to be the CEO; right?

MS. ESTES:  Objection.  Calls for speculation.

THE COURT:  Overruled.

A.  I think so, yes.

Q.  And so when the time came for you to become CEO, Trevor did turn the day-to-day functions of the company over to you; right?

A.  Partly.

Q.  Well, you ran the company day to day, didn't you?

A.  Partly.

Q.  Well, if you looked at an order chart, most of the people were reporting to you; correct?

A.  Yes, in terms of number, yes, but the C-suite still reported to him, all the chiefs.

Q.  But the day-to-day functions of the company were in your charge?

A.  Yes.

Q.  And I think you've said the last couple days, that it was hard for Trevor to let go?

A.  Yes.

Q.  And he wasn't really ready to give up, he wanted a little bit longer, kind of in the driver's seat; right?

A.  Yes.

Q.  And that's true because Nikola was Trevor's crafted and nurtured creation, wasn't it?

A.  I believe so.

Q.  And based on your interactions with him, you understood that Trevor wanted to make sure that Nikola, his creation, was not going to turn into something else when he gave over control?

        MS. ESTES:  Objection.  Calls for speculation.

        THE COURT:  Sustained.

Q.  Would you say that in many respects, the company was kind of like his child?

        MS. ESTES:  Objection.  Calls for speculation.

        THE COURT:  Sustained as to the form of the question.

Q.  Would you agree with me that Trevor had a deep emotional connection to this company?

A.  Yes.

Q.  Now, Mr. Russell, I'd like to ask you a few questions about building a vehicle.

        Based on your experience at Nikola and your prior

experience at Worthington, I assume you're generally familiar with the process of designing and developing trucks?

A.   Vehicles in general, yes.

Q.   A lot of work building a truck or a vehicle gets done digitally these days; right?

A.   It does.

Q.   And in terms of the initial stages of vehicle design, software is a huge part of it; right?

A.   It is.

Q.   And I think you could say it's the most important thing, it runs everything?

A.   Especially for an electric vehicle, yeah, the software is the critical component.

Q.   At a later stage, after software is built, you can build a physical prototype; right?

A.   Yes.

Q.   And I'm probably jumping stages because I'm not a car guy, but see if you can go with me here.  Eventually, you test and validate the prototypes?

A.   Correct.

Q.   Sometimes a clay model could be done, I think we've heard?

A.   Yeah, a clay model is typically done early.

Q.   And then a concept or a show car, show truck?

A.   Correct.

Q.   And by the way, the term "show vehicle," that can be sort

of applied to any kind of prototype; right?

A.   Yeah, some of them are just shells, some of them are intended to be working.  There is all kinds.

Q.   And, in fact, in terms of prototypes, the Badger was intended to be a fully working prototype; right?

A.   It was.

Q.   It was intended to be and it, in fact, was when it came out; right?

A.   Yes.

Q.   Now, you've heard the term "clean sheet vehicle," correct?

A.   Yes.

Q.   And in your view, a clean sheet vehicle means something that was started from scratch, but you can get parts from somewhere else for a clean sheet vehicle?

         MS. ESTES:  Objection.  Form.

         THE COURT:  Sustained as to the form.

Q.   Clean sheet vehicle can be started from scratch, but also use parts from elsewhere; correct?

A.   Correct.

Q.   Now some questions about the work that was going on at Nikola in 2019 and into 2020.

         When you got to Nikola, the company was doing research and development in their own development lab, yes?

A.   Yes.

Q.   And over the course of '19 and '20, you — meaning the

company — purchased equipment for the development and the validation and the testing of different types of technology; right?

A.  Yes.

Q.  Powertrain technology?

A.  Yeah, electric powertrain technology, yes.

Q.  Battery technology?

A.  Yes.

Q.  In fact, there was a battery lab at Nikola's headquarters?

A.  Yes.

Q.  And that battery lab did testing and validation work and could even build small batteries.

A.  We didn't ever build batteries at a cellular level, no.

Q.  You had the ability to build the battery if you wanted to?

A.  Battery packs.

Q.  Fair enough.  As of June 2020, you had an advanced chemistry battery in the lab, but in the R and D phase?

A.  That we had developed?

Q.  Yes.

A.  Not that I recall.

Q.  Perhaps I could refresh your recollection.

        MR. MUKASEY:  If we show the witness DX-1506.

Q.  Just read that to yourself, Mr. Russell, as soon as Chris identifies the space.  Just tell me when you're done.

        Would it help you to move up a little bit in the

M9KCmil4                          Russell - cross

document?

A.   No, I do -- that does refresh my recollection, yes.

Q.   So that refreshes your recollection that as of June 2020, Nikola had an advanced chemistry battery in the lab in the R and D, the research and development phase?

A.   Yeah, but we weren't -- we didn't originate that technology.  That was technology from a company we were looking at acquiring.

Q.   Because you worked with partners, as well; right?

A.   Yes.

Q.   So Nikola did research under Nikola's roof and Nikola combined with partners or worked, collaborated with partners; right?

A.   Yeah, both universities and private companies.

Q.   And that was not a secret, that was disclosed publicly in your filings, many of your co-development partners?

A.   Yes.

Q.   Let me ask you about an eAxle.  Can you tell the ladies and gentlemen of the jury what an eAxle is?

A.   EAxle is the shorthand phrase for the motor that drives the wheels in an electric vehicle, it includes the motors and sometimes some gearing.

Q.   And around the time you joined the company, you had people tinkering, working with an eAxle in house; right?

A.   Yes.

M9KCmil4                        Russell - cross

Q.   And you also, as I said, collaborated with people outside the company; right?

A.   Yeah, we collaborated with Bosch and PT on the axles.

Q.   And you had inverter development going on in 2020, yes?

A.   With partners, yes.

Q.   Tell the ladies and gentlemen what an inverter is.

A.   The power in the vehicle, sometimes it's direct current and sometimes it's alternating current and inverters change from one to the other, and sometimes you have to do that.

Q.   And of course, you expected, as of mid 2020, this development work and the investment in it to continue into the future; correct?

A.   Yes.

Q.   Now I want to talk about some of the milestones, which I think was Ms. Estes word, a good word, that Nikola accomplished, certainly while you were there.

        When you broke ground on the new manufacturing facility in Coolidge, you thought that was an event that would go down in the history books some day; isn't that right?

A.   I think that's possible.

Q.   And groundbreaking in Coolidge was something that you thought was important in the history of mankind?

A.   Potentially.

Q.   That's what you said; right?

A.   I did.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Q.   And when you got to Nikola as president, right, the company was getting so much done, you found it dizzying; right?

A.   Yeah, I believe I did say that.

Q.   So I want to review some of that dizzying activity.  I think you mentioned in April 2019 the Nikola Two was unveiled as a fully operational hydrogen semi truck?

A.   Yes.

Q.   At Nikola World in 2019?

A.   Correct.

Q.   And there were two of them, a red one and a white one?

A.   Correct.

Q.   Both fully operational; correct?

A.   Correct.

Q.   You had been inside the Nikola Two?

A.   Yes.

Q.   You've ridden in it, it's a beautiful, spacious, operational fuel-cell vehicle?

A.   It's an impressive prototype.

Q.   And you actually put investors in some of them for rides; correct?

A.   Yes.

Q.   Now, with respect to the Nikola Two's, the red one and the white one, the white one is called storm trooper, what's the red one called?

A.   Bud, Budweiser red.

Q.  After your launch partner, Anheuser-Busch.

Let me show you what's been marked DX-1540 for identification.

MR. MUKASEY:  Chris, if you could show that just to the witness with no volume.

Q.  Do you recognize that video Mr. Russell?

A.  Yeah, this was a demonstration that took place at Nikola World.

Q.  Fair and accurate depiction of the two trucks we've been talking about at Nikola World?

A.  Yes.

MR. MUKASEY:  Your Honor, we offer DX-1540 for identification into evidence and request permission to publish.

MS. ESTES:  No objection.

THE COURT:  Received.  You may publish.

(Defendant's Exhibit 1540 received in evidence)

Q.  The jury is going to take a look at that.  Can you tell them what they're seeing?

A.  Those are the two prototypes of the two Nikola Two hauling trailers.  That's outside the convention center where the Nikola World took place.

Q.  And those are running on fuel cell technology; correct?

A.  Hydrogen fuel cells, yes.

Q.  And while we're watching, let me ask, those two trucks have started accumulating track miles?

A.   Yeah, we were -- they were -- we were testing those prototypes on the track.

Q.   Now, we heard testimony in this courtroom concerning something that's called the beer run.  You're familiar with what I'm talking about; right?

A.   The beer run in St. Louis?

Q.   Yes.

A.   Yes.

Q.   And the beer run in St. Louis was the Nikola Two red helping to deliver a load of beer to a hockey game; right?

A.   Yeah, it was the first time we actually hauled a load on a public road.

Q.   And you considered that to be a flawless success; correct?

A.   It went just as we planned, yes.  Everything went almost just as planned.  There always little things that go unexpectedly at the last minute, but it was, you know, substantially what we planned.

Q.   And that's one of the reasons that you said that Nikola will prove to be one of the greatest success stories; is that right?

A.   I'm going to need context or a date for saying that.

Q.   June 2020.  I can refresh your recollection --

A.   Is that at the St. Louis event?

Q.   No, I believe it was elsewhere.

          MR. MUKASEY:  I can refresh your recollection with

DX-1506 for the witness.  It's at page 2, Chris.

A.   Can you give me context here?

          MR. MUKASEY:  Take a look at page 2, Chris.

Q.   I'm just asking whether you recall saying that Nikola will prove to be one of the greatest success stories.

A.   Yes, I do recall saying that, yeah.

Q.   Thank you.  There's been some mention, but I want to drill down a little bit into Nikola's partners that you mentioned. There are companies that you work with, right, and there are companies that have invested with you and there are some that are both, you work with and they've invested in you; right?

A.   Yes.

Q.   And are those called co-development partners?

A.   That's one term, yes.

Q.   So one of them is a company that is called CNHI Vecto?

A.   Yes.

Q.   Vecto designs and manufactures commercial vehicles and off-road trucks?

A.   Correct.

Q.   They're a big part of your success; right?

A.   Yes.

Q.   Another is Bosch, that you mentioned?

A.   Yes.

Q.   Tell the ladies and gentlemen of the jury what Bosch does.

A.   Bosch is a global diversified manufacturing company that

does a lot of things in automotive and particularly diesel technology.

Q.  And one of the members of your board comes from a company called Hanwha; right?

A.  She's no longer on the board, but at that time, she was a member, yes.

Q.  In '19 and '20, she was on the board, that's Sophie Jin?

A.  Correct.

Q.  What did you do with Hanwha?

A.  Hanwha had an operating division that was working in renewable power, mainly solar.

Q.  We heard a bunch about Nel, the electrolyzer company.  They were a co-development partner?

A.  Yes, we worked with them on electrolyzer technology and station design.

Q.  And I'm going to come back to that in a little while.  I'm also going to mention a couple more.  Meritor?

A.  Meritor, we worked with them on suspension systems.

Q.  And Molly?

A.  Molly was a partner for thermal systems.

Q.  And all these partners were publicly disclosed in your SEC filings, in one filing or another?

A.  Yes.

Q.  Just a quick couple questions about the C-suite that you just mentioned.

By the time the company went public in June of 2020, you would call Nikola's leadership team, and I mean I guess the C suite guys, a solid leadership team; right?

A.  Yes.

Q.  That's Worthen, yourself, Joe Pike, and Kim Brady; right?

A.  And others, yeah.

Q.  And others.  And so you were some experienced and ethical professionals; right?

A.  I had confidence in that team.

Q.  And you've also mentioned Steve Girsky.  We haven't heard a lot about him, but let me just spend 30 seconds on Girsky. Girsky had a pretty impressive background in automotive and finance; right?

A.  Yes.

Q.  And he was the guy that led the chairman of VectoIQ; right?

A.  Yes.

Q.  And Girsky ended up, after the merger, on the board; right?

A.  Yeah, he joined Nikola's board.

Q.  Now, speaking of the merger, I want to talk about what it meant to go public and how that happened.

Sounds to me like somewhere in mid 2019, maybe early 2019, a bunch of different options for going public started to be considered; is that fair?

A.  Yes.

Q.  As I count it, there's four options that I've heard about.

MS. ESTES:  Objection to the commentary.

THE COURT:  Overruled.

Q.  Now, I don't want to beat that trucks.com article to death, but going public to you would serve as an inspiration for others to show the world that one company can change the world for the better?

A.  I think going public was a milestone on a path like that.

Q.  And particularly Nikola, which you said was one company that could change the world for the better?

A.  Yeah.  Yes.

Q.  So let's talk about the different options on the table for going public.

Number 1, I think you mentioned was a traditional initial public offering here in the United States securities markets; right?

Number 2 was the possibility of going public in Norway, on a Norway stock market; right?

A.  Yes.

Q.  And Norway is big into green tech, it's the home of Nel; correct?

A.  Yes.

Q.  And there was some discussions about going public in Norway; right?

A.  Yes.

Q.  Number 3 was the SPAC, the Special Purpose Acquisition

Company that you eventually decided to go with; correct?

A.  Yes.

Q.  Number 4 option was a merger with another company, wasn't that on the table for a while?

A.  Being acquired or merging with an existing company --

Q.  Correct.

A.  But not a SPAC?

Q.  Correct.

A.  That was always a possibility also, yes.

Q.  So that's four options.

And by January of 2020, you've already met Girsky; right?

A.  Yes.

Q.  And VectoIQ; correct?

A.  Yes.

Q.  And Girsky and VectoIQ had the opportunity to look kind of up, down, and sideways all over Nikola, check it out, do due diligence; right?

A.  Eventually, yes.

Q.  But the two options that were still on the table January 2020 were SPAC and Norway; right?

A.  Norway was briefly considered.

Q.  Still on the table in January 2020?

A.  I don't recall.

Q.  May I show you Government Exhibit 218 to refresh your

recollection.  I believe it's in evidence.  If you take a look at 218, I think you'll notice a sentence, once we pick a path, which seems to indicate that SPAC and Norway were still on the table as of that time?

A.  Yes.

Q.  Now, ultimately -- by the way, if you know, Kim Brady, the CFO, he favored going public with a SPAC; right?

MS. ESTES:  Objection.  Calls for speculation.

THE COURT:  Overruled.

A.  In the end, I think we all felt it was the best option.

Q.  Now, when you say in the end you all felt it was the best option, that decision to go public by SPAC was therefore not made by Trevor Milton alone?

A.  No.

Q.  Group discussion, group consideration?

A.  Yes.

Q.  And I want to be clear about the SPAC process.  When the business combination was announced in March of 2020, not completed, but announced, right, Nikola and VectoIQ were separate companies; correct?

A.  Correct.

Q.  VectoIQ was a public company trading on public markets; right?

A.  Correct.

Q.  They had public shareholders?

M9KCmil4                         Russell – cross

A.   Yes.

Q.   Nikola was a private company; right?

A.   Yes.

Q.   Didn't trade on NASDAQ or any other market?

A.   Not until June 3rd.

Q.   And -- I'm sorry?

A.   Not until June 3rd.

Q.   Right.  And Nikola did not have public shareholders, they had private shareholders; right?

A.   Correct.

Q.   Now March 3rd, the announcement comes that you're intending to combine; right?

A.   Yes.

Q.   And when the business combination was announced, VectoIQ filed a document with the SEC called an S4.  Does that ring a bell?

A.   That makes sense, yes.

Q.   And an S4 filed with the SEC is available to the public; correct?

A.   Yes.

Q.   And VectoIQ's filing contained information about Nikola; right?

A.   I hadn't looked at it recently.  I presume it would have.

         MR. MUKASEY:  I'm going to offer DX-732 pursuant to the stipulation GX-S6.  I'm not going to go through all of it,

but I just want to show it to you.  So Chris, can you --

MS. ESTES:  Your Honor, we have no objection to it.

THE COURT:  Very well.  It will be received.

(Defendant's Exhibit 732 received in evidence)

Q.  That's the S4, Mr. Russell?

A.  Yup, that's it.

Q.  And if we turn to page 133, it contains information about Nikola; correct?

A.  It does.

Q.  And that's publicly filed; right?

A.  It is.

Q.  And if you scroll through it, Chris, you'll see that it contains information about hydrogen stations and hydrogen station rollout strategy, and product offerings, et cetera.

A.  Yes.

Q.  At page 32, it contains the risk factors of investing in Nikola; right?

A.  Yes.

MR. MUKASEY:  Chris, can you scroll through the risk factors.  And you got to do it quickly because I think it takes about 30 pages of risk factors.

Now Chris, if I can move you to the table of contents.

Q.  Not only do you have risk factors about Nikola, but you have risk factors about VectoIQ; right?

A.  Yes.

M9KCmil4                         Russell - cross

Q.  So all these risk factors about Nikola, about VectoIQ, about the business combination, about Nikola's business were disclosed even before the merger was approved; right?

A.  Yes.

Q.  And in terms of the merger getting approved, VectoIQ, as far as you understand, had to propose the combination to its board of directors; right?

A.  Yes.

Q.  That was separate from the Nikola board of directors?

A.  Correct.

Q.  And the board of directors of VectoIQ had to approve it; right?

A.  Yes.

Q.  And you mentioned they did due diligence before they approved it; right?

A.  Yes.

Q.  And then the VectoIQ shareholders had to vote to approve the combination, I think you said?

A.  I believe they did.

Q.  And that happened on or about June 3rd, 2020; right?

A.  I think that happened prior to June 3rd and then the merger was effective June 3rd, yeah.

Q.  Thank you very much.

    So as of June 3rd or up until June 3rd, Nikola and VectoIQ were two separate companies; right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

A.   Yes.

Q.   And on June 3rd, when the companies combined, Nikola became the public company; right?

A.   Correct, we switched the ticker to NKLA and from there it represented Nikola.

Q.   And just to be clear, this whole SPAC process with VectoIQ and combining, that passed muster with you as CEO of Nikola?

A.   Yes.

Q.   Now, there was some mention on your direct examination about $70 million that Trevor Milton received in June of 2020. Do you recall that?

A.   Yes.

Q.   I just want to clarify a couple things there.

         You mentioned that you thought Trevor purchased a plane and a ranch when he got some of that money; right?

A.   Actually, the timing of those, I think, varied.  He was active in real estate before June 3rd and had aircraft before June 3rd, and then he -- and then I think there were transactions after that, as well.

Q.   Now the $70 million that he got, that was 7 million shares of his founder's stock that he sold back to the Pike, VectoIQ, other investors at $10 a share; right?

A.   Yes.

Q.   That's 7 million times 10 is 70 million; right?

A.   Correct.

M9KCmil4                          Russell - cross

Q.   That $70 million, that had nothing to do with the trading of Nikola's stock in the summer of 2020; right?

A.   No, I understand that transaction happened on June 3rd.

Q.   That was an arm's length negotiation; correct?

A.   Yeah, between Trevor and the VectoIQ leadership and some pipe investors.

Q.   And it had nothing to do with the movement of Nikola's stock, up or down, thereafter, it was a fixed payment?

A.   Yeah, it was a one-time transaction and, like I said, I think it took place on or about June 3rd.

Q.   Right.  And the money that Trevor was paid and then used to buy things that you mentioned, that was Trevor's money; right?

A.   Yes.

Q.   It wasn't Nikola's money that he was using to buy a plane; right?

A.   No.

Q.   By the way, that $70 million payment was disclosed to the public in an SEC filing; right?

A.   Yes.

Q.   So that wasn't a secret payment?

A.   No.

Q.   Now speaking of SEC filings, I just want to run through a few, more specifically than Ms. Estes did, but I'm going to try not to take too much time on it.

         Obviously you know the SEC, obviously you know the SEC

M9KCmil4                     Russell - cross

exists to protect investors; right?

A.  Yes.

Q.  And obviously you know that, from time to time, public companies have to make all sorts of filings; right?

A.  Yes.

Q.  And that's to provide information to the investing public?

A.  Yes.

Q.  And one of the filings is called a 10Q; right?

A.  Yes.

Q.  And a 10Q is a report that public companies file once every three months that sets out certain business and financial information about the company; right?

A.  Yes.

Q.  Available to the public online?

A.  Yes.

Q.  And available, at least in Nikola's sake, on their website?

A.  Yes.

        MR. MUKASEY:  At this time, Judge, I'd like to offer DX-1215 and DX-1508 for identification into evidence pursuant to the public filing stip, GX-S6, I think it's paragraph 6.

        THE COURT:  Very well.

        MS. ESTES:  No objection.

        THE COURT:  It will be received.

        (Defendant's Exhibits 1215, 1508 received in evidence)

Q.  So first, let's take a look at DX-1215, Mr. Russell.  This

is a 10Q for August 4th, 2020.  Do you see that?

A.  I do.

Q.  If we turn to page 60, that has your signature; right?

A.  Yes.

Q.  It has Kim Brady's signature; right?

A.  Yes.

Q.  You obviously reviewed it and determined it to be as truthful and accurate as you could as of that time?

A.  Yes.

Q.  Now, if we look at DX-1508, that's a different document, that's called a certification; am I right?

A.  Yes.

Q.  And that certification is something you signed at the bottom; correct?

A.  Yes.

Q.  Date is August 4th, 2020; right?

A.  Yes.

Q.  And that's a certification that relates to the 10Q; correct?

A.  Correct.

Q.  Could you do me a favor and read paragraph 2, which I'll have Chris blow up for you.

A.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report.

Q.  And that certification signed by you is filed with the SEC; right?

A.  Correct.

MR. MUKASEY:  You can take that off the screen, Chris.

Q.  In addition to these filings, a whole bunch of other filings were made between June 3rd and let's say September 2020; right?

A.  Multiple filings, yes.

MR. MUKASEY:  And I'm not going to show you every one, but I do want to move into evidence DX-734, 735, and 742, and just for the record, those are amendments to the S1, and 742 is a prospectus supplement, dated August 4th.

MS. ESTES:  Your Honor, no objection, although I believe DX734 is already in evidence.

THE COURT:  To the extent they are not in evidence, they will be received.

(Defendant's Exhibits 734, 735, 742 received in evidence)

MR. MUKASEY:  Thank you, Judge.

Q.  Now I'm going to ask you to look at DX-736, which is another filing, and I promise we'll get away from the filings in just a minute.  I think 736 also has an alternative government number.  Just for purposes of the record, July 17th.

In any event, 736 is a prospectus that Nikola issued July 17, 2020; right?

A. Correct.

Q. And this had information similar to the information that VectoIQ disclosed back in March of 2020; is that right?

A. Yes, it would.

Q. So take a look at page 78 in the middle, that's information concerning Nikola hydrogen stations; right?

A. Yes.

Q. And page 79, information concerning hydrogen rollout strategy?

A. Yes.

Q. Pages 76 and 77, product offerings?

A. Yes.

Q. Page 81 at the bottom is customers and backlog?

A. Yup.

Q. At the center of page 145, Chris, I think it discloses that Nikola has retained Ernst & Young as its auditor?

A. Yes.

Q. Topflight auditing firm; right?

A. Yes.

MR. MUKASEY: And on pages 7 through 30, we can scroll through the risk factors.

Now I promise I'm going to get off the filings and ask you to take a look at DX-1022 for identification. Just for the

witness at the moment, and pursuant to GSX6 -- withdrawn.

Pursuant to GX-S6, we're offering DX-1022.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1022 received in evidence)

Q.  Mr. Russell, do you recognize --

MR. MUKASEY:  And you may publish it for the jury with the Court's permission.

THE COURT:  Okay.

A.  Is this a screenshot?

Q.  It's a screenshot.  And unfortunately, I can't answer your questions, you have to answer mine, so I'm going to ask the question.

A.  This looks familiar, I'm just not exactly sure where it comes from.

Q.  Do you recognize that to be a screenshot of the Nikola website as it existed in September of -- the summer of 2020?

A.  It does look like that, yes.

Q.  So when Nikola became a public company, the company posted SEC filings to its website; right?

A.  Yes.

Q.  And anyone could access that website, right, you don't need a secret password?

A.  No.

Q.  And as you see here, the Nikola website provided a link to

M9KCmil4                         Russell - cross

the company's SEC filings; right?

A.  Yes.

Q.  And anything that was attached to the SEC filings, for example, like an analyst day presentation, that would be accessible, as well; right?

A.  Yes.

Q.  An investor page was listed there, an investor contact page, an email address, investors at NikolaMotor.com; right?

A.  Yes.

Q.  And that email account for investors to write in and ask questions or make comments was monitored by the CFO, Kim Brady; contributing?

A.  Him or his team, yes.

Q.  And as CEO, Mr. Russell, you did your best to make sure the information Nikola disclosed to the public was true and accurate; right?

A.  I did.

Q.  And you had disclosures where you needed to be reviewed by outside law firms and outside accounting firms; correct?

A.  We did.

Q.  Ultimately, the signers of the filings, people who signed the SEC filings, CEOs, CFO, they share in the responsibility for the accuracy of the SEC filings; right?

A.  Correct.

        THE COURT:  Mr. Mukasey, it's now 12:50, so we'll take

M9KCmil4                        Russell – cross

our second break.

          20 minutes, ladies and gentlemen.  Don't discuss the

case.

          (Continued on next page)

(Jury not present)

THE COURT:  Mr. Russell, you may step down and everyone can be seated.

Anything to raise, Ms. Estes?

MS. ESTES:  No, your Honor.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  No, Judge.

THE COURT:  Okay.  Don't be late.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Everyone, please be seated.

Mr. Mukasey.

MR. MUKASEY:  Thank you, Judge.

BY MR. MUKASEY:

Q.  Mr. Russell, you talked a little bit on your direct examination about Trevor's communication with retail investors.

It's true that Trevor did want to be constantly communicating, right?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  And that's with institutional investors and retail investors, right?

A.  I think more retail.

Q.  Do you recall a communication that Trevor wanted to make to PSAM and Norges?

A.  Not specifically.  Do you have anything you can show me?

Q.  Absolutely.  DX 1141, which is a 6/22/20 text chain between you and Mr. Brady.

Let me just ask if that refreshes your recollection. It's at page 11, by the way, about Trevor wanting to reach out to certain institutional investors.

A.  Yeah, I recall this.

Q.  Those are institutional investors, PSAM and Norges,

correct?

A.  Correct.

Q.  Now, Trevor was open about his belief that constant communication would build long-term value, right?

A.  Yes.

Q.  And he discussed with you and others his belief that teaching people about the company through social media would create actual value?

A.  Yes.

Q.  Long-term value and short-term value?

A.  Yes.

Q.  Now, you were discussing a little bit yesterday and today about the company Nel and its electrolyzers?

A.  Yes.

Q.  And there was some discussion about Trevor wanting to go on a media blitz, so I want to ask you about that.

First of all, when companies go public, a media blitz is not outside the norm, correct?

A.  I don't think so.

Q.  And there were folks like Jeff Ubben who was on the board and Steve Girsky who helped plan a media campaign for Trevor and others when the company went public, right?

A.  What do you mean by "plan"?

Q.  Schedule appearances.

A.  I think that the internal team at Nikola mostly scheduled

the appearances, but Jeff and Steve and myself did support the idea that we'd communicate to the market.

Q. And that's a media blitz to tell the world that we've gone from a private company to a public company and presumably to attract investment and interest, correct?

A. Yes.

Q. OK. Let me show you -- oh, before I get there, you mentioned Rivian as a company that you held out as an example of an EV company that was successful with minimal social media engagement, right?

A. I wasn't intimately familiar with their social media outreach. You know, I'm not on social media.

Q. We saw a set of texts that refer to RJ Scaringe, the CEO --

A. Correct.

Q. -- of Rivian. And I thought that your testimony -- and I'm not trying to put words in your mouth -- was something along the lines of you and Kim Brady wanted Trevor to be a little more like Scaringe who was maybe more focused on execution and less focused on media?

A. And that reference was Scaringe himself saying he wasn't like that and he focused more on execution.

Q. And there were other EV companies whose marketing plans relied heavily on social media. It begins with a "T," and it rhymes Esla.

            MS. ESTES: Objection.

M9KHMil5                    Russell - Cross

THE COURT:  Sustained.

Q.  Tesla is an EV company that relies heavily on social media, right?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Are you familiar Elon Musk's presence on Twitter?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  It is ubiquitous, correct?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  I agree.

Q.  OK.  Now I want to direct your attention to Government Exhibit 237 in evidence, and that's the email that I think Ms. Estes showed you about Trevor going to the board, wanting to purchase electrolyzers, right?

A.  Correct.

Q.  On the eve of going public?

A.  A few days before.

Q.  Right.  And, first, let me point out the obvious.  Trevor went to the board to get permission to buy the electrolyzers, right?

A.  Correct.  It was a large enough purchase that they needed to approve it.

Q.   Right.  It was not a unilateral decision.  And you had discussions with Trevor about this time about the need to purchase those electrolyzers?

A.   Yes.

Q.   And about why Trevor wanted to make the announcement?

A.   Yes.

Q.   And you agreed with buying the electrolyzers at that point in time, right?

A.   I did.

Q.   Because it was something Nikola needed to do regardless of media blitzes and going public, right?

A.   Yeah, it was no regrets.  We had to buy the electrolyzers regardless, so --

Q.   And electrolyzers, when you order them, they have long lead times, right?

A.   They do.

Q.   So ordering them on May 30 of 2020 was cool with you, correct?

A.   It was.

Q.   And as far as the stock price went, if you made that announcement and it helped the stock price, all the better, right?

A.   I thought that was OK.

Q.   There is an employee of yours at Nikola named Dale Prows, correct?

A.  Correct.

Q.  And Dale Prows was a guy you brought into the company?

A.  I helped recruit him, yes.

Q.  And you've known him for a while from prior life?

A.  Almost two decades, yeah.

Q.  Dale Prows was in charge at one point of Nikola's relationship with Nel or its dealings with Nel, right?

A.  Correct.

Q.  And is it fair to say that Mr. Prows wasn't quite familiar with the process of integrating hydrogen technology when you brought him into the company?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  Correct, he wasn't an expert in that, and there weren't many experts in that anywhere in the world, actually.

Q.  And dealing with Nel did not exactly suit Dale Prows from your perspective, right?

A.  Time proved that, yes.

Q.  And he was not a good fit for that role?

A.  Correct.

Q.  And he was a little bit of a panicker when it came to dealing with Nel?

A.  He was prone to -- I wouldn't call it panic, but he -- he very much worried about that, yes.

Q.  He was eventually reassigned away from the Nel account,

right?

A.   He was.

Q.   Just let me touch for a moment on the concept of reservations.

It's normal and standard, based on your experience in the automotive industry, to accept reservations for a vehicle before that vehicle has been produced, right?

A.   Yeah, reservations are preorders just to get a gauge of the kind of interest that it would generate.

Q.   Right.  And reservations and preorders, other terms have been used within the company called "orders," right?

A.   Generally, when we're talking about orders, we would be referring to something that had actually been ordered, whether or not a purchase order had issued, but we were looking at orders as something more firm than a preorder.

Q.   The term "orders" had been used, though, am I right?

A.   Yes.

Q.   You've used the term "hard reservations"?

A.   I have used that term before, yes.

Q.   OK.  Let me show you for identification what has been marked as DX 54, just for the witness, please.

Take a look at this, Mr. Russell.  On the first page it's an email from Britton Worthen to Vince Caramella copied to you, and you make a comment on the top of the second page.  Do you recognize this?

A.  Yes.

Q.  And you recognize it to be a series of emails that you were

included on and that you commented on, right?

A.  Yes.

MR. MUKASEY:  Defense offers DX 54 for identification

into evidence.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 54 received in evidence)

BY MR. MUKASEY:

Q.  If you start at the back of this -- which I think is

page 4, Chris -- you'll see a question from Colleen Robar:

"Can you answer this analyst's questions for me?"  Do you see

that, Mr. Russell?

A.  Yes.

Q.  Colleen Robar is a public relations woman that worked

frequently with you all at Nikola?

A.  Yeah, still does.

Q.  OK.  She's asking, "Can you answer this analyst's questions

for me?  It would be awful to have him out there doubting our

numbers."  And that gets forwarded to Vince Caramella.

Do you see that?

A.  Yes.

Q.  And then the questions are set out on the next page.  The

journalist's question at the top of the page is:  "In

March 2019 you were cited as having 14,000 trucks in preorder (trucks.com), but then in October 2019, you were cited as having USD 14 billion in preordered trucks."

Do you see that?

A.   Yes.

Q.   And the journalist asks, "Are both of these correct?" and a series of other questions, one through three.  And am I correct that the proposed answers are inserted after each question?

A.   Correct.

Q.   OK.  On the second page, moving forward, you suggest just a few tweaks, if you see at the top?

A.   Yes.

Q.   And eventually, that gets forwarded to Britton Worthen who says, "Looks good to me"?

A.   Yes.

Q.   OK.  Let's go back to the second page, the tweaks end up getting forwarded to Britton Worthen.  The first question is from the journalist are both of these correct, or eventually which journalist mixed up the figures?  The answer is "Both are correct.  The total value of the 14,000 trucks on preorder for a lease of 1 million miles is $14 billion."

Do you see that?

A.   Yes.

Q.   If you go to the answer to the second question, it says: "Our backlog" -- here you go, Chris -- "of 14,000 preorders are

all for leases of 1 million miles and will result in

approximately 14 billion in revenue."

          You see that?

A.  Yes.

Q.  Those numbers and those answers get forwarded to Britton

Worthen who says, "Looks good to me," right?

A.  Yes.

Q.  OK.  Mr. Russell, I'm going to ask you a couple of

questions about activities that Trevor Milton participated in

and did not participate in.

          He did not make presentations on analyst days,

correct?

A.  Typically, no.

Q.  And he did not meet with analysts generally, right?

A.  Typically, no.

Q.  And you mentioned an anecdote about having met with

SoftBank yesterday?

A.  Yes.

Q.  And after SoftBank he generally didn't meet with

institutional investors, right?

A.  Correct.

Q.  And you and Kim Brady did the vast majority of meetings

with institutional investors?

A.  Correct.

Q.  By the way, at that SoftBank meeting, you don't remember

Trevor making any factual representations that were inaccurate, do you?

A.  I don't have an exact recollection of exactly what was said.

Q.  You don't have any recollection of him making factual misstatements at the SoftBank meeting?

A.  The reason that we were having the discussion afterward was because he did go off the presentation.

Q.  It was a lot of selling, correct?

A.  Yes.

Q.  Puffing?

A.  What do you mean by "puffing"?

Q.  Well, I'm going to ask you, because that's what you told the government in one of your interviews.

MS. ESTES:  Objection to the comment.

THE COURT:  Sustained.

Q.  Isn't it a fact, Mr. Russell, that you told the government in one of your interviews that you don't remember Trevor making any factual representations that were inaccurate?

MS. ESTES:  Objection.  Calls for hearsay.

THE COURT:  Overruled.

A.  The concern from that meeting and the exchange was his tendency to exaggerate.

Q.  Are you telling me that you don't remember what you said to the FBI or -- I don't mean the FBI, the U.S. Attorney's Office,

M9KHMil5                    Russell - Cross

or --

            MS. ESTES:  Objection.

Q.   -- are you telling me that you didn't say that?

A.   That I didn't say what.

Q.   That he didn't make factual misrepresentations?

A.   I said I didn't remember specific representations that were made.

Q.   OK.  Let me show you what has been marked as 3544-006 at page 14.  That's only for the witness.  And just take a look at that and read it to yourself, and let me see if that refreshes your recollection that Trevor made no factual representations that were inaccurate at the SoftBank meeting.

A.   I don't -- I don't remember him making factual representations that were inaccurate.  I don't remember him not doing that either.  I'm saying I don't remember the exact conversation from that meeting.  I do remember him going off the presentation, off the script.

Q.   And selling?

A.   Yes.

Q.   And so you have no memory of factual misrepresentations?

A.   I couldn't -- I couldn't say he made this and this and this representation inaccurately in that meeting today, no.  I don't have a transcript or anything like that.

Q.   Now, the company, Nikola, had regular board meetings, correct?

A.   Correct.

Q.   Kept board minutes, correct?

A.   Correct.

Q.   And board members were able to question decisions and have free-flowing conversation?

A.   Yes.

Q.   Request more information where they needed it?

A.   Yes.

Q.   I think you mentioned before that Trevor went to the board for permission to produce -- to purchase, excuse me, the electrolyzers?

A.   Yes.

Q.   Trevor went to the board for permission to go forward with the Badger?

A.   Yes.

Q.   Trevor and others brought the decision to go public to a board vote?

A.   Yes.

Q.   There was some discussion yesterday with respect to Government Exhibit 218 -- which you can post if the witness needs it.  I'm not sure you'll need it -- about Trevor's father coming off the board when the company went public?

A.   Yes.

Q.   It turns out Trevor's father did come off the board when the company went public?

M9KHMil5                      Russell - Cross

A.   Correct.

Q.   The board composition was changed?

A.   It was.

Q.   Very new and very qualified members came on?

A.   Yes.

Q.   Now, another thing that Trevor did not participate in was earnings calls, right?

A.   Correct.

Q.   Can you tell the jury what an earnings call is.

A.   Every quarter after you issue your report for the quarter to the -- and file it with the Securities and Exchange Commission, you also typically get on a telephone call with the analysts who follow your stock, and you give them a presentation in more detail and allow them to ask questions which you try to answer.

Q.   And you participate in earnings calls typically, right?

A.   I did.

Q.   And Kim Brady?

A.   Yes.

Q.   Sometimes Britton Worthen?

A.   He was there, yes.

Q.   Like a moderator?

        THE COURT:  Mr. Russell, did you answer that question?

A.   I said correct.

Q.   Let me show you DX 1539, which I think has been admitted

pursuant to GX S-6, or if it's not, I'm going to offer it pursuant to GX S-6.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1539 received in evidence)

MR. MUKASEY:  Let's show the witness and the jury DX 1539, page 4, last bullet three.

BY MR. MUKASEY:

Q.  Mr. Russell, do you see where it says, "Our bundle leasing model for fuel cell electric vehicles"?

A.  Yes.

Q.  This last sentence of that bullet says:  "We're working with the customers who have the largest dedicated route, long haul fleets initially, and we simultaneously build the hydrogen stations tailored to serve their needs."

Now, you weren't building any hydrogen stations at the time of that statement, correct?

A.  Correct.

Q.  And when you said "build," we simultaneously build the hydrogen stations you suit their needs, you were speaking using the present tense, correct, we build?

A.  Yes, in that sentence, yes.

Q.  OK.  When you made that statement, you were talking about Nikola's model, correct?

A.  Correct.

Q.   Then in the -- staying in the same paragraph, Chris, lower down -- you said:  "And we offer do all of that at a price that is competitive with their existing diesel fleet."

          Do you see that?

A.   Yes.

Q.   Now, when you said we do all of that at a price that is competitive with their existing diesel fleet, you were speaking in the present tense, right?

A.   I think there's a missing "to" there, and we offer to do all of that at the price that is competitive.

Q.   OK.  Well, doing it is the present tense, right?

A.   I'm making the offer, yes.

Q.   OK.  Now, let me show you DX 736.

          You can take that down.

          And, again, you may have looked at this a little earlier, but I just want to highlight it.  Turn to the center of page 48.  This is the July 17, 2020, prospectus.

          And, Chris, can you highlight the words "Energy business unit."

          See that, Mr. Russell?

A.   Yes.

Q.   ". . . is developing and constructing a network of hydrogen fueling stations."

          Now, when the company made that statement on July 17, 2020, they were not developing and constructing a network of

hydrogen fueling stations at that moment, right?

A.  We were in the development, yes, but we weren't constructing.

Q.  OK.  And that was the present tense, developing and constructing, right?

A.  Yes.

Q.  You weren't, by the way, trying to mislead or misrepresent anything by using the present tense, were you?

A.  Not in that sentence, no.

Q.  Not in any sentence, I'm assuming?

A.  It was not our intent ever.

Q.  Right.  You read a couple of sentences now where you used the present tense, and I'm simply saying you were not trying to deceive anybody?

A.  I would agree with that.

Q.  You were talking about the model?

A.  Yes.

Q.  Now I'm also going to show you DX 156, just for the witness, and this is a transcript of an earnings call on August 4, 2020.

        Do you recognize that?

A.  Yes.

        MR. MUKASEY:  I'm going to offer that pursuant to DX S-6.

Q.  Mr. Russell, this is a transcript of an earnings call,

correct?

A.   It appears to be, yes.

Q.   Does it appear to you to be fair and accurate?

A.   Often these transcripts were made with voice recognition technology, and they do typically contain a lot of errors.  I haven't seen this particular transcript before, actually.

Q.   And they get filed publicly?

A.   I'm not certain.

Q.   OK.  You can set that aside, and I want to ask you a few questions about the compensation system that you talked about this morning.

     You mentioned that your salary is $1, is that right?

A.   Correct.

Q.   And you have two kinds of stock that supplement that salary, correct?

A.   Two tranches on different terms.  It's the same stock, of course.

Q.   Right.  And one tranche is the stock that vests in three years, which would be the equivalent of a salary, I think you said?

A.   That was the idea, yeah.

Q.   And bonus stock that serves as the equivalent of a cash bonus, right?

A.   That was the idea, yes.

Q.   And they both vest over three years, correct?

A.   In the case of the bonus stock, it vested over the three years plus it had price targets you had to hit, too.  So it was a double trigger.  You had to hit both.

Q.   Right.  The stock price had to hit certain numbers to trigger your bonus?

A.   Correct.

Q.   OK.  What was the approximate value of the compensation you received in cash and stock in 2020, up to September 2020, let's say?

A.   Value based on what?

Q.   Value based on the market price of the stock, ballpark.

A.   I don't recall the exact number.  The base -- the base number was 6 million, I believe.

Q.   And --

A.   I don't recall the value at the other.  But, of course, that was stock that you had to -- that was unvested at the time.

Q.   It was unvested, but was it more than $10 million?

A.   If you include both tranches, I believe it was, yeah.

Q.   Was it more than $20 million?

A.   I think it was.

Q.   Thirty?

A.   I don't recall the total.

Q.   Was it close to 100 million?

A.   I'd have to look at it.  I mean, there's a document that

M9KHMil5                        Russell - Cross

describes it with a Black-Scholes --

Q.  I'm just asking you to give your best guess.

MS. ESTES:  Objection.  Calls for speculation.

THE COURT:  Overruled.

And best guess as of September, Mr. Mukasey?

MR. MUKASEY:  Yes.

A.  So the value at the time of the grant?

Q.  The value as of September 2020, was it somewhere close to $100 million?

A.  That's a Black-Scholes calculation.  In September it would have been -- that would change every day based on the price of the stock, of course.

Q.  I'm just asking you to approximate what the value was of the stock you owned in Nikola around September 2020.

A.  The stock I owned or the compensation stock?

Q.  The compensation stock.

A.  I couldn't say.

Q.  But you could say it was more than 20 or $30 million?

A.  Likely, yes.

Q.  Fifty?

A.  Likely, yes.

Q.  You also mentioned shares that Trevor gave you, essentially, or placed into this entity called T & M Residual, right?

A.  We talked about T & M Residual.

Q.   T & M, yes.

     How many shares did Trevor put in there on your behalf?

A.   The shares weren't given to me in T & M.  The shares were placed in T & M, and the idea was that I would get the upside on those shares.  He retained the base value at that time.

Q.   Have you recognized the upside on those shares?

A.   To an extent.  I still own the -- I now own shares outright that were based on the upside of those shares, yes.

Q.   How much are those shares worth?

A.   Today?

Q.   Yes.

A.   I haven't seen the price today, but, say, yesterday, they would be worth in the range of 19 or $20 million -- sorry, 190 to $200 million, sorry.

Q.   190 to $200 million?

A.   Correct.  Now, that includes all the T & M's.  I also contributed shares into T & M as well.

Q.   Understood.  Let's talk first --

A.   Those were shares that I had purchased.

Q.   I understand.

          THE COURT:  Before you move on, Mr. Mukasey.

          Mr. Russell, I believe you used a term Black-Scholes.

          THE WITNESS:  Correct.

          THE COURT:  What is that?

M9KHMil5                        Russell - Cross

THE WITNESS:  Black-Scholes is a mathematical method for estimating the value of a stock that you don't -- either don't own completely yet or which cannot be exercised except in the future.  So --

BY MR. MUKASEY:

Q.  And that's because you had vesting restrictions, right?

A.  Correct.

Q.  Now, Mr. --

A.  Because they're worth nothing if you can't -- if you can't do anything with them right now, so what is the value now of something that's in the future?  That's where a Fischer Black and Myron Scholes got a Nobel Prize for coming up with a way to be able to estimate that, and that's the Black-Scholes method.

Q.  But yesterday, as of yesterday, it's about $200 million?

A.  No, that would be the price -- that would be the -- if you sold them all yesterday, that would be what the value would be.

Q.  If you sold them all yesterday --

A.  Yeah.

Q.  -- that's what the value would be?

A.  Yeah.

Q.  OK.  Now I want to talk to you about some of the podcasts that the government played.

Take a step back.  First of all, Nikola had a marketing department I think you mentioned, right?

A.  Yes.

Q.  And that was comprised of Vince Caramella.  He's like the global head of marketing?

A.  Yes.

Q.  Someone named Stephanie Fleck?

A.  Yes.

Q.  We talked a little bit about Colleen Robar?

A.  Yes.

Q.  And the marketing department reported to you in the org chart, right?

A.  Actually, I think, depending on the date --

Q.  I'm talking up to September 2020.

A.  I'm not sure.  I'd have to see an org chart of that date.

Q.  You certainly had oversight of them, right?

A.  Generally, they reported to Trevor.

Q.  But these people were involved with you; you were included?

A.  Oh, yes, I was involved, yes.

Q.  OK.  Now, one of the ways you were involved is the marketing department scheduled public appearances for Trevor, right?

A.  Yes.

Q.  And for you?

A.  Yes.

Q.  And for Kim Brady?

A.  Yes.

Q.  And for others within the company?

A.   Yeah, they tried to keep a master coordinated calendar.

Q.   Right.  And since you've mentioned that, I'm going to show you what is in evidence as DX 1262.  Maybe we can go to the second page.

     Is that an example of the master calendar you're talking about?

A.   Yes.  Actually, this is a report.

Q.   Compiled by the marketing department, right?

A.   Yeah.  Some of -- I think some of it might have been what had already happened, and then some are prospective.

Q.   Right.  This is for the second half Q3 of 2020, right?

A.   Yep.

Q.   And it lists a bunch of media appearances.  And you're listed in there, and Trevor's listed in there?

A.   Yes.

Q.   That's to keep members of leadership and members of the marketing department apprised of who's going on what show and who's giving what interview, right?

A.   Correct.

Q.   Now, with respect to you, not necessarily on the calendar, but just generally speaking, you've given interviews to a -- I think we've seen Trucks.com, right?

A.   I believe so, yes.

Q.   And you've given interviews to Fox Business, right?

A.   Yes.

M9KHMil5                    Russell - Cross

Q.   You've given interviews to the Business Insider?

A.   I believe so, yes.

Q.   You've given interviews to, I think it's an automotive periodical called *Benzinga*?

A.   Yes.

Q.   And one called FreightWaves?

A.   Yes.

Q.   And you go on these platforms or outlets to promote Nikola, yes?

A.   Yes.

Q.   To promote the vision of the company?

A.   Yes.

Q.   Let me show you an email from December 2019, which is marked as DX 1121.  This is only for the witness.

A.   I see it.

Q.   You got that.

     And the top of that is from you to Vince Caramella. You see that?

A.   Vince Caramella, Stephanie Fleck, Colleen Robar, Trevor.

Q.   Yes.  And the subject is Fox Business "Claman Countdown." That's a TV show, right?

A.   Yes.

     MR. MUKASEY:  Defense offers DX 1121 for identification into evidence.

     MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1121 received in evidence)

BY MR. MUKASEY:

Q.  If we start at the bottom, Mr. Russell, this is December 17, 2019, before the company went public, correct?

A.  Correct.

Q.  At the bottom there's a link from Colleen Robar to the rest of the group to a Fox Business video, right?

A.  Correct.

Q.  And she says, "Nice job, Trevor.  Let's book some more national TV."

See that?

A.  Yes.

Q.  And it gets forwarded up to Vince Caramella who says, "Nice job, Trevor."

You see that?

A.  Yep.

Q.  And then you say, "Wow.  I don't see how that could have gone better.  Very well handled, Mr. Chairman."

See that?

A.  Yeah.

Q.  OK.  Now I want to direct your attention to some of the audio interviews and podcasts the government played for you this morning.  We're going to play, with the Court's permission, some additional clips from those interviews that

are already in evidence that the government played for you pursuant to Rule 106.

Chris, can you pull up DX 494 and 494-T, please. That's clip one.

(Audio played)

MR. MUKASEY:  Now, Chris, you can take that down and move to DX 501-B, as in boy.

(Audio played)

Q.  You heard Trevor refer to the Robin Hoods and Warren Buffetts, right?

A.  Yes.

Q.  Now, the Robin Hoods you described earlier as people who tend to be retail investors or people who are investing maybe without the help of a bank or a brokerage, right?

A.  Correct.

Q.  And Warren Buffett, I'm sure you're familiar is a famous long-term buy-and-hold investor?

A.  Correct.

Q.  Now, the last clip I want to play is that one, right?

The government played about ten other -- eight other podcasts for you yesterday and today.  You recall that, Mr. Russell?

A.  Yes.

Q.  Now, with respect to those other podcasts, any of the podcasts they played for you, you did not watch any of those

podcasts at the time that they were made, is that correct?

A.  No, I did not.

Q.  To the extent they were circulated to you by Nikola's marketing team, you did not watch them, right?

A.  Correct.

Q.  And, in fact, am I correct that you never watched any of these clips until the government played them for you?

A.  No, there were exceptions.  The one that you mentioned where Colleen Robar forwarded the link, I did look at that one. So if someone pointed out that, hey, here's one -- here's one everybody should look at, I would occasionally look at those, but generally, no.

Q.  Generally, you did not look at the podcasts?

A.  Correct.

Q.  And with respect to the podcasts that the government played for you in court yesterday and today, did they play for you the entire podcast or just a snippet?

A.  Just a clip.

Q.  OK.  Are you aware of how long some of these podcasts are?

A.  Generally, yeah.  Some of them are shorter.  Some of them are much longer.

Q.  So whether it was shorter or longer, you only got the little snippet that the government played, right?

A.  Yeah, typically, correct, that's all I heard.

Q.  OK.  So they didn't play any of the podcasts that they

played in court here for you from end to end, beginning to end?

A.  There may have been an exception for one of the shorter ones that I saw the whole thing.

Q.  OK.  And you don't know, if you didn't see the full podcast, what Trevor may have said earlier in the podcast or what he may have said later in the podcast after the clip, right?

A.  Correct.

Q.  And you don't know what the podcaster might have asked Trevor before the clip you saw or after the clip you saw?

A.  Correct.

Q.  And to the extent that some of these podcasts have disclaimers at the beginning, you didn't hear those either?

A.  No.

Q.  By the way, when you heard these clips when the government played them for you, did they select the portion for you to listen to, or did you select the portion to listen to?

A.  They selected.

Q.  Was there ever an occasion where you directed them to something that you wanted them to hear, or did they always direct you to something they wanted you to hear?

A.  Typically, I was listening to what they wanted to play for me.

Q.  OK.  Did they ever show you -- withdrawn.

        By listening to only the clip they played, you're

M9KHMil5                          Russell - Cross

deprived of the full context of the podcast, correct?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Did you hear the full context of the podcast, yes or no?

MS. ESTES:  Objection.

THE COURT:  Sustained as to form.

Q.  Did you hear the full podcast for any of these?

A.  Like I said, maybe one or two of the shorter ones.  The rest, I did not.

Q.  Not the longer ones?

A.  Correct.

Q.  Would you agree, in general, that the context in which things are said matters?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  When you listen to the podcasts, were you provided -- with the government, were you provided a transcript?

A.  Typically, yes.

Q.  OK.  Were you provided a full transcript or just a transcript of what clip was played?

A.  Usually just the excerpt.

Q.  Other than what the government played for you, are you aware of how many other podcasts Trevor did in 2019 and 2020?

A.  No, I don't have a total master of that.

Q.   And when I say "podcasts," I also mean television

interviews.  Do you understand that?

A.   All media appearances?

Q.   Right.  So you don't know if you heard ten podcasts out of

a thousand or ten out of 12, right?

A.   I don't know the exact number, no.

Q.   Do you know which ones were posted on Nikola's social

media?

A.   No.

Q.   Do you agree, Mr. Russell, that if someone snipped a little

portion of one of your interviews from out of a longer

interview, it could distort what you meant?

          MS. ESTES:  Objection.

          THE COURT:  Sustained.

Q.   Now, let me direct your attention back to some of the other

podcasts that Trevor appeared on.

          The government played for you on direct something

called the Hitting the Mark podcast.  Do you recall that?

A.   Yes.

Q.   And we just played some additional clips from that podcast.

Let me show you, and only the witness, what's been marked for

identification as DX 303.

          Do you recognize that?

A.   Yes.

Q.   That's an email from Colleen Robar to Trevor and to you and

others?

A.  Correct.

Q.  And the subject is the podcast that was played before, Hitting the Mark, right?

A.  Correct.

MR. MUKASEY:  Defense offers 303 for identification into evidence.

MS. ESTES:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 303 received in evidence)

MR. MUKASEY:  May we publish it to the jury?

THE COURT:  You may.

BY MR. MUKASEY:

Q.  What's the date on this email, Mr. Russell?

A.  July 4 of '20.

Q.  It's from Colleen Robar, the outside PR specialist for Nikola, to you, Trevor, and others.  Do you see that?

A.  I do.

Q.  Can you read what Colleen Robar sent starting with "This just."

A.  "This just went live today," and then there's the link, and "Good job, Trevor."

Q.  Government also played for you -- you can take that down, Chris -- some other interviews, but I'm going to add in this clip, what has been marked for identification as DX 1076 for

identification, only for the witness.

Do you recognize that?

A.  I do.

Q.  That's a text message between you and Trevor Milton dated June 19, 2020?

A.  Yes.

MR. MUKASEY:  Defense offers 1076 for identification into evidence.

MS. ESTES:  Your Honor, may we have a sidebar?

THE COURT:  Sure.

(Continued on next page)

(At the sidebar)

THE COURT:  Is this a text or an email?

MR. MUKASEY:  Text.

MS. ESTES:  Your Honor, I think the problem is this is a text chain between Mr. Russell and Mr. Milton, but it's redacted and I think without giving the witness the full context, it's not really fair to ask him about this.

MR. MUKASEY:  I only redacted it because I thought you'd object to the full context.  We have the full context.

MS. ESTES:  We thought you were objecting to it because we understand you didn't want to get into religion.

MR. MUKASEY:  We offered it, we redacted it, we're not trying to have it both ways.

Let me let you in on what's going on here.  This is a text message similar to the last few we've seen where Trevor goes on TV and they say, great job, Trevor.  This one happens to say from Mr. Russell, I know you did well because you're winning the battle and the war --

MR. CARUSO:  You're a warrior in heaven.

MR. MUKASEY:  It's a Mormon reference.  I didn't think it was appropriate to put in front of the jury, I redacted it for that reason, and now I guess you want me to unredact it. I'm happy to do that.

MR. PODOLSKY:  I think this is a 403 issue that the defendants brought up.  This is bringing religion into the

case.

MR. MUKASEY:  That's why we redacted it.

MR. PODOLSKY:  We don't need to start putting text messages in front of the jury, that he's a warrior in heaven.

MR. MUKASEY:  That's why we redacted it.

MR. PODOLSKY:  You can't give him part of it and say don't give him the part we don't want.  I don't think you should have a sanitized version so the jury has a misleading understanding of what the text is about.

THE COURT:  I guess I'm not understanding the government's position.  I'm unfamiliar not only with Jewish holidays, but with Mormon phrases.

MR. CARUSO:  Scripture.

THE COURT:  Is a warrior for heaven, is that a thing?

MR. PODOLSKY:  I'm not going to represent I understand, but the point is the text message is actually a religious illusion if you understand the whole thing.  What they want to do is extract something favorable out of this text message that actually has a broader context.  We think, under 403, it's not a fair thing.

THE COURT:  That's not what they want to do.  They're happy to offer the entire thing.  So you're saying it shouldn't come in redacted and it shouldn't come in whole.

MR. PODOLSKY:  Either way, it's a 403 problem is our point.

MR. MUKASEY:  It's commentary on a TV show.

THE COURT:  I'm going to allow it redacted.

MR. MUKASEY:  Thank you.

(Continued on next page)

(In open court)

MR. MUKASEY:  Defense offers 1076 into evidence.

THE COURT:  It will be received.

(Defendant's Exhibit 1076 received in evidence)

Ladies and gentlemen, you see that part of this is redacted.  You should not concern yourselves with what's behind the black ink.

Q.  Mr. Russell, this is a text message that you sent to Trevor Milton on June 19th, 2020.  Do you see that?

A.  I do.

Q.  Can you read what you wrote to Mr. Milton at 10:05:36.

A.  Just caught your CNN interview.  You have always had a gift for battle in the war of ideas, but you have clearly worked and focused yourself to a whole other level.  So cool for me to see it.

Q.  That's what you said after the CNN appearance; correct?

A.  Correct.

MR. MUKASEY:  You with can those down, Chris, and let me show what's been marked for identification, just for the witness, DX-968.

Q.  Do you recognize that, Mr. Russell?

A.  I do.

Q.  That's an email from Colleen Robar, dated July 8th, to you, Mr. Milton, Kim Brady, and others?

A.  Correct.

Q.   And the subject is CNN Markets Now interview.  Do you see that?

A.   Yes.

        MR. MUKASEY:  Defense offers 968 into evidence as Defense 968.

        MS. ESTES:  No objection.

        THE COURT:  It will be received.

        (Defendant's Exhibit 968 received in evidence)

Q.   Taking it from the top, Mr. Russell, now that the jury can see it, this is Colleen Robar to you on Wednesday, July 8th, 2020; correct?

A.   Correct.

Q.   Subject line is CNN Markets Now interview; correct?

A.   Yup.

Q.   And it includes a link to a CNN video; right?

A.   It does.

Q.   And can you read Colleen Robar's response to the group.

A.   Trevor did a great job answering some tough questions.

        MR. MUKASEY:  Now, can you take that down, Chris.

Q.   Ms. Estes asked you some questions this morning about the TeslaCharts video, right, the podcast?

A.   Correct.

Q.   And she showed you an email and she showed you some text messages.  You never listened to the TeslaCharts podcast in 2020; correct?

A. Correct.

Q. You don't remember a conversation that you had with Trevor regarding the things he said on that podcast in 2020; right?

A. I don't remember a specific conversation at the time. Doesn't mean we didn't have it, I just don't remember.

Q. You can't point to any conversation where you told Trevor what you said on that podcast was inaccurate?

A. That particular podcast?

Q. Correct.

A. No, I don't recall doing that, no.

Q. And Ms. Fretheim's communications with you by email and by text message did not prompt you to have any conversation that you know about with Trevor?

A. I mean, I don't remember having a conversation or not having one. I just don't remember.

Q. You don't have any note or record memorialization of any conversation with Trevor; right?

A. Not about that one, no.

Q. And sitting here right now, you cannot say that you ever spoke to Trevor about that podcast?

A. Correct, I don't recall that.

Q. And I think you said this morning you gave no direction to take down the TeslaCharts podcast because I don't think you even knew it was up; right?

A. When you say up, do you mean there was a link on the

website?

Q.  On the website.

A.  Yeah, I didn't know it was linked.

Q.  So you gave no direction to take it down, obviously?

A.  No, I did not.

Q.  Now, a couple of weeks after this TeslaCharts podcast was brought to your attention, another podcast or interview was brought to your attention.  Let me show you DX-362 for identification.

        MR. MUKASEY:  That's only for the witness.

Q.  Do you recognize this email, Mr. Russell?

A.  I do.

        MR. MUKASEY:  Defense offers 362 for identification into evidence.

        MS. ESTES:  No objection.

        THE COURT:  It will be received.

        (Defendant's Exhibit 362 received in evidence)

        MR. MUKASEY:  May we publish it for the jury, Judge?

        THE COURT:  You may.

Q.  Take us through here, Mr. Russell.  This is from Colleen Robar, the PR consultant, to Trevor and you and others; correct?

A.  Correct.

Q.  Dated Friday, July 31st; right?

A.  Correct.

M9KCmil6                    Russell - cross

Q. About two weeks after the TeslaCharts issue was brought to your attention?

A. I believe that's correct.

Q. And Ms. Robar says here's the link to watch Trevor's interview on Barron's Roundtable, it just aired on Fox Business. And you see the links she forwarded?

A. Yes.

Q. And what does she say?

A. Nice job, Trevor.

Q. Would you agree with me that "Nice job, Trevor" is positive feedback?

A. Yes.

Q. You spoke a little bit this morning about the Badger, Mr. Russell, and I want to ask you some followup questions on that.

The Nikola board approved the Badger; correct?

A. Correct.

Q. Trevor took it to the Nikola board; right?

A. He did.

Q. You voted in favor of the Badger; right?

A. I did.

Q. In the press release that we've seen, you told the world that you thought the Badger was a game changer; right?

A. Yes, I believed that at the time.

Q. And you did believe that at the time?

M9KCmil6                        Russell - cross

A.  Yeah, there was no fuel cell passenger pickup like that anywhere in the world.

Q.  And to the extent that you disagreed in any sense with the Badger, it was a business decision that you disagreed with Trevor about; right?

A.  Yeah, it was the business strategy, not the substance of the -- I believe that was a much better-looking vehicle than the cyber truck.

Q.  It was badass looking, right, it was a killer-looking car?

A.  I liked the way it looked, I did.

Q.  So your disagreement with him was simply --

A.  Economics.

Q.  Economics, not legal?

          MS. ESTES:  Objection.

          THE COURT:  Overruled.

A.  It was economic and strategic.

Q.  Fair enough.  Let me show you GX-274, something the government showed you this morning.  If you look at page 2, I think it's the third to last bullet.  That's an email from Kim Brady, right, giving his sort of economic assessment of the Badger?

A.  Yes.

Q.  And do you see the bullet that begins, "When investors understand"?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Q.  Can you read that.

A.  When investors understand we are signing up for massive losses over the next five years, I'm afraid the stock price will take a big hit.

Q.  So that's Kim Brady focusing on the stock price; right?

A.  Correct.

Q.  Go up about three bullets to the sentence that begins "I question."

A.  I question, once the headline wears off and the investors and analysts understand what we had to give up, whether any gain in stock price will stay level.

Q.  That's Kim Brady speaking about the stock price; right?

A.  Yes.

Q.  With respect to building the Badger, I think you said earlier that you understood that Trevor wanted a functioning Badger?

A.  Yeah, he wanted a functioning prototype to unveil.

Q.  And a functioning prototype showed up by the end of 2020; right?

A.  Yeah.  The issue in the early language was he wanted it production ready, which that's a different standard.

Q.  Understood.  Let me ask you about the basis of this prototype.

    You knew that the Badger prototype was, in part, based on a donor vehicle; right?

M9KCmil6                        Russell - cross

A.   Yes.

Q.   And in the industry, it's okay to use donor parts in building trucks, that's normal; right?

A.   That's not unheard of.

Q.   Mr. Russell, on September 19th, Nikola received a grand jury subpoena; correct?

A.   I can't remember the exact date.  It sounds like the right timeframe, though.

Q.   And you understood that a grand jury subpoena means an investigation is beginning; right?

A.   Yes.

Q.   And Nikola decided to cooperate with that investigation?

A.   Correct.

Q.   Meaning they made employees available to speak to the government; right?

A.   Correct.

Q.   Including yourself?

A.   Correct.

Q.   Meaning they provided hundreds of thousands, I think well into the millions of documents to the government as part of that cooperation; right?

A.   We did produce a large number of documents and electronic records.

Q.   And you, yourself, met with federal prosecutors, ballpark, eight, nine times?

A.   Multiple times.

Q.   And you're aware that before this trial, we asked, defense asked to meet with you?

A.   Yes.

Q.   And you declined?

A.   Yes, on advice of counsel.

Q.   And Nikola's cooperation extended to meetings, not just with you, but with many other employees and the government; correct?

A.   Correct.

        MR. MUKASEY:  May I have one moment, your Honor?

        THE COURT:  Yes.

        (Pause)

Q.   Now, Nikola's cooperation with this investigation is continuing even now; right?

A.   It is.

Q.   And your testimony here is part of that cooperative effort, yes?

A.   Yes.  I think I would have appeared here regardless, but --

Q.   But Nikola continues to cooperate here?

A.   They do.

Q.   I want to close out, and I'm probably going to be about ten more minutes, I want to show you a video, Mr. Russell, April 6th, 2020 was an analyst day; correct?

A.   That sounds correct.  I'm not sure of the exact date unless

you're showing me something.

Q.   I can show you GX-281 just to refresh your recollection.

A.   Yup.  That looks good.

Q.   And a video was shot for that day; right?

A.   Correct.

Q.   And you were in the video?

A.   I was.

Q.   And you've seen that video, you recognize it?

A.   Yeah.

Q.   And Kim Brady was in it and Trevor was in it and Dale Prows was in it?

A.   Correct.

Q.   And it was professionally produced and kind of like a mini movie type of thing?

A.   Yes.

        MR. MUKASEY:  My understanding, your Honor, is that GX-432, which is the full analyst video, is in evidence.  But, Chris, I'm going to ask you to play a little clip, which we've marked as DX-1516.

        (Video played)

Q.   Right there, you said the only byproduct is water, which is what we started out with when we made the hydrogen in the first place.  Did you hear that?

A.   Yes.

Q.   You didn't make the hydrogen in the first place; correct?

M9KCmil6                          Russell - cross

A.  No.

Q.  You got a third-party supplier to give it to you; right?

A.  Correct.

Q.  And that was Air Liquide?

A.  It could have been.  It was an industrial gas company, I don't remember which one at the time.

Q.  But when you said in that video we made the hydrogen in the first place, you did not think or intend to make a misrepresentation, did you?

A.  I was just saying that's what we started out with in the first place was water.  The water was broken apart to make the hydrogen.

Q.  When you said we made the hydrogen, you didn't mean Nikola made the hydrogen, did you?

A.  No, I did not.

Q.  And you were not trying to mislead anybody?

A.  No, I was not.

        MR. MUKASEY:  Now, Chris, could you keep playing.

        (Video played)

Q.  Mr. Russell, Dale Prows wasn't actually pumping fuel into that Nikola Two; correct?

A.  No, we had to do multiple takes.  We were just demonstrating the fueling, but that's how we fueled the trucks, with those.

Q.  It was a simulation; right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9KCmil6                    Russell - cross

A.  Correct, for purposes of the video.

Q.  And the simulation was actually your idea; correct?

A.  Yeah, I wanted to show that, the fueling.

Q.  And you were not trying to mislead anybody by doing a pretend fueling; right?

A.  No, this was important information.  This was the only hydrogen dispensing station in Arizona at the time.

Q.  And the way you did it, by simulating a fueling, you didn't intend to mislead anybody?

A.  No.

Q.  Now, you testified at the end of your discussion with Ms. Estes about what you called an intervention.  This intervention, tell us what day it occurred.

A.  I don't recall the date.

Q.  Tell us what time it occurred.

A.  During business hours.

Q.  You're unable to say exactly what date or what time; is that right?

A.  No, we didn't -- I didn't keep any notes.

Q.  And as a lawyer, you know that people keep notes to memorialize important events; right?

A.  Yes.

Q.  And you did not keep any notes from this intervention?

A.  No, this was very personal between us and Trevor.

Q.  And did you write a memo related to this?

A.  No.

Q.  Did you make a journal entry related to this?

A.  No.

Q.  A diary entry?

A.  No.

Q.  Did you send a report to Trevor?

A.  No.

Q.  Did you put anything in writing?

A.  No.

Q.  Did you give Trevor any directions in writing?

A.  As part of this meeting?

Q.  Correct.

A.  No.

Q.  You did not memorialize this so-called intervention at all?

A.  No.

Q.  The purpose of memorializing something is to keep a record that it occurred; right?

A.  Yes.

Q.  And you did not memorialize the intervention in an email or any other written form?

A.  No.

Q.  And you certainly didn't put anything in writing to Trevor?

A.  No.

        MR. MUKASEY:  One moment, please.

        (Pause)

                I have no further questions.

                THE COURT:  Any redirect?

                MS. ESTES:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.  Good afternoon, Mr. Russell.

A.  Hello.

Q.  So Mr. Mukasey just showed you an analyst day video where you were fueling or Mr. Prows was fueling the Nikola Two.  Do you recall that?

A.  Yes.

Q.  And Mr. Russell, your hydrogen station at headquarters, the dispensing station, it could actually fuel a truck; right?

A.  That was the only way we could fuel that truck, yes.

Q.  How long would it take to fuel the truck?

A.  Depends on how much fuel you were trying to get on board. If you went from empty to full, it would take probably more than an hour.

Q.  That's not the kind of thing you do on a video for investors, right, an hour-long fueling?

A.  No.

Q.  Mr. Russell, I think Mr. Mukasey asked you on cross examination about the Nikola One In Motion video.  Do you recall that?

A.  I do.

Q.  And that's the video where it looks like the truck is driving down a road; right?

A.  Correct.

Q.  Mr. Russell, based on your time at Nikola, do you have an understanding of whether that prototype could actually drive under its own power?

A.  As I sit here today?

Q.  Yes.

A.  Yes, it was not able to drive under its own power.

Q.  So that truck could not drive under its own power like it looks like in the video; right?

A.  Correct.

Q.  So Mr. Russell, that's different from the fueling of that Nikola truck, right, because the station could actually fuel the truck; right?

A.  In that way, yes.

        MS. ESTES:  Ms. Wolfson, can you pull up Defendant's Exhibit 1539.

Q.  Mr. Russell, do you recall being asked about this on cross examination?

A.  Yes.

Q.  And this was the Nikola VectoIQ transaction announcement call?

A.  Yes.

        MS. ESTES:  Ms. Wolfson, could you zoom into the

bottom portion of this page, the disclaimer.

Q.  Mr. Russell, could you read the first couple of sentences after that second bullet there that starts with "I would like to begin by reminding everyone..."

A.  I would like to begin by reminding everyone that the discussion today may contain forward looking statements, including, but not limited to, with regards to the VectoIQ and Nikola's expectations or predictions of future financial or business performance or conditions.

Q.  Mr. Russell, defense counsel didn't show you this disclaimer about forward looking statements, did he?

A.  It was on the first page here, but we didn't read it, no.

Q.  And he asked you some questions about context.  Do you recall those questions?

A.  Yes.

Q.  He didn't give you the context for your statements in this presentation by showing you this disclaimer, did he?

A.  No.

        MS. ESTES:  Ms. Wolfson, can you turn to page 4 of this.  Ms. Wolfson, can you zoom in there.

Q.  Mr. Russell, do you recall defense counsel asking you some questions about the last bullet here?

A.  Yes.

Q.  And the first sentence of that last bullet refers to the bundled leasing model; is that right?

A.   Correct.

Q.   So this paragraph is about Nikola's model; right?

A.   Correct.

Q.   And that was something Nikola had not achieved yet; right?

A.   Correct.

Q.   So everything in this paragraph relates to Nikola's plans for the future; is that right?

A.   Yes.

          MS. ESTES:  Ms. Wolfson, let's take that one down.

          Ms. Wolfson, can you pull up Government Exhibit 520, which is in evidence.

Q.   Mr. Russell, what's the date of the tweet on the bottom there?

A.   June 9th of '20.

Q.   And Mr. Milton there says, it wasn't the physics, it was the cost of stations and energy, both of which Nikola has solved.

          In your view, is that a statement about the future or something else?

A.   The future.

Q.   Is there any sort of forward looking statement there?

A.   No.

          MS. ESTES:  Ms. Wolfson, let's take that down.  Can you pull up 521.

Q.   Mr. Russell, looking at the bottom tweet there from

Mr. Milton, can you read the first sentence there.

A.  We are now below $4 per kilogram, which is the lowest in the world.

Q.  Can you read the next sentence.

A.  We started at $16 and now are at $4.

Q.  Mr. Russell, in your view, are those two sentences about the future?

A.  They use the word "now."

Q.  And the next sentence says, "we plan," right, that one's about the future?

A.  Yes.

Q.  So in this tweet, Mr. Milton is distinguishing between what has been done now and what is a plan for the future; right?

A.  Yes.

Q.  And was it true that Nikola was now at $4 a kilogram for the production of hydrogen?

A.  No.

        MS. ESTES:  Ms. Wolfson, let's take that down.

        Ms. Wolfson, can you pull up 525.

Q.  Mr. Russell, can you read the tweet at the bottom there.

A.  We are already under $4, working on $3.

Q.  In your mind, is this a statement about the future?

A.  It says "already."

        MS. ESTES:  Let's take that down.  Ms. Wolfson, can you pull up 531.

Q.  Mr. Russell, can you read the sentences there in Mr. Milton's tweet.

A.  We are less than $4 per kilogram now.

Q.  And what about the next couple of sentences there?

A.  FYI, Nikola changed H2 forever, driving it down from $16 to under $4, along with our partners, Nel.

Q.  In your view, is that a statement about the future?

A.  No, it says "changed."

Q.  Mr. Russell, was this true in June 2020, that Nikola had driven down the costs to under $4?

A.  No.

        MS. ESTES:  Ms. Wolfson, let's take that down and pull up 543.

Q.  Mr. Russell, can you read the below tweet from Mr. Milton.

A.  It's lower now, which is awesome.  @NikolaMotor now has it below $4 per kilogram, which is cheaper than diesel.  Working on sub $2.50 kilogram now.  Excited for Europe market introduction.

Q.  Mr. Russell, in your view, is this a statement about the future?

A.  It uses the word "now."

        MS. ESTES:  Ms. Wolfson, let's take that down.

Q.  Mr. Russell, do you remember Mr. Mukasey asking you some questions about an October 2019 email about preorders for Nikola's trucks?  Do you recall that?

A.   Yes.

Q.   And that was before the company went public?

A.   Yes.

Q.   And the email described these as preorders.  Do you recall that?

A.   Yes.

Q.   And in your mind, is there a distinction between preorders and then the term "binding contracts"?

A.   Yes.

Q.   What's the distinction?

A.   A preorder is a nonbinding indication of interest or a reservation.

Q.   And in your mind, is it important to distinguish between the two?

A.   Yeah, they're different.

Q.   Why are they different?

A.   One can be changed or canceled at any time, the other one is more definite and firm.

Q.   Mr. Russell, do you recall Mr. Mukasey asking you about various board votes in the company?

A.   Yes.

Q.   He asked you about the board vote when Nikola made the decision to go public.  Do you recall that?

A.   Yes.

Q.   He asked you about the board vote related to Nel's

electrolyzers?

A.  Yes.

Q.  And how the board had approved both of those things?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 218.  Can you zoom into the first paragraph at the top there.

Q.  Mr. Russell, can you read the third sentence there that starts with "the most important."

A.  The most important is that I fully control the board at all times and have people who work well with my personality.  I have had a bad board member in the past and refused to ever go down that road again.

Q.  Mr. Russell, can you remind the jury who is Nikola's largest shareholder?

A.  Trevor.

Q.  And what did that mean in terms of control of the company?

A.  Well, he has the largest voice in the board room, represents the most number of shares.

MS. ESTES:  Ms. Wolfson, you can take that down.

Q.  Mr. Russell, do you recall Mr. Mukasey showing you some emails from Colleen Robar?

A.  Yes.

Q.  Who is Colleen Robar?

A.  She's an outside media consultant who has worked with

M9KCmil6                    Russell - redirect

Nikola for several years.

Q.   Did she actually work at Nikola?

A.   No, she's an independent contractor.

Q.   Did she have an office at Nikola?

A.   No.

Q.   Did you discuss with Ms. Robar the status of Nikola's hydrogen stations?

A.   Not typically.  Only in the context of preparing for a media conversation, perhaps.

Q.   Was Ms. Robar read in on the decisions with respect to Nikola's products and technology?

A.   Generally, no.

Q.   Mr. Russell, do you sometimes compliment Mr. Milton on his speaking style?

A.   Yes.

Q.   And why is that?

A.   He's gifted.

Q.   Did you also confront him about the need to be accurate in his public statements?

A.   Yes.  I didn't see those things as mutually exclusive.  I wanted to use his considerable gifts in a way that would be appropriate.

Q.   Mr. Russell, do you recall Mr. Mukasey asking you about some of Nikola's milestones?

A.   Yes.

M9KCmil6                      Russell - redirect

Q.   And you're the CEO of the company.  Do you believe in this company?

A.   Very much so, yes.

Q.   And you've hit some real milestones, haven't you?

A.   We've accomplished a great deal.

Q.   Mr. Russell, you testified on direct about your concern with Mr. Milton's public statements.  Do you recall that?

A.   Yes.

Q.   And does the fact that Nikola has hit some milestones change your concern over Mr. Milton's misstatements?

A.   No.

Q.   Why not?

A.   Well, they needed to be accurate.

Q.   Does the company need to be accurate in all statements they issue to the public?

A.   Yes.

Q.   Why is that important?

A.   So the investors can rely on those statements.

          MS. ESTES:  Nothing further, your Honor.

          THE COURT:  Anything else, Mr. Mukasey?

          MR. MUKASEY:  Nothing further.

          THE COURT:  Thank you.  Mr. Russell, you may step down.

          (Witness excused)

          Government, please call your next witness.

M9KCmil6                        Amzallag - direct

MR. PODOLSKY:  Your Honor, the government calls Stephanie Amzallag.

THE COURT:  Please step up into the witness box and remain standing.

STEPHANIE AMZALLAG,

   called as a witness by the Government,

   having been duly sworn, testified as follows:

THE COURT:  Ma'am, you may be seated.  And that microphone in front of you is flexible, so bring it close to you if you would.  And please begin by stating your first and last name and spelling your first and last name.

THE WITNESS:  Stephanie Amzallag, S-t-e-p-h-a-n-i-e A-m-z-a-l-l-a-g.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Good afternoon, Ms. Amzallag.

A.  Hi.

Q.  Where do you work?

A.  I work at Nikola Corporation.

Q.  When did you start working at Nikola Corporation?

A.  March 2019.

Q.  What is your title?

A.  I'm the social media digital marketing manager.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Q. And have you been in that position since you've started at the company?

A. Yes.

Q. Are you in a particular team or division of the company?

A. I'm on the marketing team.

Q. And again, were you on the marketing team going all the way back to the beginning of your work at Nikola?

A. Yes.

Q. What is the role of the marketing team at Nikola?

A. The role is essentially to drive brand awareness, especially we were in the EV community, so we were a new startup, so that was something, you know, we worked on as essentially driving what we were doing within that industry.

Q. Now focusing on 2020, can you describe what your responsibilities were on the marketing team.

A. Sure. So I was a social media digital marketing manager, so I essentially did everything from content creation, strategy, social listening, analytics, recording, essentially building out our followers across all our social media platforms.

Q. Are you familiar with somebody named Trevor Milton?

A. Yes.

Q. How are you familiar with Mr. Milton?

A. He was the former founder and CEO.

Q. Focusing again on 2020, did you report directly to

Mr. Milton in your role?

A.  No.

Q.  Did you nonetheless interact directly with him in the course of your job duties?

A.  Yes.

Q.  And generally, in what circumstances?

A.  A lot of it was related to social media.  So if, you know, there was something he wanted to post on social media or anything of that nature, he would, you know, either talk to me in person, email, phone, text.

Q.  Was Mr. Milton actively involved in the company's media and social media strategy?

        MR. BONDI:  Objection, form.

        THE COURT:  Overruled.  You can answer.

A.  Yes.

Q.  In fact, when you joined the company, before you came, who ran the company's social media?

A.  Trevor did.

Q.  Now after you started, were you able to post using the company's social media platforms?

A.  Yes.

Q.  Was anyone else at the company?

        MR. BONDI:  Objection.  Timeframe, your Honor.

Q.  Why don't we focus on 2020.

A.  At the time, it was myself and Trevor.

Q.  And, in fact, was that true from the time you started until, say, September 2020?

A.  Yes.

Q.  Did Mr. Milton also do his own media?

A.  Yes.

Q.  Did he run his own social media accounts?

A.  Yes.

Q.  Did he also schedule his own media appearances?

MR. BONDI:  Objection.  Leading.

THE COURT:  Overruled.

A.  Yes.

Q.  In 2020, who would you say directed the overall media strategy of Nikola?

A.  Trevor.

MR. BONDI:  Objection.

MR. PODOLSKY:  Your Honor, I'm going to start a new line of questioning.  I do notice it's just about time, I'm happy to start, but I just want to flag it.

THE COURT:  We can stop there and pick up again tomorrow morning.

Ladies and gentlemen, before we leave tonight, I just wanted to let you know and so that you could plan, next week, Monday, Tuesday are the Jewish holidays, we will not be sitting next week, Monday or Tuesday, that's the 26th and 27th of September.  The following week, on October 5, which is the

M9KCmil6                        Amzallag - direct

Wednesday, it's another Jewish holiday, we will not be sitting that Wednesday.  In the following week, the Monday, which is October 10, is Columbus Day or Indigenous People's Day, however you want to refer to it, that's a national holiday, we will not be sitting on Monday, October 10.  So September 26, 27, October 5, and October 10.

But that is it for the day.  We will see you again tomorrow morning.  Please do try to get to the jury room by no later than 9:15 or so.  Be safe getting home.  Do not discuss the case, read anything about the case, or listen to anything about the case.

(Continued on next page)

(Jury not present)

THE COURT:  Ms. Amzallag, you can step down and everyone can be seated.

Before I forget, I wanted to let the parties know, I do not and my staff does not keep track of what exhibits are in evidence.  I depend on the parties to do that.  It's probably on the transcripts at the end, so please do bear that in mind.

MR. PODOLSKY:  We've been keeping track, your Honor.

THE COURT:  Anything else to discuss today, Mr. Podolsky or Mr. Roos?

MR. ROOS:  So the order tomorrow is going to be the current witness, followed by Scott Damman, followed by, if we get to her, Dina Mayzlin, who is the government's expert witness, and there was previously some discussion I think at the final pretrial conference about the exhibit or slides for her, those are marked as Government Exhibit 1014.  We intend to offer them and --

THE COURT:  Is that a deck, so called, 1014?

MR. ROOS:  That's the exhibit number.

THE COURT:  Yes, for the Power Point presentation?

MR. ROOS:  Exactly, your Honor.  And we attempted to address some or all of the concerns by making edits to the headers to make them not argumentative, just to say, like, "example tweet" or whatever instead.  But I'm just putting this on the record so that everyone knows, the Court and counsel,

about sort of the timing for when -- to the extent there are objections still to the exhibits so to when we might want to take them up.

THE COURT:  Are there a number of exhibits or slides to which you're still discussing?

MR. ROOS:  It's this one slide deck, which is 1014.  I don't know if they've had a chance to sort of formulate their objections, I don't want to put them on the spot.  Obviously there is two witnesses before her still, so we could take it up at 9:00, we can take it up during break.

THE COURT:  Three witnesses before, right, her because Ms. Amzallag --

MR. ROOS:  Amzallag and then Damman and then her.

MR. MUKASEY:  We'll review and speak to the government this evening or tomorrow morning.  They've generally been almost close to reasonable, so I think we should be able to.

THE COURT:  Well, I'll be here at 9:00.  If there some indication this evening as to particular slides that are controversial, you can send me the slides and some small snippet on what the issue is.  Okay?

MR. MUKASEY:  Thank you, Judge.

THE COURT:  Very well.

(Adjourned to September 21, 2022, at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                        Page

MARK RUSSELL

Direct By Ms. Estes  . . . . . . . . . . . . . .1036

Cross By Mr. Mukasey . . . . . . . . . . . . . .1132

Redirect By Ms. Estes  . . . . . . . . . . . .1218

 STEPHANIE AMZALLAG

Direct By Mr. Podolsky . . . . . . . . . . . .1228

DEFENDANT EXHIBITS

Exhibit No.                                     Received

 167   . . . . . . . . . . . . . . . . . . . .1037

 1540   . . . . . . . . . . . . . . . . . . .1148

 732   . . . . . . . . . . . . . . . . . . . .1157

 1215, 1508 . . . . . . . . . . . . . . . . .1161

 734, 735, 742  . . . . . . . . . . . . . . .1163

 1022   . . . . . . . . . . . . . . . . . . .1165

 54    . . . . . . . . . . . . . . . . . . . .1176

 1539   . . . . . . . . . . . . . . . . . . .1183

 1221   . . . . . . . . . . . . . . . . . . .1194

 303   . . . . . . . . . . . . . . . . . . . .1200

 1076   . . . . . . . . . . . . . . . . . . .1205

 968   . . . . . . . . . . . . . . . . . . . .1206

 362   . . . . . . . . . . . . . . . . . . . .1208

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

GOVERNMENT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 274 | 1043 |
| 20 | 1059 |
| 22 | 1065 |
| 237 | 1070 |
| 29 | 1077 |
| 519 | 1078 |
| 30 | 1081 |
| 54 | 1083 |
| 61 | 1090 |
| 71 | 1092 |
| 83 | 1095 |
| 314 | 1098 |
| 407-A through 407-F and 407-T | 1110 |
| 420, 420-A through 420-E, and 420-T | 1115 |
| 428, 428-A and 428-T | 1119 |
| 318 | 1121 |

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300