M9LCmil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        21 CR 478 (ER)

TREVOR MILTON,

                Defendant.

------------------------------x

                                   New York, N.Y.

                                   September 21, 2022
                                   9:00 a.m.

Before:

                  HON. EDGARDO RAMOS,

                              District Judge

                       APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

M9LCmil1

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  It's 9:00 a.m. Happy to note I found nothing under the tree this morning.

Do the parties have anything to raise?  Mr. Roos.

MR. ROOS:  Yes, we conferred last night regarding the government's expert's slides, and I think we've hopefully narrowed some of the issues, but there is certainly at least one hearsay issue, and potentially defense counsel has some others.  She is the third witness today, so we could do it now or later.

THE COURT:  Will additional talks on your part resolve the issue or do you need intervention now, because I have a half hour now.

MR. ROOS:  Let's do it now.  I think we'll have more talks and I think the extra time will be helpful for us in case we have to make any edits to the slides.  I can give your Honor a copy of the --

THE COURT:  Please.  Okay.

MR. ROOS:  So it's a 30-page deck, and I believe there's a hearsay objection to slides 19 to the end.  Happy to talk about that.  Maybe it makes sense for defense counsel to say what they're objecting to at this point.

THE COURT:  19 to the end, all of them?

MS. YOUNG:  Yes, your Honor.  So starting with slide 19, there are posts from Reddit, StockTwits, and articles, none

M9LCmil1

of which are in evidence, all of which are originated by authors that are not Mr. Milton.  And this is just a backdoor attempt at putting hearsay in front of the jury.

While I appreciate that an expert can rely on hearsay if it's in the normal course of their expertise, but there's no reason to be putting articles that were not noticed, we have StockTwits from user names like Stupidcomebacks, Schwepp, I mean, Thaddeus, Chacha72.  This is just blatant hearsay.

THE COURT:  Because of the names?

MS. YOUNG:  I don't even know who to attribute them to.

THE COURT:  I have to admit, I never heard of StockTwits.  What is that?

MR. ROOS:  So Professor Mayzlin is going to testify about three different online platforms in which investors talk about Nikola stock, one is Twitter, one is Reddit, and the last one is StockTwits, which is both a website and an app.  It gives pretty basic stock information and then it's effectively a message board.  So people write things with the Nikola ticker, like I'm excited about this or I'm buying, I'm selling, et cetera.  That's what some of these example to.

THE COURT:  Why isn't this hearsay?

MR. ROOS:  Yes, your Honor.  So there is two reasons. The first is that we're not offering the Reddit board posts or the StockTwits messages, twits, whatever you call them, of

these potential investors to prove the truth of the statements. In other words, we're not offering them to show that Nikola was like, for instance, one of them says Nikola is producing hydrogen for under $4.  We're not offering the post, obviously, to prove Nikola was producing hydrogen for under $4.  We're also not offering these to prove the defendant said anything of these things.  The purpose of offering these is to show that investors are reacting.  So it's not -- so it's the fact of them commenting, messaging about Nikola and the defendant's tweets, not the substance of those.  So the first reason is they're not offered for the truth.

The second reason is under 803(3), they're admissible as the declarant's then-existing state of mind.  There is a Second Circuit case on this, in *Fun-Damental Too, Ltd. v. Gemmy Industries Corp*., which is 111 F.3d 993.  The Court allowed a witness to testify about retail customer complaints.

And let me give you a little context what the case was about.  It's a Lanham Act case, and the witness testified that some retail customers complained because they thought Fun-Damental was selling this toilet bank at a lower price than the retailers.  So the evidence was a witness testifying about consumer complaints.  And the defendants argued those consumer complaints were inadmissible hearsay, much like the defendant here is arguing that these posts by consumer investors are inadmissible hearsay.  The Second Circuit disagreed, quote, the

M9LCmil1

testimony in question was not offered to prove that Fun-Damental was actually selling to some retailers at lower prices, but was probative of the declarant's confusion.  And the circuit went on, federal Rule 803 allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind.

There is several cases like this, but the bottom line is we're not offering these to prove the substance of the messages, but rather just to prove that people were reacting, which was the point of the expert's testimony.

THE COURT:  And what exactly will she say about these posts?

MR. ROOS:  So, your Honor, the sequence is that the defendant did not post on Reddit or StockTwits.  Her testimony, if your Honor looks at page 18, her testimony is that there is a relationship between the defendant's postings on Twitter and activity on these other investing sites.

So looking at page 18, when the defendant's tweets increase around June 9th, there is a similar correlation of increase in investor activity on these other messaging platforms.  The subsequent slides are just examples of how investors are talking about the defendant's statements on these platforms.

MS. YOUNG:  Your Honor, first, I take issue with even calling these users investors.  We know nothing about their

identity or their investment habits.  The fact they show up in some blog, some post that happens to talk about investing doesn't make them *de facto* an investor.  And then when you say that they are kind of expressing confusion and that their state of mind is relevant, then put your retail investors on the stand so that we can question them regarding their confusion, not having an assessment over some junk about what they're saying.

THE COURT:  The confusion has to do with this other case, the Lanham Act case, not this case.

I take it you don't know whether any of these folks or all of these folks are investors or not?

MR. ROOS:  That's right.  Just to clarify, I think I probably misspoke when I called them investors.  The expert's not going to say these people are investors, she's going to say that these are users on investor platforms.  It will be up to the jury to infer sort of what weight to assign to her testimony about this.  She's just going to say people on these investment platforms are responding to the defendant's statements.

THE COURT:  I take it you have no issue with page 18; correct?

MS. YOUNG:  No, your Honor.

Although, I do have an issue with slide 15, which is a selection of eight random CEOs, in addition to Mr. Milton, and

M9LCmil1

their Twitter activity.  Their names and their companies were not previously used in our *voir dire* process.  I think it's confusing to bring in all of these companies and their habits, and it's irrelevant to Mr. Milton and the charges he faces.

THE COURT:  Mr. Roos.

MR. ROOS:  So, two points on that, your Honor.  The first is the prior slide, slide 14 shows that there was an increase in the average number of tweets by the defendant when the company went public.  The purpose of slide 15 is that the expert will say -- she's basically accounting for the argument that when companies go public, they start tweeting more or their executives start tweeting more.  So slide 14, she'll say look how his tweets increase.  Slide 15 is basically to respond to either a defense argument or to something a juror might be confused about, which is that it's because the company went public.  So these are examples, the expert selected examples of the other larger SPACs that went public -- are companies that went public through a SPAC in 2020 and 2021.  That's it.

THE COURT:  Are these the only companies that went public back in that time period?

MR. ROOS:  There are many companies that went public, the selection here are the biggest ones.  Nikola is one of the biggest ones.  These are the other roughly ten, these are like the ten largest.

MS. YOUNG:  Your Honor, if this is to express that

he's an outlier, then I think this comparison is very misleading because, under that theory, Mr. Meeker at Bark Box who never logged in could never be fraudulent, but someone who tweets a lot after they go SPAC would be. I just find this entire slide incredibly misleading and confusing.

THE COURT: My concern would be more the process that the expert went to select these companies. And the explanation, which is why I asked where did these come from, if the explanation is that these were the other nine largest IPOs through SPACs in a defined time period, that that's relevant to Nikola or to this case, then that would assuage my concern.

MS. YOUNG: Your Honor, if I may, there could be a number of other criteria to select. If you have a company like SoFi where you don't have a consumer base, really, compared to others with products, I would argue that's not comparable and this slide is titled Comparable CEOs. Are we comparing them by age, by demographic, by location, by industry? The size of the SPAC has nothing to do with how much you tweet.

THE COURT: Or the type of industry. Some of these companies I've never heard of. That means nothing, necessarily.

MR. ROOS: Some of them have larger investor bases like DraftKings than Nikola. The point here is just to explain that the dramatic change in the defendant's tweet numbers is not a product of just the company going public. That's it.

M9LCmil1

We're not going to say, like, he's worse than Jason Robins of DraftKings or whatever. It's a very short slide. I think a lot of these points, which ultimately won't really be relevant because this is really just to address the argument that this is just sort of a fact of going public, but to the extent they have these concerns, I'm sure they can, on cross examination, make whatever points they want about the dog food company.

THE COURT: Well, except I haven't really heard the argument. It seems to me to be a rebuttal slide. I haven't really heard the argument that his, because I guess we haven't got to that part of the case, his activity on Twitter is so much different than any other CEO's. So to the extent you're anticipating an argument, it might be better to wait until the argument is made.

MR. ROOS: I think they made it yesterday when Mark Russell was questioned about the defendant's social media activity, testified that they were trying to get him to tone it down. There is both testimony and documentary evidence. On cross examination, they asked some questions about Elon Musk, doesn't he also tweet, et cetera. So I think they really have opened the door to at least us putting in evidence about the increase, which goes to his use of social media in terms of defrauding investors.

MS. YOUNG: Your Honor, if they want to add Elon Musk to this slide, I would happily accept that edit.

M9LCmil1

THE COURT:  I don't know necessarily that cross examination about Elon Musk, that it opens the door to this argument.  As I recall the context was, yes, CEOs tweet and Elon Musk's name has come up prior in this case, so I don't know necessarily that this opens up the door or makes the argument that Mr. Milton's activity on Twitter is not extraordinary.

MR. ROOS:  Listen, I'm happy to pull this particular slide if we have a commitment from the defense that they're not going to then say all the CEOs do this or other CEOs do this or whatever it is.

THE COURT:  If they say that, then you can put in the slide.

MR. ROOS:  Well, they're going to do it on cross.  I should be able to do it when the expert is actually testifying.

THE COURT:  Except that the argument is that it's not ripe yet.

MR. ROOS:  Okay.

THE COURT:  I'll read the case that you cited, we'll pull it, but based on the arguments, I think those slides do come in, but let me read the case.

MR. ROOS:  There are two other cases I can give you cites for, for that general proposition.  One is *Schering Corp. v. Pfizer*, 189 F.3d 218, 224, which had to do with surveys asking respondents about their presently existing state of

mind, and *Bacardi and Co. v. New York lighter Co.*, 2000 WL 298915.  It's an E.D.N.Y. where the expert relied on consumer statements submitted under 803(3).

MR. MUKASEY:  Judge, if I may?

THE COURT:  Sure.

MR. MUKASEY:  I, maybe like you, didn't know a whole lot about these platforms, StockTwits and Reddit and Twitter. I think the critical distinction between the cases that Mr. Roos is citing and this case is that the confusion and the discussion in those cases is directly relevant to consumers, customers in the business at issue.  The platforms that this expert is going to discuss, and Ms. Young is taking issue with, are literally open to the whole world.  There will be no connection to any investor in this case or any investor necessarily in Nikola.  It would be like if I went on some open blog and started saying, Judge Ramos is the greatest judge ever, and somebody else said Judge Ramos is the third-greatest judge ever, Judge Ramos -- and anybody can say anything with no entry qualifications.  They could be bots, they could be 12-year-old people, they could be people who never said anything, done anything, or connected in any way with Nikola, and that's the distinction between our case and this case. That chatter, that random chatter has no connection to any issue or any element in this case.

MS. ESTES:  Your Honor, one thing I just want to

correct Mr. Mukasey on is that we actually intend to call an investor witness on Friday who will testify that he used some of these platforms, including StockTwits.  So I think he will connect it directly to the case.

MR. MUKASEY:  Then that's fair, but not the other gazillion random people on there.

THE COURT:  I assume that the expert is going to put all this in context.  At the outset, you referred to this as junk science, and I allowed her or will allow her to testify because I know, at least generally, that there is this growing area of inquiry concerning analytics of all kinds in terms of traffic on various social media platforms.  It's how teenagers who put on makeup become millionaires because of their ability to tap into the power of these platforms.  I assume that you'll be putting it in that context, and in that context, I don't know if, necessarily, that a person has to have invested in the company.  I think what is likely more relevant is that the company was being discussed and what, with respect to how many people were discussing it.

MR. MUKASEY:  Then I'll go back to what I said I think in the same breadth or paragraph when I said junk science, this is *Palsgraf* gone wild.  You make one statement and the ripples go far beyond anything you would ever be responsible for.

MR. ROOS:  I think our case, which is pretty clear from the evidence at this point, is that the defendant intended

M9LCmil1

to affect these people through the use of social media.  So --

THE COURT:  I mean, there has been testimony certainly to support Mr. Milton's intentionality with respect to use of these media platforms.  So we'll read the cases and we'll let you know later.

Anything else?

MR. PODOLSKY:  Briefly, your Honor.  We did receive something under the tree last night, which is about 24 new documents produced as Rule 16 discovery after midnight that we understand the defense intends to offer with the witness who's on the stand.  They appear, from what I can tell, to be screenshots of Nikola's social media, but we have not had an opportunity to authenticate them, we don't know if the witness will recognize them, and they seem to focus on a lot of hearsay like commentary, people's read about some of the posts.

I raise this because, I mean, look, we understand the parties are going to identify new relevant materials throughout the trial, that's fine, but this is not impeachment material, these are documents they intend to offer affirmatively and we may object depending on what they try to use them for because we've not had a chance to authenticate them, we don't really know what they are.

THE COURT:  We have another nine minutes to talk and obviously if Ms. Amzallag doesn't recognize them, she doesn't recognize them.  So take it up at the time.

M9LCmil1

Anything more?

MS. YOUNG:  No, your Honor.

THE COURT:  9:30.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Everyone, be seated.  Good morning, ladies and gentlemen.  I trust you all had a very pleasant evening. Thank you for always being on time.  We will now continue with the direct examination with Ms. Amzallag.

Ms. Amzallag, you are reminded you are still under oath.

THE WITNESS:  Yes.

THE COURT:  Mr. Podolsky.

MR. ROOS:  Thank you, your Honor.

STEPHANIE AMZALLAG, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. PODOLSKY:

Q.  Good morning, Ms. Amzallag.

A.  Good morning.

Q.  How are you?

A.  Good.  How are you.

Q.  Good.  Thank you.

I think we left off yesterday talking about overall responsibilities, so let's pick up where we left off.

Who directed the overall media strategy at Nikola?

A.  Trevor.

Q.  And specifically with respect to social media, who directed the overall strategy?

A.  Trevor.

Q.  And did that include the substantive content that was posted on Nikola's social media?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.  Yes.

Q.  Let's talk for a few minutes about your background.

          Can you just remind us when you started at Nikola?

A.  I started in March 2019.

Q.  And what type of work did you do before joining the company?

A.  So before Nikola, I worked at a plant nursery where I was the social media manager.  And then prior to that, I worked at a marketing agency where I was the social media director, so I oversaw all of our client's social media.

Q.  Are you an engineer?

A.  No.

Q.  Do you have any engineering experience?

A.  No.

Q.  How would you describe your expertise that you bring to your work at Nikola?

A.  My expertise was based around social media, essentially. So everything from, you know, content creation and development, social listening, analytics, reporting, essentially. Marketing-based job responsibilities.

Q.  Did you have any direct knowledge of the development of

Nikola's trucks?

A.   No.

Q.   Any direct involvement with the development of the Badger?

A.   No.

Q.   Did you know how the prototypes were built?

A.   No.

Q.   Did you know who was designing the technology for the production version of the Badgers?

A.   No.

Q.   What about hydrogen station development, any direct involvement in that?

A.   No.

Q.   Any direct involvement negotiating contracts for electricity?

A.   No.

Q.   What about negotiating land deals for property for stations?

A.   No.

Q.   In 2020, who did you think was the ultimate authority on the status of Nikola's technical development?

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A.   Trevor.

Q.   Does that include the status of its vehicles?

        MR. BONDI:  Objection.  Leading.

THE COURT: Overruled.

A. Yes.

Q. What about the development of Nikola's stations?

A. Yes.

Q. And what about its hydrogen fueling business generally?

A. Yes.

Q. One more background question.

Are you an executive at Nikola?

A. No.

Q. Have you ever been?

A. No.

Q. Did you have authority at any time to direct Trevor Milton's activities?

A. No.

Q. Why not?

A. He was the founder and CEO.

Q. If Mr. Milton gave you a directive, did you follow it?

A. Yes.

Q. Why is that?

A. He was the founder and CEO.

Q. Let's get into Nikola's social media a bit more.

I think you mentioned yesterday that Nikola had — and we'll focus on 2020 — its own social media accounts; is that correct?

A. Yes.

M9LCmil1                      Amzallag - Direct

Q.  On what platforms?

A.  Facebook, Instagram, LinkedIn, Twitter and YouTube.

Q.  Let me ask a few basic questions about these platforms.  I think we're generally familiar with them, but can you explain what Twitter is?

A.  So Twitter is a very popular social media platform where people can post realtime updates, anything from videos, articles, anything about nature, essentially, in real time for people to see.

Q.  What about Instagram?

A.  Instagram is more asset driven.  So that's where people share videos, photos.  You can also share content in real time, as well.

Q.  Facebook?

A.  Facebook is a platform where a lot of people obviously can connect in person with friends and family, but a lot of companies use it as a viable place for sharing what their company is doing.

Q.  What about LinkedIn?

A.  LinkedIn is a professional platform that people can use if they're looking for jobs or anything specific like that, but obviously a lot of companies have a presence on that platform.

Q.  Ms. Amzallag, I'll ask you to slow down just a touch to make sure --

            THE COURT:  Also, can I ask you a question.  You said

M9LCmil1                          Amzallag - Direct

that Instagram was asset driven.  What does that mean?

THE WITNESS:  Meaning people can share -- it's more like heavy driven on photos and sharing videos.

THE COURT:  So the photos and the videos are the assets that you're referring to?

THE WITNESS:  Yes, correct.

Q.  Were you distinguishing between mostly text driven as opposed to video and photo?

A.  Correct.

Q.  I think the last one you mentioned is YouTube.  What is that?

A.  So YouTube is more video driven, as well.  So that's where users can share videos on that platform.

Q.  And are you able to link between these?  So, for example, could you provide a link on a Twitter post to a YouTube video or something else on the internet?

A.  Yes.

Q.  Between the beginning of 2020 and September 2020, who was able to post content on Nikola's social media accounts?

A.  Myself and Trevor.

Q.  Anyone else?

A.  No.

Q.  Generally speaking, how did Nikola use its social media accounts?

A.  So we would post everything from company updates,

M9LCmil1                         Amzallag - Direct

milestones, press releases, anything that we would find interesting that we would want to share with our audience.

Q. And who was your audience?

A. People that were very invested in the EV space, people interested in new technology, you know, hydrogen and fuel-cell electric vehicles, things like that.

Q. Did you understand whether or not investors followed the company on their social media accounts?

        MR. BONDI: Objection. Foundation.

        THE COURT: Overruled.

A. At the time, I did not, until we were becoming more focused on sharing financial-related information on Twitter and we were getting questions from investors.

Q. And approximately when did that start, to the best of your recollection?

A. Around the time we went public and announced the Badger.

Q. Now, did Mr. Milton have his own personal Twitter account?

A. Yes.

Q. Did anyone at the company have access to post or direct access to the content of that account?

        MR. BONDI: Objection.

        THE COURT: Overruled.

A. No.

Q. Did Mr. Milton post content about Nikola on his personal Twitter account?

A.   Yes.

Q.   Getting back to that in a moment.

         Instagram, did Mr. Milton have a personal Instagram
account?

A.   Yes.

Q.   And did he post content about Nikola on his personal
Instagram account?

A.   Yes.

Q.   Did anyone at the company have the authority or ability to
access or post on his personal Instagram account?

A.   No.

Q.   Would you try to follow or keep track of the content that
Mr. Milton posted on his personal Twitter and Instagram
accounts?

A.   Yes, I would try to, but it was a lot of updates he would
be sharing.

Q.   And why did you try to follow or read what he was posting
on his personal accounts?

A.   Because there were times where he was sharing information
that we necessarily weren't aware of within the company, so it
would be new information that I would be finding out on social
media.

Q.   Were you doing anything to fact check the posts that he
made on his personal accounts?

         MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No, more so looking at it from a branding, messaging perspective.

Q.  Were there ever times that he asked you to — he, Mr. Milton — take a look at something before he posted it on his personal accounts?

A.  I would say maybe a few times, but in general, it would be more about looking at it from, like, grammar, you know, accuracy, messaging, branding.

Q.  Did he ever ask you to fact check the substance of what he posted before he posted it?

A.  No.

Q.  Did you have the capability to fact check the substance, the technical substance of what was posted?

A.  No.

Q.  What about after he posted a tweet or an Instagram post, did he ever ask you to go back and check it?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  What about on a company account, you mentioned that Mr. Milton had access to the company accounts.  Did he post, himself, on the company accounts?

A.  Yes.

Q.  Did he ask you to fact check before he did that?

A.   No.

Q.   What about after?

A.   No.

Q.   Now, focusing again on 2020 up to September, if Mr. Milton spoke publicly about a project, a product, or the company's engineering, did you assume at the time the statements he was making were accurately?

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A.   Why.

Q.   Why did you make that assumption?

A.   He was the founder and CEO, so he would have the most knowledge on what we were doing a company.

Q.   At that time, did Nikola have a policy about how people who worked at Nikola should use social media?

A.   Yes.

Q.   Do you know approximately when it was created?

A.   Around the time when I first started at Nikola.

Q.   Did you create that policy?

A.   I did.

        MR. PODOLSKY:  If we can pull up for the witness and the lawyers what's been marked for identification as Government Exhibit 328.

Q.   Ms. Amzallag, do you recognize this document?

A.   Yes.

M9LCmil1                     Amzallag - Direct

Q.   What is it?

A.   It is our social media PR policy and procedures.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 328.

MR. BONDI:  Objection, your Honor.  Foundation and authenticity and timeframe.  When was this document created? We don't have any information on that.

THE COURT:  When was the document created?

MR. PODOLSKY:  Sure, your Honor.  I believe we have testimony on that, but let's clarify.

Q.   Was this the document that was created by you shortly after you joined the company?

A.   Yes.

Q.   Was this policy still in place throughout 2020?

A.   Yes.

MR. PODOLSKY:  Your Honor, the government offers Exhibit 328.

THE COURT:  Any further objection?

MR. BONDI:  No, your Honor.

THE COURT:  It will be received.

(Government's Exhibit 328 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Thank you, your Honor.

Q.   Ms. Amzallag, what are we looking at in Government

Exhibit 328, if you can just explain to the jury.

A.   So this is our social media PR policy that we came up with for the company.

Q.   Before we go into the policy, was this presented to the company at some point?

A.   It was.

Q.   Approximately, when was that?

A.   This was around the time before we did our Nikola World 2019 event.

Q.   And did you present this presentation or policy?

A.   I did.

Q.   Did this policy apply to the entire company?

A.   Yes.

Q.   Does that include the company's management and its founder?

A.   Yes.

Q.   Was Mr. Milton at the training that you gave on this policy?

A.   Yes.

        MR. PODOLSKY:   Let's flip, if we can, to page 5, Ms. Wolfson.

Q.   Ms. Fleck, do you see the slide in front of you that reads: "Media policy to promote and protect Nikola by directing all media inquiries to Vince Caramella and Stephanie Fleck."   Do you see that?

A.   Yes.

Q.  First of all, who's Vince Caramella?

A.  That is our global head of marketing and my supervisor.

Q.  Why don't you read the content there next to promote and protect.

A.  Act as an owner and help build the Nikola brand by identifying yourself as a Nikola employee and promoting company-approved content.

Q.  And then next to protect.

A.  Protect.  Only share and engage with approved content that has been posted on our official Nikola social media profiles.

Q.  So you see next to promote, the "and," it says promoting company-approved content?

A.  Yes.

Q.  What does that mean?

A.  That means we encourage employees to be sharing content that's coming from our official social media company platforms.

Q.  And it says only share and engage with approved content. What is that a reference to?

A.  Referencing sharing content that we're putting out because we, as a company, you know, are obviously sharing everything from company updates and milestones versus sharing from maybe a third-party source that may not be sharing the most accurate information.

Q.  Did the policy require employees to get approval to post content?

M9LCmil1                        Amzallag - Direct

A.   Sorry.   Can you repeat the question.

Q.   Sure.   Did the policy require employees to get approval of marketing to post content?

A.   Yes.

Q.   Did Mr. Milton comply with that rule?

         MR. BONDI:   Objection.

         THE COURT:   Overruled.

         MR. BONDI:   Your Honor, can we approach, please.

         THE COURT:   Sure.

         (Continued on next page)

(At the sidebar)

MR. MUKASEY:  Judge, as I'm sure you know well from other securities fraud trials, it's a common tactic for the government to read in a company policy and ask whether or not the defendant violated or complied with the company policy. Often, an instruction is given to the jury at that time that the company policy is not the law, you're going to instruct them on the law.

The last question was asked, did he comply with the company policy, Mr. Bondi objected.  It would be appropriate to instruct the jury that the question they're going to be asked is to decide the law as you instruct it, not the company policy.

MR. PODOLSKY:  First of all, I don't think those cases are about social media policy.  It's clear that this is a social media policy.  I'm not familiar with the rule that an instruction has to be given at this time and I think the Judge's instructions are going to be very clear when it goes to the jury.

THE COURT:  There is no rule necessarily.  I don't know how, because I haven't really taken a deep look into the jury instructions yet, are they going to jive with social media policy.  I think it's going to be a whole lot of overlap between social media policy and at place in Nikola and the securities and wire fraud statutes.

M9LCmil1                    Amzallag - Direct

Do you object to me giving the jury a brief instruction that --

MR. MUKASEY:  May I.  I was going to suggest that you're going to instruct them in the case on the law and that the only question they're going to decide is whether or not -- they're hearing testimony now about company policies that may or may not have been violated.  The ultimate question at the end of the day is whether the law, as I instruct you, has been violated.  Something along those lines.  I can draft something at a break, but this is very common for this to happen in cases where the company's policy has been implicated.

THE COURT:  I imagine, and I'm not actually familiar with this government tactic, as you describe it.

MR. MUKASEY:  My word.

THE COURT:  I imagine that the policies that are at issue when that instruction is given concerns disclosures concerning the company, but I'm not sure.  So we can talk about it at the break a little more and we can decide it then.

MR. PODOLSKY:  That makes sense to me, your Honor.

MR. CARUSO:  Sorry, your Honor.  It was asked whether the government would oppose this instruction, we didn't get an answer to that.

MR. PODOLSKY:  I think we moved on the answer is yes and we'll discuss it at the break.

(Continued on next page)

M9LCmil1                      Amzallag – Direct

(In open court)

THE COURT:  The objection is overruled.

Q.  Ms. Amzallag, did Mr. Milton comply with this policy?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  And to be clear, did this policy apply to content that was posted both on company's accounts and on employees' personal social media accounts?

A.  Yes.

Q.  Did Mr. Milton comply with respect to any of those accounts?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  No.

MR. PODOLSKY:  Let's go to page 7 of the document.

Q.  Do you see there's two columns here, Ms. Amzallag?

A.  Yes.

Q.  And you see on the left, there is a column for not approved social media?

A.  Yes.

Q.  What do the bullets in that column generally reflect?

A.  Essentially, you know, not sharing anything considered financial products, legal information on social media, not sharing anything in relation to press releases, if the company

M9LCmil1                      Amzallag - Direct

hasn't shared it beforehand, not engaging with social media

trolls, which was very common when you're on social media,

linking articles that maybe don't necessarily reflect Nikola in

a positive manner.  So making sure they come to the marketing

team to make sure that what they're sharing is accurate

information that's shared within that article and something we

would want to share.

Q.  So, for example, the first bullet reads, under not approved

social media, posts confidential or information about the

company, this includes financial products and legal

information.

          Do you see that?

A.  Yes.

Q.  Did Mr. Milton comply with that rule?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.  No.

Q.  And did he comply with this rule with respect to either his

posts on the company's accounts or his personal accounts?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.  No.

Q.  The third bullet, shares news about the company prior to

the company sharing it publicly in order to break news about

Nikola.

M9LCmil1                        Amzallag - Direct

          Do you see that?

A.   Yes.

Q.   Did Mr. Milton comply with that rule?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.   No.

          MR. PODOLSKY:  We can take down this document.

Q.   Now, did there come a time when Mr. Milton seemed to increase his focus on media and social media content?

A.   Yes.

Q.   Approximately, when was that?

A.   Around the time that we announced the Badger and went public.

          MR. PODOLSKY:  Why don't we look at a document to help guide the date here.  If we could pull up for the witness what's been marked for identification as Government Exhibit 235.

Q.   Ms. Amzallag, do you recognize this document?

A.   Yes.

Q.   What type of document is it?

A.   It's an email.

Q.   What's the date of the email?

A.   Monday, May 18th, 2020.

Q.   Did you receive this email exchange?

A.   I did.

M9LCmil1                        Amzallag - Direct

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 235.

MR. BONDI:  No objection, your Honor.

THE COURT:  It will be received.

(Government's Exhibit 235 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Thank you.  Ms. Wolfson, why don't we blow up the header before we get to the content.

Q.  Now that we can all see this, Ms. Amzallag, who is this email from, the top one?

A.  Trevor.

Q.  And do you see it says in the "to" line, Nicole Rose?

A.  Yes.

Q.  Who is that?

A.  She's our director of PR.

Q.  And then you see the first name in the CC line is Stephanie Fleck?

A.  Yes.

Q.  Who is that?

A.  That's me.

Q.  Did you change your name after getting married?

A.  I did.

Q.  And we've spoken about Vince Caramella.

Who is Matthew Peterson?

M9LCmil1                        Amzallag - Direct

A.   That was Trevor's personal assistant.

Q.   Do you see that the subject line reads Re:, and then it says, lead up to IPO.

Do you see that?

A.   Yes.

Q.   What did you understand IPO to mean in this context?

A.   Nikola going public.

MR. PODOLSKY:   If we could, Ms. Wolfson, just blow up the bottom email, the beginning of the chain.

Q.   Who wrote this email, Ms. Amzallag?

A.   Trevor.

Q.   Do you see that it's addressed to Nicole?

A.   Yes.

Q.   And then Mr. Milton writes, hope you are doing well.  I want to have your team try to book me on every podcast, financial blog, TV, et cetera, leading up to IPO.

Do you see that?

A.   Yes.

Q.   And again, in this context, what did you understand IPO to mean here?

A.   Meaning before the company -- before the company was going public.

Q.   And then do you see that the next sentence is, the best way to ensure our stock continues to grow is to gain following?

A.   Yes.

M9LCmil1                          Amzallag - Direct

Q.   What did you understand "ensure our stock continues to grow" to mean?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.   Meaning the stock price would be going up.

Q.   When Mr. Milton refers to gaining or gain following, do you see that?

A.   Yes.

Q.   What did you understand that meant?

A.   Meaning gaining a following about people knowing our company, what we're doing.  Also, social media followers.

Q.   And so going back, do you see he asked "to book me on every podcast, financial blog, TV, et cetera."

          Do you see that?

A.   Yes.

Q.   Was that your suggestion?

A.   No.

Q.   Where did that idea come from?

A.   Trevor.

          MR. PODOLSKY:  Now, going up, Ms. Wolfson, if we could blow up the middle email.

Q.   Do you see there was a response from Nicole Rose?

A.   Yes.

Q.   What does she write?

A.   She writes, absolutely.  Let us do some research and create

a calendar of opportunities.  I'll also get with Matt and see if there are any days/times to avoid.

THE COURT:  I'm sorry, Ms. Amzallag.  Can I ask you to slow down a little bit when you read.

THE WITNESS:  Sure.

THE COURT:  Thank you.

Q.  If you don't mind, read that next sentence there starting with "is."

A.  Is Mark fair game, as well, to double up?  Let's do this.

Q.  So first of all, who did you understand Matt to be in that first paragraph?

A.  Matt was Trevor's personal assistant.

Q.  And then in the sentence, "Is Mark fair game, as well, to double up?"  Who did you understand Mark referred to?

A.  Mark was our president, Mark Russell.

Q.  And what did you understand Ms. Rose was asking, "is Mark fair game, as well, to double up?"

A.  It sounds like they wanted to do -- have Trevor and Mark do interviews together.

MR. PODOLSKY:  Why don't we blow up the top to see Mr. Milton's response.

Q.  Do you see that Mr. Milton responds, it would be easier for me to just do it alone.  I don't mind if he does other ones, but I like to be solo on interviews.

Do you see that?

A.   Yes.

Q.   Do you recall that Mr. Milton asked to do his interviews without Mr. Russell?

A.   Just from this email.

Q.   Now, did the marketing team help Mr. Milton book himself on podcasts, blogs, TV shows, et cetera?

A.   We did at the time, but I would say Trevor was mostly -- Trevor and Matt were mostly primary in terms of booking all of the media appearances.

Q.   Let me follow up on that.

     Did you come to learn that Mr. Milton booked his own media appearances separate through marketing?

A.   Yes.

Q.   If you could give an estimate, how frequently was Mr. Milton appearing for interviews on television or podcasts et cetera?

     MR. BONDI:  Objection.

     THE COURT:  Overruled.

A.   At least a few times a week.

Q.   So let's talk about his appearances.

     First of all, were any of the interviews that he sat for on TV or podcasts recorded and broadcast live?

A.   Yes.

Q.   Did you ever give him feedback on what he said in interviews?

A.   I think at the time, you know, the marketing team would let him know if he did a good job, if an interview went well, just positive feedback.

Q.   On what types of topics would the marketing team give feedback?

A.   Just, like, general topics.

Q.   Well, for example, would the feedback be on the technical content, the accuracy of the technical content of what he presented?

A.   No.

Q.   So if you can recall, generally, what types of things would you say to him about his performance?

A.   Just that he -- the interview went well, he did a good job, you know, things of that nature.

Q.   Was a technical review of what he said part of your job mandate?

        MR. BONDI:   Objection.   Asked and answered.

        THE COURT:   Overruled.

A.   No.

Q.   Now, to be clear, you said that Mr. Milton would book himself on many interviews.   Were there times that he did interviews without you even knowing at the time, you only learned later?

A.   Yes.

Q.   Was there a process in place to promote Mr. Milton's

M9LCmil1                      Amzallag - Direct

interviews after they took place?

A.   Yes.

Q.   Generally, how did the company promote his appearances?

A.   Through social media.

Q.   And just to walk us through the mechanics of that, how would you promote, let's say a podcast or a television interview?

A.   So, essentially, we would receive either the video file or the podcast link.  Trevor wanted those up pretty quickly, so, you know, I would have to watch the podcast or the video in as much time as I -- well, not really given a lot of time to watch the content.  So, you know, tried to understand the main talking points, come up with the copy that we would share for the video description and for the social media posts.  And then, of course, when you're uploading it on YouTube, it takes some time for the video to upload and process and then share it across all of our social media platforms.

          (Continued on next page)

BY MR. PODOLSKY:

Q. So, ultimately, would the company provide either a link or a video of the interview?

A. Yes.

Q. I think you said a moment ago that you often didn't have time to watch the whole interview or video, as it may be. Why was that?

A. Because Trevor wanted the videos up or the interviews up right away.

Q. And did he tell you that?

A. Yes.

Q. Now, to the extent you were able to watch the videos before they were posted, did you do that? Did you try to do that?

A. I tried to.

Q. And what were you watching for?

A. Essentially, talking points, what Trevor was sharing, so I could craft copy. You know, making sure that the messaging was something we would want to share on our company platforms.

Q. Were you reviewing the technical accuracy of what he said?

A. No.

Q. Why not?

A. Because I assumed everything that Trevor was saying was accurate information.

Q. Did you ever try to pay attention to whether he was consistent in each podcast, from podcast to podcast?

A.  I would say maybe sometimes if there was something, but not really from a technical perspective.

Q.  Let's look at a few communications about this process.

If we could pull up for Ms. Amzallag what's been admitted as Government Exhibit 247.

Ms. Amzallag, do you recognize this document?

A.  Yes.

Q.  What type of document is it?

A.  This is an email.

Q.  Did you write this email?

A.  I did.

Q.  When?

A.  Tuesday, June 16, 2020.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 247.

MR. BONDI:  No objection, your Honor.

THE COURT:  It will be received.

(Government's Exhibit 247 received in evidence)

MR. PODOLSKY:  Thank you, your Honor.

May we publish?

THE COURT:  You may.

MR. PODOLSKY:  All right. Ms. Wolfson, why don't we blow up the header just so we can orient ourselves.

Q.  Ms. Fleck, did you write this email?

A.  I did.

Q.   And who did you write it to?

A.   I wrote it to Trevor.

Q.   Did you copy your colleagues in the marketing team?

A.   I did.

Q.   What's the subject line of this email?

A.   "Video uploading process."

          MR. PODOLSKY:   And, Ms. Wolfson, we can maybe blow up the content now.

Q.   We can walk through a few of these lines, Ms. Amzallag. Could you just explain what this email is about.

A.   This email was essentially to show Trevor, here is our video process in terms of when we're sharing, you know, media interviews or podcasts.  Really trying to highlight the fact this is a quick-turn process and takes time.

Q.   Why did you feel that you should explain to him that this is not a quick-turn process?

A.   Because at the time Trevor was very adamant about getting the video interviews or podcasts, things like that, up in a really quick manner.

Q.   So do you see a row, "Trevor, as we continue to do more video interviews, we're working on a process to streamline this effort"?

A.   Yes.

Q.   And then below there's some bullets.  Do you see the first one is, "Once we receive the video file, the video is vetted by

M9LHMil2                        Amzallag - Direct

the team to discuss the pros and cons from different angles"?

A.   Yes.

Q.   What did you mean by that?  In what sense were the videos vetted by the team?

A.   We wanted to watch the video from a messaging standpoint to make sure what we're sharing as a company is, you know, something that's positive about the company and what we're doing and if Trevor did well in the interview.

Q.   What do you mean by "did well"?

A.   Meaning he talked about the company in a positive manner. You know, it wasn't necessarily a bad interview.

Q.   Did that include vetting it for whether he was accurate in his remarks about the company?

A.   No.

Q.   All right.  Then do you see at the bottom:  "The video will also be posted to appropriate social media platforms with social copy, including any tags, the media outlets and hashtags"?

A.   Yes.

Q.   What does that mean?

A.   That means the social copy that I would craft to share across all of our social media platforms, if we wanted to tag the media outlets that Trevor was on for that specific interview.  Any hashtags meaning like company-branded hashtags that we would use for our social media posts.

Q.  And generally, did Mr. Milton ask you to post all of his interviews and appearances?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Let's talk about a particular podcast.  Are you familiar with something called TeslaCharts?

A.  Yes.

Q.  What is that?

A.  It's a pro heavy Tesla podcast.  So a lot of Tesla users listen to that podcast.

Q.  Do you recall whether Mr. Milton appeared on that podcast?

A.  Yes, he did.

Q.  Do you remember how you first learned he was going to appear on it?

A.  I think at that time he told us that he wanted to do the podcast.

Q.  Let's focus on exactly what happened after the podcast was recorded.

If we could pull up what's been marked as Government Exhibit 258.

Do you recognize this document, Ms. Amzallag?

A.  Yes.

Q.  What type of document is it?

A.  It's an email.

Q.   And focusing just on the top, did you write the top email on the chain?

A.   Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 258.

MR. BONDI:  No objection, your Honor.

THE COURT:  It will be received.

(Government's Exhibit 258 received in evidence)

MR. PODOLSKY:  And may we publish?

THE COURT:  You may.

MR. PODOLSKY:  Thank you.

If we -- actually, Ms. Wolfson, why don't we blow up, if we can, the bottom of the first page.  We'll start with the header at the very bottom under forwarded message, and if it's possible to also bring up the second page so we can see what that email is.

BY MR. PODOLSKY:

Q.   Ms. Amzallag, can you see who the first email in this chain is from?

A.   Yes.  Nicole.

Q.   And, actually, if you look at the top -- sorry, I think it breaks across the page.  Do you see that?

A.   Sorry.

Q.   Where it says "from"?

A.   Yeah, TeslaCharts.

M9LHMil2                        Amzallag - Direct

Q.   Who did you understand that to be?

A.   That was the podcast host.

Q.   Do you see that in the "to" line it's you and Ms. Rose?

A.   Yes.

Q.   All right.  Then do you see the content reads, in part:
"Please find attached a link to download the MP3 file," and
then below:  "It sounds really great.  Trevor came off
amazingly well.  Our plan is to publish tomorrow at noon.  Once
I publish it, I will send you the best link to use for your
social media outlets"?

        Do you see that?

A.   Yes.

Q.   So did this include a link to download a file?

A.   Yes.

Q.   And what was the content of that file?

A.   It was the podcast interview.

Q.   All right.  Why don't we go to the first page.  We can just
walk through this, starting with Ms. Rose's email at 12:14 p.m.

        Do you see that the next email is now addressed to
"Hello, Trevor"?  Do you see that?

A.   Yes.

Q.   Who is that one from?

A.   Nicole.

Q.   OK.  What does she write to Mr. Milton?

A.   She writes:  "Hello, Trevor.  I am going to download and

listen now.  Please let me know if you have any requested edits by EOD.  I would imagine this is a great podcast just based on the hour I listened in.  Stephanie."

Q.  You can pause there.  Thanks.

Do you see that Ms. Rose said, "I would imagine this is a great podcast just based on the hour I listened in?"

A.  Yes.

Q.  I think you testified a few moments ago that you would often -- or the team would often tell Mr. Milton you did a great job?

A.  Yes.

Q.  When you said that, what do you mean by that?  What did you tell him he was doing a great job on?

A.  Just on the way he did in the interview, if he came across really well, talked about the company in a great manner, you know, aligned with our -- our messaging.

Q.  Was it a comment on whether or not he got the substance of the engineering or technical aspects correct?

A.  No.

Q.  Why not?

A.  Because at the time I assumed what Trevor was stating was all accurate information.

Q.  Then do you see that Mr. Milton responds?

Ms. Wolfson, maybe we can go to the next email in the chain, the block in the middle.  Just below that, actually.

Thank you.

Do you see Mr. Milton responds:  "Why don't you go ahead and listen to it and offer any suggestions.  I'm pretty sure that everything turned out fine, as I had a really good conversation with them.  I don't know if I'll have time today to go through the podcast.  So I'll just leave it up to you guys to listen to it and approve it, or if there's issues, you can let me know, and I can go listen to a certain segment of it"?

Do you see that?

A.  Yes.

Q.  What do you understand Mr. Milton was asking you to do?

A.  Just listening to it from a marketing perspective, so branding, messaging.

Q.  Did you understand him to be asking you to go back and vet all of his facts?

MR. BONDI:  Objection.  Calls for speculation.

THE COURT:  Overruled.

A.  No.

Q.  All right.  Why don't we look at the exchange on -- why don't we pull up for the witness what's been marked as Government Exhibit 259.

Do you recognize this document, Ms. Amzallag?

A.  Yes.

Q.  Is this an email?

A.   Yes.

Q.   And were you included on this chain?

A.   Yes.

MR. PODOLSKY:   Your Honor, the government offers Government Exhibit 259.

MR. BONDI:   No objection.

THE COURT:   It will be received.

(Government's Exhibit 259 received in evidence)

MR. PODOLSKY:   All right.   Why don't we pull that up. We can look at the header for a moment.

BY MR. PODOLSKY:

Q.   Do you see the top email in the chain is from Mr. Caramella?

A.   Yes.

Q.   And what's the subject line of this email exchange?

A.   TeslaCharts podcast.

Q.   Why don't we actually look at the -- there's two emails in this chain.   Let's look at the first one.

Do you see this is from Ms. Rose?

A.   Yes.

Q.   And you see the date is July 19, 2020?

A.   Yes.

Q.   Was this after you had received the copy of the TeslaCharts podcast?

A.   Yes.

Q.   You see that Ms. Rose wrote:  "There is an abundance of great content, quotes and facts that we can pull from this one podcast.  Truly a phenomenal interview.  Some of the highlights"?

     Do you see that?

A.   Yes.

Q.   And then do you see there's a summary of just a few of the quotes or comments that Mr. Milton made on the interview?

A.   Yes.

Q.   Did you know at the time whether or not the comments he made in that interview were accurate?

A.   No.

Q.   And if we go to the top to Mr. Caramella's email, it says: "Trevor, I think one of your best so far.  Nice job."

A.   Yes.

Q.   Did you understand that to be a comment on the technical accuracy of the podcast?

A.   No.

Q.   What did you understand it to be a comment on?

A.   On how Trevor performed in the interview.

Q.   And does that relate, as you said before, to his tone and presentation?

A.   Yes.

Q.   All right.  Now, did you listen to the TeslaCharts podcast?

A.   I did.

Q.   When you listened to it, did you know whether or not the facts that Mr. Milton conveyed were accurate at the time?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   I assumed at the time they were accurate.

Q.   Setting aside your assumption for the moment, did you independently know one way or the other?

A.   No.

Q.   Why don't we pull up what I believe is in evidence as Government Exhibit 261.

Do you see that this is an email from Elizabeth Fretheim?

A.   Yes.

Q.   And what's the date on it?

A.   7/20/2020.

Q.   And do you see the subject line is "forward Trevor's podcast"?

A.   Yes.

Q.   By the way, do you see that it was sent to you and the marketing team?

A.   Yes.

Q.   Then what did Ms. Fretheim write just in that first sentence?

A.   "This is rough, but below are things I just wish he wouldn't say to things that are more concerning."

Q.   And then do you see there's a list below of maybe -- I won't count -- a dozen or two spots on the podcast?

A.   Yes.

Q.   Did you understand those to be the times and issues that Ms. Fretheim said were -- she wished he wouldn't say to more concerning?

MR. BONDI:  Objection, your Honor.  Leading.

THE COURT:  Overruled.

A.   Yes.

Q.   Now, before you read this email, did you know whether or not there were issues or accuracies with any of these statements?

A.   No.

MR. PODOLSKY:  So just to -- we won't go through all of this, but just to take a look at what we're talking about, why don't we pull up Government Exhibit 422-T.  Maybe we could just blow up that title page for a second.

Q.   Do you see this says, "TeslaCharts podcast, the Chartcast with TC and Georgia"?

A.   Yes.

MR. PODOLSKY:  Why don't we go to page 4 of this transcript.  OK.  I'll try to find the line here.  I think it's line 13.  We'll just take this example.

Q.   Do you see where it says:  "We've been able to chop the cost of hydrogen from $16 a kilogram down to where we're down

below $3 a kilogram on our hydrogen now, which is $4 per kilogram as parity with diesel"?

Do you see that?

A.   Yes.

Q.   When you listened to the podcast, did you know one way or the other whether that was an accurate statement of what Nikola had achieved at the time?

A.   No, I just assumed it was accurate coming from Trevor.

Q.   We'll just do one more example.

If we go to page 22, line 11, do you see next to Mr. Milton's name it says:  "So the energy on the freeway, we -- we -- we tap directly into the main federal transmission lines, and we contract directly with groups, whether it's a -- you know, an example would be like, you know -- would be like Tennessee Valley Authority, or something," and it goes on.

Did you know one way or the other when listening to this whether Nikola had, in fact, tapped directly into main federal transmission lines or contracted with any groups for electricity?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   No.

Q.   Now, just turning back for a moment to 261, Government Exhibit, excuse me.  Did you talk to Mr. Milton directly about the podcast after receiving this email?

M9LHMil2                        Amzallag - Direct

A.   No.

Q.   Why not?

A.   At the time, you know, when Elizabeth sent this email, which was sent to myself and Vince and the marketing team, I assumed that Vince or someone higher up would speak to Trevor about the podcast.

Q.   Would you feel that it was your role to confront Mr. Milton about inaccuracies?

A.   No.

Q.   Why not?

A.   Because I am just the social media district marketing manager.  So not really my authority to do so.

Q.   Let's look at, for the witness, Government -- what's been marked for identification as Government Exhibit 262.

        Ms. Amzallag, do you recognize this email -- or, excuse me, this document?

A.   Yes.

Q.   What is it?

A.   It's an email.

Q.   And were you part of this email chain?

A.   Yes.

        MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 262.

        MR. BONDI:  No objection, your Honor.

        THE COURT:  It will be received.

(Government's Exhibit 262 received in evidence)

MR. PODOLSKY:  If we could go to the second page of the document.

BY MR. PODOLSKY:

Q.  You see that, Ms. Amzallag, this chain starts with an email from you?

A.  Yes.

Q.  And you see you wrote:  "Just saw this from Ed Ludlow. Broke previous story about Nikola One not functioning at event," and then it contains a link?

A.  Yes.

Q.  And then did you also embed, I guess, an image under TC podcast?

A.  Yes.

Q.  Is that a -- what kind of platform is that image taken from?

A.  Twitter.

Q.  Then do you see that Ms. Rose responds to your forwarding of those items?

A.  Yes.

Q.  And by the way, does that Twitter post have commentary on Mr. Milton's statements on the TeslaCharts podcast?

A.  Yes.

Q.  You see Ms. Rose wrote:  "This is definitely where the leadership team needs to determine the right balance of

disclosure on certain facts and inform us.  This speaks to Elizabeth's concerns as well.  Thanks for sharing and for staying on top of this."

          Do you see this?

A.  Yes.

Q.  And then do you see the next response is on the -- if we go to the first page -- or, actually, is from Mr. Caramella?

A.  Yes.

Q.  He writes:  "Yes, agreed.  We also need to determine (figure out) a neutral way to share this type of feedback."

A.  Yes.

Q.  Did you know what he meant by neutral type of feedback?

A.  I think he meant how we could share this feedback with Trevor.

Q.  And why would it have to be neutral, as he put it?

          MR. BONDI:  Objection.

          THE COURT:  Sustained.

A.  I would assume at the time --

Q.  Just a moment, Ms. Amzallag.  I'll ask another question.

          Did you have an understanding at the time of what "neutral" meant in this context?

          MR. BONDI:  Objection.

          THE COURT:  Overruled.

A.  Coming at it in a way where it was just giving him, you know, neutral feedback, not necessarily aggressive, an

aggressive manner.

Q.  From your perspective, why couldn't you give him feedback in an aggressive manner?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Because I think Trevor would probably get upset.

Q.  Did you feel comfortable giving him direct or aggressive feedback?

A.  No.

Q.  Then do you see Ms. Rose responded:  "Situations like this are challenging because Trevor and Mark have shared similar information in previous interviews"?

Do you see that?

A.  Yes.

Q.  Now, is it correct that in various interviews Mr. Milton and Mr. Russell had talked about these topics, hydrogen generation and electricity?

MR. BONDI:  Objection.  Leading.

THE COURT:  Overruled.

A.  Yes.

Q.  Did you have the ability yourself to distinguish between which facts that were given were accurate or inaccurate?

A.  No.

Q.  Then you see Ms. Rose wrote:  "As a team we don't know what is off limits, not factual, risky, etc.  We can raise our hands

with concerns that feel off but don't have the level of detailed knowledge that would be necessary to have identified these points as red flags."

Do you see that?

A. Yes.

Q. Did you agree with what she expressed in that paragraph?

A. Yes.

Q. Then she asks: "What else can be done to protect us, besides making sure when Trevor speaks the level of detail shared is dialed back."

Do you see that?

A. Yes.

Q. And then you see Mr. Caramella responds: "One thing we can do is continue to collect what's factual and review what's factual with the SLT"?

A. Yes.

Q. Do you understand what the SLT was in this context?

A. Senior leadership team.

Q. Now, did you and your team have the technical know-how to evaluate the accuracy of Mr. Milton's statements moving forward?

MR. BONDI:  Objection.  Asked and answered.

THE COURT:  Overruled.

A. No.

MR. PODOLSKY:  All right.  You could take that down.

Let's look at a different document.  Let's pull up Government Exhibit 327 for the witness, please.

Q.  Ms. Amzallag, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It is a document about the Nikola Badger and, essentially, a Q&A about it.

Q.  And do you see the date on the document?

A.  Yes.

Q.  What is it?

A.  7/30/2020.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 327.

MR. BONDI:  Objection.  May we approach?

THE COURT:  Yes.

(Continued on next page)

(At sidebar)

MR. BONDI:  Your Honor, this was a document that was recently produced to us by the company.  It was produced to us in a PDF form.  My understanding is Mr. Podolsky will ask about who made edits and what.

We would like the metadata.  We don't believe that this document is the actual authentic document.  We also want to explore who made what edits.  We don't think it's appropriate for him to get into saying who made what edits without us having the metadata to the document to be able to explore.  It was not produced in its native format; it was produced in a PDF.

THE COURT:  When did you get it?

MR. BONDI:  Few days ago.  Literally, I think earlier this week.

But we have very serious concerns here because we don't think this document is authentic or the final version. There were a number of edits made to this.  So this is a snapshot of a PDF of a document that's marked "Draft."  So we have serious problems about the authenticity of this.

MR. PODOLSKY:  Your Honor, let's clarify the record a little bit here.

I think what Mr. Bondi was referring to was his request for Nikola to produce this that was argued in court last week.  We produced this document to them much longer ago.

M9LHMil2                      Amzallag - Direct

They have all the information that we have on it.  This was produced in discovery.  Whatever Nikola may have separately produced to them, I'm not exactly sure, but they've had this document from us.

I believe she will testify that it is a -- sort of a version of a Google document.  Those do live sort of live on a computer.  They can be edited.  And he's welcome to cross-examine her about this.  But we've produced to the defense everything we have on it, so I'm not quite sure what the objection is to us offering this document.

MR. BONDI:  Your Honor, if this was produced earlier, I stand corrected on that, but the objection's still the same.  It says "Draft."  There were several versions, we understand, of this document.  We don't know if this was the final document that even went to Mr. Milton or Mr. Milton saw.  We have concerns about the authenticity.  We want to see this in a native format so that we can determine who made what edits when.

And if he starts exploring this document, we think it's highly prejudicial to be exploring a draft document that we don't even know went to Mr. Milton.  There's no evidence this was transmitted to Mr. Milton.  We don't see any emails where it went to Mr. Milton.  This could be an internal earlier draft that changed before it even got to him.

MR. PODOLSKY:  He can make whatever arguments he'd

like.  The witness will testify, and that will be evidence, that this was a live document, that Mr. Milton directed edits of it.  She will provide that testimony.  The fact that it says "Draft" on it is really neither here nor there as to admissibility.  And we produced everything, I believe, and I should check, but I think I'm told that we actually did provide a native version -- Word version.

THE COURT:  And --

MR. ROOS:  Nikola produced, I think, several copies of this, and they came with both PDF-stamped version and a native Microsoft version.

MR. BONDI:  So use the final version.  It says "Draft."

MR. PODOLSKY:  Again, the testimony will be, number one, there isn't a final version.  It's a live document.  Number two, whether it's final or not is not really relevant to whether the document is admissible.  She's already authenticated it, and that's all there is to it.

THE COURT:  I'm going to allow it.

(Continued on next page)

(In open court; jurors present)

MR. PODOLSKY:  All right.  So just to clarify the record, your Honor, we offer Government Exhibit 327.

THE COURT:  And over objection it will be received.

(Government's Exhibit 327 received in evidence)

MR. PODOLSKY:  Thank you, your Honor.

May we publish?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  Ms. Amzallag, can you explain -- first of all, do you see at the top it says "Badger Q&A, last updated July 30, 2020"?  Do you see that?

A.  Yes.

Q.  Can you explain what this document is.

A.  So this was a working document that we had which essentially were questions we received on social media or other types of inquiries about the Badger that we compiled for messaging purposes.

Q.  When you say "we," who are you referring to?

A.  The marketing team and Trevor.

Q.  To the best of your recollection, did Mr. Milton have authority to review this document?

A.  Yes.

Q.  To the best of your recollection, did he direct edits to it?

A.   Yes.

Q.   Just to make sure we understand, how would you use this document in your work?

A.   If we received questions about the Badger on social media, this was a way for us to reference this document and use that messaging to respond to people on social media.

Q.   So, for example, if somebody asked at the top here, "What is the Badger?" what would you use this document for in terms of giving an answer?

A.   I would use the answer to respond to people on social media.

Q.   So let's just look at a couple of the portions of this.

First of all, does this -- actually, before we look at specific questions, does this contain technical specifications and other information about the Badger truck?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.   Yes.

Q.   Did you know whether or not the information, the technical information contained in here, was accurate yourself?  Did you know?

A.   No.

Q.   Who had the authority, as you understood it, in terms of the content, the technical content of this document?

A.   Trevor.

Q.  So let's look at a question.  It's about two-thirds of the way down.  It says.  "Q.  Are you making the whole vehicle?"

We can blow that one up, Ms. Wolfson.

Ms. Amzallag, could you read the answer that was provided here.

A.  "While we do use supplier parts like every other brand, we are building the Badger from ground up.  We have designed and developed the vehicle from a clean sheet."

Q.  Focusing on the language there, "we are building the Badger from the ground up," do you see that?

A.  Yes.

Q.  Did you come up with that language?

A.  No.

Q.  Do you know if it was an accurate description of the Badger prototypes or the ultimate production version of the Badger?

A.  No.

Q.  And "we have designed and developed the vehicle from a clean sheet," did you come up with that language?

A.  No.

Q.  Do you know whether or not it was an accurate description of the Badger prototypes or ultimate production version of a Badger?

A.  No.

Q.  Who did you understand was the authority on the use of this language?

A.   Trevor.

Q.   So if somebody asked, Are you making the whole vehicle? what information would you provide based on this document?

A.   I would share that, essentially the answer, on social media.

Q.   Let's go to the fifth page, and let's go to the second question.

        Do you see it says, "Q.  Is the Badger built on an existing midsize platform, or is the design entirely unique to Nikola"?

        Do you see that?

A.   Yes.

Q.   What was the answer given?

A.   "100 percent Nikola design, but will be built with an OEM through their factory and supply chain to expedite production."

Q.   So focusing on the answer, "100 percent Nikola design," did you come up with that answer?

A.   No.

Q.   Do you know whether or not it was accurate to say that the Badger design would be 100 percent Nikola?

A.   No.

Q.   Who is the authority on giving that answer, from your perspective?

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A.   Trevor.

Q.   Let's look at one more paragraph of this document.  If we go to the very last page -- actually, before we read this, I want to make sure we understand this document.

        Was this like a live document that would have edits over time?

A.   Yes.

Q.   And did more than one person have the ability to input those edits?

A.   Yes.

Q.   But notwithstanding that multiple people could edit, who did you understand actually was the authority for what would be the -- the substance of what would be conveyed here?

A.   Trevor.

Q.   All right.  Let's look at that last page and blow up the part that says "For internal only."

        Do you see under that it says:  "Using custom designed chassis but using parts off of other vehicles for long lead times, not production ready/production intent.  They are prototypes, but functioning prototypes"?

        Did you see that information?

A.   Yes.

Q.   Did you come up with that?

A.   No.

Q.   Do you know whether that one was an accurate description?

A.  No.

Q.  Now, that one says is below for internal only.  What did you understand you were supposed to do with that information?

A.  Meaning the content below that was not to be shared externally.  So.

Q.  So would you share that content on social media?

A.  No.

Q.  OK.  Let me -- we're going to change topics.  Let me just ask one or two follow-ups about the team.

Did you understand -- do you know whether or not Nicole Rose has an engineering background or technical expertise in building trucks?

A.  She does not.

Q.  What about Vince Caramella?

A.  No, he does not.

Q.  Do you know someone named Colleen or Colleen Robar?

A.  Yes.

Q.  Who is that?

A.  She was our -- she's our outside party that handled a lot of our PR initiatives.

Q.  Did she work at Nikola?

A.  Yes -- no, she didn't work at Nikola.

Q.  Was she an engineer or involved in the development of Nikola's products and technology?

A.  No.

Q.   All right.  Let's turn to, for the witness, for
Ms. Amzallag, what's been marked as Government Exhibit 287.

         Ms. Amzallag, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   These are YouTube analytics relating to the Nikola One
semi-electric truck unveiling.

Q.   Did you create these documents?

A.   I did.

Q.   And did they use data regarding the company's social media
platforms?

A.   Yes.

Q.   To your understanding, are these accurate depictions of
data regarding the company's YouTube platform?

A.   Yes.

         MR. PODOLSKY:  Your Honor, the government offers
Government Exhibit 287.

         MR. BONDI:  May we approach, your Honor?

         THE COURT:  Yes.

         (Continued on next page)

(At sidebar)

MR. BONDI:  Your Honor, this document is an analytical document that we have serious objections over authenticity, foundation, hearsay.  We also believe from interview notes dated May 27, 2022, that this document may have been created after the fact for the government's witness Dina Mayzlin to testify.

We see that from the interview notes from Ms. Mayzlin that there were documents that were created for her, and we don't know if this was one of the documents created for her after the fact or contemporaneous.  We don't when it was created.  There's no indicia here of authenticity.  We have serious problems with the foundation.

And it's hearsay.  It's data that she gathered from all sorts of, looks like, different sources here.  This is the kind of stuff that you might see an expert try to introduce.  There's stuff about stock price, about traffic.  There's real questions about reliability here of this information.  It does not appear to be generated in the normal course either.  We just don't see how this comes in under any Rules of Evidence.

THE COURT:  Explain to me what this is.

MR. PODOLSKY:  So, first of all, I don't know what the relevance is -- what this is.

MR. CARUSO:  Still can't hear you.

MR. PODOLSKY:  Ms. Fleck, who is the social media

manager, which we've now gone over ad nauseam, pulled from their YouTube account the records of the views that they have -- that have happened that were made of certain of their posted videos during a certain period of time. It's, I think, basically the first half of -- three quarters of 2020. This is a record that she created in the normal course of her business, that they rely on in their duties. There's no authenticity problem. She just testified she created this document using data that the company --

MR. BONDI: When did she create it? When did she create it?

MR. ROOS: So, basically, if you own YouTube account -- everyone who goes on YouTube can watch videos. If you have a YouTube and you post a video, particularly if you're a corporate customer, you're able to log into your YouTube account and see how many people viewed it, how many times they've liked it, when they viewed it. And these are all statistics, tables. Literally those charts are all generated by YouTube. It's a product that then, as the social media manager, she has access to.

So they have nothing to do with Dina Mayzlin. They weren't created by an expert or anything like that. As the social media manager, she can view YouTube tables, and she literally just took a screenshot of it.

MR. BONDI: When did she create this?

MR. PODOLSKY:  Number one, I don't know if it was in the summer of '22.

MR. BONDI:  Summer, this past summer?

MR. PODOLSKY:  I don't sure I understand the relevance of that question.  It is a record of the views entire time in 2020.  You can't go back in time and change the number of views that happened two years ago.

MR. BONDI:  Your Honor, I hear this was created in the summer of 2022, after the indictment period.  It was created, we believe, at the direction of the government to her.  This is from a third-party source, YouTube.  There's no basis, there's no grounds, there's no authentication, there's no foundation.  She created this after the fact.  This wasn't created in the normal course.  If she created this in the summer of 2020, while Mr. Milton was at the company, that would be a different story.  She created it in the summer of 2022, on the verge of trial.

MR. PODOLSKY:  Can I?  A few comments here.  One, it is routine, and I've done it many times, to offer evidence, for example, somebody who pulls accounting records from their accounting system, they might have pulled it more recently than they were entered, but they show a record of what the company did, for example, transactions that happened prior, summaries of financial transactions.  This is no different.  This is just a summary of the company views, of their YouTube views.  It's

no different than that.  It doesn't matter when it was actually printed.  The data is the data.  It's a perfectly typical summary.  There's nothing unusual about it.  It's routine.

THE COURT:  So she went back this summer -- I just want to be clear.

MR. PODOLSKY:  Yes.

THE COURT:  This summer she went back and for particular periods in the summer of 2020, she took screenshots of what the analytics were for the company's YouTube account which the company has access to?

MR. PODOLSKY:  Correct.

MR. ROOS:  And had access to in 2020.

MR. BONDI:  This is from a third party, YouTube.

MR. CARUSO:  Maybe I'm the only one who's confused.  I recognize that the exhibit was created in the summer of 2022, but when she did that in the summer of 2022, was she just pulling up things that existed already in 2020, or did she create something new from data that was there in 2020?

MR. PODOLSKY:  This is no different than pulling up a screenshot of something that existed years before, which are many of their exhibits.

MR. CARUSO:  But that's my question.

THE COURT:  The answer is, yes, it existed in 2020.

MR. CARUSO:  If that's the answer, I'd like to make that clear.

MR. BONDI:  But, your Honor, we have zero evidence that she ever created any documents like this during the indictment period, zero whatsoever.

MR. PODOLSKY:  That's not why it's being offered.

MR. BONDI:  They didn't create charts like this.  This isn't created in the normal and ordinary and regular course of business.  She went to a third party, YouTube, to pull this data.  We don't have any indication that it's reliable from YouTube.  This isn't from the company's documents or database.  OK?  This isn't what she normally does in the course of her business.  She goes back to a third party to print out analytical information at the direction of the government in the summer of 2022.

THE COURT:  But the way that I see it, you can go back at a JPMorgan Chase Bank account, I can go back today and print out my statement, my monthly statement, from June, July, August 2020.  It's the same effect.  I mean, it's from a third party.  It's my account.  So I don't -- I mean, I get your point, I think, but I don't think it affects the admissibility of this document.

OK.  So it will be allowed.

(Continued on next page)

(In open court; jurors present)

MR. PODOLSKY:  To pick up before the break, the government offers Government Exhibit 287.

THE COURT:  Over objection it will be received.

(Government's Exhibit 287 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  All right.  Ms. Amzallag, we'll get a little more particular in a moment, but, generally, what does this document depict?

A.  So this is showing the amount of watch time for a specific video on our YouTube channel.

Q.  Do you know what video that is it?

A.  It's the Nikola semi-electric truck unveiling.

Q.  Is that the unveiling that happened in 2016?

A.  Yes.

Q.  OK.  I want to look at this chart a little more particularly, but just so we know, if we can flip quickly to page 2 and 3 and then go to 3 as well.

We're not going to spend time on this right now, but what are these versions of the chart?

A.  So this is showing different sources where people were watching the video.

Q.  And what about page 2?

A.   This is showing the users that were either subscribed to our YouTube channel or they weren't subscribed.

Q.   OK.  Maybe we'll get into that in a minute, but let's just focus on page 1.

So at what time period does this chart show?

A.   March 3 through September 9, 2020.

Q.   So, for example, can you tell from this chart approximately how many Internet users or YouTube users viewed this video on particular days?

A.   Yes.

Q.   Before we get into particular days, do you see that there are some statistics at the bottom?

A.   Yeah.

Q.   Under "Views," what does that box show?

A.   That means --

MR. BONDI:  Objection, your Honor, to all of these questions.  Foundation.

THE COURT:  Overruled.

A.   That means the number of times users watched this video during that time frame.

Q.   OK.  So between March 3, 2020, and September 9, 2022, how many times was the video of the 2016 Nikola One unveiling watched on YouTube?

A.   20,941 views.

Q.   Do you see there's -- if you go over next, there's a watch

time.  Do you see that?

A.   Uh-huh.

Q.   What is that?

A.   9,052.1.

Q.   What does that reflect?

A.   How many hours people spent watching the video.

Q.   And is that how many hours it was watched between March 3, 2020, and September 9, 2022?

A.   Yes.

Q.   Let's go over a couple boxes to "Impressions."

          What is that?  What is an impression?

A.   So that means anytime the video thumbnail is displayed somewhere on YouTube and someone lands across that for at least one second, that counts as an impression.

Q.   How many impressions were made of the Nikola One unveiling video between March 3, 2020, and September 9, 2022?

A.   234,205.

Q.   Now, looking at the chart, do you see that there's sort of an uptick, sort of an uptick in the number of daily views, maybe about 40 percent of the way through the chart?

A.   Yes.

Q.   Approximately what time period did that happen in?

A.   June 12, 2020.

Q.   Actually, before we get to the big -- the biggest peak, do you see there's a smaller peak, looks like, a little after

May 5?

A.   Yes.

Q.   So that was it looks like -- it doesn't have every date on it, but it was a little after May 5, before June 6, right?

A.   Yes.

Q.   So in that time period, at the sort of smaller peak, approximately how many people watched that video in a single day?

A.   Less than 500.

Q.   And was it more than 250?

A.   Yes.

Q.   Now, you pointed to another peak in June.  Do you see that?

A.   Yes.

Q.   So it looks like the top of that one is June 12, 2020.  Do you see that date?

A.   Yes.

Q.   So just taking that date for an example, on that day alone, June 12, 2020, how many people watched the Nikola One 2016 unveiling?

A.   642.

Q.   Now, if we flip to -- actually, before we get to page 4 of this -- why don't we flip to page 4.

         What is this chart?

A.   So this is showing video views for the Nikola One electric semi-truck product video.

M9LHMil2                          Amzallag - Direct

            MR. PODOLSKY:  Could we pull up, just for a moment,

Government Exhibit 402, and we can just play a few seconds of

it or so.

            (Video played)

            MR. PODOLSKY:  Pause it.

Q.  Do you recognize that video, Ms. Amzallag?

A.  Yes.

Q.  Is that the same -- is that the video that the views are

for on page 4 of Government Exhibit 287?

A.  Yes.

Q.  So let's go to page 4.

            And is this the same time period that we looked at in

the prior pages of this document?

A.  Yes.

Q.  So between March 3, 2020, and September 9, 2020, how many

times did people watch that video of what looks like the truck

driving down the road?

A.  21,469.

Q.  How many impressions of that video of the truck going down

the road were made?

A.  64,508.

Q.  You see that the line is fairly flat in the first sort of

few months of 2020?

A.  Yes.

Q.  And then you see there's a peak right in the middle?

A.  Yes.

Q.  If you can look at the chart, approximately when did that happen?

A.  Around June 6, 2020.

Q.  And do you recall how long after the company went public that was?

A.  Sorry.  Can you repeat the question.

Q.  If you remember, what was that date in relation to when the company went public?

A.  I believe so.

Q.  Was it around the same time?

A.  I think so, yeah.

Q.  And so I know we're going to have to estimate here, but at that very peak in that day in June 2020, how many people watched the video on that single day?

A.  Less than 1,200.

Q.  And was it more than 800?

A.  Yes.

        MR. PODOLSKY:  OK.  You can take that down.

Q.  Let's talk for one moment about some of Mr. Milton's tweets.  I think you testified earlier that Mr. Milton had a personal Twitter account.  Do you recall that?

A.  Yes.

Q.  Now, you also mentioned that Mr. Milton had access to the company's Twitter account.  Do you recall that?

A.   Yes.

Q.   Were there any times that the company's -- the passwords of the company's social media accounts were changed?

A.   Yes.

Q.   Did Mr. Milton get the passwords back after they were changed?

          MR. BONDI:  Objection, your Honor.  Time frame?

          THE COURT:  Yes.

          MR. PODOLSKY:  Approximately 2020.

          MR. BONDI:  And leading, your Honor.

          THE COURT:  I'm sorry?

          MR. BONDI:  Objection, time frame and leading.

          THE COURT:  Overruled.

A.   Yes.

Q.   Did Mr. Milton get the passwords back after the -- they were changed?

A.   Yes.

Q.   How?

A.   He would either, you know, text, call me, email me asking me what the password was.

Q.   Did you give it to him?

A.   Yes.

Q.   Why did you do that?

A.   Because he was the founder and CEO.

Q.   Did you feel that you could refuse?

A.   No.

Q.   All right.  Let's look at just a couple of company tweets.

If we could pull up, I think -- just one moment, your Honor -- for the witness what's been marked as Government Exhibit 565.

Do you recognize this document, Ms. Amzallag?

A.   Yes.

Q.   What is it?

A.   It's a Twitter exchange.

Q.   And is the Nikola Motor company account involved in that exchange?

A.   Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 565.

MR. BONDI:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 565 received in evidence)

BY MR. PODOLSKY:

Q.   All right.  Ms. Amzallag, what are we looking at in this exhibit?

A.   This is an exchange on Twitter from someone in the company account.

Q.   All right.  So you see the exchange starts with a message from another person, looks like @mr.arcimoto?  Do you see that?

A.   Yes.

Q.   And then what account responds to that?

A.   Sorry, what was that?

Q.   Which account responds below?

A.   The company account.

Q.   All right.  And you see what this says "replying to," and it's got a few symbols there or names?

A.   Yes.

Q.   What are those?

A.   That means anyone that was in the original thread will also receive notification of the response from the company.

Q.   OK.  Now, notwithstanding that this was a reply to somebody specific, was this publicly viewable to anyone using Twitter?

A.   Yes.

Q.   And what was the date of this tweet?

A.   January 24, 2020.

Q.   All right.  Do you see the tweet says, "Might be able to" -- well, let's start, actually, with the question.

        You see it says:  "Hi Trevor.  Is $2.50 per kilogram possible by 2021"?  Do you see that?

A.   Yes.

Q.   And then, "Theoretically, how low could it go in the next five years?"  Do you see that?

A.   Yes.

Q.   How does the company account respond?

A.   "Might be able to.  Our cost is $3 per kilogram for green

H2 on-site compressed.  So sale price would be around 4 or 5-ish.  In time, I believe it could come down."

Q.  So first question, do you know who wrote the response from the Nikola Motor company account?

A.  Trevor.

Q.  How do you know that?

A.  A few things.  So it's not worded in, you know, company messaging.  It's very casual.  And then where it says "Twitter for Android," that would be Trevor's phone.

MR. BONDI:  Objection, your Honor.  Move to strike. This is speculation.

THE COURT:  Overruled.

Q.  Also, to be clear, was anyone other than you and Trevor able to post on the company's account?

A.  No.

Q.  Did you write this?

A.  No.

Q.  Where Mr. Milton wrote, "Our cost is $3 per kilogram for green H2 on-site compressed," do you see that?

A.  Yes.

Q.  Did he run this by you before he posted it?

A.  No.

Q.  Do you know, or did you know at the time, whether or not it was accurate to say that Nikola's cost was $3 per kilogram for green H2 on-site compressed?

A.   No.

           MR. PODOLSKY:  Let's look at one more.  Let's pull up

for the witness, for Ms. Amzallag, Government Exhibit 568.

Q.   Do you recognize this document, Ms. Amzallag?

A.   Yes.

Q.   What is it?

A.   It's a Twitter exchange.

           MR. PODOLSKY:  Your Honor, the government offers

Government Exhibit 568.

           MR. BONDI:  No objection.

           THE COURT:  It will be received.

           (Government's Exhibit 568 received in evidence)

           MR. PODOLSKY:  May we publish?

           THE COURT:  You may.

BY MR. PODOLSKY:

Q.   OK.  Now that we can all look at it, is this another

Twitter exchange?

A.   Yes.

Q.   Why don't we go through it.

           So do you see the top is written by someone named

Alex?

A.   Yes.

Q.   And what did Alex write?

A.   He writes:  "It took more than one year for Nikola Motor to

build one hydrogen fueling station.  A whole other year has

M9LHMil2                        Amzallag - Direct

passed since that first station was finished.  How many more stations have they built?  Zero.  But Nikola Motor Company promises to build 820 stations in the next few years."

(Continued on next page)

M9LCmil3                        Amzallag - Direct

BY MR. PODOLSKY:

Q.  There is an emoji afterwards; is that right?

A.  Yes.

Q.  What account responded to that post or comment?

A.  The company account.

Q.  What's the date on that response?

A.  March 5th, 2020.

Q.  Was this response publicly viewable to any person on Twitter?

A.  Yes.

Q.  Do you see the response reads, it actually took four years to figure out the mass production design, it only took eight months to install and permit, which was three times faster than anyone in the world.  Now mass production is ready to plug and play.  Might want to look at the good, not the negative.

        Do you see that?

A.  Yes.

Q.  Who wrote that?

A.  Trevor.

Q.  How do you know that?

A.  Because the way the tweet is worded.  Again, it's very casual.  It's not something that I would have knowledge on in order to respond to someone.

        MR. BONDI:  Objection, your Honor.  This is speculation.  Move to strike.

M9LCmil3                        Amzallag - Direct

THE COURT:  Overruled.

Q.  To be clear, did you write this, Ms. Amzallag?

A.  No.

Q.  Now looking at the comment, that it took four years to figure out the mass production design, it only took eight months to install and permit.

Do you know whether or not it was accurate to say that it took eight months to install and permit the mass production design?

A.  No.

MR. PODOLSKY:  Just a moment, your Honor.

I think we're at a break and no further questions for this witness at this time.

THE COURT:  Very well.  Ladies and gentlemen, it's 11 o'clock, so we'll take our first break, 20 minutes.

Don't discuss the case.

(Continued on next page)

M9LCmil3                          Amzallag - Direct

(Jury not present)

THE COURT:  Ms. Amzallag, you may step down and everyone can be seated.

Mr. Mukasey.

MR. MUKASEY:  Judge, I have a proposed instruction relative to the company policy that we discussed a little earlier.  It's written in Caruso's and my chicken scratch, but I'm happy to hand it up or read it out loud.

THE COURT:  Why don't you read it out loud first, slowly.

MR. MUKASEY:  The proposed instruction would be:  You heard testimony concerning Nikola's social media policies and whether Mr. Milton complied with them.  Those are policies that may or may not apply at Nikola.  Those policies do not have the force of law and I will instruct you on the law at the end of the case.  You may consider company policy only in the context of all the other evidence in the case.  The ultimate question in this case is not whether Mr. Milton complied with a company policy, but whether he complied with the applicable law as I will explain it to you.

MR. PODOLSKY:  So we object to all of that.  It's, first of all, entirely argument.  They are commentary on the facts.  The witness testified that the policy applies to everyone.  So it would be wildly inappropriate for the Court to tell the jury to disregard the testimony.

I will note that the defense opened on that Mr. Milton was not a renegade in media, he was following policy. So I think we're entitled to put in facts to rebut that argument. I think it would be perfectly appropriate, and we would be happy to see the defense's authority for this to discuss a potential instruction that goes along with the standard instructions to the jury about listening to the judge's instructions on the law and what they ultimately have to find. I don't think it would be appropriate at this time to basically make the defendant's cross examination for them and tell the jury to assign less weight for this document. The defense is welcome to cross examine the witness and suggest that the document has less weight than might be attributed to it.

THE COURT: I'm not going to give that instruction.

MR. MUKASEY: Would your Honor consider a shorter instruction that doesn't refer to the testimony? I purposely tried not to, but the simple fact that company policy is not the law against which they're supposed to adjudge this defendant is very standard in cases where company policy is allegedly broken or not complied with.

THE COURT: Why don't you give me your draft and I'll consider it.

MR. PODOLSKY: Your Honor, I'll note we'll be happy to see the law that supports the proposition that this kind of instruction is standard. I know that, speaking from my own

experience, I've examined witnesses on government or corporate policies numerous times and I'm not familiar with that instruction.

MR. CARUSO:  If your Honor, please, Mr. Podolsky says can we see the law on this.  There's no law on this, this is discretionary.  The Court has discretion to tell the jury at the appropriate time what's important in the case, and the essence of that is you've heard testimony about a company policy, you heard testimony about the violation or of noncompliance with a company policy.  I'm instructing you that you can consider that, but the company policy is not the law. At the end of the case, the ultimate question is whether he violated the law, not the company policy.  That's all it needs. It's within the Court's discretion and I think it's very important to do that at this time and not bury it in his instruction that they're going it to hear three weeks from now.

MR. MUKASEY:  And I can cite cases in which it's happened.

THE COURT:  I'm sensitive to the issue.  I think I would be — let me consider what you've provided — giving a much, much briefer version of this, essentially that says you've heard testimony that Mr. Milton violated the company's social media policy, jump to, ultimately, I will instruct you as to the law that applies in this case.  Something along those lines.

MR. MUKASEY:  Thank you.

MR. CARUSO:  Thanks, Judge.

THE COURT:  Don't be late.  You've got 15 minutes now.

(Recess)

THE COURT:  Before we bring back Ms. Amzallag, this is what I will instruct the jury.  You have heard testimony concerning Nikola's internal social media policies and whether Mr. Milton complied with them.  You may consider company policy in the context of all of the other evidence in the case.  I will instruct you on the law at the end of the case.

MR. MUKASEY:  Fair enough.  Thank you, Judge.

MR. PODOLSKY:  No objection.

THE COURT:  Let's bring Ms. Amzallag in, please.

MS. ESTES:  Your Honor, I do believe there was a line at the bathroom and she was waiting.  Sorry.

THE COURT:  She should be given priority.

MS. YOUNG:  Your Honor, while we have a moment, may I address the cases cited by Mr. Roos earlier?

THE COURT:  Sure.

MS. YOUNG:  It appears that all of them relate to the Lanham Act where the confusion in the market is an element, which is distinguishable from the instance here where we have securities and wire fraud.

MR. ROOS:  Your Honor, we totally agree, those are Lanham Act cases.  The reason we cited them is we think the

analogy is pretty close.  There in the Lanham Act cases, witnesses, sometimes experts, as in one of the cases, testify about consumer reaction.  So, for instance, a consumer walked into the store and said, my understanding is this is supposed to be $8, and that's proof of the consumer confusion in those cases.  Here, we're not proving consumer confusion, but again, a consumer, that is investors' reaction.  And so, the same principles, at least in terms of hearsay, under it not being offered for the truth and under 803(3) apply.

THE COURT:  I agree.  I'm going to let those slides in.

(Continued on next page)

M9LCmil3                     Amzallag - Cross

(Jury present)

THE COURT:  Everyone, please be seated.

Ladies and gentlemen, before we begin cross examination, I just need to give you one brief instruction.

You've heard testimony concerning Nikola's internal social media policies and whether Mr. Milton complied with them.  Now, while you may consider company policy in the context of all of the other evidence in this case, I will be instructing you on the law that applies to the case at the end of the case.

Mr. Bondi.

MR. BONDI:  Your Honor, may it please the Court.

CROSS-EXAMINATION

BY MR. BONDI:

Q.  Good morning, Ms. Amzallag?

A.  Yes, Amzallag.

Q.  My name is Brad Bondi.  We haven't met, have we?

A.  No.

Q.  Ms. Amzallag, I apologize in advance if I slip up and call you Mrs. Fleck because I've seen so many emails with your name as Fleck.

Ms. Amzallag, you were interviewed, either in person or virtually, by the government a total of six times; is that right?

A.  I'm not sure the number of times.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M9LCmil3                          Amzallag - Cross

Q.   Well, do you recall speaking with the government in
February of 2021?

A.   I'm not sure of the date.

Q.   July of 2021?

A.   I know I spoke to the government in person, but I'm not
sure what dates they were.

Q.   And in 2022, June of 2022, does that ring a bell?

A.   Sure.

Q.   August of 2022?

A.   Sure.

Q.   September 9th of 2022, just recently?

A.   Maybe that date, yeah.  Again, I'm not sure on the exact
dates.

Q.   And just a few days ago on September 18th, 2022; right?

A.   Yes.

Q.   And in total, about how much time did you spend with the
government, roughly?

A.   Maybe an hour, two hours.

Q.   In total, across all of them?

A.   No, just per day.  I'm not sure total amount of time, hours
spent.

Q.   Would it surprise you if I said over 15 hours?

A.   I'm not sure.  It could be a total of 15 hours.

Q.   Ms. Amzallag, I want to briefly take out of order something
because the government showed you a nice colorful exhibit.

MR. BONDI:  Chris, if I could bring it up at 287, please.

And this has been admitted, your Honor.

Q.  Ms. Amzallag, you created this document for the government; correct?

A.  I pulled it from our YouTube analytics on our Nikola Motor Company social media platform.

Q.  The government asked you to create this document; isn't that right?

A.  I didn't create it, but I did pull it, yes.

Q.  The government asked you to pull this information?

A.  Yes.

Q.  And the government asked you to pull this information just this summer in 2022; right?

A.  I can't recall the exact time.

Q.  It was this year, though; right?

A.  I believe it could be around that timeframe.

Q.  If you look at the first page, there is something marked there, June 12th, 2020; right?  Do you see that?

A.  Yes.

Q.  Did the government ask you to put that legend in there?

A.  I can't recall if they asked me specifically to put that in there.

MR. BONDI:  Let's flip three pages later.

Q.  Do you see there is another ledge in there about Nikola One

electric semi truck?  Do you see that?

A.  Yes.

Q.  Did the government ask you to add that ledge in?

A.  No, that was already populated in the platform.

Q.  Did the government ask you what to look at here, what to pull?

A.  I can't recall.

Q.  Did they direct you to the timeframe?

A.  I believe that may have been timeframe that I pulled, but I can't really recall.

Q.  And Ms. Amzallag, if you pulled this data in 2022 at the government's direction, Mr. Milton never saw this data, did he?

A.  No, I don't believe he has.

Q.  And Ms. Amzallag, does it surprise you that I've never seen any of this information in all of your emails?

A.  I'm sorry.  Can you repeat the question.

          MR. PODOLSKY:  Objection, your Honor.

          THE COURT:  The objection is sustained.

Q.  Ms. Amzallag, isn't it true that you've never sent information like that by email to Trevor Milton?

A.  I've sent Trevor emails relating to reporting and analytics, so he did at some point receive reporting from me.

Q.  You've never sent him graphs like that, Ms. Amzallag, have you?

A.  I'm sure I've sent him graphs, but I can't recall sending

M9LCmil3                       Amzallag - Cross

him something like this specific data.

Q.   Ms. Amzallag, since you joined Nikola in March of 2019, Nikola's had a topnotch marketing department; right?

A.   Yes, I would say so.

Q.   And at the time all the way through September of 2020, the marketing department was headed by Vince Caramella; right?

A.   Yes.

Q.   And Mr. Caramella's title is the global head of marketing; right?

A.   Yes.

Q.   And he hired you?

A.   He did.

Q.   And all the time from March 2019 through September 2020, the company paid your salary; right?

A.   Yes.

Q.   And as global head of marketing, Mr. Caramella reviewed the press releases; isn't that right?

A.   I believe so, yes.

Q.   And there was a review process that took place for the press releases; isn't that right?

A.   Yes.  I wasn't actively involved in that process, though.

Q.   And that review process included Mr. Caramella; right?

A.   Yes.

Q.   Ms. Rose?

A.   Yes.

M9LCmil3                         Amzallag - Cross

Q.   And Britton Worthen, Nikola's chief legal officer; correct?

A.   Yes.

Q.   And Mr. Caramella reported to CEO Mark Russell; right?

A.   Yes.

Q.   And since you started at Nikola in March of 2019 through the end of September, you reported to Vince Caramella?

A.   Yes.

Q.   And in 2020, Vince Caramella attended weekly meetings with members of senior leadership; right?

A.   Yes, I believe so.

Q.   And those were sometimes called the standup meetings?

A.   I'm not sure what they were called.

Q.   And those were meetings that Mr. Russell oversaw; right?

A.   Yes, I believe so.

Q.   And the marketing team that you were part of also had weekly meetings that Mr. Caramella then led; right?

A.   Yeah, we did have weekly marketing meetings.

Q.   And those meetings would last about an hour; right?

A.   Yes.

Q.   And Mr. Caramella would tell you and the marketing team what was discussed during the weekly leadership meetings that he attended; right?

A.   To a certain extent.

Q.   And he shared what other executives were talking about; right?

M9LCmil3                         Amzallag - Cross

A.   I think he shared broad knowledge, but it wasn't specific, specific details, that I'm aware of.

Q.   And another member of the marketing team is Nicole Rose?

A.   Yes.

Q.   She does a good job with her job; right?

A.   Yes.

Q.   And Ms. Rose is Nikola's head of public relations; right?

A.   Yes.

Q.   Let's talk about Ms. Rose's duties in 2020.  Ms. Rose scheduled interviews for Trevor Milton; right?

A.   She played a part in scheduling them, but I wouldn't say she was the primary person that was scheduling them.

Q.   And Ms. Rose helped to prepare Trevor for those interviews?

A.   I'm not sure, you know, who all prepared Trevor in those interviews.  A lot of the times, he would just go on them.

Q.   Well, typically, Ms. Rose or someone from the marketing team prepared Mr. Milton for interviews; isn't that right?

A.   I'm not sure to what extent that preparation process is because I was not heavily involved in that.

Q.   Ms. Amzallag, you were interviewed by lawyers from the company in October 2020; right?

A.   Could be around that time, yes.

Q.   And you were asked about who prepared Mr. Milton for the interviews.  Do you remember that?

A.   Not -- I can't really recall.

MR. BONDI:  Can we pull up the notes from the interview --

MR. PODOLSKY:  Objection to the characterization of the document.

THE COURT:  Yes.  Sustained.

MR. BONDI:  Chris, can we pull up the notes, please --

MR. PODOLSKY:  Objection to the characterization of the document.

THE COURT:  Sustained.  Just pull up the document.

MR. BONDI:  Can we pull up the document that may refresh Ms. Amzallag's -- could you please pull up 3516-004, page 2, first bullet.

Q.  Ms. Amzallag, I just want you to read that to yourself, please.

A.  Okay.

Q.  Ms. Amzallag, does that refresh your recollection that, typically, Ms. Rose or someone from the marketing team prepared Mr. Milton for interviews?

A.  It does not refresh my memory.

MR. BONDI:  We'll go off of that, then.

Q.  In 2020, Ms. Rose was responsible, too, for media relationships; right?

A.  She was, yes.

Q.  And as head of public relations, Ms. Rose also reviewed the press releases.  We talked about that; right?

M9LCmil3                        Amzallag - Cross

A.  She reviewed them, yes.

Q.  And there was a name mentioned earlier, Colleen Robar;
right?

A.  Yes.

Q.  And she was an outside PR agent for the company; right?

A.  Yes.

Q.  And she was the PR agent for the company from the time you
started all the way through at least September of 2020; right?

A.  Yes.

Q.  And she was hired by the company; right?

A.  Yes.

Q.  Her contract was with the company; right?

A.  I can't really speak to what type of contract Colleen has,
but --

Q.  Fair enough.  Ms. Robar also helped with coordinating
Trevor's interviews and media appearances; right?

A.  I think she played a part, but again, I'm not familiar with
how the, you know, what level of detail that's all involved
with.

          MR. BONDI:  Let's see if we can pull up a document to
refresh the witness's recollection.

          MR. PODOLSKY:  Objection, your Honor.  She did not
express a failure of recollection.

          THE COURT:  Overruled.

          MR. BONDI:  3516-006, page 7, last paragraph.

Q.  Ms. Amzallag, if you can read that just to yourself, please.

A.  Okay.

Q.  Does that refresh your recollection that Ms. Robar helped with coordinating interviews of Trevor Milton and his media appearances?

A.  No.

MR. BONDI:  Let's look back to an exhibit that's already in evidence, and it's Government Exhibit 410-B, please. If you could just pull up the still here.

Q.  Ms. Amzallag, do you see that backdrop there behind Trevor?

A.  Yes.

Q.  Has a big N; right?

A.  Yes.

Q.  That's for Nikola; right?

A.  Yes.

Q.  Ms. Amzallag, this studio is located at Nikola; right?

A.  Yes.

Q.  At the headquarters?

A.  Yes.

Q.  On the third floor?

A.  Correct.

Q.  And that's the third floor with the executives; right?

A.  It is.

Q.  And Trevor had an office there; right?

A.  Yes.

Q.  And next to his office was chief legal officer Britton Worthen?

A.  Yes.

Q.  Down the hall was CEO Mark Russell?

A.  Yes.

Q.  And next to Mark Russell was CFO Kim Brady?

A.  Yes.

Q.  And this studio was 20 feet away from their offices; right?

A.  I can't really say how far away the studio was from, but it was on the third floor.

Q.  Less than 50 feet, roughly?

A.  Could be.

         MR. BONDI:  Let's move off of that.

Q.  Now let's talk specifically about your role at Nikola.

         In 2019 and 2020, you were Nikola's social media and digital marketing manager; is that right?

A.  Correct.

Q.  And in that role, you were in charge of social media aspects of Nikola?

A.  Yes.

Q.  And that responsibility included content strategy development; is that right?

A.  Yes.

Q.  And working with partners for cross branding?

M9LCmil3                          Amzallag - Cross

A.   We would work with outside partners in terms of what type
of messaging we would want to share and could affirm what we
were sharing was, you know, aligned with our messaging.

Q.   And working on website optimization; is that right?

A.   I can't really recall the specifics on the website
optimizations.

Q.   And you were involved in monitoring paid advertising; is
that right?

A.   We did some paid advertising, yes.

Q.   And part of your role was to watch that paid advertising;
right?

A.   Yes.

Q.   And you oversaw Nikola's social media platforms; right?

A.   Yes.

Q.   And that included posting on those Nikola official social
media channels; right?

A.   Correct.

Q.   You talked about this a little bit earlier, but Nikola had
a Facebook account; right?

A.   Yes.

Q.   And Nikola had an Instagram account?

A.   Yes.

Q.   And Nikola had a LinkedIn account?

A.   Yes.

Q.   Nikola had a Twitter account?

M9LCmil3                       Amzallag - Cross

A.   Yes.

Q.   Nikola had a YouTube account?

A.   Yes.

Q.   And these accounts were all public; right?

A.   They were, yes.

Q.   And anyone could see them; right?

A.   Correct.

Q.   And you posted information to Nikola's social media; right?

A.   Yes.

Q.   And only occasionally would Trevor post something to Nikola's social media; right?

A.   I wouldn't say occasionally.  It was quite often.

Q.   Well, Ms. Rose, occasionally is exactly what you told the government when you were interviewed on July 13th, 2021; isn't that correct?

A.   I can't recall what I said that time.

Q.   And the government was taking notes during that interview; right?

A.   I can't say if they were taking notes or not.  I wasn't paying attention.

         MR. BONDI:  Chris, can you pull up the notes please --

         MR. PODOLSKY:  Objection.

         MR. BONDI:  Excuse me.  Can you pull up a document, please, 3516-007, please.

Q.   Ms. Amzallag, I'd like for you to look at the document at

page 2, paragraph 2 from the bottom.  Ms. Amzallag, isn't it true, in fact, that Trevor occasionally posted to Nikola's social media?

A.  I wouldn't say occasionally.

Q.  Did you say occasionally to the government in the summer of 2021?

A.  I -- this document, I can't really say.  It doesn't refresh my memory.

Q.  Most of the time, though, you posted to the website; right?

A.  To our social media platforms, yes.

Q.  Most of the time, you posted to Nikola's social media platforms?

A.  Yes.

Q.  And you personally can see what's posted to these accounts; right?

A.  Yes.

Q.  And you would run social media posts by Vince Caramella, your boss; right?

A.  Yes.

Q.  And isn't true that you sometimes would even run posts by the legal department to get their input?

A.  Yes.

Q.  And Britton Worthen was the chief legal officer at Nikola; correct?

A.  Yes.

Q.   Now, when a post concerned technical issues about trucks and other vehicles, you would run those issues by the technical department, as needed; correct?

A.   If there were company posts that we were sharing, there would be information I would run by other departments to make sure what we were sharing was accurate.

Q.   And that would include somebody named Jesse Schneider; right?

A.   I believe so.

Q.   And what was Jesse Schneider's role?

A.   I believe he was head of the hydrogen department.  I can't recall what his specific title was.

Q.   Now sometimes Trevor's interviews were posted to Nikola's social media feeds; right?

A.   Yes.

        MR. BONDI:  I'd like to pull up what's been admitted as GX-247, please.

Q.   Now, in this email the government showed you a bit earlier, I don't want to retread --

        MR. PODOLSKY:  Objection.  This is not in evidence, your Honor.

        THE COURT:  There is not a Government Exhibit tab there.

        MR. BONDI:  It was admitted as 247.  Chris, can you pull up 247, please.

Q.  Ms. Amzallag, this was admitted earlier by the government and you were asked questions about that.  This is Government Exhibit 247.  I don't want to ask you the same questions the government asked, but I do have some followup here.

You described the process for streamlining, uploading video interviews to Nikola's social media.  Do you see that?

A.  Yes.

Q.  And this communication was only 12 days after Nikola went public on June 4th, 2020; right?

A.  I can't recall the specific date we went public.

Q.  Do you remember going public in early June of 2020?

A.  It could be around that time, but I can't identify that specific date and time.

Q.  And this was around the same time period?

A.  It could have been.

Q.  In this email, you specifically told Trevor once we receive the video file, the video is vetted by the team to discuss the pros and cons from different angles.  Do you see that?

A.  Yes.

Q.  And so, Mr. Milton was told that the team would review the statements before they were posted to social media.  Isn't that what it says?

A.  We would review the videos from a branding/messaging perspective.

Q.  And that team included Mr. Caramella; right?

A.  He was part of the team, but a lot of the times, it would come down to me reviewing that content.

Q.  And that team would include chief legal officer Britton Worthen; right?

A.  Not all of the time.

Q.  Some of the time, though; right?

A.  It just depended because due to the sense of urgency, Trevor wanting to get the videos up, the videos weren't always vetted by the entire team.

Q.  And in response to the vetting process here that you described, Trevor said, awesome, thanks for the update, exclamation point.  Do you see that?

A.  No, I don't see that on the document.

MR. BONDI:  Your Honor, withdraw that question.  I'm sorry.  I apologize.  I think that was a different document.

Let's actually go to that document, if we can.

Your Honor, I'd like to show the witness DX-526, please.

Q.  Ms. Amzallag, do you recognize DX-526?

A.  I see the email response from Trevor.

Q.  And this is a response to the email that the government showed you on direct; right?

A.  Yes.

Q.  And this was sent by Mr. Milton's Nikola account to your Nikola account; right?

A.   Yes.

MR. BONDI:  Your Honor, I'd offer 526 into evidence.

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 526 received in evidence)

Q.   Ms. Amzallag, this was where I headed earlier until I realized I didn't have the document.

In response to your email describing the vetting process in which the government showed you on direct, Mr. Milton writes back to you here, awesome, thanks for the update, exclamation point; right?

A.   Yes.

Q.   He didn't push back to the vetting process that you described?

A.   I'm sorry.  Could you repeat the question.

Q.   He didn't push back to the vetting process that you described?

A.   No.

MR. BONDI:  Let's take down this document.

Q.   Now in 2020, there were also times that Trevor asked the marketing department to post an interview to Nikola's social media and it wasn't posted; right?

A.   I can't recall what times those were.

Q.   But there were times, though, right, that Mr. Milton asked that an interview be posted to Nikola's social media and it

wasn't posted; right?

A.  I can't recall those times.  Usually, Trevor specifically asked for a video or something to be posted on social, it would happen.

Q.  Were there times where it didn't happen?

A.  Not that I can recall.

Q.  Ms. Amzallag, that's not what you told the government on February 4th, 2021, is it?

A.  I can't recall.

          MR. BONDI:  Let's see if we can pull up a document to refresh her recollection.

          Before we do that --

Q.  When the government interviewed you, they were taking notes; right?

A.  I'm not sure.

Q.  There were a lot of people in the room from the government?

A.  I can't recall.

          MR. BONDI:  Chris, why don't we pull up a document to see if we can refresh the recollection of the witness. 3516-006, page 1, last paragraph, please.

Q.  Ms. Amzallag, if you could read that just to yourself, please.

A.  Okay.

Q.  Ms. Amzallag, there were times that Trevor Milton asked to post an interview and your team refrained from posting the

M9LCmil3                          Amzallag - Cross

interview; isn't that correct?

A.  I can't recall those times.  If there was an interview Trevor said he didn't do well on and didn't want to post it, then we would say okay, we won't post the interview.

Q.  But there were interviews that he asked to post that were not posted by the marketing team; right?

A.  I can't recall what those interviews would be.

          MR. BONDI:  Let's move off of that.

Q.  And you testified on direct that Trevor Milton had his own social media accounts; right?

A.  Yes.

Q.  And Trevor posted about Nikola; right?

A.  Yes.

Q.  And from 2019 when you joined the company through at least September 2020, you followed Trevor on social media; right?

A.  Yes.

Q.  And others followed Trevor on social media, others at the company?

A.  Yes.

Q.  And you kept an eye on what Trevor was sharing on social media; right?

A.  Yes.

Q.  And if you had a concern about something Trevor posted, you would share those concerns with Vince Caramella, your boss; right?

A.   I would bring it up to him if there was something that Trevor posted that maybe I've never -- it was my first time learning about, yes, I would bring it up to Vince.

Q.   And you did this if you had a concern so that Mr. Caramella could decide if anything further needed to be done; right?

A.   Yes.

Q.   And Mr. Caramella was aware that you were monitoring Trevor's social media postings; right?

A.   Yes.

Q.   And you also would share concerns with chief legal officer Britton Worthen; right?

A.   Yes.

Q.   And Mr. Worthen was aware that you were also monitoring Trevor's social media posts; right?

A.   Yes, but Trevor was very active on social media, so there were times where, obviously, I couldn't see everything he was tweeting or posting about.

Q.   Chief legal officer Worthen even provided you some general guidance about what to look for in social media posts by Trevor after Nikola went public; correct?

         MR. PODOLSKY:  Objection, your Honor.  May we have a sidebar?

         THE COURT:  Yes.

         (Continued on next page)

(At the sidebar)

MR. PODOLSKY:  If there was a specific communication that's been produced that he wants to ask about, we're not going to object to that, but if he starts asking questions about legal advice that the company gave to her, then I think we invaded the company's privilege, which your Honor already ruled on.

MR. BONDI:  I have read your Honor's ruling.  I've been trying to be mindful to stay on the right side of that ruling.  Where I'm going with this is chief legal officer Worthen gave her general directions, not legal advice, but general directions about what to look for in Trevor Milton's post.  Those general directions were explored *ad nauseam* by the government during interviews of the witness in front of company counsel without objection.  And, your Honor, I intend to ask what direction she was told by Mr. Worthen to look for in those posts.  It's not legal advice.

THE COURT:  Of course it's legal advice.

MR. BONDI:  Excuse me.  You said, of course it's legal advice?

THE COURT:  Yeah, she went to the company lawyer to ask what she should do.

MR. BONDI:  No, your Honor.  What the question, and I'll proffer the question, is around the time that Nikola went public, chief legal officer Worthen talked to you about

reviewing Trevor's posts and making sure he wasn't talking about financially related information on social media.  This was general.  He told her, make sure she's not talking about financially related information on social media.  That's not legal advice, that's directly directing her to make sure he's not talking about that.  And so it also goes, your Honor, to the witness's state of mind because he was aware that she was monitoring, he was aware, as we're going to establish --

THE COURT:  She was aware that who was monitoring?

MR. BONDI:  Excuse me, your Honor.  I'll rewind.  This also goes, your Honor, under 803(3), but it goes to the witness's understanding of who was monitoring his social media and for what reasons.  But this was a direction from Mr. Worthen that wasn't in the context of any specific tweet, but he directed her, when the company went public, to look out for whether Mr. Milton was posting financially related information on social media.  And the government, like I said, your Honor, explored this with the witness with no objection from company counsel during the interviews.  And I'm happy to even show you the 3500 material.

MR. PODOLSKY:  Actually, if he provides a cite to the 3500 material, it would help.

MR. BONDI:  It's 3516-007, page 3 at the top of the page.

MR. PODOLSKY:  We're going to grab it to look.

M9LCmil3                          Amzallag - Cross

MR. MUKASEY:  While there is a break in the action, don't out me on this, juror number 6 is on the phone now playing and doing something.  He may have just put it away.  I noticed it at the last break, I noticed it now.  I don't know what the instructions are for that, if any.  She's in the courtroom with the phone, clearly using it.

THE COURT:  During the pandemic, we relaxed some of the phone procedures so that the jurors could bring in the phones.  I haven't seen them using their phones during the testimony.

MR. MUKASEY:  It's just been during the breaks.  Just alerting the Court.  I don't know what the exact rule is on that.

MR. PODOLSKY:  Sorry.  Where are we looking?

MR. BONDI:  It's 3516-007, top of page 3 where it says time when Britton Worthen talked to Stephanie Fleck about reviewing posts and making sure TM wasn't talking so much financially related info on SM — presumably social media — around the time when SF started paying attention to what TM posting online.  TM posting a lot more frequently when went public.

And counsel from the company and the witness were present and neither of them objected.

MR. ROOS:  Just to be clear, the 3500 notes don't necessarily reflect all the instances in interviews in which

company counsel did object to the government asking questions.

MR. CARUSO:  That's not the point.

MR. PODOLSKY:  Look, these are notes.  I suppose if he wants to ask, did Mr. Worthen ever talk to you about reviewing financially related info, I suppose that question's acceptable, but I think if he asks what direction and what you told her to do -- this refers to a topic.  He can ask about the topic.  I don't think he can get into what the advice or objections were.

MR. CARUSO:  May I come at this in a slightly different way.  We stood up at the pretrial conference and said we're not running an advice of counsel defense, we're running a good faith defense.  Now, information that goes to a person like this woman on the stand and then in turn did or could have gone to the defendant is relevant to good faith.  And whether the source of that information is the CEO, the CFO, or a lawyer, doesn't matter.  In other words, information that informs, ultimately, the defendant's state of mind is not excluded because it came from a lawyer.  They're trying to reinject --

THE COURT:  They're sitting there.  He's trying --

MR. CARUSO:  The government objected on the ground this is legal advice and my point is, so what.  It informs part of what the witness knows, which, in turn, informs part of what the defendant knows.  The information that informs the defendant's state of mind can come from the CEO, the CFO, or a

M9LCmil3                      Amzallag - Cross

lawyer.  That doesn't make -- just because it comes from a lawyer doesn't mean it's excluded because we're not running that kind of defense, we're running a much more general, good faith defense.

MR. BONDI:  Your Honor, if I may cut through and maybe try to solve everything.  When Mr. Podolsky said he was okay with this, are you okay with, did Mr. Worthen provide directions for you on what to look for on Trevor's social media?

MR. PODOLSKY:  I'm not going to script his questions.  I think his question should be, did he talk to you about the topic.  I don't think it should be what the direction was, which wasn't even in the notes.

If this comes up again, it makes absolutely clear that testimony about advice she was given by someone else for which there was no factual predicate that was related to the defendant is absolutely inadmissible.  Here's what they want to argue.  They want to argue because the lawyer — again, this is privileged anyway — said something to her, they should be able to argue that the defendant knew it.  Well, that's absurd.  If they want to ask her, did you say something to him, that's fine.

MR. CARUSO:  Judge, I'm not suggesting that so broadly.  I may have said it, but I realize there has to be some factual basis and good faith that the evidence went from

M9LCmil3                    Amzallag – Cross

the witness to the defendant.

THE COURT:  I think you can, ask did you discuss with Mr. Worthen whatever the topic is.

MR. BONDI:  What to look for in Mr. Milton's tweets?

THE COURT:  Yes.

(Continued on next page)

M9LCmil3                    Amzallag - Cross

            (In open court)

BY MR. BONDI:

Q.  Ms. Amzallag, did you discuss with chief legal officer

Worthen what to look for in Trevor's tweets?

A.  I don't remember that.

            MR. BONDI:  Chris, can we please pull up a document to

see if we can refresh the witness's recollection, 3516-007,

page 3, top of the page.

            Ms. Amzallag, if you would just review this document

to yourself, please.

A.  Okay.

Q.  I'll ask the question again, Ms. Amzallag.  Did you discuss

with chief legal officer Worthen what to look for in Trevor's

tweets?

A.  I can't recall.

            (Continued on next page)

M9LHMil4                         Amzallag - Cross

Q.   Do you recall telling the government that?

A.   No, I can't recall.

Q.   I'm showing you what -- I'd like to pull up another document for you.  I'm showing you what's been marked as Defense Exhibit 1247 for identification.

        If you could show just the witness, please.

        This document is a text exchange between you and chief legal officer Worthen, is that correct?

A.   Yes.

Q.   And do you recognize this text exchange?

A.   Yes.

Q.   And this would have been sent in your normal course of your duties at Nikola?

A.   It was sent through text, which is not typically the form of communication I would use.

Q.   But this was part of your job at Nikola.  This wasn't a personal text, in other words?

A.   Yes, it was my personal text.

Q.   But you sent it in your job at Nikola.  It wasn't a personal subject.  It was a work subject, right?

A.   Correct.

        MR. BONDI:  Your Honor, the defense offers Defense Exhibit 1247 into evidence.

        MR. PODOLSKY:  Your Honor, objection as to relevance as we just discussed at the sidebar.

THE COURT:  Overruled.

MR. BONDI:  Your Honor, may I offer 1247 into evidence?

THE COURT:  It will be received.

MR. BONDI:  May I publish to the jury, your Honor?

THE COURT:  You may.

(Defendant's Exhibit 1247 received in evidence)

BY MR. BONDI:

Q.  Now, it says "Stephanie Fleck."  That's your maiden name, right?

A.  Yes.

Q.  You forwarded here to chief legal officer Worthen a tweet from Trevor's personal Twitter account, right?

A.  Yes, looks like he responded from his personal Twitter account.

Q.  OK.  You were notifying chief legal officer Worthen that the tweet was about the Badger.  Do you see that?

A.  Yes.

Q.  And chief legal officer Worthen thanked you for sending it. Do you see that?

A.  Yes.

Q.  Chief legal officer Worthen then followed up following this tweet, isn't that correct?

A.  I'm not sure.

Q.  He followed up with Trevor after this tweet?

A.   I'm not sure.

Q.   I'd like to show you, then, what's marked for identification as GX 34, please.

     And this is a text exchange between Mr. Worthen and Mr. Milton.  Do you see that?

A.   Yes.

Q.   Does this appear to be their text messages?

          MR. PODOLSKY:  Objection.

          THE COURT:  Overruled.

A.   It looks like it.

          MR. BONDI:  Your Honor, I'd offer GX 34 into evidence.

          MR. PODOLSKY:  Objection, your Honor.  May we have a sidebar?

          THE COURT:  I'm sorry?

          MR. PODOLSKY:  May we have a sidebar on this?

          THE COURT:  Yes.

          (Continued on next page)

(At sidebar)

THE COURT:  OK.  So now Ms. Amzallag alerted Worthen to a tweet, and you want to offer a subsequent Twitter thread between Worthen and Milton?

MR. CARUSO:  Correct.

MR. BONDI:  Yes.

MR. PODOLSKY:  We're happy to take this up at another time.  She could not identify it.  She just simply read what was on the page.  Any question to her on this would be wholly irrelevant, so we would object to its admission at this time. We can talk about whether it would be admissible in the government's -- in the defense's case, but our objection in addition to doing it now is that it's hearsay.

MR. CARUSO:  If the objection is we should try again through another witness, then we can try again.

MR. BONDI:  No, I want to try through this witness, your Honor, because this completes the exchange, and I'll circle back to it, your Honor, and lay the foundation, but she alerted him to a text.  Excuse me, I should be more specific.

Ms. Amzallag, formerly Ms. Fleck, alerted Mr. Worthen to a tweet on Trevor's social media.  Mr. Worthen then followed up with Trevor by text.  This is the text I want to introduce. It was on the government's exhibit list.  We believe it comes in under 803(3) because it shows the declarant's, Mr. Milton's, state of mind.  And following this text exchange between the

general counsel and Mr. Worthen, Mr. Worthen did not take down the text -- the tweet.  In addition, your Honor --

THE COURT:  I guess all that may be true and this may come in.  I don't know, but you can't put it in through her is the point.

MR. BONDI:  I'll explain why I think I can, your Honor, and that is.  First of all, it is a business record and also, your Honor, it comes in, because the government already said these are business records, but putting that aside it comes in under 803(3) the reason why she was asked on direct about statements Mr. Milton said about the Badger, and already being produced, that came after this text exchange with Mr. Milton and Mr. Worthen.

So this goes directly to impeach her testimony on direct that he had a basis, based on his conversation with Mr. Milton, for saying "already been produced" on various podcasts that the government played on direct and has talked to her about, played with other witnesses, too.

MR. PODOLSKY:  They're welcome to make these arguments in their closing or in their defense case.  What they can't do is put in, by the way, a false exculpatory by their client, which is hearsay, and they certainly can't do it through this witness and try to put it in front of her to get a reaction.  It's irrelevant, and it's 403.

MR. CARUSO:  Are we going to argue the hearsay point

now or wait till there's another witness?  Because that's wrong.  That's wrong.  It's a hearsay argument.  It's not a false exculpatory statement.  That's irrelevant to the admissibility question.  This goes to state of mind, goes to the declarant's -- what Milton says, among other things, "So I'm OK?"  And -- "so I'm OK?"  And Worthen writes back and says, "I agree."  I mean, if that doesn't inform the defendant's state of mind, I don't know what does.

MR. BONDI:  And, your Honor --

MR. CARUSO:  It's not offered for the truth.

MR. BONDI:  And, your Honor --

THE COURT:  Also can't come in through this witness.

MR. CARUSO:  That's a different thing.

THE COURT:  I'm not going to let it in through this witness.

MR. CARUSO:  The hearsay point we'll reserve?

THE COURT:  Yes.

MR. CARUSO:  Thank you.

(Continued on next page)

(In open court; jurors present)

BY MR. BONDI:

Q.  Ms. Amzallag, after you sent the -- we can take down this document.  Thank you.

Let's go back to 1247, which has been admitted, please.

Ms. Amzallag, after you sent this text message enclosing the tweet from Mr. Milton, did you follow up with Mr. Worthen to see if he followed up with Trevor?

A.  No, because at the time if I have shared something with Britton, I would assume that would be taking place.

Q.  You assumed Trevor would have followed up with -- excuse me.

You would assume that the chief legal officer would have followed up with Trevor?

A.  Yes.

Q.  Are you aware that this tweet was never taken down?

A.  I'm not sure if it was ever taken down.

Q.  If the tweet wasn't taken down, would you believe that Mr. Worthen --

MR. PODOLSKY:  Objection.  Calls for speculation.

MR. BONDI:  I'll withdraw, your Honor.

Let's look at Defense Exhibit 1248, please.

Q.  This is an email -- you recognize this as an email from July 1, 2020, from you to Mr. Caramella and Ms. Rose?  Do you

see that?

A.   I see that.

Q.   And this was sent from your Nikola account to their Nikola accounts?

A.   Correct.

Q.   And this was sent as part of your duties at Nikola?

A.   I can't see the full context of the emails, so I'm not sure.

          MR. BONDI:   Yes, show the full context, please.

Q.   This was an email you sent as part of your work at Nikola, right?

A.   I can't recall this specific email.

Q.   Do you have any reason to doubt that you sent this email?

          MR. PODOLSKY:   Objection, your Honor.

          THE COURT:   Sustained.

          MR. BONDI:   Your Honor, defense offers Defense Exhibit 1248 into evidence.

          MR. PODOLSKY:   Objection.

          THE COURT:   Sustained.

BY MR. BONDI:

Q.   Ms. Fleck, do you -- I'm sorry, Ms. Amzallag, do you recognize the people on this email?

A.   Yes.

Q.   And if you could read the entire email to yourself, I'd appreciate it.

Chris, can you make sure you let her read the entire email.

A.  Can you scroll down.  OK.

Q.  OK.  Do you remember generally the circumstances about this?

A.  No, this doesn't really refresh my memory.

Q.  Looking at this document, are these communications that you would normally send as part of your duties at Nikola?

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Overruled.

A.  Part of my duty was seeing what Trevor was tweeting on social media.

Q.  And this would have been part of your duties monitoring what Trevor was saying on social media, right?

A.  It depended on what Trevor was stating.

Q.  And here you're following up with Mr. Caramella and Ms. Rose based on what Trevor had tweeted, right?  You see the subject line?

A.  Yes, it looks like that.

MR. BONDI:  Your Honor, I'd offer Defense Exhibit 1248 into evidence.

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Let's talk at sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  You're bringing it in as a business record?

MR. BONDI:  I am, your Honor.  And she testified that she monitored Mr. Milton's tweets.  This is her monitoring her tweet -- his tweets.  This is her alerting her boss, all in line with what she's testified to.  She sent it from her Nikola email account, part of her ordinary course of duties, regularly conducted business activity, your Honor.  Comes in under 806(6).

MR. PODOLSKY:  So I don't think it is a business record, but that's actually not my objection at this time.

I think, as we understand it, based on the sidebar discussions, it's being offered for the defendant's state of mind in some way.  But there's no evidence at all, no predicate that he's aware of this, and so I don't see how it's relevant.

MR. BONDI:  No, your Honor, I'm not going to suggest that or imply that.  I'm suggesting the fact that she monitored his tweets and this is an example of her monitoring his tweets.  We're allowed to show that she was monitoring the same tweets, your Honor, that the government now contends were misstatements, and same types of tweets that the government now contends were misstatements, she was monitoring them.

THE COURT:  Why isn't this a business admissible?

MR. PODOLSKY:  Your Honor, to be honest, we're not

going to object on hearsay basis -- actually disagree with the general analysis that just because an email is sent in the normal course of business it's a business record.  I'm not going to make that objection.

MR. BONDI:  She was doing her job.

MR. CARUSO:  We just won.

(Continued on next page)

(In open court; jurors present)

MR. BONDI:  Your Honor, defense offers Defendant's Exhibit 1248 into evidence.

THE COURT:  It will be received.

(Defendant's Exhibit 1248 received in evidence)

MR. BONDI:  May I publish to the jury, your Honor?

THE COURT:  You may.

BY MR. BONDI:

Q.  If you look at the subject line, it says, "Trevor's latest tweet."  Do you see that?

A.  Yes.

Q.  And this is a screenshot of a July 1 tweet from Mr. Milton's Twitter account.  Do you see that?

A.  Yes.

Q.  And the background here is Trevor and the tweet had offered to do a live stream chat with Ark Invest in response to statements that investment firm had made in an interview about him, right?

A.  I'm not sure.  I can't really recall this tweet.

Q.  If you scroll up here, to the emails, please -- can we blow up the first email here -- you send this to Mr. Caramella, your boss, right?

A.  Yes.

Q.  And you send that to Ms. Rose, right?

A.  Yes.

Q.   And who's Jace?

A.   He's the events manager on the marketing team.

Q.   Events manager.

     And you were monitoring Mr. Milton's tweets here and alerting them to this tweet, right?

A.   Again, I can't recall the specific thread.

Q.   And you were referring him -- referring them to a YouTube video even regarding Ark -- the Ark investment firm and what they said, right?

A.   I can't confirm what link that is, video link that is.

Q.   OK.  Let's go up to the top email, please.

     Can you tell me who's on this top email?

A.   Britton.

Q.   Who is Britton?

A.   He's the chief legal officer.

Q.   And you send it to Mr. Worthern, right?

A.   I can't really recall from just seeing this thread.

Q.   Just asking did you send -- you were sending this email thread and the tweet to Mr. Worthern?  That was just my question, not anything more.

A.   It appears so.  I'm not -- I'm not sure.

Q.   Trevor didn't do this interview, correct?

A.   I can't recall.

     MR. BONDI:  Let's take that down, Chris.

Q.   I'm showing you what's been marked as Defense Exhibit 1224

for identification.  This is an email from August 3, 2020, from you to Elizabeth Fretheim.  Do you recognize that?

A.  No.

Q.  You sent this from your Nikola email account.  Do you see that?

A.  No, I don't see that.

MR. BONDI:  Chris, can you show the entire email, please.

Q.  Stephanie.fleck@nikolamotor.com is your official Nikola email address, at least it was at the time period, right?

A.  Yes.

Q.  And Elizabeth Fretheim is also at the company, right?

A.  Yes.

Q.  And she's head of business development, right?

A.  At the time, yes.

Q.  OK.  And you sent this to her as part of your work in the marketing department, right?

A.  I can't really recall this email thread.

Q.  If we scroll out here a bit, you see Ms. Fretheim forwarded your email to the chief legal officer, right?

A.  I'm not sure.  I wasn't on that thread.

Q.  Does it appear to you to be that?

MR. PODOLSKY:  Objection, your Honor.  Document is not in evidence.

THE COURT:  I'm sorry?

MR. PODOLSKY:  The document is not in evidence.

THE COURT:  Sustained.

MR. BONDI:  Scroll back out.  And, Chris, can you look to the second page of that?  Is there a second page there?  Thank you.  If you could bring that up, I just want to make sure the witness sees the entire document, please.

THE WITNESS:  It's very hard to read.

MR. BONDI:  Chris, is there a way you might be able to make that better?  I think it's just a --

THE WITNESS:  It's very hard to read.

MR. BONDI:  Scroll back to the cover emails, please, the whole thing, Chris.  If you could box the whole thing, the whole chain.  Thank you.

BY MR. BONDI:

Q.  Ms. Amzallag, do you remember an exchange with Ms. Fretheim regarding the cost of hydrogen?

A.  No, I can't recall.

Q.  Do you remember her following up with Mr. Worthern regarding any of Mr. Milton's tweets regarding cost of hydrogen?

A.  No, because I wouldn't be involved in those conversations, so I'm not sure to what extent she would --

Q.  Did Ms. Fretheim ever tell you she was going to speak with Mr. Worthern concerning some of Mr. Milton's tweets?

MR. PODOLSKY:  Objection.  Calls for --

MR. BONDI:  I'm just asking generally.

THE COURT:  Overruled.

BY MR. BONDI:

Q.  Did Mr. Worthern, the chief legal -- strike that.

Did Ms. Fretheim ever tell you that she was following up with chief legal officer Worthen concerning some of Trevor's tweets concerning hydrogen?

A.  Not that I can remember.

MR. BONDI:  Your Honor, defense would still like to offer Defense Exhibit 1224 into evidence.

MR. PODOLSKY:  We object to the top portion.  We have no objection to the bottom portion coming into evidence.

THE COURT:  The last email?

MR. PODOLSKY:  The email that's below the forwarded message symbol or indication.

THE COURT:  I will allow it with that adjustment.

(Defendant's Exhibit 1224 received in evidence)

MR. BONDI:  Your Honor, may I publish, then, just the bottom email then?

THE COURT:  Yes.

MR. BONDI:  OK.  Thank you.

And, Chris, stay on the bottom email, please.

BY MR. BONDI:

Q.  Why did you send this email to Ms. Fretheim?

A.  I can't recall.

Q.  Could you please read the email out loud.

A.  "Hi, Elizabeth:  I saw this thread from Trevor regarding the cost of hydrogen and bringing it down.  Is this information accurate?  I know we've been communicating under four kilogram, but just want to clarify with his other comments on this."

Q.  Who's the "we've been communicating under four kilograms"?

A.  I'm not sure.

Q.  That's the company, right?

A.  Not sure.

Q.  Are you aware that the company was communicating a price of under $4 a kilogram?

A.  Not that I can recall.

Q.  Are you aware that chief executive officer saying that, Mr. Russell?

A.  Not that I can recall.

Q.  Have you ever heard Mr. Brady say that?

A.  Not that I can recall.

Q.  Have you ever seen any documents on the company's website listing a hydrogen price of $2.47?

A.  Not that I can recall.

Q.  Did you ever speak with Trevor about this tweet that is on the second page?

        Can you go to the second page.

        Did you ever speak to Trevor about this tweet?

A.  No, I don't think so.

Q.   OK.   Why don't we go off this document.

I want to shift gears, just generally, because I want to ask you, just generally, about social media here.  And I'm going to be telling some of my age here probably with some of my questions, and if I get the terminology wrong, please correct me.

Is it easy to delete a tweet?

A.   Yeah, I would say it's fairly easy.

Q.   OK.   What about a Facebook post?  It's easy to delete a Facebook post, right?

A.   Yes.

Q.   What about a YouTube video?  Is that easy?

A.   It does require some work.  You have to go in the backend and, you know, delete the video itself, and sometimes it takes some time for that to process.

Q.   What about an Instagram post?  Is that easy to take down?

A.   Typically, yes.

Q.   So these posts aren't permanent, right?

A.   They're not permanent, but you can use certain websites where they archive those posts.

Q.   OK.   And you had the ability to remove content from Nikola's social media feeds, right?

A.   Yes.

Q.   And you had the ability to add content to Nikola's social media feeds, right?

A.   Yes.

Q.   And you could have added clarifying content to Nikola's social media feeds, right?

A.   Not sure what you mean by "clarifying content."

Q.   You could have added information to Nikola's social media if you wanted to clarify a point for the public, right?

A.   Usually when the company or myself was posting, the information that we were sharing was accurate and would be taken that way.  So we typically didn't have to clarify tweets.

Q.   You testified earlier that you had some concerns regarding some of Trevor's statements on social media?

A.   Yes.

Q.   Including statements to the company's social media?

A.   Sorry.  Can you repeat the question.

Q.   Including to the company's social media?

A.   Are you saying --

Q.   Sorry.  Let me rephrase that.

        Did you have concerns about any of the posts to the company's social media?

A.   If the company was posting or if what Trevor was posting?

Q.   Post to the company's social media from anyone, did you have any concerns?

A.   If -- not from the company, because that would be typically coming from me, but -- unless Trevor was on the company platform posting from the company, then yes.

M9LHMil4                        Amzallag – Cross

Q.  You never removed any post that you can recall from the company's social media, right, regardless of who posted, right?

A.  Unless there was someone that was directing me to remove a post, then yes.

Q.  Do you remember being directed to remove a post?

A.  I can't recall.

Q.  Mr. Caramella is a seasoned marketing executive, right?

A.  Yes.

Q.  He's someone you respect, right?

A.  Yes.

Q.  Someone you trust?

A.  Yes.

Q.  Someone you relied on when you had a problem?

A.  Yes.

Q.  Someone, in your experience, who would not allow inaccurate information to be posted on the company's social media?

A.  At the time we assumed what was being shared from Trevor was accurate information.

Q.  You understood, isn't it a fact, that Mr. Caramella or chief executive officer Mark Russell or chief legal officer Worthen decided whether or not to keep Nikola's social media posts up?

MR. PODOLSKY:  Objection.  Calls for speculation and confusion.

THE COURT:  Sustained.

Q.  Did you have an understanding that others decided what social media posts to keep up?

MR. PODOLSKY:  Objection.

THE COURT:  Overruled.

A.  I'm sure there were conversations, but I'm not sure who was the point person in directing what should be taken down on social media.

Q.  Sometimes you would ask Mr. Caramella about deleting posts on media, isn't that correct?

A.  I can't recall.

MR. BONDI:  Chris, let's see if we can pull up a document that might refresh the recollection of the witness. Pull up 3516-004, page 4, third bullet from the bottom, please, and highlight.

A.  OK.

Q.  Does that refresh your recollection?

A.  No.

Q.  We'll go on to another topic, then.

I want to ask you about the TeslaCharts podcast that the government asked you about.  You're familiar with the TeslaCharts podcast, right?

A.  To a certain extent.

Q.  Do you recall Trevor directing you to delay his appearance on TeslaCharts so that he could prepare for it?

A.  I don't remember.

MR. BONDI:  Chris, let's see if we can show the document to the witness to refresh her recollection.  DX 1580, please.

A.  OK.

Q.  Does this refresh your recollection that Trevor directed you to delay his appearance on the TeslaCharts podcast so that he could prepare for it?

A.  No.

Q.  Does it refresh your recollection that he directed anyone to delay his appearance so he could prepare for it?

A.  No.

Q.  Do you remember any of the circumstances behind this email?

A.  No.

Q.  Do you remember Trevor saying he wanted to get data to prepare?

A.  No.

MR. PODOLSKY:  Objection.  Calls for hearsay.

MR. BONDI:  I'm asking if she remembers, your Honor.

THE COURT:  Overruled.

A.  No.

Q.  I'd like to show you what's been marked as DX 1670, please.

If you could read DX 70 to yourself, please.

A.  OK.

Q.  Do you recall the circumstances of Ms. Rose -- withdraw, your Honor.

M9LHMil4                        Amzallag - Cross

        Did Ms. Rose tell you about the circumstances of
setting up the TeslaCharts podcast?

A.   No.

        MR. PODOLSKY:  Objection.  Calls for hearsay.

        MR. BONDI:  Just asking if Ms. Rose told her.

        MR. PODOLSKY:  Objection.  Calls for hearsay.

        MR. BONDI:  Not asking for what she said, your Honor.

        THE COURT:  Sustained.

BY MR. BONDI:

Q.   Are you aware, generally, of the circumstances of setting
up the TeslaCharts podcast?

A.   No.

Q.   Are you aware of any directions that Mr. Milton gave
Ms. Rose regarding setting up that podcast?

A.   No.

Q.   Are you aware of any data that Mr. Milton asked for in
advance of that podcast?

A.   No.

Q.   Are you aware of any communications between Ms. Rose and
CFO Kim Brady regarding that podcast?

A.   No.

        MR. BONDI:  Let's take that down, then.  Let's pull up
Government Exhibit 258, please.

        And, your Honor, this is already in evidence, so may I
publish, please?

THE COURT:  You may.

Q.  After Trevor recorded the TeslaCharts podcast but before the podcast was released to the public, he directed you and -- excuse me, he directed the marketing team in this email to review the podcast, isn't that correct?

A.  I wouldn't say "review."  I would say typically when we were watching interviews or podcasts, the marketing team would provide feedback related to if he did well, performed well on the interview or podcast.

Q.  Well, let's look at what Mr. Milton says in his email here that the government admitted.

First of all, let's just walk through this email here. If I can understand correctly, the bottom email here is from TeslaCharts.  That's the podcast, right?

A.  Correct.

Q.  And the podcaster is sending to Ms. Rose and yourself a copy of the podcast, right?

A.  Correct.

Q.  And even gives you an MP3 file?

A.  Yes.

Q.  That's the audio file of the podcast, right?

A.  Yes.

Q.  And gives you the password to access that file?

A.  Yes.

Q.  And says the podcaster says, "It sounds really great.

Trevor comes off amazingly well."

Do you see that?

A.  Yes.

Q.  The podcaster says:  "Our plan is to publish tomorrow at noon."

Do you see that?

A.  Yes.

Q.  And then they say:  "Once I publish it, I will send you the best link to use for your social media outlets," right?

A.  Yes.

Q.  And what do you understand by "your social media outlets" in this email to you and Ms. Rose?

A.  I would assume that, you know, our social media platforms.

Q.  OK.  Ms. Rose forwards that email to Trevor, you see, and says at July 18:  "Hello Trevor, I'm going to download and listen now."

You see that?

A.  Yes.

Q.  "Please let me know if you have any requested edits by EOD."

Do you see that?

A.  Yes.

Q.  And "EOD" means end of the day?

A.  Correct.

Q.  "I would imagine this is a great podcast just based on the

M9LHMil4                        Amzallag - Cross

hour I listened in."

Do you see that?

A.  Yes.

Q.  And she said "listened in," right?

A.  Yes.

Q.  Because you understood her to be there present for the podcast, right?

A.  Sorry.  What was the question?

Q.  You understood by that comment that she was present for the podcast.  She said "I listened in"?

A.  I can't recall if she listened in live or if she listened in from the file that was sent over.

Q.  She says:  "Stephanie will be ready to link to the podcast hosting site tomorrow around noon."

Do you see that?

A.  Yes.

Q.  And the Stephanie meant you, right?

A.  Correct.

Q.  And what she's saying is you're ready to link on Nikola's social media to this podcast, right?

A.  Yes.

Q.  OK.  Now, Trevor says -- and I want to focus on the next email and what you understood by.  He says back:  "Why don't you go ahead and listen to it and offer any suggestions," right?

A.   Yes.

Q.   And he says:  "I'm pretty sure that everything turned out fine, as I had a really good conversation with them," right?

A.   Yes.

Q.   But he says:  "I don't know if I'll have time today to go through the podcast."

          Do you see that?

A.   Yes.

Q.   So then he says:  "So I'll just leave it up to you guys to listen to it and approve it."

          Do you see that?

A.   Yes.

Q.   Approve it, right?

A.   Yes.

Q.   "Or if there's any issues, you can let me know where I can go listen to a certain segment of it," right?

A.   Yes.

Q.   Ms. Rose says back to him:  "Sounds good to me!"

          Do you see that?

A.   Yes.

Q.   And you say:  "Sounds good.  I'll take a listen here in a bit.  Excited to check it out!"  Right?

A.   Yes.

Q.   These sound like pretty encouraging words, don't they?

A.   Sure.

Q.   And he left it to you all, to you and Ms. Rose, to listen to it and approve it, right?

A.   I'm not sure what he meant by "approve."  Typically, when we were listening to interviews, it would be from a branding/messaging perspective.

Q.   Did you ask him in his email, what do you mean, Mr. Milton, by approve?  Did you ask him back in your email?

A.   Not that I can recall.

Q.   That's not what your email says, though, right?

A.   No.

Q.   I'm showing you what's been marked as -- let's take that down, Chris.

        I'm showing you what's been marked as Defense Exhibit 1665, please, for identification.  And this is -- this document is a July 18, 2020, email chain, you see, between you and Ms. Rose regarding the TeslaCharts podcast.

        Do you see that?  Do you see that?

A.   Yes.

Q.   This is the last email we saw was from the 18th, right, the same day as the bottom email, right?

        Do you want to go back to the earlier emails?  It's the same day as the earlier email, right?

A.   Can you pull back the other --

        MR. BONDI:  Yeah.  Chris, can you go back to at earlier exhibit, please.

A.   OK.

Q.   You see the earlier email from Saturday, July 18, 2020?

A.   Yes.

        MR. BONDI:  Now, Chris, please go back to DX 1665, the email the same day.

Q.   And this is an email exchange just between you and Ms. Rose regarding the TeslaCharts podcast on the same day, and then it goes into the next morning of July 19, right?

A.   Looks like it.

        MR. BONDI:  Your Honor, defense offers 1665 into evidence.

        MR. PODOLSKY:  No objection, your Honor.

        THE COURT:  It will be received.

        MR. BONDI:  May I publish to the jury?

        THE COURT:  You may.

        (Defendant's Exhibit 1665 received in evidence)

BY MR. BONDI:

Q.   Now, Ms. Amzallag, Trevor's not on this email, right?

A.   No.

Q.   It's just you and Ms. Rose?

A.   Correct.

Q.   And directing your attention to the 3:56 p.m. email here, you ask Ms. Rose, right -- and, Chris, if you could pull up that -- "What do you think of this for the post?" right?

A.   I don't really recall the specific email.

Q.   But you write, "What do you think of this for the post?"
correct?

A.   Correct.

Q.   And following that, it has a quote in here, right?  Do you
see that, that you write in your email to Ms. Rose?

     Chris, can you highlight the quote underneath it where
it says "the long awaited," for the witness, please.  The whole
quote, please.  Thank you.

     By "the post," you meant what you planned to post on
Nikola's social media to promote the podcast, right?

A.   It looks like it.

Q.   And this is a post that you drafted for the TeslaCharts
podcast, right?

A.   I can't remember if I drafted it or Nicole helped with
drafting it.

Q.   OK.  We'll get to that.

     The first email's from you, though, with a post.  Do
you see that, the 3:56 email?

     So you're drafting a post to promote the podcast here,
right?

A.   It looks like it, yes.

Q.   In the next email from Ms. Rose, she provides some edits,
right?  Do you see that?

A.   It's a little hard to follow.

Q.   Excuse me?

A.   It's a little hard to follow.

Q.   I'm sorry.  I can't hear you.  I'm sorry.

A.   It's a little hard to follow the email.

Q.   OK.  Let me see if I can direct you through this.

          The two of you are coming up with what to post for Nikola's social media to promote the podcast TeslaCharts, right?

A.   It looks like -- it looks like this in the email.  Yeah, I think so.

Q.   Ultimately, this is what was posted, right, what the two of you came up with, right?

A.   I can't recall what post we went with to -- if we shared the TeslaCharts podcast, what the copy was.

Q.   The two of you, though, came up with the post, not Trevor Milton, right?

A.   I can't recall specifically.

          MR. BONDI:  OK.  Well, let's pull up -- if we can maybe pull up, Chris, DX 1683.

Q.   Do you recognize this?

A.   Yes, looks like the tweet from the company.

Q.   And you drafted this, right?

A.   I can't recall who specifically drafted the copy.

Q.   Does this match what the last email said between you and Ms. Rose?

A.   I can't remember.

MR. BONDI:  Let's go back to the last email, please.
Chris, go back to the entire email so she can see it, please.

Q.  Does what's in that email match up to what was posted on
Nikola's social media?

A.  I don't see it on this email.

MR. BONDI:  Chris, can you highlight -- this is the
top of 9760, please.  Highlight both of those.  And let's go
split screen, please, just for the witness only, for DX 1683.
Split screen, please, just for the witness only, please.

Q.  Ms. Amzallag, does this refresh your recollection about who
posted to Nikola's social media promoting the TeslaCharts
podcast?

A.  No.

MR. BONDI:  Your Honor, I don't know if 1683, which is
the tweet, is in evidence, but at this time I'd offer 1683 into
evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1683 received in evidence)

MR. BONDI:  Publish the split screen for the jury for
a moment.

THE COURT:  Very well.  Mr. Bondi, it's now 12:50, so
we'll take our second break.

Ladies and gentlemen, 20 minutes.  Don't discuss the
case.

(Jury not present)

THE COURT:  Ms. Amzallag, you may step down.

Folks can be seated.

Anything to discuss now?

MR. PODOLSKY:  Not for the government, your Honor.

MR. MUKASEY:  No, Judge.

THE COURT:  OK.  Twenty minutes, folks.

(Recess)

(Continued next page)

THE COURT:  Everyone, please be seated.

Mr. Bondi.

MR. BONDI:  Thank you, your Honor.

Let's pull up GX-259, which has already been admitted into evidence.

BY MR. BONDI:

Q.  Ms. Amzallag, I'd like to ask you about this email.  The government showed it to you and you recalled it.

If you look at the bottom email in this chain, Ms. Rose wrote to Trevor, and you're copied on this email exchange, if you remember from the government asking you questions about it.

Ms. Rose wrote to Trevor, there is an abundance of great content, quotes, and facts we can pull from the podcast. Do you see that?

A.  Yes.

Q.  She uses the word "content," right?

A.  Yes.

Q.  She uses the word "quotes," right?

A.  Yes.

Q.  She uses the word "facts," right?

A.  Yes.

Q.  She doesn't say that's great lighting in that interview, does she?

A.  Not that I can see, no.

Q.   She calls it a --

MR. BONDI:   Chris if you can highlight this.

Q.   -- truly, a phenomenal interview; right?

A.   Yes.

Q.   And she provides some highlights; right?

A.   Yes.

Q.   And she writes, we will reduce the cost of hydrogen through the standardization of the fueling infrastructure and stabilizing load and grid balancing.  Do you see that?

A.   Yes.

Q.   And do you see where Ms. Rose thought Trevor, quote, explain where hydrogen makes sense and why it isn't about efficiency, but rather costs per mile in an incredibly simplistic and factual terms.  Do you see that?

A.   Yes.

Q.   And you see Ms. Rose said to Trevor, well said and well done; right?

A.   Yes.

Q.   Well said; right?

A.   Yes.

Q.   If we go to the top of the email chain, Mr. Caramella told Trevor, I think one of your best so far, nice job, exclamation point; right?

A.   Yes.

Q.   And this is Mr. Caramella who attends the weekly leadership

M9LCmil5                        Amzallag - Cross

meetings every week; right?

A.  Yes.

Q.  And wouldn't you say that this is an encouraging email?

        MR. PODOLSKY:  Objection.

A.  I think he was providing positive --

        MR. PODOLSKY:  Objection.

        THE COURT:  Sustained.

        MR. BONDI:  Why don't we take this down and let's show the witness Defendant's Exhibit 1343 for identification.

Q.  This is a July 19th, 2020 email from Vince Caramella to Nicole Rose, Trevor, and you regarding the TeslaCharts podcast. Do you see that?

A.  Yes.

Q.  And this is on the same topic; right?

A.  It appears so.

Q.  And you received this to your Nikola email account?

A.  Yes.

Q.  Same topic; right?

A.  It appears so.

        MR. BONDI:  Defense offers 1343 into evidence.

        MR. PODOLSKY:  May we have one moment, your Honor.

        No objection, your Honor.

        THE COURT:  It will be received.

        (Defendant's Exhibit 1343 received in evidence)

        MR. BONDI:  May I publish to the jury, your Honor?

THE COURT:  You may.

Q.  This document is another email from Vince Caramella regarding Ms. Rose's email about the abundance of great content in the TeslaCharts podcast; right?

MR. BONDI:  Show the whole email, Chris, please, just so we have it.

Q.  We looked at the chain at the bottom, you looked at it with the government, you remembered it.  Do you remember?

A.  Yes.

Q.  Do you remember the chain now?

A.  Yes.

Q.  And do you see where Mr. Caramella wrote to Trevor again, this was a great podcast?  Do you see that?  Or great PC.  Do you see that?

A.  Yes.

Q.  PC means podcast; right?

A.  Yes.

Q.  Ms. Fretheim sent you and the marketing team some concerns she had about the podcast on July 19th; right?

A.  I believe so.  I can't recall what exact date it was.

Q.  And while Trevor was at the company, that was the only time you were made aware of what Trevor might have said wasn't accurate, right, the only time?

A.  Can't recall that being the only time.

Q.  Ms. Amzallag, that's not what you told the government on

M9LCmil5                        Amzallag - Cross

February 4, 2021, when they were interviewing you; isn't that right?

A.  I can't recall.

Q.  You were interviewed in February of 2021; correct?

A.  I can't remember the exact date.

Q.  Number of prosecutors were there?

A.  I can't recall.

MR. BONDI:  Chris, why don't we pull up --

Q.  You were admonished in that interview to tell the truth; right?

A.  Yes.

MR. BONDI:  Chris, why don't we pull up 3516-006, page 9, paragraph 2 from the bottom and highlight that for the witness, please.

Q.  Would you read that to yourself, Ms. Amzallag.

A.  Okay.

Q.  And I'll ask the question again.

The only time you were made aware of what Trevor might have said wasn't accurate was Ms. Fretheim's email regarding the podcast, the TeslaCharts podcast; correct?

A.  I can't recall.

Q.  Ms. Amzallag, why is it that the government asked you questions and you recalled every single fact --

MR. PODOLSKY:  Objection, your Honor.  Argumentative.

THE COURT:  You can finish the question and then it's

going to be sustained or you can move on, Mr. Bondi.

MR. BONDI:  It's going to be sustained, your Honor, I won't ask it.

Q.  Ms. Amzallag, is there a reason why you're having difficulty recalling events today on cross examination by me?

A.  Because it happened a long time ago.

Q.  Did someone instruct you that it would be better if you don't remember things during cross examination?

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Overruled.

Q.  Did someone instruct you whether it would be better if you don't recall during cross examination, did someone say something to you like that?

A.  No.

Q.  Did you meet with lawyers from the law firm Kirkland & Ellis before you testified in preparation for today?

A.  Yes.

Q.  And those are lawyers also for the company?

A.  Yes.

Q.  How long did you meet with lawyers from Kirkland & Ellis in preparation of your testimony in this trial?

A.  I can't say specifically.

Q.  How many lawyers were present?

A.  Can't say specifically how many.

Q.  More than five?

A.   I can't really recall.

Q.   Was the law firm Paul Weiss there, too?

A.   I can't recall.

Q.   Ms. Amzallag, no one ever told you to take down the
TeslaCharts podcast; isn't that true?

A.   I don't believe so.

Q.   Let's turn to a different podcast.

        Do you remember Trevor recording a podcast interview
for Transport Topics RoadSigns in January of 2020?

A.   I can't really remember.

Q.   Do you remember Colleen Robar scheduling this interview for
Trevor?

A.   No.

        MR. BONDI:  Chris, can we pull up a document, see if
we can refresh the witness's recollection, DX-1658.

Q.   Ms. Amzallag, does this refresh your recollection that
Colleen Robar set up an interview for Trevor with Transport
Topics RoadSigns?

A.   No, it was never sent to me, so I wouldn't have
recollection.

Q.   Ms. Amzallag, just stepping back for a moment, you do know
who Colleen Robar is; right?

A.   Yes.

Q.   And you do know that she was setting up interviews for
Trevor with the media; right?

M9LCmil5                    Amzallag – Cross

A.  I know she was part of that process, yes.

Q.  And you know Nicole Rose was part of that process, too?

A.  Yes.

Q.  But you personally weren't involved in that; right?

A.  No.

Q.  I'm showing you what's been marked as Defendant's Exhibit 1698 for identification.  This is an email you sent on January 9th, 2020 on your Nikola account, and it was sent to others.  Do you see that?

A.  Yes.

          MR. BONDI:  Defense offers 1698 into evidence.

          MR. PODOLSKY:  No objection.

          THE COURT:  Sorry?  Any objection?

          MR. PODOLSKY:  No, your Honor.

          THE COURT:  It will be received.

          (Defendant's Exhibit 1698 received in evidence)

Q.  On January 9th, 2020, this is before the company went public; right?

A.  I believe so.

Q.  The company went public in June of 2020; right?

A.  I believe so.

Q.  And January of 2020 is before the company went public; right?

A.  Yes.

Q.  On January 9th, 2020, you emailed Trevor and others at

M9LCmil5                          Amzallag - Cross

Nikola.  Do you see that?

A.  Yes.

Q.  And you emailed CEO Mark Russell; right?

A.  Yes, it looks like that.

Q.  CFO Kim Brady?

A.  Yes.

Q.  Chief legal officer Britton Worthen?

A.  Yes.

Q.  And your boss, Vince Caramella?

A.  Yes.

Q.  And you told them TT article just hit; right?

A.  Yes.

Q.  And TT stood for Transport Topics; right?

A.  Correct.

Q.  Two exclamation points; right?

A.  Yes.

Q.  Is it fair to say you were excited about the article?

A.  It could have been a good article, yes.

Q.  And you were letting them know that that would be shared on social media; right?

A.  It looks like that, yes.

Q.  And you provided a link to the article; right?

A.  Yes.

Q.  For all of these executives to see?

A.  Yes.

Q.   Including the chief lawyer of the company; right?

A.   Yes.

Q.   I'm showing you --

        MR. BONDI:  Your Honor, I'm sorry.  I already offered that into evidence.  Excuse me.

        We can take that down and I'd like to show the witness Defendant's Exhibit 1699 for identification, please.

Q.   And this is Colleen Robar replying to your email on January 9th; right?

A.   Yes.

Q.   And you received this to your Nikola email account?

A.   Looks like it, yes.

Q.   Same topic we were just talking about?

A.   Yes.

        MR. BONDI:  Your Honor, defense offers Defendant's Exhibit 1699 into evidence.

        MR. PODOLSKY:  No objection, your Honor.

        THE COURT:  It will be received.

        (Defendant's Exhibit 1699 received in evidence)

        MR. BONDI:  May I publish to the jury?

        THE COURT:  You may.

Q.   Ms. Robar replied to your email; right?

A.   It looks like it, yes.

Q.   And Ms. Robar also copied CEO Mark Russell; right?

A.   She did.

Q.  CFO Kim Brady?

A.  Yes.

Q.  Matt Peterson; right?

A.  Yes.

Q.  Vince Caramella?

A.  Yes.

Q.  We're talking about Peterson who was the assistant to Trevor; right?

A.  Yes.

Q.  Vince Caramella, your boss.

She copies Britton Worthen, too, the general counsel; right?

A.  Yes.

Q.  Alain Hadorn, who is he?

A.  I can't remember his specific title, but he was in the truck department.

Q.  She copies Dane Davis; right?

A.  Correct.

Q.  He was the chief technical officer; right?

A.  I believe so.  Can't recall his specific title.

Q.  Part of C suite, pretty senior; right?

A.  I don't think he was part of the C suite.

Q.  Chief technical officer?

A.  Might have been.

Q.  And Kevin Lynk, Jace Croshaw, and also Trevor on her reply;

right?

A.   Yes.

Q.   And she said, podcast with Trevor will be posted shortly; right?

A.   Yes.

Q.   Because there was a podcast that went along with the article by Transport Topics; right?

A.   I'm not sure if that was the podcast she was referencing.

Q.   Let's look at that, then.  I'm showing you what's been marked as Defendant's Exhibit 1700 for identification.  This document is an email thread between you and Ms. Robar on March 12th, 2020, just a little while later.  And you sent and received emails here from your Nikola account and they were sent in the normal course of your duties at Nikola; right?

A.   Yes.

          MR. BONDI:  Defense offers 1700 into evidence.

          MR. PODOLSKY:  No objection, your Honor.

          MR. BONDI:  May I publish it for the jury?

          THE COURT:  It will be received and yes you may publish.

          (Defendant's Exhibit 1700 received in evidence)

Q.   On March 12th, 2020, Colleen Robar sent you a link to the Transport Topics podcast; right?

A.   Yes.

Q.   And you responded to Colleen, great interview; right?

M9LCmil5                    Amzallag - Cross

A.   It looks like it, yes.

Q.   And you copied Vince Caramella in your reply?

A.   Yes.

Q.   And Nicole Rose; right?

A.   Yup.

Q.   And that man over there, Trevor Milton?

A.   Yes.

Q.   Pretty encouraging; right?

A.   Related to the fact that it was probably an interview he did that was -- that he performed well on.

Q.   Let's move on to a different interview.

          MR. BONDI:  We can take that down, Chris.

Q.   Trevor recorded a live interview with Varney & Co. with Fox Business in February of 2020; right?  Do you remember that?

A.   There were a lot of interviews at that time, so I can't recall.

Q.   Sure.  Let me see if I can refresh your recollection.

          MR. BONDI:  Let's bring up -- actually, we'll go right to it.  Before I go there --

Q.   Colleen Robar scheduled that interview, right, the Varney & Co. Fox Business?

A.   I don't know if she did or someone else did.

Q.   Do you have any reason to doubt that someone scheduled this interview for Trevor?

          MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Overruled.

A.  There were people, other than Colleen, that were scheduling interviews.  So I'm not sure if it was Colleen or someone else.

Q.  Scheduling for Trevor; right?

A.  Trevor did his own interviews, as well.

MR. BONDI:  Let's show just the witness DX-1669.

Q.  Ms. Amzallag, does this refresh your recollection that Colleen Robar scheduled this interview for Trevor?

A.  No.

MR. BONDI:  Let's see to a document.  Chris, let's show the witness DX-1662 for identification.

Q.  This is an email thread between you, Nicole Rose, and Vince Caramella on February 13th, 2020.  Do you see that?

A.  Yes.

Q.  And these emails were sent and received from your, Ms. Rose, and Mr. Caramella's Nikola email accounts; right?

A.  Yes.

MR. BONDI:  Your Honor, I would like to offer into evidence 1662.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1662 received in evidence)

MR. BONDI:  May I publish for the jury, your Honor?

THE COURT:  You may.

Q.  Ms. Amzallag, do you see in this email chain, sent from

your account, Stephanie Fleck --

MR. BONDI:  Scroll down and show everything.

Q.  -- Ms. Rose asked you what Nikola's typical protocol, do you see that in quotes, excuse me.  That's the quote.  Typical protocol for promoting these interviews.  Do you see that?

A.  Yes, I see that.

Q.  And you shared with Ms. Rose that you typically share a clip of the interview on social media afterwards.  Do you see that?

A.  Yes.

Q.  And that was the typical protocol for you; right?

A.  The typical protocol would be Trevor wanting to get the interviews up that he was on.

Q.  That's not what that says.  That says typically, you share a clip of the interview on social media; is that right?

MR. PODOLSKY: Objection.  Argumentative.

MR. BONDI:  No, it's not, your Honor.  Sorry.

THE COURT:  It is argumentative.  The objection is sustained.

Q.  Does that say, normally, I get a clip of the interview and share on social media; right?

A.  Yes, but it relates back to Trevor, was very adamant on sharing those interviews on social media.

Q.  That's not what it says, does it?

MR. PODOLSKY:  Objection, your Honor.  Argumentative.

THE COURT:  Overruled.

MR. BONDI:  Let's move on to a different exhibit. Chris, let's bring up 1655, please, for identification.

Q.  This is an email that Nicole Rose sent to Trevor copying you and Trevor's assistant on May 27th, 2020.  Do you see that?

A.  Yes.

Q.  And this was sent to you at your Nikola account?

A.  Correct.

MR. BONDI:  Defense offers 1655 into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1655 received in evidence)

MR. BONDI:  May I publish for the jury?

THE COURT:  You may.

Q.  So this shows that Nicole Rose is scheduling an interview for Trevor; right?

A.  Yes, I see that.

MR. BONDI:  Let's go to a different exhibit, Defendant's Exhibit 1666, I'm showing the witness for identification.

Q.  This is an email Ms. Rose sent to you, Mr. Caramella, and Jace Croshaw on June 1st, 2020.  Do you see that?

A.  Yes.

Q.  And Ms. Rose emailed this using her Nikola account to your Nikola account?

A.   Yes.

          MR. BONDI:  Defense offers 1666 into evidence.

          MR. PODOLSKY:  No objection.

          MR. BONDI:  May I publish, your Honor?

          THE COURT:  Yes.

          (Government's Exhibit 1666 received in evidence)

Q.   So the following Monday here of that podcast, June 1st, 2020, and the podcast that we were talking about was the JMac podcast in the last email?

A.   I believe so.

Q.   The following Monday, this is an email Ms. Rose emailed to you, Vince Caramella, and Jace Croshaw with a weekly update relating to marketing; right?

A.   It appears so, yes.

Q.   And it's a weekly team update, week of June 1st.  Do you see that?

A.   Yes.

Q.   And Ms. Rose indicated that the JMac Investing YouTube video had launched on Sunday.  Do you see that?

A.   Yes.

Q.   And nowhere in this email does Ms. Rose raise any concerns, does she?

A.   Not that I'm seeing.

          MR. BONDI:  Let's move on to another one, please.

Q.   I'm showing you what's been marked as Defendant's Exhibit

1664.  It's an email thread between you, Ms. Rose, and Jace Croshaw, and Colleen Robar, June 26th, 2020?

A.  Yes.

Q.  And you see this concerns -- excuse me.  And this was sent from your email accounts at Nikola; right?

A.  Yes.

MR. BONDI:  Defense offers 1664 into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be --

MR. BONDI:  Your Honor, may I publish for the jury?

THE COURT:  You may.

(Defendant's Exhibit 1664 received in evidence)

Q.  Here, you wanted to make sure to receive the video files of the CNBC Fast Money interview; right?

A.  Yes.

Q.  And that was to post on Nikola's social media?

A.  Yes, I'm sure it was a request from Trevor that he would want it on social media.  So typically, that's the process asking for the video files.

Q.  Do you see Trevor anywhere on this email, Ms. Amzallag?

A.  I do not, but again, he was very adamant on getting all interviews up on social media.

MR. BONDI:  Let's shift to a different subject here.

Q.  Social media calendar.  There was a social media calendar that was regularly sent around by you; isn't that true?

A.   To the leadership team?

Q.   Yes.

A.   Yes, there was a calendar.

Q.   That you sent regularly?

A.   I believe it was on, I think, a monthly basis.

Q.   Now, Ms. Amzallag, the goal of the marketing team was to generate interest in Nikola and demand for its products; right?

A.   Correct.

Q.   And you were trying to bring awareness to what the company was doing; right?

A.   Yes.

Q.   And in fact, for the years 2019 and 2020, you had a personal goal of growing aggregate follower base and engagement scores by 10 percent by May of 2020; right?

A.   Yes.  I mean, that's kind of a typical goal for a social media manager.

Q.   And beginning in 2020, you sent out a monthly social media report that highlighted certain social media activities being scheduled by the marketing department; right?

A.   I believe so.

Q.   I'm showing you what's been marked as Defendant's Exhibit 1237 for identification purposes, and also the attachments to that email, which are 1238 -- DX-1238, DX-1239, and DX-1240.  There are three attachments to the email that's marked as Defendant's Exhibit 1237.

Do you see this is an email from you to a number of people, do you see that, from your Nikola account?

A.   Yes.

MR. BONDI:  Defense offers exhibits 1237 and their attachments, 1238, 1239, and 1240 into evidence.

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibits 1237, 1238, 1239, 1240 received in evidence)

MR. BONDI:  May I publish for the jury, your Honor?

THE COURT:  You may.

Q.   This is a typical social media calendar that you would send out in 2020; right?

A.   Yeah, I mean this was monthly social reporting that I would pull together for the senior leadership team.

Q.   And you sent it to the CEO, Mark Russell?

A.   Correct.

Q.   The chief legal officer, Britton Worthen?

A.   Yes.

Q.   Chief financial officer, Kim Brady?

A.   Yes.

Q.   Head of HR, Joe Pike?

A.   Yes.

Q.   Michael Erickson, he was the president of Nikola Powersports; right?

A.   Yes.

Q.   Umran Ashraf, he was the global head of vehicle engineering; right?

A.   Yes.

Q.   Kevin Lynk, he was the chief engineer?

A.   Yes.

Q.   And in these reports, you would highlight what had happened in the media and what was coming up; right?

A.   Yeah, I know it would be typically a month overview of what we did in terms of our social media reporting and then traditional media reporting.

        MR. BONDI:   If we can just pull up for the jury 1240, which is the attachment there.

Q.   And this is the typical format that you would use to brief the executive team about media appearances; right?

A.   That I was aware of, yes.

        MR. BONDI:   Let's take a look at another one of these, if we can go to Defendant's Exhibits 1250 and the attachments, 1251, 1252, and 1253, please.

Q.   Defendant's Exhibit 1250 is an email, you see, that you sent, right, and it was the June social media report.  Do you see that?

A.   Yes.

        MR. BONDI:   Defense offers 1250, 1251, 1252, and 1253 into evidence.

M9LCmil5                    Amzallag - Cross

MR. PODOLSKY:  No objection, Your Honor.

THE COURT:  It will be received.

(Defendant's Exhibits 1250, 1251, 1252, 1253 received in evidence)

MR. BONDI:  Briefly, let's pull up 1253.

Q.  Do you see Trevor's May 28th, 2020 JMac Investing podcast is on here; right?

A.  Yes.

Q.  And the June 4th, 2020 Yahoo Finance article?

A.  Yes.

Q.  And the TeslaCharts cast interview is on here; right?

A.  Yes.

MR. BONDI:  We can take that down.

Q.  Just for completeness, I want to show you one more, Defendant's Exhibit 1255 for identification, and it has two attachments that are identified as part of 1255.

You see, this is another one of the social media calendars for August, right, for July, but it was sent in August.

MR. BONDI:  Thank you, Mr. Roos.

A.  Yes.

MR. BONDI:  Defense offers 1255 into evidence.

MR. PODOLSKY:  No objection, your Honor.

(Defendant's Exhibit 1255 received in evidence)

MR. BONDI:  I won't publish for the jury, your Honor.

We'll come back to it.

Q.   Let's shift to a couple more topics here, and one of which is the Badger.

The Badger was the pickup truck that the company was developing; right?

A.   Correct.

Q.   And part of your marketing role was to promote the Badger; correct?

A.   Yes.

Q.   And that involved more than just Trevor Milton giving interviews; right?

A.   Yes.

Q.   And you were trying to -- Nikola was also running Facebook and Instagram paid advertising campaigns on the Badger; right?

A.   Yes.

Q.   And those were paid by the company; right?

A.   Yes.

Q.   I'd like to show you what's been marked as Defendant's Exhibit 1654 for identification.  It's a June 26th, 2020 email chain between you, Ms. Rose, and Trevor sent from your Nikola account.  Do you see that?

A.   Yes.

MR. BONDI:  Defense offers Defendant's Exhibit 1654 into evidence.

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 1654 received in evidence)

MR. BONDI:  May I publish, your Honor?

THE COURT:  You may.

Q.  In this email chain, you and Nicole Rose asked Trevor to film some videos for customers who placed Badger preorders.  Do you see that?

A.  Yes.

Q.  And you see Nicole Rose writes to Trevor, you are great with off-the-cuff narratives, so the only ask is to include the following and anything else you would like to add.  Do you see that?

A.  Yes.

MR. BONDI:  You can take that down, Chris.

Q.  Nikola also worked with somebody named Dave Sparks to promote the Badger; right?

A.  Yes.

Q.  And he was somebody hired by Nikola; right?

A.  I believe so.

Q.  And his television name was Heavy D?

A.  Yes.

Q.  And he had a show on the Discovery Channel called Diesel Brothers; right?

A.  Yes.

Q.  That's about pickup trucks; right?

M9LCmil5                      Amzallag - Cross

A.  I think so.

Q.  Defense would like to show you what's been marked as Defendant's Exhibit 1696 for identification.  It's an email series of chain from June 29th to July 10th between you and Van Oates, Cole Cannon, Mike Herrera, Jordan Rich and Lane Veech. Do you see that?

A.  Yes.

Q.  You sent this as part of your Nikola email account; right?

A.  Yes.

        MR. BONDI:  Your Honor, we offer DX-1696 into evidence.

        MR. PODOLSKY:  No objection.

        THE COURT:  It will be received.

        (Defendant's Exhibit 1696 received in evidence)

        MR. BONDI:  May I publish for the jury?

        THE COURT:  You may.

Q.  Ms. Amzallag, Trevor's not on this email chain, is he?

A.  Not that I can see.

Q.  And you worked directly with David Sparks, otherwise known as Heavy D's team to market the Badger on social media; correct?

A.  Yes.

Q.  And here, you are editing a promotional script for the Badger; right?

A.  I can't read the full content of the email.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

MR. BONDI:  Let's pull it back so she can scroll through, please, Chris.

Q.  Let me draw your attention -- are you finished looking at it?  I know it's a long chain.

A.  Okay.

Q.  Couple people on this chain.  Cole Cannon, who's Cole Cannon?

A.  He's part of Heavy D's team.

Q.  And he was Heavy D's lawyer; right?

A.  Yes.

Q.  And if you turn your attention to the email that's dated July 8th, 2020, at 1:16 p.m., do you see that?

MR. BONDI:  Bring up 116, the entire email chain, it's on Bates number 007804, please, Chris, right in the middle. Thank you.

Q.  You see you say, Hello, Matt and Cole.

Who is Matt?

A.  I can't remember who --

Q.  Matt Herrero, who is part of Heavy D's team; right?

A.  I believe so, yes.

Q.  Cole Cannon is the lawyer for Heavy D?

A.  Yes.

Q.  And you say, Great video, Matt.  We think it will be beneficial in answering a lot of questions we're getting on social.  Do you see that?

A.   Yes.

Q.   We do have a couple of edits on our end so far?

A.   Yes.

Q.   And then you provide a number of edits; right?  Do you see that?

A.   Yes.

Q.   Including you changed, you say 542, the pounds per feet needs to be switched to feet per pounds.  Do you see that?

A.   Yes.

Q.   And you provide a number of pretty detailed edits, wouldn't you say?

A.   I can't recall everything that is provided.  We worked with the team a lot on ads, so --

Q.   And you worked directly with Heavy D's team; correct?

A.   I did.

        MR. BONDI:  Let's move to a different topic.

Q.   Ms. Amzallag, at no point did Trevor Milton ever speak to you about Nikola's stock price; correct?

A.   I'm sorry.  Can you repeat the question.

Q.   I will.  At no point, while Trevor Milton was at the company, did Trevor speak to you about Nikola's stock price?

A.   Not that I can recall.

Q.   And at no point did Trevor speak to you about Nikola's success either?

A.   I'm not sure what you mean by that.

Q.  Ms. Amzallag, do you remember giving an interview with the government on February 4th, 2020?

MR. PODOLSKY:  Objection, your Honor.  She didn't understand the question.

THE COURT:  Overruled.

MR. BONDI:  Chris, why don't we pull up 3516-006, page 1, second paragraph.  If the witness could read it to herself.

THE WITNESS:  Okay.

Q.  Trevor Milton never spoke to you about the success of the company; isn't that true?

A.  I'm not sure.  I can't really recall, recall these notes.

MR. BONDI:  Let's move to a different topic.

Q.  I'm showing you what's been marked as Defendant's Exhibit 70 for identification.  This document is an email that you sent to Jesse Schneider on July 31st, 2020; right?

MR. BONDI:  Sorry.  Bring it up for the witness.

Q.  Do you see that?

A.  Yes.

MR. BONDI:  Your Honor, the defense offers Defendant's Exhibit 70 into evidence.

MR. PODOLSKY:  Objection, your Honor.  Hearsay.

THE COURT:  Sustained.

MR. BONDI:  Your Honor, may we approach on this?

THE COURT:  Sure.

M9LCmil5                    Amzallag - Cross

(Continued on next page)

(At the sidebar)

MR. BONDI:  Your Honor, I can add more predicate questions.  I was trying to speed things along.

Your Honor, this is along the same lines of every document that has been admitted.  Somebody had a question about the tweet, here, this is public tweet.  Government's already talked about this tweet and the issue, which is the zero emission beer run, somebody has a question about this tweet here on social media.  So Stephanie Fleck --

THE COURT:  Anheuser-Busch was the one with the question?

MR. BONDI:  No, your Honor.  Ms. Fleck is emailing another person at the company following up on technical issues relating to a tweet just like she testified that she would do on cross, she said she would follow up if she had technical issues.  Someone is asking a question on a tweet, there is an error in your tweet and raises an issue about a company tweet along the lines that she testified.  She then follows up with Jesse Schneider, and I laid this foundation earlier, he's the head of hydrogen and she says, Hi, Jesse, I had a question for you, I re-shared our zero emission beer delivery AB on social, and I'm wondering if you can help answer this question as we did initially communicate that the delivery was 60K, please see comments below.  Mr. Schneider responds to her, as she said she would do, to reach out to technical people like Jesse

Schneider, who we established on cross and he says, good to hear from you, here is a response, and he provides technical information to her back.  She says great, thanks for clarifying, Jesse.  I hope all is well.  This is an ordinary course, social-media question.  She says she's following up on technical issues, which she said she will do, your Honor.  It's ordinary course of business and she's on it.

MR. PODOLSKY:  I agree she's on it, I agree that she sent this email, I agree she got this response.  To the extent that he was offering it for the truth of the response, it's hearsay.  To the extent he's offering it because she asked a question about some tweet doesn't have relevance to anything in this case.  I don't understand why we're going through this.

MR. BONDI:  I'll tell you, your Honor, it shows that she's following up on technical information.  We won't offer it for the truth, we don't need to offer it for the truth.  We're offering the fact that when she had technical information, including with respect to hydrogen-related issues, she followed up with Jesse Schneider.  The relevance was --

THE COURT:  Let me ask, Mr. Podolsky, what's the difference between this one and the series of emails that have just come in through this witness?

MR. PODOLSKY:  Some of the other ones were actually not topics related to this case, some were not connected to Mr. Milton.

MS. ESTES:  Your Honor, I think there is an additional 403 objection here.  The question that is asking Mr. Schneider is about the weight of the delivery.  I think, as your Honor may recall, we played a video of the Anheuser-Busch delivery and we elicited from Mr. Prows that there was a misstatement from Mr. Milton about whether the hydrogen was zero emission. I think this document is going to confuse the issue because it's suggesting that because Mr. Schneider approved of the issue on weight, that he also approved of this other statement in the video about the hydrogen being produced zero emission. I believe if he was called to testify, he would agree with Mr. Prows.  So that is the problem with offering it for the truth.

MR. BONDI:  It sounds like a perfect line for redirect, your Honor, but this is --

THE COURT:  On the beer run, there has been a lot of testimony about the beer run, we've seen the beer run.  What is the 60K about or 60 kilograms?

MR. BONDI:  It's about the weight of the truck.  This is a tweet --

THE COURT:  About the weight of the beer that's --

MR. BONDI:  The weight of the truck.

THE COURT:  The truck itself?

MR. BONDI:  Yeah, 60,000 delivery flagship.  She posted on social media, your Honor, this tweet, did you know

Nikola completed its first ever zero emission in St. Louis with Anheuser-Busch, Nikola Two, et cetera.

THE COURT:  I'm trying to understand.  So the 60,000 pounds, does that refer to the weight of the truck or the weight of the beer that was being carried?

MR. BONDI:  Both, I believe both.

MS. ESTES:  In either case, we're not alleging misrepresentations regarding the weight, which is why it's irrelevant.

MR. BONDI:  It is relevant.  There are several reasons.  This shows she put out this tweet, not Mr. Milton.  Number 2 is it shows that when she had a question about tweets relating to hydrogen and hydrogen issues, because this relates to the fuel cell electric vehicle, Mr. Schneider's a hydrogen person, who she reaches out to Mr. Schneider to ask him a question about her tweet, and it says thank you for clarifying.  This shows that she had the ability and did follow up with hydrogen people regarding questions, including questions relating to her tweet about the first-ever zero emission --

THE COURT:  That's the difference, right?  It's her tweet and she wants to make sure she has the technical information correct.  I'm going to allow it.  I think it's minimally relevant, but I do think it's different from the testimony that she's been giving about the tweets that Mr. Milton sends.

MS. ESTES:  Your Honor, just to be clear, they're not going to be allowed to offer it for the truth of what Mr. Schneider says in there; right?

THE COURT:  Right.

(Continued on next page)

(In open court)

MR. BONDI:  Your Honor, defense offers 1701 into evidence.

THE COURT:  It will be received.

(Defendant's Exhibit 1701 received in evidence)

MR. BONDI:  May I publish for the jury?

THE COURT:  You may.

MR. PODOLSKY:  Your Honor, may we have an instruction regarding the use of this document as far as the truth.

THE COURT:  Yes.  Ladies and gentlemen, as with several other documents, this exhibit is being provided to you not for the truth of the information that's contained, but to show its effect on the readers of the information.

Q.  Ms. Amzallag, I'm showing you Defendant's Exhibit 1701 here.  Do you remember this exchange with Mr. Schneider?

A.  I can't really recall this exact exchange.

(Continued on next page)

BY MR. BONDI:

Q.   OK.   Well, let's take it to, first, the email at the bottom of the first page that ends in 3674, and it's an email that you sent to Jesse Schneider on July 31, 2020, at 12:25 p.m.   Do you see that?

A.   Yes.

Q.   And you write:   "Hi, Jesse.   I had a quick question for you."

     Do you see that?

A.   Yes.

Q.   And we talked about Jesse Schneider.   He was the head -- global head of hydrogen, right?

A.   Yes.

Q.   He was somebody you went to with a question, right?

A.   Yes.

     MR. BONDI:   In fact, if we could pull up, Chris, briefly what's already been admitted as Government Exhibit 326, please, and just pull up the first page for now.

Q.   This was that social media and PR training that you talk about on direct.   Do you remember that?

A.   Yes.

     MR. BONDI:   And let's go to page 11, right?   Wrong page 11.   The page ending in 992.   There you go.

Q.   You see that?

A.   Yes.

Q.   And you see Jesse Schneider's listed here for all hydrogen, fuel cell and safety topics, right?

A.   Yes.

Q.   He's somebody you would go to if you had any questions, technical questions, about hydrogen, right?

A.   He was one person, yes.

Q.   You see also there's Dane Davis on there, right?

A.   Yes.

Q.   And it says "CTO," right?

A.   Yes.

Q.   Chief technology officer?

A.   Yes.

Q.   Chief meaning C-suite, right?

A.   Yes.

Q.   OK.  Let's go back to 1701 here.  You write to Mr. Schneider:  "I had a quick question.  I reshared our zero-emission beer delivery with AB on social."

         Do you see that?

A.   Yes.

Q.   That's saying that you shared about the beer delivery on social media, right?

A.   It could be that I reshared a post from Anheuser-Busch.  I can't really recall.

Q.   Well, we'll look at the post in a second.

         And you say:  "And I'm wondering if you can help

M9LHMil6                        Amzallag - Cross

answer the question, as we did initially communicate the delivery was 60k.  Please see the comments below," right?

A.  Yes.

Q.  And let's go to the next page.

You sent him a copy of this post to Nikola's social media, right?

A.  I believe so.  I can't recall what the exact context was from the email.

Q.  Do you have any doubt that this is an email sending that post?

A.  I don't believe so.

Q.  OK.  Well, let's look at this tweet.

This is a post you did to social media, right, because you say on the prior page, "I reshared our zero-emission beer delivery with AB," right?

A.  I'm not sure if this was the exact tweet.  "Reshare" could mean that I reshared a post from Anheuser-Busch.  So I'm not -- I'm not entirely sure.

Q.  My question, though, is you're posting something to Nikola's social media, right?  I reshared, meaning you posted something?

A.  Yes.

Q.  OK.  About the zero-emission beer delivery, right?

A.  Correct.

Q.  If we go back to the email -- stay on this page for a

second, please -- someone on Twitter had asked some questions

and said, "There's an error in your tweet."

Do you see that?

A.   Yes.

Q.   And the error they claim relates to the 60,000 pounds of

beer or something.  Do you see that?

A.   Yes.

Q.   They're questioning the tweet, and you send an email to

Jesse Schneider asking him and asking him about the question

that someone had asked on social media, right?

A.   Yes.

Q.   You were staying on top of things, right?

A.   Yeah.  Again, I'm not an engineer, so this was a question

we received on social that, you know, I wanted to share with

our team of experts.

Q.   And Jesse Schneider was the person we saw on the social

media training policy that you were talking about earlier as

somebody you would go to for hydrogen-related issues, right?

A.   Yes.

Q.   And you ask him the question and he provides a response,

right?

A.   Yes.

Q.   OK.  So when you had a question, Ms. Amzallag, you knew

where to go to get the answer, right?

A.   I mean, it depended on the topic, the question, who I would

go to.

Q.  You had resources where if you wanted to check the facts, you could go check the facts, right?

A.  If it's related to what the company was posting.

Q.  If you wanted to check the facts about something posted on Nikola's social media, you knew where to go to check the facts, correct?

MR. PODOLSKY:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  If it was the -- something the company was posting that I was directing the social media content, I would make sure to go to the correct departments to make sure the information was accurate.

MR. BONDI:  No further questions, your Honor.

THE COURT:  Any redirect?

MR. PODOLSKY:  Just a bit, your Honor.

REDIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Why don't we actually stick with what we were talking about.

Are we able to pull up Defense Exhibit 1701?  Maybe we can do side by side the email and the attachment, if possible.

OK.  So I think you just testified in response to Mr. Bondi's questions that you posted a reshare of this tweet, is that right?

A.   Yes.

Q.   Then you got a question about whether the math of the weight of the vehicle was correct, right?

A.   Yes.

Q.   So you went to Mr. Schneider -- I think this was your testimony just a moment ago -- to get it right, is that accurate?

A.   Yes.

Q.   Because when you said something on behalf of the company, it was important to be precise and accurate, right?

A.   Yes.

Q.   Now, this is what you would do whenever you posted something, right?

A.   Correct.

Q.   And that was consistent with the company's social media policy, right?

A.   Correct.

Q.   Now, when Mr. Milton posted something, did he vet it?

A.   I'm not sure.

Q.   Did he vet it through marketing?

A.   No.

Q.   In fact, I think you testified earlier that he did not comply with the social media policy, is that right?

A.   Correct.

        MR. BONDI:  Objection, your Honor.  Leading.

THE COURT:  Overruled.

Q.  Now, when Mr. Milton posted something on the company's social media or his social media, did you fact check what he wrote?

A.  No.

Q.  Why not?

A.  I assumed what he was writing was accurate.  He was the founder and CEO of the company.

MR. PODOLSKY:  Now we can put that down.

Q.  I actually just want to ask you about what Mr. Bondi said about your recollection for a moment.

Now, you're testifying here under oath today, is that right?

A.  Yes.

Q.  Do you particularly want to be here?

A.  No.

Q.  Mr. Bondi asked you -- actually, I think he asked if somebody had told you to say you don't remember.  Do you remember him saying that to you?

A.  Yes.

Q.  I think he said it in a pretty loud voice, didn't he?

A.  He did.

Q.  Now, before --

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

M9LHMil6                        Amzallag - Redirect

Q.  Before he said that to you, he had shown you a number of documents, is that right?

A.  Yes.

Q.  And you couldn't remember the content of all of them?

A.  Correct.

Q.  Now, were some of the emails and documents that he showed you emails and documents that were written two or more years ago?

A.  Yes.

Q.  And had you seen any of those in the two or more years until Mr. Bondi showed them to you on the screen?

A.  No.

Q.  Were you able to recall the emails that you wrote in the course of your work from two years ago that you haven't seen since?

A.  No.

Q.  Now, did Mr. Bondi also show you a number of documents and emails that you weren't on?

A.  Yes.

Q.  Had you ever seen those before Mr. Bondi showed you to them?

A.  No.

Q.  Were you able to recall a document or email that you've never seen before in your life?

A.  No.

Q.  You think it's fair to accuse you of being told to say "I don't remember" to a document that you have never seen before?

MR. BONDI:  Objection, your Honor.  Argumentative.

THE COURT:  Sustained.

Q.  Now, just a couple questions on the substance here.

Mr. Bondi asked you a bunch of times -- or pointed you to a number of times where you said to Mr. Milton "good job," in substance, after an interview.  Do you recall that?

A.  Yes.

Q.  Why did you tell Mr. Milton he did a good job?

A.  If he performed well in the interview, you know, that was some positive just reinforcement for him.

Q.  Did you know at the time whether or not the things he was saying were a lie or not?

A.  No.

Q.  Actually, let's take a look at Government Exhibit 259 for a moment.  Go there myself.

OK.  If we pull up the bottom -- well, first of all, before we blow it up, do you see the date on this is July 19, 2020?

A.  Yes.

Q.  I just want to give you a chance to make sure you're oriented and know what we're talking about.

Do you see that the subject here is the TeslaCharts podcast?

A.   Yes.

Q.   Now, do you recall, as you testified earlier, that this was before receiving Ms. Fretheim's email bringing to your attention a number of issues with it?  Do you recall that?

A.   Yes.

Q.   By the way, before you received Ms. Fretheim's emails, did you think the podcast -- Trevor did a good job on the podcast?

A.   Yeah, I thought so.

Q.   How come?

A.   He sounded like he did really well.  He talked about the company in a positive manner.  It overall was a good interview.

Q.   Do you know whether or not he was lying on that podcast?

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A.   No.

Q.   All right.  So let's pull up the one from Trevor and then the first paragraph from Ms. Rose's email in the middle there. I think Mr. Bondi asked you about this.

        Do you recall he emphasized to you how Ms. Rose wrote: "There's an abundance of great content, quotes and facts that we can pull from this one podcast"?  Do you remember that?

A.   Yes.

Q.   So if Mr. Milton said something on a podcast or an interview that sounded positive, might the marketing team then use that content later?

M9LHMil6                      Amzallag - Redirect

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  So we're clear, if Mr. Milton said something and you listened to the podcast, you might just repeat what he said, is that right?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  Yes.

Q.  Would you know whether or not what he had said was true or a lie?

A.  No.

Q.  Did you assume that it was true at the time?

A.  I assumed it was true at the time.

Q.  So if Mr. Milton gave a podcast like TeslaCharts and actually lied throughout it, you might unwittingly repeat his lies when he asked you to repost or share the information, is that right?

MR. BONDI:  Objection, your Honor.

THE COURT:  Sustained as to the form.

Q.  Might you repeat content that was not true without realizing it?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  Yes.

MR. PODOLSKY:  Nothing further, your Honor.

THE COURT:  Anything more, Mr. Bondi?

MR. BONDI:  Nothing, your Honor.

THE COURT:  Ms. Amzallag, you may step down.

(Witness excused)

THE COURT:  Government, please call your next witness.

MR. ROOS:  Thank you, your Honor.  Government calls Scott Damman.

THE COURT:  Sir, please step up into the witness stand and remain standing.

SCOTT DAMMAN,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT:  Sir, you may be seated.

Please, when you speak, speak directly into the microphone, and please begin by stating your first name and your last name and spelling your first name and your last name.

THE WITNESS:  Sure.  My name's Scott Damman.  It's spelled S-c-o-t-t, D-a-m-m-a-n.

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ROOS:

Q.  Mr. Damman, where do you work?

A.  I work for General Motors.

M9LHMil6                        Damman - Direct

Q.   I suspect most of us know what that is, but what is General
Motors?

A.   Automobile company, GM.

Q.   It makes cars, right?

A.   We make cars and trucks, yep.

Q.   And I think you just said it.  Some people call General
Motors GM?

A.   That's correct.

Q.   How long have you worked at GM?

A.   A little over 16 years.

Q.   What's your title there right now?

A.   I am a senior manager in our software development
organization called Software Defined Vehicle.

Q.   What position did you hold before that?

A.   I was architectural program engineering manager for our
battery electric truck program starting with our Hummer EV and
feeding into our Silverado EV and our other electric truck
platforms.

Q.   Now, during what period did you have that job, roughly?

A.   I was three years, so -- been in this job for about a year,
so starting about four years ago until about December of last
year.

Q.   All right.  So safe to say during the year 2020, you were
in that job?

A.   Yes, correct.

Q.   So I want to focus on your time in that position, and I think you just mentioned battery electric vehicles or trucks. What is that?

A.   So we are -- General Motors is going after all EV future for our vehicles.  And part of that is developing and building battery electric trucks.  So just like our Silverado and Sierra of today with gas and diesel engines, we are building all whole new platform that will be fully electric, and that starts with our Hummer EV.  And the second truck in that line is the Silverado EV.

Q.   So when you say a truck is fully electric, how is it running?  You're not putting gas in it?

A.   No gas, no diesel.  So it has a high voltage battery --

        THE COURT:  I'm sorry, Mr. Damman, you're saying a lot of complicated words, and you're saying them very quickly. Could I ask you to slow down, please.

        THE WITNESS:  Sure thing.  Sorry.

Q.   Let me ask it again.

        So an electric truck doesn't take gas or diesel. What's powering it?

A.   Sure.  On board there's a high voltage battery, usually made of lithium ion cells.  That is the energy storage source for the vehicle.  You can charge that up at home or at an EV charging station.  And then to propel the vehicle down the road, there's what we call drive units, an electric motor with

either on-board or off-board power electronics, inverters, and other controllers to run the vehicle.

Q.  And you said General Motors has two of these battery electric trucks now, is that right?

A.  The first truck is an Hummer EV, which is available to customers now, with a slower rollout to customers, and then the next truck which comes out next year is the Silverado EV.

Q.  All right.  And what were your responsibilities as a program engineer manager for the battery electric truck?

A.  So I had the pleasure of being on our battery electric truck team from day one, one of the first five people kind of on the team, which now is about 1100 people.  And I was responsible for the entire architecture and all of the engineering decisions that went into the base structure, think like frame, as well as the body structure, into engineering decisions that led to how the propulsion system was going to work, the seat structure, we were going to use, interior. Working with our creative design team to kind of make those decisions.

Q.  So we'll come back to several of those things.

Let me ask you, when you started, was the battery electric Hummer a brand-new program at General Motors, or was it based on some sort of existing product or program?

A.  Sure.  So the battery electric truck program is all brand new at General Motors.  If we look at, like, today's Silverado

M9LHMil6                            Damman - Direct

nonelectric version, none of those component sets really moved over to our battery electric truck.  All new kind of from the ground up.

Q.  OK.  So let me ask you, then, about the process of bringing a new vehicle to market.

Does the process vary depending on whether it's a new vehicle, like the ones you described, or a truck that's based on an existing program?

A.  Yes, it varies, varies quite a bit.  From an existing program -- we use a lot of acronyms at GM.  MCE, mid-cycle enhancement, usually what we call it.  So if it's an existing program and we're going to make some changes, interior and exterior changes, but largely the structure of the truck stays the same, the frame stays the same, the engine drivetrain stays the same, that's a much shorter, condensed development cycle versus something starting that's from scratch.

Q.  So before we talk about something starting from scratch, taking the category that uses an existing frame, can you give us an example of a car or a truck that falls into that category?

A.  Yeah, sure.  Often, like right now, we actually have a new Silverado coming out, the non-EV version, that has some new interior components, new screens for the customer to interact with, new seat styling, some new exterior styling, but the base vehicle is the same as what would have been in, like, 2020,

right?  But it's a new styling to the vehicle.

Q.  So the internal components and frame are largely the same, maybe with some modifications, but the exterior and interior styling is different?

A.  That's correct.

Q.  All right.  Now, a few moments ago you used the terms "ground up" and "from scratch."  What do those mean?

A.  Yeah.  When we're starting a whole new development, a new platform, you know, kind of starting with a blank sheet of paper and going to develop something new, it's -- it's -- kind of nothing is carried over from a previous program is the point.  So we -- you know, the wheelbase and where the customer and driver/passenger sit are all new and laid out from scratch.

Q.  OK.  So is a "ground up" vehicle sort of a known term or concept in the automotive industry?

A.  Yeah, I'd say it is, yeah.

Q.  So if you're making a vehicle from the ground up, in terms of the time and resources involved, does that differ at all from using sort of an existing car program?

A.  Yeah.  From a time perspective, you know, obviously, a lot more needs to go into kind of a ground-up program, a brand-new program, than existing because every single one of those components needs to be engineered and designed.  And when we get down to it, it needs to be sourced from a supplier, whereas a carryover build, something where we're just making more minor

changes, there's a lot less change.  A lot less needs to be engineered.

Q.  By the way, the term "clean sheet," how does that fit into this?

A.  I think it's kind of similar to that, that ground up or, again, like starting from zero kind of clean sheet build. Similar idea.

Q.  OK.  Just to clarify, if I took like a piece of paper -- if I worked at General Motors, if I took a piece of paper and I sketched out on the piece of paper a new version of the existing Silverado with some different exterior stylings, is that clean sheet?

A.  No, that would be more like creative design, making some, you know, changes to the interior and exterior of the vehicle, not necessarily a clean sheet rebuild of a platform.

Q.  So if we're talking about now a ground-up vehicle, can you walk us through the process of the start of a ground-up vehicle to mass production and launching it to consumers?

A.  Sure.  So at GM we call that GVDP, which is global vehicle development process.  Again, lots of acronyms.  But, basically, how we would start that is we have a team of people that kind of figure out where we need a new vehicle, where there's a market for a new vehicle.  And so that's the first step is we define what we need and what we want to do.  In this case, in battery electric truck case, we knew we wanted to build an

electric truck platform.  So that kind of kicked off the beginning.

So the first part we do is we start to kind of define what the key attributes and performance characteristics of the vehicle are going to be, and we start to kind of lay out the wheelbase, where the driver/passenger are going to fit, kind of the reach curves of what they can get to, where the pedals are going to be, where the seat is in relation to the steering wheel and pedals.  That stuff gets laid out somewhat early.

And at the same time, our creative design teams are starting to design exterior sketches based on kind of those initial first kind of layout and proportions.  And as we continue to develop, we refine those as we go along.  Working with our creative design teams, we start bringing in our other subject matter experts, like body and chassis teams, to start designing in the actual componentry that create the chassis and structure of the vehicle.  We start to figure out what -- again, what key features are important to the customer and keying in on those as we develop it, all along, you know, working with our creative design teams, doing the actual creative design, what it's going to look like inside and outside at the same time.

If we have parts that we can use off the shelf, we start putting those in.  So we do have, of course, a parts -- catalog of parts we're able to use that we can bring in.

M9LHMil6                          Damman - Direct

Window switches and those sorts of things, we often will do new creative design like caps or covers over them, but start bringing those parts in and laying them into math or the computer-aided design to start laying that out.

Once we get far enough along with kind of that initial layout, we'll actually start engaging our manufacturing partners to start figuring out how we're going to manufacture this truck, taking a look at the parts.  They're with us, you know, from that point on talking through every part on the vehicle, how we are going to assemble it, how the line worker is actually going to be able to put this part on.  And so we're working with those key counterparts to balance and design all those parts, as well as starting to run final element analysis, which is computer-aided validation and development to find out, you know, where things are going to break, where we need to add more material.  In the case of the body and structure, where we need to add welds and that kind of thing happen during that time.

All the time we're working with our creative design team to really finesse and kind of get a final layout of what the vehicle's going to look like, what it's going to feel like.  Kind of the essence of what a Hummer EV needs to be, that type of thing is all happening during that time.

And, eventually, we get to the point where we get to build our first vehicles.  We, GM, build them at our

preproduction operations in Warren where we actually build the whole body structure and actually build a whole vehicle, kind of hand built, not on a line exactly. Those vehicles feed into development and validation testing, which happens at our Milford Proving Grounds.

From there we -- we have a couple iterations of design that we can do to, again, fix any areas that we find structural issues, those kind of things. How the seats sit even, right? We have people sit in them. We might make changes to the foam of the seats, making sure everything's in the right spot, the customer can reach all the controls and knobs. It gives us that time to make some final changes.

And then we build -- and then we start building vehicles at our actual assembly plant. In Hummer EV's case, it's Factory Zero in Detroit-Hamtramck. Those first vehicles are, again, preproduction vehicles. They're not vehicles meant to be sold to the public. But we use those, again, for some additional final development validation.

The vehicles that are built at the plant are also crashed. So we do all our crash testing on those vehicles. So, officially, vehicles built, plant built, are crashed. And we have another loop of feedback into the system of, again, any issues that we find before we build vehicles that go to an actual customer's hands. That whole process, in Hummer EV's case, was a little over three years from kind of the first,

hey, we're going to build a battery electric truck and it's going to be a Hummer, all the way to the first vehicle coming down the line that could be sold to a customer.

MR. MUKASEY:  Judge, I'm sorry for interrupting.  Can we maybe throw in a question here instead of the narrative?

MR. ROOS:  I'll ask some follow-up questions.  But the question to him was can you describe the process, which he did.

THE COURT:  You can go ahead and finish.  It sounded like you were getting ready to finish up any way.

THE WITNESS:  Yeah, that's basically the end of it, yes.

THE COURT:  OK.

BY MR. ROOS:

Q.  So you said the whole process in the case of a Hummer EV took three years?

A.  Yeah.

Q.  And roughly how many people needed to be involved to do that whole process?

A.  Yeah.  So that process was very condensed.  So we had more people than I think even some other vehicle programs within General Motors.  But at the end, when we launched the vehicle, we had about 700 people working on Hummer EV.

Q.  Let me ask you a few follow-up questions about your description of the process.

So, first, just some terms.  You used the word

"chassis."

A.   Yeah.

Q.   What's a chassis?

A.   Chassis, in most cases of a truck, is like the frame and the components that the wheels and tires connect to.  The axle in the vehicle, the suspension components are often the chassis.

In the case of Hummer EV, it's actually a unibody design.  So the entire body structure makes up the overall chassis, but we talked about that as like total structure.  And then chassis components are, in our case, a cradle that holds, like, the drivetrain, you know, holds the actual motor that's going to drive it down the road.  And the suspension component's hooked to that cradle, and then that gets bolted up into the body of the vehicle.

Q.   And then you used the word "frame."  What's that a reference to?

A.   Yeah.  Generally in trucks we have a frame, like an actual frame underneath the body, and the body sits on the frame.  Again, in our case that frame is part of the overall vehicle structure.  It's all one part.

Q.   All right.  So let's say we were looking at a vehicle, like inspecting a vehicle, and can you see the frame from the outside looking at it?

A.   Sometimes, depending on what kind of vehicle it is.  Most

of the time, no.  You know, the frame's kind of the underpart that you don't really see.  We call it the dirty side often because it's the side that's dirty when you're going down the road, if that makes sense.

Q.  And how about like if I'm walking around a vehicle inspecting it, can you see the chassis, the parts of the chassis?

A.  Generally, just maybe some control arms, and you can often see, like, shock absorbers and springs from the exterior of the vehicle.  But most of the chassis components you can't see.

Q.  OK.  Understood.

Now, you walked us through the parts of the process of manufacturing a vehicle.  At some point you mentioned there were sketches or renderings.  Do you remember that?

A.  Yeah.

Q.  So just to clarify, at that point has the vehicle been built yet?

A.  The first sketches or renderings, no.  In fact, we might just have the initial layout of the wheelbase and maybe where the customer is going to sit in the car to start those sketches.

Q.  Then similarly this computer design, what did you call it?

A.  So couple of things.  There's finite element analysis that's done on structured components to find out if they're going to break under certain loads, and then CAD,

computer-aided design.  We call it "math" often, often multiple terms, but that's just the design of the vehicle in the computer.

Q.  OK.  So then just to clarify the process again, when you've got the design of the computer -- the design of the vehicle in a computer, has the truck been built yet?

A.  Generally, no.  Early on we design everything in computer, right?  Eventually, when you get far enough along in the process, you are going to build a vehicle off of, you know, what's designed in the computer.  But early on, no.

Q.  So those are not prototypes yet?

A.  No.

Q.  Now, in the course of developing a new vehicle, does GM ever show off the vehicle along the way?

A.  Yeah, we do.

Q.  And what are those vehicles called?

A.  We call them show vehicles.

Q.  And what's a show vehicle?

A.  A show vehicle in our case could be, for instance, Hummer EV's show vehicle was a shell of the vehicle made out of fiberglass with a kind of hand-built tubular steel frame underneath, and it actually had the Bolt EV drivetrain in it to make it move.  Not at all representative of what the final vehicle was going to be, but it looked like the vehicle.  So that was used to go up on stage.  We did a little bit of video

with it to get some different shots for video.

Q.  OK.  So it's like for marketing?

A.  It is for marketing only, yeah.

Q.  But it's not a fully functional truck, I take it?

A.  Most -- all of our show vehicles are -- that I know of are not fully functional vehicles.  They're one-off builds for -- just for show.

Q.  Is it right that sometimes show vehicles have parts that don't work?

A.  Oh, yeah.

Q.  Like what?

A.  Most cases like the infotainment screens, the --

         MR. MUKASEY:  I'm going to object to the relevance here, Judge.

         THE COURT:  Overruled.

         Mr. Damman, if I could just ask you to slow down just a bit more.  You're doing great.

         THE WITNESS:  OK.

A.  So in the vehicle, things that aren't functioning on a show vehicle normally, like infotainment screens, the cluster and center screen are often just, like, iPads in there that are playing a loop of a video.  You know, normally, seats, interior components, none of that stuff works on a show vehicle.

Q.  Is a show vehicle a prototype?

A.  I don't consider a show vehicle a prototype, no.

Q.   What's the difference?

A.   To me a prototype is a vehicle that is going to be used to feed into the engineering of the final vehicle.  And a show vehicle, because of how they're constructed, they have no bearing on the design and engineering of the actual final vehicle.  So it wouldn't be considered a prototype.

Q.   And just to be clear, is a show vehicle production-ready? Can you go to production with it?

A.   No, no.

Q.   Why not?

A.   Again, in our case, most of our show vehicles are pieced together from, you know, components that aren't production at all.  So, again, like a fiberglass body instead of a steel or aluminum body.  We might take seats from another vehicle and wrap them in something that looks kind of like what the final might be.  But, again, it's just all to show off what it might look like.

Q.   All right.  When General Motors makes show vehicles, are they used for engineering the ultimate vehicle?

A.   Generally, no.

Q.   So they're just something to show off for marketing?

A.   Right.

Q.   When General Motors does that, does it say these vehicles, to the best of your knowledge, are fully functional?

          MR. MUKASEY:  Objection to the form, "does it say."

THE COURT:  Sustained as to form.

Q.  All right.  Based on your knowledge and experience at General Motors, are you aware of any times where General Motors has said a show vehicle is fully functional?

A.  I am not aware of any time.

Q.  All right.  Because, in fact, show vehicles are typically not fully functional?

MR. MUKASEY:  Objection.  Leading.

THE COURT:  Sustained.

Q.  Are show vehicles fully functional?

A.  No.

Q.  Now, are you familiar with the term "donor vehicle"? What's a donor vehicle?

A.  Often a donor vehicle will be something -- I'll give you an example.  Hummer EV, the wheelbase is shorter than our Silverado today.  We might take a Silverado and cut it down to get that wheelbase, to start doing things like development testing on suspension and -- and drivetrain components.

But then also a donor vehicle could be used as a sense of like we're going to take the frame or other components from one vehicle and move those into a new platform as a donor part into that new platform.

Q.  So when General Motors used a donor vehicle, based on your experience, where does that donor vehicle come from?

MR. MUKASEY:  Objection, your Honor.  Can we approach?

M9LHMil6                        Damman – Direct

THE COURT:  Sure.

(Continued on next page)

(At sidebar)

MR. MUKASEY:  Judge, I tried to give this guy some leeway.  The General Motors truck-building process and a long explanation about his experience with General Motors truck building has nothing to do with the issues on trial here.  It's going to come up that General Motors was engaged by Nikola to perform certain functions.  What General Motors' definitions are, what General Motors' habits are, practices are, how many people they put on truck-building projects, what they do to build their Hummer EV has literally nothing to do with any element that's on trial here.

THE COURT:  What are you going to do with this guy?

MR. ROOS:  Well, as Mr. Mukasey said, at some point -- there two events that happen:  First, General Motors visits Nikola in February 2020, and they're briefed on the Badger. They see information, materials, etc.  So there's a site visit. No deal happens.

Fast-forward to, I'm going to say, August roughly, GM and Nikola come back together.  There's a public announcement that GM and Nikola are doing a deal.  As part of the deal, GM is going to build the Badger truck.  There are a series of representations by the defendant about it being a ground-up vehicle, clean sheet.  He does not say it's a donor vehicle.

So it's necessary and highly relevant for this witness, who is the chief engineer on the GM side, to explain

what those terms mean so that when he's interpreting and discussing these emails and documents later --

MR. CARUSO:  May I?  There's no connection between what this witness thinks those terms mean and what the defendant thinks the terms mean.

THE COURT:  Well, I mean, there could be a connection if it were made because we're only talking in the context of GM.

MR. ROOS:  GM is going to build their truck.

THE COURT:  Right.  But I guess the point is this is what it means in GM.  Is this true of the automotive industry?

MR. CARUSO:  Right.

MR. ROOS:  I can ask that.

THE COURT:  It almost sounds like you're putting him on as an expert witness.

MR. CARUSO:  And that's the point.

MR. MUKASEY:  That's the next point.

THE COURT:  He's not an expert, correct?

MR. ROOS:  No.

THE COURT:  He's not being offered as an expert?

MR. ROOS:  He still has a lot of expertise, but --

MR. MUKASEY:  In GM.

THE COURT:  He appears to know what he's talking about.  But if you could -- I was going to say hurry him along, but don't do that in terms of --

M9LHMil6                    Damman - Direct

MR. MUKASEY:  If they want to try to connect him to Mr. Milton, they can try to connect him to Mr. Milton.

THE COURT:  Right.  So that's --

MR. CARUSO:  I think your Honor's put the finger on it.  My finger's going to miss.  If this man says "clean sheet" and this man thinks this means something else, there's no state of mind issue.  They haven't had a meeting of the minds.

THE COURT:  We'll see.

MR. CARUSO:  Yes.

MR. ROOS:  Anyways, in terms of this background stuff, I was almost done.  I was going to ask him what does donor car mean and then move on to the Nikola visit.

THE COURT:  Maybe we do that and then break for the day.

(Continued on next page)

M9LHMil6                         Damman - Direct

(In open court; jurors present)

BY MR. ROOS:

Q.  Mr. Damman, I just asked you about donor vehicles, and you gave us what that means.  Are you aware of a time General Motors has ever used a donor vehicle from another company?

A.  I am not aware, no.

Q.  All right.

THE COURT:  I'm sorry.  I didn't hear you.

THE WITNESS:  I am not aware, no.

Q.  And now I want to change topics.  Are you familiar with the company called Nikola Motor Corporation?

A.  Yes, I am.

Q.  Did you ever visit the company?

A.  I did.

Q.  When was that?

A.  February of 2019.

Q.  And why did you visit Nikola?

A.  At the time we were looking -- our corporate development team was looking to do a deal with Nikola Motors for fuel cell and potentially a truck development.

Q.  At the visit did you learn about the Nikola Badger?

A.  Yes, I did.

Q.  And at that time, based on your visit, what was your understanding of the status of the Nikola Badger?

A.  What I saw when I visited there was kind of some parts laid

out maybe in like a PowerPoint presentation on -- with some idea of what the vehicle was going to be capable of, but that was about it.

Q. Had they built a truck at that point?

A. Not that I saw.

Q. Did they have any prototypes that you were aware of?

A. Not that I was aware of.

Q. And did you see any technical specifications for it?

A. Just the specs that they had run down for its, like, range and some of the capabilities, but no other kind of validation to back that.

Q. And did you know the basis for those?

A. No.

Q. Now, in terms of what you saw, I think you said concept. What do you mean by what?

A. When I was there in February, we saw kind of a picture of the frame of a vehicle laid out with what hydrogen tanks might look like laid into that frame, a drive unit picture sort of laid in, kind of some general parts laid out in a PowerPoint, as well as, again, kind of some of the specs that they were shooting for.

Q. So in February they had drawings?

A. They had, yeah.

          MR. MUKASEY:  Objection.  Misstates the testimony and argumentative.

M9LHMil6                       Damman - Direct

THE COURT:  Overruled.

It's 2:40.  It's the end of the day, ladies and gentlemen.  We'll break now.  We'll get it together again tomorrow morning.  Please do try to be in the jury room by no later than 9:15 or so.  Until then, do not discuss the case or listen to anything about the case or read anything about the case.

(Jury excused)

(Continued on next page)

(Jury not present)

THE COURT:  Everyone can be seated.

And, Mr. Damman, do try to be very conscious about speaking very deliberately.

OK.  Does the government know when it will be calling its witness that will be in a wheelchair?  Because we do need to make some adjustments to the electronics here.

MS. ESTES:  Yes, your Honor.  It will be tomorrow.

THE COURT:  Tomorrow.  After Mr. Damman?

MS. ESTES:  Yes, your Honor.

THE COURT:  OK.  Anything to raise, Mr. Mukasey?

MR. MUKASEY:  Just the same thing I seem to raise every afternoon, which is there's still something like 20 witnesses on the government's list, which include about 45 potential retail investors.  They're telling us slowly but surely, but the earlier they could tell us who's coming or who can be wiped off the list, the more efficient we can be in the courtroom.

THE COURT:  Yes, I would think that the government is in a much better position now to know who is not coming so that they don't have to prepare for any of those folks.  So why don't you tell them that.

MR. PODOLSKY:  We can do that, your Honor.

THE COURT:  And let them know what's going to be on for the rest of the week.

M9LHMil6

MR. ROOS:  We've done that.

THE COURT:  Anything else?  Nothing to raise?

MR. MUKASEY:  Thank you, Judge.

THE COURT:  We'll see you tomorrow.  Have a good night, everyone.

(Adjourned to September 22, 2022, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

STEPHANIE AMZALLAG

Cont'd Direct By Mr. Podolsky . . . . . . . .1251

Cross By Mr. Bondi . . . . . . . . . . . . . .1331

Redirect By Mr. Podolsky . . . . . . . . . .1431

SCOTT DAMMAN

Direct By Mr. Roos . . . . . . . . . . . . . .1438

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 328    . . . . . . . . . . . . . . . . . . . .1261

 235    . . . . . . . . . . . . . . . . . . . .1270

 247    . . . . . . . . . . . . . . . . . . . .1278

 258    . . . . . . . . . . . . . . . . . . . .1282

 259    . . . . . . . . . . . . . . . . . . . .1286

 262    . . . . . . . . . . . . . . . . . . . .1292

 327    . . . . . . . . . . . . . . . . . . . .1300

 287    . . . . . . . . . . . . . . . . . . . .1312

 565    . . . . . . . . . . . . . . . . . . . .1319

 568    . . . . . . . . . . . . . . . . . . . .1322

 1666   . . . . . . . . . . . . . . . . . . . .1408

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 526    . . . . . . . . . . . . . . . . . . . .1348

 1247   . . . . . . . . . . . . . . . . . . . .1360

1248 . . . . . . . . . . . . . . . . . . . .1370

1224 . . . . . . . . . . . . . . . . . . . .1374

1665 . . . . . . . . . . . . . . . . . . . .1387

1683 . . . . . . . . . . . . . . . . . . . .1390

1343 . . . . . . . . . . . . . . . . . . . .1394

1698 . . . . . . . . . . . . . . . . . . . .1399

1699 . . . . . . . . . . . . . . . . . . . .1401

1700 . . . . . . . . . . . . . . . . . . . .1403

1662 . . . . . . . . . . . . . . . . . . . .1405

1655 . . . . . . . . . . . . . . . . . . . .1407

1664 . . . . . . . . . . . . . . . . . . . .1409

1237, 1238, 1239, 1240 . . . . . . . . . . .1411

1250, 1251, 1252, 1253 . . . . . . . . . . .1413

1255 . . . . . . . . . . . . . . . . . . . .1413

1654 . . . . . . . . . . . . . . . . . . . .1415

1696 . . . . . . . . . . . . . . . . . . . .1416

1701 . . . . . . . . . . . . . . . . . . . .1426