M9MHMil1_corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          21 Cr. 478 (ER)

TREVOR MILTON,

              Defendant.

------------------------------x

                                    New York, N.Y.

                                    September 22, 2022
                                    9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                    District Judge

                        APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:   JORDAN L. ESTES
      NICOLAS T. ROOS
      MATTHEW D. PODOLSKY
      Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
      Attorneys for Defendant
BY:   MARC L. MUKASEY
      KENNETH A. CARUSO
      TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
      Attorney for Defendant
BY:   BRADLEY J. BONDI

                    SOUTHERN DISTRICT REPORTERS, P.C.

                        (212) 805-0300

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  It's 9 a.m., and I did get the parties' letters from yesterday and early this morning.

Mr. Caruso, is there anything else you wanted to put on the record?

MR. CARUSO:  Yes, your Honor.  Thank you very much.

So we oppose the admission of testimony from these individual investors.  The issue is one of materiality, which, of course, is an element of the offense.  And the materiality standard is objective, of course, and under *Litvak*, the Court will police -- not my word, Second Circuit's word -- the Court will police the admissibility of this sort of testimony.

And I think the government has misunderstood my position.  My position is that the burden of proof is on the government as a foundational matter, and they have not proved the foundation in order to have this testimony to be admissible.

Sorry.  Much better.  Forgive me, Judge.

In order for this testimony to be admissible, the government has to prove the individual views of a purchaser or seller may be relevant to the element of materiality, but only so long as the testimony is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue.  In other words, there must be evidence of a

M9MHMil1

nexus between the particular trader's viewpoint and that of the mainstream thinking of investors in that market.

The government has not submitted any such evidence. We have here witnesses who are going to say --

THE COURT:  I'm sorry.  Can I just -- just so that I'm clear --

MR. CARUSO:  Yes, sir.

THE COURT:  - when you say that the government hasn't submitted any such evidence, are you referring exclusively to the 3500 material?

MR. CARUSO:  No, no, on the contrary.  I'm referring to the trial record so far.

THE COURT:  OK.

MR. CARUSO:  What we're going to see is testimony -- here, is testimony from witnesses who will testify (1) I didn't read the SEC filings; (2) I didn't read the company's press releases; (3) I relied on social media.  There's no evidence that that viewpoint has a nexus to the viewpoint of a mainstream investor.

THE COURT:  Are you suggesting that a mainstream investor is one who necessarily has to have read the press releases and the SEC filings?

MR. CARUSO:  I'm going to suggest that at the correct time.  That's as a matter of law.  We're not talking law now. What I'm saying is they have a burden of proof at a threshold

M9MHMil1

foundational matter that this testimony comports with the viewpoint, has a nexus to that of the reasonable investor, and they haven't even tried to do that.  I mean, under *Litvak* they can't just put somebody on the stand and say:  What did you do?  Tell us what you did before you invested.  That's inadmissible, at least potentially inadmissible.

The government argues here in opposition -- and I think this shows that they don't really -- well, they don't really meet my argument -- excuse me.  There's nothing idiosyncratic about how or why these investors invested.  How do we know that?  That's government say-so.  There's no witness, no expert, for example, who took the stand and said, oh, this is mainstream.

THE COURT:  Let me tell you another sort of area of confusion for me in terms of what you're saying.

MR. CARUSO:  Yes, sir.

THE COURT:  None of them have testified.  So what would you have had the government do through other witnesses to talk about what the retail investors will say?

MR. CARUSO:  Well, OK.  I think that's their problem for them to decide.  I'll make a suggestion.  They should have called an expert.  They should call an expert who says it is within the mainstream of thinking for people to buy without reference to SEC filings, without reading the company press releases, and it's mainstream thinking to buy on the basis of a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9MHMil1

podcast.  Now --

THE COURT:  So we need an expert to tell you what a reasonable person, a mainstream person, would do or say or think?

MR. CARUSO:  Well, if I had the burden of proof, which I don't, but if I did, I'd be calling an expert to say that. Now, maybe there's some other way to do it, but they haven't even tried, and this is a threshold matter.

Let me just continue briefly.  Here, less sophisticated investors -- the government's criticizing my argument -- less sophisticated investors who do not read SEC filings are not reasonable investors, both common -- it's contrary to common sense that an investor who does not read every SEC filing is outside the mainstream of thinking.

All we have here is government say-so.  There has to be an evidentiary foundation.  The government has to put in evidence.  They have the burden of proof.  The government has to prove -- sorry, back to this one.  The government has to show -- excuse me.

The testimony of an individual investor may be relevant, but only so long as the testimony is shown, by the government, to be within the parameters of mainstream thinking of reasonable investors in the particular market.  In other words, there must be evidence, introduced by the government as a foundational matter, of a nexus between this person's

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9MHMil1

viewpoint and mainstream thinking.

*Litvak* imposes this as a foundational requirement to admissibility. *Litvak* reversed because there was no foundation for this evidence. So far we don't have any foundation here except government say-so. The government can't just stand up there and say, this is mainstream. They have to have evidence of that, and they have no evidence of that.

THE COURT: OK. Mr. Roos.

MR. ROOS: Thanks, your Honor.

So I think the problem with this proceeds from the premise that the use of the language "mainstream investor in the particular market" means legally an investor that has read prospectus and in some ways is an institutional or is sophisticated. The case law says otherwise.

Here, the Court has before it a pretty substantial amount of evidence that we cite in our papers about how the defendant targeted a particular class of investor, retail investors. It was intentional. And those are the people that the misrepresentations were targeted at, and so, therefore, it's totally -- so that's the universe of what the relevant market is, and it's totally appropriate for the government to call witnesses that have testimony about that class of investors.

Then the question is are the government's proposed witnesses mainstream investors within that marketplace? And I

M9MHMil1

can just proffer the Court the defense has 3500 material.  The answer is absolutely yes.  Unlike *Litvak* where the particular witness had an idea in his head that was totally contrary to reality and what both parties agreed, the witnesses here are regular investors, regular retail investors.  They did look at some things; they didn't look at some other things.  The defense has the 3500 material.  That meets the basic threshold requirement for relevance, and they should be able to testify.

MR. CARUSO:  Judge, that's ridiculous.  The 3500 material doesn't prove their case.  They've given us discovery.  They have to put on evidence Mr. Roos just said.  If he can prove it, let him prove it.  It's not enough for the government to stand up and say this is mainstream; they have to have proof that it's mainstream.

You know, the -- we're not -- we don't have any burden here to show that what these people will say they did is unreasonable or contrary to mainstream thinking.  They have the burden of admissibility, foundational proof that what they did has a nexus to the mainstream.  They haven't shown that.

I mean, the government says the testimony is relevant to materiality, and materiality is a jury question.  My response to that is maybe; maybe not.  But --

THE COURT:  Materiality may not be a jury question?

MR. CARUSO:  It may not be if they can't get this kind of evidence in or if the evidence is all one way.

M9MHMil1

But let's not go that far, right? *Litvak* -- they want to say this is relevant, but *Litvak* creates a threshold requirement on the issue of admissibility. It's foundational, and they have to show that there's a nexus between what these people did, their viewpoint, and the viewpoint of mainstream thinking in the market. I mean, the case law -- let's not just throw quotes around, but a reasonable investor cannot disregard the common knowledge of the marketplace, as in SEC filings, for example.

MR. ROOS: Not as in SEC.

MR. CARUSO: What they would do is drain, drain, the objectivity from the materiality standard.

MR. ROOS: Your Honor want anything else from me?

THE COURT: No.

MR. ROOS: OK.

THE COURT: The motion is denied. I think that the government has certainly proffered sufficient evidence, as set forth in their letter, that Mr. Milton was very focused on so-called retail investors. Now, there's not a whole lot of case law on so-called retail investors, but I think there's an understanding of what that is. These are individual investors who trade on their own accounts based on their own research, and Mr. Milton was focused on them and said that they were "very important to him."

As I understand it, these folks who are being

M9MHMil1

proffered by the government will not -- I think will not just say, look, I relied on social media. They will say that they relied on social media where Mr. Milton himself appeared, spoke, made representations, and they relied on those representations. They weren't looking at TikTok dance videos. They were listening to Mr. Milton. So in that regard, I don't think that there's anything else that they need to do at this point.

MR. CARUSO: OK, Judge. I understand. I'm just going to say two things.

THE COURT: OK.

MR. CARUSO: Evidence that Mr. Milton "targeted" retail investors may go to intent to defraud, but it doesn't go to materiality. So I think that that type of evidence does not carry the burden on that, on this threshold issue raised by *Litvak*.

THE COURT: I mean, the materiality will come in in terms of what Mr. Milton told that segment of the investing public.

MR. CARUSO: I'm just going to say something for the record now.

THE COURT: OK.

MR. CARUSO: I've made my record. Your Honor has ruled. I'm going to -- when the government's direct case is over and before we start cross, I'm going to ask to approach

M9MHMil1

just so I can make my record on a motion to strike.

THE COURT:  Very well.  I think that would be perfectly appropriate and that would be the appropriate time to do it.

MR. CARUSO:  Just so you don't -- I don't want you to wonder why I'm asking to come up.  OK.

MR. MUKASEY:  Judge, may I add just one thought for the record?

THE COURT:  Sure.

MR. MUKASEY:  I think your Honor is correct that there is very little case law about retail investors, and I think the reason for that underscores Mr. Caruso's point.  There is no such special category of retail investors versus institutional investors, which is why the standard for materiality is an objective one.  It's not the most unsophisticated person in the market.  It's not the most sophisticated person in the market.  There's no distinction in the law between retail investors and funds or institutional investors.  It's the objective investor.

MR. CARUSO:  To add, just build on that, at the time we get to the jury charge, we can talk about this point because the phrase -- I just want to lay down a marker again -- the phrase "retail investor" has no legal significance whatsoever.  The legal phrase is "hypothetical reasonable investor in the market."

THE COURT:  Yes, but I don't know that the case law

M9MHMil1

goes as far as Mr. Mukasey would suggest.  I mean, there is language in case law that sort of distinguishes out these very highly sophisticated institutional investors that use very powerful computer programs.  They're treated -- they're looked at differently.  So what I believe the jury's entitled to look at is what is the relevant marketplace --

MR. MUKASEY:  Exactly.

THE COURT:  -- that we're in.

MR. CARUSO:  And we think -- this is not a today issue -- the relevant marketplace is the entire market on NASDAQ.  That's the market.  That's the market they chose to invest in.  But we'll deal with that in due course.

THE COURT:  OK.  Anything else from either side?

MS. ESTES:  Your Honor, just one logistical point.  The second witness will be the retail investor in the wheelchair.  I want to make sure he's able to see a screen.  So maybe we could just turn --

THE COURT:  Yes.  We have a microphone set up.  We have a screen that I'm told we can place in front of the witness --

MS. ESTES:  OK.

THE COURT:  -- that has sufficient slack in the wire so that it can easily be moved.

We may just need -- I don't know whether the defense has a view on this.  What I want to do is bring the person

M9MHMil1

through the back here.  Sometimes the jurors congregate there before they come out.  We may not want them to see that person as they come out.  So we'll need to choreograph that in some fashion.

MR. MUKASEY:  I have absolutely no problem with whatever is required to make Mr. Ryan comfortable and keep him in a good place.

THE COURT:  Get close to a microphone, Mr. Mukasey, if you would.

MR. MUKASEY:  I have no problem how you want to choreograph it to make the witness comfortable.  I want to make sure when I'm crossing Mr. Ryan, I can see a screen.  I've been -- normally, we have a screen at the podium.  I've been sort of actually peering over the government's shoulder, using their screen.

THE COURT:  Did we take the screen?  Was there a screen over there that we took?

MR. MUKASEY:  There has not been a screen at the podium.  I think we've all been sort of squinting at one of those screens, but I may move up a little closer just so I can see the screen.

THE COURT:  Yes, whatever it takes to make sure that you do -- you can do what you need to do and the witness can see the evidence on the screen.

MR. MUKASEY:  Yeah, you can put him wherever you want

M9MHMil1

and bring him in however you want.

THE COURT:  Very well.  Anything else?

MS. ESTES:  No, your Honor.

THE COURT:  OK.  9:30.

(Recess)

THE COURT:  Good morning, Mr. Damman.

THE WITNESS:  Good morning.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, good morning.  I trust you all had a pleasant evening and that you missed the rain as you came in today.

We will now continue with the direct examination of Mr. Damman.

Mr. Damman, you are reminded that you are still under oath, and you are reminded to try to slow down.

SCOTT DAMMAN, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. ROOS:

Q.  Good morning.  I want to pick back up where we were, your first visit to Nikola.  OK.  Let me ask, just first, a clarifying question because I may have misspoke when I asked you a question yesterday.

Was your visit to Nikola in February 2019 or February 2020?

A.  I believe it was February 2020, yeah.

Q.  Now, you had told us that you received some information about the Badger when you were there, is that right?

A.  Yes, correct.

Q.  What did you learn about the Badger?

A.  We were shown, in a conference room some, initial performance targets for the vehicle as well as some PowerPoint documents of how some components might be laid out in the

Badger truck.

Q.   Did you see any engineering or building of the truck?

A.   I did not.

Q.   How about any prototype vehicles?

A.   Did not see one, no.

Q.   Now, while you were there, did you see any of Nikola's semi trucks?

A.   Yes, I did.

Q.   And which one?

A.   I think it was the Nikola Tre.

Q.   Are you positive about that?

A.   I am not.

Q.   OK.  It was one of the electric semi trucks, though?

A.   Correct.

Q.   And did you learn anything about the inverters Nikola was using?

A.   What they had said is they were going to be developing their own inverters, but what we were shown kind of in the lab didn't reflect that.

Q.   What do you mean by that?

A.   We you saw we thought were Bosch inverters on the truck that had the cab off in the lab, but we didn't see any specific inverters developed by Nikola.

Q.   Now, when you visited, was Trevor Milton around?

A.   No.

Q.   So when you learned this stuff about the Badger and the semi truck, Trevor Milton was not present?

A.   I never met Trevor Milton.

Q.   What happened after General Motors visited Nikola in February 2020?

A.   Pretty quickly after, our corporate development team along with our engineering assessment decided we were not going to pursue a deal with Nikola at that time.  It came down to not being able to facilitate a fuel cell deal.  General Motors wanted to sell fuel cells to Nikola for their fuel cell semi.

Q.   Did there come a time after February 2020 when you learned that General Motors was in discussions with Nikola about the pickup truck again?

A.   Yes, I did.

Q.   When approximately was that?

A.   I don't actually recall.  It wasn't maybe four or five months after the visit.

Q.   What was your reaction upon learning this?

A.   A bit surprised, to be honest.

Q.   Why is that?

A.   Again, because there wasn't a lot kind of laid out on paper.  No engineering work had been done on the truck.  At the time when I relearned we were looking at a deal with Nikola, I didn't know the details of what we were going to enter into to, so I thought we were going to be building something they

M9MHMil1                         Damman - Direct

developed and design.  So I was surprised that we would be able to enter a deal just a few months later.

Q.  When the conversations picked up in the summer of 2020, what, if any, involvement did you have after that?

A.  So I was considered the chief engineer from General Motors' side dealing with the Nikola Badger, and so I was in every single discussion, engineering discussion and quite a bit of the deal discussion and preparation.

Q.  Now, you testified just a moment ago about what you initially thought upon hearing about a potential deal.  What's your understanding of what Nikola was ultimately looking for when you got back involved?

A.  Once I learned a little more, it became clear that Nikola was looking for a partner to truly develop and build the whole vehicle for them with, you know, some inputs from Nikola.  But they were looking for someone to be able to develop and build the whole thing.

Q.  When you got back involved, what was the status of Nikola's engineering and development of the pickup truck?

A.  I wasn't shown anything that would indicate that it had developed any further than what we saw when we visited.

Q.  And did there come a time that General Motors and Nikola announced a deal publicly?

A.  Yes, we did.

Q.  With respect to the Badger pickup truck, what, generally,

was General Motors going to do?

A.   So General Motors was going to be responsible for the entire development, manufacturing, validation of the vehicle, so all the engineering work.  Nikola was responsible for the creative design.  General Motors' creative design team was going to be doing the actual sketching and creative design, but Nikola had the buy-off for -- so exterior, interior, kind of what the truck looked like and felt like was responsible for Nikola.

Q.   What was General Motors' plan for building the pickup truck?  What would it be based on?

A.   The truck was actually going to be based on two of our vehicles.  It was going to take the suspension and drivetrain from the Hummer EV, but the main structure, wheelbase and those attributes, would actually come from our Silverado EV.  So it was going to be a combination of those two.  The reason it was that way was to meet the performance numbers that Nikola was looking for.

Q.   All right.  Let me show you now what's been marked for identification as Government Exhibit 1231.

Do you recognize this?

A.   That's the Hummer EV.

MR. ROOS:  All right.  Government offers 1231.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

MR. ROOS:  May we publish it?

(Government's Exhibit 1231 received in evidence)

THE COURT:  You may.

BY MR. ROOS:

Q.  For the jury, what are we looking at here?

A.  So this is General Motors first fully electric full-size truck.  It is our Hummer EV battery-electric truck designed to be an extreme off-road vehicle but still capable as a full-size truck.

Q.  This is like a real truck, not a rendering, right?

A.  This is a real truck.

Q.  So is this the vehicle that the Nikola Badger was going to be based on?

A.  Again, the suspension and the lower structure of the vehicle, yes.  The upper structure, a lot more like a Silverado.

Q.  So when you say the lower part, what part of this vehicle was the Badger going to incorporate?

A.  Most of the stuff that you can't see, actually.  So, like, the chassis components, suspension, battery structure, underbody structure -- those kind of items would have been from the Hummer EV.

MR. ROOS:  OK.  We can take that down.

Q.  Now, did GM and Nikola have an agreement on who was going to develop the parts of the Badger?

M9MHMil1                        Damman - Direct

A.   We did.  We had a very specific RASIC, roles and responsibilities matrix, in our deal document as well as some agreement on the level of change allowed in each of the different areas.

Q.   And used the term "RASIC," roles and responsibilities, matrix.  What is that?

A.   That's just a way to keep track of who's responsible for what parts of a development.  Whenever we have a deal with a third party, we just want to make sure we document in clear writing who's going to be responsible for each part.

Q.   Showing you -- show the witness what's been marked for identification as Government Exhibit 1115.

        Do you recognize this?

A.   Yes, I did.

Q.   What is it?

A.   This is our program plan that fed into the deal documentation for the deal between Nikola and General Motors. And it spells and lays out all the details of what the vehicle was going to be based on, the level of change we were going to allow, as well as, you know, who was responsible for what parts of the development, validation, engineering of the vehicle.

Q.   And this is the execution version, right?  See at the top? Yes?

A.   Yes.

        MR. ROOS:  OK.  Government offers 1115.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1115 received in evidence)

MR. ROOS:  Thank you.  May we publish it?

THE COURT:  You may.

BY MR. ROOS:

Q.  So now, Mr. Damman, for the jury, could you explain what this document is?

A.  Yeah, sure.  Again, the program plan is designed to lay out exactly how we're going to interact with a third party, who's responsible for what parts.  It actually has in it a way to escalate concerns.  It lays out the level of change allowed in all the areas within the development of a vehicle, as well as you kind of see where we have the -- kind of the drive configuration.  The key attributes of the vehicle are all laid out in this document as well.

Q.  OK.  Just looking at the top, it says the program plan is entered into as of September 3, 2020.  Do you see that date?

A.  Yes, I do.

Q.  All right.  This was before the public announcement?

A.  I don't recall when the public announcement was, but I think it was before the public announcement, yes.

Q.  OK.  We'll come back to that.

Now let's go to page 7 of this document.  Mr. Damman, do you see towards the bottom of this page where it says "A2

Vehicle Scoping Document"?

A.  Yes.  Yes, I do.

Q.  It says "Nikola Badger BET."  Can you explain what that's a reference to?

A.  Yeah.  So BET is battery-electric truck, and that's what our program is called, and this is the Nikola Badger version of our General Motors battery-electric truck.

Q.  Then starting on this page and for the next several pages, maybe we could just scroll through for a second through page, I guess it is, 22.

As we're scrolling through this, you see this, you see it's a lengthy chart.  Once we've scrolled through, Ms. Wolfson, can we go back to page 7.

So, Mr. Damman, what's the purpose of this chart?

A.  So at General Motors we have a document like this that helps us define the level of change allowed in a vehicle program.  And we do this for all of our programs to really nail down how much engineering resources we're going to need, how much it's going to cost us to actually develop the vehicle.  In the Nikola Badger case, for GM's version of it, we laid this out to define the level of change allowed by Nikola in each of the areas.

So this is -- essentially, it accounts for all the components that go into a vehicle, although not every single part number is listed here, they're in groups, but we're

M9MHMil1                          Damman - Direct

looking at the powertrain here on this screen, the I0 through N2.  N2 being a full brand-new part, where I0 is 100 percent carryover with no changes.

In the comment section we actually make comments of what we're going to change.  So like high voltage cables, for instance, there were some changes needed because the length of those needed to get to a longer wheelbase vehicle, needed to change, but otherwise the cables were largely exactly the same.

Q.  All right.  So I just want to use this as an example since yesterday you talked to us a little bit about a chassis.  That's the underbody, right?

A.  Right.

Q.  Why don't we go to the next page, page 8.

Do you see where it says "chassis"?

A.  Yes, sir.

Q.  So right below it says -- there's a line for front steering.  Do you see that?

A.  Yes.

Q.  And so is front steering of the truck part of the chassis?

A.  Correct, it is.

Q.  So just using that one as an example, can you explain to us how we read that row in the chart.

A.  Yeah, for sure.  So the front steering for us actually incorporates the hardware, like the steering gear, the physical device that steers the vehicle as well as some tuning, so how

M9MHMil1                        Damman - Direct

the steering feels.  So that I2 marked with a one in it, that says that we can -- we're going to keep the hardware exactly the same, but the tuning, the calibration, the software on the steering gear would be changed slightly for the Nikola Badger. And that has to do with the overall vehicle length, how it's going to handle, those kind of things.  So you always need -- usually need a different steering calibration on different vehicles.

Q.  Do you see in the comment there's a comment right there?

A.  Yes.

Q.  So it says, "Carryover GM BET hardware with new tuning for Nikola variant."  What does that mean?

A.  That's correct.  So, again, the hardware from our battery-electric truck -- all of our battery-electric trucks actually use the exact same front steering gear, including the Nikola Badger would have as well.  And, again, we would have had some tuning calibration changes for this version of it.

Q.  OK.  Now, as we were scrolling through, like, for instance, this page all of them say carry over GM BET with some commentary after each of them?

A.  That's correct.

Q.  And is that generally what the majority of these comments are throughout this document?

A.  Yes.  The one area -- I think the two areas where we would see some changes there would be body exterior.  So, again, like

the styled surfaces -- we call those A surfaces -- those would be different because we would be styling the vehicle different than a Chevy Silverado.  It needs to look like a Nikola Badger. As well as interior, we'd have some new parts in the interior, modified parts in the interior, same -- same kind of reason, right?  We're styling those parts to look like Nikola Badger.

Q.   So why is it that the majority say "carryover GM BET"?

A.   Because we were -- General Motors was responsible for all the -- all of these parts.  So they were all carryover from our battery-electric truck program, feeding into the Nikola Badger version of the battery-electric truck.

Q.   OK.  Now, a moment ago you used a term "RASIC."  Why don't we look at that.

Can we go to page 36 of this document.

Mr. Damman, what does this show?

A.   So, again, this shows the roles and responsibilities where "R" is responsible, "S" is support, "A" is -- I don't recall. But it shows the roles and responsibilities for each of the different areas.

Q.   So what is role -- what does "responsible" and "support" mean?  How are we supposed to interpret that?

A.   So where there's Rs in the GM column, GM has 100 percent responsibility for vehicle requirements, component specifications, all those things, with support of the Nikola Badger program team.

Q.  OK.  So just in terms of responsible, let's just take an example that we might recognize.  The vehicle integration, it says "R" for GM, "S" for Nikola.  So what does that mean?

A.  So vehicle integration is sort of the final work done at our Milford Proving Grounds to get all of the parts to work and function together, doing the tuning and calibration of those parts.  GM was responsible for that integration of all of the components.

Q.  OK.  Now, do you see -- let's go to page 37.  And you see this little box for infotainment-connected services?

A.  Yes, sir.

Q.  What does this refer to?

A.  So during our discussions with Nikola, there was some concern about General Motors' infotainment system and being able to deliver the look and feel that Nikola wanted.  They had an infotainment system functioning in their semis, and originally they had asked for that to be incorporated into our truck.  In the timeline that we had available for this truck, there was no possibility to try to integrate a different infotainment system into our vehicle's electrical architecture, so we landed on that we would be using GM's infotainment system.

The screen sizes are specified there.  Nikola had the opportunity at some time during the deal to say they didn't accept how ours was looking, how the final software was

working, and we could put their infotainment system in. However, it would have delayed the introduction of this truck probably about a year to do that.

MR. ROOS:  OK.  Now, can we please go to page 39. Actually, let's just go back to 38 for one second.  And the next page, please.  Thanks.

Q.  So I think a lot of these we've seen.  For the RASIC on the last two pages, almost everything was GM was responsible, is that right?

A.  Correct.

Q.  On this page there's -- there are, I guess, two categories where Nikola was responsible.  So what was Nikola responsible for on the Badger?

A.  So Nikola was responsible for the buy-off of the creative design, so how the vehicle looked, interior and exterior. Again, GM's design teams were doing the sketching and, you know, 3D modeling of that, but Nikola had the actual buy-off on that look and feel.

Then UI/UX, so that is the interface that the customer interfaces with on the infotainment system.  So Nikola was going to be responsible for creating those images, not the actual base software that ran but the images that the customer sees on the infotainment screen, and that kind of thing.  As well Nikola was going to be responsible for creating the phone app, Android or iPhone application, that would interface with

GM's back office and interface with the vehicle then.

Q.  So Nikola was responsible for creative input on the design of the truck, the images for the screen, and the phone app, is that right?

A.  Correct.  Yes, correct.

Q.  And General Motors was responsible for everything else?

A.  Correct.

MR. ROOS:  Now, could we please go to next page.  This is page 39, correct.  Thank you.

Q.  So what do we see on this page?

A.  So this defines where the source -- who is responsible for sourcing the parts from suppliers was on this page.  So, again, you know, we source -- we develop the vehicle and then we source all the parts from the supplier.  This defines who was responsible for that sourcing and where the parts were coming from.

Q.  And on this first page, who was responsible for the cab, chassis, e-drive, axles, batteries, BMS, battery cooling, fuel cell cooling, electronics, system integration, vehicle auxiliaries, e-brakes, e-steering, and HVAC?

A.  General Motors was responsible for all those parts.

Q.  Do you see where it says "infotainment" on line 12?

A.  Yes, I do.

Q.  Primary GM, secondary Nikola, is that what you were describing to us about infotainment?

M9MHMil1                          Damman - Direct

A.  Yes.  If GM's infotainment was not living up to what Nikola needed, this was their opportunity to put parts in.

MR. ROOS:  And then go to the next page, please.

Q.  So on this one, too, Nikola -- I'm sorry, GM is responsible for the fuel cell, hydrogen system, functional safety, capacity BEV, and hydrogen safety, is that right?

A.  Correct.

Q.  And Nikola's responsible for the hydrogen infrastructure technology, is that right?

A.  That's correct.

Q.  What do you understand that to be?

A.  Nikola was developing, as far as we knew, fueling stations to fuel hydrogen vehicles, and so that was their responsibility.  We didn't say this at the beginning, but there was two versions of this truck, an electric version --

MS. YOUNG:  Objection.

A.  Sorry.

MS. YOUNG:  Narrative.

THE COURT:  Sustained.

Why don't you ask another question, Mr. Roos.

MR. ROOS:  OK.

Q.  When you started, were there two versions of this truck?

A.  Yes.  The reason fuel cell's listed in here is there was going to be a fuel cell battery-electric truck Badger as well as part of the deal.

MR. ROOS:  We can take this document down.

Q.  Now, at the time General Motors and Nikola reached this agreement in September 2020, were you aware that Nikola was already working on a show or prototype vehicle?

A.  Yeah.  We were told there were some show vehicles being built at that time.

Q.  Did you ever see those?

A.  I did not.

Q.  Why not?

A.  I'm not sure.  We did ask for them.  We thought it would be prudent for our creative design team to see them.

MS. YOUNG:  Objection.  Narrative.

THE COURT:  Overruled.

Q.  You can continue your answer.

A.  We thought it prudent for our creative design team to see them, to use to base some of their creative design work off of.

Q.  Was General Motors going to base the Badger truck it was working on on the show trucks that Nikola made?

A.  We were not.

Q.  Why not?

A.  Again, we were developing the Nikola Badger off of our platform.  We weren't planning on using any of component sets that Nikola had or had developed for the show vehicle.

Q.  And what did you understand Nikola's show vehicles were based on?

MS. YOUNG:  Objection.  Hearsay.

THE COURT:  Overruled.

A.   From a size and proportion perspective and kind of performance numbers, we thought it was based on a Ford F-150 Lightning.

Q.   Now, from your review of Nikola's designs, were there aspects General Motors wasn't going to incorporate?

A.   Yeah.  Just, I think, the main one was the water dispenser inside the cab.

Q.   Why weren't you going to do that?

A.   It was a little too complicated to try to get in in the timing that we had.  We didn't have any suppliers that could do it.  And the premise of being able to drink water directly from a fuel cell doesn't actually work.  You have to run it through filtration and some other things.  So --

Q.   Why can't you drink water from a fuel cell?

A.   I'm not an expert in fuel cells, but I believe it's alkaline when it comes out.

Q.   Sorry.  You believe it's what?

A.   It's alkaline.  The water is high alkalinity.

MS. YOUNG:  Objection.  Foundation.

THE COURT:  Overruled.

Q.   What does high alkaline water mean?

A.   I think it just is not pH balanced, right?  It's not something that a human should consume.

Q.  All right.  I'm going to ask you about a few things that Trevor Milton said.

First read a portion of Government Exhibit S-2.  Put that up, paragraph 6.  Government Exhibit -- yeah, that's right.  Can you pull that up again.  I'm sorry.

Government Exhibit 40 -- sorry, the one before.  My bad.  Paragraph 5.

Government Exhibit 404-A is an authentic copy of a February 14, 2020, interview of Trevor Milton on Fox Business' "Mornings with Maria," and Government Exhibit 404-T is an accurate transcript of that recording.

So I'll offer Government Exhibit 404, 404-A, and 404-T.

MS. YOUNG:  No objection.

THE COURT:  They will be received.

(Government's Exhibits 404, 404-A, and 404-T received in evidence)

MR. ROOS:  May we play 404-A for the jury?

THE COURT:  You may.

(Audio played)

(Continued on next page)

M9MCmil2                        Damman - Direct

BY MR. ROOS:

Q.  Mr. Damman, did you hear the part in the interview where the host asks Mr. Milton if Nikola was making the whole machine, the frame, the chassis, the engine, everything?

A.  I did.

        MS. YOUNG:  Objection.  May we approach?

        THE COURT:  Yes.

        (Continued on next page)

M9MCmil2                      Damman - Direct

(At the sidebar)

THE COURT:  So the question was, did you hear.

MR. MUKASEY:  So first of all, that wasn't the clip we expected, it was a different number.  You told us it was going to be a different clip.

That aside, I think what's about to happen now is basically an argument of stunt.  This guy never spoke to Trevor, never met Trevor.  They're playing a tape of Trevor and they're going to ask him questions about, is this true, is that true.  Again, that's a stunt that is really asking him to opine in place of the jury opining.  It's the jury's decision about what Trevor said is true or not.  He's being used a mannequin to make the government's argument.  So I think that's wildly improper.

MR. ROOS:  So I'm going to play four clips.  The first one we just heard is from February 2020.  The witness went to Nikola in February 2020, saw what the program was.  I'm going to ask him, based on his visit to Nikola at the time, what is his understanding of the accuracy of those statements.  The next three clips are going to be Trevor Milton's comments about the General Motors deal, which this guy was a lead GM engineer on, I'm going to ask him the same questions.

MR. MUKASEY:  It's an argument.  It's masquerading as a direct examination.

THE COURT:  I'm not understanding the objection.  The

government needs to show, if it wants to convince the jury, that Mr. Milton made material misrepresentations to the investment company. So what they're doing is they're putting Mr. Milton's representations before the jury and asking people with knowledge about those representations, whether or not they are accurate. I don't see how that is wildly inappropriate or the least bit inappropriate.

MR. MUKASEY: What he saw, what he did, what he didn't see, what he didn't do, I think that's appropriate. I think it depends on the form of the question whether Mr. Milton was lying, whether Mr. Milton was telling the truth, that, to me, goes to -- he can say what he did and what he saw or what he didn't see. Is that a truthful statement, I think, is an improper question.

THE COURT: Based on his knowledge and understanding. I guess the cross examination will be, well, you don't know because you didn't know, you weren't in a particular place at a particular time, what Mr. Milton was referring to, I don't think it's inappropriate at all.

MR. CARUSO: May I make one request to note. In particular, I think it will be improper if the government asks this witness whether Mr. Milton's statement about "ground up" was true or not because the way this witness uses that phrase, the way General Motors uses that phrase has no connection with whether he can tell whether Mr. Milton uses that phrase. We

had testimony, Mr. Russell in particular said, yeah, it was ground up.  This man shouldn't be allowed to testify that Mr. Milton made a false statement when he said it was ground up because that's a subjective term.  This guy doesn't have -- there is no foundation asking this witness whether what Mr. Milton said about ground up is false.

MR. ROOS:  Your Honor, he saw the program status, he, yesterday, testified what his understanding of ground up is.  He also testified it's sort of a common phrase in the industry, has a commonly known meaning.  So I think they have a lot of cross here.  It certainly sounds like a lot of this is jury argument, but definitely there is no motion to preclude ground up.

MR. CARUSO:  I just did.

THE COURT:  Again, he did testify about his understanding of ground up.  If Mr. Milton has another understanding of ground up that you want to argue to the jury, that's fine.

MR. CARUSO:  I understand.  I don't have a -- I do have a problem talking about what he thinks.  What I specifically object to at this stage is for him to say that Mr. Milton's statement of ground up is false, because there is a disconnect there.  There is no foundation for him saying that.

THE COURT:  There is a foundation for his

M9MCmil2                    Damman - Direct

understanding?

MR. CARUSO:  So far, which we objected to, but we have it in so far.

(Continued on next page)

M9MCmil2                          Damman – Direct

(In open court)

BY MR. ROOS:

Q.  Mr. Damman, did you hear the part of the interview where the host asked Mr. Milton if Nikola is making the whole machine, the frame, the chassis, the engine, everything?

A.  I did.

Q.  And did you hear Mr. Milton respond, characterizing the truck as one of the best in the world?

A.  Yes.

Q.  And did you hear Mr. Milton respond, we're building it from the ground up and that Nikola was doing everything ourselves?

A.  I did.

Q.  Based on your visit at Nikola, had Nikola built a truck and was it building it from the ground up and doing everything itself?

A.  During the visit, I did not see a truck that had been built and also did not see enough engineering to suggest that a truck was ready to be built and manufactured.

MR. ROOS:  Let's take a look at Government Exhibit 557.

The government offers pursuant to stipulation S5.

THE COURT:  Pursuant to stipulation, it will be received.

(Government's Exhibit 557 received in evidence)

MR. ROOS:  May we publish it?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

THE COURT:  You may.

Q.  Mr. Damman, do you see a tweet in front of you?

A.  Yes, I do.

Q.  The first guy, Matt Bubbs, writes:  I'm a Ford guy and a believer in Nikola Motor.  This GM news has me confused.

And Trevor Milton says:  Well, it will be a Nikola truck.  GM is helping, is manufacturing it the right way.  So don't worry, it will always be a Nikola truck.  Our design, our tech in many areas, our DNA, our customer approach, our future.  GM was awesome and willing to help, which I could not be more proud of.

Do you see that?

A.  Yes, I do.

Q.  Now, does what Trevor Milton has written here accurately reflect your understanding of the status of the GM—Nikola deal?

MS. YOUNG:  Objection.

THE COURT:  Overruled.

A.  It does not.

Q.  Why not?

A.  The design, the technology in the vehicle where it's going to be General Motors design and tech, Nikola was going to be responsible for the creative design, and they did speak to this DNA of what a Nikola Badger needs to be, that feeds into the creative design.

Q.  Was it going to be, quote, Nikola tech in many areas?

A.  No Nikola tech in the truck.

MR. ROOS:  We can take this down.

Government offers Exhibit 558 pursuant to stipulation S5.

THE COURT:  Pursuant to stipulation, it will be received.

(Government's Exhibit 558 received in evidence)

MR. ROOS:  May we publish it?

THE COURT:  You may.

Q.  So, again, September 8th, 2020 tweet.  Do you see this?

A.  Yes, I do.

Q.  So Jim McPherson writes:  What Nikola technology will go into the Badger?

Trevor Milton responds:  We will share components that make sense for cost reduction, the rest by Nikola.  Our infotainment, controls, design, interior, cab, phone apps, controls, et cetera.  We will share inverters, powertrains, and power electronics.  Also sharing factory lines, which saves us billions.

Do you see that?

A.  Yes, I do.

Q.  Now, first of all, this is September 8th.  Is that after the program plan we had looked at earlier?

A.  Yes, it is.

Q.  Now, does Trevor Milton's statement here accurately reflect

your understanding of the GM-Nikola deal?

A.   No, it does not.

Q.   Why not?

A.   Again, all of the components and parts were going to come from General Motors.  General Motors would be responsible for the controls, all the interior parts.  Again, Nikola had the responsibility on buyoff of creative design of the interior and exterior, but all of the components would be coming from General Motors.  Phone app would be coming from Nikola, though.

Q.   So the phone app part is true?

A.   Correct.

        MR. ROOS:  You can take that down.

        Government offers Exhibit 559 pursuant to stipulation S5.

        THE COURT:  It will be received.

        (Government's Exhibit 559 received in evidence)

        MR. ROOS:  May we publish it?

        THE COURT:  You may.

Q.   Mr. Damman, do you see another tweet on your screen?

A.   I do.

Q.   And this is from the same date; right?

A.   Yes, it is.

Q.   So David writes:  So is Nikola not making Badger, but GM will make Badger?  I thought Nikola is already working on Badger?  Confused.

And Trevor Milton responds:  We built the Badger from the ground up.  They're going to help us refine it, use common parts, then manufacture it for us, drive cost down through the supply chain and we will all win.  It will always be a Nikola Badger and our design and DNA, we just need help manufacturing it.

Based on your understanding of the deal, was that accurate?

A.  No, it is not.

Q.  Why not?

A.  Again, we weren't using the show vehicle or anything that they had built to help develop or engineer the GM version of the Nikola Badger.

MR. ROOS:  Now we can take that down.

Could we please put up stipulation S2, paragraph 30.

That says:  Government Exhibit 429-A is an authentic copy of a portion of a September 8th, 2020, interview of Trevor Milton on Bloomberg TV, and Government Exhibit 429-T is an accurate transcript of that recording.

The government now offers exhibit 429, 429-A, and 429-T.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  They will be received.

(Government's Exhibits 429, 429-A, 429-T received in

M9MCmil2                    Damman - Direct

evidence)

MR. ROOS:  Thank you, your Honor.

May we play 429-A for the jury.

(Video played)

Q.  Now, based on your involvement in this program, was all that accurate?

A.  No.

Q.  What parts?

A.  So there was no software feeding into -- from Nikola into our truck.  Again, they were responsible for the creative design of the vehicle, but not responsible for the component sets of the vehicle.  And there were no other components coming from Nikola going to be on this vehicle.

Q.  Did you hear the part where he said, we've already built the Badger from the ground up ourselves, so everything is owned by Nikola?

A.  I did.

Q.  Did you ever see a built car from them?

A.  I did not.

Q.  Did you hear the part where he described things that were coming from Nikola, we do the software, we do the infotainment, we do the controls, we do the over-the-air updating, we do the phone controls?  Was all that coming from Nikola?

A.  No, the only thing that would have been coming from Nikola was the phone app, but not the way the phone controlled the

M9MCmil2                         Damman - Direct

truck.  That was -- General Motors would have provided certain APIs or controls that the phone app could have integrated with.

Q.  And the last part there, we actually provide a tremendous amount of this truck, most of it, actually.  How about that?

A.  No, not accurate.

Q.  And why not?

A.  It was -- the majority of the truck, all of the components, all of the structure of the truck were all coming from General Motors.

MR. ROOS:  Can we put Government Exhibit S2 back up, and please show paragraph 31.

Government Exhibit 430-A, 430-B, 430-C — that looks like a typo.  It says 427, but I think it should be 430-D — 430-D, and 430-E are authentic copies of portions of a September 9, 2020, interview of Trevor Milton with the Financial Times reporter Richard waters, and Government Exhibit 430-T is an accurate transcript of those recordings.

The government now offers Government Exhibit 430, all of the subparts of 430, and 430-T.

THE COURT:  Any objection?

MR. CARUSO:  One moment, your Honor, please.

MS. YOUNG:  No objection.

THE COURT:  Very well.  They will be received.

(Government's Exhibits 430, 430-A, 430-B, 430-C, 430-D, 430-E, 430-T received in evidence)

MR. ROOS:  I want to play 430-B.

Ladies and gentlemen, this is in your binders, 430. The portion we're listening to is this portion that starts on page 2 at the 6:55 mark.

(Audio played)

Q.  Mr. Damman, did you hear the host — and I know it was a little tough, but it's in your transcripts — say what technology do you bring to the party or are you mainly design, sales, organization, and did you hear Trevor Milton say, no, actually, most of the entire core, the vehicle is our IP?

A.  I did hear that, yes.

Q.  Based on your involvement, was that accurate?

A.  No, it is not.

Q.  Why not?

A.  Again, the technology, the parts, the designs were all General Motors and General Motors IP.

Q.  After that, Mr. Milton said that Nikola developed the Badger from the ground up ourselves, and later on says, other than the batteries and fuel cells and some of the power electronics, the rest of the entire truck is ours.  Is that accurate?

A.  No.

Q.  Why not?

A.  Again, all of the components, there was never any parts or development coming from Nikola for the GM version of the Nikola

M9MCmil2                    Damman - Direct

Badger.

Q.   Then there is a portion here that says, so we bring the --

Nikola brings everything that's really important to the truck,

like the infotainment, the over-the-air updating, the user

profile, the controls, you know, all the stuff that is very,

very delicate to intellectual property, Nikola brings to the

table.

Was that accurate?

A.   No.

Q.   Why not?

A.   So again, the infotainment was going to come from General

Motors with that caveat, if we couldn't meet what they wanted

from a controls perspective, that they had the opportunity to

put their infotainment system in with a large program delay.

The over-the-air updating would be coming through General

Motors.  It's our software, our back office, meaning the

servers and stuff that send the new calibrations down.  The

user profiling probably would have been on their phone app, so

they might have owned that piece of it with integration into

General Motors' back office.  Controls would have been General

Motors doing all the control work for the vehicle.

Q.   What about all the stuff that is very, very delicate to

intellectual property, Nikola brings to the table?

A.   Again, there was no intellectual property coming from

Nikola into the GM version of the Nikola Badger.  General

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Motors owned all the IP for the driving, the battery, the kind of expensive stuff that takes a lot of development to do and as well as, you know, infotainment, all of the other componentry was General Motors.

MR. ROOS:  Please put up Government Exhibit S2, paragraph 32.

Government Exhibit 431-A and 431-B are authentic copies of portions of a September 9, 2020, interview of Trevor Milton on TD Ameritrade network's Morning Trade Live, and Government Exhibit 431-T is an accurate transcript of those recordings.

Government offers Government Exhibit 431, its two sub parts A and B, and the transcript, 431-T.

MS. YOUNG:  No objection.

THE COURT:  They will be received.

(Government's Exhibits 431, 431-A, 431-B, 431-T received in evidence)

MR. ROOS:  Can we play 431-A for the jury, which is also in everyone's binders at 431.

(Video played)

Q.  Mr. Damman, you have a transcript, I think, by the way, in front of you.  So I'm looking on page 3 of that transcript, and Mr. Milton, finishing an answer, says, we're actually really doing most of the IP internally at Nikola.  And the host says, so what's the important IP that's coming from you guys?  And

Mr. Milton says, yeah, the battery supply, from the sales comes from GM, the sales and the module -- and I think this should be sells just for the record, that's what I heard.  The rest of the vehicle, like the over-the-air updating, the software, the controls, the infotainment, the design of the vehicle, the cab, the interiors of the cab, even the driver profile, we've been all the way down to the suspension, that all comes from Nikola.

Did you hear that?

A.  Yes, I did.

Q.  Was it accurate?

A.  No, it was not.

Q.  Why not?

A.  So the part about the battery coming from General Motors, that was accurate, it did come from General Motors or was going to.  The rest of the vehicle, over-the-air updating, again, would have come from General Motors.  All of the software on the vehicle, present on the vehicle would have come from General Motors.  The controls, how the vehicle feels, drives, brakes, accelerates, that's all coming from General Motors. Infotainment would have been General Motors.  The design of the vehicle, the creative design, again, was responsible for Nikola, but the overall engineering design leading into the structure of the vehicle would have come from General Motors. The interior of the cab, the driver profile, the suspension, the suspension would have been all General Motors components.

M9MCmil2                         Damman - Direct

Q.   Later on that page, Mr. Milton says, we've took our technology and our existing Badger, we overlaid it on theirs, used what we could, implemented theirs, and then we built the rest around -- um, around ours.  So it's probably 70 percent Nikola, 30 percent GM when it comes to -- on the parts that are really important to us.

Do you see that?

A.   Yes, I do.

Q.   Was that accurate?

A.   No, we never -- I was in all engineering discussions for the GM version of the Nikola Badger.  We never overlaid or looked at any parts from Nikola to feed into this vehicle.  It was all always going to come from General Motors.

Q.   So it's probably 70 percent Nikola, 30 percent GM when it comes to the parts that are really important to us.

Was that true?

A.   No.

Q.   Why not?

A.   Again, there were no components coming from Nikola.  So it was -- they owned the creative design, what the vehicle looked like and felt like, but all of the parts would have been coming from General Motors.

Q.   Now, did General Motors end up building a Nikola Badger?

A.   We did not.

Q.   Why not?

M9MCmil2                         Damman - Cross

A.   The deal was dissolved before then.

          MR. ROOS:  No further questions.

          THE COURT:  Cross examination.

CROSS-EXAMINATION

BY MS. YOUNG:

Q.   Mr. Damman, GM has been around since 1908; correct?

A.   I believe so.

Q.   Over 100 years old?

A.   Yes.

Q.   And for about 75 or so, they were the largest automaker in the world?

A.   I don't know that stat.

Q.   They've been a public company for decades?

A.   Yes.

Q.   They've been public for all of your career at GM?

A.   I don't know.

Q.   You don't know if GM has been public for the last 15 years?

A.   The reason I say that is we went through bankruptcy and some other things, so I'm not exactly sure what happened during that time.

Q.   And GM is a multinational company; right?

A.   Yes.

Q.   396 facilities?

A.   I don't know.

Q.   Across multiple continents?

M9MCmil2                        Damman - Cross

A.  Yes.

Q.  Manufacturing plants in many countries?

A.  Yes.

Q.  Produced millions of vehicles?

A.  Correct.

Q.  And GM also has a huge parts bin; right?

A.  Yeah.

Q.  And by parts bin, I mean a catalog of parts used across multiple platforms?

A.  Correct.

Q.  And GM makes Buick and Chevy and Cadillac; right?

A.  Correct.

Q.  And in 2021, GM's revenue was $127 billion; is that right?

A.  I don't know.

Q.  And when GM makes new vehicles, you said it typically takes 700 people or so?

A.  Depending on the type of program, yes.

Q.  And about five or so years to come up with a new vehicle; right?

A.  Normal timeline is around five years, correct.

Q.  And that was expedited for the Hummer, correct, for the Hummer EV?

A.  Yeah, for the Hummer EV, it was expedited.

Q.  Now, you've been to Nikola's facility in Arizona; right?

A.  One time.

M9MCmil2                      Damman - Cross

Q.  And it was much smaller than GM; right?

A.  It was a reasonably sized building, but yeah, smaller than General Motors, yes.

Q.  You saw about 100 people?

A.  Roughly, I think, yeah.

Q.  And you're on a team with about 1100 people for the EV program?

A.  So when we started at this time in February, we probably would have been around 250 or 300 at that time.

Q.  And now it's 1100 people; right?  Okay.

        And when you're there, you rode in vehicles; correct?

A.  Yes, rode in a couple vehicles.

Q.  A UTV; right?

A.  Yup.

Q.  A semi truck; right?

A.  Correct.

Q.  And you were in and out in about a day; right?

A.  Yes.

Q.  Maybe five or six hours, physically, at Nikola?

A.  Probably.

Q.  Now, you testified in this courthouse yesterday; correct?

A.  Yes, I did.

Q.  And you're here today, yes?

A.  Yes.

Q.  So you spent more time in this courthouse than you've spent

on Nikola's premises; right?

A.   Yes.

Q.   Now, yesterday, you testified about show cars; correct?

A.   Yes.

Q.   And I believe you testified that in addition to producing cars for sale to consumers, GM builds show cars all the time. Regular part of the process; right?

A.   Correct.

Q.   And to you, show cars are cars that are used to show or display; right?

A.   That's correct.

Q.   And one purpose might be to get video; right?

A.   Yes.

Q.   Or to get photos, yes?

A.   Mhm.

Q.   And those cars are not for production; right?

A.   Correct.

Q.   And that's a completely normal part of the industry; right?

A.   That's correct.

Q.   And it's also normal in the industry to use computer-aided tools; right?

A.   That's correct.

Q.   And those tools can give an initial look at performance; correct?

A.   Yes.

Q.  And yesterday, you also discussed donor cars; correct?

A.  Yeah.

Q.  And I think you said the show car of the Hummer EV used another powertrain, a donor, to run the vehicle; right?

A.  That's correct.

Q.  And that was the Chevy Bolt as the donor?

A.  That's right.

Q.  And now the Chevy Bolt is a small, subcompact hatchback vehicle; right?

A.  That's correct.

Q.  Much smaller vehicle than the Hummer EV; right?

A.  Correct.

Q.  And it was the Bolt parts, the powertrain that was transferred into the Hummer EV; correct?

A.  Into the Hummer EV show vehicle.  It was the battery and drivetrain.

Q.  And GM never intended for the battery and powertrain from the Bolt to be in the Hummer EV for the production; right?

A.  That's correct.

Q.  And when GM put these tiny car parts into the big Hummer EV prototype or show car, that wasn't a fraud; right?

        MR. ROOS:  Objection.

        THE COURT:  Overruled.

A.  No, there was no fraud in that.

Q.  And based on your working definitions, the GM EV program is

ground up; right?

A.   Yeah, the battery electric truck program for General Motors is ground up.

Q.   And included in the battery-electric vehicle program is the Hummer EV; correct?

A.   Yeah, I'm trying to define this specifically.  We have battery-electric cars and battery-electric trucks, so we're specifically speaking to battery-electric trucks.  In that platform is the Hummer EV.

Q.   Thank you.  Now, I want to add one more term in the mix that you did not mention yesterday or today, and that's a mule.

You're familiar with a mule vehicle; correct?

A.   Yes.

Q.   What's a mule vehicle?

A.   A mule vehicle is a vehicle that's put together to use in development, usually at our Milford proving grounds.  A mule vehicle, a good example might be a Chevrolet Silverado, that's cut down, weight is added to it to make it similar to a Hummer EV.  The wheelbase might be created the same so that we can start doing some vehicle dynamics and controls, work on it, but no representation of Hummer EV at all otherwise.

THE COURT:  I'm sorry.  Could you repeat the last thing, no representation that --

THE WITNESS:  It would not have represented Hummer EV otherwise in any other way.

Q.   So at some point, you learned that the Badger prototype was being built; correct?

A.   Yes, correct.

Q.   Are you aware that the Badger has been referred to as a mule?

A.   No.

Q.   And that a different Nikola partner referred to it as a show car?

A.   No.

Q.   And another referred to it as a prototype; right?

A.   I don't know.

          MS. YOUNG:   Chris, could you please pull up GX-801, which is already in evidence.

Q.   This is the press release from February 2020 announcing that the Badger will be built in conjunction with another OEM; correct?

A.   I've never seen this before.

          MS. YOUNG:   So then turning to page 2, Chris.

Q.   You've never seen before that it was going to be built in conjunction with another OEM utilizing their certified parts and manufacturing facilities?

A.   We heard -- our corporate development team told us that there was another partner, potential partner, but that's all I'm aware of.

          MS. YOUNG:   And then on page 3, Chris.

Q.   You were also not aware, Mr. Damman, that prototypes will be available for select customers and media to ride in at Nikola World?

A.   I was aware that there were some vehicles being built for Nikola World as we were in deal discussions.

Q.   But GM was not involved in Nikola World; correct?

A.   We were not.

Q.   And there's no doubt that GM qualifies as an OEM for purposes of providing their parts; correct?

A.   Correct.

Q.   And when you first met with Nikola in February of 2020, you understood they were looking to GM to be an OEM for their parts to manufacture the Badger; correct?

A.   When I was first there, that wasn't abundantly clear that they were looking for somebody to do all of the engineering and manufacturing of the vehicle.

Q.   The question was whether they were looking for an OEM to use their parts; correct?

A.   To use our parts.

Q.   And OEM's parts to manufacture the Badger?

A.   Yes, I believe we knew that, yeah.

Q.   And ultimately, seven months later, a deal with GM came to fruition; correct?

A.   Yes.

Q.   Now, you were asked to view a clip a few moments ago with

M9MCmil2                         Damman - Cross

Mr. Varney.  I don't know if you recall which clip that was?

A.  I don't.  Sorry.

Q.  Had you ever seen that clip before preparing for your testimony today?

A.  Just once in preparation, yeah.

Q.  Were you aware that that clip was filmed in June 2020?

A.  Not specifically, no.

Q.  And in June 2020, was GM involved in negotiations or were they at pause with Nikola?

A.  No, it was in pause.

Q.  Now, you're familiar with the agreement from I guess end of August, September 2020 between Nikola and GM; right?

A.  Yes, I am.

Q.  And Nikola was going to save billions using GM's parts as part of that deal; right?

A.  The context of using GM's parts, GM was going to be manufacturing the entire vehicle and yes, saving Nikola billions.

Q.  And not just billions for a phone app, right, it was for other parts?

A.  General Motors was providing all the parts.

Q.  Now with Mr. Roos, you suggested that all of the parts and processes were going to be GM's responsibilities; right?

A.  Yes.

Q.  But that was for the production vehicles, yes?

M9MCmil2                          Damman - Cross

A.   Yes, the vehicles going to the public.

Q.   Not the two show car Nikola World vehicles; right?

A.   I never saw those vehicles.

Q.   Now, for the vehicles that GM's parts were going to be used, the Badger still was going to be the look from Nikola; right?

A.   Correct.

Q.   And the feel of the Badger was going to be Nikola's; right?

A.   So, again, based on the available, allowable change that we looked at in the document, we would have changed as many parts as we could have for the look and feel of the vehicle, but I think overall proportions would have still looked like what the Chevrolet EV looks like today.

Q.   So the DNA of the Badger was going to be Nikola's; right?

A.   That was the idea.

Q.   Now you testified about your understanding of the term "clean sheet," correct?

A.   Yes.

Q.   And your understanding of "ground up," correct?

A.   Correct.

Q.   And your testimony reflects your personal understanding of those terms based on your work at GM; correct?

A.   Pretty standard at GM, but yes, that's how I recognize it and that's how most of my colleagues at General Motors would say, as well.

M9MCmil2                        Damman - Cross

Q.   And you've never been employed at Nikola; right?

A.   I have not.

Q.   And you have no knowledge of how Trevor Milton used those terms; correct?

A.   I do not.

Q.   And in terms of your interactions with Trevor, you never reported directly to Trevor; right?

A.   I never met Trevor or reported to him.

Q.   You never had a standing meeting with him, never had a phone meeting with him?

A.   No.

Q.   And in terms of the Badger, you did not review Nikola's prototype simulations for the Badger; right?

A.   We did not.

Q.   And you did not review Nikola's cad files of the prototype?

        MR. ROOS:  Objection.  Foundation.  It's not clear that these things even exist.

        THE COURT:  Overruled.  Can you answer the question, sir?

A.   I never saw any cad documents or files.

Q.   And you were not responsible for any invoices related to the prototype, the Badger prototypes?

A.   No.

Q.   And you never spoke to Kim Brady, Nikola's CFO?

A.   No.

M9MCmil2                         Damman - Cross

Q.   And you were not involved in the meetings with the Nikola

partners in Italy or Michigan for the Badger prototypes; right?

A.   No.

Q.   So you never spoke to anyone with ITAL Design?

A.   Say that again.  I'm sorry.

Q.   Did you ever speak to anyone with ITAL Design regarding the

Badger?

A.   I don't know what that is, no.

Q.   You never spoke to anyone from Technosports regarding the

Badger?

A.   I did not.

Q.   You were not involved in decisions regarding the suspension

system for the Badger prototype; right?

A.   No.

Q.   Not the selection of the independent suspension as compared

to solid axle; right?

A.   No, not for the prototype or show vehicle.

Q.   For the prototype, you were not involved in the decision

regarding the frunk?

          MR. ROOS:  Objection.  Assumes a fact that's not in

evidence.

          THE COURT:  Sustained.

Q.   Safe to say, you were not involved in any decision

regarding design or engineering of the two Badger prototypes

that were intended for Nikola World; correct?

A.   I never saw any vehicles.  I wasn't involved with those vehicles in any way.

Q.   I'm not just asking about seeing the vehicles themselves, I'm asking about kind of the process leading up to those vehicles.

A.   I was not involved with those vehicles in any way.

Q.   And you've never met Trevor Milton; correct?

         MR. ROOS:  Asked and answered.

         THE COURT:  Overruled.

         MR. ROOS:  We'll stipulate he's never met Trevor Milton.  I think he's said that.

         THE COURT:  You can answer the question.

A.   I have never met Trevor Milton.

         MS. YOUNG:  Chris, could you please pull up GX-1220, already in evidence.

Q.   GM didn't build that, did it?

A.   I have never seen that before, but no, we did not build that vehicle.

         MS. YOUNG:  One moment.

         (Pause)

         Nothing further questions.

         THE COURT:  Any redirect?

         MR. ROOS:  Yes, please.  And can we actually leave that up there, 1220.

REDIRECT EXAMINATION

BY MR. ROOS:

Q. Mr. Damman, just looking at that truck, you have no idea when that was built; right?

A. Correct.

Q. No sense of the timing or its development; right?

A. Correct.

Q. And just looking at it, you don't know whether or not there's a Ford frame underneath; right?

A. Correct.

MR. ROOS: We can take that down.

Q. So the beginning of your cross examination, you were asked some questions about General Motors' history; right?

A. Yes.

Q. Really, a company that's existed for over 100 years, and I think you testified that's a giant company, thousands of people work there, hundreds of millions of dollars into these electric vehicle programs, 700 people. Was that your testimony?

A. Yeah.

Q. GM has, at its disposal, parts and tons of experience; right?

A. That's correct.

Q. It still took you multiple years to build an electric pickup truck; right?

A. That is correct.

Q. When you visited Nikola in 2020, in February, that was

what, ten months before the end of the year before Nikola

World; right?

A.  Correct.

Q.  At that point, Nikola only had sketches; right?

A.  That I saw, correct.

Q.  You were shown a press release from February 2020.  Do you

remember that?

A.  Yeah.

Q.  And it referenced that Nikola was going to be working with

an OEM?

A.  Correct.

Q.  Now, in February 2020, General Motors actually passed on

that deal; right?

A.  Correct.

Q.  You were asked some questions about the vehicles that

Nikola was working on.  Do you remember that?

A.  Yes.

Q.  And you were asked about distinguishing between

production-intent vehicles and show vehicles.  Do you remember

that?

A.  Yeah.

Q.  And also, you were asked about General Motors working on

its own show vehicles.  I want to take those in two parts.

Let's talk about the GM process first.

        When GM does a show vehicle, is that a

M9MCmil2                    Damman - redirect

production-intent vehicle?

A. No.

Q. And in your experience, does GM ever say, it's a fully functional truck?

A. We do not. Usually a disclaimer with it.

Q. Does GM ever announce it showed the picture of the show vehicle and say it's a real truck, not a show vehicle?

A. No, we wouldn't do that.

Q. Now, turning back to the show vehicles that Nikola was building --

MR. ROOS: Government offers Government Exhibit 508 pursuant to stipulation.

THE COURT: Pursuant to stipulation, it will be received.

(Government's Exhibit 508 received in evidence)

Q. Mr. Damman, could you read what Trevor Milton wrote in this tweet.

A. Sure. Come to Nikola World 2020 in September. Production-intent vehicles will be there. It takes three to five years to get a vehicle to production and we are about to release them all this year and next.

Q. General Motors doesn't call show vehicles production-intent vehicles; right?

A. Correct.

MR. ROOS: You can take this down.

Q.  And those show vehicles that Nikola was going to show off --

MR. ROOS:  Let's look at Government Exhibit 519, which the government offers pursuant to stipulation.  And may we publish it?

THE COURT:  You may.

(Government's Exhibit 519 received in evidence)

Q.  Can you read this one, Mr. Damman.

A.  Sure.  We open up reservations for the most badass zero emission truck on June 29th.  See the @NikolaMotor Badger in person at #NikolaWorld2020 this year.  You'll get to see a real operating truck, not a fake show truck.  Expect stamped metal panels, functioning interior with HVAC, 4x4, et cetera.

Q.  All the show vehicles that you've seen or worked on in the past, did they ever say they're a real operating truck, not a fake show truck?

A.  No, not show vehicles.

MR. ROOS:  No further questions.

THE COURT:  Anything further?

MS. YOUNG:  No, your Honor.

THE COURT:  Government want to call your next witness.

(Witness excused)

MS. ESTES:  The government calls Joseph Ryan.

THE COURT:  This will take just a minute, ladies and gentlemen.

M9MCmil2                        Damman - redirect

(Pause)

Ladies and gentlemen, let's take our break early today.  20 minutes.  Don't discuss the case.  We'll be back out at ten after the hour.

(Continued on next page)

M9MCmil2                    Damman - redirect

(Jury not present)

THE COURT:  Folks can be seated.  Anything we need to discuss?

MS. ESTES:  Your Honor, just one thing for the record. In eliciting this witness's background, we were going to elicit that he has a degree in finance, we're going to ask him what did he do for work after college.  He will say I got a job at Barclays, but he didn't end up working there.

THE COURT:  A job where?

MS. ESTES:  At Barclays, but that he didn't end up working there because he had an accident.  We're otherwise not going to go over that.

I think he may also, when he talks about when he got into investing, he may say I started investing after I got some money from a settlement.

But other than that, that's sort of all we plan to do. We're not planning to try to elicit any sympathy related to his disability, just to be clear.

THE COURT:  Very well.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Everyone, please be seated.

Ms. Estes, can you call your next witness again.

MS. ESTES:  Yes, your Honor.  The government calls Joseph Ryan.

JOSEPH RYAN,

        called as a witness by the Government,

        having been duly sworn, testified as follows:

THE COURT:  Mr. Ryan, could I ask you to begin by stating your first name and your last name, and spelling your first name and your last name.

THE WITNESS:  It's Joseph Ryan, J-o-s-e-p-h, Ryan, R-y-a-n.

THE COURT:  Ms. Estes.

MS. ESTES:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. ESTES:

Q.  Good morning, Mr. Ryan.

A.  Good morning.

Q.  Where are you from?

A.  New York, originally.

Q.  Where do you currently live?

A.  San Diego, California.

Q.  How long have you lived in California?

A.  The past five years.

M9MCmil2                          Ryan - Direct

Q.   Mr. Ryan, what do you do for work?

A.   I'm unemployed.

Q.   What's your educational background?

A.   I have a finance degree from the University of Delaware and a minor in management information systems.

Q.   What did you do after college?

A.   I would have a job offer from Barclays Card as a credit analyst, but I was injured and I was never able to take the position.

Q.   Have you ever invested in the stock market?

A.   Yes.

Q.   Mr. Ryan, can you describe for me your background as an investor.

A.   I started my first portfolio when I was 18, mainly blue chip stocks, and then became a more active trader in 2019 after a personal injury settlement.

Q.   Mr. Ryan, you mentioned blue chip stocks.  Can you explain what those are?

A.   So my original portfolio has large companies such as Apple, Ford, GM, Facebook, Southwest Airlines, companies of that sort.

Q.   What trading platforms do you use for your investments?

A.   I currently have portfolios in three that are actively used.  TD Ameritrade, Robinhood, and Webull.

Q.   What is TD Ameritrade?

A.   It's a brokerage account with a brokerage firm that

M9MCmil2                        Ryan - Direct

facilitates trading.

Q.  What does your portfolio in TD Ameritrade look like?

A.  Mainly blue chips again, Ford, Southwest, Apple, GM, Facebook.

Q.  You mentioned Robinhood, too.  What's Robinhood?

A.  It's another platform, but they were the original zero-commission platform.  So I switched to them at some point.

Q.  Because there was zero commission?

A.  Yes.

Q.  And can you just explain what it means to be zero commission?

A.  So every time you execute a trade in kind of pre-Robinhood or before zero commission, you'd pay seven to ten dollars per trade transaction, and when I was trying to be a more active trader, that added up.

Q.  What does your Robinhood portfolio look like?

A.  It's split into blue chips, but it also has a slightly riskier section of the portfolio, but smaller.

Q.  When you say riskier, what do you mean?

A.  Newer companies, companies like -- it might be new to the market.  Just not necessarily as established as some other companies that have been around.

Q.  Mr. Ryan, you also mentioned Webull.  What is Webull?

A.  It's similar to Robinhood.  It just has a little more technical data, but I'm also using it to create a new

M9MCmil2                        Ryan - Direct

portfolio.  So I just wanted to add a different platform for my new --

Q.  Mr. Ryan, I didn't catch that last part.  What kind of portfolio do you have on Webull?

A.  On Webull, I was creating more of a dividend portfolio.  So I just wanted it separate from my Robinhood and TD Ameritrade.

Q.  As an investor, Mr. Ryan, what sort of media do you review?

A.  I usually read The Wall Street Journal daily, and when I'm actively trading, I usually have CNBC on in the background or I'm watching all day.  And then occasionally, just Googling articles, ticker symbols and occasionally StockTwits.

Q.  I want to take a couple of those points in turn.  So you mentioned articles.  What sort of articles do you Google?

A.  So usually Robinhood will link to articles from the company's ticker symbol web page.  So usually there's three to four articles a day, depending on what's going on with the company, then you can just click on it, on the platform.  It directs you to the publisher's website, it could be anywhere from Yahoo Finance, to Reuters, to Barron's, to CNBC, Wall Street Journal, any of those articles or platforms.

Q.  Mr. Ryan, you also mentioned StockTwits.  What is StockTwits?

A.  It's basically similar to Reddit, the idea it's a thread where investors kind of just post strategies, news, rumors or, like, what they are planning to do with their portfolios.

Q.  Mr. Ryan, have you ever invested in a company called Nikola?

A.  Yes.

Q.  How did you first hear about Nikola?

A.  Mainly through just media, hearing that they had merged with a SPAC and they were skyrocketing at the beginning of trading.

MS. ESTES:  Ms. Wolfson, can you pull up for the witness Government Exhibit 1116.

Q.  Mr. Ryan, do you recognize what's on your screen there?

A.  Yes.

Q.  What is that?

A.  This looks like screenshots of my transactions via the Robinhood app.

Q.  Are those transactions in a particular company?

A.  Yes.

Q.  What company?

A.  Nikola.

MS. ESTES:  Your Honor, we offer Government Exhibit 1116.

MR. MUKASEY:  Objection.  Lack of foundation, lack of authentication.

THE COURT:  You want to come to sidebar.

(Continued on next page)

(At the sidebar)

THE COURT:  I don't understand, he's authenticating it.

MR. MUKASEY:  I must say, the whole case, we've been waiting for actual trading records that have dates, times by itself from a particular brokerage firm, maybe monthly, maybe quarterly.  These are, I think, screenshots that are not complete, that show no connection to any platform that may well have been made at home.  I just don't know.  Maybe your Honor can contemplate the rule of admissibility, but this is not anywhere near a typical trading record.  It's a homemade photograph.

THE COURT:  This may be not surprising, but I have no idea what a typical trading record looks like.

MS. ESTES:  Your Honor, these are screenshots from the Robinhood app, and this is the function the way trading is done nowadays.  Mr. Ryan testified he trades on Robinhood.  It's an app, so he's not really looking at statements over these records, he's looking in his phone, and this is what you see on his phone as the Robinhood app.

MR. MUKASEY:  You think about a typical brokerage statement, like a bank statement that has a -- that old-timers could get, you know, it says Merrill Lynch on top and it has buys and sells and comes every quarter.  This is apparently pictures of pieces of things he did somewhere.  He says it's

M9MCmil2                        Ryan - Direct

Robinhood, it doesn't say Robinhood anywhere.  I don't know if it's complete, I don't think it is.  He's engaged in all sorts of trades that are not represented here.

THE COURT:  Are there Nikola trades or non-Nikola trades?

MR. MUKASEY:  Nikola trades.  By the way, none of the Nikola trades, which would be relevant to his sophistication and his knowledge, are not listed here.

THE COURT:  Is that what these are in?

MR. MUKASEY:  These are some of his Nikola trades.  I don't think his options trades are.  It's incomplete.  It's incomplete.  It's not tied to any platform.  It's not an official record of anything.  It's a picture.

THE COURT:  Let me ask, Ms. Estes, does Robinhood send monthly statements or quarterly statements by mail, paper?

MS. ESTES:  I am not sure.  It may be something where if you request it, you can get it, but I don't know offhand if they do.  I think this is the way most people have on an app, this is how you look at it.

MR. MUKASEY:  I don't think that's right.  I think when you engage in a trade, they simply email confirmation which has an actual Robinhood affiliation to it.  This is a picture that somebody snapped with their own phone.

THE COURT:  I think the testimony was this is my Nikola statement or my Robinhood statement for Nikola.  He may

M9MCmil2                         Ryan - Direct

not have used the word statement, but he has testified that this is a record provided by Robinhood of his Nikola-related activity.  I think that's sufficient in terms of he's laid the foundation, he's authenticated it.  It's coming in, but you may want to ask questions about --

MS. ESTES:  Yes, your Honor, I was going to go over it once it's in.

THE COURT:  Okay.

(Continued on next page)

(In open court)

THE COURT:  The objection is overruled.  The exhibit will be received.

(Government Exhibit 1116 received in evidence)

BY MS. ESTES:

Q.  Mr. Ryan, now that the jury can see what's on the screen here, what are we looking at?

A.  It's just limit buy and sell orders for Nikola.  It looks like June 9th through June 11th.

Q.  Where does this document come from?

A.  It's from my Robinhood trading history.

Q.  And did you access this from your Robinhood app?

A.  Yes.

Q.  So looking at this screenshot in particular, how do you read this screenshot, your trading history there?

A.  So it looks like I was day trading Nikola on the 9th, bought 500 shares probably in the morning, sold it by midday or afternoon, and then ended up buying a little bit more before the day was out.

Q.  Mr. Ryan, do you read this document with the earliest trades on the bottom and later trades at the top?

A.  Yes.

MS. ESTES:  Ms. Wolfson, can you click through the whole document so the jury can see it.

Ms. Wolfson, let's go back to the first page of it.

M9MCmil2                          Ryan - Direct

Q.  So Mr. Ryan, focusing on the line at the bottom there that says Nikola limit buy, what does that mean?

A.  A limit buy is simply just a way of executing an order that there is a set price that you're willing to buy it at.  So it won't execute at any price above what you set as a lower limit.

Q.  So with respect to this limit buy at the bottom, how much did you buy?

A.  It looks like 500 shares at $69 a share.

Q.  And then going to the line above that that says Nikola limit sell, what does that mean?

A.  Similar thing, it's just on the selling side instead of buying side.  It looks like I sold 500 shares at $89.

Q.  So on this first day, June 9th, did you make money?

A.  Yes, it looks like I realized around $10,000, yes.

Q.  Mr. Ryan, why did you buy Nikola on June 9th, 2020?

A.  Usually, there is a lot of media coverage, and since they had just gone public in a way, there was a lot of volatility. Usually when there is a lot of volatility, you can buy low, sell high within minutes or hours and make a profit.

Q.  Mr. Ryan, you described this earlier as day trading, what do you mean by that?

A.  Day trading is generally when you buy and sell a security in the same day or multiple times a day.

Q.  Mr. Ryan, did there come a point when you decided to hold Nikola stock more long-term?

A.   Yes.  I mean, usually, when you day trade, you read or watch as much as you can about the company to kind of get an idea of where it's going to be going.  And so, obviously, after reading articles and listening to interviews, I thought that there was potential for long-term growth and to be a successful company.

Q.   Mr. Ryan, I want to get to the articles and interviews you looked at in a minute, but first let's keep going through your trading records here.

MS. ESTES:  Ms. Wolfson, can you go to the next day there.  Ms. Wolfson, actually, can we keep it zoomed out so we can see the whole day.

Q.   Mr. Ryan, what are we looking at for these trading records?

A.   So it looks like on June 11th, I bought another 200 shares at $60 a share.  Then I tried to sell some, but it looks like the price was probably trending upward at the time.  So I probably was canceling my limits and increasing them to potentially make more money.  And it looks like due to an error on my part, I sold 63.25 shares instead of at $63.27 at some point on June 11th.

MS. ESTES:  Let's go to the next page here.

Q.   Mr. Ryan, what do you see on this page here?

A.   It looks like I'm closing, I think, if the math looks correct, it looks like I'm probably closing out my position, if I remember correctly.  I have to do the math.  Yes.  Yes, I

have to look at the previous page.  I'm sorry.

MS. ESTES:  Ms. Wolfson, can you go back to the previous page.

A.  A hundred sold, bought another 200, that's 300.  So yeah, it looks like by the end of June 11th, it looks like at the end of June 11th, I was still day trading and I would have zero shares.

MS. ESTES:  Let's keep going.  Ms. Wolfson, can you go to the next page.

A.  Okay.  On the 15th, on the last one on the previous page, I bought 1,000, I sold 400 on the 15th.  So at 600 then bought another 1,000, so 1600 shares, and then sold 1,000.  So at the end of June 17th, I was still holding 600 shares of Nikola.

Q.  So at this point, you had a stake in the company that was continuing; is that fair?

A.  Yeah.

MS. ESTES:  Ms. Wolfson, let's go to the next page.

A.  On the 22nd, it looks like --

MS. ESTES:  Mr. Ryan, if you don't mind, let me just ask a question first.

THE WITNESS:  Sorry.

MS. ESTES:  Sorry.  Let's go to the next page there.

Q.  Mr. Ryan, I want to ask what your stake was as of July 2nd. Can you tell from the records there what your stake in Nikola was as of that date?

M9MCmil2                        Ryan - Direct

A.  Could we go back to the previous page for one second.  I want to make sure I'm carrying the right numbers over.

Q.  Yes.

A.  Okay.  So at the end of June 24th, it looks like I had 601 shares.  So then if we go to the next day.

MS. ESTES:  Let's go to the next page.

A.  Okay.  So it looks like at the end of July 2nd, I should be at 1600 shares, I think, if my math is correct.

MS. ESTES:  Ms. Wolfson, can you go back one page.

Q.  Mr. Ryan, how many shares did you buy on June 22nd?

A.  At the end of the day or just in general?

Q.  By the end of the day.

A.  So I had 1,000, bought 1,000, sold 1,000.  So I had 601 at the end of June 22nd, and then I bought 1,000 on June 24th, so that brings me to 1601, sold 1,000, brings me back to 601.

Q.  So Mr. Ryan, as of June 24th, what was your stake in Nikola?

A.  601.

MS. ESTES:  Let's go to the next page.

Q.  Now Mr. Ryan, looking at that, can you describe your trading on July 2nd?

A.  July 2nd or June 30th, as well?

Q.  Why don't we start with June 30th.

A.  So I had 601, went to 1601, went to 1600, it looks like 601 again, 1601, and 2601.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Q.   So by July 2nd, how much were you up?

A.   It was 2600 shares.

          MS. ESTES:  Ms. Wolfson, let's go to the next page.

Q.   Mr. Ryan, looking at this page, I want to ask you how much you were up on July 22nd.  Can you tell from the document there?

A.   I had 2600 shares since I don't see any other sells.

Q.   And did you buy any shares on July 22nd?

A.   Yeah.  Yes.  So July 22nd was another 500 and another 1,000.  So July 20th was another 1,000.  So 4100 shares.

          (Continued on next page)

Q. All right. Mr. Ryan, when you were up to 4,100 shares, is this about when you were considering a long-term hold for Nikola?

A. I would say around that time, yes.

MS. ESTES: All right. Ms. Wolfson, can we just go to the next page just to sort of complete this out.

Q. Mr. Ryan, generally speaking, what are we seeing here?

A. While I was holding the shares, I started selling covered calls or options on those shares.

Q. What is that?

A. It's basically agreeing to sell the shares at a given price at a future date, but by selling them, I get a commission for just allowing that option to take place.

Q. What was the purpose of doing that?

A. It's a way of making some money while holding the underlying asset without having to necessarily sell.

Q. So as of September 2020, were you still up 4,100 shares in Nikola?

A. It looks like that, because none of the options were executed.

MS. ESTES: All right. Ms. Wolfson, we can take that down.

Q. Now, Mr. Ryan, I want to go back to what you said about reading articles and watching interviews about the company as you were deciding to look at it long term.

Can you describe what sort of articles you looked at?

A.   I mean, looked at everything from just hydrogen production to the Badger to just the trucking industry as a whole and the idea of been able to service and sell the fuel needed for those trucks once they were sold.

Q.   Mr. Ryan, did you watch any interviews involving Trevor Milton?

A.   Yes.

Q.   What sort of television programs did you watch?

A.   I mean, CNBC was my primary TV outlet, but usually Robinhood linked to articles, videos, or transcripts of interviews which I watched or read.

Q.   Mr. Ryan, do you remember every video you saw involving Mr. Milton?

A.   No, I do not remember every video.

Q.   Why did you review videos involving Mr. Milton?

A.   Because he was the CEO of the company at the time, and he was talking about what they were accomplishing and what they were doing.

Q.   And did Mr. Milton's statements in the interviews have any effect on your decision to invest?

A.   Yes.

Q.   Why was that?

A.   Because it sounded like they were making great progress in every aspect of what they were targeting, whether it be

M9MHMil3                         Ryan - Direct

hydrogen production, the truck, or the consumer truck, the

Badger.  And so it seemed like they were well ahead of some

competitors at the time.

Q.  Mr. Ryan, as head of the company, Mr. Milton, did you

believe you could rely on him given his position?

A.  Yes.

Q.  Why is that?

A.  He's the CEO -- he was the CEO, and that kind of gives him

more credibility because he has to -- he has firsthand

knowledge of what's going on in the company.

Q.  Did you believe you could rely on the accuracy of his

statements?

A.  Yes.

Q.  Why is that?

A.  Because he had firsthand knowledge, and also as CEO, I

believe that there's certain rules that he needs to abide by.

Q.  Mr. Ryan, did you review any SEC filings involving Nikola?

A.  No, not really at the time.

Q.  Why not?

A.  Because when I normally -- when I first started day

trading, I was going -- using kind of a social strategy where I

was just kind of playing the hype around the stock, especially

the amount of attention it was getting.  A lot of retail

investors generally don't read the SEC filings.  So I was just

watching news and trying to predict where it would go up and

M9MHMil3                        Ryan - Direct

down and then buying it accordingly.

Q.   Then, Mr. Ryan, when you watch interviews involving Mr. Milton, did you believe you could rely on the accuracy of his statements?

A.   Yes.

Q.   Mr. Ryan, you mentioned hydrogen.  As you were investing in Nikola, did you see any interviews with Mr. Milton involving hydrogen fuel?

A.   Yes.

     MS. ESTES:  Ms. Wolfson, can you pull up for the witness what's in evidence as 410-B.

     (Audio played)

     MS. ESTES:  Could you pause it there.

Q.   Mr. Ryan, just looking at the screen there, do you see the media outlet on the bottom left of the screen?

A.   Yes, Yahoo! Finance.

Q.   Is that a media outlet you watched?

A.   Likely, because it was often linked to articles on the Robinhood app.

     MS. ESTES:  Ms. Wolfson, can you start the video over, and let's play the clip.

     (Audio played)

     MS. ESTES:  Ms. Wolfson, you can pause it there.  And can we pull up the transcript, 410-T.

Q.   Mr. Ryan, that clip right there we just watched, do you

M9MHMil3                          Ryan - Direct

recall whether you watched that clip during the time of your

investment?

A.  It seems likely that I would, based on the outlet.

Q.  Do you recall Mr. Milton making statements about hydrogen

and getting the cost of fuel down?

A.  Yes.

        MS. ESTES:  Ms. Wolfson, can you zoom in to the

transcript there.

Q.  So, Mr. Ryan, looking at this transcript here, I think we

just heard in the clip Mr. Milton say:  "When we first started,

hydrogen was $16 a kilogram.  We can now produce it for well

under $4 a kilogram."

        Do you recall in the media you were watching hearing

statements like that from Mr. Milton?

A.  Yes.

Q.  And, Mr. Ryan, was this something that mattered to you in

terms of your investment?

A.  Yes, significantly, because if you could reduce the cost of

hydrogen production by 75 percent, it would be -- it makes the

economics of trucking work.

Q.  Why was it important that the economics of trucking work?

A.  Because that was -- the business strategy was to change the

trucking industry in which it could run on hydrogen and be

cleaner option but also a more cost-effective option.

Q.  Later in that clip, you can see on the transcript there,

Mr. Milton says it's cheaper to operate per mile than diesel. Is that something that mattered to you?

A.  Yes.  Primarily because fossil fuels are a finite resource, and so if you switch to something renewable and you were the producer and supplier of it, it seemed like a great revenue stream.

Q.  Mr. Ryan, if you had known at the time of your investment that Nikola was actually purchasing hydrogen at $14 a kilogram, would that have mattered to you?

A.  Yes.

Q.  Why would that have mattered?

A.  Because they had not hit that milestone of under $4 a kilogram, so it wasn't cheaper to operate than diesel, and that their technology just wasn't there yet.

Q.  Mr. Ryan, if you knew that that $4 a kilogram was a target but it was a number they hadn't actually achieved, would that matter to you?

A.  Yes.

Q.  Why would that matter?

A.  Because it's -- it would be a milestone or a goal or a wish and not an actual tangible asset or process that they had figured out.

Q.  Mr. Ryan, as an investor, why would it matter if a company just had a goal or a wish?

A.  Because if that's the goal, obviously, the technology

M9MHMil3                          Ryan - Direct

wasn't there yet, and they weren't able to produce at that price.  So it means that they didn't have the technology to do it, and so they just weren't as far along as they were saying they were.

MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q.  Mr. Ryan, during your investment in Nikola, did you see interviews with Mr. Milton involving the Badger pickup truck?

A.  Yes, and also -- I think I read some transcripts from interviews.

Q.  Did you review articles involving the Badger pickup truck?

A.  I've seen some articles and some tweets regarding it.

Q.  What do you remember hearing or reading about the Badger?

A.  Just the excitement around it and how that they were going to be taking reservations and that it was -- they were taking reservations for it down the road, and it seemed like they had a prototype or almost ready for mass production, except that they were just going to potentially partner with another manufacturer to help produce it on a large scale.

Q.  And, Mr. Ryan, you said you understood they had a prototype, is that right?

A.  From what I remember, yes.

Q.  Was that something that mattered to you in terms of your investment?

A.  Yes.

Q.  Why did that matter?

A.  Because having a physical, functioning prototype serves as the basis to move forward with reservations.  It really is just they're missing the production of it, the mass production of it.

MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 519.

Q.  Mr. Ryan, you mentioned reservations.  Was that significant to you that Nikola was taking reservations on the Badger?

A.  Yes.

Q.  Why did that matter?

A.  Because it seemed like they were progressing along and that they would have a product to deliver to consumers relatively quickly.

MS. ESTES:  All right.  Ms. Wolfson, let's take that down.

Q.  Mr. Ryan, based on what you reviewed about the Badger, did you have an understanding of whether Nikola had built the Badger using its own parts and technology?

A.  I thought that the prototype was built solely by Nikola.

Q.  Was that something that mattered to you in terms of your investment?

A.  Yes.

Q.  Why did that matter?

A.  Because if you build it from scratch yourself, you have

M9MHMil3                        Ryan - Direct

some intellectual property rights to it, and so that creates value.

MS. ESTES:  All right.  Ms. Wolfson, can you pull up 425-F for the witness.  Let's play this clip.

(Audio played)

Q.  Mr. Ryan, do you recall if you saw this specific clip of Mr. Milton?

A.  I don't recall seeing this specific clip.

Q.  Do you recall hearing Mr. Milton say similar things about orders?

A.  Yes, I am sure I probably read in some sort of transcript or article that summarized this clip or a similar clip.

Q.  Mr. Ryan, Mr. Milton referred to billions of dollars in orders.  Is that something that mattered to you in terms of your investment?

A.  Yes.

Q.  Why did that matter?

A.  Because that potentially could give the company more cash to do R&D and build out their production.

Q.  Mr. Ryan, is there a distinction in your mind between binding orders and reservations?

A.  Yes.

Q.  What is that?

A.  Binding orders is there's really solid commitment.  I would assume that there's some sort of financial stake involved.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Reservations, seem like they could change their mind at any point and not follow through.

Q. So would it matter to you as an investor to know that these were just reservations, not binding orders?

A. Yes.

Q. Why would that matter?

A. Because I assume that there was more money on the line than I was led to believe.

MS. ESTES: All right. Ms. Wolfson, we can take that down.

Q. All right. Mr. Ryan, as you were investing in Nikola, did you review any videos involving the Nikola One?

A. Yes.

MS. ESTES: Ms. Wolfson, could you pull up Government Exhibit 402.

(Video played)

Q. Mr. Ryan, do you recall seeing this video during your investment?

A. Yes.

Q. When you saw this video, what was your understanding of the functionality of the truck in the video?

A. That they had a fully functioning prototype.

Q. Mr. Ryan, did you later learn anything about this video?

A. I later learned that it was simply just rolling down a hill.

M9MHMil3                        Ryan - Direct

Q.  How did you feel when you learned it was a truck rolling down a hill?

A.  Angered, a little deceived.

Q.  Did it matter to you that that was a truck rolling down the hill?

A.  Yeah.  Because if it wasn't fully functioning, it means, again, the technology wasn't where they were leading people to believe it was.

Q.  And, Mr. Ryan, if you knew that in 2019 Nikola had developed a functioning prototype for a different hydrogen truck, would that affect your view of this video that we just watched there?

A.  Yes.

Q.  How so?

A.  I mean, if they had another functioning truck, why not show that one and just make the -- everyone more aware of it, I suppose?

Q.  Mr. Ryan -- actually, Ms. Wolfson, let's pull up Government Exhibit 403 and play 403-A.

(Video played)

MS. ESTES:  You can pause it there.

Q.  Mr. Ryan, if you understood that this truck was a functioning prototype, would that affect your view of the Nikola One video we just watched?

A.  Yes.

M9MHMil3                          Ryan - Direct

Q.  How so?

A.  I mean, if this truck was functioning, seems that the technology may have gotten a little further and been nearer functioning and moving along to assembly and production.

Q.  Mr. Ryan, in your view, should all videos that a company puts out be an accurate depiction of the state of the company?

        MR. MUKASEY:  Objection.

A.  Yes.

        THE COURT:  Overruled.

Q.  So in your mind, does it matter that there's one video with a truck rolling down a hill and one video with a truck that works?

A.  Could you repeat that.  Sorry.

Q.  So in your mind, does the fact that the company issued a video of a truck rolling down the hill, does that matter?

A.  Yes.

Q.  Why does that matter?

A.  Because if it was rolling down a hill, why release it if it wasn't functioning?

Q.  Mr. Ryan, is it important to you that a company be accurate in all of its public statements about its products and technology?

A.  Yes.

Q.  Why is that important?

A.  Because I think it really demonstrates to shareholders --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M9MHMil3                         Ryan - Direct

or keeps shareholders in the loop or just the general public in the loop.

Q.   And why is it important that as a shareholder you are up to date on products and technology?

A.   Because I'm an investor in the company and my assets are at stake.

Q.   Mr. Ryan, what is the current status of your investment in Nikola?

A.   I currently own roughly 3,500 shares.

Q.   And how much are you -- have you made money?  Have you lost money?  What's the status there?

A.   I've lost money.

Q.   How much have you lost?

A.   Roughly $160,000.

Q.   And is that significant to you?

A.   Yes.

Q.   Mr. Ryan, are you currently holding on to your investment?

A.   I am currently holding on to it.

Q.   Why is that?

A.   It's gone down in value so much that I'm either willing to -- waiting to sell it to offset some gains for other investments or hoping that they may get acquired or bought out by somebody larger.

          MS. ESTES:  Nothing further, your Honor.

          THE COURT:  Cross-examination.

M9MHMil3                        Ryan - Cross

CROSS-EXAMINATION

BY MR. MUKASEY:

Q.  Hey, good morning, Mr. Ryan.

A.  Good morning.

Q.  My name is Marc Mukasey.  A couple questions about just investing in general.

         You understand, obviously, stocks go up and stocks go down, right?

A.  Yes.

Q.  That's just kind of the function of the marketplace and the world and the economy, correct?

A.  True.

Q.  I'm going to get into some questions about some of your thoughts about Nikola, but first I want to ask you a little bit about your trading.

A.  OK.

Q.  Day trading, pretty risky, huh?

A.  There is a risk component to it, yes.

Q.  The SEC calls day trading --

         MS. ESTES:  Objection.

         THE COURT:  Overruled.

Q.  -- extremely risky.  Are you aware of that?

A.  I didn't know they titled it extremely risky.

Q.  You don't pay much attention to the SEC warnings or guidance or filings, is that true?

M9MHMil3                         Ryan - Cross

A.   I do now.

Q.   Now meaning after your experience here?

A.   After the Nikola experience.

Q.   You mentioned that it was important for a company to be accurate in its public statements, right?

A.   Yes.

Q.   You know that all public companies file public statements with the SEC, correct?

A.   Yes.

Q.   Would you agree with me that SEC filings as opposed to, say, StockTwits or CNBC are probably the most reliable information about the company out there?

A.   Could you just say that one more time.  I'm sorry.

Q.   Would you agree with me that SEC filings are the most reliable information out there about companies because they're required by law to be accurate?

A.   Yes.

Q.   Now, are you familiar with the various types of SEC filings that public companies need to make?  And I'll give you just examples.  Prospectuses, 10-Qs, 10-Ks, things like that?

A.   I know very little.

Q.   So maybe if we start from the beginning.  You're aware that the SEC is a government agency that exists to protect investors, right?

A.   Yes.

M9MHMil3                              Ryan - Cross

Q.  And that public companies file, periodically, statements with the SEC?

A.  Yes.

Q.  And those statements are designed to give public investors information about the company, right?

A.  Yes.

Q.  And SEC filings, I'm sure you're aware, are available to the general public on an SEC website?

A.  Yes.

Q.  And very often they are also available on the company's website?

A.  Yes.

Q.  That's also free, right?  You don't have to pay money for that?

A.  Yes.

Q.  So with one click of a mouse, you could find a lot of information about a company through an SEC filing, correct?

A.  One click?  Not that simple, but yes.

Q.  Couple clicks of a mouse?

A.  Yeah.

Q.  Depending how sophisticated your mouse is, right?

A.  Sure.

Q.  Now, you know that Nikola did make public filings with the SEC, right?

A.  I mean, I would assume that they had to.

M9MHMil3                          Ryan - Cross

Q.   But you never looked at them?

A.   I may have.  I've looked at a lot of things and a lot of links during my trading time.

Q.   I thought you had told the government when you met with them that you didn't really review the SEC filings?

A.   I don't think I did.

Q.   OK.

A.   I just know that there's usually a lot of links to a lot of articles that -- that I was looking at at the time.

Q.   I'm going to get to the articles in a moment, because I'm actually super interested to hear what you have to say about that.

        But, Chris, do you think we could look at DX 736.

        And tell me if that's up on your screen, Mr. Ryan.

A.   It is up on my screen.

Q.   Yeah.

        If you go to the table of contents, Chris.

        That's a Nikola prospectus.  Do you recognize that --

A.   I don't --

Q.   -- document?

A.   -- know if I've seen it.

Q.   OK.

A.   But I know what a prospectus looks like.

Q.   That document disclosed about 30 pages of potential risks, if you look at the table of contents?

M9MHMil3                              Ryan - Cross

A.   OK.

Q.   And I'm not going to fly through all of them, but it

discloses risks related to the company's network of hydrogen

stations.

          Chris, you can fly through that if you want so we

don't waste too much time.

          It discusses the fact that reservations for trucks are

cancelable.

          MS. ESTES:   Objection.   Testifying.

          THE COURT:   Overruled.

Q.   You see that?

A.   Yes.

Q.   And it discusses that Nikola is dependent on suppliers.   I

think that's at page 18.   See that?

A.   Yes.

Q.   And it discusses that Nikola expects to begin assembly of

its trucks at a manufacturing plant in Arizona in 2021 at the

earliest.

          That's at page 11, Chris.

          See that?

A.   Yep.

Q.   This filing discloses at page 12 that Nikola intends to

establish a series of hydrogen fueling stations.   That's at, as

I said, page 12.

          I'm not going to take you through the rest of these,

but you understand that risk factors and information about the company is readily available in this prospectus, right?

A. Yes.

Q. OK. I want to ask you about the articles and TV shows and other things that you read, links that focused on your investment.

Let's talk about the Badger. You said the Badger was an item of interest to you?

A. Yes.

Q. The Badger looked like a pretty cool truck, yes?

A. Yeah.

Q. Which of the parts were you concerned with being built from the ground up?

A. I mean, I thought the concept as a whole from the ground up that they had designed it, that they had built -- had a powertrain, the technology to make it functioning.

Q. Were you aware -- well, actually, can somebody show me DX 1220, please.

You got that?

A. Now I do, yes.

Q. Do you know what that is?

A. That looks like a Badger.

Q. Do you know whether that's a functioning Badger?

MS. ESTES: Objection.

THE COURT: Overruled.

M9MHMil3                      Ryan - Cross

MS. ESTES:  Can we have a sidebar?

THE COURT:  OK.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

(At sidebar)

MS. ESTES:  Your Honor, this is a photo of the Badger that wasn't made until December.  He's talked about his investment that summer, June and July and September, but it's entirely misleading to show him a prototype that's made months afterwards and ask him questions to suggest there was a prototype in the summer.

MR. MUKASEY:  Ms. Estes brought out that he bought stock in December and still owns stock today.  There's no temporal problem.

THE COURT:  I'm going to allow it, and we'll see what he knows or doesn't know about this photograph.

MR. ROOS:  Judge, if they're going to show him documents or materials that came after he invested and ask whether that would have mattered to him, it plainly opens the door to us showing him, for instance, the company's subsequent SEC filing that says these were the things that were not true and ask him if that mattered.

MR. MUKASEY:  I didn't ask him whether it mattered to him.  I just asked him whether he's seen it before, that's all.

MR. ROOS:  He obviously has not seen it before because it was created after the investment.

MR. CARUSO:  He's still an investor.

THE COURT:  He said that he recognized it as the Badger.  Did I mishear that?

MR. CARUSO:  Your Honor heard it correctly, and he's still an investor.

MR. MUKASEY:  I didn't ask him in some deceptive way that -- if he had known this existed before it actually existed.  I'm moving on.

MS. ESTES:  OK.

(Continued on next page)

(In open court; jurors present)

BY MR. MUKASEY:

Q. Now, sticking with the Badger, Mr. Ryan, I think you mentioned that you had read articles and seen things on TV about it?

A. Yes.

Q. Can you tell me what articles you saw about the Badger?

A. I can't recall.

Q. Can you tell me what exactly you saw on TV about the Badger?

A. I can't recall.

Q. When you started talking with the government about the Badger in your prep sessions --

A. OK.

Q. -- did you raise the Badger with them or did they raise the Badger with you first?

A. I would say I raised the Badger.

Q. And when they showed videos, did they relate to the Badger?

A. Videos of the Badger itself or interviews about the Badger?

Q. Yeah, either.

A. I don't recall them showing any videos of the Badger.

Q. OK. Did they show you articles about the Badger?

A. There was a tweet and then there was -- I think there was an interview about the Badger, yes.

Q. You didn't follow Mr. Milton on Twitter, correct?

M9MHMil3                          Ryan - Cross

A.   Not technically.  To elaborate, you could Google someone's Twitter account and look at their tweets.

Q.   Right.  But you weren't a follower of Mr. Milton?

A.   No, because I did have not an account, but I was able to look at the tweets.

Q.   And you hadn't seen the Badger tweet until the government showed it to you, right?

A.   No, I had seen it.

Q.   What date?

A.   I don't remember the exact date.

Q.   OK.  Was it while you were day trading or was it while you were trading options?

A.   I would -- I can't really recall.

Q.   Because the government showed you 410-B, which was a video they just showed you.

        Can we call it up.  I think it's GX 410-B.  We don't have to play it, but we can just look at it.

A.   Yeah.  OK.  Yes.

Q.   That's the Yahoo! Finance video they showed you, right?

A.   Yes.

Q.   And you talked about how it affected you or contributed to your investment decision?

A.   Yes.

Q.   OK.  The date of that video is June 4, 2020?

A.   OK.

M9MHMil3                          Ryan - Cross

Q.   You were day trading at that time, right?

A.   I think the first investment was June 9.

Q.   Well, you were certainly not buying and holding on June 4, right?

A.   No, not at that time.

Q.   And we'll come back to the day trading in a moment.

        With respect to the other things, you said hydrogen was something that was important to you?

A.   Yes.

Q.   Which did you prefer as a hydrogen delivery method, liquefaction or electrolysis?

A.   I could not tell you the difference of process.

Q.   OK.  The articles that you read about hydrogen, tell us when the first one was.

A.   I don't remember the first, the date.

Q.   Tell us an article you read about hydrogen.

A.   I mean, mainly, I just remember the $16 per kilogram coming down to $4 per kilogram, and I know that they were trying to be the supplier for their trucks.

Q.   And you know that Nikola was a pre-revenue company, correct?

A.   Yes.

Q.   And you know that pre-revenue companies put out model information, right?

A.   Yes.

Q. Because they don't actually have revenue, so they put out projections, right?

A. They do.

Q. Right. And $16 cost of hydrogen projected to be $4. You understand that?

A. Kind of, yes.

Q. Now, you also mentioned reservations were important to you?

A. Yes.

Q. Reservations for the trucks?

A. For the Badger, yes.

Q. Reservations for the Badger were important to you?

A. Well, so the reservations were for Badger, and then the contracts were for the semis.

Q. Where did you read about reservations? Tell me specifically.

A. I think initially -- honestly, it could have been either CNBC video or it could have been a tweet.

Q. But you can't say specifically?

A. I can't say specifically.

Q. You had CNBC on all day long, you said?

A. For the most part at that time.

Q. And so it just sort of ran all day in your apartment or your house?

A. Yeah, for the most part.

Q. Does that become a little bit like kind of background

noise?

A.  At this point, probably, but I don't believe so too much at that time.

Q.  But you can't pinpoint a particular segment or a particular person or a particular statement --

A.  I remember seeing --

Q.  -- from a particular time?

A.  A specific date, no, but I can pick out a couple faces.

Q.  I'm going to get to the faces that you saw.

Was one of the faces that you saw Jim Cramer?

A.  Not that I recall, because I -- actually, it may have been on one interview on CNBC with Trevor Milton in the morning.

Q.  Because Cramer is like the loudest guy on CNBC, and if you're leaving CNBC up in your house all day, you're going to hear Cramer probably, right?

A.  Yes.  But I'm not a big fan.

Q.  And he's not a big fan of Nikola; he was a hater?

A.  He hates on a lot of things.

Q.  OK.  Jumping back to the SEC filings for a second.  You realize that the accuracy of SEC filings, especially 10-Qs, are certified by the leaders of the company, the CEO, the CFO, right?

A.  OK.  Yes.

Q.  And you mentioned Trevor Milton as the CEO in the summer of 2020.  Remember that?

A.  Yes.

Q.  OK.  You know he was not the CEO in the summer of 2020; Mark Russell was, right?

A.  I don't remember --

Q.  Okeydoke.

A.  -- when he was or wasn't.

Q.  When you trade on Robinhood -- and just so everybody's completely clear, in the old days, right, you used to call your broker and say, Mr. Jones, I'd like to buy ten shares of IBM, correct?

A.  Before I could trade, yes.

Q.  With Robinhood, there's no Mr. Jones broker, right?  You enter the trade directly on your phone or your iPad or your computer, correct?

A.  Yes.

Q.  That's why it's commission-less, right?  You don't have to pay money to some guy to recommend a stock to you?

A.  I mean, I don't know why it's commission-less.  I'm just assuming that they found a way to make it commission-less.

Q.  Now, Robinhood has certain disclaimers on the program that you need to sort of read through, click through, look at before you execute trades, correct?

A.  Yes.

Q.  And one of the disclaimers talks about margin investing being risky and not appropriate for everyone.  Does that ring a

M9MHMil3                        Ryan - Cross

bell to you?

A.  I'm sure it's in there.

Q.  And before considering margin investing, you should fully understand the risks involved.  Does that sound familiar to you?

A.  Yes.

Q.  And you can lose more than you deposit.  Does that sound familiar?

A.  True.

Q.  Does it ring a bell if I tell you that it's in all bold and all caps?

A.  It does not ring a bell, but if it is, then it is.

Q.  OK.  You talked to Ms. Estes about the truck rolling down the hill.  You remember that?

A.  Yes.

Q.  And you said that was an important thing to you because you wish you would have known that they had a working truck, not a truck rolling down a hill, right?

A.  Right.

        MR. MUKASEY:  OK.  So, Chris, may I ask you to please show Mr. Ryan DX 1563 in evidence.

        (Video played)

Q.  That's the truck you saw rolling down the hill, correct?

A.  It looks similar.  I mean, has a different paint job.

Q.  I'm sorry?

A.   It has a different paint job.

Q.   You know that Nikola had a working -- two working hydrogen fuel cell trucks at the time you were investing?

A.   The question being that I knew that or I did not know that?

Q.   Did you know that?

A.   I mean, based on the videos, it seemed like they had some working trucks.

Q.   Did you know that that video is a truck called the Nikola Two driving on a highway under its own power?

A.   Looks like, yes, it is a video of it driving.

Q.   Had you known that Nikola had two working fuel cell trucks at the time you made your investments, would that have made a difference to you?

A.   If I knew that they had two working fuel cell trucks?

Q.   Yeah.

A.   Yes.

Q.   When you met with the government -- withdrawn.

        Tell me how you first came to meet with the government.

A.   I --

Q.   I know the first meeting was a phone call.

A.   Oh, yeah.

Q.   Tell me how that evolved.  How did that come about?

A.   I received an email regarding my investment in Nikola.

Q.   What happened after you got the email?

A.   I responded, saying that I'd be willing to talk.

Q.   And when you spoke to them, did they ask you questions about specific issues, or did you sort of tell them about specific issues?

A.   The first call, I think they were really just asking background.  They asked some of my investing history and then asked just, I feel, general questions about the time that I was investing in Nikola.

Q.   Had they played videos or audiotapes for you?

A.   Yes.

Q.   Which ones?

A.   I'm trying to think.  Some of the ones that we saw today, another one that I think was a CNBC interview, maybe another one.  I can't remember every one that they showed me.

Q.   Did they play these interviews from beginning to end or just portions, or you're not sure?

A.   I'm not sure.

Q.   I assume you would agree, by the way, that the context in which anybody makes a statement in the middle of a TV show is important, right?

A.   Wording is important, yes.

Q.   Now, there was a video shown to you this morning by Ms. Estes.  It's the one we just put up a little while ago, GX 410.  You said -- it was the Yahoo! Finance one.  You said on your direct examination it seems likely that you watched it.

M9MHMil3                              Ryan - Cross

A.   Yes.

Q.   You mean it seems likely that you watched it back when it broadcast or it seems likely that you watched it in the U.S. Attorney's Office?

A.   Back when it broadcast.

Q.   So when you say it seems likely, there's some doubt in your head about whether you definitely saw it, correct?

A.   There is a chance that I did not see it, small.

Q.   But some doubt?

A.   Yeah, miniscule.

Q.   When the government played interviews for you, did they supply you with a transcript, or no?

A.   No.

Q.   Because you don't watch with a transcript at home, obviously?

A.   Say that again.

Q.   Because you don't watch TV with a transcript at home, right?

A.   You mean subtitles or just like --

Q.   A written transcript.  Nobody watches --

A.   No, I do not watch TV with a transcript.

Q.   OK.  I want to go back to Robinhood just for a moment.  I asked you about a couple of disclaimers, and I'm remiss in not asking you about another one.

        Are you familiar with a Robinhood disclaimer that

says:  "Robinhood Financial encourages its customers to invest carefully and to use the information available at the websites of the SEC and FINRA."

You know what FINRA is, right?

A.  Oh, yes.

Q.  OK.  If I understand your testimony correctly, you did not follow those warnings, right?

A.  For certain companies, yes.

Q.  But for Nikola, no?

A.  No.

Q.  Now, you also mentioned something called StockTwits, right?

A.  Yes.

Q.  Can you just remind us what StockTwits is.

A.  It's just generally a community forum where people discuss strategies or put links to news or what they plan on doing with their positions.

Q.  It's not exactly a bunch of Harvard-educated finance folks, right?

A.  No, but I didn't use it for technical data.

Q.  OK.

THE COURT:  Mr. Mukasey, I'm sorry, can I ask you not to wander too far away from a microphone.

MR. MUKASEY:  Sorry, sorry.  I apologize, Judge.  I'll carry the microphone with me.  Kidding.

Q.  StockTwits is basically an open forum to anybody who wants

M9MHMil3                          Ryan - Cross

Q.  to say whatever they want?

A.  Correct.

Q.  Like if you go on StockTwits, even the Nikola subsection of StockTwits, like -- and I'm giving examples here -- you're going to see dogs driving cars and movie reviews and I hate this guy and I don't like that guy, right?  It's like a little bit of a rant-and-rave place?

A.  I'm sure there are some very weird comments in there.

Q.  And you and I would agree that nobody who's a reasonable investor would take their --

MS. ESTES:  Objection.

THE COURT:  Overruled.

Q.  -- would take their investment advice from StockTwits, right?

A.  It depends on what's being posted.

Q.  Well, you don't know who's posting on StockTwits, right?

A.  Not necessarily, but if you follow a link to a published account, it's not really them.  It's still an accredited publisher.

Q.  You don't know the source of the posts on StockTwits, right?

A.  The comment of it or the link itself?

Q.  Either.

A.  Well, the link, I would assume, yes, because I could click on it.  It would bring me to a publishing website, such as

maybe Yahoo! Finance or a news outlet.

Q. You don't know who put that link there and for what reason?

A. No.

Q. You never saw an original post on StockTwits from Trevor Milton, correct?

A. Not that I recall.

Q. If I asked you this already, I apologize. You've never spoken to Trevor Milton?

A. No.

Q. You've never texted him, tweeted him, emailed him, called him?

A. No.

Q. On the Nikola website, there's a -- I should ask. Are you aware that there's a way to contact the company at nikolamotors.com?

A. I would assume that there's a way of contacting them.

Q. Never reached out?

A. No.

Q. Can we talk about options trading for a second?

A. Sure.

Q. Nikola was a pre-revenue company, right?

A. Yeah.

Q. It went public by SPAC. You understand that?

A. Yes.

Q. SPAC -- and the stock was volatile, as I think you said?

A.   Yes.

Q.   Options trading is quite risky, correct?

A.   Yes.

Q.   So you were trading a volatile stock in a pre-revenue company in an extremely risky way, right?

A.   Not exactly.

Q.   OK.  Well, options trading is risky, right?

A.   To an extent.

Q.   To an extent that you could possibly lose all your money, right?

A.   Not really in my case.

Q.   OK.  Yes or no, you could lose all your money options trading?

A.   You could.

Q.   Do you have your trading records in front of you still?

You know what, can we put them on the screen.

I actually have them if you want to look at them in hard copy.

A.   Whichever's easier.  Oh, they're up.

Q.   OK.  I just want to talk a little bit about this day trading.

Day trading, I think you said, is buying and selling throughout the day, correct?

A.   Yes.

Q.   And you try to profit in day trading not because the

M9MHMil3                        Ryan - Cross

companies come out with a new product or because there's some long term interest. You're really looking at the intraday movement of the stock, right?

A.  Yes, usually based on news or announcements.

Q.  Or just the volatile movement of the market?

A.  True.

Q.  You try to catch the highs and avoid the lows?

A.  Yes.

Q.  OK.  If you direct your attention to June 11, 2020 --

A.  Yes.

Q.  -- by my count, you bought Nikola stock 11 times on that day.

A.  Bought 11 times?  One --

Q.  You may have to scroll the screen.  I don't know.

A.  I see three buy orders.

Q.  How many sell orders do you see?

A.  One, two -- completed sell orders or canceled sell orders?

Q.  Completed.

A.  Four.  I see four sell orders.

Q.  That's all in the same day?

A.  Yes.

Q.  Now, if you look at June 11 at 12:48 p.m., can you check that out.

A.  I don't see a time.  I don't have a timestamp.

Q.  You don't have a timestamp.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Where'd you get these records from?

A.   Robinhood.

Q.   Directly from Robinhood?

A.   Yes.

Q.   Or are they screenshots?

A.   Screenshots of my app.

Q.   Do you get an actual account statement from Robinhood that says you bought this many times at this time this many shares, an official account statement?

A.   Yes.

Q.   You didn't bring that to court today, right?

A.   I did not.

Q.   These are screenshots of whatever you selected and gave to the government, right?

A.   This is all of my transactions on the Nikola trading history page.

Q.   But from here we cannot tell that you bought eight times within one minute on June 11?

A.   I cannot.  Yeah, I can't tell from this.

Q.   And you can't tell from this that 34 minutes later, at 1:23 p.m., you sold all of those shares?

A.   I can't tell.

Q.   So you can't tell that in 34 minutes you bought more than $60,000 in Nikola stock and then you sold it and you actually made a thousand bucks.  Can't tell that because you don't have

M9MHMil3                         Ryan - Cross

the timestamps, right?

A.   Yeah, I can't tell from the time, without the timestamps.

Q.   And you also can't tell that when you bought and sold in the same day here, especially within 34 minutes, there was no Nikola news or Trevor Milton statements in those 34 minutes. You can't see that here, right?

A.   I can't see that either.

Q.   All right.  And you didn't read any new SEC releases in those 34 minutes?

A.   I don't recall.

Q.   OK.  Let's move along, because June 11 wasn't the only day you day traded.  You day traded on June 15, 2020, eight trades. Do you see that?

A.   I see the first one.  Let's see.  I see one on this list, but I don't -- there's no timestamps associated with it.

Q.   Right.  And the timestamps are important to know in how many lots you executed the trades and when, right?

A.   Yes, I guess.

Q.   June 17, you did 12 trades of Nikola, right?

A.   I can't tell.

Q.   Because you don't have the official records?

A.   Yeah.  You -- I'm assuming you do, so you would be telling me.

Q.   You mentioned, Mr. Ryan, that your Robinhood platform links to Yahoo! Finance articles, I think you said Barron's?

A.   Barron's.  I think I've seen Reuters.  I think I've seen some Wall Street Journal.  I've seen numerous publishers.

Q.   You can't point to any statements at this moment from any article that Trevor Milton made that influenced any trade of yours in particular?

A.   Are you referencing a specific -- I mean, a specific article from a specific publisher?

Q.   Do you have a specific article from a specific publication?

A.   No.  I would just have things that I remember reading, and I just don't remember the exact publisher.

Q.   But you can't say what they are or when they were?

A.   No.  It's over two years ago.

MR. MUKASEY:  One moment, your Honor.

THE COURT:  Yes.

(Counsel confer)

MR. MUKASEY:  Thanks, Mr. Ryan.  I have no more questions.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.   Mr. Ryan, Mr. Mukasey just asked you if you could point to a particular article relating to Mr. Milton.  You recall that?

A.   Yes.

Q.   Mr. Ryan, your trading was about two years ago, right?

A.   Yes.

M9MHMil3                          Ryan - Redirect

Q.   And Mr. Milton was on the news a lot two years ago, right?
He was doing a lot of interviews, right?

A.   Yep.

Q.   Lot of tweeting?

A.   Uh-huh.

Q.   You can't remember everything you read of his, right?

A.   No.

Q.   Because there was so much of it?

A.   Yeah.

          MS. ESTES:  All right.  Ms. Wolfson, can we pull up
Government Exhibit 1116 again.

Q.   Mr. Ryan, Mr. Mukasey asked you a little bit about your day
trading in June.  Do you recall those questions?

A.   Yes.

          MS. ESTES:  Ms. Wolfson, can you turn to July.

Q.   So, Mr. Ryan, by July you were not day trading anymore,
isn't that right?

A.   Let's see.  Sell, buy.  Oh, yes, now I see.  Yeah, these
are options, sorry, for the most part.

          (Continued on next page)

BY MS. ESTES:

Q.   Is around July --

A.   Actually, no, these are back to normal by and sells.  These are more options and purchases.

Q.   Mr. Ryan, around July, is that when you started your long-term hold of Nikola?

A.   Looks like it, yeah.

Q.   Can you remind the jury, why did you decide to hold Nikola long-term?

A.   I thought they had the potential for multiple revenue streams from different aspects.

Q.   And that was after doing a lot of research on the company; right?

A.   Yeah.

Q.   You reviewed a lot of things before deciding to do this long-term hold; right?

A.   Yes.

Q.   Interviews involving Mr. Milton; right?

A.   Yes.

Q.   Articles; right?

A.   Yes.

Q.   Mr. Ryan, for a pre-revenue company, it was important to do your homework; right?

A.   Yes.

Q.   And you believed by watching interviews of Mr. Milton and

reading articles on things he said, you could rely on that; right?

A.  Yes.

MS. ESTES:  Ms. Wolfson, let's take that down.

Q.  Now, Mr. Ryan, do you recall Mr. Mukasey showing you some SEC filings?

A.  Yes, part of the prospectus.

Q.  And he pointed you to some of the risk factors in those filings; right?

A.  Yes.

Q.  He asked you if you had read those; right?

A.  Yes.

Q.  He kind of blamed you for not reading them; right?

A.  He inferred it.

Q.  Mr. Ryan, why did you feel comfortable relying on the word of Mr. Milton rather than the SEC filings?

A.  I mean, he was -- seemed like he had firsthand knowledge of everything and was probably very involved in the day-to-day running of the company.

Q.  Would you expect the head of a company to say something inconsistent with the SEC filing?

A.  No, I would not expect that.

Q.  Why would you not expect that?

A.  Because he's a representative for the company.

MS. ESTES:  Ms. Wolfson, can you pull up Defendant's

M9MCmil4                          Ryan - Redirect

Exhibit 736.  Can you go to page 76.

          Ms. Wolfson, can you zoom into the bottom of the screen there.

Q.  Mr. Ryan, in this SEC filing, do you see anything on the bottom of the screen there that says the Nikola One was rolled down a hill in the video?

A.  No, I do not.

Q.  Do you see anything on the bottom of the screen there that says Nikola never had a functioning prototype of the Nikola One?

A.  I do not see that.

          MS. ESTES:  Ms. Wolfson, can you go to the next page. Can you zoom into the part on the Nikola Badger there.

Q.  Mr. Ryan, do you see anything on the screen there that says Nikola did not have a functioning prototype for the Badger?

A.  I'm just going to read it quick.

          No, I don't see anything.

          MS. ESTES:  Ms. Wolfson, can you go to the next page. Can you zoom into the hydrogen station section there.

Q.  Mr. Ryan, I'll give you a moment to read that and then I'll ask a question.

A.  Okay.

Q.  Mr. Ryan, do you see anything there that says Nikola was actually purchasing hydrogen for $14 a kilogram?

A.  No, I do not.

MS. ESTES:  Ms. Wolfson, you can take that down.

Q.  Mr. Ryan, did you expect, as an investor, that you had to fact check the statements of the head of a public company?

A.  No.

Q.  Did you believe you could rely on what he said?

A.  Yes.

Q.  Why did you believe that?

MR. MUKASEY:  Asked and answered.

THE COURT:  Overruled.

A.  I'm sorry.  Can you repeat that.

Q.  Why did you believe you could rely on Mr. Milton's statements?

A.  Because he was the head of the company and I'm assuming he had more day-to-day knowledge than other people.

Q.  And how did you feel when you learned that some of his statements were false?

A.  Initially, I thought it was kind of -- I think someone in Nikola, I believe, used, like, the word hit job or Hindenburg, and I sided with Nikola and slowly realized that they were right.  So, angry, felt a little deceived, stuff like that.

MR. MUKASEY:  Objection.  Move to strike.

THE COURT:  Overruled.

Q.  Mr. Ryan, do you believe you're a reasonable person?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  I would like to believe so.

Q.  Do you believe you're a reasonable investor?

A.  I believe so.

MS. ESTES:  Nothing further.

THE COURT:  Anything more, Mr. Mukasey?

RECROSS EXAMINATION

BY MR. MUKASEY:

Q.  Do you believe it would have been reasonable to read the SEC filings?

A.  To an extent.

Q.  Is that a yes?

A.  Partially.

Q.  Are you saying that the U.S. government website that protects investors is unreasonable?

MS. ESTES:  Objection.  Argumentative.

THE COURT:  Sustained.

A.  That means --

THE COURT:  No, you don't have to answer.

A.  No, I'm not --

THE COURT:  Mr. Ryan, wait for another question.

Q.  You said you did your homework; right?

A.  Yes.

Q.  You can't point to particular articles about the particular subjects that Ms. Estes raised at this moment; correct?

A.  Yes.

M9MCmil4                      Ryan - Recross

Q.  You believe it would have been a reasonable thing to do to read some of the SEC filings?

A.  Yes.

MR. MUKASEY:  Nothing further.

THE COURT:  Anything more?

MS. ESTES:  No, your Honor.

THE COURT:  So you want to call your next witness and have someone assist Mr. Ryan.

(Witness excused0

MR. CARUSO:  Your Honor, please, we would like to approach on the application that I mentioned this morning.

THE COURT:  Sure.

(Continued on next page)

(At the sidebar)

MR. CARUSO:  Your Honor, at this time, we move to strike the testimony of the witness on the ground that the government has not proven the requisite foundation under Litvak, which is they have to prove but they failed to prove a nexus between this particular witness's viewpoint and that of the mainstream thinking of investors in the NASDAQ market now.

I'll incorporate what I argued earlier today before the witness testified, but let me just add briefly, please, we now know what the witness did, we know his viewpoint, and there is no evidence that shows a nexus between that viewpoint and mainstream thinking.  In particular, he didn't read the SEC filings, even though he acknowledged that they would be the most probative, I didn't use the word probative, but he acknowledged that they're the best source and that he does so now based on this experience.  He said that he pursued a social strategy.  There is no evidence in the record that a hypothetical reasonable investor would rely on a social strategy as distinct from reading the SEC filings.

And he also, finally, this day trading doesn't coincide -- there's no evidence, I should say, that day trading coincides with the viewpoint of a reasonable investor when the man buys six, eight, ten times a day and sells almost the same number of times, and does so in a short timeframe without any reference to any reliance upon what the company published or

that Mr. Milton said.

MR. ROOS:  Well, taking the last point first, he testified he initially did day trading because the company had some hype.  He then did a lot of research he testified about. He listened to Mr. Milton's statements, he testified he read articles, he testified he listened to television programs, he clicked all sorts of things on the investment, he did his diligence.  That's the point where he made a long-term purchase and hold which resulted in over $100,000 in losses.  This is not an exceptionally rare and unusual case like in Litvak where the testifying witness said something that was contrary to law, contrary to facts, and agreed by both parties to be irrational. This guy has an investment strategy that maybe Mr. Caruso would not follow, but there is zero precedent in the world that says an investor is, per se, unreasonable for failing to read an SEC filing.

MR. CARUSO:  That's not my argument, Judge.  My argument is that they haven't proved that this is within the mainstream or that there is a nexus between the viewpoint of this witness and the mainstream view.  I'm not arguing that as a matter of -- I will later, but I'm not arguing now that as a matter of law, he was required to read SEC filings.  What I'm saying is the government hasn't carried its burden of proof of showing a nexus between this man's viewpoint and the viewpoint of the mainstream thinking.  There's no evidence of the

mainstream thinking.

THE COURT:  The application is denied.  To the extent that whether you consider to be mainstream thinking is developed by your average investor, educating him or herself about a particular company before making an investment, so I use that as sort of a baseline.  I think that Mr. Ryan sufficiently showed that prior to making his investment in Nikola, he researched the company in a variety of different ways using social media to be sure, but using the links in social media to access, I will use the term, mainstream financial media, which is of the type that I think most investors would rely on and, accordingly, I think that they have shown that the relevancy of Mr. Ryan's testimony, they have shown, I believe, that, minimally, that Mr. Ryan engaged in the types of activities that a reasonable investor would engage in prior to making an investment.

MR. CARUSO:  Thank you.

(Continued on next page)

M9MCmil4                          Mayzlin – Direct

(In open court)

THE COURT:  Government want to call its next witness.

MR. ROOS:  Yes, your Honor.  Government calls professor Dina Mayzlin.

DINA MAYZLIN,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Please be seated.  Please make yourself comfortable.  Please bring the microphone as close to you as possible.  When you speak, please speak directly into the microphone.  Please begin by stating your first name and your last name and spelling your first name and your last name.

THE WITNESS:  So my name is Dina Mayzlin, and you spell it D-i-n-a, and the last name is M-a-y-z-l-i-n.

THE COURT:  Mr. Roos.

DIRECT EXAMINATION

BY MR. ROOS:

Q.  Good afternoon.

A.  Good afternoon.

Q.  What do you do for work?

A.  I'm a professor of marketing at the University of Southern California.

Q.  And what, specifically, is your title at the University of Southern California?

A.  I am the Robert E. Brook chair in marketing.  Also, I'm an

associate on the Ph.D. program.

Q. Are you in a particular school at USC?

A. That's right, the Marshall School of Business.

Q. How long have you been in that role?

A. This is -- I'm starting my 11th year at the USC.

Q. What do you teach and specialize in?

A. I teach digital marketing, social media, and marketing analytics.

Q. Do you teach that as part of the MBA program, undergrads, Ph.D.s?

A. I've actually taught in all the programs. Currently, I teach in the marketing -- the MBA program, the online program, but I've also taught in the past undergrads, and also I teach Ph.D.s, as well.

Q. I'm going to take a moment and go back a little bit and ask about your educational and employment background.

Let's start with education. Did you go to college?

A. Yes, I have a bachelor of science from Massachusetts Institute of Technology.

Q. Did you do any degrees after that?

A. Yes. So my undergrad was in economics with a minor in math. Then I proceeded to do a Ph.D., also in the Sloan School of Business at MIT in marketing.

Q. What was your Ph.D. in?

A. So I did -- I was one of the first people to study the

M9MCmil4                          Mayzlin - Direct

effect of word of mouth.  So people talking and the internet.

Q.  And after graduate school, what did you do?

A.  My first job was at the Yale School of Management.  So, yeah, I was an assistant and an associate professor there.

Q.  What happened after Yale?

A.  So I was at Yale for 10 years and then I moved from the east coast to the west coast, and I got a job as a tenured associate professor at USC, the Marshall School, and then I was promoted to full professor, and then last year I got a chair.

Q.  Since you've been a professor, both at Yale and USC, what has your research been into?

A.  So I study exactly that.  So conversations that people, consumers, investors have online about, you know, their products, their political choices, or stocks.

Q.  And when you say consumers and decisions online, does that also include investors?

A.  Yeah, I mean, at the end of the day, it's all about human beings making decisions.  So I've used examples, you know, a lot of my work is in marketing, but I've also used examples from finances, examples from politics.  I've also coauthored papers with financial professors.  We're all in the business school, so sort of groups in the business school.  So yeah, so both.

Q.  What sort of ways do you do research on these topics?

A.  So there's -- some of my papers use data.  So it's called

empirical work.  So I collect data and kind of use statistical analysis, and I also run experiments with companies, as well. Finally, I do theoretical work.  So kind of more mathematical modeling, and that's called gained theoretical work.

Q.  Do you publish any papers?

A.  Yes, I've published close to around 14 papers, and some chapters, as well.

Q.  What types of topics have those papers been on?

A.  So most of the papers are on, you know, the effect of social media, how firms can manage social media, you know, how firms can interact with consumers on social media, and I also have done some work in advertising.

Q.  Are these papers peer reviewed?

A.  Yes, so I have about 14 peer-reviewed papers, which means that they're sent to journal, there is a team of people who read them, give you feedback, critique it, and then it goes on for a couple of rounds of revision.

Q.  How many times have your articles been cited, approximately?

A.  Yeah, so there is one -- one way to count is Google. Google has this search engine called Google Scholar and they reference publications and research.  So according to Google Scholar, I've been cited more than 60,000 times, which includes published work and also working papers.

Q.  Has your research been cited in any academic works on

investing?

A.   Yes.  So, as I mentioned, I have coauthored a paper, a kind of early paper that looks at, you know, why people engage in word of mouth, what are the drivers of word of mouth, and that included the finance professor.  He has written, like, very famous papers such as that, has written a famous paper in finance where he cites me, and there are other finance papers that cite my work.

Q.   In addition to authoring papers, do you edit any academic journals?

A.   Yes, so I am an associate editor at our, kind of, prestigious journal called Marketing Science.  I used to be an associate editor at a journal called Journal of Marketing Research.  And I'm also on editorial boards, which we review for other journals, as well.

Q.   Do you give any work speeches as part of your work?

A.   Yes.  So I give talks regularly.  So usually I give talks in, like, a business school, at NYU, you know, would invite me to give a talk and I talk about my latest research.  But sometimes I also give what are called, you know, a few times I've given what are called keynote addresses, which are like the headline speaker at a conference.  So I'm about to do that.  I'm going to Munich to do it in November.

THE COURT:  It is now 12:50, ladies and gentlemen, so we'll take our second break.  We'll pick up at 10 minutes after

M9MCmil4                     Mayzlin - Direct

the hour.  Don't discuss the case.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

(Jury not present)

THE COURT:  Dr. Mayzlin, you may step down.

Anything to raise?

MS. ESTES:  No, your Honor.

MR. MUKASEY:  No, Judge.

THE COURT:  Okay.  Ten after.  Don't be late.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you.

BY MR. ROOS:

Q.  Professor Mayzlin, when we broke, you were giving us some of your background.  Let me ask you, have you ever served as an expert before?

A.  Yes, I served as an expert on two other civil cases.

Q.  And you don't need to give us the specifics, but broadly speaking, did they relate to the internet in some form?

A.  Yeah, they were also related to social media.  They involved online reviews.

Q.  Have you ever testified in court before?

A.  I have been deposed, but I have never testified in court.

MR. ROOS:  Your Honor, the government requests that professor Mayzlin be qualified as an expert in the effects of social media, consumer and investor decisions.

THE COURT:  Any objection?

MS. YOUNG:  Not on our prior objections on the record.

THE COURT:  Very well.  She will be allowed to testify as an expert.

Q.  Professor Mayzlin, are you being compensated in connection with your work on this case?

A.  Yes, I am.

Q.  What's your hourly rate?

A.    $850 an hour.

Q.    Is your rate for testifying any different from your rate for preparing to testify?

A.    It's the same rate.

Q.    Have you done preparation for your testimony here today?

A.    Yes, I have.

Q.    Do you know approximately how many hours?

A.    It's probably around 75 hours or so.  I haven't added it up exactly.

Q.    So 850 times 75, so around $70,000?

A.    Probably, yes, around there.

Q.    And you're also going to be paid some additional money by a consulting and research firm that you work with; right?

A.    That's right.

Q.    Do you know the specific amount?

A.    I'm not sure exactly the specific amount, but it's sort of a fraction of what -- how much they are spending, you know, the efforts that they take.  It's a small fraction of the efforts.

Q.    Have you met with the government previously as part of your preparation?

A.    Yes, I have.

Q.    Have you also billed for that time?

A.    Yes, I have.

Q.    That's part of the total figure you gave us?

A.    That's right, that includes everything.

Q.  Does your pay depend at all on the outcome of the case?

A.  Not at all.

Q.  So, in other words, you get paid regardless of what happens here today?

A.  That's right.

Q.  Let's talk briefly about your investment in this particular case.  Do you have any personal knowledge of the facts at issue in this case?

A.  No personal knowledge.  I hadn't heard of the company until I started working on the case.

Q.  Have you seen or reviewed all of the evidence in the case?

A.  No, I haven't.

Q.  What evidence have you looked at?

A.  So the government gave me social media data.  Specifically, I got data from a platform called StockTwits and Twitter, and I also had access to transcripts of podcasts and TV show appearances by Trevor Milton.

Q.  Let me just ask about those.  Did you end up using the podcasts and interviews at all?

A.  No.  So, I will reference them in terms of reach, how many people.  And there'll be some examples where they're referenced on social media, but I didn't really get into, like, I didn't listen to most of them.

Q.  Your testimony is not about the substance of any of these recordings?

A.   No, my testimony focuses on the social media aspect.

Q.   And besides the data that you received, did you get any other publicly available data?

A.   Yes, I collected data from a community on a website called Reddit, it's called the subreddit, that's what they call it, called the Nikola Corporation.  And it's public data and it was, you know, scraped, it was -- I got it from the web.

Q.   And so, if I hear you right, your focus has been on Twitter, StockTwits, and Reddit?

A.   That's right, those three platforms.

         MR. ROOS:  Can we show just for the witness what's been marked for identification as Government Exhibit 1014.

Q.   Professor Mayzlin, do you recognize this document?

A.   Yes, these are the slides that I prepared for this testimony.

         MR. ROOS:  The government offers exhibit 1014.

         MS. YOUNG:  No objection.

         THE COURT:  It will be received.

         (Government's Exhibit 1014 received in evidence)

         MR. ROOS:  May we publish it to the jury?

         THE COURT:  You may.

Q.   So, professor Mayzlin, as part of your academic work, have you looked at online communities on the internet?

A.   Yes, that's basically -- most of my research is about online communities on the internet.

Q.   What's an online community?

A.   So, an online community is basically a group of people who talk to each other.  It usually takes place, because it's an online community, in an online platform, but it's basically people talking to each other about different topics.

Q.   And any specific topic area or could it be anything?

A.   It could be anything.  I mean, one of the amazing things about online -- the internet and online communities and the internet is just the wide variety of topics that you find.

Q.   And is the prior research on people making important decisions in these online communities?

A.   Yes, definitely.  So I have focused on, you know, decisions that involve choosing products.  So marketers, you know, really worry about that or are very interested in that, but also health decisions, political decisions, investment decisions. Since the beginning of these online communities, investment decisions have been discussed.

Q.   So is there academic literature on online financial communities on social media on the internet?

A.   Yes, there is a very active literature on online communities, as you would imagine, because people are using them to make financial decisions.  A lot of researchers are interested in that.  So you have these three examples.  So what you're seeing on this slide -- the jury can see the slide, right?

Q.   Yes.

A.   Cool.  So what everyone is seeing are screenshots of headings, front pages of articles.  And academic articles may be at 20 page line paper that appears in a journal.  So these three papers looked at different online communities.  The one in the middle is the rise of Reddit and it looks at the GameStop trading kind of incident.  On a separate --

          MS. YOUNG:  Objection.  Move to strike.

          THE COURT:  Overruled.

A.   On a community called WallStreetBets, which is part of -- it's a subreddit.

          And then the other two papers look at -- it's actually -- the author sometimes can't tell you what the community is, what's called an, you know, it's an anonymous community, but it's for people who trade on the foreign exchange markets.  So the neat thing about those papers is that they see what people say and they see the stocks, the trades that they make, whether they buy or they sell.  So this paper looks at, you know, connects the conversations to the trading behavior.

Q.   So big picture, what's the consensus takeaway from these papers and other academic literature on online financial communities?

A.   So, you know, so first of all, these communities are very, very common.  They're very active in, you know, in addition to

this, there is survey data that asks investors, you know, if they made decisions based on this and they, you know, they confirm this.  And also, you know, another thing that's important is how much do they affect behavior.  So they're doing it, but is this just sort of chatting or does it have a consequence.  So my next slide talks about that.

Q.  Before we go there, let me ask you one question.  In terms of these online financial communities, are there online financial communities that involve retail investors?

A.  Yes.  So, they do.  So, I mean, most of it -- most of the research that I've seen has concerned retail investors.  So these are kind of, you know, regular people trading.  So usually you say a retail versus institutional investors.  So they're not professionals.  They usually have smaller size portfolios, they don't have as many resources, they're maybe sometimes less sophisticated than large institutional professional investors.  All these papers talk about retail investors.

Q.  So before we move on from that, let me just ask, does that research show that retail investors behave the same or differently than institutional investors?

A.  So the research -- the consensus on the research is that there are big differences in how retail investors act versus institutional investors.  So as I mentioned, they are sort of less sophisticated, they have fewer resources, you know, they

M9MCmil4                        Mayzlin - Direct

sometimes are prone to biases --

          MS. YOUNG:  Objection.  May we approach?

          THE COURT:  Okay.

          (Continued on next page)

(At the sidebar)

MR. MUKASEY:  This is not a legal objection yet, it's an observation.  This is the most condescending approach I've ever heard.  What she's saying is certain people who trade stocks that she sees are stupid and I think --

MR. ROOS:  I think that was your cross.

MR. MUKASEY:  Hold on a second.  That was not my cross.

She hasn't interviewed these people, she hasn't met these people.  What she's saying is, is people who speak in online communities are more vulnerable to fraud, she doesn't know who they are.  This is outrageous.  This is saying, like, everybody who's on Twitter is a moron, or everybody who's in StockTwits is a moron.  This is not factually based, this is not firsthand knowledge, this is not study based.

By the way, there is no distinction, as we laid out this morning, in the law between a retail investor and a sophisticated investor.  An objective reasonable investor, the hypothetical one, is the standard by which the jury judges materiality.  This is saying, well, there is really stupid people that get taken advantage of.  That's legally irrelevant and factually, I think, insulting.

MR. ROOS:  I did not hear her saying that, but I was planning to ask some followup questions about retail investors.  I don't think she's saying --

MR. MUKASEY:  There is no such thing as retail investors.  You guys made that up.

MR. ROOS:  I think the defendant made it up.

THE COURT:  Let me stop you, Mr. Mukasey, because what I heard her say was that there is a consensus amongst the papers that she has reviewed that retail investors behave differently than institutional investors.

MS. YOUNG:  She also said that those papers related to foreign exchanges, not U.S. markets.

THE COURT:  All of them?

MR. ROOS:  She's talking about -- if you read the papers, they're talking about foreign exchange trading for option, so FX, not foreign markets.

MS. YOUNG:  Not NASDAQ.

MR. CARUSO:  This case doesn't involve FX.

MR. ROOS:  She's just talking about the literature. These are case studies about the ways online investors behave.

MS. YOUNG:  It's a different set of investors unrelated to this case.

MR. ROOS:  It's cross points.  These are just studies that various academics use.  She's familiar with that literature about how they study investor behavior, consumer behavior.

THE COURT:  So, was there an objection to the particular question, because if there is, the objection is

overruled and we continue to ask followup questions.

MR. MUKASEY:  We'll continue to object.

(Continued on next page)

          (In open court)

          MR. ROOS:  Thank you, your Honor.

Q.  Professor Mayzlin, I want to clarify something, you're not saying these investors are less smart or anything like that, just that they consume information differently; is that right?

A.  They have fewer resources, they're not professionals, so it's harder for them.

Q.  Does the research say anything about the ways in which retail investors consume information online?

A.  Yes.  So the research, you know, so I think part of the reason researchers found that people love online communities and they, you know, they love going to them -- and so part of the traction of online communities to retail investors is that the information is, you know, shorter, it's compelling, it's easier to consume opposed to something like a legal document that's very long.

          So there has been research, for example, you know, there has been some frustration on the part of the government, the regulators that, you know, like consumers -- investors have all this information available, like prospectuses, 8K or 10K filings, but they sometimes don't seem to read it.  So EDGAR is a database that provides all these legal documents, you know, like IPO prospectuses, and there is a paper that shows that not that many people, you know, at least use that database.  It's kind of a surprisingly few people.  It doesn't get that many

hits.

MR. ROOS:  Let's go to the next slide.

Q.  Now, is there any research on how these online communities investors -- sorry.  The effect of social media on investors' trading activities in these online communities?

A.  Yeah.  So, you know, I think the important thing in this research is, again, kind of moving beyond that people do it, what is the effect that it has.  Actually, a lot of my, sort of, contribution, part of the reason why I get so many cites is because I was one of the first people to study data marketing and these people study this in finance.  So all these papers tried to get at so, you know, yeah, we know that they talk on these platforms, but does that impact their trading activity, their investment activity, and this paper showed that it does.

MR. ROOS:  Let's go to the next slide.

Q.  Now, is there any research on the effect of news media on investor trading activities?

A.  Yes, so there is also -- there is a large literature that looks at the impact of media.  So when, you know, and if, you know, it didn't find that indeed, when consumers -- when investors look at information in media, it has an effect on them.

MR. ROOS:  We can take this down for a second.

Q.  So, bottom line, what's the takeaway from the research on these three points?

A.   So the takeaway is there's a lot of conversations on social media about investments, that's the first point.  The second point is those conversations make a difference.  They impact, when you see your friend, you know, making suggestions, recommendations to buy or sell, sometimes you listen to that recommendation.  So it's an information that has an impact on what investors do.  And finally, the third point is if you see something in the press, in the media, in your local newspaper or, you know, an online publication, that also makes a difference that impacts what people do.

Q.   So you mentioned online financial communities, that you looked at three, Reddit, StockTwits, and Twitter; is that right?

A.   That's right.

        MR. ROOS:  Let's put back up Government Exhibit 1014 and go to slide 4.

Q.   Professor Mayzlin, what are we looking at here?

A.   So this is a subreddit.  So subreddit is a community on a website called Reddit, and it's the Nikola Corporation community subreddit.  So you can see that it's a moderated community.  On the right, it sort of talks about the commission of the community.  It says that 4,000 people have interacted in this community.  19 means right now, 19 people when the screenshot was taken are active right now, are logged in right now.

M9MCmil4                          Mayzlin - Direct

Q.  And for Reddit, can any person look at Reddit, is it publicly accessible?

A.  Yeah, anybody can look at it.

MR. ROOS:  Let's look at the next one, slide 5.

Q.  Professor Mayzlin, what are we looking at here?

A.  So this is another platform that I looked at called StockTwits.  This is another platform that sort of is focused on investment, in trading.  And this one is -- it aggregates -- this page aggregates all the conversations about the Nikola stock.

MR. ROOS:  Let's go to the next one, slide 6.

A.  So this one is Twitter.  So it's a screenshot from Twitter. This is a conversation that I looked up and it's -- you can kind of see the query, when it was taken.  But you can see that this person, Jason, has a post about Nikola.  And you can tell -- I just want to point out -- you'll see this over and over again, the dollar sign, NKLA, that's the ticker, you know, it's kind of like a nickname for Nikola.  This way you can search it, like, if you just searched it for Nikola, you might get somebody whose name is Nikola.  So it's a better way to reference the stock.

Q.  So on Reddit, Twitter, StockTwits, any person can post; right?

A.  That's right.

Q.  And I'm sure you've seen people post comments, memes,

pictures, some troll-like activity. Why does the literature and the research say this can have an effect still?

A. So that's actually one of the things that, like, was the very first piece of research I did as a grad student, and it was this puzzle, because, you know, when I started doing my research in the late '90s, it was sort of the birth of these communities, it was becoming popular, it was before Facebook, it was like some other ones, Usenet.

So the question was, you know, you can see this happening, you can see people talking, and sometimes they're recommending products and sometimes they're recommending stocks, but we also heard about examples of, you know, trolls or people pretending to be someone else. And sometimes companies, you know, like sellers acting like consumers, sort of hiding their true identity. Everything is anonymous. In the end, you don't really know who is posting a lot of the time. You know if it's my account on Twitter, you know it's me, but, you know, a lot -- you see a lot of examples where people have these names, kind of nicknames.

And so the amazing thing, I think, about this research, this large body of research, including my research — I was, you know, happy to contribute to this — is that it matters. And I think the reason why it matters is that even though there is a lot of, you know, there is some fakery, there is some trolling. On average, there is still good information

M9MCmil4                        Mayzlin - Direct

in these communities, and people, you know, people still are --
they trust what they see and sometimes they make a mistake, but
a lot of the time, you know, the information helps them make
better choices.

Q.  So we're just talking about Twitter.

Did Trevor Milton have a Twitter account?

A.  Yes, Trevor Milton had a Twitter account that I looked at.

MR. ROOS:  Let's look at slide 7.

A.  Yes, this is a screenshot of Trevor Milton's Twitter
account.  So I can discuss a little bit, the red box.

So what it shows is that Mr. Milton tweeted out over
2,000 times, 2500 times.  On Twitter, you can follow people,
can you also have followers.  So at this moment, the screenshot
that the screenshot was taking, Mr. Milton only followed one
account, and he had over 100,000 followers.  So 100,000 people
followed his posts.  This was just the total number of likes.
On Twitter, you can like a post.  So this is how many times he
liked the posts.

Q.  Do you see, this account, tweets are protected?

A.  Yeah.  So, in September of 2020, Mr. Milton made his
account basically private.  So he had to approve all the
followers.  Prior to that, his account was public.

Q.  Some of these things here, so 2,510 tweets are in the red
box.  You said that refers to the number of tweets he made?

A.  Yes, the number of tweets, which means the number of posts.

So either original posts or replies to someone else.

Q.  And then where it says followers, what's a follower?

A.  So follower is, you know, there are different names for this, like on Facebook, is he your friend.  But on Twitter, a follower is someone who clicks the "follow" button on the account and they're exposed to that person's posts.

Q.  Now, for those of us who aren't on Twitter, could you still see a person's post even if you're not a follower?

A.  That's right, you can see -- so there are several ways that you can see the post.  So if your friend likes the post, you can see that.  So, like, if your friend follows Mr. Milton, but you don't, and the friend likes that post, then you can see that post.  Also, somebody -- a follower can re-tweet the post and then it exposes his or her followers to that post.

Q.  Now, is there any research that quantifies influence based on the number of followers?

A.  Yeah.  So, you know, what we can think about -- like how much -- how can you think about this in terms of the numbers, the raw numbers.  And, you know, advertising agents think it's useful to put people into buckets, like when are you influential.  So one classification that I found was that, you know, if you have more than 40,000 followers, you have what's called a macro influencer.  If you have millions, you're a mega influencer.

Q.  So from what I'm hearing from you, Mr. Milton is an

influencer, but falls within sort of a middle tier?

A.   Yeah, so kind of -- there is actually two categories, like, below him.  There is, like, micro influencer and nano influencer, so kind of towards the mid to high.  Micro, this is actually in terms of companies, they really like those kinds of influencers because, you know, they have enough of a following that they make a difference for the products.

Q.   I just want to be clear, though, Mr. Milton wasn't the number one influencer by any means?

A.   No.  No.  But he was influential.

         MR. ROOS:  Let's go to the next page.

Q.   Let me ask you, when someone posts on Twitter, what's that called?

A.   That's called a tweet.  So this is an example of a tweet.  This is -- I can read it out or --

Q.   No need to read it out, looking at it.  I think some of the jury may be familiar with Twitter, but can you just tell us what re-tweets and likes mean?

A.   So re-tweets is how many times Mr. Milton's followers shared the post to their timelines, to their feeds.  And the likes is how many -- so 1300 followers pressed the like on that particular post.

Q.   Now, have you done an analysis of the topics of Mr. Milton's tweets on his Twitter account?

A.   Yeah, so, I was interested to see to what extent, when you

talk about, you know, online, usually it's a mix of sort of personal things and also kind of more, you know, I guess, in this case, business things.

So if you look at the next slide --

Q.  Let me ask you about that.  What does this show?

A.  What this shows is, this is a categorization into, you know, I look through the posts, how many of them just were about -- related to Nikola versus how much of them were related to something else, like something personal.  So what I found, these are original tweets from 2016 to 2020.  So this is not replies, this is just stuff he posted on his feed and, you know, vast majority of them, 86 percent were about Nikola.

Q.  So I just want to clarify something.  A few slides ago, we saw a figure that said little over 2,500 tweets by Mr. Milton, this one only says 448.  Why the difference in numbers?

A.  So, you know, original tweet is just one action you can do on Twitter, but you can also engage with other people.  And so Mr. Milton was very actively engaging with other users.  So somebody, for example, you know, can reference his tweet or ask him a question, he would reply.  So the rest of it is his, you know, basically something that's a reply to someone else.

(Continued on next page)

Q.  Now let me ask you about some of the types of tweets you reviewed.

Did you see any tweets about investing?

A.  Yes.  So in the next slide, you know, give some examples. There were -- OK.  So here are some examples from Mr. Milton's feed that talks about investing, you know, in particular.  So, you know, the first one says:  "I've wanted to say this my whole adult life.  Nikola is now worth more than Ford and FCA. Nipping on the heels of GM."  And then the second one also talks about, you know, kind of particulars of investing in this stock.

Q.  OK.

A.  Actually, if you -- you can see that the first one had over 3,500 -- over 3,000 people retweeted that.

Q.  Let me ask you a few more questions about what you observed reviewing Mr. Milton's Twitter and running analyses.

Did you see any instances when he tweeted about going on podcasts or television interviews?

A.  Yeah.  He was very active about sort of promoting his appearances on other media, other platforms.  So the next slide has some examples of that.

Q.  Why don't we go there.

A.  Yeah.  So these examples talk about his different appearances.  You know, sometimes they -- he posts before it happens, and so he says, you know, "Don't miss my appearance.

M9MHMil5                        Mazlin - Direct

It's coming up."  Sometimes he'll post a link.  If something already happened, like the one in the upper right, he said:  "I went on CNN today if you want to check it out.  Got a little testy and fun.  I think I did pretty well" and then there's a link to that video.

Q.  By the way, while on the subject of podcasts and television, did you look at any measures of popularity of some of the podcasts and television shows?

A.  Yeah.  So the next slide talks about that.

Q.  So let's look at that.  Page 12, please.

A.  Yeah.  So this is -- this chart shows his sort of most -- so this is podcasts, and it shows his kind of most popular appearances.

Q.  Let me stop you right there.  I just want to ask you a few questions so we can kind of understand what we're looking at.

So, first of all, I see it says, "Source:  Listen Notes."  Can you explain what that is?

A.  Yeah.  So podcasts are -- it's a little bit hard to quantify how many people listen to podcasts because they're available on different platforms.  So it was actually a little challenging to find some quantitative data on this.  But this is a podcast search engine, and so what it does is it ranks podcasts.  It says, like, this is the No. 1 podcast.

So what I'm giving you is -- the last column basically has the rank from that search engine, Listen Notes.  And the

M9MHMil5                        Mazlin - Direct

way to read the rank is if it says 99.95, it says it's in the top -- you know, it's better that that many.  It's way, way in the tippy top in terms of global rank, in terms of reach.

Q.  So I don't know how many podcasts there are out there, but the way we would interpret this is if, say, there are a million podcasts out there, something is in the top 99.0 percent, it's in the -- that means it's in the top 1 percent of the most popular of those --

MS. YOUNG:  Objection.  Leading.

THE COURT:  Overruled.

A.  Yeah.  So it just means, like, you know, like the top 1 percent.  It's actually less than 1 percent.  The first one is the top .05 percent.  It's way in the top.  It's like -- you know, it's a popular podcast.  There's probably -- there's a lot of podcasts, so -- you know, there are some that are better, but it's better than a lot of them.

Q.  OK.  Let's go to the next page.

THE COURT:  I'm sorry.  Could I ask you a question. The podcast global rank, the number in that column, does that refer to the podcast or to the particular episode?

THE WITNESS:  So this is just generally the podcast, so --

THE COURT:  For the podcast?

THE WITNESS:  Yeah.  I wasn't able to find data episode per episode.

MR. ROOS:  Thank you, your Honor.  That actually ties well with the next slide.

Q.  So let me just start by asking, what are we looking at on slide 13?

A.  So this one is TV show, the number of viewers.  And, again, these are sort of the top appearances.  So with TV shows, we have better data because there's better measurement techniques.  TV's an older medium.  They know how -- they basically put things -- they put these boxes and they track a panel of viewers.

So this is from -- the source is ShowbuzzDaily, and it's just the number of viewers.  So it's -- not surprisingly, I think, CNN "Newsroom" was the top appearance with 923,000, and then CNBC, the three CNBC shows.  And this is per episode.  So this is for -- so I looked out for that segment because Showbuzz gives you kind of like timeline -- time, so you can look at the segment and you can look up how many people watched it.

Q.  So just picking up on Judges Ramos' question, unlike the last slide which just showed the rank for the overall podcast, this is the number of viewers for a particular television episode, is that right?

A.  Yes, for particular -- exactly, for a particular.  We just have better data for TV shows.

Q.  OK.  So I want to go back, then, to Mr. Milton's Twitter

account.

Did you look at the average number of tweets by Mr. Milton over time?

A. Yes, I did.

Q. Let's go up to page 14. And, Professor Mayzlin, can you explain what we're seeing on page 14.

A. So on this page I'm showing you the average number of original tweets, OK. So this is not, you know, his interactions with others. This is just stuff that he posts on his feed. So you can see -- and I -- you know, this is over time, so starting with 2016. And so the number is pretty low. Like, he posts once in a while, but it's really very -- it's under ten.

Then what you can see here is right around the time when Nikola announces going public via the merger with VectoIQ, you can see a sharp rise that starts around May, and then you see, you know, the peak is in June of 2020. So he goes from just having like a couple of posts per month to having, you know, something like -- I think it it's 120 in June. Then you see a fall in July, August, and September.

Q. You said this is just for original tweets. So these numbers, for instance, the peak you gave us, little over 100, is that for all of his tweets in that month?

A. So this is just the original tweets. Actually, the number is much, much larger as you saw. There's a discrepancy between

original tweets and just engagement where he's, you know, direct mentioning others.  Basically, every time you mention someone else, you respond to someone else.

So this is actually kind of a fairly conservative measure.  If we graphed total activity, it would be much, much bigger, but it follows the same curve.  There's not that much and then that sort of late spring/summer, you see this really sharp jump.

Q.  Now, we've been talking about Mr. Milton's Twitter activity.  Have you also done measures of the reaction or effect of that Twitter activity?

A.  Yes, I have.

Q.  I want to talk first about reactions on Twitter.  Have you looked into how people reacted?

A.  Yes, I actually have a slide on that.

Q.  OK.  So why don't we go to slide 15.

A.  Yes.  I think it's important that so far I've showed what he did, but, again, the important thing with his activity is how did people react?  Did it sort of -- you know, did it generate engagement?  Did people really interact with him?  Did they kind of forward the message?  And this chart shows sort of the amplification effect of his activity that happens through others.  And this is really why -- you know, this, I think, illustrates why people care so much about this, marketers care about this, this kind of amplification.

M9MHMil5                          Mazlin - Direct

So, for example, so we started with the 384 tweets that were about Nikola. So this doesn't include the personal tweets. And then you see that there is almost 27,000 people of his followers retweeted that. So what that means is now, you know, their networks, all their followers are seeing that. So now we have exposure of followers of followers. You know, these kind of secondary effects, this power of the conversations percolating on these networks.

And then even more you see -- you know, a retweet is kind of a big deal. So you're putting someone else's post on your timeline. Kind of an easier thing to do is to press "like." So in terms of -- because it's sort of an easier action, there's even more of that. So you see 220,000 likes of his posts.

And, again, as I mentioned, the way the Twitter algorithm works is when you like something, your followers, with some probability, will see that. So, again, you have this information that starts to move across the networks and Twitter where now you have followers of followers, and maybe that -- let's say I wasn't -- I hadn't heard of Nikola and I hadn't really known about it, then when I see that my friend is liking it, my friend is talking about it, now I may become interested. Now I look it up. Now I -- so that's sort of, you know -- now it's not coming from Mr. Milton. Now it's coming from my friend, and I trust my friend, and so on.

Q.  Let me ask you just some questions about what data's in this particular chart and what's not.

So does this particular chart include information about retweets and favorites of replies that Mr. Milton made to other people's tweets?

A.  This is just original tweets.

Q.  OK.

A.  Just original.  Yeah, so that other stuff is on top of that.  So we're not counting --

Q.  So these numbers would be larger if we counted the replies?

A.  They would be larger if we counted the replies.

Q.  A few minutes ago you testified that it's also possible for people to look at a Twitter post without following or liking or retweeting, right?

A.  That's right, yeah.  So Twitter does this to kind of -- if you just only saw stuff that you followed, things would get sort of boring, because maybe I don't follow that many people. So Twitter wants to make things engaging, so it's kind of exposing you to what your friends like.  It's how Twitter works.  And, like, I know I've often -- if I see somebody I follow liking something, then I will go and follow that person.

Q.  Now, did you do an analysis of this activity that we're seeing in this chart over time?

A.  Yes, I did.

Q.  Can we look at the next slide, please.

A.   Yeah.

Q.   What do we see here?

A.   So this is the same kind of chart, but now, instead of Mr. Milton's activity, you see the total retweets and the total favorites of original tweets.

And you can see that, you know, it's the same kind of a shape, right?  So Mr. Milton is not getting a lot of retweets before that spring, but then you see a gradual rise and a peak. It's the same shape, a peak in June where -- so when his activity was highest is when other people's engagement with his activity was highest.

Q.   Now, we've been talking for a few minutes about the effect of people on Twitter.  Did you do any work to analyze the relationship between Mr. Milton's tweets and activities on the two other platforms you mentioned, StockTwits and Reddit?

A.   Yes, I did.

Q.   OK.  Let's look at that.  Actually, yeah, let's look at that and let's turn to the next page, please.  Oh, here we are.

Can you describe what this, what looks like an EKG, what this graph is?

A.   Yes.  So what this graph is -- so now this is just that summer period, so it's June to August.  And what I have are the three graphs, the three lines.  So the blue line on the bottom is Mr. Milton's tweets, OK?  The gray line is -- so now I'm adding two other platforms because it's not -- I don't want to

give the impression that all the activity was stuck on Twitter. You know, even -- that's sort of, again, the power of these networks is that if there's activity that happens on Twitter, but it really -- people are discussing it on other platforms as well.

So the gray line is the -- just the number, the average number of Reddit posts, on the sub-Reddit Nikola. And the orange line is the number of posts on the platform called StockTwits, where people talk about investing. So you can see this over time. And then I also have some, you know, some dates on this as well.

Q. Before we get to the dates, so just looking at around June 8, June 9 here, we see what I'm going to call a spike, although I don't want to put words in your mouth. Besides sort of the naked eye test, from a statistical standpoint, did you see a correlation between the activity on Twitter and those on StockTwits and Reddit?

A. Yeah. So we can -- you can just look at this and sort of see that these things seem to be related to each other, right? Like, it's not three different lines. They're not perfectly related to each other, but, you know, they seem to be related to each other. So when -- you know, when Mr. Milton's activity is spiking, you know, you see spikes on the other platforms as well.

So the kind of the most dramatic spike is the one that

happens towards the beginning, and that is on this -- on the dates, you know, 8th, 9th, 10th. Sorry, it's actually -- so sorry. You see the vertical line is on June 9, but it's -- there's some kind of peak even before that. So that date is when I showed you that post about the Badger reservations being opened. That post happened on the night of the 7th, and then Mr. Milton had a bunch of posts kind of, you know, elaborating on that post as well.

And so you can see that people were really talk -- that was big news. People were really talking about this on StockTwits. People were talking about it on Reddit. And I can tell you, I've looked at some of these posts, and they're mentioning the Badger. The Badger was like a hot topic of conversation on these other platforms.

Q. Let me ask you that question. You've got some other dates called out here. We're not going to go through this whole chart right now, but let me just ask you about one more, which is the next one, June 17.

What happened that you're aware of on that date?

A. So June 17 was when the Bloomberg article came out that put some doubts about, you know, the authenticity of some of the claims, and Mr. Milton responded, you know, very actively on Twitter. And you can also see that there was discussion on the other platforms as well. And, again, I definitely found examples where people were talking about the article. Some

M9MHMil5                          Mazlin - Direct

people didn't -- a lot of people didn't believe the article. So, for example, the Nikola, the Reddit posts, they were -- a lot of those people were sort of fans, and they -- you know, they dismissed the article, but they were still talking about it.

Q.   Now, in addition to the statistical analysis, did you -- I think you've already said you did some content review, is that right?

A.   That's right.

So, sorry, actually didn't tell you.  So you can find correlation.  So you can find statistical correlation, you know, significant correlation between Mr. Milton's activity and the other -- the other platforms.

Q.   Sorry.  Just on that --

A.   Yeah.

Q.   -- you just commented that you could find statistical correlation.  That was an answer to my question a little earlier --

A.   Yes.

Q.   -- about if there was a statistical standpoint to it?

A.   Yes, yes.

Q.   Understood.

You mentioned examples.  Have you pulled out, as part of your analysis, examples where you observed Mr. Milton's Twitter activity having an effect on either Reddit or

StockTwits?

A.   Yes, I have.   So, you know, I think that's also very interesting.   You can see kind of the quantitative effect to kind of -- you know, what is going on?   What are people talking about?   And the next slide has some examples about that.

Q.   OK.   So before we just talk about this particular slide, let me just ask you.   There are tons of posts, right?

A.   Yes.

Q.   And you're not going to show us, like, every single post, right?

A.   No.

Q.   These are just representative examples?

A.   Yeah.   So just some examples to give everyone kind of a flavor of the types of activity that was happening.

Q.   OK.   So the first one, it says, "Example Reddit Post."   And explain to us how this shows the effect of Mr. Milton's Twitter postings on Reddit users.

A.   Yeah.   So this is a post that talks about a Q&A.   So Nikola -- so the headline of the article is "Nikola Founder Hits Back at Elon Musk," the headline of the post.   So one user engages with this and says in quotes, you know, quotes Mr. Milton, what he said on Twitter:   "We're under $4 right now.   That's important because $4 is cheaper than diesel."   So even though, you know, this is a post that happened on a totally different platform, this user also goes on Twitter,

M9MHMil5                           Mazlin - Direct

right -- because at the end of the day, these are all people --
they go on different platforms and brings it in.  And then
KaiserCyber, who is the founder of the group, who's the
moderator, says:  Oh, you know, see page 25 of this prospectus
for a breakdown, and has some other comments, you know, saying
that this claim is actually believable.

Q.  So I want to ask a few questions about that.

KaiserCyber says:  "See page 25 of this prospectus for
breakdown.  Here's my take on it.  So it's more logical for me
to believe their sub-four claim because they'll get hurt bad if
they're faking it."

MS. YOUNG:  Objection.

MR. MUKASEY:  Objection.  Can we approach on this?

THE COURT:  Yes.

(Continued on next page)

M9MHMil5                    Mazlin - Direct

(At sidebar)

MR. MUKASEY:  I think that this examination is moving from the sublime to the ridiculous in that we're now reading posts of unknown random people, presumably coming in for the truth, because I haven't heard any other instruction otherwise, disconnected from Mr. Milton yet being connected to Mr. Milton by this witness.

Reading things that other people say about you or about your comments or about your interviews is just rank hearsay.  It's just -- it's hearsay within hearsay.  The whole blog StockTwits is hearsay.  And now people are commenting on other comments on the blog.  I don't know what it's coming in for except that there's chatter out there.  If it's coming in for the truth or they're going to argue that -- look at the kind of effect Milton had, there should be an instruction that says these could be robots, these could be 12-year-old children, these could be Russian bots.  Who knows?  We're now moving into multiple layers of prejudice and hearsay.

MR. ROOS:  So I'm interpreting this as a motion for reconsideration since we argued these slides yesterday.

Here's the point.  These are not being offered for the truth.  No objection to your Honor saying these statements are not being offered for the truth.  I am asking her questions about the effect of tweets being basically the information moving to a different platform.  That's how this -- those were

the questions that introduced this.  My next question is going to be to those points.  I'm not asking her at all, like, are these $4 statements true?  Did the investor believe the $4 statements, etc.?

MR. MUKASEY:  Yet the examples of how StockTwits and Robinhood works happen to be $4 per kilogram statements.  I mean, if you want to ask how this works mechanically, that's totally fair.  If you want to bring out hearsay statements maligning Mr. Milton and 403 prejudicing Mr. Milton, that's not right, and there should be an instruction.

MR. ROOS:  These are definitely not -- none of these are intended to malign Mr. Milton.  I mean, they are the -- they are on the subject areas of some of the false statements, although not all the examples we'll look at today.  I don't think any of them say things like he's an idiot, he's a fraudster, or anything like that.

I think, again, the reason we raised this yesterday and had a whole argument and briefing on it was because -- to prevent sort of a second sidebar on this like this.  But we have no objection if your Honor wants to give an instruction that all the tweets by -- or messages by people other than Mr. Milton are not being offered for the truth, and you shouldn't consider them for that fact.

MR. MUKASEY:  I think that would be appropriate.

THE COURT:  Absolutely.

M9MHMil5                          Mazlin - Direct

(In open court; jurors present)

THE COURT:  So, ladies and gentlemen, you're seeing a slide that has a posting by an individual, and you'll see some additional postings by other individuals in the coming slides. These statements, or these postings, are not being put before you for the truth of the matters that are asserted in these postings.  OK?  They're simply being put before you to show the effect that they had or could have on other individuals.  OK.

MR. ROOS:  Thank you, your Honor.

THE WITNESS:  Thank you.

BY MR. ROOS:

Q.  Exactly on that, Professor Mayzlin, you weren't, in fact, checking the accuracy of these actual posts?

A.  No, no.

Q.  These are illustrations about the effect of Twitter on other platforms, right?

A.  This is just stuff people are saying online.  I didn't check the accuracy.

Q.  Yes.

Now, I want to ask you one question about something here.  You see the KaiserCyber poster is talking about evaluating information about a prospectus versus this other information online?

A.  That's right.

Q.  Does the academic literature tell us anything about how

M9MHMil5                      Mazlin - Direct

investors on the Internet weigh information like a prospectus versus other online information, like a tweet?

A.  Yeah.  So, you know -- so prospectus is something that is more technical, there's more legalese, so it's harder for investors to really read it, to understand it.  There is kind of a lot of literature on that, you know, just how hard it is for normal people, and that includes me, actually, to understand these complicated documents.

So what you're seeing here is sort of very, very interesting because KaiserCyber, who's a moderator who's sort of in the weeds of this, is, you know -- he or she, we don't know the identity, is talking about the prospectus.  And so investors do hear other people discussing the prospectus, but it's probably hard for them to go and actually read the prospectus.

MR. MUKASEY:  Objection.  Move to strike.  That's outrageous.

THE COURT:  The objection's sustained.

MR. ROOS:  All right.  Let me ask a different question.

Q.  You have done some academic work on word of mouth online. How does that work in the context of investors?

A.  So, yeah, so word of mouth, so what makes word of mouth compelling, right?  Why do people go and they listen to word of mouth?  Why do they go on these forums, for example?  And they

go on these forum because they feel like there's good information. They're getting tips. You know, they're getting -- maybe, like, for example, maybe I don't know as much, but there's sort of this wisdom of the crowd, right? Some people have different information. Some people know more than I do. Maybe some people -- maybe I know something that they don't know. And then we come together, we exchange information, and then, you know, I can make a better decision.

So it's just -- it's very similar to just people, you know, talking about other things. Like you talk to your friends about restaurants, you talk to your friends about medical decisions, you talk to your friends about political candidates, you also talk to your friends about stocks. So people talk to their friends about stocks in the offline world, and I've studied that as well. I cited conversations like in real life in the offline world, but they also go and they talk about stocks in the online world as well. So these examples that you are seeing are people talking about Nikola in the online world.

Q. All right. So you've got several other examples here. We're not going to read through the rest of the Reddit posts, but why don't we flip through the next few pages that say "Example Reddit Post."

A. Yeah. So, you know, they're --

Q. Actually, let me just ask you one question about them.

A.   Yeah.

Q.   Are all these instances in which you observed commentary about Mr. Milton's statements on the Reddit platform?

A.   That's right.  So these are examples where, again, investors are talking to each other.  They're chatting. They're having conversation with each other, and they bring in information that they get from Mr. Milton's posts and often on Twitter; sometimes it's podcasts.

Q.   OK.  Let's go to the next page.

So another Reddit post, right?

A.   Yeah, that's another Reddit post, that's correct.

Q.   Let's click through until we get to StockTwits.

A.   OK.

Q.   All right.  Again, we won't bother reading all these, but are these examples that you pulled together of similar type activity on StockTwits?

A.   Yes.  So these are examples from StockTwits, which is, you know, a popular platform.

Just want to call your attention, if I may, to one of the posts which I think is sort of -- you know, I thought it was kind of typical of a type of post where Mr. Milton had a lot of fans, you know, a lot of people.  You just kind of see the excitement about the technology.  You see the excitement about Mr. Milton.

So the one on the lower right corner says, "Check out

this interview from today.  Trevor is the man."  So -- but this is, you know, a lot of them are talking about, you know, his appearances or his statements, but especially earlier on there's a lot of excitement.

Q.  All right.  Why don't we look through the next few slides.  These are all examples of StockTwits, right?

A.  Yes.  So -- uh-huh.

Q.  Then let's go to page, exactly, 29.

A.  OK.

Q.  Professor, let me ask you, did you also observe instances of Trevor Milton's tweets being picked up on other places?

A.  I did, yes.

Q.  What are we looking at here?

A.  Yeah.  So, again, this is another thing that happened, which is -- you know, the previous example showed other users amplifying his activity on other platforms, and what we're seeing here is the media doing the same thing.  So these are all examples.  The Motley Fool is a website and a newsletter that is popular in the finance community, and they're word for word basically citing the Badger tweets.  And they say:  "Until Milton's tweets, most investors assumed the Badger was a someday product, not a someday soon product."

        And the same thing on the right.  You see examples of other newspapers that basically cited his online activity.

Q.  Yeah.  So let's look at the next page.  This is another

M9MHMil5                          Mazlin - Direct

example that you were referring to?

A.   Uh-huh, yeah.  So this is Barron's, which is this very kind

of like traditional financial publication, you know, and

they're talking about the tweet.  So it says:  "Nikola founder

Trevor Milton tweeted about the company's coming electric

pickup truck offering called Badger late Wednesday night."  So

this was big news.  It was big news for investors.

           MR. MUKASEY:  Objection.  Move to strike.

           THE COURT:  Sustained.

Q.   OK.  Let me ask you -- let's take this one down.

           So, big picture, I want to go back to the points you

made early on about the academic research.

           So, first, the first point was that there are online

financial communities that exist on the Internet.  Have you

seen that with respect to Nikola?

A.   Yeah, you definitely see that with respect to Nikola.  You

see a lot of activity.  And these are just the ones we looked

at.  You know, there are others.  You see a lot of activity on

StockTwits.  You see a lot of activity on Reddit.

Q.   The second point you mentioned to us from the academic

literature was that online financial communities affect

investors.  Have you seen that with respect to retail investors

interested in Nikola?

A.   So I think this analysis that I've done shows pretty

clearly -- you know, if you think back to the kind of

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

amplification slide and the -- you know, the time series where you look at the activity, that his activity on Twitter had an impact on the word of mouth.  So had an impact on the online, you know, conversations that retail investors had.

Q.  The third point was that news affects investor behavior.

Have you seen evidence of -- that Mr. Milton's Twitter activity or other public statements affected potential investors' activity?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  So, yeah, we also find examples of the press, you know, kind of retweeting or publishing his tweets, and we know from the literature that that has an effect on investors.

Q.  All right.  Now, bottom line, is -- well, sorry, let me actually say, is there evidence that, from the analyses you did, that Mr. Milton's tweets are influencing individuals on these investment forums?

MS. YOUNG:  Objection.

MR. MUKASEY:  Objection as to form.

THE COURT:  Sustained.

Q.  What was your conclusion based on your analyses of the effect of Mr. Milton on these online communities?

A.  So I just want to, again, tie it back to the literature.  So kind of to summarize, what I find is that his -- you know, his activity had an impact on buzz, generated buzz.  And we

know from the literature that buzz is very important.  So papers have shown that across fields -- in finance, in marketing, and economics.

And then, secondly, above and beyond just the buzz, which is regular -- regular people, the regular investors talking about it, it had -- you know, the press also amplified his activity.  And, again, we know from the literature that that has an effect on investors as well.

MR. ROOS:  No further questions.

THE COURT:  Cross-examination.

MR. CARUSO:  Your Honor, one moment, please.

THE COURT:  OK.

CROSS-EXAMINATION

BY MS. YOUNG:

Q.  Professor Mayzlin, you're a dean in marketing, correct?

A.  No.

Q.  In the management school of the University of Southern California?

A.  I'm the associate dean of the Ph.D. program.  That includes all the groups in the business school.  That includes finance, data sciences, operations management.  So I run the Ph.D. program for the entire business school.

Q.  And your Ph.D. is in marketing, correct?

A.  My Ph.D. is in marketing.

Q.  And your dissertation was on fake reviews, correct?

A.  I mean, that was one of the papers on the dissertation.  I also have -- so I have three papers.  Do you want me to go through them?

Q.  No.  The question was just whether your dissertation contained information on fake reviews.  Yes?

A.  That was one of the papers.  There was also a paper that showed the effect of online activity on basically TV ratings.

Q.  Professor, would you agree that not everything on the Internet is truthful?  There are fake reviews, correct?

A.  Absolutely, and I study that.  I have three papers on the subject.

Q.  And as a marketing expert, you would agree that it's normal for a company to advertise?

A.  It is normal.  I would say, just as a business expert, that it's normal for a company to advertise.

Q.  And as a marketing expert, you would agree that it's normal for a company to market events, correct?

A.  What kind of events?  Can you clarify?

Q.  It's normal for a company when it's hosting an event to market that event, correct?

A.  What kind of an event?

Q.  Are you telling me that it matters what type of event in order to market?

A.  I guess I'm just trying to answer the question.

Q.  OK.  Is it normal for a company to want to grow brand

recognition?

A.   Yes, it is.

Q.   And you're not an automotive industry expert?

A.   No, I'm not.

Q.   And you're not an electric vehicle expert?

A.   No, I'm not.

Q.   And you're not a hydrogen industry expert?

A.   Not at all.

Q.   And you're not a retail investor expert?

A.   Well, I would say that I'm very knowledgeable about retail investors.

Q.   Have you, in any of your 14 papers, written on retail investors specifically, yes or no?

A.   I have used examples from -- I have used -- I have used examples from retail investing, so I would say I actually have written on retail investors.

Q.   Why don't we look at some of the literature that you pointed to.

          If we could please pull up slide 1 of GX 1014.

A.   Sure.

Q.   So we see "Peer Pressure:  Social interaction and the Disposition Effect," and that's authored by Rawley Heimer, correct?

A.   That's right.

Q.   And then "The Rise of Reddit," that's authored by Danqi Hu,

M9MHMil5                          Mayzlin - Cross

Charles Jones, Valerie Zhang, Xiaoyan Zhang, correct?

A.    Yeah.

        THE COURT:  Ms. Young, you need to slow down your reading as well.

        MS. YOUNG:  Yes, your Honor.

Q.    How about Social Interactions?  That one's also authored by Rawley Heimer and another author, David Simon, correct?

A.    That's right.

Q.    And the same if we flip to page 2.

A.    What do you mean "the same"?  It's not the same authors.

Q.    No, but none of those authors are you, correct?

A.    So what I'm doing here is I'm citing literature that, you know, pertains to investment.  And so what I said was I've used examples from retail investors, but I didn't actually study it. I don't have --

Q.    So out of these nine articles cited in your presentation today, yes or no, you did not author any of them, correct?

A.    I actually cited more than just these nine articles.  I also talked about --

Q.    On pages 1, 2, and 3 we see nine articles.  You did not author any of them?

        MR. ROOS:  Your Honor, I don't mean to interrupt Ms. Young's cross-examination, but I think the witness was cut off from at least giving her answer.  So if we could just ask the witness be permitted to answer the question.

THE COURT:  Why don't we start on a clean question and answer.

Ms. Young.

Q.  For the nine articles cited on GX 1014 on pages 1, 2, and 3, you were not the author of any of them, correct?

A.  Let me clarify.  So I have slides with nine articles, but I also -- when I was talking, I referenced a bunch of my own articles, including some really seminal papers on the effect of online conversations on consumer decisions.  So the articles you're seeing in the slides, they're specifically chosen from the finance literature, but I've also referenced my own articles that made a big, big impact on the finance literature as well.

Q.  So, Professor Mayzlin, for articles on slides 1, 2, and 3, you did not author any of those articles, correct?

A.  That's correct.

Q.  OK.  You describe yourself as a word-of-mouth expert, correct?

A.  It's one of the qualifications.

Q.  And in your research as a word-of-mouth expert, prior to being retained for your testimony, you had not heard of Mr. Milton before, correct?

A.  Sorry.  Can you repeat the question.

Q.  Prior to being retained as an expert for this case, you had never heard of Mr. Milton before, correct?

A.   Correct, that's correct.

Q.   So he had not been someone that had been brought to your attention as a word-of-mouth expert before, right?

A.   I try to keep up with the news.  You know, there's a lot going on in 2020.  I have kids, you know, that I was also -- I have my research.  I have kids.  I can't keep up with all the stories, that's correct.

Q.   You testified that information spreads by word of mouth, yes?

A.   Yes.

Q.   And that with each passing, it can jump from platform to platform, correct?

A.   That's right.

Q.   And you would agree that there's the possibility for information to be distorted from one platform to another, correct?

A.   There is always a possibility that the information can be distorted, for sure, even on its own platform, on any platform.

Q.   And your research confirms that information spreads quickly, correct?

A.   My research, a lot of research, shows that information can spread quickly, yes.

Q.   Including information about Nikola Corporation, correct?

A.   I don't -- I'm not sure I understand your question.

Q.   Does your analysis show that information about Nikola

Corporation spread quickly across platforms?

A.   It shows that there was a lot of -- you know, a lot of spread of the information, I guess, relatively quickly, yeah.

Q.   I want to take a look at some of the literature that you have on slides 1, 2, and 3.  Let's start with the "Do Individual Investors Trade on Investment-Related Internet Postings."  And I want to confirm that that article focused on European markets, correct?

A.   That example was from Europe.

Q.   And then the causal relationship article between social media sentiment and stock return, experimental evidence, that analyzed the Chinese stock market, correct?

A.   That's right.

I just want to add that, you know, I think that's very, very common to look at platforms in different countries and to say, look, an investor's an investor.  And so, you know, just because it -- you would expect that if something happens in China, you know, investor behavior wouldn't be that different in the U.S.

MS. YOUNG:  Your Honor, I move to strike everything after correct.

MR. ROOS:  No.

THE COURT:  Sustained.

MR. ROOS:  Your Honor, can we have a sidebar?

THE COURT:  Ms. Mayzlin, just answer the question just

M9MHMil5                    Mayzlin - Cross

asked, OK?  If the government wants to bring out any additional information, they will on their redirect.  OK.

THE WITNESS:  OK.

BY MS. YOUNG:

Q.  The "Facebook Finance:  How Social Interaction Propagates Active Investing" article also analyzed a foreign exchange, correct?

A.  I believe it was a foreign exchange, but it's based in the U.S., yeah.  They're just trading in foreign currency.  Doesn't mean it's a foreign --

MS. YOUNG:  Your Honor, move to strike.

THE COURT:  Sustained.

Q.  You referenced a study that identified investors having, I guess, difficulty assessing filings being available from EDGAR, and I want to clarify your assessment of that study.

A.  So what I said --

Q.  If I may.

THE COURT:  Ask your question, Ms. Young.

Q.  Is it your understanding that the U.S. government doesn't provide filings that are for investors well because they post them on the Internet?

MR. ROOS:  Objection.  Vague.

THE COURT:  Sustained as to the form of the question.

Q.  Is it your assessment from that study that the U.S. government doesn't protect U.S. security investors because

M9MHMil5                          Mayzlin - Cross

information is posted on the Internet?

MR. ROOS:  Objection.  Same form objection.

THE COURT:  Sustained.

Q.  Did the study assess when SEC filings are on company websites?

A.  So what -- so just to clarify, what the study shows is that people choose -- sort of surprisingly, they don't see people downloading that information.  So, you know, like, a reasonable hypothesis would be that if that information is available because people are trading and people are so -- this is such important information, that database would get a lot of hits as soon as there was a filing.  And so all that the paper shows is that there just wasn't that many hits.  So that's all it shows.

Q.  So it shows there weren't many hits, not that it's too difficult to access SEC filings from EDGAR?

A.  That's correct.  It just shows that they weren't -- people didn't act.  You know, they were not seeking to get that information just from EDGAR, that's right.

Q.  You testified that consumer decisions are similar to investor decisions, yes?

A.  That's correct.

Q.  Surely you agree that investor decisions are riskier than most consumer decisions, correct?

A.  I don't agree with that at all.

Q.  Is it possible to lose your entire life savings with buying

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

a bag of potato chips?

A.   But it is possible --

MR. ROOS:  Objection.

THE COURT:  Sustained.  The objection is sustained.

Q.   Consumer product purchases have different risks than investor purchases, correct?

A.   It is possible to lose a lot of money if you make a bad decision buying a house, for example, or buying a very expensive car.

Q.   Do consumer product purchases have different risks than investor purchases, yes or no?

A.   It depends.

Q.   I want to direct your attention to a lot of the posts that you reviewed.

Isn't true you don't know if the post was made by a bot for any of the posts you looked at?

A.   It is absolutely true that I have no idea what the identity of the poster is, and that's true for anything you see on the Internet where there's not sort of a verified account.

Q.   So you don't know if it's a paid post, someone potentially paid to put the post there?

A.   So this is exactly what I study, which is this idea that, you know, online chatter is a mix of real content and a mix of, you know, biased, fake content, and still people make decisions based on this information.

Q.  So you have no real names of any post you reviewed, correct?

A.  That's correct.

Q.  And you have no real photos of the individual users, correct?

A.  That's what it means to be anonymous, yes.

Q.  Why don't we turn to some of those users.  If we could pull up GX 1014 at 24 and just zoom in on -- pick any one of those.

A.  That's right.

Q.  Schweppes24, so you don't know who Schweppes24 is, correct?

A.  It could be a man.  It could be a woman.  It could be a kid.  It could be anything.  It could be a Russian troll.  It could be anything.

Q.  And you don't know their educational background, correct?

A.  I don't know anything about them.

Q.  You don't know if they're drunk when they posted?

A.  It's an anonymous post.  That's what it means to be anonymous.

Q.  You don't know if that person ever invested in Nikola, correct?

A.  It's an anonymous post.  I don't have access to their trading activity.

Q.  And that would be true for LiveHotRod, Thadeus587, Chacha72, every post that's in your presentation, correct?

A.  That's the Internet.

Q.  Now, for purposes of your analysis, you counted all of them regardless of source, correct?  So regardless of knowing whether it's true or fake or robot or human or anything else, those were all counted as part of your methodology, correct?

          MR. ROOS:  Objection.  Misstates testimony.  She didn't testify about counting these.

          THE COURT:  Well, I'll sustain the objection as to the form of the question.  It's also compound.

Q.  Professor Mayzlin, you, as part of your analysis, counted posts, correct?

A.  So if I may, before I answer that, let me just give you -- yes, I did.  And the reason is that I have research that shows that online activity -- and other people have research -- makes a difference.  So when we look -- you know, when I research online activity, when I look at all those papers, that was the same case.  I didn't know who was there, and I just -- you know, we treat it as if it's real.  And that's -- it looks like it's a real -- we just sort of -- we know that some of it is real and some of it is not real, but the investors who listen to it are in the same position as us, right?  So they can't tell who is who, but we show that despite the fact that we don't know that, it still has an effect.

          MS. YOUNG:  Your Honor, I move to strike everything after "yes, I did."

          MR. ROOS:  I want to know what the basis is.

THE COURT:  The basis is that it was nonresponsive.

I'm going to not grant that request.  Ask another question, Ms. Young.

BY MS. YOUNG:

Q.  OK.  So you would agree that there are fake posts on Twitter, correct?

A.  Absolutely.

Q.  And you would agree that there are fake posts on Reddit, correct?

A.  Absolutely.

Q.  You would agree that there are fake posts on StockTwits, correct?

A.  Yes, there are.

Q.  And you would agree that you did not see a single post originated by Trevor Milton on Reddit, correct?

A.  So what I will agree is that --

THE COURT:  Dr. Mayzlin, there was a specific question that was asked.

A.  Can you repeat the question.  I'm sorry.

Q.  You would agree that you did not review a single post originated by Trevor Milton on StockTwits, correct?

A.  I don't know if Mr. Milton posted on StockTwits because all the posts are anonymous.  He might have, but I wouldn't know if he did.

Q.  You're aware of the disclaimer on StockTwits, yes?

A.  No, I'm not.

Q.  So your analysis didn't include clicking through disclosures or disclaimers on StockTwits?

A.  What do you mean?  My analysis did not include that.

Q.  Did your analysis include reviewing information available to users while they posted on StockTwits?

A.  I just look at posts on StockTwits.

Q.  Are you aware that StockTwits includes links to other information, like the SEC filings?

A.  You mean to say, just to clarify, that there are posts that include links to -- yes, yes, there are.

Q.  And are you aware that in Reddit there are links to additional information on the subpage at all times, not within a post, but at all times?

A.  I was not aware of that, no.

Q.  Did you visit the Nikola Reddit page?

A.  Oh, you mean the moderator posted the prospectus?  Is that what you're saying?

Q.  Did you visit the Reddit page to do your analysis, Ms. Mayzlin?

A.  Yes, I did.

Q.  So you saw links and resources for investors on the right side of the page, correct?

A.  That's right.  The moderator had links and resources, that's right.

Q.  And that included SEC-filed prospectus, yes?

A.  I think so.  You know, I don't remember exactly, but that would make sense.

Q.  And that included SEC-filed S-4, correct?

A.  I really don't remember, but if you're telling me it did, I believe you.

Q.  And it included language that any post or comment in this Reddit should not be construed as investment advice or guidance, correct?

A.  I don't remember seeing that.

Q.  And it included language that Reddit users and moderators are not investment professionals and do not have a financial duty to any other users, correct?

A.  Are we talking about terms of service or some kind of disclaimer somewhere on the page?  I guess I would say --

        THE COURT:  Dr. Mayzlin, you answered the question.

        Can you ask another question, Ms. Young.

Q.  Why don't we go to the methodology for your analysis.

A.  What do you mean?

Q.  You did not do an independent review.  The government directed you to certain tweets, correct?

A.  I wouldn't say that, no.

Q.  The government did not direct you to certain tweets and podcasts for purposes of your analysis?

A.  The government gave me access to the entire Twitter feed of

Mr. Milton and gave me access to the entire database of StockTwits.  So they didn't say "look at this one."

Q.  The government gave you a selection of podcasts, correct?

A.  The government gave me a selection of podcasts and TV appearances.

Q.  And the government gave you a selection of TV interviews, right?

A.  That's right.  So I got a data set of podcasts and TV interviews, that's right.

Q.  So you were never provided the universe of Trevor Milton's media appearances, correct?

A.  So what I got was -- oh, so you're saying there were some missing ones?

Q.  So you do not know if the selection you were provided was from 10 or 100 or 1,000 podcasts, correct?

A.  I got a sample of podcasts.  And even if you're saying that it's a small sample, it still had a big reach.  So even the stock sample, if that's true that there were some missing ones, they still had plenty of reach.

Q.  I want to direct your attention to your categorization of tweets.  You divided Trevor's tweets into two categories: Nikola-related and personal, correct?

A.  That's right.

Q.  And then you had a process by which you designated the tweets as either Nikola-related or personal, correct?

M9MHMil5                          Mayzlin - Cross

A.   That's right.

Q.   And out of the 2,510 tweets from Trevor's personal Twitter account from 2016 to 2020, you counted 448 original tweets, correct?

A.   That's incorrect.  So you're -- what you're referring --

          THE COURT:  I'm sorry, Dr. Mayzlin.  You answered the question.

Q.   You counted 448 times Trevor posted not in response to someone else, correct?

A.   That's right, not 2,500.

Q.   So out of the 2,500, you counted 448 posts that were not in response to someone, correct?

A.   That's incorrect.

Q.   If we could please pull up GX 1014 at page 9.

A.   So the starting number -- I'm sorry.  Go ahead.

Q.   The slide says that the number of original tweets is 448, correct?

A.   That's right.

Q.   And 384 of those tweets are categorized as Nikola tweets, correct?

A.   That's correct.

Q.   And isn't it true that you categorized the following as being a Nikola tweet:  "Sitting in a pizza restaurant right now listening to investors in the booth next to me talk about hydrogen/electric semi trucks and driverless hubs.  They have

no idea who I am, and that's great.  Tempted to say hi and answer their questions, but decided to just listen instead."

Q.   You categorize that as a Nikola tweet, correct?

A.   Yes, I did.

Q.   You also categorized a February 10, 2020, tweet as a Nikola tweet when it said "Creative," and then included a link to a meme of Mr. Milton looking like a "Game of Thrones" character, correct?

A.   That's correct.

Q.   So those were included in your counts of tweets related to Nikola, yes?

A.   Yes.

Q.   And then those tweets related to Nikola were used for your analysis of amplification, correct?

A.   I mean, it is possible that we can quibble about a few --

         THE COURT:  Dr. Mayzlin, is what she said correct --

         THE WITNESS:  Yes, correct.

         THE COURT:  -- in your mind or not?

         THE WITNESS:  That's correct.

         THE COURT:  And it's 2:40, ladies and gentlemen, so that brings us to the end of the day.  Please be careful getting home.  Have a wonderful evening.  Do not discuss the case, listen to anything about the case, or read anything about the case.

         (Jury excused)

(Jury not present)

THE COURT:  Everyone can be seated.

Dr. Mayzlin, you can step down.

THE WITNESS:  Thank you.

MR. ROOS:  You can come this way.

THE WITNESS:  OK.

THE COURT:  Anything to raise?

MR. MUKASEY:  Judge, I just want to renew a motion to strike that I'll identify in a letter later, but there was a question asked that -- by Ms. Young, and the response was, "Before I answer that question," and she carried on.  I'm going to renew the motion to strike there.  I'll get you the line and the transcript page.  I have no other comment.

THE COURT:  Very well.  I'm happy to reconsider.

MR. MUKASEY:  Thank you.

THE COURT:  The issue for me was how do we get through this in the most sort of practical way from the perspective of the jury.  Now, I will -- and you should tell the witness this -- I will continue to tell her when she has answered a question that you will have every opportunity to raise these issues on redirect examination.

But she was being a bit feisty, and we've got to get through this in the appropriate way.  She was being nonresponsive in the sense that she would answer the question and then explain, but that's not the way this is supposed to

M9MHMil5                          Mayzlin - Cross

work.

MR. ROOS:  Totally hear you, your Honor.

I'll tell you, from meeting with her in the past, I think this is more a product of an academic style than a deliberate attempt to be difficult, I'll just say, perhaps without really getting into it.  But totally hear you.

She's on cross, so I'm not sure it really makes sense for me to give her instructions, but we certainly have no problem with your Honor continuing to focus the questions.

MR. CARUSO:  I think that -- I think there should be an exception to that general rule.  I think the government should be directed to tell that witness to control herself.

MR. ROOS:  That's fine.  Listen, if they are fine with me saying something to her tomorrow morning like on cross-examination you need to answer the question and then -- and not continue to elaborate, I'm totally happy to do that. Whatever they're comfortable with.

MR. CARUSO:  I think that would be entirely appropriate.  That witness was out of control.

THE COURT:  I don't know if I would characterize it as out of control.  I've seen it in many other witnesses.

But to the extent that you can just tell her just answer the question, and then we'll follow up with whatever we believe we need to follow up with and leave it at that.

MR. ROOS:  OK.  I'll do that.

M9MHMil5                    Mayzlin – Cross

THE COURT:  Anything else?

MR. MUKASEY:  No.  I understand we have Mr. Brady next and Mr. Jhaveri after that.

MR. PODOLSKY:  Probably the order will be the reverse. Mr. Jhaveri is another retail investor, and he only is available tomorrow.  So we'll probably put him on so that he can get him off and followed by Mr. Brady.

THE COURT:  Very well.

MR. MUKASEY:  Thank you.

THE COURT:  See you folks tomorrow.  Have a good night.

(Adjourned to September 23, 2022, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

SCOTT DAMMAN

Direct By Mr. Roos . . . . . . . . . . . . . . .1479

Cross By Ms. Young . . . . . . . . . . . . . .1515

Redirect By Mr. Roos . . . . . . . . . . . . .1528

 JOSEPH RYAN

Direct By Ms. Estes . . . . . . . . . . . . . .1534

Cross By Mr. Mukasey . . . . . . . . . . . . .1561

Redirect By Ms. Estes . . . . . . . . . . . .1587

Recross By Mr. Mukasey . . . . . . . . . . . .1593

 DINA MAYZLIN

Direct By Mr. Roos . . . . . . . . . . . . . .1598

Cross By Ms. Young . . . . . . . . . . . . . .1648

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 1231    . . . . . . . . . . . . . . . . . . .1484

 1115    . . . . . . . . . . . . . . . . . . .1486

 404, 404-A, and 404-T   . . . . . . . . . . .1497

 557   . . . . . . . . . . . . . . . . . . . .1503

 558   . . . . . . . . . . . . . . . . . . . .1505

 559   . . . . . . . . . . . . . . . . . . . .1506

 429, 429-A, 429-T   . . . . . . . . . . . . .1507

 430, 430-A, 430-B, 430-C, 430-D, 430-E, . . .1509
          430-T

431, 431-A, 431-B, 431-T . . . . . . . . . .1512

508    . . . . . . . . . . . . . . . . . . .1530

519    . . . . . . . . . . . . . . . . . . .1531

1116    . . . . . . . . . . . . . . . . . . .1542

1014    . . . . . . . . . . . . . . . . . . .1608

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300