M9NCmil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          21 CR 478 (ER)

TREVOR MILTON,

                Defendant.

------------------------------x

                                    New York, N.Y.

                                    September 23, 2022
                                    9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                    District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  It's 9:00 a.m.  I received the defense submission from last night.  Who's going to argue over that?  Mr. Bondi.

MR. BONDI:  Good morning, your Honor.  First of all, we apologize for the late-night/early-morning letter.  In your words, we left something under the tree here, but the reason for it is the urgency because the government left something before the jury that shouldn't be there, and that's professor Mayzlin's testimony.  We filed a *Daubert* motion previously, your Honor, we renew that motion, we also renew our motion to exclude her and to strike her testimony.

Your Honor, her testimony fails about every aspect of *Daubert*.  First of all, your Honor, it fails the relevance fit test of *Daubert*.  It focuses on the consumer and the applicable legal standard is that of the reasonable investor.  We're not quite sure why we're talking about consumers and stuff, but to add insult to injury, your Honor, it's not just consumers, it's anonymous consumers that may not even be real people.  They could be bots, they could be short sellers, they could be people posing as people, they could be kids.  Professor Mayzlin testified about social media posts about anonymous purported consumers may or may not be real people, may or may not be investors, may or may not have been paid for their posts, may or may not be conveying information that the poster believes in

good faith to be true.  Her testimony, in essence, links the missing critical link, which the Second Circuit in *United States v. Zafar* says is requisite here, the missing critical link.

Moreover, your Honor, there's no evidence connecting professor Mayzlin's opinions on consumer behavior with the mainstream thinking of investors in the relevant market, that is the NASDAQ market.

There is also, your Honor, no nexus between these purported anonymous alleged consumers and investors.  Professor Mayzlin cannot know and has not testified that these consumers are, indeed, investors in the relevant market, much less any nexus between their supposed viewpoint, all anonymous, of course, and that of mainstream thinking in the market.  As professor Mayzlin conceded, that's the internet.

As to a second prong of *Daubert*, your Honor, and that is the reliability prong, it also fails the reliability threshold.  First, professor Mayzlin's methodology lacks any objective basis.  She testified that she focused on original Tweets, which she characterized as related to Nikola and not related to Nikola, but this is entirely subjective and we've heard that she includes a Tweet about Mr. Milton being in a pizza parlor and a meme from the Game of Thrones.  What's next, a Tweet about the weather?  There is no discernible, much less objective criteria for which professor Mayzlin made these

categorical decisions on how to classify these Tweets.

The second point on reliability, your Honor, is professor Mayzlin testified only, only to correlation, not causation, but she tries to sneak in causation a few times, though. As a threshold matter, correlation is a lay matter and is not capable of expert testimony, should not be the matter of the expert testimony, and that's *United States v. Mulder* from the Second Circuit. Here, professor Mayzlin has not demonstrated that Mr. Milton's Tweets caused anything, caused any behavior in the investing market or anything. She says, and I thought this was telling, she simply pointed out that quote, you know, they seem to be related to each other, so when, you know, when Mr. Milton's activity is spiking, you know, you see spikes on the other platforms, as well. Okay.

THE COURT: Can I ask you a question about that, Mr. Bondi.

MR. BONDI: Please.

THE COURT: Do you think she should testify about causation or she should not testify about causation?

MR. BONDI: She cannot testify about causation.

THE COURT: She cannot testify about causation.

MR. BONDI: She does not have the ability to testify about causation based on what she's done and she's merely trying to testify based on correlation, which is improper for expert testimony here. What she's saying is she's saying,

well, you know — and I'm paraphrasing — if there is activity here by Mr. Milton, there happens to be activity here on these other social media platforms here.  Okay, but we don't know if that was independently caused, we don't know if there was other news about the company or exciting information that caused it. She's basically saying, look, this happens here and this happens here.  It's sort of like saying, your Honor, when I wear my little goldfish tie that Mr. Mukasey bought me, it's a sunny day outside.  It's just correlation, not causation.

The other point, your Honor, is a particular concern, is professor Mayzlin's attempt to make the causation argument, even though she couldn't testify about anything more than, at best, some correlation.  She says, his activity on Twitter had an impact on the word of mouth.  So that had an impact on the online, you know, conversations that retail investors had. Zero basis for this, zero basis for that testimony.

The final point, your Honor, which I think is equally troubling here, is that she doesn't meet the basic standards of Rule 703.  Here, professor Mayzlin has failed to establish that the academic literature upon which she relies for much of her testimony here -- by the way, I note that on those pages that Ms. Young pointed out, they're all written by other people. She's basically trying to be a mouthpiece for this academic literature, but she hasn't established that this academic literature bears any relationship on the case.  None of the

papers concern the stock market in the United States and there's no basis upon which to conclude, for example, that the behavior in investors in the Chinese market, which was one of the papers, where social media is strictly controlled by the state is relevant to the behavior of investors and the NASDAQ market in the United States. And she's merely conveyed to the jury what these academic pieces of literature say. That's not the proper form for expert testimony.

THE COURT: Are you saying that she should not rely on the academic papers in the field?

MR. BONDI: An expert can rely, your Honor, on academic literature in the field. However, an expert cannot merely be a mouthpiece for papers that other people have written, other people who are not on the witness stand here that have no bearing to this case.

Let me give you a great quote from the transcript. She says, at page 1642, lines 5 through 8, there is kind of a lot of literature on that, you know, just how hard it is for normal people, and that includes me, actually to understand these complicated documents.

Referring to SEC filings and investor documents, there's no connection here between this literature and the case, and any attempt to try to connect it falls flat.

So, your Honor, we're at a juncture here that we think is quite serious, and that is we have what we think to be

entirely unconnected testimony from a purported tendered expert, doesn't fit the case, isn't relevant to the case, and isn't reliable now before the jury.  The only move right now would be to exclude her testimony, strike it, and instruct the jury to disregard it.

THE COURT:  Thank you.  Mr. Roos.

MR. ROOS:  Thank you, your Honor.  I want to make three high-level points for starters, and then I'm going to address the argument.

First high-level point.  Many of these arguments were advanced in the original *Daubert* motion or in the subsequent objections to the defense slides and were rejected by your Honor.  So the arguments related to her qualifications to testify on investors because she has a background in consumer issues, the objections to the slides, which included some of the slides we're talking about now, your Honor rejected those arguments.  There is not a new basis to reconsider them.

The second is a waiver point, which is that many of these things, including the academic literature slides, were before the defense.  We discussed various slides, these were not ones they objected to, there is a basis for them in the 3500, so it's waiver.

Third is that all these arguments really just go to weight, not admissibility of the expert's testimony.

Let me go through now the defense arguments.

The first is the relevance point.  High level, the expert's been qualified to testify about the effect of social media, the defendant's social media activities on people on the internet, potential investors.  She hasn't been qualified necessarily for any other purpose.  The government is not advancing her for any other purpose.  So nothing they've said about these arguments about the retail market, who's a mainstream investor, are necessarily a reason that she's been advanced.  Her testimony is plainly relevant because Mr. Mukasey opened on the idea that Tweets, podcasts don't affect people, those aren't filings.  It educates the jury, they can learn about the reach of the defendant's postings.

So the plain relevant basis.  In terms of the defense arguments, the first is that it's irrelevant because she focuses on consumers, not on the reasonable investor.  This is an argument your Honor rejected previously at the *Daubert* stage.  Besides that, she did testify about how one of her early responses in the Q&A is that investors are a form of consumer, they behave like consumers in other product areas, they consume stock and, therefore, the literature supports that.  If defense disagrees, they can cross examine her on that point, but it's not a basis to preclude her.

These arguments about *Litvak*, which are really just the versions of the argument advanced yesterday against the retail investor aren't applicable here.  *Litvak* went to

preclude a point what the Court called an irrelevant point of view testimony because the particular purchaser there, the counter-party basically had an irrational viewpoint, he had a view that was not consistent with the law or the facts.  Here, this is something totally different.  Now, maybe they're citing *Litvak* just for the general proposition that in assessing materiality, you have to look at the reasonable investor within the particular market.

I will note that the Court doesn't need to decide this now.  The defense keeps saying it's the NASDAQ market.  I'm actually not sure there is any facts in the case that support that definition of the market.  All the evidence indicates that the defendant was targeting retail investors, so there is actually no factual predicate at this point to say it also includes people like institutional investors, private investors, et cetera.  The Court doesn't need to reach that now.  I just want to put a marker down that that's going to be an issue.

The second issue they said was unreliable.  The defense brief cites to the cross examination on two Tweets. I'd note that the defense on cross examination didn't ask any followup questions about why she categorized those two Tweets for the reasons she did.  She seemed, based on the way she answered the question, to have a reason for it.  So this is certainly not a basis to preclude it.  And I don't know, just

anecdotally, that 448 tweets is what she analyzed.  They have issues with her categorization of two, didn't ask for why she categorized them.  But let's say she was wrong about how she categorized them, two out of 448 is .4 percent, which is not really a basis to preclude an expert.  Rather, that's a basis if they want to argue to the jury, she got two of the 448 Tweets wrong, maybe that's a reason the jury should discount her, certainly not a reason to preclude her.

The correlation versus causation point.  Frankly, I think this argument is incoherent.  There is no case that I've seen, and certainly none of the ones in the defense brief that say correlation necessarily is only a matter for a jury and not something an expert could opine on.

Also, frankly, I think probably something, an argument that the defense doesn't want to make given their anticipated calling of an expert, who I think is going to testify about correlation coefficients in the context of event studies, professor Mayzlin not only used the naked eye test, which they quoted, but also looked at the correlation coefficients of the movement of those lines on what I called the EKG slide.

And certainly, the cases cited by the defense, the one Mr. Bondi called out is actually just a general case about matters that are appropriate for a fact finder and not the subject of expert testimony should not be for an expert.  The other case they cite is this Libow civil case.  In that case,

the expert tried to advance correlation evidence for the purpose of proving causation and the Court said you can have your correlation, but you can't use it to prove causation. She's not arguing there is any sort of causation here.

The final point, this is a 703 point, this one I also think is a fairly misleading argument.  They argue that because she put up slides written by other people, academic literature that says that investors in other markets, like foreign markets, behave in a certain way, that that necessarily is not like an acceptable form of expert testimony.

There are two issues with this.  The first is that she was being cross examined about this.  She was asked yes or no, is it true, these are foreign-market participants, she said yes, gave an answer afterwards, they immediately moved to strike.  The answer afterwards, by the way, was, but those investors behave the same way as American investors and the literature supports that.  So they can't have their cake and eat it, too, on this argument.  And I also think, this is, again, an issue of weight, not necessarily admissibility of expert testimony.

For those reasons, it's plainly before the jury. Their motion was to preclude, was to strike her prior testimony, there is no basis for that.  They haven't meet the legal foundation for that.  Their second part of the motion was to preclude further testimony.  It's their cross, so they can

M9NCmil1

decide whether they want to keep crossing her or not.

THE COURT:  I'll give you two minutes, Mr. Bondi, if you wish to respond.

MR. BONDI:  I'll be brief, your Honor.  This is an expert, obviously, who's called by the government in a federal criminal case, and the seriousness of this cannot be underscored.  They are presenting testimony here that the Court, as the gatekeeper, properly should exclude here.  It is not about the weight here.  The calculation is very different in these circumstances for experts called by the prosecution in a criminal case that just does not fit here, the case.

I want to briefly address one point.  We disagree, obviously, with the prosecution that this case is not about the retail investor, but the reasonable investor, that's the legal standard.  But even if it were, for sake of argument, about the retail investor, there's been no testimony or connection between anything professor Mayzlin said and the retail investor here.  It is about Tweets, buzz, social media activity, there is no link there.  She has not established it.

The final point I would just say, your Honor, is it is perfectly permissible for you to now reconsider this.  We now have testimony here.  We now know exactly here the points that we were concerned about and, quite frankly, we're even more concerned, far more concerned after hearing this testimony.  It doesn't belong in front of the jury, your Honor, and we move to

exclude her, to strike, and to instruct the jury.

Thank you.

THE COURT:  Thank you.  So the motion is denied.

I want to just take a step back and sort of consider what I have seen over the course of the trial.  Over the course of the trial, certainly, there has been a large emphasis, at least by the government, on Mr. Milton's desire through the various witnesses' testimony to get to the story of Nikola out to the investing public through aggressive social media presence.  There's also been testimony about Mr. Milton's desire to specifically target retail investors because, at least for, among other reasons, they serve as a hedge against short sellers, and there has been a lot of Mr. Milton's social media postings introduced.  That goes out onto the internet, and that is a real thing.

The question for me is, is that an appropriate subject for testimony before the jury, how the internet, in particular, affects consumer behave.  Let me say I think there is the false dichotomy between an investor and a consumer.  An investor is a consumer of financial products, and much of the literature that Dr. Mayzlin testified about concerns the financial markets.  So it is an appropriate subject to put before the jury, I think it is an appropriate subject for expert testimony, and she clearly is qualified as an expert in the effects of social media on consumers.  I don't think there can be any doubt about that.

The testimony that she gave included her reliance on certain papers. I think part of what I am required to consider is whether the particular person proffered as an expert is in line or knows about the literature on the subject, and that is what we do here all the time. That's garden variety — well, he's an expert or she's an expert because they're well versed in the literature and also because they are cited in the literature and are accepted as an expert. So I believe that there is no question but that she is qualified to testify on issues that are really at the center of this case, I believe.

And I agree with Mr. Bondi that, certainly, I am entitled to reconsider and can reconsider at any time, that's what motions *in limine* are, and I believe I agree with the unspoken criticism that perhaps Dr. Mayzlin's presentation is not what we would want, which is why I asked the government to direct her to answer the precise question that's put to her and not continue because that's the way we do things around here. When you're on cross examination, even when you're an expert, you don't have free rein to lecture, and I think that was a lot of the problem that we encountered yesterday. I don't think she was being malicious in any way, she just sort of made an assumption about what the question was getting at and attempted to answer the implicit criticism in a way that's really only appropriate for redirect examination.

Concerning the methodology, her acknowledgement that

some of the Tweets and posts, et cetera, are bots, they're anonymous, there could be people who are getting paid, and her response, that that's the internet, was likely an appropriate response.  I think we all realize or we all, at a lay perspective, understand that what happens on the internet can consist of a lot of that stuff.  She said to that, as I recall — I'm not going to quote her directly, I don't have the transcript — but we understand that and we account for that, but it's still true that the results that we get can be proven to be accurate, notwithstanding all of those other things, which is, by the way, why I don't look at, when you go to a restaurant and they give four stars or three stars, I never listen to any of that, but that doesn't mean that there is not a real market that affects real people on the internet.  So, for all those reasons, the motion is denied.

Anything else to raise?

MR. ROOS:  Two issues for the government.  I'm actually going to step out because I want to talk to Dr. Mayzlin about the point we discussed yesterday and your Honor just flagged.  She was gone after we left court, but my colleague is going to handle them.

THE COURT:  Very well.  Be ready by 9:30, by the way, Mr. Roos.

MR. ROOS:  I'm just going to tell her to say yes or no to answers.

THE COURT:  Yes.

MR. PODOLSKY:  One is very brief.  We do continue to get overnight Rule 16 material from the defense, it's well past the deadline.  We understand this happens, but we are going to ask them to really be producing what they're going to use next week by the end of this weekend.  So I just want to raise that this continues to be an issue.

THE COURT:  Have you told them who your witnesses are for next week?

MR. PODOLSKY:  I believe they know because we've given them the rest of our list, but we'll make sure to be clear.  And that actually raises the second issue, which is just a scheduling one.

We had an expectation yesterday of calling a retail investor today.  We're not going to do that today.  As it turns out, that person is not going to testify, so we're going to go straight from professor Mayzlin to Mr. Brady, Kim Brady.  We expect that we'll take the rest of the day, but we had a discussion with defense counsel last night that if it ends up being faster than expected on cross, the parties agree that the next witness, who is Mr. Hicks, it doesn't make sense to start him today in a brief period, so we would ask to begin him on Wednesday.  And we provided an assurance on that.  I know your Honor was skeptical of me last time I said this, but as we sort of understood the defense's case here, we've been able to edit

M9NCmil1

down our witness list and we're on schedule to rest next week.

THE COURT:  Anything over there?

MR. BONDI:  Briefly, your Honor.  Actually, Mr. Podolsky's points raise a housekeeping matter.  With the religious holidays coming up here, we have several observant members and we ask to make things as smooth as possible, that the government not only disclose the witnesses for the short week of Wednesday through Friday, but also the order, that way we can make this as smooth as possible.  We've asked for that, we would ask that they disclose it today before people start observing the Sabbath tomorrow and then the holiday on Monday and Tuesday.  Thank you.

MR. PODOLSKY:  There is a very small number of remaining witnesses.  We'll tell them our expectation.  I think it's already been made clear, but we'll certainly tell them today.

THE COURT:  Very well.  So we'll be ready to start in two minutes.

(Continued on next page)

(Jury present)

THE COURT:  Everyone, please be seated.  Ladies and gentlemen of the jury, happy Friday.  We will now continue with the cross examination of Dr. Mayzlin.

Dr. Mayzlin, you are reminded that you are still under oath.

THE WITNESS:  Okay.  Thank you.

DINA MAYZLIN, resumed.

CROSS-EXAMINATION CONTINUED

BY MS. YOUNG:

Q.  Good morning, Dr. Mayzlin.

A.  Good morning.

MS. YOUNG:  Chris, if you could please go to GX-1014 at 16 so we could pick up where we left off yesterday.

Q.  Dr. Mayzlin, yes or no, you counted a Tweet with the word "creative" and a picture of Trevor as a Game of Thrones character as a Milton's Nikola relevant Tweets?

A.  Yes.

MS. YOUNG:  And as a demonstrative to the jury, Chris, could you please pull that image up.

Q.  And that Tweet was dated February 10th, 2020; correct?

A.  That's right.

MS. YOUNG:  Chris, could we please go back to 1014 at page 16.

Q.  And professor Mayzlin, that February 10th, 2020 Tweet is

one of the 384 in the slide; correct?

A.   Correct.

Q.   And if that Tweet had Retweets, then those Retweets were counted in the 26,995; correct?

A.   Correct.

Q.   And if that February 10th, 2020 Tweet was favorited, those favorites were counted in the 227,578; correct?

A.   Correct.

Q.   So what Tweets were selected for the 384 impacted your count of the Retweets, yes?

A.   Yes.

Q.   And your count of the favorites; yes?

A.   Yes.

Q.   Isn't it a fact that the Tweets you categorized as Milton's Nikola Relevant Tweets, the 384, are not limited to Tweets that are alleged to be part of the wire fraud or securities fraud counts in this case?

          MR. ROOS:   Objection.

          THE COURT:   Overruled.

A.   I'm actually not sure at all because I don't know which -- I don't have enough information to answer that.

Q.   You selected the Tweets for the Milton Nikola Relevant Tweets; correct?

A.   Correct.

Q.   By the way, yesterday, you testified that you have no idea

what the identity of a poster is, and that's true for anything you see on the internet where there's not a verified account; correct?

A.   Correct.

Q.   And isn't it true that Twitter puts a white checkmark next to user profiles if the user has a verified status; correct?

A.   Correct.

          MS. YOUNG:  Chris, could we please go to GX-1014 at 7.

Q.   Professor Mayzlin, there's no indication from Twitter that @NikolaTrevor was a verified account; correct?

          MR. ROOS:  Objection.  May we have a sidebar?

          THE COURT:  Yes.

          (Continued on next page)

(At the sidebar)

MR. ROOS:  I think your Honor asked if there was a stipulation as to authenticity.  There was a stipulation as to authenticity, there was a stipulation that this account was, in fact, Trevor Milton's.  The cross examination is going to mislead the jury to believe that this is some sort of fake Trevor Milton account.  First of all, that's improper.  Second of all, we need to know what the good-faith basis is for the line of cross.

MS. YOUNG:  The line of cross was designed to go towards being an influencer because she went to say that certain verified accounts are of influencers, other accounts she doesn't know, and I was going to discuss the meaning of the word "influencer."

MR. ROOS:  Her testimony on "influencer" had to do with the number of followers, not with regard to the blue checkmark.  The question that was just asked on cross was whether the blue checkmark has to do with whether a person's verified, not their status.  You can be verified and not have a million followers.

THE COURT:  I am concerned that the jury not be given a counterfactual, a thought that this is not a Trevor Milton's account.

I assume that that's not what you're going to argue.

MS. YOUNG:  No, your Honor.

M9NCmil1                    Mayzlin - Cross

THE COURT:  So move quickly to the point that you want to make.

MS. YOUNG:  Yes, your Honor.

(Continued on next page)

(In open court)

BY MS. YOUNG:

Q.  So no checkmark on this account; correct?

A.  Correct.

          MS. YOUNG:  Chris, if we could go back to GX-1014 at 16.

Q.  For any Twitter account associated with the Retweets of Milton's Relevant Nikola Tweets, you do not know if the user was an investor; correct?

A.  Correct.

Q.  You do not know if the Retweet is from a competitor; correct?

A.  Correct.

Q.  You do not know if the Retweet is a short seller; correct?

A.  Correct.

Q.  You do not know if the Retweet is a Nikola employee; correct?

A.  Correct.

Q.  You do not know if the Retweet is Nikola's company account; correct?

A.  Correct.

Q.  You do not know if the Retweet is from someone who was paid to Retweet it; correct?

A.  Correct.

Q.  And you do not know if the Retweet is from a bot; correct?

A.  Correct.

Q.  And if I were to ask all of those questions again for the favorites, all would be true; correct?

A.  Correct.

Q.  And just for a moment on the Retweets being potentially or could be a bot; correct?

A.  Could be.

Q.  And for the jury, a bot is an automated user account; correct?

A.  Correct.

Q.  And you do not know how many bots post on Twitter relating to Milton's Relevant Nikola Tweets; right?

A.  That's right.

Q.  And you do not know how many bots post to the Nikola Reddit page; correct?

A.  Correct.

Q.  And you did no analysis of how many bots posted to the Nikola StockTwits page; correct?

A.  Correct, I can't observe that information.

MS. YOUNG:  Chris, if we could go to GX-1014 at 18.

Q.  Professor Mayzlin, this analysis does not include any company statements; correct?

MR. ROOS:  Objection.  Vague.

THE COURT:  Yes.  Rephrase, Ms. Young.

Q.  Professor Mayzlin, this slide takes into account Milton's

Tweets, that's the bottom row; correct?

A.   Correct.

Q.   And then the gray line are Reddit posts; correct?

A.   Correct.

Q.   And then the orange line are StockTwits posts; correct?

A.   Correct.

Q.   And at the top, it's titled Relationship Between Milton's Twitter Activity and Activity Related to Nikola on Reddit and StockTwits; correct?

A.   Correct.

Q.   And that relationship is a correlation, not a causation relationship; correct?

A.   So can I clarify that?

Q.   Is it a correlation relationship?

A.   It depends.

Q.   Do you know for sure that it is a causation relationship, yes or no?

         THE COURT:  Can you answer that question yes or no, Dr. Mayzlin?

         THE WITNESS:  No.

         MR. ROOS:  Just for the record, to be clear, it's not clear from the question whether she's saying she can answer the question or whether her answer is no to the question.

         THE COURT:  Now I'm completely confused.

         MR. ROOS:  Your Honor, the question had a yes or no

M9NCmil1                        Mayzlin - Cross

potential answer, you then asked her whether she could answer the question.  I'm not sure it's clear whether her answer of no was I can't answer the question or the answer to the question is no.  It's sort of like a who's on first type of situation.

THE COURT:  Dr. Mayzlin, you when you said no, were you answering my question or Ms. Young's question?

THE WITNESS:  I was a little confused, so I can't -- I can answer -- it depends.  There is some -- I think a lot of it is correlational, but I think there is one date where I feel very comfortable making causal claim, the early date.

Q.  Why don't we look at some of these dates.  Just to be clear, overall, the relationship -- and this title is a correlation relationship that you were referring to; correct?

A.  No.

Q.  But you are not capable of confirming a causal relationship for, say, August 4th?

A.  Not for August 4th.

Q.  And on August 4th, does this take into account the company earnings call that occurred on August 4th, yes or no?

MR. ROOS:  Objection.  States a fact that's not in evidence.

THE COURT:  Overruled.

A.  Sorry.  What was the question?

Q.  Does this slide take into account the company earnings call that occurred on August 4th, yes or no?

A.   I think in the instance of, yes, August 4th was the earnings call.  I think in this instance, it was the earnings call that caused the spike.

Q.   Because Reddit posts related to the earnings call, yes?

A.   That's what I would assume.

Q.   And StockTwits posts related to the earnings call, yes?

A.   That seems very reasonable, yes.

Q.   And on July 17th, are you aware that the company filed a prospectus?

A.   No, I wasn't aware the company filed a prospectus.

Q.   You're not aware?

A.   Yeah.

Q.   Okay.  And on June 29th, were you aware that the company posted press releases?

A.   I was not aware of that.

        MS. YOUNG:  Chris, if we could please go to page 12 of GX-1014.

Q.   Professor Mayzlin, your source for this slide is from listennotes.com; correct?

A.   Correct.

Q.   Did you contact anyone at listennotes.com for this data?

A.   No, I didn't.  It was just public information.

Q.   Did you verify the public information on listennotes.com in any way?

A.   No.

Q.  And isn't it true that this slide does not actually relate to any episode in the far-left column, correct, any single episode?

A.  This slide very much relates to the episodes.  They list the episodes.

Q.  So the entire episode for Nikola Founder for This Week in Startups was ranked?

A.  Oh, you're referring to the rank, just to clarify, or are you referring to the whole slide?

Q.  Well, the slide lists an episode, but the rank is not specific to that episode; correct?

A.  Correct.

Q.  So then Plugging in With Nikola CEO Trevor Milton for the TruckShow podcast, that individual episode does not have that ranking; correct?

A.  The data -- that's correct.  And just to add, if we had data for the episode, I would have gotten it, but this is the best data I was able to get.

Q.  So would it have been more accurate to remove the far left-hand column of this slide and removed the date column of this slide and simply had a list of podcasts and a list of rankings?

A.  I don't agree with that.

Q.  For interview of Nikola Motors CEO Trevor Milton of the podcast TeslaDaily, which is dated June 3rd, 2020, that ranking

is not specific to that episode; correct?

A.   The ranking, that's correct, the ranking is for the podcast on average.

Q.   Dr. Mayzlin, did you listen to these podcasts?

A.   No, I did not.

Q.   And are you aware that listennotes.com ranks nearly 3 million podcasts; correct?

A.   I wasn't aware of the total number, but I'm not surprised.

        MS. YOUNG:   Chris, if we could please move on to slide 13.

Q.   So this source for this slide is from Showbuzz Daily; correct?

A.   That's correct.

Q.   Did you contact anyone from Showbuzz Daily to verify the data?

A.   No, I did not.

Q.   Are you aware if the number of viewers is for the entire program or part of the program?

A.   So the data, the viewers is for that segment.  So I think it's the half hour for that time.  So when the interview aired on that time, this is where the data is from.

Q.   Are you aware that Mr. Milton did not speak during the entire program?

A.   I wasn't aware, but it makes sense.

Q.   Did you watch these TV episodes?

A.   I did not.

Q.   So it's possible that the viewer count includes someone who did not see Trevor Milton while he was speaking on, say, CNN Newsroom?

A.   Yes, that's always possible.

Q.   And isn't it true that you don't know if a single viewer is an investor?

A.   That's right, I don't know.

Q.   Isn't it true you don't know if the person was even in the room while it was on their TV; correct?

A.   Yes, that's correct.

          MS. YOUNG:   Chris, we can take that one down.

Q.   Briefly turn back to the influencer concept that you testified to, I believe you used the term macro influencer; correct?

A.   That's right.

Q.   And that's a term that you labeled Trevor Milton; correct?

A.   I found this term and something on a website called influencer hub, it comes from there.

Q.   Isn't it true that there are pets that could be labeled influencers; correct?

A.   I don't think that's correct.

Q.   Are there Twitter accounts associated with pets?

A.   I think there are Twitter accounts associated with pets, but nobody would consider a pet to be an influencer.

Q.  Would certain accounts have broad reach that are associated with nonhumans; correct?

A.  I am really not sure.

Q.  Now, you recognize that there's a lot of information out there on social media and other platforms; right?

A.  Yes, I do.

Q.  And isn't it true that your research shows that if there's enough real information, then information on average is truthful, yes?

A.  So that depends.  It's a little bit more complicated than that.

Q.  Is it your view that misinformation adds noise to the information posted on networks, but does not completely destroy the usefulness of the information?

            MR. ROOS:  Objection.  Compound.

            THE COURT:  Overruled.

A.  Under some circumstances, yes.

Q.  In other words, does truthful information on the internet get erased by a misstatement, yes or no?

            MR. ROOS:  Objection.

            THE COURT:  Overruled.

A.  Can you repeat the question.

Q.  In other words, does truthful information on the internet get erased by a misstatement, yes or no?

A.  I'm not sure how to answer that question.  I don't think

that's exactly right.

Q.   If there is truthful information out there and then fake news that you've said exists on the internet, my understanding is that -- strike that.

MR. ROOS:  Objection.

Q.   If there is truthful information and then fake information on the internet, your research shows that there's still a value to the overall information; correct?

A.   My research shows that on average, there is value, but there could be instances where consumers are misled.

Q.   And if those consumers are misled, that's based on a subjective response to the information; correct?

A.   I'm not sure what that means.  I'm not sure what that question means.

Q.   Well, each individual consumer can respond differently to that information that's out on the internet; correct?

A.   Why would they respond differently?  I'm not sure how to answer that.

Q.   Does every consumer respond the same way to information that's out on the internet?

A.   No.

Q.   Professor Mayzlin, you were aware that the SEC requires companies, by law, to publicly file information on the internet; correct?

MR. ROOS:  Objection.  Scope.

THE COURT:  Sustained as to the form of the question.

Q.  Professor Mayzlin, you are aware that Nikola Motor company posted SEC filings to EDGAR; correct?

A.  Actually, I was not aware of that.

Q.  You're aware that public companies are required to file with EDGAR; correct?

MR. ROOS:  Objection.  Scope.

THE COURT:  Overruled.

A.  I wasn't aware of that.  I knew they had to -- yeah, I wasn't.

Q.  Professor Mayzlin, you don't know if a single Tweet affected a single purchase of Nikola stock; correct?

A.  I know, based on my research, that if that were the case, that no -- this had no effect.  I would be shocked if that were -- that would be very shocking.

Q.  Professor Mayzlin, it's a simple yes or no question.  Do you know if a single Tweet that you counted impacted a single purchase of Nikola stock, yes or no?

A.  No, I don't know that.

Q.  And you don't know if a single post on Reddit impacted a single purchase of Nikola stock, yes or no?

A.  I guess I would say that I'm not sure.

Q.  And by not sure, you mean no, you don't know?

A.  I don't know.

Q.  And you don't know if a single post on StockTwits impacted

a single purchase of Nikola stock, yes or no?

A.   I don't know with certainty, but I know with high probability that they had an impact.

Q.   The question wasn't impact, the question was do you know if a single StockTwits post resulted in a single purchase of Nikola stock?

MR. ROOS:  Objection.  The prior question did include whether it had impact.

THE COURT:  Sustained.

Q.   Professor Mayzlin, you were given podcasts by the government; correct?

A.   Correct.

Q.   You did not review those podcasts; correct?

A.   I did not focus on the podcasts, correct.

Q.   You were given TV clips by the government; correct?

A.   Correct.

Q.   You did not view those TV clips?

A.   I did not.

Q.   You were directed to Robinhood data; correct?

A.   No, that's not correct.

Q.   You reviewed Robinhood data for purposes of your engagement with the government; correct?

A.   I did not review Robinhood data.

Q.   You did not assess any data for trading?

A.   I did some preliminary analysis, but I didn't, you know, I

M9NCmil1                        Mayzlin - Cross

didn't complete it.  And also, that wasn't -- that turned out to be not the focus of the analysis, so I wouldn't say that I reviewed it completely.  I had it in my dataset, but I didn't -- I didn't end up working on it.

          (Continued on next page)

Case 1:21-cr-00478-ER   Document 232   Filed 10/21/22   Page 36 of 216   1706
M9NHMil2                          Mayzlin - Redirect

BY MS. YOUNG:

Q.  And you did not present on trading data yesterday, correct?

A.  I didn't complete the analysis, and I didn't present the data.

MS. YOUNG:  One moment.

Nothing further.

THE COURT:  Redirect.

MR. ROOS:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. ROOS:

Q.  Professor Mayzlin, do you remember being asked a few questions by Ms. Young about check marks, verified accounts?

A.  Yes.

Q.  And whether Trevor Milton had a verified account?

A.  Yes.

Q.  Verification of accounts has to do with whether it's the person's real account, right?

A.  Yes.

MR. ROOS:  All right.  Could we please put up for everyone Government Exhibit S-5.  And why don't we zoom in on the portion that says "Stipulation," and then the first paragraph.

A.  You want me to read it, or --

Q.  Yeah, if you could read it out loud.

A.  The whole thing?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  Slowly, please.

A.  OK.

It is hereby stipulated and agreed by and between the United States of America, by Damian Williams, United States Attorney for the Southern District of New York, Jordan Estes, Matthew Podolsky, and Nicholas Roos, Assistant United States Attorneys, of counsel, and Trevor Milton, the defendant, by his attorneys, Marc Mukasey, Esq., Torrey Young, Esq., and Bradley Bondi, Esq., that:

1.  Trevor Milton created the Twitter account on February 3, 2014, with the username @nikolatrevor.  Mr. Milton was the sole user of that account.  Government Exhibit 584 is a screenshot of Mr. Milton's Twitter profile.

Q.  So the stipulation says that the parties agree that @nikolatrevor is Trevor Milton's Twitter account.  He was the sole user.  Is that the Twitter account you were looking at?

A.  Yes, it is.

Q.  Now, you were just asked some questions about whether a tweet could affect a purchase.  Do you remember those questions?

A.  Yes.

Q.  Let me ask you just one follow up.

So based on your research and analysis, and I think you were starting to say this, is there a high probability that

M9NHMil2                               Mayzlin - Redirect

the social media posts at issue affected investors?

A.   Yes, I do think there was one instance where I feel very confident that there was causality, the Badger tweets.

Q.   Now, by "causality" you mean the social media post about -- the Badger posts caused the activity on the investor forums; is that what you're saying?

A.   Yes, that's correct, that Mr. Milton's tweet is -- was the sole cause of the -- well, it was one of the causes was the -- his -- you know, his tweet and then the subsequent sort of retweeting of his tweet is what caused the forum activity.

Q.   Now, move to a different topic.  You were asked some questions about whether truthful information -- if there's truthful information in the market, whether that would sort of moot any sort of false or take information.  Do you remember that?

A.   Yes, I do.

Q.   And I think your answer was, no, it would not moot the false information, is that right?

A.   That's right.

Q.   Can you explain why not?

A.   So what I find is that, you know, these -- this false information or this, let's say, by trolls or by sellers who are trying to, you know, sell something actually has an effect.  So it has an effect.  It doesn't, unfortunately, get erased by the truth.  Even though there's truth out there, you know, this

false information still has an effect.  So, yeah, that's what my research shows.

Q.  All right.  One final topic.

Mr. Grimm, could we pull up the tweet that Ms. Young used as a demonstrative.

Professor Mayzlin, you were asked about this tweet a few minutes ago, right?

A.  Yes.

Q.  And this is one of the tweets that you counted as part of the set of tweets by Mr. Milton, right?

A.  Yes.

Q.  As Nikola-related?

A.  Yes.

Q.  Before we talk about that, there were a total of 448 original tweets, right?

A.  That's right.

Q.  And so one tweet, the sort of percentage of that in your data set, would be one divided by 448, right?

A.  That's right.

Q.  I think they actually asked you about two tweets, right?

A.  Right.

Q.  So two divided by 448, that's about .4 percent, right?

A.  That's correct.

Q.  They were arguing with you about .4 percent of the data, right?

MS. YOUNG:  Objection.

THE COURT:  Sustained as to the form.

Q.  The image here, let's start with the image, is of Trevor Milton's head on the body of a king with a sword, right?

A.  That's right.

Q.  So he's like the king from "Game of Thrones"?

A.  I think it's like Jon Snow, yeah, I think.

Q.  But it doesn't say "Game of Thrones," right?

A.  No, it says "Game of Emissions."

Q.  Why did you categorize this as Nikola-related?

A.  So I categorize this as Nikola-related because he's talking about Game of Emissions, and so in a lot of his tweets about the Badger and Nikola, he would this, you know, hashtag that was no emissions.  So no emissions, zero emissions is kind of part of the branding of -- of the concept.

And then it says, instead of in "Game of Thrones" it says "winter is coming," which is like the scary thing, but this says "hydrogen is coming."  And hydrogen is at the heart of sort of like the cool thing about the technology of Nikola. You know, the car runs on hydrogen and it has no emissions, and it, like, produces clean water.

Q.  Let me just stop you right there and ask you a question.

Did you see other tweets about hydrogen?

A.  Lots of tweets about hydrogen, yes.

Q.  Some of them related to whether or not Nikola was producing

hydrogen?

A.   That's right.

Q.   All right.  So this one you saw, and it's also suggesting that hydrogen is coming, right?

A.   Yes.  It's kind of this memey, you know, Internety thing, but it clearly relates to the technology and sort of the claims and the branding.

Q.   Got it.  By the way, you're not -- it says hydrogen's coming.  Within the scope of your expertise, though, you didn't assess whether or not he was telling the truth about hydrogen was actually coming or being produced, right?

A.   No.  I just knew that this was a theme in a lot of the postings.

Q.   And even if somebody said, Hey, I disagree with your analysis, this doesn't really relate to Nikola, even though it says "hydrogen is coming, Game of Emissions," would that significantly alter your analysis?

A.   Not at all.

          MR. ROOS:  No further questions.

          THE COURT:  Anything more, Ms. Young?

          MS. YOUNG:  One question.

          MR. ROOS:  I'm sorry, no questions or one more question?

RECROSS EXAMINATION

BY MS. YOUNG:

M9NHMil2                        Brady - Direct

Q.   Professor Mayzlin, for the June 9 date, you are not aware that the company posted regarding the Badger, correct?

A.   I was not aware of that.

           MS. YOUNG:  Nothing further.

           THE COURT:  Anything more, Mr. Roos?

           MR. ROOS:  Nope.

           THE COURT:  Dr. Mayzlin, you may step down.

           THE WITNESS:  All right.  Thank you.

           (Witness excused)

           THE COURT:  Government, call your next witness.

           MR. PODOLSKY:  Thank you, your Honor.  The government calls Kim Brady.

           THE COURT:  Sir, please watch your step.  Step up into the cube here and remain standing.

KIM BRADY,

      called as a witness by the Government,

      having been duly sworn, testified as follows:

           THE COURT:  Mr. Podolsky.

           MR. PODOLSKY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. PODOLSKY:

Q.   Good morning, Mr. Brady.

A.   Good morning.

Q.   Where do you currently work?

A.   Nikola Corporation.

Q.  How long have you worked at Nikola?

A.  I joined Nikola in November 2017.  Approximately four years and ten months.

Q.  What is your title?

A.  Chief financial officer.

Q.  Have you been chief financial officer since you started at the company?

A.  I have.

Q.  Is that sometimes referred to as a CFO?

A.  Pardon me?

Q.  That's sometimes referred to as a CFO?

A.  That's correct.

Q.  What are your responsibilities as the chief financial officer of Nikola?

A.  General accounting, financial reporting, financial analysis and planning, investor relations, tax, special projects, and acquisitions, and being a strategic partner to CEO.

Q.  All right.  I'm not going to ask you about all of those right now, but let me just ask about one.

You mentioned financial reporting.  What does that mean?

A.  Financial reporting involves capturing data with respect to company's performance; analyzing, summarizing, reporting to management as well as to regulatory bodies such as the SEC.

Q.  So do you have a role in the company's filings with the

M9NHMil2                        Brady - Direct

Securities and Exchange Commission?

A.   I do.

Q.   What type of information is filed, at a high level -- we'll look at some specifics -- but by a public company with the Securities and Exchange Commission?

A.   We file on a quarterly basis the company's financial performance, as well as on an annual basis 10-K; as well as when we sell securities to the public, we file what is known as S-1; as well as if company conducts mergers or acquisitions, we also file S-4.

Q.   Now, is it important for the information contained in those filings to be truthful and accurate?

A.   Absolutely.

Q.   Why is that?

A.   It's important that we file timely and accurate information that's fairly disclosed to the public so that investors can make judgment as to company's performance and actions.

Q.   Now, from time to time have executives at the company made public statements that were not in the company's SEC filings?

A.   Yes.

Q.   Is it important for those public statements to be accurate as well?

A.   Yes, especially for company executives.  They are taught and also trained to make sure that what you say is accurate, especially because investors listen to company's executive

officers and what they disclose and what they say and how they say it.

Q. Now, does what you just said apply to statements that are made in television interviews?

A. Yes.

Q. What about on the Internet, social media, podcasts, or other public fora?

A. Yes.

Q. Now, focusing on 2020, we'll mostly talk about the beginning of 2020 to September 2020. Who would you say was the -- let's focus on before the company went public. Let's focus on the beginning of 2020 until June 2020.

Who was the company's chief executive officer?

A. Trevor was the company's chief executive officer as well as the founder and the chairman.

Q. And following -- did the company go public during 2020?

A. Yes, it did. The company announced merger in the beginning of March and then completed the merger on June 3, 2020.

Q. What was Mr. Milton's role after the merger was completed?

A. His role transitioned to executive chairman.

Q. Would you consider him to have been the leader of the company throughout that period?

MR. MUKASEY: Objection.

THE COURT: Overruled.

A. Yes. Trevor was the founder as well as the CEO and the

chairman, and after we went public, he was still the founder and the executive chairman and the largest shareholder.

Q.  Now, during that entire time period, that is, the beginning of 2020 to September, did you ever have conversation with Mr. Milton about the importance of accuracy in public statements by Nikola's leadership?

A.  Regularly.

Q.  Were Mr. Milton's public statements, in fact, all accurate?

A.  No.  Often they were not factual or exaggerated.

Q.  And during that time period, did you ever have discussions with Mr. Milton about the types of investors who might be listening to his public statements?

A.  Yes.  Mr. Milton was very much focused on retail investors. And Nikola's daily trading volume consists most of -- mostly retail investors, and we were concerned about retail investors and Mr. Milton's hyperfocus on them.

Q.  During that time period, did you have discussions with Mr. Milton about Nikola's stock price?

A.  Yes, regularly.

Q.  Why?

A.  Simply because of Mr. Milton's focus on retail investors. And Nikola at that point was what we call a "story stock"; meaning, the company traded based on the expected performance in the future rather than any financial fundamentals.  And so it was important that we are careful as to what we talk about

to the public, especially retail investors who did not have appreciation for the company's fundamentals.

MR. MUKASEY:  Objection.  Objection.  Move to strike.

THE COURT:  Overruled.

Q.  You may continue, Mr. Brady.

A.  So we talked about that regularly.

Q.  Were you concerned in that time period about whether Mr. Milton's inaccurate statements were having an impact on investors?

A.  Yes.  In fact, once after the merger announcement was made, and this was in March while Nikola has not officially traded, VectoIQ stock represented Nikola's company --

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.  -- and because of that we saw, based on what the company said or what Mr. Milton said, it impacted the stock price even before the merger happened, even before the merger was completed.

Q.  Did Mr. Milton ever say to you, in substance, that his public statements impacted the stock price?

A.  Yes.  Time to time Mr. Milton talked about the stock price, especially after something was posted or something may have been said by Milton, and he would point out why the stock price went up.

Q.  All right.  We're going to return to those topics in more

detail, but first I'd like to step back and ask you a little bit about your background.

We can keep this at a high level, but what type of work did you do before joining Nikola?

A.  For the first four years, I worked for Baxter International, a multinational company, right out of college in cost accounting, general accounting, financial reporting, as well as financial planning and analysis and strategic role for European operations.

After that I joined Caremark.  Once again, this is a publicly traded multinational company focused on mergers and acquisitions.

After a couple of years, I joined company called PrimeCare International, a private company in integrated healthcare delivery, with the intent of taking the company public and served as vice president of business development. While I was there, I went out and acquired a business here in New York City and ran that business and had P&L responsibility and also provided oversight for financial reporting and analysis.

After that I joined with some of my colleagues for what we call middle market investment banking and boutique M&A restructuring shop for approximately 15 years.  I worked on middle market M&A transactions that involved buying and selling businesses as well as raising capital.  And then restructuring,

which involved fixing balance sheets of underperforming companies as well as profitability improvements, raising capital, and ultimately also involved in making principal investments on behalf of the firm.

Q.   So in all, about how many years of experience would you say you have in corporate and financial matters?

A.   Twenty-five years.

Q.   Now, you mentioned earlier that you joined Nikola in -- sorry, now I forget.  Was it 2017 or 2018?

A.   November 2017.

Q.   Thank you.

Where was the company based at that time?

A.   Salt Lake City.

Q.   Did you work physically in the Salt Lake City office?

A.   I did.  I was living in Chicago at that time, and I commuted each week to Salt Lake City.

Q.   Was Nikola a public or a private company at that time?

A.   A private company.

Q.   And at that time, what was Mr. Milton's role at the company?

A.   He was the founder, CEO, and chairman.

Q.   Now, is Nikola still a private company?

A.   No, it's a public company.

Q.   I think we've already talked a bit about this.  Can you just explain what that means, to be a public company.

M9NHMil2                          Brady - Direct

A.   As a public company, you have public owners of the company. You also have a board that represents the fiduciary interest of the public. We also have an obligation to file timely and accurate and fair disclosures to the SEC. And we have an obligation whenever we speak that, once again, we are fair, timely, and accurate, accurately disclosing information about the company.

Q.   Now, what process did Nikola use to transition from a private company to a public company?

A.   Well, obviously, there's a filing that's involved with the SEC, as well as training the board as well as the company management with respect to the importance of being a public company and the disclosure obligations and making sure that the company is prepared to meet the public company standards and obligations with respect to financial reporting.

Q.   Let me ask you a more basic question about process here.

     Are you familiar with the term "IPO"?

A.   Yes.

Q.   What is an IPO?

A.   Initial public offering. This is a company when it's private and goes through a process to become a public company.

Q.   Now, are you familiar with the term "SPAC"?

A.   Yes.

Q.   What is a SPAC?

A.   Special purpose acquisition company. This is what we call

a blank check company.  The company goes through an IPO process.  However, it actually does not have any operating assets.  It's a blank check company, and then with a goal to acquiring an operating company and going through a merger.

Q.  And so, ultimately, what is the purpose of a SPAC or a blank check company?

A.  The purpose of the SPAC is to -- during three years to find and acquire a target.  And in the case of Nikola, Nikola was the target, and the blank check company was VectoIQ.

Q.  OK.  So to be clear, did Nikola go public by merging with one of these blank check companies?

A.  Correct.

Q.  And I think just said the name, but what was the name of the blank check company?

A.  VectoIQ.

Q.  And where were VectoIQ shares traded before the merger?

A.  NASDAQ.

Q.  Did those shares become Nikola shares once the merger was complete?

A.  Correct.

Q.  Who ran VectoIQ?

A.  Steve Girsky.

Q.  And where were Mr. Girsky's offices located?

A.  New York City.

Q.  When was the merger between VectoIQ and Nikola announced to

the public?

A.   Beginning of March 2020.

Q.   Now, does that mean that the transaction was actually completed at that time?

A.   No.  It was completed after the shareholder vote, and Nikola became public, I believe, on June 3, 2020.

Q.   Were there events in New York City associated with the announcement of that merger?

A.   Yes.  After the merger announcement, I believe there was a media tour in New York City by Trevor Milton and one of our board members, Jeff Ubben.

Q.   Now, if somebody wanted to invest in Nikola after -- a member of the public, that is, after the merger was announced in the beginning of March but before it was completed, was there a way to do that?

A.   Yes.  They could buy VectoIQ shares.

Q.   And what would be the effect of buying VectoIQ shares between March and June 2020?

A.   Because the merger was already announced, essentially, VectoIQ was a proxy stock for Nikola.

Q.   And if you owned a share of VectoIQ, would it become a share of Nikola starting at the beginning of June?

A.   Yes.

Q.   OK.  Let's talk about a few of the changes that happened when the company went public.  Why don't I start generally.

Were there any negotiations with Mr. Milton about changes that he would have to accept when the company went public?

A. Yes. Before the merger announcement in February of 2020, I was negotiating with PIPE investors through Morgan Stanley. At the time, PIPE investors demanded the following: Number one, Trevor steps down as the CEO; number two, Trevor agrees to a lockup agreement for six months; number three, that Trevor's father also step down from the board.

Q. Just to understand those negotiations, first of all, were you directly involved?

A. I was directly involved.

Q. We've heard this term "PIPE investors." Can you explain who the PIPE investors are.

A. These are institutional investors. Essentially, they are making a private investment in public equity, and so they were making investment prior to us becoming public. And ultimately, after we become public, we register their shares. And so these are institutional investors that came in at that time to provide additional capital to the company.

Q. These are folks who agreed to invest in Nikola in connection with and before the merger, is that fair?

A. Correct. These are companies such as Fidelity, BlackRock.

Q. OK. And you mentioned Morgan Stanley. What was Morgan Stanley's role in this?

M9NHMil2                        Brady - Direct

A.   Morgan Stanley was our investment banker advising us.

          MR. PODOLSKY:  Why don't we, just to help guide us,

put up for Mr. Brady what's been marked as Government

Exhibit 222.

Q.   And, Mr. Brady, you have the option of your binder, and it

should also be on the screen if that's easier for you.

A.   OK.

Q.   Do you recognize this email?

A.   I do.

Q.   What's the date at the top?

A.   February 11, 2020.

          MR. PODOLSKY:  Your Honor, the government offers

Government Exhibit 222.

          MR. MUKASEY:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 222 received in evidence)

          MR. PODOLSKY:  May we publish?

          THE COURT:  You may.

          MR. PODOLSKY:  Why don't we just blow up the header so

we know who's on this email.

BY MR. PODOLSKY:

Q.   Mr. Brady, now that everyone can see this, who wrote this

email?

A.   From me to Pat Dillon.

Q.   Who is Pat Dillon?

M9NHMil2                         Brady - Direct

A.  Pat Dillon was a director in Morgan Stanley's investment banking division.

Q.  Do you see there is a blind carbon copy on that?

A.  Yes.

Q.  Who was that?

A.  Steve Girsky.

Q.  When was this email exchanged?

A.  February 11, 2020.

Q.  Was this during the time period that the SPAC merger was being negotiated?

A.  Correct.

MR. PODOLSKY:  Could we blow up the first email on the chain.  The bottom email.  Thank you.

Q.  All right.  Do you see that this is an email from Pat Dillon to you?

A.  Correct.

Q.  Do you see that Mr. Dillon wrote:  "Kim, is below an accurate summary of what Trevor and the company are willing to accept?  Sounds like some slightly different proposals given to Steve Girsky, but want to make sure nothing is lost in translation"?

Do you see that?

A.  Yes.

Q.  And in this process were you somewhat of a go-between between the PIPE investors and Mr. Milton?

A.   Yes.

Q.   OK.   The first bullet I think you referenced:

"Trevor/Nikola accepts the proposed board changes.   William

Milton comes off board and a VectoIQ director comes on."

        Do you see that?

A.   Yes.

Q.   Who is William Milton?

A.   Trevor's father.

Q.   All right.   Do you see below the next one is "Trevor stays

as CEO but will transition in 12-18 months"?

A.   Yes.

Q.   Can you explain what that proposal was.

A.   Yes.   Investors have asked that Trevor be removed as CEO.

        MR. MUKASEY:  Objection.  Move to strike.  Hearsay.

        THE COURT:  Let's talk at sidebar.

        (Continued on next page)

(At sidebar)

THE COURT: Mr. Mukasey, there's been all sorts of evidence before the jury already that this was the case -- strictly speaking, I suppose, but I thought we had passed this.

MR. MUKASEY: I think the question was what did this mean regarding one of the bullets in the email. The answer was Mr. Brady talking about what investors want. That's not -- not only nonresponsive, but it injects a level of hearsay that I think is inappropriate.

If he wants to bring out conversations that he's had that's within the hearsay exception, that's fine, but this was sort of a gratuitous attempt to throw in people's dissatisfaction with Milton. I don't know who he's talking about. I don't know when he's talking about. The document's in. If he wants to talk about what he meant in the document and what he understood from the document, that's fine, but what investors want is not in the document.

MR. PODOLSKY: Mr. Brady just testified that he was acting as Mr. Milton's agent in these negotiations. It is not hearsay to explain what the investors were saying during these negotiations. It's being offered for what they said.

THE COURT: Again, remind me if I'm wrong, but there's already been some level of testimony -- I'm not going to say a lot but some level of testimony -- that one of the conditions that people were insisting on as Nikola went public was that

Mr. Milton would step down as CEO.  Am I wrong about that?

MR. MUKASEY:  There has been testimony that Mr. Russell and Mr. Milton discussed that.  What investors wanted is a new topic.

MR. PODOLSKY:  I believe there has been testimony about this, but in any case, he just said he was engaged in negotiations between the PIPE investors and Mr. Milton.  What the PIPE investors were saying is clearly relevant to Mr. Milton's state of mind.  It's not a hearsay issue.

THE COURT:  I'm going to overrule the objection.

MR. MUKASEY:  While we're here, I'm sorry, I don't want to have to cause us to come back here.

THE COURT:  Sure.

MR. MUKASEY:  There's a document coming up.  I wasn't convinced the government was actually going to offer it, but it is a news article that refers in great detail to the fraudulent and, I think, prejudicial story of the Theranos company which has become sort of the poster child for fraudulent startup companies.  I think Mr. Podolsky's going to try to introduce an email with an attached article all about Theranos, and I think that that's -- that fails under 401 and 403.

MR. PODOLSKY:  I guess we can do this now.  I actually don't really care about the article.  The point is Mr. Brady sent an email, I believe it was in 2018, if I'm getting my dates right, to Mr. Milton saying:  Here's what happened at

Theranos.  You need to be careful because if you're not careful with your statements, like in Theranos, you could be subject to false representation litigation.

It goes directly to the defendant's state of mind. We're not going to get up there and argue he said Theranos; therefore, he's guilty.  We're going to argue that he warned Mr. Milton about the importance of false statements and even showed him an example how this can get you in trouble.

MR. MUKASEY:  He's already said that he warned Mr. Milton about false statements.  Everybody said it.  To use the name Theranos is to drop a grenade in the jury box.

THE COURT:  You're not going to put in the article?

MR. PODOLSKY:  I think it's an attachment.  We're fine removing the article.  He basically gives some bullet point explanation to Mr. Milton about why he needs to be careful. That's really what we want to put in.  We don't care about the article.

MR. MUKASEY:  It's cumulative.  And the only thing that's interesting or different about it is that it has the name Theranos in it.  If he wants to weave Mr. Brady through, one more time, did you lecture Mr. Milton on the importance of public statements, I have no problem with that.  Theranos is a grenade.

MR. PODOLSKY:  I'm not sure this is going to come up before the break anyway, but I'll just point out the defense

M9NHMil2                         Brady - Direct

has said this entire case is about Mr. Milton's state of mind. I mean, that's the issue in the case.

THE COURT:  We can talk about it some more, but I would be inclined to let the email come in but not the article.

(Continued on next page)

M9NHMil2                          Brady - Direct

(In open court; jurors present)

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

BY MR. PODOLSKY:

Q.   OK.  Mr. Brady, I think where we left off was I'd asked you to explain the meaning of the second bullet point in this email, "Trevor stays the CEO but will transition in 12-18 months."

Can you go ahead and answer the question.  Explain what that refers to.

A.   Yes.  Trevor had originally agreed with Mark that when the company went public, Trevor would step down, and Mark would step up as CEO of the public company.  As part of negotiations with PIPE investors, they have asked that Trevor step down as CEO and Mark step up as CEO of Nikola.

Q.   And was there a concern about Mr. Milton remaining as CEO that was conveyed to him?

MR. MUKASEY:  Objection.  Leading.

THE COURT:  Overruled.

A.   There were a number of concerns by the institutional investors that Trevor was not prepared to be CEO of a public company, and there were comments during due diligence with respect to Trevor and some of his statements.

Q.   Now, I think you referenced a moment ago that there had been agreement between Mr. Milton and Mr. Russell regarding

M9NHMil2                        Brady - Direct

Mr. Milton's status as CEO.  Did I get that correct?

A.   Correct.

Q.   What was the nature of that agreement?

A.   As part of Mark Russell joining the company, Trevor and Mark agreed that Trevor would step down at the time that Nikola went public.

Q.   Now, at the time the company was going public, did Mr. Milton follow through on that, or did he continue his agreement?

A.   Mr. Milton wanted to stay on longer.  He felt the company needed him longer.  And so as part of our negotiation with PIPE investors, what Trevor had proposed was that he stays on as CEO for 12 to 18 months before he relinquished that title.

Q.   At the conclusion -- what was the result of these negotiations?  At the conclusion, what role did Mr. Milton take?

A.   Ultimately, the PIPE investors did not agree and demanded that Trevor had to step down as CEO, and ultimately, Mark Russell became the CEO when we went public.

Q.   Now, you said "step down."  Did Mr. Milton simply remove himself from running the company?

A.   Mr. Milton stepped down as CEO, but he became the executive chairman.

Q.   What does it mean to be executive chairman as opposed to just chairman?

A.   The difference is that with an executive title in front of "chairman," that means he also had the oversight of the company's operation.  Typically, a chairman of the board does not have oversight, or direct oversight, of day-to-day company operations.

Q.   Just so we make sure we understand, did he maintain his authority over the company's operation?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

A.   He maintained the authority over CEO.

Q.   Now, there's another bullet here that says, "Six-month lockup with no restrictions after six-month mark."

Do you see that?

A.   Yes.

Q.   What is a lockup?

A.   Lockup is a typical provision when the company goes public so that insiders, meaning management members who had a significant ownership in the company, do not sell for six months after going public.

Q.   Why is that a typical provision when a company goes public?

A.   It's important to show and build confidence with investors that management is committed for the long-term value creation. And if management was allowed to sell quickly, that would show that somehow management may not have confidence in the company's future and the stock price.

M9NHMil2                            Brady - Direct

Q.   And just to make sure we're all understanding, to sell what?

A.   Stock.

Q.   The particular executive's stock?

A.   Yes.

Q.   Did Mr. Milton agree to such a lockup?

A.   Mr. Milton was strongly opposed to any type of lockup, even though it was quite standard.  There is some flexibility to the duration of lockup.  In this situation, Mr. Milton felt it was important that he was able to sell some stock.  As part of negotiation, while we agreed to the lockup that was proposed by the PIPE investors, we were able to carve out up to $70 million for Mr. Milton to sell his stock.

Q.   OK.  So at the conclusion of these negotiations -- let's focus on that last piece -- was Mr. Milton able to sell a portion of his stock?

A.   Yes.

Q.   How much?

A.   70 million.

Q.   Was that all of his stock holdings?

A.   No.

Q.   Was it a lot or a small fraction?

A.   That would have been a small fraction.

Q.   And did Mr. Milton, along with that, ultimately agree to some form of lockup?

A.   Yes.

Q.   And can you explain the -- how the lockup worked that was agreed to.

A.   The agreement that we had was for six months.

Q.   So when would that six months start?

A.   Would start beginning of June, and then it would expire by end of November.

Q.   OK.   We could take this email down.

     I want to talk about compensation.   Was a new compensation plan put into place for executives when the company went public?

A.   Yes.

     MR. PODOLSKY:   Let's put up for Mr. Brady what's been marked as Government Exhibit 283.

Q.   Mr. Brady, do you recognize this document?

A.   Yes.

Q.   Just at the highest level -- well, what type of document is it?

A.   These are key terms and conditions related to executive compensation post close of business combination on June 3, 2020.

Q.   Was this document relating to compensation created in the regular course of Nikola's business?

A.   Yes.

     MR. PODOLSKY:   Your Honor, the government offers

Government Exhibit 283.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 283 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Thank you.

BY MR. PODOLSKY:

Q.  OK.  Now that everyone can see this, we'll zoom in to some particular parts.

It's a little dense, but just generally, Mr. Brady, what is this document?

A.  This is compensation for what we call C-suite officers.

Q.  Before we get into the nitty-gritty, when the company went public, what was the salary compensation for the executive officers at Nikola?

A.  The cash compensation proposed under this compensation plan was $1.

Q.  In what form did the remaining compensation take?

A.  In stock.

Q.  All right.  So let's zoom in to maybe the portion that starts "Time vested."

Can you explain what the time vested portion reflects?

A.  Yes.  This represented stock grants that we would receive each year.  And it's time vested, meaning end of three years,

there would be clear vesting, and what was granted three years ago would be available.

Q.  So looking at this chart, in the middle you see it says "Value."  What is that line?

A.  That represented market compensation, although paid in restricted stock units, for working at Nikola.

Q.  OK.  And you see it says "Implied shares."  What's that line?

A.  Implied shares meaning because we were receiving that value in shares and the price was at VectoIQ merger price, so that means 600,000 units would be awarded.

Q.  OK.  So let's see if we understand this.

As an annual salary, each executive would get shares, is that right?

A.  Correct.

Q.  But you couldn't sell those shares right away, is that fair?

A.  Correct.

Q.  How long would you have to wait?

A.  Three years.

Q.  So in the first year -- so, first of all, do you see there's five people listed here?

A.  Correct.

Q.  Who's the first one?

A.  Mr. Milton.

Q.   The second one?

A.   Mr. Russell.

Q.   I think we've talked about him.

     Third one, is that you?

A.   Yes.

Q.   Pike, who's that?

A.   He is chief human resource officer.

Q.   And Worthen, who's that?

A.   Chief legal officer.

Q.   I think you used the word "C-suite" earlier?

A.   Yes.

Q.   What does that refer to?

A.   This represents top five executive officers of Nikola.

Q.   Is this the C-suite, these five?

A.   Yes.

Q.   Ask about a name that came up.  Have you heard of Dane Davis before?

A.   Yes.

Q.   Was he part of the C-suite?

A.   He was not.

Q.   So in this chart it says "Implied shares, 600,000" under Milton.  Do you see that?

A.   Yes.

Q.   So is that the number of shares that Mr. Milton received annually at this point?

M9NHMil2                         Brady - Direct

A.   Yes.

Q.   Now, did the compensation plan also have, in substance, a bonus component?

A.   Yes, performance component.

Q.   If we go down to the part where it says "Performance/Market-based Awards," OK, so were these also awarded in shares of stock?

A.   So, yes, this would also be awarded shares in stock based on achieving certain performance requirements.

Q.   I want to talk about those performance requirements, but first I just want to understand the structure.

     Did those awards of stock have the same rule that you'd have to wait three years to actually get them and sell them?

A.   This was based on achieving certain share price milestones.

Q.   So what does that mean?

A.   Pardon me?

Q.   What does a share price milestone, what does that mean?

A.   There were three milestones:  One, achieving $25 target; second, $40 target; and, third, $55 target.

Q.   So make sure I understand this.  What price did the shares of Nikola start trading at?

A.   $10.

Q.   How was that decided?  How was that decided that it should start at $10?

A.   Well, VectoIQ shares, because it's a blank check company, the value of the stock price represents the amount of cash in the trust account, and so it always trades at $10.  Any SPAC company has a $10 value equivalent based on cash value.

Q.   As part of the merger, did the folks negotiating the merger attempt to assign a value to Nikola so that it could be translated to that $10 share?

A.   Yes.

Q.   All right.  So if the shares started trading at $10, what would happen in terms of performance bonus if the stock price went up to $25?

A.   Mr. Milton would receive an additional 1,069,000 shares.

Q.   And what would happen for Mr. Milton's bonus if the stock price went up to $40?

A.   Additional 1.6 million shares.

Q.   And what would happen if Nikola stock price traded up above $55 per share?

A.   2,187,000 shares.

Q.   So if Nikola's stock price made it through all of those thresholds, meaning traded above $55 per share, in total, how many additional shares would Mr. Milton get?

A.   4,859,000 shares.

Q.   By the way, the other members of this C-suite would get shares as well, is that right?

A.   Right.

Q.   Now, do you see there's a bullet below that, "Earned upon a 20 consecutive day stock price trading threshold and a continued employment through the third anniversary of the effective date"?

Do you see that?

A.   Yes.

Q.   Are those requirements for one of these individuals to actually get their award?

A.   Correct.   There were two conditions:   Number one, when it came to share price milestone, the share price had to trade at that threshold for at least 20 consecutive days, and then the person had to be employed through the third anniversary of the effective date.

Q.   So focusing on the 20 consecutive days' stock price, can you explain the idea behind that?  Why require the stock price to stay above the threshold $25, say, for 20 days instead of get there right away?

A.   The concept is that you are trying to create long-term value for shareholders, and it's not simply a movement of stock price for a short term.

Q.   Were you involved in negotiating the length of that plateau, that 20-day threshold?

A.   We discussed, as management team, the duration of 20 consecutive days.  When I say "management team," that involved Mr. Milton, Russell, Brady, Pike, and Worthen.

My biggest concern was that Nikola was still very much a story stock at that point and susceptible to stock volatility and movements very fast.  And I originally suggested that we should have a longer period, perhaps 45 days or even 60 days.

Q.  And what would be the -- why would you want a longer period?  What would be the impact of that?

A.  The impact of that would be it would be more difficult to achieve those targets.

Q.  Now, you've mentioned this, I think maybe two times, that Nikola was a story stock.  Could you explain what you're getting at there.

MR. MUKASEY:  Asked and answered two times.

THE COURT:  Overruled.

A.  The story stock means the company does not have any financial fundamentals at this point.  Does not have revenue, does not have profit.  It's simply based on expected future business plan and what we plan to do.

Q.  OK.  So can you explain the connection between it being a story stock and the concern about having a longer threshold for achieving this bonus.

A.  Ultimately, stock price is dependent on actual performance over the long term.  However, stock does not always represent the company, and the value of the stock price can be separated from the value of the company, especially in the early stage, such as Nikola back in 2020.  The value of stock price did not

necessarily represent the intrinsic value of the company.  They can be separated, and stock price can run up ahead of the actual value of the company.

Q.  For a story stock, what can cause the value to be separated from the intrinsic value of the company?

A.  Speculation, what the company may say, what might have been represented by the company's management.

Q.  Did you have conversations about these concepts with Mr. Milton at the time?

A.  We had regular conversations about the importance of making sure that anytime anything was said by any of the management team members, C-suite officers, it had to be accurate.

Q.  Now, returning to the concept of this threshold, I think you said that you had recommended 45 or even 60 days, is that correct?

A.  Correct.

Q.  Do you recall in these negotiations whether Mr. Milton wanted a longer threshold or shorter?

A.  Shorter.

Q.  Was 20 consecutive days the ultimate agreement?

A.  It was the ultimate agreement by Mr. Milton and Mr. Russell.

Q.  Were any of these thresholds met in 2020?

A.  I believe $25 threshold was met.

Q.  Now, did the stock, in fact, at any time go above $55?

A.  Yes.

Q.  Did it sustain it for long enough to achieve the 20-day threshold?

A.  No.

Q.  All right.  Just a couple more questions about stock ownership.  Try to do this before the break.

From the time the company was founded until September 2020, who was the largest shareholder of Nikola?

A.  Trevor Milton.

MR. PODOLSKY:  Let's pull up Government Exhibit 318, which I believe is in evidence.  It is.

Q.  Do you recognize this document, Mr. Brady?

A.  Yes.

Q.  What is it?

A.  This is Form S-1 registration statement that was filed with the SEC.

MR. PODOLSKY:  Let's go to page 127 of the PDF, Ms. Wolfson, please.  I believe it's page 120 of the document. I think you had it.  127 of the PDF.  There we go.

Q.  Do you see at the top it says "Principal Securityholders"?

A.  Yes.

Q.  What is this page?

A.  This is a list of larger shareholders of Nikola, insiders.

Q.  Does this reflect the share -- the ownership of the company at the time this filing was made?

M9NHMil2                        Brady - Direct

A.   Yes.

Q.   And we can flip back if that helps, but do you recall

making this filing in July of 2020?

A.   Yes.

Q.   Why don't we blow up the chart and look at the top of it.

          First of all, Mr. Brady, are you on this list?

A.   Yes.

Q.   OK.  Who is at the top of the list?

A.   Mr. Milton.

Q.   So how many shares of Nikola did Mr. Milton own after the

company went public?

A.   91,602,734, representing 25.4 percent of outstanding common

stock.

Q.   So, by the way, who is the second largest shareholder?

A.   Mr. Russell.

Q.   As compared to Mr. Russell, what were Mr. Milton's relative

shareholdings?

A.   Approximately two times or more.

Q.   All right.  So do a little math.  If, let's say, the price

of Nikola's stock was $10, what would be the value of

Mr. Milton's share holdings?

A.   Approximately 910 million.

Q.   I think you mentioned that at some point the stock went

even above $55 per share, is that right?

A.   Correct.

Q.  Do you remember approximately how much the peak was?

A.  I think it went up as high as almost $90.

Q.  Do you remember about when that was?

A.  Sometime towards the end of June, early July time frame.

Q.  All right.  So let's use that $90 figure.

So between the $10 and $90, how many times increase is that?

A.  Eight times.

Q.  Eight, nine times.

Let's do a back-of-the-envelope.  So I think you said if the stock price was $10 a share, Mr. Milton's holdings would be about $910 million, right?

A.  Correct.

Q.  Can you do an estimate?  Going to put you on the spot.

A.  About 8.1 billion.

Q.  That's what the shares would be if the shares are 90?

A.  Yes.

Q.  8.1 billion?

A.  Uh-huh.

Q.  OK.  Now, sticking with the stock, let me ask more generally.  The $70 million worth of stock that Mr. Milton was able to sell, do you recall testifying about that?

A.  Yes.

Q.  Was that at the $10 valuation?

A.  Yes.

Q.   So how many shares was that?

A.   7 million, approximately.

Q.   Do you remember, was that included in the 91 million, or is the 91 million on top of that?

A.   I would have to look into that.  I think those shares may have been sold prior to going public, and this filing represents after going public.  This number may exclude that, but I would need to double-check.

Q.   If this filing was made in July and represented 91 million, would that be after this whole transaction with the 7 million shares?

A.   I believe that's accurate.

MR. PODOLSKY:  All right.  Your Honor, I'm about to slightly change subjects.  Just looking at the clock, is this a good time?

THE COURT:  It is 11 o'clock, so we'll take our first break, ladies and gentlemen.  Twenty minutes.  Don't discuss the case.

(Jury excused)

THE COURT:  Mr. Kim -- rather, Mr. Brady, you can step down.  Everyone can be seated.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Mukasey.

MR. MUKASEY:  Judge, I wanted to hand up what's been marked Government Exhibit 212, that was the subject of our sidebar discussion, just so your Honor can take a look at it.

THE COURT:  Okay.

MR. MUKASEY:  I think we made this objection just separately with respect to Mr. Russell, but the reference to VectoIQ's stock has a proxy for NKLA, Nikola stock, we think is improper and, frankly, incorrect.  We addressed it with Mr. Russell, but I wanted to note the objection again.

The term "proxy stock" is extremely misleading.  They were separate companies.  One traded publicly, one did not.  There was no guarantee that if you invested in VectoIQ before the merger, that the merger was even going to be approved.  So it's really not a proxy, that's pretty misleading.  You could have invested in VectoIQ and ended up with no Nikola stock.  It was not a foregone conclusion.

MR. PODOLSKY:  Your Honor, if defense counsel wishes to testify and say that's his view, he can, but every single witness in this case has explained their understanding that you are able to speculate on Nikola stock by buying VectoIQ.  That's the testimony.

MR. CARUSO:  Your Honor, in addition to Mr. Mukasey's point about the testimony being factually misleading by calling

it a proxy stock, the testimony is incorrect as a matter of law because -- and this is relevant to the in-connection-with element of securities fraud. So it's going to come up at Rule 29, it's going to come up in our charge conference, and as a matter of law, there's no such thing as what he calls a proxy stock. A purchase of VectoIQ was simply not a purchase of or in connection with Nikola's shares. That's going become very relevant as a matter of law. I'm not asking you to do anything about that as a matter of law at this point, but I did want to state that, and it's in our request to charge.

MR. PODOLSKY: Can I make a note on this?

THE COURT: Sure.

MR. PODOLSKY: VectoIQ stock was publicly traded on NASDAQ, that is a stock. Misrepresenting and lying and inducing investors to buy VectoIQ stock is in connection with a stock. Now, the facts of the case are that Mr. Milton intended people to buy VectoIQ stock, began hyping that stock so that they would ultimately -- it would increase the value of Nikola's stock. It is in connection with the security. I'm not quite sure I understand what the issue is here.

THE COURT: Let me ask, because I don't exactly recall what you, Mr. Podolsky, asked and what Mr. Brady said, but I believe the question and answer were essentially, so after March 3rd, one could speculate on Nikola's stock by buying VectoIQ stock. Was that --

M9NCmil3                        Brady - Direct

MR. PODOLSKY:  That's the substance of the testimony, yes.

MR. MUKASEY:  I don't think the word "speculate" was in there.  Speculate is not a proxy.  Speculate is a hope, a proxy --

THE COURT:  That was my question, because I remember "speculate."

MR. MUKASEY:  "Speculate" is what he just said in his argument now.  I don't think "speculate" was in the question.  Proxy, which is obviously a lot more firm, was in the question and the answer.

MR. CARUSO:  Judge, I think the testimony was that one could purchase Nikola by purchasing VectoIQ, and that's wrong.  But may I suggest, at the moment, this is not -- this is a legal question.  Mr. Podolsky says that a purchase would still be in connection with a purchase of Nikola shares as charged in the indictment.  I disagree with that, but today, we don't need to resolve that today.  We just wanted to note our objection and if there's going to be more testimony along this line, then maybe we do have to decide it today, but if that's the sum of it, then we can just move on and we've noted our position.

THE COURT:  I guess to Mr. Podolsky's point, to the extent that an announcement was made and there was publicity around the announcement and statements about the announcement, it is not, I think, irrational to say that people — maybe this

is true, maybe it is not as a factual matter — were buying VectoIQ stock because they believed that the transaction would ultimately close.  And so, there may be a line there somewhere, I don't know that it's been crossed as yet.

MR. CARUSO:  Very well.  I repeat, if we're going to have more testimony on it, then maybe we need to revisit it, but if that's the end of it, then I think that really can be the end of the discussion for now.

THE COURT:  Do you want me to do anything about this now, other than read it?

MR. MUKASEY:  I just want you to take a look at it and make a judgment as to whether even accepting the article, the email on its face is prejudicial because of the reference to fairness.

MR. ROOS:  Your Honor, three authorities that would support the admission of this, all cases in which courts have ruled that prior complaints or other information that was offered for the defendant's knowledge or putting him on notice of acting unlawfully were admissible.  So other instances where the defendant was put on notice that this type of thing is unlawful was admitted to prove his knowledge, three cites.

First, *United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020).  There, there were prior complaints that the defendant was acting unlawfully, and those were admitted to show the defendant's notice.

Next, *United States v. Ansaldi*, 372 F.3d 118, 130, (2d Cir. 2004).  FDA paper circulated to the defendant was admitted to show the defendant was on notice of his unlawful conduct.

And third, United States v. Parnas, 19 Cr. 725.  This was an oral decision by Judge Oetken admitting complaints in a campaign finance case about prior unlawful donor campaign finance violations, articles that were sent to those defendants about those unlawful campaign donations.  Judge Oetken ruled those were admissible.  He ruled at oral argument at the final pretrial conference, which was on October 12th, 2021, and we're happy to get your Honor a copy of the transcript.

MR. MUKASEY:  I think Mr. Roos undercuts his own argument.  There has been plenty of testimony in this case that Trevor was warned about making public statements and the potential consequences of making incorrect public statements.  That is wholly different than raising before this jury the poster child for fraudulent startup fake companies.  You're going to be like Theranos.  Everyone on this jury knows Theranos, everybody in the courtroom knows Theranos.

THE COURT:  I don't know that everyone on the jury knows Theranos.  I would guess that maybe less than half of the people know Theranos.

MR. MUKASEY:  I would prefer it remain that way because they can make their point without dropping, as you say,

that grenade in the jury box.  The point can be made, it has been made.  If they want to cumulatively make it more, I'm not going to object, but there's no reason to put in that kind of hot-button explosive name.

MR. PODOLSKY:  Mr. Mukasey is right, there has been testimony about warnings by executives to Mr. Milton, but Mr. Mukasey has also, both in opening and on cross examination of Mr. Russell, suggested that these witnesses made up those stories, that they made up the intervention.  So I think we're entitled to put in emails that actually show the defendant receiving these warnings.

MR. MUKASEY:  That's a total non-sequitur.  Again, I opened, I said what I said, we can prove what we can prove.  It's not evidence.  It doesn't give them the right to put in 403 evidence.

THE COURT:  So here's where I think I'm coming down on this.  I had an opportunity to look at this email.  As I indicated, I won't allow in the article.  Also, a large part of this email is the Theranos profile, I don't think that's necessary, so you should redact that out, but the top part, the part from Mr. Brady to Mr. Milton, I will allow.  There has been testimony, certainly, that Mr. Russell gave warnings to Mr. Milton.  I think it's relevant that Mr. Brady, the CFO, did, as well, and there was suggestion that all of the Nikola employees who have since provided information and testified and

will testify at this trial did a u-turn concerning what was and what was not appropriate.  So I do think it's relevant and I will allow that top paragraph.

MR. MUKASEY:  And then maybe I'll cross examine Mr. Brady on the fact that other members of the management team at Theranos went to prison, too.  So I guess what's good for the goose --

MR. BONDI:  Your Honor, a housekeeping matter before we break.  At the close of professor Mayzlin's testimony for the record, we would renew our prior motions, your Honor.

MR. ROOS:  We oppose.

THE COURT:  And they're denied.

You have ten minutes.

(Recess)

MR. ROOS:  Your Honor, I want to confirm, based on our prior discussion, it's okay for us to let the next witness drive back to Boston now.

THE COURT:  I take it Mr. Brady will be on the stand for a substantial part of the day.

MR. ROOS:  Honestly, I'm not sure he's even going to finish with cross.  Mr. Podolsky still has a significant amount of time on direct, I'm sure Mr. Mukasey has a cross with the like of Russell's around there, so --

MR. MUKASEY:  I have a tight and efficient, yet comprehensive cross that will not go over the same things that

M9NCmil3                     Brady - Direct

we've been through already, but he's going to go to the end of the day.

THE COURT:  Okay.  Then yes.

MR. ROOS:  Thank you.

(Continued on next page)

(Jury present)

THE COURT:  We appear not to have a prosecutor, but everyone can be seated and we'll wait.

Mr. Podolsky.

MR. PODOLSKY:  My apologies, your Honor.

BY MR. PODOLSKY:

Q.  Mr. Brady, when we left off, we were talking about stock and some performance awards.  Do you recall that?

A.  Yes.

Q.  I wanted to follow up on one sort of sidenote.  I asked you about somebody named Dane Davis and whether he was on the C-Suite or executive team.

A.  Correct.

Q.  What was his title, do you remember?

A.  I believe, ultimately, he had the title of chief technology officer.

Q.  Can you just say that a little bit louder.

A.  Chief technology officer.

Q.  If his title is chief technology officer, why was he not part of the executive team?

A.  Dane had the title when Nikola was still relatively small and, ultimately, as Nikola expanded and as we hired more people, more experienced adult development and engineers, it became clear that Dane did not have sufficient experience. Ultimately, Mark Russell had asked him to give up that title.

Q.   So was he not, in substance, the chief head of technology at the company?

A.   No.

Q.   Let's talk a little bit more about the stock price.

Did you discuss the company's stock price with Mr. Milton in 2020?

A.   Yes.

Q.   Between, say, March 2020 and the summer of 2020, how often do you think you talked to Mr. Milton about it?

A.   Regularly, likely once a week or more.  Nikola stock price was very volatile and Nikola stock price was going up, especially after the merger announcement.  After we became public, I was very concerned about Nikola's stock price.

Q.   Now I want to get into the content of those discussions.

Did those discussions begin when the company officially merged in June 2020 or earlier?

A.   Earlier, starting after the merger announcement.  After the merger announcement, Nikola stock price quickly went up past $20, at which point I became concerned simply because there is no substance for stock price moving up that quickly.  And this was discussed as management team because what goes up will come down without substance supporting that stock price.

Q.   I think you said a moment ago Nikola's stock price, but Nikola was, as the name, Nikola, was not listed before June 2020; is that right?

Case 1:21-cr-00478-ER    Document 232    Filed 10/21/22    Page 88 of 216    1758
M9NCmil3                        Brady - Direct

A.   Correct.  In fact, VectoIQ was essentially a proxy stock for Nikola once the merger agreement was announced.

Q.   Is that why you were discussing it with your management team?

A.   Yes.

Q.   Does that include Mr. Milton?

A.   Yes.

Q.   Now, in the discussions you had with Mr. Milton, did you have any concerns about his approach to the stock price?

A.   Mr. Milton was hyper focused on Nikola's stock price and he believed that he wanted to speak directly to retail investors. I was very concerned about that simply because Nikola's trading volume was mainly retail investors.

Q.   Let me ask this:  Do many, in your experience, company executives care about the company's stock price?

A.   They do.

Q.   Did you care about the company's stock price?

A.   Yes.

Q.   So why were you concerned about Mr. Milton's focus on the stock price, was it different in some way?

A.   There's a difference being fixated with daily movement of stock price.  Stock price, simply, is a quoting mechanism in the short-term, does not represent the true value of the company, and ultimately it will represent the true value of the company, but at this early stage, stock price does not

SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

M9NCmil3                    Brady - Direct

necessarily represent the value of the company and it was clear that stock price was ahead of the value of the company.

Q.  So to make sure I understand your answer, did you find that Mr. Milton was hyper focused, to use your language, on the sort of constant or daily movements of the stock price?

A.  Correct.

Q.  When did that hyper focus start, from your observation?

A.  It magnified once we became actually a public company after the merger was approved by the shareholders.  So it started in March timeframe and it became magnified once we became public in June.

Q.  Based on your conversations with Mr. Milton, was the hyper focus on the stock price distinct from the focus on the general success of the company?

A.  I don't believe Mr. Milton had long-term appreciation for what it would take to execute those visions and goals --

            MR. MUKASEY:  Objection.  Move to strike.

            THE COURT:  Overruled.

A.  -- for Nikola to achieve those visions.

Q.  Now, generally, in those conversations, what did you tell Mr. Milton about the stock price?

A.  That we should not focus on short-term stock price movement, it does not represent the true value of the company. This is a story stock at this point.  We have to be careful what's actually Tweeted, what's on social media because you

will influence retail investors in their decision to buy the stock price.

Q. Did Mr. Milton agree with you in those conversations?

A. No.

Q. What did he say?

A. Mr. Milton regularly ignored my advice.

Q. What, if anything, did he say about -- let me back up.

The story stock concept that you mentioned, did you explain that concept or term to Mr. Milton?

MR. MUKASEY: Asked and answered three times.

THE COURT: Not that particular question. Overruled.

A. I've tried to help Mr. Milton understand a variety of ways to help him understand the difference between the stock price and, ultimately, the company value, and what it takes to ultimately create long-term value for shareholders. And when it comes to Nikola, at that stage, was a story stock. I clearly viewed that Nikola stock price was overvalued and we talked about regularly, in terms of being careful, because it was important that we did not hype the stock price.

Q. I'm going to look back to that in a moment.

Do you recall the day that the stock was first traded under the Nikola name or ticker?

A. Yes.

Q. Did you have any conversations with Mr. Milton after the trading began that day?

M9NCmil3                        Brady - Direct

A.   Yes.

Q.   Do you recall that conversation?

A.   On June 3rd, approximately at 6:00 a.m., I received a call from Mr. Milton and he stated that Nikola stock price had dropped $5 from previous day, and that there must be something wrong with the NASDAQ trading system.  I asked him why.  He said something had to happen and NASDAQ must have made a mistake for Nikola stock price to go down by $5.  I stated that it's simply supply and demand and, obviously, there must be investors selling at lower price.

Q.   And what did he say?

A.   He asked me to contact NASDAQ.

Q.   Did you do that?

A.   No, I did not.

Q.   Let's look at a few other communications along those lines.

         MR. PODOLSKY:  Let's pull up for Mr. Brady what's been marked for identification as Government Exhibit 65.

Q.   Mr. Brady, do you recognize this exchange?

A.   Yes.

Q.   What type of communications are these?

A.   This is a text message from Mark Russell.  Mr. Milton talked to Mark Russell --

         MR. PODOLSKY:  Before we get to the document.  Your Honor, the government offers Government Exhibit 65.

         MR. MUKASEY:  Hearsay.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

M9NCmil3                        Brady - Direct

THE COURT:  Sidebar.

(Continued on next page)

(At the sidebar)

MR. MUKASEY:  I didn't expect to be granted a sidebar, but now that I'm here, this is an out-of-court statement between Mr. Brady and Mark Russell.  Both Mr. Russell and Mr. Brady -- Mr. Brady, just moments ago, testified that he ignored requests from Mr. Milton.  Mr. Russell testified the same way.  I don't think this qualifies as hearsay exception under 801(d)(2)(D).

MR. PODOLSKY:  Two responses.  One, this is a prior instance of corroboration of what he told Mr. Milton, which we litigated *ad nauseam*.  Two Mr. Milton directed his subordinates what to do and they're discussing it.

THE COURT:  What's Cowen?

MR. PODOLSKY:  Cowen is an investment bank.

THE COURT:  Overruled.

(Continued on next page)

M9NCmil3                          Brady - Direct

(In open court)

MR. PODOLSKY:  Your Honor, may Government Exhibit 65 be admitted?

THE COURT:  It will be admitted.

(Government's Exhibit 65 received in evidence)

MR. PODOLSKY:  Thank you.  May we publish.

BY MR. PODOLSKY:

Q.  Mr. Brady, do you see the exhibit on your screen?

A.  Yes.

Q.  Is this a representation of text messages?

A.  Correct.

Q.  Between who?

A.  Mr. Russell and myself.

Q.  And what's the date of this exchange?

A.  8/17/2020.

Q.  Do you see that Mr. Russell wrote to you, Trevor is anxious to learn anything Cowen, et cetera, may know about who was selling today?

A.  Yes.

Q.  First of all, who's Trevor in this sentence?

A.  Trevor Milton.

Q.  Do you know who Cowen is or what?

A.  Cowen is a Wall Street investment bank.

Q.  What did you understand Mr. Russell to be telling you about Mr. Milton being anxious to learn anything that Cowen may know

about who was selling today, what is that a reference to?

A.  Obviously, the stock must have been going down that day, stock price, and Mr. Milton wanted to understand why the stock price was declining.

Q.  And then you see Mr. Russell wrote, on the lookout for scapegoats and you responded.  Do you see that?

A.  Yes.

Q.  How did you respond?

A.  I said, he needs to chill because he's focused on the stock price movement.

Q.  Why don't you just read the full response, if you don't mind.

A.  He needs to chill.  He called this morning wanting to know why the stock price was down.  He was absolutely certain there was something going on because our competitor stocks weren't declining by 5 percent.

Q.  Is this an example of the time that Mr. Milton contacted you about stock price movement?

A.  Yes.

        MR. PODOLSKY:  Let's pull up another one for Mr. Brady, Government Exhibit 68.

Q.  Do you recognize this exhibit, Mr. Brady?

A.  Yes.

Q.  Is this another text message exchange?

A.  Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 68.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 68 received in evidence)

Q.  Now that we can all see it, Mr. Brady, is this a representation of text messages that you exchanged?

A.  Yes.

Q.  With whom?

A.  Trevor Milton.

Q.  What is the date of these text messages?

A.  8/21/2020.

MR. PODOLSKY:  So I can pull up 65 next to it if it helps.

Q.  Do you remember the date of the last exhibit we looked at?

A.  8/17.

Q.  So how many days after did you get this message?

A.  Four days.

Q.  And do you see that Mr. Milton wrote:  This is weird stuff. Five days of decline after a huge announcement.  Makes no sense at all.

Do you see that?

A.  Yes.

Q.  What did you understand him to be referring to?

A.  I'm trying to remember what the recent announcement was.

Mr. Milton tended to believe that after huge announcement, that stock price will automatically go up and he was focused on making announcements. And I simply commented, confidence is being eroded.

Q.  So just to be clear, where it says five days of decline, decline in what did you understand him to mean?

A.  Stock price.

Q.  Did Mr. Milton, in your conversations, connect the price of the stock to public announcements?

A.  Mr. Milton's actions show that public announcements were tied to stock price.

MR. PODOLSKY:  Take that one down. Let's look at, for Mr. Brady, Government Exhibit 63.

Q.  Do you recognize this document, Mr. Brady?

A.  Yes.

Q.  Is this another text message exchange?

A.  Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 63.

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

(Government's Exhibit 63 received in evidence)

MR. PODOLSKY:  Your Honor, just for the record, is it admitted and may we publish?

THE COURT:  It may.

M9NCmil3                          Brady - Direct

Q.   Mr. Brady, who is this text message exchange between?

A.   Mark Russell and myself.

Q.   How many days after the last one, if you can recall?

A.   Three days.

Q.   Do you see that you wrote:  Could you call me, spoke with Trevor this morning.

          Do you see that?

A.   Correct.

Q.   Who's Trevor in this sentence?

A.   Trevor Milton.

Q.   And then could you just read the second message.

A.   Jeff Bezos used to say the stock is not the company and the company is not the stock.  Trevor is not going to be able to handle the price fluctuation.  He believes that you and I and he need to do something right away.  Let's discuss.

Q.   Who's Jeff Bezos?

A.   He's the founder, former CEO, and chairman of Amazon.

Q.   And you gave this, I take it to be a quote, the stock is not the company and the company is not the stock.

          Do you see that?

A.   Yes.

Q.   Did you say that to Mr. Milton?

A.   Yes.

Q.   What does it mean?

A.   It simply means that stock price doesn't always represent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

intrinsic value of the company.  Most of the time, the stock price and intrinsic value of the company are separated.  At some point, the market will recognize what the true value is, but that's not always the case.

Q.  And you see, you go on, Trevor's not going to be able to handle the price fluctuation.

And then you write, he believes that you and I and he need to do something right away.

Do you see that?

A.  Yes.

Q.  What did you understand him to mean by, to do something right away, what is that a reference to?

A.  Trevor would say that often, especially when we had stock price declining.  It was very difficult for him because he and I would talk about his emotional state when the stock price went down.

Q.  And do what?

A.  I don't know exactly what he had in mind, but, basically, we have to act or make an announcement or do something to support the stock price.

Q.  Now, you've testified that the short-term stock price doesn't reflect the intrinsic value of the company or isn't it less important; is that right?

A.  Correct.

Q.  In your conversations with Mr. Milton, did he ever explain

to you in substance why he cared so much about the short-term price of the stock?

A.  No.

Q.  Did he ever discuss with you the value of his stock holdings?

A.  He did one time in my office, he came by and he showed me an app, and it's Forbes 400 app, which lists 400 richest people in the U.S., and Trevor's name was on that, and he was ranked somewhere around 270 or so.  And he told me one of his goal was to be in top 100.

Q.  And how would one get to the top -- or how would he get to the top 100 on that list?

MR. MUKASEY:  Objection.

THE COURT:  Sustained.

Q.  Did he explain, in substance, how he would get to the top 100?

A.  The share price would have to be higher.

Q.  Does the Forbes list include the value of the individual's stock holdings?

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

MR. MUKASEY:  Hearsay.

A.  Yes.

Q.  Let's talk a little bit more about retail investors.

MR. PODOLSKY:  If we could pull up for Mr. Brady

what's been marked as Government Exhibit 254.

Q.   Mr. Brady, do you recognize this document?

A.   Yes.

Q.   What type of document is it?

A.   This is an email from me to Trevor, Mark Russell, and Britton.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 254.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 254 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

Q.   Mr. Brady, to orient us with the header here, do you see that this is an email?

A.   Yes.

Q.   When was it sent?

A.   July 7th, 2020.

Q.   From whom?

A.   Myself.

Q.   Who did you send it to?

A.   Trevor Milton, Mark Russell, Britton Worthen.

Q.   Do you see you wrote, Trevor, Mark, and Britton, see an email below from Nathan at NASDAQ regarding NKLA's trading activity.  Do you see that?

A.   Yes.

Q.   What's NKLA?

A.   Nikola's stock symbol.

Q.   Do you see below there are a number of trading observations?

A.   Yes.

Q.   I want to go through at least some of them.

Do you recall why you sent this email?

A.   Yes.  The purpose of this email is to help the executive team, including Trevor, understand most of our daily trading volume was from retail and high-frequency traders and not institutional traders.

Q.   I don't think we actually defined some of those terms.

First of all, what is a retail trader or investor?

A.   Retail investors are regular Joe, you and I, who buy stocks through brokerage account.

Q.   And institutional investors, what is that?

A.   Institutional investors would be like Fidelity.

Q.   For folks who don't know Fidelity, can you explain what that means?

A.   These are investment firms and they aggregate access and management and demand from various institutions, such as from hedge funds, endowment funds, and they invest on behalf of their clients.

Q.   I think you mentioned, and we'll see in this high-frequency

traders.  What is that?

A.   That's program mission trading.

Q.   What does that mean, what's actually making the trading
decisions?

A.   It's a program where there is algorithm that's been
designed to aggregate information and it can detect sentiments
of investors, especially retail investors, and able to execute
trades before retail investors by fractions of second.

Q.   Now why did you feel that you should send an email
explaining the composition of Nikola's trading population to
the team in July of 2020?

A.   Because 90 percent of Nikola's trading volume was retail
and high-frequency traders, and because of their trades, create
huge volatility.  Average trading size was about 300 shares,
and at that point Nikola was trading approximately 15 million
shares a day.  That means there are thousands of trades that
are being made by retail investors and they create volatility
and they react based on news and speculations and what they
read on the media.

Q.   So you see on these trading observations, in bold, you
note, non-blocked volume, 22.6 million shares or 94.17 percent
of the total trading volume.

          Do you see that?

A.   Yes.

Q.   Below it says, this is all high-frequency algorithm in

retail trading?

A.   Correct.

Q.   So then you provide some takeaways below.  Do you see that?

A.   Yes.

Q.   In the first takeaway, it is retail and high-frequency traders that are selling Nikola stocks and creating downward pressure on the price and not institutions.

     Do you see that?

A.   Correct.

Q.   And then you write, these are the same people who drove up the stock price from around $40 to the north of $60 and $70 and now they're selling.

     Do you see that?

A.   Correct.

Q.   Then below, you see there is a paragraph of lessons to be learned?

A.   Yes.

Q.   I'll go through the parts specifically, but what lessons were you trying to impart?

A.   Trying to teach that it's the retail traders that are reacting, they are reacting to, essentially, social media and what they read and not making informed decisions.  They don't read what has been filed with the SEC.

     MR. MUKASEY:  Objection.  Speculation.  Move to strike.

M9NCmil3                         Brady - Direct

THE COURT:  Overruled.

Q.  Is that what you were attempting to teach?

A.  Yes.

Q.  Who were you attempting to teach that to?

A.  Trevor.

MR. MUKASEY:  Judge, what is the --

THE COURT:  Did you want to speak at sidebar, Mr. Mukasey?

MR. MUKASEY:  Yes, or *voir dire* the witness.  But let's start at sidebar.

THE COURT:  Okay.

(Continued on next page)

(At the sidebar)

MR. MUKASEY:  This is the witness parroting the government's theory rather than speaking from personal knowledge.  He just said retail investors don't read SEC filings.  What is the foundation for that?  What they're doing is basically taking their own government's requirements to educate investors and trashing them.  This guy has no basis for saying what retail investors read and don't read.  He hasn't spoken to a single retail investor that he's talked about. What he's saying is, we didn't want Trevor to talk to retail investors, fine; the market is volatile, fine.  What retail investors read and don't read, there's no foundation for him to talk about that.

MR. PODOLSKY:  Actually, that was not the testimony. He did not testify to a factual matter what happened, he testified what he was trying to tell Mr. Milton.  What this is about is Mr. Milton's state of mind.  We are absolutely entitled to put in evidence that Mr. Milton was warned about all of these very facts.

MR. CARUSO:  The testimony didn't come out that way.

MR. MUKASEY:  They're not facts.

MR. PODOLSKY:  They're facts in Mr. Milton's head. That is what's relevant here and that's what the witness just testified to.

THE COURT:  Well, again, correct me if I'm wrong, you

M9NCmil3                         Brady - Direct

say there is no foundation.  Mr. Brady testified of his years of being a financial professional in both public and private companies, he's testified about warning Mr. Milton on various occasions about retail investors and his focus on retail investors.  He's now explaining why he is warning or he has warned Mr. Milton about retail investors.  So my working assumption, I understand your point, my working assumption isn't the government put this in his head, but this is a reason why he believes retail investors are not a fruitful market for Nikola stock.

MR. MUKASEY:  I have no problem with him saying, in my opinion -- for retail investors because they're too volatile or they're not long-termers.  What he just said was retail investors don't read SEC filings.  That's outrageous.  We should put on a witness from the SEC who says, do you realize the government is now putting on -- your own government is putting on witnesses that say nobody reads your filings.  I mean, he can't say with any factual basis, and he's interviewed retail investors, as a whole, they don't read SEC filings. He's undermining the entire disclosure system that's existed since the crash of 1927 or whatever.

MR. PODOLSKY:  To be precise, again, we have not asked him to testify to his opinions.  Whether the financial system or disclosure system works, we've asked him to testify -- what every question has gone to is what he said he wrote and

communicated to Mr. Milton.  I have no opinions, frankly, on whether the disclosure system is good or bad.  What I do care about is whether Mr. Milton was told by Mr. Brady, don't do this because retail investors are going to follow.

MR. MUKASEY:  What he said was retail investors don't read SEC filings, and that's way beyond the pale.

THE COURT:  His testimony is that this is what he told Mr. Milton.

MR. CARUSO:  That's not the way he testified to it. He said retail investors don't read SEC filings.  That's improper.

THE COURT:  Why is it improper if that's what he believes?

MR. MUKASEY:  He can say that's what he believes.

MR. CARUSO:  It didn't come out that way.  He said these people don't read these.

MR. MUKASEY:  He said that as a fact.

While we're here, because I think this is testimony without any kind of foundation or first-person knowledge, while we're here, if you're going to put in the Theranos document, even with your considered warning, I don't do this lightly or hardly ever, I'm going to move for a mistrial.

MR. CARUSO:  The reference --

MR. MUKASEY:  The 403 is so explosive, there's 15 documentaries on Netflix and Hulu and HBO right now about what

a criminal enterprise that was.  I'm going to move for a mistrial if that comes in.  No disrespect to your ruling, I have to protect my client.

MR. PODOLSKY:  This is so explosive and such a mistrial -- Mr. Mukasey waited one minute before the witness took the stand.  It was on our exhibit list and we specifically said we're going to put it in.  Number 2, if he wishes to do that, it should be outside the presence of the jury.

THE COURT:  Of course it should be.

MR. MUKASEY:  That's why I'm saying it here.

(Continued on next page)

(In open court)

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.  I think I've forgotten the last question, so why don't we just turn to the document and we'll keep going.

BY MR. PODOLSKY:

Q.  Mr. Brady, if we look at the second page of the document.

A.  Yes.

Q.  Maybe we can focus on that paragraph there at the very bottom.  Do you see, you wrote, it is not at all that clear to me where the market bottom is for Nikola shares and whether long institutional investors would step in and start buying it.

Then you continue just below, in my view, the intrinsic value can only be validated by markers/milestones such as commercial BEV contracts, building out our production capacity, delivering Nikola Tre on time and generating revenue, building out HT infrastructure and de-risking station rollout, et cetera.  It is about what we promised, markers and milestones to deliver, and how we execute against our promise.

Do you see that?

A.  Yes.

Q.  What were you trying to convey to Mr. Milton here?

A.  Mr. Milton spent an inordinate amount of time on social media and trying to understand retail investors' comments and sentiments, and my point is stop paying attention, focus on

long-term value drivers, execute on company's milestones,
that's how we create long-term value.

Q.  So here you have one, two, three, four items that I think
you call milestones.  Do you see that?

A.  Yes.

Q.  What do you mean by milestone?

A.  Meaning these are -- this is to show progress, that we are
executing on our plan.

Q.  And had those milestones been met at the time?

A.  No, we were working on that.

Q.  So, for example, and we'll talk more about this in detail,
but number 4, building out H2 infrastructure and de-risking
station rollout.  Do you see that?

A.  Yes.

Q.  First of all, what is H2 infrastructure here?

A.  Hydrogen infrastructure, when we say that, we really mean
hydrogen production and hydrogen dispensing.

Q.  So this is July 2020, but at any time through September
2020, had Nikola built out any hydrogen production
infrastructure?

A.  No.

Q.  Why would that have been a milestone that you pointed to if
Nikola had achieved it?

A.  Simply because we were looking to build better electric
truck and hydrogen fuel cell truck.  Ultimately, to sell

hydrogen fuel cell truck, we need to actually have hydrogen fuel available to sell to our customers.

Q.  Now, based on your discussions with Mr. Milton, in the summer of 2020 through September 2020, did he change his focus away from retail investors?

A.  No.

Q.  Does this email reflect the only conversation that you had with Mr. Milton about this topic?

A.  No.

MR. PODOLSKY:  One other document, Government Exhibit 31, if we can pull that up for Mr. Brady.

Q.  Mr. Brady, do you recognize this document?

A.  Yes.

Q.  What type of document is it?

A.  It looks like it's a text message.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 31.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 31 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

Q.  Mr. Brady, do you see this document?

A.  Yes.

Q.  Is this a text message exchange or a printout of one?

A.   Yes.

Q.   Who wrote the first text message in the exchange?

A.   Trevor Milton.

Q.   On what day?

A.   June 8th, 2020.

Q.   So about how long after the merger actually closed and Nikola was officially listed?

A.   Five days.

Q.   Do you see that there is an image in the message body there?

A.   Yes.

Q.   Can you explain what you understood this image to be that Mr. Milton sent?

A.   This image came from Robinhood app that shows number of users.  These are retail investors holding Nikola stock.

Q.   So you see it says, top increases in number of users holding for stocks held by Robinhood traders today.  Do you see that?

A.   Yes.

Q.   And number 2 on the list, it says NKLA.  Do you see that?

A.   Yes.

Q.   And then it's plus 36,551; right?

A.   Yes.

Q.   And then Mr. Milton writes to you and Mr. Russell, over 36,000 private investors added today alone.  One of the best in

M9NCmil3                          Brady - Direct

history.  Do you see that?

A.  Yes.

Q.  How did you respond?

A.  Strong momentum created by retail investors.  Hopefully they will stay in for long-term.  Amazing to me how many calls are received from retail investors today that have no clue about Nikola, other than their friends told them to buy.  A lot of hype out there with retail investors.

Q.  What were you conveying when you said, hopefully they will stay in for the long-term or a long-term?

A.  Retail investors tend to trade a lot, especially for Nikola stock.  As I have mentioned, average trading size is about 300 shares and our average volume is about 15 million shares at that point.  So there are thousands of trades being made by retail and high frequency traders.

Q.  And strong momentum, what's that a reference to?

A.  Meaning if there were that many retail investors that were added that day and if they were buying Nikola stock, it creates a price increase and momentum.

              (Continued on next page)

Q.  And how did Mr. Milton respond at the bottom there?

A.  "That's how you build a foundation.  Love it."

MR. PODOLSKY:  OK.  Can take that one down.

Q.  Now, you've spoken about social media a bit.  Did there come a time when Mr. Milton's social media and, actually, general media usage increased?

A.  Yes.

Q.  About when was that?

A.  I believe that increased especially after we went public, and not only that.  Mr. Milton spent an inordinate amount of time reading retail investor feedback and comments.

Q.  -- actually, I'm going to say this generally about both social media and media, meaning television interviews and so on.

Did Mr. Milton's engagement with that begin when the company went officially public or when the merger was announced, from your perspective?

A.  It started when the merger was announced.

Q.  Now, did -- as a member of the executive team, from your perspective, who was directing the company's media approach in that time period?

A.  I believe Mr. Milton was at the center of it.  We had marketing department, as well as outside PR, but Mr. Milton drove his own media strategy.

Q.  Now, did you have a specific role with respect to media

appearances?

A.   No.

Q.   Was a part of your job to monitor Mr. Milton's media appearances?

A.   No.

Q.   Did you follow him on social media?

A.   No.

Q.   Do you use social media?

A.   No.

Q.   Were you aware whether there was supposed to be a vetting process in place for social media statements?

A.   We had a process in place where Mr. Milton, as we became aware of his frequency, he was supposed to review those statements.  As well as when it became problematic, we made sure that he reviewed all the statements with Britton Worthen, our chief legal officer.

Q.   Now, based on your role on the executive team and your conversations with Mr. Milton, did he actually follow that vetting policy?

A.   No.

Q.   Now, you testified earlier, I think at the beginning of your testimony, that it is important to be accurate in all public statements.  Do you recall that?

A.   Yes.

Q.   Did you ever say that, in substance, to Mr. Milton?

M9NHMil4                    Brady - Direct

A.   A number of times.

Q.   Why?

A.   Simply because, once again, we knew that retail investors were investing into Nikola based on what they were hearing on social media.

          MR. PODOLSKY:  If we could pull up for the witness what's been marked for identification as Government Exhibit 212.

Q.   Do you recognize this document, Mr. Brady?

A.   I do.

Q.   Is this an email?

A.   It's an email.

          MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 212.

          MR. MUKASEY:  I'm going to object and reiterate the argument that I made at the sidebar and the motion I made at the sidebar.

          THE COURT:  The objection is overruled.

          MR. PODOLSKY:  May it be admitted and published, your Honor?

          THE COURT:  It may.

          And again, ladies and gentlemen, this exhibit is going to have a redaction.  You are not to concern yourselves with what is being redacted out of the document.  OK?

          (Government's Exhibit 212 received in evidence)

BY MR. PODOLSKY:

Q.  All right.  Mr. Brady, do you see -- if we can just pull up the top there, we can just do the whole email above the black bar there.

OK.  Mr. Brady, did you send this email to Mr. Milton?

A.  Yes, I did.

Q.  And do you see it's also got Britton Worthen and a blind carbon copy to Joe Pike on it?

A.  Yes.

Q.  Who were you directing this email to?

A.  Trevor Milton.

Q.  Do you see that the date is June 4, 2018?

A.  Yes.

Q.  And you see it says "Inside the fall of Theranos" at the top?

A.  Yes.

Q.  And it says -- do you see the first sentence?  It refers to an interesting article.  Do you see that?

A.  Yes.

Q.  And there's a reference there to a company that couldn't deliver what it promised the market.  Do you see that?

A.  Yes.

Q.  All right.  And there's a reference, then, below that the company was sued by SEC in 2018 for a fraud relating to false misrepresentations?

M9NHMil4                          Brady – Direct

MR. MUKASEY:  Objection.  Move to strike.

Q.  See that?

THE COURT:  Overruled.

Q.  You see you wrote that, Mr. Brady?

A.  Yes.

Q.  Then you say, you write to Mr. Milton:  "There are some lessons here for us.  As we get closer to commercializing, we need to be absolutely certain that our trucks/stations meet performance specs that we promise to market/customers.  Otherwise, we will be exposed to all kinds of product liability and false representation litigations."

Do you see that?

A.  Yes.

Q.  Why did you warn Mr. Milton about the potential exposure to false representation litigations?

MR. MUKASEY:  Objection.  It speaks for itself.

THE COURT:  Overruled.

A.  This is about five months after I joined the company, and we had launched Series C capital raise process.  By this time I had interacted with Trevor long enough to see that from time to time he misstated facts, and I was concerned.  And when this article came out, I wanted to convey the importance of making sure that we had accurate disclosures whenever we interacted with any investors or whenever we conveyed about truck's performance or statistics.

M9NHMil4                     Brady - Direct

MR. PODOLSKY:  We can take this down.  And let's go ahead and change topic.

Q.  Mr. Brady, are you familiar with something called the Badger?

A.  Yes.

Q.  What is that?

A.  Badger was the name for Nikola consumer pickup truck.

Q.  Now, do you recall approximately when you first heard about the concept of Nikola doing a consumer pickup truck?

A.  This was, I believe, in January 2019 at the CES conference.

Q.  Now, were you directly involved with the development of the prototypes of that truck?

A.  No.

Q.  All right.  I want to talk to you about later in the process.

Did there come a time when Nikola negotiated with General Motors relating to the Badger?

A.  Yes.

Q.  Were you involved -- and I want to focus you on the time period of the summer.  Late in the summer of 2020, August into September, OK?

A.  Yes.

Q.  Were you involved in those discussions?

A.  Yes.

Q.  Who else was?

A.   Mark Russell was negotiating directly with GM, and I was participating in those calls.  And then, ultimately, about three weeks before we concluded negotiations, Trevor led those negotiations directly.

Q.   Was there a transition?  What happened?  How did it come to be that Mr. Milton was leading the negotiations?

A.   I think Mr. Milton became frustrated with the speed and not getting to the closing quickly enough.  And he must have lost confidence in Mr. Russell to move quickly, so he decided to negotiate directly.

Q.   Now, can you just explain at a high level, what was the deal over?  What was the deal about?

A.   The deal was about Nikola introducing a consumer electric pickup truck, and the deal contemplated that while we controlled the design, that GM would build the pickup truck using their components.  And, ultimately, we still had to figure out how to sell those trucks, pickup trucks.  However, we would fund the CapEx as well as, in exchange, GM would receive approximately $2 billion from us.

Q.   So GM would receive approximately $2 billion from --

A.   In Nikola stock.

Q.   In Nikola stock, is that correct?

A.   Yes.

Q.   And Nikola would also fund the CapEx, did I hear that?

A.   Correct.

Q.  What does that mean, the CapEx?

A.  Meaning capital expenditures to build the Badger.

Q.  So GM builds the Badger.  Nikola gives GM 2 billion in stock and also pays for the Badger to be built, is that right?

A.  Correct.

MR. PODOLSKY:  Let's pull up for Mr. Brady Government Exhibit 67.

Q.  Do you recognize this exhibit, Mr. Brady?

A.  I do.

Q.  Is this a text message exchange?

A.  Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 67.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 67 received in evidence)

BY MR. PODOLSKY:

Q.  Mr. Brady, do you see this exhibit in front of you?

A.  Yes.

Q.  I think everyone else does, too.

What's the date on this exchange?

A.  August 20, 2020.

Q.  These are -- and the three messages, who wrote them?

A.  Kim Brady to Mark Russell.

Q.  All right.  So do you see you wrote:  "Joined the GM call

late.  Based on what I heard, I think we have a problem with the GM deal.  I am not sure how we can justify the in-kind contribution build up.  As I suspected, in-kind doesn't include CapEx.  So what are we allocating 2 billion to other than engineering services, cruise, and access to the part bins?"

Do you see that?

A.  Yes.

Q.  Can you unpack that for us.  What are you saying there?

A.  Essentially, what I'm saying is that -- what are we paying $2 billion for if on top of that we still have to come up with CapEx, which was going to be additional 700 to $900 million?  So my message is I don't believe what we're getting in terms of engineering services and access to the part bins is worth $2 billion.

Q.  And then you write:  "I think we need to step back and ask some really tough questions.  We are caught in a deal momentum and not asking the right questions."

Do you see that?

A.  Yes.

Q.  At this point was -- who was leading the negotiations?

A.  I believe Trevor.

Q.  So let's turn on this topic to what is in evidence as Government Exhibit 274, and do you see that this is an email exchange between Trevor Milton, you, Mr. Russell, and Mr. Worthen?

A.   Yes.

Q.   And this is August 25, 2020.   Do you see that?

A.   Yes.

        MR. PODOLSKY:   All right.   Why don't we blow up the
bottom of the page, and we don't have to blow this up.

Q.   But do you see, Mr. Brady, this email is from you?

A.   Yes.

Q.   OK.   So you wrote:   "All the projected cumulative net
losses and cumulative cash flow from 2022 to 2026 (five-year
period) related to the Badger are as follows."

        Do you see that?

A.   Yes.

Q.   Then there's a figure for net loss.   What does "net loss"
mean?

A.   This is purely from an accounting and profit and loss
statement perspective that we would have cumulative net loss of
3.2 billion.

Q.   From what?

A.   From selling Badger.

Q.   Then the next one is cumulative cash flow from 2022 to
2026.   What does that -- what are you explaining there?

A.   That includes CapEx on top of operating net loss.

Q.   So when there's a parentheses around 4.6 billion, what does
that mean?

A.   Negative.

Q.   So what are you conveying with these numbers?

A.   That likely moving forward with the introduction of Badger will create significant loss for Nikola and create significant issues for the company.

Q.   So on that note you wrote, I think there's a paragraph there that starts, to put in this context, and you say:  "Based on the current deal structure with GM, we are projecting massive losses for the company, which WILL not be sustainable."

     Do you see that?

A.   Yes.

Q.   What were you conveying there?

A.   That this is not a good deal.  We should walk away.

Q.   Was this deal going to save Nikola billions of dollars from your perspective?

A.   We contemplated that there will be some savings for part bins, potentially for battery cells.  But battery cells are only part of the Badger, and the contemplated price, offering price, for the Badger, which was going to be on the higher end, was still less than the cost to build the pickup truck.  So we would still have had significant losses.

Q.   So if we go to the top page -- sorry, the next page at the top.  Just the very top bullet, you see it says:  "If projection volume ends up being higher, it will only increase our losses, since the unit economics is negative."

     What does that mean?

A.  Meaning we were already selling the Badger at a premium pricing, and our cost to produce the Badger would have been still higher than the price that we would sell at.  And so the more units we sold, the greater the loss.

Q.  Did this deal ultimately go through?

A.  It did.

Q.  Based on your involvement in the discussions, who was the proponent of this deal?

A.  Trevor Milton.

Q.  Based on your discussions with him, did he explain to you why he wanted this deal to go through despite your concerns?

A.  There are principally three reasons that he explained: One, this will increase our stock price.  He thought perhaps by 20 to 25 percent.  I actually bet him in terms of whether the stock price would go up that high, and I told him, ultimately, it will quickly come down.  He also believed that by going through with this deal, we'll be able to raise a significant amount of capital.

Q.  All right.  Let's change gears again, and let's talk about the SEC filings now.

So, first of all, what types of information does a company like Nikola file with the SEC?

A.  We file information anytime we sell shares to the public. This is S-1 filing, and it shows the size of the offering, but it also has forward-looking statements as well as all the

specific risks associated with investing in Nikola stock.  It describes the company's operation as well as strategy and the progress that we're making, as well as detailed financial information.

Q.  So let's look at the S-1.  Why don't we use Defense Exhibit 734 to look at this.

When was this document filed, if you can see?

A.  June 15, 2020.

Q.  All right.  So I don't know if you can tell.  Do you know about how long this document was?

A.  Including supplemental financial information, 350 pages.

Q.  Why don't we go to page 7 to pick up on something you just mentioned, page 7 of the PDF version at least.

Mr. Brady, do you see this?

A.  Yes.

Q.  What is this section?

A.  Forward-looking statements.  The document contains statements with respect to future periods, future events that has significant risk and uncertainties.  And we use certain words to indicate that these are related to future events and not present condition.

Q.  Did you ever in the 2020 time period discuss the concept of forward-looking statements with Mr. Milton?

A.  Yes.  We talked about the company's required to file SEC documents where we have to use forward-looking statements, and

we have to be very careful and use the right language to convey

the current condition of the company and what we plan to

accomplish in the future.

Q.  Did you discuss whether the same concepts would apply to

other public statements by company executives like Mr. Milton?

A.  Yes, regularly.

Q.  All right.  Let's go to page 15 of the document.

Do you see a section called "Risk Factors"?

A.  Yes.

Q.  What is this section of the filing?

A.  In addition to forward-looking statements, risk factors are

specific risks associated with Nikola's business plan and the

uncertainty and risks associated with that plan.  And if

certain events are not materialized or does not happen, it

could significantly impact Nikola's business plan and what

Nikola anticipates achieving.

Q.  Now, does this section give detail about, like, the current

activities, what's going on at Nikola's headquarters?

A.  No.

Q.  So let's look at a little bit about what this section

actually tells people.  Let's go to, for example, page 20 of

the document.

All right.  Can you just read the top -- if we could

blow up maybe, Ms. Wolfson, the top, we'll call it, risk

factor.  Great.  You can include the italicized part.

OK. So, Mr. Brady, would you just read the heading of this, the bolded italicized part.

A. "Our plan to build a network of hydrogen fueling stations will require significant cash investments" --

THE COURT: I'm sorry, Mr. Brady. Can I stop you and ask you to read just a little slower.

A. "Our plan to build a network of hydrogen fueling stations will require significant cash investments and management resources and may not meet our expectations with respect to additional sales of our electric vehicles. In addition, we may not be able to open stations in certain states."

Q. Then do you see -- we won't read all of it, but see the content there starts with "Our plan to build a network of hydrogen fueling stations in the United States will require significant cash investments and management resources and may not meet our expectations with respect to additional sales of our FCEV trucks the request"?

Do you see that?

A. Yes.

Q. Does this paragraph describe potential risks associated with whether Nikola would accomplish its fueling -- hydrogen fueling station plans?

A. Correct.

Q. Does it describe what's actually happening on-site at Nikola at the time?

A.  No.

Q.  If we go to the second one just below it, you see it says: "We may not be able to produce or source the hydrogen needed to establish our planned hydrogen fueling stations"?

A.  Yes.

Q.  Does this paragraph discuss risks associated with whether Nikola would be able to achieve production of hydrogen?

A.  Correct.

Q.  Does it discuss what's actually happening on-site at Nikola?

A.  No.

Q.  Now, were these paragraphs discussing the risks of what -- associated with Nikola's plans, were these accurate to the best of your understanding?

A.  At that time.

Q.  If Nikola could accomplish these plans, would that be a significant milestone, to hearken back to your prior email?

A.  Yes.

Q.  Now let's pull up Government Exhibit 521, which is in evidence.

        Now, Mr. Brady, do you see a tweet on your screen?

A.  Yes.

Q.  All right.  And do you see that there's a tweet from some user named Nicholas Ang that starts:  "Amazing work so far @nikolatrevor.  You solved the chicken and egg issues with the

leases"?

Do you see that?

A.   Yes.

Q.   And then if we skip down to Mr. Milton's tweet, you see he has a tweet there on June 9, 2020?

A.   Yes.

Q.   All right.  Do you see, "We are now below $4 per kilogram, which is the lowest in the world.  We started at $16 and now are at $4"?

Do you see that?

A.   Yes.

Q.   Did that accurately describe the state of Nikola's achievements with respect to hydrogen production at the time?

A.   No.

Q.   Why not?

A.   We were not producing any hydrogen at that time.

Q.   And you see actually afterwards it says, "We plan on reducing that again"?

So I'm going to come back to that in a moment, but it says, "We are now below $4 per kilogram."  I believe you said Nikola had not produced any hydrogen.  Did Nikola have any ability at that time to produce hydrogen at that price?

A.   No.

Q.   Was Nikola working on trying to achieve that?

A.   We were working on it.  There are many components of our

plan to ultimately get to and produce hydrogen at $4 or below

$4, but none of those variables have materialized yet.

MR. PODOLSKY:  OK.  Why don't we actually -- let's

keep this up, Ms. Wolfson, and if we could pull up with it

page 7 of DX 734.  Maybe we could just blow up that heading and

top paragraph there on 734.  Is that possible?

Q.  OK.  Now, focusing on the first two sentences of 521, we

are now below, and then we started at $16 and are now at $4, do

you see any of those forward-looking words that we discussed

earlier?

A.  No.

Q.  What about in the next sentence?  It says, "We plan on

reducing that again."  Is there a forward-looking word in that

sentence?

A.  "Plan," yes.

Q.  Now, in the first two sentences where it says, "We are now

below $4 per kilogram," etc., do you see any words that are

inconsistent with the forward-looking statement concept?

A.  Yes, the word "now."

Q.  And this was June 9, 2020.  Had you already discussed with

Mr. Milton the importance of -- or the concept of

forward-looking statements?

A.  Yes.  Once we agreed to a merger, we had a number of

discussions about making sure that we are careful with the

statements that we make.

Q.   Look at another one.  We can do Government Exhibit 543, which is also in evidence.

Do you see a tweet in front of you, Mr. Brady?

A.   Yes.

Q.   Do you see the top says, "Hydrogen fuel prices could be as low as gas in five years"?

A.   Yes.

Q.   And then do you see below there's a tweet from Mr. Milton on June 27, 2020?

A.   Yes.

Q.   What does Mr. Milton write there?

A.   "It's lower now."

Q.   You can go ahead and read the whole thing if you don't mind.

A.   "Which is awesome.  Now has it below $4-kilogram, which is cheaper than diesel.  Working on sub $2.50 kilogram now."

Q.   Let me ask you about a couple facts.

So in the summer of 2020, had Nikola installed any equipment for the generation of hydrogen?

A.   No.

Q.   Did Nikola have any permitted hydrogen production stations?

A.   No.

Q.   Did Nikola have any hydrogen production stations at all?

A.   No.

Q.   Is electricity an important input into the cost of

hydrogen?

A.   Vital.  To generate green hydrogen, electricity price will likely represent 80 to 85 percent of your operating costs.

Q.   Now, in the summer of 2020, was Nikola negotiating to try to obtain electricity in the volume and price it needed to generate hydrogen?

A.   We started to work on that.

Q.   Had you obtained any contracts for a price that would allow the production of hydrogen at $4 a kilogram?

A.   No.

Q.   All right.  Just to be clear, where it says Nikola Motor now has it below $4 a kilogram in that sentence, do you see any forward-looking language?

A.   No.

Q.   Let's do one more.  Government Exhibit 553.

      Do you see the tweet at the bottom from Trevor Milton?

A.   Yes.

Q.   What's the date on that one?

A.   August 13, 2020.

Q.   So at this point had you already had discussions with Mr. Milton about the importance of forward-looking language?

A.   Yes.

Q.   And had you at this point warned him about being accurate in his public statements?

A.   Yes.

Q.  Do you see that he writes:  "We currently make our own green H2 for under $4 a kilogram.  We are open to others down the road, but we have our stations going up and need to focus on completing ours first.  Then we can work with others as we expand"?

       Do you see that?

A.  Yes.

Q.  Was it accurate or true that Nikola was currently making its own green hydrogen for under $4 a kilogram?

A.  No.

       MR. PODOLSKY:  Let's take this down.

       I want to ask you a related question about the concept of models.  So let's pull up Government Exhibit 281, which is in evidence.

Q.  Mr. Brady, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a presentation made to covering analysts for Nikola on April 6, 2020.  The purpose of this document was to help analysts who were going to cover Nikola stock understand Nikola's business model.

Q.  I want to ask you about that idea of business model, but just to understand what this event was, do you see it's dated April 6, 2020?

A.  Yes.

Q.   It says "Analyst Day."  What is Analyst Day?

A.   So this is a day where we invited research analysts who were looking to cover Nikola stock to educate them on Nikola's business plan.

Q.   Was the invitation extended generally to retail investors?

A.   No.

Q.   OK.  Let's go to page 17 of the document.

     Mr. Brady, do you see that it says "Nikola Market Overview and Business Model Summary"?

A.   Yes.

Q.   What's a business model?

A.   A business model is, essentially, a framework, and it's a projection, what we're looking to achieve.

Q.   OK.  So you used the word "projection."  Does a business model explain what the company has already done?

A.   No.

Q.   Now, had Nikola in the summer of 2020 sold any trucks or made any revenue?

A.   No.

Q.   So help -- can you explain the importance of a business model with respect to a pre-revenue company?

A.   The purpose of this document is to help research analysts understand what could be in the future as Nikola executed on its business plan and its business model.

Q.   So let's look at a particular part of the model, page 25.

All right.  Do you see this?  Here we go.  Do you see it says, "H2 Station Unit Economics"?  Do you see that?

A.  Yes.

Q.  What is this page about?

A.  This is to help explain what it costs to generation -- generate hydrogen, as well as what it would cost to build a hydrogen generation and dispensing station.  And once you consider both factors in terms of the profit that you may be able to generate by selling hydrogen and CapEx, what would be the return over 21 years.

Q.  Just briefly, how does this -- we'll get some of the details, but how does this piece about the projection of cost of hydrogen production and stations fit into Nikola's overall business model?

A.  It's important and critical because, ultimately, there is no place or there is not readily available infrastructure where you can go buy hydrogen fuel.  And so part of our value proposition was to build that hydrogen station network to provide fuel to our customers when we sold fuel cell trucks.

Q.  Before we get to the assumptions that I want to talk about, there's a box to the right there, annual cost to produce hydrogen.  Maybe we could blow that up.

Why don't I start generally here, Mr. Brady.  What is this chart on the left there showing?

A.  These are key assumptions and drivers and a cost estimate

to potentially produce hydrogen.

Q.   OK.  So you see at the bottom it says "Costs per kg."  Is that kilogram?

A.   Yes.

Q.   $2.47?

A.   Yes.

Q.   Was that something that Nikola was able to do in the summer of 2020?

A.   No.

Q.   So what is this -- what does that number signify?

A.   This is what we aspire to do in the future when the variable cost and fixed costs of hydrogen production would come down low enough and we are able to procure electricity at the right price.

Q.   OK.

A.   That we could potentially achieve $2.47.

Q.   Was there any guarantee that Nikola would be able to achieve this price for production of hydrogen?

A.   No.

Q.   What types of things would impact whether Nikola could one day achieve this?

A.   Two biggest factors, number one, is that can we build a station at the cost estimate that we were thinking?

Number two, when it comes to electricity, can we obtain electricity price at wholesale rate, which is not available to

retail customers or corporate customers?

Q.  So let's look at those factors.

If we blow up the box on the left under hydrogen station key assumptions, what's an assumption in this context?

A.  Well, there are a number of assumptions.

Q.  Well, I actually mean more generally the word "assumption."

What's being conveyed by the word "assumption" here?

A.  Assumptions meaning simply we are making -- we are assuming certain things.  This has not been realized.  This is in the future.

Q.  So you see the first bullet says $0.035 -- I think that's kilowatt-hours electricity.  Do you see that?

A.  Yes.

Q.  Is that the price of electricity?

A.  Yes.

Q.  So can you explain, what is that assumption?  How does that impact the model that we're looking at here?

A.  From an operating perspective, electricity price has the greatest sensitivity since it represents likely anywhere from 80 to 85 percent of your operating cost.  You need electricity and electrolyzers with water to generate green hydrogen.

Q.  Does the $2.47-per-kilogram price that you were projecting depend on the ability of Nikola to purchase electricity at a price of 3.5 cents per kilowatt-hour?

A.  Correct.

Q.   Does this model say that Nikola -- this page, this model, actually say that Nikola had obtained electricity at that price?

A.   No.

Q.   Was Nikola able to obtain electricity in 2020, up through September or beginning of September 2020, at the price of 3.5 cents per kilowatt-hour?

A.   No.

Q.   In fact, had -- was Nikola finding it challenging to find a partner who could provide energy at a suitable rate at that time?

A.   Yes.

Q.   So, again, just to understand how our model works, what happens if Nikola is unable to obtain energy at 3.5 cents per kilowatt-hour but actually it's higher?  What happens to the cost of the hydrogen?

A.   The cost of hydrogen would increase.

Q.   All right.  Is the reason that you needed a model for this because it was not actually done at this time?

A.   Yes.  We need to convey to analysts and, ultimately, investors the framework as to what it takes to actually generate hydrogen in the future at this price.  And there are a significant number of variables that could impact the ultimate outcome as to what we can generate hydrogen for.  And we were helping research analysts, because they publish reports, what

those components are.

MR. PODOLSKY:  So let's keep this in mind.  Let's keep this up and add to the right one of those tweets.  521, let's do.  Maybe we could blow up just -- perfect.  And then the tweet at the bottom, if it's not going to be too difficult.

Q.  OK.  So June 9, 2020, Mr. Milton writes:  "We are now below $4 per kilogram, which is the lowest in the world.  We started at 16 and are now below $4."

Does the model on the left there support the statement we are now below $4 per kilogram?

A.  No.

Q.  Why not?

A.  Because the assumption is clear that this is a future state versus what Trevor is stating is present state.

Q.  All right.  So to be clear, does the model, that work, show that on June 20 -- June of 2020, Nikola was able to produce hydrogen at $4 per kilogram?

MR. MUKASEY:  Asked and answered.

THE COURT:  Overruled.

A.  No.

MR. PODOLSKY:  OK.  Let's take that down.

Q.  Actually, at that time was Nikola at least exploring other options for hydrogen production than just the on-site electrolysis?

A.  Yes.

Q.  Was that because electricity costs to that point were too high for this model to work?

A.  Several factors.  This is -- this was still at an early stage with respect to equipment suppliers, and the costs were too high than what we were estimating.  So we were exploring different technology for electrolyzers as well as different vendors.  We were exploring various models so that we moved on away from on-site gaseous hydrogen generation and dispensing to potentially a centralized hydrogen hub production separate from dispensing stations.

So we were exploring various different models to better understand how quickly we can move towards achieving a price and to be at parity with diesel.

Q.  For any of those options had Nikola made any physical steps to lock in land, electricity rates, anything like that?

A.  No.

Q.  Was Nikola also considering whether it would be feasible to just purchase hydrogen from another vendor?

A.  Yes.  And we knew at first we may need to do that, especially for our prototype vehicles.  And ultimately, even when we went into production initially in 2023, we may have to do that temporarily.

Q.  Was there any guarantee that if you purchased hydrogen it would be from a green source of electricity?

A.  No.

Q.  So if we look at 553 again for a moment, where Mr. Milton says, "We currently make our own green H2 for under $4 a kilogram," let's just break this down.

Was Nikola making any hydrogen at this time?

A.  No.

Q.  Was Nikola making hydrogen for $4?

A.  No.

Q.  If Nikola were making hydrogen -- excuse me.

Was there any guarantee that if Nikola did make hydrogen and it was under $4 that it would be green hydrogen?

A.  If we generated hydrogen using electrolyzers and electricity and water, it would be considered green hydrogen.

Q.  But only if you achieved that?

A.  That's right.

Q.  Now, with that in mind, you've testified that those statements were not accurate at the time.  I think you testified earlier that the way the risk assumptions were described in the SEC filings, you believe those were accurate, is that right?

A.  Correct.

Q.  I think you testified earlier that you had concerns about some of Mr. Milton's statements in this time period, is that right?

A.  Yes.

Q.  Now, can you explain why you were concerned with

Mr. Milton's statements despite the fact that the risk assumptions described in the SEC filings were accurate?

A.  It's highly unusual for an executive chairman to tweet and communicate via social media directly with retail investors, perhaps other than that Elon Musk.  And we were also concerned, finding out after the fact, that there were misstatements.  We were also concerned about increased retail shareholding into Nikola and who were paying attention to Trevor's statements.

Q.  Were you concerned about potential misstatements or inaccuracies even despite the fact that the SEC filings were accurate, to your understanding?

        MR. MUKASEY:  Objection.  Leading.

        THE COURT:  Overruled.

A.  Yes.

Q.  Why is that?

A.  Well, simply because what we filed, we were very careful. We had internal process disclosure committee to review our filing by various key individuals who were driving the company's progress.  To make sure that our statements were accurate, we also had filings reviewed by an outside counsel, SEC attorney, who specialized in reviewing filings to ensure that we had appropriate forward-looking statements and specific risk factors were identified.  And we believed those were accurate.  However, Trevor's -- many of his statements were not consistent with what we filed.

Q.   Were any of those people -- did Mr. Milton submit his tweets or podcast interviews or TV interviews to be reviewed by any of the people you just described?

A.   No.

MR. PODOLSKY:   One more item, I think, before we break on that.  If we go to DX 734, the S-1, let's go to page 25 of the PDF, I believe.  And we can blow up the very top.

Q.   Is this another risk factor that was listed in the SEC filings?

A.   Yes.

Q.   Can you read this one.

A.   We are highly dependent on the services of Trevor Milton, our executive chairman.

Q.   Do you see that it says:  "We're highly dependent on the services of Trevor R. Milton, our executive chairman and largest stockholder.  Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola"?

Do you see that?

A.   Yes.

MR. PODOLSKY:   All right.  Your Honor, this may make sense for a break.

THE COURT:   Yes.  It's just about 12:50, ladies and gentlemen, so we'll take our second break.  Twenty minutes. Don't discuss the case.

(Jury excused)

M9NHMil4                          Brady - Direct

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Brady, you may step down, and folks can be seated.

Any issues that you wish to discuss, Mr. Podolsky?

MR. PODOLSKY:  One thing I want to flag maybe after the witness has left.

I just wanted to flag one -- we were produced some defense exhibits early this morning or late last night.

THE COURT:  I'm sorry.  You were introduced?

MR. PODOLSKY:  We were produced by the defense some exhibits.  I think it was 8 a.m. this morning.  But we -- and I think we have now produced 3500 relating to this.  We showed Mr. Brady one journal entry that I think is from -- dated September 14, 2020.  In the entry it reflects a conversation between Mr. Brady and an outside investor where the investor -- this was shortly after Hindenburg comes out -- the outside investor, who's not internal to Nikola, there's a comment reflected that says something like TM exaggerations not fraud, or something.  So it's a reflection of what some outside investor sort of speculated about the Hindenburg report.

THE COURT:  So this is not Mr. Brady speaking, it's the outside investor speaking?

MR. PODOLSKY:  Correct.  I wanted to flag that because I wanted to be careful on cross that this shouldn't be introduced as his statement.  So that's why I'm putting it on

the record.  I think they've gotten the 3500 on this, but --

THE COURT:  That it should not be introduced as Mr. Brady's statement?

MR. PODOLSKY:  I think it shouldn't be introduced at all, but I want to be clear about what it is for that reason. It's somebody -- outside investor's speculation, reading the Hindenburg report.

MR. MUKASEY:  I'm actually not sure whose statement it is.  It is certainly written down by Mr. Brady in connection with his discussion with this outside investor.  And Matt's right, it says, "TM, aspirational exaggerations, no fraud."  I don't know if those are Brady's conclusions based on what he discussed with the investor.

They may be Brady's conclusions based on what he discussed with the investor, or he may have been transcribing what the investor told him.  Either way, I think they're relevant.  If they're Mr. Brady's conclusions, they're certainly relevant.  If they're the investor's conclusions, they tend to undercut the notion that Mr. Milton intended to commit fraud.  The same way -- the same way that the government puts on witnesses who say these representations defrauded me or misled me, there are people in similar situations who say I wasn't misled at all.

THE COURT:  I don't know that it would be admissible on that basis.  As I'm sure you all know, communications of a

similar sort are admissible or not depending on who's proffering them. So I think you can certainly inquire of Mr. Brady what it was before offering it, and see what he says.

MR. MUKASEY: We're certainly not offering it for the truth, but for what somebody told him under the circumstances.

MR. PODOLSKY: I want to be clear. We've not offered any out-of-court declarant saying I've been defrauded. And if he wants to ask Mr. Brady, have you ever said this? Have you ever said this? Maybe it would be relevant if Mr. Brady had said it, but I think if the answer is no, that's the end of the inquiry.

MR. MUKASEY: Mr. Brady has written it, so it's worthy of inquiry.

THE COURT: It's absolutely worthy of inquiry. Whether it's admissible or not, we have to await Mr. Brady's testimony.

MR. CARUSO: Very well. Thank you, Judge.

THE COURT: OK. Don't be late.

(Recess)

(Continued next page)

M9NCmil5                          Brady - Direct

THE COURT:  Everyone, please be seated.

Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

BY MR. PODOLSKY:

Q.  Mr. Brady, I think where we left off, we were talking about some topics related to hydrogen.  One more related topic.

Did there come a time in 2020 when a particular podcast that Mr. Milton was on was brought to your attention?

A.  Yes.

Q.  Do you remember what that was called?

A.  Something related to Tesla.

Q.  Are you familiar with -- well, let me just ask about that.

Generally, what was the issue that you recall being brought to your attention?

A.  I received, I believe, an email from Elizabeth Fretheim, who was, I believe, at the podcast or listening to the podcast, and she reported that there were a number of misstatements that she was concerned about.

Q.  Do you recall whether you had a conversation with Mr. Milton around that time, after this podcast that you're referencing?

A.  Yes.  I discussed with Mark Russell and Britton --

MR. MUKASEY:  Objection.  Not responsive.

THE COURT:  Sustained.

Q.  Let me ask another question, Mr. Brady.  You don't have to

get into the content, but before, I think you testified a

moment ago that you had a discussion with Mr. Milton; is that

correct?

A.   Yes, after I had discussion first with Mr. Russell and

Ms. Worthen.

Q.   Generally, let's focus on the conversation with Mr. Milton.

What do you remember the content of that conversation being?

A.   I think we were quite concerned about the podcast, and I

believed this was something that we discussed as management

team, and we even discussed with certain board members --

          MR. MUKASEY:   Objection.

          THE COURT:   Overruled.

          MR. PODOLSKY:   You can continue your answer.

A.   -- and ultimately, it was decided that Jeff Evan, who was

the lead director, would also talk to Trevor about his

misstatements on social media.

          MR. MUKASEY:   Objection, Judge.   The question was with

conversations with Mr. Milton.

          THE COURT:   Why don't you ask the question again,

Mr. Podolsky.

Q.   Let me ask this, did you have a series of discussions

amongst the management team about how to raise these issues

with Mr. Milton following the podcast?

A.   Yes.

Q.   Is that what you described a moment ago?

A.  Yes.

Q.  Now, were you aware, to the best of your recollection, as to whether that podcast was linked in some way on the company's website or social media accounts?

A.  No.

Q.  Let's talk about another topic.

MR. PODOLSKY:  Let's pull up Government Exhibit 279, which is not in evidence.  Let's show Mr. Brady.

Q.  Mr. Brady, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a master tractor agreement with Anheuser-Busch that was made on February 22nd, 2018.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 279.

MR. MUKASEY:  No objection.

THE COURT:  279 will be received.

(Government's Exhibit 279 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Ms. Wolfson, if we can blow up from the master agreement up to "Now, therefore."

Q.  I'm not going to have you read the entire contract, but could you explain to us what this contract is?

A.  This was a contract and understanding with Anheuser-Busch

that Nikola would be required to deliver a certain number of
prototype trucks for pilot testing, and to the extent that
Nikola was able to meet a common reliability, then there would
be an opportunity to negotiate a separate sublease agreement
for each Anheuser routes between their distribution center and
the brewery.

Q.  If we go to page 15, this is Exhibit A, it says network,
and it's got a list of brewery locations and distribution
centers.  Do you see that?

A.  Yes.

Q.  Did this contract, Government Exhibit 279, guarantee Nikola
any particular routes, Anheuser-Busch routes?

A.  No, not at this point.

Q.  What would have to happen in order for Nikola to be
providing trucks for particular Anheuser-Busch routes?

A.  Nikola would have to build and produce fuel cell truck and
it would have to be tested and meet reliability requirements,
and we would likely have to also demonstrate that we had some
fueling capability, and then there will be negotiation with
Anheuser-Busch for various routes.

Q.  Would there be separate contracts to cover the particular
routes?

A.  Yes.

Q.  So let's focus on our time period, 2020 up through
September.  Let's say a particular route, Los Angeles to

Phoenix.  Did Nikola have the guarantee of providing trucks for a route between Los Angeles and Phoenix for Anheuser-Busch?

A.  No.

Q.  Was there any guarantee that Nikola would provide trucks for that route?

A.  Not at that point.

Q.  As of April 2020 -- actually, we'll do the whole time period.  As of 2020 up until September, had Nikola procured power for stations along a route between Los Angeles and Phoenix?

A.  No.

Q.  Had Nikola taken any energy off the grid on any Anheuser-Busch route?

A.  No.

Q.  And I was focusing on Los Angeles to Phoenix, let's make it a little broader.  In that time period, did Nikola have any guarantee of any routes for Anheuser-Busch?

A.  No.

Q.  Had Nikola procured power along any Anheuser-Busch route?

A.  No.

Q.  Had Nikola taken energy off the grid along any Anheuser-Busch route?

A.  No.

        MR. PODOLSKY:  Let's talk about another topic.  We can go back to, why don't we use DX-734, the S1 we've been using,

and go to page 20.  I think it's at the very bottom there, if we can blow up --

Q.  Do you see, Mr. Brady, that this is another risk factor in the S1 filing?

A.  Yes.

Q.  Can you just read it, what it says.

A.  What we had was expression of interest.

Q.  Actually, before we get to that, why don't you actually read the text.

A.  Reservations for our trucks are cancelable.

Q.  Then you can go ahead and read that sentence.

A.  As of December 31, 2019, we had reservations for 14,000 Nikola Two fuel cell electric vehicle trucks, all of which are subject to cancellation by the customer until the customer enters into a lease agreement.

Q.  I think you used, I thought I heard you use the word expression of interest a moment ago?

A.  Yes.

Q.  What did you mean by that?

A.  Meaning, simply, these are not binding, they are cancelable.  These are simply expression.  There are no deposits, and these are customers or potential customers indicating that there could be interest in Nikola fuel cell trucks in the future.

Q.  Was there any basis in 2020, up through September, on which

Nikola could, at its election, convert 80 percent of its reservations to binding contracts?

A.  No.

MR. PODOLSKY:  One last topic.  We can take this down.

Q.  You discussed various conversations you had with Mr. Milton during 2020.  I want to direct your attention to August 2020.

Did there come a time when you and other members of the executive team spoke to Mr. Milton about the issues we've discussed relating to his media usage and so on?

A.  Yes.

Q.  Can you explain how that meeting came about?

A.  I was quite frustrated by this time in August with respect to some of the misstatements and some of the poor decision-making with respect to some of the announcements and had some concerns about potentially resigning.  I had arranged a call with Mark Russell and Britton Worthen to discuss about the company's situation and whether it made sense for all of us to resign at that time.

Q.  Following that conversation, did you meet with Mr. Milton?

A.  We did.  I think all three of us met together with him to express our frustration and some of our concerns.

Q.  Where did that meeting take place?

A.  I believe it was in Trevor's office.

Q.  Can you describe the sort of tone or atmosphere of the meeting?

A.   I, you know, I think there was ample amount of frustration and our concerns and our views about the company's direction, as well as Trevor's consistent presence on social media and the -- and there was a lot of concerns expressed.

Q.   Who did most of the talking from the perspective of you and Mr. Russell and Mr. Worthen?

A.   Mr. Russell, myself, and then Britton.

Q.   In that order?

A.   Yes.

Q.   In substance, what did you tell, the three of you, what did you tell Mr. Milton?

A.   That he needs to stop, he needs to make sure that he vets everything like we have agreed.  And that his social media needs to be toned down and, optimally, not participating in any social media, as well as we need to make sure that we are focused on execution.

Q.   Did Mr. Milton express agreement with you in that meeting?

A.   No.

Q.   What do you remember him saying?

A.   I think Mr. Milton was highly disappointed about the conversation.  Mr. Milton hated having meetings with three of us because he felt like we are ganging up on him.  I think after that meeting, there was a separate meeting with Mark Russell where Mr. Milton talked about Mark really needs to decide whether he is with Mr. Milton.

Q.   That last word, with Mr. Milton?

A.   Pardon?

Q.   I didn't hear that last piece.

A.   That Mark will need to decide whether Mark is with him or not, and I think subsequent to that conversation, Mr. Russell walked into my office.

         MR. MUKASEY:  Objection to what happened subsequently and what he thought.

         THE COURT:  Ask another question, Mr. Podolsky.

Q.   What happened, did Mr. Russell come and talk to you after the conversation he had?

A.   Yes, he did.

Q.   What happened then?

A.   Mr. Russell came in and told me about the conversation that he had with Mr. Milton, and he felt like it was a --

         MR. MUKASEY:  Objection to what he felt like. Hearsay.

Q.   What did he say to you?

A.   Mr. Russell said he felt that it was a veiled threat.

Q.   Now, after that conversation with Mr. Milton, did you, in the remainder of August, beginning of September, did you observe any changes in Mr. Milton's conduct?

A.   No.

Q.   Did there come a time when a report was published online alleging various misstatements by Mr. Milton?

A.  Yes.

Q.  Do you remember approximately when that was?

A.  Around September, early part of September.

Q.  And did Nikola's board convene any meetings following the publication of that report?

A.  Yes.

Q.  Did you participate in any of those meetings?

A.  Yes.

Q.  Can you describe what happened?

A.  There were several.  Obviously, we're very, very concerned about the report.  There were one board meeting where we had discussed and Mr. Milton was present.  And then there was another board meeting very shortly thereafter where the board met with management team without Mr. Milton and they asked us in terms of our views on the situation and what our recommendation was, and we all -- each member of the management team had chance to speak and we all spoke and said that we had no confidence in Mr. Milton and that he needs to resign or we all need to resign.

Q.  And subsequent to that meeting, who resigned?

A.  Subsequent to the meeting, there were further conversations and, ultimately, Mr. Milton resigned.

            MR. PODOLSKY:  Just one moment, Mr. Brady.

            Nothing further at this time, your Honor.

            THE COURT:  Cross examination.

MR. MUKASEY:  Chris, can you give me GX283, please.

CROSS-EXAMINATION

BY MR. MUKASEY:

Q.  Mr. Brady, that's the executive compensation document that you spoke about earlier this morning with Mr. Podolsky; right?

A.  Correct.

Q.  And that executive compensation regime was Mark Russell's idea, right, originally?

A.  Correct.

Q.  And you went along with that; right?

A.  We discussed it and we all felt that the scheme aligned all of our compensation with investors.  However, I objected to the performance element and strongly suggested that 20 consecutive day of stock price trading was inadequate.

Q.  But your view was rejected and, ultimately, you all went along with Mr. Russell's view; correct?

A.  Yes, ultimately --

Q.  Including Trevor, he went along with Mr. Russell's view; right?

A.  Well, ultimately, Mark Russell is my boss and Mark Russell and Trevor Milton is Mark Russell's boss.

Q.  So I'm not asking sort of why it happened, I'm just asking, at the end of the day, you went along with it; right?

A.  Well, I had no choice.

Q.  I'll try one more time.  At the end of the day, you went

M9NCmil5                          Brady - Cross

along with Mark Russell's proposed regime?

MR. PODOLSKY:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  Yes.

Q.  Thank you.  How much stock were you granted in Nikola as a sort of base of your compensation, can you just read that out?

A.  The time vest component would be 320,000 shares.

Q.  And then for the bonus compensation component?

A.  The performance component, that's if those share price milestones were met, could be up to 2.59 million shares.

Q.  How many shares do you own in Nikola right now?

A.  I do not own any shares, I own options.

Q.  Okay.  How many options do you own?

A.  Approximately 10.3 million options.

Q.  Can you put a ballpark estimate on the value of those?

A.  At the current price, I don't know what the current price is today.  Let's say at $4, that could be worth about $43 million or so.

Q.  $43 million?

A.  Yes.

Q.  Thank you.  And I should also note, this compensation regime was approved by the board; correct?

A.  Correct.

Q.  By the time you started working at Nikola about five or so years ago, Mr. Brady, you had been in the financial industry

M9NCmil5                    Brady - Cross

for about 20 years?

A.   Correct.

Q.   And you hold securities licenses; correct?

A.   At one point.

Q.   Series 7; right?

A.   Yes.

Q.   Series 63?

A.   Yes.

Q.   And you passed tests to get those licenses?

A.   Yes.

Q.   Among other things, those tests examine your familiarity with the rules surrounding ethics and honesty in the stock market; correct?

A.   Yes.

Q.   Now, from 2017 when you started up until let's say the end of 2020, your role as CFO included supervising all accounting functions, yes?

A.   Yes.

Q.   And all finance functions reported to you?

A.   Yes.

Q.   And all treasury functions reported to you; right?

A.   We really didn't have that function, but yes.

Q.   And whatever internal reporting reported up to you; correct?

A.   Meaning internal accounting function?

Q.   Correct.

A.   Yes.

Q.   And you also were responsible for reporting numbers and financials externally to auditors and regulators; correct?

A.   Correct.

Q.   And you didn't just do this by yourself, you had a team of people working with you?

A.   Correct.

Q.   I'm probably not going to get everybody, but just, let me give you a list of names and you tell me if these are folks that were on your team.  Okay.

          Stasy Pasterick?

A.   Yes.

Q.   Is she the controller?

A.   Yes.

Q.   Joey Kiessig?

A.   Yes.

Q.   Dillon Sandu?

A.   Yes.

Q.   Tony Epperson?

A.   Yes.

Q.   And as the CFO, you were responsible for making sure the company's financial information was recorded truthfully and correctly in the company's books and records, yes?

A.   Yes.

M9NCmil5                          Brady - Cross

Q.   And when I say making sure it was reported correctly, I
mean reported in various directions, reported, for example, to
the board of directors, yes?

A.   Yes.

Q.   Reported to outside auditors; right?

A.   Yes, the financials were prepared according to Gap,
reviewed by our outside auditors and signed off.

Q.   Once you became public, your outside auditors were
Ernst & Young; right?

A.   Correct.

Q.   Topflight accounting firm; right?

A.   Correct.

Q.   And to the extent you filed things with the SEC, you make
sure your books and records are accurate for investors to read
and potential investors to read?

A.   Yes.

Q.   Now, you were also responsible, as I understand it, as CFO
for internal controls, policies to make sure that reporting
comes out accurately?

A.   Yes.

Q.   And making sure, in terms of controls, that rules and
regulations are being complied with?

A.   Yes, with help of the policies that we had in place, as
well as our chief legal officer.

Q.   You played a key role in that?

M9NCmil5                          Brady - Cross

A.   Yes.

Q.   And you also had responsibility for reporting fraud or misconduct; right?

A.   Yes.

Q.   And there are different outlets where you could report fraud or misconduct if it came to your attention, you could report it up the chain to Mark Russell; right?

A.   Yes.

Q.   You could report it to the audit committee; right?

A.   Yes.

Q.   Tell the members of the jury, just short form, what the audit committee is.

A.   You mean who is on the audit committee?

Q.   No, what an audit committee does.

A.   The purpose of the audit committee is comprised of three members of the board, and their responsibility is to ensure that the company reports fairly, accurately, timely to our -- to the SEC, as well as they review financial performance.  They also ensure that the IT securities issues are also in place.  So those are some of audit committee's functions.

Q.   And had you learned of reports of misconduct, you could have reported them to the audit committee; right?

A.   Yes.

Q.   Or to the full board of directors?

A.   Correct.

Q.  Just to be clear, the audit committee is a subcommittee, it's made up of three people from the board of directors?

A.  That's right.

Q.  If necessary, and you learned of misconduct, you could report it to the SEC; right?

A.  Well, depending on the nature of misconduct, yes.

Q.  Right.  If it were financial related, if it were disclosure related, if it were filings related, those are the kinds of things you could have reported to the SEC; correct?

A.  Yes.  A lot of those technical issues or interpretation issues.

Q.  So are you telling us you would only report a technical issue to the SEC?

A.  No.  What I'm saying is that, oftentimes, those are the nature of discussions with the SEC.

Q.  So I'm not really asking about oftentimes, I'm asking about who you could report misconduct to.  One of the outlets is the audit committee, one is the board of directors, and one is the SEC; right?

A.  Uh-huh.

Q.  Now, before the company went public, let's say up till June 2nd or 3rd of 2020, sometime right before there, you underwent training, didn't you, on the responsibilities of a CFO in a public company?

A.  Correct.

Q.   And that training was done by a law firm?

A.   Yes.

Q.   Now, you took all your responsibilities, I imagine, very seriously as CFO?

A.   Yes.

Q.   And you did your level best to live up to them at all times?

A.   Yes.

Q.   And nobody within the company complained about your vigilance?

A.   Not that I'm aware of.

Q.   And Mr. Podolsky asked you some questions about the model that you were also responsible for, and you were, by the way, the guy in charge of the model at the end of the day, yes?

A.   Yes.

Q.   And one of the reasons a model is developed, if I understand correctly, is to show investors the goals and the plans of the company in the future?

A.   Correct.

Q.   And that's especially important in a pre-revenue company because you don't have dollars and cents or products sold to show them, so you show them the model; right?

A.   That's right.

Q.   Now you and your team, the people I mentioned earlier, probably others, you built solid, well-reasoned, well-founded

models, yes?

A.  I think we did as best as we can, based on the information that we had.

Q.  Now, before the company went public, let's say from the time you joined till early 2020, you handled what are called due diligence questions that came in from investors; is that right?

A.  Correct.

Q.  And due diligence questions are coming from investors, are inquiries, questions, ideas that investors who may want to invest in Nikola want to get some answers to.  Is that a fair explanation?

A.  That's right.  And certain due diligence questions, Trevor was also involved.

Q.  Well, thank you for volunteering that information, I'll get there when I want to get there, but that is a very helpful answer to me.  Thank you.  I'm going to get right there.

Now, you had ultimate authority over due diligence, if I understand correctly, yes?

A.  Yes, that was part of my responsibility.

Q.  And when a potential investor asks questions about the company, tell me about the process.  You would try to gather information from the relevant subject matter experts and compile it and send it to the investors, that's a general process?

A.   I think that's a general process.

Q.   Right.  So if somebody wanted information about hydrogen, you might talk to the hydrogen guys; if someone wanted information about, I don't know, the Badger, you might talk to the Badger guys; if somebody wanted information about stations, you would gather it together into a document, have your team review it, have people review it, and send it out to the investor?

A.   That's right.

Q.   I'm going to ask you to take a look at a couple of these due diligence type of accumulations and answers.

There came a time, I want to say, in 2018, but you'll correct me, I'm sure, if I'm wrong, that a company called Hanwha was interested in investing in Nikola; right?

A.   Correct.

Q.   And Hanwha was given access to information about Nikola; right?

A.   Yes.

Q.   And sometimes that information is put in something called a data room; right?

A.   Yes.

Q.   Please tell us what a data room is.

A.   A data room has collection of documents with respect to the company as well as a company's projections or models or business plan, both technical and nontechnical information, and

it's a repository of information related to the company in one place to facilitate due diligence.

Q.  I'm guessing that when you started out your career, the data room was actually a room with a bunch of boxes in it that people came and looked through your stuff.  Today, the data room's online; is that correct?

A.  Correct.

MR. MUKASEY:  I'd like to show just the witness, Chris, what's been marked for identification as DX-1602 and DX-1604.

Q.  Mr. Brady, take a look at those.  It's an email on the left side and a response on the right side.

Do you recognize the email on the left side?

A.  Yes.

Q.  And that's an email from you to a couple of others, including Trevor and Britton, dated August of 2018; right?

A.  Yes.

Q.  And the attachment is a Hanwha management presentation.  Do you see that?

A.  Correct.

Q.  Take a look at the right-hand side, if you look at the upper left-hand corner, those are the followup responses to Hanwha; right?

A.  Yes.

MR. MUKASEY:  Defense offers 1602 and 1604 for

identification into evidence.

          MR. PODOLSKY:  No objection.

          THE COURT:  They will be received.

          (Defendant's Exhibits 1602, 1604 received in evidence)

Q.  Now, these are --

          MR. MUKASEY:  As we publish them to the jury with the
Court's permission.

          THE COURT:  You may.

Q.  -- the answers that you gathered and sent to Hanwha;
correct?

A.  Correct.

Q.  So if we start at page 1, paragraph 4.

A.  Yes.

Q.  That talks about a company called Nel; right?

A.  Yes.

Q.  And it says that Nel is committed to Nikola due to the
large order of electrolyzers Nikola placed with Nel.  Do you
see that?

A.  Yes.

Q.  And that refers to Nikola's relationship with a hydrogen
tech company in Norway called Nel that we've heard about;
right?

A.  Yes.

Q.  And that's back in 2018?

A.  Yes.

Q.   The third sentence says, there's no other equivalent demand in the world for electrolyzers and hydrogen stations on the scale that Nikola is building.  Do you see that?

A.   Yes.

Q.   Nikola was not actually building any hydrogen stations at that moment, were they?

A.   No, this is talking about what Nikola is looking to build.

Q.   But it says, present tense, Nikola is building; am I right? Yes or no.

A.   I can tell you that Hanwha knew that Nikola was not building any hydrogen stations.

        MR. MUKASEY:  Motion to strike what Nel knew.

        MR. PODOLSKY:  Objection.

        THE COURT:  Sustained.

        MR. MUKASEY:  Was the motion to strike sustained or the objection sustained?

        THE COURT:  The motion to strike was sustained.  I apologize.

Q.   So without referring to what Nel may or may not have known --

A.   This is not about Nel knowing --

Q.   If you let me finish the question.  "The hydrogen stations that Nikola is building."  Do you see those words?

A.   Yes, I see those words.

Q.   That's present tense, yes or no?

A.    Well, that depends on how you're looking at the context of the whole paragraph.

Q.    Because context is important when you read things and say things and write things; correct?

A.    It is.

Q.    So when you say Nikola is building hydrogen stations, it's important that you appreciate the context; correct?

A.    When you have the right context, meaning Hanwha was in a position of understanding the right context because they had access to the data room and they fully understood that there was no building right now.

Q.    I understand you want to talk about Hanwha, I just want to talk about the language here.

       This says Nikola is building; right?

A.    I'm only pointing out that this email is to Hanwha, and if you are talking about context, then it has to be context with Hanwha.

Q.    It has to be context within what you're reading, right, and it says Nikola is building hydrogen stations.  You can talk on redirect if you wish about what Hanwha might have known or not known --

       MR. PODOLSKY:  Objection.  Arguing with the witness.

       THE COURT:  Sustained.

Q.    Simple question, "Nikola is building" is written in the present tense, yes or no?  Those three words.

A.  "Nikola is building" if you're only looking at those three words.

Q.  Thank you.  Let's move on to page 3.  That is a list of stations, right, station locations?

A.  Correct.

Q.  Let's move on to page 5.  There is a question at the top of page 5, which starts with number 10.  How do you see possibility of diesel price decrease and electricity price increase in short-term?

Do you see that?

A.  Yes.

Q.  And can you tell us what that chart shows?

A.  This looks like it's showing the historical diesel price as well as potential future diesel price.

Q.  And it shows the price going up or going down?

A.  Correct.

Q.  Going up or going down?

A.  It's going up.

Q.  And read the next paragraph, starting regarding electricity pricing?

A.  Regarding electricity pricing, Nikola model assumes average energy price of $40 per megawatt hour or $0.04 per kilowatt hour.  In most of the markets throughout the US, energy prices fluctuate from $0.02 to $0.05 per kilowatt hour, and these rates should be achievable given Nikola's energy demand and

willingness to enter into long-term PPAs with energy providers.

Q.   The next paragraph says many states offer long-term power purchase agreements from $0.02 to $0.05 cent per kilowatt hour. Do you see that?

A.   Yes.

Q.   Read the next sentence, please.

A.   For example, the Tennessee Valley Authority, which covers 7 states, (Tennessee, Alabama, Mississippi, Kentucky, Georgia, North Carolina, and Virginia) in the southeastern U.S. is willing to offer Nikola energy at $0.03 per kilowatt hour through a long-term PPA.  Nikola is currently paying around $0.35 per watt for solar before tariffs that were just implemented.

Q.   That's good enough.  Thank you.

These answers were submitted by your team to Hanwha; correct?

A.   Correct.

Q.   And Trevor Milton was copied on the email that is 1602; right?

A.   Actually, the information about Tennessee Valley Authority came directly from Trevor based on his conversation with Tennessee Valley Authority.

MR. MUKASEY:  Motion to strike.  Not responsive to the question.

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Sustained.

Q.  I'm going to ask my question again.

The email, 1602, went to Trevor Milton?

A.  Yes.

MR. MUKASEY:  Chris, you can take down the Hanwha due diligence.

Q.  By the way, one of the executives from Hanwha eventually joined the Nikola board; is that correct?

A.  Correct.

Q.  That's Sophia Jin?

A.  Yes.

MR. MUKASEY:  Now let's take a look, just for the witness, at DX-1610, please.

Q.  Mr. Brady, take a look at 1610.

A.  Yes.

Q.  This is an email from somebody named Brent Williams to you. Do you recognize this?

A.  Yes.

Q.  Dated August 1, 2018, Brent Williams is at an email address called KLGates.  That's a law firm; right?

A.  Yes.

MR. MUKASEY:  Defense offers 1610 for identification into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  That exhibit will be received.

(Defendant's Exhibit 1610 received in evidence)

Q.  Are you familiar, Mr. Brady, with an investor by the name of Nimbus?

A.  Yes.

Q.  And Nimbus, attached to this email, submitted some due diligence questions similar to Hanwha; right?

A.  Yes.

Q.  So why don't you turn to page --

MR. MUKASEY:  Chris, why don't you give us the SDNY 5496, or am I looking at page 14?

Q.  Why don't we start with the first page of the frequently asked due diligence questions, that's 5496.

At number 3, Mr. Brady, at the bottom, do you see that?

A.  Yes.

Q.  Nikola's first milestones is the unveiling of the truck in January/February of 2019; right?

A.  Yes.

Q.  Next page at the bottom talks about beta trucks?

A.  Yes.

MR. PODOLSKY:  Your Honor, may we have a brief sidebar to work something out about this exhibit?

THE COURT:  You want a sidebar?

MR. PODOLSKY:  Please.

THE COURT:  Okay.

(At the sidebar)

MR. PODOLSKY:  Sorry to bring the whole circus.  It's just that we were not produced a full copy of this.  We want to see what the exhibit is.

MR. MUKASEY:  I apologize.  Maybe I read from the wrong page.  Do you have the financial page?

MS. ESTES:  We don't have the attachment.  Our exhibit only goes through page 6 of the email.

MR. MUKASEY:  I'll show you what I'm going to do right now, I'm going to read the financial model assumes this, and the same Tennessee Valley Authority that he just read.  That's it.

MR. PODOLSKY:  I don't have an issue with the document.  I just didn't know what it was.  It's fine.

MR. MUKASEY:  It's the same thing you just heard.

(Continued on next page)

(In open court)

MR. MUKASEY:  Chris, let's go to the financial models assumptions here.

BY MR. MUKASEY:

Q.  Do you see that, Mr. Brady?

A.  Yes.

Q.  Can you read the last line on that page?

A.  Highlighted line?

Q.  You got it.

A.  Nikola's model assumes average energy prices of $40 per megawatt hour or $0.04 per kilowatt hour.

Q.  It's that your model; right?

A.  Correct.

Q.  If you go to the top of the next page, in most of the markets throughout the USA, energy prices fluctuate from $0.02 to $0.05 per kilowatt hour.  These rates should be achievable given Nikola's energy demand and willingness to enter into long-term PPAs with energy providers.

That's your model language; right?

A.  Correct.

THE COURT:  Please try to read slowly, Mr. Mukasey.

Q.  The next paragraph talks, again, about the Tennessee Valley Authority, and the last sentence says at $0.35 per watt, one could see solar producing energy at less than $0.02 per kilowatt installed; right?

M9NCmil5                         Brady - Cross

A.   Yes.

Q.   And I think you suggested earlier that that was Mr. Milton's Tennessee Valley Authority report; right?

A.   Yes.

Q.   This is your financial model; correct?

A.   Yes.

Q.   I'm going to show you one more of these due diligence reports, DX-1067 and 1068.

     In April of 2018, there was an investor interested in Nikola called Indigo; right?

A.   Well, yes.  I'm trying to remember who they were, but --

Q.   I think they were a family office.  Does that ring a bell?

A.   Not quite, but name sounds familiar.

Q.   And that is an email from Britton Worthen to you, copied to Trevor, yes?

A.   Yes.

     MR. MUKASEY:  We'll offer 1067 for identification into evidence.

     MR. PODOLSKY:  No objection.

     THE COURT:  It will be received.

     (Defendant's Exhibit 1067 received in evidence)

Q.   Right behind that or right connected to that is DX-1068. Do you have that on your screen Mr. Brady?

A.   Yes.

     (Continued on next page)

Q.  1068, the response is to due diligence questions from Indigo.  Do you see that?

A.  Yes.

MR. MUKASEY:  Going to offer 1068 for identification in evidence as DX 1068.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1068 received in evidence)

BY MR. MUKASEY:

Q.  At the bottom of page 5, Chris, under direct electricity costs, can you read the first sentence, Mr. Brady, please.

A.  "Nikola's model assumes average energy price of 4 cents per kilowatt-hour.  At 4 cents per kilowatt-hour, Nikola's vehicle profit margin per truck is illustrated below."

Q.  Then there's a chart on the next page.  And if you continue reading, it says, "We are able."  Do you see that?

A.  Yes.

Q.  Can you just finish out that sentence.

A.  We are able to assist the grids balance their loads in the same markets and take energy when they have a peak, and we may be able to purchase energy for less than $2 per kilowatt-hour.  We have not factored that reduction into the business model to be conservative.  We believe we should be able to average 3 cents per kilowatt-hour.

Q.  OK.  Thanks.  We can take that down.

Now, Mr. Brady, you mentioned a little bit on your direct examination about Nikola going public, right?  All these due diligence examples that I showed you was when it was a private company, right?

A.  Correct.

Q.  And you mentioned a little bit about going public.  So I just want to ask you a couple questions about that.

There were different options on the table, we've heard, for going public.  There was a potential IPO in the U.S., right?  There was at one point a potential IPO in Norway people were talking about, is that correct?

A.  Correct.

Q.  And at one point Trevor was leaning toward an IPO in Norway, correct?

A.  Correct.

Q.  And there was the special purpose acquisition company that you talked about with Mr. Podolsky this morning, right?

A.  Correct.

Q.  You favored a SPAC, right?

A.  Yes.  But let me give you the context.

Q.  Let me ask a question, and I'll try to bring out the context.

A.  Sure.

Q.  There was a possibility of going public in Norway which Trevor seemed to be interested in, according to you, right?

A.   Correct.

Q.   And you had some bankers at an investment bank called Cowen who was helping you out through this?

A.   Correct.

Q.   And it was your preference to use a SPAC as opposed to going public in Norway, right?

A.   We had two options that the board asked us to explore.

Q.   I want to know just your preference at the moment.  I'll get to the board, for sure.

Your preference was --

A.   It was my preference in the end of February 2020 to -- and beginning of March when the country and the whole world was shutting down because of COVID and there was huge market volatility and the market was falling off and by the time we had already procured commitments from PIPE investors.

Q.   So you wanted to go SPAC?

A.   So there was --

Q.   Yes or no?

A.   There was great uncertainty.

Q.   Did you not want to go SPAC?

A.   Because of the greater certainty --

Q.   Sir --

A.   Because of the greater certainty --

THE COURT:  Mr. Brady, Mr. Brady, please listen to the question, and answer the question that's asked.  OK?

THE WITNESS:  OK.

Q.  I know you have things you want to say, and you'll be able to say them when your lawyer gets up.

MR. PODOLSKY:  Objection.

THE COURT:  Sustained.

Q.  Just do me a favor and answer the questions, and we'll get out all the context.

MR. PODOLSKY:  Objection.  Can we have a question, please?

Q.  Here's the question:  It was your preference at that time, in that place, in the world as it was then --

A.  Correct.

Q.  -- to go with a SPAC?

A.  Correct.

Q.  The board approved going with a SPAC, right?

A.  Correct, including Trevor.

Q.  Thank you, Mr. Brady.  Thanks.

He was a member of the board, right?

A.  Correct.

Q.  In March of 2020, when the business combination with Vecto was announced, Vecto was trading on the NASDAQ, right?

A.  Correct.

Q.  They had public shareholders, right?

A.  Correct.

Q.  Tell us what exchange Nikola was trading on at that time in

March of 2020.

A.  Nikola was not trading.

Q.  Tell us what public shareholders they had at the time?

A.  Nikola did not officially have shareholders.

Q.  OK.  So Vecto, by the way, had its own board of directors, right?

A.  Correct.

Q.  Nikola had a separate board of directors, correct?

A.  Correct.

Q.  Vecto had a board that had to approve the business combination, right?

A.  Correct.

Q.  Nikola had a board that had to approve the business combination?

A.  That's correct.

Q.  And it was not until the two boards separately voted to approve the SPAC that it was going to go forward, right?

A.  Correct.

Q.  So, theoretically, if the Nikola board had not approved going forward with the SPAC, it wouldn't have gone forward?

A.  That's correct.

Q.  And Nikola, at least for the moment, would have remained a private company?

A.  That is correct.

Q.  Now, you mentioned around the time of the SPAC or the time

of going public this lockup of shares that was negotiated in connection with going public.  You remember that?

A.  Yes.

Q.  And one of the decisions that was made in connection with those negotiations was that Trevor would be able to sell some stock, right?

A.  Correct.

Q.  I think you said he sold $70 million worth, right?

A.  Yes.

Q.  That was all approved by Vecto, by the PIPE, by Nikola, etc., right?

A.  That's right.

Q.  OK.  That wasn't done behind closed doors; that was done out in the open?

A.  That's right.

Q.  That was disclosed to the SEC?

A.  That's right.

Q.  Now, you also mentioned a lockup period.  Do you recall that?

A.  Yes.

Q.  Now, the lockup period -- and I'm just going to summarize your words, so correct me if I'm wrong.

        The lockup period is a period of time during which insiders, or high-ranking folks, in a company will be prohibited or restricted from selling stock so as to show that

they are digging in and not kind of running away as soon as the company goes public, right?

A.  That's correct.

Q.  And government showed you a document suggesting the length of Trevor's lockup, and I think it was six months, is that right?

A.  Yes.

Q.  And that's six months from the day the company went public forward, so it's about June to November 31?

A.  Yes.

Q.  Again, that lockup period was negotiated between and among the relevant parties -- Vecto, PIPE, Nikola, Girsky, etc.?

A.  Yes.

Q.  And in your experience, lockup periods, the time periods when people are restricted from selling stock, they can vary in length.  They're sort of whatever you negotiate, right?

A.  That's right.

Q.  And in your experience, a lockup period from 90 days to about six months is pretty typical?

A.  Yes.

Q.  And again, with respect to the lockup, nobody hid the ball. That was disclosed to the SEC, disclosed to investors, potential investors, right?

A.  Correct.

Q.  And the $70 million that Trevor got, that was a negotiated

number, correct?

A.  Correct.

Q.  It was not subject to the later trading patterns of Nikola stock?

A.  That's right.

Q.  Now, you also discussed with Mr. Podolsky Trevor's focus on the stock price, right?

A.  Yes.

Q.  Now, based on your observations and your discussions, is it fair to say that Trevor was somewhat naive about the workings of the stock market?

A.  I would not say that.

Q.  Would you say that he had less experience than yourself?

A.  Yes.  However --

Q.  Less experience than Mark Russell?

A.  Trevor was highly in tune with retail investors --

Q.  OK.  I'm just asking about the workings of the market. We're going to get to the retail investors in a second. Actually, let's go there now, if you want to go there now.

       You did not like focusing on retail investors, correct?

A.  Correct.

Q.  You were more of an institutional investor guy.  You wanted to focus on the big fat cats, right?

A.  No.

Q.   The institutional investors you mentioned were BlackRock, right?

A.   The state of the company in 2020 when we went public, the focus should be on long-term shareholders and not short-term retail.

Q.   That's your opinion --

A.   That's my opinion.

Q.   -- correct?

Trevor wanted to be able to communicate with long-term investors, right?

MR. PODOLSKY:  Objection.  Calls for speculation.

THE COURT:  Overruled.

Q.   Remember PSAM and Norges, and Trevor wanted to speak to them?

A.   Yes.

Q.   OK.  Those are institutional investors, right?

A.   Correct.

Q.   Trevor also wanted to talk to retail investors, correct?

A.   Correct.

Q.   And you disagreed with the focus on retail investors?

A.   Correct.

Q.   That's a business disagreement, right?

A.   It's a business disagreement based on experience and where Nikola was at, at that time.

Q.   Because you had more experience than Trevor?

A.   Yes, I did have more experience.

Q.   And you had a different interest or a different opinion than Trevor, right?  That's a business disagreement, correct?

A.   It's a business disagreement about where the focus should be given where Nikola was at that time.

Q.   OK.  So you thought that you were the right one, the correct one, and he was the incorrect one based on your experience, yes?

A.   Based on my experience at that time, yes.

Q.   OK.  But, again, that is a business disagreement, a strategic disagreement?

          MR. PODOLSKY:  Objection.  Asked and answered several times.

          THE COURT:  Overruled.

Q.   It's a strategic disagreement, right?

A.   I'm not sure whether you'd call it strategic, but definitely different focus about where the emphasis should be.

Q.   OK.  Some say tomato; some say tomato.  It's a disagreement, right?

A.   I believe Trevor viewed that he had more influence with retail investors.

          MR. MUKASEY:  OK.  Move to strike.

          THE COURT:  Sustained.

Q.   You had a business strategic disagreement on where to focus?

A.   We had different views on where the focus should be.

Q.   Thank you.

     There was either an email or a discussion between you and Mr. Podolsky about the first day that Nikola's stock went public.  And he called you or he contacted you -- I think it's like June 3, 2020.

A.   Correct.

Q.   And he, I guess, had looked at the stock price, and he wanted you to call NASDAQ, right?

A.   Yes.

Q.   And he wanted you to call NASDAQ because he thought NASDAQ was broken, right?

A.   Yes.

Q.   He thought -- this is the first day that his company is trading publicly in his whole life, right?

     MR. PODOLSKY:  Objection to asking what the defendant thought.

     THE COURT:  Overruled.

Q.   It's the first day that his company is trading publicly, right?

A.   Yes.

Q.   And did you detect that he was worried?

     THE COURT:  We may have missed the first part of that question, Mr. Mukasey.

Q.   Did you detect that he was nervous or worried?

A.   I'm sure he was worried.

Q.   And he called you to find out if a stock market, an entire stock market, was broken, right?

A.   I guess you could use your words.  I'm not sure --

Q.   Don't use my words.  Use your words.

     He called you to find out what was wrong with the market?

A.   Did I think the stock market was broken because Nikola stock went down by five?  No.

Q.   He asked you whether it was broken, and you told him it was not, right?

A.   He told me he thought there was something wrong with NASDAQ trading system.

Q.   You told him there wasn't?

A.   Correct.

Q.   He was obviously wrong, right?

A.   Correct.

Q.   It was no secret, Mr. Brady, within the company that Trevor was talking a lot about the stock price, right?

A.   Yes.

Q.   And from time to time after June 3, he would contact you and want to know why the stock price was down, correct?

A.   Yes.

Q.   And would you agree that when the stock price was up, Trevor was in a good mood, and when it was down, he was in a

bad mood?

A.  Yes.

Q.  I think you said this morning he had a hard time when the price fluctuated?

A.  Yes.

        MR. MUKASEY:  May I have one moment, your Honor?

        THE COURT:  You may.

Q.  Now, Mr. Brady, there were some questions about the tweets that you were shown by Mr. Podolsky concerning $4 a kilogram versus $16 a kilogram.  You remember those?

A.  Yes.

Q.  Did you see those tweets at the time that they were posted?

A.  No.

Q.  Did you see them before the government showed them to you?

A.  I don't believe so.

        Let me rephrase that.  I think I saw that when there was an investigation by the board without our --

Q.  I don't want to get into that.  Let me rephrase the question.

        Before September 2020, had you seen those tweets?

A.  I don't believe so.

Q.  Now, Mr. Podolsky also asked you about emails, text messages that Elizabeth Fretheim brought to your attention about a particular podcast?

A.  Yes.

Q.   That's the TeslaCharts podcast?

A.   That's right.

Q.   Now, you testified this morning that Trevor spent a lot of time on social media, right?

A.   Yes.

Q.   You don't follow Trevor on social media, right?

A.   No.

Q.   You don't use social media?

A.   Rarely ever, other than Facebook.

Q.   Yet somehow you know that Trevor spent a lot of time on social media?

A.   Yes.

Q.   From time to time you participated in media events on behalf of Nikola, right?

A.   Yes.  Most of those events are conferences with investment banking firms.

Q.   Yes, I understand, something called "fireside chats."

     Did you ever do fireside chats?

A.   Yes.

Q.   What's a fireside chat?

A.   It's at an investment banking conference where different companies are either presenting or involved in fireside chats. It's a one-on-one discussion with covering analysts.

Q.   And you said this morning that when you speak on behalf of a public company, you've got to do your best to be truthful and

accurate, right?

A.  Yes.

Q.  And you did your best to be truthful and accurate when you spoke at conferences?

A.  Yes.

Q.  Now let's get back to this TeslaCharts podcast.

When Elizabeth Fretheim brought her concerns to you, you did not go to Trevor and tell him:  You got a major problem to worry about here, did you?

A.  I believe, and my recollection, is that I talked about it with Mark and --

Q.  That's not my question.  Wait.  Hold on.  Let me just make sure my question is clear.

You did not go to this guy, Trevor Milton, you did not go to him and say:  You've done something wrong in the TeslaCharts podcast, right?

A.  I am trying to remember.  So I may or may have not gone directly to him.

Q.  Well, you certainly don't have a clear recollection that you did, right, Mr. Brady?

A.  Look, I had a lot of meetings with Trevor about this type of discussion.

Q.  Well, you certainly didn't tell Trevor that he must issue a correction, did you?

A.  No, I did not.

M9NHMil6                        Brady - Cross

MR. MUKASEY:  Chris, can you show the witness DX 1641.
Just for the witness.

Q.  Do you recognize this, Mr. Brady?  This is an email from
you to Trevor Milton dated June 25, 2020.  See that?

A.  OK.

Q.  The subject is Observer story.  You see that?

A.  Yes.

MR. MUKASEY:  Defense offers 1641 for identification
into evidence.

MR. PODOLSKY:  Your Honor, may we discuss one matter
at sidebar, quickly?

THE COURT:  Sure.

(Continued on next page)

M9NHMil6                        Brady - Cross

(At sidebar)

MR. ROOS:  Judge, this is about the Observer story the defense successfully moved to preclude us from.

MR. MUKASEY:  It's not about the story.

MR. ROOS:  Just look at the subject line.

MR. MUKASEY:  I understand it says "Observer story." It could say *National Enquirer*.  It could say *Sports Illustrated*.  The only issue is he's giving positive feedback to Trevor.  That affects Trevor's state of mind.  But the underlying story is it could have been a cartoon, but he's giving him positive feedback.

MR. ROOS:  Well, if it's a cartoon, we object to relevance.

MR. MUKASEY:  It's not.

THE COURT:  Remind me what the Observer story is.

MR. ROOS:  It was an interview that Trevor Milton sat for that the defense objected to, claiming that the quotes can't be traced to him; it's double hearsay.  Your Honor sustained their objection.  We can put it in.  This is him compliment a story that is not coming in.  So we don't understand the relevance here.

MR. MUKASEY:  It's apples and oranges.  You can't put in a hearsay article or double hearsay article because it's not reliable.  This is simply Brady -- he's been talking all day long about how he's giving feedback to Trevor.  This is an

example of feedback to Trevor.  Which particular article doesn't matter.

MR. ROOS:  The probative value of the interview is minimal, if nothing, if the underlying article cannot come in. And the defense --

MR. MUKASEY:  We spent all day with Russell putting in "good job, Trevor"; "great job Trevor"; "that's good TV, Trevor," without putting in the underlying articles, and there was not a single objection.

MR. ROOS:  That's totally different.  Those interviews, which were Colleen Robar -- by the way, probative value of that, also minimal -- but Colleen Robar complimenting him on interviews that the government put into evidence and alleged there's a misrepresentation there.

MR. MUKASEY:  If the probative value is so minimal, why are you objecting so vehemently?

MR. ROOS:  If there's no probative value, it's inherently not relevant.

MR. MUKASEY:  It goes directly to his state of mind. That's probative value.

MR. ROOS:  A general compliment of "good interview" does not go to state of mind.

THE COURT:  I'm trying to figure out what's in this, and if what's in the article is not before the trier of fact or can't be put before the trier of fact, then I don't see the

relevance of this.

MR. CARUSO:  Let me speak to you over here.

MR. MUKASEY:  May we have one moment?

MR. CARUSO:  Sidebar, sidebar.

THE COURT:  Absolutely, yes.  You want the court reporter?

(Counsel confer)

MR. MUKASEY:  All right.  We'll withdraw it.

(Continued on next page)

M9NHMil6                         Brady – Cross

        (In open court; jurors present)

BY MR. MUKASEY:

Q.  Mr. Brady, I want to talk to you a little bit about the Badger.

        We talked about a business disagreement, retail versus institutional investors.  You had a business disagreement with Trevor about the Badger, is that fair to say?

A.  Yes.

Q.  You saw the Badger as a bad business move, right?

A.  Yes, because.

Q.  And you thought -- yeah, you thought it was outside Nikola's core of business and outside maybe the economic model, is that correct?

A.  As well as Nikola did not have enough capital or personnel resources to be able to pursue another business segment.

Q.  But they were going to partner with an OEM.  You understand that, right?

A.  Only for manufacturing.

Q.  Correct.

A.  That was going to create losses.  We did not have any development plan.  We did not have any distribution plan.

Q.  You disagreed with this plan of Trevor's, correct?

A.  Correct.

Q.  Now, you knew there was going to be an OEM, an original equipment manufacturer, that was going to actually produce the

M9NHMil6                        Brady - Cross

Badger if you got that far, right?

A.  Yes.

Q.  You also knew that prototypes of the Badger were being developed in 2020, right?

A.  Yes.

Q.  Did you understand them to be functional prototypes? Working prototypes was the goal?

A.  "Functional" meaning, yes, that they were early stage prototype that can be driven.

Q.  And Trevor informed the board about the Badger project, right?

A.  Yes.

Q.  It's obviously the role of the board to supervise and help guide the business activities of the company, right?

A.  Yes.

Q.  And the Nikola board at that point in time had a lot of wisdom on it, wouldn't you agree?

A.  Yes.

Q.  When Trevor brought the idea of the Badger to the board, there were questions asked and thoughts exchanged.  Do you remember that?

A.  Yes.

Q.  And the board voted unanimously to approve the Badger, right?

A.  Yes.

Q.  OK.  Not everybody may have loved it, but it was a unanimous vote to do the Badger, correct?

A.  Correct.

Q.  Now let me show you DX 1621 for identification.

Do you recognize that?

A.  Well, I'm definitely copied on this email.

Q.  It's from Trevor to Sophia Jin and you and the board?

A.  Yes.

Q.  Right?

A.  Yes.

MR. MUKASEY:  Defense offers 1621 for identification into evidence.

MR. PODOLSKY:  Objection.  Hearsay.

THE COURT:  Let's talk at sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  This is an email by Mr. Milton to the board or to Ms. Jin?

MR. MUKASEY:  So I'm just trying to get him to identify it at the moment, but it's from --

THE COURT:  You moved it into evidence, right?

MR. PODOLSKY:  He offered it.

MR. MUKASEY:  Yeah, we offered it.

It starts out Trevor to Kim Brady, witness on the stand, copied to other members of the board.  And it speaks from Trevor to one of the members of the board, copied to everybody else.  And it is just questions from the board to Trevor about the Badger process.

Our view is it goes to his state of mind.

MR. PODOLSKY:  The objection is the defendant's own statements explaining his activities are hearsay.

MR. MUKASEY:  Not if they go to his state of mind.

THE COURT:  How do they go to his state of mind?

MR. MUKASEY:  The government's --

THE COURT:  What is he talking about here?  I don't have this.

MR. MUKASEY:  Building the Badger.

THE COURT:  OK.

MR. MUKASEY:  And how it's going to be done.  And there are certain questions asked by the board, and he answers

M9NHMil6                          Brady - Cross

the questions.  Now, their theory is the Badger was a big, old fraud.  And here he's talking about his plans for the Badger, and the board approves it.

THE COURT:  Is your theory that the Badger was a big, old fraud?

MR. PODOLSKY:  No.  But our theory is that the defendant made numerous fraudulent statements about the Badger.

MR. MUKASEY:  OK.

THE COURT:  Seems like hearsay to me, so I'm not going to allow it.

(Continued on next page)

M9NHMil6                           Brady - Cross

                    (In open court; jurors present)

BY MR. MUKASEY:

Q.   After Badger approved the board -- I'm sorry, after the
board approved the Badger.

        After the Badger was approved by the board, you
started making payments in your capacity as CFO to a couple of
companies that were building the Badger prototypes, right?

A.   Yes.

Q.   One of them was called Technosports?

A.   Probably.

Q.   I can --

A.   I'm aware we made payments to a number of vendors.

Q.   I can show you some documents that refresh your
recollection.  But the other one, if you recall, was named
Italdesign?

A.   Yes.

Q.   And why don't we start with Italdesign.  Let me show you
DX 1628.

        Do you recognize that?

A.   Yes, I see this email.

Q.   That's an email from you to Mr. Milton concerning
Italdesign invoices and payments.  You see that?

A.   Yes.

        MR. MUKASEY:  Defense offers 1628 for identification
into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1628 received in evidence)

BY MR. MUKASEY:

Q.  This is you approving -- we can publish it for the jury, and let everybody see it.

This is you approving an invoice for 125 -- I want to say 125,000 lira, is that right, for services to the Badger production.  You see that?  It's at the bottom.

A.  Services for Badger design, I believe.

Q.  Yes.  And, by the way, I'm sure you will recall that Mr. Milton wanted to put a water fountain in the Badger, right?

A.  Yes.

Q.  That was something you disagreed with?

A.  Yes.

Q.  Again, a business disagreement?

A.  Yes.

Q.  Does this document show that you approved the payment for that water fountain?

A.  No, I think I approved the payment to Italdesign for the Badger.

Q.  OK.  Let me show you 1627 for identification.

Do you recognize that?  Says "Purchase Order" on top.

A.  I see PO.  Just so that you're aware --

Q.  And it has your name on the bottom, right?

M9NHMil6                        Brady - Cross

A.  Yes, but that's just automatic.  Just so that you understand, I don't look at every detailed PO.

Q.  OK.

A.  No CFO does.  This was prepared by my team.

Q.  So just let me make sure I understand.  Your name is on this.  It was $125,000 out the door of Nikola, and you didn't look at it?

A.  The detailed PO is not reviewed by CFO on every PO.  There are thousands of POs.

Q.  And you're not doubting that you authorized this payment?

A.  I authorized the payment.

        MR. MUKASEY:  OK.  I'm going -- I'm going to offer --

A.  Doesn't mean that I approved or I agreed with water dispenser concept.

Q.  Well, you approved it, certainly.  I don't care if you agreed with it.  You approved it?

A.  I did not know that was in there.

Q.  So you just let 125,000 bucks go out the door?

A.  Yes.

Q.  Without looking at --

A.  It's for design work.

        MR. MUKASEY:  I don't know if I moved this in, Judge, but 1627 we're going to offer.

        MR. PODOLSKY:  No objection.

        THE COURT:  It will be received.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

M9NHMil6                         Brady - Cross

(Defendant's Exhibit 1627 received in evidence)

BY MR. MUKASEY:

Q.  Now let me show you 1719 for identification.  That's another purchase order, right?

A.  Uh-huh.

Q.  Does that refresh your recollection that one of the companies working on the Badger was called Technosports?

A.  I don't remember the name, but I'm aware of the company that Nikola procured to build the Badger in --

Q.  Take a look at the upper left-hand corner.

A.  Yes, I see that.

Q.  OK.

A.  In Michigan.

MR. MUKASEY:  OK.  We're going to offer 1719 for identification into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

MR. MUKASEY:  And we can publish it for the jury?

THE COURT:  Yes.

(Defendant's Exhibit 1719 received in evidence)

BY MR. MUKASEY:

Q.  You look at the bottom right-hand corner, this shows $2.9 million?

A.  Yes.

Q.  $2.9 million for the Badger to Technosports, right?

M9NHMil6                          Brady - Cross

A.  Yes.

Q.  Date is July 16, 2020?

A.  Yes.

Q.  And that was approved by you?

A.  Yes.

Q.  Notwithstanding your business disagreement about the Badger?

A.  Yes.

MR. MUKASEY:  Judge, I'm about to go into a different area.  I don't know where we are.

THE COURT:  No, we are at the end of the day, at the end of the week, at the end of the second week.

Ladies and gentlemen, you will recall that we will not be sitting on Monday or Tuesday.  So you have four days.  For those of you who are observing the holidays, I hope you do so in good health.  We will see you Wednesday morning.

Until then, do not discuss the case, do not read anything about the case, do not listen to anything about the case.  Be well.

(Jury excused)

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Brady, you may step down.

And if we could, I'm happy to hear any issues that you want to raise, but if we could discuss scheduling.

Mr. Podolsky has made the representation -- we'll see how accurate it is -- that the government will rest or can rest as early as next week.

I take it, Mr. Mukasey, that the defense is still pondering putting on a case?

MR. MUKASEY:  We are contemplating putting on a case, Judge.  I think I had said at some point a week.  It will certainly not be a week.  At some time over the weekend, we'll start giving the government some concept of what, if any, a case might look like.

THE COURT:  OK.  Because I want to at least put down a marker on when we might have a charge conference.  Probably in -- just to be on the safe side, we ought to do it sometime late next week.  Would that work?  I can get you guys the proposed charge or the draft charge Wednesday or Thursday, and we can do it like on Friday.  I'm talking about at the end of the day.

MR. CARUSO:  I'm sorry, your Honor, what about the end of the day?

THE COURT:  After Friday, after we put in the trial day, we can have the charge conference.

M9NHMil6

MR. CARUSO:  Yes, if the Court's ready to do that on Friday at this hour of the day, we'll be ready.

THE COURT:  Actually, let me see what my calendar is.

Ms. Rivera, what does my calendar look like next Friday afternoon?

Completely clear.

And we'll see.  Depending on where we are, we can push that back to Monday.

MR. CARUSO:  Right.

THE COURT:  I just want to make sure that there's no hurry on getting that done.

MR. CARUSO:  We'll be ready when the Court is.

THE COURT:  Very well.

MR. CARUSO:  Just to clarify, does your Honor plan to give us a draft that you're going to write?

THE COURT:  Absolutely.

MR. CARUSO:  OK.

THE COURT:  Another question for you is I am willing to give the charge before summations, but I will not do it if there's objection from either side.

MR. CARUSO:  I'm sure we'll confer on that.

THE COURT:  Anything else that the parties wish to bring up at this time?

MR. PODOLSKY:  Maybe I'll just sort of give our predicted schedule on the record so that defense counsel knows.

THE COURT:  OK.

MR. PODOLSKY:  Obviously, Mr. Brady is still on the stand.  Our anticipation is that following Mr. Brady, we expect the next witness will either be a retail investor or Peter Hicks.  Basically, what we have left is Peter Hicks, maybe two -- approximately two retail investors, and a summary witness.

There are a few witnesses on our list who we could still call, depending on the remaining cross of Mr. Brady or Mr. Hicks, but our most likely prediction at this stage is it would be the two retail investors, Mr. Hicks, and a government summary witness.  Depending on how fast those move, we could rest as soon as Thursday.  I don't know how long the crosses are, though.

THE COURT:  OK.

MR. MUKASEY:  May I --

MR. CARUSO:  Go ahead.

MR. MUKASEY:  May I be so bold as to ask Mr. Podolsky whether Britton Worthen can be scratched off the list?

MR. PODOLSKY:  I think we can say that, unless there's a different cross than what we've been seeing so far, we can anticipate that he will not testify.

MR. MUKASEY:  Thank you.

MR. CARUSO:  Your Honor, I'm saying this with a smile, not an any sort of anger, but Mr. Podolsky uses the phrase

M9NHMil6

"retail investor" as if they're all interchangeable. And having prepared three cross-examinations for three of them which haven't been given, I can assure you they're not interchangeable. So it would be helpful if we knew who the retail investors were or will be.

MR. PODOLSKY: Your Honor, I'm just -- I just don't think I need to put these individuals' names on the record right now. We're happy to share with them --

MR. CARUSO: That will be fine.

MR. PODOLSKY: -- later.

THE COURT: As long as you tell them.

MR. CARUSO: It doesn't have to be public. That's fine. Thank you.

MR. PODOLSKY: I should note there are two or three stipulations percolating. We're hopeful that the defense will sign off on them. If not, it's possible we'll need to call a custodial witness from JPMorgan Chase and a government agent to authenticate some records from a search warrant. We're hopeful that won't be necessary, but those would be the other witnesses.

THE COURT: And Mr. Hicks, is he related to Count Four?

MR. PODOLSKY: Correct.

THE COURT: OK. Anything else from this table?

MR. BONDI: One other thing, your Honor, if I may. It

M9NHMil6

was an expert Ken Lehn on the government's list, and we haven't received anything from Ken Lehn, any 3500, any analyst analysis.  We understand, I guess, there are no event studies as part of Mr. Lehn's proposed testimony, Professor Lehn's testimony.

Are we scratching Professor Lehn offer the list, too, Mr. Podolsky?

MR. ROOS:  We only noticed that expert, Mr. Lehn, as a rebuttal expert, and so we don't plan on calling him at this time, certainly not in our case in chief.

THE COURT:  OK.

MR. BONDI:  Thank you, your Honor.

THE COURT:  Anything else?

No.  OK.  I'm sure I'll be hearing from you all at some point.

Have a wonderful weekend.

(Adjourned to September 28, 2022, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                        Page

 DINA MAYZLIN

Cross By Ms. Young . . . . . . . . . . . . . . .1688

Redirect By Mr. Roos . . . . . . . . . . . . . .1706

Recross By Ms. Young . . . . . . . . . . . . . .1711

KIM BRADY

Direct By Mr. Podolsky . . . . . . . . . . . . .1712

Cross By Mr. Mukasey . . . . . . . . . . . . . .1830

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 222   . . . . . . . . . . . . . . . . . . . . .1724

 283   . . . . . . . . . . . . . . . . . . . . .1736

 65  . . . . . . . . . . . . . . . . . . . . . .1764

 68  . . . . . . . . . . . . . . . . . . . . . .1766

 63  . . . . . . . . . . . . . . . . . . . . . .1767

 254   . . . . . . . . . . . . . . . . . . . . .1771

 31  . . . . . . . . . . . . . . . . . . . . . .1782

 212   . . . . . . . . . . . . . . . . . . . . .1787

 67   . . . . . . . . . . . . . . . . . . . . . .1792

 279   . . . . . . . . . . . . . . . . . . . . .1822

DEFENDANT EXHIBITS

Exhibit No.                                        Received

 1602, 1604  . . . . . . . . . . . . . . . . . .1841

 1610    . . . . . . . . . . . . . . . . . . . .1847

1067 . . . . . . . . . . . . . . . . . . . .1850

1068 . . . . . . . . . . . . . . . . . . . .1851

1628 . . . . . . . . . . . . . . . . . . . .1876

1627 . . . . . . . . . . . . . . . . . . . .1878

1719 . . . . . . . . . . . . . . . . . . . .1878