M9SHMil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              21 Cr. 478 (ER)

TREVOR MILTON,

           Defendant.

------------------------------x

                               New York, N.Y.

                               September 28, 2022
                               9:00 a.m.

Before:

                  HON. EDGARDO RAMOS,

                             District Judge

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  It's 9 a.m.  So we can get started.  I see everyone is here.  There was a flurry of correspondence that came in.  So why don't we take them in the order that they're likely to come up during trial.

So there's the telephone conversation that Mr. Brady had with Mr. Schoenfeld, maybe.

MR. CARUSO:  Exactly.

THE COURT:  OK.  Mr. Caruso.

MR. CARUSO:  Good morning, your Honor.

We want to examine Mr. Brady concerning that conversation, and as I said in my letter, I think the evidence raises three issues:  One is relevance; second is hearsay; third is lay opinion.

With respect to relevance, the government has argued that the evidence in question is not relevant to materiality.  That may be true, but we're not offering it on materiality.  We're offering it with respect to the defendant's state of mind.  I believe that the government's argument --

THE COURT:  Mr. Milton's state of mind?

MR. CARUSO:  Yes, yes.  I believe that the government is arguing here with respect only to Count One, whereas I am arguing with respect to Counts Two, Three, and Four, wire fraud as well as Title 18 securities fraud.

The purpose -- sorry, I should have said the relevance

of testimony from a "victim" is to show that a defendant intended to deceive or to harm, and that's clear from the *Weaver* case.  That's the only purpose for which that evidence would be admissible with respect to Counts Two, Three, and Four.

And my argument is very simple:  That Schoenfeld was himself an investor, and his understanding of whether he was deceived bears on whether the statements were reasonably calculated to deceive a person of ordinary prudence and comprehension.  The Schoenfeld testimony on those counts is just as relevant as the testimony of Mr. Ryan or the other investors that's going to be offered today and tomorrow.

THE COURT:  So let me just ask you about that.  Is the government correct, I assume they are, that Mr. Schoenfeld is, in fact, the head of an investment firm, and they were a PIPE investor in Nikola and had invested in Nikola or the company prior to it going public?

MR. CARUSO:  Correct, but irrelevant.

THE COURT:  How is it irrelevant?

MR. CARUSO:  Because at the time of the Hindenburg report and at the time of the telephone conversation with Brady, he, through his company, was an investor.  Doesn't matter what kind -- doesn't matter whether he bought it privately or publicly on the market.  At that time they were investors in a company that -- whose shares were listed on

M9SHMil1

NASDAQ.

THE COURT:  How is he an average reasonably prudent investor when he had all of this, apparently, inside information?  He had access to the data room, as I understand it, if that's true.

MR. CARUSO:  Yes, that's true, but again irrelevant.  The point is what was his status with respect to -- at the time of the Hindenburg report?

Again, I repeat, your Honor, we're not offering this for materiality where the reasonable investor -- hypothetical reasonable investor comes in.  We're offering it to show the absence of intent.

THE COURT:  Tell me about that.  How does Mr. -- if he is like every other investor, how is his testimony relevant to show Mr. Milton's intent?

MR. CARUSO:  "Because," and I'm quoting from *Weaver*, "the only significance in a fraud case of proof of harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm."  So, presumably, the government's going to argue that the defendant's statements, the way they hit the minds of Ryan and those other so-called victims, that that shows that they were likely to be deceived, and therefore that bears on circumstantial evidence that Mr. Milton intended to deceive.

M9SHMil1

Mr. Schoenfeld is in precisely the same position.  At that time his company was an investor.  Now, if the words as taken by Mr. Ryan -- just using him as an example, if Ryan's views are circumstantially relevant to Mr. Milton's intent to deceive, then Schoenfeld's views are just as relevant.  I mean, it's equal.  It's tit for tat.  It's what's fair is fair.  It's one side and the other.  If they can show what investors thought as bearing on this man's state of mind, we can show that, and Schoenfeld's just as much of an investor at the time as Ryan.

THE COURT:  Thank you.

MR. CARUSO:  Then you come to hearsay.

THE COURT:  Sorry?

MR. CARUSO:  Then you come to hearsay.

THE COURT:  OK.

MR. CARUSO:  The hearsay analysis, I think, is two levels but very easy.  There are two declarants here:  Brady and Schoenfeld.  Brady's on the stand so there's no problem.  Schoenfeld's words, exaggeration -- sorry, "aspirational."  "TM," that's Mr. Milton, "aspirational exaggerations, not fraud."  That's not offered for the truth.  It's offered to show what Schoenfeld thought, which again is relevant to what Mr. Milton's intent to deceive was, and so there's no hearsay problem.

And then the lay opinion, this is a proper lay opinion

M9SHMil1

and your Honor can tell the jury, like it told the jury once earlier in the case, when this man says no fraud, he's not instructing you on the law.  I'll instruct you on the law.  This just goes to the witness -- excuse me, the declarant's state of mind, which in turn goes to defendant's intent to harm.

THE COURT:  Thank you.

Mr. Roos.

MR. PODOLSKY:  It's me, Mr. Podolsky.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

I'm happy to respond to the specific arguments advanced if helpful, but I'll just make a general statement.

The Court would never allow the government or the defense simply to call people to the witness stand and ask them:  What do you think?  Did the defendant intend to -- have fraudulent intent?  That's not admissible testimony.  That hasn't been the testimony in this case, and the Court wouldn't allow that of a witness on the stand.

What the defense wants to do is one thing even more inadmissible, which is offer the same testimony through hearsay without any foundation, without any context explaining what the witness might have been looking at, what the witness might have been responding to.

I think this testimony or evidence is inadmissible on

M9SHMil1

each and every level.  I'd be happy to respond to the defendant's arguments if it's helpful, but this is simply inadmissible under almost every rule in the Rules of Evidence.

THE COURT:  I don't know about all that, but I do agree with the government that this is testimony that is inadmissible.  Mr. Podolsky is correct that Mr. Ryan did not take the stand and say that one or another of Mr. Milton's comments was or was not true.  He took the stand to say that he listened to Mr. Milton and relied on Mr. Milton's testimony. And it would have been highly inappropriate for Mr. Ryan to have said that one or another thing that Mr. Milton said was true or false or aspirational or otherwise.

So for that reason alone I think it is inadmissible. I also don't know that I agree with the hearsay analysis proffered by Mr. Caruso.  But in any event, that testimony is not coming in.

MR. CARUSO:  Fine.  May I?

THE COURT:  Yes, sir.

MR. CARUSO:  In that case I'd like to discuss what flows from that ruling, which is that the government can only argue materiality from the testimony of witnesses like Ryan.  I mean, if that's the only purpose that the government offered it on and if that's the rationale of the Court's ruling, then I can rest assured, I suppose, that we're not going to hear on summation that that testimony shows Mr. Milton's intent to

M9SHMil1

deceive.

THE COURT:  Mr. Caruso, I frankly don't understand the point that you're trying to make.

MR. CARUSO:  Let me try again.

The government has said that the testimony from Ryan shows -- or goes to the issue of materiality.  The Court agreed with that in its ruling.  That's fine.  But in that case, I don't expect to hear the government to argue that the victim testimony shows Mr. Milton's intent to harm, because if the government's excluding Schoenfeld testimony based on the concept that the Ryan testimony only goes to materiality, fine, then the jury arguments can only go to materiality.

THE COURT:  Mr. Podolsky, do you?

MR. PODOLSKY:  Yes, your Honor, the parties are each entitled to argue any fair inferences from the evidence presented at trial.  Mr. Caruso seems to be confusing issues. The issue here is whether a witness, with no foundation and no basis, can opine on another person's, in this case the defendant's, state of mind.  We didn't elicit that from Mr. Ryan.  We wouldn't elicit that from another witness, like Mr. Schoenfeld or anyone else.

With that said, the parties are each entitled to argue any fair inferences to the jury from any of the testimony or evidence that's been put before them.

MR. CARUSO:  Judge, we're not offering the Schoenfeld

M9SHMil1

testimony -- we're offering Schoenfeld's testimony evidence to show his own state of mind.  OK?  It shows what Mr. Schoenfeld thought were aspirational exaggerations.

But what I'm saying now, Mr. Podolsky now says, well, I've admitted the Ryan testimony -- the Court has admitted the Ryan testimony because it goes to the element of materiality. But, oh, by the way, I'm free to argue different theories of -- different elements and different theories because I can argue anything I want from the evidence.  That's not appropriate.  If they're now going to argue that type of testimony, the Ryan testimony, on both materiality and on Counts Two, Three and Four, intent to harm, then I think the Schoenfeld testimony comes in because it goes to the lack of intent to harm.  I mean, they can't have it both ways.

THE COURT:  Again, I'm not getting your point.  But the Schoenfeld testimony is inadmissible for other reasons, not the least of which is foundation.  There's no Hindenburg report before the jury.  There's no basis.  Therefore, I can't imagine a way in which Mr. Ryan would be able to argue -- or will be able to testify about the context in which Mr. Schoenfeld made that statement.  The statement itself is vague and ambiguous.

So there are any number of reasons why it should not come in, and I don't see how that determination limits the ability of the government to make appropriate arguments from testimony that's been admitted.

M9SHMil1

Now, Mr. Podolsky, I don't know if you're going to argue intent from the testimony of the victim witnesses, but --

MR. PODOLSKY:  I certainly don't think we're going to stand up there and say this victim witness testified as to Mr. Milton's state of mind.  So I don't think this is an issue. If the defense thinks that an argument we make is objectionable, I'm sure they'll stand up and object.

THE COURT:  OK.  I think the other one that we should deal with now is the summary charts.  Has the government provided the summary charts to the defense?

MR. ROOS:  We've produced the summary charts to them, and we have copies if your Honor wants to see them.

THE COURT:  Let me just see whether there are going to be objections to the summary charts.

MR. BONDI:  There will be, your Honor, and we don't see this coming in today.  We'd like to brief the Court.  We received the government's motion after midnight last night, in other words, this morning.  We'd like to brief the Court on this.  We'll have something at a reasonable hour filed with the Court today.  And we would suggest, your Honor, that we take this up tomorrow morning first thing.

MR. ROOS:  So the issue with that -- in the abstract I have no problem with that, except if the government is in a position where that witness is being -- we're going to make that witness probably our last witness.  But because these are

charts, if there is -- depending on the nature of the objections, they're not the type of thing that can be changed instantly.  If it's a header, if it's an objection to a header as being argumentative, we can change that quickly.  But if it's something more substantive, we need a little bit of time to adjust it, which is the reason why we filed the letter, which, by the way, is very short and just says:  Summary charts are routinely admitted.  Here's what our summary charts are.

So we'd offer to do it now, but we'd just ask either at the end of the court day today maybe we can hash it out that way so there's no issues tomorrow.

THE COURT:  Yes.  So why don't you folks meet and confer, as it were, and we can -- I'm here all day.  So I'm here after -- I think I have a 4 o'clock plea, but I'm otherwise available.  I'm happy to come back and meet with you all.  My concern is, obviously, that there not be a gap, or too much of a gap, in the presentation of evidence to the jury so that we don't take up too much of their time or needlessly take up their time.

OK.  The next issue, the Worthen-Milton texts.

MR. BONDI:  Your Honor, similarly, I don't see how this could possibly come up today.

THE COURT:  OK.

MR. BONDI:  We just got it after midnight as well last night.  We're working on a response, and we'll have it to your

Honor at a reasonable time today.  We suggest that the Court take it up tomorrow morning.

THE COURT:  That's fine.

MR. ROOS:  That one, no objection to that.  We just want a ruling before we rest because if it does come in, we may do some other things differently.  So our only ask is that we resolve it before the government closes its case in chief.

THE COURT:  OK.  So then that leaves the issue of the various exhibits, defense exhibits.

Mr. Bondi.

MR. BONDI:  Yes, your Honor.  This came up during the witness Dale Prows.  Your Honor, we've briefed the matter, and we think that the questions themselves that I asked of Mr. Prows on the stand establish that the documents do come in as business records.

There is a lot of extraneous argument from the government relating to these documents, but the bottom line is the witness testimony the government has not taken on, which is that these documents were sent or received in the regular course of business from the witness.  And I've laid out those questions in the motion.  We think they are clear foundation that these come in as business records.

With respect to the Travel Centers of America document, your Honor, I can imagine I know why the government fights so hard on that, because it refutes, directly and

squarely, some of the contentions the government has made that Mr. Milton did not have support for his statements about identifying and gobbling up locations of stations.  These were negotiations between Mr. Milton and Travel Centers of America on behalf of Nikola.  There were term sheets exchanged.  These negotiations continued and ultimately resulted in an announced deal with Travel Centers of America.

Now, the government has argued and the Court has ruled that stuff after the indictment period doesn't come in.  So that press release doesn't come in.  But Mr. Milton's negotiations and the exchange of term sheets is admissible under 803(15).  Now, the government says, picking up what your Honor said at sidebar, that 803(15) only is meant to apply to deeds and stuff like that, your Honor.  And as I argued and Mr. Caruso argued, that's a -- too narrow of a reading of 803(15).  803(15) deals with interest in property.  What this term sheet was, dealt with a leasehold agreement.  It is a dispositive interest as it conveys a potential leasehold agreement.

The Southern District's ruling in the *Silverstein* case, which we've cited, says that it doesn't have to be the final term sheet.  It doesn't even have to result in a deal.  The fact is that there's negotiations over an interest in property that is a leasehold interest with Travel Centers of America.  A term sheet's exchanged.  It should come into

M9SHMil1

evidence.  It's important, your Honor, exculpatory evidence. And, your Honor, we ask that the Court reconsider the motion, our offer of that proof during Mr. Prows.

MS. ESTES:  Your Honor, first, I just want to correct some of Mr. Bondi's statements on the Travel Center's term sheet.  So, first of all, this was a term sheet -- I think it's labeled "potential term sheet" -- sent by the defendant.  This isn't something that Travel Center sent to Nikola.  It was sent by the defendant in an email.  And from our review of the documents in the case, Travel Centers of America did not send anything back.  They did not send back a marked-up version. There was nothing like that during the rest of the time that Mr. Milton was at the company.  So this is the defendant's own self-serving term sheet, a proposal he made that, from what we can tell from the documents, never got any traction when he was at the company.  It looks like they picked up negotiations in November 2020, a few months after he left.

But putting that aside, the document is just plainly inadmissible under the rule.  This is a rule that relates to deeds.  The rule specifically and the notes discusses recitals in the deeds and how there are things like that that can give you assurance that these sort of documents are trustworthy. What we have here is something that is entirely untrustworthy. It is a term sheet put forth by the defendant who, I think we've established during trial, has lied over and over again in

M9SHMil1

various forms.

So I think his self-serving term sheet here, it does not have the indicia of trustworthiness that a deed would have, that a mortgage would have, something like that.

THE COURT:  I agree that these documents do not come in under subsection (15).  They're not dispositive of anything. They are dispositive of negotiations, perhaps, that were taking place, but they cannot be relied on to establish any particular interest in any particular piece of land.  So those documents do not come in.

Why don't you speak to, Ms. Estes, the emails.

MS. ESTES:  Yes, your Honor.  So I think in our letter we took them email by email, and that is what courts have instructed that you do, that you need to look to the regularity requirements of each particular email.  And we cited the *Lyondell* case, which is a case defense counsel had relied on in their brief, and I thought the analysis there was particularly on point because they look to the emails to see if -- is this an email that is sent regularly?  Is it about a regularly occurring activity?  So in that case they admitted emails that were weekly agendas, weekly update emails, things like that.

What we have here is entirely different.  These are sporadic negotiations occurring that summer.  There's no indication these are regular occurrences.  There's no indication and there was certainly no testimony from Mr. Prows

M9SHMil1

that he was under a duty in his job to write these sort of emails.

So I think, under the analysis related to regularity, they simply do not meet the requirements of the business records exception.

MR. BONDI:  Your Honor, if I may, the record clearly establishes from the witness' own mouth as for Defense Exhibit 1228, I asked:

"And this was sent as part of your job at Nikola?"

"Yes."

With respect to Defense Exhibit 206:

"And this was received as part of your ordinary course of work at Nikola, right?"

"Yes."

In terms of Defense Exhibit 209 and 210:

"And you sent that in the ordinary course of duties at Nikola, right?"

"Yes."

The witness said it.  We don't need the government's argument that this wasn't.  If the government wanted to testify for the witness, they could have prepped the witness to say differently, I'm sure, or others.  But the fact of the matter is the witness testified on the stand that this was part of the ordinary course of business.

THE COURT:  Ms. Estes.

MS. ESTES:  Your Honor, the fact that they were sent as part of his job, this would open the door to any email that was sent from any Nikola account by any employee.  That's simply not the standard.  There has to be some sort of regularity.  I think the Second Circuit has referred to systematic checking, continuity, habits.  These have to be emails where you're under a duty to send it every week to update people on something.

There was no testimony that Mr. Prows was required to update his supervisors on things.  There's no testimony that he was under a regular obligation to send these sort of emails.  These are one-off emails.  And in fact, one of them, Defense Exhibit 206, relates to a side project.  It makes clear this is not something that's a regular occurrence.  It's sort of a one-off modeling project.

Sort of putting aside the regularity requirements, I would note that admitting these emails now, when Mr. Prows is off the stand, would be incredibly misleading because there's not going to be a witness to interpret these documents.  I think he would have things to say in response to the documents that will not be in evidence.  And at this point it would just -- there are 403 reasons for excluding the exhibits as well.

MR. BONDI:  Your Honor, I plainly asked ordinary course of work, ordinary course of your duties.  The record is

M9SHMil1

quite clear that Mr. Prows was not on a lark or detour when he sent and received these emails.  This was part of his duties at Nikola with respect to each of these documents, and the record is quite clear on it.

With respect to admitting the document now and the prejudice, the government is trying to introduce about a couple hundred documents, from their emails last night, with witnesses that are not on the stand or not anticipated to take the stand. So that prejudice argument, I think, goes out the door.

But the record is quite clear on direct in terms of what Mr. Prows did.  I asked specifically ordinary course of your work, ordinary course of your duties at Nikola, did this for each document.  We've laid it out in the transcript.  He said this was part of the work he did.  If he thought this was lark, he could have -- lark or detour, as Ms. Estes is arguing, he should have said:  No, it wasn't part of my ordinary work. It was something I was doing on the side or a side project. That's plainly not what he said.

THE COURT:  I guess the problem that I have is that, depending on what Mr. Prows said, either one of you could be right.  And so I think I have to think about this a little more.  I'm forgetting precisely Mr. Prows' job title and responsibilities, but I'm pretty sure that he testified as to having responsibilities in connection with the acquisition of hydrogen sources, etc.  And it's not unclear to me that these

were very different responsibilities that he had, but --

MS. ESTES:  That's true, your Honor, but what I would say is that there still needs to be a requirement, a duty, that you send these sort of emails.  And in the *Lyondell* case, that was a distinction there, that these were weekly agendas that were sent out before every sort of meeting.  This is Mr. Prows -- or in one he's even just receiving an email from Mark Keith.  And that one in particular, that's Government Exhibit 206, I will note that there was no testimony about whether Mark Keith was under a duty to send these sort of emails, whether this was part of his regularly conducted business activity.  So that alone, I think, raises problems with Government Exhibit 206.

But it can't be that just because this is your job, every email you send comes in.  That is not the standard.

THE COURT:  No, I get that.  I get that.

Let me see where the jury is.  I'm going to take this under advisement.  Hopefully, we'll have a jury at 9:30.

Is Mr. Brady here?  He is?

MS. ESTES:  Yes.

THE COURT:  OK.  So, hopefully, we get started in two and a half minutes.

(Recess)

(Continued next page)

            (Jury present)

            THE COURT:  Everyone, please be seated.

            Ladies and gentlemen, good morning.  Wonderful to see you all again.  Trust you had a wonderful weekend.

            We will now continue with the cross-examination of Mr. Brady.

            Mr. Brady, you are reminded that you are still under oath.

            Mr. Mukasey.

            MR. MUKASEY:  Thank you, Judge.

KIM BRADY, resumed.

CROSS-EXAMINATION CONTINUED

BY MR. MUKASEY:

Q.  Mr. Brady, on March 3, 2020, how many shares of VectoIQ stock did you own?

A.  None.

Q.  When we left on Friday, we were talking a little bit about some fundraising that the government did when it was a private company, the due diligence rounds that we were talking about. Recall that?

A.  Yes.

Q.  Your team -- just to set the morning, your team was involved in providing information to potential investors who wanted to invest before Nikola went public, is that correct?

A.  Correct.

Q.   And you had the final say as the chief financial officer at that point in providing information to potential investors, right?

A.   Meaning I gave the final sign-off, but --

Q.   Good enough.

A.   Depending on discussions, depending on the questions, we consulted many people in the company.

Q.   OK.  And you had the final say on the due diligence answers, right?

A.   Meaning I had the final sign-off in terms of sharing that information with investors.

Q.   So the answer to my question is, yes, you had the final sign-off?

A.   Yes.

Q.   Now, in the ordinary course of your work at Nikola as the CFO, you kept a file of the due diligence responses that you sent out, correct?

A.   Anything we sent out, we had in our hard drive.

Q.   Right.  And you kept those due diligence responses at or about the time that they were created; in other words, after they were created, you put them in the file essentially, right?

A.   They were saved in central hard drive.

Q.   And maintained in the ordinary course of your business' recordkeeping?

A.   Correct.

Q.   Now, we spoke on Friday about Hanwha, one of the companies that invested in the private rounds of fundraising.  You remember that?

A.   I do.

Q.   Hanwha ended up investing about $100 million, give or take, in Nikola when it was a private company, right?

A.   Correct.

Q.   And we also discussed a company called Nimbus.  Remember that?

A.   Yes.

Q.   Nimbus is an investment arm associated with Bosch, the automobile manufacturer, is that right?

A.   That's correct.

Q.   And they also invested about $100 million?

A.   Correct.

Q.   I want to take a look at just a couple more documents related to these due diligence files that you kept.

     May I show the witness, Chris, just the witness, DX 1298 for identification.

     Mr. Brady, just take a look at that document.  Maybe look at the upper left-hand corner, the date of April 2019, the document's note in the upper box there.

     You recognize this document, right?

A.   Yes.

Q.   And this is one of the types of due diligence documents I

just mentioned that's kept in the ordinary course of your business, right?

A.   Correct.

MR. MUKASEY:  I'm going to offer it, Judge, as 1298, DX 1298 for identification, into evidence.

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 1298 received in evidence)

MR. MUKASEY:  Chris, can you publish that for the jury with the Court's permission.

BY MR. MUKASEY:

Q.   I'll just take you through this document a little bit, Mr. Brady.  It's titled "Hydrogen Station Electricity Cost Input Assumptions."  You see that in the upper left-hand corner?

A.   I do.

Q.   I'm going to ask you to read the note that starts with the word "below."

A.   "Below highlights the support for our electricity cost assumptions of $35 per megawatt hour or 3.5 cents per kilowatt-hour.  The research is based on publicly available information regarding both recent trends in solar and wind power purchase agreements as well as general wholesale electricity prices for each of the major power markets in the U.S."

Q.  So if we were to translate that into kind of less formal terms, this document lays out public sources for various energy costs, is that right?

A.  That's correct.

MR. MUKASEY:  So, Chris, would you mind showing Mr. Brady page 2 where it says "source" and number one.

Q.  Mr. Brady, that refers to a PPA pricing index.  Do you see that?

A.  Yes.

Q.  That's a power purchase agreement pricing index, right?

A.  Yes.

Q.  And that is a publicly available index, correct?

A.  Correct.

Q.  Now, let's go down to number two.

It talks about the 2018 Berkeley National Lab Utility-Scale Solar trends.  Do you see that?

A.  I do.

Q.  Again, another publicly available source for energy pricing information, right?

A.  Yes.

MR. MUKASEY:  Now, if we go, Chris, to page 6, on the bottom line.

Q.  Mr. Brady, do you see at the last bullet it says the chart shows the average day-ahead power prices for each major hub, which ranges from 26 to 38 per megawatt hour, and then refers

M9SHMil1                        Brady - Cross

to data from the Federal Energy Regulatory Commission?  Do you

see that?

A.  Correct.

Q.  Again, publicly available sources, right?

A.  Yes.

         MR. MUKASEY:  Now, Chris, you can take that down.

Q.  I want to direct your attention, Mr. Brady, to November of

2019.  It's about November 2019 when you and your colleagues in

leadership at Nikola first met with Steve Girsky and VectoIQ,

is that right?

A.  I can't recall exact date, but we did meet in November.

Q.  No exact date needed.

         That was, in part, to consider going public in a SPAC

form with Vecto, right?

A.  Correct.

Q.  And there came a time when some investment bankers at a

place called Cowen sent you a presentation about Vecto and the

SPAC process.  Do you recall that?

A.  Yes.

         MR. MUKASEY:  So let me show the witness only, please,

Chris, 1748 and 1749 of the Defense Exhibits.

Q.  On the left side, Mr. Brady, you'll see an email that goes

from you to Jeff Ubben.  We'll get to him.  You know Jeff

Ubben, right?

A.  Yes.

Q.  The subject is report on our meeting with Girsky and Chan.
Do you see that?  And there's an attachment.

A.  I do.

Q.  I want you to take a look at 1749 now, and that should be
the attachment to 1748.  Recognize that?

A.  OK.

        MR. MUKASEY:  Judge, I'm going to offer 1748 and 1749
for identification into evidence.

        MR. PODOLSKY:  Just one moment, your Honor.

        No objection.

        THE COURT:  They will be received.

        (Defendant's Exhibits 1748 and 1749 received in
evidence)

        MR. MUKASEY:  So let's start by publishing the email
to the jury, Chris.

BY MR. MUKASEY:

Q.  The last paragraph of the email -- well, withdrawn.

        Let's talk about who's on this email.  This is sent by
you, Mr. Brady, correct?

A.  Correct.

Q.  November 26, 2019, right?

A.  Yes.

Q.  To Jeff Ubben, right?

A.  Yes.

Q.  Copy to Trevor Milton and Mark Russell and others.

First of all, Jeff Ubben, Jeff Ubben, was a board member at Nikola, member of the board of directors, correct?

A.   Correct.

Q.   And he was a member of the board of directors when it was a private company, and he stayed on when it was a public company, correct?

A.   Right.

Q.   And he was associated with a company called ValueAct, is that right?

A.   Yes, at that time.

Q.   And ValueAct was an investment company, right?

A.   Yes.

Q.   OK.   So you send this email to Jeff Ubben and to Trevor and to others.

And let's look at the last paragraph on page 1, Chris, at this point.

So that says:   "At this point our view is we should be open to both options:   IPO in Oslo and SPAC merger."

You see that, Mr. Brady, right?

A.   Yes.

Q.   And that indicates to you that in November 2019, you still had not yet decided to definitely go forward with a SPAC.   The IPO in Oslo was still on the table, right?

A.   Yes.

Q.   And an IPO in Oslo, just to remind everybody, would be an

initial public offering of Nikola's securities, Nikola shares, on a stock exchange in Norway, right?

A.   Yes.

Q.   OK.  Correct me if I'm wrong, you were deciding at that point, do we want to do a SPAC and go public that way, or do we want to do an IPO in Oslo and maybe go public that way?

A.   Yes.

Q.   Now, an IPO in Oslo, initial public offering of Nikola securities in Oslo, would not have involved VectoIQ in any way, correct?

A.   That's correct.

Q.   And Vecto stock would not be involved in that; that would be not part of any Nikola IPO in Norway, right?

A.   That's correct.

Q.   And if you look at the second sentence of that last paragraph, it says:  "Since we won't know with certainty whether VectoIQ/Cowen can raise $500 million in PIPE until the end of January, our current thinking is that we go the parallel path until the end of January."

THE COURT:  I'm sorry.  Mr. Mukasey, can you read that again slowly and stay closer to the microphone.

MR. MUKASEY:  Sorry, Judge.  I'm jumpy.

Q.   The second sentence in the last paragraph, Mr. Brady, says:  "Since we won't know with certainty whether VectoIQ/Cowen can raise approximately $500 million in PIPE until end of January,

M9SHMil1                        Brady - Cross

our current thinking is that we go the parallel path until the

end of January."

        Did I read that right?

A.  Yes.

Q.  And "the parallel path" means that, at least till the end

of January, your thought was to keep open two possibilities,

two parallel paths to going public, right?

A.  Yes, that's what the board wanted.

Q.  OK.  Terrific.

        One, IPO in Norway; second potential path, SPAC,

right?

A.  Right.

Q.  Attached to this email is something called a VectoIQ-Nikola

discussion materials.  That's DX 1749.

        And if we can publish that for the jury.

        This document, Mr. Brady, was intended to educate its

readers, correct?

A.  I believe so.

Q.  And among other readers were Jeff Ubben and -- or among

other recipients, I should say, were Jeff Ubben and Trevor

Milton, right?

A.  Yes.

Q.  And you were educating them on the possibility of a SPAC,

or at least this document was, correct?

A.  Correct.

MR. MUKASEY:  So, Chris, if we can go to page 5 of the PDF and post that for the jury.

Q.   This document at this page shows the board of directors of the VectoIQ Acquisition Corp.  Do you see that?

A.   Yes.

Q.   And that was included as part of this presentation for Ubben and Trevor Milton.

If we go to page 8 of the PDF, you will see that it's entitled "Nikola Public Markets Alternatives."  Do you see that?

A.   Yes.

Q.   And the far right column refers to the SPAC merger.

Just so we're oriented, this document is intended to educate about what a SPAC merger would be like.  It was a relatively new thing to some of these email recipients, right?

A.   Right.

Q.   OK.  And the third X down in the third box talks about the de-SPAC process, right?  Do you see that?

A.   Yes.

Q.   And it says the "De-SPAC process requires a marketing effort to shore up financing," right?

A.   Yes.

Q.   And that means that part of the de-SPACing process, part of going public, would require a marketing effort, right?

A.   If you are raising additional capital, it would require

additional marketing.

Q.  Correct.  Now, if we look at the next page, which is page 14, in the far right column, it refers to a company called Virgin, and on the top of "Virgin" it says "Galactic."  Do you see that?

A.  Yes.

Q.  Now, underneath that -- withdrawn.

Virgin Galactic was a company that went public by way of SPAC, correct?

A.  Yes.

Q.  And it was being used in this presentation as an example of some of the ways and things that are done when a company goes public by SPAC, right?

A.  Right.

Q.  And Virgin Galactic is a space travel company, right?

A.  Yes.

Q.  And it's -- to the best that anybody can understand what Virgin Galactic does, it's some form of space travel, right?

A.  I would say it's designed for a low-orbit space travel tourist company.

Q.  Fair enough.

It's owned by or at least run by a guy named Richard Branson, right?

A.  I think Richard Branson was the majority shareholder.  He was not involved in day-to-day management.  I believe he served

as chairman.

Q.  So when I say it's run by, it's led by Richard Branson, right?

A.  Correct.

Q.  And they were one of the examples that you and the other recipients on this email, Trevor and Jeff Ubben, were looking at as having gone through a SPAC while you were considering that, right?

A.  Yes.

Q.  If you look at this column under the first check mark, it says "Marketed forward projections:  Successfully marketed the deal," etc.  You see that?

A.  Yes.

Q.  And then it says on the third bullet, the third check mark "Access to public investors."  See that?

A.  Yes.

Q.  On the next page under "Key steps to a successful SPAC merger," on the right-hand side it says, "Roadshow to investors."  Got that?

A.  Yes.

Q.  And it says, "Establish dialogue with current SPAC holders to introduce them to the story and gauge receptivity," right, "market to new potential investors"?

A.  Yes.

Q.  Bottom left-hand bullet, second bullet on the bottom

left-hand side:  "A clear message to the market and specific ask of investors is key."  And this is under Cowen's thoughts on proper strategy and sequence for a SPAC, right?

A.   Yes.

MR. MUKASEY:  Now you can put that document aside, Chris.

Q.   And sometime after this presentation is sent in November of 2019 to Jeff Ubben and Trevor and others, Nikola decided to go forward with VectoIQ in a SPAC merger, correct?

A.   Correct, because that was the only available path.

Q.   OK.  You then entered a due diligence period with VectoIQ, right?

A.   Yes.

Q.   And in a due diligence period, Vecto asked you questions about Nikola, and Nikola gave answers to Vecto, right?

A.   Yes.

Q.   You maintained those answers, I think we said earlier, in the ordinary course of your business in a file, right?

A.   We coordinated the answers.  Some answers were prepared by finance team; other answers were prepared by others within the company, including Trevor with respect to the battery cells and I --

Q.   I want -- I know you want to talk about Trevor, and I'm going to give you that chance.

My question is were the due diligence --

A.   I'm giving you the answer related to due diligence effort.

Q.   I don't want to talk over you.  Is there anything else you want to say before I ask my question?

A.   I am answering your question, sir.

Q.   OK.  Thank you.

So my question simply is:  The due diligence answers, as you said earlier this morning, were kept and maintained in a file in the ordinary course of Nikola's business, right?

A.   Yes.

Q.   Thank you.

Let me show you DX 1601, just for the witness.  This is a due diligence document related to VectoIQ, is that right?

A.   Yes.

MR. MUKASEY:  Defense offers DX 1601 for identification into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1601 received in evidence)

BY MR. MUKASEY:

Q.   Date of this document is December 6, 2019, is that right?

A.   Yes.

Q.   And this contains Nikola's responses to Vecto's due diligence questions, correct?

A.   Correct.

Q.   Now, I think it's been published for the jury.

M9SHMil1                        Brady - Cross

Chris, if you can go to page 2, question No. 4.

Got that, Mr. Brady?  "What percentage of existing backlog is booked at the model price, 235K."  You see that?

A.  Yes.

Q.  And could you read Nikola's response in the first bullet.

A.  "Of our 14,000 preorders, roughly 9,000 are from large commercial customers.  The remaining 5,000 are from small mom-and-pop operators."

Q.  And the second bullet, please.

A.  "Although pricing has not been confirmed as part of the preorder process, we feel confident that large corporate customers have a strong appetite for Nikola's BEV and fuel cell EVs at prices currently reflected in the model."

Q.  And "strong appetite," that's language that you approved, correct?

A.  Yes.

MR. MUKASEY:  OK.  Let's go now, Chris, to page 12, question 27.

Q.  Going to ask you a couple more of the questions that you responded to, Mr. Brady.

If you look at question 27, it asks, what is the basis for the $3 billion pre-money round valuation?  Do you see that?

A.  Yes.

Q.  And your answer in the first bullet, if you don't mind reading it.

A.  "Valuation is driven by many factors.  Overall reservations is, frankly, not an important driver of valuation."

Q.  "Overall reservations is not an important driver of valuation," that's your language, right?

A.  Yes.

Q.  OK.  Now I want to go to the middle of page 5.  Talks about hydrogen, and you see where it says, "Cost, hydrogen sales price 350k per lease"?  Do you see that?

A.  Yes.

Q.  $3.75 per kilogram, right?  And what does it say right underneath that in terms of cost, 230,000 in parentheses?

A.  2.47 per kilogram.

Q.  Your language, correct?

A.  Yes.

       MR. MUKASEY:  If we can go to page 8, in the middle of the page.

Q.  Under Nikola's flexible hydrogen demand, do you see that?

A.  No, it says Nikola's flexible power demand.

Q.  You're right.  I stand corrected.

       If you look at the second paragraph, it says:  "Due to hydrogen's intrinsic capacity to store electric power in conjunction with Nikola's consistent daily power demand."

       You see that?

A.  Yes.

       (Continued on next page)

BY MR. MUKASEY:

Q.  Over a 24-hour period, Nikola's hourly power demand is very flexible.

Do you see that language?

A.  Yes.

Q.  That's your language; right?

A.  Yes.

Q.  And it says that, Nikola's consistent daily power demand; right?

A.  Yes.

Q.  And then it says, Nikola can accommodate a very uneven supply of power during peak demand periods; right?

A.  Yes.

Q.  And if you go just one paragraph lower, it talks about APS in Arizona.  What's APS?

A.  You know, I don't know what it stands for.  Obviously, it's the utility company in Arizona.

Q.  Is it Arizona Power Supply?

A.  That seems reasonable.

Q.  And it talks about Nikola hydrogen station No. 1.

Do you see that?

A.  Yes.

Q.  So APS in Arizona, Nikola hydrogen station No. 1 is mentioned, they may be willing to sell us power at the incremental production cost, which is about $15 per megawatt

M9SCmil2                        Brady - Cross

hour; right?

A.   That's what it states.

Q.   And $15 per megawatt hour is 1.5 cents per kilowatt hour.

Is my math right there?

A.   Yes.

Q.   I just want to ask one more thing about hydrogen and we can get off this document.

MR. MUKASEY:   Chris, you can take this down.

Q.   You talked a little bit about Nel last Friday and Nikola's partnership with Nel, which is the Norwegian hydrogen company; right?

A.   Correct.

MR. MUKASEY:   Chris, can you show the witness only DX-1292, please.

Q.   Take a look at that document, Mr. Brady, and tell us if you recognize it.   It's dated June 2, 2020, and it appears to be a purchase order form.   Do you recognize that?

A.   Yes.

MR. MUKASEY:   Defense offers 1292 for identification into evidence.

MR. PODOLSKY:   No objection.

THE COURT:   It will be received.

(Defendant's Exhibit 1292 received in evidence)

MR. MUKASEY:   With the Court's permission, can you publish that to the jury, Chris.

M9SCmil2                        Brady - Cross

Q.   At the bottom of that, Mr. Brady, it says approved by you;

right?

A.   Yes.

Q.   And the total amount purchased from Nel is -- can you read

that for us?

A.   $31,850,000.

Q.   And that relates to, if you want to look at the middle,

equipment for producing hydrogen; right?

A.   Correct.

          MR. MUKASEY:  We can take that down.

Q.   After the due diligence period that VectoIQ went through,

when they asked you questions and you gave them answers, around

March 2020, I think March 3rd 2020, Nikola and VectoIQ decided

to announce a business combination; right?

A.   Correct.

Q.   At the time the business combination was going to be

announced, there was going to be some publicity around it,

right, they were going to announce it publicly?

A.   Yes.

Q.   Because that's a big moment for each of those companies;

right?  Yes?

A.   Yes.

Q.   And we mentioned Virgin Galactic, which had gone public by

way of SPAC and which you all had looked at, there were

discussions in March 2020 about you at Nikola and your cohorts

M9SCmil2                        Brady - Cross

using Virgin Galactic as an example or a model for how to do

the publicity surrounding the announcement.  Do you remember

that?

A.  No.

Q.  I will show you two documents, 518 and 519, defense

exhibits, just for the witness.

        While you're taking a look at those, Mr. Brady, I want

to ask you a different question.

        You mentioned Jeff Ubben, a board member.  Jeff Ubben

was the board member, in your view, that Trevor trusted the

most; right?

A.  Likely.

Q.  Likely, did you say?

A.  Uh-huh.

Q.  And Jeff Ubben was a board member who also advocated --

A.  The reason why I say that --

Q.  I'm sure you'll get a chance to say the reason, just give

me one second to finish the question, please.

A.  Okay.

Q.  Thank you.  Jeff Ubben, based on your observations, was a

board member who believed in communication with retail

investors; is that correct?

A.  I'm not sure.  I think Jeff believed communication with

institutional investors, but I'm not certain about his views

with respect to retail investors.

Q.  But he was the one that Trevor, from your point of view, respected or trusted the most?

A.  Likely.  The reason why I say that is that Trevor's father was also on the board and there are other members on the board that Trevor had a long relationship with.

Q.  Agreed.  Agreed.  Thank you for that.

By the way, Trevor's father came off the board when the company went public; right?

A.  Correct.

Q.  And that was something that was agreed to and that Trevor agreed to?

A.  Correct.

Q.  Take a look at 518 and 519 for identification.  518, if you'll see, is an email, right, dated March 2, 2020, from Jeff Ubben to you, but -- I'm sorry.  From Jeff Ubben to Trevor and you, but it actually starts in the back with an email from a guy named Jason Breeding at ValueAct.  He's a partner of Jeff Ubben; right?

A.  Well, he's certainly at ValueAct.  I'm not sure what role he plays at ValueAct.

Q.  Good enough.  And take a look at 519, and 519 appears to be a schedule of media activities.  Do you see that?

A.  Yes.

Q.  For Richard Branson when Virgin Galactic went public, and it's the attachment to 518.  Do you see that?

A.  Yes.

MR. MUKASEY:  Defense offers 518 and 519 for identification into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  They will be received.

(Defendant's Exhibits 518, 519 received in evidence)

Q.  Mr. Brady, let's start with the email, if we can publish that for the jury.  As I mentioned, it started with Jeff Ubben in the middle of the page.  Jeff Ubben, on February 29th, emails Trevor Milton and Steve Girsky; right?  Girsky is the head of VectoIQ; correct?

A.  Yes.

Q.  And Ubben says to Trevor and Girsky, here is a template. Branson got a retail following.

Do you see that?

A.  Yes.

Q.  We should aspire for Trevor to do the same.

Do you see that?

A.  Yes.

Q.  And a couple days later, Jeff Ubben at the top of this email sends to Trevor and to you and to Mark Russell, big launch on TV, Trevor personality comes through.  Then quiet for 2 months.  Another round on regular way trading in June.

That's the email; right?

A.  Yes.

M9SCmil2                        Brady - Cross

MR. MUKASEY:  Attached to the email is DX-519 for the jury, please.

Q.  This is a chart of activities that Richard Branson followed when his company went public; right?

A.  What this shows me is what Virgin Galactic did when they went public.  So looks like it's a filing and interview record.

Q.  Exactly.  And that talks about CNBC interviews, do you see that, down at 7/9/2019, about the fifth one?  It talks about CNN interviews, it talks about a Sky News interview, it talks about where they're going to be posted on the far right-hand column, and it juxtaposes them or leaves them in with SEC filings that are going to be filed at the same time, if you look at the top right.

A.  Is that a question?

Q.  Am I understanding this correctly?

A.  Yes.

MR. MUKASEY:  Thank you.  We can take that down, Chris.

Q.  One more thing about the business combination announcement.  When the announcement was about to be made in March of 2020 and these Virgin Galactic media examples were being shown around, Trevor asked the leadership team to make sure it had a good SEC attorney to help out with the announcement; correct?

A.  It would not surprise me if you said that.

Q.  Well, let me see if I can refresh your recollection or try

M9SCmil2                        Brady - Cross

to remind you so that you're not surprised by showing you

DX-1497.  Do you see that, Mr. Brady?

A.  Yes.

Q.  That's an email dated March 2nd, 2020, from Trevor to you

and others on the senior leadership team.  Do you recognize

that email?

A.  I see it, yes.

          MR. MUKASEY:  Defense offers 1497 for identification

into evidence.

          MR. PODOLSKY:  Objection, your Honor.

          THE COURT:  Let's talk at sidebar.

          (Continued on next page)

(At the sidebar)

MR. PODOLSKY:  It's hearsay.  It's the defendant's own statements.

MR. MUKASEY:  Defendant's own statements are admissible under Second Circuit law.  It goes to the state of mind and they predate any motive to fabricate.  This is quite the opposite.  This is, get me a lawyer, this is before Bloomberg, Hindenburg, before criticism.  This goes directly to his state of mind and his good faith, get me a good lawyer that I can use for my Tweets.  Pure good faith, state of mind.

THE COURT:  Not being offered for the truth?

MR. MUKASEY:  Being offered for what he asked for.

MR. PODOLSKY:  Again, your Honor, the defendant described statements about himself, it is after he has been warned, this is the defendant's own exculpatory statement.

MR. MUKASEY:  It's not an exculpatory statement in any way.

THE COURT:  What do you mean, he's already been warned?

MR. PODOLSKY:  So I believe the date on this is March 2020, and I believe the testimony has been that they were talking to Trevor before the announcement about being accurate and he'd have a history of making exaggerations and false statements.  In fact, the evidence shows those warnings went back to 2018.

M9SCmil2                      Brady - Cross

MR. MUKASEY:  If a request for an attorney to help you be accurate is not good faith, I don't know what is.  This goes directly to his state of mind.  This is not a false exculpatory statement in any sense.

THE COURT:  But it's being offered for the truth.

MR. CARUSO:  No.  Your Honor, "get me a lawyer" has no assertion of fact that can be true or false.  It's a request.

MR. MUKASEY:  It's an instruction, which is not hearsay.

THE COURT:  It's an instruction.  I'll allow it.

(Continued on next page)

(In open court)

MR. MUKASEY:  Your Honor, defense offers 1497 for identification into evidence.

THE COURT:  It will be received.

(Defendant's Exhibit 1497 received in evidence)

MR. MUKASEY:  May we post it for the jury?

THE COURT:  You may.

Q.  Mr. Brady, this is a March 2nd, 2020 email sent by Trevor Milton to Britton Worthen, he's the chief legal officer; correct?

A.  Correct.

Q.  So Vince Caramella, he's the chief marketing officer; correct?

A.  Correct.

Q.  To you, the chief financial officer; right?

A.  Yes.

Q.  To Mark Russell, the president at the time; right?

A.  Correct.

Q.  Joe Pike, the head of human resources at the time?

A.  Yes.

Q.  That's the C-Suite, right, we talked about that the other day, the C-Suite?

A.  Yes.

Q.  And can you read what Trevor wrote at the second paragraph of his email?

A.  We need a good SEC attorney to begin helping us for all Tweets.

Q.  Now, if you look at the back of the email where it actually started, there's an email from Vince Caramella, the head of marketing, on March 2nd, 2020, at 8:29 a.m.  Do you see where he says, for your question about the guidelines and social media, here's what I would recommend?

A.  Yes.

Q.  Read the last bullet starting with "Business as usual."

A.  Third bullet?

Q.  Yes, sir.

A.  Business as usual social posts are fine so long as you don't talk about the deal, provide information about the deal, or timing outside of the scope of the press release.

Q.  And that's the advice from the head of marketing; correct?

A.  Yes.

        MR. MUKASEY:  Now, we can put this document aside.

Q.  Let me ask you, Mr. Brady, there came a time later in the summer of 2020 when Nikola engaged a company called Rystad Energy.  Does that ring a bill?

A.  Who?

Q.  Rystad, R-y-s-t-a-d?

A.  I'm not sure who that is.

Q.  I may be able to refresh your recollection in a moment, but do you recall a time in the summer of 2020 when Trevor asked

for a researcher or a fact checker to be hired by your company, by Nikola?

A.   I don't recall that.

          MR. MUKASEY:  Do we have 1752 that can --

Q.   Let me show you, Mr. Brady, only you, what's been marked as DX-1752 for identification.

          MR. MUKASEY:  And Chris, I think you know the specific box and section to go to.  This should not be in front of the jury at the moment.

Q.   Do you see that section of the spreadsheet, Mr. Brady?  Can you take a quick look at that to yourself, and I'll ask you again, do you recall a company called Rystad Energy?

A.   No, but I see there's a transaction that you're showing me.

Q.   And does it refresh your recollection the transaction was about $11,000, $11,100?

A.   Correct.

Q.   And does that refresh your recollection that, in the summer of 2020, Trevor asked for Rystad Energy to be hired as a fact checking or research team?

A.   No, it does not, but I do see this transaction --

Q.   Very well.

A.   -- you are showing me.

Q.   Very well.

          MR. MUKASEY:  We can take that down.

Q.   I want to go back one more time to the board member, Jeff

Ubben.  Jeff Ubben I think we said was associated with a company called ValueAct; right?

A.  Correct.

Q.  And ValueAct had a related entity called VA Spring.  Do you remember that name?

A.  VA Spring?

Q.  VA, like ValueAct Spring?

A.  Yes.

Q.  An investor in Nikola?

A.  Yes.

Q.  There came a time before Nikola started trading publicly, before June 3rd, 2020, when Jeff Ubben purchased stock from Trevor Milton.  Do you remember that?

A.  Yeah.

Q.  That was in May 2020.  Does that sound about right?

A.  I think that sounds about right.

Q.  And this transaction was not on the public market because Nikola hadn't gone public yet; right?

A.  That's correct.

Q.  And didn't have anything to do with VectoIQ's stock, he was buying in a private -- or the trading of VectoIQ stock.  He was buying in a private transaction from Trevor Milton; right?

A.  Correct.

Q.  And that was negotiated, arm's length, between Trevor Milton and Jeff Ubben; right?

M9SCmil2                        Brady - Cross

A.   Correct.

Q.   And it was documented in the stock purchase agreement; right?

A.   Yes.

Q.   And you signed that stock purchase agreement?

A.   Yes, my signature is on it, that means I signed it.

Q.   Let me show you so we can be 100 percent without doubt. Let me show you DX-1753 for identification.  Take a look at that agreement.  I think we said ValueAct Spring is Ubben's entity; right?

A.   Yes.

Q.   And if you look at the second -- well, you recognize this agreement, right.  Take a look at the back page, it's got your signature on it.

A.   Okay.

Q.   Bottom left, it's got Trevor's signature; correct?

A.   Yes.

Q.   It's got a ValueAct signature; right?

A.   Yes.

         MR. MUKASEY:  Defense offers 1753 for identification into evidence.

         MR. PODOLSKY:  No objection, your Honor.

         THE COURT:  It will be received.

         (Defendant's Exhibit 1753 received in evidence)

Q.   Take a look at paragraph 2 --

M9SCmil2                         Brady - Cross

MR. MUKASEY:  And let's publish that for the jury.

Q.  -- and again, this is Jeff Ubben's purchase of Trevor's stock.  Paragraph 2 says, in full consideration for the transfer of the subject shares, concurrently with the execution of this agreement, purchaser — that's Jeff Ubben — shall pay or cause to be paid to seller — that's Trevor — an amount in cash equal to $19.01 per share or an aggregate of $24 million and change.

Do you see that?

A.  Yes.

Q.  And you signed off on that; right?

A.  Yes.

Q.  And $19.01 per share equals — stay with me on the math here — $10 per share after the 1.9 conversion took place on June 2nd; right?

A.  That's correct.

Q.  So effectively, Jeff Ubben paid 10 bucks a share for the Nikola stock; right?

A.  Jeff Ubben paid $19.01 per Nikola stock, which converted, I believe, into 1.9 share.

Q.  Which would equate to $10 a share?

A.  Yes, based on that.

Q.  And there was no relationship between that transaction and the VectoIQ trading price in May 2020?

A.  Correct.

M9SCmil2                         Brady - Cross

Q.  Now, there's been a lot of talk in the courtroom about the Badger, the pickup truck.  We talked about it last Friday.  You understood, did you not, that the Badger would not be built without an original equipment manufacturing partner; right?

A.  Yes.

Q.  An OEM partner.  Let me show you, only the witness, DX-176 for identification.  Take a look at that, Mr. Brady.  That is a board of directors presentation; correct?

A.  Yes.

Q.  And presentations like this are kept and maintained in the ordinary course of business at Nikola; right?

A.  Yes.

Q.  And they are reflective, they show information accumulated by people with knowledge; right?

A.  Yes.

Q.  And the information is recorded presumably somewhere around April 2020; right?

A.  Yes.

        MR. MUKASEY:  I'm going to offer it as a business record, I understand the government is not going to object.

        MR. PODOLSKY:  No objection, your Honor.

        THE COURT:  It will be received.

        (Defendant's Exhibit 176 received in evidence)

        MR. MUKASEY:  Let's go to page 17.

Q.  If you look at the bottom portion of page 17, the first

M9SCmil2                          Brady - Cross

bullet says "Continuation of the project depends on Nikola

finding an OEM partner."  Correct?

A.  Yes.

Q.  And "Can you talk about the project cost of the alpha

Badger development, please."  What's the number there?

A.  $15 million.

Q.  And "there are a couple of companies that are listed here

that Nikola's going to work with to build the Badger

prototype."

        Do you see those?

A.  Yes.

Q.  That's ITAL, which you know to be ITAL Design; right?

A.  Yes.

Q.  And Technosports.  You've heard of that company because you

mentioned it on Friday; right?

A.  Yes.

        MR. MUKASEY:  Now, you can put that down and put that

away.

Q.  One of the OEM partners, and the OEMs are the giant

automobile manufacturers, right, Ford and GM and Fiat,

Chrysler, et cetera?

A.  I think OEM means any original equipment manufacturer, but

I think in this context, I think you're right.

Q.  Fiat Chrysler is an OEM; right?

A.  Yes.

M9SCmil2                              Brady - Cross

Q.  Now, one of the possible OEM partners for building the
Badger that Nikola was talking to was Fiat Chrysler; right?

A.  Yes.

Q.  And there came a time when data information, numbers about
the Badger was sent to Fiat Chrysler.  Do you remember that?

A.  Can you repeat the question.

Q.  There came a time when information about the Badger was
sent from Nikola to Fiat Chrysler.

A.  I suspect there were some information exchanged.

Q.  Let me show you what's been marked as DX-1746 and 1747 for
identification.

          MR. MUKASEY:  Just for the witness.

Q.  Take a look at 1746 first.  That's an email from Mr. Milton
to Fiat Chrysler, a guy named Bob Szymanski, and it attaches
something called a functional simulations assessment.  Do you
see that?

A.  Yes.

Q.  And you take a look at 1747, that's the attachment that was
sent to Fiat Chrysler; right?

A.  I can't recall exactly what was sent, but if that's what
was attached, then that's what was sent.

Q.  And 1747 is the kind of presentation that was kept and
maintained in the ordinary course of your business by people
with knowledge around the time that they recorded that
knowledge?

A.   Is your question that 1747 -- I'm not sure exactly what was in there, but --

Q.   Well, take a minute.  Chris can flip through it.  Take a minute and look at -- and if you look at the first page, you'll see, I think, what it related to in connection with the Badger.  Do you see that, Mr. Brady?

A.   This looks like, to me, something that was created by Trevor, by his request, to someone within Nikola.  I don't know whether this was actually put together by Trevor or someone else.

Q.   But you know that it was kept and maintained in the ordinary course of Nikola's business because these presentations, as you testified before, are kept in the file?

A.   This was kept in some file.  I was not involved with this.

          MR. MUKASEY:  Your Honor, I'm going to move this in under Federal Rule of Evidence 803(6) as a business record.

          MR. PODOLSKY:  Objection.  Hearsay.

          THE COURT:  Let's talk at sidebar.

          (Continued on next page)

(At the sidebar)

THE COURT:  Before we talk about this, I wanted to ask you, Mr. Mukasey, in connection with the stock purchase agreement that you just discussed a little bit ago, it was between Nikola and VA Spring.  You kept referring to Mr. Ubben and Mr. Milton.

MR. MUKASEY:  Milton signed it, representative of VA Spring signed it.  Ubben owns ValueAct Spring, he testified to that.

THE COURT:  Okay.  Now, with respect to this, it doesn't appear as though Mr. Brady has set the foundation for it as a business record, he doesn't recognize it.

MR. PODOLSKY:  This is an email sent by Mr. Milton attaching some presentation.  The testimony by the witness was I don't know what this is, I don't how it was kept, I don't know who wrote it.  Mr. Mukasey kept asking, doesn't it look like the type of document that would be kept in the file and the answer was maybe it could be in a file.  I don't know.  That's not sufficient to make it a business record.

MR. MUKASEY:  He's testified that documents like this have been kept in the ordinary course, was very proud to say earlier that everything is kept in the database.  I can try to lay more foundation as to this document as something that went by his email that had this attachment.  I think he's very happy to volunteer that he thinks Trevor created it.  I don't think

there is any foundation for that either, and it's something that at least he didn't object to it going out the door because he was on the email.  So if I can get him to say it was a business record, whether he's familiar with it or not, is inconsequential.

MR. PODOLSKY:  He was --

MR. MUKASEY:  The whole point of the business record exception is that it's impossible to be familiar with all the documentation in a business.  So it's kept and maintained in the ordinary course, it comes in.

MR. PODOLSKY:  He was able to testify to records that were kept in the ordinary course within the financial matters of the firm.  That's what he does as the CFO.  Mr. Mukasey is saying because the title says Nikola on it, it must be a business record, but that's ridiculous.

THE COURT:  I'm not saying it doesn't come in just for now, it can't come in under this witness.  You can try to lay some more foundation, but he's not going to able to identify it as a business record.

MR. MUKASEY:  I may ask one or two more questions, but I won't --

THE COURT:  Okay.

(Continued on next page)

M9SCmil2                        Brady - Cross

                    (In open court)

BY MR. MUKASEY:

Q.  Mr. Brady, take a look at 1746.  It's the email you're
copied on; right?

A.  Yes.

Q.  And you see that it went to Bob Szymanski at FCA group;
right?

A.  Yes.

Q.  Among others.  FCA group is Fiat Chrysler Automotive?

A.  Yes.

Q.  With respect to 1747, which is that deck --

          MR. PODOLSKY:  Objection.  Describing and testifying
about a document not in evidence.

          THE COURT:  Sustained.

Q.  With respect to 1747, which is in front of you, I hope?

A.  Yes.

Q.  That document contains data; correct?

A.  That's what it appears.

Q.  And documents that contain data accumulated by Nikola and
sent to other companies are kept and maintained in the ordinary
course of Nikola's business; right?

A.  I don't know if that -- this data was sent to any other
company.  I suspect this was within some Nikola drive.  I
suspect this was prepared based on Mr. Milton's instruction.  I
don't know who prepared it.  These are engineering specs.

M9SCmil2                         Brady - Cross

Q.   Do you deny it was created by Nikola in the ordinary course of its business?

A.   That's not what I stated.

          MR. PODOLSKY:  Objection, your Honor.

          THE COURT:  Sustained.

          MR. MUKASEY:  We will come back to this momentarily. You can take that down, Chris.

Q.   Now, while Nikola was looking for an OEM partner to mass produce the Badger, you were aware, were you not, that two physical prototypes of the Badger were being created; correct?

A.   Yes, I was aware that Nikola had hired a company in Detroit to build a prototype.

Q.   And a company in Italy, ITAL Design?

A.   That performed original design of the Badger.

Q.   Now, the original designs, the original renderings were drafted at Nikola, you know that; correct?

A.   I suspect.

Q.   Now, Nikola's suppliers and partners in designing the Badger included Technosports, you said, ITAL Design.  How about Bosch?

A.   How about Bosch with respect to the design?

Q.   With respect to the Badger.

A.   In what manner?

Q.   In any manner that you know about, did they contribute to building the Badger?

A.   I'm not sure.  I'm not responsible for engineering.

Q.   How about Pratt & Miller?

A.   I suspect they did some work with respect to the Badger.

Q.   I'm going to show you a few documents that maybe will ring a bell.  First, let me show you DX-1048.

MR. MUKASEY:  Just for the witness.

A.   Okay.

Q.   Do you recognize that document?

A.   Now I see it.  So, obviously, they send it to us.

Q.   And Tony Epperson is a name on there.  That Tony Epperson worked in your department; correct?

A.   Correct.

Q.   And this is a scope of work, if you look at the second page; correct?

A.   Yes.  Looks like it's a project scope for some work that Pratt & Miller did on our behalf.

Q.   And this is the kind of document that's kept and maintained in the ordinary course of business at Nikola; right?

A.   This would be kept in our file.

MR. MUKASEY:  Defense offers 1048 for identification into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1048 received in evidence)

MR. MUKASEY:  Chris, if you turn to page 2 while we

publish it for the jury.

Q.   First of all, Pratt & Miller is a engineering company; correct, Mr. Brady?

A.   Yes.

Q.   And if we read under the paragraph, project scope, this proposal was developed through a series of calls with Nikola leaders.  Pratt Miller engineering will support Nikola and Nikola's primary key suppliers by being the assembler of the two Nikola Badger-Alpha Level prototype EV pickup trucks.

Do you see that?

A.   I do.

Q.   And the date on this document, if you look at the front page, is August 26th, 2020.

A.   Okay.

Q.   Now let me show you DX-1737 for identification.  And I asked you about Bosch's participation in the Badger.  Check out DX-1737.  You recognize that; right?

A.   I recognize the name of Bosch.  I'm not sure exactly what Bosch's involvement with respect to the Badger.

Q.   Well, take a look at the bottom portion of the document, it has your name; right?

A.   Once again, we talked about this last week.  This our automatic signatures.  On any PO approval, has my name and ultimately requires CEO's name.

Q.   So my understanding is you wouldn't allow your name to go

on something that you did not approve; correct?

A.  Ultimately, yes, I approved it, but if you're suggesting --
I'm not sure what the point is here.

Q.  The point is you --

          MR. MUKASEY:  Let me move this into evidence so the
jury can see what we're talking about.  I'm going to offer
DX-1737 for identification into evidence.

          MR. PODOLSKY:  No objection.

          THE COURT:  It will be received.

          (Defendant's Exhibit 1737 received in evidence)

Q.  Mr. Brady, here's the point, now that the jury can see it,
this is a purchase order; right?

A.  Yes.

Q.  Upper left-hand corner, the vendor is Robert Bosch; right?

A.  Yes.

Q.  Big automotive parts and engineering company; correct?

A.  Yes.

Q.  The description of the work in the middle of the page,
Nikola Badger VCU development and E/E architecture support;
right?

A.  Yes.

Q.  And VCU is vehicle control unit.  Does that sound right?

A.  Yes.

Q.  And here's the punch line, if you look at the right-hand
corner, you approved $1.6 million to be spent on the Badger

here; correct?

A.  Correct.

MR. MUKASEY:  Chris, we can take that down.

Q.  Now, it turns out that General Motors was the OEM that ended up in an agreement to build the Badger with Nikola; right?

A.  Yes.

Q.  And when I say build, I mean to mass produce the Badger; right?

A.  Yes.

Q.  And that agreement came to pass somewhere in the end of August 2020; right?

A.  Yes.

Q.  Let me show you what's been marked, and only for the witness, DX-601.  Do you recognize this document, Mr. Brady?

A.  I see it.  I'm just trying to understand exactly what -- oh, press release.  Okay.  Yes.

MR. MUKASEY:  Pursuant to stipulation GX-S6, paragraph 2, we offer DX-601.

MR. PODOLSKY:  No objection.

THE COURT:  Pursuant to stipulation, it will be received.

(Defendant's Exhibit 601 received in evidence)

Q.  Finally, on the Badger, Mr. Brady --

MR. MUKASEY:  You can take that press release down for

the moment.

Q.   -- you testified, I think on Friday when I was talking to you, that you and Trevor had a business disagreement about the Badger; right?

A.   Yes.

Q.   And by that I mean that you thought it was a bad move business-wise, economics-wise, and Trevor thought it was a good move; right?

A.   Yes.

Q.   And you actually thought that the Badger might hurt Nikola with respect to institutional investors; is that right?

A.   No.   What I said was it's a bad business move based on how the deal was structured.

Q.   You also thought it might hurt Nikola with respect to institutional investors, did you not?

A.   Look, I don't know exactly as to how they might perceive it.   What I said, I believe, was that it was structured incorrectly and it was going to cost great deal of money to actually build that for Nikola.   Not only that --

Q.   So you had a business disagreement as to cost; right?

A.   Yes.

Q.   Okay.   Now let me show you DX-167 for identification.   Take a look at that, it's an email, it's dated February 9, 2020.   It was sent by you; correct?

A.   Yes.

M9SCmil2                       Brady - Cross

Q.  And it was sent by you to three-quarters of the leadership team including Trevor, Mark Russell, and Britton Worthen; right?

A.  Yes.

MR. MUKASEY:  Defense offers 167 for identification into evidence.

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 167 received in evidence)

Q.  This is an email from you to Trevor laying out a few questions for consideration --

MR. MUKASEY:  If the jury can see it.

Q.  This is a few questions laid out for Trevor by you, listing a few questions for consideration about the Badger announcement and the Badger project.

Do you see that?

A.  Yes.

Q.  And with respect to my earlier question about you thought institutional investors would not like this, I direct your attention to the last sentence of the email.  You say to Trevor, certain verbally committed PIPE investors may decide to back out.

Do you see that?

A.  Yes.

Q.  So it is true that you thought the Badger project might

cause certain investors to back out of Nikola; right?

A.   You got timing difference here.  Just so that you understand, this email was February 9th, 2020.  We had not mentioned anything about the Badger when we went and marketed it to PIPE investors.  Your prior question to me was in late August 2020 with respect to the deal with GM, the Badger was already known.

Q.   I'm putting aside the deal with GM.

A.   I was only answering questions related to GM.

Q.   Let's put aside GM.  This is a separate question focusing on February 9, 2020.

A.   Yes.

Q.   As of February 9, 2020, you believed that building the Badger could cause PIPE investors to back away from Nikola; right?

A.   Right, because we had not mentioned anything about the Badger when we went on a road show in January 2020, so this would have been a surprise to PIPE investors.

Q.   And you thought that the Badger announcement and the Badger project could hurt Nikola?

A.   That's what I said on this email.

          MR. MUKASEY:  We can take this down, Chris.

Q.   Now last week, Mr. Brady, when you were talking to Mr. Podolsky, talked a lot about Trevor focusing on the NKLA stock price.  Do you remember that testimony?

M9SCmil2                         Brady - Cross

A.   Yes.

Q.   And it's fair to say that Trevor spoke to you from time to
time about the stock price; right?

A.   All the time, myself, as well as to Mark Russell.

Q.   And Mark Russell.  Thank you for volunteering that.

         And Britton Worthen, maybe, the company's chief
lawyer?

A.   I suspect.

Q.   So Trevor was not hiding from the leadership team that he
was interested in the stock price; right?

A.   No.

Q.   It was open, yes?

A.   Yes.

Q.   It was transparent, yes?

A.   The whole point is, he talked about all the time, he was
fixated with the stock price.

Q.   Thank you.  Now, last week, Mr. Podolsky showed you
Government Exhibit 31 in evidence.

         MR. MUKASEY:  If we can pull that up.

Q.   This is a text message from Trevor to you and Mark Russell;
right?

A.   Yes.

Q.   And remember, Mr. Podolsky asked you about this chart that
appears to have been screenshot on the right-hand side; right?

A.   Yes.

M9SCmil2                           Brady - Cross

Q.  And the chart depicts top increases in number of users holding for stocks held by Robinhood; right?

A.  Yes.

Q.  And Robinhood, I think you said, and just correct me if I'm wrong, is a platform that is used by retail investors predominantly to buy and sell stock; right?

A.  Yes.

        MR. MUKASEY:  Chris, can you just go back to the text message portion.

Q.  And there is an exchange that Mr. Podolsky read last week where Trevor says, underneath the chart, over 36,000 private investors added today alone, one of the best in history.

        Do you see that.

A.  Yes.

Q.  And you tell Trevor, strong momentum created by retail investors.  Hopefully they'll stay in for the long-term. Trevor says back to you, that's how you build a foundation, love it.

        Do you see that?

A.  Yes.

Q.  Look in the upper left-hand corner, that's a June 8th, 2020, starting at 3:41 p.m.

A.  Yes.

Q.  Mr. Brady, do you know where Trevor got that link from to the Robinhood -- the Robintrack chart?

M9SCmil2                        Brady – Cross

A.   Suspect probably his app.

Q.   His what?

A.   His app, Robinhood platform app.

Q.   Were you aware 20 minutes before Trevor sent you and Mark Russell that Robinhood link, he received it from Steve Girsky, who was the chairman of the audit committee of Nikola?

A.   How would I know that?

Q.   Well, I'm going to show you DX-1142.

          MR. MUKASEY:   Judge, under Rule 106, I'm going to offer this.  And I'd be happy to proffer the 106 issue at sidebar.

          THE COURT:   Please do.

          (Continued on next page)

(At the sidebar)

THE COURT:  So what is this?  This is a Tweet from Mr. --

MR. MUKASEY:  So the government put up last week, look at Trevor tracking Robinhood, he sees retail investors and he's chasing retail investors.  The 106 point is 20 minutes -- the only way Trevor had that was 20 minutes later, the chairman of the audit committee, Steve Girsky, sent it to him.  So we have the completion of this chain in a text message between Girsky and Trevor.  Girsky says to Trevor, great job with your Robinhood, great job getting retail investors.  He then forwards it to Russell and Brady, and the government presents the second half of it, which is, we don't want you chasing these retail investors.  We're presenting the first half of it, which the chairman of the audit committee gave him.  So it's not like he's -- in fact, it's interesting, Brady just made a good case for the Rule of Completeness because he said, well, I assume Trevor got it off his app.  That's what probably the jury thinks, too.  He didn't get it off his app, he wasn't chasing, Girsky, the mentor and the chairman.  Audit committee sent it to him.  That's classic 106.  It relieves a misleading impression.

THE COURT:  How is it a misleading impression?

MR. MUKASEY:  He just testified to a misleading impression.  He said, I assumed he got it off his app because

he's obsessed with retail investors.  The truth of the matter is Girsky sent it to him and said, great job chasing retail investors, look how well you're doing on this app.  So the government presents it in the light most favorable, we need to complete the story.  He got it in a positive way, do what you've been doing.

MR. PODOLSKY:  I don't know what a positive way means, but let's talk 106.  It was Mr. Mukasey who asked the witness to speculate where this witness got it.  There was no misimpression until Mr. Mukasey asked that question.  You can't open the door by asking the witness to speculate to his own rule of completeness.  That's number 1.

Number 2, this is 106.  106 is required when part of a snippet of a conversation -- (indiscernible crosstalk) in other words, to understand the conversation.  This is not.  This is the entire conversation between Mr. Milton of Russell and Brady.  It must be a different conversation.

THE COURT:  I disagree.  I don't think it's 106.  How Mr. Milton got the information is, for this purpose, I think, irrelevant.  He got it and he chose to send it to other members of the management team.

MR. MUKASEY:  But he got it from Girsky when he emailed it, "Look how great you're doing."  That's why he forwarded it.

THE COURT:  How does that complete?

MR. MUKASEY:  Because they've presented a side of this which is Trevor was obsessed with retail investors in a bad way, that's part of this fraud.  We're saying Trevor was encouraged by Girsky to do this.  That's exactly what it shows.

THE COURT:  I don't get that part of it.  In any event, I don't think it's --

MR. CARUSO:  Can I just -- the inference that the government is going to want the jury to draw from the part they play is Mr. Milton dug this information up by himself, that he's obsessed with the retail investors and, therefore, he must have dug this up.

THE COURT:  Those are two very different things.

MR. CARUSO:  I think they follow each other.  That's what the government's going to argue.

THE COURT:  Certainly I think they're going to argue that he was obsessed with retail investors.

MR. MUKASEY:  I'm showing you, just for the record, what's been marked as DX-1142.  This is Girsky saying Robinhood is an online platform.  Trevor doesn't know this.  This table provides a measure of the retail base showing really impressive.  So this is the link which he then -- Trevor then forwards to Russell and Brady.  So it really is a completion of how Trevor got this and the circumstances under which he got it.

MR. PODOLSKY:  I think it's remarkable.  The only

party here who's asked where he got this is the defense.  We didn't ask Mr. Brady to speculate.

MR. MUKASEY:  I don't really care what he knows or not.  I'm making this application regardless of what Brady testifies.

MR. PODOLSKY:  We haven't made any arguments where he got it.  We offered a series of these text messages that showed Mr. Milton talking about retail investors.  That's what it was.

THE COURT:  I don't think it is --

MR. MUKASEY:  -- incomplete thread of the --

THE COURT:  It's not.  I don't know what comes before that.  It's between Mr. Brady, Mr. Milton, and -- is Russell the other person on the thread?

MR. PODOLSKY:  The one in evidence is Mr. Brady, Mr. Russell, and Mr. Milton.

MR. MUKASEY:  This also goes directly to good faith, by the way.  When you're getting from the chairman of the audit committee a link to a Robinhood retail investor website and he's saying really impressive, that goes directly to Trevor's good faith.

THE COURT:  Objection is sustained.

(Continued on next page)

(In open court)

BY MR. MUKASEY:

Q.  Mr. Brady, we talked last week about SEC filings, I think both on direct and cross, and you said, on direct examination, it's important to have accurate SEC filings, obviously; right?

A.  Yes.

Q.  And SEC filings, probably everybody knows by now are available on the SEC's website; right?

A.  Yes, as well as on our website.

Q.  Thank you very much for that.

In that light, I'm going to show you DX-1022, which is a copy — and it's already in evidence, it can be published for the jury — of the Nikola website as it existed in 2020.  Do you recognize that?

A.  Yes.

Q.  Now this provided a link to the company's SEC filings; correct?

MR. MUKASEY:  Chris, you can blow that up.

A.  Yes.

Q.  And anything that was attached to SEC filings, like presentations or press releases or analyst day reports, things like that; correct?

A.  Yes.

Q.  Now, the investor page of the Nikola website also provided an email address for people who had questions; isn't that

right?

A.   Yes.

Q.   Investors at NikolaMotor.com, and that email account was monitored by your team?

A.   Yes.

Q.   And your team, from time to time, responded to investor questions, yes?

A.   Yes.

Q.   And there's an email address, I think your personal, KimBrady@NikolaMotor.com is there; right?

A.   Yes.

Q.   And so people could reach out to you with questions; right?

A.   This was for our research analyst and my side institutional analyst.

Q.   You didn't want retail investors reaching out to you?

A.   No.

Q.   You said that retail investors are, last week, average Joes.  Do you remember that?

A.   I would say retail investors are not institutional investors.

Q.   You said average Joes last week.  Do you want me to read you the transcript?

A.   If that's what I said, then I -- if it's on the transcript, I believe.

Q.   So you don't want the average Joe investor reaching out to

you?

A.  No, I don't necessarily want retail investors reaching out to me.

Q.  Because they're average Joes?

A.  No, because otherwise I will be spending all of my time, that's why I have my team.

Q.  Right.  You'd rather only interact with the big rich guys?

A.  I don't know what -- I'm not sure if they're rich guys.

Q.  You'd rather only interact with the institutional investors; correct?

A.  Generally, CFOs interact more with institutional investors than retail investors.

Q.  But this guy wanted to talk to the average Joe, right, the retail investor?

A.  Yes.  It's highly unusual for any CEO or executive chairman to spend time on social media responding to retail investors.

Q.  You did not want to engage with the average Joe; right?

A.  Yes, because it's highly unusual for anyone from the company to engage with retail investors on a regular basis because it's easy to get into trouble talking to retail investors.

Q.  And sometimes, doing what's unusual isn't a bad thing; right?

          MR. PODOLSKY:  Objection.  Vague.  Argumentative.

          THE COURT:  Sustained.

A.   I'm not going to speculate on that.

Q.   There's no question pending.

          I think you've made clear your views on --

          MR. PODOLSKY:  Objection.  Arguing with the witness.

          THE COURT:  I think he's building up to a question.
Go ahead, Mr. Mukasey.

          MR. MUKASEY:  Thank you, Judge.

Q.   I think you've made clear your views on retail investors
and what you preferred and what Mr. Milton preferred; correct?

A.   You have to be very careful when you're interacting with
retail investors because they tend to trust what you say,
that's why.

          MR. MUKASEY:  Objection.  Foundation.  And move to
strike.

          THE COURT:  Overruled.

Q.   Now, Mr. Brady, let's get back to the SEC filings.

          Among the documents that Nikola filed every few months
was something called a 10Q; right?

A.   Yes.

Q.   I'm going to show you what's in evidence as DX-1215.  Do
you recognize that as the August 4th, 2020 10Q?

A.   Yes.

          MR. MUKASEY:  Can you go to page 60, Chris.

Q.   That's your signature, electronically; correct?

A.   Yes.

M9SCmil2                       Brady - Cross

Q.   And with respect to this 10Q, you also personally certified to the SEC that you reviewed the report; right?

A.   Yes.

Q.   Let me show you DX-1217 for identification.

        THE COURT:  Before you do that, we're going to take our first break.  It's 11 o'clock, ladies and gentlemen.  20 minutes.  Don't discuss the case.

        (Continued on next page)

(Jury not present)

THE COURT:  Mr. Brady, you may step down.

Everyone can be seated.

Anything to discuss?  Mr. Podolsky.

MR. PODOLSKY:  Not from the government, your Honor.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  No, Judge.

THE COURT:  20 minutes.  Don't be late.

(Continued on next page)

M9SHMil3

THE COURT:  OK.  Mr. Mukasey, we have a couple of minutes.  What is it that you want to raise.

MR. MUKASEY:  I wonder if we should do it at sidebar, just because the witness is here.

THE COURT:  OK.

MR. MUKASEY:  It's not particularly confidential, but I just think it's probably better safe than sorry.

(Continued on next page)

(At sidebar)

MR. MUKASEY:  We are cognizant of the Court's ruling pretrial on the motions *in limine* that Mr. Milton's gift of stock to employees was a sort of prior good act that the Court excluded.  There were two gifts of stock.  One pledged in 2017 that we -- I think that application related to, and we respect that ruling.

On Friday, Mr. Podolsky introduced an executive compensation document, GX 31, I believe, that talked about stock granted to Mr. Milton in 2020 as a result of hitting price milestones over the course of 20 days.  The suggestion was he got this because the stock stayed at that price for 20 days, and the other executives got it too.

The fact is that it has been publicly disclosed in filings that are coming in this case that Mr. Milton took that stock award and gifted it to employees.

THE COURT:  The entirety of it?

MR. MUKASEY:  The entirety of it.

THE COURT:  OK.

MR. MUKASEY:  The implication that he kept the award and it was somehow connected to misstates or inflated stocks is wrong, and we think that opens the door, not to the August 2017 gratuitous stock gift, but to rebut the suggestion that he got some award of 1,069,000 shares in 2020 and somehow was going to run out the door with them or not entitled to them.  He gave

them away.

THE COURT:  So you want to ask Mr. Brady whether Mr. Milton gave him part of that?

MR. MUKASEY:  Gave away part of that.

THE COURT:  OK.

MR. PODOLSKY:  We object, your Honor.  First of all, I don't believe it's right that he gave away that stock.

MR. MUKASEY:  I can show it to you.

MR. PODOLSKY:  I think he stated his intention to do so.

MR. MUKASEY:  No, he did.  I'll show it to you.

MR. PODOLSKY:  It's irrelevant to the point we made, which is he gets a bonus based on the stock price.

THE COURT:  How he spends his money or what he does with it is not necessarily relevant, I suppose, but --

MR. MUKASEY:  Especially since they're going to put in that he bought airplanes with it.

THE COURT:  When do you intend to do that?  When would you propose to do that?

MR. MUKASEY:  I could do it whenever your Honor wants. I'd like to do it quickly with a few questions and get out of it and move on.

MR. PODOLSKY:  When do you believe he actually gave this gift?

MR. MUKASEY:  August 2020, if I remember correctly.

And it's actually memorialized in his resignation letter that says -- we're not going to put that in -- but it's memorialized. He got 1,069,000, and he gifted them. And the company agreed to it and everybody -- he didn't walk out the door with them. He didn't pump and dump them. He gave them away to employees.

MR. PODOLSKY: What he gave them, I guess, was as he was being fired, he gave potential witnesses a bunch of stock.

MR. MUKASEY: No, no, in August of 2020 he gifted it. It was memorialized when he resigned.

MR. BONDI: Your Honor, I hate to say this, but I was a witness to his separation. I was there.

MR. PODOLSKY: So call Mr. Bondi.

MR. BONDI: No. And I will proffer --

MR. MUKASEY: He's incompetent.

MR. BONDI: And I will proffer, your Honor, during the resignation process, it was acknowledged that Mr. Milton had previously given away these stock back well before Hindenburg and well before his resignation, and it was memorialized in the resignation letter that this was a previous gift.

MR. MUKASEY: It rebuts the claim that he was pumping and dumping or robbing and grabbing.

THE COURT: No, I'm going to stick with the pretrial ruling. It is still a version of doing good acts and putting that before the jury, so I'm not going to allow it.

M9SHMil3                          Brady - Cross

                    (In open court; jurors present)

                    THE COURT:  Ladies and gentlemen, I apologize for the

short delay.  We were, as always, trying to figure out ways to

streamline the presentation of evidence for you.

                    Mr. Mukasey.

                    MR. MUKASEY:  Thank you, Judge.

Q.  We were just talking about the August 10 -- I'm sorry, the

August 4, 2020, 10-Q quarterly filing.  Got that?

A.  Yes.

Q.  The filing is in evidence as DX 1215.  We saw your

signature.  DX 1217 is something I'd like to show you now, just

for the witness.

                    You recognize that document, Mr. Brady?

A.  Yes.

Q.  You signed it in connection with the filing, correct?

A.  Yes.

                    MR. MUKASEY:  And defense offers 1217 for

identification into evidence pursuant to the GX S-6 stip.

                    MR. PODOLSKY:  No objection.

                    THE COURT:  It will be received.

                    (Defendant's Exhibit 1217 received in evidence)

BY MR. MUKASEY:

Q.  This is a document that you personally certified,

Mr. Brady, right?

A.  Yes.

Q.   And could you read paragraph 2, please, starting with based on your knowledge.

A.   "Based on my knowledge, this report does not contain any untrue statement of a material fact, or omit to state a material fact, necessary to make the statements made in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

Q.   And that certification was filed by the -- with the SEC, correct?

A.   Yes.

Q.   OK.  Now, since Nikola became a public company on June 3, it also holds what are called earnings calls, correct?

A.   Yes.

Q.   And those are also quarterly, four times a year?

A.   Yes.

Q.   And those earnings calls are calls when the leadership of the company gets on the phone on a conference call and speaks to analysts or investors, interested parties, about the company's past quarter and their business and their financials, right?

A.   Yes.

Q.   And investors can call in and ask questions and hear information, right?

A.   Investors can call in.  It's a webcast, but they do not ask questions.  The analysts, research analysts, ask questions.

Q.   And they ask questions about the company and its
fundamentals and its projections, etc.?

A.   Yes.

Q.   At Nikola, those earnings calls are taped, correct?

A.   Yes.

Q.   And preserved for posterity, correct?

A.   Yes.

Q.   And they're also transcribed so somebody could read what
was said on the call, right?

A.   Yes.

Q.   And those tape recordings, audio recordings, and the calls,
the transcripts, are maintained on Nikola's website for access
by investors, correct?

A.   Yes.

Q.   Now, you've spoken on those earnings calls since the
company went public, yes?

A.   Yes.

Q.   And Mark Russell, the company's CEO, has spoken on those
calls?

A.   Yes.

Q.   And Britton Worthen from time to time will play a role in
those calls?

A.   He reads the disclaimer statement.

Q.   At the outset of the call, correct?

A.   Correct.

Q.   And you are always honest on those calls, aren't you?

A.   We do our best to state the facts.

Q.   You're not always honest on the calls?

A.   Yes, we are.

Q.   OK.  I'd like to show you what has been marked as DX 156, just for the witness.

Do you recognize that, Mr. Brady?

A.   Yes, it looks like the transcript.

Q.   And I have the audiotape of that, and do you think you would recognize the voices on the audiotape from the August 4 earnings call transcript?

A.   Yes.

MR. MUKASEY:  Chris, is there a way we can play the audio just to confirm that Mr. Brady recognizes the voices?

Or, more quickly, I can offer the tape and the transcript under DX -- I'm sorry, GX 6-S, the stipulation.

THE COURT:  Any objection?

MR. PODOLSKY:  No, your Honor.

(Defendant's Exhibits 156 and 156-T received in evidence)

MR. MUKASEY:  OK.  So in that case, Chris, why don't we put up the relevant portion of DX 156 and play the clip DX 77-E.

Q.   And just to set the scene, Mr. Brady, I think what you're going to hear is, and you'll confirm it for us, the audiotape

M9SHMil3                         Brady - Cross

and the transcript of a statement you made August 4, 2020,

earnings call.

           Go ahead, Chris.

           (Audio played)

Q.   Mr. Brady, that's your voice, right?

A.   Yes.

Q.   And that was a truthful statement by you, correct?

A.   Yes.

Q.   And Emmanuel is an analyst that you were speaking to?

A.   Correct.

Q.   OK.   Now, in addition -- you can take that down.

           In addition to that filing, Mr. Brady, the 10-Q and

the surrounding earnings call, Nikola made other SEC filings

throughout 2020, right?

A.   Yes.

Q.   They filed prospectuses and revised prospectuses and

something called an 8-K, all different forms of filings, right?

A.   Correct.

Q.   All approved prior to filing by you?

A.   There are some regulatory filings depending on what the

filings are, but the important filings would be 10-Q and 10-K,

which are approved by me.

Q.   Are you saying that there are SEC filings that are

unimportant?

A.   No, but there are -- you know, there are a number of

documents.  There may have been filings that has Britton Worthen's signature and is filed by the chief legal officer.

Q.  But you didn't --

A.  I just want to clearly state what you asked is that --

Q.  But you didn't disapprove of those?

A.  No.

Q.  OK.  Now, one of these filings was an 8-K on April 3, 2020.  Does that ring a bell?

A.  Well, I would have to look at what the filing is, but I'm sure if it was filed, then we filed it.

Q.  Let me show you what's been --

A.  Company filed it.

Q.  Sorry.  Let me show you what's been marked DX 1742 for identification.

A.  OK.

Q.  Do you recognize that?

A.  Looks like we made a filing on April 3, 2020.

Q.  And if you go to page 5 of that exhibit, you'll see that it attaches a presentation.  You see that?

A.  Yes.

MR. MUKASEY:  Defense offers 1742 for identification into evidence.

MR. PODOLSKY:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 1742 received in evidence)

BY MR. MUKASEY:

Q.  Mr. Brady, we can take that down.

Apologize if I asked this already, but you made sure, together with your outside lawyers and your outside accountants, that what you filed was true and correct, to the best of your knowledge?

A.  To the best of my knowledge.

Q.  Let me go back for a second to that Robinhood app that we were talking about a moment ago.

You testified on Friday that the image that appeared in a text message was from a Robinhood app.  Do you recall that testimony?

MR. PODOLSKY:  Objection.  Misstates the testimony.

MR. MUKASEY:  Actually, I'm going to read it to you from page 1783 of the transcript, line 12.

"Can you explain what you understood this image to be that Mr. Milton sent?

"A.  This image came from Robinhood app that shows number of users.  These are retail investors holding Nikola stock."

Do you recall that testimony?

A.  Yes.

Q.  That Robinhood app that was sent in a text message to you, you don't know where that came from, in other words, how Trevor got it, do you?

A.  No, I don't.

Q.  You don't know whether it came from Steve Girsky, the chairman of the audit committee, do you?

A.  No, I don't.

Q.  Now, you also testified on Friday about certain members of the C-suite, the chief suite, people who were in the C-suite and not in the C-suite.  You remember that testimony?

A.  Yes.

Q.  You were asked by Mr. Podolsky if Russell and you and Worthen and Pike were in the C-suite.  Remember that?

A.  Yes.

Q.  You were asked whether someone named Dane Davis is in the C-suite, and you said he was not, right?

A.  Yes.

Q.  He was a lower level employee?

A.  He was lower than C-suite.

Q.  OK.  I'm going to read you a list of names, and you tell me whether they were in the C-suite or they were lower level.  OK?

A.  OK.

Q.  Stephanie Fleck?

A.  Lower level.

Q.  Elizabeth Fretheim?

A.  Lower level.

Q.  Dale Prows?

A.  Lower level.

Q.  Brendan Babiarz?

M9SHMil3                          Brady - Cross

A.  Lower level.

Q.  Now, you testified on Friday also that Nikola's trading volume was mainly what you called retail investors.  Recall that testimony?

A.  Yes, I do.  I believe what I said was retail and high-frequency traders.

Q.  Well, I'm going to get to that, and I think we already discussed that retail investors are -- you liken to an average Joe.

First of all, I want to be clear.  There is nothing wrong or improper with communicating with individual or retail investors, right?

MR. PODOLSKY:  Objection.  Vague.

THE COURT:  Overruled.

A.  Once again, I stated this.  You have to be extremely careful when you're talking to retail investors.

Q.  I'm going to ask you just answer my question.

MR. PODOLSKY:  Objection, your Honor.  He's trying to answer the question.

Q.  I think we've agreed --

THE COURT:  Overruled.

Q.  I think we've agreed you have to be careful when you speak to investors.  Let's agree on that, right?  Yes?

A.  Yes.

Q.  OK.  When you speak to retail investors, a company, an

individual, an executive, a board, there's nothing wrong with that, it's not illegal, it's not improper to speak to retail investors, correct?

A.   It's not illegal.

Q.   Thank you.

A.   But it's highly unusual.

Q.   There's nothing improper with it, right?

         MR. PODOLSKY:  Objection.  Asked and answered and calling for legal conclusion.

         THE COURT:  Overruled.

A.   Nothing illegal.

Q.   It's a yes-or-no question.  There's nothing improper with communicating with retail investors?

A.   Yes.

Q.   Yes, there is nothing improper, right?

A.   Nothing improper.

Q.   Thank you.

         Now, the government -- by the way, your website at Nikola is available to all investors -- institutional, retail, average Joe, super sophisticated, right?

A.   Correct.

Q.   Same with the SEC website, right?

A.   Correct.

Q.   Now, you talked with Mr. Podolsky about GX 254, which was a document that you got from NASDAQ and made some commentary on.

M9SHMil3                          Brady - Cross

You remember that?  I can show it to you.

        Chris, can you pull up 254.

A.   Yes.

Q.   So 254, in the middle of the page, says that it's retail and high-frequency traders that are selling Nikola stock, right?

A.   Yes.

Q.   To be clear, high-frequency traders are generally not individuals, right?

A.   Correct.

Q.   High-frequency traders are people who trade stocks using supercomputers, algorithms, and very, very advanced trading algorithms, right?

A.   Correct.

Q.   And they fire sometimes hundreds of trades in less than a second?

A.   They can.

Q.   OK.  Retail traders or retail investors you're talking about are like your average Joe, right?

A.   There are retail investors that may trade on some kind of platform.

Q.   But there's a distinction between retail investors and high-frequency traders.  High-frequency traders are generally not individuals, as you said?

A.   Generally not individuals.

Q.  Government Exhibit 254 lays out -- I think it's in the next bullet -- general trading volume statistics for NASDAQ stocks. Those are not Nikola-specific, right?  General trading volume statistics for NASDAQ stocks are high frequency, 50 to 60 percent; retail, up to 20 percent, right?

A.  Uh-huh.

Q.  That's not Nikola-specific?

A.  I believe that's accurate.

Q.  OK.  Now, you also testified on Friday -- and we can take this down -- that retail investors "did not have appreciation for the company's fundamentals."  Remember that testimony?

A.  Yes.

Q.  And thereafter you testified, this is 1774 of the transcript, line 22 to 23:  "Retail traders are reacting to, essentially, social media and what they read and not making informed decisions.  They don't read what has been filed with the SEC."

        That was your testimony, right?

A.  Yes.

Q.  First of all, Mr. Brady, you weren't on social media, right?

A.  Correct.

Q.  So you're talking about social media without being on social media.

        Now, more importantly, you testified in this courtroom

under oath that retail investors, average Joes, in your words, don't read what's been filed with the SEC.  That's what you said?

A.  That's correct.

Q.  You have no basis on which to say that.  You have not done a survey of what retail investors read, and you don't know what retail investors read because they don't tell you because you don't know who they are because you don't talk to them, right?

MR. PODOLSKY:  Objection.  Argumentative.

THE COURT:  It's compound.  Why don't you break that down, Mr. Mukasey.

Q.  You don't know what your average Joe retail investor reads and doesn't read, correct?

A.  No, that's not correct, Mr. Mukasey.

Q.  You haven't done a survey, Mr. Brady?

A.  Mr. Mukasey, are you going to let me talk?

THE COURT:  Mr. Brady, you've answered the question. Let Mr. Mukasey ask the questions.  OK?

THE WITNESS:  OK.

Q.  I imagine that you have spoken to retail investors from time to time?

A.  Yes, I have.

Q.  OK.  You have no basis for saying in any sweeping manner that retail investors blow off the SEC filings?

A.  Oh, actually, I do.  Ones that I have talked to, it was

absolutely clear none of them have read any of the filings.

Q.   There are hundreds of millions of retail investors.  Can we agree on that?

A.   I can.

Q.   OK.

A.   But I can only -- I can tell you -- I can only tell you my experience.

          THE COURT:  Mr. Brady, please try to answer the question that's asked.

Q.   You have not spoken to the large swath of retail investors, right?

A.   No.  I can only testify to whom I have spoken with.

Q.   And you haven't even spoken to the large swath of Nikola retail investors, right?

A.   I don't know what "large swath" means, but other than ones that I have spoken with.

Q.   But you did tell us earlier that you don't really want to talk to retail investors?

A.   What I said was that you have to be so careful about talking to retail investors -- is because they typically make statements or they want you to answer questions about the company, and they want to rely on those statements.  I want them to make their own choices and study and read what has been properly filed with SEC, so --

Q.   You think they're too lazy or too stupid to read SEC

filings?

A.   No, I'm just simply stating.

Q.   So you make accurate SEC filings.  You've testified five or seven times about that, right?

A.   Correct.

Q.   And you make those accurate SEC filings so that retail investors and anybody can get accurate information, correct?

A.   That would be the goal of the filing.

Q.   OK.  Nobody reads it.  Why do you have to bother?

A.   It's required by law, sir.

Q.   So, yeah, you do it because it's required by law, but the average Joe investor can't appreciate it.  Is that what your testimony is?

A.   Sir, you should ask the SEC.  That's not my responsibility.

Q.   Have you told the SEC that nobody reads their filings?

          MR. PODOLSKY:  Objection, your Honor.

          THE COURT:  Sustained.  Sustained.  There's no question before you, Mr. Brady.

Q.   OK.  Mr. Brady, respectfully, you don't know what the average retail investor --

A.   I only know --

          THE COURT:  Mr. Brady, let him finish the question, and then only answer the question that's asked.  OK?

Q.   You don't know what the average retail investor reads and doesn't read, correct?

A.   I know based on the conversations which I had with retail
investors.

Q.   With a handful of retail investors.  I'm asking about the
average retail investor.  You don't know, do you?

A.   I know what retail investors are thinking based on ones
that I have spoken with.

Q.   You know what all retail investors --

A.   No.

Q.   -- are thinking?

A.   Not at all.

Q.   So let's agree you've spoken to some retail investors.  You
don't know what the average retail investor thinks, do you?

A.   I only know ones that I have spoken with.

Q.   Can we agree, Mr. Brady, when you said that retail
investors do not have an appreciation for the company's
fundamentals and they don't read what has been filed with the
SEC, you were exaggerating a little bit?

A.   I don't think so, not from my perspective.

Q.   Mr. Brady, you testified on direct that you were familiar
with a report that came out in September of 2020 that was
issued by some short sellers, right?

A.   Are you referencing the Hindenburg report?

Q.   I am.

A.   OK.  Yes.

Q.   You're familiar with it, right?

A.   Yes.

Q.   And you told Mr. Podolsky that the report alleged various misstatements by Trevor Milton.  Remember that?

A.   Yes.

Q.   When that Hindenburg report came out, you said it was a hit job, correct?

A.   I may have said that.

Q.   You did say it.

A.   OK.

Q.   When that Hindenburg report came out, you called it a short seller hit job?

A.   If I stated that, then I stated it.

Q.   You said the Hindenburg report was a character assassination on Trevor Milton, did you not?

A.   If I stated it, then I stated it.

Q.   Is there any doubt in your mind that you stated it? Because I'll show it to you.

A.   Oh, I believe you.  If I stated it, then I stated it.

Q.   And you said the Hindenburg report had no substance to it, Mr. Brady, didn't you say that?

A.   I may have said that.

Q.   Again, if there's doubt in your mind, I'm going to show it to you.

A.   I don't remember everything I said.  It was two years ago, but if you're telling me that's -- that I stated that, then I'm

M9SHMil3                           Brady - Cross

telling you I believe you.

Q.  You said it had no substance to it?

A.  If I stated that and if you can show me that, then I believe you.

        MR. MUKASEY:  Can we show DX 1105 to the witness to refresh his recollection, at the bottom of the page.

Q.  Let me ask you again now, Mr. Brady --

A.  Yes, it looks like I stated at the Cowen conference.

Q.  You called Hindenburg a short seller hit job and a character assassination on Trevor Milton, yes?

A.  Yes.

Q.  You said there was no substance to it, yes?

A.  Yes.

Q.  We heard testimony in this courtroom -- you can take that down.

        We heard testimony in this courtroom, Mr. Brady, that -- withdrawn.

        That Cowen conference that you just referenced was on or about September 14, 2020?

        Chris, can you show him the first page of DX 1545.

        See the date there, Mr. Brady?

A.  Yes.

Q.  Those comments you made were September 14, 2020, right?

A.  Yes.

Q.  Nikola got a grand jury subpoena on September 19, 2020,

M9SHMil3                          Brady - Cross

right?

A.   I don't know, but --

Q.   On or about September 19?

A.   I don't know the exact date, but if you're telling me that's the date, I suspect you have researched it, so I believe it.

Q.   And that meant that Nikola and various individuals were under investigation, correct?

A.   Yes.

Q.   And you've been cooperating with the government in that investigation, right?

A.   Yes.  I mean, we provided information to the government that they requested.

Q.   Right.  You provided hundreds of thousands, if not millions, of documents, correct?

A.   Correct.

Q.   You submitted yourself for six, seven, eight, nine interviews, right?

A.   Correct.

Q.   With federal prosecutors, right?

A.   Yes.

Q.   With SEC lawyers?

A.   Yes.

Q.   With federal agents?

A.   Meaning whether federal agents were in those rooms?

M9SHMil3                          Brady - Cross

Q.   Investigators and agents in the room.

A.   I suspect there were.  I'm not sure who everybody was in the room.

Q.   But you knew this was a serious criminal investigation?

A.   Yes.

Q.   And in fact, you are sitting here today as part of that cooperation, yes?

A.   Yes.

Q.   Now, you also testified last week about various meetings and discussions with Trevor Milton about his use of social media and his public statements, right?

A.   Yes.

Q.   Now, you did not document any of those meetings to Trevor Milton.  You didn't send him a memo as a result of those meetings, did you?

A.   No.

Q.   You did not issue a formal reprimand to Trevor Milton saying he had done something wrong, did you?

A.   I'm not in a position of formally represent -- I mean reprimand the executive chairman.

Q.   But you had a duty --

A.   That's not my responsibility.

Q.   But you had a duty to root out wrongdoing, correct?

A.   I raised it to audit chairman, to CEO, as well as there was a discussion at the board.

M9SHMil3                         Brady - Cross

Q.   I know you say that now.  Do you have any documentation to prove that, because I haven't seen it?

          MR. PODOLSKY:  Objection.

          THE COURT:  Sustained.

A.   Oh, there is an email communication where I have raised a situation to Girsky and I have a copy.  You can also -- there is also evidence, and you can talk to -- it's corroborated by Mark Russell, where this was elevated to Jeff Ubben.

Q.   I think you're missing my question.

          Did you issue a memo to Trevor Milton --

A.   Why would I --

Q.   -- documenting your findings?

A.   Why would I issue a memo to Trevor Milton?

Q.   I'm not asking why.  I'm asking a yes-or-no question.

          Yes or no, did you issue any memo, any reprimand, any kind of formal letter to Trevor Milton, yes or no?

A.   No.

Q.   OK.

A.   It's not my job to issue a memo to my executive chairman.

Q.   OK.  If it's not your job, it's not your job.

          Now, did you ever issue a formal memo sometime before September 2020, sometime around September 10, 2020, to the audit committee that you copied to Trevor Milton?

A.   I did not issue any memo.

Q.   OK.

A.   These are sensitive topics.

Q.   Did you ever --

A.   I have talked to Steve Girsky, who was the audit chairman.

Q.   Did you ever issue any written guidelines from you or one of these little group meetings to Trevor Milton?  No?

A.   There were guidelines by the company with our outside counsel.  There was actually a disclosure training meeting --

Q.   That's not what I'm asking.  That's not what I'm asking you.  That's not what I'm asking you.

     Did you, as a result of your meetings in September, let's say, up through September 10 or 20, issue a formal memo, a document, a report, a letter to Trevor Milton about what you had concluded at one of these supposed meetings?  No?

A.   That's not my job.

Q.   You didn't think it was your job to issue any such memo to Trevor Milton, correct?

A.   I don't believe that's my responsibility.  My responsibility --

     MR. MUKASEY:  Thank you.  Thank you, Mr. Brady.  Appreciate it.

     No further questions, Judge.

     THE COURT:  Redirect.

     MR. PODOLSKY:  Your Honor, may we approach briefly on one matter?

     THE COURT:  Sure.

(At sidebar)

MR. PODOLSKY:  We briefed this, I think, in advance of Mr. Russell.  Defense counsel has now asked Mr. Brady about his initial response to the Hindenburg report, then has questioned the veracity of his statements about whether he met with Mr. Milton, and then claimed -- argued, essentially to the jury, and asked questions about eight or nine meetings with the government that happened subsequently.

I intend to ask Mr. Brady if, in between his initial statements about the Hindenburg report and meeting with the government, the company conducted and internal investigation, learned that there were additional lies by Mr. Milton, and the company ultimately issued corrective statement saying Mr. Milton had, in fact, done many of the activities described in the Hindenburg report.

MR. MUKASEY:  It's totally inappropriate.  I was very careful.  What -- they're changing their argument now.  What they said was if we talked about the press release, it would trigger this, which we disagree with.  I stayed way away from the press release.  I asked him about his own statements made on his own.  He said he was always trying to be truthful and careful and accurate.  He made statements at a conference where he said the Hindenburg was a hit job.  I stayed away from the press release specifically because of the application you made to the judge.

The rest of it goes to his bias.  If he's under investigation by the government, then he has a motive to change his story.  He changed his story.  The prior consistent statements that -- the trigger of the prior consistent statements, September 19 was grand jury subpoena.  You want to bring up stuff that happened before that, you can try, but what happened after that is self-serving because he's under investigation.

MR. PODOLSKY:  OK.  First of all, self-serving is not an objection.

Second of all, what Mr. Mukasey just put before the jury is that this individual changed his views, has a bias, after being interviewed by the government.  And what we're entitled to put in front of the jury is that's not an accurate statement, because what happened in between the grand jury subpoena and those interviews is the company conducted an internal investigation, and he learned additional information.

THE COURT:  So this came after the subpoena?

MR. PODOLSKY:  Correct.

THE COURT:  I think that the government is entitled to reply.  The question in my mind is how far.

I think it would be appropriate for the government to inquire as to whether there was an investigation, was he aware of the investigation, there was a question in connection with the investigation, and did you learn additional facts as a

result of the investigation?

MR. MUKASEY:  Judge, the questions about his meetings with the government had to do with bias, right?  He's cooperating with the government.  Whether he learned additional information -- information or not, it goes to bias.  He's meeting and cooperating with the government regardless of what he's learned.  He's meeting and cooperating with the government because he had a grand jury subpoena.  He's meeting and cooperating with the government not because he learned new information but because he got a grand jury subpoena.  The point here is --

THE COURT:  I'm sorry.  Could I just stop you for a second.  He personally received a grand jury subpoena?

MR. MUKASEY:  No, the company did.

THE COURT:  Is he personally -- is he personally under investigation, so far as you know?

MR. MUKASEY:  What the filing says most recently is the investigation continues by the Southern District and further charges against individuals and employees and executives are still open.  I'm paraphrasing.

MR. PODOLSKY:  There was a subpoena to the company.  I think the people here know what that means.  I'm not sure the jury understands it based on the questioning.  But the real point here is Mr. Mukasey wants to use his questioning as a sword and a shield.  He says, I'm just drawing out bias.

That's fine.  We didn't object to the questions he drew out bias.  Now the government is able to elicit testimony and facts to show why there was not bias.  For example, the fact that when he met with the government, he had already learned additional facts.  He didn't change his story when he met with the government.

MR. MUKASEY:  The fact that he's under subpoena is the same kind of bias that's shown in every cooperator case.  You get a grand jury subpoena, you get arrested, and you have motive to change your story.  The fact that there was a Kirkland investigation, the fact that he changed his story because he supposedly learned new facts -- first of all, those new facts are total hearsay, complete -- you can't elicit that he learned new facts, that he changed his mind about Mr. Milton because Kirkland told him to change his mind.  The bottom line is he hired corporate lawyers who told him to cooperate and throw Trevor Milton under the bus, basically.

MR. PODOLSKY:  Mr. Mukasey is absolutely allowed to make that argument and elicit the facts to support that.  He did that.  We are absolutely allowed to elicit facts that actually cut against their argument.  That's all this is.

THE COURT:  Again, I'm just trying to figure out how far you can go with that.

MR. PODOLSKY:  I actually will make it pretty short, your Honor.  I'm not going to, at this point, even go into,

like, post corporate announcements.  I'm just going to go into what happened in between, essentially, the Hindenburg report and when he met with the government.

MR. MUKASEY:  But it's not even consistent with his testimony.  What you're saying is somehow he was duped by Mr. Milton, and Kirkland told him the true facts.  That's not what happened.  He said up here the whole time:  I thought Milton was doing this and doing that.  He wasn't duped and then had the true facts set upon him by Kirkland.  That's not what happened.

MS. ESTES:  I think it's the executives did not know he was on a million podcasts.  They did not know he was on Twitter saying all these lies.  When they learned that through the investigation, they changed their impression of him.

MR. MUKASEY:  But that's a self-serving investigation.  They hire Kirkland in order to get them out of it.

MR. PODOLSKY:  These are all great arguments.  We can still put the facts before the jury.

MR. CARUSO:  Judge, the date of the subpoena is the date at which there becomes a motive or influence to testify differently.

MR. PODOLSKY:  That's your theory.

THE COURT:  And that's before the jury.  So very quickly.

MR. PODOLSKY:  Thank you, your Honor.

M9SHMil3                        Brady - Cross

MR. CARUSO:  Judge, before we go --

THE COURT:  Yes.

MR. CARUSO:  -- I just want to flag something in case we have to pop up again.

Testimony about content of what Kirkland & Ellis found, did, said, also raises confrontation issues.

THE COURT:  Yes.

MR. CARUSO:  OK.

THE COURT:  Very good.

MR. CARUSO:  In addition to the hearsay.

THE COURT:  Yes.

(Continued on next page)

(Jury present)

THE COURT:  Redirect examination.

REDIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Good afternoon, Mr. Brady.  Why don't we pick up where we just left off.

Now, do you recall that Mr. Mukasey asked you some questions about your initial reaction to the Hindenburg report? Do you recall that?

A.  Yes.

Q.  When the Hindenburg report came out, there was a whole post of allegations in there about Mr. Milton and about the company; right?

A.  Correct.

Q.  And is it fair to say that right after the report came out, I suppose at this Cowen conference, you defended the company; is that right?

A.  Yes.

Q.  Now, Mr. Mukasey also asked you about whether the company received a grand jury subpoena.  Do you recall that?

A.  Yes.

Q.  Was that subpoena directed at you or at the company, to your understanding?

A.  To the company.

Q.  And did it ask the company to produce documents and so

forth, to your understanding?

A.   Yes, that's my understanding.

Q.   Then Mr. Mukasey asked you if you met with the government personally.  Do you recall that?

A.   Yes.

Q.   I believe you answered that you did several or a number of times before this trial; is that right?

A.   Yes.

Q.   Now, was there an intervening period of time between receiving the grand jury subpoena and your first personal meeting with the government?

A.   Several months.

Q.   Now, before you met with the government, did the company conduct an internal investigation?

A.   Yes.

Q.   And did that internal -- and as a result of that internal investigation, did you, Mr. Brady, before you met with the government, learn additional facts that were relevant to the matters we've been discussing here?

        MR. MUKASEY:  Calls for hearsay.

        THE COURT:  Overruled.

A.   Yes, there were several things that I learned through that report.

Q.   Before you get into the content, I'll just ask some specific questions.

Did you learn about additional statements made by Mr. Milton that you were not aware of at the time in 2020?

A.  Yes.

Q.  And did you come to believe, after the point, that Mr. Milton, after reviewing additional content and so on, had lied to investors?

MR. MUKASEY:  Objection.

THE COURT:  Sustained.

MR. PODOLSKY:  Your Honor, I'm asking what he had come to believe.

THE COURT:  Sustained.

Q.  Did you come to form a different view about the Hindenburg report as a result of additional information that you received?

A.  Yes.

Q.  Now, do you recall that Mr. Mukasey also asked you whether it is, I guess as a general matter, improper to speak to retail investors?  Do you remember that question?

A.  Yes.

Q.  And I think you said just in a most general way, in substance, there's not a prohibition on speaking to a retail investor; is that fair?

A.  Correct.

Q.  What about if you lied to retail investors, would you consider that to be improper?

A.  Yes.

M9SCmil4                        Brady - Redirect

Q.  Actually, you were asked a number of questions about your basis for your understanding about how retail investors behave. Do you recall that?

A.  Yes.

Q.  And I believe your testimony was based on your experience with them, you had reached some conclusions or concerns that you had about speaking with retail investors; is that right?

A.  Yes.

Q.  Now, I believe you also testified that those concerns focused around a particular concern that the truthfulness of what you say is of paramount importance because retail investors tend to rely on what is told them by executives.

        MR. MUKASEY:  Objection.  Misstates the testimony.

Q.  Is that your understanding?

        THE COURT:  Overruled.

A.  Yes.

Q.  Now, did you convey, in substance, that concern to Mr. Milton in 2020?

A.  Many conversations.

Q.  Actually, I think you got some questions, sort of related questions on Government Exhibit 254.

        MR. PODOLSKY:  Maybe we can pull that up.

Q.  Do you recall this email, Mr. Brady?

A.  Yes.

        MR. PODOLSKY:  Maybe we can blow up the bottom portion

under "Lessons to be learned."

Q.  Do you see there is a reference to high frequency trading volume, and the second sentence, it says it is computer-driven and algorithm-based.

Do you see that?

A.  Yes.

Q.  And it says the program automatically collects data, social media, news, certain technical trading indicators, as well as retail investor sentiments, tricks by trades, executes dozen of buy-and-sell trades throughout the day.

Do you see that?

A.  Yes.

Q.  And then you wrote, what is the implication, question, this means that HF -- is that high frequency?

A.  Yes.

Q.  Algorithms can detect and get in front of retail day-trading volume caused by retail investor market sentiments.

Do you see that?

A.  Yes.

Q.  So, to your understanding, did high frequency or computer-based trading actually amplify or magnify the effects on the stock price that retail trading had?

A.  That's my belief.

Q.  And so if retail investors were led to invest in the company, thereby driving up the stock price, the high frequency

M9SCmil4                          Brady - Redirect

trading would actually increase that effect?

            MR. MUKASEY:  Objection.  Calls for speculation.

Q.  Is that your understanding?

            THE COURT:  Overruled.

A.  That's my understanding.

Q.  And you said that to Mr. Milton in this email; is that
right?

A.  Yes.

            MR. PODOLSKY:  Now, if we go to the second page of the
email and blow up the top paragraph there that starts "It is
not all that clear."

Q.  Do you see you wrote, "In my view, the intrinsic value can
only be validated by markers and milestones."

            Do you see that?

A.  Yes.

Q.  What did you mean by intrinsic value?

A.  Meaning the real value of the company, not the stock price.
The real value of the company can only be substantiated by the
real progress that the company is making with respect to our
goals and milestones and aspirations.

Q.  So for example, on number 4, building out H2 infrastructure
and de-risking station rollout, et cetera, if the company could
actually achieve that, it would increase the value of the
company; right?

A.  I believe so.

Q.   But the company had not achieved that in 2020; is that right?

A.   Correct.

Q.   So if somebody said or made investors think that that milestone had been achieved, might that cause the stock price to go up?

MR. MUKASEY:  Objection.  Calls for speculation.

THE COURT:  Overruled.

A.   Yes, I believe so.

Q.   And if somebody had made retail investors believe that, would the effective high-frequency trading amplify the effect on the stock price?

A.   I believe that's the case.

Q.   And is that the concept or are those among the concepts that you communicated to Mr. Milton in this email?

A.   Yes.

Q.   Let's go to some documents about VectoIQ.

You recall you got a number of questions about VectoIQ today and on Friday?

A.   Yes.

MR. PODOLSKY:  Why don't we pull up Defendant's Exhibit 1601, if we're able to do that.

Q.   Mr. Brady, do you recognize this as due diligence responses for VectoIQ?

A.   Yes.

Q.  Was this information shared during the process in which --
essentially leading to the SPAC merger?

A.  Yes.

MR. PODOLSKY:  Let's go to page 2.  If we could blow
up number 4.

Q.  Now, defense counsel asked you some questions about this
question in the below bullet points.  Do you recall that?

A.  Yes.

Q.  Where it says, of our 14,000 pre-orders, roughly 9,000 are
from large commercial customers, the remaining 5,000 are from
small mop-and-pop operators.

Below:  We feel confident that large corporate
customers have a strong appetite.

Do you see that?

A.  Yes.

Q.  First of all, does it say anywhere here that there were
binding orders or contracts for these vehicles?

A.  No.

Q.  And do you recall on Friday, I know this was now a few days
ago, but Mr. Mukasey, at some point, kind of shouted or asked
you about, context matters.  Do you remember that?

A.  Yes.

Q.  So let's actually look at just a couple parts of this that
defense counsel did not show you.

MR. PODOLSKY:  Let's go to page 3, number 7.

Q.   The question there is, can you disclose any of the other major companies with a large order, besides AB, what is the definition of a reservation, 14,000 reservation.  Is there any money down.

So you see, this is actually a question about what reservations mean.  Do you see that?

A.   Yes.

Q.   Do you see the second bullet point is, the preorders do not expire and are nonbinding.

Do you see that?

A.   Yes.

Q.   And reservation holders are able to cancel the reservations at any time.

Do you see that?

A.   Yes.

Q.   So if somebody were to say, in 2020, that Nikola's reservations were binding, signed-on-the-dotted-line contracts, would that be true or false?

A.   False.

MR. PODOLSKY:  Actually, let's go to page 12.  We can blow up number 27.

Q.   And do you recall Mr. Mukasey asked you about the first bullet, valuation is driven by many factors, overall reservations are frankly not an important driver of valuation.

Do you see that?

M9SCmil4                          Brady - Redirect

A.  Yes.

Q.  Why is that, why is that not an important driver of valuation?

A.  Because simply they are an expression of interest, they can be canceled at any time.  So investors are not looking at that, they understand, especially institutional investors.

Q.  So, actually, they don't represent guaranteed revenue, they're just an expression of interest?

A.  Right.

Q.  So if that were true or someone said that, in fact, the reservations were binding, signed on the dotted line, might that give the impression that they are an important driver of valuation for a company like Nikola?

A.  Yes.

        MR. PODOLSKY:  Let's do a couple more pages of this, page 5.  Let's do it the way defense counsel did it.  Let's blow up just where it says hydrogen.

Q.  Do you recall that Mr. Mukasey asked you about these lines where it says sales price, 350k per lease, $3.75 per kg?

A.  Yes.

Q.  He asked you about below, it says cost $230,000, $2.47 per kg.

        Do you see that?

A.  Yes.

Q.  Do you recall him asking you about that one?

A. Yes.

Q. Why don't we actually look at the full section and blow up the question all the way down to hydrogen.

Do you see here the question is, please walk us through the components of the per-unit economics for each of the major business segments, BEV, FC, and hydrogen, there is a separate tab in the model for each segment, but understanding the base assumptions would be helpful.

So now with the benefit of this question, were the facts or numbers given below hydrogen about what Nikola had already done or about Nikola's model?

A. Nikola's model.

Q. So were they, in fact, about what Nikola hoped to achieve some day in the future?

A. Correct.

Q. Let's stick with VectoIQ for a few more minutes.

Do you remember Mr. Mukasey asking at the very beginning of today and last week on Friday about, I think, the difference between VectoIQ's stock and Nikola's stock?

A. Yes.

Q. I want to just look with you at a few statements about that.

MR. PODOLSKY:  Why don't we pull up, for Mr. Brady, what's been marked for identification as Government Exhibit 585.

M9SCmil4                    Brady – Redirect

Q.  Mr. Brady, do you see that this is a Tweet?

A.  Yes.

Q.  Do you see that is a Tweet by Trevor Milton?

A.  Yes.

        MR. PODOLSKY:  Your Honor, the government offers
Government Exhibit 585.

        MR. MUKASEY:  No objection.

        THE COURT:  It will be received.

        (Government's Exhibit 585 received in evidence)

        MR. PODOLSKY:  May we publish?

        THE COURT:  You may.

Q.  So Mr. Brady, now that everyone can see this, do you see
this Tweet by Trevor Milton?

A.  Yes.

Q.  And do you see that the date of the Tweet is March 3rd,
2020, and the time is 3:09 p.m.?

A.  Yes.

Q.  Was that a significant date for Nikola?

A.  That was the announcement of Nikola and VectoIQ merger.

Q.  So why don't you, if you don't mind, read the Tweet that
Mr. Milton wrote the day that the merger was announced.

A.  Nikola and @VectoIQ announce a merger that will allow
Nikola to become the first publicly traded hydrogen fuel cell
and battery-electric heavy-duty truck manufacturer.  VectoIQ
stock symbol VTIQ to be changed to NKLA symbol after completion

of the merger.

Q.  So that last sentence, do you understand that to be a reference to the fact that VectoIQ's NASDAQ stock will automatically be called Nikola stock at the closing of the merger?

A.  Yes.

MR. PODOLSKY:  Let's look at a few more.  Government Exhibit 593 for Mr. Brady.

Q.  Do you see this is another Tweet by Mr. Milton?

A.  Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 593.

MR. MUKASEY:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 593 received in evidence)

MR. PODOLSKY:  If we can publish that, please.

Q.  Mr. Brady, do you see a Tweet by Trevor Milton on the screen?

A.  Yes.

Q.  When was this Tweet posted?

A.  Same day at 5:32 p.m., March 3rd, 2020.

Q.  It says, upon completion of the transaction announced today, NASDAQ traded VTIQ stockholders will automatically become stockholders of Nikola Motor, publicly traded stock, NKLA upon completion of the merger.  This is not a

solicitation, rather an explanation for those that have asked.

Do you see that?

A. Yes.

MR. PODOLSKY: For the next ones, to maybe do this faster, if we can just put up for Mr. Brady on the screen, maybe a few seconds each so he can see them, Government Exhibit 592 and 591, 590, 589, 588, 587, and 586.

Q. Mr. Brady, did you see that those are all Tweets by Trevor Milton?

A. Yes.

MR. PODOLSKY: Your Honor, the government offers Government Exhibits 592, 591, 590, 589, 588, 587, and 586.

MR. MUKASEY: No objection, Judge.

THE COURT: They will come in.

(Government's Exhibits 592, 591, 590, 589, 588, 587, 586 received in evidence)

MR. PODOLSKY: Thank you, your Honor.

Q. Let's look at these quickly. We'll do them in chronological order, that's why I was doing the exhibits backwards. Let's do 592 first.

Mr. Brady, do you see this is now April 18th, 2020?

A. Yes.

Q. So was that after the merger was announced?

A. Yes.

Q. And before it was closed?

M9SCmil4                         Brady - Redirect

A.  Yes.

Q.  So you see in this one, Mr. Milton says, for example, if VTIQ trades at $20 per share at time of the merger, the valuation of Nikola would be $6.6 billionish at merger.  Share value is transferred through merger.  Hopefully everyone understands now.

        Do you see that?

A.  Yes.

        MR. PODOLSKY:  Why don't we show 591.

Q.  Do you see it's the same date, April 18th, 2020?

A.  Yes.

Q.  And do you see this one says, people, this is not that hard, if you have $100 worth of VTIQ stock, then you'll have $100 worth of Nikola stock.

        Do you see that?

A.  Yes.

        MR. PODOLSKY:  How about 590.

Q.  Do you see this one is May 12th, 2020?

A.  Yes.

Q.  Could you just read this one.

A.  @NikolaMotor and SEC merger vote planned June 2nd.  That date can change, but it is the expected date as of now.  I appreciate everyone who has believed in us.  I can't wait for the merger to complete and the ticker to be changed to @Nikola.

        MR. PODOLSKY:  Let's go to 589.

Q.  Do you see that's the very next day, May 13th, 2020, now?

A.  Yes.

Q.  Why don't you read this one, please.

A.  If you have 10 shares in VTIQ worth $30 per share, you will still have 10 shares worth $30 per share after the merger, assuming stock prices don't change in that moment.  Increased value now is carried forward in merger.

        MR. PODOLSKY:  588.

Q.  Do you see this is May 16th?

A.  Yes.

Q.  2020.  And you see this one simply says, you can buy VTIQ and it automatically converts to Nikola upon merger?

A.  Yes.

        MR. PODOLSKY:  Government Exhibit 587, please.

Q.  Do you see this one is May 18th, 2020?

A.  Yes.

Q.  Do you see it reads, T-minus 2 weeks and a day to merger vote on June 2nd.  Nikola will be traded on the NASDAQ and &amp, convert automatically from VTIQ to Nikola.  It's going to be a great couple weeks and so on.

        Do you see that one?

A.  Yes.

        MR. PODOLSKY:  Let's go to the last one, Government Exhibit 586.

Q.  Do you see that this one is May 22nd?

A.   Yes.

Q.   If you don't mind, would you read this last one.

A.   That PIPE money was presold before we merged.  All shares being traded as VTIQ on NASDAQ will continue to trade at whatever price it is that day of the merger.  The ticker automatically changes after the merger on June 2nd, within a day or two.

Q.   Fair to say that Trevor Milton told anyone following him on Twitter that buying VectoIQ shares would automatically result in owning Nikola shares?

          MR. MUKASEY:  Objection to the form.

          THE COURT:  Sustained as to the form.

Q.   Do these Tweets say that VectoIQ shares would convert automatically to Nikola shares upon the closing of the merger?

          MR. MUKASEY:  Objection.

          THE COURT:  Overruled.

A.   Yes.

          MR. PODOLSKY:  A few more on VectoIQ, if you'll bear with me.  Defendant's Exhibit 1749, can we pull that up.

Q.   Mr. Brady, do you recall that Mr. Mukasey asked you some questions about this presentation?

A.   Yes.

          MR. PODOLSKY:  Could we go to page 13 of the document.

Q.   Do you see there is a reference to road show to investors?

A.   Yes.

Q.  Do you recall that Mr. Mukasey pointed out to you some references in this document to the idea of marketing a SPAC?

A.  Yes.

Q.  What do you understand the idea of marketing to be in this context?

A.  Means we are going on a road show with potential PIPE investors, which were all institutional investors, to talk about the company's story.

Q.  Does marketing mean that the company's executives should go out and falsely overstate the company's accomplishments?

        MR. MUKASEY:  Objection.  Argumentative.

        THE COURT:  Overruled.

A.  No.

        MR. PODOLSKY:  Let's look at DX-1497.

Q.  Mr. Brady, do you recall some questions about this email?

A.  Yes.

        MR. PODOLSKY:  If we could blow up the date at the top.

A.  Monday, March 2nd, 2020.

Q.  Do you see that it says subject, post-announcement guidance from GPP?  Do you see that?

A.  Yes.

Q.  Do you know what that's a reference to?

A.  Yes, it's an outside PR firm.

Q.  And what's the post-announcement, what does that refer to?

A.  Post merger announcement.

Q.  If we go to the third page, I think Mr. Mukasey asked you about that last bullet point in Mr. Caramella's email.  Do you see that?

A.  Yes.

Q.  Do you see it says, business as usual.  Social posts are fine so long as you don't talk about the deal, provide information about the deal, or timing outside of the scope of the press release.

        Do you see that?

A.  Yes.

Q.  Was this email about what details of the -- what financial details about the merger could be broadcast publicly?

A.  No.

Q.  What was it about?

A.  I think it's about the general guidelines with respect to the merger.  So the way I read this is that, don't talk about the deal and about the information with respect to the deal or timing other than simply what's on the press release.  So meaning just rely on the press release, don't provide any additional information.

Q.  So this is specifically about what information about the deal could be provided before it was announced; is that right?

A.  Yes.

Q.  Do you see anything in here, in this bullet point or

otherwise, about whether it's okay to overstate the accomplishments of the company on social media?

A.  No.

Q.  Do you see anything in here that says, it's business as usual to lie to investors about the company's accomplishments?

        MR. MUKASEY:  Argumentative.

        THE COURT:  Overruled.

A.  No.

        MR. PODOLSKY:  Let's go to the first page of this. Let's blow up the top email.

Q.  And you see now Mr. Milton says, I agree with most of that. And then he says, we need a good SEC attorney to begin helping us for all Tweets, et cetera.

        Do you see that?

A.  Yes.

Q.  Do you understand that be to a reference to Tweets about the deal?

        MR. MUKASEY:  Objection.

        THE COURT:  Overruled.

        MR. MUKASEY:  Foundation.

        THE COURT:  Overruled.

Q.  Let me ask you this, Mr. Brady, make it simple.  In 2020, did you have discussions with Mr. Milton about asking him to submit his Tweets and public statements to review either internally or externally?

A.  Yes.

Q.  And did he agree to do that?

A.  Yes.

Q.  Did he do that?

A.  No.

Q.  Did he, as far as you're aware, ever submit his Tweets to review by an internal lawyer or external lawyer?

A.  Not that I'm aware of.

Q.  Let's talk about maybe one sort of final topic.  We'll talk a little bit about hydrogen here.

MR. PODOLSKY:  Why don't we pull up, I believe this was DX-1292.

Q.  Mr. Brady, do you see that this is a purchase order?

A.  Yes.

Q.  And I believe it's a purchase order related to Nel electrolyzers.  Am I right about that?

A.  Correct.

MR. PODOLSKY:  If we can blow up the bottom part where it talks about who approved it.

Q.  Now, Mr. Mukasey asked you several times if you put your signature on these purchase orders to approve them.  Do you recall that?

A.  Yes.

Q.  Who's the person just below, whose signature is on this document below yours?

A.  Trevor Milton.

Q.  To your recollection, was it your idea or Mr. Milton's to purchase these electrolyzers?

A.  Mr. Milton, but we had talked about it as management team.

Q.  But it was Mr. Milton who proposed that; is that right?

A.  Yes, but to move forward with building out of hydrogen stations, we would need to order electrolyzers.

Q.  Were those electrolyzers ever installed?

A.  No.

         MR. PODOLSKY:  Let's go to DX-1604.  Just blow up the top.

Q.  Mr. Brady, do you recall that, on Friday, Mr. Mukasey asked you questions about the Hanwha diligence responses?

A.  Yes.

         MR. PODOLSKY:  Let's go to page 5 of the document.

Q.  I think there is a paragraph in the middle that starts "Many states."  Do you see there is a reference begins, many states offer long-term power purchase agreements for 2 cents to 5 cents per kilowatt hour, for example, the Tennessee Valley Authority, which covers seven states, and then continuing, is willing to offer Nikola energy at 3 cents per kilowatt hour through long-term PPA.

         Do you see that?

A.  Yes.

Q.  Where did the information about the Tennessee Valley

Authority's willingness come from?

A.   Verbal conversation with Mr. Milton based on his meetings.

Q.   Were you part of those meetings with Tennessee Valley Authority?

A.   I was not at the company at that point.

Q.   So this is based on something Mr. Milton said; is that right?

A.   Based on what Mr. Milton represented.

Q.   Now this document, we can kind of zoom out of this, this document is about or these answers about a model; is that right?

A.   Correct.

Q.   So can you remind us what that means?

A.   Model is a -- it's an economic model where we make various assumptions about literally dozens of key variables and, based on those assumptions, you are constructing a financial statement so you have an understanding about what the future could look like.

Q.   So this is 2018, this particular one.  Do you recall that Mr. Mukasey showed you a few other documents that had similar language?

A.   Yes.

Q.   And you said it was about the future.  So had the electricity rates and hydrogen production costs projected in these models been achieved in 2018?  Let's start with that.

A.   No.

Q.   In this document.  Okay.  What about in 2020 up through September of 2020, had the projections in these models been achieved?

A.   No.

Q.   By the way, was that something that was discussed openly among management at Nikola, that Nikola had not achieved the projections in these models?

A.   Yes.

Q.   So let's talk about context a little bit.

        MR. PODOLSKY:  With that in mind, let's pull up Government Exhibit 553.  We'll do this one, I know we spoke about others last week.

Q.   Do you see August 13th, 2020?

A.   Yes.

Q.   And we currently make our own green H2 for under $4 a kilogram.

        Do you see that?

A.   Yes.

Q.   So at the time that this was written, had any of the projections in those models actually materialized?

A.   No, we did not even have -- we did not generate any hydrogen at that point.

Q.   And again, let's make sure we understand the context.

        So you said you hadn't generated any hydrogen.  Did

you have any electrolyzers hooked up to produce hydrogen at that point?

A.  We did have some electrolyzers, but we were not using to make any hydrogen.

Q.  And did you have any electricity contracts for the production of hydrogen at that point?

A.  No, we did not.

Q.  Did you have any property on which to build hydrogen production stations?

A.  No.

Q.  Did you have permits for building hydrogen production stations anywhere?

A.  No.

Q.  Now, at the time that Mr. Milton wrote that we currently make our own green H2 for under $4 a kilogram, had you already discussed with him the importance of being accurate and the use of forward-looking language for things that are projections only?

A.  Yes.

Q.  Are you aware of any context that would make it an accurate and true statement that Nikola was currently making our own green H2 for under $4 a kilogram in August of 2020?

A.  No.

          MR. PODOLSKY:  One moment, your Honor.

          (Pause)

M9SCmil4                        Brady – Recross

Nothing further, your Honor.

THE COURT:  Mr. Mukasey, anything more?

RECROSS EXAMINATION

BY MR. MUKASEY:

Q.  Mr. Brady, if you were talking about the model, that would be an accurate statement, right, because Nikola was modeling hydrogen under $4 a kilogram, so if you're talking about the model, that would be accurate; right.

A.  We anticipated that we could get there in the model, yes.

Q.  Thank you.  In the summer of 2020, Mr. Brady, you knew that Trevor was tweeting; correct?

A.  Yes.

Q.  You knew that he was on podcasts; right?

A.  Some.

Q.  You knew he was on TV some, yes?

A.  Some.

Q.  You didn't learn those facts only after Hindenburg, right, you knew that before; correct?

A.  A lot of it I learned after the Hindenburg.

Q.  You knew he was on TV, on social media, on podcasts before Hindenburg, yes or no?

A.  Yes.

Q.  Now, with respect to the questions Mr. Podolsky asked you about the TVA, the Tennessee Valley Authority, you said that information in the due diligence came from Mr. Milton; right?

A.   Yes.

Q.   You would never allow false and inaccurate information to go out in a due diligence report, would you?

A.   Not purposely.

Q.   Now, with respect to institutional investors and retail investors, your preference was for communication with institutional investors; right?

A.   I have stated many times why I was reluctant to communicate with retail investors directly.

Q.   My question is, your preference was for communication with institutional investors; right?

A.   We only communicate generally when we receive questions from institutional investors or they're looking to potentially invest in Nikola or in doing conferences.  We do not proactively go out and try to communicate with institutional investors.

Q.   You thought they were more attractive than average Joe investors, right, better for the company, yes?

A.   I do think institutional investors are generally better for the company because they tend to be more longer term investors and they have more --

Q.   They also have -- they also have more money; right?

A.   They do have more money.

Q.   And isn't it a fact, Mr. Brady, that for every $10 million that institutional investors invested, you got paid $250,000?

M9SCmil4                        Brady – Recross

Is that true or not true?

A.   That was in the private round.

Q.   Exactly.   That was in the private rounds.   The more money you raise for institutional investors, the more money you put in your pocket; right?

A.   Part of my compensation involved raising capital for Nikola.   So you get customary --

THE COURT:   Let him finish.

Q.   And the average Joe, unlikely to raise as much money as an institution; right?

A.   No, you could not raise as a private company from retail investors because they're not qualified investors.

Q.   So you focused on institutional investors because that's how you got a $250,000 bonus every time they put in $10 million; right?

A.   No, it's because you cannot raise money from retail investors because they're not qualified investors.   It's the SEC rule (indiscernible crosstalk) by the company.

Q.   Answer my question.

A.   I am answering your question.

Q.   You got paid?

A.   Yes.

Q.   Let me finish.   You got paid $250,000 for every $10 million that was put in, in the private rounds; correct?

A.   Correct.   That's part of my compensation.

Q.   Now, next question.  The grand jury subpoena we were talking about earlier, do you recall that?

A.   Yes.

Q.   Criminal investigation going on; right?

A.   That's right.

Q.   Still going on as you sit here today; correct?

A.   That's right.

          MR. MUKASEY:  No further questions.

          MR. PODOLSKY:  Nothing further, your Honor.

          THE COURT:  Mr. Brady, you may step down.

          (Witness excused)

          Since we're about five minutes from the next break, why don't we take our break now.  So we'll get back at five minutes after the hour, that's 20 minutes from now.  Don't discuss the case.

          (Continued on next page)

(Jury not present)

THE COURT:  Folks can be seated.

Anything to discuss?

MR. PODOLSKY:  No, your Honor.

MR. MUKASEY:  I'm spent.

THE COURT:  20 minutes.  Don't be late.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  The government, please call your next witness.

MR. PODOLSKY:  Your Honor, the government calls Peter Hicks.

THE COURT:  Sir, please step up into the witness stand, in the cube there, and remain standing.

PETER HICKS,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Good afternoon, Mr. Hicks.  What do you do for a living?

A.  A real estate investor.

Q.  What does that mean?

A.  I invest in real estate.

Q.  What kind of real estate?

A.  Multifamily in New England and land in Utah.

Q.  Where do you live?

A.  Milton, Massachusetts.

Q.  Focusing on the land in Utah, why do you invest in land in Utah?

A.  Many years ago I came out to Utah for personal purposes.  I

became interested in the land, and I began to invest in it.

Q.   What type of land, generally, do you invest in out in Utah?

A.   Mountain recreational ranches.

Q.   All right.  I'll ask you a few questions about those in a moment.  But, first, are you familiar with an individual named Trevor Milton?

A.   Yes.

Q.   How do you know him?

A.   He purchased property from me.

Q.   Where?

A.   Utah.

Q.   Approximately when?

A.   Put it under contract in -- in or about June 2020, and closed on it in August 2020.

Q.   And what type of compensation -- what did he pay you for the land?

A.   Cash and stock options.

Q.   Stock options in what company?

A.   Nikola.

Q.   What is a stock option?

A.   Well, at least in this case, I, as the recipient of such, have a right at a point in the future to purchase the stock at a set price.

Q.   And who would you purchase that stock from?

A.   Trevor Milton.

Q.  Now, aside from this transaction, have you ever sold a property in exchange, in part or whole, for stock or stock options?

A.  No.

Q.  Why did you do it this time?

A.  Didn't want to.  First time he came to me, I wanted all cash.

Q.  And why, ultimately, did you decide to take part of the payment in stock options?

A.  Because, first, the cash component of what he offered went up, and secondly, various things that he said and represented caused me to have some greater comfort in taking stock as part of a compensation.

Q.  When or in what circumstances did Mr. Milton make the representations that you just alluded to?

A.  Initially, June -- no, excuse me, April 10, 2020.

Q.  And in what format?

A.  By conference call.

Q.  And generally, what was the topic of that conference call?

A.  The idea of it was there was a commercial real estate broker involved, and he wanted -- he suggested the phone call occur so that Mr. Milton could better describe his company and why I should be interested in taking options as part of the compensation.

Q.  And was that company Nikola?

A.  Yes.

Q.  We'll get into the specifics of that phone call, but was what Mr. Milton told you about Nikola on that phone call important in your evaluation of the value of those stock options?

A.  Yes.

Q.  Was it important in your decision to sell your ranch in part in exchange for those stock options?

A.  Yes.

Q.  Now, was any portion of that call recorded?

A.  Yes.

Q.  We'll come back to that in a moment.

        Did you ever exercise those stock options?

A.  No.

Q.  Why not?

A.  Worthless.

Q.  All right.  We'll get into the timeline of how that happened.  But, first, let's talk about the land that you sold to Mr. Milton.

        First of all, was there a name for the property?

A.  When I purchased it, it was called Wastach Back Ranch.  I changed its name to Wastach Creeks Ranch.

Q.  Approximately when did you purchase what you called Wastach Creeks Ranch?

A.  March 2020.

Q.   For approximately how much money?

A.   $6,850,000.

Q.   Can you describe what the property is.

A.   Well, it is a mountain recreational ranch.  It is -- it contains two major creeks, one -- and it includes numerous small creeks, and it includes many mountains, and it includes some hay fields.

Q.   And generally --

A.   And some high alpine pastures.

Q.   Generally, how is land like that used or what is it used for?

A.   Hunting, fishing, and ATVing, all-terrain vehicling, snowmobiling, hiking, and in this case, minor agriculture.

Q.   How big was this property?

A.   Roughly 4,700 acres.

Q.   So, if you know, generally, how does that compare to, say, the island of Manhattan?

A.   One-third the size of Manhattan.

        MR. PODOLSKY:  All right.  Let's pull up what's been marked as Government Exhibit 1401 for the witness.

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's a write-up of the ranch in question.

Q.   Does it include photographs?

A.   It does.

Q.   Do those photographs fairly and accurately depict Wastach Creeks Ranch?

A.   I'd have to go through.  I think all but maybe there's one or two stock in there, but everything else, yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1401.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  It will be received.

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

(Government's Exhibit 1401 received in evidence)

BY MR. PODOLSKY:

Q.   All right.  Mr. Hicks, now that we can all see this, what is the document in front of us?

A.   Same one we've been referring to.

Q.   Now that the jury can see it as well, why don't you explain to them what this document is.

A.   It's a write-up of the ranch in question.

Q.   Just looking at that cover, the first page, what is that a photograph of?

A.   It's one of the high -- I call it high alpine.  One of the pastures on the ranch.

Q.   What does "high alpine" mean?

A.   High alpine means, to me, higher elevation.

MR. PODOLSKY:  All right.  Maybe just to get a sense of this property, let's skip to page -- fifth page.  Maybe blow up the top photo.

Q.   Mr. Hicks, what is that a photograph of?

A.   East Canyon Creek.

Q.   Is that on the property of Wastach Creeks Ranch?

A.   Yes.

Q.   Can you describe how the owner or user of this property might use this area.

A.   Prime fishing.

Q.   Prime sorry?

A.   Prime fishing.

Q.   Is there something special or unusual about the fishing on Wastach Creeks Ranch?

A.   Yes.  It's called a tailwater fishery, and that means that immediately upstream from this is a large reservoir, and the water that comes out of the reservoir, rather than coming over the top, it comes from the bottom.  Coming from the bottom of the reservoir, that means it's continually feeding cold water versus warmed-up water on the top.  The fish love the cold water.  So if you're near the base of a dam that releases the water from the bottom, the fishery is very good.

Q.   Look at one other.  Show Mr. Hicks one other picture.  Government Exhibit 1426.

A.   Yes.

MR. PODOLSKY:  Pull that up.

Q.   Do you recognize this, Mr. Hicks?

A.   I do.

Q.   What is it?

A.   It's a photograph of the ranch.

MR. PODOLSKY:  All right.  If we could -- well, the government offers Government Exhibit 1426, your Honor.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1426 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.   Now that everyone can see this, Mr. Hicks, can you describe what we are looking at in Government Exhibit 1426.

A.   This is still the same photograph.

Q.   If you could explain it to everyone else.

A.   It's a photograph of the ranch.

Q.   Is everything that you can see in this picture part of the property included in Wastach Creeks Ranch?

A.   I believe in this case it is.  There's a remote possibility that the farthest, farthest peak with a little snow on it to the middle left might be off the property, but everything else

should be the property.

MR. PODOLSKY:  We can take that down.

Q.  How did you first hear about Trevor Milton?

A.  I received an email from a ranch broker I know, David Anderson, and he indicated that he had a client -- I think he characterized him as a billionaire -- and that he was interested in buying ranch property and that he could be interested in buying Wastach Creeks Ranch.

MR. PODOLSKY:  All right.  Why don't we pull up for the witness what's been marked as Government Exhibit 1435.  We could blow up the top there, maybe make it a little bit easier.  Thank you.

Q.  Mr. Hicks, do you recognize this document?

A.  That's the document I was just referring to.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1435.

MS. YOUNG:  Objection.  May we approach?

THE COURT:  You may.

(Continued on next page)

(At sidebar)

THE COURT:  Yes.

MR. CARUSO:  This is hearsay.  I believe the government is offering on the theory that the declarant, Mr. Anderson, is Mr. Milton's agent.  If that's true, I will address the point.

MR. PODOLSKY:  This is Mr. Milton's real estate agent, as he's already testified to and I think we're going to hear a lot more about.

MR. CARUSO:  Right.  There's no proof that this man is Mr. Milton's agent.  Proof from the other side of the transaction doesn't satisfy that at all.  An agency requires proof of control and a fiduciary relationship.  The manifestation of control and authority to act has to come from the principal.  That man -- excuse me.

THE COURT:  OK.

MR. CARUSO:  Sorry.

The manifestation for the control and the authority to act has to come from the principal, not from someone on the other side of the transaction.

Moreover, if there were an agency relationship, then the agent, Mr. Anderson, would have a fiduciary duty to Mr. Milton, and that would include a duty to disclose.  Yet this document itself tells us that Mr. Anderson is withholding information from Mr. Milton.

This is Anderson to the witness:  "I, obviously, have kept what you paid strictly confidential, and he has no clue. All he knows is what it was listed for."

There's no agency where the purported agent fails to disclose to the purported principal.  The only way they could establish this is by calling Anderson.  Even that would probably be insufficient, because the manifestations of control and consent to act have to come from the principal.

THE COURT:  So no one can put on in a criminal case an agent of the defendant unless the defendant takes the stand?

MR. CARUSO:  No, no, they could -- maybe there was an email from Mr. Milton to the purported agent saying, please contact seller for me.  The defendant doesn't have to take the stand, but, ultimately, they have to have some proof that the manifestation came from Mr. Milton.  Now, maybe they could get that if Anderson were on the stand and were to say, Milton told me to do this.  Milton told me, please go out and make contact with this -- with this seller, but there's no evidence of that. There's nothing that this witness can establish -- withdrawn.

This witness -- there's no evidence of the existence of an agency based on what we have in the record so far.

MR. PODOLSKY:  There are additional documents that aren't in the record, but let's start where we are already.

There is an email that says I'm representing Trevor Milton.  The witness has already explained that he then met

with Mr. Milton.  They were on a phone call where Mr. Anderson identified himself as Mr. Milton's agent in the presence of Mr. Milton.  I am not really sure where these requirements come from.  It is clear from these documents and the testimony that's already been given that Mr. Anderson was authorized by Mr. Milton to work as his agent.

MR. CARUSO:  Statement that Anderson makes, quote, I believe I heard Mr. Podolsky say, "I'm representing Mr. Milton," is hearsay.  It's obviously only for the truth of the matter that he represents Mr. Milton.

THE COURT:  I think that the government has made an appropriate proffer that in this case the agent is representing Mr. Milton in this transaction.

This transaction closed, right?

MR. PODOLSKY:  It did.

THE COURT:  Was this person Mr. Milton's agent in connection with the transaction?

MR. PODOLSKY:  I believe that's what we're going to hear throughout the testimony.

THE COURT:  OK.

MR. CARUSO:  OK.

(Continued on next page)

(In open court; jurors present)

MR. PODOLSKY:  Just to clear the record, the government offers Government Exhibit 1435.

THE COURT:  It will be received.

(Government's Exhibit 1435 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

BY MR. PODOLSKY:

Q.  So, Mr. Hicks, we're going to pull it up on the screen so everyone in the courtroom can see it, and then I'm going to ask you some questions.

Do you see the top is from david@A5realestate.com?

A.  Yes.

Q.  And then at the bottom there's a signature block, David Anderson.  Do you see that?

A.  Yes.

Q.  Who is David Anderson?

A.  He's a commercial -- well, he's a ranch broker in -- based in Utah.

THE COURT:  I'm sorry, Mr. Hicks.  The microphone in front of you is flexible.  Can you bring it down closer to you.  Yes.  And maybe stretch it out there so that you can speak more closely into it.

THE WITNESS:  Is this better?

THE COURT:  That's much better.  Thank you so much.

MR. PODOLSKY:  Thank you, your Honor.

A.  What was the question again?

Q.  I believe you answered it, but let's make sure we got it.

Who was David Anderson?

A.  A ranch broker based in Utah.

Q.  Now, I think you stated this just a few moments ago, but, ultimately, a transaction did close with Trevor Milton relating to Wastach Creeks Ranch, is that right?

A.  Correct.

Q.  Who acted as Mr. Milton's broker in that transaction?

A.  The same David Anderson.

Q.  All right.  So do you see that the date on this email is March 25, 2020?

A.  I do.

Q.  And it says to Hicks MGT.  Do you see that?

A.  I do.

Q.  Who is that?

A.  Me.

Q.  All right.  So I'm just going to go through this email quickly with you.

Do you see that Mr. Anderson wrote:  "I just spent an hour on the phone with a client of mine (with whom I have a fully signed buyer agency agreement, so he pays my full commission) who happens to be a billionaire"?

Do you see that?

A.   I do.

Q.   Did you later come to learn who this client, this billionaire referred to, was?

A.   I did.

Q.   Who was that?

A.   Trevor Milton.

Q.   So Mr. Anderson then writes:  "I told him about the Wastach Back Ranch that you just purchased, and he said he would have an interest in purchasing it from you if you for any reason are willing to sell it."

         Do you see that?

A.   I do see it.

Q.   About how long after you had closed on the ranch did you get this email, approximately?

A.   I would guess -- I mean, I'm thinking when I closed, so I'm thinking this might have only been a week later.

Q.   All right.  See Mr. Anderson continues:  "However, his comment to me was that he has unbelievable real estate deals and opportunities banging down his door right now during this crisis that are much better investment opportunities and ROIs than him buying a ranch."

         By the way, what's ROI, do you know?

A.   Rate of return.

Q.   "But he really does want to buy a ranch in Utah."

         Mr. Anderson continues:  "What he asked me to ask you

is that if you are willing to be open with him about what you just paid for the ranch, he may be willing to quickly purchase it from you at the same price you just paid."

          Do you see that?

A.  Yes.

Q.  Were you interested in selling the ranch at the same price you had just paid?

A.  No.

Q.  Why not?

A.  Because I -- it was an investment eventually to make profit.

          Can I revise one answer?  ROI, I believe, stands for return on investment.

Q.  Thank you for clarifying.

          Then if you see below, he says:  "Anyway, I'm unsure of how you will feel about all this, but he could literally just write you a check and close in a week or two if you wanted."

          Do you see that?

A.  I do.

Q.  Was an initial potential cash price suggested to you after this email?

A.  Yes.

Q.  How much?

A.  It was -- David Anderson indicated that Mr. Milton was

thinking in terms of it was some number in the 5 millions.

Q.   Was that an acceptable offer to your -- for your ranch at that time?

A.   No.

Q.   Why not?

A.   I was there to make a profit, not a loss.

Q.   Now, did there come a time when Mr. Milton increased the offer that he conveyed to you?

A.   Yes.

Q.   What was the nature of that increased offer?

A.   Seven and a half million cash, seven and a half million in stock options.

Q.   What was your reaction to that proposal?

A.   No.

Q.   Why?

A.   I wanted cash.

Q.   Is that to say you did not want the stock options?

A.   Correct.

Q.   Why did you not want the stock options at that time?

A.   I am fairly limited focus.  I believe in things that are very tangible to me, and that is real estate and cash.  I don't want stock.

Q.   What happened after you conveyed that you weren't interested in that offer?

A.   There was some conversation between me and Mr. Anderson,

M9SHMil5                         Hicks - Direct

the broker -- well, excuse me.

Sometime very soon thereafter, Mr. Anderson suggested that a phone call involving me, him, and Mr. Milton might be useful for Mr. Milton to better describe why it might be wise for me to consider stock options.

Q.  Did that call happen?

A.  Yes.

Q.  When?

A.  April 10, 2020.

Q.  Who was on that call?

A.  Mr. Milton; myself; David Anderson; and my son, Lucas Hicks.

Q.  Approximately how old was your son at the time?

A.  Twenty-three.

Q.  Why did you include him on the call?

A.  Because he had never really been interested in my business before.  He was home from COVID and he had time, and I suggested that maybe he'd be interested enough at least to join me.

Q.  Was any portion of that call recorded?

A.  Yes.

Q.  Who recorded it?

A.  My son.

Q.  Did you realize he was recording it at the time?

A.  No.

Q. Approximately when did you learn that the call -- that there was a recording of a portion of the call?

A. Probably two years later.

Q. Now, does that recording contain the entirety of the conversation that you had with Mr. Milton?

A. No.

Q. How long was the call in total, approximately?

A. Slightly over an hour.

Q. And about how much of it was recorded?

A. Half.

Q. Now, was that recording started at the beginning or partway through?

A. Partway through.

Q. And once it was begun, is the recording complete, the whole way until the end?

A. Yes.

Q. All right. Before we get to the recorded portion, let me ask some questions about the call generally.

How did the call begin?

A. I believe David Anderson initiated it by pre-agreement.

Q. And to the best of your recollection, how was the called introduced? Who started speaking at the beginning of the call?

A. I would -- I believe David Anderson introduced the parties.

Q. Who did most of the talking on the call after that?

A. Mr. Milton.

Q.   Did you learn what type of company Nikola was on that call?

A.   Yes.

Q.   And at a high level, what did you learn?

A.   Low or non-emissions truck builder whose, perhaps, bigger game plan was to sell energy.

Q.   Did you have an understanding at that time whether Nikola had generated any revenue to that point?

A.   I understood it to be a pre-revenue company.

Q.   Was that significant to you?

A.   Yes.

Q.   Why?

A.   Not interested in stock to begin with, and pre-revenue companies are to me, as they are, pre-revenue.  There's no evidence -- revenue would be some kind of evidence of what to expect out of them.  There was no revenue, so it was in that category of company pre-revenue, risky.

Q.   Now, did Mr. Milton provide explanations during that call as to why the stock would be valuable?

A.   Yes.

Q.   Did he describe milestones that the company had achieved at that point?

A.   Yes.

Q.   We'll get into what they were, but why, if at all, was it significant to you to hear about achievements or milestones of the company?

A.  Well, there are certain milestones that were interesting to me, and those milestones were evidence of very tangible success that would lead to very tangible and clear results.

Q.  So before we get to the recorded portion, I want to ask about one topic.

Did Mr. Milton say anything to you about the company's reservations or preorders?

A.  Yes.

Q.  Was that on the recorded portion or the portion before the recording started?

A.  Before.

Q.  What do you recall Mr. Milton saying to you about the company's reservations or orders?

A.  He indicated that the -- they had something along the order of many, many billions, I think it might have been $14 billion worth of truck orders, and that 80 percent of them -- he could make 80 percent of them hard if he chose, and he chose -- and he did not do that because he's afraid he couldn't deliver timely.

Q.  What did you understand him to mean by making 80 percent of them hard?

A.  That means -- I'm from a real estate background.  We use hard money and reservations all the time.  Hard money to me indicates that the -- that the buyer has put up a substantial deposit that he forfeits if he does not conclude the

transaction.

Q.  Would you understand -- or did you understand a hard order reservation to be a binding contract?

A.  Yes.

Q.  Did you understand from Mr. Milton that the reservations he was referring to were mere expressions of interest?

A.  Could you repeat the question.

Q.  Sure.  Based on what Mr. Milton told you, did you understand these reservations in Nikola's products to be mere expressions of interest?

A.  No, hard money.  Hard deposits, excuse me.

MR. PODOLSKY:  All right.  Let me grab one thing.

Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  Mr. Hicks, I've handed you a compact disc that's been marked for identification as Government Exhibit 1400.  Do you recognize that?

A.  I do.

Q.  How do you recognize it?

A.  It's a disc of the recorded part of the conversation on April 10 that we have just discussed.  This is a disc with that conversation.

Q.  And have you reviewed the contents of that disc?

A.  I have.

Q.  How do you know that's the disc that you reviewed?

A.  Because I initialed it.

Q.  And does the disc contain an accurate copy of the recording of that phone call?

A.  Yes.

        MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1400.

        THE COURT:  Any objection?

        MS. YOUNG:  No objection.

        THE COURT:  It will be received.

        (Government's Exhibit 1400 received in evidence)

        MR. PODOLSKY:  Thank you, your Honor.  I'm going to retrieve the disc for a moment.

BY MR. PODOLSKY:

Q.  Now, Mr. Hicks, I believe -- if we could flip -- I believe you have it on your binder, but we could also put it on the screen, what's been marked for identification as Government Exhibit 1400-T.  Do you see that?

A.  I do.

Q.  What is that?

A.  What am I looking at?

Q.  Yes, what is that document?

A.  Looks like the cover page of the transcript of the recording.

        MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1400-T, the transcript of the recording in

Government Exhibit 1400.

THE COURT:  Any objection?

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1400-T received in evidence)

MR. PODOLSKY:  All right.

BY MR. PODOLSKY:

Q.  Now I want to ask you a couple questions about this recording before we listen to it.

I believe you testified a few moments ago or a few minutes ago that you didn't realize that the conversation was being recorded.  Do you recall that?

A.  Right.

Q.  Now, to the best of your recollection, was Mr. Milton or Mr. Anderson told on the call that a portion was being recorded?

A.  Were they told that?

Q.  Yeah, to the best of your recollection.

A.  I believe not.

Q.  OK.  Are you aware of whether, in some circumstances, it could be considered a crime in Massachusetts to record someone without their consent?

A.  Yes.

Q.  Are you aware that your son received a form of protection from the government saying that he would not be prosecuted for

turning over that disc?

A.  Yes.

Q.  Or the contents of that disc, I should say.

All right.  With that in mind, let's -- what I want to do is listen to the recording and follow along in the transcript.

And to make it easier for everyone, your Honor, I'm just going to hand out copies of the transcript, with your Honor's permission.

THE COURT:  Very well.

MR. PODOLSKY:  Thank you.

THE COURT:  Will it also be on the screen, Mr. Podolsky?

MR. PODOLSKY:  Your Honor, I believe we can.

Sorry.  Just one moment, your Honor.  Let me make sure.

(Counsel confer)

MR. PODOLSKY:  Your Honor, it will be on the screen. I'm also happy to hand up a copy of the transcript to your Honor if you would like it.

THE COURT:  As long as it's on the screen, I don't need a copy.

MR. PODOLSKY:  Thank you, your Honor.

BY MR. PODOLSKY:

Q.  All right.  So what I'd like to do is -- Mr. Hicks, can you

remind us, about how long is this recording?

A.  A little bit over an hour -- the recording?  About half an hour.

MR. PODOLSKY:  All right.  Rather than listen to all 30 minutes, let's go to page 17 in the transcript.  And we're going to -- Ms. Wolfson, if you can try to start us at -- so this will be 17, page 17, line 9, and we'll try to start us at 13:26 into the recording.

(Audio played)

MR. PODOLSKY:  Ms. Wolfson, before we go on.

Q.  Just to orient us, the voice that we just heard, who is that saying, at line 11, "How this energy is delivered, these trucks, because they have to have -- they have to set up like Tesla energy stations all over," who is that?

A.  That is I.

Q.  OK.  And the lines below in the transcript where it says "L. Hicks," who is that?

A.  That is Lucas Hicks.

Q.  Now, do you see that, before we go on, you started in this portion asking about energy stations?  Do you see that?

A.  I do.

Q.  Why were you asking about energy stations?

A.  I was leading up to trying to understand whether, at least on certain routes, he had a complete network in existence and eventually whether I would learn that he cornered that market.

He basically monopolized that market.

Q. When you refer to "he," who are you referring to?

A. Nikola, Mr. Milton.

MR. PODOLSKY: OK. Why don't we go ahead and listen, and we'll just listen for -- until we get to page 20.

(Audio played)

MR. PODOLSKY: Stop there. Thank you.

Q. Let me just ask a couple questions about what we listened to. We can use the transcript, Mr. Hicks.

On the bottom of page 19, at line 24, Mr. Milton says at the very end of that line: "Once we broker it, we've already gobbled up all the excess energy on the grid."

So just stopping there, when Mr. Milton's referring to gobbling up excess energy, what did you understand him to be talking about here?

A. I understand -- understood him to be indicating that he had gobbled up, cornered, whatever word, verb, you want to use, the cheap electricity, which is essential for producing the hydrogen that runs the trucks.

Q. And do you see where he says, "We get 20-year contracts"?

A. Yes.

Q. What did you understand him to be referring to? What types of contracts?

A. Well, a 20-year contract, five-year contract, ten years, it's the period of time that he's got it locked up.

Q.  Got what locked up?

A.  Oh.  The electricity.

MR. PODOLSKY:  OK.  All right.  Why don't we just listen down to line 12 of this page so we can hear the next question, Ms. Wolfson.

(Audio played)

MR. PODOLSKY:  Let's pause it there, please.

Q.  Mr. Hicks, why did you ask, "Is it pretty stable that that will also be true five years from now, or would those pricings move around?"  Why did you ask that?

A.  Because the longer the contract, the more tangible and real is his advantage.  If he had, for instance, a one-year contract, that would be virtually meaningless to me.  Five years, better; ten years, better; twenty years is fabulous.

MR. PODOLSKY:  All right.  So let's listen to the response, and we'll keep going to page -- until we get to page 22, line 13.

(Audio played)

MR. PODOLSKY:  Let's pause right there.

Q.  Mr. Hicks, before we get to the answer to your question, let's look at page 20 and, I guess, look at the answer to your prior question.

Line 13, do you see that Mr. Milton responds to your question, "Is it stable that that will also be true five years from now, or would those pricings move around?" with "No,

we've -- we've locked."

     Do you see that?

A.   I do.

Q.   And then down to line 18, towards the end of that line, he says:  "So when we do a deal for power, we do 20-year-minimum deals.  Some of them we're looking at are 30 to 40 years."

     You see that?

A.   I do.

Q.   And do you see he says:  "We guarantee a certain amount of energy, and we can -- we take all their excess energy, and they also give us the free energy off the grid whenever -- whenever the grid spikes from solar."

     Do you see that?

A.   I do.

Q.   "So we're the first people there getting all the energy for free and also getting discounted energy."  Do you see that?

A.   Yes.

Q.   What did you understand him to be saying in this portion of the response?

A.   That he had accomplished these things.

Q.   And do you see down on line 18 of page 21, the word "gobbled" again?  He says, "We kind of gobbled all the freight on that route before we build the truck."

A.   Right.

Q.   Do you see that?

A.   I do.

Q.   What was the significance of that?  What did you understand that to be trying to convey?

A.   He's conveying -- again, my view of it is he has cornered, monopolized, whatever word you want to use.  He's projecting to me that he has accomplished that, and that's very tangible.  If he controls that route and not only does he control it, but at a remarkable price for the hydrogen, then that's a heck of an accomplishment, and that portends that there will be economic success for the company doing that.

Q.   All right.  So let's go to your -- the last question that we paused at on page 22.  Do you see at line 10 you wrote: "Now, Trevor, this is the plan.  I mean, you're not gobbling it up right now because that would be getting too far ahead of yourself, or are you?"

        Do you see that?

A.   I do.

Q.   Can you explain what you were asking there.

A.   I wanted to make certain that this wasn't something that had not yet been accomplished.  I wanted to make sure this was real and tangible because it was important to me.  Because if it's real and tangible and he's got the control of that route, as an example, and he indicated others, he was doing it elsewhere as well, that he had accomplished that between LA and Phoenix, that was a very tangible thing that suggested success

for the company.

MR. PODOLSKY:  OK.  So I think we're going to hear a little bit more about LA to Phoenix.  Why don't we play where we left off, and we'll go to -- just over to page 23, line 3.

(Audio played)

MR. PODOLSKY:  OK.  We can pause there.

Q.  So going back to page 22, when you asked:  "You're not gobbling it up right now, because that would be getting too far ahead of yourself, or are you?" and Mr. Milton responded, "No, we are on certain routes," what did you understand him to be telling you?

A.  Mission accomplished already.

Q.  Then he says, "So from LA to Phoenix, we're already doing that."

Did you understand that Nikola already had a guaranteed route from LA to Phoenix?

A.  Yes.

Q.  Do you see it says, "That's where AB in BEV with Anheuser-Busch"?  Did you understand that Anheuser-Busch had already given them this route?

A.  Yes.

Q.  And then it continues, you see, starting at line 16:  "So they've already given us their routes."  You say, "OK."  And Mr. Milton continues, "On those 13 routes."  So let me pause just right there.

Q.   Did you understand from what he said that Nikola had already obtained 13 routes from Anheuser-Busch?

A.   Yes.

Q.   He says, "We've already begun procuring power."

Did you understand that on those routes Nikola already was obtaining power for its hydrogen production?

A.   Correct.

Q.   Did you understand that Nikola already had contracts in place for that power?

A.   Yes.

Q.   He says, "And planning stations and gobbling up the rates and taking energy from the grid."

Do you see that?

A.   Yes.

Q.   Did you understand from what Mr. Milton said that Nikola had actually already been taking electricity, power, to use to generate hydrogen?

A.   Yes.

Q.   Did you understand from what he said that Nikola was, in fact, producing hydrogen along these routes?

A.   Yes.

Q.   Were those facts, as you understood them, significant to you?

A.   Crucial.

Q.   Why?

A.   This is a pre-revenue company.  It needed a lot of convincing for me to be even slightly interested in any of this, and I needed something tangible that would establish that in the near term down the road they had something that clearly would produce substantial income on an advantageous basis.

Q.   Now, a moment ago we saw -- we went through some answers about 20-year contracts.  Did you understand that Nikola, in fact, had 20-year contracts for this power?

A.   Yes.

Q.   And then Mr. Milton says at the bottom here of page 22, line 24:  "You can't go public on a hope and a dream.  We have the largest hydrogen station in the western world, and our facility, fully operational, you know, operating every day."
          Do you see that?

A.   I do.

Q.   So I haven't asked you about this.  At this moment in April 2020, to your understanding, was Nikola a public or a private company?

A.   Private.

Q.   What did you understand this reference to going public to be?

A.   Well, I know what going public means.  I'm trying to remember whether -- no, of course, I did.  It's somewhere in that conversation, I'm certain, that we talked about what a SPAC was and what he was doing, but -- so going public means

this company was going to become a publicly traded company.

Q.  So did you understand that Nikola was in the process of going from a private to a publicly traded company?

A.  Yes.

Q.  So what did you understand Mr. Milton to be conveying to you when he said, "You can't go public on a hope and a dream"?

A.  He underscored exactly my analysis.  That you have to have something real or you can't go public.  He's underscoring exactly my point.

Q.  Now, was the timing of these accomplishments, that is, that Nikola had already gobbled up these rates and taken electricity off the grid and obtained these routes, important to you in your evaluation of the value of the Nikola stock options?

A.  Yes.

Q.  Was it important to you in your decision as to whether to accept Mr. Milton's proposal eventually?

A.  Yes.

Q.  Why?

A.  As I earlier stated, there had to be some tangible proof to me that this company going public had accomplished something, that there was a direct line between what they accomplished and certainty -- and relative certainty of financial success, at least on those particular things, and that's what this did.

Q.  Now, did you negotiate -- continue to negotiate with Mr. Milton about a potential deal after this call?

A.  Well, I don't recall whether the offer was just before the call or after the call.  I presume it was before the call.  And then after that, I had communicated -- again, these communications -- other than this phone call, communications were with broker David Anderson, not directly with Trevor Milton.  And I indicated that I was not interested in the offer at seven and a half and seven and a half, and so fairly soon thereafter it withered away.

Q.  In other words, you did not accept the offer of seven and a half million in cash and seven and a half million in stock options?

A.  Correct.

          (Continued on next page)

MR. PODOLSKY:  Now, let's turn for Mr. Hicks to what's been marked for identification as Government Exhibit 1404.

BY MR. PODOLSKY:

Q.  Do you recognize this exhibit, Mr. Hicks?

A.  I do.

Q.  What is it?

A.  It is an email from David Anderson to me of -- it's actually on David Anderson's phone, but at the bottom of the message, it indicates Trevor Milton was the one who actually typed the message.

Q.  Just so we make sure we understand, is this a photograph of a text message that you received?

A.  Yes.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1404.

MS. YOUNG:  Objection.  May we approach?

THE COURT:  You may.

(Continued on next page)

(At the sidebar)

MS. YOUNG:  Your Honor, he failed to authenticate it in part because he was confused by the fact that there are dates here for an email, a screenshot of a photo, and then hearsay within hearsay here, attributing language to supposedly being written by Trevor.  And then down here, we have a mail address from an AOL account where we have no reference for where this actually came from and a reference to page, I guess, 4 out of 10, which makes this also seem incomplete.

MR. PODOLSKY:  Not really sure what the objection is here.  He identified that the photograph -- it's a photograph a text message.  The text message he identified is from David Anderson.  He has authenticated the document.  If defense counsel prefers to redact the mail address and year, that's fine, we're not really offering it for that information, we're offering it because of the image of the text message that he received.

MS. YOUNG:  I think there are serious reliability concerns with this exhibit based on all of the issues associated with it.

THE COURT:  As I understand it, it's a screenshot of a statement of a party opponent.  The screenshot was presumably taken by Mr. Hicks, although I don't know.

MS. YOUNG:  We can't tell.

MR. MUKASEY:  It's Anderson purporting to include

Trevor's statements.  In other words, Trevor supposedly wrote on Anderson's phone, hey, these are the terms of the deal.  The only person that can authenticate whether it is, in fact, Trevor is Anderson.

THE COURT:  Well, whether it's Mr. Milton or Anderson, it's either Mr. Milton's statement or a statement of his agent, which I believe we established at the last --

MR. MUKASEY:  If it's authentic.  It can't be authenticated.  This guy is saying, I've seen this photo.  He can't authenticate what's in it.

MR. PODOLSKY:  He authenticated a photograph of a text message.  That is authentication of this exhibit.

THE COURT:  I guess I'm missing the point, because that's how you authenticate a photograph.

MR. MUKASEY:  They can't say what the photograph is.  They can say it's a photograph of somebody's screen.

MR. PODOLSKY:  He just said it was a photograph -- I think he said photograph, it may be screenshot.  A photograph of a text message that he received from David Anderson.

THE COURT:  That he received.

MR. PODOLSKY:  I can ask him again, but he just said it.

MS. YOUNG:  Can we redact the confusing dates and headers?

THE COURT:  I assume that he emailed it at some point.

MR. PODOLSKY:  I think he produced it to us or his lawyer.  I think that's what that's referencing.

THE COURT:  Before it goes to the jury, redact those indications.

(Continued on next page)

(In open court)

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1404.

THE COURT:  It will be received.

(Government's Exhibit 1404 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Ms. Wolfson, if you can focus just on the image contained in the exhibit.  Perfect.

BY MR. PODOLSKY:

Q.  Mr. Hicks, now that this is on everyone's screen, can you describe what this image is?

A.  It's an image of an offer conveyed to me via broker David Anderson's phone, but, by its text, it indicates that Trevor Milton is writing the text.

Q.  Let's go through it.  First of all, so everyone is on the same page, the portion of this image that starts $8.5 million cash all the way down to Dave now, from whose phone did that content come, in other words, how did you receive that?

A.  David Anderson is a ranch broker.

Q.  Do you see the date above it is June 1st, 2020?  Do you see that?

A.  Yes.

Q.  Now, I think you mentioned this a moment ago, does the content here include a renewed offer by Mr. Milton for Wasatch

M9SCmil6                        P. Hicks - Direct

Creeks Ranch?

A.   Yes.

Q.   I want to go through what the terms of the offer conveyed to you were.

     Do you see the first part here is $8.5 million cash?

A.   Yes.

Q.   Can you just explain, what's that?

A.   Well, there was two components to it.  The first component of the offer was he was paying me a certain amount of cash $8.5 million.

Q.   Had the cash component increased from the last offer?

A.   By $1 million.

Q.   And you see it says, 30-day due diligence?

A.   Yes.

Q.   What is that a reference to?

A.   Due diligence, under the law, if somebody is buying a house is the inspection period.  Due diligence gives the buyer an opportunity to check anything and everything, documents, the land, everything else.  If everything is swell, then he proceeds and his money typically goes hard.  If he doesn't like anything, he walks away and he gets his deposit back.

Q.   So this refers, if I understand you, to a period for Mr. Milton to do due diligence on the property; is that right?

A.   Right.

Q.   What about 15-day close, what is that a reference to?

A.   Normally, it indicates -- this is all shorthand of course, but that would normally mean somebody like myself or Mr. Milton, that he's indicating that 15 days after the due diligence period has expired, there will be a closing.

Q.   And then 1MM deposit, what's that?

A.   Deposit of $1 million.

Q.   So that's money put down up front?

A.   Yes.

Q.   And then it says 8.5MM of options at today's closing price. Do you see that?

A.   I do.

Q.   Can you explain what that part is?

A.   I think the same or later.  It means that at the time of the close, the stock will be set at some price and then you get eight and a half million dollars of that stock if you exercise some period later.

Q.   I'm going to come back in a moment so we can make sure we understand how that works.

        But do you see it says six months from merger, options are available to exercise?

A.   Right.

Q.   What is that point?

A.   That means that you have an option and the question is, when can you exercise it.  In this case, he's indicating that you can't exercise it for six months.

Q.  So does that mean that you are allowed to purchase the stock, if you choose, six months after the merger; is that right?

A.  Correct.

Q.  What does the merger refer to in this context?

A.  It's the merger between Nikola and VectoIQ, whatever the SPAC stock was.

Q.  The SPAC company that it was merging with?

A.  Yes.

Q.  So, let me make sure I understand you.  At six months after that, you had the right, if you chose, to purchase up to $8.5 million worth of stock from Mr. Milton; is that right?

A.  Up to, yeah.  Up to and including.

Q.  So at what price would you be purchasing the stock?

A.  Whatever the strike price is.  Strike price would be the price set forth in the agreement.

Q.  And is that the reference to today's closing price?

A.  Correct.

Q.  I think there's an example here.  It says, from Mr. Anderson, if shares are $67.94 at the six-month mark, you only pay $33.97 per share and make the difference.

        And then I'm going to come back to the next sentence.

        But then he says the $33.97 is realtime quote, but the option will be at today's closing price if you sign the contract today.

M9SCmil6                              P. Hicks - Direct

          Do you see that?

A.   I do.

Q.   By the way, was Nikola actually trading as Nikola at this moment?

A.   No.

Q.   So what did you understand the $33.97 quote to be referring to?

A.   That would be the price of the merged -- as of the moment -- as of that moment, that would be the strike price on the stocks once merged.

Q.   So, to play this out, if that was the closing price that day, $33.97, you could then purchase 8.5 million shares six months later, approximately, for $33.97 a share; is that right?

A.   Yes.

Q.   So in the scenario outlined by Mr. Anderson, that the stock price went up to $67.94, could you then sell the shares --

          MS. YOUNG:  Objection.  Leading.

          THE COURT:  Overruled.

Q.   You can answer.  What is the $67.94 in this scenario?

A.   I think it's pretty clear what Mr. -- by the way, this was written by Mr. Milton, not Mr. Anderson, at least that's what it says.

          I think it's quite clear he was giving an example and he said six months later, $67.95, if my math is correct, that doubled, the $33.97.  So they're saying six months from then,

it doubled, this is what you'd make.

Q.  Let's make this concrete.  Let's say the scenario comes to pass, the value of the stock doubles, how much profit would you make from the stock option side of this deal?

A.  If I'm doing my math right, that would be eight and a half million net.

Q.  Now you've referenced this a few times, but these texts -- you see below, it says these texts above are written by Trevor on my phone?

A.  Yes.

Q.  Who did you understand Trevor to be in that sense?

A.  Who did I understand him to be?

Q.  Who did you understand the reference to Trevor, who was that a reference to?

A.  Trevor Milton.

Q.  Did you accept this offer?

A.  Yes.

Q.  Why did you decide to accept this offer at the beginning of June 2020?

A.  Just went off my screen.

Q.  That's okay.  You can just answer.

A.  I accepted it for a number of reasons.  One, the cash component went up $1 million.  Two, in the interim between the phonecall on April 10 and rejection of that offer — and this is approximately two months later — the performance of the -- I

call it the mirror stock, SPAC, VectoIQ or whatever it's called or was called had performed well, and I understood from observation of writings on the internet and so forth that generally reflected the sentiment as to the merger itself. So those things combined with what was important to me on the April 10 conversation led me to look at it in a different light.

Q. Would you have accepted this deal without the information that Mr. Milton provided on April 10th about the status of the company's reservations, routes, and hydrogen production?

A. No.

MR. PODOLSKY: Let's turn for the witness, for Mr. Hicks, to what's been marked as Government Exhibit 1405.

Q. Mr. Hicks, do you recognize this document?

A. Yes, it is the contract, the purchase -- it's called a purchase and sales a contract. A purchase whereby Mr. Milton and/or his LLC agrees, under contract, to purchase and I agreed to sell to him the ranch.

MR. PODOLSKY: Your Honor, the government offers Government Exhibit 1405.

MS. YOUNG: No objection.

THE COURT: It will be received.

(Government's Exhibit 1405 received in evidence)

MR. PODOLSKY: May we publish?

THE COURT: You may.

MR. PODOLSKY:  Ms. Wolfson, can we blow up the heading and first paragraph above article 1.

Q.  We won't read this entire contract, but do you see the top says, purchase and sale agreement?

A.  Yes.

Q.  What property does this agreement relate to?

A.  Wasatch Creeks Ranch.

Q.  Do you see the sort of introductory paragraph says this purchase and sale agreement, agreement is effective as of June 1st, 2020 by and between Hicks LLC and Wasatch Hicks LLC?

A.  I do.

Q.  What are Hicks LLC and Wasatch Hicks LLC?

A.  LLCs owned by me.

Q.  And do you see Riverbend Bar Milton Ranch LLC?

A.  I do.

Q.  What's that?

A.  LLC owned by Trevor Milton.

Q.  Is it common in a transaction like this to use LLCs to buy and sell property?

A.  Yes.

MR. PODOLSKY:  Why don't we, Ms. Wolfson, blow up from article 1 to just above purchase price.

Q.  So you see under property or next to property, 1.1, the property, it says, subject to all the terms, conditions, and provisions of this agreement and for the consideration herein

set forth, seller hereby agrees to sell and buyer hereby agrees to buy the following, all of which together are herein referred to as "The Property."  Do you see that, Mr. Hicks?

A.  No, I don't.  Oh, we're up -- okay.  Let me read it.  Yes.

Q.  Do you see below next to A, it says the certain real property known as Wasatch Creeks Ranch, do you see that?

A.  Yes.

Q.  It says, consisting of approximately 4,678 acres of real property and improvements?

A.  Yes.

Q.  Is that the size of the property?

A.  Yes.

Q.  And then below it, for B, it has all water rights and water shares and so forth?

A.  Yes.

Q.  Do those two portions describe what was transferred to Mr. Milton in this deal?

A.  Yes.

          MR. PODOLSKY:  Let's look at the purchase price.

Q.  Do you see where it says 1.2 Purchase Price, Mr. Hicks?

A.  Yes.

Q.  Do you see it reads, the purchase price, which seller agrees to accept and buyer agrees to pay for the property, is the sum of $8,500,000 and no over one hundred.  Do you see that?

A.   I do.

Q.   Was that the cash component of this deal?

A.   It was.

Q.   And you see there is a reference then, "and the option," do you see that?

A.   Yes.

Q.   What is that?

A.   That's the option agreement we were earlier referring to.

          MR. PODOLSKY:  Let's look quickly, I think it's page 33 of the document, Ms. Wolfson.

Q.   Mr. Hicks, do you see signatures on this page?

A.   I do.

Q.   Whose?

A.   My signature and Mr. Milton's signature.

Q.   Do you see the date under the signature, June 2nd, 2020?

A.   I do.

Q.   In your experience, is it common to sign a contract like this a day after the offer is made?

A.   No.

Q.   Why did it happen so quickly here?

A.   Because Mr. Milton had indicated that there was -- the merger was imminent and it was required -- if this transaction were to occur, it was required that it occur before the merger happened.

          MR. PODOLSKY:  So let's go to page 41 of the exhibit.

Q.  Mr. Hicks, do you see this portion, it says option agreement?

A.  Yes.

Q.  What is this part of the document?

A.  This is the contract between the parties related to the option, the eight-and-a-half-million-dollar option.

MR. PODOLSKY:  Let's go to page 43 of the exhibit, Ms. Wolfson.  Actually, let's go straight to 45.  We could blow up the top paragraph.

Q.  Do you see that this reads, there's a heading at the top, option, exercise, deliveries, do you see that?

A.  I do.

Q.  And below, grant exercise price?

A.  Right.

Q.  Maybe you could just read this paragraph.

A.  The whole paragraph?

Q.  If you don't mind, why don't you go ahead and do it.

A.  Grant exercise price subject to the conditions and restrictions contained herein.  Grantor is jointly and severally hereby granted to optionee the right and option (hereafter the option).  The purchase from grantors up to $270,960 (the same) of the grantor-owned shares, as such grantor-owned shares may be adjusted pursuant to section 3 below herein after the option shares, an exercise price of 31 and 37/100 i.e., $31.37, per option share or an aggregate of

M9SCmil6                          P. Hicks - Direct

$8,500,000 dollars.  $8,500,000 (the exercise price).

Q.  So the portion where it refers to $270,960, do you see that?

A.  I do.

Q.  What's that a reference to?

A.  That's the number of shares.

Q.  Do you see the exercise price is listed here?

A.  I do.

Q.  What was the exercise price under this contract?

A.  $31.37.

Q.  Now, was this form of option agreement agreed to June 2nd, 2020?

A.  Yes.

Q.  Did it become apparent that there were any problems or issues with this agreement?

A.  Yes, it was defective in a couple ways.

Q.  In what ways was it defective?

A.  It provided that the shares would be available for exercise in five months and Mr. Milton had, what I later learned, was a lockout that prevented him from conveying those shares in five months, he couldn't legally do so, and so it had to be six months, but not five months, but the document said five months.

     Secondly, he specifically represented that he owned SPAC shares on that date and he did not.

Q.  Were you concerned at the time, did you have any concerns

that this agreement wouldn't be enforceable and the agreement might not close or a deal might not close?

A.   I concluded sometime later, when I looked at it more carefully, that it was defective and I deemed it unenforceable.

Q.   Now, I think you testified earlier that the deal ultimately did close; is that right?

A.   Correct.

Q.   Approximately when?

A.   August of 2020.

Q.   Did you want that deal to close at that time?

A.   I did.

Q.   Why did you want to make sure the deal closed?

A.   Because that gave me more opportunity to observe more facts about -- well, facts.  More representations about Nikola, and that combined with the performance of the stock led me to conclude, yeah, I should proceed on that.

Q.   So what you just described, observing more representations about Nikola and the performance of the stock, did that occur between the signing of this agreement and the closing?

A.   Correct.

Q.   What types and what sort of format did these representations you were just alluding to come?

A.   Well, post-contract signing, they came, I think, exclusively by the internet.

Q.   Did you do some research in that intervening period?

A.   I did and other people referred stuff to me.

Q.   And what types of materials did you look at?

A.   I think -- well, I observed Mr. Milton on more than one occasion in TV interviews and other -- and I also watched the performance of the stock, firstly every day.  I had it set to -- some setting.  I can't remember what it was.  I'm technologically challenged.  And that, in turn, kicked off to me the articles of the day on Nikola.

Q.   Did the statements that you listened to -- actually, let's just be clear.  I think you said this, but did you observe Mr. Milton making public statements in the media during that time?

A.   I did.

Q.   And did those public statements appear to you to corroborate what he had told you on the call on April 10th, 2020?

A.   They did.

Q.   I want to look at one in particular, but before we do that, did your research include looking at SEC filings?

A.   It did not.

Q.   Just why did you focus on the public statements of Mr. Milton and not on the SEC filings?

A.   It all originated with my -- or our conference call with Mr. Milton, and again, before that conference call, I knew nothing about Mr. Milton and nothing about Nikola.

And lost my train of thought.  I apologize.

Q.  The question was, why did you focus on Mr. Milton's public statements as opposed to, say, paper filings?

A.  Oh, so when we had that meeting or that conference call and this information was being conveyed to me by the founder and the CEO of Nikola, of a many, many billion dollar company, it never struck me that he would be making false representations. In fact, many false representations.  So I thought it all to be credible and true and never thought to do otherwise.

MR. PODOLSKY:  Let's put up for the witness what's been marked as Government Exhibit 1420.  If we could blow up the email.

Q.  Mr. Hicks, do you recognize this document?

A.  I do.

Q.  What is it?

A.  It's an email from me to my son and my wife referring them to a thread on the internet related to Mr. Milton.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1420.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1420 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

Q.  Mr. Hicks, now that we're all looking at the email, who is

this email from?

A.   Me.

Q.   To whom?

A.   My son and my wife and to me.

Q.   And do you see the subject was, Fox Business, Nikola
founder says his company just has to execute, now on hydrogen
fuel cell trucks.  Do you see that?

A.   Yes.

Q.   And the email was sent August 1st, 2020.  Do you see that?

A.   I do.

Q.   Do you see there is like a blurb just below, do you see
that, Nikola founder --

A.   Yes.

Q.   Did you write that or was that content from somewhere else?

A.   No, that's not something I would write.

Q.   Well, do you see that it includes a link?

A.   Yes.

Q.   Was that a link to a video?

A.   Yes.

Q.   And did you watch that video at the time?

A.   Yes.

          MR. PODOLSKY:  Let's pull up Government Exhibit 426,
which I believe is in evidence, and we have a transcript for
this, 426-T.  We can do 426-A if there are subparts.  I think
the transcript should be in binders, but we can do it

alongside, if that's easier for folks.

Q.  Mr. Hicks, I believe you should have a hard copy, if you prefer, of the transcript, as well.

A.  I have it here.

MR. PODOLSKY:  Why don't we play a couple seconds of this clip for Mr. Hicks.

(Video played)

Q.  Do you recognize this video, Mr. Hicks?

A.  I do.

Q.  Is this a clip of the same video that you sent to your son and wife?

A.  Yes.

MR. PODOLSKY:  Let's go ahead and listen to the clip, and we can listen straight through to 1:38.

(Video played)

Q.  Starting on page 2 of the transcript, the bottom, Mr. Milton, line 25 says, we saw an opportunity to bring the cost of hydrogen down going zero emission and putting it on parity or lower than diesel and it is the first time in history that has been able to be done.

Do you see that?

A.  Yes.

Q.  Is that something you thought was important about the company?

A.  Yes.

Q.  You see it continues, so it went from about $16 a kilogram, we're down now below $4 a kilogram.

Do you see that?

A.  I do.

Q.  And he goes on and gives some reasons.

Did you understand at the time that Nikola, in fact, was able to produce hydrogen at $4 a kilogram?

A.  From this, yes.

Q.  And did that corroborate your understanding from what Mr. Milton told you during the April 10th, 2020 call, that Nikola already had hydrogen production facilities?

A.  Yes.

Q.  And did you understand from this that Nikola already had favorable electricity contracts in place?

A.  Yes.

Q.  And did it corroborate your understanding of that from the April 10th, 2020 call?

A.  Yes.

Q.  Did the information in this video confirm your desire to close the deal for Wasatch Creeks Ranch in exchange, in part, for stock options for Nikola?

MS. YOUNG:  Objection.

THE COURT:  Overruled.

A.  Yes.

MR. PODOLSKY:  You can take that down and turn to

Government Exhibit 1406.

Q.  Mr. Hicks, do you recognize this document?

A.  Yes.

Q.  Is this an email that you received relating to the terms of the close?

A.  Correct.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1406.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1406 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  Let's actually go to the second page, Ms. Wolfson, and blow up the email from Mark Gail at the bottom.

Q.  Mr. Hicks, you testified a few minutes ago that there was some issues with the form of the options agreement that was signed in June 2020; is that right?

A.  Yes.

Q.  What's the date of this email that we're looking at here?

A.  August 11.

Q.  And I'll ask you about some of the specifics, but do you recall, generally, what the purpose of this email was?

A.  Solve the defects in the contract.

M9SCmil6                          P. Hicks - Direct

Q.  Let's look at some of those issues.  Just quickly going through, do you see number 1 is all references to Nanolowa in the options agreement and its exhibits are scribner's error and should be populated with Hicks, Hicks LLC, and/or — this appears to be a typo, as well — Wasatch Hicks LLC?

A.  I do.

Q.  So this is to resolve some scribner's errors in the options agreement?

A.  Yeah, there were references from some prior document of theirs that shouldn't have been there.

Q.  So let's focus on number 2.  It says as to section 2A of the option agreement, the number of shares was $270,960 and the share price was $31.37.

Do you see that?

A.  I do.

Q.  Then it says the stock split multiplier, is 1.901?

A.  Right.

Q.  Can you explain your understanding of what that's a reference to?

A.  Yes.  When the merger occurred, the owners of the private Nikola stock got certain benefits, and one of them was that their stock somehow split and had this multiplier.  Beyond that, I think we're going beyond my range of competence.

Q.  So did this portion describe a correction to the number of shares and the strike price for the options agreement?

M9SCmil6                         P. Hicks - Direct

MS. YOUNG:  Objection.  Leading.

THE COURT:  Overruled.

A.  Yes.

Q.  So do you see it says the number of shares is 515,095, do you see that?

A.  I do.

Q.  So what was that?

A.  That's the new number of shares that I'm entitled -- I was entitled to per this modification of the agreement.

Q.  And the adjusted share price is $16.50.  What was that?

A.  That's the new strike price per modification of the agreement.

Q.  So once the deal was closed, how many shares were you entitled to buy of Nikola stock from Mr. Milton and at what price?

A.  515,095 at $16.50 per share.

Q.  And when could you decide to purchase that, those shares?

A.  That was remedied, as well.  It became six months out, which was December of 2020.

Q.  So in other words, you were not able to purchase those shares for several months until the beginning of December?

A.  Correct.

MR. PODOLSKY:  Let's pull up what's been marked as Government Exhibit 1407 for Mr. Hicks.

Q.  Mr. Hicks, do you recognize this document?

M9SCmil6                         P. Hicks - Direct

A.   Well, this is the formal amendment to the option agreement, which occurred the same day or the day prior to the close.

MR. PODOLSKY:   Your Honor, the government offers Government Exhibit 1407.

MS. YOUNG:   No objection.

THE COURT:   It will be received.

(Government's Exhibit 1407 received in evidence)

MR. PODOLSKY:   May we publish?

THE COURT:   You may.

MR. PODOLSKY:   Ms. Wolfson, maybe we can try blowing up the whole text portion.

Q.   Mr. Hicks, what is this amendment number 1 to option agreement document?

A.   It's the amendment through the original option agreement, which had been signed on or about June 2nd, 2020, and it was amended per this date, August 14, 2020.

Q.   I see that date up there, August 14th, 2020.   Is that the date on or about the deal's closing?

A.   Yes.

MR. PODOLSKY:   If we go down, Ms. Wolfson, to maybe the bottom half of the document starting with 1, maybe we blow that up.

Q.   Do you see it reads, section 1G of the original agreement is hereby amended and restated to read in its entirety as follows.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M9SCmil6                          P. Hicks - Direct

Do you see that?

A.   I do.

Q.   And then G, do you see it has some text that indicates exercise period?

A.   Yes.

Q.   So what's that part?

A.   That's, again, we had to make this correct, it had to move the exercise period back to December 2020.

Q.   And then you see the next paragraph, number 2, the parties hereby confirm the understandings with respect to the terms of the original agreement set forth in an email from Mark Gail to Matthew L. Anderson on August 11th, 2020, at approximately 3:31 p.m. Mountain Time, and the email sent by Matthew L. Anderson to Mark Gail in response, dated August 12th, 2020, at approximately 1:36 p.m., Mountain Time.

Do you see that?

A.   I do.

Q.   Is that a reference to the email exchange we looked at a moment ago in Government Exhibit 1406?

A.   Yes.

Q.   So were those emails -- the content incorporated by reference into this agreement?

A.   Yes.

MR. PODOLSKY:   Let's do one more Gail document.   If we can show Mr. Hicks Government Exhibit 1408.

M9SCmil6                          P. Hicks - Direct

Q.  What is this, Mr. Hicks?

A.  This is the settlement -- the final settlement statement where you close on a given date and then you've got to make adjustments for taxes and such.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1408.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1408 received in evidence)

MR. PODOLSKY:  Can we just blow up the top, Ms. Wolfson.

Q.  So you see this says, First American Title Insurance Company, do you see that?

A.  I do.

Q.  You see it's got a settlement date, 8/14/2020?

A.  Yup.

Q.  Is that the closing date of this deal?

A.  Yes.

MR. PODOLSKY:  If we go down below, Ms. Wolfson.  In the upper right-hand corner of the box there, you could blow that all the way up.

Q.  What is the $8,500,000 referring to?

A.  The cash initially paid to me.

Q.  So that's the cash component of the deal?

A.  It is.

Q.  Did you also receive the right to purchase up to eight and a half million dollars of Nikola stock as we've discussed?

A.  Yes.

Q.  Do you recall approximately how much it appeared those options were worth when the deal closed?

A.  Yes.

Q.  How much?

A.  In excess of $15 million.

MR. PODOLSKY:  Your Honor, I'm about to change topics. I'm happy to keep going or break here.

THE COURT:  It's almost 2:40 in the afternoon.

Ladies and gentlemen, that will conclude our day. Please be safe getting home.  Please endeavor to be in the jury room no later than a quarter after tomorrow or so.  Until then, don't discuss the case or read anything about the case.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Hicks, you may step down and folks may sit.

Anything to raise, Mr. Podolsky?

MR. PODOLSKY:  So, just as a scheduling matter, we don't know how long the cross of Mr. Hicks or our witnesses will be, but I think there is a chance that we could rest tomorrow.

I just raise that sort of reciprocal request, which is we would just like to know who defense's first witnesses will be.

THE COURT:  Just so I understand, how much more of a direct is there for Mr. Hicks?

MR. PODOLSKY:  Not long, your Honor.  I would guess certainly less than an hour, maybe closer to a half hour, I'm guessing.

THE COURT:  Any estimate as to how long the cross will be?

MS. YOUNG:  Under an hour, 45 minutes.

THE COURT:  And then there is how many of the investor witnesses?

MR. PODOLSKY:  So we have one or two, and we'll inform the defense of the final names tonight, but I think they know who's coming after that.  I expect their testimony to be similar length to the prior investor testimony.  And then there

is one summary witness for the government, an agent who will be approximately maybe two hours, your Honor, could be less, but that's our best estimate.

THE COURT:  That sounds like it may take us till the end of the day, but if it doesn't take us till the end of the day, it will take us to substantially the end of the day.

So we'll end at that point and I won't require the defense to have a witness ready, but it sounds like the defense ought to have, if you're going to put on a case, you should have your first witness ready to go as of this Friday or witnesses as early as Friday.

MR. MUKASEY:  We will, Judge.  And we'll inform the government specifically who they are.

I wonder, if the government does rest tomorrow afternoon, when, if at all, your Honor will entertain Rule 29 arguments.

THE COURT:  Immediately after they rest.

MR. MUKASEY:  Would you prefer those orally or in writing or both?

THE COURT:  Orally.  I've never received them in writing, but if you want to put something in, I suppose I could consider.

MR. MUKASEY:  We thought we'd drop on you about 2:30 in the morning, maybe.

THE COURT:  I expected nothing less.  Anything for you

M9SCmil6                          P. Hicks – Direct

to raise?

MR. MUKASEY:  No, sir.

THE COURT:  I also want to make sure, right now we're scheduled to hold the jury charge Friday afternoon, so I assume that's still a good time to do it.

The other question that I had is whether I should tell the jury anything about where we are in the schedule.  As long as we're within the timeframe that we gave them, I don't imagine there's any reason to say anything to them.

MR. MUKASEY:  I think we're within it or actually maybe ahead of schedule slightly.

MR. PODOLSKY:  Based on what we've heard about the defense's case, I think we're ahead of what we warned the jury, so I think we're in good shape.

THE COURT:  I gave them the five weeks based on the government's representation that your case will be three to four weeks and the defense case would be one week.

So I'll look forward to seeing what you have for me tomorrow morning.

MR. MUKASEY:  Judge, can I weigh in on one issue you raised last week.  You posed to the parties the question of whether we would be interested in a jury charge before summations or after summations.  We, on the defense side, vote for the traditional after summations.

THE COURT:  That settles the issue.

M9SCmil6                        P. Hicks - Direct

MR. MUKASEY:  Thank you.

THE COURT:  Have a good evening, everyone.

(Adjourned to September 29, 2022 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                              Page

KIM BRADY

Cross By Mr. Mukasey . . . . . . . . . . . . . . .1906

Redirect By Mr. Podolsky . . . . . . . . . . .1999

Recross By Mr. Mukasey . . . . . . . . . . . . .2024

PETER HICKS

Direct By Mr. Podolsky . . . . . . . . . . . . .2029

                       GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 585   . . . . . . . . . . . . . . . . . . . . . .2010

 593   . . . . . . . . . . . . . . . . . . . . . .2011

 592, 591, 590, 589, 588, 587, 586   . . . . .2012

 1401   . . . . . . . . . . . . . . . . . . . . .2034

 1426   . . . . . . . . . . . . . . . . . . . . .2036

 1435   . . . . . . . . . . . . . . . . . . . . .2041

 1400   . . . . . . . . . . . . . . . . . . . . .2051

 1400-T   . . . . . . . . . . . . . . . . . . . .2052

 1404  . . . . . . . . . . . . . . . . . . . . . .2068

 1405  . . . . . . . . . . . . . . . . . . . . . .2074

 1420  . . . . . . . . . . . . . . . . . . . . . .2082

 1406  . . . . . . . . . . . . . . . . . . . . . .2086

 1407  . . . . . . . . . . . . . . . . . . . . . .2089

 1408  . . . . . . . . . . . . . . . . . . . . . .2091

```
                        DEFENDANT EXHIBITS

Exhibit No.                                      Received

 1298     . . . . . . . . . . . . . . . . . . .1909

 1748 and 1749   . . . . . . . . . . . . . . . .1912

 1601     . . . . . . . . . . . . . . . . . . .1920

 1292     . . . . . . . . . . . . . . . . . . .1924

 518, 519 . . . . . . . . . . . . . . . . . . .1928

 1497     . . . . . . . . . . . . . . . . . . .1933

 1753     . . . . . . . . . . . . . . . . . . .1937

 176      . . . . . . . . . . . . . . . . . . .1939

 1048     . . . . . . . . . . . . . . . . . . .1947

 1737     . . . . . . . . . . . . . . . . . . .1949

 601      . . . . . . . . . . . . . . . . . . .1950

 167      . . . . . . . . . . . . . . . . . . .1952

 1217     . . . . . . . . . . . . . . . . . . .1971

 156 and 156-T   . . . . . . . . . . . . . . . .1974

 1742     . . . . . . . . . . . . . . . . . . .1976
```