M9TCmil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

   v.        21 CR 478 (ER)

TREVOR MILTON,

     Defendant.

------------------------------x

           New York, N.Y.

           September 29, 2022
           9:00 a.m.

Before:

      HON. EDGARDO RAMOS,

         District Judge

       APPEARANCES

DAMIAN WILLIAMS
  United States Attorney for the
  Southern District of New York
BY: JORDAN L. ESTES
  NICOLAS T. ROOS
  MATTHEW D. PODOLSKY
  Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
  Attorneys for Defendant
BY: MARC L. MUKASEY
  KENNETH A. CARUSO
  TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
  Attorney for Defendant
BY: BRADLEY J. BONDI
  SARA ORTIZ

(Trial resumed; jury not present)

THE COURT: Good morning, everyone. It's 9:00 a.m. There are apparently a couple of things to go over.

I received letters from the defense team concerning some Rule 17 subpoenas, a request for judicial notice that NASDAQ servers are in New Jersey, and both parties' letters concerning the summary charts.

Is there anything else that came in in the last 20 minutes?

MR. BONDI: Yes, your Honor, not quite the last 20 minutes, but it was overnight.

Briefing our response to the government's motion to prevent the admission of some documents relating to communications with Britton Worthen, the chief legal officer, and that, your Honor, for your reference, is our responses at docket entry 195. We filed that last night.

THE COURT: That's the text that we saw yesterday?

MR. BONDI: It is among one other communication, and we can take that up at your Honor's convenience.

THE COURT: Okay. So which one do we want to take first?

MR. ROOS: In terms of issues that will come up today and the potential order, there is a decent chance the summary witness testifies today, so I think discussing the summary charts would be appropriate.

THE COURT:  Okay.

MR. ROOS:  The Britton Worthen text exchange would also come up during the summary witness, but I want to give your Honor the opportunity to read their letter, so we can handle that the next break.

THE COURT:  Okay.

MR. ROOS:  Then I think the subpoena to the defense experts, presuming their compliance, we should probably address that, that way they understand their subpoena obligations.

So I think those are probably the most immediate items, at least from my perspective.

The judicial notice thing, I think, probably does not need to be resolved until the end of the case, but we could also argue that today.

MR. BONDI:  Your Honor, respectfully on that, we would like it resolved before Rule 29, the judicial notice issue.

THE COURT:  Let me ask this, does the government oppose the request on the NASDAQ servers?

MR. ROOS:  Yes, your Honor.  Sort of one point on the law and one point on the substance.  I think my colleague, Mr. Podolsky, is actually going to argue this one, but I'll just give you high level.  We don't think the subject matter is appropriate for judicial notice, and just looking at the documents, which are largely articles, they're really a mixed bag, they're what they sort of are cited for by the defense.

M9TCmil1

THE COURT:  When did the servers move over to New Jersey?

MR. BONDI:  They've been there for some time, your Honor, long before this case.  They're in Carteret, New Jersey.

Your Honor, NASDAQ is an electronic trading platform.  All the trades, all the trades run through a server located in Carteret, New Jersey.  That's on NASDAQ's home page.  You can even find it on the SEC's page.  There is not a single trade in this case that ran through New York City and the Southern District of New York.

There have been witnesses that have been elicited testimony, lay testimony from company witnesses talking about where the location of NASDAQ is, and I noticed the government put in last night a nice video of Times Square where it shows the NASDAQ conference room in Times Square, we've all seen it, and the big electronic screen outside Times Square.  Not a single trade goes through that building.  NASDAQ is an electronic trading platform, it goes through New Jersey.  This is an appropriate thing for the Court to take judicial notice that the servers are located in New Jersey.  That's where the trading goes through.  The government can't refute that, plain and simple.

MR. PODOLSKY:  Your Honor, I think this is actually pretty simple, how to deal with this motion.  If the defense wishes to make a Rule 29 argument at the close of the

government's case, that it has failed to establish that a reasonable juror could find venue by a preponderance of the evidence, they're welcome to make that argument and we'll discuss it at the appropriate time.

As far as notice of the fact about where the servers are located, putting aside whether that's a legally appropriate request, the defense has certainly not met the standard under Rule 201 for that.

I'll note the defense pointed to *United States v. Chow*, a Second Circuit case, where, actually, the circuit noted that the facts in that case, which involved fact testimony about the location of the server, was that the employee or whoever testified couldn't specify whether the relevant servers were in New York or New Jersey.  What the defense now is asking is for your Honor to take judicial notice of where servers are based on some articles, public statements about the primary location of NASDAQ's servers, none of those articles establish as a factual matter and certainly not in any way that's been put forth in this trial where the relevant servers for any trades relevant to this case are.

So the bottom line is we think the request for judicial notice should be denied.  If the defense wishes, again, to make an argument at Rule 29 about the government failing to carry its burden as to venue, we're certainly prepared to argue that later today or whenever we take up

M9TCmil1

Rule 29 arguments.

THE COURT:  What about the charts?

MR. ROOS:  The summary charts?

THE COURT:  Yes, the summary charts.

MR. ROOS:  We put our letter in on that yesterday and last night, so I guess we put in two letters.  The types of summary charts that we're admitting fall, really, into two categories.  One summarizes voluminous financial data.  So there are a few charts that provide summaries of stock or bank record data, and those are totally consistent with prior precedence, including two cases before your Honor in which summary witnesses put on data, summaries related to stock or financial tracing.  The other category of summary charts are those that are effectively -- we call them timelines, but they're basically a compilation of emails, text messages, and other materials, in chronological order, to aid the jury.

Those types, we modeled those after the charts that were used in *United States v. Ho*, in which the Second Circuit affirmed the use of such summary charts.  Also in *United States v. Skelos*, in which the Judge the wrote on the admissibility of summary charts*, United States v. Parnas* where, again, the judge wrote on the admissibility of those summary charts.  So this style of summary chart has been widely accepted within this district and at the circuit as admissible under 1006.

And then, your Honor, our letter takes up the specific

objections to each charge, largely which are arguments for fodder for cross, not a basis to keep them out.

THE COURT:  The defense letters points out that at least some of the charts are based on documents or information not in evidence.

MR. ROOS:  So, two points on that.  Some of the charts are based on text messages or emails that are not yet in evidence.  The government intends, as we've told the defense a few days ago, to offer several of these pursuant to stipulations.  Actually, right after Mr. Hicks is off the stand.  So we'll do that.  If your Honor keeps any of them out, we'll remove those items from the chart.

The other category of materials that are not in evidence that may come in through stipulation, but even if they don't, are publicly available stock data from Yahoo Finance, and Rule 1006 contemplates that such voluminous data does not need to be in evidence as long as it's made available to the opposing party.  It obviously is.  They've, in fact, presented us with a similar type, publicly available stock data, that I think their expert relies on, too.

MR. BONDI:  Your Honor, respectfully, the devil's in the detail in these charts, and I would like to go through them because I think that will illustrate the concerns here --

THE COURT:  I don't have them, by the way.

MR. BONDI:  I'm happy to put them on the Elmo or the

M9TCmil1

government has it --

MR. ROOS:  Let me make sure I have a set for your Honor.  We'll pass them up.

MR. BONDI:  Your Honor, while the government is doing that, I would respectfully say these charts fall into two buckets and these are our objections.

One, they contain incorrect information, just flatout false information.  The second is they contain prejudicial and irrelevant information.  Just walking through these charts, as the government gets them for you, and for GX-1000, we said we're fine.  With GX1002, the government has withdrawn that chart.

So focusing on the ones that remain at issue, GX-1001 has a value of Trevor Milton's stockholdings here.  It has identification of amounts of $1 million and $2.7 million of VectoIQ stock.  Mr. Milton never, ever, ever owned VectoIQ stock.  So this chart, which, I'm sorry, I'm holding up for your Honor to see, has two dots.  We've told them this has nothing to do with this case because he didn't own VectoIQ stock.  Now, if they want to start with Nikola stock, different story, but they're starting with VectoIQ stock suggesting somehow he inflated VectoIQ stock.  He never owned VectoIQ.  So it's extraordinarily confusing and misleading to the jury and it's just flatly incorrect.

THE COURT:  Incorrect in that the amounts listed on

here are incorrect?

MR. BONDI:  Correct, because, your Honor, he never had VectoIQ stock.

THE COURT:  I understand that point.  I take it the government's response is that he owned that amount of Nikola stock at the time listed on the chart; correct?

MR. ROOS:  Yes, your Honor.  The witness is going to testify that this is meant to provide the jury an aid in understanding the value of Mr. Milton's shareholdings at various times and because Nikola, his legacy shares of Nikola were obviously not publicly traded.  This valuation is based on the then existing price of VectoIQ, which, of course, there is a lot of evidence in the case now that that automatically converted to Nikola.

Just to be clear, the witness is not and, in fact, will affirmatively disclaim that Mr. Milton owned VectoIQ shares.  The purpose is merely to illustrate to the jury the value of his stockholdings, which do become publicly traded Nikola shares over time.  And I think these points, to the extent they're concerned about it being misleading, can clearly be resolved both on the direct examination and on cross.

MR. BONDI:  This is fiction, your Honor, and it's fiction because to get to these amounts, what they've done is they've done a retroactive application of what Trevor Milton's private Nikola shares became when they became public and then

retroactively went back to say, okay, if, hypothetically, he owned VectoIQ, it's just false.  These two dots are false, misleading, and pure fiction.

So the only purpose for the government to put that information, and I appreciate they say we're not going to have our agent testify to that, but we want this document to go into evidence so it goes back to the jury room so it looks like he's got VectoIQ stock.  He never had $1 million worth of VectoIQ stock, never had $2.7 million of VectoIQ stock.  Pure, pure fiction.

THE COURT:  Was there any valuation of Mr. Milton's Nikola stock in the period prior to the merger?

MR. ROOS:  So I think VectoIQ is valuing, my colleague just mentioned, the stock at $10 as part of the PIPE transaction, so the same would apply here.  This is really simple math.  It's taking his then existing shares, multiplying by the event price and saying, if these things could be traded, if he could sell any of these, if he sold these, this is what the then present value of VectoIQ, which becomes Nikola, was.

MR. BONDI:  But, your Honor, he couldn't.  And his Nikola shares were valued through Lone Peak.  It's attached to GX-283.  So the government has the valuations of what Mr. Milton's actual Nikola shares were valued at, private shares were valued at.  They don't need to make some fiction here, well, what if he had Nikola, VectoIQ, and what if.

THE COURT:  What is the value?  It's an exhibit that's in evidence?

MR. BONDI:  It's an exhibit, Government Exhibit 283.

MR. ROOS:  The exhibit shows that the valuation coupled with the multiplier with VectoIQ is the same as the starting stock price here.

THE COURT:  I'm sorry?

MR. ROOS:  So basically, they value his private shares at $10 a share, which is how the PIPE value the transactions.

MR. BONDI:  No, your Honor.  That's not right.  Again, he never owned VectoIQ shares.

THE COURT:  Can you stop for a second, because I'm trying to figure out what was just said.  So there is a Government Exhibit in evidence that contains the valuation of Mr. Milton's shares in Nikola prior to the merger.

MR. PODOLSKY:  Here's my understanding, your Honor, and I don't think that particular government exhibit that was referenced a moment ago is in evidence.  My understanding, in order to make this merger work, you need to take the Nikola legacy shares and convert them into VectoIQ shares for the merger.  And so, what they did is, the PIPE investors, and they had outside firms and so on, tried to value the Nikola shares when they were privately owned.  They then converted them using a conversion rate into VectoIQ shares at the time of the merger.  That's how they --

M9TCmil1

Let me back up.  All SPACs start out being valued at $10 a share.  That's just the process.  So what they have to do is they have to take the legacy company, the private company and convert the value of their privately owned shares to match the publicly traded shares so that they sync up at merger.

What this chart does is it simply does that conversion for the jury.  It's basically saying we're taking the value of Trevor Milton's shares during this period and we're just converting them, we're using the publicly traded shares as the metric.  That's all it does.

MR. BONDI:  Your Honor, a couple of reactions to that, your Honor, is taking a hypothetical situation, first of all, is misleading.  Second of all, no expert would ever value that like that.  So they're trying to get through a summary chart which no expert would say is reality.

We said, if the agent is not testifying as to these amounts, why put them on the chart?  Take them off the chart.  Those two amounts, $1 million and 2.7, they can just remove.  There's no reason to put them on the chart.

THE COURT:  I take the point that Mr. Milton never owned VectoIQ stock, and to that extent, the chart is misleading, but the fact that Mr. Milton's holding in Nikola were valued is prior to the merger and valued at different prices at various points in time is something that I think can go before the jury.  So I think you can use the chart, maybe

M9TCmil1

just change the attribution of the ownership of VectoIQ.

MR. MUKASEY:  Judge, I'm sorry.  I want to throw something in so I think we're all playing on the same field.

Mr. Milton's private Nikola stock before the merger was valued by a company called Lone Peak.  They do independent valuations of privately held stock.  That valuation, which I don't think was at $10, is referred to in a Government Exhibit, in a filing.  The actual valuation document is not in evidence, but it's referred to by a document in evidence.  The $10 — Mr. Podolsky is right — was a number that people agreed upon as the par value for when VectoIQ and Nikola merged and went public.

The valuation of Mr. Milton's shares does not equal $10, it equals this independent valuation assessment by this company called Lone Peak.  So to say that because the par value of the SPAC stock was $10 means that Mr. Milton's stock was worth $10 times the amount of shares is misleading.

THE COURT:  What was the valuation?

MR. MUKASEY:  I'm not smart enough at math to answer that.  We can look it up in the independent valuation document, which, as I say, is not in evidence, but does inform our objection.

MR. PODOLSKY:  Your Honor, two comments.  I think the reason the parties are having trouble with the numbers of the independent valuation is you then have to -- there is a

conversion rate between legacy shares.  So it's not as simple as saying they're valued at X dollars per share in Nikola legacy.  You then have to convert it to be -- there is like a 1.901 conversion rate when they switched it to VectoIQ shares.

Let me step back and talk about what's on this chart, what the chart actually is and why it's accurate.

What the chart depicts is the number of shares in Nikola that Mr. Milton owned and multiplied by the trading value of the company, which, at one point, was called VectoIQ and later became Nikola.  Now, it is true, the defense is right, we're not arguing that Mr. Milton owned VectoIQ shares before the merger, but here's why this is a useful summary chart for the defense.  The government has made the case --

THE COURT:  Useful summary chart for the defense?

MR. PODOLSKY:  Excuse me.  For the jury.  Thank you, your Honor.

The government has put forth, I think, quite a bit of evidence that Mr. Milton's scheme began before the merger was actually consummated and closed on July 3rd, that Mr. Milton was already going on and inflating the value of Nikola's stock and that Mr. Milton did this with the intent to raise VectoIQ's stock price, which he knew would automatically convert into Nikola.

So, in order to show the jury the way that his statements and so on changed the value of the stock price,

going all the way back to March 3rd, the government wants to present evidence of what that stock price was when Mr. Milton was making the statements going back to March 3rd.

What this chart does is simply compiles information that the government could otherwise argue to the jury that here was the stock price of VectoIQ starting at March 3rd and here's how it changed over time.  If you multiply it by the number of shares Mr. Milton owned, you can come up with an implied value of what Mr. Milton would see as his net worth of the company.

Now, we can do that by putting before the jury reams of data or we can do it in a summary chart that the jury can understand.

THE COURT:  But I guess the point is that this chart says that Mr. Milton owned VectoIQ shares from March through June.

MR. PODOLSKY:  I think if the real issue here is that the title or the language on the chart might imply that, we can certainly put "implied value" or "assumed value" or something like that on that portion of the chart.

THE COURT:  I think that would address the concern that I have, as it's been raised by the defense because, obviously, the transaction was put in place no later than March 3rd, and according to the government's theory, Mr. Milton was very active in promoting both the transaction and the company during that period of time and he had the ability to

see what the value of his holdings would be once the transaction was consummated.  So I think that so long that it's labeled in that way, it would be an appropriate chart to put before the jury.

MR. PODOLSKY:  I think my colleague is trying to make the changes right now.

MR. BONDI:  Your Honor, respectfully, I just would like to correct something for the record, if I may.

The proposed merger was announced March 3rd.  The merger documents had 24 conditions that had to be met, including approval by both VectoIQ shareholders and Nikola shareholders.

MR. MUKASEY:  Russell said it wasn't a done deal.

MR. BONDI:  As Mark Russell, the CEO, said, it wasn't a done deal.  There were a lot of conditions that had to be met.  Your Honor, if we look at the news today, we saw Elon Musk's Twitter deal fell apart here.  Deals and mergers fall apart all the time here.  It was not a done deal until June 3rd here.

Moreover, what's misleading here is the reason why the value went up as we get closer to the deal being consummated, it's what's known in the law as merger arbitrage.  It's because as closer you get to it looking like it reaching the finish line, the value goes up.  That's not anything that Mr. Milton did, and the chart here is to suggest here that somehow he

pumped that up here, and that's not the case.

Moreover, valuation has always been a realm of expert testimony here.  What is a backdoor here, its Mr. Podolsky and Mr. Roos' idea of what valuation could be.  They would never get an expert to say those were the values of his holdings because, number 1, they didn't exist --

THE COURT:  I'm sorry to cut you off, Mr. Bondi.  I get all that.  So long as it is expressed as an assumption, so long as the argument is Mr. Milton was well aware of the proposed transaction, it was something that he wanted to see to completion, it was very important for him and his company, and he was also very aware of what his Nikola holdings would be during this period of time and, therefore, it's something that he put himself to attempt to make come to fruition, then I think it would be fine so long as it is properly labeled as he understood that if the transaction were to be consummated today, for example, whatever that day is, May 12, his holdings would be worth $2.7 million.

MR. MUKASEY:  Where is that in the record?  Where is it in the record that he understood the value of anything at any point in time?

THE COURT:  I think it's a fair inference from all of the evidence that he knew what his Nikola holdings were, he knew that the SPAC was priced at $10 per share, and we don't need an expert to multiple number of shares times 10.

M9TCmil1

MR. MUKASEY:  Again, I think that's an oversimplification because not all shares are created equal, not every share is worth $10.  He had numerous business entities that held shares at different values at different times.  To say that every share that he owned was valued at $10 and you just multiple the number of shares that he owned, and you come up with the valuation --

THE COURT:  I'm sorry.  Let me stop you again because we're getting close to 9:30.

My understanding through this entire trial is that every share of the SPAC was worth $10.

MR. PODOLSKY:  At the beginning, obviously the price went up during this time period and all we've done is taken the number of shares listed in the public filings that Mr. Milton owned when it went public, and this chart accurately multiples those by the trading value of the stock.

THE COURT:  So again, when you come up with the appropriate changes to the chart, I think we can place it before the jury.  We have two minutes.

MR. BONDI:  Government Exhibit 1013, if you remember, your Honor, yesterday at sidebar, you made a comment, and I don't want to misquote you, but it's something to the effect that it's irrelevant how Mr. Milton spent his money.  1013 is exactly what the government is trying to suggest is relevant that is not relevant.  And this is a series of charts.  There

are a number of problems with this.

Number 1 is, Mr. Russell testified that the $70 million that Mr. Milton made here, prior to Nikola going public, has nothing to do with the allegations in this case. There's no allegations of misconduct relating to the $70 million.

THE COURT:  I don't think the government is making that argument.  Again, let me sort of cut to the chase on this. I said what I said at sidebar.  I think that the defense is taking it a little bit out of context and stretching it beyond what I meant to relay.  Prior to the trial, in a motion *in limine*, I said that the government could put in evidence of purchases by Mr. Milton during the relevant time period.  The comment that I made related to a similar motion *in limine* where I think I ruled that Mr. Milton could not put in evidence of good acts.  So, for example, if he spent $1 million, you know, gave it to the ASPCA, whether he gave stock to his employees, that is not relevant.  So if that's the objection, the objection is overruled.

We got to get the jury out.  Do we have the witness?

(Continued on next page)

M9TCmil1                        P. Hicks - Direct

                (Jury present)

                THE COURT:  Please be seated.

                Ladies and gentlemen of the jury, good morning.  Thank you, as always, for being prompt.  We will now continue with the direct examination of Mr. Hicks.

                Mr. Hicks, you are reminded that you are still under oath.

                THE WITNESS:  Yes.

                MR. PODOLSKY:  May I proceed, your Honor?

                THE COURT:  Mr. Podolsky.

                MR. PODOLSKY:  Thank you.

 PETER HICKS, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. PODOLSKY:

Q.  Good morning, Mr. Hicks.

A.  Good morning.

Q.  Do you recall that when we left off yesterday, we had just finished discussing the closing of the sale of Wasatch Creeks Ranch to Mr. Milton?

A.  Yes.

Q.  I want to pick up and talk about what happened after the sale closed in August.  Okay?

A.  Yes.

Q.  Did there come a time thereafter when the price of Nikola stock dropped?

M9TCmil1                         P. Hicks - Direct

A.   Yes.

Q.   Approximately, when did that happen?

A.   Within a month of the closing.

Q.   Do you recall what event it was around, from your observation?

A.   I'm sorry.  What event?

Q.   Yes.

A.   Yes.  There was a large investment firm that had done extensive research on Nikola, and specifically Mr. Milton, and they disclosed and went into the press, a large study indicating that --

          MS. YOUNG:  Objection.

          THE COURT:  Overruled.

A.   -- that Mr. Milton had engaged in an extensive --

          MR. MUKASEY:  Objection, Judge.  There is a stipulation that covers this.

          THE COURT:  Let's talk at sidebar then.

          (Continued on next page)

(At the sidebar)

MR. MUKASEY:  There's a stipulation between the parties so that witnesses don't go off and describe what's in the Hindenburg report in a way that is prejudicial to us and that the government agrees shouldn't come in.  If he wants to say there was a report that alleged misstatements, I think that's out there already, otherwise they should just read the stip.  Letting him freelance on the Hindenburg report is really not what we negotiated.

MR. PODOLSKY:  I just asked the question so he could explain, from his perspective and his mind, what happened next. That's all the question is.

THE COURT:  But what Mr. Mukasey said is accurate?

MR. PODOLSKY:  Yes.  I'm not trying to elicit the underlying facts of the Hindenburg.

THE COURT:  So lead him.

MR. PODOLSKY:  Okay.

(Continued on next page)

(In open court)

BY MR. PODOLSKY:

Q.   Thank you, Mr. Hicks.  I'm going to ask some specific questions on this part.

Did it come to your attention in or about September 2020 that a report had been published online alleging misrepresentations by Mr. Milton?

A.   Yes.

Q.   And was it your observation that, after the publishing of that report online, Nikola's stock price began to drop?

A.   Yes.

Q.   Now, at that time, did you know whether or not anything Mr. Milton had told you on your call was false?

A.   No.

Q.   Did you reach out to Mr. Milton in the time period after that report and the stock price had begun to fall and why did you reach out to Mr. Milton at that time?

A.   Because the drop in the stock price and the reports all suggested that the stock would continue to drop.

Q.   And why did that cause you to reach out to Mr. Milton?

A.   I was concerned that the events indicated that my stock options would be -- the value of my stock options would be in peril.

Q.   What did you want Mr. Milton to do about that?

A.   What I suggested to him initially was the idea -- or some

point early on, I suggested to him the idea that he buy out my stock options.

Q. Did you have a number of communications with him during the fall of 2020?

A. I did.

Q. I'm going to show you a few of those.

MR. PODOLSKY: Let's go, for Mr. Hicks, Government Exhibit 1423.

Q. Mr. Hicks, do you recognize this email or this exhibit?

A. Yes.

Q. And does this exhibit contain an email exchange between you and Mr. Milton?

A. Yes.

MR. PODOLSKY: Your Honor, the government offers Government Exhibit 1423.

MS. YOUNG: No objection.

THE COURT: It will be received.

(Government's Exhibit 1423 received in evidence)

MR. PODOLSKY: May we publish?

THE COURT: You may.

MR. PODOLSKY: So now that we are looking at this email, why don't we blow up the lower email in the chain, starting below "Original message."

Q. Mr. Hicks, do you see that this contains actually an email from Mr. Milton to you?

A.  Yes.

Q.  And do you see Mr. Milton wrote, Peter, I can't do anything as of now due to the fact we are in communication with the SEC. Well, I can't get into detail.  I can tell you that we have not done anything wrong.

Do you see that?

A.  I do.

Q.  Had you reached out to Mr. Milton prior to this email?

A.  Yes.

Q.  And had you asked him about the stock options and report that had been published online?

A.  I believe I referred to it, yes.

Q.  And do you see Mr. Milton responds, thanks for the update. I extend to you best wishes and have confidence in a successful end to this chapter and an exciting future.

Do you see that?

A.  No.  Where am I looking?

Q.  Do you see the top portion?

A.  Oh, yes.

Q.  Now he says, look forward to reconnecting at a future date.

Do you see that?

A.  I do.

Q.  Did you continue to communicate with Mr. Milton after this email about the stock options?

A.  I did.

M9TCmil1                        P. Hicks - Direct

Q.   Why did you do that?

A.   I wanted to find a way or a possibility that there was a way to better assure that those stock options would have some value.

MR. PODOLSKY:   Now, let's show Mr. Hicks what's been marked as Government Exhibit 1413.

Q.   Mr. Hicks, do you recognize this document?

A.   Yes.

Q.   What type of document is it?

A.   It's an email from Mr. Milton to me.

Q.   Does it contain below additional email communications?

A.   It does.

MR. PODOLSKY:   Your Honor, the government offers Government Exhibit 1413.

MS. YOUNG:   No objection.

THE COURT:   It will be received.

(Government's Exhibit 1413 received in evidence)

MR. PODOLSKY:   May we publish?

THE COURT:   You may.

MR. PODOLSKY:   Ms. Wolfson, if you could take us to the first email on this chain, which I think is on the very last page.   If we could blow that up.

Q.   Who wrote this email, Mr. Hicks, that's on your screen right now?

A.   Myself.

Q.   And when did you write this email?

A.   December 29, 2020.

Q.   So just some contextual questions here.

Was December 29, 2020 during the period in which you were able to exercise the options?

A.   Correct.

Q.   And at this time, December 29th, 2020, did the options have any value?

A.   No.

Q.   Why not?

A.   Because during the month of December, the options -- the price of the stock was approximately a little bit below or above the strike price of the options themselves.

Q.   And so, can you just explain why does that mean that the options don't have value?

A.   Well, for instance, if the strike price was $16.50, I believe, and the stock was trading at $16.50, I'm getting back the same value that I paid.  There's no incremental profit or value to it.  I'm just going to the stock market and buying at the same price.

Q.   So you would have to buy those shares at $16.50 and sell them at the same price; is that right?

A.   In that hypothetical, yes.

Q.   And were there times during December that, actually, the stock price of Nikola was below the strike price?

M9TCmil1                      P. Hicks - Direct

A.  Yes.

Q.  Were there also times in December when the stock price of Nikola was slightly above the strike price?

A.  Yes.

Q.  Did that mean the options were valuable to you?

A.  No.

Q.  Why not?

A.  Because the slight increment that existed was so small, given the amount of money one would have to pay, which was 8 million bucks, and the stock was so volatile, that by the time you could effect the transaction, the stock could well have dropped three bucks and I could have lost a million and a half dollars.

Q.  By the way, one other question about that.  Are you familiar with the term "transaction cost"?

A.  I think I know what it means.

Q.  What do you think it means?

A.  I think it means that -- well, for instance, in this case, you don't just buy and sell.  You have not only to pay your attorneys to pay for it over, but you have to pay various entities and, my case, Wells Fargo, a certain amount of money to check out the stocks that are being transmitted, making sure that they're real, that you're not getting fake paper and all those other things that I know nothing about.

Q.  So there are other additional costs you have to pay if you

were to exercise the options?

A.  Yes.

Q.  So looking at this email, do you see that you wrote,
Trevor, I'm reaching out with regard to the options to inquire
whether we could agree to extend the exercise period for a few
weeks to the end of January 2021?

     Do you see that?

A.  Yes.

Q.  Why did you ask to extend the exercise period?

A.  Why did I ask to extend it?

Q.  Why, yes.

A.  I was hoping for an amiable resolution and I thought if we
extended it out another 30 days that perhaps the stock would
get in the money and it would make some value out of it.

Q.  And then you wrote, as you know, the stock has not
performed as was anticipated and discussed in your meetings.

     Do you see that?

A.  Yes.

Q.  When you talked about "discussed in our meetings," what
were you referring to?

A.  Predominantly, the April 10 conversation.

Q.  The phonecall that we listened to yesterday?

A.  Yes.

Q.  And you wrote, before we decide on other courses of action,
we thought that extending the option exercise period to provide

M9TCmil1                         P. Hicks - Direct

an opportunity for the stock to recover made sense.  And then

you write, please let me know as soon as practical.

Do you see that?

A.   I do.

Q.   What did you mean by other courses of action?

A.   Civil lawsuit.

Q.   And so does that mean the possibility of suing Mr. Milton

regarding the loss value?

A.   Correct.

Q.   Couple questions about a potential lawsuit.

First, are you familiar with the term "discovery"?

A.   I am.

Q.   What is that?

A.   Discovery, at least in a civil lawsuit, means that both

parties have ample opportunity prior to the actual trial to

subpoena documents from the other side and to interview, under

oath, potential witnesses from the other side.

Q.   So at this time, December 29th, 2020, did you know whether

or not Mr. Milton had lied to you during that April 10th call?

A.   I did not.

Q.   If you had sued Mr. Milton, might you have received

information during discovery relevant to that question?

MS. YOUNG:  Objection.  Speculative.

THE COURT:  Overruled.

A.   Yes.

Q.   Now, would a lawsuit, if filed, have been public?

A.   I'm sorry?

Q.   Would a lawsuit, if you had filed it, been a public action?

         MS. YOUNG:  Objection.

         THE COURT:  Overruled.

A.   Yes.

         MR. PODOLSKY:  We'll come back to that in a few minutes.

         Let's look at the top of page 3 in this document.

Q.   So before we read this, we won't go through every part of this exchange, but did you continue to have a discussion with Mr. Milton about possible ways to resolve any dispute, short of a lawsuit?

A.   Yes.

         MR. PODOLSKY:  If you don't mind, let's blow it up here on the screen, the top of page 3 of Government Exhibit 1413.

Q.   Do you see there's an email sent Wednesday, December 30th, 2020?

A.   Yes.

Q.   At 12:35 p.m.?

A.   Yes.

Q.   Who wrote that email?

A.   Mr. Milton.

Q.   Do you see he starts, "Peter, as stated on the call..."

Do you see that?

A.  I do.

Q.  Were you having phone calls with Mr. Milton at this time, as well?

A.  I believe I was.

Q.  He wrote, I'm okay to discount the offset price to 25 percent from current market value rather than a complicated 25 percent upside we had discussed.  It would need to be completed before the new year.  This will allow me to include it in a single form 4 that I have to report.

Do you see that?

A.  I do.

Q.  Were you discussing different types of ways to settle this dispute or issue that you would raise?

A.  Say that again.

Q.  Were you discussing different ways in which to settle or resolve the dispute that you had?

A.  Yes.

Q.  Did you understand that what's described here would be a way to provide compensation to you?

A.  Yes.

Q.  Now, were you able to resolve this at this time, December 2020?

A.  No.

Q.  Did you file a lawsuit at that time?

A.  No.

Q.  Why not?

A.  I did not know whether any or all of his representations were accurate or inaccurate.  We were also, on and off, engaged in further discussions.

Q.  Did those discussions resume at some point after December 2020?

A.  They did.

Q.  Did you ultimately reach some arrangement for Mr. Milton to provide some compensation?

A.  Yes.

Q.  Can you describe the nature of that compensation?

A.  Yes.  I had the -- it was contracted that I had the ability to buy some stock from him at a discount.

Q.  So were the options off the table at that point?

A.  The options under the contract?

Q.  Yes.

A.  Had expired at the end of December.

Q.  So explain what you mean by you had an arrangement to purchase additional stock, can you describe what the nature of that agreement was?

A.  Yes.  The ultimate contract enclosed involved me buying -- I believe it was $10 million of stock for $8 million, and the idea was it was going to be at a 20-percent discount.

Q.  Discount from what?

A.   From the value -- face value of the stock at a set time, which was a floating number until we got at or near the close.

Q.   So I want to break that down, make sure I understand it.

But first, approximately, when did this happen?

A.   I believe it was early February of 2021 -- no.  Early March, I believe, of 2021.

Q.   So you mentioned purchasing $10 million worth of stock. Was that Nikola stock?

A.   Yes.

Q.   From whom?

A.   Mr. Milton.

Q.   And you said that you would -- I believe you just testified it would be at a 20-percent discount; is that right?

A.   Correct.

Q.   Is that from the market, the current traded market value of the stock?

A.   Yeah, whatever date that market was defined.  I don't recall exactly what day it was.

Q.   So what was the idea, what would you do once you purchased $10 million of stock for $8 million?

A.   Well, that was up to me.  I didn't want to own the stock, so my intent was to sell it as soon as it was cleared for me to sell it.

Q.   And so, under that arrangement, what would the compensation, the sort of net compensation be under this

arrangement?

A.   Well, I vaguely remember it took maybe two business days to clear.  At the time that the stock came in, it had to be cleared by Wells Fargo, and I believe that took -- I was nervous.  That took till 10 o'clock in the morning, I believe, that I was able to actually sell the stock, and then I sold all of it within a couple of hours.

Q.   Let me come back to what actually happened at the end of that deal.  Let's look at some documents to make it concrete.

          MR. PODOLSKY:  If we can pull up for Mr. Hicks what's been marked as Government Exhibit 1424.

Q.   Mr. Hicks, do you recognize this document?

A.   Yes, I do.

          MR. PODOLSKY:  If you could just give me one moment.

Q.   What type of document is this?

A.   Well, it's an email, which is a cover, for an attached stock purchase agreement, which is the agreement between the parties on this stock transaction.

          MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1424.

          MS. YOUNG:  No objection.

          THE COURT:  It will be received.

          (Government's Exhibit 1424 received in evidence)

          MR. PODOLSKY:  May we publish?

          THE COURT:  You may.

M9TCmil1                         P. Hicks - Direct

MR. PODOLSKY:  So just blowing up the header here for.

Mr. Hicks.

Q.  Mr. Hicks, do you see the subject of this email is Re:

Milton transaction?

A.  Yes.

Q.  Do you see the top email on the chain is from Trevor

Milton?

A.  Yes.

Q.  Do you see it says to Christopher Robertson?

A.  Yes.

Q.  Who's that?

A.  My attorney.

Q.  And do you see carbon copy to Kimberly Petillo-Decossard,

do you see that?

A.  Yes.

Q.  Do you know who that was?

A.  Mr. Milton's attorney.

Q.  Do you see her name there, as well?

A.  I do.

MR. PODOLSKY:  Before we look at this email, just pull

up quickly Government Exhibit S7.

Your Honor, I'm just going to read from a portion of

this stipulation.

THE COURT:  Very well.

MR. PODOLSKY:  The stipulation, which is stipulation

regarding certain electronic communications, begins:  It is hereby stipulated and agreed.  And then moving down to paragraph 1 reads, Government Exhibit 1424 contains records of electronic communications that were sent and received by an attorney located in Orange County, New York.

Your Honor, at this time, we do offer Government Exhibit S7 into evidence.

MS. YOUNG:  No objection.

THE COURT:  S7 will be received.

(Government's Exhibit S7 received in evidence)

MR. PODOLSKY:  If we could go back to Government Exhibit 1424.

Q.  Mr. Hicks, physically, where were you when you were receiving these emails and reading these emails?

A.  Massachusetts.

MR. PODOLSKY:  Let's go to the attachment, which I believe is page 7 of the exhibit.  If we could blow up from "amended and restated" and then the top paragraph, A.

Q.  What is this, Mr. Hicks?

A.  This is the stock purchase agreement between the parties.

Q.  Do you see the date?  It's dated March 2nd, 2021.

A.  I do.

Q.  Did you understand that the purpose of this agreement was to provide some compensation to you from Mr. Milton?

A.  Yes.

Q.   And do you see that, it says next to purchase and sale, the undersigned hereby electrics to purchase 483,425 shares of Nikola, and then continues, from sellers at a price of $14.48 per share for total purchase price of $7 million.

Do you see that?

A.   I do.

Q.   That $14.48, was that below the currently trading value of Nikola stock?

A.   I believe, yes.

Q.   Did you ultimately purchase these shares from Mr. Milton?

A.   I did.

Q.   Did you have to borrow any money to do that?

MS. YOUNG:  Objection.  Leading.

THE COURT:  Sustained.

Q.   Mr. Hicks, did you have the funds to purchase all these shares at once?

A.   I was short $3 million.

Q.   Did you borrow that money?

A.   I did.

Q.   And did you sell these shares after you purchased them from Mr. Milton?

MS. YOUNG:  Objection.  Leading.

THE COURT:  Sustained.

Q.   What did you do with these shares after you purchased them from Mr. Milton?

M9TCmil1                         P. Hicks - Direct

A.  I sold them.

Q.  And how much money did you make?

A.  Approximately, I netted approximately $1.6 million.

Q.  Now, did you hold off on filing a lawsuit at this time?

A.  I did.

Q.  Why is that?

A.  Because I still did not know whether the representations made by Mr. Milton were accurate or inaccurate.

Q.  And did this payment from Mr. Milton impact that decision, as well?

          MS. YOUNG:  Objection.  Leading.

          THE COURT:  Could we talk at sidebar.

          (Continued on next page)

(At the sidebar)

THE COURT:  So, you've objected on leading grounds a number of times.

MS. YOUNG:  Yes, your Honor.

THE COURT:  Many times, it's close and I overrule it because the information that's being requested is going to be perfectly admissible information and if you object and he asks two questions to get at the same thing.  I've sustained the last couple because I take it Mr. Hicks is the only witness who's going to be testifying concerning the account for, and I know this lengthy sidebar is going against what I'm about to say, but I have a sense of when a question is getting close to the bone and will sustain it, but if there are going to be issues that are non-controverted, noncontroversial, I'm going to give both sides leeway with respect to those types of questions.

MR. MUKASEY:  Allow me to take the bullet on this.  She has more discretion, like you wanted to be exercised, and it's me saying that's leading, that's leading, that's leading.

THE COURT:  I see that.

MR. MUKASEY:  I take the bullet on that.

MR. PODOLSKY:  Just for the record, I realize some of these questions get closer to leading.  These matters are complicated to talk about, stock options, and the way these deals work, I'm trying to get through it in an efficient way.

M9TCmil1                    P. Hicks – Direct

THE COURT:  I completely understand, but Mr. Hicks appears to be a fairly sophisticated guy.

MR. PODOLSKY:  Understood.

(Continued on next page)

Q.   All right.  Returning to the deal here, Mr. Hicks -- I'll just give the court reporter a moment.

What role, if any, did this payment that we've been looking at in Government Exhibit 1424 play into your decision of whether to file a lawsuit at this time?

A.   It didn't.

Q.   Let me come back to that in a moment.  Let's look at the last page of this exhibit.

Do you see -- if we could blow this up for Mr. Hicks.

Mr. Hicks, do you see that this says "Firm, Wells Fargo Advisors, account name"?

A.   Yes.

Q.   What role did Wells Fargo Advisors have in this transaction?

A.   They handle all the logistics on my behalf, including taking in the stock and disposing of the stock.

Q.   So what type of account is this account name here?

A.   I think it's my investment account.

Q.   Based on the last question that you just answered, does this relate to the receipt of stock?

A.   It does.

Q.   So who received the stock that you obtained from Mr. Milton?

A.   Well, my agent, Wells Fargo.

Q.   And physically, where was that agent located?

A.   Well, White Plains.

Q.   Of what state is that?

A.   New York.

Q.   Now, coming back to the purpose of these payments or these transactions, did you discuss additional potential transactions like this with Mr. Milton?

A.   I did.

Q.   Why?

A.   Well, he had initially offered me $30 million worth of stock, but I didn't have that kind of money, and so that led to a discussion of could this be done in sequence, in installments, if you will.

Q.   So was this what we just went over, to your understanding at the time, the total transaction or one installment?

A.   This is the only one that ever happened.

Q.   Did you understand that there might be more?

A.   I understood initially there may be discussions about more.

Q.   And what did you understand these offers were in response to?  Why were you receiving the offers of these kinds of transactions, from your perspective?

A.   I inferred that he was trying to find a way to compensate me and, therefore, avoid a lawsuit.

Q.   Let's look at one more document on this, Government Exhibit 1425.

        Mr. Hicks, do you recognize this document?

A.   Well, yes, it's an email from Mr. Milton's attorney.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1425.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1425 received in evidence)

MR. PODOLSKY:  All right.  Now that it's up, OK, if we blow up the top email, please.

BY MR. PODOLSKY:

Q.   All right.  Do you see this, the top of the chain is an email exchange with the same individuals we looked at a moment ago in Government Exhibit 1424?

A.   Yes.

Q.   Do you see the top email references or states:  "I understand the 7 million was wired and just received by Trevor"?  Do you see that?

A.   I do.

Q.   What is that a reference to?

A.   Money that I sent for purchase of the stock.

MR. PODOLSKY:  Now let's look at the email below that on this page.  If we could blow up the second email on this page.  Thank you.

Q.   Do you see this is an email from Christopher Robertson?

A.   I do.

Q.   Who is that again?

A.   My attorney.

Q.   Do you see he wrote:  "Kimberly, attached is the fully executed agreement.  We will advise when the wires are sent so that they may be confirmed on Trevor end.  Also, the contact at Wells Fargo for the Hicks account is Robert Heinemann.  Contact information below"?

Do you see that?

A.   I do.

Q.   Who's Robert Heinemann?

A.   He's now deceased.  He was my stockbroker.

Q.   If we go to the top of the next page, is that Mr. Heinemann's contact information?

A.   It is.

Q.   Do you see where it says "Purchase, New York"?

A.   I do.

Q.   Is that where your Wells Fargo account was located?

A.   Yes.

Q.   Where were you when you were sending and receiving the emails we're discussing?

A.   Massachusetts.

MR. PODOLSKY:  If we could just pull back up Government Exhibit S-7, and I'll just read into the record that, in paragraph 2:

Government Exhibit 1425 contains records of electronic communications that were sent and received by an attorney

located in Orange County, New York.

All right.  We can take that down.  And I just want to go back to the discussion about additional potential payments. If you go to Government Exhibit 1417 for Mr. Hicks, please.

Q.  Mr. Hicks, do you recognize this document?

A.  I do.

Q.  Is this an email exchange?

A.  It is.

MR. PODOLSKY:  Your Honor, the government offers Government Exhibit 1417.

MS. YOUNG:  No objection.

THE COURT:  It will be received.

(Government's Exhibit 1417 received in evidence)

MR. PODOLSKY:  May we publish?

THE COURT:  You may.

MR. PODOLSKY:  If we could blow up the first email in the chain, that is the bottom email sent at 9:34 a.m.  Thank you.

BY MR. PODOLSKY:

Q.  Mr. Hicks, do you see that this email was sent on May 7, 2021, at 9:34 a.m.?

A.  I do.

Q.  Who sent it?

A.  Me.

Q.  I want to focus our attention on the second paragraph.

Could you read what you wrote there.

A.  "Wanted to return to our mutual goal of doing more transactions like early March.  We talked about at least three more.  As I recall, the attorneys clearly thought we could continue, provided we did not contractually commit to such and we waited a while.  I recall there was discussion that the passage of four months might prove timely for the next round. That would translate to a little less than two months from now."

Q.  What was the reference to transactions and at least three more here?

A.  Well, the first transaction turned out to be $8 million. He had originally suggested up to 30.  We had had a discussion, well, maybe we can do this in segments.  But there was no commitment, nothing more than the thought.  And so about halfway through four months, I thought I'd send him a tickler to see where he was at.

Q.  Were there any more transactions of this type?

A.  No.

        MR. PODOLSKY:  We can take that down.

Q.  Did there eventually come a time where you filed a lawsuit against Mr. Milton?

A.  Yes.

Q.  Approximately when was that?

A.  The winter of this year, I believe.

Q.  Why did you do that?

A.  I first wanted to exhaust any possibility of a friendly settlement and that failed, and so that's when I filed.

Q.  Is that lawsuit currently pending?

A.  It is.

Q.  What was the demand on that lawsuit?

A.  I believe it was $45 million.

Q.  Where does that number come from?

A.  Slightly more than the -- the close price of the stock on the date that Trevor closed, Trevor Milton closed, on the ranch was approximately, I believe, $46 a share.  And compute that through my option price, and the value at the moment of the close was a little over $15 million net.

Q.  So how do you get to 45?

A.  Under Utah fraud law, it's treble damages.  So that's how you get from 15 to 45.

Q.  Do you know whether you'll get any of that money, sitting here today?

A.  No.

Q.  Now, was that lawsuit filed publicly?

A.  Yes.

Q.  Did there come a time after that lawsuit was filed that you spoke to representatives of the government here?

A.  Yes.

Q.  Now, to be clear, did you contact the government or did the

government contact you?

A. Government contacted my attorney.

Q. Did you agree to speak to the government at that time?

A. I did.

Q. Why is that?

A. My obligation.

Q. Now, would you have entered into the deal to sell your ranch in exchange for stock options if Mr. Milton hadn't convinced you to do so on that April 10, 2020 call?

MS. YOUNG: Objection.

THE COURT: Overruled.

A. No.

Q. If it turned out that Nikola did not have the ability to convert 80 percent of its reservations to binding contracts, would that have changed your evaluation of the deal?

A. Could you repeat the question.

Q. Sure. If it turned out -- well, let me take a step back to make sure you understand what I'm asking about.

Do you recall yesterday discussing what Mr. Milton told you about binding or hard reservations?

A. I remember.

Q. If it turned out that Nikola or Mr. Milton did not, in fact, have the ability to convert 80 percent of its reservations to binding contracts, would that have changed your evaluation of the deal for Wastach Creeks Ranch?

A.   Yes.

Q.   And if it turned out -- well, actually, let's just make sure we remind you here.

     Do you recall yesterday listening to portions of the call relating to routes with Anheuser-Busch?

A.   I do.

Q.   If it turned out that Nikola did not already have dedicated routes in place with Anheuser-Busch, would that have changed your evaluation of the deal?

A.   Yes.

Q.   Do you recall yesterday listening to portions of the call regarding Nikola's use of electricity for hydrogen production?

A.   I do.

Q.   If it had -- if it turned out that Nikola did not already have contracts in place for electricity to produce hydrogen, would that have changed your evaluation of the deal that you entered into with Mr. Milton?

A.   Yes.

Q.   If it turned out that Nikola was not producing hydrogen at all at that time, that is, 2020, would that have changed your evaluation of the deal that you engaged in with Mr. Milton?

A.   Yes.

          MR. PODOLSKY:  Just a moment, your Honor.

          No further questions at this time.

          THE COURT:  Very well.  Cross-examination.

CROSS-EXAMINATION

BY MS. YOUNG:

Q.  Mr. Hicks, you're seeking $45 million from Trevor Milton, correct?

A.  Correct.

Q.  Because you filed a lawsuit in Utah, right?

A.  Correct.

Q.  And that lawsuit is seeking $45 million in damages, right?

A.  Correct.

Q.  Now let's back up to 2020.

        March 2020, you bought the Wastach Creeks Ranch for $6.85 million, correct?

A.  Correct.

Q.  And that was an arm's length negotiation, yes?

A.  Correct.

Q.  Negotiated with lawyers, right?

A.  Contract was, yes.

Q.  And then about a week later, you were introduced to Trevor, correct?

A.  He was -- a week later he was identified by a broker, not by name yet.

Q.  And then by August 2020, you closed a land sale with Trevor, correct?

A.  Correct.

Q.  And you received a total of $8.5 million, right?

A.   Less broker's fees which I paid.

Q.   The sales price for the land in August 2020 was for $8.5 million, correct?

A.   The sale price was.  I had to pay half the broker's commission.

Q.   And that was in exchange for the Wastach Creeks Ranch that you had purchased in March of 2020, correct?

A.   Correct.

Q.   Same 4,678 acres, right?

A.   Correct.

Q.   So you paid 6.85 million; Trevor paid 8.5 million, correct?

A.   Correct.

Q.   And that's 1.65 million more within a matter of months, right?

A.   You said "within a matter of months"?

Q.   Yes.

A.   Correct.

Q.   And on top of the cash, the tangible cash that you received for that land, you also had the option to purchase Nikola stock down the road, correct?

A.   Correct.

Q.   And that was the option agreement that you entered into in August, right?  The option to purchase the stock down the road was memorialized in an option agreement, correct?

A.   The modified new one in August, yes.

Q.   And you never exercised the options from that option agreement, correct?

A.   Correct.

Q.   And then in March of 2021, few more months later, right, you actually bought some Nikola stock at a discount from Trevor, yes?

A.   Yes.

Q.   And about a day and a half later from your purchase of stock, you sold that stock, didn't you?

A.   I guess the answer is yes.  When I could actually trade it, I sold it the same day.

Q.   So you purchased the stock, and then a few -- within a matter of days, you sold the stock, right?

A.   Correct.

Q.   And you made approximately $1.6 million from that sale of stock, correct?

A.   Correct.

Q.   So that's $1.65 million from the August land sale and then $1.6 million in March, right?

A.   Yes.

Q.   So, quick math, that's about $3.25 million, correct?

A.   Yes.

Q.   Now, there came a time after you sold the ranch and after you sold the stock when you learned that Trevor Milton was charged with a crime, correct?

A.  Could you repeat the question.

Q.  There came a time after the land deal and after the stock sale that you learned Trevor Milton was charged with a crime, correct?

A.  Correct.

Q.  And it was after that, after you learned that he was charged with a crime, that you filed your lawsuit, correct?

A.  Correct.

Q.  But in between, your lawyers reached out to Trevor Milton, right?

A.  Yes.

Q.  And they made a threat, correct?

A.  I'm sorry?

Q.  They made a threat?

A.  I don't know anything of a threat.

Q.  They threatened litigation, right?

A.  They indicated that there would be litigation if we didn't settle.

Q.  Right.  That's a threat of litigation, right?

A.  I'm not going to characterize it.

Q.  The lawyers were proposing an alternative resolution, right?

A.  My lawyers were.

Q.  And that was for money, correct, for you to receive money?

A.  Technically, I don't know that we ever put anything on the

table, nor did they.

Q.  So you're not aware that your lawyers proposed the possibility of a land transaction to resolve the matter?

A.  Well, I thought you were referring to money.  No, his lawyers suggested that, not mine.

Q.  And your lawyers identified specific parcels of land to be the subject of that transaction, correct?

A.  It was one, one property.

Q.  The Bear Mountain property, is that right?

A.  Correct.  One property, multiple tax ID numbers.

Q.  Right.  There's kind of a north half and a south half of that property, right?

A.  Correct.

Q.  And how much did you pay for that property?

A.  They're two different transactions, so I'm trying to remember each.

Q.  Is there something I could use to refresh your recollection, perhaps?

A.  Sure.  But I think I can do this.

Q.  Perhaps I'll show you a document to refresh your recollection.

A.  I think it's slightly less than $4 million.

Q.  OK.  So you paid slightly less than $4 million for those parcels of land, the north and the half of the Bear Mountain, right?

A.   Right.

Q.   And your lawyers proposed that Trevor buy that land, correct?

A.   Well, again, it wasn't our idea.  It was -- it was Mr. Milton's idea that he buy land for us -- from me in a way to resolve the matter.  And after quite some consideration -- I didn't want to sell any land.  After quite some consideration, I decided to offer this property.

Q.   So you offered this property that you paid $4 million for, correct?

A.   I did.

Q.   And the ask of Mr. Milton was to pay $39 million, right?

A.   It was 37, 39, somewhere in there.

Q.   OK.  So you paid 3 or 4 million, and you asked him to pay 39 million, right?

A.   The idea was his.

Q.   The $39 million was his idea, is that what you're suggesting?

A.   No, the notion that he buy some land from me to resolve the matter.

Q.   The $39 million price was your idea, correct?

A.   That is correct.

Q.   That would have been a pretty good ROI, right?

A.   Yes.

Q.   All right.  Trevor declined that, correct?  He did not

accept the land transaction for $39 million, right?

A.   I think he offered back $4 million.

Q.   And so he declined paying $39 million for that property?

A.   If offering 4 million and no more is a declination, yes.

Q.   And that's when you filed your lawsuit, right, after he said no?

A.   I'm trying to remember the timing.  Yeah, some time -- that was part of the settlement discussions, and when that failed, then soon thereafter I filed a lawsuit.

Q.   OK.  So let's just get the timeline straight, then, because I think it all happens within a year.

In March of 2020, you bought land for $6.85 million, right?

A.   Correct.

Q.   August of 2020, Mr. Milton paid $8 1/2 million for that same parcel of land, right?

A.   Correct.

Q.   And you got the profit from that land transaction, correct?

A.   I got the cash component.  I got no profit out of the stock options.

Q.   We'll get to the stock options in a moment.

For the land cash, you got $1.65 million tangible cash, right, from that land transaction?

A.   You're referring to the net?

Q.   Yes.  8.5 minus 6.85.

A.   If that's the math, and less the broker's fees.

Q.   OK.  Then in March of 2021, you did a stock transaction with Mr. Milton, right?  You purchased stock at a discount, correct?

A.   Correct.

Q.   And from that you made $1.6 million?

A.   Approximately.

Q.   In December you learned he was charged with a crime, right?

A.   If that was the month, yeah.

Q.   And then you asked him for $39 million for land that you paid $3 million for, right?

A.   Following the chronological sequence I depicted earlier, yes.

Q.   He rejected that offer, and then you filed a lawsuit, correct?

A.   Correct.

Q.   And then you agreed to testify in this case, right?

A.   Yes.

Q.   You're a lawyer, right, Mr. Hicks?

A.   Yes.

Q.   So now you are aware, of course, that if the government wins in this case, you are in a better position to win more money, money in the Utah case, right?

A.   I don't know that.

Q.   Do you intend to inform the Utah court regarding the

results of this case?

A.  I haven't given it the slightest thought.  I would have to ask my lawyers what happens.  I haven't practiced law since '84.

Q.  You have a law degree, though, right?

A.  Correct.

Q.  OK.  Now I want to turn your attention to the phone call.

You testified on direct regarding a phone call on or around April 10, 2020, correct?

A.  I did.

Q.  And there were four people on the call?

A.  Yeah.

Q.  You, correct?

A.  Yes.

Q.  Your son, Lucas Hicks, right?

A.  Correct.

Q.  David Anderson, the real estate broker, right?

A.  Correct.

Q.  And Trevor Milton?

A.  Correct.

Q.  And that phone call was recorded, right?

A.  Part of it.

Q.  Yes, we'll get to that.

Part of that phone call was recorded by Lucas Hicks, right?

A.   Correct.

Q.   On his phone, yes?

A.   Correct.

Q.   And he provided that recording to the government, correct?

A.   Correct.

Q.   Now, during that phone call, you were in Massachusetts, right?

A.   Correct.

Q.   And your son was in Massachusetts, yes?

A.   Correct.

Q.   You were in the same room, right?

A.   Correct.

Q.   Was Trevor Milton in the room with you?

A.   No.

Q.   He was in Utah, yes?

A.   I believe.

Q.   And David Anderson also in Utah?

A.   Utah.

Q.   So it was an interstate phone call, right?

A.   Correct.

Q.   And you didn't tell Trevor that Lucas Hicks was recording the call?

A.   I was unaware.

Q.   Lucas Hicks didn't tell Trevor that he was recording the call, right?

A.  Correct.

Q.  At the time of the call, nobody told Trevor he was being recorded, right?

A.  I think that's accurate.

Q.  And no one got a consent beforehand to record the call, right?

A.  I think that's accurate.

Q.  No permission, correct, in advance?

A.  What was that question?

Q.  Instead of consent, any kind of permission or ask or warning?

A.  Not that I'm aware.

Q.  And you say you didn't know it was being recorded, right?

A.  Correct.

Q.  OK.  You're aware that tape recording -- that tape recording was illegal, right?

A.  I don't know enough to answer that question.

Q.  Well, you testified yesterday that your son got a form of protection from the government, correct, for that phone call?

A.  Yes.

Q.  And you know what immunity is, right?

A.  I do.

Q.  So immunity protects a person from prosecution from a crime, correct?

A.  I think that's true.

Q.  And your son was granted immunity by the government, right?

A.  Yes.

Q.  The government has declined to prosecute your son right now, correct?

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  Overruled.

A.  Which government?  I -- I just know he has immunity.  I don't know the consequences beyond that.

Q.  So that he could provide the recording to the government, right?  He was granted immunity and then handed over the recording, correct?

A.  Yes.

Q.  So that you could testify about that recording today, right?

A.  Nothing to do with my intent, so I can't answer that question.

Q.  Well, you testified to that recording yesterday and today, correct?

A.  I did.

Q.  Now, you heard the recording before testifying in this trial, correct?

A.  Yes.

Q.  The government played it for you, right?

A.  Correct.

Q.  You'd seen the transcript of that recording before

testifying?

A.  Yes.

Q.  And neither the transcript nor the recording capture the full beginning to end call with Trevor, right?

A.  Correct.

Q.  Because the call lasted an hour or so, right?

A.  Correct.

Q.  Recording is about half, 30 minutes, right?

A.  Yes.

Q.  So Trevor spoke on the call before the recording started, right?

A.  Yes.

Q.  You spoke on the call before the recording started, right?

A.  Yes.

Q.  Lucas Hicks spoke on the call before the recording started, right?

A.  Yes.

Q.  David Anderson probably spoke on the call before the recording started, right?

A.  Probably just at the beginning.

Q.  And we don't have a complete record of that, correct?

A.  Correct.

Q.  Now let's talk about after the recording was turned off.

Yesterday you testified that the recording was -- I believe the back half of the call, correct, that there was

nothing said after the recording, is that right?

A.   Yes.

          MS. YOUNG:  Chris, if we could please pull up page 37

of GX 1400-T, which is already in evidence, and go to just the

last line.  If we could zoom in on that.

Q.   Now, the transcript cuts off mid-sentence, correct?

A.   Yes.

Q.   So is it your testimony that there was no more conversation

after that recording cut off?

A.   Is that a question?

Q.   Yes.

A.   What's the question?

Q.   You spoke more on the call after the recording was turned

off, correct?

A.   I don't have any recollection of that.

Q.   Could you please read that line.

A.   "There is if he --" blank, blank.  Is that your question?

Q.   Right.  So you spoke more on the call after the recording

was turned off?

A.   Anything after that was pleasantries, nothing substantive.

Q.   We have no record of that, right?

A.   Correct.

Q.   So exactly who said what to whom this jury will never know,

correct?

A.   You mean after "there is if he"?

Q.   And before.  For the entire phone call, there is no
complete record, correct?

A.   There's no complete tape-recorded record, correct.

Q.   All right.  Now let's talk for a moment about what you said
was important to you during that call.  All right?

A.   Uh-huh.

Q.   Isn't it a fact that you knew Mr. Milton was talking about
the business model during at least part of that call?

A.   Partially describing business model, partially describing
alleged facts.

Q.   So Mr. Milton talked to you about the business model during
part of that call, correct?

A.   Yes.

Q.   All right.  And you testified that hydrogen stations were
important to you, right?

A.   Correct.

Q.   And that lease routes were important to you, is that right?

A.   Correct.

Q.   During that call, you did not ask for the timing for
completion for those lease routes, did you?

A.   Correct.

Q.   You did not ask what rates the power would be purchased,
did you?

A.   He informed me.

Q.   You did not ask when those routes would be completed, did

you?

A.  Correct.

Q.  You did not ask how much potential revenue would be associated with those routes, did you?

A.  Gross revenue, again, he indicated the profit margins.

Q.  For any specific route, did you ask timing or revenue?

A.  No.

Q.  But you knew that the company was pre-revenue, right?

A.  Yes.

Q.  And you knew that Nikola had not yet sold any trucks, correct?

A.  Hadn't closed on any sales.

Q.  Why don't we turn to the land transaction now.

That wasn't your first transaction with land, correct?

A.  With Mr. Milton or generally?

Q.  Generally.  That was not your first land transaction?

A.  Oh, not.

Q.  Correct.

A.  Correct.

Q.  Because you're a professional real estate investor, right?

A.  I am.

Q.  Like a real estate mogul, right?

A.  I wouldn't characterize it as such.

Q.  You're an experienced real estate investor?

A.  Yes.

Q.  You've had decades of experience doing land transactions, right?

A.  I -- I'll answer a different way.  I did my first land transaction probably in 1998, something like that, but I didn't do a lot of them.  I didn't do them every year, yearly, or every five years.

Q.  Your first transaction's in 1998.  It's 2020 at the time of this transaction, correct?

A.  Correct.

Q.  And you've done them in the East Coast, right?

A.  No land transactions other than Utah.

Q.  You've done real estate transactions on the East Coast, correct?

A.  Correct.

Q.  And then land transactions in Utah, right?

A.  Correct.

Q.  You have different companies that you do these transactions with, correct?

A.  I'm sorry.  I couldn't hear that.

Q.  Different companies, different LLCs or entities that you do these land transactions with?

A.  Typically, when you buy a piece of land, you do it with a different LLC.  It's just the normal way of doing business. There's a good reason for.

Q.  Sure.  And some of yours were Wastach Hicks LLC, right?

A.  Wastach Hicks LLC was only involved in this particular transaction.

Q.  And actually, before we get to this particular transaction, Wastach Creeks Ranch, I want to direct your attention to Wastach Peaks Ranch.  You know that place, correct?

A.  I do.

Q.  You were one of the owners, right?

A.  I was.

Q.  And it's one of the most spectacularly pristine and private recreational properties in the U.S. right?

A.  Maybe.

Q.  Now, you and your partners put that land up for sale in 2016 for $46 million, right?

A.  Forty-six sounds like the right price.  I'm not sure it was 2016.  You're probably right.

Q.  And in 2018, it was sold, correct?

A.  No, 2019.

Q.  In 2019 it was sold.  For how much?

A.  Well, there's some complicated pieces to it, but somewhere between 36 and 42.

Q.  Million, right, 42 million?

A.  Correct.

Q.  OK.  It won land deal of the year, right?

A.  Some magazine did that to sell issues.

Q.  Safe to say you're an experienced land investor?

A.  Of this type of property, yes.

Q.  And in addition to being an experienced land investor, you also have specialized legal training, right?  You went to law school?

A.  I did.

Q.  OK.  Let me direct your attention to the phone call you had with Trevor.

During that call, Trevor pointed you to the SEC filings, right?

A.  I don't recall that.

MS. YOUNG:  Chris, if we could please play what's been marked as DX 1750-B, which is a clip from GX 1400 which is already in evidence, and maybe bring up 1400-T as well, just to have the transcript along.

(Audio played)

Q.  All right.  You know what an S-4 filing is, right?

A.  Say that again.

Q.  You know what an S-4 filing is, correct?

A.  I do not.

Q.  You know it's a filing with the SEC?

A.  Somebody says they filed something with the SEC, I believe them.

Q.  Your son read it, though, right?

A.  It appears that he did.  I don't know that.

Q.  You know the SEC website is available to the public,

correct?

A.  Truthfully, I know nothing about the SEC and how to access its information.

Q.  Are you aware that your son sent you a link to the SEC, correct, the SEC website?

A.  If he did, I didn't read it.

MS. YOUNG:  OK.  Chris, why don't you play what has been marked as 17 -- DX 1750-A, which is another clip from GX 1400 that's already in evidence.

(Audio played)

Q.  That was Trevor Milton telling you about his colleagues who he learns from, correct?

A.  The colleagues from whom he learned, is that what you said?

Q.  He was describing learning information from those around him, right?

A.  Yes.

MS. YOUNG:  OK.  Let's just finish this out and play what's been marked as DX 1750-C, Chris, please.  That's the final clip from GX 1400 that's already in evidence.

(Audio played)

Q.  There was another reference to the SEC filings in that clip, correct?

A.  You're asking me if there's another one?

Q.  Did you just hear a reference to the SEC in the clip that was just played for you?

A.   I did.

Q.   Yes?

A.   I heard it, yes.

Q.   OK.   Now, the ranch deal for Wastach Creeks Ranch was not made on that April call, correct?   You didn't reach terms for the deal in April, right?

A.   That's correct, yes.

Q.   At that point or either before or after the call, I believe was your testimony yesterday, Trevor had offered $7.5 million for the ranch plus stock, correct?

A.   Correct.

Q.   Now, isn't it a fact that you and your son analyzed the deal and assessed $8.45 million as the amount that you wanted for that land, correct?

A.   We did.   We did an assessment.   We did multiple assessments at multiple price points and multiple variations after --

Q.   And the result of that assessment was $8.45 million, right?

A.   One of the notions was that.   There were others.

Q.   And Trevor paid you $8.5 million, right?

A.   Two months later when the circumstances have changed.

Q.   Within two months of you assessing $8.45 million, Trevor paid you $8.5 million plus the option for stock, correct?

A.   Yeah.

Q.   All right.

A.   Again, I don't think that analysis that you cite was ever

communicated to Trevor.  I might be wrong, but I don't believe so.

Q.  Now, you wanted a deal that was heavier on cash, though, right, from the 7.5 million to the 8.5, correct?

A.  I wanted all cash.

Q.  Because you did not want your profit to depend on the stock option, right?

A.  Correct.

Q.  Now, speaking of stock, you know that stock goes up and stock goes down, right?

A.  Yes.

Q.  No guarantees what the stock price will do on any given day, correct?

A.  Correct.

Q.  There's also no guarantees when you buy an option, right?

A.  Correct.

Q.  And there's no guarantee that you will make a profit when you buy an option, right?

A.  Correct.

Q.  And there's certainly no guarantees when the option cannot be exercised months away, right?

A.  Correct.

Q.  And before you could exercise the option, the option's not really of any value to you?  You can't exercise it at that moment, right?

A.   Well, probably has a value, but I wouldn't know those markets.  You can probably take any option and sell it to a third party, but I don't know anything about that market.

Q.   But the value of the option when you cannot exercise it is not the stock price at that moment, right?

A.   It's -- I guess, yeah.  Repeat the question, please.

Q.   The value of the option when you cannot exercise it is not tied to the stock price, right?

A.   Incorrect.

Q.   It's not the value of the stock price if you can't exercise it at that moment, right?

A.   It may or may not be.  I think there's other market dynamics that would answer that question.

Q.   OK.  You can't strike before the exercise period, correct?

A.   Correct.

Q.   Meaning, you can't purchase the stock for the price that's on the market before the exercise period?

A.   Correct.

Q.   Now, I'd like to direct your attention to the agreements that you entered into with Trevor.

        Chris, if we could please pull up GX 1405, which is already in evidence, and let's go to 589, Bates 589.

        Now, this is the option agreement you entered into with Trevor, right?

A.   I'm not sure I'm on that page.  I'm on page 7, looks like

it might be.  Is that where we are supposed to be?

Q.  Sure.

Chris, if, actually, you could show the first page again just to orient Mr. Hicks.

A.  This looks like the purchase agreement, the option agreement was a separate document.

Q.  Let's go to page 583 of this document.

A.  Okay.

Q.  So that's the option agreement, yes?

A.  Correct.

Q.  Let's now go to page 7 of the option agreement, which is Bates 589.

A.  OK.

Q.  Now, I want to direct your attention to the bottom of the page, section (f), entire agreement:  "This agreement constitutes the entire agreement among the parties and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof."

Is that what that says, correct?

A.  Yes.

MS. YOUNG:  Chris, if we could please turn to page 592 of the agreement.

Q.  And that's your signature on the agreement, right?

A.  Yes.

MS. YOUNG:  OK.  Now, let's also take a look at GX 1424 that's in evidence, and if we could please turn first to page 660.

Q.  This is the stock purchase agreement that you entered into in March 2021, correct?

A.  It appears so, yes.

Q.  All right.  Let's now go to page 661 and look at subsection (f).

Now, purchaser in this instance is you, correct?  You were purchasing the stock, right?

A.  Yep.

Q.  You received and carefully reviewed the public filings of the issuer, which is Trevor, right, with the Securities and Exchange Commission, is that what that says?

A.  Yep.

Q.  And received and carefully reviewed other publicly available information regarding the issuer, right?

A.  Yes.

Q.  And prior to the execution of this agreement, which was executed in March 2021, purchaser has been given access to and has had the opportunity to obtain such other information should the issuer and its advisers deem necessary in connection, right?

A.  Right.

Q.   It goes on:  Purchaser is knowledgeable and experienced with respect to the financial tax and business aspects of the ownership of the shares, right?

A.   Yes.

Q.   And has evaluated the risks and merits of an investment in the shares based exclusively on its own independent review and consultations with such investment, legal, and goes on, right?

A.   Yes.

Q.   And then actually subsection (ii), if you could please read that.  You could please read subsection (ii).

A.   Oh, you want me to read?  I'm sorry?

Q.   Are you seeing on your screen a subsection (ii) that starts "Can bear the economic risk of an investment"?

A.   I do.

Q.   And "can afford to suffer the complete loss thereof," right?

A.   Yes.

Q.   And then subsection (iii), if you could please read out loud subsection (iii).

A.   You want me to read it?

Q.   Yes, Mr. Hicks.

A.   "Has made its own decision" -- excuse me.  "Has made its own decision concerning its investment in the shares without reliance on any representation or warranty or (other than the representations and warranties of sellers expressly set forth

in Section B) or advice from seller."

Q.  Thank you.

        And, Chris, if we could please turn to the next page, 662.

        That's your signature, correct, Mr. Hicks?

A.  It is.

Q.  There is no guarantee that you were going to make a profit when you bought options, correct?

        MR. PODOLSKY:  Objection.  Confusing the record, your Honor.  Happy to approach.

        THE COURT:  Overruled.

        MS. YOUNG:  I can rephrase.

Q.  When you entered the option agreement, there was no guarantee for profit, correct?

A.  I was willing to make take the market risk.  I was not willing to take the fraud risk.

Q.  You were willing to sign an agreement that said no representations besides what was in the agreement, correct?

A.  I believe by Utah law fraud does not get exempted.  Fraud does not get governed by that provision.

        MS. YOUNG:  Your Honor, objection.  Move to strike.

        THE COURT:  Sustained.

        MR. PODOLSKY:  Your Honor, may we approach on that for a moment?

        THE COURT:  Sure.

(At sidebar)

MR. PODOLSKY:  So, your Honor, defense counsel elicited from Mr. Hicks the entire agreement.

THE COURT:  The entire?

MR. PODOLSKY:  Entire agreement provision.

THE COURT:  OK.

MR. PODOLSKY:  That's what she's asking about now. So, first of all, it's not a legal defense to fraud, and we're going to request an instruction to the jury on this in the jury instructions.  We didn't object to it because we understood defense counsel to be asking him (a) just to read the document, and it might be relevant to what's in his mind.  She now asked the same question, which is, in substance, what is your understanding about this, and he gave the answer.  If she can ask him to read the legal document, she can ask him to give his understanding of what it means.

THE COURT:  I believe the question was, you were willing to sign a document that said.

MS. YOUNG:  Correct.  And we could read it back, if necessary.

MR. PODOLSKY:  I think he was trying to give an answer which is saying this was my understanding of the document.

THE COURT:  Well, no, the question was, you were willing to sign a document that said, which requires a yes-or-no answer.  Mr. Hicks decided to give his response to

the question, so I thought it was an appropriate request to strike, and something that you can clean up on redirect examination.

MR. PODOLSKY:  That's fine, your Honor.

(Continued on next page)

(In open court; jurors present)

THE COURT:  Ms. Young.

BY MS. YOUNG:

Q.  I believe we left off with there's no guarantee that you will make a profit when you buy an option, correct?

A.  Correct.

Q.  Now, I believe you testified yesterday that you didn't know a lot about options or stock, correct?

A.  That is correct.

Q.  When you entered the agreement, you knew that the options were locked up for several months, though, correct?

A.  Yes.

Q.  And as a guy that didn't know a lot about options, right, I think we should take a look at GX 1413, which is already in evidence.

Let me start at page 2, please, Chris.  And if we could zoom in at the bottom of the page.

M. Hicks, that's your email to Trevor, right?

A.  It is.

Q.  And it says:  "First, the exercise price reflects the low price at which the shares traded in the last week (13.51 per share), which, given the extreme volatility and recent trends in the stock, seems the most reasonable price to use for purposes of" --

THE COURT:  I'm sorry, Ms. Young.

MS. YOUNG:  Sorry.  I'll slow down.

Q.  -- "protecting against substantial downside risk.  I discounted from that number by 25 percent to $10.13.  Second, the signatory on the agreement reflects a series of assignments as contemplated by the 1031 exchange language in the option agreement."

That's what that says, right?

A.  Uh-huh, yes.

Q.  And you wrote that email, correct?  You wrote that email?

A.  I did.

MS. YOUNG:  OK.  Then looking at page 1, Chris, if we could turn to page 1, maybe zoom in on the middle of the page.

Q.  Again, that's your email, correct, Mr. Hicks?

A.  It is.

Q.  And it says:  "Perhaps a better idea.  I would purchase all the stock at 50 percent discount from market and then would give you 50 percent of the net on immediate resale.  Per this idea, you would get 50 percent of the stock value up front, half the remainder net value likely within a week," and it goes on, right?

A.  It does.

Q.  OK.  Now, in your naivete you wrote that email, correct?

A.  I can't respond to that characterization.

Q.  You wrote that email, though, right?

A.  I'm sorry?

M9THMil2                        Hicks - Cross

Q.  You wrote that email?

A.  I did.

          (Continued on next page)

BY MS. YOUNG:

Q. Now, back to the option agreement. Once it was amended, the exercise period was from December 1 to December 31; correct?

A. Yes.

Q. So you would agree that between the closing of the option agreement on August 14th, 2020 and December 1, 2020, you could not exercise the options; right?

A. Until December 1, is that what you said?

Q. Correct.

A. Yes.

Q. So you could not get the stock price for the options until December 1?

A. That means I could not exercise at December 1, correct.

Q. And I believe you said your strike price for the options was $16.50 per share; correct?

A. Yeah. Yes.

Q. In other words, once you could exercise, you could have bought the stock at $16.50 a share; right?

A. Correct.

Q. And then you could go and sell the stock at the market price; right?

A. Correct.

Q. So if the stock was trading at, say, $20, for example, you could buy at $16.50 and then sell at $20; right?

M9TCmil3                        Hicks - Cross

A.   Correct.

Q.   And the difference between $20 and $16.50 puts you, I think the phrase you used was in the money; right?

A.   Correct.

Q.   And you negotiated the strike price at the time that you entered into the option agreement; right?

A.   Yes.

THE COURT:  Ms. Young, it's now 11 o'clock, so we'll stop there for our first break.

20 minutes, ladies and gentlemen.  Don't discuss the case.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Hicks, you may step down.

Folks can be seated.

I do want to give the parties a break, but we can also talk for a few minutes now or in the second half if you have a preference.

MR. PODOLSKY:  Now is fine, your Honor.

THE COURT:  So I think we've done two of the charts, 1001 and 1013; is that right?  Next chart.

MR. BONDI:  Yes, your Honor.  And I don't want to beat a dead horse, but on 1013, there is a reference to a payment to Sard Verbinnen, which was a firm that was engaged at the direction of counsel.  Mr. Milton was responsible for the payment.  We ask that be redacted and removed from the chart.

Also, there is a reference of Gun Works for a hunting rifle.  Do we really need to put that into a New York jury?  I would ask that to be removed, as well.

THE COURT:  What's the first one?

MR. BONDI:  Sard Verbinnen.  They are a PR and communications firm that we, my firm, engaged to work with us in light of Mr. Milton's separation from the company and related issues related to the government investigation.  We would contend that that's work product and really shouldn't be on that chart.

Also, your Honor, there's a reference to Gun Works.

I'm not quite sure why the government wants to list a purchase of hunting rifle on something going to the jury.

THE COURT:  I'm sorry.  Where are you seeing this, because the chart that I have is several pages.

MR. BONDI:  Yes, your Honor.  The very first page of that chart, roughly about halfway down, there is a payment for $100,000 to Sard Verbinnen & Company.  That was a firm that was engaged at the direction of counsel.  It's work product.  It should never come in for the jury.  We would ask the government redact that.

There is a reference to Gun Works, that is for hunting rifles, fourth from the bottom.  We'd ask that be redacted.

THE COURT:  Was that one rifle?

MR. BONDI:  I believe it was a few rifles.  They're hunting rifles, your Honor, which are legal in Utah, not legal in New York, so we don't know why this needs to come into a New York jury.  We ask that be redacted.

THE COURT:  I think they're probably legal in New York, as well.  Who knows.

Mr. Roos, any objection?

MR. ROOS:  Your Honor, what we're going to do on this one, the witness is going to say, here are the proceeds from the sale of stock, here's how the money was spent.  I'm asking zero questions about both those things, so I don't know why the jury would know anything about that or what the purchases are

for.  So I don't think it needs to be redacted.  On the other hand, if your Honor would be more comfortable with that, we don't need it, it's just to have for completeness.

THE COURT:  I understand.  Take them out.

MR. ROOS:  We'll put a little black box over those items and leave the number, is that okay?  My concern with omitting the line items is it's going to change the bottom line.  So I propose we put a black box over the description of the payment and it will just say like $12,000, not indicate who it's to.

THE COURT:  Why not just subtract the bottom line, the bottom line figure?

MR. ROOS:  Then the chart would be factually incorrect because it's just a tracing of money going in, money going out.  So it would actually change the truth, which is this is the amount of money going out, which is why I'm proposing we just omit those lines with redactions, but leave the bottom line.

MR. MUKASEY:  I think that's more prejudicial.  Why not characterize it as Milton expense or miscellaneous expense, something like that?

MR. ROOS:  We can do that, miscellaneous expense or something.

MR. BONDI:  We're fine with that, your Honor.  There are a few others relating to medical expenses to Mr. Milton's wife, which we just don't see needs to come in.  We're happy to

talk offline with Mr. Roos and go through these, but personal medical expenditures, stuff like that really doesn't belong in.

MR. ROOS:  It's not clear from the face.  These types of edits take time, they've had it for several days.

THE COURT:  That's fine.  Take those two out.  To the extent you can agree to say miscellaneous medical expense or personal expense, that's fine.  Okay?

MR. ROOS:  Okay.

THE COURT:  So that's that one.  Next.

MR. BONDI:  Your Honor, a few points here.  Just taking them up back in chronological order, the government is withdrawing 1002, which takes care of that.

1003 is a stock chart showing the stock price.  We're not quite sure the purpose of this, but we think that it's quite misleading because it suggests that the Hindenburg report here, on September 10th, somehow caused the stock price to go down.  We're fine with this if they just take out the Hindenburg chart or take out this reference or this line.  It should be a simple edit.  You take out the vertical line, we're fine with that chart.

THE COURT:  That motion is denied.

MR. BONDI:  Your Honor, with respect to GX-1004, we note that the government has taken a normal scale that goes, starting at zero and starts at 60, and the reason for that, which we've looked at the same chart using a zero-to-70 scale,

and it doesn't quite look the same.  It doesn't look quite anywhere near these large drops and these large exaggerations in the stock price.  I think quite a lot of work went into showing how these were big drops, they're not.  The chart is quite misleading.  The axis should start at zero.  That's how charts go.  Starting the Y axis at 60 is improper.

THE COURT:  As I look at it, first of all, it shows intra day trading, apparently, and it's clear where the amount starts, it starts at 60, it ends at 70.  It's not misleading, it's factual.  So that application is denied.

MR. BONDI:  1005 has Tweets and information that has not been entered into evidence.  So what's not in evidence, it shouldn't come into this chart.  Moreover, it didn't quite look necessary for voluminous exhibits, for 1006, but the biggest objection we have on that is it has information that's not in evidence.

THE COURT:  Mr. Roos, will these communications be put into evidence if they're not already?

MR. ROOS:  That's our intent.

THE COURT:  So let's break.  20 after the hour.  Don't be late.

(Recess)

THE COURT:  Can we get Mr. Hicks.

(Continued on next page)

(Jury present)

THE COURT:  Everyone can be seated.  Ms. Young.

BY MS. YOUNG:

Q.  Mr. Hicks, your strike price for the options was $16.50 per share; correct?

A.  Correct.

Q.  Isn't it a fact that you did not exercise on December 3rd, 2020; correct?

A.  Correct.

Q.  And you testified yesterday that you got an alert regarding the stock price; correct?

A.  Yes.

MS. YOUNG:  Perhaps it would help, actually, if we could please pull up DX-6001 for the witness.

A.  Can I clarify one thing.  I didn't get an alert every day that came automatically to me.  I pushed a button and it gave me that information.

Q.  You pushed a button and you got the stock price on your phone; correct?

A.  Correct.

MS. YOUNG:  The defense would like to offer this as an exhibit of the stock price under 803(17).  My understanding is there is no objection.

MR. PODOLSKY:  No objection, your Honor.

THE COURT:  It will be received.

(Defendant's Exhibit 6001 received in evidence)

MS. YOUNG:  Chris, if we could please publish.

Q.  Your strike price was $16.50 per share; right?

A.  Correct.

Q.  So if the stock price was over $16.50, you could make a profit; correct?

A.  Theoretically.

Q.  So then let's look at December 3rd.  Stock price closed at $18.98; right?

A.  Yes.

Q.  If you had exercised, you would have made $1.28 million; correct?

A.  If I had a crystal ball to do that.

Q.  You would have been in the money; correct?  $18.98 is greater than $16.50, yes?

A.  In hindsight, yes.

Q.  And you chose not to exercise then; right?

A.  Correct.

Q.  Then on December 4th, stock price closed at $18.88; right?

A.  Yes.

Q.  You would have made $1.226 million; right?

A.  I'm not doing the math.  I'm just trusting that your math is correct.

Q.  You would have been in the money; correct?

A.  Yes.

Q.  And you chose not to exercise then; right?

A.  Correct.

Q.  December 7th, stock price closed at $18.44; right?

A.  Yes.

Q.  You would have been in the money; correct?

A.  Correct.

Q.  You chose not to exercise then; right?

A.  Correct.

Q.  December 8th, stock price closed at $18.92; right?

A.  Yes.

Q.  You would have been in the money; correct?

A.  Yes.

Q.  You chose not to exercise then; right?

A.  Correct.

Q.  Then on December 9th, stock price closed at $18.31?

A.  Yes.

Q.  You would have been in the money; correct?

A.  Correct.

Q.  You chose not to exercise then; right?

A.  Correct.

Q.  Then on December 10th, the stock price closed at $18.57; right?

A.  Correct.

Q.  You would have been in the money; correct?

A.  Correct.

Q.  You chose not to exercise then?

A.  Correct.

Q.  And then on December 11th, 2020, stock price closed $17.62; right?

A.  Yes.

Q.  You would have been in the money; correct?

A.  Correct.

Q.  And you chose not to exercise then?

A.  Correct.

Q.  And I'll stop there, but if you look at that chart on December 3rd, 4th, 7th, 8th, 9th, 10th, 11th, 16th, 17th, 18th, 21st, and 22nd, you would have been in the money; correct?

A.  Probably not the last date, the 22nd.

Q.  So 3rd, 4th, 7th, 8th, 9th, 10th, 11th, 16th, 17th, 18th, and 21st, you would agree, would you have been in the money; correct?

A.  The ones that are really close, there might have been some transaction costs, but maybe no, but anything that's not close.

Q.  It just was not enough money for you; right?

A.  I didn't hear that.

Q.  You chose not to exercise on any of those dates; correct?

A.  Correct.

Q.  Because it was not enough money for you; right?

A.  No, because of the risk.  This is all hindsight.  In fact, when I did exercise in March -- this is extremely volatile

stock.  So there is two issues here.  One is that the stocks are hovering around my strike price because of the actions of your client and the effects of the revelations in September. So that's why they're in dangerous territory.

Secondly, as an example, when I did exercise, the stocks thereafter were volatile as heck, going down, down, sometimes up, down.  And there is evidence of that when I did exercise in March, the very moment that I got my hands on the stock, it dove.  And if, in these cases, it dove like it did in March, I might not have been in the money on any of this.

Q.  Mr. Hicks, I asked a yes or no question.

A.  Yup.  Go ahead.

Q.  You did not exercise on any of those trading days in December; correct?

A.  Wouldn't have been prudent.

Q.  You would have been in the money, I believe you just testified, you would have been in the money in 3rd, 4th, 7th, 8th, 9th, 10th; right?

A.  Only in hindsight.

Q.  Your exercise period was in the month of December, December 1 to December 31; right?

A.  You're putting $8 million up, you better be wise in your decisions.

Q.  Your exercise period was December 1 to December 31; right?

A.  Correct.

Q.  And the price of the stock was above your strike price on at least 10 days; correct?

A.  In all those cases, it could have dove and I could have lost money just like --

Q.  The price of the stock was above the strike price on all of those days; correct?

A.  Correct.

Q.  And you just wanted more money; correct?

A.  No, I wanted to make a prudent decision.  It would not have been prudent to exercise on any of those days.

Q.  It would not have been prudent to make $1.2 million on December 4th?

A.  In hindsight.

MS. YOUNG:  One moment, please.

(Pause)

Nothing further.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. PODOLSKY:

Q.  Mr. Hicks, before we get to those options, let's clear something up.

MR. PODOLSKY:  Let's pull up Government Exhibit 1424 and go to page 8 of the document.  You can blow up the top half.

Q.  Mr. Hicks, do you recall that defense counsel asked you,

Ms. Young asked you a bunch of questions about the language in this contract here?

A. I do.

Q. About the sort of disclaimer-type language. Do you recall that?

A. Yes.

Q. And do you recall that right after that, she asked you about how you had assumed the risk in the options deal? Do you recall that?

A. Which option? Yeah, the options deal, yes.

Q. Let's look at what this document actually is. Let's go back to page 7 of this. We'll look at the cover page of this and blow up the top.

Do you see what this says at the top?

A. Amended and Restated Stock Purchase Agreement.

Q. What's the date?

A. March 2, 2021.

Q. Is this the options agreement?

A. It was --

Q. Is this the options agreement from 2020 where you agreed in connection with the land deal?

A. No.

Q. What is this?

A. This is the agreement, year later, which myself and Mr. Milton negotiated whereby I bought stock at a 20-percent

discount.

Q.  So let's actually look at the options agreement then,
quickly.  This is 1405.  We don't even need to go through the
language itself.

Let me just ask this, is there anything in this
contract, to your understanding, that says it's okay for one of
the parties to commit fraud?

A.  No.

Q.  So anything in here that says it's okay, it's acceptable,
it's allowed for one party to lie to the other about the value
of what they're offering?

A.  No.

MR. PODOLSKY:  We can take that down.

Q.  So do you recall that Ms. Young asked you a number of
questions about the money that you've made on land
transactions?

A.  Yes.

And I would like to clarify one thing.  At Wasatch
Creeks Ranch, I only own 22 percent of it.

Q.  So some of the deals that you engaged in, you have partners
on; is that right?

A.  Yes.

Q.  And Ms. Young asked you a bunch of questions about making
money on, for example, Wasatch Peaks Ranch?

A.  Correct.

Q.   And about making money on Wasatch Creeks Ranch; right?

A.   Correct.

Q.   What do you do for a living?

A.   I'm a real estate investor.

Q.   That's your business; right?

A.   It is.

Q.   And do you do that job to make money?

A.   I do.

Q.   Does the fact that you work to make money mean that it's okay for someone on the other side of a transaction to lie when doing business with you?

A.   No.

Q.   And by the way, what Mr. Milton told you about his business, that was actually recorded on a phonecall; right?

A.   Yes.

Q.   We listened to that yesterday?

A.   Yes.

Q.   And we actually heard his voice on the recording; correct?

A.   We did.

Q.   And it was Mr. Milton who told you on that recorded call that Nikola had 20-year contracts for electricity; right?

A.   He did.

         MR. PODOLSKY:  Actually, we can look at the transcript for this.  This is Government Exhibit 1400-T, I'm going to turn to page 22.

Q.   And it was you who asked Mr. Milton, you're not gobbling it up right now because that would be getting too far ahead of yourself, or are you.

          Do you see that?

A.   Yes.

Q.   But it was Mr. Milton who said, no, we are on certain routes.  So from L.A. to Phoenix, we're already doing that.

          Was that Mr. Milton?

A.   Yes.

Q.   And below on line 19, where it says on those 13 routes, we've already begun procuring power and planning stations and gobbling up the rates and taking energy from the grid, and we're already in that process right now.

          Do you see that?

A.   Yes.

Q.   Was that Mr. Milton?

A.   Yes.

Q.   Was that recorded?

A.   Yes.

Q.   Now, was that about a model or something in the future?

A.   That's stated fact, accomplished.

Q.   And did that stated fact impact your decision, your decision to engage in this transaction with Mr. Milton?

A.   It did.

          MR. PODOLSKY:  Thank you, your Honor.

THE COURT:  Anything further?

RECROSS EXAMINATION

BY MS. YOUNG:

Q.  Mr. Hicks, I believe you were just shown page 22 of the transcript, and it said begun procuring; correct?

A.  Out of context, yes.

Q.  And planning stations; right?

A.  Out of context, yes.

Q.  Begun and planning were said to you; correct?

A.  Correct.

MS. YOUNG:  We can take that down, Chris.

Q.  And then back to GX-1424 that you were just shown, which relates to the stock purchase agreement in March of 2021, which you signed; right?

A.  I'm sorry.  Did I sign the stock purchase agreement?

Q.  Correct.

A.  Yes.

Q.  That had the language --

MS. YOUNG:  Chris, if we can go to 661 again.

Q.  As of March 2021, you signed that you carefully reviewed the public filings of the SEC; correct?

A.  Yes.

Q.  And you testified earlier today that you never looked at the filings of the SEC; right?

A.  Incorrect.

M9TCmil3

Q.   You did not testify earlier today that you looked at them or did you look at them or did you not look at them?

A.   We were referring to the land transaction.  This is not the land transaction.

Q.   This is the stock purchase agreement, sir.

A.   Entirely different, yes.

Q.   So at that time of the stock purchase agreement, had you reviewed the Nikola SEC filings, yes or no?

A.   I had my -- all my lawyers and advisers review them for me.

Q.   Your lawyers and advisers reviewed all the SEC filings at that point?

A.   It was their role.

Q.   But you did not; correct?

A.   Correct.

        MS. YOUNG:  Nothing further.

        THE COURT:  Anything more?

        MR. PODOLSKY:  No, your Honor.

        THE COURT:  Mr. Hicks, you may step down.

        (Witness excused)

        MR. ROOS:  Your Honor, at this time, the government would offer a series of stipulations and exhibits associated with them.

        THE COURT:  Very well.  Read slowly.

        MR. ROOS:  Government offers Stipulation S1, which relates to records from Nikola.

M9TCmil3

Pursuant to the stipulation, we offer Government Exhibits 3, 11, 14, 15, 16, 21, 38, 39, 62, 64, 202, 203, and its attachment, which is 203-A, 204, 205, 208, 210, and its attachment, which is 210-A, 211, 224, 234, 295, 296, 297, 298, 299, 301, 303, 304, 305, 306, 307, 319, 320, 321, 322, 324, 326, and 330.

Next, pursuant to Stipulation S2, government offers Government Exhibits 405, 405-A, 405-T, which, for now, will be a demonstrative and the parties will work out the transcripts. That goes for all the T exhibits I'm about to list.  Government Exhibit 408, 408-A, 408-B, 408-C, 408-D, 408-T.  Government Exhibit 411, 411-A, 411-T.  Government Exhibit 413-T, Government Exhibit 414-A.  Government Exhibit 415-A. Government Exhibit 417-A, 417-B, 417-C, 417-D, 417-E, 417-F, 417-T.  Government Exhibit 423-A, 423-B, 423-C, 423-D, 423-E, 423-F, and 423-T.

Next, pursuant to stipulation, government offers exhibits 504, 509, 528, 529, 556, 560, 561, 583.

Next, the government offers exhibits 900, 901, 902, 906, 907, 908, 920, 921, 922, 923, 924, 925, 926, 927, 928, 929, 930, 931, 932, 937, 938.

Next, the government offers exhibits 1504 through 1526, Government Exhibit 1503 and Government Exhibits 1300 through 1304.

Finally, the government offers Stipulations S7 and S8

M9TCmil3

and S2 to the extent they're not already offered.

MR. MUKASEY:  May I have one moment to confer with the government?

THE COURT:  Yes.

(Pause)

MR. MUKASEY:  Judge, may we approach?

THE COURT:  You may.

(Continued on next page)

(At the sidebar)

MR. MUKASEY:  I think with respect to stipulation S1 as the numbered documents that came in through there, the stipulation was to the authenticity.  We are preserving our right to object to the admissibility.  We'll try to do that maybe at the next break without objecting piecemeal a thousand times when the agent is testifying.  We can identify -- actually, I don't mind giving you our chart.

THE COURT:  When the agent is on the stand, the chart will be up there.

MR. MUKASEY:  We have to discuss this.

MR. ROOS:  This is why we sent this a few days ago, this list.

MR. MUKASEY:  With respect to the other stips, would you like to speak to that?

MR. BONDI:  With respect to the S2, we have no issue on the S2 stip, we signed the stip, which was the podcast.

Were you moving pursuant to any other stips or was it S1 and S2?

MR. ROOS:  I think the Twitter one, which is S5.

Listen, just to be clear, I think many of the stipulations -- all the stipulations solve the authenticity problem.  And several of them, particularly the ones at issue here related to emails and documents.  Defense counsel preserved their hearsay and relevance objections, they're not

waiving anything, so I think they're admissible, unless there is an objection.

MR. MUKASEY:  Well, we have a whole list of objections and we can discuss it now, we can discuss it --

THE COURT:  We're not going to discuss it now.

MR. MUKASEY:  We're getting charts at 2 o'clock in the morning, 3 o'clock in the morning, it's hard to keep a moving -- it's hard to object to a moving target.

MR. PODOLSKY:  We sent this days ago to avoid this very issue.  This is the end of our case, that's why we sent them a list, so they could object before they got this.

MR. ROOS:  Sent it a few days ago.

THE COURT:  Anymore reading to do?

MR. ROOS:  No.

THE COURT:  You're done?

MR. ROOS:  I'm done.

THE COURT:  So I guess we move them into evidence, I'll reserve, and you can talk.

MR. CARUSO:  While we're here, if the government is going to call Mr. Schonberger next, is that a fact?

MR. ROOS:  Yes.

MR. CARUSO:  In that case, I would like to renew our objection.  He's one of these retail investors, so I want to renew the objection that the testimony should be excluded for lack of foundation under *Litvak*.  I previously made that.  I'm

M9TCmil3

making the record now.

THE COURT:  Very well.  It's denied.

(Continued on next page)

M9TCmil3

(In open court)

MR. ROOS:  One more to add to the list, 1119.

The government now moves to admit all of those exhibits and stipulations I just listed.

THE COURT:  In accordance with our conversation at sidebar, I will reserve on the motion.

MR. ROOS:  Thank you, your Honor.

Want to call your next witness.

MS. ESTES:  Yes, your Honor.  The government calls Marc Schonberger.

THE COURT:  Sir, please watch your step as you make your way to the witness box.  Yes, that way.  Sorry for the winding road.  Step into the witness box and remain standing.

MARC SCHONBERGER,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Sir, you may be seated.  Bring the microphone as close to you as you can.  When you speak, please speak directly into the microphone and please begin by stating your first name and your last name, and spelling your first name and your last name

THE WITNESS:  My name is Marc Schonberger, M-a-r-c S-c-h-o-n-b-e-r-g-e-r.

THE COURT:  Ms. Estes.

MS. ESTES:  Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DIRECT EXAMINATION

BY MS. ESTES:

Q.  Good morning, Mr. Schonberger.

A.  Good morning.

Q.  Where are you originally from?

A.  I am originally from New York.

Q.  Where do you currently live?

A.  Fort Lauderdale, Florida.

Q.  How long have you lived in Florida?

A.  Since 2003.

Q.  What do you do for work?

A.  I own a medical sales company.

Q.  Is that a public company or a private company?

A.  Private company.

Q.  What's your educational background?

A.  I have a BA from Binghamton University.

Q.  And what was your major when you were in college?

A.  I was a psych major, business minor.

Q.  Have you ever invested in the stock market?

A.  Yes, I have.

Q.  Mr. Schonberger, can you describe to me your background as an investor?

A.  I would consider myself a midlevel investor.  I've been investing since my 20s.  So I know, shocking, but that would be 35 years.

Q.   Mr. Schonberger, what trading platforms do you use for investing?

A.   So I've used E-Trade, Ameritrade, and more recently, Robinhood.

Q.   What is Robinhood?

A.   Robinhood, best described as a trading platform, electronic trading platform.

Q.   And when did you start using the Robinhood platform?

A.   Probably like 2019, I'm going to guess, somewhere around there.

Q.   Mr. Schonberger, have you ever invested in the company Nikola?

A.   Yes, I did.

Q.   How did you first hear about Nikola?

A.   I had seen some press reports, some news, some multimedia, some stuff on television initially, that's how I found out about it.

Q.   Mr. Schonberger, on Robinhood, is that platform linked to any news articles or things like that?

A.   Yes, that's how I would mostly do my research.  I would hear about the company, you know, looked at their ticker symbol.  Then, with Robinhood, it makes it very simple, you can literally link to all kinds of articles from a variety of different sources and watch or read about a company.

Q.   And as to Nikola in particular, what sort of things did you

watch or read?

A.  So I watched various television clips that were highlighted from MarketWatch, from Reuters, depends on the company, whatever was available, but a variety of different sources, Barron's.  A bunch of different sources would be on there.  And then also any of the marketplace stuff with the articles and stuff about the company.

Q.  With respect to Nikola, did you review any interviews involving Trevor Milton?

A.  Yes, I did.

Q.  About how many, would you say?

A.  Probably three or four that featured him.

Q.  And do you remember every video you saw of him?

A.  I don't remember every video, no.

Q.  And why did you review things involving Trevor Milton?

A.  Cause I was listening to the CEOs of companies, you know, they have a fiduciary responsibility to kind of tell you exactly what's going on, and be truthful and honest.  So I rely a lot on that.

Q.  And why do you rely on CEOs to be truthful and honest?

A.  Because, as I said, they have a fiduciary responsibility to tell the truth about their company and their claims.  So a lot of that is -- a lot of my investment decisions is based on that.

Q.  And did statements made by Mr. Milton have any effect on

your decision to invest in Nikola?

A.   Yeah, as it usually does.

Q.   Did you review any SEC filings involving Nikola?

A.   I would probably say no, no specific SEC filings.  I go more based on what was available on the platform and my research that I did.

Q.   And in your previous history as an investor, was it your usual practice to review SEC filings?

A.   No.

Q.   Why not?

A.   They're just lengthy and really don't give you a relevant description of sort of what would be the reason to invest or not invest.

Q.   Mr. Schonberger, would you ever have any expectation that what the CEO of a company would say would be different from the facts in the SEC filings?

          MR. CARUSO:  Objection.  Objection.

          THE COURT:  Overruled.

A.   I would say yes to that, that it should absolutely match, and then usually would save you a lot of time from reading SEC filings.

          MS. ESTES:  Ms. Wolfson, can you pull up for the witness what's marked as Government Exhibit 1117.  Can you go to the next page for the witness, Ms. Wolfson.

Q.   Mr. Schonberger, what do we see on the screen here?

A.   That was my orders on Robinhood to purchase Nikola and to sell Nikola shares.

Q.   Was this from the Robinhood app?

A.   That is correct.

Q.   This is a screenshot of those?

A.   That is a screenshot.

         MS. ESTES:  Your Honor, we offer Government Exhibit 1117.

         THE COURT:  Any objection?

         MR. CARUSO:  One moment, please, your Honor.

         THE COURT:  Yes.

         MR. CARUSO:  No objection.

         THE COURT:  It will be received.

         (Government's Exhibit 1117 received in evidence)

         MS. ESTES:  Ms. Wolfson, can you go back to the first page there.

Q.   Mr. Schonberger, what's the date of your first purchase there?

A.   September 8th, 2020.

Q.   And what was the amount of your first purchase?

A.   $20,000 worth of shares.

Q.   And turning to the next page there, what does this page show, Mr. Schonberger?

A.   That shows my sale of those same shares for $16,000, approximately.

Q.   What's the date of this?

A.   September 10th.

Q.   So I'll turn back to that in just a moment.

         First I want to ask you a few things about what else you reviewed during your investment.

         MS. ESTES:  Ms. Wolfson, can you take that down for now.

Q.   Mr. Schonberger, during your investment, did you review any interviews with Mr. Milton involving the Nikola Badger?

A.   Yes, I did.

Q.   Did you see any articles regarding the Nikola Badger?

A.   Yes, I did.

Q.   What about Tweets involving the Nikola Badger?

A.   I didn't recall any Tweets specifically.

         MS. ESTES:  Ms. Wolfson, can you pull up Government Exhibit 429.

         (Video played)

Q.   Mr. Schonberger, did you hear Mr. Milton just say there that they had developed the Badger from the ground up?

A.   That is correct.

Q.   And during the course of your investment or before investing, do you recall him saying things like that about the Nikola Badger?

A.   That was my understanding, yes.

Q.   Do you know if you saw this particular video or are you

sure?

A.  I recall this specific wording that he used, built from the ground up.

Q.  Was it significant to you that Nikola had built the Badger from the ground up?

A.  Yes, as an owner of an electric car and I'm familiar with another electric car company that also builds from the ground up, their cars, that was important to me that they had built their own car.

Q.  And when you say you own an electric car, what kind of car is that?

A.  I own a Tesla.

Q.  And the other company that you're referring to, is that Tesla, as well?

A.  Correct.

Q.  Would it have mattered to you to know that the Badger was actually developed with a base of a Ford F-150?

A.  Yes.

Q.  Why would that have mattered?

A.  Because that's not built from the ground up.  That's not owning your own car from the ground up like Tesla does.

Q.  Mr. Schonberger, based on the interviews and articles you had seen, did you have an understanding of whether Nikola had a prototype for the Badger?

A.  Yes, my understanding was they did.

Q.   Was that something that mattered to you in terms of your investment?

A.   Yes.

Q.   Why did that matter?

A.   Because having your prototype means you're ready to go into production and ready to sell.

MS. ESTES:   Ms. Wolfson, if you could now pull up for the witness Government Exhibit 426-A.

(Video played)

MS. ESTES:   Ms. Wolfson, can we actually pull up 426-T side-by-side there.  Let's go to the next page.  Ms. Wolfson, can you zoom into the bottom there, the statements from Mr. Milton.

Q.   Mr. Schonberger, do you recall just seeing the video of Mr. Milton saying that that hydrogen was a problem they had tackled?

A.   Yes, that's correct.

(Continued on next page)

BY MS. ESTES:

Q.   He said they had brought the cost from $16 down to four. Did you just hear that?

A.   That is what he said.

Q.   Mr. Schonberger, is that something you heard during or before you invested in Nikola?

A.   Yes.

Q.   Was that something that mattered to you as an investor?

A.   Yes, absolutely.

Q.   Why did that matter?

A.   Because that's a technology that they had conquered, basically, that they were able to bring to market.  That, as he was stating, whether car or no car, he had brought down the cost, and that would be incredibly valuable as an investor if someone had figured out how to make hydrogen that cost-effective.

Q.   And, Mr. Schonberger, based on what we just listened to, did you understand that this was something Nikola had actually achieved or if it was a goal for the future?

A.   My understanding was they already had built stations to be able to do this at that cost.

Q.   Was that important to you that it was something they had already achieved?

A.   Yes.

Q.   Why?

A.   Because if they achieved it, then they're able to capitalize on that, and as a shareholder, that's value to the company and that's value to the shareholder.

Q.   Mr. Schonberger, as an investor is it important to you that companies distinguish between milestones that have been achieved and goals for the future?

A.   Absolutely.

Q.   Why is that?

A.   Because as they achieve their goals, they're generating value in the company, which again translates into value for the shareholders.

        MS. ESTES:  All right.  Ms. Wolfson, let's take that down.

        And if you could pull up Government Exhibit 425-F for the witness.

        (Audio played)

Q.   All right.  Mr. Schonberger, did you hear Mr. Milton just say that Nikola had billions and billions of orders?

A.   Billions of dollars in orders.

Q.   Is that something you heard during the course of your investment or before you invested?

A.   Yes, correct.

Q.   And did you hear him say they had signed contracts, signed on the dotted line?

A.   That's correct.

Q. And is that something you heard or saw before or during your investment?

A. Prior to my investment, absolutely influenced my investment.

Q. Why did that influence your investment?

A. Billions of dollars in orders is revenue to the company. Revenue to the company eventually translates into shareholder value at a multiple. And that's why you invest in companies, because of their ability to generate revenue. And having billions of dollars in sales is direct revenue that would translate to profit for the company and value to the shareholder.

Q. And, Mr. Schonberger, if you had understood that Nikola just had reservations, not signed-on-the-dotted-line contracts, is that something that would matter to you?

A. Yes.

Q. Why would that matter?

A. Reservations can be canceled. Orders are orders. Orders mean sales, and sales are typically not canceled like a reservation.

Q. All right. Now, Mr. Schonberger, we looked at your trading records earlier. So what happened with your investment in Nikola?

A. Two days after my investment, there was a report that came out from Hindenburg Research that basically had countered all

of the claims of the basis for my investment.

Q.  And what did you do after that report came out?

A.  I sold the stock.

Q.  Why did you sell the stock?

A.  To minimize my risk of loss.

Q.  And, Mr. Schonberger, how much did you lose?

A.  $4,000, approximately.

Q.  Was that something that was significant to you?

A.  Still is.

Q.  Mr. Schonberger, did you read that report you described?

A.  I did.

Q.  How did you feel after reading that?

        MR. CARUSO:  Objection.  Objection.  His feelings
don't matter.

        THE COURT:  Overruled.

A.  Deceived.

Q.  Sorry.  Can you say that again.

A.  Deceived.

Q.  Have you invested in Nikola since then?

A.  No, I have not.

        MS. ESTES:  Nothing further, Your Honor.

        THE COURT:  Cross-examination?

        MR. CARUSO:  Yes, sir.

CROSS-EXAMINATION

BY MR. CARUSO::

M9THMil4                          Schonberger - Cross

Q.  Mr. Schonberger, good morning.

A.  Good morning.

Q.  I'm Mr. Caruso, one of Mr. Milton's lawyers.

Now, sir, I believe you testified that you didn't understand this truck to be built from the ground up, is that right?

A.  I didn't understand for it to be built from the ground up, or I did understand for it to be built from the ground up?

Q.  Sorry.

A.  I did understand that it was built from the ground up.

Q.  And are you suggesting that it was not built from the ground up?

A.  I'm not suggesting anything.

Q.  Do you think it was not built from the ground up?

A.  The ground up means that they owned everything that was part of that car.  That they had built it from the ground up, that's my definition.  Would be like Tesla builds their cars from the ground up.

Q.  Ahh, I see.

Government asked you about Badger's use of Ford platform for its truck, correct?

A.  Yes, they did.

Q.  And you say that you didn't know that Ford -- that Nikola used a Ford platform for the Badger.  Is that what your testimony is?

A.   I don't believe -- I didn't say that.  I said I would be surprised to learn if they had not used -- that they had used the Ford F-150.

Q.   Now, aren't you aware that Tesla early models used parts from a different original equipment manufacturer?

A.   I'm not -- I'm not aware of that, no.

Q.   No, you're not, are you, because you don't know anything about how to build a truck or a car, do you?

          MS. ESTES:  Objection.

          THE COURT:  Overruled.

A.   I don't build trucks or cars.

Q.   Now, you met with the government several times before you testified here today?

A.   Not several times.  I met with them once.

Q.   Only once.  That was Tuesday, two days ago?

A.   Thought it was yesterday.  Am I wrong, or is it two days ago?  I don't recall.

Q.   Now, at that meeting --

A.   Two days ago, sorry.

Q.   Before you met with the government, who contacted whom first?

A.   I submitted my -- my trades to the government or to whoever it was that was seeking information relating to this case.  I contacted them.

Q.   But, sir, isn't it a fact that the government contacted you

first?

A.  I sent in my paperwork.  I don't know what you mean by "contacted."  I sent in my trades relating to this case.

MR. CARUSO:  All right.  Let me show the witness, Chris, Defense Exhibit 1755, please.

Q.  And, sir, my question for you is, please take a look at that, and does that refresh your recollection that it was the government who reached out to you rather than you reaching out to the government?

A.  What I'm suggesting is -- my recollection was that I had taken photos of my trades, and I had submitted them to something that had asked if there was anybody that was damaged by -- by Nikola.

Q.  But, sir, doesn't this tell you that the government reached out to you before you reached out to the government?

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.  Does it refresh your recollection, sir, that the government reached out to you on this date before you reached out to the government?

A.  It shows --

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  It shows me they reached out to me.  I don't recall if I had reached out to them prior to this.  But this shows that

they reached out to me.

Q.  Right.  Now, you mentioned this understanding that Nikola
used a Ford platform for the Badger, is that correct?  Did I
hear you right?

A.  Restate that question again, please.

          MR. CARUSO:  May I have the question read, please,
your Honor.

          THE COURT:  You may.

          (Record read)

A.  It wasn't my understanding --

Q.  Excuse me.  I didn't say "my understanding."

A.  No.

Q.  I asked you whether that was your understanding.

A.  I was asked if it would surprise me if it was -- that they
used a Ford F-150, and I said it would surprise me if they did.

Q.  OK.  You were asked by whom?

A.  She just asked me during this.  Ten to five minutes ago she
asked me if it would surprise me if they had used that.

Q.  "She" meaning the prosecutor?

A.  The prosecutor asked me.

Q.  Now, in your prep session two days ago, the government
asked you about that topic as well, didn't they?

A.  Yes, it was a question that was asked of me.

Q.  Yes.  Now, who raised the topic first?  Did the government
raise -- tell you first that Nikola used a Ford platform?

MS. ESTES:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q.  OK.  When you went into that meeting with the government, you didn't know anything about the use of a Ford platform, did you?

A.  I had read about it in the article that we had mentioned.

Q.  So in the meeting, who raised that topic first?

A.  Again, what I had said is I had read about it in the Hindenburg Research article.

Q.  Just a second.  I'm asking you about that meeting.  Who in that meeting --

A.  She asked me the question.

Q.  Can I finish my question?

A.  Sure, I'm sorry.  My apologies.

Q.  In the meeting, who first raised the topic of Nikola using a Ford platform?  Was it you or was it the government?

A.  The prosecutor asked me the question.

Q.  I see.

OK.  Then the prosecutor asked you whether that would have had an impact on your investment decision, didn't she?

A.  That's correct.

Q.  Now, turning back to this question of ground up and the use of a Ford platform for the Nikola Badger, you are not a mechanical engineer, are you?

A.  No, I'm not.

Q.  You are not an electrical engineer, are you?

A.  No, I'm not.

Q.  You are not a thermal engineer, are you?

A.  No, I am not.

Q.  In fact, you're not an engineer of any kind, right?

A.  That is correct.

Q.  Right.  You also have no experience in developing trucks, do you?

A.  Correct.

Q.  Now, have you heard the term "donor vehicle"?

A.  I have not.

Q.  You don't know what that means, do you?

A.  Nope.

Q.  So you are not aware that it is standard practice in the automotive industry to use a donor vehicle when developing a new vehicle, are you?

A.  No.

Q.  Standard practice, you don't know about that, do you?

A.  No.

        MS. ESTES:  Objection.  Asked and answered.

        THE COURT:  Overruled.

Q.  Please, sir, you don't know about that, do you?

A.  That is correct, I do not.

Q.  And you are unaware that it is also standard practice for a company to take this donor vehicle, strip it down, modify it,

add to it, and use that in that process making its own vehicle. You don't know anything about that, do you?

A. Correct.

Q. Now, are you aware that, with respect to the Badger, the Ford platform was modified by 95 percent in developing the Badger? Were you aware of that?

MS. ESTES: Objection. Testifying.

MR. CARUSO: I'm repeating the testimony of a prior witness, Judge.

THE COURT: Don't engage in speaking objections, Mr. Caruso. The objection's overruled.

Do you remember the question, Mr. Schonberger?

A. I am not aware.

Q. Now, the government didn't tell you that, did they, in your prep session?

A. It was not discussed.

Q. The government didn't tell you that, did they?

MS. ESTES: Objection.

THE COURT: Sustained.

Q. Now, are you aware that the Badger has independent suspension, while the Ford Raptor has a solid axle suspension?

A. I am not.

Q. Are you aware that the Badger is a battery-electric vehicle, while the Ford Raptor is an old-fashioned combustion-engine vehicle?

M9THMil4                    Schonberger - Cross

MS. ESTES:  Objection.  Can we have a sidebar, your Honor?

THE COURT:  OK.

(Continued on next page)

(At sidebar)

MR. ROOS:  Judge, these are facts, many of them are not even in evidence.  He's now just arguing it to the jury. Let's see the transcript, then.

MR. CARUSO:  OK.  Would you like to --

THE COURT:  No, no.

MR. CARUSO:  Mr. Babiarz testified to every single one of these.  I have an absolute good-faith basis for every one of these questions.

THE COURT:  I don't doubt that you do.

Beyond that, is there an objection?

MR. ROOS:  The objection is he's just testifying to the jury about this.  The witness has already said he doesn't know anything about this, so it's just repeating the same thing.  It's effectively an asked-and-answered objection.

MR. CARUSO:  I'm entitled to show what little he knows.  He says it's ground up, and he doesn't know a darn thing.

THE COURT:  Look, if you think this is a fruitful avenue for you, the jury's going to be told at the end of the day, as they were told at the outset of the trial, that whatever he says is not evidence.

MR. ROOS:  OK.  I mean, I just want to make clear that I think it's totally appropriate, then, on redirect to say: You don't know whether Mr. Caruso was making up all those

things he was just asking him.

MR. CARUSO:  That would be inappropriate, since I'm not.

THE COURT:  That would be inappropriate.

MR. CARUSO:  Thank you, Judge.  Actually, I'm not going to belabor this.

(Continued on next page)

(In open court; jurors present)

MR. CARUSO:  Just one or two more on this.  Actually, I'll move on.

Q.  Now, with respect to the use of the Ford Raptor platform for the Badger, you have no idea who made the decision to use the Ford Raptor as a platform, do you?

A.  That is correct.

Q.  You don't know that that decision was made by Nikola's chief engineer, do you?

A.  I do not.

Q.  And you don't know whether Mr. Milton -- withdrawn.

In fact, Mr. Milton had nothing to do with that decision.  Do you know that?

A.  I know nothing about that.

Q.  Well, in fact, you never met Mr. Milton, have you?

A.  No, I have not.

Q.  You never spoke to him?

A.  Nope.

Q.  You never communicated with him electronically?

A.  I have not.

Q.  Now, you said on direct, if I heard you correctly, that you thought that the Badger was ready for production, right?

A.  Correct.

Q.  Right.  Well, did you see -- withdrawn.

I direct your attention to September 8 of the year

2020.  Did you see an announcement in a press release between General Motors and Nikola announcing an agreement that they made?

A.  I had read that.

Q.  Ahh, you read about it in the newspapers, is that it?

A.  I read about it online.  I don't recall.

Q.  You didn't read the press release, did you?

A.  I did not read a press release.

MR. CARUSO:  Let's show the witness Exhibit 601 in evidence.  Excuse me, that's Defense Exhibit 601 in evidence.

Q.  So if I could direct your attention, sir, to page 1 -- pretty much in the middle, Chris -- it states that General Motors will engineer, etc.

The second, yes, that's it.

General Motors will engineer, homologate, validate, and manufacture this Badger -- Nikola Badger electric fuel cell versions.

So the press release states very clearly, does it not, that Nikola had not developed the truck, correct?

A.  It says they're going to work together for engineering and putting it together.  It does not mean that they had not already developed one.

Q.  Sir, I direct your attention to that language.  It says "will," Nikola will utilize -- excuse me, General Motors will engineer, homologate, validate, and manufacture the Nikola

Badger battery electric and fuel cell versions.  It uses the future tense, doesn't it?

A.  "Will" does not mean that something is not already built. "Will" means that they could intend to able to produce it together.  It does not mean that they did not produce one on their own first.

Q.  I see.  Will produce does -- sorry.  Say that again.

You think will -- just a second.

You think that "will produce" means already produced?

A.  No.

Q.  Is that what you said?

A.  That's not what I said.

Q.  Is that what you think?

A.  It does not mean that one is not already been produced. You asked if there was a -- if there was one that was already produced.

Q.  I think you also said that, on direct examination, that you thought that the company already had fuel stations built, is that right?

A.  Correct.

Q.  So let me direct your attention to the second page of Exhibit 601 -- withdrawn.

Leave that page on there.

But if you look at this language in the third paragraph, "Badger production is expected to start," just going

back to my prior line of questioning, sir, you see that says,

"Badger production is expected to start in late 2022"?

A.  Correct.

Q.  OK.  Not that it had already started in September 2020,

correct?

A.  Correct.

Q.  Now, I think you also said that you don't read SEC filings,

is that correct?

A.  That's correct.

Q.  You think they're too long?

A.  I just don't read SEC filings.

Q.  But I think you said on direct examination that you regard

them as too long?

A.  Typically, they're very lengthy.

Q.  And you said they're not relevant?

A.  I said I take the word of the CEO as more important than

that of an SEC filing.

Q.  But you also said they're not relevant, didn't you?

A.  I might have stated that, correct.

Q.  So you are familiar with the existence of SEC filings, yes?

A.  I am.

Q.  And publicly traded companies, of course, file SEC filings

in order to make disclosures about the business of the company,

right?

A.  Correct.

Q.   And they make those disclosures in order to disclose

information about the financial condition of the company,

correct?

A.   Correct.

Q.   And they make disclosures about the plans of the company,

yes?

A.   Correct.

Q.   And they make disclosures about the risks of investing in

the company, correct?

A.   Correct.

Q.   And those disclosures are available on the SEC's website?

A.   I assume they were.

Q.   You never checked?

A.   Correct.

Q.   They're available to all investors, correct?

A.   I would assume they are, correct.

Q.   Aren't -- you assume.  Don't you know that?

          MS. ESTES:  Objection.  Argumentative.

          THE COURT:  Sustained.

Q.   They're free on the website.  He don't have to pay for

them, right?

A.   I would assume correct.  Again, I have not checked their

website.

Q.   You had access to all that information in the SEC filings,

didn't you?

A.   Correct.

          MR. CARUSO:   Now, Chris, would you please call up

Defense Exhibit 736, first page, please.

Q.   Mr. Schonberger, do you recognize this document?

A.   I do not.

Q.   You don't because you don't read SEC filings, right?

A.   We've already stated I don't read the SEC filings, correct.

Q.   Yeah.   And that's why you don't recognize this one,

correct?

A.   Correct.

Q.   Now, I believe you testified on direct that you thought

that the company had firm reservations.   Is that the gist of

it?

A.   My understanding was they had orders.

Q.   Orders.

A.   Based on what he said, billions of dollars in orders.

Q.   And you thought that those orders could not be canceled?

A.   Orders are typically not canceled like a reservation.

Q.   You thought that the Nikola orders couldn't be canceled?

A.   That is correct.

Q.   Let me direct your attention to page 13 of that.

          Right at the top, Chris, please.   Actually, go to the

prior page.   We'll have to read the bottom because it spills

over.

          Can you see it, sir?

A.   I can read that, yeah.

Q.   "As of December 31, 2019, we had reservations for 14,000 Nikola Two FCEV trucks, all of which are subject to cancellation by the customer until the customer enters into a lease agreement.  At times we have indicated that if we are able to sell or lease every truck which has been reserved, we would have $10 billion in projected revenues.  Because all of our reservations are cancelable, it is possible that a significant number of customers who submitted reservations for our trucks may cancel those reservations."

     You see that now, sir?

A.   I do.

Q.   You didn't see it in September of 2020, though, did you?

A.   No, I did not.

Q.   Now, I think you also said in your direct testimony that you thought that the company had already -- was already producing hydrogen fueling stations, yes?

A.   Correct.

Q.   So let me direct your attention to page 51.

     Chris, please, right at the top.  Right at the top, please.  "Once we have reached," can you highlight that, please, that paragraph.

     "Once we have reached commercial production, cost of revenues will include direct parts, material and labor costs, manufacturing overhead, including amortized tooling costs, and

M9THMil4                    Schonberger - Cross

deprecation of our greenfield manufacturing facility, depreciation of our hydrogen fueling stations, cost of production, shipping, and reserves for warranty expenses."

So the company did not have hydrogen fueling stations as of September 2020, correct?

A.  Again, I based my investment decision on what he had said, not on this SEC filing.

Q.  Yeah, because you didn't read them, did you?

A.  Again, I've already answered that question.

Q.  Now, one moment, please.

I believe you testified that you traded on the Robinhood platform, right?

A.  Correct.

Q.  And I think you testified that you read articles and information that popped up on your computer, is that right?

A.  Correct.

Q.  And you read those because Robinhood makes it very simple, is that it?

A.  Robinhood makes it available.

Q.  I think you said Robinhood makes it very simple, didn't you?

A.  Simple to access, correct.

Q.  And it's not as long as SEC filings, is it, are they?

A.  I would assume that would be correct.

Q.  So much easier to deal with than SEC filings, right?

A.   Correct.

Q.   So, sir, aren't you aware that Robinhood Financial encourages its customers to invest carefully and to use the information available at the websites of the SEC, and then it gives you the link to the website?  Aren't you aware that Robinhood encouraged you to do that?

A.   I am not.

Q.   Oh, you didn't read that part of Robinhood?

A.   I did not.

Q.   And are you aware that Robinhood also told you, stated in a way that was available to you:  "Buying a stock means becoming a partial owner in that company.  As a shopper, you're generally looking for one that is well managed and profitable, and you want to pay a reasonable price.  To find that information, turn to the company's financials.  Companies with publicly traded stocks make their financial information available to the SEC and the public.  The information, which you can typically find on the SEC's site, includes the 10-Ks," etc.

        Did you read that part?

A.   I did not.

        MR. CARUSO:  Just give me one moment, your Honor, please.

Q.   So let me just ask you a few questions, sir, about the sequence of your trading activities.

I think you testified that you purchased Nikola stock on September 8, is that right?

A.  Correct.

Q.  That was the day that Nikola and General Motors announced their transaction, is that right?

A.  My recollection is correct.

Q.  And then two days later you saw what you call a negative story, correct?

A.  The Hindenburg Research report, correct.

Q.  And you sold your stock that day, right?

A.  Correct.

Q.  Now, sir, at that time were you aware that Hindenburg was a short seller?

A.  At the time, no.

Q.  You know what a short seller -- withdrawn.

At that time did you know what a short seller was?

A.  Yes.

Q.  What was it?  Somebody who likes to drive the price down to make money, right?

A.  Correct.

Q.  But you didn't know at the time that Hindenburg was a short seller, did you?

A.  I did not.

Q.  And you didn't bother to find out, did you?

A.  That's correct.

Q.  You just assumed that Hindenburg -- that the Hindenburg report was correct, didn't you?

A.  That is correct.

Q.  It didn't ever even occur to you that that might be a report issued by a short seller for selfish reasons to drive the price down regardless of truth?

MS. ESTES:  Objection.

Q.  That never even occurred to you, did it?

MS. ESTES:  Objection.

THE COURT:  Sustained.

A.  Not regardless of truth.

THE COURT:  Mr. Schonberger, the objection was sustained.  You don't have to answer.

THE WITNESS:  Sorry.

MR. CARUSO:  I'll rephrase it.

Q.  Isn't it a fact that it didn't occur to you that Hindenburg might have written that report to drive the price down?

A.  I was not looking at the Hindenburg report to be true or not true for their purposes.  I was just reading it based on the information they provided against the --

Q.  Excuse me, sir.

May I have the question read, because I don't think you answered it?

A.  Okay.

THE COURT:  Why don't you rephrase the question,

Mr. Caruso.

MR. CARUSO:  I'll move on.

Q.  Now, you sold your stock that day without waiting for a response from Nikola, didn't you?

A.  That is correct.

Q.  Now, sir, let me show you another video.  It's Defense Exhibit 501-B.

Please, Chris, when you have it up -- can you hold that, please.

I'm going to show you a video clip of Mr. Milton, and this is in evidence, so please play this now, Chris.

(Video played)

Q.  OK.  Now, you have testified that you relied on what Mr. Milton said in interviews like this, haven't you?

A.  I relied on what he said in certain interviews, correct.

Q.  And you just heard him say buy and hold for six months; don't even think about holding it for less than six months. You just heard him say that, didn't you?

A.  I did not see that interview.

Q.  I didn't ask you that.  I asked you whether you just heard him say that.

A.  I heard him say it.

Q.  Six months, right?

A.  That's what he said.

Q.  You held for two days, right?

A.  Correct.

MR. CARUSO:  OK.  Your Honor, just let me check my materials here and talk to Mr. Mukasey.

(Counsel confer)

MR. CARUSO:  I have nothing further for the witness at this time, your Honor.

THE COURT:  Redirect.

MS. ESTES:  Thank you, your Honor.

MR. CARUSO:  Just give me one moment to get my materials.

MS. ESTES:  Yes.

MR. CARUSO:  Thank you.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.  Mr. Schonberger, defense counsel just showed you a video where Mr. Milton said you should stay in this stock for six months, right?

A.  Yes, he did.

Q.  And you testified earlier that you learned of this Hindenburg report that Mr. Milton may have made some false statements, right?

A.  Correct.

Q.  And after learning that he may have made some false statements, would you trust his statement that you should stay in the company six months?

A.   No.  And I'm glad I did not.

Q.   Now, Mr. Schonberger, Mr. Caruso asked you a lot about Mr. Milton's statements about the Badger.  Do you recall that?

A.   Yes.

Q.   And he asked you about Mr. Milton's statements about building the Badger from the ground up, is that right?

A.   Correct.

Q.   In any of the public statements or articles you reviewed, did you see Mr. Milton or hear him say the Badger was being built on the F-150 platform?

A.   I did not.

Q.   And if he had said that, would that have mattered to you?

A.   Yes.

Q.   Do you recall on cross-examination Mr. Caruso just asked you a lot about the SEC filings?  Do you recall that?

A.   Yes.

          MS. ESTES:  Ms. Wolfson, can you pull up Defense Exhibit 736.  Ms. Wolfson, can you zoom in to the date at the bottom there.

Q.   What's the date of the prospectus listed there?

A.   July of 2020.

Q.   July 17?

A.   July 17, 2020.

          MS. ESTES:  Ms. Wolfson, can you pull up 425-T.

Q.   All right.  Mr. Schonberger, this is the transcript of that

podcast you looked at involving the orders.  What's the date of the podcast there?

A.  July 31, 2020.

Q.  OK.  So after the prospectus which was issued on July 17?

A.  Correct.

Q.  And you, in fact, invested in the stock September 8, 2020, right?

A.  Correct.

Q.  So after Mr. Milton's statements in the July 31 podcast, correct?

A.  Correct.

MS. ESTES:  All right.  Ms. Wolfson, you can take that down.

Q.  Do you recall Mr. Caruso asking you questions about Robinhood and how they encourage you to invest in companies carefully?

A.  Yes.

Q.  Mr. Schonberger, you did research on this company before investing, right?

A.  Correct.

Q.  That involved watching interviews of Mr. Milton, right?

A.  Correct.

Q.  Did you believe you could trust his statements in interviews?

A.  Yes, I did.

Q.   Why did you believe that?

A.   Because, as I said, CEOs have a fiduciary responsibility to tell the truth about their company, and that -- you can rely on that as well as you can rely on an SEC filing.

Q.   How did you feel when you learned that what he said may not have been true?

          MR. CARUSO:  Objection.  This has been asked, and it's just repeating the direct now.

          THE COURT:  Overruled.

A.   I felt that it was deceptive; that his statements were not in line with what the truth was and what was published.

Q.   Mr. Schonberger, you testified on cross-examination -- do you recall Mr. Caruso asking you questions about the SEC filings not being relevant?

A.   Yes.

Q.   And what did you mean by that?

A.   What did I mean by that they were not relevant?

Q.   Yeah.

A.   I just meant that it wasn't relevant to my investment decision at the time.  I based my investment decision on the articles and information that I had reviewed.  Not that it's not relevant for anybody at any time, but it was not relevant for my investment decision at the time.

Q.   And did you believe that all the things you reviewed involving Mr. Milton's statements would be consistent with any

facts in the SEC filings?

A.   Correct.

Q.   Why did you believe that?

A.   Because that's what it needs to be by the law.  He has to be able to state exactly what is in the SEC filings and not be different than the SEC filings.

MR. CARUSO:  Objection.  Move to strike his legal analysis.

THE COURT:  Overruled.

MS. ESTES:  Nothing further, your Honor.

THE COURT:  Anything else?

MR. CARUSO:  Yes, I have a couple more, Judge.

RECROSS EXAMINATION

BY MR. CARUSO::

Q.   I think you testified now on redirect that it would have mattered to you if you had known that Nikola was using a Ford platform, correct?

A.   Correct.

Q.   And you mean to say that it would have mattered to you even though Nikola modified the platform by 95 percent?

A.   I was not aware of their 95 percent.

Q.   Yeah, but you're saying it would matter to you.  I'm asking would it matter to you --

MS. ESTES:  Objection.

THE COURT:  Sustained.

Q.   Would it have mattered to you if you had known that Nikola
had modified the Ford platform by 95 percent?

A.   The answer still is yes.

Q.   OK.   Now, you were asked on redirect about research on
Robinhood, yes?

A.   Correct.

Q.   So you did research on Robinhood, correct?

A.   Yes.

Q.   But you didn't do the kind of research that Robinhood
encouraged you to do by looking at SEC filings, did you?

A.   I did not review SEC filings.

Q.   Even though Robinhood encouraged you to do so?

A.   Robinhood did not encourage me to do so.   Robinhood states
on their platform that you might be encouraged to do so.   They
did not encourage me to do so personally.

Q.   No, they encourage all the people who use Robinhood,
including you?

A.   It might be on their platform, correct.

Q.   And you're one of the users, yeah?

A.   Correct.

Q.   Now, the government, I believe, showed you one of these SEC
filings from August.

         Chris, would you call up Exhibit -- Defense
Exhibit 742, please, and go to page 60 -- hold it for now, but
we're going to go to page 69.

You were aware in 2020 -- in September of 2020, weren't you aware that when Mr. Milton made the statements that you have seen and referred to, he was talking about the execution of Nikola's business plan, correct?

A.   Correct.

Q.   If you look at page 69 at the bottom of this particular SEC filing, you'll see that it says:  "Our business model has yet to be tested, and any failure to commercialize our strategic plans would have an adverse effect on our operating results and business, harm to our reputation, and could result in substantial liabilities that exceed our resources."

You see that, sir?

A.   I see that.

Q.   And that's about the execution of the business plan, correct?

A.   Correct.

MR. CARUSO:  Nothing further, Judge.

MS. ESTES:  Nothing else, your Honor.

THE COURT:  Mr. Schonberger, you may step down.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Ladies and gentlemen, it's about five minutes from our break, so why don't we take it now.  Twenty minutes.  So we'll get back together at five minutes after the hour.  Don't discuss the case.

(Jury not present)

THE COURT:  Everyone can be seated.

So let's discuss timing for today.  You have one more investor witness?

MR. ROOS:  We're not going to call that witness.  So we have one witness left in the case, who is the summary witness.

THE COURT:  And there are any number of issues that we need to discuss.

MR. MUKASEY:  There are objections to some of the exhibits that will affect some of the charts.  I apologize that these were not worked out in advance.  I think your Honor's seen sort of what the late-night horse trading has been.  We're doing our best to keep up.  We can identify for Mr. Roos immediately a lot of those objections.  I think they impact some of his charts and not others.

I can tell you, if it means anything to the Court's scheduling, that if we can work out the majority of these objections in a meet-and-confer kind of way, my cross of this witness will be quite short.  I don't want to impact the sort of flow of where we're going.  I'm happy to talk to Mr. Roos and maybe make this break a little more extended.  Whatever the Court wants to keep this thing flowing efficiently.

THE COURT:  What is the likelihood that all of these issues will be resolved in an hour?

MR. ROOS:  We haven't, obviously, had a chance to talk, but I think, in terms of the issues that are outstanding before this next witness testifies, to the extent there are any remaining objections to the summary charts themselves, they have not been ruled on, the pending motion relating to Government Exhibit 34, which is the Britton Worthen text messages, and then any objections to the exhibits that the government offered an hour ago are things that need to be resolved before -- really before the witness takes the stand.

THE COURT:  Because what I'm thinking is just letting the jury know that we're ending early today, and I'll tell them it's -- and I will tell them, if the parties agree to end early, that we're doing it in order to streamline the presentation of evidence, and that we still absolutely believe that we are on schedule to finish this trial within the next week.

MR. ROOS:  Certainly, your Honor.  I think, based on what Mr. Mukasey said about his cross, I'm confident that we could put on the summary witness in the morning, get her on and off, and start the defense case.  So we won't be -- I don't think we'll be meaningfully behind kind of where we were projecting yesterday, if Mr. Mukasey agrees about his cross. So I think it's OK to send the jury home and tell them we're still on schedule or even ahead of schedule.

MR. MUKASEY:  Totally agree.

THE COURT:  OK.  So question is do we bring them back out or just send them home?

Jazmin.

(Discussion off the record)

THE COURT:  So we'll bring them out at the five after, and we'll tell them that they're going home.  OK.  I just didn't want to upset them that they waited 20 minutes to be told to go home.

(Discussion off the record)

THE COURT:  Never mind.  We'll bring them out at five after.

MR. MUKASEY:  Thank you, your Honor.

THE COURT:  Then I would recommend that we take a normal break and come back early afternoon, unless you folks have different --

MR. ROOS:  I think that makes sense, your Honor. There is also -- there's some pending issues relating to the defense expert, and so we could sort of -- we could try to figure -- resolve some of the issues and then present whatever is left to your Honor.

THE COURT:  OK.  So we'll come back at five after, and then we'll take like 45 minutes or an hour.

(Recess)

(Continued next page)

M9TCmil5

(Jury present)

THE COURT:  Everyone can be seated.

Ladies and gentlemen of the jury, there is a quote that, based on my most current understanding, is falsely attributed to Mark Twain, and it goes like this.  I'm sorry for the length of this letter, but I didn't have the time to make it shorter.  Which translates, essentially, into, if I were able to put in a little bit more time, it would have been more efficient and shorter and pithy, all of which is to tell you that we are ending today for the day because there is a lot of legal work that I have to go over with the lawyers so that the presentation of the evidence coming up will be as efficient as possible.  I also have been authorized to tell you that we are still on course to have this case completed by on or before October 14.  So we're still on track.

With that, we will reassemble tomorrow at 9:30.  Please do endeavor to be in the jury room by 9:15.  Until then, don't discuss the case, don't read anything about the case or listen to anything about the case.  Have a good evening.

(Continued on next page)

M9TCmil5

(Jury not present)

THE COURT:  Folks can be seated.  When do you want me to come back?

MR. CARUSO:  Your Honor, I have been asked to go through this list, our side and then with the government.  It's quite a lengthy list.  I can't think of any other way to do it except to sit here across the table from each other figuratively, if not literally, and then go through the list, and then we'll present the Court with what we can't agree with. It's a long list, 15 pages.

THE COURT:  Do you know how many exhibits are on there or what all needs to be resolved or whether they fall into -- I'm sure there is dozens of items, but if they fall into two or three buckets that you can easily resolve.

I will be upstairs.  I'm going to wait to hear from you.  Okay.

MR. CARUSO:  Okay.  Very good, your Honor.

THE COURT:  You should give yourselves a lunch break.

MR. CARUSO:  That sounds like a good idea.

THE COURT:  Okay.

MR. MUKASEY:  You're not getting a lunch break.  Sit down.

(Recess)

AFTERNOON SESSION

(2:49 p.m.)

THE COURT:  We're back on the record.

The record will reflect that we are having a conference concerning certain evidentiary issues that arose earlier in the day and that will be coming up with future witnesses.

Mr. Milton requested, through counsel, to be excused from this session and that request was granted.

Mr. Caruso.

MR. CARUSO:  Yes, Judge.  Just before we turn to the main topic of these exhibits, as I mentioned to Mr. Podolsky, I forgot this morning, but I'm going to do it now, I move to strike the testimony of Mr. Schonberger on the same grounds that I've been arguing before for lack of a foundation.  And I just want to make my record.

THE COURT:  You've made it twice today.

MR. CARUSO:  Yes, before and after.  That's what I think is good, but anyway.

THE COURT:  So what do the parties want to tell me?

MR. ROOS:  Your Honor, just starting with an agenda, here are the outstanding issues.

So first are a series of defense objections to exhibits the government proffered into evidence earlier this morning, and I would say included within that big category

would be the Britton Worthen text message exchange that the government and defense wrote on, as well as a few defense exhibits that relate to metadata.  They're all sort of included within the broad evidentiary objection issues and we'll get more detail on that.

Second is the outstanding summary charts that the defense objects to.

Third is, I think there is an outstanding motion to quash the government's subpoenas.  I think that might be it, your Honor.

THE COURT:  So describe for me, if you would, Mr. Roos, you read from two or three stipulations, and there were long lists of exhibits.  Can those exhibits be categorized in some fashion?

MR. ROOS:  Yes, your Honor, and we've worked a bit between the parties to group them into issues.

Broadly speaking, most of the stipulations stipulated either only authenticity or in some cases, which I don't think will actually matter for your Honor, authenticity in the business record exception.  So the issues before your Honor, though, are in some cases hearsay, relevance, and 403 issues.

THE COURT:  Okay.

MR. ROOS:  So maybe for starters, and I can sort of complete the record at the end of today's conference, but for starters, I'll just list into the record the exhibits that the

parties have an agreement on and also the exhibits that the government is going to withdraw and proffer.

THE COURT:  Okay.  Can you do that by stipulation?  Is that how you will do it or no?  Never mind.  Do what you planned on doing.

MR. ROOS:  So the government and defense, I believe, have an agreement on Government Exhibits 16, 202, 203, 203-A, which is the attachment, 224, 234, 319, all of the exhibits within the 400 series that I read earlier today, 528, 529, 556, 560, 561, 900, 901, and 1504 through 1526.

So those are the ones that there is no dispute on.  If your Honor would like, you can say they're admitted now or I can do it again before the jury tomorrow.  And then also tell your Honor the ones that we're withdrawing, which are --

THE COURT:  So for the record, let's do it as cleanly as possible.

For the record, the exhibits that Mr. Roos just put on the record as to which there is no longer any dispute are admitted.

(Government's Exhibits 16, 202, 203, 203-A, 224, 234, 319, 405, 405-A, 405-T, 408, 408-A, 408-B, 408-C, 408-D, 408-T, 411, 411-A, 411-T, 413-T, 414-A, 415-A, 417-A, 417-B, 417-C, 417-D, 417-E, 417-F, 417-T, 423-A, 423-B, 423-C, 423-D, 423-E, 423-T, 528, 529, 556, 560, 561, 900, 901, 1504, 1505, 1506, 1507, 1508, 1509, 1510, 1511, 1512, 1513, 1514, 1515, 1516,

1517, 1518, 1519, 1520, 1521, 1522, 1523, 1524, 1525, 1526 received in evidence)

MR. ROOS:  Thank you, your Honor.  In terms of the 400, series, I think they're on the record, but afterwards, I will pass up the numbers to the court reporter so we have the full numbers or I can read them now again.

THE COURT:  How many are they?

MR. ROOS:  Several.

THE COURT:  Give the list to the court reporter.

MR. ROOS:  I'll just say on the record they are subparts or the complete version of 405, 408, 411, 413, 414, 415, 417, and 423, and I will give the full list to the court reporter, which includes the subparts.

THE COURT:  Very well.  By the way, those, I take it, are the various podcast interviews, the videos?

MR. ROOS:  Correct, your Honor.

THE COURT:  Okay.

MR. ROOS:  Next, the government is withdrawing its offer of exhibit 21 and exhibit 1503.  The government was going to offer exhibits 39 and 902.

To give your Honor some context, during the first witness, Mr. Lackey, the government offered some screenshots of the Nikola Insider Twitter account, which Mr. Lackey Tweeted from, he testified.  The defense objected.  The government offered two bases for admission.  One was that it was a prior

consistent, and the other was relevancy based on the effect to Mr. Milton.  There was an objection on that ground arguing that there's no evidence that Mr. Milton saw these.  The government offered that they could be conditionally admitted, and this is to sort of close the loop on that.

Now, I'm told by Mr. Caruso that they will withdraw that objection to the previous exhibits that were admitted such that we don't need to close the loop, and once that's confirmed, we will withdraw our offer of Government Exhibits 39 and 902.

MR. CARUSO:  Confirmed on that, that way the exhibit doesn't have to come in twice.

THE COURT:  Okay.  So now I'm confused.  With respect to those two exhibits, I believe I did amazingly recall that I admitted at least one exhibit subject to connection.

MR. ROOS:  I think your Honor, looking back at the transcript, your Honor said these are admissible both because there was a dispute calling to question the witness's testimony as to whether he's telling the truth.  So it's relevant as an admissible prior consistent statement and also relevant as an effect on Mr. Milton.

So I think your Honor agreed with two bases for admission.  On one of them, there was a condition attached to it, which is that we subsequently introduce evidence, and so we were prepared to do that.  And then upon being shown the

evidence, I understand the defense is now withdrawing their objection such that we no longer need to put in the evidence to close the loop or complete the connection.

THE COURT:  Okay.  So there is no longer an objection to the admission of those exhibits?

MR. ROOS:  Correct, that's my understanding.

MR. CARUSO:  Yes, that's right, Judge.

MR. PODOLSKY:  Just want to make sure the record is clear.  There is no longer an objection to the exhibits that were offered during Mr. Lackey's testimony, but we are not going to offer these two additional exhibits.  Those are the ones we're now withdrawing.  I want to make sure we're clear on that.

THE COURT:  Now I'm more confused.

MR. CARUSO:  May I try?  During the direct examination of Mr. Lackey, I objected to a particular exhibit — the government can remind me of the number — and the Court admitted it subject to connection.  I'm just withdrawing that objection.

THE COURT:  Okay.

MR. CARUSO:  And as a result of that, there's another exhibit that we discussed today that the government is withdrawing.

THE COURT:  So what exhibit number is it that was put in or attempted to be put in through Mr. Lackey as to which there is no longer an objection?

MR. ROOS:  It's 578 through 581, which were the Nikola Insider Tweets.

THE COURT:  Okay.  So now we have those as to which there is agreement, those that are withdrawn, and the exhibit that was initially admitted subject to connection, which is now fully admitted.

(Government's Exhibits 578, 579, 580, 581 received in evidence)

MR. ROOS:  Thank you, your Honor.

MR. BONDI:  Your Honor, just to be clear, with our agreement to the 400 series is subject, of course, to the whole audio and the whole transcript, and also our transcript excerpts, which we're working out with the government just to make sure they're accurate.

THE COURT:  I think the government at some point began putting in the entirety of those videos.

MR. ROOS:  That's correct, your Honor.  Just to confirm what Mr. Bondi said, there are some full transcripts that include portions of the audio and what would be the transcript that are the types of things that the government objected to, like personal family matters that your Honor already ruled on.  The parties are going to work out those redactions, but, otherwise, the government and the defense have an agreement that we will just put the entirety of the audio and the transcripts in.  So we have an agreement on that.

The only things we're working through are the redactions and to the extent there are errors in the transcripts.

THE COURT:  Okay.

MR. ROOS:  So now in terms of the objections.  We've tried to put them into categories.  So the first category are documents that reflect purchases made by Mr. Milton, and these are some of the source documents that are on the government's summary chart, and the numbers are 301, 303 to 307, 906 through 908, and I understand the defense has objection.

THE COURT:  So these are, when you say purchases by Mr. Milton, purchases by Mr. Milton of products or purchases by Mr. Milton of stock?

MR. ROOS:  So they are in the summary chart, 1013. There is a tracing of the stock proceeds and then the bottom, it will say "house" or "airplane."  Each of those has a reference to a government exhibit number, and those government exhibits are the ones we're talking about.  They are, for instance, the contract to purchase the plane, the contract to purchase the house, they're what ties sort of the wire transfer information out to what actually the purchase was for.

Cognizant of your Honor's 403 statements at the final pretrial conference, we were not attempting to admit pictures of the planes, pictures of the houses, videos or pictures of any of the other items.  So there is a contrast.

THE COURT:  So, Mr. Bondi, I thought I ruled on this pretrial.

MR. BONDI:  You did, your Honor, and I'm not going to waste your time.  Just for the record, we have relevance and 403 with respect to all of those exhibits.

THE COURT:  I'm standing by my pretrial motion as I believe I indicated at the time.  Those types of purchases are not only generally admissible at fraud trials such as this, they are relevant to motive and intent.  So that objection is denied.

Next.

MR. ROOS:  Thank you, your Honor.  The next category is the government has a summary chart, it's called Timeline of Creation of In Motion video, and it is exhibit 1006.  It is largely a chronological summary of many emails, and I will read for the record the numbers.  They are 210 and 210-A, 211, 295 to 299, 320 to 322, 324, 326, 920 to 931.

The government's position is all these, either the defendant is on, he's either sending it or he's receiving it, so it's for the effect on him.  And they're relevant because they relate to the creation of the In Motion video and the Philips video.

MR. BONDI:  Your Honor, we have a few objections with these.  First of all, with respect to Philips underlying documents themselves, many of these involve communications with

Phillips, which we would say is not a business record. This was a one-off commercial that Philips did, so it wouldn't be a Nikola business record. And there are communications with Philips individuals.

Secondly, your Honor, we have some serious concerns under the confrontation clause here because there was a number of different witnesses here on these documents and emails that we believe we have a right to confront and cross examine rather than get them shoehorned in here as a summary exhibit.

We have objections as to relevance, and obviously under 403 to the prejudicial impact and the misleading.

Finally, your Honor, with respect to both the chart and all these documents is they don't represent, your Honor, a complete picture of what this timeline is supposed to say of the creation, timeline of creation of In Motion video. It leaves off quite a bit of the documents, your Honor, like DX-88 and 89, which was a meeting minutes relating to this very video.

THE COURT: I take it, Mr. Bondi, that two documents that you just mentioned are not in evidence?

MR. BONDI: They're not in evidence, your Honor. It also leaves out DX-245 and 246, which were board of director minutes of the Nikola board of directors showing the involvement of the board of directors in this. By leaving out these, they create a very big hole and leave a very misleading

impression for the jury that the board of directors and executives were not invested when they very much were.

The other thing, your Honor, under 1006, we don't think this falls into the type of category that requires a summary exhibit here and would object on that ground, as well.

THE COURT:  Actually, can someone describe for me, because all we've seen is the video and we don't have any of the background.  So I know I thought Philips was the lightbulb company when it was first mentioned, but I take it that's not the company that's involved.  So what, generally, is this chart, what's the story of this cart?

MR. ROOS:  Basically, in July 2017, an employee from Philips emails the defendant and says, Philips wants to do a commercial, wants to have the Nikola truck in it.  That's an email sent to the defendant.  It's being offered for its effect on the defendant.

The next email in the sequence is just sort of a back and forth about Mr. Milton wants to do the commercial, they're taking preparations to do this commercial, the video is shot.  There is then discussions about edits to the Philips commercial.  There is then emails about using footage from the video shoot for Nikola's own purposes, there is emails about editing the video, then there is emails about posting the video on the Nikola social media and website.  And I'll note that every single one of the emails referenced in the government's

summary chart, which were the ones that the government is attempting to offer now, are either emails to the defendant, which go to or are either part of the same chain and are necessary context or go to a state of mind and are not being offered for the truth, or they're emails by the defendant himself. So these are just email exchanges with the people about setting up the company. They all involve the defendant. None of them are between other parties.

THE COURT: And the four exhibits that Mr. Bondi mentioned, are those exhibits that you would consider including as part of this timeline?

MR. ROOS: So I'll let -- two thoughts on this. I think as a legal matter, they broadly -- maybe defense counsel thinks they are completing of the story, but they're not admissible under the Rule of Completeness for the much more narrow purpose. In terms of the substance, Ms. Estes reviewed them, so I'll let her speak to at least our reading of the documents.

MS. ESTES: So one of the documents is an email exchange. It appears to be among engineers, and then they attach an agenda from a meeting involving engineers. Mr. Milton is not on the email exchange, does not appear to have attended the meeting. So it's just entirely unclear how this, in some way, completes the story of emails involving the defendant and Philips. So I don't know what the argument is

there.  They can certainly try to argue that it's admissible in their case for some reason, but he's not on the email or in the meeting.  So that's the first one.

The second one is an email attaching board minutes.  It's simply not a Rule of Completeness issue.  Our emails are exchanges between Mr. Milton and Philips.  This is a separate email.  Philips is not copied on it, and then it just attaches board meeting minutes.  Again, the defendant can seek to offer it in his case, maybe we'll get to it, maybe we won't, but it's simply not a completeness issue where it needs to be offered through our summary witness.  And we're happy to pull them up if that's useful for the court.

MR. BONDI:  May I, your Honor?

THE COURT:  Yes.

MR. BONDI:  The story is much, much more detailed than the government has suggested here.  The involvement and creation of this video involved the general counsel of the company and it was well known and involved the board of directors, both the general counsel and the board of directors involved.

The first of these documents that we have here is DX-88 through 89, which were scalability meeting minutes, that included the participation of the general counsel putting him on notice about the situation here involving the Philips truck and involving rolling down the hill.

The second document is board minutes that were sent to Trevor Milton that say the commercial was, quote, truck moving not under its own power. Because, your Honor, we would proffer that the evidence will show and would show that the general counsel was involved, reviewed the, quote-unquote, In Motion video, the clip that was released, authorized its release, was involved in the creation of the language of the release In Motion, and that the board was well aware of the commercial going out and the fact that the truck was not moving under its own power, all of which, your Honor, goes squarely to the good-faith defense that we have asserted for Mr. Milton. He has advisers around him, including the general counsel, that say this is okay, and the board of directors say this is okay. Your Honor, I'm not quite sure why the government is resisting the admission of those four documents, but we think they are critical to telling the story here.

MS. ESTES: Your Honor, the defense can seek to offer them in their case, but they are not completing the emails that we are seeking to offer. I think it might be helpful if we actually pull some of them up.

THE COURT: Okay.

MS. ESTES: Ms. Wolfson, can you pull up 925.

Your Honor, this is to provide you some context. This is one of our exhibits. It's an email from Mr. Milton himself. So we think it's very plainly admissible. It's to Philips.

M9TCmil5

This is an exchange about the video, he's asking why doesn't their video show the truck going down the road, as we talked about. We think that's plainly relevant to the In Motion video and Mr. Milton's intent by that.

Let's take that down and pull up Defendant's Exhibit 88.

So, your Honor, this is just an email exchange with minutes attached. The defendant, his brother, Travis Milton, is copied here, but he's not copied on it.

Let's go to 89, the attachment. And so, your Honor, these are minutes from a meeting the defendant is not in, and I just don't see how, in any world, they complete the story of that email exchange between Mr. Milton and Philips.

THE COURT: Let me ask a couple of quick questions.

MR. CARUSO: Could we have that brought up.

THE COURT: Now, I know Dane Davis is a Nikola employee; correct?

MS. ESTES: Yes.

THE COURT: And Tony Epperson.

MR. CARUSO: Same.

MR. ROOS: They're all Nikola employees at the time.

THE COURT: My view is that I don't believe that the documents described by Mr. Bondi serve to or ought to come in in order to avoid any unfairness to Mr. Milton. My take of the defense's position is generally, look, he didn't do this on his

own, he wasn't hiding it from everyone, everyone at the company knew.  That's clear from these documents that are in the chart. So I don't think Mr. Milton is prejudiced by the failure to include those documents.  Again, I don't think that they're necessary to complete the story or to be put in in the interest of fairness.  So that motion is denied.

MR. BONDI:  Your Honor, just for the record, I believe the exhibit that Ms. Wolfson just put up is not in the chart. That was the one we wanted to put in and include.

THE COURT:  I understand.

MR. BONDI:  Thank you, your Honor.

MR. CARUSO:  If your Honor, please, is it the government's position that if we offer these four exhibits in our case, they're going to object?

THE COURT:  Oh, I'm sure they will.

MR. PODOLSKY:  Yes, your Honor.

MR. CARUSO:  That's having it both ways, it really is.

THE COURT:  Again, from my perspective, the decision I need to make with respect to this chart is whether I ought to include, in fairness, the documents that you have described, and based on the description that's provided and my view of this document, I don't believe that I have to.

MR. BONDI:  Your Honor, if I may proffer very quickly for the record, the date of that board meeting with the approval was October 26, 2017, which would have put Mr. Milton

on notice in the midst of these communications here, and that's why we think that was important, but we understand your Honor's ruling.  Thank you.

THE COURT:  Very well.  Next.

MR. ROOS:  The next is, maybe it makes sense to do, the government moved to exclude a text message exchange that involves Britton Worthen and the defendant on hearsay and 403 grounds.  The defendant opposed the motion and identified a few documents to be admitted, also related to metadata, and so I think that's the next issue before the Court.

THE COURT:  Very well.

MR. BONDI:  Thank you, your Honor.  Let's start with the texts from Britton Worthen.  If your Honor remembers during Ms. Amzallag's testimony, I admitted into evidence a document, which was a text exchange between Ms. Amzallag — formerly Ms. Fleck — and Mr. Worthen where she sent Mr. Worthen a screenshot of a text of Mr. Milton.  And she said sorry to be texting so late, but heads up on a Tweet Trevor sent out a bit ago, heads up on a Tweet.  And she attached the Tweet and she said in regards to the Badger, and Mr. Worthen said thanks for forwarding.

I then, during Ms. Amzallag's cross examination, attempted to admit the next exhibit, which is Government Exhibit 34, which is a text exchange that immediately follows where Britton Worthen, the chief legal officer, follows up with

Mr. Milton on the text.  And on the text, he says, you know, need to be careful here — this is Mr. Worthen to Trevor, and he attaches the Tweet.  Trevor Milton says prototype is already being produced.  They didn't ask when it would be on the roads or driving.  Worthen said I think it could be interpreted as if it's already produced, not that it's currently being produced.  Mr. Milton said, yeah, I can see how that could be misunderstood, but the first prototype is being produced so, legally, I'm okay, but I'll be more clear next time.  Mr. Worthen then says, agreed, I knew what you meant, that is why I suggested we need to be careful, it is not misunderstood.  And Trevor says yes.

This text exchange, your Honor, was the issue at sidebar, if your Honor remembers.  We've had so many.  During sidebar, the government said it would be happy to take up the admissibility of this document at another time and was essentially pointing out that there was another witness that it could come through.  At the time of my cross, Mr. Worthen was on the witness list for the government and as since, Mr. Worthen has been removed.

But, your Honor, this document should be admitted into evidence, and the reason why it should be admitted into evidence is several reasons.  Number 1 is, under Rule 106, in fairness and in completeness, it should come in.  The government explored on direct her interactions with Mr. Milton

M9TCmil5

and others and left the jury with a misleading impression that Britton Worthen didn't do anything or didn't follow up with Mr. Milton there.  We introduced the texts --

THE COURT:  I'm sorry.  The government left the misleading impression that what?

MR. BONDI:  That Mr. Worthen didn't follow up with Mr. Milton or didn't review his Tweets and didn't do anything. This email establishes that Mr. Worthen was informed by people like Ms. Fleck, and that document is in evidence that she informed him of Mr. Milton's Tweet.  And, in fact, Mr. Milton did follow up in Government Exhibit 34, which we're seeking to admit into evidence.  It is a critical document in the defense, your Honor, and I don't mean to sound like a broken record, but if I had to do a Christmas wish list, this would be at the very top of it.

And the reason why it's so important, your Honor, is because it sets the stage.  This is Mr. Milton being put on notice from Mr. Worthen about one of his Tweets and it informs Mr. Milton's state of mind in two respects, your Honor, and this is early in the process.

June 9th, 2020, it puts him on notice with respect to two things.  Number 1 is that Mr. Worthen was looking at his Tweets and that things were being brought to Mr. Worthen's attention and that Mr. Worthen was following up with Mr. Milton, therefore establishing Mr. Milton's belief that

Mr. Worthen would follow up or inform him of any concerns about any of his statements. The second issue, your Honor, is with respect to it put Mr. Milton on notice that this Tweet was okay. In Mr. Milton's words, legally okay, and Mr. Worthen essentially concedes that here in the text message.

Following this text exchange, Mr. Milton made a series of other public statements concerning the Badger, which the government has contended in their case, were misstatements, but those alleged misstatements, your Honor, were informed by this exchange, by GX-34, and in all fairness and in all completeness, and also for non-hearsay reasons, that is to educate on Mr. Milton's state of mind and to provide him notice here. This document should come in.

THE COURT: Mr. Roos.

MR. ROOS: Thank you, your Honor. So, taking the arguments in a slightly different order. Mr. Bondi says it's relevant for notice for two reasons. One, it's notice that Mr. Worthen is following Mr. Milton, and on that, as the government wrote in its letter, we're not objecting to the first two lines of the message. So if they want to admit Mr. Worthen sending him the text screenshot and the message above it, that's okay, and they can make that argument if they want. The government's objection is to --

By the way, your Honor, I have a copy of the exhibit if it's helpful for you.

M9TCmil5

THE COURT:  Sure.  I was looking for your letter. What's the docket number of your letter?

MR. PODOLSKY:  I believe our docket number on this was 189, your Honor.

THE COURT:  Got it.

MR. ROOS:  So, if they want to make that notice point about Worthen following him and keeping track of him, the government doesn't object to the first two lines.

The government's objection is a hearsay objection based on Mr. Milton's subsequent statements after that.  As Mr. Bondi highlighted, it's Mr. Milton's words where he says, "I'm legally okay," and describes the reasons the prototype is already being produced.  "I see how it could be misunderstood, but the first prototype is being produced, so legally, I'm okay."  As Mr. Bondi described it, Worthen concedes or acquiesces.

Here's the problem with this.  These are statements by the defendant.  They're out-of-court statements being offered for the truth.  As the Second Circuit cases we cite highlight, these types of backward-looking statements that are self-serving, particularly here when he's confronted by the general counsel, don't have the indicia, necessarily, of truthfulness.  They're not probative of the defendant's state of mind, rather, they're a way for him to put defenses before the jury that are hearsay that we're not able to cross examine

M9TCmil5

him on.

Moreover, as our letter indicates, if he was asked, Mr. Worthen would say he's not even agreeing with the defendant about that he's legally okay, he's agreeing about being more clear next time or about the status of the prototypes.

And so, given the ambiguity and the potential for confusion before the jury, that's our 403 argument.

So, no objection to the top part, but the second part is riddled with self-serving hearsay statements and there is certainly no completeness issue here.  It's the defense that asked Ms. Fleck or Ms. Amzallag, weren't you sending these things to Mr. Worthen, et cetera, they're the ones who put in the other exhibit, and so they can't both introduce those facts and argue it was a Rule of Completeness to get it in.

MR. BONDI:  Your Honor, briefly, Mr. Roos is right, that we couldn't just try to backdoor in a Rule of Completeness, but the reason why the Rule of Completeness comes in is because of the fact that, on direct, the questions that were elicited by Ms. Fleck were essentially that Worthen wasn't part of the process, and that there wasn't followup with Worthen or vetting or reviewing and that sort of thing.  So the cross examination was part of refuting that.  This, in completeness, comes in as a result of the direct and what started in the direct.

Secondly, your Honor, you'll notice that Mr. Worthen

says the word "agreed."  He agreed with Mr. Milton's statements.

But more importantly, your Honor, for all of this, I think two points is, number 1, it is not being offered for the truth of the matter, it's being offered with respect to notice. Your Honor can address this through an instruction to the jury and we would have no issue if your Honor wanted to instruct the jury on this, but this is a critical document that comes in for the defense on notice and to Mr. Milton's state of mind.

The second thing is the government has said, well, we don't have a problem with the first two lines, need to be careful here in sending the Tweet, but then that leaves a misimpression there.  The rest of the text needs to come in. This text exchange is a complete text exchange.  It was originally on the government's witness list, GX-34, and it should come in.

Now, as far as what Mr. Worthen knew or didn't know, that goes to the weight, not the admissibility of this document.  Moreover, the government had Mr. Worthen on their list.  If they want to call Mr. Worthen, they can call Mr. Worthen, but the fact of the matter is, this text exchange should come into evidence, your Honor, as a non-hearsay reason.

THE COURT:  The application is denied.

On the notice issue, as the government points out, that can be established through the first two lines.  So to the

extent that what you want to argue is that, because of this text, Mr. Milton was on notice that he was being minded by others at the company, well, that takes care of it, those communications.

With respect to the other legal issue, I do not believe that it comes in under the state of mind exception for the reasons as set forth in the government's letter. Essentially, these are backward-looking statements. He's not being told when you go forward, as you engage in this media blitz, you really have to be careful about what you say. The cases that the government cites, *United States v. Netschi*, 511 F.app 58 (2d Cir. 2013), affirming district court's exclusion of statements defendant made and reactions he had concerning the unraveling of the scheme; and *United States v. Blake*, 195(f) Supp. 3d 605, a (S.D.N.Y. 2016).

Refusing to admit a defendant's self-exculpatory statements about his past conduct speak to this precise issue and indicate and suggest that it would be inappropriate to allow these backward-looking statements to come in under 803(3), so that application is denied.

MR. CARUSO:  May I have one moment, your Honor?

THE COURT:  Yes.

MR. CARUSO:  I have to confess, I don't understand how anybody can read this as backward-looking.  Mr. Milton said, the prototype is already being produced.  That's what he thinks

when he's speaking, and then Mr. Worthen says, I think it could be interpreted — that's not a backward-looking statement, that's what Mr. Worthen thinks at that moment, and then Mr. Milton says, I can see how it could be misunderstood.  But the first prototype is being produced.  That's the statement of the current state of affairs.  So legally I'm okay right now, I'll be more clear next time.  There's nothing backward-looking.

THE COURT:  I know that tense and sentence structures has been a major part of your defense.  However, it is backward-looking because what they are talking about are conversations or a Tweet, I guess it was a Tweet that Mr. Milton had already sent.  So regardless of the particular tenses that are used in these messages, it's nothing but looking backwards at a prior Tweet.

MR. CARUSO:  I see what you're saying, but there's a difference between 803(1) and 803(3).  803(1) requires the immediate, contemporaneous statements.  803(3) is more flexible.  And this is so prompt after the Tweet, so prompt.  I just don't see this as backwards.

THE COURT:  What?

MR. CARUSO:  The exchange here between Worthen and Milton comes so promptly after the Tweet in question that I don't think -- it really is contemporaneous, it's very prompt. 803(3) is designed to avoid things like, I remember I had a

headache last week in order to prove you had a headache last week.  There is a substantial lapse of time and the evidence is excluded because it's not anything contemporaneous that's being recorded or stated, it's a recollection about something in the past.  Let me put it this way, I think it this is contemporaneous enough, more than contemporaneous enough for subdivision 3 as distinct from subdivision 1.

MR. BONDI:  Your Honor, the other thing, just factually here, the Tweet remained live in the market, it remained up, it remained live.  The fact is here, it is forward-looking with respect to that Tweet.  Mr. Milton could remove the Tweet, Mr. Milton could have added a Tweet, he could have put some clarifying information out, and perhaps we would not be here, and the fact is he was informed and on notice that this Tweet was okay, that he didn't need to take those steps to either remove it or put out clarifying information, and that was based on the information here that was conveyed by Mr. Worthen.

THE COURT:  Okay.

MR. BONDI:  Your Honor, if I could move on to the next exhibit related to this, your Honor may recall that there has been a lot of discussion --

MR. CARUSO:  Before we leave that, may I just confer.

So with respect to the question whether we would like to have those first two lines into evidence, can we just get

back to the government and the Court on that?

THE COURT:  Absolutely.

MR. CARUSO:  What's that exhibit number, so I don't forget?

MR. BONDI:  34, GX.

MR. CARUSO:  Thank you.

MR. BONDI:  Your Honor, pivoting here, there was quite a bit of testimony about TeslaCharts podcast, the July 19th podcast that Mr. Milton appeared on.  There was quite a bit of a flurry of emails, if you remember, that were put into evidence.  The Ms. Fretheim email raising her concerns, communications that she made with the executives concerning that podcast, communications between Ms. Rose and Mr. Milton concerning that podcast.  Many of those documents were introduced as part of the government's case.  We introduced some, but they introduced quite a bit of them.

Your Honor, we would move Defendant's Exhibit 212 into evidence.  What that is, your Honor, is a communication, and it reflects the metadata of a subject line.  And itself, your Honor, we don't believe is hearsay, it's a verbal act.  And it was Ms. Rose sending the podcast to Mr. Worthen, the chief legal officer, with the subject line, "Immediate approval needed: TeslaCharts podcast."

Thank you someone for bringing it up.  Ms. Wolfson.

That was sent before, your Honor, the podcast went

live.  And just to set the stage and remind the Court, what happened was the podcaster gave Nikola the opportunity to review it before it was released publicly.  Mr. Milton, if you'll remember in the email exchange that came in, he says I will leave it up to you all to review and approve, to Ms. Rose and to others in the marketing department.

THE COURT:  Of Nikola?

MR. BONDI:  Of Nikola.  He believed that part of that vetting process included review by the general counsel as necessary.  There's been testimony to that effect from Ms. Amzallag that the general counsel would be consulted from time to time concerning these things.  And, indeed, your Honor, on the TeslaCharts podcast, he was consulted before its release through this email, "Immediate approval needed: TeslaCharts podcast."

THE COURT:  He being Mr. Worthen?

MR. BONDI:  Mr. Worthen.  And Ms. Rose consulted Mr. Worthen.

Following that consultation, which is redacted, so we don't know what the discussion was.  Following that communication, the podcast was Ms. Rose -- by the way, during all this process, Ms. Rose indicated to the podcast, we're going through legal approval.  She sends an email to the podcaster sort of saying okay.  The podcaster releases the podcast and Nikola posts the podcast to its social media.

Following that, of course, is when Ms. Fretheim's story comes in where she sees it, she sends the email to Mr. Worthen, Mr. Russell, Mr. Brady raising concerns about that podcast.

The missing component of that big puzzle is this document, 312. All the other documents are in there, but now the jury is left with the impression that Worthen never saw the podcast before it was released. We know he saw the podcast after it was released because that information got in through other exhibits, but the fact is he was consulted on this by Ms. Rose before its release. This is a very simple document with the subject line "Immediate approval needed: TeslaCharts podcast."

We are not offering it for hearsay reasons. It would be a business record because it was part of the vetting we heard from Ms. Amzallag testify occurred. But it's being offered, your Honor, essentially as a non-hearsay reason, a verbal act, the act being Ms. Rose reached out to Mr. Worthen to vet the podcast.

What happened in those communications is all redacted, but what we do know is the podcast was released, and that, we think, is extraordinarily important. We think it comes in under Rule 106 and Rule 611 to complete the record concerning the purpose of the reviews conducted by Ms. Amzallag's team because it shows that the reviews included legal review, not just marketing and branding and messaging, as some of the

M9TCmil5

testimony has suggested.

THE COURT:  So you keep saying metadata.  What do you mean, metadata?  Do you mean a redacted version of the exhibit with just a heading?

MR. BONDI:  It's a redacted version -- I'll ask my colleague to maybe explain what happened here, but in the native version of this, we see the subject line of this document, and the subject line itself shows the subject of the communication from Ms. Rose.

Ms. Ortiz, would you like to add to that.  My colleague, Ms. Ortiz.

MS. ORTIZ:  Your Honor, if I may.  The document itself has been withheld for privilege.  What we're able to tell from the metadata that was produced with the document is first who sent the email, which is Ms. Rose; who she sent it to, which is Britton Worthen and Vince Caramella; the date on which she sent it, which was June 18th, 2020, which is the day before the podcast was released; and we can tell what the subject line is, which is "Immediate approval needed: TeslaCharts podcast." That's the only information that we're seeking to introduce with respect to this document.  Again, the email itself has been withheld for privilege.  We merely want to introduce the fact that the email was sent to Mr. Worthen.

MR. PODOLSKY:  So we put up on the screen the exhibit to give a sense of what we're talking about here.  What the

defense wants to do is put in a document with no text, no context, no testimony, no nothing, just a subject, a blank document and a subject line that says something like, please approve or please review. We don't know if it was looked at and we don't have any content, so we don't know what was actually asked.

By the way, on that note, though I don't think this ultimately matters for the evidentiary issue, we've spoken to these witnesses not about this particular document, but our understanding is sometimes they might ask Mr. Worthen specifically about whether it was okay to release financial or legal information, not about whether the facts that Mr. Milton were saying were correct.

But focusing on this document, we keep hearing a mantra of 106, 611. 611 is not a rule of admission, by the way, and 106 is a Rule of Completeness. This doesn't complete anything. What I understand the defense to be saying is that, somehow, the subject line of a redacted email bears on Mr. Milton's state of mind, but it doesn't, and this goes actually directly to your Honor's ruling on why these communications are privileged, which is Mr. Milton didn't know anything about them. He wasn't on this communication, he had no idea what Ms. Rose might have said, might not have said to Mr. Worthen, so this has no relevance. We have no context for this document, and it's inadmissible.

THE COURT:  But the defense theory shifts, has frequently been the case, and part of what they've been saying, I believe, is that there has been testimony concerning the vetting or not, the prior vetting or not of Mr. Milton's public statements.  I don't recall Ms. Amzallag stating that Mr. Worthen was part of the marketing vetting process, although I could be wrong about that.

MR. PODOLSKY:  I don't believe that was the testimony, your Honor.  I don't believe this document, such as it is, suggests that either.  It suggests that for some reason, with some question that we don't know, Ms. Rose forwarded this to Mr. Worthen.  We don't know what her question was about, we don't know what Mr. Worthen did, whether they responded to it, whether they discussed anything, we have no idea.  So it's hard to understand what relevant purpose this could be offered for.

THE COURT:  I think that it would be error to admit this document for the reasons set forth on the record by Mr. Podolsky.  Also, we don't know whether Mr. Worthen, if he was the recipient, even read it, much less that he had an opportunity to review the podcast, much less that he opined on whether or not it was a good idea for Mr. Milton to have taken part, or whether or not, to the extent that he reviewed it, if he reviewed it, the reasons for which he reviewed it, the analysis that he undertook.  There is just too many questions that will be unanswered and that will have the tendency to

confuse the jury, so I am not going to allow this document. Next.

MR. ROOS: Next is there are three exhibits, Government Exhibits 11, 14, and 38, to which the defense, as far as I understand it, believes additional portions of the overall text message conversations with the recipients. Sorry.

To set sort of what this is, Trevor Milton has a multi-month text message exchange thread with a person named Steve Girsky, that's two of the exhibits 11 and 38, and he has a multi-month text message exchange with someone named David Sparks, that's Government Exhibit 14. So the government has marked portions of those overall threads. As I understand it, the defense objects to those.

(Continued on next page)

M9THMil6

THE COURT:  I don't think I've heard Mr. Sparks' name throughout the trial.  Who is he?

MR. ROOS:  Well, at some point I think some of the witnesses talking about the Nikola Badger mentioned a person named "Heavy D" or the diesel brothers.

THE COURT:  Yes.

MR. ROOS:  Anyways, I understand there's an objection and specifically a rule of completeness objection, so we thought it made sense to group those together since it's the same legal issue, and Ms. Estes is going to handle it.

MS. ESTES:  So, your Honor --

THE COURT:  Government Exhibit 11, Government Exhibit 14, and Government Exhibit 38?

MS. ESTES:  38, yes.

THE COURT:  OK.

MS. ESTES:  Ms. Wolfson, can you pull up 11.

So, your Honor, this is a text message chain from March 2, 2020.  And as Mr. Roos indicated, defense counsel wants to -- instead of admitting these few text messages from a particular date, they want to admit a multi-month email chain involving Mr. Milton and Mr. Girsky.

Maybe we can pull that up side by side.  It's Defense Exhibit 1142.

So, your Honor, you can see here that the government exhibit is March 2; the defense exhibit starts on February 5.

And can we just click through it.  Keep going.  It's just many, many months.

I don't think, just because we're admitting a text chain from a particular day, that the entirety of Mr. Milton's text messages with Mr. Girsky should come into evidence under the rule of completeness.

THE COURT:  Let me just ask, the government exhibit has five lines.  Are there any interim messages that are not included?

MS. ESTES:  There are no interim messages.  There are a few messages from earlier that day on March 2.

Let's go to that date, Ms. Wolfson.  Keep going up one more.

So the government's text there starts with, "Hey, I'm not in a place I can read."  Then if you look at the defense exhibit, there are three messages earlier that day starting at 1623.  Our view is that these are a different subject matter. They're about a PR firm and getting on a plane to New York. So, in our view, they're not necessary to complete the story of that day, but if there is any argument for completeness, it's that these three messages should be added, not months and months of text messages.

THE COURT:  Who's dad?

MS. ESTES:  That's Steve Girsky, and I think he says that because that's how he calls himself in his phone.

M9THMil6

MR. BONDI:  Your Honor, there are a few texts after this, shortly thereafter, that also in completeness should be included as well.  Shortly after Mr. Milton's last message, literally less than two minutes later, Steve Girsky responds with three text messages back to him, OK, you know, which similarly should be added all the way through the end of the day.

So, in fairness, your Honor, it should be the entire chain, at a minimum, for March 2 because it's all part and parcel of the same discussion and communication.

THE COURT:  Over how many months?

MR. BONDI:  One day, your Honor.

THE COURT:  No, no, you said the entire chain should be.

MR. BONDI:  Excuse me, your Honor.  Our first position was 1142, which is this series of texts and messages between Mr. Girsky and Mr. Milton.

As a fallback argument, your Honor, to the extent that the government offers just the text from March 2, this isn't even the complete text chain for March 2.  Shortly before and shortly after, less than two minutes after Mr. Milton sends that last text to Mr. Girsky, he responds to that text with three different texts.

So, your Honor, as a fallback, what we would say is let's put the text in before and let's put the text in after,

and then we're good.

THE COURT:  What about the two after, Ms. Estes?

MS. ESTES:  Your Honor, I think that's fine.

MR. BONDI:  Three after, your Honor.

MS. ESTES:  I only see two.

THE COURT:  There's only two for March 2.

MR. BONDI:  Excuse me.  The ones before and the ones after, yes, your Honor.

THE COURT:  The ones before, are they part of this conversation?

MS. ESTES:  The ones before actually don't relate to the press release that they're talking about in the earlier messages, so I don't think those are necessary to complete, and they are from hours earlier.

MR. BONDI:  They are part of the same thread and part of the same talk, which is talking about promoting and promoting the company.  They're talking about the PR firm. They're talking about getting the messages out, and so it's all part and parcel.  It's only about a couple hours before.  The ones after are less than two minutes after, but the ones before are less than three hours before.  About two and a half hours, I think by my count here, before -- three hours.  Excuse me, three hours.

THE COURT:  Can someone tell me, what are they talking about?

M9THMil6

MS. ESTES:  So, your Honor, this is around the time that they are going to announce that Vecto and Nikola are going to combine.

So I think two things are happening in these messages: The later messages are talking about a press release they're trying to get out, and then the earlier messages are about Mr. Milton coming to New York; there's some discussion of planes.  So they do seem to be separate issues here.

THE COURT:  I'll allow the earlier ones as well.

MS. ESTES:  OK.  So everything -- just so we know how to modify this, your Honor, everything from March 2?

THE COURT:  Yes.

MS. ESTES:  OK.  Great.  Then the next one is Government Exhibit 38.  Can you pull up 1142, too.

This is really the same issue, your Honor.

THE COURT:  OK.

MS. ESTES:  Let's just go to the messages from that day.

THE COURT:  So you include the first two messages from that day?

MS. ESTES:  So we have the first two messages, and then there are a few later ones that day.  We certainly don't think the entirety of this monthslong chain should come in because we're offering two messages from that day.

MR. BONDI:  Your Honor, this is all part and parcel of

it.  You'll see that Mr. Girsky writes:  "I saw the article.  I can't believe he was writing about something in 2016.  Not sure what his motivation is."

You know, this is all part of the same discussion over the article.  First of all, your Honor, none of this should come in under 403, but to the extent your Honor does admit it under 611, the entire communication chain should come in.  So what we would suggest, your Honor, is the messages beginning at 611 -- excuse me, 617.  If your Honor overrules my objection under 403, the beginning messages that start with did you see rip Ed Ludlow a new one -- "did you see me rip Ed Ludlow a new one" all the way through the last one that says, "Hopefully more coming."

Ms. Wolfson, if you could, for the Court.  I'm sorry, if I can commandeer Ms. Wolfson for our purposes, that would be great.  Thank you.

Peter would never have let me do that, by the way.

It's all part of the same discussion, part of the same chain, your Honor.  We don't think any of this, again, should come in, but to the extent it does, the rest of the chain should come in.

MR. PODOLSKY:  Your Honor, just on this, Mr. Bondi's right, same chain, same day, but that's not the inquiry under 106.  It's whether these messages, which are hearsay pages, are needed to understand the offered communications, and they're

not.  It's just Mr. Girsky and Mr. Milton kind of insulting this Mr. Ludlow.

MR. BONDI:  Your Honor, it's a discussion about that article.  And why the government is so pushing on that is because of Mr. Girsky's communication right in the middle where he says:  I saw the article.  I can't believe he was writing about something in 2006.  Not sure what his motivation was.

The two of them were talking about how ridiculous it was to be talking about this article.  It is all part and parcel of the same communication here.  It's part of their same discussion over how completely irrelevant a discussion of a truck from 2016 was.  And this is part of the same ongoing discussion between Mr. Girsky and Mr. Milton.  By excerpting just two texts that happen to be from Mr. Milton here, without the complete context, is entirely misleading.

THE COURT:  I don't believe it's misleading.  While it's certainly true that it's part of the same texts, as we learned, or as we've seen from many proffered communications here, only certain things need be put before the jury.  I do not believe that the balance of this text chain, which is basically to the same effect, is necessary under 106 to make what is being offered to the jury fair.  So that application is denied, at least with respect to Exhibit 38.

MR. CARUSO:  May I add one thought to that, your Honor, please?

THE COURT:  Yes, Mr. Caruso.

MR. CARUSO:  The other thing here is Mr. Girsky says: "I saw the article.  I can't believe he was writing about something in 2016.  Not sure what his motivation was."  Now, we had Mr. Lackey on the stand bragging that he was Ludlow's source.  And Mr. Lackey, of course, became a short seller, and we know what his motivation was.

So I do think this is also relevant to complete that part of the saga of all these short sellers and their motivations.  Mr. Girsky's the one who's querying this at the time, querying the motivations at the time, and we've got a lot of testimony about motivations of people like Lackey.

THE COURT:  And you've got a lot of information before the jury questioning his motivations.  I don't think the balance of the thread on that day, as I indicated, is necessary in order to prevent unfairness to Mr. Milton.

MR. CARUSO:  OK.  Thank you, Judge.

MS. ESTES:  All right.  Then, your Honor, there's one more in this same vein.  It's Government Exhibit 14 and then Defense Exhibit 1143.

So, your Honor, these are messages between the defendant and the diesel brother guy, Dave Sparks --

THE COURT:  OK.

MS. ESTES:  -- you know, in the early part of the tags talking about Instagram, things like that.  It seems entirely

irrelevant to what we're offering, which is a text at the very bottom there: "Dude, this is going to be crazy, man. The next two months with all the announcements we have, I believe is going to send the stock through the roof." And then the last message from Mr. Milton, release of reservations, so it doesn't appear to go to the message he sent before about the stock going through the roof.

MR. BONDI: Your Honor, if I may, this is watercooler talk between somebody that's not even at the company and Mr. Milton. We're at a loss as to the relevance. We think it's misleading by selectively pulling out this one text out of context when it's a communication, all part of the same discussion. Pulling out one statement in a conversation is hardly appropriate, and I think that it is meant to try to suggest some improper motives or something.

I'm not quite sure why the government's offering just this one for Mr. Milton, but in the same context, in the same breath, literally 22 seconds later, I think -- no, yeah, excuse me, 18 seconds later, 18 seconds after this text is the follow-up text from Mr. Milton. So, I mean, it is like one conversation. It's like one sentence almost, 18-second difference here. This is a very quick communication.

This also, if you look at this complete chain, your Honor, it's not Mr. Milton that's raising the issue of the stock price, it's Mr. Sparks, and that puts it in context.

M9THMil6

It's not like Trevor Milton out of the blue sends this random text to David Sparks suggesting the stock's going through the roof. He's responding to Mr. Sparks, and in the same breath, literally, he talks about the reservations. OK. It's not like he was obsessed with the stock going through the roof. It's not like he unilaterally sent this text out of the blue. It's in response to the series of texts.

We object to the entire text chain coming in because we don't see it's relevant, we don't see it's -- any probative value is otherwise outweighed by being misleading to the jury. But to the extent it comes in, 1143, the entire exchange, literally in a matter of few minutes here between these individuals, should be coming in.

THE COURT: I don't quite know that I understand what's going on. I mean, I think I understand what Mr. Milton says in the one text that the government wants to proffer.

MS. ESTES: Your Honor --

THE COURT: This was on the day of the announcement. They have -- the media blitz, I take it, was already scheduled, and he's commenting about how all of those media communications will affect the stocks.

MS. ESTES: So, your Honor, in earlier messages what I understand to be happening is that Mr. Sparks seems to want to buy some stock. That's the 1122 text. Milton says, "Let me find out. Give me a minute to ask SEC lawyers to make sure

you're safe."  And then Milton sends back a text that says,

"I'd stay away from it due to the relationship."  I think those

texts about whether it's appropriate for Mr. Sparks to buy

stock are totally unrelated to the last text at the bottom, the

last two texts at the bottom there.  You know, the one we think

has a lot of probative value is Mr. Milton's statement that the

next two months, with all the announcements, our stock is going

to go through the roof.

MR. BONDI:  The reason why Mr. Milton's talking about

the stock is because it was initiated in that 1122 text from

David Sparks about buying stock, whether he could buy stock.

So there's a discussion about buying stock.  Mr. Milton

responds about, no, you can't, and he says the stock's going to

go through the roof.  And literally 18 seconds later, he also

talks about reservations.

This is -- taking this one text out of context, which

is like taking a sentence out of context, because we're talking

about literally seconds apart here from a number of these

tweets, is entirely misleading.

MS. ESTES:  I mean, your Honor, I think the bottom

one, that would be fine with us, the reservations one.

MR. BONDI:  We would be fine, your Honor, with 1122

down to it because it puts into perspective that Mr. Milton

isn't initiating the discussion about the stock; Mr. Sparks is.

THE COURT:  I guess my reaction to that is so what?

M9THMil6

Even if it's Mr. Sparks that's initiating the conversation, is it necessary, in order to avoid unfairness, to include that portion of the text, and I don't believe it is.  The fact that Mr. Sparks wants to buy stock and Mr. Milton is cautioning him or telling him, well, you know, you need to be careful for various reasons, I don't see why putting that before the jury is necessary to make fair the statement of the party opponent that the party wants to put in.

And you say that you are -- have no objection to putting in the second one of those?

MS. ESTES:  The reservation one that Mr. Bondi says is, you know, 18 seconds later, that's OK with us.

THE COURT:  OK.  Mr. Bondi, do you actually want that in?

MR. BONDI:  Let me confer, your Honor.  I think we wanted the whole chain in.  Let me confer to see if this makes it even more misleading.  Hang on a second.

(Counsel confer)

MR. BONDI:  Your Honor, we'll stand on our initial objection to the entire chain, and we think adding the last chain without the rest of it is -- makes it worse.  So we would not want that, your Honor.

THE COURT:  OK.  That takes care of that.  Next.

MR. ROOS:  Next up, hopefully we can take things quickly.  Government Exhibit 3, in the last, I don't know

M9THMil6

however long we've been here, hour, the government is now no longer going to offer this.  So we could cross it off the list.

THE COURT:  OK.

MR. ROOS:  Next, I'll just tell you Government Exhibit 15 and Government Exhibit 330, the government's offering.  The relevant purpose is to prove Trevor Milton was in New York.  15 is a text message exchange that --

THE COURT:  Was in New York?  I'm sorry.

MR. ROOS:  Was in New York.

THE COURT:  OK.

MR. ROOS:  15 is a text message exchange with a family member.  The notable line is the last one:  "I'm in New York."

And 330 is -- if we go to the second page, it's an email to him, to Trevor Milton, and it's a copy of his itinerary while he's in New York.

THE COURT:  And this is part of the media blitz, the post-announcement media blitz?

MR. ROOS:  This is like the day after the announcement, or is it the day of the announcement?

MR. PODOLSKY:  It's a media tour, I think, the day of the announcement of the merger.

MR. BONDI:  Your Honor, I just invoke the rule of the case.  We tried to introduce communications from Ms. Robar as business records.  Government popped up and said she was not at the firm, she's not at the company, she's an outside PR firm,

M9THMil6

and your Honor sustained our admission of Robar emails. Following the rule of the law of the case, it should not come in either.

MR. ROOS:  So on this, a few things:  First of all, I think several Colleen Robar emails where she's telling Trevor Milton how great of a job he's doing did come in.  So I don't think there's a universal Colleen Robar rule.

In terms of these documents, there are two bases:  One is it's received by the defendant, which makes it relevant in terms of his understanding that he will be in New York.  The second is an itinerary certainly does come much closer and is a business record because it's something that's made in the regular course.  It has all the indicia of trustworthiness. It's not like a stray text message or something like that.

THE COURT:  And the relevance is the fact of Mr. Milton being in New York?

MR. ROOS:  Correct, your Honor.  So in this case, the defense has disputed venue.  I suspect they'll dispute wires. The substance of this is probative on both grounds.

THE COURT:  OK.

MR. BONDI:  The mere presence, your Honor, in New York doesn't establish venue.  He could have gone -- done anything in New York.  The fact that he's in New York here alone doesn't establish anything about venue.  We're not sure of the relevance of any of this.

THE COURT:  These documents state that he's in New York for a particular business purpose.

MR. BONDI:  But nothing nefarious, your Honor. Nothing illegal here.  There's been no allegations of anything illegal here with respect to his presence in New York in March of 2020.

THE COURT:  I don't believe the government is putting it in for that purpose.  And I know that you know very well, Mr. Bondi, that acts in furtherance of a conspiracy need not be themselves illegal or acts in furtherance of a criminal activity.  So these documents will be admitted.

(Government's Exhibits 15 and 330 received in evidence)

MR. ROOS:  The next ones I'm going to group together are Government Exhibits 62 and 64 and 937 and 938.  So 62 and 64 are text messages between the defendant and Matthew Peterson, who was his personal assistant, relating to the wiring of money to Peter Hicks.

And Government Exhibit 937 and 938 --

THE COURT:  I'm sorry, who is on 62?

MR. ROOS:  Matt Peterson is Trevor Milton's personal assistant.

THE COURT:  Personal.  And what is the substance or the subject matter of those communications?

MR. ROOS:  We need to wire money to Peter Hicks.  Did

M9THMil6

you wire it?  Yes, yes.  JP Morgan says it will be wired in the morning, stuff like that.

And the two others that Ms. Wolfson is pulling up are wire transfer detail information again to, among other things, establish evidence relating to the particular wires at issue.

THE COURT:  To the?

MR. ROOS:  Particular wires at issue in relation to the Hicks --

THE COURT:  And they went through JP Morgan in New York?

MR. ROOS:  Correct.

MR. CARUSO:  They went actually through the Federal Reserve Bank in New York.

THE COURT:  In New York?

MR. CARUSO:  Yes.

MR. BONDI:  But, your Honor, our position is he didn't direct that.  It wasn't foreseeable.  He didn't know that they were going through New York.  He wired them from his bank in Utah to a bank in California.  What JP Morgan did or didn't do was not in his understanding.

MR. ROOS:  So for that reason, these records are highly probative because they are -- two of them are text messages where he's directing the wiring, and two of them are documents from his email account that indicate that his bank account is attached to a New York address.  So they're

M9THMil6

probative for that reason on foreseeability.

THE COURT:  I think, if I'm remembering from the draft jury charge, which, by the way, you have, I think with respect to a wire, you only need to be aware of the likelihood of the use of a wire, not the likelihood that it will cross a state line.  Am I remembering that properly?

MR. ROOS:  Mr. Podolsky had a very lengthy and elaborate argument about this in a prior trial, so I'm going to let him handle it because I know he has an affection for it.

MR. PODOLSKY:  The short answer is you're right, your Honor.  The foreseeability inquiry is quite broad, but what these documents are being offered for is to show that, in fact, Mr. Milton did direct a relevant wire and that was foreseeable to him that the wire would go through New York, through the Southern District of New York.  That's the purpose of the documents.

THE COURT:  OK.

MR. BONDI:  We dispute the reasonable foreseeability of that, your Honor, just for the record.

THE COURT:  Very well.  The objection to those documents is overruled.

(Government's Exhibits 62, 64, 937, and 938 received in evidence)

THE COURT:  Next.

MR. ROOS:  So one thing just -- I think we all know

M9THMil6

what we're talking about, but the two 900 series document numbers I just gave you, I think, are wrong maybe by one or two numbers, so Ms. Wolfson's giving me the numbers.  I'll just put those on the record.

The next disputed issue is Government Exhibit 208, which is an email of a former Nikola employee to the defendant, and Ms. Estes is going to argue it.

MS. ESTES:  Ms. Wolfson, can we pull it up.  I'm sorry.

THE COURT:  Tell me about Mr. Spira.  Who is he?

MS. ESTES:  Sorry.  Can you zoom in to the whole thing.

So, your Honor, you can see from this exhibit here, he was the chief financial officer of Nikola before Mr. Brady from August 2017.  And what's important here is Mr. Spira is warning Mr. Milton about the need to be accurate.  And this just goes to show that for many years he was warned about the fact that he needed to be accurate in his public statements.  And this, in particular, relates to orders which, as your Honor knows, that is one of the false statements we're alleging in this case is that Mr. Milton was inaccurate when he was describing Nikola's reservations as binding orders.

THE COURT:  OK.  Mr. Bondi, seems highly probative.

MR. BONDI:  I'm not sure about that, your Honor.  It's from 2017, long before the company went public.  We would

object under relevance, under 403, and under 404(b).  I mean, this is an email from someone in 2017 about issues in 2017. This is improper 404(b) type of evidence, we would think.

It's misleading here in the sense that this had anything to do with the public statements that Mr. Milton made three years later that were then after the company went public. Circumstances changed.  There were additional things that happened at the company and orders.  This has nothing to do with 2020.  Moreover, Ms. Amzallag testified that at this time there were paid reservations here and that the reservations were refunded.  Things changed here.  Circumstances changed with the reservations.

So this is not probative of anything Mr. Milton said in 2020.  They're trying to get this in as improper propensity-type evidence or 404(b).  It's confusing.  We don't have a witness here in Mr. Spira to cross-examine him, so we have confrontation problems.  This one is just way far afield.

MS. ESTES:  Your Honor, first of all, the reservations that Mr. Bondi mentions where there was money put down, for many of them it was a dollar deposit.  So they certainly did not have $8.5 billion in preorders then.  So even though the $1 deposit on many of these trucks was refunded, that's a pretty minor change.  There was no world where they had a billion dollars in orders.

And, your Honor, this is highly probative.  He says --

he talks about exaggerating company data.  He's talking about meeting with investors and needing to be accurate.  He says, "Consider being more conservative when publishing statements on social media or speaking with someone from the press."  These are exactly the issues that go to the heart of this case.

THE COURT:  What about the temporal distance between this communication and the communications at issue in this case?

MS. ESTES:  Your Honor, the point we intend to make is that Mr. Milton was warned for many years about this.  He was warned in 2017.  He was warned by Mr. Russell when he was discussing joining the company.  The fact that this is years before it went public doesn't change that.  It almost makes it worse that for many years Mr. Milton has been told you have to be accurate, and he makes a choice to go out there and lie anyway.

THE COURT:  Do you agree with Mr. Bondi that this is 404(b)?

MS. ESTES:  We do not, your Honor.  This is going

directly to Mr. Milton's state of mind.  It's not -- we're not alleging the truth of whatever is said here.  This is going to the issue of the warning.

MR. BONDI:  Your Honor, let's talk about what the statements at issue were.  OK.  The statements at issue in 2020 that the government contends are with respect to binding, those sorts of issues, the discussion, the description about contracts and that sort of thing, the 2020 prospectus, which is in evidence, your Honor, said that there were 14,000 preorders that totaled $10 billion here.  OK.  This email -- which, by the way, to Ms. Estes' own argument earlier, we don't know if he even received this.  We have nothing.  We have no response from Trevor.  We don't even know if he received this email at the time or read it or if there were subsequent discussions or anything.

We have an email from a now-employee -- Mr. Spira, by the way, was fired, your Honor, and had an ax to grind.  We don't know the circumstances behind this or anything, but what we do know is this is being introduced for nothing about what happened in 2020 but merely to try to suggest propensity issues.  If you get caught exaggerating company data in this, introducing it through a document that we don't have a witness to now cross-examine, runs afoul of constitutional concerns under the confrontation clause as well as -- improper propensity evidence is what this is availed as.

MR. CARUSO:  Your Honor, please, I think your Honor quite accurately put his finger on the temporal problem.  This is so old compared to the facts at issue in this case, the charges at issue in this case, that it really does spill over to propensity, and it's just not fair to roll 2017 up with 2020 when so much has changed.

And equally, this is going to open the door to a trial within a trial because, if your Honor admits this, then under Rule 806 we're entitled to impeach the credibility of Mr. Spira, and we would then be entitled to show that he was fired and why, and we will.  We don't want to.  It's a trial within a trial.

THE COURT:  When was he fired and why?

MS. ESTES:  Your Honor, he was -- I do believe he was fired in 2017.  I mean, Mr. Milton, I think, gave reasons for firing him.  I think he was somebody who was pushing back against Mr. Milton.  So there may be other reasons.

MR. CARUSO:  Even more.

MR. BONDI:  There may be other reasons, your Honor.  He was caught watching pornography on an 80-inch television screen that he flashed up with an -- in a conference room.  He engaged in other misconduct which is well documented in documents that the government has from the company, including from Mr. Worthern, the chief legal officer, documenting the nature of him firing.

He also had issues, your Honor, with sexually harassing one of Mr. Milton's relatives, his wife's sister, which is documented in a number of tweets and other information that we've gathered that would need to be introduced to impeach Mr. Spira's character if this document comes into evidence. As Mr. Caruso says, this is going to be a big trial in a trial just because of introducing this individual.

We note, your Honor, that the government had him on their witness list. I think they quickly wised up and realized all the problems associated with him and dropped him off the witness list fairly quickly.

MR. CARUSO: This is what's left.

MR. BONDI: And this is what's left, and this is far afield from 2020.

MR. PODOLSKY: Just because now Mr. Spira's business is being discussed here, your Honor, Mr. Spira was the first CFO of Nikola Motor. Mr. Spira repeatedly told Mr. Milton in documents and in word that he was lying to investors, that he was stealing money from the company, and Mr. Spira was fired.

Defense counsel's correct to the extent that the reason that Mr. Milton gave related to purportedly finding viewing of arguably pornographic images. Candidly, I have no idea whether that happened or not. That was the reason given. I will say this: If the defense wanted to call Mr. Spira as a defense witness to examine the credibility of this statement,

which, by the way, the probative value of this email is the warning, not a fact, but a warning to Mr. Milton, it certainly would be, we believe, inappropriate under 403 to bring up whether Mr. Spira looked at pornography.

THE COURT:  Mr. Spira?

MR. PODOLSKY:  Looked at pornography.

So the bottom line, your Honor, is that the email is --

THE COURT:  Why would that be the case?  I mean, if he were fired -- I guess I am concerned somewhat about the confrontation issue.  Because if what we're going to put in is this one document, when I first read the document when it was put up a couple minutes ago, it's something that could have been sent by Mr. Brady during his tenure given the nature of his testimony.  I mean, it's precisely the same kind of stuff that Mr. Brady expressed grave concern about.

But if we were to put up just this one email without anything else, why doesn't that implicate Mr. Milton's confrontation rights?

MR. PODOLSKY:  Simply offering it for the fact that Mr. Milton received this email.  I don't -- and we're happy to provide briefing on this, if it would help, your Honor, but I don't believe there is any law that says that that would violate Mr. Milton's confrontation rights.  And, look, Mr. Milton is welcome to call Mr. Spira if he wishes.

THE COURT:  OK.  Why don't you give me that briefing.

MR. PODOLSKY:  Sure.

THE COURT:  And I'll reserve on 208.

MR. ROOS:  OK.  504 and 509 and 583 are all Twitter records.  Here's what I understand the objections to be.  504 and 509 were tweeted a month or so before the SPAC was announced, and 583 is a picture of Mr. Milton's Twitter profile which actually was included as part of the Professor Mayzlin slides.  The government's just looking to admit it as its own exhibit for identification purposes, you know, for use in the trial.  And these two tweets that predate March are, obviously, plainly relevant.  They relate to the Badger announcement.  And there's other evidence that's already come in from this time period.

THE COURT:  So --

MR. BONDI:  Your Honor, if I may short-circuit this, we'll withdraw our objections to these.

THE COURT:  I was about to say, haven't we seen just --

MR. BONDI:  We'll withdraw the objection.  Sorry, your Honor.

THE COURT:  Very well.  Next.

(Government's Exhibits 504, 509, and 583 received in evidence)

MR. ROOS:  Next is 1119 and 1120, which Mr. Podolsky

will handle.

MR. PODOLSKY:  Sure.  Your Honor, these are exhibits that show -- I'm not sure if it's the first or second one, but they show a video that's broadcast live in Times Square at the NASDAQ building on the day that Nikola is -- convert from VectoIQ to Nikola, and --

THE COURT:  That was on June 3?

MR. PODOLSKY:  Correct.

THE COURT:  OK.

MR. PODOLSKY:  June 3 or -- it may have been June 4, your Honor, but I think the exhibits actually make that clear.

But what the videos show -- we can pause them for the moment -- but what they are is Mr. Milton does a virtual ringing of the NASDAQ bell in the morning.  And if you look at the -- on your screen to the right, the sort of like round corner of the building that's a large screen with windows, that's actually a large video screen in Times Square.

And actually, Ms. Wolfson, you want to just like forward the video on the right to maybe like two-thirds of the way through.  Either a little before or a little after that. Trying to get a shot of the actual. . .

While she's looking, what's happening here is Mr. Milton is -- and he identifies himself as being in Phoenix in Nikola's headquarters, and he is being broadcast live in Times Square talking about Nikola and how it's, you know, the

name is being publicly listed.

So the purpose of this exhibit is, again, we understand that the defense is contesting both wire and venue in this case.  What you can actually see in this video is Mr. Milton on an interstate wire between Arizona and New York City promoting the company.  So that's the reason that we're offering these videos.

MR. BONDI:  Your Honor, is the government contending that there are misstatements in this video?

MR. PODOLSKY:  So again, your Honor, I think you put your finger on this not that many minutes ago.  To be in furtherance of a scheme to defraud, the particular wire transmission does not have to include a misrepresentation.  It simply has to be sent in furtherance of the scheme.  And there you can see Mr. Milton speaking live in early June in Times Square in New York City.

MR. BONDI:  We're not quite sure, your Honor, the relevance of this, but if this comes in, we would just renew our point that NASDAQ is a trading platform that's run through servers in New Jersey, because there's been a lot of testimony to suggest that somehow trading happens here in New York.  It doesn't.  And to preserve that, in fairness, we think that there needs to be a statement to that effect that the trading is done in New Jersey.

But in any event, your Honor, they just got in the

fact that he went to New York for a meeting here.  We're not quite sure why they need a video here in Times Square because I think it's going to -- if they do play this, your Honor, which we would object over, at a very minimum it should come with an instruction that there's no allegation of a misstatement in this video because we know the government's played a whole lot of videos of Mr. Milton where they've accused him of making misstatements.  I don't want the jury to come across thinking that they're accusing him of making a misstatement in this video.

THE COURT:  I don't know what the government is going to say about it, but I do know that there are more ways to initiate a wire than through trading, and this seems to be very clearly a wire from Phoenix to New York.  So it's relevant to a disputed issue in this case, and it will come in.

Is that one or two exhibits?

MR. PODOLSKY:  I think it's two exhibits, your Honor. It's 1119 and 1120.

THE COURT:  OK.  You may want to consider whether you need both.

MR. ROOS:  We'll look into that.

THE COURT:  OK.

MR. ROOS:  I think there was a reason.

MR. PODOLSKY:  I think it may have been to show a date, your Honor, but we'll review.  And if we can do it with

M9THMil6

one, we'll do it with one.

THE COURT:  OK.  Next.

MR. PODOLSKY:  Sorry, your Honor.  We're just figuring out if we can cut anything here that would speed things along.

THE COURT:  OK.  Any other exhibits?

MR. ROOS:  The next are Government Exhibits 204 and 205.  They are -- to just sort of short-circuit some of the issues, basically, the defendant sends a 2016 press release to Britton Worthen.  Britton Worthen sends back edits to the press release.  That's what those are.  And the defendant -- the defense objects.  The press release itself is in evidence already.

THE COURT:  The press release is in evidence?

MR. ROOS:  Yes.

MR. BONDI:  Not quite sure the relevance of this, your Honor, but --

THE COURT:  Is the relevance the fact that Mr. Worthern advises Mr. Milton concerning his public statements?

MS. ESTES:  Your Honor, the relevance is, if you look at Mr. Edit -- Mr. Worthern's edits there on the left, what he tried to do was make it forward-looking.  He tried to say Nikola One truck plans to achieve zero emissions.  He deleted "working" from electric truck prototype.  There's another insertion of "plan" below.

As your Honor knows, much of this case has involved verb tense and Mr. Milton's intent in that regard.  This shows that, back in 2016, Mr. Worthern was trying to educate Mr. Milton on the need to use forward-looking statements, and the ultimate press release rejected Mr. Worthern's edits.  I think you can see in the second draft of it over here, the second draft is after Mr. Milton has made a pass through and already rejected many of the edits on the left there.

So I think this shows (1) that Mr. Worthern is trying to educate him on using forward-looking statements, and (2) that Mr. Milton is ignoring him.

MR. BONDI:  Your Honor, the government takes a lot of liberty to say what Mr. Worthern intended to do, what Mr. Worthern was doing, what Mr. Worthern was that.  Where's Mr. Worthern?

The fact of the matter here is, Judge, from 2016 we don't have all the communications here.  This raises major confrontation clauses here -- confrontation problems here -- confrontation clause problems here.  He's not on the stand to say what he was doing and what he meant by this.  Your Honor, if I heard from the government a few minutes ago, they said he wasn't on the stand to explain what he meant by his text "agree," and what's good for the goose is good for the gander. He's not on the stand here to explain what he was doing in the edits, whether he got comfortable ultimately with Mr. -- the

version that went out, whether he had subsequent conversations where he said, OK. It's fine. They're reading a whole lot into this document from 2016, a distant past ago between then and the issues that are at the case and that are in the indictment period, which is in 2020.

So they're taking something from four years ago, trying to read a lot into what Mr. Worthern was doing and not doing without -- we don't know if there's other emails or other text messages or other communications. I suspect there were. And we don't know what the ultimate discussions were because we don't have Mr. Worthern here to discuss.

And your Honor, just for the record, because I think this is important to put on the record here relating to this, we still have a problem serving company witnesses. We have been trying and trying to serve company witnesses. We think that they're -- we believe that there is indicia that they're evading service through our process servers. So I know the government says, well, we can go subpoena these witnesses. Well, we're having a whole lot of hard trouble. And the company will not accept service at all, and the company's counsel won't accept service of any of the witnesses. But I felt that I needed to put that on the record as it relates to this.

This press release, too, your Honor, which I think is important, was on the company's website through September 2020.

So if they're going to start arguing what Mr. Worthern intended in 2016, did he suddenly become comfortable with this press release to allow it to stay on the public website after the company became public all the way through September 2020?

Again, we're making a whole lot of arguments, speculating about Mr. Worthern when Mr. Worthern's not here. This document shouldn't come in for propensity reasons, for 404(b) reasons, for 403 reasons, and for 401 reasons.

THE COURT:  What's the introductory email from Mr. Worthern?  It seems clear from the edits, I mean, the first of those drafts were the draft that Mr. Worthern sent, that what he's doing is putting in forward-looking-type language. So I don't have any major concern with admitting this document.

MR. BONDI:  Your Honor, there are additional communications around this.  We again object to its admission, but if it comes in, there's a lot more documents surrounding this that we think would need to come in as well, and then it becomes a sideshow about 2016, a press release in 2016.

THE COURT:  But, again, to the extent that -- as I indicated, highly probative that this has been a theme with respect to Mr. Milton apparently for years that he wants to say, obviously, very positive things about his company and the development of the truck, and some of the other folks in the room try to rein him in, to the extent that they can, but he continues to do and say things that he wants despite those

M9THMil6

warnings.

MR. BONDI:  Your Honor, there are a number of additional documents that we would just put a marker down here that are additional feedback that Mr. Worthern gave to Mr. Milton in 2020 after the company became public, including feedback relating to tweets, including feedback relating to statements, all of which then we will intend to introduce into evidence if this comes in because that's more relevant feedback.  What he was saying in 2020 is relevant, not what he was saying in 2016 when the company wasn't public.

THE COURT:  I'll allow these, but there may come a point at which I say, OK, you have enough or no *mas*.

(Government's Exhibits 204 and 205 received in evidence)

MR. ROOS:  Understood, your Honor.

The final I'm going to -- not actually sure there's an objection, but the Government Exhibits 1300 to -- the 1300 series, which are trading data from Robinhood, I'm not sure if there's an objection to it.

MR. CARUSO:  I've not seen it.  Can I see it?

THE COURT:  It's not up.

MR. ROOS:  They're -- I think they are, I think, three Excel spreadsheets plus the record custodian certification and --

THE COURT:  I'm sorry, three Excel spreadsheets and

M9THMil6

what?

MR. ROOS:  And then the record custodian certification that were produced with them.

THE COURT:  OK.

MR. ROOS:  And I think Ms. Wolfson can probably pull up one of them as an example.  But strictly speaking, they are spreadsheets that list the name, the trade date, the amount, amount of money spent or received from the trade for people who traded in Robinhood.

THE COURT:  I'm sorry.  These are trades of Mr. Milton or trades of Nikola or what?

MR. ROOS:  Robinhood investors who traded in Nikola.

THE COURT:  OK.  I don't know whether you intend to put it up.  It appears Mr. Caruso's waiting to see something.

MR. CARUSO:  Yes, if they're going to show it, yes.

OK.  This is not a business record.  This looks like something that Robinhood created for the government.

MR. ROOS:  It's definitely a business record.  It comes with a business record custodian certification.  And what it is, is it is a spreadsheet.  So, not surprisingly, for many reasons Robinhood keeps records of people's trades, and that's what this is.  There's no narrative description.  They didn't do anything.  They just took -- we asked them and they produced all of the VectoIQ trades and all of the Robinhood trades for the period -- I'm sorry, all the Nikola trades for the period

relevant to the charges in this case.

MR. CARUSO:  Let me try to simplify.  The government -- what is the government going to do with this?

THE COURT:  I think it's going to build a chart.

MR. CARUSO:  Is that a question?

THE COURT:  Is that what you are going to do?

MR. ROOS:  I suspect, not necessarily with the summary witness, but in closing we may pull some of the data out of here relating to people who traded from the Southern District of New York.

MR. BONDI:  And, your Honor, we don't know why they traded.  We don't know if it was because they read SEC filings and nothing else.  We don't know if it was an automated trader that they are trading pursuant to an algorithm that had nothing to do with Mr. Milton.  I mean, this is creating shadow testimony here through trading records.  We don't have an opportunity to cross-examine these people.

MR. CARUSO:  One moment.  Did I understand the government to say that they're offering this to show the trades occurred in this district?

MR. ROOS:  So there are individuals in this district who traded.

MR. CARUSO:  So does that mean that the government is offering this solely on the venue issue?

MR. ROOS:  I think it's probably probative on some

M9THMil6

other issues as well, but --

MR. CARUSO:  Then I guess we have to talk about the other issues.  I'm trying to simplify this.  This looks like a big mishmash to me.  I'm trying to figure out what they're going to do with it before I object.  I'm trying to make this easy.

THE COURT:  Well, he stated what he's going to do with it.  I assume that they're going to pick out, I don't know whether it's zip codes or what, that show that people in New York were trading in Nikola stock during the relevant period.

MR. CARUSO:  Yes.  But then I heard counsel say he was going to do some other things with it.

THE COURT:  I mean, if it's relevant on that basis, so what?

MR. BONDI:  Your Honor, these are addresses of the people.  This was also during the COVID period.  We don't know if these people were trading in New York.  We don't know where they were.  They could have been in Florida.  They could have been elsewhere.  We just don't know.  This is their address, their mailing address, under Robinhood.

MR. CARUSO:  Your Honor, please, based on what -- I won't ask again what the government's going to do with it.  Based on what I've heard, we object.

MR. ROOS:  So on this question about whether these

M9THMil6

people went to the Hamptons, or wherever, during COVID, the data includes -- includes thousands, tens of thousands of people with SDNY zip codes.  The jury needs to find venue by a preponderance.  This is certainly probative evidence of that.

If the defense is concerned about having materials in here that -- I don't know what they would be -- but go beyond that, we could create a sub-exhibit that just contains people who traded out of the SDNY with SDNY zip codes during the relevant period and just offer that instead.

THE COURT:  OK.  Yes, based on that representation, this exhibit will be received.

(Government's Exhibit 1300 through 1304 received in evidence)

MR. CARUSO:  I believe that that exhausts the list, not to mention the participants.

MR. ROOS:  So I think that's the end of the evidentiary objections to exhibits.  I don't know if there are any lingering objections to any of the other summary charts, and so there's that.  And then there is the issue of the defense experts and the subpoenas.

So I guess the question is -- the first question is, is there anything else to discuss but the summary charts?

MR. BONDI:  Your Honor, we do have objections to 1009 summary chart.  They have screenshots here of Mr. Milton and then the truck rolling down the hill like that.  As I

M9THMil6

understand, two things --

THE COURT:  Is this 1009?

MR. BONDI:  Yes.  Yes, your Honor.  As I understand, this was B reel footage that was played in the background during his interview, and he never even talked about the Nikola One or the truck rolling -- the truck here on the road or anything relating to this.  This was just something CNBC played in the background -- excuse me, Fox played in the background here as he was being interviewed.

So we have serious 403 issues here because it seems to imply that he's there talking about this video or that truck. He wasn't.

(Continued on next page)

MR. CARUSO:  Your Honor, I'm just going to excuse myself.

THE COURT:  Okay.

MR. ROOS:  All of the evidence on the chart is or will be, based on the evidentiary rulings, in evidence.  The summary witness is not going to suggest Milton's knowledge about the video playing, which already will be in evidence.  I don't think there is a fact, one way or the other, in the trial record about whether he selected or curated Fox's video, the video played on Fox while he was doing this interview.  But I will say the underlying evidence is in evidence, and so certainly permissible to play here.  It seems like this objection is really just a basis they could cross the summary witness and say you don't know if Mr. Milton directed that or not.

MR. BONDI:  We would have no objection if they removed the video on the right.

THE COURT:  Mr. Roos, will you accept that counteroffer?

MR. ROOS:  I don't think so, your Honor, because the exhibit itself is in evidence.  So we should be permitted to put stills from it on -- I mean, a fact that's going to go to the jury is he appeared for an interview in New York.  On the interview, the truck rolling down the hill was played.  Whether or not Mr. Milton requested that, authorized it, acquiesced to

it or had no idea about it is a jury argument, it's not an admissibility threshold.

THE COURT:  The admissibility has been shown so many times, there has been so much testimony about it, so it's not the least bit prejudicial.  It is in evidence, so I will allow it.  Next.

MR. BONDI:  Government Exhibit 1012, summary exhibit, value Peter Hicks options.  Two things, your Honor.  The options were not exercisable, so that isn't the value of their options, period.

Secondly, your Honor, options that are out of the money, we heard from professor Mayzlin even alluded to this, get valuated through what's known as the Black-Scholes. Remember, she said they won the Nobel Prize for that.  That's not evaluation here of the Black-Scholes of the value of Peter Hicks' options.  And so what they're doing here is they're trying to say that's the value of his options.  That absolutely wasn't.

THE COURT:  Wasn't it because these figures are --

MR. BONDI:  Are not Black-Scholes.

THE COURT:  Are wrongly calculated or --

MR. BONDI:  Correct, your Honor.  What they're doing is they're trying to say if he could have exercised them then and there, which he could not because there was a lockout period, if he could have recognized them, that's how much his

options would have been worth.  That's absolutely wrong.  The value of Peter Hicks' options, as this chart said, gets valued under the Black-Scholes method for evaluating options.  That's not what this is.  This is improper, it's inaccurate.

THE COURT:  Mr. Roos.

MR. ROOS:  So, your Honor, the chart's not going to mislead the jury.  The red line, as the key indicates, shows that that's a restricted period, and the witness will say the red line refers to a restricted period in which he could not exercise his options, the green line refers to the period he could not exercise the options.

The reason this is probative is because the witness, Mr. Hicks, testified about what the stock was looking like when he signed and closed, and his expectations and then where it was when he ultimately was able to exercise, he was crossed on that about the December 1st period onwards, so I think these option issues can be somewhat difficult for the jury to understand.  The chart presents it to the jury in a way that they can understand by looking at the closing price of the stock and how that relates to what the options would sell for if they could be traded, but we're not going to mislead the jury and say he could have sold these during this period.

MR. BONDI:  This says option value, the red, that's wrong.  On the title, it says Peter Hicks, stock options.  That's wrong, your Honor.

M9TCmil7

THE COURT:  I guess my question is, is it similar to the other chart with the VectoIQ information?  I thought I heard Mr. Bondi say that the calculation that you had, the value that you described to the options is wrong as a mathematical matter.

MR. ROOS:  I think he's suggesting there is an alternative way in which some finance professionals value the then existing value of an option that exists in the future.  That's different than what we are trying to present here, which is just the number of options multiplied by the then existing share price, what would that look like to a person.  If the objection is the title, Value of Peter Hicks' Stock Options, just let us know what title -- the Court can weigh in, the defense, we'll change the title.

THE COURT:  Presumptive value.

MR. ROOS:  Presumptive value is fine with us.

THE COURT:  So, again, what that line represents is if he could and if he did exercise his options on those particular days, that's what they would have been worth.  I think that's perfectly appropriate.

I think that takes care of all of the charts, because we did 1013 already; correct?

MR. ROOS:  Yes.

THE COURT:  Next item on your agenda, Mr. Roos.

MR. ROOS:  The next item on the agenda is the

government sent subpoenas to Mr. Milton's two experts and, also, sent to defense counsel what we call an "if when" subpoena directed to Mr. Milton in the event he chooses to testify.

The defendant has moved to quash all the subpoenas. The defendant then, through counsel, produced, last night, some more expert materials from Mr. Farrell. The government then, today, moved to preclude certain slides that were produced because of the late disclosure issues.

THE COURT: Is that something that I received?

MR. PODOLSKY: I think it was sent in the middle of the day today, that last letter, so you may have been in the courtroom or upstairs.

MR. BONDI: Your Honor, while I was sitting here, we're planning to brief that and respond to that. We obviously have strong feelings and disagreement with the government's position on that, and everything we have disclosed, we disclosed back in September, they have.

Let's be clear what their beef is, is charts that our expert created that are basic training charts, your Honor, that are in line with what their summary expert is putting in here that we're talking about today, and it's keyed to the points where the government's testimony during this case has said there was a misstatement. We couldn't have created them earlier and we haven't heard the testimony. Per the testimony,

okay, that date had a misstatement, here's the misstatement, here's the GX number.  We can show you the charts, your Honor, we would ask we have an opportunity to brief if your Honor is going to rule on this with respect to professor Ferrell's charts.

THE COURT:  I haven't seen the government's motion, I haven't seen the charts, I haven't seen your objections, so we can wait.

MR. BONDI:  Your Honor, with respect to the subpoenas, the background here is our experts received, by email from someone in the U.S. Attorney's Office, two subpoenas.  As an initial matter, I don't believe that's the way you serve subpoenas.  It was less than 48 hours ago.  The subpoenas are very, very broad under 17(c), calling for all documents, communication, other records, et cetera, et cetera, all records of this, all records of that, all documents.  It goes well beyond 26.2 and Rule 16 obligations.  We object.  We're moving to quash the two subpoenas against the experts.

That being said, your Honor, in the spirit of cooperation, we went ahead last night and produced documents that would be responsive to the subpoena to the government.  We're still trying to collect more documents.  Obviously, we've had less than 48 hours here and our witness is taking the stand tomorrow, so we're doing as much as we can.  We've been scrambling.

But the fact of the matter is, they've known about this witness since June 6th, 2020.  They've known about this witness, they could have subpoenaed the witness for this information earlier.  They could have subpoenaed the witness at the beginning of the trial if they wanted to.  Instead, they waited until 48 hours before as the witness was in transit down here for his testimony.  So we're scrambling.  I think the subpoenas were meant to harass our experts and we're scrambling, we're trying to produce the information voluntarily just in the spirit of cooperation here.  We produced a lot of documents last night that would have been responsive to the subpoena.  We've satisfied our Rule 26.2 and Rule 16 obligations previously, we supplemented last night some slides that correspond to the testimony in this case, and that's the issue that the government is briefing on and we'll address that in our opposition.

THE COURT:  So do I understand you to say, Mr. Bondi, that you are not pressing the motion to quash?

MR. BONDI:  We are pressing the motion to quash, but we are, at the same time, your Honor, just in the spirit of good faith, trying to satisfy the subpoena at the same time. It was served less than 48 hours ago and we're scrambling because the witness is supposed to take the stand tomorrow and the subpoena calls for documents today or tomorrow.  Let me just check.  For tomorrow.

THE COURT:  So I haven't seen the subpoenas.

MR. BONDI:  I can give you a copy.

THE COURT:  Are they 17(c) subpoenas, Mr. Roos?

MR. ROOS:  They're technically not 17(c) subpoenas because 17(c) subpoenas would apply for production of records before the start of trial, but they are Rule 17 subpoenas.

THE COURT:  And what are you looking for, generally, that they're upset about?

MR. ROOS:  So basically, your Honor, the background here is several months ago, the defense disclosed to us a letter disclosing the subject matter of Mr. Farrell's testimony, and then about a month after the 26.2 deadline, we asked was there any 26.2 material, they gave us 8 pages.  At the beginning of the trial, they gave us an 8-page exhibit, and unlike every other witness in this case, this is an expert whose run sophisticated regressions, events studies.  It takes a little bit of time to verify the accuracy, to test the regression.  It's not something we can do instantly in the sense that we could read other materials.  So we were surprised that there were no drafts, no work papers, no underlying data, no source materials, no emails, no notes for any of this.  We asked defense counsel multiple times.  In fact, I think we had a colloquy before your Honor.  So, that's why when they took the position that none of these things, that obviously exists, were within their possession and they were going to produce

them pursuant to Rule 26.2 or Rule 16, that's why we went out and then once they indicated they were going to call this guy definitely, then we served a subpoena. So it doesn't really matter to me if they are going to collect it or if the expert is just going to produce it pursuant to the subpoena.

But the bottom line is, we're entitled to these things, we're entitled to see the drafts just like we've given them, we're entitled to see the notes, the emails, if they're substantive, and we need that for cross and they can't sandbag us in this way. That's the purpose of the subpoena. We don't need a ruling right now, but that was the purpose of our letter motion, also.

THE COURT: Fair to say, Mr. Roos, the documents that you subpoenaed were the sorts of documents that were asked for in the course of discovery that should have been turned over in the course of discovery?

MR. ROOS: It's our position, we sent a letter on this and then we subsequently requested 26.2 materials.

THE COURT: Let me ask you about the service by email. Is that the appropriate way to serve a subpoena on a defense witness?

MR. ROOS: So on this subject, your Honor, I'll say two things. First, because these are retained experts, I think, theoretically, we could have actually served through defense counsel. I guess they'll tell us whether or not they

will accept service, but maybe that just moots the issue. They certainly moved to quash on behalf of the experts. And, of course, if they're not going to accept service, I guess it's a question, really, if the defendant has standing to move to quash.

On the second question, I think there is authority, just to cite one, a decision by Judge Gorenstein with the very thorough analysis of this question. Basically, Rule 17 contemplates who is the server, not necessarily the method. Sort of the bottom line is that there needs to be sufficient notice so that the witness receives it and has an opportunity to register objections. Obviously these witnesses received it, defense counsel received it, so we don't think the email issue is a basis to quash the subpoena. If it is, we'll just have agents go to these individuals' hotels or apartments and personally serve the subpoena, but I think that's kind of a waste for everyone.

THE COURT: It sounds like things are being worked out, so I'm not going to insinuate myself at this point. Let me know if I need to. Everyone is scrambling, so I understand, but get them whatever it is that they're entitled to.

MR. BONDI: Absolutely, your Honor.

And just to be clear for the record, we've given them every single event study that our expert did for every training day. We're relying on a one-day event study. We gave them the

one-day, two-day, and three-day event studies every literal day.  We showed them the numbers, we showed them all the information.  What we've even volunteered to do here, we were even offering to show them the underlying calculations here, literally showing them the map.  Now they can get to the map, they can do that themselves, they've got people there, but we were willing to even give them that.

Last night, we produced well above what would be 26.2 and required under Rule 16 because the subpoena does go much, much broader, your Honor.  So we gave them all of the database information, the source documents, all sorts of things.

Moreover, your Honor, in September, we gave them the slides that we were planning to use for this expert.  We supplemented the slides last night with some additional slides based on the trial testimony, and we gave those to the government.

Similar, we had the same thing happen with professor Mayzlin.  Right before her testimony, we got additional slides.  That happens in litigation as testimony comes in and the expert is reacting to the testimony, but everything in the slides that they have was already in the information that we produced way back in September, but we'll continue to work with the government, continue to give them whatever they need in terms of this expert.

MR. ROOS:  Here's the question, these slides that were

produced to us last night, when did they come into the possession of defense counsel and are there any other drafts?

MR. BONDI:  They just came in -- as soon as they came into our possession, we were getting them stamped and ready and produced, literally --

MR. ROOS:  There are no prior drafts.  This is the first time we saw slides and you immediately produced them to us.

MR. BONDI:  I'm not aware, but I will give you whatever we have.  We'll go back and look some more, Nic, but we're willing to cooperate and do whatever we can to get you whatever information you think you are entitled to.  But we've produced quite a bit of information already and this is, when we get the subpoena, it was a pretty big surprise to us.  We wish we had a phonecall instead of a subpoena.

THE COURT:  Sorry.  You wish you would what?

MR. BONDI:  I had a phonecall, your Honor, instead of a subpoena.

THE COURT:  Like I said, I'm not going to insinuate myself at this point, unless you ask me to.  Again, I haven't seen the subpoenas, so I'll wait to hear from Mr. Bondi.

Does that cover your agenda, Mr. Roos?

MR. ROOS:  I think so, your Honor.

MR. CARUSO:  I just want to ask about the schedule, your Honor.

M9TCmil7

THE COURT:  Yes.  I actually wanted to talk about that, as well.

Yes, Mr. Caruso.

MR. CARUSO:  So tomorrow, I think I'm stating this accurate, tomorrow, the government is calling what they call a summary witness, then they're going to rest, then we're going to have Rule 29 motion, then we're going to put on our first witness.

THE COURT:  Correct.

MR. CARUSO:  And I'm assuming that's going to exhaust the evidentiary day and then we're going to have a charge conference.

THE COURT:  Well, I wanted to talk about that.  Do you know how many witnesses you'll be calling going into next week?

MR. CARUSO:  Yes.

THE COURT:  Because it would be my preference to move the charge conference from tomorrow.

MR. CARUSO:  You would have no objection from me.

MR. ROOS:  That's okay.

MR. PODOLSKY:  That's fine, your Honor.

MR. ROOS:  Your Honor, while we've been here, Mr. Mukasey filed a letter related to the second defense expert, which is Mr. Kurfess, and basically, I think your Honor indicated, preliminarily at the final pretrial conference, an inclination to preclude, I think, some of the testimony and --

THE COURT:  Certain categories.

MR. ROOS:  It looks like defense would like to call this expert and so maybe we'll need argument or a hearing on that tomorrow.  So certainly, if there is a way to accomplish that tomorrow and move the charge conference to a different day, I think that would work for us.

MR. CARUSO:  I think that's a good idea.

THE COURT:  That's fine.

MR. CARUSO:  We want to call professor Ferrell tomorrow and then professor Kurfess, as counsel just said, that's subject to some further rulings.  If we can move the charge conference to Monday, that would be absolutely fine by me.

THE COURT:  Okay.

MR. PODOLSKY:  And just followup on your Honor's question, I heard defense counsel say yes as to witnesses.  Can we just -- I understand professor Ferrell will be first.  Are there any other witnesses, besides professor Ferrell and professor Kurfess?

MR. CARUSO:  Let me answer it this way, the witnesses that I -- we're definitely calling professor Ferrell, we definitely want to call professor Kurfess.  We are not sure whether we're going to call Mr. Girsky, cannot commit to that now, sorry, can't commit.  And, of course, Mr. Milton has to make up his own mind with respect to his testimony.

M9TCmil7

MR. PODOLSKY:  I think at some point we would like to know if he's going to testify.  That will prolong the trial and I think --

MR. CARUSO:  Referring to Mr. Milton?

MR. PODOLSKY:  Correct.

MR. CARUSO:  So would I like to know, but it's a decision he has to make.  I don't want to put like a big thing on this, but it's an ethical issue.  I think we have to wait until the last minute.

THE COURT:  Well, in my experience, whenever a criminal defendant opens on the fact that he'll be testifying almost never has he or she testified.

MR. CARUSO:  We didn't open on that.

THE COURT:  I know.  The point is, when the defense doesn't open, we only find out after the government rests whether or not he or she will testify.

MR. CARUSO:  Exactly.  And I promise we'll do the very best we can.  My expectation is that our case should finish on Monday assuming Mr. Milton does not testify, should finish on Monday.

THE COURT:  Okay.

MR. CARUSO:  And if that were to occur, if we had a crystal ball here, but if that were to occur, would the Court expect summation and charge on Tuesday, considering, also, that Wednesday is --

M9TCmil7

THE COURT:  Given our schedule, it is unlikely, in my experience, that we can put in three summations and what will likely be an hour charge into one day.

MR. CARUSO:  I agree.

THE COURT:  So it will likely lead into next Thursday if you rest on Monday.

MR. CARUSO:  Thank you.  That's helpful to know.

MR. PODOLSKY:  Maybe on that note, we can reassess tomorrow at the end of the day to see how far we've gotten and if defense has an update on what they expect in terms of their witnesses.

MR. BONDI:  Your Honor, if I could get the schedule, too.  How long does the government have for its summary witness, in light of our work today?

THE COURT:  Isn't Mr. Mukasey the one who's going to tell us how long or not he's going to go?

MR. CARUSO:  It is, but think that question was how long the government thinks the direct will be.

MR. ROOS:  So I think the government's direct, partially just because some of it is literally just reading off of charts, is probably going to exceed an hour but be under two.  Then, talking to Mr. Mukasey earlier, not to speak for him, but he said his cross is relatively short.  So I think, if I to guess, we'd probably stay with the witness through the first break, but not the second one.  That's sort of my guess.

M9TCmil7

MR. CARUSO:  I, too, heard what Mr. Mukasey said about the length of his cross.  I also heard what the Court said about Mark Twain.

THE COURT:  So it will be more brief than he indicated today then.

MR. CARUSO:  I could answer that without prejudice. Thank you, Judge.  See you tomorrow.

THE COURT:  Anything else?

MS. ESTES:  Your Honor, one more thing.  Does the Court put any time limitations on summations?  Is there anything we can expect in that regard?

THE COURT:  I don't, but I'd like to give what I believe will be a reasonable time based on the length of the trial.  My experience, what seems to work before juries and what doesn't, I would think that, in this case, if we close on Monday, both sides rest on Monday, an hour and a half per side for main summations and no more is what I would shoot for if I were you, and half hour for rebuttal.

MS. ESTES:  And, your Honor, just to be clear, if we bleed more into like an hour forty-five, is that something where the Court will cut you off or is it --

THE COURT:  I won't cut you off, I'll just look very disappointed.

MS. ESTES:  We'll try our best, your Honor.

THE COURT:  Now, with the charge, you have the draft

M9TCmil7

charge.

MR. CARUSO:  Yes.

THE COURT:  I say this all the time and it never works, I accept every edit for typographical errors, grammatical errors, et cetera.  I have no pride of authorship, so it's likely helpful if you were to assign one person to that task because things always fall through the cracks.  So if you can get me your edits Sunday afternoon.

MR. CARUSO:  Okay.

MR. PODOLSKY:  Yes, your Honor.

THE COURT:  Very well.  See you tomorrow.

(Adjourned to September 30, 2022 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                    Page

 PETER HICKS

Direct By Mr. Podolsky . . . . . . . . . . . .2118

Cross By Ms. Young . . . . . . . . . . . . . .2149

Redirect By Mr. Podolsky . . . . . . . . . . .2193

Recross By Ms. Young . . . . . . . . . . . . .2198

 MARC SCHONBERGER

Direct By Ms. Estes . . . . . . . . . . . . .2206

Cross By Mr. Caruso: . . . . . . . . . . . . .2217

Redirect By Ms. Estes . . . . . . . . . . . .2240

Recross By Mr. Caruso: . . . . . . . . . . . .2244

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1423 . . . . . . . . . . . . . . . . . . . .2122

 1413 . . . . . . . . . . . . . . . . . . . .2124

 1424 . . . . . . . . . . . . . . . . . . . .2133

 S7 . . . . . . . . . . . . . . . . . . . . .2135

 1425  . . . . . . . . . . . . . . . . . . . .2142

 1417  . . . . . . . . . . . . . . . . . . . .2144

 1117 . . . . . . . . . . . . . . . . . . . .2210

 16, 202, 203, 203-A, 224, 234, 319, . . . . .2254

           405, 405-A, 405-T, 408, 408-A,

           408-B, 408-C, 408-D, 408-T,

           411, 411-A, 411-T, 413-T,

414-A, 415-A, 417-A, 417-B,

417-C, 417-D, 417-E, 417-F,

417-T, 423-A, 423-B, 423-C,

423-D, 423-E, 423-T, 528, 529,

556, 560, 561, 900, 901, 1504,

1505, 1506, 1507, 1508, 1509,

1510, 1511, 1512, 1513, 1514,

1515, 1516, 1517, 1518, 1519,

1520, 1521, 1522, 1523, 1524,

1525, 1526

578, 579, 580, 581  . . . . . . . . . . . . . .2258

15 and 330  . . . . . . . . . . . . . . . . .2299

62, 64, 937, and 938  . . . . . . . . . . . .2301

504, 509, and 583  . . . . . . . . . . . . . .2309

204 and 205  . . . . . . . . . . . . . . . . .2317

1300 through 1304  . . . . . . . . . . . . . .2321

DEFENDANT EXHIBITS

Exhibit No.                              Received

6001   . . . . . . . . . . . . . . . . . . . .2189