M9UHMil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                    21 Cr. 478 (ER)

TREVOR MILTON,

                Defendant.

------------------------------x

                                      New York, N.Y.

                                      September 30, 2022
                                      9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                      District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  We're a couple minutes short of 9 o'clock, but we're all here, so what say we get started.

So let's talk about the expert first.

MR. BONDI:  Your Honor, good morning.

I think we might have resolved some of this.  I don't know if I or Mr. Roos lost steam last night, but we were communicating late into the night, and a couple of things, your Honor.  Number one is with respect to slide No. 3, Mr. Roos had an issue with the title.  I asked him what title he proposed.  He gave us a title back, and we've changed it.  So we've adopted his title.

With respect to the government's concerns about slide No. 4, it references some other charts.  And, your Honor, if I may, I'll pass up the slide deck to you.

THE COURT:  Please.

MR. BONDI:  May I approach, your Honor?

THE COURT:  Yes, of course.

MR. BONDI:  So, your Honor, I'm sure the government will correct me if I'm misstating their arguments, but they had concerns with slide 3 of this presentation, and it was on the prior title, like I said.  We've changed the prior --

THE COURT:  Slide 3 after the cover page?

MR. BONDI:  Yes, sir.  It's in the bottom left corner

on the blue line.  Has the page number.  It's faint.

THE COURT:  Yes.

MR. BONDI:  They had an issue with the prior title being argumentative.  This is the proposed title from Mr. Roos.  We accepted his change.

This slide was created, your Honor, in response to Professor Mayzlin's testimony about the importance of retail investors and such.  And what this illustrates -- I affectionately call this the pond chart.  It illustrates that just as many were selling at the time, just as many were buying.  In other words, they didn't act monolithic.  We're not going to spend a lot of time on this chart or graph, but it's important to illustrate.

The information that was used to create this was publicly available information from a database called VandaTrack.  It's a subscription database that experts oftentimes rely on.  The same concept here, in this illustration here, can be duplicated through data that the government itself has and produced to us from Robinhood.  It's the same concept.  It's the same punchline, which is retail investors didn't act all the same.

THE COURT:  Can I ask a question just to show my complete ignorance.  When someone sells a stock, someone else is buying, right?

MR. BONDI:  That's absolutely correct, your Honor.

M9UHMil1

THE COURT:  So what does this show?

MR. BONDI:  It's a great question.  Because when someone sells, the other person buying could be an institution, and oftentimes it is an institution like a Vanguard or a Fidelity.  This data is based purely on retail individual behavior and trading pattern, and it shows their purchases versus sales.  So, in other words, here at a time when retail investors were purchasing, it was almost as many equally selling here.  They didn't act as a big pack, as a big group.  That's the illustration here based purely on data, and the same illustration can be shown in the data that the government has from Robinhood.

We also, your Honor, produced quite a bit of data to the government, which we think was voluntarily produced because we don't think it was required by 26.2 or Rule 17, but because the government subpoenaed for more data well beyond that, we produced a lot of data in the database.  The government can replicate this.

The second slide that the government has an issue with is slide No. 4.  And slide No. 4, as I understand the government's argument is, you're mentioning other stocks here.  Your Honor, we're not planning to talk about any other stocks or anything on this.  It's illustrative, just to show here that the net purchasing behavior of retail investors was consistent with the rest of the market here.  In other words, here there

M9UHMil1

weren't more retail investors for Nikola as compared to other stocks.

Those stocks, by the way, were based on, I think, the -- based on StockTwits, which was information, if you remember, that the government had and Professor Mayzlin was talking about.  But we're not planning to get into the other stocks or anything like that.  It's purely for illustrative purposes here.

THE COURT:  The companies, who picked these companies?

MR. BONDI:  They were the top-mentioned companies in StockTwits -- tweets?  StockTwits?  StockTwits.  Excuse me, your Honor, I'm going to get this lingo down.

They were the top-mentioned companies in StockTwits in the data that the government produced, and it was data that Professor Mayzlin relied upon.  We didn't cherry-pick these, in other words.  These were the top companies mentioned.

The remainder of the slides, your Honor, we're a little bit at a loss as to why the government's raising issues with them, and they start at page 19.  They're the flatline slides, your Honor.  We previously produced similar flatline slides to the government back in September, September 6, September 6.  We produced an original slide deck before trial started.  This is just adopted or adapted to what came out in evidence at trial as to what the government put into evidence as being the misstatements.  If you remember, your Honor, my

cocounsel, Mr. Mukasey, opened using a similar slide, flatline slide.

So, your Honor, if I can explain, just looking at slide 19 -- and rest of the slide deck is very similar -- let me just explain what this is.  This is just the movement of the stock, just the movement of the stock.  It's a reference to the government exhibit that was in evidence.  And you might ask, what are those hashtag lines?  In August, August 18, 2020, we produced the data underlying Professor Ferrell's opinion, and these are the bands of statistical significance.  In other words, here, if the stock moves above the band or below the band, it's a statistically significant movement.  The government has all the data and has had all the data underlying these slides since August 18, 2020.

THE COURT:  What's the significance of June 17?

MR. BONDI:  June 17, your Honor, great question.  If you see GX 413 is referenced on the far right there, and that's the Bloomberg article that came out that the government put into evidence and entered into evidence as GX 413, and -- excuse me? -- and it's in their agent slides, too, your Honor. So it's an article where Mr. Milton talked -- was asked about the Nikola One, if you remember, and the reveal, and this is to show what happened to the stock when the article came out.

THE COURT:  But it came out at 3:30.

MR. BONDI:  It did, and the market closed at 4:00.

MR. MUKASEY:  We have a corresponding slide.

MR. BONDI:  And we also have the next day slide, your Honor, which I will bring up.

What slide number is it, please?

We have the next day slide at page 23, and I'm glad you mention that, your Honor.  June 18 is at page 23, and there were additional tweets that the government put into evidence, GX 532 and *The Irish Times* article, if you remember.  Those are the ones referenced, and you see how the stock performed on the very next day.  These are really basic charts, your Honor.

THE COURT:  OK.  Mr. Roos.

MR. ROOS:  Thank you, your Honor.  Let me just, I guess, go in the order that -- actually, let me go in the reverse order.

So just as background, the defense, as Mr. Bondi indicated, produced to us in August a -- like a six-page document that lists each day from June through September and, basically, the various variables within the event study and then the statistical significance score.  So it's literally basically like a spreadsheet.  Just has each of the variables, the significance score, the price change.

Then shortly before trial, about a week before trial, we got a -- I think it's about eight-page-long expert slide deck.  The defense, over our objection, opened on one of those slides.  They picked out particular days they were going to

focus the testimony on.  I think the one in opening was July 1.

These things are a little different than the other evidence throughout the case because they're the product of an event study.  So they have regression, in which there is sort of the source level data, so stock data, trading data.  There's then the results of the regression, and then there is the presentation of that information on a slide like the ones that are marked as exhibits.

So unlike, you know, an email where you just read the email and you sort of understand the exhibit, each of these exhibits take a considerable amount of time for us to check the source data, check what I'm going to call like the working papers, the event study analysis itself, and then verify the slide accurately reflects the data.

So the issue here is really twofold:  The first is that sometime between when they produced their prior exhibits and yesterday, they both added about 20 new slides and switched some of them, including they've now abandoned the slide that was in the opening.  So our objection is to the change, and it also really puts us at a disadvantaged position because now we have one day to try to check these event studies.  And it's compounded by the fact that, while they're correct that they gave us the statistical significance scores a while ago, we didn't have any, until yesterday, any of the actual source data they used or the, what I'm going to call, working papers, the

M9UHMil1

Excel spreadsheets behind these charts.

So we're trying very hard, as Mr. Bondi noted. We were up, Judge, late last night looking at these things, but we're at a real disadvantage because we're unable to check many of these things and see if they're accurate.

So, I mean, we made a preclusion motion. I think, if your Honor's -- you know, as an alternative to that, although we think preclusion of these particular slides is appropriate, I think another remedy would be we'd need a little more time to cross-examine on this. Maybe our cross -- I'm not even sure we're going to get to cross -- wouldn't start today, and I also think they should do the slide that was in opening.

MR. BONDI: Your Honor, if I may, the reason why we don't have the slide in opening is the government didn't introduce a misstatement on July 1.

THE COURT: I'm sorry?

MR. BONDI: It was illustrative that we were doing in the opening, saying we're going to show what happened with the stock.

So let's level set here, if I may, your Honor, and that is, we asked at the beginning and we asked the government, what's the list of the misstatements you have? We filed a bill of particulars and such, and your Honor ruled on that. So we didn't know, until the government presented the case, precisely what days they were going to put in for misstatements.

M9UHMil1

That being said, your Honor, we analyzed and our expert analyzed every trading day, every single one, and we gave them the results for that. And I think the government's under --

THE COURT: I'm sorry. When did you give them the results for that?

MR. BONDI: August 18, 2020.

THE COURT: OK.

MR. BONDI: 2022, excuse me. I'm living in 2020, your Honor.

August 18, 2022, we gave them the results. We gave them the results of every single trading day. The first time I heard that they wanted the underlying data that supported the spreadsheet was just this past week. We gave them that. We gave them the sells; we gave them the calculations; we gave them everything.

To Mr. Roos' point, we don't anticipate that cross is going to happen today. They're going to have all the whole weekend to work with their rebuttal expert, Mr. -- or former rebuttal expert, or whoever they're using to help them on this, but they have everything, your Honor. They've had everything. And nothing here is -- should be or is a surprise to them.

THE COURT: Let me ask this, because, again, I don't know a whole lot about all of this: What is the difference in the nature of the slides that you received versus -- now,

versus the slides you got pretrial?

MR. ROOS:  So the -- I'm going to set aside slides 3 and 4, which I want to come back to at some point, but the slides in the 20s and 30s, which are each of these event studies, close to close event studies for particular days, the previous slides we got were three days, and they had basically a price line for the price of a stock throughout the day.  And the new slides are different dates, and they now also have these bands, statistical significant bands on them.

So where we're coming at from here is we need to both check whether the chart accurately reflects the intraday price movements and we need to look at the statistical significance lines or deviation bands that have been placed onto the chart. So they're right that they gave us this, like, six-page, eight-page document with the statistical significance scores from which it looks like they've drawn these bands --

THE COURT:  For each of these days?

MR. BONDI:  Yes, your Honor.

MR. ROOS:  It was for every day.

MR. BONDI:  Yes, your Honor.

MR. ROOS:  -- but we need to check it.  I think their expert at the time ran a few different versions of the model. It's not clear to us which one exactly they're using.  Just to be clear, none of these things are -- of these particular objections are totally insurmountable.  They require work.  And

when we get the work papers 24 hours before, it can't -- it's not the type of thing you can pull off through an all-nighter.

THE COURT:  Let me ask you, do you have a rebuttal expert?

MR. ROOS:  We're not going to call our rebuttal expert.

THE COURT:  OK.

MR. ROOS:  If your Honor's asking whether I'm going to be sitting up 24 hours with a calculator, I may have a little help.

THE COURT:  I'm sorry?

MR. ROOS:  I may have a little help.  It won't just be me with a calculator.

THE COURT:  Yes, I imagine.

So here's my thinking.  First of all, I do think that the defense protests too much about the particular statements. I denied the bill of particulars for a reason.  You got all of the tweets.  You got all of the podcasts.  You got all of the interviews.  I don't know whether the government has put in all of them or whether there are like many, many more you received that were not played.

MR. BONDI:  There were.  Sorry.  There were, your Honor.

THE COURT:  But what I have seen, whether it's a tweet or a podcast or an interview or an article, is all of a piece.

There are a small universe of statements that Mr. Milton made in different contexts that are alleged to be misleading. So when you complain about, well, we didn't know what they were going to -- what specific statement on a specific day, particularly since you had your expert do an analysis for the entirety of the relevant period -- but there is no objection from the government as to the admissibility of this information, so it's going to come in.

The question for me is how do we give the government a sufficient amount of time to prepare for a cross-examination based on documents that arguably should have been provided earlier? Again, I'm thinking, as always, about the jury and their time.

So, Mr. Roos, I'm happy to see what you suggest.

MR. ROOS: Well, Mr. Bondi said to me yesterday that he thinks his direct is about three hours. That may just take us through the day. But if it doesn't, we would just ask to start our cross on Monday at 9:30, or whenever the expert is off direct.

MR. BONDI: That's fine with us, your Honor.

THE COURT: That doesn't sound like an ask at all. That's fine.

MR. ROOS: OK. I'm trying to be reasonable here and keep the trial moving. I do have a few more asks.

THE COURT: Yes.

MR. ROOS:  So one is Mr. Bondi's -- get into a little more of the details here -- mentioned that we have an objection to slide 4.

THE COURT:  Yes.

MR. ROOS:  Your Honor may recall that --

THE COURT:  Oh, yes.

MR. ROOS:  -- our expert did something similar with a comparison to other stocks.  They objected.  It stayed out.  We think this has -- the same sort of relevancy and 403 issues there we think are manifest here, and so we object to that slide.

THE COURT:  As I recall, the slide that Dr. Mayzlin prepared had the number of tweets sent out by Mr. Milton compared to the tweets sent by other CEOs of other companies, and I believe the government's rationale was, well, these are the ten biggest SPACs or the ten biggest transactions at the time.  And although that rationale was less than random, it was still sufficiently random for me to be concerned.

Why isn't this of the same ilk, Mr. Bondi?

MR. BONDI:  Two reasons, your Honor.  Number one is stocks that are identified here, the other companies, this is slide 4, the basis for our choosing this was the government's production.  We note the production document at the bottom of the slide there.  This comes from their own information.  This comes from their own document.

Your Honor, I am not going to ask anything about these other companies. OK? The illustrative purpose here is purely an empirical data point, which is Nikola's -- the number of retail net purchasing activity is similar to the rest of the U.S. stock market, and the top stocks on StockTwits from the document that was produced by the government. This is purely empirical, purely mathematical here, but I'm not going to get into anything Tesla or the other companies, or whatnot. If your Honor remembers, Professor Mayzlin testified that there was more interest in Nikola. That was a -- that was her testimony from the stand. There was more interest in Nikola. In terms of the purchasing activity, it was the same, and that's what the point of this chart is.

THE COURT: Well, this is -- based on that and based on my prior ruling concerning the government's proposed chart, if what you want to do is show the two blue bars, I'd let you do that, but I'm not going to have you put in all these other companies.

MR. BONDI: Your Honor, we can fix that. We can -- I think we will be able to fix it in time. But we can fix it, and we'll remove the other charts, and it will just be the two blue bars.

MR. ROOS: One last issue, your Honor, in terms of production of materials. The defense has been helpful in giving us the source data and some of the spreadsheets used by

the expert over the last 24 hours.  Here are the things we think we're entitled to but still missing:  Either his billing rate and the amount he's billed or the invoices or contracts, whatever the compensation structure is.

THE COURT:  I'm sorry, the compensation structure for the expert?

MR. ROOS:  Yeah.

THE COURT:  You don't have that?

MR. ROOS:  No.

THE COURT:  OK.

MR. ROOS:  Any emails with him, any sort of communications with him.  I don't know if they've had any substantive communications ever, but that type of thing.  And any notes either that he has or the defense has about what his testimony will be.

THE COURT:  OK.

MR. BONDI:  Your Honor, a couple of things on that is we're gathering up all the information.  We received the government's subpoena just 48 hours ago, and we'll be happy to give them bills and billing information.

Just for the record, they didn't give us billing information for Professor Mayzlin.  We're going to bring out in direct how much he gets paid and how many hours he's spent, all of what came out in Professor Mayzlin.  In fact, it's going to be very similar in terms of the first part of the direct as

their direct.  So they have exactly the same information we got for Professor Mayzlin.

But I'll be happy to give them the bills from Professor Ferrell.  I'm gathering those up, obviously, because I'm responding to their just recent request of less than 24 hours -- or less than 48 hours ago.  That's the first time we've heard about wanting his bills.  So we're gathering them. We'll get them for them.  They'll have them, my guess is, today, well in advance of cross-examination on Monday.

THE COURT:  And the emails?

MR. BONDI:  Your Honor, we don't communicate substantively with experts.  That's my policy.  And if you remember, I said I don't take notes when I meet with witnesses or experts.  We've been looking.  We haven't found anything that would fall into that category other than, "Hey, can you give me a call?" that sort of thing.

I'll just note, again for the record, that that's not the typical type of information that gets produced.  It's not substantive.  And we also didn't get any of that for Professor Mayzlin.

THE COURT:  Let me ask you, because I find this interesting.  You don't communicate substantively with experts at all?

MR. BONDI:  Over email, no, your Honor.

THE COURT:  Over email?

MR. BONDI:  Yes, your Honor.  So my policy has always been, since I was a baby associate at Williams & Connolly, when I meet with a witness, whether it's a substantive witness or an expert witness, I actually don't take notes.  And later, sometime later, I might do a memo to the file, but I'm not taking down notes.  I'm not taking down contemporaneous or any notes like that.  But -- I don't write things down.  And when I communicate with a witness or an expert, I don't communicate substance over an email.  The most I'll say is "Got time for a call?" or "Let's talk."  So everything is done either in person or by phone.

But, your Honor, I just again want to note for the record, we didn't receive a single document of that realm or nature relating to Professor Mayzlin.  So I'm a bit surprised that the government is pressing for that now, considering we didn't get that for Professor Mayzlin.  We did get 3500 material, and I'll be clear on that.

THE COURT:  OK.  So your response in response to the request for emails and notes is that there are none?

MR. BONDI:  That's right, your Honor.  We're continuing to look to see if there are any additional things, but we've produced everything that we could find in response to their request.

Now, again, your Honor, there are emails like "Got time for a call?" and that sort of thing.  They're not

M9UHMil1

substantive.  They're not relating to the testimony.  We've conferred with cocounsel.  We've looked at this.  We think we've satisfied our Rule 26 obligations.

THE COURT:  What about other Cahill orders or Mukasey-French orders, any substantive conversations with the expert?

MR. BONDI:  It's been primarily that I've been interfacing with some cocounsel, but I haven't seen -- we haven't seen anything like that, no.  When I talk to my people, I say don't communicate substantively with witnesses.

THE COURT:  OK.

MR. BONDI:  I just don't, and that's how I was taught.

THE COURT:  Very well.  So that, I think, settles that.

Anything else that we should discuss before bringing out the jury in five minutes?

MR. MUKASEY:  Judge -- oh, I'm sorry.

MR. PODOLSKY:  That's all right.

While we're on this topic, I think it's related.  Professor Kurfess, the second proposed expert by the defense, we can talk more substance about that expert at the end of the day, but we haven't received any of these -- actually received -- I think the entirety of what we've received is maybe there or four pages of indecipherable notes from August.  There's been no production of any kind related to Kurfess, no

information related to what information Professor Kurfess was provided, no indication of what Professor Kurfess is going to testify about, other than what's was in Mr. Mukasey letter yesterday.  No bills, no billing structure.

Our request, so we don't end up in the same place on Monday, is that we get those materials now.

THE COURT:  Do those materials exist?

MR. MUKASEY:  We will turn over whatever we have.

THE COURT:  When?

MR. MUKASEY:  I'm not a thousand percent sure Kurfess is testifying yet.  We'll turn it over regardless by the end of the day.

THE COURT:  Very well.

MR. CARUSO:  I should add, we did produce certain Rule 26.2 materials for Kurfess in September.  I believe it was September 9.

THE COURT:  OK.

MR. CARUSO:  If the government has nothing further, I just wanted to revert to the lengthy discussion we had yesterday in the afternoon about the various exhibits.  I believe that there are two open items, and I just want to confirm that these are the only open items.

One, Government Exhibit 208, which was an email offered by the government from a certain man named Spira who used to be the CFO of Nikola.  It was addressed to Mr. Milton.

M9UHMil1

And the way the government argued it, it gave certain warnings about that being accurate. We opposed that on 404(b) grounds. We also argued that it was well out of time in 2016 or '17. I can't remember which, but it wouldn't matter considering it would still be out of time. And then perhaps equally important, we made the point that if that exhibit were received, we would then be allowed to impeach Mr. Spira under Rule 806 by showing that he's a biased witness because he thought Mr. Milton -- well, he was fired, and he thought Mr. Milton was responsible for that.

MR. PODOLSKY: I just want to short circuit this. In light of what we are offering today, we have decided not to offer that document affirmatively in our case. Should the defendant testify, we certainly may revisit on cross-examination, but we're not going to offer that today.

THE COURT: Very well.

MR. CARUSO: All right. That's off the table, then.

The only other item was Government Exhibit 34. And the way I remember this, the government was willing to consent to the admission of that exhibit if -- with respect to only the first two lines of the communications and gave us the option as to whether we would like to have that in the record or not. The answer's no, we do not want that document, that exhibit, into evidence solely for the first two lines.

THE COURT: And that's Defense Exhibit 34, correct?

MR. ROOS:  Government exhibit.

MR. CARUSO:  I had GX.  I think I'm correct.

THE COURT:  OK.  Very well.  So --

MR. CARUSO:  Now, as far as --

THE COURT:  I thought I ruled on that.

MR. CARUSO:  Thank you.

As far as I know -- and this is directed to the government through the Court -- I think this resolves all of the issues.

MR. PODOLSKY:  That's right.  And I actually made a list of exhibits we intend to read into the record.  I'll hand a copy to the defense and to the Court.

THE COURT:  Very well.

MR. CARUSO:  I don't want to have to do this in front of the jury, but we preserve, repeat, reiterate, all of our objections on the record yesterday.  Your Honor's made his rulings, but I want to make the record clear.  Positions we took yesterday are positions we adhere to now, and the Court has made its rulings.

THE COURT:  I believe the record is clear from yesterday as well.

MR. CARUSO:  Thank you, your Honor.

(Recess)

(Continued on next page)

M9UHMil1

(Jury present)

THE COURT:  Everyone, please be seated.

Ladies and gentlemen of the jury, good morning.  Thank you, as always, for being prompt.

Government, please call your next witness.

MR. PODOLSKY:  Your Honor, prior to calling our next witness, we're just going to read into the record and offer a list of exhibits to pick up where we left off yesterday.

THE COURT:  Very well.

MR. PODOLSKY:  Your Honor, at this time the government offers Government Exhibits 11; 14; 15; 16; 38; 62; 64; 202; 203; 203-A; 204; 205; 210; 210-A; 211; 224; 234; 295; 296; 297; 298; 299; 301; 303; 304; 305; 306; 307; 319; 320; 321, 322; 324; 326; 330; 405; 405-A; 405-T; 408; 408-A, B, C, D, and T; 411; 411-A; 411-T; 413-T; 414-A; 415-A; 417-A; 417- -- actually, B, C, D, E, F, and T; 4-2-3-A, B, C, D, E, and T; 504; 509; 528; 529; 556; 560; 561; 583; 900; 901; 906; 907; 908; 920; 921; 922; 923; 924; 925, and actually all the way through 932.  So all the way to 932.  937, 938, 1119, 1119-A, 1120, 1120-A, and 1504 through 1526, GX S-1 through S-9, some of which are already in evidence, but just for clarity.  And then, finally -- and I apologize because it's not on the sheet that I handed up -- 1311.  And 1311 is in lieu of Government Exhibits 1300 through 1304 to clarify the transcript from yesterday.

M9UHMil1                         Penland - Direct

THE COURT:  Very well.  Those exhibits will be received.

(Government's Exhibits 11, 14, 15, 16, 38, 62, 64, 202, 203, 203-A, 204, 205, 210, 210-A, 211, 224, 234, 295, 296, 297, 298, 299, 301, 303, 304, 305, 306, 307, 319, 320, 321, 322, 324, 326, 330, 405, 405-A, 405-T, 408, 408-A, 408-B, 408-C, 408-D, and 408-T, 411, 411-A, 411-T, 413-T, 414-A, 415-A, 417-A, 417-B, 417-C, 417-D, 417-E, 417-F, and 417-T, 423-A, 423-B, 423-C, 423-D, 423-E, and 423-T; 504, 509, 528, 529, 556, 560, 561, 583, 900, 901, 906, 907, 908, 920, 921, 922, 923, 924, 925 through 932, 937, 938, 1119, 1119-A, 1120, 1120-A, and 1504 through 1526, GX S-1 through S-9, and 1311 received in evidence)

MR. PODOLSKY:  Thank you, your Honor.

MR. ROOS:  Government calls Deleassa Penland.

DELEASSA PENLAND,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ROOS:

Q.  Good morning.  Where do you work?

A.  For the U.S. Attorney's Office in the Southern District of New York.

Q.   What's your title there?

A.   Special agent.

Q.   How long have you been a special agent with the U.S.
Attorney's Office?

A.   Seven years.

Q.   Generally speaking, what are your duties as a special agent
with the U.S. Attorney's Office?

A.   I investigate federal crimes.

Q.   What did you do before working at the U.S. Attorney's
Office?

A.   I worked for the Internal Revenue Service.

Q.   And most of us have a sense of the Internal Revenue Service
from doing our taxes, but what was your job there?

A.   I examined income and business income tax returns and
worked in conjunction with the criminal division.

Q.   How long were you at the IRS?

A.   For 12 years.

Q.   What sort of education and training did you have before the
IRS?

A.   I have a college degree, a bachelor's in accounting.

Q.   All right.  Let's talk a little bit about this case.

          Have you heard the name Trevor Milton?

A.   I have.

Q.   How did you become familiar with him?

A.   I was introduced to the name by the trial team, the

M9UHMil1                      Penland - Direct

prosecution team.

Q.  Just to be clear, I want to talk a little about your -- how you were involved with this case.

Were you involved with the grand jury investigation that led to the charges in this case?

A.  I was not.

Q.  So what has your role been in the investigation of the case?

A.  I reviewed charts and source documents that were provided to me in relation to the case.

Q.  And who created these charts?

A.  The prosecution team.

Q.  All right.  What has your role been in preparing the charts for today?

A.  I reviewed the charts for accuracy and verified the information that was listed on the chart.

Q.  Talk us through a little bit about how you went about reviewing for accuracy.

A.  Each chart lists a government exhibit that supports the chart, and so I would review the source documents, those government exhibits, and verify that they were correctly indicated on the charts.

Q.  Were you able to verify that all the information on the summary charts is reflected in one of the source documents?

A.  I was.

Q.   And just to be clear, you said all the source documents are cited on the chart?

A.   They are.

Q.   With respect to bank records, what did you do to prepare your testimony today?

A.   I reviewed spreadsheets of bank records, tied them to the original bank record, and followed the flow of funds related in those bank records.

Q.   And we're going to talk a little about Nikola stock price today.  How did you go about reviewing data relating to Nikola stock price?

A.   I pulled up information on a public website, Yahoo! Finance, and was able to download the supporting data relating to those charts.

Q.   And how about for documents like tweets, podcasts, television recordings, emails?  How did you review those materials?

A.   I reviewed the actual tweet, email, or whatever the document was and verified the accuracy.

Q.   Now, roughly how many pages of documents did you look through or review in connection with preparing your testimony?

A.   Hundreds of documents.

Q.   And I just want to be clear, though, did you review all the exhibits in the case?

A.   I did not.

Q. And I think you've effectively answered this question, but did you review all the evidence collected during the course of the investigation?

A. I did not.

Q. All right. Now, Special Agent Penland, do you have in front of you a binder?

I'm sorry, on the screen. Can we, just for the witness, show her Government Exhibit 1000 and then 1001 and then 1003 and then 1004, 1005, 1006, 1009, 1012, and 1013.

Do you recognize these documents?

A. I do.

Q. What are they?

A. These are the charts and schedules that I reviewed.

MR. ROOS: Your Honor, the government offers 1000, 1001, 1003, 1004, 1005, 1006, 1007, 1009, 1012, and 1013.

THE COURT: Any objection?

MR. MUKASEY: I have no objection. I don't believe Mr. Roos asked her whether she recognized 1007, but I have no objection --

MR. ROOS: OK.

MR. MUKASEY: -- when you went through the list the first time.

THE COURT: Those exhibits will be received.

(Government's Exhibits 1000, 1001, 1003, 1004, 1005, 1006, 1007, 1009, 1012, and 1013 received in evidence)

MR. ROOS:  All right.  Let's start by playing an exhibit in evidence.  Can we play Defense Exhibit 467.

(Video played)

BY MR. ROOS:

Q.  Special Agent Penland, have you seen that video before?

A.  I have.

Q.  Did you review it as part of preparation for your testimony?

A.  I did.

Q.  And do you recognize it as a commercial for Phillips?

A.  Yes.

MR. ROOS:  Now let's play Government Exhibit 402.

(Video played)

Q.  Special Agent Penland, did you review that video in anticipation of your testimony today?

A.  I did.

Q.  Did you see at the end it said "Nikola Motor Company"?

A.  Yes.

Q.  Did you also see it said "Nikola One" on it?

A.  Yes.

Q.  OK.  Now I want to talk about these videos some.

Did you work on a timeline relating to the creation of those videos?

A.  I did.

Q.  Take a look at Government Exhibit 1006, which is in

evidence.

Special Agent Penland, is this the timeline?

A.   It is.

Q.   What types of evidence are listed on this timeline?

A.   The date -- I'm sorry, I misheard your question.  Say that again.

Q.   What types of evidence are included in this timeline?

A.   There are emails, tweets, and other information that's provided.

Q.   And how is the information organized?

A.   By date and time.

Q.   And in terms of the order, is it chronological?

A.   Yes.

Q.   Who selected what would be in the chart?

A.   The prosecution team.

Q.   Now, before we get into the substance of the chart, can you just briefly describe how we should go about reading this thing.

A.   Yes.  It should be read by row from left to right, and then you would go down to the next row.

Q.   Now, does the information in this chart come from exhibits?

A.   It does.

Q.   How do we know which exhibits?

A.   On the far right-hand side, there's an exhibit column. Those GX numbers should tie to the exhibit.

Q.   Do you see under the date and time it says "MDT/MST"?

A.   Yes.

Q.   What is that a reference to?

A.   That all of the times are listed in mountain time.

Q.   All right.  Now, if you reviewed a document that, say, was in UTC or Eastern Time, how did -- what did you do in verifying the accuracy of the chart?

A.   We would have done the conversion to convert it to Mountain Time so that way you could compare the conversations.

Q.   Got it.

By the way, the rest of the charts we're going to talk about today, are the rest of them in a different time zone?

A.   They are.

Q.   OK.  Eastern?

A.   That's right.

Q.   All right.  So let's read through this chart.  And what we're going to do is we're going to go line by line, row by row, and so let's start with row one.

Can you read us through row one.

A.   On July 25, 2017, at 5:25 p.m., Ron Alvarez sends an email to Trevor Milton and David Diaz.  The subject is Phillips 90th anniversary and Nikola truck video.

"This week I was notified by our director of marketing that they're preparing a video for Phillips' 90th anniversary, January 2018.  He inquired if Nikola Motors allows promotional

videos of your new truck.  It's my understanding the video will include a classic truck from 1928 (year Phillips was established) and your Nikola truck (future truck) to show just how far Phillips has come along over the years."

Q.  All right.  And if we wanted to look at the material from which this came, what exhibit would we look at?

A.  You would Government Exhibit 920.

MR. ROOS:  Can we look at Government Exhibit 920 for a minute.

Q.  Now, is this the document you were referring to?

A.  It is.

Q.  And the portion you read, where is that on this?

A.  Part of the portion was from the first paragraph, and then the second part was from the second paragraph.

Q.  All right.  So the chart doesn't include every word from every email, is that right?

A.  That's correct.

Q.  If the jury wanted to look, though, at the entirety of the communication, is that in evidence?

A.  Yes.

MR. ROOS:  All right.  Why don't we just zoom in on that top email there.

Q.  And on the chart you were just talking about, you said it was from Ron Alvarez to Trevor Milton, copy David Diaz.  Based on your review of the materials, where do Ron Alvarez, who's

the author of the email, and David Diaz work?

A.   Phillips.

          MR. ROOS:   OK.   You can take this down, and let's put
the chart back up, 1006.   Why don't we zoom in on line 2.

Q.   Can you read the response to the email.

A.   "Our team is able to help and support you in your video
efforts.   Just let me know, and I can put you in touch with the
right people here internally."

Q.   All right.   And that was about three days after, right?

A.   Yes.

Q.   And from what exhibit is that drawn?

A.   GX 921.

Q.   So, again, this is another email.   Why don't we just look
at GX 921.

          And you're referring to the top email here?

A.   Yes.

          MR. ROOS:   OK.   We can take that down and go back to
1006.   OK.   Let's zoom in on line 3.

Q.   So line 3 has a different set of individuals, right?

A.   Yes.

Q.   Why don't you read us through line 3.

A.   On October 3, 2017, at 10:28 a.m., Dane Davis sends an
email to Trevor Milton, Tony Epperson, and Kevin link:

          "I think we need to buy a lift for the truck to be
able to work on it safely.   Tony E. said we need to get the

truck ready for a off-site commercial shoot with Phillips. There are some items under the truck that we need to be able to take care of to prepare it for safe transport . . . with the truck not having a working air compressor, we will need an on-site to keep the system charged between shoots and possibly during transport.  The gearboxes do not have bearings in them, and there will be damage to the housings when the half shafts rotate in the gearboxes . . . the battery pack isolation mounts were not fully installed . . . .  Lastly, is there any concern that an image of our truck being pushed or pulled during the commercial shoot could be leaked, and do you think that would hurt us in any way?  I would think that a commercial shoot on-site may be less risky . . . ."

Q.  All right.  And this comes from Government Exhibit 923?

A.  That's right.

Q.  So let's look at Government Exhibit 923, and we can zoom in on this top email.

Now, the email's from Dane Davis.  It's to Trevor Milton, Tony Epperson, and Kevin Lynk.  You haven't mentioned Dane Davis, Tony Epperson, Kevin Lynk yet.  Based on your review of documents, including their email addresses, where do they work?

A.  Nikola Motors.

Q.  It's Dane Davis who writes this email to Trevor Milton, is that right?

A.   That's right.

Q.   OK.  Let's look at -- go back to 1006, and can we read line 4, please.

A.   On October 3, 2017, at 10:30 a.m., Trevor Milton sends an email to Dane Davis, Tony Epperson, and Kevin Lynk:  "You have my approval to buy them."

Q.   Let's bring up Government Exhibit 924.

So this email you just read from Trevor Milton, he is responding to Dane Davis' email that we read previously, is that right?

A.   That's correct.

Q.   OK.  Let's go back to 1006.

So, Special Agent Penland, there are, obviously, a number of rows here.  Each of them has a government exhibit reference, is that right?

A.   Yes.

Q.   From this point onwards, I think we're largely just going to read through the chart, but if the jury wanted to see the source document, where would they look?

A.   They would look at the government exhibit listed beside it.

Q.   All right.  So let's pick up with line 5, and can you start reading us from there.

A.   On October 3, 2017, at 12:32 p.m., Ron Alvarez to Trevor Milton and Patrick Carungi:  "Can you provide your electrical engineer/designer contact information?"

Q. Line 6, what's the response?

A. Trevor Milton responds:  "Please meet with Kevin Lynk and Dane Davis."

Q. What's the date on his response?

A. October 3, 2017, at 12:39 p.m.

Q. OK.  Now, take a look at line 7.  Could you read that.

A. October 6, 2017, at 4:03 p.m., there is a Nikola Twitter. It says:  "You may or may not see the Nikola truck moving in a commercial soon . . . ."

        MR. ROOS:  Let's just publish that to the jury.  Can we just show Government Exhibit 563.

Q. This is the tweet you were just reading?

A. Yes.

Q. Do you see where it says "Twitter for Android"?

A. Yes.

Q. All right.  I think people may know, but what is Android?

A. A cell phone.

Q. OK.  Now, let's go back to 1006.

        So we've been reading through messages in October 2017.  Line 8 picks us up on December 4, 2017.  Can you start back up there.

A. At 2:39 p.m. Trevor Milton to David Diaz and Tony Epperson. Subject, Nikola/Phillips video:  "Why does this not show the truck going down the road as we talked about?  That was the reason why I approved it to be used in the commercial.  I think

we should talk about this."

Q.   Can you read David Diaz's response.

A.   "We went back and cut a rough for you including a moving truck."  And there's a link.  "Did you get all the bonus drone footage we shot?"

Q.   Now, by the way, that link, it's like a download link.  Do you see that?

A.   Yes.

Q.   Were you able to access it at this point a few years later?

A.   No.

Q.   All right.  Line 10.

A.   On December 4, 2017, at 5:09 p.m., Trevor Milton to David Diaz:  "I think that looks a lot better.  I don't know if you are able to extend that moving part by another one full second or so, but I think that would really help since it is kind of a fast frame.  So give it maybe another full second of it driving added to the content you have.  It has the truck pulling up from 1:35-1:33.  So a two-second clip is kind of quick for the eye to realize this is moving.  Maybe add another one to two seconds to that of the truck rolling.  This will be the first time anyone has ever seen the Nikola truck move, so it could get millions of views on our YouTube channel.  I am only trying to maximize that exposure for you and to help get it viral.  Do you have another two seconds of it driving?  Good job."

Q.   Just to clarify, looking back at line 8 where Trevor Milton

asks, "Why does this not show the truck going down the road as we talked about?" that is -- the subject line on that email is Phillips video, right?

A.   Nikola/Phillips video, yes.

Q.   And the same on line 10, this email about making edits, that's -- that again is the subject line Nikola/Phillips video?

A.   Yes.

Q.   OK.   Let's go to the next page.   Could you read us through line 11.

A.   On December 5, 2017, at 10:24 a.m., David Diaz to Trevor Milton:   "It was our hope to make a spot that you would be happy with.   We are going to be delivering to you two products. One, a version of the 90-year you can show to your people, and two, bonus glamour footage of the Nikola truck cruising down the road.   I'll get on the changes you made today."

Q.   All right.   And Trevor Milton's response?

A.   "Perfect.   Excited to see it."

                (Continued on next page)

BY MR. ROOS:

Q. And the next email from that same date.

A. David Diaz to Trevor Milton. With your second round of changes, download link and the links attached.

Q. Do you see there's a download link?

A. Yes.

Q. And do you see that there's like a file name below it?

A. Yes.

Q. What's the file name?

A. 90-year final render. December 4, 2017, plus Nikola.MP4.

Q. How does Trevor Milton respond in line 14?

A. I really like that one. Great job. Are you going to post it on YouTube and provide us the link to help us get views. How are you planning on rolling it out?

Q. What does David Diaz say in response?

A. We will be sending an email blast out of our spot. After that, we will be playing it at our shows in our booth. Who at your company should I send all of the bonus drone footage?

Q. And how does Trevor Milton respond?

A. Please send it to jordan@nikolamotor.com. Also, let me know the YouTube link so I can get this out to everyone, including our following. I would imagine you may have a couple hundred thousand views on this from our side.

Q. Can you read line 17.

A. On December 6, 2017, at 11:23 a.m., from David Diaz to

Trevor Milton.  Jordan will get everything in a final form.
You are free to use the 90-year spot on your YouTube channel.
Any views are good to have.

Q.  Let's turn the page to line 18.

A.  December 6, 2017, at 11:32 a.m., from Trevor Milton to
David Diaz.  Do you want me to upload it?  I'm happy to do so
if you are okay and release us to upload it.  Let me know when
you are okay with it going live and I will upload it on our
YouTube channel, FB, and other social media platforms.

Q.  Do you understand FB to be Facebook?

A.  Yes.

Q.  Let's go back one page.  Do you see line 11, David Diaz
references bonus glamour footage?

A.  Yes.

Q.  And do you see, he says, and bonus glamour footage of the
Nikola truck cruising down the road?

A.  Yes.

Q.  And do you see in line 15, David Diaz writes to Trevor
Milton, who at your company should I send all the bonus drone
footage.

        Do you see that?

A.  Yes.

Q.  Do you see in line 16, Trevor Milton writes, please send it
to jordan@nikolamotor.com?

A.  Yes.

Q.  Let's go to the next page, and line 19, do you see where it says video footage of Nikola One?

A.  Yes.

        MR. ROOS:  So let's now play that.  Can we play 295.

        (Video played)

        Okay.  We can take that down.  Let's play 296.

        We'll come back to it.

        Let's go back to 1006.  Let's pick up where we left off, line 20.

Q.  Special Agent Penland, you'll note that the last few lines we're reading are from December 2017?

A.  Yes.

Q.  We're picking back up on line 20.  What's the date now?

A.  January 23rd, 2018.

Q.  And do you remember the very first email you read us through referenced that the Philips commercial would be January 2018?

A.  Yes.

Q.  So why don't you read us, starting on line 20.

A.  At 1:11 p.m., David Diaz to Trevor Milton and Ron Alvarez. We are good to load the video today at 4:30 p.m.

Q.  And line 21, how does Trevor Milton respond?

A.  We just posted it on our Facebook page, so that is good.

Q.  And three minutes later at 10:05, what does he write to Jordan Rich?

A.   Hey, can you upload this to our YouTube channel.  90-year final render, December 4th, 2017, Nikola Two.

Q.   And that 90 year final render, December 4, 2017, Nikola, is that the same file name as the video for the Philips commercial you looked at a few minutes ago?

A.   Yes.

Q.   And let's just look at Government Exhibit 321 for a minute.

         MR. ROOS:  Can we zoom in on the from/to/subject line.

Q.   Do you remember the email where Trevor Milton said -- the email where Trevor Milton said to David Diaz to send the raw footage to Jordan at Nikola Motor?

A.   Yes.

Q.   Now, do you see the email address for Jordan Rich?

A.   Yes.

Q.   And what is it?

A.   Jordan@nikolamotor.com.

Q.   So the email address we were talking about?

A.   Yes.

         MR. ROOS:  We can take that down.  Let's go back to 1006.

Q.   So Trevor Milton asks in line 22, to Jordan Rich, can you upload this to our YouTube channel.  And how does Jordan Rich respond in line 23?

A.   This is now on our YouTube channel.  Here is the link.  It is also on the press page of our website — and there is a

M9UCmil2                    Penland - Direct

website listing.  I am working on putting together a good video loop of the truck for our website and for you to post.  I probably won't have it done until tomorrow.  I'll let you know when it's done.

Q.  Line 24, January 4, 2018, Philips commercial that we've been talking about, is that the video we played at the beginning of your testimony?

A.  Yes.

Q.  Let's go to line 25, then.  Can you read us through line 25.

A.  On January 24th, 2018, at 6:12 p.m., Jordan Rich to Trevor Milton.  Here it is.  I added some music and our logos.  Those things won't be in the loop video on the website.  Let me know if it's good or if you want any changes made.

        And then there is a file, Nikola One social media.

Q.  So I just want to be clear, in line 23, Jordan Rich says this is now on our YouTube channel, here's the link.  And that's in response to the email about posting the Philips commercial on the YouTube channel; right?

A.  Yes.

Q.  At the bottom, Jordan Rich says to Trevor Milton, I'm working on putting together a good video loop of the truck for our website and for you to post; right?

A.  Yes.

Q.  And then in line 25, he says, here it is, I added some

M9UCmil2                          Penland - Direct

music and our logos; right?

A.  Yes.

Q.  So then line 26, what does Jordan Rich say to Trevor

Milton?

A.  He says version two, and then there is a link.

Q.  So let's look at version two with the link.

          MR. ROOS:  Can we play Government Exhibit 210-A.

          (Video played)

Q.  This is that video, the second video we watched at the

beginning of your testimony; right?

A.  Yes.

Q.  It's the same as that.

          So that's the -- this is the version two that we just

watched, is that right, on line 26 that Jordan Rich sends to

Trevor Milton?

A.  That's correct.

Q.  And he says, in line 23, Jordan Rich writes, I'm working on

putting together a good video loop of the truck for our website

and for you to post.

          Do you see that?

          MR. ROOS:  Can we highlight that for her.  It's the

last paragraph in line 23.

A.  Yes.

Q.  Now let's turn the page to line 27.  Do you see a post to

Nikola's Twitter account?

M9UCmil2                        Penland - Direct

A.   Yes.

Q.   So instead of reading off here, why don't we look at it.

          MR. ROOS:   Can we see Government Exhibit 564.

Q.   Can you read the Tweet?

A.   Behold, the Nikola One in motion.  Pre-production units to hit fleets in 2019 for testing.  The Nikola hydrogen-electric trucks will take on any semi-truck and outperform them in every category; weight, acceleration, stopping, safety and features — all with 500-1,000 mile range.

Q.   And below it is the video?

A.   Yes.

          MR. ROOS:   Let's go back to the chart, 1006, line 28.

Q.   What does Jordan Rich say to Trevor Milton?

A.   This video is now also on our YouTube channel.

          And there's a link.

Q.   And then line 29.

A.   The in motion video is posted to Facebook.

          MR. ROOS:   Let's look at that.  Can we publish Government Exhibit 1111.

Q.   Next to the video, can you just read the top comment.  I'm sorry.  Not the comment.  The description.

A.   Behold, the 100hp zero-emission Nikola semi-truck in motion.  Get ready for the pre-production units to hit fleets in 2019 for testing.  The Nikola hydrogen-electric trucks will take on any semi-truck and outperform them in every category;

weight, acceleration, stopping, safety and features — all with 500-1,000 mile range.

MR. ROOS:  We can zoom out of this.  Why don't we zoom in on the comment.

Q.  Can you just read the comment from Nikola Motor company?

A.  They operate 20 to 30 percent less than diesel without government help or funds.  It is not for everyone, but if you are in it to make money, then this is the way to go.  Oh, and did we say it is 1,000hp and 2,000 ft. lbs of torque.

MR. ROOS:  We can take that down.  Can we go back to 1006, the last page.

Q.  We just read line 29.  So line 30, what's that?

A.  It is the in motion video.

Q.  And is this the second video that we watched this morning?

A.  Yes.

Q.  So line 31, can you read it.

A.  January 25th, 2018, at 2:10 p.m., from Jordan Darling to Trevor Milton.  Any way I can get some of the footage of the Nikola One for Bosch.

Q.  And line 32, how does Trevor Milton respond?

A.  We can send you what we cut.  We took out stuff we didn't want seen so I can have Jordan Rich send you what we cut and you can use that.  It is essentially what we just posted.

MR. ROOS:  Now, why don't we do this.  Can we play the raw footage, GX-295 side-by-side with the in motion video that

was posted, GX-402.

Q.   Special Agent Penland, did you observe any differences in how the trucks were moving in the two videos?

A.   I did.

Q.   What differences did you observe?

A.   The Nikola One commercial, the truck seems to be moving quite faster.

        MR. ROOS:  We can take this down.  Let's switch topics.  We'll talk about a different exhibit.

Q.   Did you work on a chart related to a trip Trevor Milton made to New York City?

A.   Yes.

        MR. ROOS:  Can we publish Government Exhibit 1009.

Q.   Is this that chart?

A.   It is.

Q.   And what does this show?

A.   This shows some emails.  I'm sorry.  Some text messages, as well as a schedule related to a visit to New York.

Q.   And what dates does this cover?

A.   March 3rd through March 5th, 2020.

Q.   How should we read this chart?

A.   It's read just like the previous chart, from left to right, by row.

Q.   So why don't we read through it.  Can you read the first line?

A.   On March 3rd, 2020, at 10:38 p.m.  I'm in New York for CNBC tomorrow and just landed.

MR. ROOS:  Let's take a look at that.  Can we see Government Exhibit 15.  Why don't you zoom in on the text messages.

Q.   These are between Trevor Milton and Brock Milton.  Do you see the last line?

A.   I do.

Q.   Is that where the sentence about, I'm in New York for CNBC tomorrow and just landed is?

A.   Yes.

MR. ROOS:  Let's go back to Government Exhibit 1009.

Q.   Can you read us through the remainder of the chart?

A.   On March 4th, 2020, at 7:45 a.m., it was an interview with David Faber, CNBC, NYSE, at 11 Wall Street, New York, New York. At 9:15 a.m., there is an interview with Maria Bartiromo with Fox, 1211 Avenues of the America, New York, New York.  At 12:00 p.m., there is an interview with Gary Gastelu, Fox, 1211 Avenues of the Americas, New York, New York.  At 1:00 p.m., morgan Stanley visit with Steve Girsky, 1585 Broadway, New York, New York.  2:00 p.m., interview with Peter Valdes-Dapena CNN, 30 Hudson Yards, New York, New York.

The next day, March 5th, 2020, at 12:51 a.m., I just landed into Phoenix with my New York trip.  Sorry.  From my New York trip.

Q.  So CNBC, Fox, CNN, those are national broadcasts; right?

A.  Yes.

        MS. ESTES:  Let's look at Government Exhibit 330 for a minute, page 2, please.

Q.  Is this the schedule for that trip?

A.  Yes.

Q.  And this is where that information that you just read came from; right?

A.  That's correct.

        MR. ROOS:  Let's go back to the exhibit, 1009.

Q.  Do you see these images below the interview with Maria Bartiromo?

A.  Yes.

Q.  What are those images from?

A.  The interview.  It's the footage from the interview.

Q.  And do you see the image on the left, what is that?  That's a screenshot?

A.  Yes.

Q.  And the image on the right, do you recognize the screenshot of that video?

A.  I do.

Q.  And what is it?

A.  That appears to be the video of the commercial we saw.

Q.  And so, just to be clear, did that video play during this interview?

A.  Yes.

MR. ROOS:  We can take this down.  While we're on the subject of New York, can we show the everyone, they're in evidence, 1120-A and 1120.

Q.  Why don't we start by, on the right side of the screen, can you just read the title.

A.  Nikola Corporation Rings the Nasdaq Stock Market Closing Bell in Celebration of its IPO.

Q.  What's the date?

A.  June 2020.

Q.  June 4, 2020?

A.  Thank you.  Yes.

Q.  Do you see like an embedded video below that?

A.  Yes.

MR. ROOS:  Let's play the video.

(Video played)

Seems like we might be having some sound issues on this one.  Can we skip ahead a little bit in the video just so we can see --

Q.  We see Trevor Milton there; is that right?

A.  Yes.

MR. ROOS:  Can we try to find a spot where we see the picture.  There.  Okay.

Q.  Do you see that?

A.  Yes.

Q.   And do you see Trevor Milton sort of up on the building

billboard there?

A.   Yes.

Q.   Do you recognize that location?

A.   I do.

Q.   What do you recognize it as?

A.   Times Square.

Q.   Sorry for the obvious question, where is Times Square?

A.   In Manhattan, New York.

         MR. ROOS:  Since this one is not working, can we do

Government Exhibit 1119-A, and next to it 1119.

Q.   Special Agent Penland, on the right, do you see a Tweet?

A.   Yes.

Q.   And it's from Nikola Motor Company?

A.   Yes.

Q.   And can you just read it.

A.   #NKLA day is finally here.  We're so excited to be joining

the @Nasdaq family today.  Be sure to follow our social

channels to watch the latest live updates.  #NKLA Nasdaq $NKA.

Q.   There is a video embedded below it?

A.   Yes.

         MR. ROOS:  Let's play a few seconds of the video.

         (Video played)

         You can stop it there

Q.   Do you recognize that location?

A.   Yes.

Q.   Where is that?

A.   That's in Times Square.

Q.   Time square is in Manhattan?

A.   Yes.

Q.   One more piece of geography, by the way.  Are you familiar with Mamaroneck?

A.   Yes.

Q.   What county is Mamaroneck in?

A.   Westchester.

         MR. ROOS:  Let's move to a different exhibit.

Q.   Are you familiar with the Nikola Badger?

A.   Yes.

Q.   Have you worked on a timeline related to the Badger?

A.   I have.

         MR. ROOS:  Let's pull up Government Exhibit 1005.

Q.   What's this?

A.   This is the timeline.

         MR. ROOS:  And why don't we just sort of flip through the pages here for a second.  Let's go back to the first page now.

Q.   What sort of materials are included in this timeline?

A.   Tweets, press releases, TV interviews, podcast interviews, and a variety of other type of interviews.

Q.   How is the timeline organized?

A.  By date.

Q.  Now, do you know if every statement that Trevor Milton made about the Badger is on this timeline?

A.  It is not.

Q.  This is just a subset of some of the materials; right?

A.  Yes.

Q.  The jury's heard a lot about the Badger, so we're not going to go through this whole thing.  Let me just do a few examples with you.

Do you see at the top there, it says February 10 press release on the first page?

A.  Yes.

Q.  So what's that a reference to?

A.  It references the Nikola press release related to the Badger pickup, and it gives the GX number that shows that press release.

Q.  Like I mentioned, I don't really want to bother with a lot of the substance here, this is in evidence, but just so people understand how to read this, if you wanted to see the press release from that day, where would you look?

A.  GX-801.

Q.  And let's do another example.  Do you see where it says April 20th?

A.  Yes.

Q.  And what's on April 20th?

A.   The truck show podcast, GX-407.

Q.   So there's no quote here in the box.  How do we know it has something in it that relates to the Badger?

A.   I reviewed it to verify that it did.

Q.   So any of the podcasts or television appearances referenced here have something in there related to the Badger?

A.   Yes.

Q.   Let me just ask you the Tweets here.

        MR. ROOS:  Let's zoom in on February 12th.

Q.   So for a Tweet, how do we know where it comes from?

A.   GX-508 will be the actual Tweet.

Q.   So much like the other exhibits or the other sort of boxes on this chart, if you want to see the actual Tweet, you look at the little GX label?

A.   That's correct.

        MR. ROOS:  Ms. Wolfson, would you mind flipping to the next page.

Q.   On page 2 here, do you see a June 25th Tweet?

A.   I do.

        MR. ROOS:  Why don't we blow that up.  I'm sorry.  Before we do that, I'm jumping around a little bit.

Q.   You'll notice on the timeline, there's a line, the timeline, and there is different colors above and below.  Do you see that?

A.   Yes.

Q.   What's the significance of the different color?

A.   Anything above the timeline, which is in the peach color, would be known by the public, so it was available to public knowledge.  Anything below in the blue color would not have been available to the public.

MR. ROOS:  Can we zoom in on that Tweet we just had up, the June 25th.

Q.   It's a public Tweet; right?

A.   Yes.

Q.   Can you read it.

A.   Milton Tweets:  "Getting questions about what we do with all the water coming out of our hydrogen trucks.  Well, we will use most of it for our windshield washer fluid and then some for pure driver drinking water.  Yes, you heard that right, we will have a drinking fountain in our truck."  "Using the hydrogen byproduct water for the drivers to have nice cold, clean, pure drinking water.  The rest is reused at our facility when they arrive for H2 production recycling."

MR. ROOS:  We can zoom out.

Q.   Now, do you see there is a box below the timeline?

A.   Yes.

MR. ROOS:  Why don't we zoom in on that.

Q.   For starters, do you see what exhibits are referenced?

A.   Yes, 900 and 901.

MR. ROOS:  Let's take that down.  Can we put up S9.

I'll just read this.  Can we zoom in on the two paragraphs, 1 and 2.  It's a stipulation that's already in evidence.

Government Exhibit 900 is a record of parts of the internet browsing history from Trevor Milton's MacBook Pro on July 7, 2020.  The "URL" column shows the web page visited and the "title column" shows the title of that website.  The "date visited" column shows the date and time the website was visited.

Government Exhibit 901 is a record of parts of Google search history from Trevor Milton's MacBook Pro on certain dates in June and July 2020.  The "search string" column reflects the words searched by Milton.  The "date last visited" column reflects the date and time of the Google search.

Can we go back to the exhibit now, and page 2.  Let's zoom in on that internet search.

Q.  Can you read what was searched?

A.  Is water from hydrogen okay to drink.  Can you drink water from a fuel cell.  Then there's a website, www.autonews.com. Toyota, fuel cell water safe to drink... but don't try it.

MR. ROOS:  We can zoom out.

Q.  So the Tweet in which Trevor Milton said, you heard that right, we will have a drinking fountain in our truck using the hydrogen byproduct water for the drivers to have nice cold, clean, pure drinking water.

How long after were these searches?

A.   13 days after.

MR. ROOS:  Let's go to the third page of this chart.
This is the last page of the timeline; right?

A.   Yes.

MR. ROOS:  We can take that down.  Going to move to
another exhibit.  Can we show everyone Government Exhibit 1007.

Q.   As part of your work, did you review a chart relating to
statements about hydrogen?

A.   Yes.

Q.   And what's this that we're looking at here?

A.   This is a timeline related to the statements about
hydrogen.

Q.   And what sort of materials are included?

A.   Tweets, interviews from podcasts and TV shows, those types
of things.

Q.   And how is the timeline organized?

A.   Chronologically, by date.

Q.   Basically the same format as the last timeline we looked
at; right?

A.   It is.

Q.   We're not going to go through, really, anything in this
timeline except we'll just flip through it.  So that's the
timeline?

A.   Yes.

Q.   And broadly speaking, this relates to the costs of

producing hydrogen; is that right?

A.  That's right.

Q.  Just to be clear, statements about the costs of producing hydrogen?

A.  Yes.

Q.  Now, does this include every statement that Trevor Milton made about hydrogen?

A.  No.

        MR. ROOS:  We'll take this down.

Q.  I want to change topics.

        Did you review some stock data in preparation for your testimony?

A.  I did.

Q.  What sort of data did you look at?

A.  I looked at the closing stock prices for Nikola throughout a period of time, as well as source documents related to the S1 and various other documents.

Q.  And the stock data, was that publicly available data about Nikola?

A.  Yes.

Q.  Did you look at the data for the daily closing price?

A.  Yes.

Q.  So that means the price of the stock when the stock market closed each day?

A.  That's right.

Q.  I just want to be clear, before we look at some of these charts about stocks, did you do any type of economic analysis of the stock price?

A.  I did not.

Q.  So your work was just limited to taking the stock price on a particular day; is that right?

A.  That's right.

Q.  Let's start with Government Exhibit 1000.

What does this chart show?

A.  This shows the Nikola stock price from March 3rd, 2020, to September 29th, 2020, at the close of each day.

MR. MUKASEY:  Objection.  Misstatements the testimony, the evidence, and the chart.

THE COURT:  Overruled.

Q.  So I just want to be clear, you see the first part of the chart is in green, and it says VTIQ, and then the second part is in blue and it says NKLA.  Can you explain that for us?

A.  Yes.  So, prior to June 3rd, 2020, the stock says VTIQ on June 3rd is when the merger took place and the stock began trading as NKLA.  If you go to Yahoo Finance, this is the chart that it gives you when you put in NKLA.

Q.  So the reason why -- this is the March to the end of September chart if you went to Yahoo Finance today and looked at NKLA.  You've just color coded them -- you testified you color coded and labeled things to differentiate when the stock

changed its ticker symbol; is that right?

A.   Correct.

Q.   I'm sorry, you may have said it, but the reason we're starting at March 3rd is because that's the day that VectoIQ and Nikola announced its business combination?

A.   Correct.

Q.   Just to be clear, this is just like the daily closing stock price each day for the six-month period?

A.   Yes.

          MR. ROOS:  Let's look at another chart, 1001.

Q.   What does this chart show?

A.   This chart shows the same thing.  It's the same chart as the previous chart showing the closing price of the stock each day, but it also includes the value of Trevor Milton's stockholdings at specific times.

Q.   A few moments ago, you testified that prior to June 3rd, Trevor Milton -- I'm sorry.  Prior to June 3rd, this was listed as VectoIQ at that point, right, VTIQ and then it switched over to Nikola; is that right?

A.   Yes.

Q.   So I just want to be clear about a few things.

          Did Trevor Milton own VectoIQ stock?

A.   No.

Q.   So for this period before its Nikola stock, though, you've got some markers.  Do you see those?

A.   Yes.

Q.   I want to be clear so everyone understands sort of what those represent, and you actually have a few sentences here. So why don't you just read those and then we'll talk about it.

A.   Between March 3rd, 2020, and June 3rd, 2020, Trevor Milton owned legacy shares of Nikola stock, but not VectoIQ shares. Valuation of Mr. Milton's shares before June 3rd, 2020, is based on the VectoIQ share price at that time, and Mr. Milton's implied shareholding.  Stock prices listed are the daily closing price.

Q.   So just to break that down, Mr. Milton did not own shares of VectoIQ from March to June; right?

A.   Correct.

Q.   He owned what you just read as legacy shares of Nikola; right?

A.   That's right.

Q.   Which are not publicly traded; right?

A.   Correct.

Q.   So the second sentence here says, in valuing this, you took the implied shareholdings.  So what does that mean?

A.   When the companies merged, there was a factor giving to do the conversions because of his shares and then the shares of the publicly traded.  So I used that factor in converting his shares prior to what it would have been equal to if it had been VectoIQ shares.

Q.   So you basically did some math.  You took his legacy Nikola shareholding, you multiplied it by that conversion to figure out how many shares he would own if he did, right, that's how you figured out the implied shareholding?

MR. MUKASEY:  Objection to the leading and the form.

THE COURT:  Overruled.

A.   That's correct.

Q.   And then so once you had that implied shareholding number for that period, and just to be clear, did you have the actual shareholding number for the period of June 3rd onwards?

A.   I did.

Q.   So using that implied shareholding and then the actual shareholding, how did you come up with the value of the holding?

A.   I took the number of shares and multiplied it by the closing stock price for that day.

Q.   So pretty simple math, you take the share number times the share price at the closing and that's how you come up with these numbers in the chart; is that right?

A.   Correct.

Q.   So using the implied share value in March of 2020, what's the value there that you got listed?

A.   $1,098,699,255.

Q.   So the implied value in March is a little over a billion; is that right?

A.   Correct.

Q.   How about in May in this little sort of mini peak?

A.   $2,767,170,056.

Q.   How about here in early June?

A.   $7,303,485,982.

Q.   At this point in June, this is actual shareholding; right?

A.   That's correct.

Q.   Now the next marker, we have a little over $7 billion, and then in August, do you see the next marker?

A.   Yes.

Q.   And how much is that?

A.   $3,557,850,189.

Q.   By the way, have you reviewed some documents related to a date on which a report called a Hindenburg report was published?

A.   Yes.

Q.   Now, after that date in September, where is this holding?

A.   $1,938,273,434.

Q.   So Mr. Milton's stock holding value changed depending on the stock price?

A.   Correct.

Q.   And so when the stock price went from around $10 a share to around $80 a share, that's about a $6 billion change in value; right?

A.   Yes.

MR. ROOS:  You can take this down.  Let's look at Government Exhibit 1004.

Q.  Just for starters, what dates does this cover?

A.  June 17th to June 18th, 2020.

Q.  Now, you previously told us about daily stock price data like the price of each closing day.  What does this one show?

A.  This shows from 9:30 a.m. on June 17th to 8:00 p.m. on June 18th, the stock price minute-by-minute.

Q.  So what does the blue line on this show?

A.  That's the share price.

Q.  The minute-by-minute share price.

And what do we have at the bottom here?

A.  The time.

Q.  And along the left side, what are those numbers?

A.  That's the share price.

Q.  Thank you.  I just realized there were no labels on them.

So I just want to be clear, though, about the scale here because we looked at some other charts with a different scale, this is just $60 to $70; is that right?

A.  Correct.

Q.  It's not like a full zero-to-a-billion-dollar range; right?

A.  Correct.

Q.  And a few other sort of identifiers here.  Do you see the little green and the little red diamonds?

A.  Yes.

Q.   What do those signify?

A.   The green diamond indicates when the stock market opens for the day and the red diamond indicates when the stock market closes for the day.

Q.   And how about the yellow markers, what do those certify?

A.   Those are where we plotted events.

Q.   So looking at the green and the red dots, some of these stock price movements happen while the stock market is open; right?

A.   Yes.

Q.   And some of them happen when the stock market is closed; right?

A.   Yes.

Q.   Now, before we talk about the events, I just want to be clear about sort of what you did and didn't do here.  Has any part of your responsibilities been to look into what caused the price movements?

A.   No.

Q.   You're just plotting three exhibits on the timeline of the stock price movement; is that right?

A.   That's correct.

Q.   So why don't you walk us through what these three events are?

A.   On June 17th, at 3:29 p.m., Bloomberg published an article titled Nikola Founder Exaggerated the Capability of its Debut

Truck.

Q.  Let me stop you there.

MR. ROOS:  Why don't we put up for the jury Government Exhibit 700.  Okay.  And we can take that down.

Q.  Special Agent Penland, why don't you read the next one.

A.  At 4:24 p.m. on June 17th, Milton response to Bloomberg article on Twitter.

MR. ROOS:  And why don't we just show the jury 532 and 535.  And we can take those down.

Q.  And then the last one?

A.  At 6:08 p.m. on June 17th, Milton texts Girsky:  I don't back down.  Share value went up after my response.

MR. ROOS:  Why don't we look at that one, Government Exhibit 38.  Can we zoom in on the text messages.

Q.  Would you mind just reading those.

A.  Read both of them?

Q.  Yes.

A.  Did you see me rip Ed Ludlow a new one for falsely reporting on us today?  The call is recorded, so he's fucked.

I don't back down.  Share value went up after my response.  You better come with better than lies to take me down.

MR. ROOS:  We can take that down.  Let's go back to the chart, 1004.

Q.  Now, just looking at the movements here, do you see the

yellow dot where the Bloomberg article is published?

A.  Yes.

Q.  And do you see the movement of the stock afterwards?

A.  Yes.

Q.  What direction does it head in?

A.  Down.

Q.  And do you see the second and third yellow dots?

A.  Yes.

Q.  And how would you describe the stock movement there?

A.  After the -- well, prior to, before the response, the Twitter response, it looks like the stock is going up a little bit and it continues to go up a little after the Twitter Tweet, and then it drops back down and then, again, starts to make a little climb before the last text.

Q.  And then it continues to climb sort of into June 2018; is that right?

A.  Yes.

Q.  Just to be clear, you're not doing an analysis and you're not saying sort of why this stock went up and down, you're just testifying about your observations of the movement; is that right?

A.  Correct.

        MR. ROOS:  Let's move on to another chart.  Can we see Government Exhibit 1003.

Q.  Special Agent Penland, what's this?

A.   This is also a chart showing the daily closed stock price for Nikola from September 8th, 2020, to September 30th, 2020, and it indicates when the Hindenburg report was published.

Q.   And so I think the first stock chart you showed us, it showed us the period March to the end of September.  Is this sort of a subpart of that?

A.   Yes.

Q.   Just a zoomed in portion of that larger chart?

A.   That's correct.

Q.   And here, you have the date and time the Hindenburg report is published.  And can you describe generally, just based on your observations, what happens to the stock price over the next few days?

A.   It goes down.

        MR. ROOS:  Let's do one more stock chart.  Can we see Government Exhibit 1012.

Q.   What is, generally, this chart about?

A.   This is a chart showing, again, the closing stock price for Nikola.  This time period is from June 1st, 2020, to December 28th, 2020, but it also shows the exercise price for the stock options that were given to Peter Hicks.

Q.   Before we talk about the substance of the chart, since there's a number of different things going on in the chart, I just want to talk about each portion of it.

        So why don't we just start with the little key at the

bottom.  What does the blue refer to?

A.  That's the stock price, what it was at closing for the day.

Q.  And do you see this, I'll call it black line that goes across at $16.50?

A.  Yes.

Q.  What does that refer to in the key?

A.  That's the exercise price for the stock option.

Q.  So the price at which Peter Hicks could exercise the option?

A.  Correct.

Q.  And do you see the red line?

A.  Yes.

Q.  What does the red line, according to the key, refer to?

A.  It indicates the restricted period, so the period that he was not able to exercise the option.

Q.  And it says expected option value based on stock price. Does it say "expected" because he couldn't actually exercise it at that time?

A.  That's correct.

Q.  So it would be, if he could have exercised it, this would be the expected value, but to be clear, he could not exercise it?

A.  Correct.

Q.  And then how about the green?

A.  That's the value during the period when he could exercise

the option.

Q.  And then you've got -- there's some numbers on the left side and some numbers on the right side.  What do those refer to?

A.  The numbers on the left side are the -- that's the stock price, the closing price for each day.  And the numbers on the right side are the value for the options.

Q.  And then do you see there's two labels at the bottom, one says Hicks contract signed.  What's that a reference to?

A.  That's the date the property contract was signed and the option.

Q.  And then there's one that says Hicks deal closes.  Do you see that?

A.  Yes.

Q.  What's that a reference to?

A.  That's the date it closes.

Q.  So now, why don't you describe to us generally what happens over time, first from the date on which the Hicks contract is signed to its close.  Let's do that.

A.  So the date the contract is signed, the expected or potential value of the option is high and it continues to stay high for a period of time and, over time, it steadily decreases.  Once we get to the time period where he's able to exercise the option, there is very low expectation of value or, at one point, it goes below value.

MR. MUKASEY:  I'm going to object and move to strike as to "high," "low," and "expectation."

THE COURT:  Overruled.

Q.  Just to break your answer down a little bit, when the contract is signed, the stock price is somewhere between $30 and $40.  Does that look right?

A.  Correct.

Q.  And then if you look over on the right side, the expected option value is sort of in the neighborhood of $10 million; is that right?

A.  Yeah, a little less, a little less than 10, I think.

Q.  A few days later on June 8th or 9th, the stock price is above $80 a share; is that right?

A.  Yes.

Q.  And how does that correlate with the expected option value?

A.  It looks like it's in excess of $30 million.

Q.  So then let's fast forward a little bit.  August 14th, I think the marker is actually a little off here, it's moved.  So let me just ask you, if you look at the scale where August 14th is, roughly, where is the stock price?

A.  On the 14th, on August 14th?

Q.  Yeah.

A.  It looks like it's around $45.

Q.  And how does that correspond to expected value?

A.  Around $15 million.

Q.   And then do you see where it says Hindenburg report?

A.   Yes.

Q.   So I think you testified that the value decreases?

A.   After the Hindenburg report, yes.

Q.   And then the period starting December 1st where it's green, where the option can be exercised, do you see that?

A.   Yes.

Q.   That's sort of at the $20 and below share price; is that right?

A.   That's right.

Q.   And that's sort of the part where you're testifying it was comparatively lower; is that right?

A.   Yes.

          MR. ROOS:  We can take this down.  We're going to do one last topic and slide.

Q.   As part of your work on this case, have you reviewed how Trevor Milton spent money from stock sales?

A.   I did.

          MR. ROOS:  Can we please display Government Exhibit 1013.

Q.   Special Agent Penland, what's Government Exhibit 1013?

A.   This is a summary of the sales, where the money went and how it was spent.

Q.   What are we looking at on the first page here?

A.   On the first page, there are three green boxes.  Those are

the sale of stock and money that was received from that sale. It shows that those funds then went into several bank accounts and how that money was spent out of those bank accounts.

Q.   So what are the four stock sales?

A.   On June 4th, 2020, there was a sale, redemption of stock by Nikola Corporation of $70 million.  On May 18th and May 22nd, 2020, there was sale of stock to VA Spring NM LLC for $24,068,599.  And then on June 1st, 2020, there was a sale of stock to ClearSky Power & Technology Fund for $5,000,010.

Q.   And just to be clear, these are sale of stock by Trevor Milton?

A.   That's correct.

Q.   So he's receiving money?

A.   Yes.

Q.   And then the gray box, what does that refer to?

A.   That's a summary of where the funds were actually spent.

Q.   So big picture, the chart summarizes how he is spending money from stock sales?

A.   Correct.

        MR. ROOS:  Why don't we zoom in on the very top of this gray chart.  Let's look at everything, let's say, over $2 million.

Q.   Now, I just want to be clear, your testimony has nothing to do with whether any of the spending is legitimate or illegitimate; right?

A.   Correct.

Q.   Likewise, your testimony has nothing to do with whether the sale of the stock was legitimate or illegitimate; right?

A.   Correct.

Q.   You're just testifying about how the money was spent; is that right?

A.   Yes.

Q.   So looking at the transactions here, have you done an additional analysis or tracing with respect to some of these transactions?

A.   Yes.

          MR. ROOS:   So why don't we move to the next page of the chart.

Q.   Can you describe for the jury what this next page shows?

A.   So this page shows those three green boxes, they're the same as the fir chart, the sale of the various stock, and all of those funds are then deposited into Trevor Milton's JP Morgan Chase account ending 8301.  From those funds, on June 16th, 2020, and August 25th, 2020, there are two wires totaling $13,193,900 paid to First Caribbean National Bank for the purchase of an estate in Turks and Caicos.

Q.   What's Turks and Caicos?

A.   It's an island.

Q.   Do you see there is a Government Exhibit referenced in blue box there?

A.   Government Exhibit 907.

Q.   What's that?

A.   That is the purchase agreement related to that.

     MR. ROOS:  Why don't we put that up on the screen for a minute so the jury can see it.

Q.   So just to be clear, this is the purchase agreement for the property that the money was trace -- for the purchase of the property that the money was traced to; is that right?

A.   Correct.

     MR. ROOS:  The one after Turks and Caicos.  Thank you.

Q.   Why don't we talk about this one.  What does this chart show?

A.   This chart shows the sale of the stock from the $70 million and the $5 million that came into the Trevor Milton JP Morgan Chase account, ending in 8301.  From that, on June 4th, 2020, there was a $1 million wire.  And then on August 13th, 2020, there were transfers of $8 million sent to Riverbend Bar Milton Ranch.  That went into a bank account, a JP Morgan Chase account, ending 8209.  From that account, there was one wire on August 14th, 2020, in the amount of $7,645,155.  Both of the wires, the $1 million on June 4th and the $7 million on August 14th went to the First American Title Insurance Company for the purchase of a ranch from Peter Hicks.

Q.   And why don't we start with -- well, actually, let me ask you about the purchase of a ranch from Peter Hicks.

Peter Hicks is the same person we -- or this is the same transaction we talked about in relation to those options a few minutes ago; is that right?

A.   That's correct.

Q.   But this chart has to do with the transfer of money as opposed to the option part; right?

A.   Yes.

Q.   So I want to talk about this.  I want to talk about these wires, this $7 million wire on August 14th.

            MR. ROOS:  Can we please pull up Government Exhibit 1520.

Q.   Is this one of the bank statements?

A.   It is.

Q.   And what's the bank on it?

A.   I'm sorry?

Q.   What bank is it from?

A.   JP Morgan Chase.

            MR. ROOS:  Can we go to the next page.  And zoom in.

Q.   And do you see the August 14th wire that is referenced on your chart?

A.   I do.

Q.   And what's the amount of that wire here?

A.   $7,645,155.

Q.   And do you see who it was sent to and a transaction number? You don't have to read them, but can we just highlight them and

M9UCmil2                       Penland - Direct

tell me if you see them.

A.  I do.

Q.  The entity that it was sent to, that's the entity that's listed on your chart; right?

A.  Yes.

Q.  Let me show you -- actually, before we do something else. Do you see an August 17th wire right below it?

A.  Yes.

Q.  And it's for a smaller amount, right, 600 and change?

A.  Yes.

Q.  And it's sent to the same entity; right?

A.  Yes.

Q.  So let's look at the wire detail records.

           MR. ROOS:  Can we pull up Government Exhibit 1523.

Q.  And what's this?

A.  This is documents related to a wire transfer.

Q.  Starting on the first page, do you see the amount of the transaction this relates to?

A.  I do.

Q.  And how does the amount compare to the wire transfer that we were just talking about?

A.  It's the same amount.

Q.  Is this also for August 14th?

A.  Yes.

Q.  And do you see that transaction ID?

A.   Yes.

Q.   Does this also match the transaction ID I just asked you to look at?

A.   It does.

Q.   Do you see there is a section that says texts?

A.   Yes.

          MR. ROOS:   Why don't we blow up that whole part.

Q.   Do you see a few lines down, it says -- there's a number, and then it says JP Morgan Chase?

A.   Yes.

Q.   Do you recognize the number there?

A.   I do.

Q.   What do you recognize it as?

A.   That's a routing number.

Q.   Can you read the routing number?

A.   021000021.

          MR. ROOS:   Let's zoom out and go to the second page of this.

Q.   Is this the record for the August 17th transfer we were talking about?

A.   It is.

Q.   And why don't we look at the routing number again.

          MR. ROOS:   So if we zoom in on the text.

Q.   Is that the same routing number?

A.   It is.

MR. ROOS:  Now, we can take this down.  Let's bring up Government Exhibit 937.  Can we zoom in on it.

Q.  Now, do you see this is instructions for a JP Morgan checking account?

A.  Yes.

(Continued on next page)

M9UHMil3                          Penland - Direct

Q.   And what's the name on the account?

A.   Trevor Milton.

Q.   Do you recognize the account number?

A.   I do.

Q.   It's one of the accounts you reviewed?

A.   Yes.

Q.   Then do you see where it says, "Federal fund wires should be sent to"?

A.   Yes.

Q.   Let's zoom in on that part.

Do you see the routing number we were just talking about?

A.   I do.

Q.   That's where it says ABA number?

A.   Yes.

Q.   And this is for the account of Trevor Robert Milton?

A.   Yes.

Q.   And what's the bank address that corresponds with this?

A.   270 Park Avenue, New York, New York.

Q.   Now --

THE COURT:  Mr. Roos, unless you are at or near the end, we're going to take our break now.

MR. ROOS:  That's fine.

THE COURT:  Very well.  Twenty minutes, ladies and gentlemen.  Don't discuss the case.

(Jury not present)

THE COURT:  Ms. Penland, you may step down.  Everyone can be seated.  Anything to discuss, Mr. Roos?

MR. ROOS:  Not for us.

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  No, Judge, thanks.

THE COURT:  Twenty minutes.

(Recess)

MR. ROOS:  Your Honor, just one very minor issue.

So we noticed a typo in one of the charts where the August 14 arrow was misplaced while we were printing, and also one of the other documents we offered where the -- there was a -- without a title.  So I'm just going -- I could reoffer them now or I could reoffer them in front of the jury.

THE COURT:  Any objection?

MR. MUKASEY:  I have no objection.  I totally understand.  It has caused no prejudice to us.  So however he wants to handle it is fine.

MR. ROOS:  So maybe without the jury.

THE COURT:  Yes.

MR. ROOS:  The government offers 1311, the revised copy, and 1012, the revised copy.

THE COURT:  Very well.  They will be received.

(Government's Exhibits 1311 and 1012 revised received in evidence)

(Jury present)

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

BY MR. ROOS:

Q.  Special Agent Penland, before we pick up where we left off, earlier in your testimony I think we noticed an error where the arrow for August 14 on this Peter Hicks chart was sort of misplaced.  Do you remember that?

A.  Yes.

Q.  We've since fixed the chart?

A.  We have.

Q.  And so that will be available in evidence.

Just to be clear, sort of part of the reason this looks a little funny is because the diagonals of the dates right, but the arrow lines up with the right times, is that right?

A.  That's correct.

MR. ROOS:  We can take this down.

Q.  OK.  So we were talking about the Peter Hicks wire transfer.  Do you remember that?

A.  Yes.

Q.  Let's go to Government Exhibit 1013, page 3.

I think we were focused in on the August 14 wire.  Do you remember that?

A.  Yes.

Q.   And you had just been telling us about the routing number
associated with that wire.  Do you remember that?

A.   Yes.

Q.   So why don't we look at two more documents relating to
that.

Can we see Government Exhibit 938, please.

Do you recognize this as wire transfer instructions?

A.   Yes.

Q.   All right.  And it's actually for that $70 million stock
sale wire, right?

A.   Right.

Q.   Now, why don't we zoom in on the beneficial -- or the
routing/reference information.

So, for starters, whose account does this reference?

A.   Trevor Milton's.

Q.   And under the Beneficiary Bank, do you see that same
routing number that was associated with the Peter Hicks wire?

A.   Yes.

Q.   And what address is associated with that?

A.   The New York, New York, address.

MR. ROOS:  Let's take this down.  Can we bring up
Government Exhibit 1424, and let's go to page 7, please.  Let's
zoom in on the title of this document.

Q.   Would you just read it.

A.   "Amended and restated stock purchase agreement dated

M9UHMil3                           Penland - Direct

March 2, 2021."

MR. ROOS:  OK.  Let's go to the last page of the agreement, page 9.  Can we zoom in on this whole thing.

Q.  Now, who signs at the top of this agreement?

A.  Peter Hicks.

Q.  And who signs at the bottom of the agreement?

A.  Trevor Milton.

MR. ROOS:  All right.  Can we zoom in on the bank information below "Trevor Milton."

Q.  What does it say for the bank information?

A.  JPMorgan Chase Bank, N.A., 270 Park Avenue, New York, New York.

Q.  And do you recognize that routing number?

A.  I do.

Q.  It's the same routing number we were looking at?

A.  Yes.

Q.  It's associated with the JPMorgan Chase Bank there?

A.  Yes.

Q.  And whose name is above that bank?

A.  The M&M Residual or Trevor Milton.

MR. ROOS:  Now we can take this down, and let's go back to the document, 1013, page 3.

Q.  This wire was on August 14, right?

A.  Correct.

Q.  Through JPMorgan Chase?

A.   Yes.

Q.   And we also looked at a smaller $600 wire on August 17, right?

A.   Yes.

Q.   All right.  So on that August 14 wire -- can we bring up Government Exhibit 62.

          Let's zoom in on these text messages between Matthew Peterson and Trevor Milton on August 14, and would you just read them for the jury.

A.   "Did you get the wire down for Hicks?"

          Trevor Milton responds:  "Yeah.  Should go out today."

Q.   And we can take that down.

          Do you remember the August 17 wire we were talking about?

A.   Yes.

          MR. ROOS:  Why don't we bring up Government Exhibit 64, and why don't we zoom on these text messages.

Q.   Would you mind reading through these text messages on August 17.

A.   On August 17 from Matthew Peterson to Trevor Milton:

          "Hey, we need to wire a bit more money to close on Hicks today.  Just sent you an email.  Can you send the wire this morning ASAP?"

          Trevor Milton responds:  "K.  Let me call you back in a few."

M9UHMil3                              Penland - Direct

Matthew Peterson says:  "Did you send the wire for Hicks?"

Trevor Milton responds:  "No.  I will.  Travel.  I just called JPMorgan, and they're wearing it right now.  It will be going out today.  It should hit first thing in the morning, but it will be wired today."

Q.  All right.  Thank you.

We can take that down.  Let's bring up 1013 again, and I want to go to the next transaction.  Let's go to page 4.

Can you describe for the jury what this shows.

A.  This page shows the four sales of stock that we discussed from the beginning going into the Trevor Milton JPMorgan Chase account ending 8301.  From that account 9,250,000 is transferred on June 4, 2020, to a Mesa Landing LLC JPMorgan Chase account ending 3413.  On June 10, a wire is sent for 8,500,000 for the assignment of lease of Gateway Jet Center to Gary and Catherine Daichendt.

Q.  And from your review of the source document, is Gateway Jet Center an airplane hangar, aircraft hangar?

A.  Yes.

Q.  All right. Let's go to the next page.  Can you describe for the jury what this page shows.

A.  This shows the sale of stock to VA Spring in May of 2020, of 24 million going into the Trevor R. Milton JPMorgan Chase account 8301 from those funds on May 22, 2020.  This was a wire

of 4,295,418 to Northern Title Company of Wyoming for the purchase of a lot in Alpine, Wyoming.

Q.   OK.   Let's go to the next page.

Can you describe this for the jury.

A.   This shows the sale of the stock from the 70 million and the 5 million in June that went into the Trevor Milton JPMorgan Chase account 8301.   From those funds, on June 3, 2020, and August 4, 2020, there were two wires totaling $2,213,879 that went to High Country Title for the purchase of 201.7 acres in Utah.

Q.   OK.   Let's go to the next page.

What does this one show?

A.   This shows all four sales of stock going into the JPMorgan Chase 8301 Trevor Milton account.   From those funds, from the period of  May 18, 2020, to July 7, 2020, there were five transfers totaling $5 million.   That $5 million went into Riverbend Bar Milton Ranch account, JPMorgan Chase, ending 8209.   From those funds, there were three wires totaling $2,100,000 that were made between May 18, 2020, to July 7, 2020.   Those funds were sent to Embraer Executive Aircraft for the purchase of an Embraer Phenom 300 aircraft and two engines. There was also a wire on August 27, 2020, that came straight from the Trevor Milton 8301 account in the amount of 7,068,000 also made payable to Embraer Executive Aircraft, Inc.

Q.   OK.   Embraer is an aircraft maker, sorry?

A.   Yes.

Q.   And in reviewing the documents out of there, was this for the purchase of an aircraft?

A.   Yes.

Q.   OK.   Let's go to the next page.

Could you describe this for the jury.

A.   This shows the 70 million sale of stock on June 4 coming into the Trevor Milton JPMorgan Chase account ending 8301. From those funds there were two transfers on June 18, 2020, and July 20, 2020, totaling 14,250,000.   Those funds went into Alpine Landing Management LLC JPMorgan Chase account ending 8183.   From that account there were two wires on June 18, 2020, and July 20, 2020, totaling $13,532,100.   They were made payable to Gulfstream Aerospace Corporation for the purchase of a Gulfstream aircraft.

Q.   OK.   And the source document references that the payment is for the purchase of an aircraft, is that right?

A.   Yes.

Q.   OK.   Let's go to the last slide.

Can you describe for the jury what this shows.

A.   This chart shows the bank balance available in Trevor Milton's personal 8301 JPMorgan Chase account from June 13, 2020, to September 30, 2020.

Q.   Can you describe generally what happens with the balance over time.

A.  The balance is around 453,000 at the beginning, and then it reaches a high of 91,330,000 around the beginning of June.  And then from then it steadily decreases until you get to September 30, and there's a balance of 17,150,000 left.

Q.  All right.  Now, just to be clear, the chart starts in May, right?

A.  That's right, May 18, 2020.

Q.  During this period, were there other large sources of income besides the sale of stock?

A.  There was not.

Q.  All right.  So it goes up to 91 million and then is spent downwards.  Let's go back to the very first page of this chart.

During the period of May 2020 to September 2020, how much did Trevor Milton spend?

A.  Based on this chart, it's $83,477,154.

MR. ROOS:  No further questions.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. MUKASEY:

Q.  Special Agent Penland, you're not the case agent on this case, are you?

A.  I am not.

Q.  Who's the case agent?

A.  There are several is my understanding.

Q.  But you were not involved in any way in the investigation

M9UHMil3                              Penland - Cross

as I understand it?

A.  Correct.

Q.  Did you sit in on any interviews of government witnesses?

A.  I did not.

Q.  Did you collect any documents beyond what the government gave you to prepare your charts?

A.  I did not.

Q.  Did you inspect any Nikola products or designs?

A.  No.

Q.  Did you visit Nikola?

A.  No.

Q.  Did you collect -- withdrawn.

        Do you know how many documents were collected in connection with this investigation?

A.  I do not.

Q.  Do you know whether it was, ballpark, 2.8 million?

A.  I have no idea.

Q.  Do you know how many text messages were collected in connection with this investigation?

A.  I do not.

Q.  We've heard the term here "retail investors."  If I asked you how many individual investors were interviewed in connection with this case, do you know the answer?

A.  I do not.

Q.  Do you know, just generally, whether retail investors

reached out to the government in connection with this investigation or whether the government reached out to the individual investors?

A.   I do not know.

Q.   The charts that you put together, I think you said earlier in your testimony you put together, together with the prosecution team, right?

A.   That's correct.

Q.   So just to be clear, the charts that were put together do not even attempt to tell the whole story of what happened here, right?

A.   They explain exactly what we explained that they show.

Q.   They show what Mr. Roos and his colleagues asked you to show, right?

A.   That's correct.

Q.   They do not show all the exhibits that were introduced in this trial, right?

A.   Correct.

Q.   And they don't show all the documents that were collected during the course of the investigation, right?

A.   Correct.

Q.   And they are an incomplete -- and I'm talking about the charts -- depiction of all the events?  They're a partial depiction, right?

A.   They are not a -- they do not show everything that

happened, no.

Q.  Right.  So they slightly distort the entire version of events because they only include some events?

A.  That is not correct.

Q.  I understand that you say what is included was accurate, right?

A.  Yes.

Q.  But not everything was included, right?

A.  That's correct.

Q.  You selected, or together with your colleagues you selected, what you wanted to put on those charts, right?

A.  I was told what should be included on the charts, yes.

Q.  Very well.  You're aware of NASDAQ market hours, special agent?

A.  Roughly, but not specifically.

Q.  What's your rough estimate?

A.  I think it closes around 4:00.

Q.  And it opens?

A.  I honestly don't know.

Q.  You don't know during what hours stocks are traded on NASDAQ?

A.  No.

Q.  Now I want to direct your attention to Government Exhibit 1000, if we can throw that on the screen.

That's one of the charts that you helped create,

M9UHMil3                        Penland - Cross

right?

A.  Yes.

Q.  Can you tell us what the indictment time period is in this case?

MR. ROOS:  Objection.

THE COURT:  Overruled.

A.  I don't know.

Q.  So you don't know the dates that are covered by the charges against Mr. Milton?

A.  I do not.

Q.  OK.  If you take a look at GX 1000, it starts March 3, 2020, correct?

A.  Yes.

Q.  Who gave you the dates to put on the horizontal axis on the bottom?

A.  The prosecution team.

Q.  There is nothing on that horizontal axis from November 2019, correct?

A.  Correct.

Q.  Nothing from December 2019?

A.  Correct.

Q.  Nothing in January 2020 or February 2020, right?

A.  Correct.

Q.  But if you included those months I just mentioned on the horizontal axis on the bottom, the chart would look different,

wouldn't it?

A.  Say that again.

Q.  If you included from November 2019 through September 2020 on the horizontal axis of the chart, that chart would look different, right?

A.  It wouldn't look different for these dates.  It may add additional data, but this chart would not change, this graph.

Q.  But the graph would look differently if it were spread over more time, correct?

A.  No, I don't think so.

MR. MUKASEY:  Chris, could I ask you to, just by way of example, spread out the horizontal axis so that more time is depicted.

Q.  So if you include more time on the horizontal axis on the bottom line, the graph gets spread out correspondingly, correct?

MR. ROOS:  Objection.  He's literally just stretching a picture.

THE COURT:  Overruled.

A.  Can you ask that question again.

MR. MUKASEY:  Raquel, can you read that back, please.

(Record read)

A.  So when you say add more time, that's different than making the chart where it's, like, day by day versus minute by minute. I'm not for sure what you're asking.

Q.  Well, if you included more months on the horizontal axis, the chart would not be so condensed, correct?  It would be spread over a longer time?

A.  Not correct.

Q.  You're saying that more time included on this chart would not affect at all the depiction of the stock movement?

A.  No.

Q.  OK.  We'll test that out in a moment.

With respect to 1000, you're aware that Trevor Milton owned no stock in VectoIQ until June 3, 2020, right?

A.  Correct.

Q.  In fact, he owned no stock in Vecto, period, at any time. He owned no public Nikola stock until June 3, 2020, right?

A.  Correct.

Q.  Now, this chart is not some sort of publicly available standardized chart.  You guys created this in the office, you said, right?

A.  This is a publicly available chart.  The only thing we changed was the color and adding the VTIQ ticker to show that it was trading as VTIQ before June 3.  But this chart is pulled off a public source.

Q.  OK.  Including the break between VTIQ and NKLA?

A.  That is exactly how it looks.

Q.  Now, when you put together this chart, it does not take into account the general movement of the stock market overall

during this period of time, right?  It doesn't depict other stock movement at the time.  It doesn't depict the general market movement at that time, correct?

A.  Correct.

Q.  And it doesn't depict similar companies and similar sectors as NKLA, as Nikola, right?

A.  Correct.

Q.  OK.  It's in a vacuum.  Do you understand what I mean by that?  It looks at Nikola in isolation, right?

A.  Yes.

Q.  No more stocks in the tech sector or the electronic vehicle sector, right?

A.  It's just Nikola stock.

Q.  Now, if you went to Yahoo! Finance in March of 2020, if you had googled and gone onto Yahoo! Finance in March of 2020, NKLA stock would not exist, correct?

A.  Correct.

        MR. MUKASEY:  Now, if you move to 1001, Chris.

Q.  Again, this includes nothing from November 2019 through February 2020, right?

A.  Correct.

Q.  Now, with respect to the valuations on here, if I understood correctly, you took the value of Vecto stock and multiplied it by the number of shares that Trevor held, is that right?

A.   There was a conversion between the Nikola shares and the Vecto shares, and then I multiplied it by the stock price.

Q.   And did you pay any attention to the fact that Nikola private stock was not valued by the value of Vecto stock?  It was independently valued as a private company.

A.   I don't know about that.

Q.   Have you ever heard of a company called Lone Peak?

A.   No.

Q.   So you're not aware that when Nikola stock was private, it was valued by an independent company called Lone Peak?

A.   I am not.

Q.   I think we've established or March 17 when you point out $1.098 billion, Trevor owned no VTIQ stock?

A.   Correct.

Q.   And NKLA wasn't trading on March 17, 2020?

A.   Correct.

Q.   Now, with respect to the number 1.098 and the other numbers on here, you arrived at that through multiplication of a share price times the number of shares that Trevor held, right?

A.   Correct.

Q.   Even though he held no Vecto shares in any time before June -- held no Vecto shares ever, right?

A.   Correct.

Q.   So these amounts are what I would call -- see if you would agree with me -- paper amounts.  In other words, Trevor Milton

M9UHMil3                        Penland - Cross

did not have $1.098 billion in his bank account in March of 2020?

A.   I don't know what he had in his bank account on that day.

Q.   He did not have $7.3 billion of accessible cash in his ATM machine in May or June of 2020.  That's just a mathematical calculation that you performed, correct?

A.   Correct.

Q.   You had access to his bank records, by the way, didn't you?

A.   I did for a specific period.

Q.   Now, you also know that from March of 2020 through -- withdrawn.

     You also know that from June of 2020 through December of 2020, Trevor's stock was locked up, right; his NKLA stock was locked up?

A.   Yes.

Q.   And that was something he agreed to, right?

A.   Yes.

Q.   That was something that was publicly disclosed, right?

A.   Yes.

Q.   And when I say "locked up," what I mean is he could not sell it.  Understand that?

A.   Yes.

Q.   So if he had a valuation of 7.3 billion, which I think we've established is a mathematical calculation of some curiosity, he couldn't have sold a penny of it, right?

A.   As of what date?

Q.   Between June 4 and December 1.

A.   I believe he did sell some on June 4, or he received the money on June 4.

Q.   Ahh.  But now you're talking about the 70 million, right?

A.   Yes.

Q.   OK.  So I'm glad you brought that up.

The 70 million was a private transaction, correct?

A.   I'm not for sure.

Q.   The 24 million transaction with ValueAct NA that we looked at during your direct, that was a private transaction, right?  That was before Nikola went public.

A.   Yes.

Q.   And the $70 million was the same.  That was negotiated between Trevor and VectoIQ and Nikola and PIPE investors and agreed to, right?

A.   I'm not for sure if that's considered private, but OK.

Q.   Well, it wasn't while Nikola was trading on the public markets, right?

A.   Right.  It was part of the merger is what I understood.

Q.   So that $70 million had nothing to do with the buying and selling and trading of public NKLA shares, correct?

A.   I don't know.

Q.   When you were putting this chart together, and I'm referring to 1001, were you able to come up with the different

M9UHMil3                        Penland - Cross

types of stock that Trevor held in NKLA?

A.   I did not.

Q.   So you did not distinguish between founders' shares?

A.   No.

Q.   Or common stock?

A.   No.

Q.   Or stock that he held through an entity called M&M?

A.   No.

Q.   Or stock that he held together with Mark Russell in an entity called T&M?

A.   No.

Q.   And the stock that he held in the T&M entity, he would not get any upside on; in other words, if there were an increase or a sale, only Mark Russell would get that advantage.  Did you take that into account in your calculations?

A.   I did not.

Q.   Did you take into account in your calculations how Nikola stock that Trevor held was valued during private fundraising?

A.   No.

Q.   So if Nikola stock that Trevor held was valued at one amount during -- withdrawn.

         Are you aware of the four rounds of private fundraising that Nikola engaged in before they went public?

A.   I'm not.

Q.   You've never heard of Series A, Series B, Series C, Series

D?

A.   No.

Q.   And I'm assuming that however the stock was valued during that period that Trevor held did not factor into your calculations?

A.   It did not.

Q.   Familiar with a calculation, mathematical formula, called Black-Scholes?

A.   I am not.

Q.   So you didn't perform any evaluation that estimates the theoretical value of derivative securities, options, for example?

A.   No.

Q.   Your chart, by the way, 1001 -- I'm looking at the correct one.  Let me lean over your shoulder for one second -- doesn't visually depict in the drawing, if you will, in the portrayal, the demonstration, the lockup period, right?

A.   It does not.

Q.   And the chart does not show the effect on Mr. Milton's holdings after any particular podcast or tweet that was sent out about Nikola, right?

A.   Correct.

Q.   Now, there's been some testimony here about incentive compensation that Mr. Milton received in, I think, the third quarter of 2020.  Have you become familiar with that?

A.   I'm aware of it.

Q.   Just so we're on the same page, I'm talking about 1,069,000 shares that he received as a bonus for meeting certain benchmarks or milestones in 2020.  Are you familiar with that?

A.   I am.

Q.   And I just want to take you through a little hypothetical. If you look at your 3,557,000,000 number on the right-hand side of the chart, which, by my estimate, corresponds to August 4?

A.   Yes.

Q.   If he got 1,069,000 bonus shares at that, what looks to be, $40 price -- you see that?  That's the price it was trading around August 4, right, 40 bucks?

A.   Yes.

Q.   -- and you multiplied the 1,069,000 shares that he got as his incentive at 40 bucks, could you trust my math that that comes out to $42 million?  Basically, a million shares times 40 bucks a share is about 40 million bucks.

A.   OK.

Q.   The chart does not reflect that that 40 million bucks, if we're following the way you did the math, would represent about 1 percent of his holdings.

          Does that make sense to you?  In other words, 40 million is 1 percent of 3.5 billion?

A.   Let me be clear.  I don't know that he received that.

Q.   OK.  Fair enough.

And you don't know whether your evaluation includes the incentive shares that he received or not?

A.   Correct.

Q.   So let's move to GX 1003.

You and Mr. Roos talked a little bit about the Hindenburg report, right?

A.   Yes.

Q.   Nobody told you to put on this page that the Hindenburg report was a short-seller report?

A.   No.

Q.   Did anyone tell you to put on the page that the government's first witness in this case made $600,000 by shorting Nikola stock in connection with the Hindenburg report?

A.   No.

Q.   You start this at 60 bucks on the left-hand axis, the vertical axis, at September 8, 2020, right?  Yes?

A.   I started -- the date starts at September 8, yes.

Q.   And the price starts at 60 bucks on your chart?

A.   The range on the chart is zero dollars to $60.  The price does not start at $60.

Q.   I meant the price started at the top of the chart, but I take your point.

Now, September 8, 2020, you know what happened that day, correct?

A.   I do not.

Q.   OK.   That's the highest price point on your chart, right, somewhere between September 8 and September 9?

A.   Correct.

Q.   And you did not know that the GM deal was announced by Nikola on that day?

A.   No.

Q.   By the way, we're talking about 22 days depicted here, right?

A.   Yes.

Q.   And you know the indictment period is 11 months, correct?

A.   I do not.

Q.   I thought I heard you say to Mr. Roos that you did not intend to convey that the Hindenburg report caused this price movement, is that right?

A.   That's correct.

Q.   And, again, this chart does not show what else was happening in the market during this time period?

A.   Correct.

Q.   So it's possible, is it not, that the movement of Nikola stock could have followed generally the market during this time period?

A.   Ask that again.

Q.   So it's possible that the movement of Nikola stock could have followed generally the movement of the entire market during this period?

M9UHMil3                         Penland - Cross

A.   Yes.

Q.   And it's possible that the movement of Nikola stock could have followed other electronic vehicle stocks during the time period?

A.   Yes.

Q.   And you must be familiar with the general movement of SPAC stocks over time, right?

A.   No.

Q.   So you don't know, or the chart doesn't depict, whether this made -- this Nikola stock price movement may follow the way other SPACs move during the same time period?

A.   It does not.

Q.   Now, this chart, which goes from September 8 to September 30, does not depict that Trevor Milton was locked up from selling during this total time period, the entire time period?

A.   It does not.

                (Continued on next page)

BY MR. MUKASEY:

Q.  This chart reflects nothing about Trevor Milton's actions; correct?

A.  Correct.

Q.  This chart does not reflect that the CFO of Nikola, Kim Brady, called the Hindenburg report a hack job, does it?

A.  It does not.

Q.  And a character assassination?

A.  It does not.

Q.  Now, take a look, if you would, at the next chart, GX-1004. This is 36 hours out of the 11-month indictment period; right?

A.  Correct.

Q.  This is June 17 and June 18, and this chart does not reflect that, again, Trevor could not sell one share of stock during this period; right?

A.  Let me correct myself.  I do not know the indictment period, but it does show 36 hours.

Q.  It shows 36 hours.  The indictment period is what it is.

You referred to minute-by-minute movements of the share price being depicted here.  Do you recall that testimony?

A.  I do.

Q.  So I want to take a look at the horizontal bottom axis.  It starts at 9:30 a.m. on June 17; right?

A.  Yes.

Q.  Goes 10:30, 11:30, 12:30.  So best as I can tell, it's not

showing anything minute-by-minute, it's showing hour-by-hour.

A.   The data behind this chart is actually minute-by-minute. That's why you get the lines look like they're on top of each other because it is actually plotted minute-by-minute.

Q.   But would the lines look like they're on top of each other if more days were included in this chart or would they be more spread out horizontally?

A.   I think that depends on what size you make the chart.

Q.   Exactly.  Right, you can distort the way the chart looks depending on what size you make it, yes?

A.   I wouldn't say distort.

Q.   You could manipulate?

A.   You can make it easier to see.

Q.   And you can make it look the way you want to make it look?

A.   No.

Q.   Well, when you say you can change it, what did you mean?

A.   Meaning you can make it where it's easier to see, meaning if you put too many days or too many data points, you wouldn't be able to tell what the actual amounts are.  So just like on this one, you can't tell minute-by-minute based on this chart what the actual stock price is, you can more tell hour-by-hour, but all the plots are -- all the minute plots are in the chart.

Q.   But you can't tell them, is what you said?

A.   Not minute-by-minute.

Q.   So it does not depict minute-by-minute share price.

Now, with respect to the lockup period, not mentioned on this chart; right?

A. Correct.

Q. And the chart shows stock prices from $60 to $70; right?

A. Yes.

Q. And that also affects the way the chart looks; right?

A. And makes it easier to read.

Now, if we follow the horizontal axis, you go 9:30 to about 3:30 or 4:30. Can you follow me there?

MR. MUKASEY: Chris, you want to blow that up.

Q. Now, you don't know what time the market closes, I think you said, right, I think you said around 4:00, 4:30?

A. Right, 4 o'clock, I believe.

Q. So on June 17, when the article is published, it's at 3:29; right?

A. Yes.

Q. And that's right before the market closes, a half an hour?

A. Yes.

Q. And you don't know what other events occurred in the market before it closed, do you?

A. I do not.

Q. June 17, Milton responds. The market is closed at that point; correct?

A. I think that's correct.

Q. Because he responds at 4:24 and the market closes at 4:00

M9UCmil4                          Penland - Cross

p.m.?

A.  Yes.

Q.  At 6:08 p.m., he texts Steve Girsky; right?

A.  Yes.

Q.  That's a private event, that doesn't go to the market; right?

A.  Correct.

Q.  And he says, I don't back down, share value went up after my response.

          Now, you'd agree with me that just because Trevor said that, that doesn't mean Trevor caused that?

A.  Correct.

Q.  And with respect to the opening the next day, which is the green dot on the right-hand side, the market doesn't open higher than it closed, it opens lower; right?  You compare the green dot on the right-hand side to the red dot on the left-hand side.

          MR. MUKASEY:  And we can blow that up.

A.  Maybe slightly lower.

Q.  Slightly lower you said; right?

A.  Yes.

Q.  Now, I just have some more questions about the bottom horizontal axis.  It goes hour-by-hour from 9:30 till 8:30 p.m., 9:30 a.m. to 8:30 p.m.  Then it skips, what, seven hours or something like that from 8:30 p.m. to 4:00 a.m.  Do you see

that?

A.  Yes.

Q.  So had you included 9:30 p.m., 10:30 p.m., 11:30 p.m., the horizontal axis would be longer; right?

A.  Yes.

Q.  And that goes all the way through 4:00 a.m.

Now, there's no trading or no major trading certainly between 4:00 p.m. and 9:00 a.m. the next morning; right?

A.  I don't know.

Q.  So you don't know whether or not there's trading in Nikola stock overnight?

A.  No.

Q.  And your chart also includes, way on the right-hand side of the bottom axis, 5:00 p.m., 6:00 p.m., 7:00 p.m., and 8:00 p.m. on June 18; right?

A.  Yes.

Q.  The market is closed there, that's just dead space; right?

A.  No.

Q.  Are you saying there was trading after hours on those days?

A.  I don't know, but the stock price changes during those hours.

Q.  But we can agree that the market was closed during a bunch of hours on this chart?

A.  Yes.

Q.  Here's just a question that I have.  Why did you switch

from marking the bottom of the hour on the left-hand side, 1:30, 2:30, 3:30, to the top of the hour on the right-hand side, 4:00 a.m., 5:00 a.m., 6:00 p.m., 7:00 p.m.?

A.  I don't know.

Q.  So that was a mistake or a random change?

A.  That's how the chart was provided.

Q.  By whom?

A.  The prosecution team.

Q.  So you didn't put this together?

A.  No, I verified its accuracy.

Q.  By the way, Special Agent Penland, Steve Girsky, the guy that's mentioned in the bubble on the bottom, the box on the bottom, do you see that?

A.  Yes.

Q.  Steve Girsky, you know him to be the chairman of the audit committee or did anybody tell you he's the chairman of the audit committee of Nikola?

A.  I don't know who he is.

Q.  You know, based on your training and experience in law enforcement, what an audit committee is?

A.  Yes.

Q.  And you know it's an audit committee's obligation to, in a sense, police the goings on inside a public company?

A.  I'm not familiar with how it works within a public company.

Q.  Well, your understanding of audit committees, generally,

they audit, they check, they make sure rules, regulations are being followed; yes?

A.  Yes.

Q.  So do you think it makes sense that if you thought you were doing something wrong, you would tell the chairman of the audit committee?

          MR. ROOS:  Objection.  Scope.

          THE COURT:  Sustained.

Q.  But you understand it's the audit committee's obligation or mission to police the goings on of the company; right?

          MR. ROOS:  Same objection.

          THE COURT:  Sustained.

Q.  What do you understand the duties of the audit committee to be?

          MR. ROOS:  Same objection.

          THE COURT:  Sustained.

Q.  Let's move on to GX-1005.  So here's the first time that we see November 2019 appear in a chart, yes?

A.  In this chart?

Q.  Yes.

A.  Yes.

Q.  And I think you mentioned, and it may have been in connection with one of the later charts, but the sort of purplish, bluish section is what was not publicly known and the peach-red section was publicly available information?

A.  Correct, on top of the bar line is public knowledge, underneath would not have been.

Q.  So in the upper-peach portion of the chart where publicly available information is set forth, you did not include any SEC filings; correct?

A.  Correct.

Q.  But that's publicly available information; right?

A.  Yes.

Q.  And with respect to a couple of the Tweets, I'm not going to go through all of them, but the first one I think Mr. Roos touched on, the February 10th press release, Nikola unveils the Nikola Badger pickup; right?

A.  Yes.

Q.  That was released by Nikola, the company; correct?

A.  Yes.

Q.  And that was approved by the full board, unanimously; right?

A.  I do not know.

Q.  Taking a look at the next page, there's a Tweet posted on June 8th on the left-hand side that talks about the word "already."  Do you see that?

A.  Yes.

Q.  It refers to GX-518?

A.  Yes.

Q.  You have no idea who approved anything in connection with

that Tweet, do you?

A.  No.

Q.  Do you know whether there was communication about that Tweet between Mr. Milton and the general counsel of Nikola?

A.  I don't.

Q.  Do you know whether anybody in the general counsel's office at Nikola approved of that Tweet or reviewed that Tweet?

A.  I do not.

Q.  Let me direct your attention to some of the podcasts that are listed here, particularly GX-407, which is the truck show podcast.

MR. MUKASEY:  Chris, can we find that on here.

Q.  Have you listened to that podcast, Special Agent Penland?

A.  I either listened to it or I reviewed the transcript.

Q.  Great.  So you know that the truck show podcast had a total run time of two hours?

A.  I would have to look at the transcript or -- I don't know, sitting here, how long it was.

MR. MUKASEY:  If we have GX-407, the cover page, can we get that.  Chris, you want to blow that up.

Q.  See where it says time, 1:59:59?

A.  I do.

Q.  Does that refresh your recollection that The Truck Show Podcast ran for virtually two hours?

A.  Yes.

Q.   And the clip the government played, 407-E, have you heard that?

A.   No, not specifically that clip.

Q.   And so you don't know whether 407-E lasted for one minute and 19 seconds?

A.   I do not.

        MR. MUKASEY:   Now why don't we go to 1006.

Q.   By the way, before we get off the Badger, did anybody tell you to include in this chart that there were two functional, working prototypes of the Badger developed by December 2020?

A.   They did not.

Q.   Now, with respect to 106, Mr. Roos walked through it very carefully and showed you a bunch of emails that back it up as source documents.  Just, first of all, directing your attention to the general time period, your chart starts in July of 2017; right?

A.   Correct.

Q.   And Nikola was a private company in 2017?

A.   I don't know.

Q.   Do you know whether Nikola was a private company in 2018?

A.   I don't.

Q.   2019?

A.   I do not know.

Q.   Do you know whether VectoIQ was a private company or a public company in 2020?

A.  I know in 2020 they were public.

Q.  But you don't know when Nikola went public?

A.  I don't know when Nikola began.

Q.  Mr. Roos showed you a couple of the emails that were behind GX-1006, so I want to review just a couple of those real quick. He showed you GX-922.

MR. MUKASEY:  So if we can get that on the screen.

Q.  And I think you read a couple of these between Philips and people at Nikola; right?

A.  Yes.

Q.  I want to show you one that Mr. Roos didn't show you, which is between Ron Alvarez, who I think you identified as a Philips guy, and Trevor, at 9:34 a.m. on July 17th.

MR. MUKASEY:  Chris, it starts at the bottom, but the actual substance, "Hello Trevor," starts at the top of the page.  I think you have it there, "Hello Trevor."

Q.  That reads:  I hope all is good.  You mentioned you'll be redesigning your truck over the next six months when we met in your office in February.

Do you see that?

A.  Yes.

Q.  And that is from Philips executive to Trevor; right?

A.  Yes.

Q.  And the truck that Mr. Roos and you played videos for was the Nikola One; right?

M9UCmil4                        Penland - Cross

A.  Yes.

Q.  That's what they had the communication with Philips about, yes?

A.  In the emails I read, yes.

Q.  And the videos you showed?

A.  Yes.

Q.  And this says that Trevor mentioned that they will be redesigning that truck over the next six months; right?

A.  Yes.

Q.  And Mr. Roos also showed you GX-923 in connection with the same chart, GX-1006.  And that was an email from Dane Davis to Trevor Milton.  Do you see that?

A.  Yes.

Q.  And if you look at the second to last paragraph, Dane Davis says all the things above can be done, but it will take time away from our current development work.

       Do you see that?

A.  Yes.

Q.  The government didn't read that section to you; right?

A.  They didn't read it to me?

Q.  They didn't have you read it in the courtroom?

A.  No, I didn't read it today.

Q.  And the last thing I want to ask you is, again, back on 922, a couple of the emails refer to a guy named David Diaz; right?  See that name, David Diaz?

A.   Yes.

Q.   David Diaz is the director of marketing at Philips; right?

A.   I don't know.

        MR. MUKASEY:  Let's go to GX-1007.  I have just a couple of questions here.

Q.   Again, with respect to what's beneath the reddish-purplish line, no SEC filings are included; correct?

A.   Correct.

Q.   And to the extent those SEC filings included Nikola's business model information, that's not included here either; right?

A.   Correct.

Q.   And any feedback Trevor got from Tweets, podcasts, interviews, that's not included here either?

A.   Correct.

Q.   And if we look at GX-412, the Autoline After Hours podcast, did you listen to that in connection with your work in the case?  It's on the second page, upper left, June 11th.

A.   I either listened to it or reviewed the transcript.

Q.   Can you recall how long that podcast was?

A.   I cannot.

Q.   Do you know how many listeners tuned in?

A.   I do not know.

Q.   Do you know whether anybody who listened purchased a share of stock?

A.   I do not.

Q.   Would you accept it if I told you the Autoline After Hours podcast was 72 minutes long, that sound consistent with your recollection?

A.   I don't remember how long it is.

Q.   Are you aware that the four -- sorry.  The three clips the government played totaled four minutes?

A.   I don't know what clips the government played.

Q.   Last one I'm going to ask you about is GX-424.  The answer is going to be the same if I ask you how long it was and how long the government clips were, you're not going to know?

A.   Correct.

Q.   Okay, because we have that in evidence elsewhere.

There was a chart, Mr. Roos showed you GX-1009, which has various references in it to New York and a picture of Mr. Milton.  There you go.

First of all, before we look directly at this, Mr. Roos played a video of the Nasdaq screen that's in Times Square.  Remember that?

A.   Yes.

Q.   And you saw Trevor's image up there; right?

A.   Yes.

Q.   You know that Trevor was in Phoenix when that was prerecorded; right?

A.   I don't know where he was.

Q.   This time period, March 3rd to March 5th, was when Nikola

was a private company.  Did you know that?

A.   Yes.

Q.   And this was before Trevor received the $70 million that

you referred to earlier; right?

A.   Yes.

Q.   And just to look at a couple of the entries on the chart,

CNBC, you know where their studios are located; right?

A.   Yes.

Q.   Where?

A.   In Times Square.

Q.   In New Jersey.

A.   Oh.

Q.   Were you aware of that?

A.   No.

Q.   Nothing on this chart relates to Peter Hicks and

Mr. Milton's dealings with him; correct?

A.   Correct.

Q.   And speaking of Peter Hicks, if we can look at GX-1012, you

pointed out, and just correct me if I'm wrong, the sort of peak

on the left-hand side is at 80 of the Nikola stock price and I

think you went with Mr. Roos and drew a line till it was about

40, the date the deal closes; right?  You guys drew a slanted

line from 80 down to 40 during the direct examination?

A.   Okay.

Q.  Okay.  You recall that?

A.  Yes.

Q.  So are you aware that on June 1st or thereabouts till August 17th or thereabouts, the deal hadn't closed; right?

A.  It closed on August 14th.

Q.  Right.  But it didn't close until August 14th?

A.  Correct.

Q.  And between the time the stock was at 80 in early June and the time the stock fell to 40 in mid August, Peter Hicks could have walked way from the deal; right?

A.  I don't know what the terms of the deal were.

Q.  Well, you know the deal didn't close until August 16th or 17th; right?

A.  August 14th.

Q.  Okay.  I'm sorry.  August 14th.  That means that up until August 14th, Peter Hicks was free to walk away, Trevor Milton was free to walk away; right?

A.  You say free to walk away.  I don't know if there were terms that he would lose money.  I don't know if he was free to walk away.

Q.  So you don't know whether or not Peter Hicks could have walked away and not lost a penny?

A.  Exactly.

Q.  Or not gained a penny?

A.  Correct.

Q.   You also recognize, if I understand it correctly, that from June 1st until December 1st, the stock was locked up, it was restricted; right?

A.   Yes.

Q.   So there could be no sales and no money realized; right?

A.   Yes.

Q.   And you also realize that on December 1, when your chart changes from an outline in red to an outline in green, Peter Hicks was in the money during various points in December; right?

A.   Possibly.

Q.   Why do you say possibly?  Because your chart depicts it in green, what does the green indicate?

A.   That he was able to exercise the option.

Q.   Okay.  And he was able to exercise the option above the strike price of $16.50; right?

A.   Yes.

Q.   And if he was able to exercise the option above $16.50, he would have been making a profit?

A.   I don't know that.

Q.   If you have a strike price of $16.50 and the stock is trading at $20 and you sell and you get 20 bucks, you're making a profit; right?

A.   Say that again.

Q.   I'm sorry?

A.   Say that again.

Q.   You can buy something for $16.50 and sell it for $20, you're making a profit; right?

A.   Yes.

Q.   This chart does not designate anywhere that the restricted period is over; correct?

A.   It does indicate when it's over.

Q.   Show me where it indicates that?

A.   When the red line ends.

Q.   And when the green starts, he can be in the money, right, he can sell and make a profit?

A.   Possibly, yes.

Q.   Now, you know that there was a transaction between Trevor Milton and Peter Hicks where he made $1.6 million in 2021, that's not on this chart; right?

A.   No.

Q.   You weren't asked to include that; right?

A.   Correct.

Q.   And between June 1 and August 14th when the deal closed, Peter Hicks owned no stock in Nikola; right?

A.   I don't know.

Q.   Now, we talked a little bit about GX-1013 and the disposition of some money; right?

A.   Yes.

Q.   And I think the first -- one of the first items that

Mr. Roos highlighted was this Gulf Stream Aerospace Corporation expenditure; right?

A.   We discussed it.

Q.   Are you aware Mr. Milton made that aircraft available for lease by Nikola, the company?

A.   I do not.

Q.   Are you aware that the chief executive officer, Mark Russell, flew around in that plane?

A.   I am not.

Q.   Or that the CFO, Kim Brady, flew around in that plane?

A.   No.

Q.   And that it was available for company business?  No?

A.   I don't know.

Q.   You used to work for the IRS; right?

A.   I did.

Q.   So they got $5.6 million, I'll just note, on the sixth or seventh line.  They got another million about ten lines down.

         Now, these stock sales that you list in green on the left side, the green boxes?

A.   Yes.

Q.   Those are all sales of private stock, right, not public NKLA traded stock?

A.   So, I just want to be clear that I'm not for sure if it's classified as public or private, the $70 million, but I understand that there were stock sales during those times.

Q.   But you don't know if they were public or private?

A.   Correct.

Q.   And it's not your contention that any of these stock sales were illegitimate or improper?

A.   No.

Q.   And it's not your contention that any of the payments on the right-hand side were illegitimate or improper?

A.   No.

Q.   So, I mean, I'm suggesting you could have labeled this chart, Trevor Milton's Lawful Use of His Perfectly Lawful Funds.

A.   I'm not making a determination, one way or the other.  I'm just listing where the money went.

Q.   And you're just putting on the titles that the government asked you to put on; right?

A.   The title of the chart?

Q.   Yeah.

A.   Yes.

Q.   I just have a couple more questions.

         With respect to some of the wires and the routing information that you spoke to Mr. Roos about, I think it was JP Morgan was the institution; right?

A.   Yes.

Q.   The 2020 payments, those were inbound or outbound?

A.   You would have to be more specific, what you're asking

about.

Q.   Can you say when Mr. Milton's funds -- can you say whether Mr. Milton's funds came inbound or outbound to JP Morgan?

A.   The $70 million stock sale was inbound.  The $7 million wire for Peter Hicks, that would have been outbound.

MR. MUKASEY:  May I have a moment, your Honor?

THE COURT:  Yes.

(Pause)

Q.   One last question, Special Agent Penland, and I appreciate your patience.

With respect to the expenditures on GX-1013, did you conduct any kind of analysis regarding valuation?  For example, if you made a purchase and that purchase appreciated in value, did you make any kind of analysis like that?

A.   No.

Q.   So if there were a piece of property or a similar type of real estate, you did not include or evaluate whether or not the expenditure may have been $1 million, but the value of what he bought appreciated to $2 million?

A.   I did not.

MR. MUKASEY:  Thank you very much, Special Agent Penland.  I have no more questions.

THE COURT:  Redirect.

MR. ROOS:  Briefly.

REDIRECT EXAMINATION

BY MR. ROOS:

Q.  Special Agent Penland, do you remember Mr. Mukasey asking you a few questions about a performance bonus for Mr. Milton?

A.  Yes.

Q.  And he gave you a hypothetical that if Mr. Milton got about a million shares as a performance bonus and the stock was about $42 a share, what that would look like, do you remember him asking about that?

A.  Yes.

Q.  And I think your answer was $42 Million?

A.  Yes.

Q.  So if you got $42 Million, would that matter to you?

A.  Yes.

Q.  You'd get out of bed in the morning for $42 Million; right?

A.  Yes.

Q.  One other question.  You were asked some questions about the scale of some of the charts.  Do you remember that?

A.  Yes.

Q.  You actually looked at one with Mr. Mukasey that was for, basically, a period of a day and a half.  Do you remember that chart?

A.  Yes.

Q.  He asked you some questions about the scale; right?

A.  Right.

Q.  And so, and I think you said it has a zoomed-in scale so

you can see the price difference; right?

A.  Make it easier to read, yes.

Q.  Easier to read.  Let's say you really zoomed out the scale, instead of looking at the range that the stock is trading at, you made it a really big, zoomed-out range, what might the line look like?

A.  It would still have the same indentations, they would just be a lot smaller and a lot harder to read.

Q.  It's sort of like if you're looking at a map on your phone and you zoom out, suddenly, New York City looks like a tiny little dot; right?

A.  Exactly.

Q.  But, actually, New York City is kind of a big city; right?

A.  Right.

        MR. ROOS:  No further questions.

        THE COURT:  Anything else?

        MR. MUKASEY:  No, Judge.

        THE COURT:  Ms. Penland, you may step down.

        (Witness excused)

        Government, do you have another witness?

        MS. ESTES:  Your Honor, with the Court's permission, we would just like to publish a few exhibits that have been admitted for the jury, just three.

        THE COURT:  Very well.

        MS. ESTES:  Ms. Wolfson, can you pull up GX-1311.

And can we publish for the jury?

THE COURT:  You may.

MS. ESTES:  I'll just read into the record that the title here is Select Robinhood Trading Data for NKLA.

Ms. Wolfson, can you zoom into the headings there so we can see what this is.

So on the left it says order entry, date and time, execution, date and time, and then there's names, address, city, zip code, state, and order quantity there.  Just want to focus on the address column.  We can just look at that there for this one, and the city and zip code and state.

Ms. Wolfson, let's zoom out of that and let's go to the next page.  Let's do the same thing for the address column.

Ms. Wolfson, let's zoom out of that and let's click through a few more pages of this.

We can stop there.

Ms. Wolfson, can we now pull up Government Exhibit 11.

So I'll just read into the record.  It says device owner, Steven Girsky.  Participants, Steven Girsky, Trevor Milton.

Ms. Wolfson, let's zoom into lines 4 through 8 of this one.

I'm going to read a few of these text manifestation into the record.

It says March 2nd, 2020, from Steven Girsky to Trevor

Milton.  Hey, I'm not in a place I can read the changes or get on the phone, but there will be plenty of opportunity to amplify your message once we get this out the door.  Just need something we can launch off tomorrow.  Don't want lawyers harassing us all night.

Then at 7:46 p.m., from Trevor Milton.  Not sure what you mean.  I get drilled on the press releases by the reporters, so I want it a certain way, it's not a big deal.

At 7:50 p.m., from Steven Girsky.  Okay.  The lawyers just need to approve it.  They are a pain when it comes to this stuff.  I'll join when I can.

At 7:51 p.m., from Trevor Milton.  I don't care if they are a pain.  They will learn who runs this show.  I won't tolerate them telling me what to do when I have to deal with the aftermath.

At 7:51 p.m. from Trevor Milton.  It was a shitty press release.  It needed to be modified.  I suggest they get my input way earlier than that and don't approve anything without me reviewing it first.

Ms. Wolfson, can you zoom out and go to the next page.

Let's take that down and let's pull up Government Exhibit 224.  Ms. Wolfson, can you zoom into the top email there.

So this top email has a sent date of March 2nd, 2020, from Trevor Milton to Steven Girsky and Jeff Ubben.

Before we get to the top email, let's zoom out and go to the bottom email from Mr. Girsky there.  We'll put that on the screen for a minute and we'll go back to the top email.

So in this email from Trevor Milton, he says, can you send the document?  It is not attached in this email.  I would like to see it.  We also need to make sure we are getting retail investors on our side.  That is what prevents the stock short selling.  This is super important to me.  Trevor.

Your Honor, the government rests.

THE COURT:  Very well.  Ladies and gentlemen, the government has rested.  We are about five minutes short of the break, but because I have to do some legal work with the lawyers, we'll take our break now.  So do expect to come out at five minutes after the hour.  It may be a little later, and if so, we'll let you know.  Don't discuss the case.

(Continued on next page)

(Jury not present)

THE COURT:  Everyone can be seated.  Mr. Caruso.

MR. CARUSO:  Judge, we move for a judgment, acquittal under Rule 29, but I was hoping that we could take the break first.

THE COURT:  Absolutely.  Let me ask this, I would ask that you make it brief.

MR. CARUSO:  Yes, sir.

THE COURT:  So that we can get the jury back in short order and we'll take it from there.  So be back in ten minutes.

MR. CARUSO:  That would be fine, but I want to be sure I understand the Court when your Honor says make it brief --

MR. MUKASEY:  I'll explain it.

MR. CARUSO:  As usual, I'm the one being obtuse now.

THE COURT:  Okay.  10 minutes, folks.

(Recess)

(Continued on next page)

M9UHMil5

MR. CARUSO:  When, your Honor, is ready -- I've discussed this with counsel and cocounsel for the government -- I'm going to request/suggest the following with respect to the Rule 29 motion, because I know the Court would like to use the jury's time wisely.  What we can do now is to make the motion, simply list out, identify the grounds.

THE COURT:  Yes.

MR. CARUSO:  And then if the Court would reserve decision under 29(a), as distinct from grant or deny, we can have argument if and when the Court wants to hear it.

THE COURT:  Absolutely.

MR. CARUSO:  Thank you, Judge.

MS. ESTES:  That's fine.

MR. CARUSO:  I think that will be very good.  I think we should wait for Mr. Mukasey.

MR. ROOS:  I think also probably technically they need to waive the defendant's presence or have the defendant here.

MR. CARUSO:  Yes, yes.  Let's just wait a moment.

(Recess)

THE COURT:  Mr. Caruso, your witness is here?

MR. CARUSO:  Yes, Mr. Bondi is going to examine this witness, but I saw the man in the hallway.

THE COURT:  Very well.

MR. CARUSO:  I believe he's here.  Mr. Milton is now here.

THE COURT:  OK.

MR. CARUSO:  Your Honor, can we proceed?

THE COURT:  Yes, please.

MR. CARUSO:  Your Honor, at this time, on behalf of the defendant, I make a motion for judgment of acquittal under Rule 19, and that will cover all counts.

THE COURT:  Rule 29.

MR. CARUSO:  Sorry, Rule 29.  Looking right at it.

Count One, as a matter of law, the alleged misrepresentations and omissions are not material because the SEC filings and the other publicly available materials in the total mix of information disclosed all the material facts that Mr. Milton allegedly misrepresented or omitted.

Second ground, as a matter of law, the statements and omissions were not made in connection with the purchase or sale of a security.

Third ground, as a matter of law, the evidence is insufficient to raise a jury question with respect to Mr. Milton's intent to defraud investors and/or his lack of good faith.

Turning to Count Two -- no, sorry, one more point on Count One.

The Court should not submit this case to the jury on a theory of scheme liability because, as a matter of law, the government has not proven a deceptive act required as an

M9UHMil5

essential element of the crime on that theory.  The government has not shown "something beyond misrepresentations and omissions," which, of course, they must show under the *Rio Tinto* case in order to have a jury question on that theory of the case.

And with respect to the scheme liability theory, I also incorporate by reference the arguments I made earlier with respect to the other theory of Count One.

THE COURT:  OK.

MR. CARUSO:  Turning to Count Two, the statute is vague, unconstitutionally vague, and the defendant lacks fair notice with respect to the application of that statute.

Next argument will be that lack of a specific intent to defraud, which the government must prove on Count Two, that in turn has two aspects: an intent to deceive the alleged victims and an intent to harm the alleged victims by depriving them of money or property.  And we contend that the evidence is insufficient to raise a jury question on either of those portions of the intent element.

Second argument, the statements were not made in connection with purchase or sale or in connection with a security.  Essentially, we'll argue that when the Court would like to hear it.

And with respect to Section 1348(2), as a matter of law, statements were not material because the government was --

is required to prove that -- sorry, excuse me.

The standard of materiality is the same as I will argue with respect to Count One, except that instead of the hypothetical reasonable investor, the test is the reasonable and prudent person, but the results should be the same.

Again, next argument, lack of intent to deceive, defraud, and to harm. Same as in Count One, I'm going to incorporate that by reference.

Again, the next argument is that the statements and omissions were not made in connection with the purchase or sale of a security.

And then the next argument which is distinct for Counts Two, Three -- Two and Three, is that the alleged victims got what they paid for, which goes to the absence of scheme as well as the absence of intent to deceive.

One moment, please.

As I'll embellish if and when the Court wants more detailed arguments, there's no evidence that the alleged misstatements by Mr. Milton influenced Nikola stock price. On the contrary, the stock price was determined by market forces on an efficient market. NASDAQ being a quintessentially efficient market.

Turning to Count Three -- excuse me one moment.

Turning to Count Three, once again statements -- as a matter of law, statements and omissions were not material to

the reasonable person.  We'll incorporate the arguments that we'll make with respect to Counts One and Two.  Once again, there was insufficient proof of intent to deceive and intent to harm, both of which are required to prove wire fraud.  The arguments will be incorporated from -- by reference from Counts One and Two.  And once again, the victims, namely, the purchasers, the alleged victims, got what they paid for.  Essentially, the same argument as Count Two.

With respect to Count Four, wire fraud regarding Peter Hicks, Mr. Milton's statements as a matter of law were not material because all the facts were disclosed.  Hicks being not only -- not only is Hicks a lawyer, but he had a lawyer who, in fact, read the SEC filings.

Second argument there, no intent to defraud, either because the argument -- the statements were not reasonably calculated to deceive persons of ordinary prudence and comprehension, which is the same argument that we'll be making on Counts Two and Three that goes to lack of intent to deceive.  Once again, lack of any intent to harm, same as we will argue with respect to Counts Two and Three.  We'll incorporate that into Count Four.  Mr. Milton had every reason to believe that the alleged victims had access to the facts.  Therefore, the proof is insufficient as a matter of law.

And then with respect to Mr. Hicks, the "victim" was paid fair market value.  I won't recount the evidence in

detail, but we'll argue that when the Court would like to hear argument on that. Our argument is that as a matter of law he was paid fair market value and therefore suffered no injury.

THE COURT: Very well.

MR. CARUSO: And then, finally, a lack of venue on all counts.

THE COURT: I don't know whether the government wanted to put anything on the record now. I'm going to reserve.

MS. ESTES: Your Honor, we oppose. We submit the evidence has been overwhelming, but we're happy to provide more argument later.

THE COURT: Very well.

MR. BONDI: And, your Honor, just for the record, to the extent that Mr. Caruso has not covered, we reassert the grounds that were set forth in ECF 152, our motion, and as -- and renew that under Rule 29 and also renew the venue motion. And, your Honor, the ECFs that provide support for the record are ECF 152, ECF 38, ECF 39, ECF 40, ECF 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, and 51.

THE COURT: Slow, slow.

MR. BONDI: Excuse me, your Honor. The ECF numbers for support are ECF 152, ECF 38 through 51.

THE COURT: OK.

MR. BONDI: We incorporate those by reference.

MR. MUKASEY: Your Honor, I know you want to bring the

M9UHMil5

jury in.  This is a much more mundane point, although no less important.

We are informed that a major broadcast network is going to air on Tuesday evening a documentary about Mr. Milton. It is expected to be unflattering.  And other folks who have passed through this courthouse whose names are well-known and who have met their judicial demise have been subjects of this same series.  It's called "American Greed," and it is a true crime documentary that's being heavily promoted, as I understand it, and will air the night of summations.

The only reason I'm raising this is I know your Honor has been warning the jurors not to read and talk and look and search and investigate.  As we come to closing arguments next week, I just want to make sure we continue to pound that into them, because the temptation will rise.

THE COURT:  Yes, I was not aware of that.  If there's any additional language or any particular language you want me to instruct next Monday or Tuesday, I'm happy to do so.

MR. MUKASEY:  Thanks.  Just wanted to put it on the radar.

MR. BONDI:  Your Honor, if I might add, that raises an interesting question, and that is, one of my colleagues who was sitting in asked, why didn't the judge instruct the jury not to read anything about Mr. Milton?  You correctly instructed the jury not to read anything about the case.  And now, granted,

this was a lawyer asking this, so you know the lawyers are parsing language, but, your Honor, if in your instruction to the jury you might be a tad broader, if we may request, and just say do not read anything about the case or any of the parties involved, perhaps, or talk about any of the parties involved.

THE COURT:  I'm happy to do that.

MR. ROOS:  I think, on behalf of the government, I think that's included within "the case" as a part of the case, but we have no objection to broader language.  If they want an instruction saying:  Don't watch "American Greed" on Tuesday night, that's fine.  The general instruction's fine.  Whatever they want.

THE COURT:  OK.  We'll see.

So we'll bring out the jury.  Be prepared to call your witness.

MR. BONDI:  Your Honor, should the witness take the witness stand or should he wait?

THE COURT:  He can take the witness stand if he wishes.

Please be careful.  It's going to be like a little winding road into the little plastic box there.

THE WITNESS:  Thank you.

THE COURT:  Please watch your step.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, as you know, the government has rested, and as I instructed you at the outset in a criminal trial, the defendant has no obligation to put on a case of any kind.  However, in this particular case, Mr. Milton has chosen to offer evidence.

And so with that, does defense want to call its next witness, Mr. Bondi?

MR. BONDI:  Your Honor, the defense calls Professor Allen Ferrell.

THE COURT:  Sir, would you please stand and raise your right hand.

FRANK ALLEN FERRELL,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BONDI:

Q.  Would you please introduce yourself to the jury.

A.  My name is Professor Allen Ferrell.

Q.  And what is your profession, Professor Ferrell?

A.  I'm an economist, and I'm also a professor at Harvard.

Q.  And where are you a professor at Harvard?

A.  I'm a professor at Harvard Law School.

Q.  What do you teach at Harvard Law School?

A.  I teach corporate finance, I teach law on finance topics, I

teach securities regulation, I teach securities litigation, and a variety of topics in intersection of law and finance.

Q.  Just in layman's terms, what's a security?

A.  A security is an instrument that represents an interest in a company.  So often an example of a security would be a stock.  It would also be debt.  So when you think of a security, common example of that would be stocks and bonds.

Q.  What are your areas of focus as a professor and researcher in the field of economics?

A.  So I do a lot of research in the area of corporate finance.  So that's the interaction of companies, firms, and the capital markets and sort of the interaction between the two.  More particularly, there are a lot of work and research on disclosures by companies and how that impacts the markets, how that impacts the stock market, for example.  And I've also done research on corporate governance or how the company's governed, as well as more general issues in the law and finance area.

Q.  And what is econometrics?

A.  So econometrics is a reference to statistics.  It's a reference to the use of statistics in analyzing data.  So what I do is financial econo- -- econometrics.  So that is using statistics to understand financial data.  So, for example, using statistics to understand stock price movements or other movements in the capital markets.

Q.  And specifically in the field of econometrics, what is the

area of focus of your research?

A.   In the field of econometrics, it's financial econometrics. It's the analysis using statistics of financial data, such as stocks, such as debt, and how that's impacted, for example, by disclosures by companies and how that impacts the markets, how that impacts prices in the market.

Q.   And what is your educational background?

A.   I went to Brown University where I received a bachelor's and a master's.  I then went to Harvard Law School where I received a JD, and then I after that I received -- I went to MIT.  I received a Ph.D. in economics from MIT.

Q.   And what was your area of focus in the Ph.D. program at MIT?

A.   So it was the economics program.  My fields were finance and econometrics.  And my dissertation, my research project that led to the Ph.D., concerned the effect of company disclosures on the stock market.

Q.   Are you affiliated with any professional organizations in the field of economics?

A.   I am.

Q.   Could you describe those, please.

A.   Sure.  I'm a research associate at a consortium.  It's called the National Bureau of Economic Research, the NBER, and that's a group of economists from around the country, and that's research oriented.  So they have workshops and research

seminars, and I'm associated with that organization.

I'm also a research associate at the European Corporate Governance Institute. So that's both legal and also economists who are interested in the governance of firms.

I'm also a faculty associate at the Kennedy School of Government at Harvard.

And I'm also a fellow at Columbia University. They have a program at Columbia on the law and economics of capital markets, and so I'm associated with Columbia in that capacity.

Q. Have you published any articles in the field of economics?

A. I have. I publish both in law reviews and in economics journals. So some of my publications involve publishing economic research in peer-reviewed economic journals.

Q. About how many articles have you published in the field of economics?

A. So, overall, I've published north of 30. A subset of those is in the economics journals and deals with economic topics.

Q. Has any of your work in the field of economics won any awards for your research relating to stocks?

A. Yes.

Q. Could you describe that.

A. So I did a paper with some co-authors where we looked at companies that were socially responsible, companies that did the right thing according to different measures in terms of environment, in terms of treating their workers properly. And

we looked at whether those companies did well in terms of the stock market and how the stock market and the capital markets viewed the firm.  And that paper, with my co-authors, we won what's called the Moskowitz Prize, which is a prize given every year for the best paper in the area of corporate social responsibility.

Q.  Now, you testified a few minutes ago that you're both an economist and a law professor.  Are you here to give any legal opinions?

A.  No.

Q.  You ever testified as an economic expert in any case in the past?

A.  I have.

Q.  About how many times?

A.  So I've been deposed or testified over a number of years. I haven't done an exact tally, but somewhere in the range of 70 to 80 times testifying, including depositions.

Q.  OK.  Have these been civil cases or criminal cases?

A.  Both.

Q.  Focusing on the criminal cases, have you testified as a witness called by the prosecution or by the defense?

A.  Both.

Q.  Which prosecution -- how many times have you testified?

A.  In a criminal trial, twice.

Q.  So one for the prosecution, one for the defense?

A.   That's correct.

Q.   Which prosecution office hired you to testify?

A.   That would be the U.S. Attorney for the Southern District of New York.

Q.   The same office that's bringing this case?

A.   Yes.

Q.   So, generally speaking, what was the subject of your testimony in that case?

A.   I haven't reviewed the testimony in many years, but it involved disclosures, SEC filings to the market by companies.

Q.   Is that similar to the nature of the opinions you're prepared to give today?

A.   Yes.  I am going to be talking about disclosures concerning a company, yes.

Q.   Talking about all the past cases where you've testified as an expert economist, will you please describe the areas in which you've provided expert economic testimony generally.

A.   Yeah.  So not all, but many, many of the matters that I've been involved in involve the use of -- I'm going to use a phrase here -- event studies.  So that's a statistical analysis of whether stocks, stock prices, move, maybe up, maybe down, when a company, for example, makes a disclosure.

        So many, many of the matters that I've been involved in involve the use of that type of analysis, but I've also done valuation analysis, valuing companies.  I've also been involved

in a number of M&A cases, cases involving mergers and acquisitions, companies merging.

Q.  We'll talk in a minute about event studies, but can you briefly describe for the jury what an event study is.

A.  Yeah.  So this is really important.  So a stock might go up or it might go down on a particular day.  Let's say it's Apple stock, take an example.  Apple stock goes up on Monday.  I'm just picking an arbitrary day.  Now, maybe Apple stock went up on Monday because the stock market did well, the general market did well, and that can be a reason why Apple stock went up.  It could be the case that maybe Apple stock went up because the technology went up, the industry that Apple is in.  So that could be another reason why a particular stock goes up in my example, Apple, on this particular Monday.  Or maybe the stock price of Apple went up because a statement, a disclosure by the firm.  Something specific to the firm that the market views as important is causing Apple stock price to go up.

The event study, which is the gold standard, it's what economists do -- this has been around for over 50 years.  It's based on Nobel Prize-winning work -- the event study is the gold standard for determining why is it the Apple stock went up?  Is it because of the market?  Is it because of the industry?  Is it perhaps something important about the company, a statement, a disclosure that's being disclosed.  So the event study is a statistical technique that's used all the time by

economists to answer that question.

Q.   And prior to this case, about how many event studies have you done?

A.   Many hundreds.  It might be in the thousands.

Q.   We'll get into details in a moment, but you did event studies in this case as well?

A.   I did.

Q.   Are you being paid here for your testimony?

A.   I am being paid for my time, yes.

Q.   How are you paid?

A.   So I'm being paid my hourly rate, which is $1,250 an hour. My total number of hours through last Monday in this matter is 412 hours.  I also, in terms of compensation, received a fraction of the consulting firm that I'm using in this matter of -- research associates there, research associates at the consulting firm that do research projects pursuant to my instruction and supervision.  And that would be my compensation in this matter.

Q.   So, in total, approximately how much have you been paid related to your work in this matter?

A.   So in terms of my -- so I was retained last summer, not this summer but 2021, and so that would be the 412 hours that I mentioned through last Monday when I did the tally, and that would be times 1250, whatever that is.  So, roughly speaking, half a million.

And then, as I mentioned, I also receive a fraction of the billings for the research associates at the consulting firm that work pursuant to my instructions, supervision.

Q. Roughly, how much was that?

A. That -- I don't have the number for that.

Q. Does your compensation depend in any way on the outcome of this case?

A. It does not.

Q. Will you get paid regardless of what happens in this case?

A. Yes.

Q. Have you been paid on all invoices today?

A. Yes.

Q. Have you and I ever worked together before this case?

A. No.

Q. Have I told you what to say?

A. No.

Q. Is there anything that I or my colleagues have restricted you from doing?

A. No.

Q. Are there any areas that you wanted to look into that you weren't able to?

A. No.

Q. Approximately when were you retained in this case?

A. It was the summer of last year, so the summer of 2021 was my memory of when I was retained.

Q.  Prior to being retained, had you ever met Trevor Milton?

A.  Never heard of him.

Q.  And since being retained, have you even met Mr. Milton?

A.  No.

          MR. BONDI:  Your Honor, at this time we offer

Professor Ferrell as an expert witness in economics, including

the impact of public information on stock price movement.

          THE COURT:  Any objection?

          MR. ROOS:  No objection to qualifying him as an expert

witness in economics.  In terms of the second part of that, I

think there needs to be a little more foundation.

          THE COURT:  OK.  Mr. Bondi.

          MR. BONDI:  Yes, your Honor.

Q.  Do you have experience in determining the impact of public

information on stock price movement?

A.  Yes.  I've written academic articles on that.  That was my

dissertation.  That was my training.  I've done it many, many

times.  I teach event study analysis to my students.  I

supervise the students.  So every aspect of my professional

life involves the analysis, using event study analysis of the

fact of disclosures by companies on stock prices.

Q.  And have you been accepted as an expert witness in prior

cases in that area?

A.  Yes, I have.

          MR. BONDI:  Your Honor, at this time we offer

Professor Ferrell as an expert witness in economics, including the impact of public information on stock price movement.

MR. ROOS:  No objection.

THE COURT:  Very well.  He will be received as an expert.

BY MR. ROOS:

Q.  Professor Ferrell, before we get into the nuts and bolts of this case, I'd like to go over some terms and concepts that the jury might hear today.

What does it mean for a company to be public?

A.  So as the name suggests, as the word "public" suggested, it means that an investor can buy or sell the shares in the public markets.  It's available to the public.  Retail investors, institutions, whoever might want to buy or sell that security is free to do so because it's publicly available.  The company is public, and now the shares are available, if we're talking about stock, for purchase or sale by the general public.

Q.  And what is a stock exchange?

A.  So a stock exchange is a -- is a -- is where investors, again, whether it be retail investors or institutions, can go and buy and sell shares, buy and sell shares that are available to the public.  So it's the place where orders, whether it be to sell or to buy the public shares, occur.

Q.  We'll get into the specifics in a second, but do you know what stock exchange Nikola is traded on?

A.   I do.

Q.   What is that?

A.   That's the NASDAQ market.

Q.   Can you explain to the jury what the NASDAQ market is.

A.   So it's a stock exchange, again, where investors orders to buy or sell, it's where they get filled, where they get executed.  And it's done on computers.  And so it's, you know, an investor might place a trade with Robinhood to buy or sell, and the broker-dealer might send that order by the investor to NASDAQ electronic marketplace for that order to be filled, again, whether it be to buy or to sell the stock.

Q.   And do you know where the NASDAQ servers are located that handle the trading you described?

          MR. ROOS:  Objection.  May we have a sidebar?

          THE COURT:  Yes.

          (Continued on next page)

(At sidebar)

MR. MUKASEY:  Can you read the last question.

(Record read)

MR. ROOS:  So I suspect, or we can find out, the question calls for a hearsay answer.  Unless Professor Ferrell has personally inspected the servers, he's either read it or he has heard it from someone else, and those would be hearsay.

MR. BONDI:  Your Honor, I can flesh out even further foundation about Mr. Ferrell's background, which I think will be sufficient for the Court.  But, nonetheless, an expert can rely upon what he's read or heard or that's -- an expert can rely upon --

MR. ROOS:  No.

MR. BONDI:  -- all sorts of information that experts would normally rely upon, including his normal research and such.

THE COURT:  I have a question.  Why are you asking him that?

MR. BONDI:  Because he knows where the trading's done through the servers.

THE COURT:  But is he for a particular purpose?

MR. BONDI:  It is, for the record, to show that the trading through the servers are done through servers that are located in New Jersey, your Honor.  Now, I know you and I disagree, your Honor, in terms of the importance for venue, but

we think it's important for the record to show that the trades are done through servers located in New Jersey.

THE COURT:  I agree that it's important.  I just don't see why you're using this guy to do that.

MR. BONDI:  I tried through judicial notice, your Honor, but I was unsuccessful.

MR. ROOS:  It was a clear --

MR. BONDI:  And he does have background, your Honor, and I can flesh it out, in terms of his work.  He worked at FINRA and its predecessor, which was called NASD.  He's familiar with NASDAQ.  He's familiar with the servers and the location.  He's familiar how it works.  I can flesh that out for the next five, ten minutes to lay the foundation, but I really don't think that's necessary here.

MR. ROOS:  So on this, few things:  He's been qualified as an expert on something other than this, and so if he wants to testify about this, it has to be as a fact witness, and so the normal hearsay rules apply.

Even if they didn't, the Second Circuit law is clear that just being qualified as an expert cannot make you a vehicle to just transmit otherwise hearsay information.

And so in terms of a foundation, there is really just one question here:  Have you personally seen the servers?  If the answer is yes, next question.  If the answer is no, he should move on.  If they want to put this into the record, they

should call the obvious witness, which is a witness from NASDAQ.

MR. BONDI:  We could call a witness from NASDAQ, but that's not necessary, your Honor.  He knows where the servers are located.

MR. MUKASEY:  Has he been there?

MR. BONDI:  I don't know if he's physically been there, but he is aware that the servers are located there.

MR. ROOS:  There we go.

MR. BONDI:  And NASDAQ publishes that.  He used to do work, by the way, for NASD.

THE COURT:  I understand that he's a very, very knowledgeable person, and he could know not only where the servers are but who services the servers, etc., etc., but he's not here to testify about that.  OK.

MR. BONDI:  All right, your Honor.  Thank you.

(Continued on next page)

(In open court; jurors present)

THE COURT:  The objection is sustained.

BY MR. BONDI:

Q.  Professor Ferrell, we've heard the concept of an investor. What is an investor?

A.  An investor is somebody that would include somebody that's buying stock, hopefully to make money, hopefully to make a profit, although not guaranteed.  There's many types of investors.  There's retail investors, there are institutions, large institutions, that buy and sell stock.  There are institutions that buy or sell stock on behalf of retail investors, and there's also high-frequency traders, for example.  So these tend to be very sophisticated, high-powered computers that quickly send out orders to try to take advantage of small price movements.

So there's a range of investors -- retail, institutional, high-frequency trading -- that can buy, if they want, the public stock or they can sell the stock as well.  So those would be examples of a range of investors in the -- in stock, and stock that might be publicly available.

Q.  Now, professor, the jury's heard the term "consumer," too, in this trial.  Is a consumer the same thing as an investor?

A.  No, it's not, not the same concept.

Q.  Why not?  Can you explain.

A.  Well, a consumer, I'm just going to use the word, is

somebody that consumes.  So somebody that is buying, you know, spending money on a vacation, buying groceries, they're consuming.  That's a consumption good.

An investor is somebody that presumably is putting up their money, money that maybe they saved, in order, hopefully, to make a profit by investing in the stock or whatever the investment happens to be.  So it's really actually a kind of opposite concepts, consumption and investing.

Q.  And how does an investor buy shares of a company traded on NASDAQ?

A.  So an investor -- many investors use brokerage firms or what's called broker-dealers.  So that would be Robinhood. That would be E\*TRADE.  There's lots of brokers out there.  And often what happens is an investor, or somebody who wants to invest, might go to Robinhood, as an example, and place an order to buy some stock or an order to sell some stock.  That broker is then going to send that order typically to a place where that order can be filled.  So that might be the NASDAQ marketplace where that order that was placed with the broker, my example Robinhood, can be filled, again, whether it's to buy or sell the stock.

Q.  Now, are you familiar where those orders get sent specifically?

A.  I am.

Q.  And where are they sent?

MR. ROOS:  Objection.  Same objection we talked about.

THE COURT:  Sustained.

Q.  OK.  In general, what are the risks associated with buying stock in a publicly traded company?

A.  So I would go back to my earlier example.  So in my example, Apple stock went up on Monday, but Apple stock could have -- can go down as well.  And so the risk would be maybe the stock falls because the market is falling that day.  So, you know, that would be a risk that investors are taking that the particular stock that they own is going down because the market that day isn't doing very well, or the stock could go down because the industry isn't doing that will, whatever the industry might be.  The stock could go down because of a statement or disclosure by the company, so something specific to the company that's negative, and that could cause the stock price to fall.

So there's market risk.  There's industry risk.  There's also risk that there's negative information about the firm.  Maybe the firm's business isn't doing so well.  So those are risks that can affect the stock price.  Again, these are the risks that I talked about earlier when I talked about what an event study does.

Q.  And, professor, as an economist, are you familiar with the particular trading strategies of buying and selling stock of a public company?

A.   Yes.   There's a range of different ways to invest and a range of different trading strategies that investors can engage in if they want to.

Q.   Are there particular trading strategies that are considered riskier than others?

A.   So, again, one way to increase risk -- so, again, the risk could be the market not doing so well or the industry not doing so well or the company not doing so well, something specific to the company.  One way, one common way, to increase the risk is to borrow money, or sometimes it's called leverage, sometimes it's called margin, but it's all the same thing.  It's borrowing money and putting that into the stock market.  Now, that could mean that you make more money because now you have more economic exposure, but it does increase the risk if something goes wrong, such as the market or the industry or something negative about the company itself.

Q.   OK.  You used another term there, "market."  What's meant by the term "market"?

A.   So the market is -- if we think about the market price of a stock, the market is the market -- the market price of a stock, the price that it trades at at any particular point in time, reflects the market consensus of investors.  It represents the market's view reflecting the consensus view of all these investors for the value or the price of the stock.

So it's just like any other market in that sense.

There's a market price for strawberries.  There's a market price for bananas.  It's going to be dependent on -- it's going to be a function of the demand and supply for those particular items.  Just like other market prices, there's a market price for stock.  And, again, it reflects the market consensus of the value of that stock of the -- from across these different types of investors.

Q.  So who sets the price, then, of a stock?

A.  You know, it's really the same answer as strawberries and bananas.  It's set by the market.  The market decides what the price is, and the market can change its mind.  The market could say it's worth more or less, but it's the market consensus of what the value of the stock is.

And if the market -- and this is very important -- if the market consensus changes, maybe because of the market, what's happening in the market, maybe because of what's happening in the industry, or maybe something specific to the firm, to the company, that can change the market consensus, and therefore, the stock price might -- would change as well.

Q.  OK.  So if I heard you right, there are essentially three categories or reasons that could cause a stock price to move: the overall market, the industry sector, or important information specific to that company, right?

A.  Yes.  I would add a fourth one that is going to come up, you know, when we think about event studies, and that is random

volatility.  So it is well known and established for many, many decades in finance that every stock, you're talking about Apple, whatever the stock is, every single stock has random volatility.  So you can think about it as random bouncing around.  It's not because of the market.  It's not because of the industry.  It's not because of something specific to the company.  Every stock has random volatility.  This is random bouncing around.  And so I would add that to our list.

Q.  OK.

A.  The market, the industry, random volatility that every stock has, and something specific to the company.

Q.  As an economist, how do you know which one of these reasons is causing the stock price to move, whether it's the market, the industry, something specific to the company, or just random volatility?

A.  This is the event study.  So it's based on Nobel Prize-winning work.  It's been around for 50 years.  It's used all the time in the academic literature.  It is the gold standard for an economist to think about this.

So the event study is going to tell us, is the stock price -- let me go back to my example of Apple.  Let's say Apple went up on Monday.  Is it going up because of the market, the general stock market's doing well that day?  Is it going up because of the industry, the technology industry?  Is it, that price movement up, just because of random volatility; it's not

about a disclosure, just random bouncing around?  Or is there important information, information that's important to the market, such as a statement or a disclosure by the company, that's causing the stock price to move?

So the event study is the gold standard, ubiquitous, used for many, many decades way of addressing that question in a rigorous, scientific manner.

Q.  And generally speaking, before we talk about the specifics of this case, can you tell the jury what type of data goes into an event study.

A.  So I don't think it would be surprising to hear that you need stock price data on the market.  So you have to know what the market is doing, so you need data on what the stock market is doing generally.  You need stock price data on what the industry is doing, and you also need stock price data on what the company's stock is that you're interested in.  So if you were interested in Apple, you would need the data, the stock price data, for Apple stock.

So you need -- given that we're going to be looking at -- one looks at market, industry, and firm-specific effects, you need the market data, the industry data, the data on how the industry's performing in the stock market, and the stock price data for the individual firm that you're interested in.

Q.  What is the window of time you would use for an event study?

A.  So the standard typical approach is to look at one day.  So what do I mean by that?  If you're interested in why Apple went up, in my example, you would look at a day.  So you would say, why did Apple stock move up Monday, or why did Apple stock go down on Thursday?  So the standard window is a day.  That is, why is it moving up or down for that particular increment of time?  Again, you normally think about it in terms of a day.

Q.  Why use a day?

A.  So a day is very standard because, in the academic literature, it's normally thought of as enough time for the market, the market consensus, to react to information.  So if there's a disclosure or a statement by the company, a day is thought of as the standard -- you know, as a long enough period of time to see, well, is it having an effect?

So if there's a disclosure on Monday, you would look at what happened on the stock -- you do your event study applied to that day, that Monday.  Again, it's normally thought that that's enough time for the market consensus to change if the market consensus views the information as important.

Q.  Now, is this true for different types of information?  In other words, is some information you use one day and other information you might use a different day?

A.  No.  The key here is, is it public?  Public information, whether it's on social media, whether it's a TV program, whether it's a newspaper article, whether it's an SEC filing

that's made -- that's public, those -- if it's public, it's available to the market.  The market consensus can react if it's viewed as important.  So public information is public, and it doesn't matter whether it's on social media or an SEC filing by the company.

Q.  Now, just so we're all on the same page, by "social media" you're talking about tweets, podcasts, that sort of stuff?

A.  Exactly.

Q.  OK.  Before this case had you ever done an event study involving a post on social media?

A.  I have.

Q.  And for that event study in that other case, what time period did you use?

A.  A day.

Q.  Now, Professor Ferrell, you testified a minute ago that important information about a company is one reason that the stock price of the company will move.

     Does everyone, though, get the same public information at the same time?

A.  Well, if it's public, it's available to everybody.  Doesn't mean that everybody is going to be, you know, looking at it or even -- you know, or necessarily aware of it.  So public means it's available.  No one's going to be forced to, you know -- there's no obligation to read a social media post or an SEC filing.  So public means it's available.  It doesn't guarantee

that everybody necessarily wants to read or look at it.

Q.  OK.  I want to pivot to some slides that we'd like to show you.

Chris, will you please pull up Defense Exhibit 955, and just for the witness, please.

And just Professor Ferrell -- if, Chris, you can flip through this -- Professor Ferrell, do you recognize this document?

A.  I do.

Q.  What is it?

A.  So these are slides I had prepared that would aid me in my testimony.

MR. BONDI:  OK.  Your Honor, the defense offers Defense Exhibit 955 into evidence.

MR. ROOS:  No objection.

THE COURT:  It will be received.

(Defendant's Exhibit 955 received in evidence)

MR. BONDI:  Your Honor, may I publish Defense Exhibit 955 to the jury?

THE COURT:  You may.

MR. BONDI:  Chris, if you could display the first slide for the jury, please.

BY MR. BONDI:

Q.  Professor Ferrell, what does this slide demonstrate for the jury?

A.  So this is examples of public information that might be available for a company.  It could include SEC filings for a company; it would include analyst reports.  So analysts are market professionals that follow a company and make available publicly their thoughts, their reports on the company. Financial press or financial magazine articles, news articles, presentations, statements, public statements from executives.

So there's a mix of public information available potentially concerning a stock, and these would be common sources of public information about the company that's available and might or might not affect the market consensus of investors as to -- as to the value of the stock.

Q.  Is there a name for the public filings with the SEC?

A.  Yes.  So there's mandatory disclosures by public companies, and there's a series of different types of filings that have to be made public by companies, and they take different forms.  So there's a Form S-1.  There's a series of different disclosure reports that companies have to make available to the public.

Q.  And, Professor Ferrell, this slide here, slide 1, the information on here, was this available to investors in Nikola in the period between June 4 and September 30, 2020?

MR. ROOS:  Objection.  Vague.  Is he talking about available, the slide was available or the content?

MR. BONDI:  The content of the slide.

A.  Yes, it was.

Q.   OK.   There's been a lot of talk about SEC filings in this case, Professor Ferrell.   As an economist, have you personally ever researched the importance of mandatory filings with the SEC for investors?

A.   This was actually the topic of my dissertation research at MIT a number of years ago, now almost 20 years ago, but that was my dissertation which was then published.   It involved studying the impact of requiring companies to make these disclosures, these SEC filings, to the market.

And I examined that, and I found that the market became more efficient; that stock prices went up.   The market liked and viewed as value added these mandatory disclosures, the requirement that companies make public to the market, to whatever investors care to take a look, these required disclosures.

Q.   So from an economic standpoint, how important are SEC filings?

A.   In my opinion, unquestionably important.

Q.   Now, Professor Ferrell, there's a reference in here to analyst reports.   What's an analyst report?

A.   So an analyst is -- it might be a bank that has an individual working for the bank.   And an analyst is somebody who's professional job it is, so this is what they do as a profession, is to follow some companies.   So an analyst will be following a certain set of companies.   Maybe it's companies in

a particular industry.  And an analyst will write analyst reports and might write a number of analyst reports over time. And the analyst report will give the -- will express the views, the opinions, the analysis of that analyst as to what's going on at the company, what's important, what's their view.  They might make recommendations to buy or not to buy the stock, the stock of the particular company.

These are reports that are publicly available that express the opinion of the analyst, this market professional, as to what's going on at the firm.  Again, often they're going to be making recommendations as to whether they think the stock is a good buy or not.

Q.  Now, Professor Ferrell, you said that the information that's represented on this slide was available to investors in Nikola stock in 2020.  Does that mean analysts covered Nikola stock in 2020?

A.  They most certainly did.

Q.  Were there analyst reports?

A.  There's a number of analysts reports, yes.  So there is coverage, meaning there's analyst reports, in this June 4 to September 30 time period, by various analysts expressing their view at different point in times about the company, what's going on, their view of the company and, again, making recommendations or maybe changing their recommendation as time goes on.  So there's a number of analyst reports during this

time period.

Q.  Now, I just want to level set.  There's a lot of information here on this chart that was available for investors.  Does everyone read all the public information right away, as soon as it comes out?

A.  Of course not.

Q.  OK.  Does that mean that the market then doesn't react until everyone reads the information?

A.  Of course not.

(Continued on next page)

BY MR. MUKASEY:

Q.  Can you explain that.

A.  Well, the market is a competitive place.  Market actors, investors, maybe it's a hedge fund, maybe it's a very sophisticated investor, but there's a race to be the first to figure out something new about the company.  So there's a company disclosure, let's say it's an SEC filing.  Folks that want to make money from that are going to be in a race, essentially, to figure out what does that mean, what does that information mean about the value of the stock.  So you're going to have this very competitive process where investors that are going to try to make money on this are going to try to figure out -- figure it out and trade on it.

So, information, public information gets quickly reflected in the stock price, not because everybody reads it or reads it -- it's out, but because there's this competition among market professionals to quickly analyze the information and trade on it, and that ensures the market reflects that information quickly.  If it took a long time for important information to affect the stock price, that's the same as really leaving money on the table because somebody could take, you know, somebody could have traded on it earlier.  And that's why on a day, it is normally thought of as long enough to see the impact of important information on the stock price, on the market consensus.

Q.   And professor Ferrell, as an economist, did you examine in this matter how quickly investors reacted to public information about Nikola?

A.   I did.

Q.   And in general, we're going to get into specifics, but what was the results of that?

A.   So in this time period, there are, you know, important information about the company came out and the stock price reacted quickly.  That is to say a day is an appropriate length of time to take a look at in terms of the events.  Now, it might be much shorter than that, but a day, given this company, given the mix of public information available, and given the fact that in this time period when new important information came out, the stock price in that day did react.

THE COURT:  Professor, can I ask you a question?

THE WITNESS:  Yes.

THE COURT:  How do you measure the day?

THE WITNESS:  Yes.  So, the standard way to do it is close to close.  So let's say they're talking about Tuesday.  So Tuesday, in a day window, would be defined as the closing price Monday to the closing price Tuesday.  So the market closes at 4:00 p.m.  So it would be the 4:00 p.m. price on Monday to the 4:00 p.m., the closing price, on Tuesday.  So that would be -- that would define Tuesday, close of market Monday to close of market Tuesday, and that would be -- people

M9UCmil6                              Ferrell - Direct

talk about that as Tuesday, and that's the day.

THE COURT:  Thank you.

Q.  Now, professor Ferrell, all this public information that was available for investors in Nikola, does all public information, though, cause a stock price to move?

A.  No, it does not.

Q.  And does that include stuff on social media, too?

A.  It includes any of these information.  Information is going to change the stock price if it's important to the market, if it's important the market consensus of investors.

Q.  So who decides, then, what information is important to investors?

A.  The market, the trading in the marketplace, folks buying and selling.  It's a function of the market pricing that information.  No one decides, no one decides Apple goes up or down on a particular day, it's the market decides, the market consensus reflecting the view of investors as to what's important and as to what's not important.

Q.  And you measure that through an event study?

A.  Again, the event study is going to -- is the gold standard approach, the way to do this.  That is, is the stock price going up or down because of the market or industry?

Now, I really want to emphasize this.  If the stock price is going up or down because the market is going up or down or because the industry is going up or down, if that's the

reason that the stock price is moving, the market or the industry, that means that there isn't -- that there is no statement or disclosure by the company that's causing the stock price movement.  In other words, it's fully explained in my example by market and industry movements, these are more general market factors that are not specific to the company.

Q.  Professor Ferrell, turning now to this case, what information did you review in preparation for your opinions?

A.  We're looking at it on the slide, I read analyst reports, I read financial press, I read the SEC filings, I read the earnings announcements or the earnings disclosures.  So all the materials reflected in this exhibit.  And I should add there that I also reviewed the trial transcript up to today in conjunction with that, as well.  So analyst reports, financial press, SEC filings, as well as the trial transcript till today in the course of understanding the public information available to investors.

Q.  Did that include also looking at social media?

A.  Absolutely.

Q.  And social media posted by the company?

A.  Absolutely.

Q.  And social media posted by Trevor Milton?

A.  Yes.  I looked, just to reiterate, I looked at it all.

Q.  From an economist standpoint, what's meant by all this information, public information, is there a term for it?

A.   This is the mix of public information available to the market.  And again, this is all the -- this is the mix of public information that was available for this company in the time period that we're talking about.

Q.   The total mix of information?

A.   This is the total information that we're talking about and it's the total mix of the public information that is available about the company during this time period, the June till September 2020 time period.

         MR. BONDI:  Chris, you can take down this slide.

Q.   Professor Ferrell, did you also use public data sets, too, in your research?

A.   I did.

Q.   And can you describe, just generally, some of that public data sets that you used.

A.   Well, there is the stock price data that we talked about, there is different vendors for stock price data.  I also looked at data on retail investors and used data for retail investors, as well.

Q.   Now, professor, was Nikola traded on any public exchange before June 4th, 2020?

A.   No.

Q.   Could a retail investor, including the witnesses you read about in this case, buy Nikola stock before June 4th, 2020?

A.   No, it was not a public company.  It had investors, it had

its own private investors, but it was not available, prior to June 4th, for purchase or sale by retail investors.  It was not public.

Q.  So can you tell us how Nikola became a public company?

A.  Sure.  So, I mean, it involves something called a SPAC and a De-SPAC transaction, but essentially it involved an acquisition vehicle, it's called VectoIQ.  VectoIQ has a bunch of cash and their business model is to try to take a private company public through a merger.  So they're going to -- so the company is going to become public through this merger process that involves VectoIQ, which has a bunch of cash that is going to help arrange and is involved in this merger.

So the bottom line is there's a merger, maybe the merger happens, maybe it doesn't, but there is a merger which, if it's successful, results at the end of the day in a public company.

Q.  Now you mentioned SPACs.  Before in case, had you done work research in the field of SPACs?

A.  I teach SPACs and De-SPAC transactions every year -- well, I teach -- most years, I teach securities regulation, and we always cover SPAC and De-SPAC transactions.

Q.  Now you mentioned this acquisition vehicle, VectoIQ.  Did VectoIQ set the price for Nikola's stock when it became public?

A.  Of course not.  It's a market.  No one gets to decide the price.  The price is the public price.  So there is no mystery

here.  You can look on June 4th as to the market price, it was in the mid $30s, maybe it was $34 or so.  There is a market price and you can look it up.  And that's a reflection at that point in time, June 4th being my example when it's public, as to the price of the stock, again, reflecting the market consensus of investors, reflecting the total mix of public information.

Q.  And the jury's heard this term called PIPE investor.  What is a PIPE investor?

A.  So a PIPE investor here is a private investor, this is not public retail investors, who invested into the company, I believe in May, so before the company became public, and they invest based on the negotiations.  So it's a deal with a company, they negotiate how much they're going to pay for shares and they provide funds, again, right before the merger is consummated, right before the merger happens, and that is a negotiation, but that's not the market price.  The market price, well, if we want to know the market price, we can just look at the price on June 4th.  That's the market price.  The market decides the value of the company.

Q.  So just to be clear, did the PIPE investors set the price for Nikola's stock when it became public?

A.  Absolutely not.

Q.  Did the PIPE investors value Nikola's stock?

            MR. ROOS:  Objection.  He doesn't know what's in their

M9UCmil6                          Ferrell - Direct

ahead.

THE COURT:  Sustained.

MR. BONDI:  I'll rephrase that.

Q.  How did the PIPE investors end up with $10 per share as their purchase price?

A.  So the purchase price is a negotiation.  So there is raising of funds.  This is typical in a SPAC transaction, that you raise some additional funds alongside the merger and there is a negotiation about the price for those investors for those shares.  So it's a negotiation between the investors and there's also, generally speaking, it's also considerations that might go into that.  The rest can, and maybe the merger doesn't go through, et cetera, et cetera.  So that is a negotiation, but the market price is set by the market.

Q.  Was that $10 per share price the value of Nikola at the time of the PIPE investment?

A.  No.

Q.  And between March 3rd when the merger agreement was announced and June 3rd when the merger was completed, do you consider trading in VectoIQ to be essentially the same as trading in Nikola?

A.  It is not.

Q.  Why not?

A.  Well, first of all, these are separate companies.  Nikola has its own board of directors, VectoIQ is a separate entity,

it has its own board of directors.  They're separate companies. Now, the merger happened on June 3rd, but in this time period that we're talking about, March to June, they're separate companies.

Another thing I would point out is there is a merger agreement.  So there is a plan for the merger to happen on June 3rd, which then results in the public company.  There is no guarantee the merger is going to happen.  If you look at the merger announcement, they list a number, I believe it's 24, conditions to the merger happening.  So, yes, there's a merger agreement, that does not guarantee the merger's going to happen.  So they're separate companies, they have a plan, there's no guarantee that it's going to actually happen.

And I've been involved in and as well as teaching concerning merger agreements that don't come to fruition because of the conditions in the merger agreement.  So there's a plan, there's no guarantee the plan's going to happen.  And that means, among other things, is that they're not the same.

Q.   Now, after June 4th when Nikola started trading on the Nasdaq, what type of investors composed the market for Nikola's stock?

A.   It's just what we were discussing earlier.  There's a range of investors.  There could be retail investors, there can be institutional investors, there can be high frequency traders, which are these very sophisticated, high-powered computer

systems that are shooting out lots of orders to try to take advantage of minute pricing discrepancies.  So there is a range of investors in the public markets and we've discussed that range of investors earlier.  And so I would repeat the answer.

Q.  Now, professor, would you please describe for the jury the areas in which we ask you to provide expert analysis.

A.  So I was asked for two buckets.  I was asked to analyze the retail investor trading and patterns during the public period, the June 4th to September 30th time period.  That's bucket 1.

Bucket 2, the other analysis that I was asked by counsel to analyze economically, was to analyze whether Mr. Milton's statements at issue impacted the stock price, and hence, was considered important or was not considered important by the market, by the market consensus of investors.  And so those are the two analyses or two sets of questions that I was asked to take a look at.

Q.  As part of your analysis, did you also evaluate the overall stock market during this period of time?

A.  Yes, and you have to do that because, again, if you want to understand why the stock price might go up or down, you have to understand what's going on in the marketplace, because if the stock market is doing well, that could positively influence the stock, or if the stock market is doing poorly, that can have an effect, as well.  So I did take a look at the Nasdaq stock market.

Q.   What about Nikola's industry sector, did you also evaluate that industry sector?

A.   Yes.  So I used an industry -- the electronic vehicle, the autonomous driving industry in thinking about what's going on with the industry.  So, you know, if the stock is going up or down on money, what's happening to the industry.  So the industry reflects a number of companies in this general space.  So I looked at the industry and what was happening of the stock prices in the industry through this time period as well as the general stock market.

Q.   And why look at the industry and the overall stock market?

A.   Well, this is very important.  If, and this is conditional, if it's the case that the stock price went up or the stock price went down, if it's the case that that movement, up or down, is due to the market and the industry — let's assume that's true for the moment — that means there was no important information about the company, such as a statement or disclosure, that's causing the stock price to move.  The stock price is fully explained in my example by the market and industry.  The market and the industry is something -- are general market forces, it's not specific to the firm or the company.

Q.   And considering this period between June 4th, 2020, and September 30th, 2020, professor Ferrell, if there was important information to investors, would you expect it to cause Nikola's

stock price to move?

A.  I would.  If information is important, whether it be a statement, whether it be a disclosure, whatever it is, if information's important to the market, as an economist, that means, you know, that the market price would change.  If the market price doesn't change, it's not important to the market consensus as to the value of the company.

So just to reiterate, if information is important, then it should change the stock price, because if it's not -- and conversely, if it's not important, then the market doesn't care, it's not considered important.

Q.  And then what happens to the stock if it's not important?

A.  It stays flat or stays flat, putting aside the effects of the market and the industry.

Q.  Now, professor --

A.  I just want to add one thing --

MR. ROOS:  Objection.  611.

A.  -- add that there is random volatility, as well.

Q.  Professor, when you testified earlier that stock price movement is how you determine what investors deem to be important, does that also apply to retail investors?

A.  Retail investors are part of the market consensus.  The market consensus reflects the consensus view of investors, retail, institutional, all the different types of investors out there.  That's going to form or result in a market price that

reflects that consensus.

Q.  Does that also apply to information that's publicly posted on social media?

A.  Absolutely.

Q.  Do you have any professional experience with retail investors?

A.  I do.

Q.  And could you tell the jury about your experience.

A.  So I was on the board of economic advisers to NASD, that's the National Association of Securities Dealers, it's now called FINRA.  This is the organization under government supervision by the SEC that regulates, overseas all the broker dealers in the United States, basically.  So this is the regulatory organization that supervises and regulates broker dealers in the United States.

So I was on the board of economic advisers to this organization, and I was also an academic furlough at NASD, now called FINRA, the financial regulatory authority.  And in that capacity, I spent a lot of time reviewing their rules, the rules that they had to protect retail investors and make recommendations about whether those rules should be changed.

So I did statistical analysis of retail investor orders and see how the rules could be changed to better protect retail investors, to make sure that they're being served well by broker dealers.  They get good prices for their orders if

they're buying, they get a good price, if they sell, that they get a good price.  That they're treated fairly.  I'm honored that the rules were changed based on my recommendations, but that was a significant project that I did in that capacity.

Q.  Just one more question about Nasdaq, the organization that you served on the board --

A.  NASD.

Q.  Excuse me.  NASD.  Thank you.  Thanks for the correction. NASD, which has now become FINRA.  Is there a government agency that oversees NASD now called FINRA?

A.  Yes, it's called the Securities and Exchange Commission, often abbreviated as the SEC.  So they're very closely regulated, overseen by the SEC.  In fact, when working with the NASD, now called FINRA, the SEC's views were considered very important.

Q.  In this case, professor, have you analyzed trading behavior of retail investors in Nikola's stock in the period of June 4th, 2020, through September 30th, 2020?

A.  I have.

Q.  Have you formed an opinion based on this analysis?

A.  I have, and that's the first bucket of analysis that we talked about, and the answer to your question is yes.

Q.  And could you tell the jury your expert opinion regarding the trading behavior of retail investors in Nikola stock?

A.  Well, I have two opinions here.  One is, again, looking at

retail investor trading behavior from June to September, the first opinion that I have is they did not act uniformly.  This is not a monolithic group that thinks identically.  You can see very clearly in the data, the data on investors that they acted very differently.  They did not act uniformly, and that's my first of my two opinions on this topic.

Q.  You used the term monolithically.  Can you break that down for me, what does that mean?

A.  Monolithically means as one group doing the same thing. Somebody turns left, everybody turns left, somebody turns right, everybody turns right.  Retail investors were doing different things in the same day.  So retail investors, on a particular day, might be buying -- some of them might be buying a lot of shares or there might be a lot of retail investing resulting in purchasing shares, and on the same day, you're going to observe a lot of retail investing activity, selling those same shares on that same day.  So they're not monolithic, they're acting very differently.

Q.  Have you prepared slides to explain your analysis?

A.  I have.

          MR. BONDI:  Chris, could we go to slide 3, please, and publish it for the jury, please.

Q.  Professor Ferrell, slide 3 here of Defendant's Exhibit 955, what does this slide show?

A.  So this is the June to September period, the period where

the stock is publicly available.  I kind of call this the pond chart.  So the dark blue, which is above the line, represents the retail -- retail investors' purchases for every trading day for this period.  So for every day over this period.  And so that blue line above the straight line represents the retail purchases of the stock and then the light blue line below that straight line represents for that same day the retail investor investing activity or retail investor orders selling the stock.

So, again, my conclusion from this is they did not act uniformly.  You see retail investor orders buying the stock. You also see, on the same day, selling.  It's not perfectly symmetrical, it's not a mirror image, but I think visually, you can see why I reached the conclusion that retail investors did not act uniformly.

Q.  Professor Ferrell, let's go to your next slide.

MR. BONDI:  Page 4, Chris.  Thank you.

Q.  Professor Ferrell, what does this slide demonstrate here?

A.  So I said I had two opinions on retail investors.  We just talked about my first one.  My second opinion on retail investors, during this time period, the June to September time period when the company was public, is reflected here.

So if you look at the net purchasing activity of retail investors, so how much are they going into and purchasing the stock relative to selling or selling plus buying, it's the same as all U.S. stocks that are exchange

listed.

So 53 percent net purchasing activity, so they're a little bit more into the stock than they are selling, we're above 50 percent, and that's the same for this time period as for all U.S. stocks.  So there's nothing unusual here among this dimension in terms of the net purchasing activity by retail investors during this period.

Q.  So bottom line here, these two slides, what do they say?

A.  They say that retail investors do not act as a group, did not act uniformly, and the net purchasing activity during this time period was the same as for all U.S. stocks, exchange-listed stocks.

Q.  Let's talk about your second bucket, as you used the phrase here, and that's the analysis of the impact of the statements at issue in this case on Nikola's stock price.

Before getting into the details, were you able to reach an opinion based on your analysis?

A.  I was.

Q.  Could you please describe your opinion or opinions?

A.  So I have two opinions here.  One opinion is Mr. Milton's statements at issue did not affect the stock price during the public period, the June to September period.  That's opinion 1.

Opinion 2 is the statements at issue, Mr. Milton's statements at issue did not cause the stock price, Nikola's stock price to be inflated when it did go public on June 4th.

So those are my two opinions in this second bucket, as we're calling it.

Q.  Let's walk through some of these opinions in the time we have left for the day.

Just so everyone heard, did I hear correctly that your first opinion is none of what the government has alleged in this case to be misstatements caused the stock price to move?

MR. ROOS:  Objection.

THE COURT:  Sustained.

Q.  Professor Ferrell, when you talked about your first opinion here and you evaluated, you said the statements at issue, how did you get those statements at issue?

A.  As I said earlier, I reviewed -- I mean, I also reviewed the indictment in this matter, but I also, more directly to your question, reviewed all the trial transcripts up to now to understand the statements at issue in this matter.

Q.  So you reviewed all of the trial testimony to date?

A.  I did.

Q.  And that's how you identified through what the government presented in evidence?

A.  Yes.

Q.  And did you reach a conclusion as to those statements that the government put into evidence?

A.  I did.

Q.  And what was your opinion?

A.  My opinion is the statements at issue did not affect the stock price, was not considered important to the market when the company was publicly traded.  So June 4th to September 30th, the statements at issue did not affect the stock price, was not considered important by the market.

Q.  And how do you know that?

A.  This goes back to what I discussed earlier, the gold standard way of analyzing this for an economist, going back many, many decades, is an event study.  Why is the stock moving?  Obviously, the stock price does move, it goes up and down.  Why is it moving?  Is it the market?  Is it the industry?  Or is there something specific by the company, such as a statement, such as a disclosure that might be causing the stock price to move?  So that's the analysis I did to reach that conclusion.

Q.  I'd like to turn to your next slide, professor Ferrell.

MR. BONDI:  Which I believe is slide 5, Chris, please.

Will you please explain what this slide is to the jury.

A.  So this is just the stock price over this time period, June 4th to September 30th.  So it starts in the mid 30s, you can see that in the beginning, June 4th.  By the end of the summer, it's, you know, it's hovering in the 30s.  Obviously, there is a lot of stock price movements up and down here, but this is just the stock price, you know, without doing any

analysis over this time period.

Q.  Well, did you do some analysis on Nikola's stock price during this period from June 4th to September 30th?

A.  Yes, I did.

Q.  And professor Ferrell, why did you start on June 4th?

A.  Because the stock was not traded before then.  The stock -- the company became public on June 4th.

Q.  And we'll get into before June 4th later, but in this time period from June 4th to September 30th, did you analyze every day during this period?

A.  I analyzed every trading day.  So any day that the stock traded, I analyzed.

Q.  How do you analyze if information is important on a day that the market's closed?  Let's say there's a Tweet at 9 o'clock at night or over the weekend, how do you analyze if that information is deemed important to investors?

A.  So this is very standard, which is, if there is a statement, a Tweet, whatever it is on Sunday, market's not open, you look at Monday.  That's the first time the market gets a chance to react, if it is going to react.  Or if it's a statement after the market closes on Friday, the market closes at 4:00, so if it's a statement at 9 o'clock at night on Friday, you look at Monday because that's the first time the market has to react to that information.  And so that's the way you do it.

Q.   And what analysis did you perform during this time period?

A.   So I did a -- this technique we've been discussing, I did an analysis of the stock price movement on every day that the stock traded during this time period.  I also, I should add, alongside doing that, reviewed the total mix of public information available to the market during this time period.

Q.   So, professor, you did an event study for every day Nikola stock traded from June 4th to September 30th?

MR. ROOS:  Objection.

THE COURT:  Sustained.

Q.   Have you formed any opinions about what caused Nikola's stock price to move during this period of time?

A.   I have.

Q.   Before we get into specifics, generally, what is your opinion about why the stock price moved like this on page 5?

A.   So, most of these days, it moved up or down because of the market and the industry.  There's a handful of days where there was important information specific to the company that caused it to move, but none of that information, the information specific to the company involved or included the statements at issue by Mr. Milton.

Q.   Would it help if we looked at a calendar to talk through the trading days?

A.   That would be very helpful.

Q.   Terrific.  Let's turn to your next slide, slide 6.

What does slide 6 represent?

A.   This is just a simple calendar for this time period, the June 4th, that's when the company became public, till the end of September.

Q.   If I heard you correctly, Nikola stock doesn't trade on every day.  When does Nikola stock trade?

A.   So it doesn't trade on weekends and there is some holidays in here, as well.  So those days would be days where it doesn't trade.

Q.   Have you removed the holidays and weekends that the stock doesn't trade here?

A.   I did.

Q.   Let's go to the next slide.  What does the blue here in the next slide represent?

A.   These are the days that it did trade.  So you can see I'm dropping Saturday and Sunday, it didn't trade.  So there is 83 days, and that's reflected in the blue here, where the stock traded during this time period.

Q.   Just to be clear, on these 84 days --

A.   83.

Q.   83, excuse me.  83 days, you performed an event study for how long on each of those days?

A.   I examined the price movements, why is the price moving for every day, every trading day, every one of these 83 days when the stock traded.

Q.   And have you formed an opinion based on each and every one of these 83 trading days?

A.   I did.

Q.   In your opinion, how many of these days can be attributed to movement of the overall stock market or the electric vehicle industry?

A.   So, out of these 83 days, the standard event study analysis shows that 72 of those days, the price movement, whether it's up or down, is due to the market and the industry.  So, again, 72 days, the price movement is explained fully by something not specific to the company, i.e., the market and what that general industry is doing, that's 72 out of the 83 days.

Q.   Now, professor, have you prepared a calendar to show what removing those 73 days?

A.   I did.

        MR. BONDI:  Let's go to slide 8.

Q.   So what does this show, slide 8, it looks like there are how many dates are here in blue?

A.   So the blue, I believe it adds up to 11.  The blue represents the -- so, I mentioned there is 72 days where the price is either going up or down, but it's explained by the market and industry.  So the 83 minus 72, we're left with 11 days.  Those 11 days are in dark blue here where the stock price did move, sometimes up, sometimes down, in a way that's not fully explained by the market and the industry.  And the

M9UCmil6                        Ferrell - Direct

light blue is the other, the 72.

THE COURT:  Mr. Bondi, it is the end of the day, and ladies and gentlemen, it is the end of the week.  It's Friday, so we won't see you again until Monday morning.

Until then, have a wonderful weekend, get home safely. Do not discuss the case or any of the parties or read anything about the case or the parties or listen to anything or see anything about the case or the parties.  We'll see you Monday morning.  Be safe.

(Continued on next page)

(Jury not present)

THE COURT:  Professor, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Everyone can be seated.  Folks, I'm happy to be guided by you.  We can take a break for lunch, come back, we can take a break until Monday.  I know you folks have been putting in a lot of hours.  I'm happy to come back at 3:30.

MR. CARUSO:  I'm sorry.  For what purpose, your Honor?

THE COURT:  The Rule 29 or --

MR. CARUSO:  Sorry.  Okay.  Whatever suits your Honor.

MR. PODOLSKY:  Your Honor, we're trying to confer about how much time we think we actually need and whether we can just wrap it up now or not.

THE COURT:  Okay.

MR. PODOLSKY:  I think, your Honor, just on the Rule 29, if I'm reading signals correctly here, the parties are content to simply submit it as it is unless your Honor has questions, in which case, we're happy to argue.

MR. MUKASEY:  I think on our side, Judge, Mr. Caruso would prefer to elaborate and put down whatever else he wants to put down on Monday.

THE COURT:  Okay.  Very well.  So we'll do it on Monday.  So we'll have a very busy Monday afternoon, because we're also doing the charge conference then.

MR. CARUSO:  Precisely.

MR. PODOLSKY:  I to want to raise one or two other quick items now.

I know the witness is still in the courtroom.

THE COURT:  Yes, if you could, professor.

MR. PODOLSKY:  So I think maybe one two items on my list.

The first is professor Kurfess.  Mr. Mukasey mentioned earlier they're not sure they're ultimately going to call him, so I'm a little bit loathed to waste everyone's time arguing about the relevance of his testimony if he's not going to be called.  On the other hand, if we're going to expect him on Monday, I think we do have questions following from the final pretrial conference about whether any of this testimony is actually useful for the jury and relevant to any issue in this case.  I'm not sure where we stand on that, to be honest.

THE COURT:  Can you give us some guidance, Mr. Mukasey?

MR. MUKASEY:  Judge, we think it is relevant.  The question, from our point of view, is how much, if at all, we need.  And that's something I told Mr. Podolsky, we'll get back to him later it this afternoon.  If he is going to provide any testimony, it will not include hydrogen and probably stick pretty close to some of the issues that their witness, Mr. Damman, opined on.  I understand the context in which he opined, but I think there are certain terms and concepts that

we may choose to put brief testimony on to clarify, elaborate or explain from our point of view.  I'm not going to jerk around Mr. Podolsky or the government.  We're going to huddle on this, get him what he needs to get, give him the contours of the testimony, should we put it on, as soon as we make that decision.

MR. PODOLSKY:  That's fine, your Honor.  And we're happy to confer with Mr. Mukasey today.

The logistical issues are, one, we're fine with this, we may have to put in a letter over the weekend explaining our positions, that's fine.  But also, the logistical issue is, I don't expect professor Ferrell to be on the stand for all of Monday, and so I think we have a question about what the trial day is Monday.  We don't know who the next witnesses are, if any.

THE COURT:  We're getting back together again Monday morning at 9:00.  So if there is going to be an issue, if defense wants to proffer him, you can submit something and you object to it, I don't know that you will entirely, but if you do, then we can get together Monday morning and discuss it.

MR. PODOLSKY:  I guess my question along those lines, your Honor, is whether there was going to be another witness after Mr. Kurfess, or if he doesn't testify, that will be the end of the presentation of evidence.

THE COURT:  Mr. Mukasey, do you know?

MR. MUKASEY:  Again, I don't think there will be another fact witness.  We're still making a decision as to whether the defendant will testify.  I will try to be as fair as humanly possible with the government because I know what it takes to get a cross examination ready, but there will not be, for example, the other folks that were on our witness list.  So you can count on the possibility of Kurfess, the possibility of the defendant, and the completion of Ferrell, at the most.

MR. PODOLSKY:  One other matter I just wanted to put on the record.  There are really a couple facts I want to proffer in case there's a potential appeal on one issue that came up earlier this week.

THE COURT:  Okay.

MR. PODOLSKY:  At a sidebar during Mr. Brady's testimony, there was proffer about an offer of evidence relating to the defendant gifting certain performance-based awards or shares based on a performance-based award.  Your Honor denied the application to put in that evidence.  There was a suggestion at the sidebar that this was a separate gift from the prior gift of shares that had been the subject of pretrial motion practice.  We wanted to follow up on that so the record was clear about it and to make sure we were making an appropriate objection.  We asked the defense to provide documentation about whether these were two gifts.  They provided something marked DX-1764, which is the defendant's

resignation agreement in September of 2020.

THE COURT:  The defendant's what agreement?

MR. PODOLSKY:  Resignation.  As well as pointed us to certain public statements by the company, including an August 2020 press release.  So here are the facts that I want to proffer as we understand them.

The defendant, in 2017, stated that he was going to give a gift of shares to early employees.  In August of 2020, the company issued a public announcement saying, indeed, those shares had vested and the defendant was going to make that gift.  That was the subject of the pretrial ruling.

The defendant, around the same time, received performance-based bonus of about a million shares; however, those had a three-year vesting period.  At the time of the defendant's resignation, those shares had not vested and he voluntarily departed.  He was not entitled to keep that performance-based award.

In connection with that resignation, the company appears to have agreed that it would put those shares that were going to go to Mr. Milton towards -- they would instead gift them to these early employees rather than just taking them back.  There was no separate gift of these performance-based shares at all and I just wanted to make the record clear on that again in case this becomes an issue at some later time.

THE COURT:  So the shares that were going to vest that

Mr. Milton had agreed to give to the early employees, he no longer had a personal interest at the time of his resignation, but the company voluntarily gifted them in the way Mr. Milton had indicated?

MR. PODOLSKY:  Let me try to just be clear here. There is about a $6 million gift that Mr. Milton made in 2017. The shares were not actually gifted at that time, it would take three years for that gift to, I suppose, vest the way it was structured.  In August 2020, it was announced, indeed, Mr. Milton would giveaway those shares.  Put that to one side.

Separately, Mr. Milton earned a million shares for a performance-based bonus, but those had to vest, as well, it would take three years.  Because he left the company in 2020 and they had not vested, he was not entitled to keep those.

In connection with his resignation agreement with the company, they made the judgment, I guess, to be nice, that those shares would go towards this early employee gift, in substance, offset the gift that he had made, but that has nothing to do with the notion that Mr. Milton, in addition to this 2017 gift, decided to just give away the performance-based award to be nice.

MR. MUKASEY:  So, Judge, our view on this, and I think Mr. Podolsky and I have a similar view of the facts, but our view of this is that there is enough in the record, specifically with respect to Mr. Milton's disposition of his

shares, including buying property and airplanes, et cetera, through the sale of those shares, plus Mr. Brady's discussions about executive compensation and what was awarded to Mr. Milton, that it would be a fair rebuttal to say the 1,097, and many maybe there is a stipulation that can be worded the right way so it doesn't twist the facts, but perhaps there's enough in the record to say Mr. Milton was awarded a million 97.

Was it 97?

THE DEFENDANT:  A million-69.

MR. MUKASEY:  A million-69 shares as a result of a performance-based award, Brady testified to that.  Those shares were distributed, gifted, ended up in the hands of employees. I know Mr. Podolsky doesn't want to make the exact connection that Mr. Milton gave them to the employees because it happened through the company, but I think it's a fair inference from the evidence that a stipulation like that ought to be allowed.

THE COURT:  I mean, if it's a stipulation, then I'm not going to get in the way.

MR. MUKASEY:  I'm just proposing it through your Honor.

MR. PODOLSKY:  There is no stipulation, your Honor. That's not what happened.  The company gave away these shares when the defendant --

THE COURT:  The effect of his resignation was to

Case 1:21-cr-00478-ER    Document 238    Filed 10/21/22    Page 201 of 204    2543

M9UCmil6                         Ferrell - Direct

forfeit those shares because they didn't vest while he was employed, then those shares were no longer his to give.

MR. BONDI:  Your Honor, we have a different understanding of the facts than Mr. Podolsky does in terms of the timing of the gift of the 1,069,000 shares.  It's, in part, informed because we were part of the separation discussions on behalf of Mr. Milton.  We're going back to try to check in terms of what was discussed in the timing.  At present, I do have a different understanding, though, than Mr. Podolsky, but we're going to go back and look, and if we find something, we'll proffer.

MR. MUKASEY:  I think Podolsky and I are going off the documents.  I'm not aware of the additional facts, but if we come up with facts that we can offer through a stipulation or somehow offer it into evidence, we're going to try and do that.  So we appreciate him raising the issue.

THE COURT:  Great.  Anything else?

MR. ROOS:  One more thing on the question of production of materials relating to professor Ferrell.  When he testified, he said he also gets compensated through basically a cut of a consulting firm of the research associates he works with, he couldn't recall, though, how much money that is.  We ask that -- and this has to be knowable to the defense, that whatever the total amount is and whatever sort of documents sets forth his share be produced to the government.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M9UCmil6                              Ferrell - Direct

MR. BONDI:  We're already working on it, your Honor.

MR. CARUSO:  Your Honor, just one more item.  I simply have not had time to raise this with Mr. Podolsky today, so I will and I don't want to surprise anybody, but we would like the government to please confirm the identity of the author of certain 3500 material.  There are only five such reports.  So I would like to discuss that and then if there's any problem with that, we'll let your Honor know.

MR. PODOLSKY:  I think we responded to an email on this last night.

MR. CARUSO:  Yes, but there is some confusion.  Without going into all the details, which may not be necessary, this may be relevant to the admissibility of evidence in our case.  I just want the government to be able to answer that question.

THE COURT:  Very well.

MR. CARUSO:  Thank you.

THE COURT:  See you Monday morning.  I'm sure I'll hear from you before then.

(Adjourned to October 3, 2022 at 9:00 a.m.)

* * *

                          INDEX OF EXAMINATION

Examination of:                                    Page

DELEASSA PENLAND

Direct By Mr. Roos . . . . . . . . . . . . . . . .2366

Redirect By Mr. Roos . . . . . . . . . . . . . . .2469

FRANK ALLEN FERRELL

Direct By Mr. Bondi  . . . . . . . . . . . . . . .2483

                         GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 11, 14, 15, 16, 38, 62, 64, 202, 203, . . . .2366

            203-A, 204, 205, 210, 210-A,

            211, 224, 234, 295, 296, 297,

            298, 299, 301, 303, 304, 305,

            306, 307, 319, 320, 321, 322,

            324, 326, 330, 405, 405-A,

            405-T, 408, 408-A, 408-B,

            408-C, 408-D, and 408-T, 411,

            411-A, 411-T, 413-T, 414-A,

            415-A, 417-A, 417-B, 417-C,

            417-D, 417-E, 417-F, and

            417-T, 423-A, 423-B, 423-C,

            423-D, 423-E, and 423-T; 504,

            509, 528, 529, 556, 560, 561,

            583, 900, 901, 906, 907, 908,

            920, 921, 922, 923, 924, 925

through 932, 937, 938, 1119,

1119-A, 1120, 1120-A, and 1504

through 1526, GX S-1 through

S-9, and 1311

1000, 1001, 1003, 1004, 1005, 1006, . . . . .2370

1007, 1009, 1012, and 1013

1311 and 1012 revised   . . . . . . . . . . .2423

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 955   . . . . . . . . . . . . . . . . . . . .2507