UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                         21 Cr. 478 (ER)

TREVOR MILTON,

                Defendant.

------------------------------x

                                   New York, N.Y.

                                   October 3, 2022
                                   9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                   District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

SOUTHERN DISTRICT REPORTERS, P.C.
        (212) 805-0300

(Trial resumed; jury not present)

THE COURT:  Good morning, all.  It's 9 o'clock.  I received the parties' submissions concerning the jury instructions.  We'll be taking that up this afternoon.

Is there anything that the parties wish to raise this morning?

MR. BONDI:  Yes, your Honor.  After midnight last night -- actually, this morning, I should say, after midnight, we received from the government two additional exhibits that they indicated that they intend to use with professor Ferrell or may use with professor Ferrell, and they're GX-1121 and GX-1122.  They're exhibits from February of 2021, well after the period in question, and namely, it includes the form 10-K that was filed by the company that indicates that the company and individuals made various misstatements.

Your Honor, that has been kept out of the case to date.  We have, on both sides, I think, and your Honor, have been very, very careful not to go beyond September 30th, 2020.  In fact, your Honor, if you remember, I tried to introduce a report that was nine days after Mr. Milton left the company, the government objected and your Honor sustained the objection.

Professor Ferrell has not testified to anything after September 30th, 2020.  He does not intend to testify to anything after September 30th, 2020.  Indeed, when he describes his opinions, he will say, my opinions are through

September 30th, 2020.

Why on earth does the government think that a 10-K issued by the company on February 25th, 2021, dealing with various misstatements, would in any way come into evidence? Your Honor, that is simply in the same vein as even the short seller report that your Honor and the government and we all agree does not come into evidence.

So, your Honor, we have a serious concern about GX-1121 and GX-11222.

THE COURT:  What is the other one?

MR. BONDI:  Yes, your Honor.  The other one is a stock chart of the performance of the stock in February of 2021. Again, your Honor, there is not a single exhibit, there is not a single document, and there is not a single piece of testimony from professor Ferrell that would open up the door to things in February of 2021.  As your Honor will hear and had heard, everything is cabined by September 30th of 2020.  I'll make that very clear in my questions.  So we haven't opened the door to this and this doesn't come in.

MR. ROOS:  Thank you, your Honor.  So first I'll describe what the exhibits are.

On February 25th, 2021, Nikola filed a 10-K that disclosed that Trevor Milton had made several false statements, confirming many of the allegations in the Hindenburg Report, as well as some other allegations, all issues that are the subject

of this trial.

Subsequently, the same day, so the next exhibit, or that day and the next day and the day after that shows a pretty dramatic drop in the stock price, I think it's roughly 10 percent the day that 10-K filing happens and it continues from there.

Here's what the government would like to do. Professor Ferrell is, today, I think, going to probably walk us through for an hour or more how several days on which the government alleges misrepresentations, there was no statistically significant stock price drop and he, I think, is going to testify that he did not look at a period after September 30th.

On cross examination, it should be totally permissible for us to cross examine him about corrective disclosures. A corrective disclosure is when the truth is disclosed to the market, and it's very common in these types of event studies to look at when the truth was ultimately disclosed to the market, what was the effect on the stock price, sort of the inverse of the analysis he's doing. On the days where there were misrepresentations, did the stock price go up, and on days where the truth was revealed, did the stock price go down.

And so, the government is going to cross examine him and say, did you or did you not look at the disclosure on this date, did you or did you not observe the stock price, that it

went down.  It's totally permissible because they've opened the door to it by having calling an expert who's going to say none of this is significant.  Well, on cross examination, it's totally reasonable for us to then say, isn't it true, when the truth came out, that the stock price went down.

Now, in terms of the various notice questions and the legality and the legal issues --

THE COURT:  Various what questions?

MR. ROOS:  Sort of the, you know, we are cabining ourselves to September 30th.

This is what we said at the final pretrial conference.  There was a motion *in limine* relating to whether or not evidence of stock price would come in after September 30th, and on the record, at the final pretrial conference, the government said, we had conceded we're not going to try to put that in, but we say, quote, there is one other caveat within our position, which was that if the defense calls their expert and their expert testifies about sort of from a quantitative standpoint, these materiality issues, we think it's relevant to cross examine him about the stock price.  Since then, it's a permissible line of cross related to corrective disclosures.

So we told them from the beginning, if they're going to call an expert and the expert is going to say when the stock price went up, that wasn't caused by Mr. Milton's statements, well, then we, on cross examination, are allowed to say, well,

when the truth came out and the stock price went down, did you look at that or not, was that significant or not, did you analyze that or not.

There is a case, actually, that supports our position, which is *United States v. Forbes*, it's a District of Connecticut decision, 2017 WL 141952 at 8. The 403 analysis was affirmed on appeal in a summary order, 249 F. App'x 233 at 2. There, the Court said this was permissible, relevant, not unduly prejudicial evidence on a materiality question. The court gave a limiting instruction that said the jury should only consider it for materiality. We're fine with that type of instruction here.

We're also fine -- I mean, I don't know how the witness is going to answer these questions, but we don't have to put in the 10-K if he's -- I mean, if he's going to fight it and say I never heard of this before, then we might have to. But, if he says I'm aware of that, I know they said that, we don't have to put in the 10-K. But the reality is when you call the guy and say nothing is significant, we're allowed to cross examine him and say, well, when the stock price dropped, wasn't that significant.

MR. BONDI: Your Honor, response briefly. Number 1, nothing is significant during the period leading up to September 30th, 2020, period. He's not going to go beyond September 30th, 2020. They don't need to.

Second of all, a factual correction, your Honor.  The government says this is what's been testified, came out in the 10-K.  The 10-K has nine items, and this is the February 25th, 2021 10-K, and it references at link Hindenburg.  But it says the Hindenburg article alleged that Mr. Milton or the company made a number of statements which it asserted were inaccurate, including, but not limited to, the following.  There were at least, by my count, four items that are not in evidence, including solar panels on the roof of the company's headquarters, including that five trucks were coming off the assembly line and all in Germany.

Some of these statements, too, your Honor, were made by government witnesses who've testified and have left the stand.  We would need to call those witnesses back then if they open the door to these four different items that have never been in the trial.  Similarly, Hindenburg covers many things that are not in the trial.

Your Honor, we're not opening the door to anything. We're talking only about the period leading up to September 30th.  We don't think it's fair game for cross examination or for entry of this into evidence.

And, to be frank, your Honor, if this 10-K comes in with all this new information, all these new allegations that have not been introduced in the trial today, we think this is going to create a mistrial caused by the government.

THE COURT:  That's easily fixed.  Either the document itself doesn't come in or it comes in in a redacted fashion.  So that's not an issue of concern.

MR. ROOS:  We would consent to redacting those items we identified.

MR. BONDI:  We do not consent to it coming in in any way, your Honor.

THE COURT:  Very well.  Let me read the case.  I haven't thought about this, but as I'm thinking through it, a 10-K is a report of what happened in the previous year so, arguably, are statements concerning those time periods that are relevant in the case.

MR. BONDI:  Your Honor, actually, this includes information that was the subject of an internal investigation from Kirkland & Ellis, which, similarly, your Honor, said doesn't come in.  So they opened the door and create a problem with Hindenburg, the internal investigation, and things that did extend beyond 2020, and certainly beyond the period in question through September 30th, 2020.  The activity occurred after September 30th, 2020.  That's when the internal investigation occurred and it extended into 2021, which led to the 10-K referencing the results of that internal investigation.  It would be fair game to start calling Kirkland & Ellis lawyers, to start calling more people from the company.  This is going to extend the trial literally weeks, if

not months.

THE COURT:  That's not going to happen.

MR. MUKASEY:  Judge, if I may, I apologize.  Mr. Bondi has really been on top of this issue with Mr. Roos and I've only been following a little across the email track, but I will say this, we have been religious on this side of the table about not raising anything after September 30th, 2020 because the government has taken the position that that would open the floodgates to the Kirkland & Ellis report and everything that happened as a cleanup to this whole saga.

Now, in a way, it seems like we're being whipsawed because, as we have been really Orthodox about not opening the door, now the door is getting slammed in our face.  I think there has been a working understanding in this trial that September 30th, 2020 is the outer limit of where the evidence on counts One through Three is going to go.  Peter Hicks is a separate story on Count Four, and everybody has sort of abided by that.  Now, to say because we've put on a witness who's going to talk about things up through September 30th, 2020, the door gets thrown open to what the company did as a cleanup matter in 2021 is sort of no good deed goes unpunished on our part as to us.

MR. ROOS:  On this, your Honor, a few points.

First, I think your Honor is absolutely correct about how to characterize the 10-K that relates to the year 2020 and

acts within 2020.

Second, there's no sort of whipsaw here. We literally, before the trial, said if you put on this witness and he does this type of thing, this is our plan. It's on the record for the final pretrial conference. So, we made it clear at the pretrial conference there's two scenarios we're going to go into 2021, Peter Hicks or this. So I don't think there is any sort of surprise here.

In terms of the issues of the substance of this report, we're open to a lot of different ways this will work. The report doesn't have to go into evidence if the witness doesn't fight it. The report, if it does have to go into evidence, can be redacted, we're fine with a limiting instruction. The way we solved the Hindenburg report issue was to do a stipulation. We're open to a stipulation in lieu of the report if defense counsel prefer that. So there is various ways to minimize any prejudice here. But I think, in light of the fact that he has cabined this analysis and not looked at corrective disclosure dates, that's totally fair game for cross examination.

MR. BONDI:  Your Honor, a couple of reactions.

Number 1, if this was the government's plan from the start here, why did they tell us at 1:00 a.m. this morning? This unfairly prejudices us. They threw these exhibits in at 1:00 a.m.  It's just not appropriate.  If this is where it's

going to go, we want to brief the issue if your Honor is going to let this in.

But there is also serious confrontation clause problems. The 10-K is not a contemporaneous characterization, but an after-the-fact description based upon internal investigation and a government investigation that happened after Mr. Milton left the company. Our expert disclosure described what professor Ferrell would testify to. They've had the slides for some time in an earlier version and then now. They've had results and data for quite a lot of time. Now here, for the first time at 1:00 a.m. this morning, we hear they're going to put in the 10-K, this is the first time.

Your Honor, on the government, with respect to saying they've raised this issue, they raised it with respect to talking about the stock price. They didn't mention anything about the 10-K and the statements in the 10-K.

Moreover, your Honor, they said if we got into the stock price after the fact. We're not getting into the stock price, we're focusing on purely the testimony that the government introduced at trial relating to the Bloomberg article, relating to the reference of the release of the Hindenburg Report, all before September 30th. We have been very careful not to go beyond that, as Mr. Mukasey has indicated. There's nothing to suggest that we should get into 2021 now.

If we get into 2021, by the way, your Honor, that then also opens the door for talking about all the trucks that happened in 2021, the contract with Arizona Public Services that happened in 2021, all evidence that your Honor, to date, has kept out.

THE COURT:  Let's see what the Second Circuit says about this case from Connecticut, which I haven't read.

Question, will you be calling your second expert or do you intend to call the second expert?

MR. MUKASEY:  No, Judge.  And we spoke about it with the government.  We reached a stipulation that will allow us to move in some exhibits by agreement.

THE COURT:  Very well.

MR. MUKASEY:  We'll be able to avoid the second witness.

THE COURT:  Okay.  What else?

MR. MUKASEY:  May I confer with the government just on one quick thing?

THE COURT:  Sure.

(Pause)

MR. ROOS:  So, Judge, the other item here is having spoken to defense counsel, it sounds like after professor Ferrell testifies, there are no other potential defense witnesses, other than Mr. Milton, and I think, customarily, if Mr. Milton then decides not to testify at that point, it would

be correct to allocute him.  So, obviously, that doesn't happen in front of the jury.  So we would just think by that point we may just ask for a sidebar, your Honor may kind of know, but we just want to flag that now.

THE COURT:  Very well.  And no decision has been made as yet?

MR. MUKASEY:  I've indicated to the government that it's likely you'll be allocuting the defendant after Ferrell.  Obviously, we have to wait till Ferrell finishes to make the decision.

THE COURT:  Right.  And if there is any particular allocution that you want to recommend, I'm happy to consider it.  Otherwise --

MR. MUKASEY:  I'm sure we can agree on one.

THE COURT:  Okay.  Anything else before the jury?  Very well.  We'll see you at 9:30.

Dr. Ferrell is here, I take it?

MR. BONDI:  Yes, your Honor.

(Recess)

THE COURT:  Have folks submitted proposed verdict sheets.

MR. ROOS:  I'm not sure if we have.  If we did, it was many months ago.  We're happy to do that.

THE COURT:  Can you also get me a clean copy of the indictment.

MR. ROOS:  Yes.

THE COURT:  It is my intention, I do give the jury a copy of the charge and I include in that package the jury charge, the indictment, and the verdict form.  So each one gets a package with those three items.

MR. ROOS:  Your Honor, anticipating this, the superseding indictment didn't have speaking allegations, so I don't think it should require anything to clean it up, but happy to hear from defense counsel later today if they --

MR. MUKASEY:  We'll review it.  I think that's right. I just want to review it one more time.  You'll recall the first indictment was about 45 pages, the second one was about 2 pages.  So we'll take a look at it.

THE COURT:  And if there is a forfeiture allegation, that should be taken out.

MR. CARUSO:  Your Honor, we may have a verdict form ourselves.  We're working on it.

THE COURT:  Very well.  I imagine we won't need it until Wednesday, but you should get it to me.  I'm sure you won't agree on the --

MR. CARUSO:  Yes, but I believe that Wednesday is not a court day.

THE COURT:  Right.  So Thursday.

MR. CARUSO:  Right.

THE COURT:  It's going to be about 10 minutes.  We're

missing one juror who let us know she is a couple of minutes away.

So you're free to stay in the witness box, professor, or you may step out if you wish.  You have at least five minutes.

THE WITNESS:  Thank you, Judge.

THE COURT:  Mr. Roos, the case he cited was a 2007 case, not 2017?

MR. PODOLSKY:  That's correct, your Honor.

(Continued on next page)

(Jury present)

THE COURT:  Everyone can be seated.

Ladies and gentlemen, good morning.  I trust you all had a dry weekend.  We are continuing now with the direct examination of professor Ferrell, who is reminded that you are still under oath.

THE WITNESS:  Yes, your Honor.

THE COURT:  Mr. Bondi.

FRANK ALLEN FERRELL, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. BONDI:

Q.  Good morning, professor Ferrell.

A.  Good morning.

Q.  Before we pick up where we ended on Friday, I have one thing that I wanted to circle back to.  We talked about how you were compensated in this case and you testified that there was a team of people working under your supervision and you were paid a fraction of that team.

Have you had a chance to refresh your recollection on how much you were paid for that work of people working at your supervision?

A.  I have.

Q.  And how much were you paid?

A.  Approximately $76,000.

Q.  On Friday, you also talked about the various forms of

public information available to investors.  Out of that group of information available to investors, how important are SEC filings to investors?

A.   I view them as critically important.

Q.   And is that the same for retail investors?

A.   Absolutely.

Q.   And why is that?

A.   Well, so, retail investors, if they want to, can read the filings.  These are public documents.

But I would also emphasize two other things.  One is the information in the financial disclosures, the information in these filings, the filings that public companies have, they can make available to the public, gets disseminated, gets -- it flows out in a variety of ways.  So analysts pick up on it and they talk about it.  There might be TV shows, financial TV shows that talk about it.  The financial press talks about it.  So the information in the SEC filings, obviously one can read that for themselves if they want, but it also gets distributed out to the public through a variety of means — again, the press, the TV, analyst reports, et cetera.  So that information is available and it gets disseminated, it gets spread out in a number of ways.

The second thing I would emphasize is that given the market and how the market works, how the market for stock prices work, it's important for retail investors because that

information, the information in the SEC filings, even if they never read it, even if they're not aware of it, the information in those SEC filings gets reflected into the stock price. So that is a critical important component. So even if they didn't listen to a TV show or read the press, it's critically important for all investors, including retail investors because that information is public and that's going to get reflected in the price. So when a retail investor or any investor, for that matter, buys or sells, they're going to be buying or selling at a price that reflects the market value, the value of the total mix of public information, including the SEC filings, the filings that public companies are required to make.

Q. Professor, you talked at length on Friday about an event study, and I don't want to beat a dead horse, but briefly, what is the event study supposed to show?

A. The event study is the standard way for an economist to think about why -- or assess why is the stock price, an individual stock price going up or down on a particular day. Is it because of the market, general stock market, Nasdaq, for example, is it the industry, or is there something specific to the firm such as a statement or disclosure by the firm. So this is the standard way to try to separate those things out in the course of understanding the stock price and why the stock price might be going up or why the stock price might be going down.

Q.   And in interpreting the results of the event study, if the stock price is flat relative to the market and the industry, what does that tell you?

A.   So if it's flat relative to the market and industry, then the market and the industry, in your example, wouldn't have any effect on the stock price.  So if the stock price reacts positively to the market going up or negatively to the market going up or the industry going up or the industry going down, then there would be no effect on the market and industry if it's completely flat.

But I do want to emphasize, and this is absolutely critical to an event study and how economists think about it.  You also, even for a flatline, you have to take into account the random volatility that every stock has, random volatility not because of a statement by the company or a disclosure by the company, but just random volatility, random bouncing around that the stock price has.  So you would want to think about that, as well.

Q.   Professor, where we left off on Friday was I believe DX-955, slide 8.

MR. BONDI:   Chris, if you wouldn't mind pulling that up for the witness and the jury, please.

Q.   Professor Ferrell, I think you testified, we started with 83 trading days and that 72 were grayed out.  Can you explain why they're grayed out here, those 72 days?

A.   Yes.  So we're looking at my analysis runs from June 4th and ends September 30th.  So that's a time period that we're talking about here, for which I'm providing my opinion.  And the kind of a light gray -- the ones that are faded out are the 72 days in this time period, June 4th to September 30th, where the stock price movement is explained by the market movement, maybe it's positive, maybe it's negative, the market that day and the industry.  In other words, for these 72 days, there is no stock price movement that's specific to the company.  It's explained by general market forces, the market and the industry for these 72 days, the days that are faded out here.

Q.   And what does that tell you about the statements at issue in this case on those 72 days?

A.   As an economist, the way an economist thinks about -- would approach these issues is if information conduct is important to the market, then you would expect the stock price to change, and to change in a way that's not fully explained by the market and the industry.

So, again, if information conduct is important to the market, as an economist, you would expect important information to affect the stock price in a way that's not fully explained by the general market movements with the general movements in the industry.

Q.   So did anything on these 72 days that Trevor Milton may have said on any of these days, did they cause any movement in

the stock price from those 72 days?

A.  My opinion is no.

Q.  Now, professor Ferrell, you started here with 83 trading days, you talked about 72 that moved along with the market and the industry, that leaves us with 11 days.

MR. BONDI:  Chris, let's go to slide 9 then that reflect those 11.

Q.  So, professor Ferrell, what are these 11 days here?

A.  So these are days where there is a stock price movement that's not fully explained by the market industry.  In other words, there is a stock price movement that's specific to the company, it's not fully explained by the market, by the industry, and by random volatility.  There's something specific to the company that's causing the stock price to move.  Some days it moves up and some days it moves down.

Q.  Of these 11 days, how many of these days did the stock move down?

A.  I believe out of the 11, six.

Q.  Do you have a slide to show that, to illustrate that?

A.  I do.

MR. BONDI:  Chris, can we go to the next slide, slide 10, please.

Q.  And slide 10, what does that illustrate?

A.  Well, the faded-out dates are the dates that are downward dates, the dates when the stock price fell out of those 11, and

if you count up the dark blue that you see on the screen,
June 8th, July 8th, August 3rd, August 10th, and September 8th,
those five dates are days when the stock price went up.

Q.  Professor Ferrell, did you analyze why the stock price
moved down in these six grayed-out days?

A.  I did.

Q.  And did you form an opinion based on the analysis?

A.  I did.

Q.  And what is your continue?

A.  My opinion is that there was important information on those
days about the company that caused the stock price on those six
days to go down, and that information was not the statements at
issue in this matter.

Q.  Professor Ferrell, on each of those six days, did Trevor
Milton's statements at issue in this case prop up Nikola's
stock price so the stock price might not have gone down as
much?

A.  No.

Q.  And why is that?

A.  Well, the standard way to approach these sets of issues
that we're talking about is to review and assess the total mix
of public information and, more specifically, what was it on
these particular days, let's say the six down days, that the
market was focused on as something that was noteworthy.

          So, again, to figure out why the stock price might be

MA3Cmil1                        Ferrell - Direct

going up or down is you want to look at what the market is focused on as reflected in analyst reports, the financial press, the total mix of public information.

Q.   Just so we all understand what you mean here, let's go through one of the days that Nikola's stock price went down in a meaningful way.

MR. BONDI:  Chris, let's move to the next slide, please.

Q.   And let's take what's highlighted there, July 20th, 2020. I understand, professor, you've reviewed the trial testimony and the documents in this case.  Is there, from your review of that, is there an alleged misstatement on that day?

A.   I believe there is alleged misstatements during this period, but, again, I looked at the total mix of public information in conjunction with July 20th.

Q.   And to confirm, the stock price went down on July 20th; correct?

A.   That's right.  Again, just to repeat, when I say go down, I mean goes down in a way that's not fully explained by the market, by the industry, and the random volatility.  This is a volatile stock, it does bounce around randomly.

Q.   And did you form an opinion why the stock price went down?

A.   I did.

Q.   And what was your opinion?

A.   Based on my total review of the mix of total information,

the market on this day, July 20th, was very concerned about the fact that the company was going to issue a lot of shares, a lot of additional shares, and that's related to the PIPE and the warrants.  But the bottom line is, is that the market commentary, the market press is very focused on the fact that the company is now going to be able to issue a lot of additional shares.  So, in economics, it tends to be the case that when you have more of something, then the price tends to go down and, in fact, there is an analyst report on this day that talks about these issues.  So, again, July 20th is about the market concerns about the additional shares that are going to be issued.

Q.  And how do you know that it wasn't because of some alleged misstatement here?

A.  Well, after you do the event study analysis and identify days -- here, we have 11 days, six are down, you have to go through the total mix of public information.  What is the market commentary, the press, analysts, what are they focused on, what are they talking about at the time.  Not somebody after the fact saying that, contemporaneous, at-the-time discussion of what the market concerns are.

My review of the total mix of information is that on this date, July 20th, there is a lot of discussion in the total mix of information, in the financial press about concerns about all these new shares that are going to be issued and the

negative effect that that could have on the stock price.

Q.   Is there any evidence that Trevor Milton's statements at issue somehow propped up the stock price from going down farther?

A.   No.

Q.   And that's the same for all the grayed days where the stock price went down; correct?

A.   That's my opinion, yes.

Q.   Now, professor Ferrell, out of the 11 days where the Nikola stock price moved in response to information about Nikola, you testified six went down, so going back to math class, that means, what, 11 went up; right?

A.   Five.

Q.   Excuse me.  Sorry.  I didn't do well in math class. 11 dates where it moved, 6 went down, 5 went up?

A.   Exactly.

Q.   Okay.  I'll get my math right here.  It's Monday morning.

          MR. BONDI:  Chris, if you go back to slide 12 of the slide deck there.

Q.   Professor Ferrell, what does this show?

A.   So, in the time period, the public time period that I'm providing an opinion, June 4th to September 30th, there's five days where the stock price went up, but in a way that's not fully explained by the market going up or the industry going up or is not fully explained by random volatility because, again,

this is a volatile stock, but on these five days, the stock price did go up.

Q.  So just so everyone heard you right, there are 83 trading days and only five days does the stock price go up in a way different than the market or industry?

A.  The market, the industry, and random volatility.  This is a volatile stock, so part of what the event study does is measure the random volatility.  This is one on.  So, yes, these are the five days where the stock price moves up in a way that's not explained by the general market, the industry, and the random volatility in the stock.

Q.  And did you analyze why the stock price moved up on these five days?

A.  I engaged in the same exercise that we discussed earlier.  You have to look at the total mix of public information, what was the market as reflected in commentary, not just one news article or one piece of information, but you want to look at everything that you can in terms of the total mix of public information to get an understanding.  And I did that exercise for each one of these five days to understand why is it that the market believes that there's important, positive information about the company.

(Continued on next page)

BY MR. BONDI:

Q. Before we get into each of these specific days, what's your overall opinion of these five days?

A. For these five days, there's important positive information about the company that's unrelated, as I understand it, to the statements at issue in this matter.

Q. OK. Let's go through each of these five positive days.

Chris, can we go to slide 13, please.

Highlighted there is June 8, Professor Ferrell. Did you analyze why the stock went up on June 8?

A. Yes, I did.

Q. Did you form an opinion?

A. I did.

Q. What is your opinion as to why the stock went up on June 8?

A. My memory around this time, there's many -- multiple dozens of financial press and discussion. So there's a lot of commentary on this day. This day the stock price did go up quite a bit, and it's clear when you review the totality of the market commentary what the market is focused on is the positive news, the market viewed it as very positive news, the statement that the Badger is open for reservations.

Q. And the statement was from the company.

A. I believe there were two statements simultaneously.

Q. By whom?

A. Mr. Milton and I think -- my understanding is at the same

time the company as well.  So there was simultaneous statement that the Badger is open for reservations.  You look at the market commentary, this was viewed very positively, and that would be important information in the market that would cause a stock price reaction that's not going to be explained by the market and the industry or random volatility.

Q.  So did the company actually open the reservations on the Badger as it announced?

A.  That's my understanding of the facts.

Q.  So you don't understand this to be a misstatement?

A.  It's not for me to say what the government's case is, but my understanding is that the Badger was open for reservations, I believe, June 29.

Q.  So the government has presented some evidence of tweets that Trevor Milton made on June 8 and over that weekend. Professor, have you looked at those tweets, and how do you know that those tweets weren't causing the stock price to go up?

A.  Because if you review the financial press, in my opinion, it's very clear the commentary -- the financial press is focused, like a laser, on the Badger being open for reservations.  It is positive, exciting news, exciting news about the company moving into a new product space, the pickup truck space.  And so the market, the financial press, the commentary at the time is very focused on the exciting, positive news, exciting and positive according to the market,

that the Badger was opening -- was going to be open for reservations.

Q.  Did that financial press that you looked at, did it repeat or mention any of the alleged misstatements in this case?

A.  Not to my memory, no.  Again, the financial press, the commentary on the company at the time is focused on the Badger being open for reservations.

Q.  So why would the stock go up on such an announcement?  Do you have any thoughts on that, professor?

A.  This was viewed as an exciting development in the company's history, the introduction of a new ability -- the movement forward in terms of a new product, that is, the pickup truck, and so this was viewed very positively in the financial press. Again, article, after article is talking about this at the time, at the time that the market is, in fact, going up consistent with the market believing it to be positive information.

Q.  So it was the mere fact of going into this line of business which made investors excited?

        MR. ROOS:  Objection.

A.  Absolutely.

        MR. ROOS:  Objection.  Calls for speculation as to a mental state.

        THE COURT:  Overruled.

A.  Yes, because the market's forward-looking.  The market is

trying to figure out the future:  Is it going to be profitable?  Is it going to lose money?  How profitable might it be?  What are the risks?

So the market is pricing the future.  And so for this company, or any company, the market's trying to figure out the future, and so information -- important information about the future, information the market views as important about what the future might hold could well result in stock price movements.

Q.  Professor, let's move to the next day that's the next up day, July 8, 2020.

And, Chris, can you go to the next slide.  Thank you.

Did you form an opinion as to why the stock went up on this day?

A.  Yeah.  So there's analysts that cover the stock.  So analysts are very important.  Analysts are -- we discussed this a little bit Friday -- they provide to the market professional analyses of what's happening at the company and make recommendations.

On this day, July 8, there's an analyst report by JPMorgan -- JPMorgan's an important analyst for the company -- that was very positive about the company.  I believe that the analyst said that you should go overweight, if I remember correctly, into the stock in that analyst report, the July 8 analyst report.

Q.   Did the JPMorgan analyst report attribute its rating change in any way to Trevor's statements at issue in this case?

A.   No.

Q.   Do you have an opinion about whether any statement by Trevor Milton made Nikola stock price go up on July 8?

A.   I do have an opinion.

Q.   What's your opinion?

A.   It went up not because of the statements at issue but, rather, the JPMorgan report, which was very positive, as I said, upped its recommendation about whether folks should buy the stock or not.

MR. BONDI:  Chris, let's move to the next slide, which is focusing on August 3.

Q.   Did you form an opinion as to why the stock went up on August 3?

A.   I did.

Q.   What is your opinion?

A.   Well, this is going to have a familiar ring to it.  So another very important analyst for the company, another major investment bank -- so investment banks have analysts, like JPMorgan.  Deutsche Bank had an analyst report on this day, August 3, that was very positive as well.  I think they had a phrase like this is a short-term catalyst, a positive short term -- it's on their short-term list as a positive stock for folks to consider buying.

So, again, just to repeat, there's a favorable coverage by the analyst on this day about the company and very positive about what the company's future holds. And not surprisingly, the stock price on this day went up.

Q. Did the Deutsche Bank positive report, did it mention any of the statements at issue in this case?

A. I don't recall that, no.

Q. Do you have any opinion about whether any statement by Trevor made Nikola stock price go up on August 3?

A. I do.

Q. What's your opinion?

A. It did not. The reason is, you know, when you review the total mix of information, the public information, it's this positive recommendation, positive report, by Deutsche Bank on this particular day.

Q. Let's move to the next positive day, August 10. Did you form an opinion as to August 10?

A. I did.

Q. What's your opinion?

A. There was positive information about the company that was exciting to the market that was unrelated to any of the statements at issue.

Q. So, in other words, nothing that Trevor Milton said caused the stock price to go up on that day?

A. It did not.

MR. BONDI:  Chris, if you move to the next day, which is September 8.

Q.  Did you form an opinion as to September 8?

A.  I did.

Q.  What is your opinion?

A.  Well, first, the stock price went up on this day.  This was one of our five, one of the five that we've been discussing.  And the reason for the price increase is the GM deal was announced.  So the market heard the information about the partnership, the deal with General Motors, on September 8, and the market viewed that as positive, and the stock price went up on this particular day.

Q.  Do you have any opinion about whether any statement by Trevor caused Nikola's stock price to go up on that day?

A.  I do have an opinion.

Q.  What's your opinion?

A.  It did not.

MR. BONDI:  OK.  Chris, let's go to the next slide.

Q.  All right.  Professor, we have an empty calendar here.  What does that show you, that empty calendar mean?

A.  That the statements at issue did not cause -- was not considered, as an economist, important to the market.

Q.  Now, professor, shifting gears for a second, I understand you indicated that VectoIQ and Nikola were two different companies, right?

A.   That's correct.  Prior to June 4, they are separate companies.

Q.   So for sake of completeness, though, I'd like to talk briefly about the VectoIQ time period.

          Chris, if you could bring up GX 1000, which was an exhibit the government put in there.  This is already into evidence.

          Professor Ferrell, what does this chart show, in your view, here?

A.   So my understanding of this chart is it's the stock price of VectoIQ.  You can see that in green.  Goes up to June 4.  And then the blue is when the company became public, that is, Nikola became -- Nikola became public.

Q.   OK.

A.   So these are two companies' stock prices that are reflected here.

Q.   Professor, I know you said trading in one isn't the same as the other, but if you were to accept the government's argument, just for argument's sake, did you look at this time period between the announcement of the merger on March 4, 2020, and when the stock started trading on June 4, 2020?

A.   I did.

Q.   And did you reach any conclusion based on that analysis?

A.   I did.

Q.   In your opinion, did any of the statements at issue by

Mr. Milton during this time period impact the price of VectoIQ stock?

A.   No.

MR. BONDI:  We can take this down, Chris.

Q.   Professor Ferrell, I'd like to talk about your second opinion in this second bucket here.  Just to refresh the jury, what is your second opinion here?

A.   OK.  You're going to test my memory.

So the second issue was the impact of any -- of the statements at issue here in this matter.  And the second opinion in that bucket, so to speak, that second bucket, concerned whether in this time period, the June 4 to September 30 time period, the period that I'm analyzing, whether or not the stock price fell because of information concerning the statements at issue or, you know, is there stock price movements downwards that would be reflective of that general consideration.

Q.   Now, I want to ask, though, about whether the alleged misstatements before Nikola went public in this March time period, if whether those inflated Nikola's stock price after it went public?

A.   Yeah, so I do have an opinion on that.  So the answer is no, and the reason is, first of all, what we just discussed, that even accepting, which I do not agree with, that these two companies are interchangeable, the stock price was not

affected.  And also during this time period, June 4 to September 30, there's no fall or decline in the stock price that would show or be indicative of the stock price June 4 when it first went public being inflated.

Q.  And would event studies help explain that?

A.  Absolutely.

Q.  And did you perform event studies?

A.  I did.

MR. BONDI:  Chris, let's go to the next slide, which is slide 19.

Q.  Professor Ferrell, what does slide 19 illustrate?

A.  So this is one of the 83 trading days.  This is just an example of one of the trading days.  This is June 17.  I believe that the -- if we look to the left, the -- I guess it's yellow, that yellow dot, is the price of the stock the day before closing.  So that's reflected in the yellow dot.  And the blue line here, or bluish, is the actual stock price during that day.  So you can sort of trace it over the course of the day.  The market opens at 9:30, and you can sort of see the stock price over time until the market closes.

Now, there's an additional component to the graph, or the figure, and that is the two dotted lines.  The two dotted lines is from -- is an output, or a result, of the event study.  So the dotted lines, both the upper one and the lower one, is how far the stock price would have to move by the end of the

day -- remember the stock market closes at 4:00, 4 p.m. -- how much the stock price would have to move in order for there to be a price movement that's not explained by the market, the industry, and random volatility.

So, again, if by the end of the day the stock price is outside those two bands, either above or below, that would mean that there's a stock price movement that's not explained fully by the market, the industry, or random volatility.  And you can see over the course of the day, but really most importantly at the end of the day, it's within those two bands; meaning that the stock price movement is -- is explained by the market and the industry and random volatility.

MR. BONDI:  Chris, can you pull up GX 1004, which is already into evidence.  And I'd like to just put the government exhibit relating to the Bloomberg article, put it right next to this slide.  OK.

Q.  So, Professor Ferrell, on the left is your slide, right?

A.  Yes.

Q.  And on the right is the government's slide, right?

A.  That's my understanding.

Q.  Could you please explain the difference between your slide and what the government introduced into evidence through the summary agent.

A.  Right.  So I would just point out that both slides, so we just orient ourselves, has the June 17 Bloomberg article.  You

can see it on my slide and you can see it in the June 17 -- you can see the Bloomberg article being referenced in the government's slide that you can see to the right.  So June 17 is the Bloomberg article that was disclosed on this day.

And so, I guess, a couple comments:  One is my Y-axis, that's the up and down, starts at zero and goes to 90.  I would note that the graph on the right, the government's exhibit, looks a little different because the Y-axis is different.  I believe it starts at 60 and then goes up.  So it's, you know, widening any price movements relative to my scale.

I would also note that the exhibit includes after-hours trading.  Again, I'm looking at close to close.  I guess the main comment I would have is there's no statistical analysis here of the stock price movement in the government's exhibit, so I would not view it by itself as being scientific.

MR. BONDI:  Chris, can we put up the second day after the Bloomberg article next to the government's slide as well here.  OK.

Q.  This is -- what does this slide on the left show?

A.  So it's the same graph.  I'm going to put aside the articles and the tweets for a moment.

So it's -- as I did for June 17, I'm tracking the price of the stock on June 18, the day after the Bloomberg article, the June 17 Bloomberg article.  You can see the actual stock price during the trading day from open to close.  Again,

that yellowish dot is the closing price the prior day, so you can see that as well.

And you see, once again, the bands; that is, this is the scientific analysis of stock price movement that an economist would do.  So you can see the stock price, particularly at the end of the day, 4 o'clock, is within those two bands; meaning, according to the event study, that the stock price movement on this day, June 18, the day after the Bloomberg article, is fully explained by the market, the industry, and random volatility.

And just to complete the picture, you can see in my slide, the one on the left, some of the statements at issue, I believe, in this matter as well as a newspaper article.

MR. BONDI:  So, Chris, let's pivot --

Q.  Before we pivot back, Professor Ferrell, as an economist, would you do a slide like the government did on the right there?

A.  No.

Q.  Why not?

A.  Because this is -- there's 50 years of academic research on how to do analysis of stock prices, and so I would not draw inferences from just eyeballing a chart, and also I would look at -- I would not use after-market trading.  So this, the government's exhibit on the right, has after-market trading in this period with no statistical analysis.

MR. BONDI:  Chris, can you put up, just to complete this story here, slide 19 on the left and slide 23 on the right, the two slides from Professor Ferrell.

Q.  OK.  So, Professor Ferrell, you have the 18th and 19th here.  Bottom line, what does that show you about the Bloomberg article that the government introduced in its case?

A.  So it's June 17 and 18, and the Bloomberg article did not cause the stock price to go up or down.  The Bloomberg article was not considered important to the market based on standard scientific analysis, that is, the event study analysis.  You can see it's -- the stock price is within the bands, particularly end of the day; meaning the stock price movement, which is pretty flat anyway, is fully explained by the market, the industry, random volatility.  In other words, it was not considered important to the market.

MR. BONDI:  Continuing to focus on this period up to September 30, 2020, Chris, can you pull up the next slide, which is page 20 of Professor Ferrell's slides.

Q.  Professor Ferrell, what does this slide illustrate to you?

A.  So I know I'm being a little repetitive.  So we see the stock price on September 10.  We also can see the close, the yellow dot there, the close the day before.  This is the day, September 10, that is, the short seller report released before market opened.  You can see the 8:06 a.m.  Again, you can just visually see the stock price movement on this day to close of

the market at 4 p.m.

You can also see the bands, and the bands tell you -- since the stock price at the end of the day is within the bands, it tells you that the stock price is explained, is fully explained, by these general market forces -- the market, the industry, and random volatility.  Again, this is a very volatile stock.

MR. BONDI:  Chris, you can take that down.

Q.  Professor Ferrell, there's been testimony that you've read in this case about a Nikola One semi truck, including video footage from an event back in December 2016 and from a commercial filmed in 2017 and shown in early 2018.

Does the video footage from 2016 and that 2018 video affect your opinion about the time period before Nikola went public?

A.  No.

Q.  Why is that?

A.  Well, I did the standard analysis for whether information, conduct is considered important to the market, and as an economist, what's important to the market is something that's going to change the stock price, maybe negatively, maybe it would go down because it's negative information, or positive. But there's no evidence that in the time -- looking at this time period that ends September 30, that the stock price was affected by what you're referencing.

Q.   OK.  So in layman's terms here, investors in the public Nikola stock, the retail investors, from June 4, 2020, to September 30, 2020, did they care, in your opinion, about the 2016 event?

MR. ROOS:  Objection.

THE COURT:  Sustained.

Q.   Is there any evidence in this time period from June 4 to September 30 that the market reacted in any way to what happened in 2016?

A.   My opinion is no, it did not.

Q.   OK.  Same question, professor, same time period.  Public company, June 4 to September 30, is there any evidence that the market reacted in any way to the commercial, the in-motion commercial, from early 2018?

A.   No.

Q.   OK.  Professor Ferrell, to make sure I understand, you testified that Nikola stock price was flat relative to the market in the industry in the two days we just talked about with the Bloomberg report and the short seller report.  What does that tell you as an economist about the price of the stock?

A.   Well, I would look not just at the stock price and whether it's flat or not, but also whether it's within those bands, whether it's explained -- whether it's flat or not, whether it's explained by the market, the industry, and random

volatility.  So that's the analysis I would do.

And for June 17, the Bloomberg article and for the short seller report, the market did not react.  The market price did not fall in a way that is not explained by the market, the industry, random volatility.

Q.  So during the relevant time period here when Nikola was public, from June 4 to September 30, did investors pay fair market value for their shares?

A.  Yes, the market price is the fair market price.

Q.  OK.  Let's shift to talking a bit about the 72 days again, and I want to test some of these things here.

You testified earlier about the 72 days where the stock price did not move other than with respect to the market, industry, or random volatility.  You just got done talking about two days, but I want to take a closer look at the rest of the days so the jury has that.

Chris, will you please share with Professor Ferrell his next slide, and for the jury, which I believe is slide 21 here.

Professor Ferrell, you see that there's a government exhibit mentioned here which is a Yahoo! Finance interview here, and you've done a graph here.  What does this slide, 21, illustrate?

A.  Well, again, it's very similar to the other -- other graphs.  Again, I would note I start my Y-axis, the up and

down, at zero and go to 90, and you can see the actual stock price over the course of the day. You can also see what I believe is one of the statements at issue here and the timing of that represented by the blue dot. And, again, this is a flat day. That is to say, I'm not just referring to visually it looks flat, but what I really want to focus on is the price movement, such as it is, is explained by the market and the industry and random volatility.

Q. So did anything Trevor Milton say on this podcast here that the government's introduced into evidence, did it boost the stock price in any way?

A. No.

MR. BONDI: OK. Chris, let's go to the next slide, slide 22.

Q. Another podcast the government introduced into evidence, GX 412, Autoline After Hours.

Professor Ferrell, what does this slide for June 12 demonstrate?

A. So I'll note that the statements at issue are after hours the previous day. So as we discussed Friday, you would want to look at the market reaction the following day, because that's when the market has a chance to react.

So, again, you can take a look at the graph. You can take a look at the actual stock price. And, again, the movement, such as it is, is fully explained by these general

market forces.  The stock price did not act positively, it didn't act negatively in response to new, important information about the company.

Q.  So what does that tell you about the statements in the podcast?

A.  Market did not care.

Q.  OK.  Let's go to the next slide, slide 23.

We talked, I think, briefly about this slide in connection with the Bloomberg article the day before, but what does this slide on the 18th demonstrate for you?

A.  So, again, the statements at issue, the tweets, are after the market closed.  So the market closes at 4 o'clock.  So, again, you would want to look at the next day in thinking about did the market view these statements at issue as important? And, again, you can visually see the stock price over the course of the day, and again it's fully explained by these general market forces.  The market did not care.  The market did not view these statements as important.

Q.  OK.  Let's go to another one, slide 24.  Jury heard about this one, GX 414, which was a CNN interview on June 19, 2020, at 9:35 a.m.

Professor Ferrell, what does this slide demonstrate?

A.  There again, starting from zero to 90 on the Y, on the up and down, you can see the stock price.  And, again, this interview took place early in the trading day, shortly after

the trading day starts at 9:30.  And, again, same story.  It's a relatively flat line.  More importantly, in my view, any price movements that -- to the extent that it existed, is explained by these general market forces.  The market did not view these statements as important.

Q.  Let's go to the next slide, slide 25.  There were some tweets that the government introduced into evidence there, GX 539 and GX 541 here.

Professor Ferrell, what does this slide demonstrate?

A.  Well, again, we're talking about tweets after the market closed, you know, 7:30, 7:46 p.m.  So, again, you're going to want to look at the following trading day to think about whether it was important to the market.  Again, these -- really, I want to emphasize these would be, if they are important, they're specific to the company, they should cause the stock price, if they're positive, if they're viewed as positive by the market, for the price to go above that dotted line.  As you can see, the price movement, such as it exists, is fully explained by the market, the industry, and random volatility.

Again, the bands represent where the stock price would need to be at the end of the day, at the close of the day at 4 o'clock, in order for it to be a positive or a negative movement that's not fully explained.

Q.  So as long as it's within those bands, the market didn't

consider those statements to be important?

A.   Correct.  But I want to be careful here.  The bands are calculated based on the end of day.  So we can see the course of the stock price over the course of the day.  The bands tell you whether it's positive or negative at the end of the day, at 4 p.m.

Q.   And that's how you do it as an economist?

A.   We discussed Friday about using the one-day event window, and so this -- these bands reflect, you know, sort of the standard one-day event window that's often used in thinking about what's important or what's not important to the market.

Q.   So let's go to slide 26.  The jury heard about CNBC's "Fast Money" interview on June 26, 2020.  It's reflected there at GX 415, some tweets there about hydrogen, and a Fox Business interview, looks like, a bit later on GX 416.

Can you tell me what this slide demonstrates for you here?

A.   I'm going to bore everybody.  It's relatively flat, but more importantly than the actual stock price movement is it's fully explained.  The movement, such as it exists, is fully explained by these general market forces.  In other words, the market did not view these statements as important.  The market -- if the market viewed these statements as positive, exciting news about the company, you would expect, as an economist, for that to show up in the stock price.

Q.  So, Professor Ferrell, you've included this interview from Friday, June 26, at 8:37 p.m. in a chart for Monday, June 29. Why'd you do that?

A.  So the market closes at 4 p.m. on Friday.  This is after the market has closed, and so the standard thing to do is to take a look at the following trading day.  The following trading day happens to be a Monday.

Q.  So do you have an opinion as to whether any of the statements here caused the stock price to move in any way?

A.  I do have an opinion.

Q.  What is that?

A.  It did not.  It was not considered important to the market. If the market viewed it as positive, that would be specific to the company, wouldn't be something about the market, the stock market, for example, you would expect to see the price to go up.

Q.  Let's go to the next slide, 27.

        Got another podcast -- interview, excuse me, that the government played, GX 418, Fox Business, June 30 at -- June 30, 2020, at 7:24 a.m.  Do you see that?

A.  I do.

Q.  What does this slide demonstrate?  More of the same, professor?

A.  More of the same.  Again, we're looking at a Y-axis, the up and down, from zero to 90, and you can track the stock price.

And, again, it's the same thing.  The market did not view this as important, didn't view it as positive, didn't view it as negative.  The stock price movement is explained by general market forces and random volatility.

MR. BONDI:  Chris, let's go to slide 28.

Q.  This is an *Observer* interview that the government played, GX 421, July 14, 2020, at 10:30 a.m.  Looks flat again.

What does this slide tell you, professor?  More of the same?

A.  More of the same.  So it's relatively flat.  I mean, everyone can take a look for themselves visually.  Relatively flat.  But more important than just eyeballing a stock graph or eyeballing a stock price, more important than that is the fact that such -- the price movement, such as they exist, is fully explained by general market forces.  In other words, to be clear, the market did not view this as important information, either positive or negative.

MR. BONDI:  Let's go to the next slide, Chris, which is slide 29 there.

Q.  It's This Week in Startups.  The jury heard about that, July 31, 2020, GX 410.

Professor Ferrell, what does this slide demonstrate?

A.  More of the same.  So the statement at issue is roughly midday, 1:09 p.m.  And, again, the stock price movements are -- again, one can take a look for one's self -- basically flat or

pretty much flat.  The movements that do occur are explained by general market forces.  In other words, the market did not view these statements as important, because if they were important, for example, if the market viewed these as exciting, positive statements like the market viewed the Badger opening for reservations as exciting, important information, you would expect the stock price to go up in a way that's not just reflective of the general market or what the industry happens to be doing.

MR. BONDI:  Chris, can we go to the next slide, 30.

Q.  We've got another one from Cheddar TV, August 5, GX 427.
Jury heard about that.  Is this more of the same?

A.  It's relatively flat.  But, again, more importantly is the -- you know, using the event study and kind of gold standard approach that we've been discussing, the stock price movements, such as they exist, are explained by these general market forces.  In other words, the market did not view as important the statements at issue on this particular day.

Q.  I promise I only have three more here.

Let's go to the next slide, August 31, August --
excuse me, slide 31, August 14, 2020.  I get too excited.

There is a tweet here that the government introduced into evidence, GX 553, a tweet about hydrogen here.  What does this slide demonstrate?

A.  So this is a tweet after the market closed.  It's 8:56 p.m.

And so as we've been discussing, we have to take a look at, well, how does the market react, if at all, the following trading day? Again, same story. It's relatively flat. Again, I'm using a zero to $90 Y-axis to take a look at the -- for one to visually look at the stock price. And, again, any stock price movement is explained by the market, the industry, and random volatility. In other words, the market did not view as important this tweet.

Q. OK.

A. If the market -- if the market viewed it as important, exciting news like the Badger opening for reservations, you would expect to see a positive stock price reaction.

Q. OK. Let's go to the next slide, Chris.

Jury heard about a TD Ameritrade interview, which is GX 428, August 19, 2020, and that was at 4:30 p.m. So you're looking at August 20 here, right? Because it's after hours, you look at the next day?

A. That's correct.

Q. What does this slide demonstrate?

A. The market did not view this as important. The market movements, such as they are, are fully explained by the market and the industry and random volatility.

Q. OK. Let's go to the next slide, and it's the last of these that I want to go through.

August 24. Professor Ferrell, on August 24 it looks

like the government introduced a tweet, GX 554, relating to the Nikola Badger here.

What does slide 33 demonstrate?

A. Again, it's the same story. It's the same analysis that we saw repeatedly, and that is that the stock price movement, such as it is, did not view this as important. The stock price moved in the way fully explained by the market, the industry, and random volatility.

Q. Now, professor, the charts that you covered, covered 11 of the 72 days you showed us. And to confirm, is it your conclusion that on each of those 72 grayed out days, Nikola stock price didn't move in any meaningful way other than with respect to the overall market or the EV industry?

A. That's correct.

Q. OK. So what does that tell you about Trevor Milton's statements?

A. So the statements that would impact those days, those 72 days, was not considered important. So we've done some examples of that. But, again, if something's considered important to the market because it's exciting news or because it's revealing something bad, you would expect the stock price to go up or the stock price to go down. That's how an economist would think about what's important and what's not important to the market, to the market price.

Q. Now, professor, Trevor tweeted a lot, and he went on a lot

of podcasts, some of which has been in evidence, some of which has not.  Does your study, does your analysis, take into consideration any sort of cumulative effect?

A.  Yes.  I do the standard analysis, which is if there's important information -- so, for example, let's take this tweet.  This is a specific statement, the 11:37 a.m. statement, and this tweet does not elicit a stock price reaction.  For sake of completeness, I also looked at two days and three days.  Now, I think one day's the right way to do it, but I also looked at two days, does it react over two days or over three days?  That analysis does not change any of my opinions.

Q.  OK.  Now, professor, I know you've reviewed all the trial testimony in this case, and I'd like to go back and talk to you about some testimony from the government's witness, Professor Mayzlin.  Did you read her testimony?

A.  I did.

Q.  Did you read the exhibits and look at the exhibits that she did?

A.  I did.

Q.  As an economist, what do you think about Professor Mayzlin's testimony?

        MR. ROOS:  Objection.  Vague.

        THE COURT:  Sustained.

Q.  As an economist, do you have a view about Professor Mayzlin's testimony with respect to stock price and stock price

MA3HMil2                        Ferrell - Direct

movements?

A.   I do have an opinion.

Q.   What is your opinion?

A.   Nothing -- her testimony, her exhibits tells you precisely zero about what's important to the market.

Q.   And Professor Mayzlin used a number of different charts, pie chart, counting the number of tweets, and that sort of thing.  As an economist, do you use tools like that in analyzing stock price movement?

A.   There's nothing wrong with counting tweets, but what you want to do if you want to think about the stock prices is, is the stock price reacting positively or negatively to whatever it is that you're taking a look at?  So, again, if you want to think about prices, the way you want to do it is the event study analysis.

Q.   Now, Professor Ferrell, the jury's heard testimony from retail investors who invested in Nikola stock.  What impact, if any, did that testimony of the retail investors have on your opinions here today?

A.   It did not change my analysis.

Q.   Help me understand why not?

A.   Well, as an economist, I'm not here to talk about what anybody or any individual or institution is thinking subjectively.  That's not part of economics that I do.  That's not the economic analysis that I provide.

The way an economist would think about what's important and what's not is whether it affects the price. So does it affect the price that investors, retail investors, other investors, does it affect the price that an investor, for whatever reasons they might be buying or selling -- obviously, folks can have all sorts of reasons -- but does it affect the price at which they're buying or selling? So that's how an economist would think about what's important to the market is what's important to the market price.

Q.   What does the market represent again?

A.   The consensus view of the investors as a whole. It's a consensus view as to the value of the stock given the full -- sorry -- given the total mix of public information.

MR. BONDI: Your Honor, if I may have a moment, please.

(Counsel confer)

MR. BONDI: Chris, if you could go back real quickly to slide 29. I had said GX 410, and it should be GX 425. So I just wanted to correct myself on that. You can take that down.

Q.   Professor Ferrell, going back a bit to the SEC filings here, where did the SEC filings appear? Where can investors see them?

MR. ROOS: Objection. Asked and answered a few times now.

MR. BONDI: No.

THE COURT:  Overruled.

A.  The SEC has a database called the EDGAR database.  So it's publicly available, but it's also available on the company website.  It's also, as we were discussing earlier, discussed, you know, in the financial press more generally.  In terms of the filings themselves, they're readily publicly available, including on the company website.

Q.  And are you familiar with trading platforms like Robinhood?

A.  Yes.

Q.  And would Robinhood also make those filings available for investors?

A.  Yes.

Q.  So, Professor Ferrell, just to sum this up, Mr. Milton is on trial for statements that are at issue in this case.  What's the bottom line as to whether those statements were deemed to be important to the market?

A.  They were not, in my opinion.

Q.  So what does that mean?

A.  Means the statements at issue were not important to the market, the market consensus of investors.

MR. BONDI:  No further questions, your Honor.

THE COURT:  Very well.  Ladies and gentlemen, it's now ten minutes before the hour, so let's take our first break now. We'll get back together at ten minutes after the hour.  Please don't discuss the case.

(Jury not present)

THE COURT:  Professor Ferrell, you may step down, and folks can be seated.

Anything to raise?

MR. ROOS:  Well, at some point during my cross, I think the corrective disclosure issue will come up, but --

THE COURT:  Let me ask you, because I've read, I believe, the pertinent parts of *Forbes* and the Second Circuit's review, and in *Forbes*, apparently the government used information concerning losses suffered by the shareholders and have used it in its opening statement and used it, I guess, in its examination of witnesses.

I'll read what the district court said, Judge Nevas, the District of Connecticut:

"The court did not abuse its discretion in admitting evidence and argument regarding the losses suffered by Cendant shareholders and the decline in Cendant's stock price on or after April 15, 1998.  As the court concluded in overruling Forbes' objections to this evidence, that it was highly probative and relevant to the issue of materiality.  And because the court instructed the jury that it could not consider such evidence at all with respect to whether Forbes was a knowing and willful participant in the conspiracy or engaged in any wrongdoing, there was little or no risk that the jury would improperly use this evidence for purposes other than

the limited purpose for which it was admitted."

On appeal the Second Circuit held Forbes also argues that the district court abused its discretion in permitting lay opinion testimony on the size of the alleged fraud and further erred by declining to give a limiting instruction concerning a similar reference in the government's opening statement.  The disputed testimony about the size of the fraud was properly limited pursuant to the district court's instructions to the issue of materiality.

The district court correctly ruled that references to the decline in Cendant's stock price and investor losses were probative on the issue of materiality and permissible under Federal Rule of Evidence 403.

So, arguably, presumptively admissible.  It was used in the government's case in chief, its opening.  In this case, that's not what you're looking to do here.

MR. ROOS:  In this case we are looking to -- so I think now that the expert is done with his direct, he's made clear that his opinion is that none of these misstatements were material, and I expect in cross-examination he will embrace the concept of a corrective disclosure, and so the government elicit from him when a corrective disclosure was made there was --

THE COURT:  I'm sorry, professor.

MR. ROOS:  -- there was a drop in the stock price.

And so the ending portion that your Honor just read, about how evidence of a stock price drop -- we're not going to go into losses, so I think this is actually less prejudicial than what Forbes had -- but the evidence of a stock price drop following the corrective disclosure, much like the Cendant disclosure that resulted in the stock price drop there, is probative of materiality and it's not unduly prejudicial under 403.

MR. BONDI:  Your Honor, I think if you get into the details of *Forbes*, you'll see that it was a very different case dealing with accounting issues, and the like.  What *Forbes* did not allow is the 10-K to get put in.  The 10-K at issue in this case involves four statements that have not been introduced into evidence, including one that the government flagged as potential 404(b) evidence that relates to nonpublic statements here by Mr. Milton relating to solar panels, allegedly related by Mr. Milton.

Your Honor, the fact is nothing Professor Ferrell testified about was after September 30.  You heard that.  He was very cabined:  September 30, September 30, September 30. And he didn't get into the words "corrective disclosure" that I can recall.  The government says he will embrace this on cross. It sounds like they're the ones trying to open the door here to try to get in this 10-K, which is entirely improper.

So his testimony has always been disclosed as being during the period leading up to September 30, 2020.  Mr. Milton

MA3HMil2

was gone from the company after that.  After that you get into an internal investigation and you get into a government investigation and you get into a 10-K that deals with -- four of the nine statements in the 10-K have nothing to do with any evidence in this case.

THE COURT:  So, Mr. Roos, I take it you mean to impeach Professor Ferrell with the idea or the concept of a corrective disclosure?

MR. ROOS:  Correct.

THE COURT:  And you can do that without necessarily using the information concerning Nikola.

MR. ROOS:  Well, as a general concept, I can say: You're familiar with the concept of corrective disclosure. That's use of event study.  Pretty confident -- that's vanilla stuff, so I'm sure he'll say that.

And then what I would like to do is cross-examine him and say:  You didn't look at the corrective disclosure made by the company in February 2021, and had you, you would have seen the stock price went down.

He made all these statements on direct examination about none of these things caused a material change, and he also made these statements, first time we were hearing about them, about how these facts from 2016, 2018 were totally immaterial to people.  And I think it's really accepted, including in Professor Ferrell's own writing, that there's two

MA3HMil2

ways you could assess materiality using event studies.  One is to look at the date of the misstatement; the other is to look at when the truth is revealed to the market.

THE COURT:  I think you can do that without putting in the documents and asking just the questions that you did.

MR. ROOS:  I guess -- so two comments on that, your Honor.  Number one is I haven't begun my cross-examination yet, so I have no sense of how Professor Ferrell will respond to questions.  I might need some latitude here if he says I've never heard of this before, I didn't look at that, I can't recall it, etc., etc.

THE COURT:  No, that's understandable, and we'll deal with it in the usual course in that event.

MR. ROOS:  And the other thing, your Honor, is the second exhibit -- the first one is the 10-K itself.  The second exhibit is just the Yahoo! Finance stock price chart.  And based on the arguments by defense counsel, I don't see a reason why that can't come in.

(Continued on next page)

MR. BONDI:  Again, the stock price movement months and months and months after Trevor Milton left the company is irrelevant, it's beyond the scope of direct, it has nothing to do with anything in this case.  He left September 21st, 2020.  They're talking about putting stock price movements in February 2021, long after he left the company.

THE COURT:  To say that it has nothing to do with what's gone on in this case is not, I believe, accurate.  Again, a 10-K is a report of what happened the previous year, and in the previous year, statements were made, corrective disclosures were made in the 10-K and that caused the price to go down.

MR. BONDI:  Your Honor, respectfully, the 10-K was not contemporaneous, though.  It came out on February 25th, 2021 --

THE COURT:  I understand it's not contemporaneous, we all understand what a 10-K is, but it's backwards looking, it reports on what happened the prior year.  To suggest, well, none of that is relevant to this case, I don't think is accurate.  I'm trying to find a way here, because I think the government is entitled to make the point, I just don't know that the government necessarily needs the documents to do that.

MR. ROOS:  I think we need the stock price charts so that he and the jury can see what happens once the report comes out.  I think I can do it, provided he doesn't fight me on it, without putting the 10-K in front of the jury, which is where I

understand the prejudice argument is coming from.

THE COURT:  So I think you can use the chart.

MR. PODOLSKY:  Just one request, your Honor.  My understanding is that some of the professor's colleagues or assistants are in the courtroom, and I don't think it would be proper for them to inform him of this discussion that we've been having, this colloquy.

THE COURT:  I don't know if they're here or not.  I'm sure that they will abide by the Court's instructions.  He was kept out of the courtroom for a reason and I'm sure they're not going to run and report to him what was going on here.

MR. PODOLSKY:  Thank you.

MR. BONDI:  Your Honor, one thing for the record.  Just as the government is now trying to open this door, professor Ferrell did do work outside of that September 30th period, but he was not offering opinions on that.  So if they go down that route, it's fair game to talk about the research and the work that he did in that time period in question if they go there, but I just wanted to flag because it was not part of professor Ferrell's testimony today, it was not going to be part of what he was going to get into, but he has done work in this area.

THE COURT:  My understanding, and I could be wrong, but my understanding is that he will be impeached, in part, on an alternative way to determine the significance or not of

certain statements, and one of these ways is through a corrective disclosure, and we'll see where that goes.

MR. ROOS:  Your Honor, I have to say this is the first time we're hearing -- I don't know if Mr. Bondi is saying that there is an analysis that was not turned over to us for this corrective disclosure date, if that's true, maybe I'm misinterpreting it, would be a serious disclosure issue that we would need to know about right now.

MR. BONDI:  He's done work, he's not opining on any of this.  We didn't introduce any testimony about any corrective disclosure work after the period in question.  But has he looked at it?  Sure.  But it's not part of his opinion.  It's not offered as part of his opinion.  It's not.

MR. ROOS:  His 26.2 should include things such as other analyses he's done on these stocks.  Are you saying that there's -- did he or did he not do an event study for these dates?

MR. BONDI:  He did event studies beyond the period in question, but they're not being offered as part of his testimony.

MR. ROOS:  He did an event study for February 25th, 2021?

MR. BONDI:  He did.

MR. ROOS:  Judge, we request that that be ordered, produced to us immediately.

MA3Cmil3

THE COURT:  Or they can't go into it later.  But if you have it, it seems that that's something that should have been turned over.  I believe that the government's request, even in open court, were sufficiently ample to bring within its scope all of the work that they did.

I assume that the amounts that he testified to, half a million and the $76,000, that's all in; correct?

MR. BONDI:  That's all part of the work, your Honor.  But just to be clear, no part of his direct was in any way based on the event studies that he did after the time period.

THE COURT:  I understand.

MR. BONDI:  So it's not part of 26.2, it's not something you would disclose because it's not part of his opinions.

MR. ROOS:  I can't believe this.  This sounds like plain impeachment material they've withheld from us after repeated requests for production.

THE COURT:  Why don't you turn over what you have.

MR. BONDI:  We will, your Honor.

THE COURT:  Obviously, forthwith.

MR. BONDI:  Forthwith, your Honor.  We're working on it.

THE COURT:  And we'll see where we are later today.  I'm going to take a five-minute break.

(Recess)

(Jury present)

THE COURT:  Everyone can be seated.  Ladies and gentlemen, I apologize for that little hiccup.  I neglected to tell Ms. Rivera I gave the lawyers a couple of extra minutes because we were having a conversation for a long part of that break.

Mr. Roos.

MR. ROOS:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. ROOS:

Q.  Good morning, professor Ferrell.

A.  Good morning.

Q.  Never have a sense of what time it is in here sometimes.

You've never spoken to Mr. Milton; correct?

A.  Correct.

Q.  You didn't interview him in connection with this case; correct?

A.  No, I did not.

Q.  So you don't know what he intended; right?

A.  I'm sorry.  I didn't hear what you said.

Q.  You don't know what he intended; right?

A.  I do not.

Q.  And you don't know whether he was intending to boost Nikola's stock price; correct?

A.  Correct.

Q.  You also don't know if he thought what he was saying mattered to increase Nikola's stock price; right?

A.  Correct.

Q.  You did read the trial testimony, I think you said?

A.  Yes.

Q.  So you know that on June 17th, 2020, Trevor Milton texted Steve Girsky, and I'll quote, share value went up after my response on Twitter?

A.  I do recall that.

        MR. ROOS:  Let's publish Government Exhibit 38.  Can we highlight the second message.

Q.  That's the piece of evidence that you reviewed as part of the trial testimony; right?

A.  I do remember.

        MR. ROOS:  We can take that down.

Q.  Now, Trevor Milton's own statements about increasing the share value weren't part of your event study analysis, right, that doesn't go into a statistical model?

A.  His statements to a private party, does that go into a statistical model?

Q.  Right.

A.  No.

Q.  And so you read, also, as part of your review of the trial testimony, you read the testimony of Mark Russell, Nikola's CEO; right?

A.   I did.

Q.   And so you know that Mr. Russell testified during this trial that at a board meeting, Mr. Milton was, quote, talking about his ability to communicate through social media and reach out to retail investors and how that was helping the stock price go up?

MR. BONDI:   Objection.

THE COURT:   Overruled.

A.   I do remember testimony along those lines.

Q.   Mr. Russell's testimony, however, is not incorporated into your statistical analysis; right?

A.   Correct.   So private statements --

Q.   Just yes or no is fine.

A.   No.

Q.   So, I take it you also reviewed the transcript and the testimony of Kim Brady, Nikola's CFO; right?

A.   Yes.

Q.   And so you know Mr. Brady testified under oath that, quote, we saw, based on what Mr. Milton said, it impacted the stock price even before the merger happened, even before the merger was completed.

You saw that; right?

A.   I do recall that.

Q.   And you must also know, then, that Mr. Brady testified that, quote, time to time, Mr. Milton talked about the stock

price, especially after something was posted on something --
and may have been said by Mr. Milton and he would point out why
the stock price went up.

You saw that testimony; right?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I do recall something along those lines.

Q.  And Mr. Brady's testimony, that was not incorporated into
your statistical analysis; right?

A.  Not as such, no.

Q.  So on direct examination on Friday and today, you talked a
little bit about retail investors.

Do you remember that?

A.  I do.

Q.  And I think, actually shortly before the end of your direct
examination, you said, as an economist, you're not looking at
what's actually in investors' heads; right?

A.  That's correct.  It's subjective beliefs.

Q.  So you're looking at sort of what the market reaction is?

A.  Correct.  In my event study, that's correct.

Q.  Now, I think on Friday Mr. Bondi asked you if you had any
professional experience with retail investors and you said you
did; is that right?

A.  Yes.

Q.  And the experience was that you were on a board of economic

advisers and you were working on rules, and as part of that, you did a statistical analysis; right?

A. Yes, as well as being an academic fellow at the NASD.

Q. And so, as part of that analysis, did you talk to any real life retail investors?

A. No.

Q. And how about in this case, did you interview any real life investors?

A. No.

Q. So did you speak to anyone who actually invested in Nikola in 2020?

A. Not to my knowledge.

Q. So looking back at your analysis, do you wish you had spoken to actual investors before rendering your opinion?

A. No, I did the standard analysis.

Q. By the way, I think you were asked about, on direct examination, the materials that you looked at and you said you looked at everything you wanted to look at; right?

A. Yes.

Q. So did you review any reports of interviews with retail investors?

A. I'm not -- I did the -- I reviewed the trial testimony, the SEC filings.

Q. Were you aware that reports of over 50 interviews with retail investors were provided to defense counsel?

MA3Cmil3                          Ferrell - Cross

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I have not read those.

Q.  So you didn't look at any of those?

A.  That's correct.

Q.  And I think you said you read the trial testimony in this case about two retail investors; right?

A.  Correct.

Q.  And so you know that Mr. Ryan, the first retail investor, answered yes when he was asked whether Mr. Milton's statements had an effect on his investment decision.

Do you remember that?

A.  I recall something along those lines.

Q.  So I take it you also read the testimony of Marc Schonberger?

A.  I did.

Q.  And he is also a retail investor?

A.  I believe so.

Q.  So you know that he testified that Mr. Milton's statements quote, absolutely influenced his investment?

A.  I remember something along those lines, yes.

Q.  And those statements, the testimony of those two retail investors were not incorporated into your statistical analysis; correct?

A.  Correct.

Q.  And the same goes for any interview reports of retail investors; right?

A.  Correct.

Q.  So when you reviewed what you were calling the total mix of information, you didn't look at any interviews or testimony of retail investors?

A.  I agree -- I reviewed the total mix of price reports, analyst reports, but not the interview transcripts that you're referring to.

Q.  Thank you.  So why don't we take a look at some of your slides.

MR. ROOS:  Can we bring up Defendant's Exhibit 955, go to page 2.

Q.  So since we're talking about the total mix of information, I think on Friday you presented this slide; is that right?

A.  Yes.

Q.  Who decided what categories to list on this page?

A.  I did.

Q.  So let's start with company press releases, the top left. Those can be found on the company's website; right?

A.  Yes.

Q.  And they could also be found, I think you actually testified, it could also be found with the SEC filings; right?

A.  If it's included in the SEC filings, yes.

Q.  Usually, a press release will be attached as like an

exhibit to an SEC filing; right?

A.  You are right.  That is correct.

Q.  And I see another one on here, presentations to investors or analysts.  That's the most far-right one on the top line.

          Do you see that?

A.  I do.

Q.  And investor presentations or analyst presentations, those can sometimes be found on the company's website; right?

A.  That's correct.

Q.  And they also are oftentimes included as an exhibit to an SEC filing; right?

A.  As a general matter, yes.

Q.  And you have on here a quarterly investor call.

          Do you see that?

A.  I do.

Q.  And that also can appear in an SEC filing, right, as an exhibit?

A.  As a general matter, yes.

Q.  So then on the second line, you've got earnings announcements, and those will oftentimes be exhibits to SEC filings; right?

A.  As a general matter, yes.

Q.  And then the next bucket, you have reports, e.g. 10-Q to investors filed with the SEC.  So those appear on the SEC website; right?

MA3Cmil3                          Ferrell – Cross

A.   The 10-Q, yes.

Q.   And the next box over, company prospectus filings, those are filed to the SEC; right?

A.   Yes.

Q.   And the next box over, company S-1 registration statement. That's an SEC filing; right?

A.   Yes.

Q.   And then on the third line, other SEC filings, those are obviously SEC filings; right?

A.   By definition.

Q.   So just to keep track of where we are, I think you made eight of the 16 boxes here things that are filed on the SEC page; is that right?

A.   Well, I agree as a general matter, these things can be attached as an exhibit.

Q.   Let's look at the bottom most-right box.

A.   Yes.

Q.   That one box represents, you've got it listed online media to include social media, YouTube, podcasts, etc; is that right?

A.   Yes.

Q.   So you would say Twitter would be in that category?

A.   Yes.

Q.   And within Twitter, you've got the company's Twitter account; right?

A.   Yes.

Q.   Nikola had a Twitter account?

A.   Yes.

Q.   And you've got an executive's Twitter account; right?

A.   I believe so.

Q.   So Trevor Milton's Twitter account?

A.   Yes.

Q.   And also, included within this category, would be any third party's Twitter account Tweeting with the company?

A.   Could be, yes.

Q.   Reddit would be in this category; right?

A.   Reddit would be online forum.

Q.   And you're aware, I guess from reviewing the trial testimony, that there was a specific Reddit page or channel devoted to Nikola; right?

A.   That's consistent with my memory.

Q.   And StockTwits would be included in this category; right?

A.   That would be online media.

Q.   And you're aware, from reviewing the testimony, that there's a specific StockTwits page about Nikola; right?

A.   Yes.

Q.   Facebook would be in this category?

A.   That would be online media, yes.

Q.   And Nikola had a Facebook page; right?

A.   I believe so.

Q.   Instagram would be in this category; right?

MA3Cmil3                         Ferrell - Cross

A.   Yes.

Q.   And Trevor Milton had an Instagram account; right?

A.   That's consistent with my memory.

Q.   And he posted about Nikola on there?

A.   I know he posted online.  I don't remember, specifically, whether it was Instagram or not.

Q.   YouTube falls in this category; right?

A.   Yes.

Q.   And Nikola had a YouTube channel?

A.   That, I don't have a specific recollection.

Q.   I think on your slides, you have a number of slides with videos from YouTube?

A.   Yes, I do have YouTube videos.

Q.   And you've got podcasts in this category; right?

A.   I do.

Q.   And Mr. Milton appeared on dozens of podcasts; right?

A.   Yes.

Q.   Also, in this category would be any other kind of online media, like videos on a website; right?

A.   Could be, yes.

Q.   And so, just by my count, we've got one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen -- so you just listed seventeen different types of media that you've got all in that one box; right?

A.  I didn't do a count, but we discussed various online media.

Q.  And so, just to be clear, you chose to make half of a slide things that are filed on the SEC page and only one box for everything on the internet; is that right?

A.  No, that's not right.

Q.  Well, let's bring it down then.  You chose to make one box everything on the internet; right?

A.  That's not correct.  So the SEC filings are on the internet, a lot of analyst reports are on the internet.  I would say most of this stuff is on the internet.

Q.  You're absolutely right, professor.  My question was imprecise.  You chose all the forms of social media, YouTube podcasts, online videos that we discussed, you chose to make those all one box; right?

A.  It is in that box.

Q.  Well, yes or no, you chose to put them all in that one box?

A.  Yes.

Q.  And you chose, we'll forget about the things on the company website, etc., you chose to make four different boxes about SEC filings?

A.  Well, as I said, I agree that, often, it's attached as an exhibit, I don't know all the time, but yes, consistent with that answer, it is the case that, for example, a press release can be attached as an exhibit to an SEC filing.

Q.  I'm just asking, I mean forget about the things that can be

attached as exhibits, I'm just asking, you chose four boxes

that are SEC filings, right, reports, 10-Qs, RN SEC filing?

A.  Yes.

Q.  Company's prospectus.  So you chose four boxes to be SEC

filings?

A.  Yes.  They reflect mandated disclosures to the market under

the SEC, correct.

Q.  You agree with me you could have made one box that said SEC

and they would all be included; right?

A.  You could have certainly done that.

Q.  Now this chart isn't specific to Nikola; right?

A.  Correct.

Q.  So the types of information available to Nikola investors,

the mix could be different than how this is presented; right?

A.  I'm not sure I understand the question.

Q.  The mix of information that could be available to Nikola

investors could be different than this; right?

A.  Well, this is available public information, which

represents a mix, but I'm --

Q.  Let me ask it this way.  The weight that you gave various

types of information here could be different for Nikola

investors; right?

A.  I didn't do any weighting here.  It's just examples of

public information.

Q.  But you picked out four examples, all of the SEC filings;

right?

A.   There are four boxes there, yes.

Q.   Now, you'd agree with me that most companies don't have a founder and CEO on Twitter, Instagram, Facebook, and YouTube; right?

A.   That might be true.  I don't know.

Q.   And just to be clear, this chart doesn't indicate what things were most important to retail investors and Nikola; right?

A.   That's not the point of the chart.

Q.   When you were testifying about this chart, I think you mentioned, this was on Friday, you mentioned that when you were working on your dissertation, you observed that SEC filings are important; is that right?

A.   Yes.

Q.   I think you said they are the most important source of information; is that right?

A.   Generally speaking, yes.

Q.   And your dissertation and research that went along with the dissertation was evidence, that was an example you said; right?

A.   It was evidence, yes.

Q.   Now, you finished your Ph.D. in 2005; right?

A.   Yes.

Q.   So you did your dissertation before then?

A.   Yes.

Q.  So I think you -- I think, actually, you said this was now almost 20 years ago; right?

A.  Sadly, yes.

Q.  Now, you're aware that 2005 was the year that YouTube was founded; right?

A.  I don't know that.

MR. ROOS:  Can we show the witness only AFX-5022.

Q.  Why don't you take a look at the big logo there and the date below it on the right side.

A.  I'm supposed to be looking at the right side?

Q.  Yeah, right below the big red logo.

A.  I'm looking at that.

MR. ROOS:  Can you highlight that portion, the date there.

Q.  Does that refresh your recollection that YouTube was founded in 2005?

A.  It does not because I don't know that offhand.

Q.  Okay.

MR. ROOS:  Why don't we take this down.

Q.  Are you aware that Twitter was founded in 2006?

A.  I don't know the exact date.

Q.  And are you aware that the Apple podcasting app and podcasts were not founded until 2012?

A.  I don't know the exact date.

Q.  And are you aware that Robinhood did not start until 2013?

A.  I don't know the exact date.

Q.  So just to be clear, did any of these things exist when you did your research on your dissertation?

A.  So, no, the YouTube and the Twitter, given your representation, no, they did not.

Q.  Now, today you testified about SEC filings and how the information in them spreads throughout the market.  So I just wanted to ask you, I think you mentioned television shows, what television shows, that you reviewed, featured Nikola's SEC filings?

A.  I never made that representation, so I don't have an example.

Q.  No example of Nikola's SEC filings appearing on television?

A.  No, that's not -- that was not what I was saying.  So no, I do not.

Q.  I'll re-ask the question then.

Did you review any television show where Nikola's filing was discussed?

A.  I don't have a recollection.

Q.  Did you review any podcasts where Nikola's SEC filing were discussed?

A.  I don't have a recollection.

Q.  Did you review any Tweet where Nikola's SEC filing was discussed?

A.  I don't have a recollection either way.

Q.  Now, you said the information in SEC filings are reflected in the stock price; is that right?

A.  Yes.

Q.  And so, if the information is significant, we would expect to see that reflected in a statistically significant manner in the stock price, according to your testimony; right?

A.  If it's important enough, then you would identify it statistically.  So, just to be clear, if it's important enough to impact the stock price above what would be expected by random volatility, then yes, it would have to be large amount.

          MR. ROOS:  Why don't we publish Government Exhibit 318.

Q.  Professor Ferrell, do you recognize this as Nikola's S-1 filing?

A.  I do.

Q.  You must have seen, from reading the transcript, that this is -- there has been a lot of discussion about this throughout the trial; right?

A.  That's fair.

Q.  And you see it was filed on July 17th, 2020; right?

A.  I see that.

Q.  And now, you did a single-day event study for July 17th, 2020; right?

A.  Yes.

Q.  And the results of your finding was that there was no

MA3Cmil3                         Ferrell - Cross

statistically significant movement attributable to Nikola; right?

A.   It was not statistically significant, that's correct.

Q.   So your testimony here is that Nikola's filing of its S-1 did not cause a change to Nikola's price?

A.   Well, I don't recall, sitting here, if this was filed after hours or not.  So to give a complete answer to your question, I would have to refresh my recollection on that.

Just to be clear, I believe July 17th is a Friday, so if it was filed after hours, and I'm not saying it is, then you would expect to see it on July 20th.

MR. ROOS:  We can take this down.

Q.   You mentioned on direct examination on Friday that investing in stocks is risky; right?

A.   Yes.

Q.   And you've invested in stocks before; right?

A.   Yes.

Q.   You've bought not just mutual funds, you've bought a specific stock before; right?

A.   Rarely, but yes.

Q.   When you did that, you recognized there were some risks involved in investing; right?

A.   Very fair.

Q.   But when you invested, you didn't think you were going to get defrauded; right?

MA3Cmil3                          Ferrell - Cross

A.   Correct.

         MR. ROOS:  Let's look at slide 3 of Defendant's
Exhibit 955.

Q.   So, this shows retail investor purchase and sale volume;
right?

A.   Yes.

Q.   So this shows that retail investors purchased Nikola stock
and they sold Nikola stock?

A.   Yes.

Q.   And this data is from Vanda Track; right?

A.   Yes.

Q.   Vanda Track uses a proprietary algorithm to identify which
trades are by retail investors, doesn't it?

A.   It does.

Q.   Do you know where Vanda Track gets its data from?

A.   The website just says it's proprietary.  I had my team call
Vanda Track to find out more.  That was the vetting process I
did for that.

Q.   So you actually don't know how this data was collected, do
you?

A.   It's a proprietary dataset, a proprietary algorithm that's
provided to their institutional clients.

Q.   To be clear, proprietary means they don't tell you where
the data comes from?

A.   That's correct.

Q.   You didn't take any independent steps to verify the data?

A.   That's false.  I did.

Q.   What steps did you take?

A.   I took the Robinhood data that's been produced in this case.  So that's a brokerage firm that has retail investors. And I did the calculations using just the Robinhood data on buys and sells and I basically replicated this chart.  So not exactly, but you see kind of that mirror image of buys and sells.  So if you look at the Robinhood data, do the same analysis I did here for Vanda Track, you get the same results.

Q.   Now, Robinhood is just retail investors; right?

A.   Yes, I made the assumption that it's retail investors, that's correct.

Q.   So sort of general, very basic questions.  Every time someone sells a stock, someone has to buy it; right?

A.   Fair.

Q.   So you can't buy a stock without someone selling it to you?

A.   Correct, unless the company is issuing, but your statement is generally fair.

Q.   Thank you.  So if there is a hundred trades of people purchasing Nikola stock, there has to be a hundred trades of people selling Nikola stock; correct?

A.   Correct.  They don't have to be retail investors, it could be institutions to retail, retail to institutions, but yes, it is a buy and sell fixed supply.

Q.  Now, were you aware that most of the trading in Nikola was by retail investors and algorithmic trading during this period?

A.  I don't know that offhand.  I had the retail investor buying here, but that's the information I have.

Q.  And you reviewed the trial testimony in this case; right?

A.  I did.

Q.  And so you reviewed the transcript testimony and Government Exhibit 254, which stated that 94.17 percent of the total trading volume was retail trading and algorithm trading?

A.  I don't recall that specifically, but I'll take your word for it.

Q.  If you'll take my word for it, I can show it to you if you doubt it.

A.  Whatever you would like to do.

Q.  So this chart shows volume, and volume basically means activity; right?

A.  That's fair.

Q.  And so on certain days, it shows a lot of buying and selling; right?

A.  Yes.

Q.  Just to look at it, this chart shows -- you may be able to characterize it better, but looking at some dates, it looks like June 8th has a noticeable amount of activity; right?

A.  Yeah, I mean, the best thing to do is just to highlight the dates that you're interested in.  But yes, it is on the left

there.

MR. ROOS:  The first, I think professor Ferrell sort of called this like a pond.  So let's highlight the first sort of splash, that first line, the biggest one there.

THE WITNESS:  Fair enough.

MR. ROOS:  And just, I'm just picking out some examples here, we'll take the really big one there, it looks like it's September 8th, if I'm reading it right.  And then let's do a few more.  Let's do two days over, September 10th. And maybe one more.  Do you see the date that's sort of before 9/22, looks like maybe September 20th, let's highlight that one, too.

Q.  So you'd agree that those dates that are highlighted, just as examples, have comparatively larger volumes than some of the other dates?

A.  For this segment, the retail trades according to Vanda Track, that's correct.

Q.  Thank you.  Now, isn't it true that high, abnormal trading volume is associated with news being material?

A.  Material is a legal conclusion.  I'm not going to testify as to material.

Q.  So isn't it true that high, abnormal trading volume is associated with news being important?

A.  It may or may not.

Q.  You're aware that there is academic literature that says

disclosures that are associated with high, abnormal trading

reactions are more likely to contain important information?

A.   That might be right, but I think the right way to answer

the question is just directly look at the stock price.

Q.   But you would agree that, in addition to the stock price,

volume can also be a way to assess the importance to investors?

A.   Again, as an economist, there, I would think about what's

important to the market is the price, the value of what we're

talking about.

Q.   Isn't it true that there is such a thing as an event study

related to volume?

A.   Yes.

Q.   And isn't it true that your team, that you testified that

you worked with on this case, did a preliminary event study

relating to volume?

A.   Yes.

Q.   And you did not present the results of that study here;

isn't that right?

A.   Correct.

Q.   I want to switch topics.

        So you work for a consulting group that was hired by

Mr. Milton; right?  Do I have that right or were you hired

directly by Mr. Milton?

A.   So I think both statements are incorrect.  I was retained

by counsel for Mr. Milton.

MA3Cmil3                          Ferrell - Cross

Q.  So just to be clear, just so I understand you, you were
retained by defense counsel for Mr. Milton?
A.  It's -- I was retained on behalf of the defense.  I can't
actually remember now whether it was defense counsel that
represents Mr. Milton or Mr. Milton directly, but I was
retained by the defense.
Q.  Okay.  That's fair.
        Now, you were first hired by, I'll just say, the
defense after Mr. Milton was indicted; right?
A.  It was at some point in the summer of last year.
Q.  Well, you reviewed the indictment, right, so you know it
was afterwards; right?
A.  I definitely reviewed the indictment.
Q.  And so you were retained over a year ago; right?
A.  That's right.
Q.  How many times do you think you've spoken to defense
counsel since then?
A.  A number of times.  I don't have a number -- I don't have
an exact number, but I definitely, over the course of that
year, spoken to defense counsel on a number of occasions.
Q.  Just give us a sense, like more than ten times, less than
ten times?
A.  More than ten times.
        Just to be clear, your question is about the year or
year-plus period?

Q.   Since you're retained until now.  If you don't remember the exact number --

A.   I'm under oath.  I just don't remember the number.

Q.   Totally understandable.  It's sometimes difficult to recall these things.

Could you give us a range, an estimate?

A.   You know, I think, early on, it was relatively infrequent. We did meet once in person in Boston.  I just don't have a number.  I'm sorry.

Q.   I think you had some regularly-scheduled calls with defense counsel with your team; right?

A.   They might be separate things, but yes, we did a, you know, particularly with my team, did a lot of Zoom.

Q.   As part of your keeping up to date with the case, defense counsel sent you their legal filings; right?

A.   I did review the indictment.  I don't recall -- I might have gotten the legal filings.  I don't recall.  I don't have a specific recollection of reading the defense file.  It's possible.  I do remember studying the indictment and then the superseding indictment.

Q.   You can't remember if defense counsel sent you their position papers, do you?

A.   I don't recall that.

Q.   We'll come back to that.

So over the course of the trial, defense counsel sent

MA3Cmil3                        Ferrell - Cross

you copies of the transcript every day; right?

A.   Yes.

Q.   And they included not just the testimony that the jury heard, but also the legal arguments amongst the lawyers; right?

A.   Yes.

Q.   So you were able to look at the arguments they're making in court, also?

A.   I skimmed over the sidebars, I just focused on the testimony, but the transcripts were complete transcripts.

Q.   So the team you've been working with, there are several people on that team; right?

A.   Yes.

Q.   And they've helped you prepare your testimony?

A.   Well, the testimony is mine, but I worked with them on various analyses that led to the testimony.

Q.   And you also spoke to defense counsel about the topics of your testimony; is that fair?

A.   Well, I was retained by defense counsel for economic analysis, that's fair.

Q.   But just specifically to my question, you spoke to defense counsel about the topics of your testimony before testifying; right?

A.   Yes.

Q.   That included talking about some of the topics of your questions and answers here today and on Friday; right?

A.  Yes.

Q.  And how many times have you gone through your testimony with defense counsel?

A.  Maybe three times, but in part.  So, really, just when I came down to New York.  So I would say -- I certainly had conversations before that were about my analyses and my opinions.  In terms of crafting the direct testimony, it's really based on the analyses and the opinions that I formed from that.  So I guess my answer to your question is I did the analyses, formed my opinions before I had any discussion of how to present it or what order to present it.

Q.  And when you were crafting your testimony, how many defense lawyers were present?

A.  Basically, it was two defense lawyers.

Q.  Did any of the defense lawyers take any notes?

A.  Not to my knowledge, no.

Q.  Did you take any notes?

A.  No.

Q.  And I think you said on direct examination, you billed 412 hours on this case up to the beginning of last week; is that right?

A.  Up until Monday.

Q.  Got it.  And so it doesn't count, whatever time from last week?

A.  Fair.

MA3Cmil3                         Ferrell - Cross

Q.   And you're also being -- I think you said your billing rate applies to your actual testimony; right?

A.   Yes, I've been working on the matter, yes.

Q.   So if I keep my cross short, I'll maybe save defense team a little bit of money; right?

A.   It's up to you.

Q.   Your billing rate is $1,250 an hour; right?

A.   Yes.

Q.   And I think you've testified that you've billed about half a million on this case to date; right?

A.   Over a year plus, yes.

Q.   Actually, just to clarify, because I guess we haven't -- this last week, you've billed or you've been paid for half a million?

A.   Both.  So I billed 412 hours up to Monday and I've been paid that amount.

Q.   You've been paid for the 412, but you haven't been paid yet for the little remainder?

A.   Yeah, I haven't -- I haven't invoiced it, no.  Since Monday, to be --

Q.   Got it.  And I think you also just testified, to clarify, this morning that you got a cut of the money that is being paid to the firm, which you said was about $75,000; is that right?

A.   76.

Q.   Thank you.  Do you know how much, in total, your team has

billed on this matter?

A.   I do not.

Q.   By the way, have you been paid that $75,000?

A.   76.

Q.   76.  Sorry.

A.   Yes.

Q.   You've been paid in full for the roughly $500,000 for the 412 hours, and you've been paid in full the $76,000, which is sort of your cut of the consulting?

A.   Yes, that's my understanding, yes.

Q.   Now, in addition to this case, you've testified or appeared for a deposition I think you said like 70 or 80 times?

A.   Over the -- I guess I'm getting older.  Close to the 20 years I've been doing this, yes.  That's not an exact count, so I don't -- I'm under oath, so 70 to 80 times, you know, over those years.

Q.   Nobody's going to hold you to this specific number.  I think you were actually handicapped a little bit because I imagine, during the pandemic, those numbers went down a little bit; right?

A.   I think people are more comfortable with Zoom now.

Q.   So in most of those cases, you testified or did work for the defendant; right?

A.   That's fair.

Q.   And I think you said you did one case for the government;

right?

A.   That's correct.

Q.   For the U.S. Attorney's Office?

A.   That's correct.

Q.   And your testimony in that case was about the features of what SEC filing requirements are; right?

MR. BONDI:   Objection.

THE COURT:   Overruled.

A.   I haven't reviewed that testimony, but that's consistent with my memory.

Q.   You didn't present an event study as part of your testimony in that case; right?

A.   That's correct.

Q.   And many of the cases you work on, depositions or trial testimony, you do event studies for the defendants; right?

A.   Yes.  So, you know, obviously, if I'm retained by the defense, that would be an event study in that connection, but whatever the party is, whether it's the plaintiff or the defense or the government, yes, it's often an event study, that's true.

Q.   Thank you.  So, in most of the however many, 70, 80 cases that you do an event study, you --

MR. ROOS:   Withdrawn.  Let me restart the question.

Q.   You can't remember the number, we're talking about roughly 70 to 80 cases; right?

A.   In terms of testimony including depositions over the close to 20 years I've been do this, yeah.

Q.   What percentage do you think are events involved an event study?

A.   A majority, not all, but a majority.  I do some valuation work and some other type of economic analysis, but I think it's fair to say majority.

Q.   And most of those cases are for defendants; right?

A.   Civil defendants, yes.

Q.   And your opinion is, typically, that the statement by the civil defendant in those cases did not impact the stock price; right?

A.   No.  I mean, sometimes it does, sometimes it doesn't.  It certainly can be the case that it doesn't, but certainly cases where it has.

Q.   Which cases for the defendant did you testify that, actually, the statement at issue did affect the stock price significantly?

A.   Sure.  So the example would be that I did a damages to Bank of America or Merrill Lynch, and I did an event study there where I found stock price effects.  I was an expert in household litigation, so this was a very large securities litigation, and I estimated damages from the alleged misconduct in that matter.  So that would be two examples that come to mind.

Q.  Both those examples, though, relate to damage calculation; right?

A.  Yes, most of the time that I do event study analysis, it's about the quantum of loss associated with a disclosure.

Q.  Now, how much income have you made from all of your consulting work, your expert work over the last 20 years?

         MR. BONDI:  Objection.

         THE COURT:  Overruled.

A.  I don't know that number.  I would say, historically, about 80 percent, not including investment income.  So I would say about 80 percent of my income, historically, is from consulting.  That number would be less if you include investment income.

Q.  So let's say over, take the last four years, I think your CV lists the last four years of your testimony.  Over the last four years, how much money did you make from expert or consulting income?

A.  About 80 percent of my total income.

Q.  So what would that be?

A.  I guess it would probably be one million, 1.2, but I want to be clear on the record that that varies a lot.

Q.  So like $1 million a year, we'll take the more conservative number, a million.

         Let me ask you, if ten percent of that money, so let's say $100,000 dollars was taken from you, would that matter to

you?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I assume your question, taken from me, you mean stolen?

Q.  Stolen, or lost, you lost it.  I'm not trying to imply why it's no longer in your bank account, but for a reason, it was lost, we'll use that, it was lost, $100,000 was lost, would that matter to you?

A.  I'd be mad at myself at how I lost $100,000.

Q.  Let's the say it's not your fault.  It's not your fault, the money was lost as a result of some other reason, would that matter to you?

A.  Yes, I would be sad.

Q.  So the answer is yes?

A.  Yes.

Q.  And let's say if, on the other hand, I said you just got a 10-percent increase, so if it was $1 million, now it's $1,100,000, that would also matter to you; right?

A.  I'd be happy, I guess.

Q.  It's a significant amount of money, it would be significant to you; right?

A.  Yes.

Q.  If everyone in this room got 10 percent more money, so a 10-percent bonus, let's call it, would the 10-percent increase that you got still matter to you?

MR. BONDI:  Objection.

THE COURT:  Sustained.

A.  So are you saying --

MR. ROOS:  He sustained the objection, so I'll just ask a new question.

THE WITNESS:  I'm sorry.  Is there a pending question?

MR. ROOS:  There is no pending question.

THE WITNESS:  Okay.

Q.  If there was a 10-percent increase or decrease to the amount of money you made per year, that would be significant to you?

MR. BONDI:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  Yeah, I mean, it's a meaningful amount of money, sure.

Q.  So you spent a good part of your testimony talking about event studies, and I want to talk a little bit about that.

So I'm going to try to say back to you what I understand an event study to mean.  You should feel free to correct me.

You said the event study is an analysis to look at whether a stock price moved as a result of information about the company, the industry, the whole market, or sort of I think we've described it as background noise or random bouncing; is that right?

A.  Right, but technically, it decomposes the stock price

movement into market industry and a firm-specific price movement. That might be ascribable, it might be attributable to important new information about the company.

Q. And you use this phrase important information. I think you testified or I've seen the phrase value-relevant information. Is that the same thing?

A. If it's value-relevant information, the way I would use the phrase "value relevant" would be information the market considers important to the value. So value relevant information, if it's important enough, would elicit a firm-specific price reaction.

Q. Now, it's conceivable that information could be value-relevant information, but failed to elicit a sufficiently large price reaction to be detected statistically, given background noise and the stock price; correct?

MR. BONDI: Objection.

THE COURT: Overruled.

A. Yes, this is a matter of statistics, so you have what's called confidence intervals. So your level of confidence of what is what you're observing not due to random chance. Normally, you think about that at the 95-percent level. So, yes, there is a probabilistic analysis, and the standard that I use, which is consistent with the academic literature is 5 percent, but it is a matter of probability. Probabilistically is what you're observing ascribable to random

MA3Cmil3                        Ferrell - Cross

volatility.  It is a matter of statistics.

Q.  Based on financial principles, one could expect that information can be relevant to the market, even if there is no statistical evidence of a price impact?

A.  Again, it's a matter of probability.  So the statistics will tell you the probability that what you're observing in terms of the stock price movement is ascribable, is due to random volatility, and there will be a probability associated with that.

Q.  So let me just ask you the true or false.  You could expect the information as value relevant to the market even if there is no statistical evidence of price impact?

A.  Again, depends on your level of statistical significance. So whatever -- you choose a level of statistical significance for whatever confidence interval you want to have that confidence that what you're observing is not due to random chance, and that is a matter of probabilities.

Q.  So really, your analysis comes down to sort of a probability estimate?

A.  Yes, it's a matter of statistics.  Statistics is about probability.  I use the standard 95-percent confidence interval.  It is a statistical analysis.

Q.  Now, I think you testified on direct examination several times, I think I counted seven times that you used the phrase, "Event studies are the gold standard."  Did you say that?

MA3Cmil3                    Ferrell - Cross

A.   Yes.

Q.   And are you aware that the Second Circuit Court of Appeals has said that the event studies offer --

         MR. BONDI:   Objection.

         THE COURT:   Overruled.

         MR. BONDI:   May we approach, your Honor.

         THE COURT:   Sure.

         (Continued on next page)

(At sidebar)

MR. BONDI:  Your Honor will instruct the jury on the law.  We don't believe Mr. Roos instructing the jury on what the Second Circuit holds and what the Second Circuit doesn't hold here is not giving a legal opinion.  I'm not sure why we're getting into what the Second Circuit said.

MR. ROOS:  Here's what I'm going to say the Second Circuit said.

THE COURT:  OK.

MR. ROOS:  "Event studies offer the seductive promise of hard numbers and dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses."

He testified seven times that the event study is the gold standard, and so I think it's perfectly proper impeachment as to say:  Are you aware of a Second Circuit case, Court of Appeals case, where they criticized event studies?

THE COURT:  That's fine, and I'll tell the jury that I will instruct them on the law at the appropriate time.

MR. ROOS:  I'm not even quoting a legal portion of this.  It's the Second Circuit's commentary on the facts.

MR. CARUSO:  May we have that read again, please, Mr. Roos?

MR. BONDI:  May we see the cite too, please?

MR. ROOS:  *In Re Petrobras* -- I can get you the cite

when I'm sitting at my table.

MR. MUKASEY:  Ramos sitting by designation.

MR. ROOS:  Yeah, that would be great, trust me.

THE COURT:  That may have been my case.

MR. ROOS:  From the district court?

THE COURT:  Yes.

MR. ROOS:  Well, that will be part of it.

MR. MUKASEY:  I don't mean to make light of it, but lecturing the jury on anything the Second Circuit said is by definition lecturing them on law, and that's just wildly improper.

MR. BONDI:  Exactly.  This is a legal opinion.  To be clear, he said the gold standard for economists.  This is what -- maybe the gold standard for the Second Circuit in law is different.

MR. MUKASEY:  What's --

MR. BONDI:  Analysis he's performing as an economist.

MR. MUKASEY:  And what's he going to argue in summation, that a higher court said that what Ferrell is talking about is not worthy?  That's not a proper argument.

MR. ROOS:  No, I think -- I think the argument is going to be this guy got on here, said these things are, you know, the best things since sliced bread, and there's a disagreement about that that exists in the legal world and academia.  And, you know, he didn't acknowledge it or he

acknowledges that.

MR. MUKASEY:  But a little disagreement is improper to bring into a factual trial.

MR. ROOS:  The quote I'm going to ask is not about the law.

MR. BONDI:  It's a legal opinion.

MR. CARUSO:  He just read it.

MR. MUKASEY:  It's a legal opinion.

MR. ROOS:  It is on a legal principle.  It is a characterization of a type of study in that case.

MR. CARUSO:  But then what does the judge -- what can a judge say about characterizing a study?  The judge is either speaking on the law or he's speaking without knowledge.

MR. ROOS:  I think, at least I think, that judges are reputable legal minds.

MR. CARUSO:  Legal, legal.

MR. BONDI:  Legal, not --

MR. MUKASEY:  This is about facts.  You can cross-examine him about the facts.

MR. ROOS:  He is a legal mind testifying about facts.

MR. CARUSO:  OK.  But he's not testifying as a lawyer.

MR. BONDI:  He's not testifying about law.

THE COURT:  Without characterizing it as from the court, you can read him the quote and see what it says.

MR. CARUSO:  Can I just have it read, please, because

MA3HMil4                          Ferrell - Cross

I think the word seductive should come out under 403.

MR. ROOS:  "Event studies offer the seductive promise of hard numbers and dispassionate truth. . ."

MR. CARUSO:  OK.  That's inflammatory, and it's just some judge just trying to sound good.

MR. ROOS:  Three-judge panel.

MR. CARUSO:  It's a three-judge panel trying to sound erudite.

THE COURT:  It's not inflammatory.  You can use the word "seductive."

MR. ROOS:  OK.

(Continued on next page)

(In open court; jurors present)

BY MR. ROOS:

Q.  Professor Ferrell, are you aware that event studies have been called "the seductive promise of hard numbers and dispassionate truth" --

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I don't recall that.

Q.  I didn't finish.  I'm sorry.  I didn't finish the question because of the objection.  I'm going to try again.  OK.  All right.

Are you aware that event studies -- event studies have been called "the seductive promise of hard numbers and dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses"?

MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I don't remember that exact language, but if you want to show me the article or opinion, I'll be happy to take a look.

Q.  Certainly.

Can we please show the witness what's been marked as AFX5025 at page 17.  Let's actually let him see the first page.

A.  I do see the first page.

MR. ROOS:  OK.  Now let's go to page 17, please, Ms. Wolfson.

A.   May I see -- I'm just curious who the judge is.

Q.   Let's go to page 2.

A.   Thank you, just to get the full context.

          Could we go to the next page.  OK.  Thank you.  I'll be happy to take a look at the language.

Q.   OK.  Thank you.

A.   Could you just give me one moment to take a look?

Q.   Certainly.

A.   I know -- I think I'm thanked in the paper that they cite. So I'm well aware of this paper by Broge.  I think I was a commentator on the paper.

Q.   Got it.

A.   I'm happy to talk about this.  I mean, I just read the language, so --

Q.   Got it.  So the question that was pending was are you aware that the event studies have been criticized as "seductive promises of hard numbers and dispassionate truth, but methodological constraints limit their utility in context of single-firm analyses"?

          Are you aware of that criticism?

A.   I'm aware of that language now.

          MR. ROOS:  OK.  All right.  We can take that down.

Q.   You did a single-firm study here, right?

A.   Yes.

Q.   So that means that your event study only looked at one

company, right?

A.   The company at issue, yes.

Q.   All right.  By the way, you looked at Nikola stock for just a three-month period, right?

A.   Eighty-three trading days.

Q.   And usually an event study would use a larger sample size?

A.   I'm sorry.  Let me just be clear.  So there's 83 days I discussed in my direct testimony.  The calibration of the model, the time period that I used to calibrate the model, is 120 days.

Q.   OK.

A.   So it goes out, I believe, to November 20 for calibration of the model.  I then analyzed the 83 days that I discussed.

Q.   I think you testified on direct examination that there was a lot of volatility in this Nikola stock, right?

A.   Yes.

Q.   By the way, during that period there was a lot of volatility in the stock market generally, right?

A.   I do believe that March was COVID, so I think that was -- that was volatile.  But I want to be clear.  When I say the stock is volatile, I'm referring to the volatility in the residual, that is, the firm-specific volatility.

Q.   Got it.  My question is there was a lot of volatility in the stock market at that time, right?

A.   That might be true.  I don't have recollection.  The

volatility --

Q.   I understand.

A.   -- was for specific --

Q.   I understand.  The question was do you recall there was a lot of volatility in the stock market, and you said you're not sure, is that right?

A.   I don't -- I do remember March was COVID.  I do believe March 12 the market went way down.  I don't know offhand the volatility number for the market in this period.  The volatility I was referring to was residuals.

Q.   Got it.  In terms of the volatility in the stock market, we had the beginning of COVID, right?

A.   Yes.

Q.   We had lockdowns?

A.   We did.  I want to be clear that beginning --

Q.   Sir, just yes or no, we had lockdowns?

A.   We did.

Q.   Around 2020 is when the meme stock sort of frenzy began, right?

A.   Might be right.  But I want to be clear --

Q.   Sir, just yes or no.

A.   Yes.  But you're mentioning dates that are not in my calibration.

Q.   OK.  Got it.  Thank you.

Now, COVID, you'd agree with me that COVID and

MA3HMil4                    Ferrell - Cross

lockdowns continued into the summer of 2020?

          MR. BONDI:  Objection, your Honor.  May we approach?

          THE COURT:  OK.

          (Continued on next page)

(At sidebar)

MR. BONDI:  Your Honor, we've tried very hard on both sides, I think, to keep COVID out of this.  I've heard now two or three questions about COVID and lockdowns, and I'm not quite sure where Mr. Roos is going with that.  I thought it would be appropriate to have a sidebar to find out, because if you're getting into COVID and COVID-related issues, I think that's far afield of his testimony on direct, far afield of the testimony in this case.

THE COURT:  Does it have to do with the calibration of the model?

MR. ROOS:  Correct.  Just why, if there's a lot of market volatility, it calls into question the calibration of the model.  So my question's getting at COVID, lockdowns, share price effects, meme stocks, GameStop are all related to how one of the baseline assumptions, that is, the NASDAQ index, may be sort of off calibration.

MR. BONDI:  But he's asking about a period prior to the calibration, if I heard the testimony correctly.

MR. ROOS:  That's why I just asked did the COVID continue into June.

THE COURT:  Yes, I mean, as I think I indicated pretrial, the world is vaguely aware that there was a COVID pandemic and that there were a lot of effects, societal and otherwise.  We all lived through it.

MR. BONDI:  Sure.

THE COURT:  So I don't think it is the subject itself is so inherently prejudicial that it ought not be gotten into, and Mr. Roos indicated an appropriate purpose to discuss -- to try to impeach this particular witness.  He has testified about the volatility, or not, of this stock and other markets during this period of time.  It may well be that he should have -- I have no idea -- that he should have taken into account greater market volatility, but I don't know what he's going to say.  But I think it is not inappropriate and is appropriate for Mr. Roos to go into.

MR. ROOS:  Thank you.

(Continued on next page)

(In open court; jurors present)

BY MR. ROOS:

Q.  So you would agree with me from June to September 2020, COVID-19 existed?

A.  Yes.

Q.  And there were still lockdowns in place?

A.  Yes.

Q.  It was still having an effect on the economy?

A.  Yes.

Q.  The market went down during that period?

A.  I know it went down in March.  I don't remember offhand what it did from June to September.

Q.  So even though that's the basis for the control in your event study, you actually don't know what happened to the market?

A.  I don't recall offhand.  I do have the NASDAQ market from June 4 to September 30 in terms of estimating the beta on the stock, that's true.

THE COURT:  I'm sorry, professor.  Can I ask you to get closer to the microphone.

THE WITNESS:  I apologize.

THE COURT:  Thank you so much.

Q.  What steps did you take to adjust for unusual volatility in the NASDAQ stock market price during the period June to September 2020?

A.   Sure.   So what I did was I estimated the relationship statistically between the individual stock price and the market.   So the statistics will tell me whether there's a -- what's called a beta, whether there's a relationship statistically between the stock and the market, as well as the stock and the industry.   So -- and then you can kind of look at both of them together.   So the beta is being estimated, would tell you the relationship, as best you can, from the data, what that relationship is.

Q.   Thank you.   That's not really an answer to my question.

My question was for -- for the NASDAQ data, what steps did you take to make sure this data wasn't unusual because of market volatility?

A.   Well, the steps that I took is you take the NASDAQ data and you ask a question:   What is the relationship between the individual stock and the general market for that period and whether or not there was a relationship there in the data?

Q.   So your testimony is you just compared the NASDAQ data to the specific stock, Nikola, data?

A.   Well, no.   An event study is a regression model where you regress the individual stock on the NASDAQ market and on the industry, and then you'll observe the statistical relationship between the two.   So it's actually done in a very standard regression model.

Q.   All right.   Professor Ferrell, did you take -- undertake

any analyses to compare whether the NASDAQ stock price over that period was anomalous because of the movements that were going on in the market?

A. I don't know how you're defining anomalous. The question for the event study is what is the relationship for this period between the individual stock and the regression model and the general market? That's what I did.

Q. Just yes or no, did you take any steps to control for the volatility during the particular period you looked at and the market price?

A. Yes, through the regression model.

Q. True or false, the regression model does not -- does not look at whether the NASDAQ price during that period is anomalous compared to other times of the NASDAQ price, right?

A. I don't know how you're defining anomalous. The question is, is there a statistical relationship between the NASDAQ market and the individual stock --

Q. OK.

A. -- for this time period?

Q. Let me ask it this way: Did you compare the volatility in the NASDAQ price from June to September 2020 to the volatility in the NASDAQ price from June to September 2019?

A. June to September 2019?

Q. Yeah.

A. No, I did not do that.

Q.  Did you do any comparison of the June to September time period of 2020 to the June and September time period of 2021?

A.  I have no idea why that would be relevant, no.

Q.  So, sir, you took no steps to look at how the volatility in the market price during this period compared to other years with the same period?

A.  I did the event study from June 4 to September 30 in terms of my direct testimony, so --

Q.  Sir, it was a yes-or-no question.  Did you compare the June to September period for -- to any other year's June to September period?

A.  No, that's not how you do an event study.

Q.  I'm not asking about the event study.  I'm asking you did you compare the volatility in the -- in the general stock price of June to September 2020 to any other year to see if it was more volatile?

        MR. BONDI:  Objection, your Honor.  Asked and answered.

A.  No, it's irrelevant.

        MR. ROOS:  Move to strike the last part of the answer.

        THE COURT:  I didn't hear the last part of the answer.

        MR. ROOS:  He said --

        THE COURT:  Ask another question.

        MR. ROOS:  Thank you, your Honor.

BY MR. ROOS:

Q.  You'd agree with me that there were several days in your event study where there was a significant change in Nikola's stock price, but your analysis didn't find it to be statistically significant, right?

A.  Could you repeat the question.  I don't think I got the first part.

Q.  Sure.  It's not verbatim from my notes.  Probably a little different when I re-ask it.

But you'd agree with me that there were several days in your event study where there was a significant change in Nikola's stock price, but your analysis didn't find it to be statistically significant?

A.  I don't know what you mean by the word "significant" in your question.  So I would define significant as being statistically significant.

Q.  OK.  So I'm just saying there were a bunch of days where the stock price went up or down by 10 percent, but your analysis said it was not statistically significant, right?

A.  So it would depend on -- so the standard there is .074, I believe.  So, yes, it could be explained by random volatility, and that would be in the standard error.

Q.  All right.  So just to be clear, for instance, on June 9, 2020, the stock went up 11.74 percent, and you found that not to be statistically significant, correct?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

A.  I would have to take a look, but I think the answer to your question --

Q.  Just yes or no is fine.

A.  I would have to take a look.

Q.  OK.  Same question, June 11, 2020, 10.37 percent increase, and you found that not to be statistically significant, correct?

A.  In your question are you referring to the raw return?

Q.  I'm talking about -- I'm not talking about the abnormal return.  I'm just talking about, yeah, the raw return.

A.  Right.  So the raw return's going to reflect market and industry movements and random volatility.  So I don't think you can make an inference from the raw return.

Q.  I'm just asking you, true or false, the stock price went up those days by 10 percent or more, and your analysis found those to be not statistically significant?

A.  I would have to review those particular dates.  But, again, I would not look at the raw return.  I would look at the residual after you control for the market and industry.

Q.  OK.  Fine.  Let's look at an example.

September 21, 2020, the stock went down 19.33 percent, and your analysis found that not to be statistically significant, is that right?

A.  What date are you referring to?

Q.   September 21, 2020.

A.   That's right.  Again, the raw return, not looking at the residual, controlling for the market and industry.

Q.   So by that you mean the -- sort of the raw stock price dropped by 19 percent, but when you controlled -- when your study controlled for the industry and the market, you found it not to be statistically significant?

A.   That's partly right.

     So you look at the residual, not the raw return, because some of the return, up or down, is -- can be due to the market and industry.  So you're asserting raw returns, and, again, you want to look at residuals given that you want to control for the market and industry.  That's the whole point of the event study.

Q.   That's the point of the event study, but I'm just talking about just the raw number.  Someone went on Yahoo! Finance September 21, they would see a 19.3 percent stock drop, right?

A.   I don't have every day memorized in terms of percentage. That could be the case.

Q.   That's what raw return means, right?

A.   Yes.

Q.   So why don't we pull it up.  This is TM26.2AF000001.

     MR. BONDI:  Objection.  Has this been marked as an exhibit?

     MR. ROOS:  Just for the witness.

And can we go to page 8.

A.  I'm sorry.  Can I see the first page again?

Q.  Sure.

A.  Yes.  OK.

Q.  And let's go to page 8.

Ms. Wolfson, we're talking about September 21, so would you mind zooming in on that row for Professor Ferrell.

A.  I'm just taking time because I have to line up the numbers.

Q.  I understand.

If it's helpful for Professor Ferrell, maybe you can zoom in on the little header so he can --

A.  Yes, that's going to save some time.  Thank you.

Q.  Sorry about that.

A.  What's the question?

Q.  I'm going to have a few questions.  The first is does that refresh your recollection that the raw return for that day was a stock drop of 19.33 percent?

A.  That's correct.

Q.  And by "raw return," we mean, just like if you looked at -- without any type of statistically analysis, if you just looked at a stock price chart, you would see a stop drop of 19.33 percent?

A.  Correct.

Q.  And then the second part of your answer was when you did the event study, you found the abnormal return, is that right?

A.   Yes, or I also referred to it as residual, but it's referring to the same thing.

Q.   OK.

A.   So the residual is the difference between the actual or what we're referring to as the raw and the predicted, which is based on the market model.

Q.   And so the residual, am I reading this right, was 11.32 percent, is that right?

A.   Well, no.  Are you interested in --

Q.   I'm sorry.  I'm looking at the wrong column.  You're absolutely right.

It was 13.25 percent?

A.   That's the residual on that day, that's right.

Q.   And then the accompanying, what you've described as p-value, indicates that that is not -- that residual change is not statistically significant, is that right?

A.   Well, it's not statistically significant at the 5 percent level.  So the p-value, which is sort of the standard p-value used in the academic literature, would have to be below .05.

Q.   OK.

A.   So using that level of statistical significance, the residual is explainable by random volatility.

Q.   OK.  So just to sort of like put it together, just the raw stock change was a 19.33 percent decrease, and the amount attributable to something other than the market or the industry

was about 13 percent, right?

A.   That's the estimate.  But, again, then there's the standard error that's reflecting the random volatility in the stock price that generates the p-value.

Q.   Got it.  So your assessment of this is the reason for the -- for those price decreases, 13 or 19 depending on which number you use, is random volatility in the market?

A.   Well, it's a little more specific than that.  The null -- I'm testing a null hypothesis.  The null hypothesis is that -- I'm testing the hypothesis as to whether the residual that you observe -- what probability you would observe that randomly, assuming that it is an assumption of random volatility, and that generates the 6.3 percent p-value.

Q.   OK.  Are you aware that Nikola announced Trevor Milton's resignation on September 20, 2020?

A.   Yes.

Q.   That was a Sunday, right?

A.   That I don't remember.

Q.   Let's pull up 955.

A.   I believe that's right, actually, but it would be good to confirm.

Q.   OK.  Let's look at -- I don't know.  Let's pick one of these calendars, page 9.

         Do you see September 20 on here, a Sunday?

A.   Exactly, yeah.  So it's -- I'm sorry.  I didn't mean to

interrupt.  Yes.

Q.  So Nikola announces Trevor Milton's leaving the company on September 20, right, and the following day that we were just talking about is September 21, the Monday, right?

A.  Correct.

Q.  And that's the day where the raw stock price drop is 19 percent, right?

A.  Rounding, yes.

MR. ROOS:  OK.  We can take this down.

Q.  Now, you're aware in its SEC filings that Nikola stated that it was highly dependent on Trevor Milton, right?

A.  That -- I don't have a specific recollection, but happy to take your word for it.

Q.  You don't have to take my word for it.

Let's pull up Government Exhibit 318 and go to page 23, and can we zoom in on the top.

A.  Yes, I remember this.

Q.  OK.  Great.

We can take that down.

I think you said you reviewed analyst reports in preparation for your testimony, right?

A.  I did.

Q.  Are you aware that in one of the reports, one of your reports that you looked at, Wedbush -- which I think is an analyst, right?

A.   Yes.

Q.   Wedbush downgraded Nikola stock two days after this because the Nikola stock change with Trevor Milton gone and the recent questions surrounding the Nikola story will be a dark cloud over the Nikola stock?

          MR. BONDI:  Objection, your Honor.

          THE COURT:  Overruled.

A.   So that's September 23.  And, yes, that's one of the two reasons given in that report.  The other reason being concerns about Tesla's battery competition.  So you did cite part of the reason that they gave.

Q.   OK.  So, just to be clear, even though Trevor Milton resigned, the company said he was a key person, the stock price dropped 19 percent rounded, and the analyst said the stock dropped at least in part because of Trevor Milton leaving the company, you marked this day as not significant?

A.   That's right.  But there's others --

Q.   Just yes or no?

A.   -- commentary, too.

Q.   Just yes or no?

A.   Yes.

Q.   Just yes or no?

          THE COURT:  Professor Ferrell, you've answered the question.

          MR. ROOS:  Thank you.

A.   Not statistically significant.

Q.   And, in fact, on direct examination you testified "if the marketplace doesn't change, it's not important to the market consensus," right?

A.   That if information's important, it should move the stock price.

Q.   OK.  So then your testimony is that Trevor Milton wasn't even important to the stock price?

A.   I didn't say that.

Q.   All right.  While we're on this topic, isn't it true that you made four different versions of your model?

A.   I reported four different versions, that's correct.

Q.   All right.  I think they're labeled like Model 1, Model 2, Model 3, Model 4?

A.   That's correct.

Q.   And isn't it true that -- so you used Model 4, I think, right?  That's the one we were just looking at.

A.   I think it's Model 4.

Q.   Pink?

A.   The equally weighted industry control.

Q.   Thank you.

        So the first model, though, said the price change on the day after Trevor Milton's resignation was significant, right?

A.   I don't think that's accurate.  I think the two-day under

MA3HMil4                         Ferrell - Cross

the -- the two-day return, not the second-day, but the two-day,

as I remember, on the value weighted is statistically

significant.

         MR. ROOS:  Why don't we pull up 26.2AF0001 and go to

page 2.  Can we zoom in on September 21.

A.  Yeah, so it's under 5 percent, you're right.

Q.  So, just yes or no, is it true that under your first model,

the price change on the day after Trevor Milton's resignation

was significant?

A.  It is under 5 percent, yes.

Q.  All right.  You didn't use that version for your testimony

here today, right?

A.  That's correct, for good reason.

Q.  And let's actually stay on that exhibit -- on that

document.  It's not an exhibit.

         The second model you did said the price change on the

day after Trevor Milton's resignation was significant also,

right?

         Page 4, please.

A.  Yeah, could we blow it up?

         Yeah, so it's under 5 percent, that's correct.

Q.  All right.  And you did not use that version of the model

either, did you?

A.  Right.  So this is --

Q.  Just yes or no?

A.   I used the equally weighted, that's correct.

Q.   So you used a different version of the model?

A.   That's correct.

Q.   All right.  You picked a version of the analysis that showed the day as not significant?

A.   For good reason, yes.

Q.   All right.  Well, let's talk a little bit about the days where your model did find statistical significance.  OK?

A.   Sure.

Q.   The first date was June 8, 2020, right?

A.   Yes.

Q.   And on that day there was a 103 percent increase in Nikola share price, right?

A.   That sounds right, yes.

Q.   And the reason I think you said on direct examination that the stock went up 103 percent was because both the company and Trevor Milton tweeted that Nikola was going to start taking reservations for the Badger, right?

A.   That's a fair characterization.

Q.   OK.  Now, you said that once you have identified a day in which the stock prices move, the next step is to figure out why it moved, is that right?

A.   Yes.

Q.   And unlike the whole statistical analysis you did to figure out whether it moved, but why it moved is just you reading a

bunch of articles, right?

A.  Analyst reports, the total mix, there's no avoiding that.

Q.  Why don't you tell -- so for June 8, why don't you tell me what you reviewed for the total mix.

A.  For June 8 I looked at June 8 and 9 together.  I believe there was 56 articles, press articles, discussing Nikola, the company, over that time period.  So my memory is June 8 and 9 is that there was 56 financial press articles, if you will, discussing the stock in that time period.

Q.  And one of those articles you looked at was a Forbes.com, article, right?

A.  That, you'd have to refresh my recollection.

MR. ROOS:  Why don't went show Professor Ferrell TM26.2AF_001874.

A.  I'm having trouble reading it.  Can you make it a little bigger?

Q.  Sure.

A.  Yes, I see.

Q.  All right.  Some of these you can only see if you really zoom in.

A.  You really have to make it bigger.  Thank you for that.

Q.  All right.  Now, in this article, Trevor Milton is quoted as stating:  "A lot of analysts and a lot of investors didn't really expect the Badger to be out this fast," right?

A.  I just -- the screen just went blank.

Q.   OK.   We can put it back up.

A.   I'm sorry.   I didn't mean to interrupt.

Q.   He says in the article -- the article says:   "A lot of analysts and a lot of investors didn't really expect the Badger to be out this fast"?

A.   Yes, I see that language.

Q.   And that's attributed to Trevor Milton?

A.   Yes.

Q.   OK.   Now, you're aware -- we can take this down -- that Trevor Milton tweeted several times on June 7 and 8, right?

A.   Yes.

Q.   And you know from review of the trial transcript that one of the tweets was that people would see a "real operating truck," right?

A.   That's consistent with my memory.

Q.   And one of the tweets was it wouldn't be a fake show truck, right?

A.   That's consistent with my general memory.

Q.   Now, of all the -- of all the tweets, comments, statements about the Badger on June 7 and 8, you can't tell which specific statements caused the increase in the stock price?

A.   Well, my opinion, as I said on direct, is the market, this corpus, these financial press articles, were very focused on the Badger being open for reservations and that that was exciting news.

Q.   OK.  But event studies can only directly measure the price
impact of statements rather than the price impact of the aspect
of a statement that is false, right?

A.   I don't think I agree with either statement.  The event --
I don't agree with your characterization.

Q.   OK.  Why don't we pull up AFX5008.

        Professor Ferrell, did you author an article called
"Price Impact, Materiality, and Halliburton II"?

A.   Yes.

        MR. ROOS:  Can we go to page 12.

Q.   Yes or no, you wrote in there:  "Event studies can only
directly measure the price impact of statements rather than the
price impact of the aspect of a statement that is false"?

        MR. BONDI:  Objection, your Honor.  He's not reading
the whole thing.

        THE COURT:  Overruled.

A.   So this is a portion of my article.

Q.   Just yes or no?

A.   What was the question?

Q.   Did you write in your article:  "Event studies can only
directly measure the price impact of statements rather than the
price impact of the aspect of a statement that is false"?

A.   I agree with that, that the event study measures the firm
specific price component, yes.

        MR. ROOS:  Let's take that down.

Q.  Now, when you were asked about the Badger statement, you said you were not aware that, from your review of the trial testimony, the -- Trevor Milton's announcement of taking Badger reservations was a false statement, a statement at issue, is that right?

A.  Yeah.  I mean, I don't want to be here representing the government in the case.  All I can say is that statement was very exciting news in the market, that is, the Badger is open for reservations.

Q.  Now, from your review of the trial testimony, do you recall that Michael Erickson, the project manager on the Badger program, wrote in a June 7 text message after Trevor Milton tweeted this announcement:  "Trevor doesn't let facts or details get in the way of a good story"?

Did you see that?

MR. BONDI:  Objection, your Honor.  Mischaracterizes the evidence.

THE COURT:  Overruled.

A.  I would have to review to refresh my recollection.

MR. ROOS:  Put up Government Exhibit 25, line 12. It's in evidence.  Actually, let's go to the first page.  Let's zoom in on the line 2.

Q.  This is that June 7 announcement, right?

A.  Yes.

Q.  And let's go to line 12.

MA3HMil4                        Ferrell - Cross

And, Professor Ferrell, could you read the text in line 12 from Michael Erickson.

A.  You want me to read the text itself?

Q.  Yeah, just read the text message.

A.  "I know . . . haha Trevor doesn't let facts or details get in the way of a good story."

Q.  Thank you.

MR. BONDI:  Objection, your Honor.  May we approach on this one?

THE COURT:  Sure.

(Continued on next page)

(At sidebar)

MR. BONDI:  Your Honor, we don't think this is proper impeachment.  It's talking about what a text message of someone said out of context.  That witness has not testified.  That person has not testified.  And what some guy says in a text message is not appropriate impeachment for this witness testifying on direct.

MR. ROOS:  So on direct examination the witness said, based on his review of the trial transcript and his understanding of what's at issue in the case, he didn't understand the Badger reservation June 7, June 8 announcement to be a fact at issue.  I'm showing him what's going to be the first of a few parts of the trial transcript, things that are in evidence, where either the witness or the exhibit show the opposite to impeach him.

MR. BONDI:  This text has nothing to do with the reservations.  He makes a general statement disparaging of Mr. Milton.  It doesn't say anything about the reservations not opening.  And, your Honor, as a matter of fact, the reservations did open.  They did open on June 29.  That's the point.  That's not in dispute.

Are you disputing the fact the reservations open, Mr. Roos?

MR. ROOS:  That's not the point, because the point is he said what drove the price was, the 103 percent increase in

the price, the announcement made by Trevor Milton and the company. The second message on that thread is the announcement. It is a reaction to that that Michael Erickson said is responding to a statement that the witness could interpret as this is a false statement. So it's certainly permissible to cross-examine him about that since it's already in evidence.

MR. CARUSO: But how could that possibly impeach this witness that some third person said something to some fourth person? It can't impeach this witness.

MR. BONDI: Your Honor, the testimony was the stock increased on the announcement of the opening of the Badger reservations. This is not in dispute. The reservations opened on June 29. These tweets have nothing to do with the reservations. There's no discussion about reservations or anything else. They're just trying to disparage Trevor with a third and fourth party saying -- we don't know what that third and fourth party was referring to. He doesn't say anything about the reservations here.

THE COURT: I think the point is, and Mr. Roos will correct me if I'm wrong, that this witness testified several times that, in preparation for his testimony here, he reviewed the trial testimony up until the day before he got on the stand. There's been substantial testimony about the rollout of the Badger. I think he's going to ask him whether or not he

considered these text messages and whether he believed them to be significant or important or not, but --

MR. BONDI: Considering them is one thing, your Honor. That's not what the line of questions is starting to go down. It's a "don't you see he's saying that that's a misstatement?" That's not what this person's saying in the text message, and the government has not contended for once that the reservations opening was a misstatement. Reservations did open on June 29. That's not a fact in dispute.

MR. ROOS: We're not alleging that reservations did or did not open on June 29. The point is that several witnesses and the documentary evidence indicate that these statements associated with the June 7 either expressly or implicitly were false. There's Brendan Babiarz testified about this, and the text message that I'm going through also establish that. And so it's totally permissible to test the witness' characterization that these weren't -- nothing about these days was false with --

MR. CARUSO: But I don't think the witness characterized it that way on direct. What he said was, if I remember the direct correctly, all the witness said was that the public announcement of the opening of reservations had whatever effect it had on the market. He didn't say anything about the truth or falsity of underlying representations, other than that -- they're open for reservations.

THE COURT:  But I think the point of it, again, is did you consider this, why or why not, period, and it's in evidence.  So he's allowed to challenge the basis for the expert's opinion and to press him on whether or not he considered certain information which is plainly before the jury.

MR. BONDI:  But the characterization, I think, of what Mr. Erickson was saying is inappropriate.  Asking whether he was aware of these texts and all that stuff and what he reviewed and everything, I understand, your Honor, but what I'm -- what's problematic is trying to characterize that Mr. Erickson was suggesting that the statement about the reservations opening was false.  That's not correct.  That's not what Erickson is doing or saying, and that's not in evidence.

THE COURT:  The objection is overruled.  I didn't see a characterization.  You made the objection.

MR. BONDI:  I jumped maybe too quick, but I think that's where he was going.

MR. CARUSO:  It says, "Trevor never let's the facts get in the way of a story."  If that's not a characterization, I don't know what is.

THE COURT:  That statement is in evidence, and the witness can be examined about it.

MR. CARUSO:  OK.  (Continued on next page)

(In open court; jurors present)

THE COURT:  You may proceed.

BY MR. ROOS:

Q.  Professor, in your characterization of what caused the price increase on June 8, did you consider the trial testimony of Brendan Babiarz.  The lead designer on the Badger?

A.  I did review all the transcripts, so to that extent, yes.

Q.  Are you aware that in reference to the June 7 announcement, from your review of the transcript, that the Brendan Babiarz wrote:  The Badger announcement is the false statement that would make people want to pump in?

A.  I did review the trial transcript.

Q.  So you saw that?

A.  That's consistent with my general memory.

MR. ROOS:  Why don't we put it up, Government Exhibit 27.  Can we go to line 9.

Q.  You see here it says:  "But, like, the Badger announcement is the false statement that would make people want to pump in"?

A.  Yes, I'm reading that.

MR. ROOS:  OK.  We can take that down.

Q.  And you also know from your review of the trial transcript that there was a text message exchange between Matt Peterson, who was the personal assistant to Trevor Milton, and Mark Russell.  Did you review that as part of your review of the trial testimony?

A.   You would have to refresh my recollection.

MR. ROOS:   Why do don't we put up Government Exhibit 29, line 6.

Q.   Do you remember seeing the trial transcript relating to the statement by Matt Peterson that this is setting up for a massive dive, one for the history books?

A.   It does refresh my recollection.

Q.   OK.   Thank you.

Now, your opinion that the June 8 change in the stock price was just because of the Badger reservation announcement didn't take into account any of these statements, right?

A.   I mean, I view -- what the market reacts to is public statements, so that's what I base my conclusion on.

Q.   Right.   So you just looked at the news articles; you did not look at these text messages?

A.   I reviewed the trial transcript, but it is correct to say that I looked at the total mix of public information for what the market was focused on.

MR. ROOS:   Your Honor, I'm about to switch topics.   I could start or I could --

THE COURT:   No, it's just about 12:50, ladies and gentlemen, so we'll take our second break.   It will be 20 minutes.   Please be prepared to come out at ten minutes after the hour.   Do not discuss the case or any of the parties.

(Continued next page)

(Jury not present)

THE COURT:  Professor Ferrell, you may step down.

(Witness temporarily excused)

THE COURT:  Anything to raise, Mr. Roos?

MR. ROOS:  No, your Honor.

THE COURT:  Mr. Bondi?  Mukasey?

MR. BONDI:  No, your Honor.

THE COURT:  OK.  Twenty minutes.  Don't be late.

(Recess)

(Continued next page)

MA3Cmil5                          Ferrell - Cross

(Jury present)

THE COURT:  Mr. Roos.

MR. ROOS:  Thank you, your Honor.

BY MR. ROOS:

Q.  Professor Ferrell, we were talking about, statistically, days that your study found were statistically significant.  Do you remember that?

A.  Yes.

Q.  I think you said there were five days in total that were positive statistically significant?

A.  Yes.

Q.  Let's talk about one more.

You found that September 8th was statistically significant increase in the stock price; right?

A.  Yes.

Q.  And Nikola's stock, the raw return on a day, went up 40.79 percent; right?

A.  That sound right.

Q.  And your assessment was it went up because of the GM news; right?

A.  Yes.

Q.  And specifically, that GM was going to manufacture the Badger pickup truck?

A.  I would characterize it as the GM deal, yes.

Q.  Now, from your review of the trial transcript, you know

that on September 8th, Trevor Milton tweeted that the Badger truck would be Nikola's design, technology, and DNA; right?

A.   That's consistent with my general memory.

Q.   So you also then must have read the trial transcript of Scott Damman, the GM engineer, that that statement was false, that it was all GM?

MR. BONDI:   Objection.

THE COURT:   Overruled.

A.   You would have to refresh my recollection.  I don't remember either way.

MR. ROOS:   Could we bring up transcript 1504, just for the witness, and highlight line 4 down to the next page, 1501. We're actually going to page 1504 of the actual transcript.  So why don't we zoom in on page 1504, lines 4 to the bottom.

Q.   Just let me know when you're done reading that.

A.   I'm almost done.  Okay.  I've finished.

MR. ROOS:   Actually, it continues to the next page, just to the first line.

Q.   Do you see that first line on page 1505?

A.   Yes, I do.

Q.   So now to return to my question.  Do you know, from your review of the trial testimony of Scott Damman, that he said it was going to be no Nikola tech; right?

A.   I just saw that in the transcript.

Q.   Assuming from your review of the transcript that you know

that, also on September 8th, Trevor Milton Tweeted that the Badger would include Nikola's infotainment, controls, design, interior, cab, phone apps, and controls.  Do you remember reading that?

A.   That's consistent with my general memory.

Q.   And you know from your review of the trial testimony that Scott Damman, the GM engineer, said that was not true, as well?

A.   I believe you might have just showed me the transcript on that.

Q.   Let's look at the same page, 1505, lines 12, through 1506, line 9.

A.   I reviewed it.

Q.   And so, from your review of the transcript, you know that Scott Damman said that that was not accurate, none of those parts were coming from Nikola?

         MR. BONDI:  Objection, your Honor.

         THE COURT:  Overruled.

A.   I saw the bottom of that transcript where he was disagreeing.

Q.   Now from your review of the trial transcript, you know that also on September 8th, Trevor Milton tweeted, "We built the Badger from the ground up"?

A.   That is consistent with my general memory.

Q.   Do you recall the testimony of Brendan Babiarz and Scott Damman that Nikola was not building the truck from the ground

MA3Cmil5                              Ferrell - Cross

up?

A.   That's consistent with my general memory.  Although, again, I'm not a fact witness, but it's consistent with my general memory of my reading of the transcript.

Q.   And you know from your reading of the transcript, on September 8th, Milton also went on Bloomberg and said, quote, here's the important thing to know, we've already built the Badger from the ground up ourselves, so everything in it is owned by Nikola.

Do you remember that?

A.   I don't remember the -- that statement is consistent with my general memory.

Q.   And you know from reading the trial transcript that both Brendan Babiarz and Scott Damman said that was not accurate?

A.   I believe that's accurate based on my memory of the transcript, but again, I'm not a fact witness.

Q.   Now, in addition to all of that, you read the trial testimony of Kim Brady, the CFO who said that, quote, likely moving forward with the introduction of the Badger will create significant loss for Nikola and create significant issues for the company from a financial standpoint.

Do you remember reading that?

A.   Yes, I do remember him disagreeing with the business decision.  To my memory, again, I'm not a fact witness, but that's my memory of the transcript.

Q.   And you say memory of a disagreement.  That was not something that was publicly disclosed, right, that was just like an internal disagreement?

A.   To my knowledge.

Q.   So we just went through, I think you said, just to count them, we went through four -- one, two, three, four different public statements by Trevor Milton that, based on your review of the transcript, you recall that people said were not accurate?

A.   Again, I'm not a fact witness, but that's my general memory of the transcript sitting here, you know, having read it once.

Q.   And those were all about the Badger and the GM deal; right?

MR. BONDI:  Objection, your Honor.

THE COURT:  Overruled.

MR. BONDI:  Mischaracterizes.

Q.   And all those statements were on the day you found there was statistically significant increase on the price; right?

A.   I don't have a memory of all the -- it could be, but I would have to review it to refresh my recollection.

Q.   Why don't we do that then just so we're sure.

MR. ROOS:  Why don't we pull up Government Exhibit 557.

Q.   And that's September 8th.

A.   It is.

MR. ROOS:  And let's pull up Government Exhibit 558.

Q.  And that's September 8th; right?

A.  I agree.

MR. ROOS:  And let's pull up Government Exhibit 559.

Q.  And that's September 8th; right?

A.  I agree.

MR. ROOS:  Let's pull up Government Exhibit 429-T.

Q.  And that's September 8th, as well, isn't it?

A.  Yes.

Q.  So let me ask you again, those four statements that witnesses said were not accurate, they all occurred on the day that you said there was a statistically significant price increase?

A.  I agree the timestamps to this are September 8th and it is a statistically significant day.

Q.  Let's change topics.

You testified on direct examination that your event study was focused on a single-day period; right?

A.  Well, I did one, two, and three days.

Q.  The event study you presented under examination was the one-day study; right?

A.  Right.  I did reference the two and three, but that is a fair statement.

Q.  And I think on Friday after Judge Ramos asked you a question, you described it as a close-to-close event study; is that right?

MA3Cmil5                         Ferrell - Cross

A.   Well, the event window is close to close if you're doing one day, yes.

Q.   What does that mean, the event window is close to close on one day?

A.   Let's say you're analyzing Tuesday, so you would look at the closing price Monday, 4 o'clock, you would look at the closing price on Tuesday, and that would be the price movement that you would be analyzing.

Q.   And you said on direct examination, quote, the stock price reacted quickly, it might be much shorter than a day, but you used a day; right?

A.   Yeah, there's academic literature on very well, large firms where it could be quicker.  But I feel here, a day, which is the standard window to use, is the appropriate window.

Q.   Using your example just now, the event study would look at the change from the closing price -- if we're looking at Tuesday, the closing price from closing price on Monday to the closing price on Tuesday; right?

A.   Yes.

Q.   And then you do the statistical analysis to see the change, whether the change over that 24-hour period is significant?

A.   Yes.

Q.   And it's possible, a lot of things could happen in a 24-hour period; right?

A.   Yes.

Q.   There could be like a stock drop for one reason followed by a stock drop for another reason; right?

A.   Yes.

Q.   And there could also be a stock increase for one reason followed by a stock increase for another reason; right?

A.   Yes.

Q.   And there could also be a stock increase for one reason followed by a stock decrease for another reason; right?

A.   Yes.

Q.   Or the reverse, stock decrease followed by stock increase?

A.   Yes.

Q.   And when there is multiple pieces of information that potentially, like an increase and an increase that come right after each other, those are sometimes called confounding events; right?

A.   Yes, so you could define -- I normally define confounding as, yes, simultaneous informational events.

Q.   Why don't you define for the jury what confounding event is.

A.   Well, it could be two pieces of information, both of which are important to the market that happen at the same time or just slows to the market at the same time, and you can label that a confounding event.

Q.   So on a day when there is both a disclosure of information and the presence of confounding information, the event study is

typically unable to separate price reaction attributable to the

disclosure from price reaction attributable to the confounding

information; right?

A.   The event study is going to look at the overall -- the net

impact for that day.

Q.   So just to be clear, the event study is unable to separate

the price reaction attributable to the disclosure from the

price reaction contributable to the confounding information;

right?

A.   If it's happening simultaneously and they're both value

relevant, yes.

Q.   So in a situation where you have confounding information or

countervailing news, a disclosure might not cause a

statistically significant price reaction, even though the

statement arguably might have a price impact associated with

it?

A.   If, in your hypo, they're both value relevant, meaning

important to the market.

Q.   Right.  Thank you.  When there are potentially confounding

events, it could be appropriate to do an intraday event study;

right?

A.   Yes, you can do an intraday.

Q.   Can you explain to the jury what the difference is between

an intraday event study and a close-to-close event study?

A.   So an intraday would be looking at, you know, a subperiod

of the day in terms of statistical significance.  Now, again, if you're going to use a period shorter than a day, the close to close, you have to have the view that the market is going to price that in the window that you're using.

Q.  Thank you.  And just to be clear, in this case, you did a close to close, not an intraday?

A.  Correct.

Q.  And examination of the intraday data allows one to disentangle the confounding effects of two events; right?

A.  If they're -- well, there is a couple pieces to your hypo. If they're separated in time and if the market is such that it's sufficient enough that it would price it in the chosen interval, I would agree with that statement.

Q.  So you've written a potential way to deal with confounding effects, a confounding effects problem is to use intraday data; right?

A.  With the predicates I just said, I agree with that.

Q.  Are you aware that several academic analyses have shown that intraday event studies detect significantly smaller price changes than daily event studies?

A.  I really depend on the data.  So my view would be it depends.

Q.  So let's look at your chart for June 17th and June 18th.

        MR. ROOS:  So can we see Defendant's Exhibit 955, slides 19 and 23.

MA3Cmil5                        Ferrell - Cross

Q.   And the bands on these charts reflect close-to-close

analyses; right?

A.   That's correct.

Q.   The data, though, that you have is intraday data; right?

A.   That's right.

Q.   And you'd agree with me that intraday has lower volatility,

so typically, there are narrower bands?

A.   There is a famous smile of volatility during the day.  So

the volatility changes based on time of day.  So, you know, it

really depends.  You could have changing volatility over the

course of the day.  So, it might be true, it might not be true.

          MR. ROOS:  Let's zoom in on the first slide, slide 19,

and can we zoom in right around the piece of the news.

          You can take down the second slide and just zoom in on

that one.  Let's zoom in right around the news.

Q.   So you'd agree with me that, just using the eye test, after

the event, there's like a fairly market drop in the stock

price?

A.   Well, again, there is a dip.  I would want to know exactly

the dollar number if I was going to call it a big change, but

again, you would want to analyze this statistically.

Q.   Actually, it's difficult to assess the dollar value from

your chart because it's so zoomed out; right?

A.   You would need to look at the data to get an exact number.

Q.   But you used a chart that has zero to $90 range; right?

A.  I would agree with that.

Q.  So if you were looking at the specific drop there, you might use a more zoomed-in range; right?

A.  You could zoom in, you could zoom out, depending on your, you know, what you want to look at.

Q.  Let's say you were doing an academic paper and you were looking at an intraday trade, you would look at a more zoomed-in range, wouldn't you?

A.  Not necessarily.  As I said in my direct, a standard event window typically is one day, although you could use longer or shorter, but the standard, in my experience, is a one-day.

Q.  But the range you picked was zero to $90, and my question is if you were doing academic research and looking at an intraday change, you would have used a smaller, zoomed-in range; rights?

A.  I think the graph is fine as it stands.

        MR. ROOS:  Can we show the witness AFX-5000.  Let's go to page 2.

Q.  Do you recognize this article?

A.  Yes.

Q.  Who authored it?

A.  Myself with a colleague.

        MR. ROOS:  Government offers AFX-5000 as a demonstrative only.

        THE COURT:  Very well.

(Government's Exhibit AFX-5000 received in evidence)

MR. ROOS:  Can we go to page 8.  It's on its side, could we rotate it.  I guess not.  Well, we can all maybe turn our heads.

Q.  Sir, this is an intraday share price of hypothetical firm ABC.

MR. ROOS:  There we go.  Ms. Wolfson is a master at this.

Q.  It's an intraday share price of ABC, and it's for a single day; right?

A.  Yes, close to close.

Q.  Close to close.  And it's for a paper you wrote; right?

A.  Yes.

Q.  And on this one, didn't use a zero to $26 rage, did you?

A.  It's from $18 to $26.

Q.  You picked a range that was right around the price movements for the intraday; right?

A.  It's a few dollars each way, yes.

Q.  All right.  And let's go to page 23.  This is another chart, right, and on this one, you picked, again, a range that's not zero to $70, but $70 to $45 or $45 to $70; right?

A.  Yes, I wanted to focus on the replacement of the officers.

Q.  Now, on these two charts, if you had made the ranges from zero to whatever the top number, the lines would get a little smaller; right?

A.   I think we can agree you can zoom in or zoom out.

Q.   Great.  So let's look at Government Exhibit 1004.  And you testified on direct examination, this isn't a statistical analysis, this is just the plain stock price over two days; right?

A.   Correct.

Q.   And so let's zoom in on the time that was on your chart that we were just looking at, let's zoom in around the time of the article, 3:29.  So from the first yellow dot to the second yellow dot.

Sir, on this chart, you can see that the stock, very quickly, drops from $67 to $62; right?

A.   I believe that's accurate.

Q.   Now, in analyzing these two days up on the chart, you just looked at the close-to-close; right?

A.   That's right, the standard one-day window.

Q.   Meaning you didn't do any intraday event study to see the significance of this movement right here; right?

A.   That's correct, I did a close-to-close event study.

Q.   Now, within the shorter period of time, let's zoom out of here, there is the first event is the news, and the second event listed on here is Mr. Milton's response to that news; right?

A.   I see that.

Q.   And he says the article's wrong, right, you looked at the

Tweets?

A.   That's consistent with my memory.

Q.   And he characterized it in the text message on the screen as share value went up after his response.  You see that, right?

A.   I do see that language.

Q.   So you would agree with me that after the initial announcement, Mr. Milton's response is confounding information; right?

A.   I'm sorry.  I'm not following.  Am I supposed to be looking at 6:08, 4:24?

Q.   My question is, so Bloomberg comes out and says the truck was exaggerated; right?

A.   Yes.

Q.   And Milton responds and says, you guys are liars; right?

A.   At 4:24, so it's not confounding because market closes at 4:00.

Q.   So your testimony is you don't consider these confounding because they come within an hour?

A.   No, you're misstating my testimony.  I'm saying in a one-day event when you're looking at close-to-close, close from 4:00 to close to 4:00.  So if I understand your question correctly, the 4:24 p.m. Tweet, Mr. Milton's response to Bloomberg article would be after the market closed.

Q.   And you did not review after-market data, yes or no?

MA3Cmil5                      Ferrell - Cross

A.  I do not use after-market date.

Q.  And the next day, you see the stock price goes up; right?

A.  Yes, over the course of the following day.  Again, the Bloomberg article on June 17th is before the market closes.  The Tweet that you're pointing to as confounding is actually after-market closing.  So it would be outside of that one-day event window.

Q.  But if you were to look at the change on June 18th and you have negative information followed by positive information, the effect may not be reflected in the June 18th stock price?

          MR. BONDI:  Objection, your Honor.

          THE COURT:  Overruled.

A.  I agree that information's value relevant and you're looking at the right window, it's long enough for the market to price it, which typically thought of as a day, under those conditions, I agree.

Q.  Speaking of value relevant, in connection with this event, you reviewed some financial news; right?

A.  I did.

Q.  Did you review a Dow Jones article?

A.  I reviewed many Dow Jones articles.

          MR. ROOS:  Let's show the witness, please, TM-262-AF-049653.

Q.  Professor Ferrell --

          MR. ROOS:  Why don't we zoom into his materials on the

highlighted part.

THE WITNESS:  Thank you.

Q.  By the way, that's you or your team's highlighting; right?

A.  I believe it is.  I'll just take a moment to take a quick look.

Q.  Sure.

A.  I've read it.

Q.  And so you read that the article said, shares went up more than 9 percent in Wednesday's session before sharp drop immediately after the article was published and the stock ended up 1.8 percent.  You read that; right?

A.  Yes, I did.

Q.  I'm going to change topics.

Your analysis, the primary analysis you presented did not look at dates before June 4th; right?

A.  The primary analysis, that's correct.

Q.  You did do another analysis and you looked at four dates before June 4th; right?

A.  I looked at six dates.  My understanding is there was two additional dates added late in the testimony.

Q.  When were those added?

A.  I don't remember.  I can tell you the dates, if that's helpful.

Q.  And when did you do that analysis?

A.  The four dates was a few days ago, I believe.

Q.   And the two additional dates, when were those added?

A.   So I believe it was late in the trial, those two additional dates.  I don't remember the exact date.

Q.   Did you send that information to defense counsel?

A.   I didn't -- I just did the calculation.

Q.   You just did the calculation.  Did you tell defense counsel about it?

A.   I said my understanding is there is six dates.

Q.   There are six dates.  Okay.

          MR. ROOS:  Your Honor, can we have a sidebar for a second?

          THE COURT:  Sure.

          (Continued on next page)

(At the sidebar)

THE COURT:  What are these dates?

MR. ROOS:  They did an analysis of dates pre-June, June 6th.  Sounds like they did it initially in the last two days.  Last night or maybe the day before, they gave us the analysis for four days.  It sounds like there are two more days that they didn't produce to us.  I frankly do not understand what's going on with the disclosure issues on this witness, but here we are again.

MR. BONDI:  Your, we produced almost 30,000 pages of information including databases, including we gave them even the subscription --

THE COURT:  Let's focus.  The two other days.

MR. BONDI:  Your Honor, my understanding is what he's referencing is after the close of the government's case, right before the close of the government's case, the government moved in some additional documents, if you remember.  I believe he's referencing two additional documents that the government moved in late in their case on Friday morning right before he took the stand.  My understanding is neither of those were statistically significant days.  It sounds like he did some work, Mr. Roos is able to examine him on that, but as I understand, there are documents that the government introduced into evidence, but there was no accompanying testimony concerning those documents, whether they were misstatements or

not.  So I think the bottom line is four times that the government has identified as misstatements, but there were two additional documents that were downward, but without accompanying testimony, these were late in the day.  It's a nonissue.

THE COURT:  Did he do some analysis with respect to those dates?

MR. BONDI:  It sounds like he did, your Honor, but as I understand, though, he's not considering them to be the statement days because --

THE COURT:  We're only talking about these disclosures.  So if he did analysis with respect to those other two days, he provided it to you, it should be turned over to the government.

MR. BONDI:  I don't know if he did provide it to us. It sounds like from his testimony, he didn't.  We'll check with him.  We can check with him, with your Honor's permission, and if he's done an analysis --

THE COURT:  Can you continue with the cross examination?

MR. ROOS:  No problem.

(Continued on next page)

MA3Cmil5                           Ferrell - Cross

                    (In open court)

BY MR. ROOS:

Q.  So picking up with the period before June 4th, you testified on direct examination the reason you gave for not looking at the period before, principally, was because Nikola wasn't publicly traded; is that right?

A.  No, I also said it was a merger and there is no guarantee that it was going to go through.

Q.  But you'd agree that, upon completion of the business accommodation, Nasdaq traded VTIQ stockholders would automatically become shareholders of Nikola publicly traded stock; right?

A.  That's my understanding pursuant to the merger agreement, that if the merger were to go through, there would be a conversion rate.

Q.  You would agree you could have bought VectoIQ and it would automatically convert to Nikola upon merger?

A.  If the merger happened, yes.

Q.  So you'd agree that if you have 100 shares in VectoIQ worth $30 per share, you'll still have 10 shares.  I'm sorry.  If you have 10 shares of VectoIQ worth $30 per share, you'll still have 10 shares worth $30 per share after the merger assuming stock prices don't change at that moment during the merger?

A.  So if the merger gets completed, that might be information to the market, but I agree, my understanding of the merger is

there is automatic conversion, assuming the merger happens.

Q.  So share value is transferred through the merger?

A.  I don't know what you mean by transferred through the merger.  The shares upon the merger happening, of which there's no guarantee, if the merger were to happen, which it did, there is an automatic conversion — my understanding of the merger agreement.

Q.  So you don't think it's right that if you have $100 worth of VectoIQ, then you'll have $100 worth of Nikola stock?

A.  Well, all I'm saying is that the merger being completed might, you know, is an event, the company going public is an event.  But I agree that if the merger happens, is consummated, then my understanding of the merger agreement is there is an automatic conversion that does happen.

Q.  Are you aware that Trevor, from your review of the trial testimony, that Trevor Milton was tweeting out if you have $100 worth of VectoIQ stock, then you'll have $100 worth of Nikola stock?

A.  I don't recall that specifically.

        MR. ROOS:  Let's put up Government Exhibit 591.

Q.  Professor Ferrell, would you read that for the jury.

A.  People, this is not that hard.  If you have $100 worth of VTIQ stock, then you'll have $100 worth of NKLA stock.

        MR. ROOS:  Thank you.  You can take that down.

Q.  Now, it's true that Trevor Milton made statements on

Twitter before June 4th; right?

A.  Yes.

Q.  And he also made statements on podcasts before June 4th; right?

A.  Yes.

Q.  And he made statements on television before June 4th; right?

A.  Yes.

Q.  And you just testified that you looked at only six dates before June 4th; right?

A.  Yes.

Q.  And all right.  Let me ask you if a statement simply repeats information already known to the market, it would not affect its stock price?

A.  I agree with that, if it's exactly the same information, has the same informational content, including the context, I agree with your hypothetical.

Q.  Well, if a statement is just confirming, I think you said exact language, if a statement is confirming something that's already been said, has already been digested by the market, it will not cause a change in the stock price; right?

A.  I agree with that.  In order for information -- it has to be new information that is unanticipated in some way, I agree with that.

Q.  What's a confirmatory misrepresentation?

A.  So, I mean, you know, you could label that as a misstatement.  Let's say it's done on Monday and all you do is confirm the misstatement and there's no other information that the market infers from that, so the market doesn't update, doesn't change its view, doesn't view the context as different, in that hypothetical, you would not expect a price reaction.

Q.  So a lack of a change in the stock price at the time of the misrepresentation does not rule out a potential price impact associated with the misrepresentation; right?

A.  Are you assuming your hypothetical confirmatory?

Q.  Yes.

A.  I agree with that.

Q.  Let me ask you for another definition.  What's price maintenance?

A.  Price maintenance is, I think it's really -- you can think about it as a version, what we were just talking about --

THE COURT:  I'm sorry, professor.  Can you get closer to the microphone.

THE WITNESS:  I apologize.

A.  So you can think about that as a version of what we were just discussing.  It could be a misstatement, it could be a truth.  Let's say it's a statement, whether it's a misstatement or not -- let's assume a misstatement at a certain time, period of time -- a certain moment in time, I should say.  If you simply confirm that misstatement -- again, the market doesn't

view it any differently, the context isn't different, so the informational content is the same, then that could be a price maintenance theory.  That is to say, you're just confirming an earlier misrepresentation that might, in this hypothetical, have value relevance, had been priced and now the market is just confirming what it already believed.

So, again, I think this idea of confirmatory, you know, you can put it into the language of price maintenance.

Q.  Thank you.  I want to talk about some of your slides.

MR. ROOS:  Let's look at Defendant's Exhibit 955, page 21.

Q.  So this is a slide --

MR. ROOS:  Looking for the one for June 4th.  Great.

Q.  So this is a slide that relates to an event on June 4th; right?

A.  Yes.

Q.  And the event that you've got called out there is an interview, correct, on Yahoo Finance?

A.  Yes.

Q.  And the statement at issue, the false statement at issue in the interview is about the costs of producing hydrogen; correct?

A.  That's consistent with my general recollection.

Q.  Now, let's look at the next slide, page 22.  This is an interview on June -- the interview was on June 11th, After

Hours, and your slide is for June 12th; right?

A.  Yes, with the June 11th closing price, but yes.

Q.  So the at-issue statement is about the cost of producing hydrogen; correct?

A.  At that level of generality, it's consistent with my memory.

Q.  Now let's look at the slide on page 24.  This is June 19th, an interview on June 19th; correct?

A.  Yes.

Q.  And the false statement at issue is producing hydrogen; correct?

A.  I believe, you know, I believe that's correct.  I would have to doublecheck with that, but that is consistent with my memory at that level of generality with the nature of the particular statement at issue.

Q.  Let's look at the slide on page 26.  There is a bunch of information here, but it includes a June 29th Tweet; right?

A.  Yes, it does.

Q.  And the false statement at issue in the Tweet is about the cost of producing hydrogen; right?

A.  The alleged false statement.  I'm not here to opine on falsity.  I'm not a fact witness.

Q.  Of course.  Now, let's go to slide 28.  And this is an interview from July 14th; right?

A.  It is.

Q.   And the statement at issue, the alleged false statement is about producing hydrogen; correct?

A.   At that level of generality, that's consistent with my memory.

Q.   Why don't we just look at it.

          MR. ROOS:   Could we see Government Exhibit 421-T, page 3, lines 9 to 17.

Q.   Do you see where he says, we produce hydrogen 24 hours a day?

A.   I do see that.

Q.   Do you see where he says, we're under $4 right now a kilogram for hydrogen?

A.   I do see that.

Q.   All the other statements we looked at were either about we produce hydrogen or we produce it for under $4 a kilogram?

A.   I don't feel comfortable testifying -- you're working off my memory and I know that -- so I don't want to mock up the record with my memory.  So I would want to go back and make sure that it's being accurately characterized.

Q.   That sounds right to you, you just would want to confirm?

A.   At the level of -- that level of generality, yes, there are statements about hydrogen, how it's said, the context, this is obviously part of a, you know, a larger interview or sometimes podcast, which is -- and we're looking at a particular statement within a --

Q.  Right.  But this particular statement, we produce hydrogen, we are doing it for under $4 appears -- one or both of those appears in every single one of the interviews or Tweets we just looked at?

A.  That could well -- that could be true, I just -- so I'm not fighting you on that, but there are other statements about hydrogen, yes.

Q.  Now, let's look at the next slide, slide 29.  This at-issue statement is also about producing hydrogen; right?

A.  That's consistent with my general memory, but, obviously, the record speaks for itself.

Q.  Now let's look at slide 31.  This is August 14th.  And the false statement alleged in this Tweet is about the cost of producing hydrogen; right?

A.  It does reference $4 a kilogram.

Q.  Very similar.  We currently make our green H2 for under $4 a kilogram.  Right?

A.  I agree that's what it says.

Q.  Do you agree with me that when a statement simply repeats information already known to the market, it's unlikely to affect the stock price; correct?

A.  If the informational content is the same, it would not affect the stock price.  If the context is different or the market updates because of different timing, then no, but I agree that the informational content is the same, then I agree.

Q.  So let's look at Government Exhibit 1007.  It's a timeline in evidence.  You see it says statements about hydrogen, January 2020 to September 2020?

A.  I do.

          MR. ROOS:  Ms. Wolfson, could we circle the box for June 4th, Yahoo Finance.

Q.  This was the first slide that we looked at just now; right?

A.  I remember that.

Q.  You'd agree with me, though, that on January, 23rd, before that first statement, Mr. Milton tweeted about the cost of hydrogen?

A.  It says -- yes, I'm looking at that second sentence.

Q.  He says, our costs are below $3 per kilogram; right?

A.  I agree it says that.

Q.  So you'd agree with me that on January 23rd, he had already said our costs are below $4 a kilogram because he's saying they're below 3; right?

A.  I agree it says that our costs are below $3 a kilogram.

Q.  You would agree with me January 23rd is before June 4th; right?

A.  Yes, I do.

Q.  And on January 24th, you'd agree with me that there's also a Tweet by the company, our cost is $3 per kilogram for green H2; right?

A.  I agree it says that.

Q.   And you'd agree that that's before all of the dates of the slides you looked at?

A.   It is before June 4th.

Q.   And it's before all the other dates we just talked about; right?

A.   Yes.

Q.   Those are all in June, July, and August; right?

A.   The dates we just discussed a moment ago.

Q.   Do you see on March 5th, there's another Tweet.  It actually took four years to figure out massproduction design. It only took eight months to install and permit, which was three times faster than anyone in the world.  Now mass production is ready to plug and play.  Might want to look good, not negative.

         Do you see that?

A.   I do.

Q.   And you see that there's also a podcast on March 12th, 2020 that says that is about hydrogen; right?

A.   That, you would have -- that's consistent with my general memory.  I'm just hesitating because I don't want to -- the record speaks for itself.  That's consistent with my memory.

Q.   By the way, the event study you ran for those six dates, the one you ran for March 12th found it was statistically significant; right?

A.   Yes.

MA3Cmil5                         Ferrell - Cross

Q.   Now, do you see there is a box for the day before the Yahoo Finance, June 3rd?

A.   Yes.

Q.   That's the Tesla Daily podcast; right?

A.   Yes.

Q.   And that also related to hydrogen; right?

A.   I would need to refresh my recollection.

Q.   Okay.  So Mr. Milton had already made statements about producing hydrogen and at under $4 a kilogram before June 4th; right?

A.   Yes.

Q.   And you'd agree that simply repeating information already known to the market would be unlikely to result in a stock price change in an event study?

A.   If the context is the same and the market doesn't view the timing temporal difference as important, I would agree with that.  If the informational content, including the context of the podcast and interview that we're talking about is the same, then, you know, almost, then, yes, it would have the same value relevance.

Q.   Now let's talk about the Badger.

         MR. ROOS:  We can take this down.

Q.   We already talked about how Trevor Milton made several statements about the Badger on June 8th; right?

A.   Yes.

Q.  Let's look at your first stock chart --

A.  Yeah, the -- I'm sorry.  I didn't mean to interrupt.  I thought the Tweet was the night before, but we also talked about some June 8th --

Q.  June 7th, June 8th, June 9th, I think there was probably this spread-out; right?

A.  That's what I was referring to.

Q.  Let's look at your first stock chart about the Badger, let's look at slide 2 of Defendant's Exhibit 955.  Now this is June 12th; right?

A.  Yes.

Q.  So it's actually after those Badger statements; right?

A.  Yes.

Q.  And the --

A.  The Badger statements being open for reservation.

Q.  The Badger statements being the statements made on June 7th, June 8th, June 9th; right?

A.  I agree, June 12th follows June 8th and 9th.

Q.  And the at-issue statement in this is about how the Badger being built as a real truck; right?

A.  That's consistent with my memory.

Q.  Let's look at the next slide about this, June 29, slide 26, please.  There are two interviews on this date, setting aside the Tweet about hydrogen that we already talked about.  The two interviews both relate to the Badger being a built truck;

right?

A.   That might be accurate.  I would want to refresh my recollection, but –– I would want to refresh my recollection. I don't want to go purely off my memory.

Q.   Well, why don't we look at Government Exhibit 415-T.  We can flip through this, I don't think it's many pages.  So why don't you look at line 17 onwards.  Let me know once you've read "we actually made the most advanced semi-truck the world's ever seen."

A.   Yes, I see that.

          MR. ROOS:  Let's go back to the defense exhibits, can we look at slide 27, the next page, which is a June 30th interview.

Q.   This is about Badger prototypes, right, how they've already built Badger prototypes?

A.   That's consistent with my memory, obviously subject to confirmation, but it's consistent with my overall recollection.

Q.   And let's go to the next page, slide 30.  It's an August 5th interview on Cheddar, same thing, built trucks; right?

A.   Again, that's consistent with my general memory. Obviously, the transcript speaks for itself.

Q.   And now let's go to slide 33, August 24th Tweet about the Badger.  And you see he says, raw frame would give away manufacturing techniques to other ones, but we will show

finished frames, interiors leading up to Nikola World.

Do you see that?

A.  I do.

MR. ROOS:  Let's put up Government Exhibit 1005.
Let's go to page 2.

Q.  Why don't we circle the first statement that you did a
slide on.  Do you see it, it's the June 11th?

A.  Okay.

(Continued on next page)

MA3HMil6                        Ferrell - Cross

BY MR. ROOS:

Q.  OK.  Now let's flip back to the first page.

You see before the interviews you looked at, Trevor Milton did an interview in February.  Do you see that?

A.  Which one.

Q.  Fox, Fox TV, February 14?

A.  Yes.

Q.  And he tweeted in February, right?

A.  I believe that's accurate.

Q.  You see he says, well, production of tent vehicles?

A.  I'm sorry, which tweet?

Q.  The February 12.

A.  OK.

Q.  Do you see he also did an interview in April, podcast?

A.  Yes.

Q.  And he did an interview in May.

Let's go to the next page.  Wait, why don't we bring that up.  Why don't we look at Government Exhibit 408-T.  Can we go to the last page -- second to last page, I'm sorry.

And you see where he says:  "We're going to show off the Badger to the whole world, and this thing is insanity.  It is the most beautiful truck I think the world's ever seen. It's a fully functional vehicle inside and out, HVAC, everything, you know, windows"?

Do you see that?

A.  I do.

Q.  So by the time of the interviews and tweets you looked at, Trevor Milton had already made the same types of statements of building a prototype and fully functioning truck?

A.  He did make statements about the Badger.  Again, what the market is going to price is the entire interview or podcast and whatever informational content it has.

Q.  Again, simply repeating information already known to the market would not affect its stock price?

A.  I agree with that.  If the informational content, including the context, is the same, it would have the same value relevance.

Q.  OK.  Switch topics.  Just, I think, two more topics.

Professor Ferrell, what's a corrective disclosure?

A.  So that would be a disclosure that reveals to the market an alleged misrepresentation, alleged concealment, or putting it more generally, a corrective disclosure is something that reveals information that, according to the government or the plaintiffs or some party, information that could and should have been disclosed earlier.

Q.  So to use like more basic terms, the corrective disclosure date is the date when the plaintiff or the government, or whoever, is saying this is when the truth came out or started coming out?

A.  Yes.  Yeah, so it's a public revelation of information

MA3HMil6                          Ferrell - Cross

according to some theory of a disclosure deficiency.

Q.  Such a revelation can occur over a protracted period of
time, right?

A.  That's possible.

Q.  All right.  And in plain English, that means the truth can
be revealed over a period of time?

        MR. BONDI:  Objection.

        THE COURT:  Overruled.

A.  It's possible, depends on the facts and circumstances.

Q.  So the truth can gradually trickle out into the market?

A.  You could have one corrective disclosure.  You could have
two.  You could have three.  It depends on the -- you know,
what the theory is of the disclosure deficiency.

Q.  All right.  So as a result, while a single day's stock
movement may not be significant, the cumulative effect on the
firm's stock price over the entire corrective disclosure period
may be, right?

A.  So it is possible that I consider the one day and the three
days as statistically significant, or the one day versus the
two days.  So, normally, you think about statistical
significance in terms of continuous trading days, and you can
run the statistics on that.

Q.  Got it.  So what I present to you is maybe, right, like one
day versus two day or one day versus three days, but not like
one day versus one month is what you're saying?

A.   I'm sorry, what's the one month?

Q.   I'm just trying to clarify.

        I had asked you, while a day might not be significant, the cumulative effect over several days could be for a corrective disclosure.  And I'm just trying to understand your clarification was to me was one day or two days or three days could be that cumulative effect, but not one month or two months or three months?

        MR. BONDI:  Objection, your Honor.

        THE COURT:  Overruled.

        Could you understand the question, professor?

        THE WITNESS:  If I could hear the question again.

        MR. ROOS:  Let me ask another different way, because it's obviously wasn't clear.

Q.   So for starters, it's possible as a result of a corrective disclosure, so a revelation, a single day's stock movement might not be significant, but the effect over -- over time could be, right?

A.   So in your hypothetical, the disclosure happens on Monday, and you're -- as I understand your hypothetical, you're saying the stock price won't be affected Monday but somehow materializes Thursday, is that it?

Q.   I'm just -- I'm not even trying to give you a hypothetical. I'm just asking as a general principle, with a corrective disclosure, while a firm's single-day stock movement may not be

significant, the cumulative effect on the firm's stock over the entire corrective disclosure period may be?

A.  Yes, with the following explanation or understanding.  So if there's a corrective disclosure Monday, another corrective disclosure Tuesday, another corrective disclosure Wednesday, so if hypothetically there's three pieces of information that are being disclosed that are going to be labeled "corrective," then you can take a look at the statistics surrounding that.

Q.  All right.  And you'd agree with me that a corrective disclosure can come in the days, weeks, and months after the market learns additional information about the implications of a misrepresentation on the company's value?

A.  It's when the market learns the corrective information, however that -- you know, obviously, that's going to be dependent on what the theory of the disclosure deficiency is.  So the corrective disclosure, or disclosures, is a function of the theory of what should and could have been disclosed.

Q.  All right.  But the full truth concerning the misrepresentation may be revealed to the market on a series of days, right?

A.  It's hypothetically possible, and I just think I gave you a hypothetical where there's information Monday, there's information Tuesday, there's different information Wednesday.  So that would be a hypothetical.  So the jargon here is "partial corrective disclosure."

Q.   OK.  Did I understand you correctly that under such circumstances it may make sense to use a multiple-day window?

A.   So if it's Monday, Tuesday, and Wednesday, and you assume the market's pricing it, you could look at a three-day window. Again, not on the theory that the market takes a week to read a disclosure from the prior week, but there's really new information.  You can certainly take a look at that statistically.

Q.   All right.  So when the corrective disclosure occurs, if there's a reaction to it over a day, two days, three days, it may be a two-day or three-day window?

A.   This is very important.  So if you're doing two- or three-day for the purpose of disclosure that happened on the first day, so if that's the hypothetical, something's disclosed Monday and now you're using a three-day, because you think it takes three days for the market to absorb that information, we're talking about an inefficient market.  That's a very long window of time for the market to react, if I understand the hypothetical correctly.

Q.   All right.  But let's say, for instance, there's a corrective disclosure on a Monday and there's a follow-up statement or confirmation or rejection by the company on a Tuesday.  We might not see the effect of the corrective disclosure until the second day, right?

          MR. BONDI:  Objection.

THE COURT:  Overruled.

A.  I think you changed the hypo.  So if it's confirming the corrective disclosure Monday, as we discussed earlier, that's not clear that that would be new value-relevant information. So, again, if the information is new to the market and it's value relevant and it comes in pieces, then you can analyze the market reaction on those days.

Q.  OK.  So now turning to page 20 of your slides, this is the day of the release of the Hindenburg report, correct?

A.  This is the short seller report, that's true.

Q.  The report claimed that Trevor Milton made deceptive and misleading public statements about the functionality of the Nikola One, Nikola's production of in-house parts, Nikola's production of hydrogen, and reservations for trucks, right?

A.  Yes.  So there's a short seller report --

Q.  Just yes or no is fine.

A.  That's consistent with my general memory.

Q.  OK.  We could just put up Government Exhibit S-4.

You see the second paragraph?  Let's zoom in on that. It's a stipulation between the parties.

MR. BONDI:  Objection, your Honor.  This has already been read.

THE COURT:  I'm sorry?

MR. BONDI:  This has already been read.

THE COURT:  Overruled.

Q.   So the stipulation says that, right, that's what the report's about?

A.   Yes.

MR. ROOS:   All right.   We can take that down.   Let's go back to Defense Exhibit 955, page 20.

Q.   All right.   After the report comes out, the stock drops 11 percent, right?

A.   The raw return, I would have to look at the data that we're looking at before.

Q.   OK.   Let me --

A.   But it does -- it does -- there is a raw return drop.

Q.   We can look at that.

Why don't we bring up TM26.2AF_1.   Let's go to the last page, and let's select, maybe to make it easy, the headers on the columns and then also the date for September 10.

OK.   So just looking at the raw return, which means just the stock price change on the chart, it's 11 percent, right?

A.   I agree with that.

Q.   So it's 11 percent drop on that date.

And your model found that this was not statistically significant, right?

A.   That's correct.

Q.   And the way we're looking at that is you mentioned this thing, the p-value, and I think you said anything at or below

0.05 is that, right?

A.  Yes.

Q.  And this is a different number.  It's .343, right?

A.  For the one-day, yes.

Q.  So now you just mentioned for the one-day.  You also did an analysis of the two-day cumulative abnormal return from the report date, right?

A.  Yes, we can see that to the right.

Q.  So over two days it's negative 19.3 percent, right?

A.  The residual is.

Q.  And you found that the p-value there is 0.058, right?

A.  Yes.

Q.  So close but no cigar on statistical significance, right?

A.  That's the number.

Q.  All right.  Now, let's go to the first page of this document.

The first page of this document is a different version of your model, right?

A.  Yes.  Are we looking at the value weighted now?

Q.  Yep.

A.  OK.  So we were just looking at the equal weighted, if I'm remembering the document correctly, and now we're going to switch to the value-weighted industry index.

Q.  Got it.  So Model 4, switching to Model 1 now.

A.  Equal to value weighted.

Q.  Let's look at the September 10 date for -- which is on page 2 for the -- your first model that you didn't use.

And for this one, let's look at the two-day.  The p-value was 0.049, right?

A.  That's right.  So this is the value-weighted industry index.

Q.  Got it.  So for the model that you didn't use, you actually found it was statistically significant, right?

A.  The two-day but not the one-day, not the three-day.

Q.  Just yes or no, the two-day for the model you did not use found the -- found it to be statistically significant?

A.  That's correct.

Q.  All right.  Let's look at the second model you did.

So can we go to page 4, and September 10 again.

So this is another version of your model, right?

A.  This is the value weighted again with a tweak, minor difference.

Q.  And the two-day version of this for September 10, again, under this model you found was statistically significant, right?

A.  I'm sorry.  So are we supposed to be looking at September 10?

Q.  Yeah, two-day, September 10.

A.  I'm seeing the p-value here is 0.053.

Q.  So you're going to round up?  You round up or you round

MA3HMil6                        Ferrell - Cross

down?

A.  I'm just reading the number.

Q.  OK.  So let's go back to, then, the model you used.

And we can zoom in on September 10.

So this model that you decided to use had the highest p-value, right?

A.  I don't think we looked at the other model.

Q.  OK.  Sure.  Let's look at that.  Let's look at page 6.

Do you see it there?

A.  Yeah.

Q.  The two-day, same number, right?

A.  It's not statistically significant under the equal weighted.

Q.  Got it.  So let's go back to the last one.

So the model you decided to use had the highest p-value, right?

A.  I don't think -- it's about 5 percent.  I don't think anything else beyond that matters.

Q.  Well, you picked one that basically -- you picked one that showed that this had the least statistically significant finding, right?

A.  I disagree with that.  It's either statistically significant or it's not.  There's no halfway house.  So it's either above 5 percent or it's 5 percent or below.  So --

Q.  Got it.

A.   There's no -- you have to have a standard, and it either meets it or it doesn't.

Q.   But if you had picked a standard that was, say, 6 percent, then all these would be statistically significant, right?

A.   Sure.  But that's not consistent with the academic literature.

Q.   And if you had picked a different model, it would have been statistically significant, right?

A.   Yes.  But the volume value-weighted model is inferior.

Q.   Just a couple more questions.

      So you're working for a company that was, I think you said, hired by defense counsel, right?

A.   As we discussed earlier today, I can't recall offhand whether I was retained by defense counsel or directly by the defendant.  I don't remember.

Q.   And I think you testified earlier that in connection with your retention, you've been paid in full $500,000, right?

A.   Whatever the 412 hours times my hourly rate is.

Q.   Now, isn't it true that before trial started, you checked in on the plan schedule for Milton's payment of 2022 bills?

A.   Yes.

Q.   And you wanted to make sure everything was squared away as trial approached?

A.   Yes.

Q.   With respect to your bills, you had serious concerns about

how the matter was unfolding, right?

A.   Yes.  I wanted everything, the staff time, my time, to be paid in full.

Q.   Given all that, you had to insist on all invoices being paid in full by time of trial?

A.   I think that's good general practice.

Q.   All right.  You said you had to insist on all invoices being paid in full by time of trial?

A.   Yes, I -- that's what I said, and I think it's good practice.

Q.   OK.  And the reason that you thought it was good practice was you were worried that if Trevor -- "If Trevor isn't happy with his end of the deal, we should just resolve that now and perhaps go our separate ways"?

A.   Well, you're leaving out some of the language in the email, so --

Q.   I'm just asking you, did you write that?  Did you write: "If Trevor isn't happy with his end of the deal, we should just resolve that now and perhaps go our separate ways"?

A.   Yes, that's part of what I said.

Q.   So you were willing to walk away from the work you had done if you were not going to be paid?

A.   I wanted -- actually, I just wanted the whole thing resolved, and it was immediately.

Q.   All right.  And because you wrote in an email that you were

concerned about the possibility that "he would refuse to pay his bills"?

A.  Again, I've never met or talked to him.  I just had a bad prior experience where somebody that worked for me, spent a lot of time, ended up not getting paid.

Q.  So because of that, you didn't want a situation with future "disappointed expectations," right?

A.  That's right.  So again --

Q.  Just yes or no, you just didn't want a situation where "future disappointed expectations?

A.  Yes, you're reading an excerpt of the email.

Q.  So before testifying you had to insist on all invoices being paid?

A.  I think it's good practice, given past experience where somebody that worked for me did not get paid at all.

Q.  Now, you haven't been paid yet for the last week of work, right?

A.  That is correct.

Q.  And you want to be, right?

A.  I will invoice as I normally do.

          MR. ROOS:  All right.  No further questions.

          THE COURT:  Redirect.

          MR. BONDI:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. BONDI:

Q.  Professor Ferrell, let's pick up where Mr. Roos left off.

Can you tell the jury the context behind the email that Mr. Roos was quoting excerpts from.

A.  Yes.  The context was I had worked on a prior matter -- and actually, he's a dear friend, but also he worked for me -- and it just ended up the person refused to -- the company actually refused to pay, and he wasn't -- he did most of the grunt work, and he wasn't paid at all.

So I -- that has nothing to do with this matter, but that stuck with me, and I didn't -- you know, I didn't want that to happen again, particularly given the amount of work that Coherent, the consulting firm, has done on it.  So that was the context.

I also have my own way of working.  I don't submit plans of what I'm going to do during the week.  I like to go where the data is, look at what I want to look at.  So I laid down that as a marker as well.  After I sent the email expressing those two concerns, I think it was resolved in three hours.  We had a phone conversation; it was resolved.  You said I could look at what I wanted to, look at the data I wanted to. I don't have to submit a weekly plan of what I'm going to do. I mentioned the bad experience where not just myself but the person who did most of the grunt work didn't get paid, and it was resolved that day.

Q.  And, Professor Ferrell, are you here to give your

independent opinions in this case?

A.  Yes.

Q.  You're a professor at Harvard Law School, right?

A.  Yes.

Q.  How long have you been a professor?

A.  Since 1999.

Q.  And you're a chair professor, is that right?

          MR. ROOS:  Objection.

          THE COURT:  Overruled.

A.  I am.

Q.  What does that mean?

A.  Well, it's acknowledgment of research and teaching that I did there.  Actually, Elena Kagan was the one that made sure that I got the chair.

Q.  And is your reputation important to you?

A.  Yes.  It's a small world.  Absolutely.

Q.  Have I told you what to say here?

A.  No.  And it would never work.  I'm very independent.  As expressed in the email, I like -- I don't -- some people don't have a problem submitting a plan of what they're going to do in the coming week.  That's just not how I operate, and I make that very clear.

Q.  And your testimony today, would it be any different if you were testifying as a witness called by the government?

A.  Not one iota.

Q.   Now, Professor Ferrell, the government went through a number of different models that you ran through and tested. Did you pick which model based on the outcome?

A.   It was an objective test in the academic literature -- I've used this in the past -- for what the industry control is.  So there's different ways to do the industry.  You could do a value weighted.  That's how big the companies are in the industry.  You can do equally weighted.  So there's different ways of controlling for the industry, and I produced to the government four different models with four different ways of doing the industry, two equally weighted and the two the value weighted.

Q.   Why did you pick the model you did?

A.   Because in the academic literature there's a test for which model is the best.  So out of these four, I picked, consistent with the academic literature, the model with the most explanatory power.  It's called adjusted R-squared.  I picked the model that does the best job of explaining the volatility, the changes in the stock price.  So you can measure how good a job the model does in explaining the stock price movements.

So this is completely standard.  What I did was I chose the model with the highest adjusted R-squared, the model with the most explanatory power, and that was one of the two equally weighted models.  A lot of what we were discussing earlier is the value weighted that has a lower adjusted

R-squared, has less explanatory power.  And, again, in the academic literature, it's clear -- and this is my own practice in the past.  I've been doing this a long time -- you pick the model with the most explanatory power.  That was the equally weighted model that I presented.

Q.  Now, the government also asked you about one-, two-, and three-day event studies, right?

A.  Yes.

Q.  Why did you do, one-, two-, and three-day event studies?

A.  I wanted to be thorough.  So one day is the standard event window that's used all the time, the close to close, but I wanted to see if the two- or the three-day, so allowing a lot of time to assess the impact to make sure my results were -- so when I did the two- and the three-day, I wanted to confirm the results from the one-day.

Q.  The model you used with the one-day window, have you used that in the past?

A.  Sure.

Q.  Is that something you use regularly?

A.  A model with an industry control and a market control like the NASDAQ, completely standard.

Q.  The government posited a theory to you in cross relating to consistent misstatements, right?

A.  Yes.

Q.  But they didn't ask you anything during cross about

consistent company statements, did they?

A. No.

Q. Let's talk about that.

Can we pull up GX 801, please, Chris.

MR. ROOS: Definitional and beyond the scope.

MR. BONDI: No, it's not, your Honor. I'll explain.

THE COURT: Overruled.

Q. Professor Ferrell, do you recognize what's in evidence as GX 801?

A. I do.

Q. What is it?

A. It's unveiling the Badger pickup, and it has some information about it. It's dated February 10, 2020. And, again, it has information concerning the Badger pickup.

Q. OK. Professor Ferrell, you'll recall we talked about June 8, right?

A. Yes.

Q. So this press release here on the screen is February 10, and then the announcement of the opening of reservations was June 8, right?

A. Yes.

Q. The government mentioned to you an exhibit, which I'd like to pull up, GX 318.

And, Professor Ferrell, what's the date of this exhibit?

A.   If you could scroll up, it's up on there.  It's filed with the commission July 17, 2020.

        MR. BONDI:  Chris, can we go to page 77 of this.

Q.   By the way, this is a filing right with the SEC?

A.   Yes.

Q.   July 17 filing?

A.   Yes.

Q.   OK.  Let's go to page 77 of the company's filing.

A.   Yes.

        MR. BONDI:  And if you highlight, Chris, if you can highlight the section at page 77, "Recently, we announced."

Q.   Can you read that for the jury, professor, just out loud?

A.   "Recently, we announced the Nikola Badger (the Badger) an advanced zero-emission FCEV/BEV hybrid pickup truck.  Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class.  At this time we are focused on the production of its Class 8 heavy-duty vehicles and do not expect to develop production plans for the Badger unless we enter into a strategic partnership with an established OEM."

        MR. BONDI:  Let's, Chris, go to page 85 of the July 17 filing, please.  There's another section on the Badger, if you can zoom in on it.

Q.   And, professor, could you read that, too.

A.   "At this time, we are focused on the production of Class 8

heavy-duty vehicles and do not expect to develop production plans for the Badger unless we enter into a strategic partnership with an established OEM."

Q.   Just to level set here, we were talking about the February 10 press release, right?

A.   Yes.

Q.   The June 8 announcement of the opening of the reservation of the Badger, right?

A.   Correct.

Q.   And this is a July 17 filing by the company, right?

A.   Yes.

Q.   Was July 17 a statistically significant movement day?

A.   No.

Q.   The market, in other words, didn't find what was in the 10-K -- excuse me, in this SEC filing to be significant?

A.   It was not important to the market because the market movement is explained by the market -- the general market in the industry and random volatility.

Q.   If there was something in this filing that somehow contradicted or was different in a material respect to what Mr. Milton said, what would you expect to happen in the market? What would you expect would happen in the market as an economist?

A.   Well, if the theory is the stock price was inflated because of false statements, that's the theory, the allegation, if you

will, and then the misinformation that was inflating the stock price came out, we were using the phrase earlier "corrective disclosure," if the correct information came out, the truth, then you would expect, under that theory, for the stock price to fall.

Q.   Let's look at page 12 of this same document filed on July 17.  There's some statements on page 12 relating to hydrogen.

And, Chris, if you could highlight those for the witness, please.  Highlight that whole paragraph, please. Thank you.

Professor Ferrell, can you read what's written there about hydrogen.

A.   Sure.

"Our plan to build a network of hydrogen fueling stations will require significant cash investments and management resources and may not meet our expectations with respect to additional sales of our electric vehicles.  In addition, we may not be able to open stations in certain states."

Q.   And can you read into that first -- that next paragraph.

A.   "Our plan to build a network of hydrogen fueling stations in the United States will require significant cash investments and management resources and may not meet our expectations with respect to additional sales of our FCEV trucks."

Q.  And last one, the bold statement right, the heading at the next section.

A.  "We may not be able to produce or source the hydrogen needed to establish our planned hydrogen fueling stations."

Q.  Professor, this document from July 17, 2020, if this contradicted something Trevor Milton said prior to that, would you anticipate a statistically significant movement in the stock price when this document came out?

A.  Of course.  So if the theory is the stock was inflated, pumped up, and the truth came out, the truth that it was a plan, you would expect the stock price to fall.

Q.  Now, professor, let's talk about that and stay on that topic for a moment.

The government showed a bunch of tweets from Trevor after this, and we talked on direct about how the stock price remained flat on those tweets relating to hydrogen.

If Trevor Milton had contradicted in a material fashion something in this document on July 17, would you anticipate that the stock price would react?

MR. ROOS:  Objection to compound, leading, and the word "material."

THE COURT:  Why don't you rephrase the question, Mr. Bondi.

Q.  Professor Ferrell, if Trevor Milton had contradicted in any significant way this document in his later tweets, would you

anticipate a movement in the stock price in response to those later tweets?

A.   Of course.

         MR. ROOS:  Objection.  Argumentative.

         THE COURT:  Overruled.

A.   Of course you would.  So if the theory is the stock price is being inflated because of misinformation that is important to the market, you would expect the stock price to go up.

Q.   And would the same be true about the Badger statements that he made after this document, too?

A.   The same analysis, same point.

Q.   So what does this tell you about the analysis that you did at DX 955, the slides?

A.   It confirms, it reflects the fact that the statements at issue were not important to the market.

Q.   Professor, it looked like you were about to try to explain something on cross regarding that Halliburton article you wrote, Halliburton II.  I don't want to deny you the opportunity, but I also don't want to bore the jury to sleep here.

         In a nutshell, what was that article about?

A.   Well, Halliburton II is a very important Supreme Court case, in my world at least, and the U.S. Supreme Court in Halliburton II, not a circuit court that we were looking at earlier --

MR. ROOS:  Judge, objection to this.

THE COURT:  Overruled.

A.  -- not a circuit opinion that we were looking at earlier, U.S. Supreme Court in Halliburton II talked about the importance of event studies, the importance of event studies in assessing the impact of information.  The article is about U.S. Supreme Court's opinion in Halliburton II and event study use. I believe the opinion was 9-0.

Q.  9-0, you said?

A.  I believe.  I'm going to put an asterisk on that.  I think it was 9 -- I'll leave it at that.

Q.  I promised I wasn't going to ask any legal opinions or any legal information, Professor Ferrell, so you don't have to remember what the Supreme Court decided there.

A.  I know what they decided.  I think it's 9-0, but I won't be held to it.

MR. ROOS:  We'll stipulate to it being 9-0.

MR. BONDI:  Thanks, Nick.

Q.  So going back to event studies in litigation here, are you guided by publications about how to use and apply event studies in litigation?

A.  Of course.

Q.  And can you tell us about what some of those publications say about event studies and what you did.

A.  They say use a 5 percent level statistical significance,

not 6 percent, not 6.2, 5 percent.  It talks about using the highest explanatory model.  It talks about using a one-day event window, you know, as a standard.  So these are practices in the literature.  It's practices that I've used over and over again in doing event studies.  There's ways to do it that are appropriate, ways to do it that are inappropriate.  And so this is not -- I know a lot of this is new to folks, but there's very clear ways of doing these event studies.  These have been done for over 50 years.

Q.  Professor Ferrell, the government asked you about slide 2 of 955.

Chris, can you pull that up.

And they asked you about that in context of an article that you wrote your dissertation, right?

A.  Yes.

Q.  And what was the year of your dissertation again?

A.  I got my Ph.D. in 2005.

Q.  OK.  As I understand, your dissertation was as to the importance of SEC filings, correct?

A.  Yes, that was my research in my Ph.D. program and also in published peer-reviewed literature.

Q.  Now, I can imagine, with all of your education, you wanted to just stop doing anything right when you got that Ph.D., but you've continued to do research on the importance of SEC filings since then, have you not?

A.   I have.  My most recent article that's coming out is on the importance of event studies in figuring out the effect of information.  It's with University of Chicago.

Q.   So with the advent of Twitter and TeslaCharts podcasts, whatever that is, and with the advent of YouTube, do SEC filings remain important for investors?

A.   It's critically important.

Q.   And would that be true also for retail investors?

A.   Of course, in the ways that I described it.

Q.   There was some testimony, too, or some questions, too, on cross about algorithmic high-frequency traders.  Do you remember that?

A.   I do.

Q.   What is an algorithmic high-frequency trader?

A.   So, generally speaking, these are very, very powerful computers that route very, very quickly all sorts of orders, buying and selling, to take advantage of slight price movements.  So these are very sophisticated, generally speaking, computerized automated systems.  In fact, it's kind of interesting.  They want to locate their computers close to where the servers are, where these trades occur, so they get that little -- little quicker.  So if you're in California, that extra millisecond is too long.  So they locate the computers near where the trades occur because they're so fast, and they're going to try and take advantage of things so

quickly.

So these are often referred to as high-frequency. These are, generally speaking, not retail investors. These are very powerful computers.

Q. Sounds like they're not even humans.

A. So it's very sophisticated, and it's an arms race between these two computing systems.

MR. BONDI: Let's go to slide 4 of DX 955, please.

THE COURT: Mr. Bondi, it's actually 40 minutes after the hour, so that brings us to the end of the day.

Ladies and gentlemen, we'll get back together again tomorrow morning. Please do endeavor to be in the jury room by 9:15, or so, so we can get started on time. Until then, don't read anything about the case or the parties or don't discuss the case or don't see or look at anything about the case or the parties.

Have a good night.

(Jury excused)

(Continued on next page)

(Jury not present)

THE COURT:  Professor Ferrell, you may step down.

Everyone can be seated.

(Witness excused temporarily)

THE COURT:  So when do you folks want to come back this afternoon?  Twenty minutes?

MR. CARUSO:  Yes, I was about to say 20, 30 minutes.

THE COURT:  OK.  Anything else to raise now, Mr. Podolsky?

MR. PODOLSKY:  I was going to suggest that we allocute the defendant now so we can have a rationale plan for tomorrow. I assume what will happen we'll go directly from Professor Ferrell into closing, but I thought it would be good to talk about what it was going to look like.

MR. MUKASEY:  Judge, I did speak with Mr. Podolsky about this.  I didn't realize how much was going to be left.  I am not against allocuting Mr. Milton now.  I do want to talk it over with him before we do it because we're not really at the end of the case, and I expected us to be at the end of the case.

THE COURT:  How much longer with Professor Ferrell?

MR. BONDI:  I probably have another half an hour with him.

MR. ROOS:  I don't think I'm going to recross him.  If I do, it's maybe one question.  So don't count our time in the

MA3HMil6

mix.

THE COURT:  So I'm happy to do it this afternoon.  I'm happy to do it tomorrow.

MR. MUKASEY:  Let me discuss with Mr. Podolsky and Mr. Milton.  Is your Honor wed to having closings tomorrow if we're still running over evidence?

THE COURT:  Yes.  I mean, even if we get one closing in.  And, by the way, I am not of the school of thought that believes that all of the closings have to go in on the same day.  So if we have a significant amount of time tomorrow, we'll get the government's opening in and perhaps even the defense -- rather, the government's closing, perhaps even the defense closing, and if we have to go over until Thursday for the rebuttal, then that's what we'll do.

MR. MUKASEY:  OK.  Fair enough.

THE COURT:  OK.  So why don't you folks talk, and I'll come back in 20 minutes.

MR. MUKASEY:  Fair enough.  It will be five after the hour.

(Recess)

(Continued next page)

MA3Cmil7

THE COURT:  Okay.

MR. PODOLSKY:  At your Honor's suggestion, I printed out a fairly bare-boned allocution from another case of mine. I'm happy to hand it up.

THE COURT:  Please.  Mr. Mukasey, did you wish me to allocute Mr. Milton?

MR. MUKASEY:  Please, your Honor.

THE COURT:  Mr. Milton, as I'm sure your attorneys have advised you, you have the constitutional right to testify in this case in your own defense.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  You also have the constitutional right, if you choose to, not to testify, as I'm sure you've heard me tell the jury throughout the entirety of this case, you don't have to do a single thing in this case.

So, do you understand that you don't have to testify if you do not want to?

THE DEFENDANT:  I understand that, yes.

THE COURT:  And sir, do you understand that if you chose not to testify, I would tell the jury that it absolutely could not hold that against you?

Do you understand?

THE DEFENDANT:  I do.  Can I ask you a question?

THE COURT:  You absolutely can ask me a question.

MA3Cmil7

THE DEFENDANT:  Will the jury know that it's not a sign of any type of guilt or innocence?  My worry is that the jury may think that because someone doesn't testify, they're guilty or hiding something, and that was my worry.  Is that described to them?

THE COURT:  Yes.  In the jury charge, there is a section, if you choose not to testify, that essentially tells the jury in this case that Mr. Milton decided not to testify and that they cannot use that in any way in their consideration as to your guilt or innocence.

THE DEFENDANT:  Okay.

THE COURT:  Okay?

THE DEFENDANT:  Okay.

THE COURT:  So now, my understanding is that you have decided that you will not be testifying in this case.  Is that true?

THE DEFENDANT:  That's correct, yes.

THE COURT:  Now, Mr. Milton, because it is a very important decision, have you had a sufficient amount of time to discuss this decision with your attorneys?

THE DEFENDANT:  Yes, I have.

THE COURT:  And are you satisfied with your attorneys and the advice that they have given you in this regard?

THE DEFENDANT:  Very satisfied with them.

THE COURT:  So there's no need, you don't believe that

MA3Cmil7

you need any additional time in order to consider this decision?

THE DEFENDANT:  No, I do not.

THE COURT:  Very well.  Any additional questions that either side wants me to ask?

MR. PODOLSKY:  No, your Honor, that's sufficient.

MR. MUKASEY:  No, Judge.  Just permission for myself, Mr. Milton and Ms. Young to be excused for the jury charge conference so we can prepare for tomorrow.

THE COURT:  Very well.  You are excused.

MR. MUKASEY:  Thank you, Judge.

MR. CARUSO:  We are depleted.

THE COURT:  Although your numbers are smaller, but are you not depleted.

MR. ROOS:  I asked to be excused and Mr. Podolsky denied my request.

THE COURT:  As the parties are aware, I distributed the draft jury instructions last week over the weekend.  I received, from the defense, two submissions concerning additional requests or changes, and I received one submission from the government, all dated yesterday.

So let me ask the defense, do these two documents go together?

MR. CARUSO:  Yes, your Honor, please.

May I just have one moment to find my --

THE COURT:  Sure.

MR. CARUSO:  So much paper here.

MR. ROOS:  On that subject, I think there is actually a third defense filing that came in during the cross today.

THE COURT:  I don't have that.

MR. BONDI:  There may be a fourth, as well, your Honor.  I apologize for the gifts that keep on giving here.  They're proposed alternative instructions to your Honor's instructions.  The one that is about to go to you any second now deals with venue.

THE COURT:  Venue.

MR. BONDI:  Talking near and dear in my heart, your Honor.

MR. PODOLSKY:  While we're waiting, your Honor, there was one of the defense's letters was about an additional immunity instruction.

THE COURT:  Yes.

MR. PODOLSKY:  I took the liberty of printing out a Second Circuit case that I think is either directly on point or near directly on point.  I could just hand it up and hand defense a copy, as well.

THE COURT:  Please.

MR. PODOLSKY:  To be clear, what the case is about is the defense relies on an analogy on Section 1344, and this case deals with a claim of duplicity in 1344, and as I read the

MA3Cmil7

case, rejects the defense articulation in its letter regarding 1344.

MR. CARUSO:  Judge, I'm awfully sorry.  I had my whole thing marked up and now I can't lay my hands on it.  It's awfully embarrassing.

THE COURT:  No, you go ahead.

Just so that I'm clear, let me ask the government first, are the requests and suggestions in your October 2 letter, are these the only requests that you have?

MR. PODOLSKY:  Your Honor, as we go through, we may notice something on the order of a typo, but I think substantively, these are the only requests we have, other than in response to requests the defense might make.

MR. CARUSO:  Your Honor, I just don't know what to do. Perhaps somebody took it back to my hotel.

THE COURT:  Well, we have your letter.

MR. CARUSO:  Yes, but that's just one item.  I've marked up the whole charge.

THE COURT:  The whole charge?

MR. CARUSO:  Well, many parts of it.

MR. ROOS:  Objection.

THE COURT:  Well, look --

MR. CARUSO:  You were saying, your Honor?  I'm sorry.

THE COURT:  I can give you five minutes and then if you don't find it in five minutes, then there is certainly work

MA3Cmil7

that we can do and we can go back tomorrow.

MR. CARUSO:  I'll take the five minutes.  I'm sorry.
I can't imagine what happened to this.

(Pause)

Your Honor, I'm sorry.  I just don't know what
happened.  I have a client here.  I can't competently do this.
I spent hours on this, marking up your Honor's draft and
inserting where I thought things should be.  I can't adequately
represent my client without that.

Can we send an email to the whole team and ask
everybody to look.  Somebody must have walked off with it.  I
had it here.  It's the Judge's jury instructions that I marked
up.

It's futile for me to keep looking.  I've looked three
times.

THE COURT:  Here's the thing, Mr. Caruso.  There is
other stuff that we can do so we don't have to waste the
afternoon.

MR. CARUSO:  So let me do some of this from memory,
not necessarily in order, in a logical order.

With respect to Count One --

THE COURT:  Could I just stop you, because as you
might --

MR. CARUSO:  I'm listening, your Honor.  Sorry.

THE COURT:  As you might tell, there are three parts

to this, there is an introductory part, there is the middle substantive part, and then there is the part in the back that also deals with a lot of garden variety issues, inferences and circumstantial evidence and bias, et cetera. So these are, at least in my experience, fairly noncontroversial in most cases.

MR. CARUSO: I had some tweaks and also some points where I think some of these standard instructions don't apply to this case.

THE COURT: That's fine. We can take that out if the parties agree we don't need particular --

MR. CARUSO: Shall we try to do that part?

THE COURT: Absolutely.

MR. CARUSO: Maybe I can do that just by memory. I'm sorry. I really am sorry.

THE COURT: So where do you want to take me?

MR. CARUSO: Let's start with that last third of the, as your Honor put it, that last section of your work.

THE COURT: So that starts after venue, so venue would be substantive. So start at page 22.

MR. CARUSO: Right. So variants in dates. Let me read that again while I'm sitting here.

I don't have an objection to that, but I don't think it's a topic that has come up in this case. I realize it's standard, but does anybody think that we really should tell the jury this, or need to?

MR. PODOLSKY:  So yes, your Honor.  First of all, this is a standard instruction.  I don't think I ever had a trial that didn't have this.  Actually, the defense in this trial did ask questions about variants and dates, about the indictment range, I think it was of Special Agent Penland, and the government does not have to prove that the scheme was started and ended on a precise date.  So I think this is an appropriate instruction.

MR. CARUSO:  No objection, then.

THE COURT:  I'll keep it in.

MR. CARUSO:  Let me read this one, please.

No objection.

THE COURT:  To persons not on trial?

MR. CARUSO:  Correct.

THE COURT:  And defendant's testimony?

MR. CARUSO:  So we can strike this.  Defendant in a criminal case never has a -- sorry.  We don't need this on the record.

THE COURT:  So the first paragraph stays.  The second paragraph is stricken.

MR. CARUSO:  Correct.

THE COURT:  The second and third.

MR. CARUSO:  Let me read the part, if applicable. Second paragraph, second line, instead of saying the defendant, you might as well say Mr. Milton, because you said that earlier

MA3Cmil7

in the same sentence.

THE COURT:  Mr. Milton?

MR. CARUSO:  May not draw adverse inferences against the defendant.  Make that against Mr. Milton.

THE COURT:  Very well.  Okay.  Anything else in that section?

MR. CARUSO:  No.  No, sir.

THE COURT:  The valuation of evidence, what is and what is not evidence.

MR. CARUSO:  I'm going to read that now.

Yes, on page 24, it's the second full paragraph.  The Court has continuously referred to the lawyers as attorneys, and then in the last sentence, switches to the word "advocates."  I would just use "attorneys" again instead of "advocates."

THE COURT:  Okay.

MR. CARUSO:  Because what's that called, the presumption of consistent usage, I'm not sure the jury would pick that up, but --

THE COURT:  Or hobgoblin of --

MR. CARUSO:  That, too.  Nothing else on that section of the charge.

THE COURT:  Direct and circumstantial evidence.  I take it the government has no comments --

MR. PODOLSKY:  We'll jump up if we have a --

MA3Cmil7

THE COURT:  Okay.

MR. PODOLSKY:  Thank you, your Honor.

MR. BONDI:  Your Honor, keeping with Mr. Caruso's last change, there is a couple of references to "advocates."  Just to be consistent and say "attorneys."

THE COURT:  And where is that?

MR. BONDI:  Halfway through -- sorry.  I'm on the wrong page, your Honor.  My apologies.  Strike that.

MR. CARUSO:  I have no objection to direct and circumstantial evidence.

I have a war story about when a judge tried to change the umbrella, the umbrella charge, but that's for another day.

MR. ROOS:  Objection to war stories, given the --

THE COURT:  Rulings on evidence and objections.

MR. BONDI:  We've located Mr. Caruso's notes.  They are in route, your Honor.

MR. CARUSO:  I want to know who had it, because they're going to be fired.

MR. BONDI:  It's either Mr. Mukasey or Ms. Young.

MR. CARUSO:  It's one of them?

MR. BONDI:  I think so.

MR. CARUSO:  I guess I can't fire Marc.  I'm reading the rulings on evidence and objections, your Honor.

No objection to rulings on evidence and objections.

THE COURT:  Inferences.

MA3Cmil7

MR. CARUSO:  No objection to that.

Now I'm looking at credibility of witnesses.

MR. BONDI:  Your Honor, we'll be filing this in a moment on the venue one, but I have a copy for your Honor and the prosecution.  May I hand it up?

THE COURT:  Absolutely.

MR. BONDI:  Thank you, your Honor.

Your Honor, one point of clarification, apparently one beat me to my third proposed supplemental change, so this should technically be the fourth and it will be filed on ECF, as well, if your Honor can note that, please.

MR. CARUSO:  I have no objection to credibility of witnesses.

THE COURT:  Okay.

MR. CARUSO:  Except, your Honor, it obviously does not use the burnt toast metaphor.

THE COURT:  Never heard it.

MR. CARUSO:  A witness who tells a half truth on the witness stand is like eating a piece of burnt toast, you can throw the whole thing away or you can cut off the burnt part and eat the rest.

Bias of witnesses.

Bias, yes, I remember reading this on Saturday.  Bias, hostility, or affection.  Does affection have anything to do with this case?

THE COURT:  No, not necessarily, but it speaks generally to the types of bias that witnesses may have.

MR. CARUSO:  Okay.  Leave it, then.

Small point.  The first full paragraph on page 29, the very last line, bear that factor in mind when evaluating the credibility of his or her testimony and accept it only with great care.  It's just really wordsmithing, but --

THE COURT:  I'll leave it as is.

MR. CARUSO:  Very well.  Okay.  Nothing else, then.

Now, uncalled witnesses.  I don't think either party is going to be arguing such a point, such an argument about there's somebody who should have been called.

THE COURT:  I'm happy to take it out.

MR. CARUSO:  I think it should come out.

MR. PODOLSKY:  We object to that, your Honor.  The defense, among other people, have referred to Britton Worthen numerous times and I think it's a standard instruction to make clear that the parties have equal opportunity to call a witness, it's a standard instruction, and we would object to it coming out.

MR. CARUSO:  Except we didn't have an equal opportunity, because as a fact, not as a law, but as a fact that Nikola employees dodged service of subpoenas.

MR. PODOLSKY:  I've heard defense counsel say that sentence every single charge conference I've been at, but the

law is both parties have equal opportunity to call witnesses and this charge is routinely given.

THE COURT:  Defense counsel always does use that line, but he has a more specific complaint.

MR. CARUSO:  Yes, much more specific.  I just don't think it's fair in this case.

THE COURT:  It will stay in.

MR. CARUSO:  Let me read it for detail, please.

THE COURT:  Sure.

MR. CARUSO:  Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.

I think that goes too far.  It's legitimate argument if someone's going to make a missing witness argument.  It's a legitimate argument to say that person didn't appear because he would have not supported this side or would have supported that side.  I think that's a legitimate argument.

THE COURT:  It's not.  This is what he or she would have said.

MR. CARUSO:  I object to this one for the record.

THE COURT:  Over your objection.

Number of witnesses.

MR. CARUSO:  No objection.

THE COURT:  Expert witnesses.

MR. CARUSO:  No objection.

MA3Cmil7

Preparation of witnesses is next.

MR. BONDI:  Your Honor, on this one I think there needs to be a distinction with the witness meeting with his personal lawyers.

MR. CARUSO:  Would you let me finish reading it for a moment, one moment, please.  Okay.  Go ahead.

MR. BONDI:  Your Honor, in the fourth line down, it says, I should tell you that there's nothing improper or unusual about a witness meeting with lawyers before testifying.  The purpose of the preparation of witness instruction is to avoid impinging upon the attorney-client privilege between the witness and the lawyer and to suggest there was something improper about a witness having a personal lawyer.

So, just to clarify this, I think it would be appropriate to say improper or unusual about a witness meeting with his or her own lawyers because, your Honor, it is a valid form of impeachment to suggest the witnesses met with the government multiple times and perhaps their testimony has evolved or changed.

MR. PODOLSKY:  That's wrong.  This instruction is specifically directed towards preparation by the parties of their witnesses, and the instruction also says that you may consider this fact when you are evaluating a witness's credibility.  So the instruction is correct.

THE COURT:  Yes, the instruction goes to meeting with

MA3Cmil7

the lawyers who will be putting on their testimony and the fact that they met with them once or twice or multiple times or dozens of times.  So I'm not going to add that additional language.

MR. CARUSO:  Your Honor, may we backfill now?  I have a couple of things, if we can backfill, please.

THE COURT:  Okay.

MR. CARUSO:  Let's go back to page 23.  I'm awfully sorry.  We go to page 23, the paragraph about Mr. Milton not testifying.  There are two paragraphs that have remained in here now.

THE COURT:  The first one?

MR. CARUSO:  The first one starts within this case, Mr. Milton did not testify.

THE COURT:  The first is on page 22, is the introductory paragraph.

MR. CARUSO:  Sorry.  No objection to that.

The last two paragraphs about the defendant not testifying, if you go to the second paragraph, it says you may not attach any significance.  I would ask the Court to change that to "must," "you must not."

THE COURT:  Any objection?

MR. PODOLSKY:  I think the language as written is clear and sufficient, but either way is okay with us.

THE COURT:  This is the language that I have always

MA3Cmil7

used.

MR. CARUSO:  I know, but it just, especially in light of what Mr. Milton said here.

THE COURT:  Sure.

MR. CARUSO:  It's good to be a little more emphatic.

Each of the first three sentences in that paragraph contains a "may" which I would ask the Court to change to "must."

THE COURT:  I'll change the first one.

What else?

MR. CARUSO:  Just one moment.

THE COURT:  But you have your notes now.

MR. CARUSO:  I do.  In rulings on evidence and objections, there are two paragraphs that remain that are in that section, and I have a comment on the second paragraph.

THE COURT:  Okay.

MR. CARUSO:  The second sentence says, you are the sole judges of the credibility of all witnesses and the weight and effect of all witnesses, and the lack thereof.  I would ask to have the Court insert that is consistent with a reasonable doubt standard where the Court refers to a lack of evidence.

THE COURT:  Any objection?

MR. PODOLSKY:  This is at the end of the sentence, it would say the weight and effect of all evidence and the lack thereof.

MR. CARUSO:  And the lack of evidence, yes, the weight and effect of the lack of evidence is a valid concept, certainly the effect.

MR. PODOLSKY:  Grammatically, I think it's bizarre to say the lack of weigh or effect of evidence.  I think the notion of the sentence is clear.  This is not a critical point, I just think the sentence is clear as written.

MR. CARUSO:  Bizarre, we can live with.  I think it's a good point, lack of evidence.

THE COURT:  Or lack of evidence.

MR. CARUSO:  Fine, or lack of evidence.  The word "lack" is the point.

THE COURT:  Okay.  I'll include it.

MR. CARUSO:  Now, if we go back to bias of witnesses, I have a sentence that I would proffer.

THE COURT:  What page are you on?

MR. CARUSO:  I'm on the very bottom of 28.  First sentence says, in deciding whether to believe a witness, you should also specifically note any evidence of bias, hostility, or affection that the witness may have toward one of the parties.  Evidence that a witness -- and this is my insert. Evidence that a witness is biased or hostile toward Mr. Milton requires you to view that witness's testimony with caution, to weigh it with care, and to subject it to close and searching scrutiny.

MR. PODOLSKY:  Objection, your Honor.  We don't think the jury instruction should be describing how the jury should weigh the evidence towards one party or the other.  In fact, that's the very purpose of these sentences.

MR. CARUSO:  In that case, saying with my language, but instead of saying bias or hostile toward Mr. Milton, say bias or hostile toward any party.

THE COURT:  That concept is encompassed certainly in the entirety of the paragraph, but also in the introductory sentence.

MR. CARUSO:  All right.  Well, you have my objection.

THE COURT:  Okay.

MR. CARUSO:  Where are we up to?  I'm caught up now.

THE COURT:  Charts and summaries.

MR. PODOLSKY:  On this one, your Honor, we did have, in our letter, a suggestion for charts and summaries.  I've never totally understood this because I think the point of 1006 is that a chart or summary is in lieu of other evidence, but as we mention in our letter, the Second Circuit does caution to make clear that the jury should evaluate all charts and summaries to -- or give an instruction, in substance, that they're no better than the underlying evidence and the jury should evaluate whether they're accurate.  So we've suggested a slight revision to the way this is written to make sure that concept applies to both demonstratives and all charts and

summaries, and we put a paragraph in our letter.

THE COURT:  Okay.  So the government's paragraph is as follows -- and this would replace what's in there now?

MR. PODOLSKY:  Exactly, your Honor.

THE COURT:  The parties presented exhibits in form -- in the form?

MR. PODOLSKY:  Looks like we omitted a word.  My apologies.

THE COURT:  In the form of charts and summaries.  As you will recall, some of the charts and summaries were not admitted into evidence, but were shown to you as aids to make the other evidence more meaningful and to help you in considering the evidence.  Others were admitted into evidence as exhibits.  I've admitted these charts and summaries in place of or in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience.  They are no better than the testimony or the documents upon which they are based.  Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based.  It is for you to decide whether they correctly present the information contained in the testimony and in the exhibits to which they were based.

MR. CARUSO:  Judge, we oppose that.  I think your original draft is much better and much more tied -- it's a much

more general proposition and describes the rule perfectly well.

MR. PODOLSKY:  So here's the problem, your Honor. It's not that we don't like your instruction, we do, but right now as I read the instruction, the sentences about these charts and summaries were shown to you to make the other evidence more meaningful, et cetera, and then below, they are no better than the testimony and the documents upon which they are based appears to refer only to demonstrative exhibits, which, frankly, as I read the rule, is correct, but the Second Circuit, including in *United States v. Ho* 984 F.3d 191, 210, has made clear that that language should be applied to both demonstrative exhibits and summary charts that are admitted into evidence, and that's the purpose of our suggested revision.

THE COURT:  Since *Ho* is recent, I'll accept the government's recommendation.  We will include that paragraph instead.

MR. CARUSO:  You have my objection.

THE COURT:  Yes.  The use of audio recording.  The one we were thinking about as we drafted this was the recording made by young Mr. Hicks.

MR. CARUSO:  Yes, and we object quite strenuously to the Court's draft.  And this morning, while we were in court, we did our own request, which I'll hand up.  For the record, it's ECF 202.  Counsel for the government, a copy.

MA3Cmil7

MR. PODOLSKY:  Thank you.

MR. CARUSO:  After your Honor has read it, let me explain our position.

THE COURT:  Can I ask a question while the government reads that.

MR. PODOLSKY:  We've read it, your Honor.

THE COURT:  Is it, in fact, illegal or is everyone being overly cautious?

MR. CARUSO:  No, it violates a specific Massachusetts statute, Massachusetts Statute 272, Section 99, which outlaws the interception of wire or oral communications, interception being defined as secretly hear or record the contents of any wire or oral communication through the use of any intercepting device by any person, other than a person given prior authority by all parties to such communications.  And it makes that a felony.

So I think that the Court is probably familiar with the shorthand, that is this a two-party state or a one-party state.  Massachusetts is a two-party state.  Young Mr. Hicks violated this felony statute when he recorded the call without Milton's consent.  And I'm assuming, I infer from the grant of immunity, that young Mr. Hicks, through counsel, took the Fifth when subpoenaed.  So we think that it is not just hyperbole or argument, it is correct to say the call was recorded in violation of the law of Massachusetts, Hicks was given

immunity, the government thereupon obtained the recording.  The government obtained it lawfully and it was lawfully admitted, but we're still entitled to argue the bias, the prejudice, the falsity, the false statement aspect of credibility argument about what the recording -- making the recording.

MR. PODOLSKY:  Couple of comments, your Honor.

First, I don't know whether this was an actual felony or violation of the law of Massachusetts.  I don't practice law in Massachusetts, I don't know what the elements are, Mr. Caruso read the statute, but it's also true Mr. Hicks requested immunity before producing these documents because he was, as many people do and as we all know, the law is not that you have to prove that they're guilty, is that he had an actual, legitimate fear of prosecution in Massachusetts.  So that's the factual predicate.

Mr. Caruso made, I think, a great point, which is they would like to argue -- I honestly don't understand this argument, I don't think there is a real factual basis for it, but they would like to somehow argue that the recording or -- I don't even know who, somehow are less credible because Lucas Hicks received immunity.  But this is a jury instruction and not a defense argument, so it should not come in here.  This is completely irrelevant.  Lucas Hicks did not even testify at this trial.  The recording was received by the government lawfully and the jury needs to be instructed on this.

MR. CARUSO:  There is no question, United States District Judges decide the law above the states all the time in diversity cases.  This is no question this is what Massachusetts law says, the government doesn't dispute that and can't dispute that.  The man violated the law.  It's a two-party state.  The fact that he -- not that he just violated the law, but he acted secretly, meaning he failed to disclose to Mr. Milton that he was making a recording, and that a failure to disclose certainly goes to credibility in a general way.

THE COURT:  So here's where I come down on this.  I'm not going to adopt the defense's version of this instruction. This instruction goes to evidence that the jury can lawfully consider, irrespective of how Mr. Hicks obtained it.  It went into evidence.  I don't recall, aside from the fact that there was only a portion of the call that was recorded, I don't recall that there was any objection otherwise to its authenticity, to its accuracy, a foundation was properly laid by the senior Mr. Hicks, the government obtained it lawfully, it is properly before the jury, and as far as the Court is concerned, period.  If you want to argue bias because it was recorded surreptitiously, it's up to you, but this is an appropriate reading of the law, that it's properly before them and they can consider it.

MR. CARUSO:  Judge, I do think that some of this,

you're kind of charging us out of court for that argument. This second sentence, this evidence was lawfully obtained by the government and properly admitted in this case. Well, it was lawfully obtained by the government, but the jury is going to hear that as, oh, it was lawfully recorded. That's not correct, it's not true, it's not legally or factually accurate, and I also think it's not necessary to say that it was properly admitted in this case because all the evidence that was admitted was properly admitted based on one of the Court's rulings. If you must say something -- if you're not going to give our charge, then I think you should just omit the whole topic, use of audio recording.

THE COURT: I'm sorry?

MR. CARUSO: If you're not going to give the request that we submitted at ECF 202, and you said you won't, then I think this whole topic of use of audio recording can just come out of the charge. There's no reason to charge the -- instruct the jury on this at all. It's obvious that it was lawfully admitted. Your Honor admitted it. You don't have to tell them that.

MR. PODOLSKY: We disagree with that. The reason this charge is given in cases like this is so the jury isn't confused about whether they can consider the evidence. The defense can certainly make the argument. Again, I don't fully understand it, that there was something untoward about

recording this and Mr. Hicks getting immunity.  But what this instruction says, and it says it very clearly, is that the government, the government obtained it lawfully and the evidence is lawfully to be considered by the jury.  It doesn't say anything more than that.

MR. CARUSO:  Saying that the government lawfully obtained it, it sounds an awful like Lucas Hicks lawfully made it.

THE COURT:  I may be wrong, but I'm assuming that Mr. Mukasey will make some mention of this.

MR. CARUSO:  Yes, he will, and that's why I don't think it's appropriate to say it was lawfully obtained by the government without also saying that it was unlawfully made.

But here's an alternative without prejudice to the objections that I voiced, how about something like this:  An audio recording has been admitted into evidence in this case. I instruct you that the evidence was lawfully obtained by the government; however, you may consider that Lucas Hicks –– you may consider that Lucas Hicks recorded the call unlawfully and received immunity, giving that evidence such weight, if any, as you believe it deserves.  It gives both sides something, it says the government lawfully obtained it, the Court properly admitted it, but you may consider the facts that we proved and that Mr. Mukasey is going to argue.

THE COURT:  And then that's precisely why this has to

come in in the way that it is, because sort of the purpose for this and the purpose that we inquire at jury selection is that there are people who don't believe that there should be any recordings at all or that the government should not be surveilling people, and therefore have a general objection to evidence that was collected in that manner.  And if that is the case, if it is a sincerely held belief that the government ought not be conducting surveillance of that type, then they ought not be on the jury because the Court has determined that it was lawfully obtained and may be used at the trial.  And all of the folks obviously that are on the jury indicated that they would be able to follow the instruction that the evidence obtained in this manner could be used and they would not hold it against the government for the reasons stated.

MR. CARUSO:  Respectfully, I just don't think -- I understand what the Court's saying, but I don't think that that rebuts my suggestion that at least the Court tells the jury that they may consider that the recording was unlawfully made as distinct from lawfully obtained by the government, and they may consider the fact that he got immunity for whatever weight they may give it.  If we're going to be allowed to argue it, then we ought to have a little bit of support that we can point to in the charge.

THE COURT:  You're barking up the wrong tree on that one.

MA3Cmil7

MR. PODOLSKY:  I was going to say in a moment of generosity, one thing we would offer to add is, in the third sentence, whether you approve or disapprove.  We would be amenable to saying whether you approve or disapprove of the government's use of the recording, just to make clear that the Court isn't commenting on Mr. Lucas Hicks' decision to record or not, and just to make sure the instruction is directed at the government's use of evidence, and maybe that helps the defense a little bit.

MR. CARUSO:  I think we've all stated our position.  What's the Court's ruling?

THE COURT:  The Court's ruling is to use it as is.  Now the government has a counteroffer to your offer, which is to say --

MR. CARUSO:  I know.  I'll take it without prejudice to my other arguments.

THE COURT:  So whether you approve or disapprove of the government's use of the recording?

MR. PODOLSKY:  Yes, your Honor.

MR. CARUSO:  I'll take that without prejudice to the objections I've already raised.

MR. ROOS:  Your Honor, just for the record, I want to put two things on it in case this is an issue at some point.

The first is I'm not a licensed attorney in Utah, but I will note that Utah appears to be a one-party consent state,

and the choice of law analysis may mean that Mr. Hicks is susceptible to Massachusetts, but again, that's not an analysis that's been done.  So I would just note that it seems the two states at issue had conflicting -- have conflicting wiretapping statutes.

The second thing I would note is in a 2020 decision by the First Circuit, *Project Veritas v. Rollins* 982 F.3d 813.  The First Circuit held that the specific Massachusetts law that we've been discussing was unconstitutional as applied to recording that particular organization of a public official that left open the question of the general constitutionality, but I will note that there is some certain level of authority calling into question the general constitutionality, so I'll leave it at that.

MR. BONDI:  Your Honor, just for the record, we don't think that case is applicable, we're familiar with it.  It did deal, as Mr. Roos said, with a public official here.  Mr. Lucas Hicks is not a public official.

With respect to the point about the choice of law, just for the record, your Honor, Mr. Hicks was in Massachusetts.  Massachusetts law would apply.  He has to comply with the state law in which he's in, and he violated that state law to which he sought immunity.

So just for the record, your Honor, we wanted to say we disagree with Mr. Roos' characterization.

THE COURT:  All very interesting legal issues that I don't have to deal with because I am giving the instruction as I've indicated with the change suggested by the government.

Next.

MR. CARUSO:  Stipulations.  The first paragraph, no objection.

The second paragraph, I think, is not applicable.  I don't think we've had the true stipulations of testimony.  I don't think we've had any stipulated testimony.  Strike true.

THE COURT:  I don't recall there being any.  Was there going to be some document custodian?

MR. ROOS:  There was one stipulation that we proposed as testimonial, but I think maybe was revised before signing, I want to check.  But, with that caveat, there is no testimonial stipulation, so we'd be fine cutting that point.

THE COURT:  So the second paragraph of the stipulations section is deleted.

MR. CARUSO:  Thank you.  Now, false exculpatory statements.  Once again, I think the concept doesn't apply here.  I don't think anybody's going to be arguing false exculpatories.

MR. PODOLSKY:  So there is a recorded conversation in evidence of Mr. Milton with a reporter named Ed Ludlow when Mr. Milton is accused of falsehoods where the government contends that he falsely, he made false exculpatory statements

in that phonecall.  So that, we think, is the basis for including this charge.

THE COURT:  Remind me.  I don't recall that exhibit.

MR. PODOLSKY:  I believe it's either 419 or 417, but it was introduced with Mr. Lackey, and this was a recording of -- as you may recall, there was the Bloomberg article that came out June 17th, so the recording was shortly before that, and it was when Mr. Milton spoke to Ed Ludlow and, we argue, falsely denied --

THE COURT:  Ludlow and his editor?

MR. PODOLSKY:  Correct, there was a second individual on the call.

THE COURT:  So that does make it applicable.

MR. CARUSO:  It's barely applicable.  Is it necessary to give this for one statement?  It really is an overkill.  It makes it sound like there's a ton of it when, in fact, there's just one that nobody else even remembered, other than Mr. Podolsky.  Nice memory, but nobody else remembers it.

MR. PODOLSKY:  I suspect the jury will remember it by the time they deliberate.

THE COURT:  There may be some mention of it in the summation, is what I'm hearing.

MR. PODOLSKY:  I would assume.

MR. CARUSO:  We've already established that because there is mention in the summation, the Court doesn't have to

instruct on it, otherwise we'd be having an instruction on Lucas Hicks.  It's such a minor point and it sounds like it's a major point when your Honor gives it.  I don't have any problem with Mr. Podolsky saying there was, out of all these hundreds and hundreds of statements, ladies and gentlemen, I want to point you to one that's a false exculpatory and shows consciousness of guilt.  It's one out of all these hundreds, it's overkill.

THE COURT:  How many statements are there in the interview?

MR. PODOLSKY:  In that particular interview?

THE COURT:  Yes.

MR. PODOLSKY:  There are a number of statements in that interview where he describes, in various ways -- and frankly, I actually should step back.  There's more than just that interview.  That's the primary one, but as your Honor will recall in followup on two television interviews, I think CNBC and CNN is my recollection, Mr. Milton, again, falsely states, when he's challenged about the article, that, in substance, the Nikola One truck was all functional, they chose not to drive it, but, in fact, it was a finished, complete functioning truck.

THE COURT:  To your point, Mr. Caruso, it's not because there may be some mention of it in summation, but because there is a factual basis for it in the record.

MR. CARUSO:  I'm just going to read it then, see if I have any linguistic suggestion.

Subject to my objection to the entire charge, nothing further.

THE COURT:  Okay.

MR. CARUSO:  Sympathy or bias, I have nothing.

THE COURT:  Okay.

MR. CARUSO:  Punishment, at the end of the first paragraph, I would ask the Court to insert the words "or the lack of such evidence."

THE COURT:  Any objection?

MR. PODOLSKY:  Just, where is it?  I see, at the end of the paragraph.  That's fine.

MR. CARUSO:  "Duty to deliberate" at the end of the first paragraph.

THE COURT:  Just give me a second.  At the end of the last sentence of the first paragraph of the punishment section, we were going to include the words "or the lack of such evidence."

MR. CARUSO:  Correct, so that the last clause reads to determine whether or not Mr. Milton is guilty beyond a reasonable doubt, comma, solely upon the basis of such evidence or the lack of such evidence.

THE COURT:  Okay.  Duty to deliberate.

MR. CARUSO:  At the end of the first paragraph, the

MA3Cmil7

Court ends that paragraph with the "and adopt that conclusion, which, in your good conscience, appears to be in accordance with the truth."  I would suggest that you substitute the word "evidence" for the word "truth."

THE COURT:  No.  Next.  This is not my language, by the way.

MR. CARUSO:  I understand.  It's just that it interjects -- well, we've been using the word "evidence" throughout.  Anyway, your Honor has my point.  Your Honor has my objection, I should say.

"All jurors required for deliberations," no objection.

(Continued on next page)

MR. CARUSO:  (Continued) Juror note-taking, I had one insert in the second sentence:  "Any notes you have taken are to be used solely to assist you and are not a substitute for the transcripts of the testimony, which has been taken down verbatim by the court reporter, or the exhibits themselves."  Testimony or the exhibits themselves.

THE COURT:  Any objection?

MR. PODOLSKY:  No, that's fine.

THE COURT:  Or the exhibits themselves.

MR. CARUSO:  Right.  My next one is on page 37.

THE COURT:  OK.  Anything from you, Mr. Podolsky?

MR. PODOLSKY:  No, just to interject, because the deliberation is reminding me of a question I wanted to ask your Honor.  Do you intend to basically only have the jurors deliberate until 2:40 or give them the option to stay the rest of the day?

THE COURT:  Once the case is in their hands, I tell them that they can set their own schedule.  That they can keep the schedule that we've kept for the last several weeks or that they can stay longer if they wish.

MR. PODOLSKY:  OK.

THE COURT:  They almost never take me up on that.

MR. PODOLSKY:  Fair enough.

MR. CARUSO:  My only other comment to the end here is in paragraph V conclusion, pretty much right in the middle, "if

MA3HMil8

the government has succeeded on a particular count, your verdict should be guilty as to that count. If it has failed, your verdict must be not guilty."

THE COURT: Any objection? I should say "must be guilty"?

MR. CARUSO: Personally, I think it's customary to say "if you think the government carried its burden of proof, your verdict should be guilty as to that count. If it has failed, your verdict must be not guilty."

MR. PODOLSKY: So it should be parallel, both for commonsense reasons and also not to suggest nullification, which would be inappropriate.

THE COURT: Yes, I'm going to keep it as is.

MR. CARUSO: All right. So now we can circle back to the beginning.

THE COURT: Yes.

MR. PODOLSKY: I thought we were done.

MR. CARUSO: Your Honor, please can I just say something while I'm thinking of it?

The defense sees no need for the Court to instruct the jury in detail on the jurisdictional means, interstate commerce, interstate wires, etc., and that might help shorten this up considerably. And what I would -- it's my understanding of the law that the Court must instruct the jury on every element but can say, with respect to a particular

MA3HMil8

element, there's no serious dispute on that, and you don't have to give them a long charge on how they should find that. We're willing to do that.

THE COURT: I mean, yes, I can say "I instruct you as a matter of law that the wire element has been satisfied here."

MR. CARUSO: I don't think it's necessary. My suggestion was much more along of lines of "there's no serious dispute here," "the parties don't dispute that," something like that. It isn't necessarily as a matter of law; it's a matter of concession.

THE COURT: Why don't you tell us where you're talking about so that I --

MR. CARUSO: OK. Right. Just give me a moment, and I'll find the first one.

MR. ROOS: Your Honor, since it's a fact issue, in my experience, the way this is often done is that the parties will stipulate to an element, and then the Court will say this isn't an element, and as you've heard, the parties have agreed or have a stipulation that it's met here. Here we don't have a stipulation. We're certainly open to it, and I think technically we could probably also put that stipulation on the record without a written stipulation. But I think, probably, if there's not going to be an instruction, there needs to be a stipulation as to the element just as we would stipulate to venue or something else.

MR. CARUSO:  Well, then in that case why don't we just leave it because -- well, that depends.

If the Court does agree that there ought to be a formal stipulation, then I'll have to talk to the guy who stole my notes, Mr. Mukasey, and make sure that he's OK with that.

THE COURT:  Yes, I don't know that it requires a formal stipulation --

MR. CARUSO:  I don't either.

THE COURT:  -- if there's agreement and there's no objection, but I'll leave it up to you folks to tell me.

MR. CARUSO:  I repeat, I've done this in a relatively informal way where the Court just says the third element is use of interstate wires, and there's no dispute about that.

MR. ROOS:  I think our office has definitely done this in the past in some form.  If it's OK, we could just look for an instruction where, I think, probably on wire and/or security this has happened, then we can just submit to the Court before midnight tonight, or something, whatever that looks like.

THE COURT:  Before midnight.

MR. ROOS:  Promise.

MR. CARUSO:  We wouldn't want to break with precedent.

Let's discuss.

MR. ROOS:  OK.

MR. CARUSO:  I'm just trying -- Mr. Bondi and I discussed this, and we just want to try to shorten this.

MR. ROOS:  I'll up my offer.  Before midnight we'll send, much before midnight, to defense counsel a proposed revision of these sort of jurisdictional instructions and then hopefully send to the Court an agreed-upon instruction.

How does that sound to you folks?

MR. CARUSO:  All right.  In other words, we're going to talk after this.

So shall we start at the beginning?

THE COURT:  Yes, sir.

MR. CARUSO:  OK.  Page 1, no dispute.

Page 2, no dispute.

Page 3, no dispute.

Page 4, no dispute.

MR. PODOLSKY:  Your Honor, we made a few suggestions to page 4 in our letter, which were in the manner of just helping to clarify what the counts are.  I think we proposed adding a sentence specifying what Count Four is in the first full paragraph on page 4, and a couple of revisions to the final paragraph on page 4 along the same lines.

THE COURT:  OK.  So --

MR. CARUSO:  This is -- the government wants to add the words "in connection with his purchase of Wastach Creeks Ranch, right"?

THE COURT:  I'm sorry.  Where does that go?

MR. PODOLSKY:  At the end of the first full paragraph

on page 4 which reads:  "It also alleges" -- this is describing the indictment -- "that from approximately April 2020 through March 2021, Mr. Milton devised a scheme to obtain money and property by means of false and fraudulent pretenses," and then we proposed, although the exact wording is not critical to us, "In connection with his purpose of Wastach Creeks Ranch."

The ideas is just that, without some definition there, it's not clear what scheme this is referring to.

MR. CARUSO:  No objection.

THE COURT:  "In connection with his purchase of Wastach Creeks Ranch."

MR. PODOLSKY:  And then, similarly, there's -- then there's a paragraph that begins "the indictment contains" and then there's a paragraph below which we suggested revising to, in the first sentence, "Counts One, Two, and Three relate to Mr. Milton's actions from November 2019," etc.

MR. CARUSO:  No objection.

MR. PODOLSKY:  And then --

THE COURT:  Counts One, Two, and Three.

MR. PODOLSKY:  Then it goes on to describe those counts more specifically.  And then Count four charges Mr. Milton with wire fraud as to his actions from April 2020 through March 2021.  And again, I think we wrote something like "relating to his purchase of Wastach Creeks Ranch."

MR. CARUSO:  We have no objection to that language.

MR. PODOLSKY:  Actually, your Honor, I realize I skipped over one similar definitional idea, which is the first sentence would read:  "Counts One, Two, and Three relate to Mr. Milton's actions to defraud investors from," etc., etc. Again, I'll just target it to make sure the jury knows which counts apply to which conduct.

MR. CARUSO:  We have no objection to what's been voiced to this point.

THE COURT:  OK.  So we're adopting the government's requests at page 1 and the top of page 2.

MR. PODOLSKY:  I have this -- at least on the version that was previously distributed, I have this on page 4 of the draft.  I see you're referring to the government's letter.  I understand.

THE COURT:  Right.

MR. PODOLSKY:  Thank you.

THE COURT:  OK.

MR. CARUSO:  Now I'm at the top of page 5.  Before the Court reaches II, the indictment, I have an insert to suggest.

THE COURT:  OK.

MR. CARUSO:  Page 5 starts with:  "You must consider each individual charge separately and evaluate each on the proof, or lack of proof, of that charge.  You must consider whether the government has carried its burden of proof" -- insert "beyond a reasonable doubt" -- "with respect to" --

MA3HMil8

insert "each element of each count."

THE COURT:  Well, its burden of proof is already defined as beyond a reasonable doubt.

MR. CARUSO:  It doesn't hurt to say it every now and then.

THE COURT:  We say it plenty, but I'll include "with respect to each element of each count."

MR. CARUSO:  Yes, sir.

THE COURT:  I'll add that.

Anything else on that paragraph, Mr. Caruso?

MR. CARUSO:  No, sir.

THE COURT:  OK.  Count One.

MR. CARUSO:  OK.  Count One, we object to the Court submitting this case, Count One, on a scheme liability theory. As the Court knows, 10(b)(5) has two theories, or allows two theories of prosecution:  (1) misrepresentations and omissions and (2) scheme liability.  They are different.  They are distinct.  Each criminal theory -- or each theory of criminal liability has different elements.  And in order to prove scheme liability, the government has to prove, has to have evidence sufficient to get to a jury on the elements that we laid out in our supplemental instruction number one:  First, that the defendant committed a deceptive act; second, that he committed the deceptive act in furtherance of his scheme to defraud; and then the other elements largely overlap with the

misrepresentations and omissions theory -- materiality, scienter, etc., etc.

But the big difference is in order to show -- to go to a jury on scheme liability, the government has to have raised a question of fact that the defendant committed a deceptive act. And in order to prove a deceptive act, the government has to prove something beyond, or more than, misrepresentations and omissions. In other words, if the government has only shown omissions and misrepresentations, then it can't proceed on a scheme liability theory.

Now, that's the *Rio Tinto* case which the Second Circuit decided back in July, and I'm quoting: An actionable scheme liability claim requires something beyond misstatements and omissions." And then *Rio Tinto* reaffirmed a case -- the case called *Lentell*, which affirmed a dismissal where "the sole basis for scheme liability is alleged misrepresentations and omissions," and which cited and quoted with approval a case by Judge Parker, who was the district judge in the *Schnell* case, dismissing where the allegations of misconduct are largely based on misrepresentations and omissions.

And without prejudice to my argument about the -- whether the government's raised a question of fact on a material -- a misrepresentation and an omissions theory, I think it's very clear that they have not raised a question of fact on a scheme liability theory because there's nothing

beyond misrepresentations and omissions here.  And I repeat, according to *Lentell* and *Schnell*, which the circuit adopted in *Lentell*, at least cited and quoted with approval, there has to be something more than simply misrepresentations.  There has to be -- scheme liability doesn't work where the allegations of misconduct are largely based on misrepresentations and omissions.

This case is a misrepresentations and omissions case, at best, for the government.  They have not proven something beyond that, and the Court should not submit 10(b)(5) on a scheme liability theory.

MR. PODOLSKY:  So, first, let me say *Rio Tinto*, these are all civil cases.  It is not at all obvious that these rules apply in the criminal context, as we briefed earlier in the case.  We actually don't need to address that really here because the notion that there haven't been any deceptive acts or acts beyond misrepresentations in this case is completely belied by the record.

So a few observations:  One, as those cases cited by Mr. Caruso make clear, dissemination of false statements is itself a deceptive act that would be sufficient for scheme liability.  The defendant here caused his statements to be disseminated on almost every possible media platform, whether it was TV, news, podcasts, Twitter, YouTube, etc.  He also caused others to do that.  For example, there was testimony

MA3HMil8

from Ms. Amzallag that Mr. Milton inserted into a Badger Q & A document false and misleading statements which the marketing team would then repeat in Nikola's own Twitter and social media accounts. There were other deceptive acts, for example, with respect to building the Badger, having basically fake receptacles to suggest there was hydrogen -- one of the vehicles was a hydrogen vehicle.

So I'm just naming a few, but the bottom line is this record is replete with deceptive acts that go beyond misrepresentations, even assuming the applicability of *Rio Tinto* and the other cases cited by Mr. Caruso.

MR. CARUSO: Judge, I still don't think the evidence is sufficient. The distinction between a person who makes a statement and a person who disseminates a statement is a valid one, but a defendant can't be both. A defendant either makes a statement or he disseminates a statement. That's the *Lorenzo* case where a defendant, who was an employee of a company, and the boss made misrepresentations. The employee said I can't be liable because it -- that wasn't my statement. Somebody else made the statement. And the *Lorenzo* case holds, no, the employee can be liable as a disseminator because he sent out someone else's statements. So Mr. Milton can't simultaneously make a statement and disseminate a statement. That's really just illusory.

And building the Badger with big receptacles,

that's -- essentially, that's a nonverbal misrepresentation. That's just nonverbal conduct. It's still a misrepresentation because it's a misrepresentation that, you know, a fuel cell could go in there. And, again, these cases, including *Kelly* -- the *Kelly* case, which is by Judge McMahon, often cited case, holds that scheme liability requires a deceptive act, but it's not sufficient that the deceptive act become misleading because of a later misrepresentation. Then that just makes it a misrepresentation case. If the empty container becomes deceptive only because of either a statement or an implication, oh, we can put a fuel cell in there, that's not scheme liability. That's still a misrepresentation.

So I really think that the evidence is too thin, and it really gives the government a crutch unfairly. I mean, they brought this case and -- let's face it, let's just face reality objectively. This is -- they've tried this case on a misrepresentations theory. They've tried to prove it on a misrepresentations/omissions theory. It just gives them a crutch. It's very unfair to go to the jury on this other theory, like, oh, you couldn't make that case, but let's just try it as a scheme liability. It's as if -- scheme liability doesn't exist just because the government or a plaintiff can't prove misrepresentations or omissions. It's a distinct -- it's a distinct theory, and I think the Court should guard carefully against giving the government that additional theory just

MA3HMil8

because they think they want it or need it and maybe their misrepresentations case isn't strong enough.

THE COURT:  Is a misrepresentations case --

MR. CARUSO:  It is -- I'm sorry.

THE COURT:  -- by definition --

MR. CARUSO:  Yes.

THE COURT:  -- a scheme case?

MR. CARUSO:  Maybe -- I want to make sure I understand what your Honor just said.

Yes, this is a misrepresentation case as distinct from a scheme case, and therefore, the Court should not submit this case to the jury on a scheme liability theory.  That's my position.

THE COURT:  OK.

MR. PODOLSKY:  Well, now we've sort of entered the land of like linguistic farce or something.  So now an action, a deceptive action, is merely a nonverbal misrepresentation. So then what is ever a deceptive act?  The definition of a scheme is deceptive act.  We've described multiple, and not even all the ones that are in the record, deceptive acts. That's point one.

Point two is *Lorenzo* absolutely does not hold that someone can't be responsible for both making a misrepresentation and disseminating it.  You won't find that in that opinion.

And, third, if we want to be real about what this case is about, this is about an individual who, frankly, back from 2016 engaged in a series of actions, not just misrepresentations but actions, to mislead people about the nature of his business.  They included false technology demonstrations, they included fake commercials, they included prototypes that have misleading parts, and they include going on different forms of media and lying about that business.  They also include causing members of Nikola to disseminate those misrepresentations.

So, frankly, reading *Lorenzo*, *Rio Tinto*, etc., and assuming they apply, it's difficult to understand how there's not a sufficient factual basis for a reasonable juror to conclude that Mr. Milton engaged in a deceptive scheme here.

THE COURT:  It sounds to me like, Mr. Caruso, you are saying, whatever evidence there is of a scheme here is small and is overwhelmed by the fact that this is really an omissions case, misrepresentations and omissions, but -- and, again, without characterizing the nature of the government's evidence, there's a basis in the record for it, and therefore, they ought to be allowed to argue to the jury.

MR. CARUSO:  Well, OK, but I go a little further than that.  What I'm saying is that the evidence that supports that theory is insufficient to go to a jury.  They haven't shown enough of it.  You know, it's like a rule -- this is where my

MA3HMil8

Rule 29 motion and the charge conference overlap.  The legal theory is viable, but they haven't shown enough evidence beyond misrepresentations and omissions.

THE COURT:  Well, what about what Mr. Podolsky just went through.

MR. CARUSO:  But I think I answered that.

And, by the way, this nonverbal conduct isn't my language.  It's from the Second Circuit.  It's from the *Finnerty* case.  And the concept of what would be a deceptive act, it's something other than oral statements or written statements.  You know, it's fake trading.

THE COURT:  But you don't believe that there's -- you don't believe that there's evidence of deceptive acts in this case?

MR. CARUSO:  Apart from misrepresentations, no.  I don't see any.

THE COURT:  What about the commercial?  What about the --

MR. CARUSO:  The commercial is a misrepresentation.  That the truck is moving on its own power, that's obviously a misrepresentation.  That's not a --

THE COURT:  Which they created.

MR. CARUSO:  Yes, but it's not deceptive beyond a misrepresentation.  Their whole argument is the truck rolling down the hill is fraudulent because it looks like Nikola

MA3HMil8

created the impression that it was going on its own power. That's a misrepresentation. It becomes the truck -- video of a truck becomes misleading only because of a subsequent misrepresentation or misleading impression. It's not beyond a misrepresentation, as in the words of *Rio Tinto*.

THE COURT: Am I missing something?

MR. PODOLSKY: I don't think so, your Honor. I mean, I guess we could say Mr. Caruso's example of fake trading is just another way of misrepresenting whether you're doing real trading.

The fact is this was a scheme that defendant executed over a number of months. It was systematic, it was lengthy, and he took a number of actions in furtherance of it.

MR. CARUSO: Do I understand the Court to have made a ruling?

THE COURT: I have.

MR. CARUSO: In that case, I'm going to argue something in the alternative.

THE COURT: Very well.

MR. CARUSO: If you're going to submit this case to the jury on both misrepresentations theory and a scheme liability theory, then we want -- we think the Court has to instruct on the elements of scheme liability, which the current draft does not do, because it doesn't define a deceptive act.

And we've got supplemental jury instruction No. 2,

MA3HMil8

ECF 184, which is a proposed jury charge on definition of a deceptive act.  The jury has to be told that they cannot convict Mr. Milton on this theory unless the government can prove that the deceptive act consisted of something beyond, or more than, misrepresentation and omissions of fact.  In other words, you cannot find Mr. Milton guilty of a deceptive act -- based on a deceptive act, if that act consisted solely or largely of misrepresentations or remissions.  That's directly from the Second Circuit language.  And if the jury's going to be act to convict this man on that theory, then they have to be instructed on that theory and each of its essential elements.

THE COURT:  I don't have the document that you were just reading from.

MR. CARUSO:  Does anybody have an extra copy of ours?  Otherwise I'll hand up.

MR. PODOLSKY:  We don't either, your Honor, because we thought that objections to the jury charge were going to be filed this weekend.

THE COURT:  I'm sorry?

MR. PODOLSKY:  I said we don't have a copy either because we understood that objections to the jury charge were going to be filed this weekend, and I think they're referring to something that they filed I'm not sure when.

MR. CARUSO:  Filed this on September 26.  May I hand this up?

MA3HMil8

THE COURT:  Sure.

MR. CARUSO:  Give the Court my only copy.  Ask to have that back.

THE COURT:  OK.  September 26.

To carry its burden of proof with respect to the charge of securities fraud in Count One, based on allegations of a deceptive act in furtherance of a scheme to defraud, the government must prove beyond a reasonable doubt each of the following six essential elements:

First, that the defendant committed a deceptive act.

Second, that he committed the deceptive act in furtherance of a scheme to defraud.

Third, that the deceptive act would have been material to the hypothetical reasonable investor.

Fourth, that the deceptive act was committed in connection with the purchase or sale of Nikola stock.

Fifth, that the defendant acted knowingly, willfully, and with the intent to defraud investors.

Sixth, that the defendant used, or caused to be used, a means or an instrumentality of interstate commerce in furtherance of the alleged fraud.

MR. CARUSO:  And the -- it's only the first two that really differ from the misrepresentations -- the elements of a misrepresentation theory and our instructions on scheme liability, which continue.  That was number one and two.  We've

MA3HMil8

got three, four, five, and six.

THE COURT:  Right.

MR. CARUSO:  Those just say I already instructed you on materiality.  The same instructions apply.  I already instructed you on state of mind and scienter.  Those also apply, etc.  The only two that really differ are deceptive act in furtherance of the scheme.

MR. PODOLSKY:  So, your Honor, I don't have this document in front of me, but I'll make the following observations just based on hearing Mr. Caruso read it.

One, your instructions do define what a device, scheme, or artifice to defraud is.  That is included in your instructions starting on page 6.  I don't think it's correct to say that a scheme requires a deceptive act.  We just heard discussion about how *Lorenzo* talks about dissemination of a misrepresentation would constitute a scheme.

And more than that, from what I could hear Mr. Caruso describing, that document doesn't set out the elements.  What it sets out is some legal argument about what would be insufficient or what else the government should have to prove compared to a misrepresentations case.  That's not a legal instruction.

MR. CARUSO:  No, I lay out the elements.  Judge, these elements come from the *Plumber & Steamfitters against Danske Bank*, 11 F.4th 90, 105 (2d Cir. 2021).  That's the case that

says scheme liability requires a deceptive act.  And then the definition of deceptive act comes from *Rio Tinto*, *Lentell*, and *Schnell*, which are cited in my request to charge.

This is not a legal argument, a legal brief.  These are requested instructions.  I repeat, if the Court is going to submit Count One on this theory of liability, then the Court must -- I rarely say what a judge must do -- but the Court must instruct on the essential elements of this theory, and these are the essential elements.

MR. PODOLSKY:  Your Honor, we're happy to take a look at what they've suggested again, but it seems to me that in this criminal case, based on pattern criminal charges, your Honor has instructed on the elements of Section 10(b) liability.  I see it right here at the bottom of page 6.

MR. CARUSO:  You haven't adequately instructed on scheme liability unless you define deceptive act in accordance with *Rio Tinto*.  That's our position.

THE COURT:  OK.

MR. CARUSO:  All right.  So let's get back to the Court's draft.

THE COURT:  Just for the record, I'm not accepting your proposition right now.

MR. CARUSO:  I understand.  Let me tell you what I think your Honor's doing was you're going to think about it.

THE COURT:  There's not a whole lot of time to think

MA3HMil8

about it.  As of now, it's denied.

MR. CARUSO:  OK.  Right.  Back to --

THE COURT:  Does the government have anything on the first element?

MR. PODOLSKY:  We have one correction, or suggestion, I should say, on page 6, which is to revise the final sentence, final words of the first paragraph under first element.  And I think our suggestion, which I've misplaced, but is to revise it to say "purchaser or seller of Nikola or VectoIQ securities" based on the way the case has been charged.

MR. CARUSO:  Oh, Mr. Bondi's going to speak to this argument here.

THE COURT:  OK.

MR. BONDI:  Your Honor, we object to adding VectoIQ securities.  As a legal matter, VectoIQ and Nikola were two different companies before the consummation of the merger on June 3.  We think it's inappropriate to group them together. The allegations throughout the case have always been related to Nikola, and Mr. Milton's statements at issue all relate to Nikola, not VectoIQ, at least not the alleged misstatements.

We think it's as a matter of law your Honor should not group them together and should not consider this to be Nikola or VectoIQ securities.

Moreover, your Honor, in terms of "in connection with," which is one of the elements here for securities fraud,

MA3HMil8

we don't believe that any statements Mr. Milton made with respect to Nikola or its products prior to June 4 were in connection with any VectoIQ securities simply because the merger had not been consummated.  He was not speaking about those securities.  He was speaking about legacy Nikola and Nikola.  So as a matter of law, we think your Honor can rule that this is inappropriate and not give the "or VectoIQ" that the government proposes.

THE COURT:  Mr. Podolsky, you said that the case was charged like this.  Are you referring to the indictment?

MR. PODOLSKY:  I am, your Honor.  So we've cited in our letter the indictment at paragraphs 16 and 22 through 26, and paragraph 16 the indictment explained that investors could purchase shares of what would become Nikola stock, NKLA stock, after on or about March 3, 2020, but before on or about June 3, 2020, by purchasing VTIQ stock, and that paragraph also defines "Nikola stock" to include VTIQ and NKLA in their proceeding paragraphs further explaining the theory.

So, as an initial matter, it was charged -- the indictment gives notice that the "in connection with" involves both VTIQ ticker and NKLA ticker.  There's also been substantial evidence adduced at trial, including the defendant's own statements and tweets, that he encouraged people, at the same time he was making misrepresentations about Nikola, to buy VectoIQ stock.  I, frankly, don't understand --

even if it were the case, I don't understand the relevance of the argument that there is a legal distinction between VectoIQ and Nikola because --

THE COURT:  Well, that is the case, right?

MR. PODOLSKY:  Sorry?

THE COURT:  It is the case that there is a legal distinction or was up until June 3.

MR. PODOLSKY:  Between the -- between the two companies?

THE COURT:  Yes.

MR. PODOLSKY:  Fair enough.  But another way to say it is that ticker, it may have changed name, but it's the same stock, VectoIQ and NKLA stock.  So it depends whether you're talking about the ticker symbol, the stock, or the companies.

But the point is we've charged that and put evidence before the jury that Mr. Milton's actions were in connection with both VectoIQ stock and Nikola stock.  So I don't think it's really of any particular moment.

MR. BONDI:  Your Honor, let's go back to the first concept from Mr. Podolsky that it was just a matter of changing the ticker here.  Nikola was a private company.  VectoIQ was a public holding company.  When they merged, they become new company, in language of M & A, it's New Co., not Old Co. with a new name.  It's New Co.

Moreover, your Honor, in the indictment -- we do not

believe the indictment puts us on notice that the government was bringing a case relating to misstatements related to VectoIQ merely because in the relevant entity paragraphs they describe this business combination at paragraph 16 and then later at 22.

I would also note, your Honor, for the record that, of course, the superseding indictment drops out all that information there.

Finally, your Honor, we don't -- unless the government correct me or others correct me here, I don't recall any investor, retail investor, talking about purchasing VectoIQ stock.  I don't believe there's been any testimony about the purchase of VectoIQ stock, and therefore, for that additional reason, it's inappropriate to charge about VectoIQ securities.

THE COURT:  Yes, let me ask you about that, Mr. Podolsky, because I don't recall it.  I guess Mr. Schonberger indicated that he purchased, was it, in June, late June?

MR. PODOLSKY:  August, I believe.  Mr. Ryan, I believe, was June.

THE COURT:  And I don't know that there was any evidence adduced concerning the purchase of VectoIQ stock. There's certainly plenty of information that Mr. Milton was encouraging people to purchase the stock, and there was a tweet that was introduced again today where he essentially says it's

not rocket science.  You buying a share of VectoIQ is the same as buying a share of Nikola.  Now, I'm paraphrasing, but that was the essence of what he was saying in that tweet, as I recall.

MR. PODOLSKY:  Yes, your Honor.  So I just want to be clear about the evidence and what we have to prove.

So if Mr. Milton had engaged in this scheme to defraud, had gone out there and lied and we could prove either it was a scheme to defraud or misrepresentations, that he did so intentionally, that he used a means of interstate commerce, it wouldn't matter if nobody had bought the stock.  In fact, I think your jury instructions make that clear.  So it's not an element of the offense that we prove that a particular anyone bought VectoIQ stock as a result of his actions.

Now, the reason we called Mr. Ryan, Mr. Schonberger in this particular instance was to provide relevant evidence of the materiality of those statements, which would be just -- we can argue from that just as effectively from, you know, inferences to Mr. Milton's earlier statements about, say, hydrogen or the Badger as well.  The jury can draw inferences from what they said about that.

Frankly, your Honor, if -- just to kind of play out Mr. Bondi's argument that, well, the merger -- maybe the merger didn't happen and then what?  Well, candidly, if the defendant engaged in the scheme to defraud people, encouraged people to

purchase VectoIQ and then the merger fell through, it never happened, it may not have been a very profitable fraud for Mr. Milton, but it still would have been a completed offense. So it's really not of any moment that the -- there was some attendant risk involved in the merger not being complete.

And I'll just note, since we had an economist on the stand today, I actually don't think the stock price changed on June 4 when companies actually merged, which suggests that the market had already priced basically a guarantee, an expectation, that the merger would actually complete on schedule.

MR. BONDI:  That's actually not correct factually.

But, your Honor, we're looking, but I don't recall either the government's witness, expert, Professor Mayzlin, talking either about VectoIQ.  We just haven't had testimony about purchasing in VectoIQ.

THE COURT:  Except through Mr. Milton's communications.

MR. PODOLSKY:  As well as Mr. Brady and I believe others, but Mr. Brady testified, I don't know if you want to say extensively or not, but talked specifically about the notion that it was in expectation that VectoIQ stock would become Nikola stock.  And during that time period, Mr. Milton specifically talked about people buying VectoIQ as, I think Mr. Brady term was, a mirror stock.

MR. BONDI:  Your Honor, we have no testimony that anyone in the world purchased VectoIQ stock because of anything Mr. Milton said.  Zero testimony from retail investors, from Professor Mayzlin, from anyone.

And, your Honor, just for the record and to proffer this, there are some days of trading of VectoIQ stock, your Honor, that there are literally like nine or ten trades in a day.  That's it, nine or ten.  This wasn't a widely traded stock.  So for your Honor to charge now on VectoIQ securities, when I don't believe we've had proper notice either from the indictment or from any of the evidence in this case, would, respectfully, be improper, your Honor.  And we would just ask that you deny the government's request on -- to add "or VectoIQ securities."  You don't need that.  Your Honor's original instruction was appropriate to say Nikola.

THE COURT:  Well, as Mr. Podolsky indicated, it's not necessarily required that anyone actually had purchased either VectoIQ or Nikola stock in order for there to be an offense.  The original indictment absolutely, I believe, put you on notice that this case involved the fraudulent representations/misrepresentations that occurred certainly at least from the announcement of the merger through to the consummation of the merger, and there has been substantial testimony, including Mr. Milton encouraging individuals to purchase VectoIQ stock because it would be the same as

MA3HMil8

purchasing Nikola stock.  So I will include the "or VectoIQ securities."

MR. CARUSO:  OK.  So to get back to the Court's draft --

THE COURT:  Yes.

MR. CARUSO:  -- so I am now on page 6, and I'll just give a corollary to my point about not submitting the case to the jury on scheme liability theory.

In the alternative, if the Court is going to do so, then the Court has to define -- has to give the essential elements of scheme liability theory, which I've already discussed, but I'm going to suggest that the Court break this into two because these are two distinct crimes, and the Court should instruct the jury on a misrepresentation/omissions theory, which is largely what the Court's draft does, and then additionally and separately instruct the jury on the theory of scheme liability.

So in the further alternative, assuming that the Court is going to not break those apart, although we think the Court should, I will continue and give your Honor some other proposed edits and objections.

THE COURT:  OK.  Why don't you do that.

MR. CARUSO:  OK.  I will.

One moment now.  OK.  I've already said the Court should break those two theories apart and state the elements

MA3HMil8

separately.  Now, if we go down near the bottom of six, a device, scheme, or artifice to defraud is merely a plan to accomplish a fraudulent objective.  We would ask the Court to include the language from our supplemental instruction No. 3, ECF 184, which is that a scheme to defraud is a pattern or -- excuse me, "a scheme to defraud is a pattern or course of conduct concerning a material matter designed to deceive a person."

That's from Judge Sand, which uses the -- sorry, that's from *United States against Rigas*, which says a scheme to defraud requires the defendant to engage in a pattern or course of conduct designed to deceive the victim.  Judge Sand has that same pattern or course of conduct language in his charge No. 44-10.  These are all cited in our requests.  I just think that the "pattern or course of conduct" is a very helpful phrase.  It's legally correct, and it's helpful to the jury.

THE COURT:  Do you have 184 up?

MR. PODOLSKY:  I'm sorry, your Honor, I'm trying to log on to pull it up now.

THE COURT:  And it's your proposed No. 3, you said.

MR. CARUSO:  It's my supplemental proposal No. 3.

MR. PODOLSKY:  I think there are now at least three supplemental proposed No. 3s.

MR. CARUSO:  Well, OK.  Then it's Mukasey-Frenchman has numbered consecutively.  I'm sorry if somebody else didn't,

MA3HMil8

but it's my proposed supplemental jury instruction No. 3, ECF 184.

THE COURT:  At ECF page 5.

MR. PODOLSKY:  OK.  I think I have it, your Honor.

MR. CARUSO:  That is correct, Judge.  No, it's at page 3, Judge, ECF 184 at page 3.

THE COURT:  Yes, but it's ECF page 5.

MR. CARUSO:  Oh, you're quite right.  Excuse me.  Forgive me, yes.

THE COURT:  So the language that you want to include is "a scheme to defraud is a pattern or course of conduct concerning a material matter designed to deceive a person"?

MR. CARUSO:  Correct.

MR. PODOLSKY:  Your Honor, I'm just looking up *Rigas* because it appears that Sand's instruction is exactly the one that you've used, and they're looking for a description from the opinion in *Rigas*.

MR. CARUSO:  All right.  I'll read out *Rigas*:  The scheme to defraud clause requires that the defendant engage in a pattern or course of conduct designed to deceive, a bank.  It's a bank fraud case, which is what I wrote in my request.

MR. PODOLSKY:  It appears to be a quote in *Rigas* describing bank fraud that's actually drawn from *Stavrovlakis* a --

THE COURT:  A what?

MA3HMil8

MR. PODOLSKY:  *Stavrovlakis*, an older Second Circuit case.

I'm not suggesting that it is an incorrect description by the Second Circuit, but it's simply not the way the element is framed in securities fraud cases.  I think your Honor has quoted Sand accurately, and I would propose sticking with the traditional instruction.

THE COURT:  Right now that paragraph, my paragraph reads:  "A device, scheme, or artifice to defraud is merely a plan to accomplish a fraudulent objective.  Fraud is a general term that embraces all efforts and means that individuals devise to deceive and to take advantage of others."  And I separately define materiality, which is also encompassed in the proposed language.

I guess I could make that the second sentence of the paragraph.

MR. CARUSO:  Yes, that's my suggestion, your Honor.

THE COURT:  OK.  I'll do that.

MR. CARUSO:  OK.  Good.  Now, on the next paragraph, I have another request, and again we did request this.  It's our request No. 14, not our supplemental request but our original request, but let me just summarize it.  It's from the *Connolly* case:  "A statement, representation, claim, or document is false if it is" insert "an assertion of fact capable of confirmation or contradiction," and then revert to the Court's

MA3HMil8

text, "untrue when made and then known to be untrue by the person making it."  But the *Connolly* case, 24 F.4th at 833, uses that formulation, "a statement is false if it is an assertion of fact capable of confirmation or contradiction," and then revert to the Court's text.

MR. PODOLSKY:  I'm sorry.  Is this in one of the proposed instructions?

MR. CARUSO:  It is.  Our request No. 14, ECF 167, at ECF 22.

THE COURT:  ECF 167?

MR. CARUSO:  Yes, sir, ECF 167.  And I'll start using the ECF pages rather than the Mukasey-Frenchman pages.  It's pages 22 to 23 of ECF 167, *United States v. Connolly*.

MR. PODOLSKY:  We object, your Honor.  The language that's in your charge is standard language that's been used over and over again.  It's fine that the Second Circuit might describe it in a different way, but, as we know, circuit opinions describe crimes in all different ways.  That doesn't mean that the elements that are given need to change to suit any particular opinion's description.

MR. CARUSO:  It's a Second Circuit case from 2022. I'm just trying to apply the law.

THE COURT:  Well, there are different ways of saying it.

MR. CARUSO:  True, but I do think that's a helpful

MA3HMil8

point because it distinguishes a statement of fact from a statement of opinion, capable of confirmation or contradiction.

MR. PODOLSKY:  Actually, just because something's an opinion does not mean it cannot be untrue.

MR. CARUSO:  No, of course not, it doesn't mean that, but it is helpful to distinguish -- it is helpful to help the jury distinguish between opinion and fact.

THE COURT:  I'm keeping it as it is.

MR. CARUSO:  All right.  You have my objection.

THE COURT:  Yes, sir.

MR. CARUSO:  Now let's go to seven.  There's a spillover paragraph, and just after the spillover paragraph is where I'm going to suggest the Court insert that definition of deceptive act from *Rio Tinto*.  I think it's a good place to put it without prejudice to my other arguments.  You can put right in there "to prove a scheme liability, the government must prove a deceptive act in furtherance of a scheme to defraud.  A deceptive act requires something beyond misrepresentations," etc.

I've shown the Court that language.  I think that's the place where it could easily go.

MR. PODOLSKY:  So I just don't think that there's a criminal case that I'm aware of that requires this kind of language.  I think the elements you have given are accurate and should be kept.

MR. CARUSO:  But, Judge, the statute applies criminally and civilly.  The only things that don't apply from civil to criminal, the government doesn't have to prove reliance, the government doesn't have to prove damages.  The rest -- the rest of the statutory concepts apply the same way both civilly and criminally.

The government has the additional burden of showing willfulness, but if you leave -- here's -- the law between civil and criminal 10(b)(5) is clear.  The elements are the same, civil and criminal, except the government doesn't have to prove reliance.  The government doesn't have to prove damages.  The government doesn't have to prove causation like would in civil case, but the government does have to prove willfulness.  Otherwise the law is the same.  Fraud, materiality, misstatement, scheme -- the law's the same civil to criminal.

MR. PODOLSKY:  But we also know that this is not a requirement even on the civil side because what *Lorenzo* says is even disseminating a misrepresentation constitutes scheme liability.

MR. CARUSO:  It's not *Lorenzo*.  It's *Danske Bank* which sets forth this deceptive act as an element, and it's *Rio Tinto* which defines the deceptive act as something beyond misrepresentations.  *Lorenzo* has nothing to do with this concept in particular.  *Lorenzo* has to do with scheme liability.  We're relying on *Danske Bank*, which states the

MA3HMil8

elements, and *Rio Tinto*, which defines deceptive act.

MR. PODOLSKY:  So *Rio Tinto* does not hold that deceptive act is an element of a 10(b)(5) violation.  I don't see that in *Rio Tinto*.  If the defense can prove it to us and show it to us, that's fine.  Never seen that.

MR. CARUSO:  That's exactly what it says, and *Danske Bank* says the same thing.  It lays out the elements.  It includes deceptive act.  The elements of scheme liability explicitly include deceptive act.  That's *Danske*.  That's *Rio Tinto*.  I don't know how you can say *Rio Tinto* doesn't say that.  It does.

MR. PODOLSKY:  Let's also start with a more basic point, which is these are not, as Mr. Caruso says, separate crimes.  They are separate means of committing a violation of Section 10(b)

(Continued on next page)

MA3Cmil9

MR. CARUSO:  Yes, they are, and they should be separately charged.

THE COURT:  The language that is used in the draft I provided properly lays forth what the jury needs to find and it will be kept as is.

MR. CARUSO:  You have my objections.  I think your Honor is failing to instruct on an essential element of a crime.

THE COURT:  Very well.

MR. CARUSO:  So, now, the next paragraph, it is not necessary for the government to establish all three types.  Shouldn't that just be both, not all three, but both, misrepresentations and omissions of one theory, scheme liability is another theory.

MR. PODOLSKY:  I think this is just a reference back to the three means listed on the top of page 6.

MR. CARUSO:  But I think it's confusing because thereafter, from that, thereafter --

THE COURT:  It refers to device, scheme, or artifice.  So that's fine.

MR. CARUSO:  Now, the Court has not -- is not proposing to instruct the jury on opinions, forward-looking statements, statements describing matters that are incapable of precise definition, and puffery.  Those are our requests, number 15 and 16, ECF 167, page 24 and 25.  We ask the Court to

MA3Cmil9

include instructions to the jury on those matters as laid out in our requests, number 15 and 16 on the pages I just cited.

THE COURT:  Any objection to that?

MR. PODOLSKY:  To the inclusion of those instructions?

THE COURT:  Yes.

MR. PODOLSKY:  Yes, we object to the inclusion of all.

MR. CARUSO:  The facts support it, puffery, we can whip -- we're going to whip the Ford truck, it's puffery. "We're the best."  "We're the best."  It's classic puffery or at least the jury could so find.  And some of these statements are statements of opinion, or at least the jury could so find. So we think that the evidence supports these instructions.

MR. PODOLSKY:  Which ECF are these at?

THE COURT:  ECF 167.

MR. CARUSO:  It's our request that we filed back in July.

THE COURT:  Back in August.

MR. CARUSO:  Withdrawn.  Sorry.  August.  Yes.  I think I worked on them in July.

MR. PODOLSKY:  So the defense is certainly able to argue they've got everything they need to argue to the jury, that these were not -- there was no intent to defraud here, that these statements were material, and all of the elements that the government hasn't met its burden as to any one of the elements of securities fraud.  I see maybe a dozen different

civil cases here discussing the concept of puffery.  I don't believe any of them apply to the elements of criminal securities fraud.

MR. CARUSO:  This is a ridiculous statement.  The law is the same on what constitutes a fraudulent misrepresentation, civil to criminal, it's exactly the same.  I said it five minutes ago.  The only thing that's different is the government doesn't have to prove damages, the government doesn't have to prove reliance, but they do have to prove a fraudulent misrepresentation or omission, and the law is the same, civil to criminal.

MR. PODOLSKY:  I agree, your Honor.  I absolutely agree with that.  That's why you are instructing on the elements of misrepresentation and materiality, and we'll have to argue to the jury that the defendant intentionally made misrepresentations or engaged in a scheme to defraud in relation to material matters.  And the defense is welcome to get up there and say nothing here was material, this guy was just doing marketing and puffery and no one cared about it, and they have everything they need to make those arguments in these instructions.  They're not entitled to have the Court also instruct as to their particular theory, unless they request an instruction as to the defense theory, in which case, they're welcome to ask for that.

MR. CARUSO:  That's what I'm doing.  That's what I'm

MA3Cmil9

doing. This is one of our theories.

MR. BONDI: Your Honor, the challenge here in this securities law is securities law, whether it's criminal or civil. The challenge here is Mr. Milton made, as Mr. Caruso said, a number of statements that really fall in any category of opinions. I could say, your Honor, you have the best courtroom in all of the Southern District and Mr. Caruso might disagree with that, and the jury might disagree with that, but that is an opinion that is not actionable under either criminal or civil law.

Similarly, this truck can move an F-150, this is the best truck — those sorts of puffery languages, your Honor, go well beyond the concept of materiality, and it goes to the fact of inactionable opinions, under criminal or civil law. And failing to instruct on that, I think, leaves the jury with this opportunity incorrectly to say, if we disagree with Mr. Milton's opinion that this truck can whoop an F-150, we can find him guilty of a crime?

MR. CARUSO: Put differently, I mean, I think that's a correct statement of the law, but the point for present purposes is that even Mr. Podolsky says that we can argue that, and all we want is some legal support from the Judge that, yes, it's as good as an argument that you, the jury, agree with it as a fact.

MR. PODOLSKY: Two things. I'm not sure why we're

MA3Cmil9

talking about whooping F-150s.  The government has never argued that was a misrepresentation or false.  That's number 1.

Number 2, if the defense wants an instruction that says the defense's theory of the case is that Mr. Milton was engaging in puffery and never made any material misrepresentations, they can have that.

MR. CARUSO:  The law is not that strict.  It's not like we're only entitled to one theory or one main theory.  These are arguments that we want to make, the record supports making these arguments, as I think even the government concedes, and the Court should therefore provide some legal guidance to the jury that says, in substance, that if you do find, as a fact, that this was an opinion or puffery, that could be a defense.  I'm not telling anybody it is a defense.  I just think it, you know, the Court should provide the legal support for the argument.

MR. PODOLSKY:  Here's the issue.  There's a difference between a defense theory instruction that says this is the defense's theory of the case and an instruction from the Court that suggests the validity of that argument.  What this instruction does is gives, out of context, the, I don't know, *informato* of the Court that certain statements that use certain words don't count as a crime, completely out of context.

MR. CARUSO:  Not don't count, but may not count.  It's up to you, ladies and gentlemen.  I'm speaking as if I were

you, your Honor.  I'm telling you what the law is, it's up to you to decide.  Nobody's saying -- you're not -- nobody's asking you to tell the jury that these statements don't constitute a crime.  We're asking the Court to explain the law so that we can argue that they don't.

THE COURT:  I think that's asking the Court to go too far.  Providing this type of instruction, I mean, you keep saying you we want legal support or we want help from the Court in terms of making this argument, and that's not what I'm here to do.  I think the instructions provide a correct statement of the law.  There are any number of arguments that could be made.  For example, even if I did, it's mere puffery, well, the car was built, that's mere puffery.  There was a fully-functioning car, mere puffery.  Those are all arguments that you're going to make, and nothing in these instructions prevent you from making that argument, but you're not going to get the Court's support to make those arguments.

MR. CARUSO:  The case I'm referring to and relying on is *Durham*, 825 F2.d 716.  It is well established that a criminal defendant is entitled to have instructions presented to any theory of defense for which there's foundation in the record, no matter how weak or incredible that evidence may be.  Continuing the quote, it is of some value to a defendant to have the trial judge clearly indicate to the jury what the theory of the case is, and that the theory, if believed,

justifies acquittal.  But I think we've got more important theories that we want to come to.

THE COURT:  Again, if you want a defense theory of the case instruction, then I'm happy to consider that, but I'm not going to make the jury instructions the defense theory of the case.

MR. CARUSO:  I understand.  You have my objection. And let's move on.  There are a couple of places where we really are going to ask for a defense theory instruction.

MR. PODOLSKY:  I'm just raising one logistical matter that I've been alerted to as we're working into the evening here.  My understanding is that defense counsel, who is intending to deliver the summation, has fallen ill.  I want to raise that now as we're sitting here together.

MR. CARUSO:  First I'm hearing of it, Judge.

MR. PODOLSKY:  It may make sense to confer with your deputy, your Honor, because this is what Ms. Estes has told me. I haven't spoken with defense counsel directly.

MR. BONDI:  Can we maybe confer with government counsel in a moment for all this?

MR. CARUSO:  Let's leave this to the Judge.  I think he's reading something.

THE COURT:  I don't have anything from Jazmin, but if true, we may not be able to go forward.

MR. CARUSO:  I think that's correct.

MA3Cmil9

THE COURT:  And I think it would be probably prejudicial to Mr. Milton if I were to require -- no offense.

MR. BONDI:  I have a feeling this is going to be offensive.

MR. CARUSO:  Your Honor is completely right.  I have no doubt of the ability of all of us to rise to the occasion, but your Honor's completely right.

MR. BONDI:  Yes, your Honor.  This is all news to us.

MR. PODOLSKY:  We can just ask you guys to confirm because, obviously, I've heard this through two levels of hearsay.  If you can confirm that it's accurate.

MR. CARUSO:  We just inquired.  Would your Honor like to continue with the instructions?

THE COURT:  Yes.

MR. CARUSO:  So I think you've made a ruling on that point.

THE COURT:  Yes.

MR. CARUSO:  Now, in connection with, I'm going to suggest to your Honor that the "touched upon" language has been, shall we say, overrun by subsequent Supreme Court cases.

The *Zandford* case talks about -- I think it's the first case that interjected the definition of "in connection with" as it is enough that the scheme to defraud and the sale of securities coincide, and then the *Merrill Lynch v. Dabit* case continues that concept, coincided in connection with is

satisfied by proof that the alleged fraud coincided with the securities transaction. And then *Troice*, which is the most recent Supreme Court case, reaffirms that coincides with, and then adds that it also must be material to a decision by one or more individuals to buy or sell.

So I recognize that the *Troice* case tends to interject a materiality concept into "in connection with," but that is the way the Supreme Court has phrased it. So I do think that the "touched upon" language, which may actually still be in *Sand*, I'm not 100 percent sure of that, I think the case law has moved beyond that. If your Honor would look at our request number 22, again it's ECF 167 at ECF page 33, 167 at 33, we have a proposed instruction using that "coincided" and "material" language, which we would ask the Court to use on the ground that it appears to be current Supreme Court language in the narrative that has developed over the years, even if the developments aren't perfectly clear.

THE COURT: I see that your proposed language has that the government has to establish a, quote, specific link.

MR. CARUSO: Yes, which I think is correct, if not squarely supported in the case law. I think that is an accurate way of putting it. Your Honor could say "link." I'll withdraw the word "specific."

MR. PODOLSKY: I think the language that's in the instructions regarding a nexus or relationship or relation is

the accurate one.  I think the defense instruction overstates the requirement in a few respects, including this direct link, as well as this insertion of this kind of materiality idea into this element.  Materiality is addressed, I believe, on the next issue.

MR. CARUSO:  Your Honor, I didn't make this up.  It's a Supreme Court case.  I'm happy to take out the word "specific" from "link."  I think "link" -- you could say "link" or "nexus," but I think it would be error to use the "touched upon" formulation in light of the cases which I've cited, which use "coincide" and "material."  I recognize that "material" has become like an add-on to "in connection with," but I repeat, I didn't write this.

THE COURT:  Do you have any information, Mr. Podolsky, on the "touched upon" language?

MR. PODOLSKY:  Your Honor, I'm trying to look up some recent charges that have been given on this count.

MR. CARUSO:  Can I object to "recent charges." They're not presidential.  Some of this stuff is from the '90s and '80s.  Other charges are not necessarily presidential.

MR. PODOLSKY:  Respectfully, I do think that the legal charges that judges in this district have given certainly are persuasive, if not presidential.

MR. CARUSO:  Well, let's get one thing straight, they're not presidential, Supreme Court is.

MA3Cmil9

THE COURT:  But they're not necessarily conflicting, either.

MR. CARUSO:  Not necessarily.

THE COURT:  I'm told Jazmin has confirmed what was discussed earlier.

MR. CARUSO:  So shall we pause then.  What does this mean?

THE COURT:  Let me just get in touch with my deputy.

MR. CARUSO:  If your Honor is going to do that, may I take a men's room break?

THE COURT:  We'll take ten minutes.

(Recess)

THE COURT:  As we had been discussing, unfortunately, one of the members of the defense team has had a medical issue, which will require us to, in some fashion, postpone the presentation of evidence and the summations.  I've spoken with counsel for the government and counsel for Mr. Milton, and we have agreed that the best, most efficient and clean course would be to adjourn the trial until next Tuesday, which I believe is October 11, at which point, we can continue with, if the defense decides, the redirect examination of professor Ferrell and summations.

We will contact the jury and let them know that they do not have to come back until next Tuesday, at which time we believe that we can still finish up the trial within the amount

MA3Cmil9

of time that we originally told them, which was October 14.  We are also adjourning, at this time, the charge conference.

Gentlemen, I can come back anytime this week, however you want to finish it up, tomorrow, we can come back tomorrow, or if you want to wait until later in the week, we can come back later in the week.

MR. CARUSO:  Tomorrow afternoon or anytime Thursday.

MR. PODOLSKY:  I'm ruling out Wednesday.

MR. CARUSO:  Tomorrow afternoon or anytime Thursday.

MR. PODOLSKY:  How early can we start tomorrow, Mr. Caruso?

MR. CARUSO:  Well, when I said afternoon, I had in mind 2:00.

MR. PODOLSKY:  Because of the holiday, I'm going to try not to be here too late tomorrow, but I think if we start at 2:00, that should be enough time.

MR. CARUSO:  You want to make it 1:00?

MR. PODOLSKY:  If that's available.

THE COURT:  1:00 tomorrow.

MR. PODOLSKY:  Thank you very much.

MR. BONDI:  My cocounsel wanted me to put on the record, and I think Mr. Roos alluded to it, that we do have some docs we want to move into evidence.  We can do that Tuesday morning, as well.

THE COURT:  Tuesday the 11th?

MA3Cmil9

MR. BONDI:  I guess we need the jury to move it in, but I think it makes sense to wait until the jury comes back and move in the documents at that point.

MR. PODOLSKY:  I think what's being contemplated there might be a few documents left to resolve.  Maybe we'll need relief from the Court.  Tuesday morning, the defense can move their final documents into evidence, then rest, and then we'll go right into closing.

MR. BONDI:  Your Honor, we're still trying to figure out whether to call professor Ferrell back, but we'll let you know in light of the governments' representation.

THE COURT:  We'll see you tomorrow at 1:00 in the afternoon.

MR. BONDI:  Judge, I'm not suggesting that any other rulings were based on any kind of time pressure to charge the jury tomorrow, I know there weren't, I wasn't suggesting that, but I do think it's really important to charge the jury, if not separately as two types of crimes under 10(b)(5), if not separately, which I think is the better course, at least to define that deceptive act under *Rio Tinto*.  I've exhausted the arguments, but I think that it's really important in terms of defining the elements.

THE COURT:  Well, see if you can convince Mr. Podolsky.

MR. PODOLSKY:  Sounds like we're being prepared for

MA3Cmil9

some *Rio Tinto* tomorrow.

MR. BONDI:  Your Honor, my cocounsel just wanted me to convey their thanks and appreciation for your accommodating this.

THE COURT:  Very well.

MR. CARUSO:  Okay, Judge.  Thank you.  See you tomorrow.

(Adjourned to October 4, 2022 at 1:00 p.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                    Page

 FRANK ALLEN FERRELL

Direct By Mr. Bondi . . . . . . . . . . . . .2562

Cross By Mr. Roos . . . . . . . . . . . . . .2612

Redirect By Mr. Bondi . . . . . . . . . . . .2734

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 AFX-5000 . . . . . . . . . . . . . . . . . .2699