MA4HMil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                           21 Cr. 478 (ER)

TREVOR MILTON,

           Defendant.

------------------------------x

                        New York, N.Y.

                        October 4, 2022
                        1:00 p.m.

Before:

                 HON. EDGARDO RAMOS,

                       District Judge

                  APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JORDAN L. ESTES
    NICOLAS T. ROOS
    MATTHEW D. PODOLSKY
    Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
    Attorneys for Defendant
BY:  MARC L. MUKASEY
    KENNETH A. CARUSO
    TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
    Attorney for Defendant
BY:  BRADLEY J. BONDI

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(Trial resumed; jury not present)

THE COURT:  In the matter of U.S. v. Trevor Milton, jury charge conference part two.

Parties, please state your appearance for the record, starting with the government.

MR. PODOLSKY:  Good afternoon, your Honor.  Matthew Podolsky, Jordan Estes, and Nicholas Roos for the government.  With us at counsel table is our paralegal, Isabel Wolfson.

MR. CARUSO:  Kenneth Caruso, Bradley Bondi, and Traci Zeller for the defendant.

THE COURT:  OK.  I'm trying to figure out where we left off.

MR. CARUSO:  Page 7.

MR. ROOS:  I think we're done.

MR. CARUSO:  Page 7, your Honor, "in connection with."

MR. PODOLSKY:  Just for the record, your Honor, I understand that the defendant has waived his presence for this legal discussion, but if we could just, for the record, have defense counsel confirm as much.

MR. CARUSO:  Yes, confirmed.

THE COURT:  OK.  So "in connection with."

MR. CARUSO:  Yes.  And I mentioned yesterday when we left off that the "touched upon" language I suggest has been outdated, I suppose would be the word, by subsequent Supreme Court cases, and we referred the Court to our requests No. 22

MA4HMil1

and 23, ECF 167, at page -- ECF page 33 and following.  And then I also have two specific requests, or suggestions, with respect to the language of the Court's paragraph on page 7.

THE COURT:  OK.  What's that?

MR. CARUSO:  In the second line, the Court has the words "or agreed to participate," and I think that that sounds like a conspiracy case, which, of course, this is not.  So I would suggest that the Court strike that language and just would then say "unless you find that Mr. Milton participated in fraudulent conduct."

THE COURT:  Any objection?

MR. PODOLSKY:  No objection.

MR. CARUSO:  And there's the same in the last sentence, last two lines on this page, strike "or agreed to participate."

THE COURT:  OK.

MR. CARUSO:  And then again we urge the Court to use the language from the *Dabit* case and *Zandford* and *Troice*, which I cited yesterday, and it's contained in our No. 22.  We urge the Court to use that instead of the "touched upon" language that's in the Court's draft.

THE COURT:  Any objection?

MR. PODOLSKY:  I'm not sure the ultimate significance of this, but if the request is to replace "touched upon" with "coincide with," we're OK with that.  We do object to the rest

of the proposed instruction in defense -- in Dkt. No. 167.

THE COURT:  We'll change the phrase "touched upon" at the fourth line from the bottom to "coincided with."

MR. CARUSO:  Yes.  OK.  But then also, again, I recognize that the court, the Supreme Court, interjected materiality here, but the phrase -- I believe the accurate wording from the case law would be "coincided with purchases or sales," and that the misrepresentations or omissions were "material to the decision to purchase or sell Nikola stock." That's the language of *Troice*.

MR. PODOLSKY:  That may have been the particular sentence in that Supreme Court opinion, but these instructions as drafted are accurate and are helpful to the jury because they divide out these two separate elements.

THE COURT:  OK.

MR. CARUSO:  Well, your Honor, has my position.

THE COURT:  I'm sorry?

MR. CARUSO:  You have my position.

THE COURT:  Understood.

MR. CARUSO:  You have my objection.

THE COURT:  Noted.

MR. CARUSO:  Now, if you turn -- when we turn the page to page 8 -- just let me read my notes here -- yes, at the top of page 8, the first two sentences are fine:  "It is not necessary for you to find that Mr. Milton was or would be the

MA4HMil1

actual seller of the securities. It is sufficient if the misrepresentation or omission of material fact involved a purchase or sale of securities."

I think that the next two sentences aren't applicable to this case: "By the same token, the government need not prove that he personally made the misrepresentations," etc. "It is sufficient if the government establishes that Mr. Milton caused the statements." I don't think that applies to the facts of this case.

MR. PODOLSKY: It does, your Honor. I mean, I can point to a few examples, but Mr. Milton caused many people to repeat his misstatements. One that we pointed to yesterday was the Badger Q & A document that Ms. Amzallag spoke to, but this is a correct statement of the law, and there may well be argument with a basis in the record as to this point.

THE COURT: I guess, Mr. Caruso, your point would be well taken if all there was was Mr. Milton's statements, but as Mr. Podolsky points out, there are instances where others repeat what Mr. Milton said. And in that sense --

MR. CARUSO: But my concern there is that I actually don't remember anything in the record to that effect. He mentioned one item, but I don't -- even if that is accurate, which I don't remember it being --

MR. BONDI: Your Honor, if I may --

THE COURT: Tweets?

MR. PODOLSKY:  Sorry, your Honor.

THE COURT:  Aren't there also retweets of his tweets?

MR. PODOLSKY:  Yes.  And also, this, of course, would apply to the fact that Mr. Milton used the company's Twitter account and social media, causing Nikola to make many of the same misrepresentations.

MR. BONDI:  Your Honor, that doesn't constitute a deceptive act.  That would be a statement under the law.

But if I could go back to something Mr. Podolsky raised, which was the testimony of Ms. Amzallag on changing the talking points.  There was no subsequent testimony from anyone, that I can recall, of anyone saying those statements or doing those things.  So if the testimony at face value is Mr. Milton somehow altered talking points or edited talking points, there's no subsequent testimony of it going anywhere or anyone doing anything with it.

As far as any tweets that were attributed to the company account from Mr. Milton, those are the company tweets, not his.  And in any event, they would be a statement, not an act here.

So I do think, your Honor, there's critical evidence missing of any "deceptive act" here.

MR. PODOLSKY:  We seem to be talking about different issues here.  As I understand, the portion that we're discussing is the sentences that it is sufficient if the

government establishes that Mr. Milton caused the statement to be made or the act to be omitted.  As we've mentioned, there's actually quite a bit of evidence in the record that Mr. Milton caused his misleading statements to be repeated or made by others.

I'll list another example.  There's several articles in the record that repeat newspaper articles, Bloomberg articles, that repeat the misstatements that Mr. Milton made.  That's yet another example.  So there's quite a bit in the record that would provide a factual basis for these sentences which, again, are legally accurate and useful to the jury.

MR. BONDI:  Your Honor, I think the case law under *Lorenzo* and other Supreme Court precedent talking about disseminating or causing misstatements is not rooted in someone repeating them.  It's a -- there has to be more than that.  There has to be a "here is the statement that you're going to put out" and a direction like that, and I think that's the critical evidence that's missing here in terms of causing.

THE COURT:  Why does it have to be that sort of a direction?  I mean, isn't Ms. Amzallag's job to disseminate information on behalf of the company?

MR. BONDI:  Ms. Amzallag also testified that she was part of a team that vetted that information and that team also included at times, as she said, the general counsel of that.

THE COURT:  Well, now you're putting a defense in

there, but it doesn't negate the fact that it was something that Mr. Milton said that was -- that he caused to be disseminated.

MR. BONDI:  Again, your Honor, I think there's superseding events here, and the superseding event is the vetting process by the company that obviates any causing situation from Mr. Milton.

But, your Honor, I think we've made our record on this point, and we can move on.  We would object to the language with respect to causing.

THE COURT:  Very well.

MR. CARUSO:  Moving on to the next sentence.

THE COURT:  Sentence or next section?

MR. CARUSO:  Next sentence.

"With regard to the alleged misrepresentations and omissions, you must determine whether the statements were true or false when made."  I would ask that the Court use the same language that we requested on the first element, adding "you must determine whether the statements were an assertion of facts capable of confirmation or contradiction that were false when made and known by Mr. Milton to be false."

That's based on the *Connolly* case, and I think that that is important in both the first element, which is page 6 of your draft, and this element, especially because the Court ruled yesterday that it wouldn't give a charge on puffing and

opinions.  This at least introduces the concept of capable of confirmation or contradiction, at least generally distinguishes between fact and opinion.

THE COURT:  I'm sorry.  Where is that language on page 6?

MR. CARUSO:  On page 6, yesterday at the bottom of page 6, the last paragraph says, "A statement, representation, claim, or document is false if it is," and we ask to insert "if it is an assertion of fact capable of confirmation or contradiction."

THE COURT:  I didn't add that language.

MR. CARUSO:  I know, but I'm asking that you do, and that you add it not only on the first element on page 6 but on the second element on page 8.  I think it's (a) accurate and (b) especially important now that the Court has ruled that he's not going to charge on puffery and opinions.

MR. PODOLSKY:  I don't -- I think it overstates the law, and I think it's confusing.  I think the instruction as written here accurately conveys to the jury what they need to find.  It also injects, as I understand it, mens rea into this element.  There's a separate instruction on mens rea.

I also have to say I'm not -- it's not clear to me what basis in the record there even is to argue that any of the false or misleading statements were opinion.  So I'm not even sure what argument that's supporting.

THE COURT:  OK.

MR. CARUSO:  Anyway, the Court, you have our position on that.

THE COURT:  And it is denied.  Next.

MR. CARUSO:  So material fact, my suggestion here is -- well, several, but with respect to the second sentence, the word "material" here refers to the nature of the facts involved in the false or misleading statements.  Insert "nature of," insert "the facts involved in the misleading statements." We use the word "material" to distinguish between the kinds of facts we care about and those that are of no importance.

THE COURT:  I'm not going to change this language.

MR. CARUSO:  OK.  Now, here we have a broader objection.  These instructions, your Honor, don't accurately state the law of 10b-5.  They may state -- they seem like wire fraud instructions.

THE COURT:  They seem like?

MR. CARUSO:  Wire fraud instructions.

THE COURT:  OK.

MR. CARUSO:  I believe that the Court simply must instruct the jury on 10b-5 materiality, which has particular requirements.  The government has to prove a substantial likelihood that the hypothetical reasonable investor would have found the fact important or significant when making an investment decision.  "A fact is important or significant if

MA4HMil1

there was a substantial likelihood that the fact would have been viewed by the hypothetical reasonable investor as one that significantly altered the total mix of information available."

That's directly from the case law like *Litvak*, *Basic against Levinson*. I think it's critically important that the Court charge in the proper language. Materiality for 10b-5 requires an instruction on total mix and the hypothetical reasonable investor, I mean, among other things. It's just inaccurate. What the Court has here on page 8 is simply not accurate on a 10b-5 charge.

And the language that I read from is from our instruction No. 17, ECF 167 at ECF page 26. I have -- I will add to that, but I think that's the basic point here.

MR. PODOLSKY: So aside from adding a bunch of words like "hypothetical," the instructions as written say "a material fact is one that a reasonable person would have considered important in making his or her investment decision."

Now, if it's important to the defense to have the phrase "total mix of information," or something along those lines, we're OK with that. Here's two proposals: One is at the end of that sentence to say "important in making his or her investment decision in light of all the information publicly available" or "in light of the total mix of information totally available."

Another possibility that we wrote in our letter back

in July is to add a sentence that says:  "To be material, information must alter the total mix of information available. In considering materiality, misrepresentations should be viewed collectively."

We're open to some -- it doesn't have to be those exact words, but I think the proposal by the defense is confusing, especially relative to the Court's instruction as drafted.

MR. CARUSO:  I'm glad that the government is saying that because, yes, we do need "total mix" and "hypothetical reasonable investor" because those are going to be squarely argued in our summation.

I suggest that my language is substantially the same -- well, is the same in substance to what Mr. Podolsky just said but is completely accurate based on the case law. What I wrote in my No. 17 comes almost verbatim from countless cases, two of which are *Litvak* and *Basic v. Levinson*.

THE COURT:  So what I will do is at the end of this sentence, "A material fact is one that a reasonable person would have considered important in making his or her investment decision," the following, "in light of the total mix of information publicly available."

MR. CARUSO:  Yes.  But I do think that on this count, and this count alone, instead of "reasonable person," the Court should say "hypothetical reasonable investor."  That's the law.

MR. PODOLSKY:  I'm not sure where the word "hypothetical" is coming from.  It seems to be trying to make the defense's argument.  A reasonable person is the standard, and it says right here, "would have considered important in making his or her investment decision."

Now, as between a "reasonable person" or "reasonable investor," we actually don't have strong feelings about that. If the request is to change "reasonable person" to "reasonable investor," that's fine.

MR. CARUSO:  OK.  But the word "hypothetical" is indisputably in the case law, indisputably.  This is a hypothetical, objective standard for materiality.

THE COURT:  The word "hypothetical" is also implicit in the sentence, "is one that a reasonable investor would have considered in making his or her investment decision."

MR. BONDI:  The worry, your Honor, is I do think that the jury will be confused thinking that that's an instruction about the investors who testified, and I think that the word "hypothetical" is critical here under the case law.  I would reiterate my colleague's advocacy for including that word. It's in the case law.  So that's a correct statement of the law, and it avoids any confusion of the jury thinking that you're talking about the people who actually took the witness stand here, and it's not.  It's a hypothetical, objective standard under the law, your Honor.

MA4HMil1

MR. PODOLSKY:  Actually, I think exactly the opposite. The word "hypothetical" is confusing to a lay jury.  We're trying to have plain English instructions here.  Hypothetical suggests they have to engage in some sort of hypothesis, which they don't.  They just have to think about what a reasonable person in these circumstances would do.

MR. CARUSO:  Judge, that's wrong, and the fact that the government didn't put on anybody to --

THE COURT:  You're both saying the same thing, and I think --

MR. CARUSO:  I don't think so.

THE COURT:  I think that the word "hypothetical" is absolutely embedded in this instruction and in this sentence. I don't think that the jury will be confused in the least.

MR. CARUSO:  OK.  I know it's not -- well, we think that the case law requires the use of the word "hypothetical." We want to be able to argue that point.

THE COURT:  You can argue that point.

MR. CARUSO:  Yes, but we want to be able to say that the jury can't just look at these two people who testified.

THE COURT:  And nothing in this instruction tells them to do that.

MR. CARUSO:  OK.  You have our position, Judge.  OK.

THE COURT:  Very well.

MR. CARUSO:  And would your Honor please indulge me by

just reading the sentence as you've --

THE COURT:  Sure.  "A material fact is one that a reasonable investor would have considered important in making his or her investment decision in light of the total mix of information publicly available."

MR. CARUSO:  All right.  That's acceptable as we -- we also request "hypothetical."  The Court has ruled.  We have our record.

THE COURT:  Yes.

MR. CARUSO:  All right.  Now, here I need once again to make a record.

Our requests No. 18 and 19, we ask the Court to instruct the jury specifically that the total mix of information publicly available to the reasonable investor includes the SEC filings.  So obviously a key point in this case.  And the case law makes it perfectly clear that the total mix includes SEC filings, and I just -- I don't see how it can be argued otherwise.  This is our request No. 18, ECF 167, at 27, citing cases that hold the SEC filings are part of the total mix.

MR. PODOLSKY:  So our issue with this is twofold: One, this is simply providing -- first of all, there is nothing that precludes the defense from arguing that the SEC filings are part of the public record.  In fact, the instructions as written absolutely permit that argument, and the defense will

be able to make it.  Providing an instruction that emphasizes the facts that the defense wants to emphasize is not appropriate.  It provides support, the Court support, to the defense's arguments.  So that is the reason we object to this.

I will also note, all although we are not asking for an instruction describing the particular set of investors here, that actually what the record supports is that the defendant targeted retail investors.  And I think emphasizing something that -- all of the evidence in the record has supported that retail investors tend not to look at this, would be inappropriate.  The record actually doesn't support an emphasis on the SEC filings.

MR. CARUSO:  Well, I think it does.

THE COURT:  Hold on.  You think it does.  You want me to put in the total mix of publicly available information includes tweets and Facebook posts and interviews on StockTwits?

MR. CARUSO:  One moment.

(Counsel confer)

THE COURT:  Or an instruction that says no one reasonable potential investor is required to have read all of these things?

MR. CARUSO:  Well, now we come to the next argument, which is our request No. 19.  The case law supports an instruction that a reasonable investor is charged with and is

MA4HMil1

responsible for knowledge of the statements in Nikola's documents filed with the SEC, right?  This comes directly from the *KeySpan* case.  It's cited at ECF 167, at ECF 28.  *KeySpan* case, investors are charged with knowledge of SEC filings. *La Pietra*, Southern District, reasonable investor is responsible for knowledge of the disclosures.

THE COURT:  Are you reading that to mean a reasonable investor is assumed and was required to have read the SEC filings?

MR. CARUSO:  Yes.

THE COURT:  You are?  You just argued yourself right out of that instruction.

MR. CARUSO:  I'm sorry, Judge?

THE COURT:  You just argued yourself right out of that instruction.

MR. CARUSO:  I don't understand.

THE COURT:  To say that a reasonable investor is required to have read the SEC filings before he or she can complain about having been defrauded is not, cannot be, the law.

MR. CARUSO:  It is the law.  I cited the cases.

THE COURT:  Is it the law?

MR. PODOLSKY:  It's not, your Honor.  Those cases don't stand for that.  And I'll point out the defendant's own expert said the opposite thing.

MA4HMil1

THE COURT:  What did he say?

MR. PODOLSKY:  I believe what Professor Ferrell said that investors look at different things.  Some look at these statements; some look at SEC filings.  He did not in any way support -- there's no factual basis at all in the record to say that reasonable investors are required and presumed to have knowledge of any particular bit of information, anymore than they're required or presumed to have knowledge of any particular podcast or tweet.

MR. CARUSO:  Look, I don't think that's right.  Professor Ferrell said that the SEC filings were the most important document for an investor to read, and I'm telling -- I'm just telling your Honor what's in these cases:  *Keyspan*, investors are charged with follow of SEC filings.  *La Pietra*, reasonable investor is responsible for knowledge.  *Seibert*, Second Circuit case, where information is equally available to both parties, a defendant should not be held liable under the securities laws.  *St. Clair*, also cited here, Second Circuit in an unpublished opinion, the defendant did not mislead.  The shareholders can be assumed to have known based on the facts, based on the disclosures.  And other cases from outside the circuit.

The case law is clear that the reasonable investor either has to read the SEC filings or be charged with knowledge of them.

MR. PODOLSKY: So those cases, which are civil cases addressing, for example, motions for summary judgment, reflect the facts of those cases. *Litvak*, which the defense cites, has cited repeatedly throughout this case, holds, in substance, that you have to look at the particular segment of investors in order to understand what the total mix of information is.

MR. CARUSO: Well, *Litvak* -- we've cited the cases for this point, that a reasonable investor is charged with knowledge, and we think the Court should charge that based on the law.

By the way, once again, this is like the third time, the law is the same on materiality between civil and criminal. It's the same.

THE COURT: I have to say, Mr. Caruso, I am not familiar with any instruction given by any judge in any case in this court that directs the jury to conclude that a reasonable investor must have read the SEC filings in order for you to find that they were defrauded.

MR. CARUSO: And we're asking -- the Court may well be right that prior charges don't say that, but prior charges didn't rely on these cases, and I do, we do. The case law supports it, and we request it.

THE COURT: And it's denied.

MR. CARUSO: So let me go back to my papers, please. And we would also like an instruction -- we request our request

MA4HMil1

No. 20, ECF 167, at page -- ECF page 30:  "A misrepresentation or an omission is immaterial if the information in question is already known to the market.  In that circumstance, the misrepresentation or omission cannot then defraud the market." And that is a quote from -- at least part of it is a quote from the Court's own decision, *SEC v. Honig*.  A misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market. We ask the Court to include that because it applies, and it's the law.

And I'm -- I mean, when I was a law clerk, Judge Lloyd McMahon, long dead, he used to say:  Don't ever quote my prior cases, because you're trying to make it sound like I'm trapped, right?  But I'm doing that not to make the Court -- not to say, oh, you said it before, so you have to say it here, but it's an accurate statement of the law.

MR. PODOLSKY:  We addressed this in our July 11, 2022, letter, and I'll just note what we said:  "A truth on the market doctrine is a corollary to fraud on the market" --

THE COURT:  You have to slow down.

MR. PODOLSKY:  Yes, your Honor.  My apologies.

"A truth on the market doctrine is a corollary to fraud on the market.  Fraud on the market is a concept used in private securities lawsuits to establish a plaintiff's reliance on public misrepresentations.  Truth on the market is a defense

to the fraud on the market doctrine which permits a defendant to rebut the presumption that its misrepresentations have affected the market price of the stock by showing that the truth of the matter was already known."

This is not at all relevant to anything that we're doing here.  This is relevant to a doctrine in private securities litigation known as fraud on the market.  It's just simply irrelevant, it's not accurate, and it undermines the accurate instructions on materiality that are included in the instructions.

MR. CARUSO:  That's wrong on the law because the case of *SEC against Honig* is not a private civil case.  Reliance is not an element of the SEC's claim, and yet that's what the Court ruled on the law, because that is the law.

*Ganino* -- *Honig*, your Honor's case, cited the *Ganino* case in the Second Circuit for that proposition.  And the Second Circuit there analyzed this point of law without -- under the heading of materiality.  This point, whether you call it truth on the market or not, the law goes well beyond the idea that this applies only in a civil case to rebut the presumption of reliance.

This doctrine -- again, whether you call it truth on the market or not -- the request that we made, is rooted in the law of materiality, and that's what *Ganino* does.  It decides this point based on materiality.  It doesn't say anything about

MA4HMil1

reliance.  The *Honig* case, by definition, didn't involve reliance because the SEC doesn't have to prove reliance.  This is a point -- this doctrine that I read out and that comes from your Honor's decision in *Honig* is based on -- it's rooted in the doctrine of materiality.  The government's argument just doesn't go far enough.  This doctrine is not limited to rebutting a presumption of reliance in a civil damages case.

MR. PODOLSKY:  So --

MR. CARUSO:  I have additional citations as well.

THE COURT:  It's OK.  Let's hear from the government.

MR. PODOLSKY:  I was going to note, I'm glad Mr. Caruso cited *Ganino*, which is at 228 F.3d 154, because actually what I read before was a quote from *Ganino* at page 167, and that quote was:  Truth on the market -- the quote hasn't started -- Truth on the market permits a defendant to "rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known."

Now, if the defendant in this case wants to argue that the truth of the statements were already known because of the SEC filings, and therefore it was immaterial, it was unimportant to an investor, he's welcome to do that.  The materiality instructions provide that.  But he's not entitled to this instruction on truth on the market because it's not accurate.

MR. CARUSO:  Judge, the *Honig* -- excuse me, the *Ganino* case, it says that, but the doctrine is not that limited.  The *Ganino* case analyzes this issue under the heading of materiality.  It's at page 161 of the *Ganino* decision.  And I repeat, there are SEC cases that give this kind of instruction.  You don't have to say "truth on the market."  The point is that the facts were already disclosed.  And as the Court said in *Honig*, a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.

That is a concept of general application.  It is not under the heading of materiality.  It is not limited to a civil action to rebut reliance.  It does that, it is applicable to that, but the concept is much broader.  And the fact that your Honor so held in an SEC case shows that.  There's another SEC case doing the same thing, *SEC v. Gruder*.

THE COURT:  It's OK, Mr. Caruso.  The request is denied.

MR. CARUSO:  All right.  OK.  Now, my next request, our request No. 21, ECF 167 at ECF, page 31, it depends on whether the government intends to give certain arguments or make certain arguments.  Cases that we cite here, *Seibert*, Second Circuit; *Koppel*, also Second Circuit:  A party's reasonable belief that the other party already has access to the facts should excuse him from new disclosures which

reasonably appear to be repetitive.

Now, this goes to the point, which the government may or may not argue, that Mr. Milton didn't have to repeat the SEC -- everything that's in the SEC filings when he gave an interview or made a podcast.  He didn't have to because he had reason to believe that the investors, whoever was listening to him, already had access.  Mr. Milton's reasonable -- I don't want -- I don't want to use his name here, but a party's reasonable belief that the other party, i.e., the prospective investors, already have access to the facts should excuse him from new disclosures which reasonably appear to be repetitive. That's the case law.  It's what it says.

THE COURT:  OK.  So are you referring there to the fact that Mr. Milton need not have provided all of the advice or the warnings about forward-looking statements, etc., every time he gave an interview?

MR. CARUSO:  That's right.  And he didn't even have to say every time:  Look at the SEC filings before you buy my stock, before you buy the Nikola stock.  He didn't have to do that because he had a reasonable belief that the investors had access to that information.

THE COURT:  OK.

MR. CARUSO:  Now, again, I don't know what the government is going to argue about that, because if they're not going to make an argument along these lines, then we don't need

MA4HMil1

that instruction.

MR. PODOLSKY:  We're not going to say exactly what Mr. Caruso said.  I don't know exactly how our arguments will come out about the basis for the falsity of repeated statements, but what this is really about his intent.  If his intent was to mislead in the -- in his statements and that's why he said what he said and didn't use forward-looking language or didn't refer to the SEC filings, then that is a basis for a conviction.  And this, frankly, confusing instruction seems to be an instruction telling the jury what they should find about Mr. Milton's intent when he made certain statements, and therefore, it's improper.

MR. CARUSO:  Doesn't have anything to do with intent.  This is a materiality concept.  When you read the cases, they discuss -- the Second Circuit is analyzing the issue of materiality.

THE COURT:  Denied.

MR. CARUSO:  So this is the last of my materiality requests, our proposed jury instruction No. 21, ECF 167, at ECF 32.  The gist of it is this:  Based on *Litvak*, the testimony of an individual investor may be relevant to the views of a reasonable investor, but only if the government has shown to your satisfaction that the individual views expressed in the testimony fall within the mainstream thinking of reasonable investors in the market for Nikola stock, not the

worst-informed investors in the market for Nikola stock. During the trial, I admitted certain testimony by individuals who purchased Nikola stock.  The weight, if any, to be given to that testimony is for you alone to determine.

Now, let me tell you why I asked for this.  We argued, based on *Litvak*, against the admissibility of this evidence for lack of foundation because the government hasn't proven a nexus between the viewpoints of Schonberger and Ryan, didn't show the nexus between their viewpoints and those of mainstream thinking of people in the market for Nikola stock.  Your Honor rejected that contention and admitted the evidence.  Surely, we're allowed to argue the weight of that or against the weight of that.

THE COURT:  Absolutely you're allowed to argue that.

MR. CARUSO:  And that's why I'd like this instruction. So that gives the jury the standard by which they can judge the weight.  It comes from *Litvak*, and if we didn't win on *Litvak* as a matter of law, we should be able to argue it as a matter of fact with that standard.

MR. PODOLSKY:  Completely agree.  That's why the instruction, as given, explains the reasonable investor or reasonable person standard as we've already gone through.  They also tell the jury it's for you to decide the credibility of any witnesses.  That's all in the instructions.  This is simply an additional instruction to make the defense's argument for

MA4HMil1

them, and it should be rejected.

THE COURT:  Denied.

MR. CARUSO:  Mr. Bondi has one more.

THE COURT:  Yes, sir.

MR. BONDI:  Your Honor, good afternoon.  We object to your Honor, the Court's, proposed instruction on venue at --

MR. CARUSO:  Just a second.  We're going to get to that.

MR. BONDI:  We're going to get to that.  Excuse me, your Honor, I'll reserve my argument on venue.

MR. CARUSO:  I thought Mr. Bondi had something related to materiality.

MR. BONDI:  Sorry, Ken.

THE COURT:  Go ahead.

MR. CARUSO:  I believe we've recovered materiality. If you just give me one moment.

OK.  At the top of page 9 -- one moment.

THE COURT:  Not that I think that this is going to happen, but I do have a 3:30.

MR. CARUSO:  A what?

THE COURT:  A 3:30 conference.

MR. CARUSO:  I can't see the clock.  What time is it?

THE COURT:  It's 1:30 now, approximately.

MR. CARUSO:  I think we'll be fine.

THE COURT:  Yes, I think we will be.

MA4HMil1

MR. CARUSO:  Yeah.  In addition, the Court -- the charge says, top of page 9:  "In addition, a written disclaimer cannot render any misrepresentation, including any oral misrepresentation, immaterial as a matter of law."

My first point is that that belongs in the wire fraud section, not the 10b-5 count.  I should say wire fraud counts, not the 10b-5 counts.  But my more important point is that that is an incorrect statement of the law.  It's based on the *Weaver* case, and the -- all that *Weaver* held -- and the government is seriously overreading *Weaver* -- *Weaver* holds, and I'm quoting: "Although the contractual disclaimers were relevant to the jury's determination of Weaver's guilt, they did not render extra-contract misrepresentations immaterial as a matter of law."

*Weaver* says I can't win a Rule 29 motion based on the disclaimers that Mr. Hicks signed, but *Weaver* also leaves open that I can argue to the jury that he's bound by those disclaimers as a matter of fact.  OK*?*  *Weaver* says -- *Weaver* -- well, *Weaver* says it's relevant to the jury's -- contractual disclaimers were relevant to the jury's determination of the defendant's guilt, and we want to be able to argue that.  This instruction on page 9 goes too far.

MR. PODOLSKY:  It does permit them to argue that.  It just says that it doesn't render it immaterial as a matter of law.  Accurate statement of the law.  Doesn't preclude them

MA4HMil1

from arguing it.

But I will say this is particularly important in the facts of this case -- and I am now referring to the wire fraud count, Count Four -- because there was a suggestion made to the jury that the contractual language as a matter of law absolved Mr. Milton of liability, and it was incredibly misleading both on the law and the facts because, among other things, the disclaimer language they pointed to was actually an entirely different contract.  It was like nine months after the transaction at issue here.

But the bottom line is this is an accurate statement of the law.  It doesn't preclude the defense from making the argument that the disclaimers are somehow relevant to materiality.  Although, frankly, I don't think there is a basis in the record to make that argument, nevertheless this language does not prevent them from making it.

MR. CARUSO:  I think if your Honor is going to leave that in as a correct statement of the law, I would say it may be correct, but it doesn't go far enough, because then if you want to -- I would take this out, I would take that sentence out, but if the Court wants to leave it in, then I think you have to add:  "However, that evidence is relevant to your determination of Mr. Milton's guilt, and you may consider it in determining the issue of materiality on Count Four."  You got to give both sides of it or give neither side of it.

MA4HMil1

MR. PODOLSKY:  Actually, I don't think you do because that's not actually true.  We're not going to ask for an instruction, although I think there would be a basis for it, to tell the jury that it is not relevant.

But I have to say, I actually don't think there is a basis in this record to say that these disclaimers are relevant to any question on Count Four, and I don't think the Court should suggest as much.

MR. CARUSO:  Well, they are absolutely relevant and --

THE COURT:  I have to say, I don't recall exactly the testimony, but it seemed to me that the defense put before Mr. Hicks certain disclaimers that I believe he said his lawyer read, and then the government on redirect pointed out that those disclaimers came from a later or from a subsequent document.

MR. PODOLSKY:  That's correct.

THE COURT:  Not the one that transferred the land, if I'm remembering correctly.

MR. PODOLSKY:  Correct.  There are two agreements in, let's see, June and then it was amended in August.  There was -- the land deal included an options agreement.  That is not where the disclaimer language came from.  The disclaimer language came from a March 2021 stock purchase agreement between Mr. Hicks and Mr. Milton, and defense counsel examined Mr. Hicks at length about the disclaimer language contained in

MA4HMil1

the March 2021 agreement and then immediately afterwards asked Mr. Hicks a question going back to the original options agreement to suggest to the jury that somehow the disclaimer language in the later agreement had any relevance to the earlier agreement, which it didn't, which is why on redirect we made sure to point that out.

MR. CARUSO:  Your Honor, please, surely we're not precluded as a matter of fact from pointing out those disclaimers and arguing their relevance to the nonguilt of the defendant.  It's all part of the same scheme.  The government's charging this as one lengthy scheme.  Those disclaimers were in a contract that the government proved as part of the scheme, and it is simply unfair and inappropriate to have this statement in the charge as a correct statement of the law without the balancing instruction that I read out from the *Weaver* case.

MR. PODOLSKY:  Your Honor, I do -- Ms. Estes reminded me we should point out that on Counts One, Two, and Three, there was a lengthy cross-examination of the retail investors as to the disclaimers in the Robinhood app, which, by the way --

THE COURT:  On the what?

MR. PODOLSKY:  What's that?

THE COURT:  Disclaimers on the what?

MR. PODOLSKY:  The Robinhood app that generally say

it's risky to invest in stock, again, to somehow suggest that, therefore, there's some immateriality as a matter of law to Mr. Milton's statements.

MR. CARUSO:  The Robinhood disclosures are entirely different.  They're not disclaimers.  None of those Robinhood users disclaimed reliance.  The Robinhood disclosures were merely -- the word in the Robinhood website is Robinhood encourages you to read the SEC filings.  That's entirely different from Peter Hicks disclaiming reliance on prior representations.

THE COURT:  I'm not going to include that language.  I think that this language sufficiently tells the jury what they can and cannot consider.  They are told generally that they are to consider all of the evidence before them, which is -- I think you're asking me to direct them to consider some things in particular, which I'm not going to do.

MR. CARUSO:  All right.  I still think it's imbalanced this way, but you have my objection.

THE COURT:  Yes.

MR. CARUSO:  Now, forgive me, let me just ask Mr. Bondi.

(Counsel confer)

MR. CARUSO:  Sorry, Judge.  I just want to be sure. We asked the Court to give an instruction about the nexus between the views of the retail investors who testified and the

MA4HMil1

mainstream thinking.  I believe the Court said he would not give that, is that correct?

THE COURT:  Correct.

By the way, anything -- you keep citing back to your submission prior to the time that I considered it and gave you this, my draft.  So I'm allowing you to make your record, but to the extent you're looking to reargue, I'm likely not going to change my mind.

MR. CARUSO:  Understood.  I just wanted to make sure I was remembering correctly.

THE COURT:  Yes.

MR. CARUSO:  Now, the final request that we have on materiality is as follows:  "During the trial, I admitted certain evidence regarding the movement of Nikola's stock price between June 4, 2020, and September 30, 2020.  You may consider that evidence as relevant to materiality.  The weight, if any, to be given to that evidence is for you alone to determine."  That's from *United States against Bilzerian*, 926 F.2d 1285, 1298.

Just informing -- I mean, I think it's pretty bland, but I think it is appropriate to inform the jury that this evidence from Professor Ferrell is relevant to materiality, and the weight that you want to give it, it's up to you.

MR. PODOLSKY:  So I doubt that *Bilzerian* said I admitted certain evidence regarding the movement of Nikola

stock price.

THE COURT:  Slow down.

MR. PODOLSKY:  I don't think that *Bilzerian* directed anyone to evidence regarding the movement of Nikola's stock price, and I think it would be inappropriate to add language again emphasizing the evidence that the defense wishes to put in front of the jury.  The fact that this evidence was admitted and relevant is not only throughout the jury instructions, it was actually a specific instruction about expert testimony.

THE COURT:  I agree that it's bland, but I don't see why it's at all necessary.  So I'm not going to give that instruction.

MR. CARUSO:  All right.  I have my record.

So now let's look at state of mind, some specifics. The second element of the Title 15 securities fraud charge in Count One relates to Mr. Milton's state of mind:  "If you find that the government has met its burden of proving the first element," insert "the first element" instead of "that Mr. Milton engaged in the charged scheme," because the Court has ruled yesterday that it's going to submit this case on both theories, scheme liability and misrepresentations.  "That is the factor I just explained," I would ask the Court to change "factor" to "element" so that there's no confusion about this being a requirement.

THE COURT:  Any objection?

MA4HMil1

MR. PODOLSKY:  No.

THE COURT:  Again, what was the -- that the government has met its burden of proving?

MR. CARUSO:  "The first element," striking "that Mr. Milton engaged in the charged conduct."

THE COURT:  Very well.

MR. CARUSO:  And then "that is the factor," strike "factor," insert "element."

Now, our next point is at the end of that paragraph: "To act willfully means to act voluntarily and with a wrongful purpose."  We ask the Court to give the Sand instruction which comes from *Bryan v. The United States*:  "A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law."  That exact instruction has been affirmed by the Second Circuit in 10b-5 cases in *Cassese* and in *Kosinski* and in *McGinn*.

MR. PODOLSKY:  So we addressed this back in our July 2022 letter and pointed out that there's actually been a development of the law on this, and it was most specifically litigated in *United States v. Middendorf* where Judge Oetken made clear that willfulness does not require a desire to violate the law, but merely, as your Honor points out here, with a wrongful purpose.

I take it from these instructions that your Honor has

endorsed that view, and we think it's the correct view.

THE COURT:  Yes, I'm not going to change the language.

And just my own personal view, sometimes a lot of these disputes happen only amongst judges, and what we tell the jury should really be as plain and clear as we can possibly make it, and this language certainly does that.

MR. CARUSO:  All right.  Well, you have -- I've made my record.

In the spillover paragraph from page 9 to 10, at the end, last two sentences:  "On the other hand, Mr. Milton denies either that these acts and statements occurred or that they show that he had such knowledge, intent, and purpose."

MR. PODOLSKY:  OK.  No objection.

MR. CARUSO:  And then the next sentence --

THE COURT:  "Knowledge, intent, and purpose"?

MR. CARUSO:  And purpose.

And then the next sentence would be changed similarly, or identically.  It ends with "such knowledge, intent, and purpose."

THE COURT:  OK.

MR. CARUSO:  Right.  Just bear with me here, please.

"Please note," this is the next paragraph, "Please note that if Mr. Milton honestly believed that his actions," I would say you should insert "statements and actions."  Case is mostly about statements.

MA4HMil1

THE COURT:  I'll add that.

MR. CARUSO:  I'm sorry, Judge, I didn't hear that.

THE COURT:  I will add that.

MR. CARUSO:  Oh, OK.  Thank you.

The rest of that paragraph is fine, but I have some requests that go back to our original requests in July.

By the way, the Court noted yesterday that the document I'm reading from, ECF 167, was filed on August 31. That is true, but only because we added Count Four on August 31.  All of these other charges that we've been discussing so far were in the charges that we submitted in July, in compliance with the Court's deadlines.

THE COURT:  Oh, no, no, I don't mean to suggest that they were late.  I'm only suggesting that I've considered them in giving you the draft that you received.

MR. BONDI:  And, your Honor, for the record, that initial request to charge by the defendants was ECF 106.

MR. CARUSO:  Now, our request No. 27, 28, and 29.  27 goes directly to the defense of lack of intent to defraud and good faith.  And the gist of it is when you consider -- you have to consider whether Mr. Milton spoke and acted in good faith.  When you consider these issues, you may consider the words and actions of others which may have had an effect on Mr. Milton's state of mind, thinking, and belief.  For example, you may consider evidence that other Nikola personnel who had

or shared responsibility for the accuracy of investor communications were or became aware of Mr. Milton's statements and did not raise objections with Mr. Milton.  That's the gist of it.  We ask the Court to include that.  It's highly relevant to the good faith defense, and I refer the Court to our request 27.

MR. PODOLSKY:  This is argument.

THE COURT:  Denied.

MR. CARUSO:  Now, 28 and 29, we ask the Court to instruct the jury that the officers and directors of a corporation owe certain fiduciary duties to the corporation and to the shareholders.  These include a duty of care, which in turn includes a duty to monitor or oversee corporate operations by exercising appropriate attention to potentially illegal corporate activities and by taking steps in an effort to prevent or remedy the situation.

That comes from the *Abbott Labs* case, a Seventh Circuit case construing Delaware law, which is the applicable law here because Nikola was incorporated in Delaware, and those officers had duties that arose under Delaware law.

Now, what's the relevance of this?

THE COURT:  Yes, what is the relevance of that?

MR. CARUSO:  The relevance of this is the existence of the duty of care and the duty to take appropriate steps and monitor potential criminal conduct.  The existence of the

MA4HMil1

statutory duty makes it circumstantially more likely that people like Brady and Russell would have acted, but they didn't, right?  If they had no duty and they didn't act, great, that's an argument.  The fact that they had a duty and didn't act, the existence of the duty makes it circumstantially more likely that they would have acted.

THE COURT:  Was Brady on the board?

MR. CARUSO:  No.  Brady was the CFO.  This says officers and directors.  Russell was CEO and a director.  Brady was the CFO.  So they were both officers.  Russell was both an officer and a director.

MR. PODOLSKY:  I think that if the defense wanted to make this argument, they should have examined the witnesses on these facts, asked them if they had a duty of care or fiduciary duty, what that meant, what they understood that to be, and then they could have made the arguments to the jury.

MR. CARUSO:  Your Honor, you know --

THE COURT:  I recall that there were questions along those lines.

MR. CARUSO:  Yes.

THE COURT:  I don't know that they were tied necessarily to Delaware law.  I don't believe that they were. And in any event, I think that there was precious little on that.  Again, I don't think there was anything with respect to the witness' obligations under Delaware law.  But more to the

point for me, I think that this would be confusing, and it would provide sort of a defense, as I understand it, well, if only these officers had done their job, I would be absolved of my fraudulent conduct, and that's not an appropriate instruction to give, I believe.

MR. CARUSO:  I believe what you just said is correct, but that's not the instruction that we're requesting.  The point is that they had a duty, and the failure to speak to Mr. Milton, to tell him what you just said in this podcast, for example, is a misrepresentation, don't say it again, that failure speaks to Mr. Milton's state of mind.  Because the absence of correction or the absence of someone with responsibility to tell -- the absence of that person telling him you did wrong there goes to his state of mind.  I don't think there's any dispute about that.

But this makes it circumstantially more relevant that those people would have acted.  Let's take the testimony of Ms. Fretheim.  Fretheim spent hours on the stand saying, with respect to this one particular podcast known as the TeslaCharts podcast, Mr. Milton made mistakes, he made misrepresentations.  And she told that repeatedly to Brady, and she told that repeatedly to Russell.  And she testified on cross-examination, essentially, I sent this up the chain of command, and I trusted Mr. Russell to tell Mr. Milton, if necessary.  And she said she never told Mr. Milton, but she trusted Russell to tell

Mr. Milton "if necessary."

Now, the absence of a warning or a correction, whatever the word is, from Russell to Milton saying, Trevor, you made a misrepresentation there, the absence of that is directly relevant to Mr. Milton's state of mind.  And the existence of a duty on Mr. Russell to make that statement where he needed to is circumstantially relevant because it makes it more likely that he would have given that information to Mr. Milton.  He had a duty to do so, and it makes it more likely that he would have if he thought it was needed, but he didn't.

THE COURT:  Again, I don't think that there is a factual basis necessarily to do that, especially to tag it to or peg it to Delaware law.  But more importantly, the arguments could be made based on the record before the jury that the adults in the room were made aware of what Mr. Milton was doing, and they didn't step in sufficiently early enough to stop him.  You have that argument to make.  That instruction, I think, intrudes too much into the purview of the jury.

MR. CARUSO:  All right.  Well, your Honor has my position on that.

THE COURT:  Yes, sir.

MR. CARUSO:  One last one here is of a similar ilk, our 29, that Nikola itself had a duty to correct a prior material statement if Nikola learned -- if the company learns

MA4HMil1

that the prior statement was misleading; and, secondly, a company has a duty to update a prior material statement where the statement becomes misleading because of a subsequent event.

Along the same lines as we just discussed here, we can argue that the adults in the room didn't correct Mr. Milton. I think it's equally relevant that Nikola itself saw no need to update or correct its SEC filings. That's the point.

THE COURT: I mean, you can make that argument, but it's not going to be in the jury instructions.

MR. PODOLSKY: Although I will say on that argument, we should give that some thought because the defense fought vigorously to preclude evidence that, in fact, Nikola did make a corrective disclosure.

MR. CARUSO: I meant no corrective disclosure before September 20 of 2020. Forgive me for not including that. But I think the whole basis of our arguments here go up to the date that Mr. Milton left the company.

MR. PODOLSKY: Well --

THE COURT: Well, that instruction is not going to be included here.

MR. CARUSO: Yes. All right. My last one regarding this topic is our supplemental instruction request No. 11, standard practice. This is ECF 200 at ECF page 4:

"When you consider whether Mr. Milton spoke and acted with intent to defraud investors and whether, on the other

MA4HMil1

hand, Mr. Milton spoke and acted in good faith, you may consider whether Mr. Milton and other Nikola management personnel engaged in standard business practices and believed that they were engaging in standard business practices when they conducted the business of the company.  Such evidence may bear on Mr. Milton's state of mind and may show his lack of or absence of intent to defraud or his good-faith belief that his conduct was not improper."

This is from *Litvak* and from case a called *US Environmental*.  This evidence of standard practices provides a basis for the jury to evaluate the defendant's intent to defraud.  And I have in mind here things like the $70 million and the lockup period were standard.  Mr. Brady said that lockup periods can range from three to six months. Mr. Milton's was six months.  The use of donor vehicles, we have testimony that that's standard.  It's standard to use a donor vehicle when building a new vehicle.  The existence of standard practices -- the following of standard practices tends to undercut the government's argument of intent to defraud, and it's relevant based on -- the instruction's appropriate based on the record.

MR. PODOLSKY:  This instruction is, well, unnecessary, it's argument, and it's actually very vague and confusing and seems to just be -- the defense is trying to license themselves to throw around the undefined phrase "standard business

practice" and claims that absolves him of all liability, which is not true.

THE COURT:  Yes.  I mean, when I read this, I was actually confused as to what exactly was meant by "standard business practices."  It's not been talked about during the testimony, and the examples that you use just show how amorphous this phrase is.  You talk both about standard practices with respect to stock options and standard practices in a very small segment of the auto industry.  There's too much to parse through here.  I'm not going to give this instruction.

MR. CARUSO:  All right.  I have my record.

Now, we come now to interstate commerce, jurisdictional means.  And, again, as I said yesterday, we're not going to dispute this, and we think that the Court can simply instruct the jury on the existence of this element, which you do at the first paragraph at the top of page 11, and then say, in substance, there's no -- this element is not in dispute in this case.

THE COURT:  Well, like I said, if there's a stipulation between the parties, it doesn't have to be a formal stipulation, but if the parties agree, then I'm happy to say that.  But in the absence of an agreement, I'm going to give the standard instruction.

MR. ROOS:  So, your Honor, on this we looked at some cases, and two things to point your Honor to.  One is a Second

Circuit summary order, *United States v. Klein*, 216 Fed. Appx. 84. There the court held there was no error in the district court not giving the financial institution jurisdictional instruction for bank fraud count where the parties indicated they were not disputing it.

And then as a potential example, we came across the instruction in *United States v. Calk*, in which the defendant was charged with financial institution officer bribery. And so one of the elements is that the defendant was an employee of a financial institution, and so there the court gave this instruction:

"The first element the government must prove beyond a reasonable doubt is that at the time of the events alleged in the indictment, Mr. Calk was an officer, director, employee, or agent of a financial institution."

The court then had a short paragraph defining what's required for that element and then said:

"The parties agree that the Federal Savings Bank is a financial institution whose deposits are insured by the FDIC, and Mr. Calk was an officer, director, employee of that bank at the time of the alleged event."

So here we might propose, as defense counsel has indicated, giving the first paragraph of your Honor's instruction. If they would like, we're happy to consent to the word "alleged" being inserted before "scheme to defraud," and

MA4HMil1

then if they agree, your Honor can say the parties agree that this element is met.

MR. CARUSO:  That's fine.  Yeah, that's fine with us, Judge.

THE COURT:  OK.  So at the end of that sentence, "furtherance of the alleged scheme to defraud," "The parties agree that this element is met," that's it?

MR. ROOS:  Yes.  Or alternatively, you could say --

THE COURT:  I'm not asking for more words.  I just want to make sure that's what you wanted.

MR. ROOS:  I think that's fine.

MR. CARUSO:  So if your Honor would just read that out, then, for us once more.

THE COURT:  Sure.

"With respect to Count One, the Title 15 securities fraud charge, the third and final element that the government must prove beyond a reasonable doubt is that Mr. Milton used, or caused to be used, the mails or the instrumentalities of interstate commerce in furtherance of the alleged scheme to defraud.  The parties agree that this element is met."  And then cross out everything else in that section.

MR. PODOLSKY:  I'm going to make one suggestion.  I would use "has been" rather than "is."  I think that will make clear to the jury what is meant by what the parties agree on.

MR. CARUSO:  Your Honor, Mr. Bondi and I discussed

MA4HMil1

this yesterday, but I think maybe he has something new to add.

THE COURT:  He's not agreeing?

MR. CARUSO:  I don't know.  He's going to speak.

MR. BONDI:  Your Honor, just for the record, we are not disputing jurisdiction, but we will be disputing venue, and I just want to make sure that that's on the record and clear.

THE COURT:  Yes, we haven't gotten to venue yet.

MR. BONDI:  Understood, your Honor.

MR. CARUSO:  OK.  That's fine.

THE COURT:  So the last sentence of the one and only paragraph of the third element is "The parties agree that this element has been met," and everything else comes out.

MR. CARUSO:  Correct.  That might make this a little shorter.

THE COURT:  That makes me very happy.

MR. CARUSO:  I thought it might.

THE COURT:  I have to read this thing.

MR. CARUSO:  Right.  Wire fraud -- excuse me, Title 18, securities fraud.  We urge the Court to charge the jury separately on 1348(1) and 1348(2) because those are two separate crimes.  They have different elements.  Now, I don't want to get into the semantics of whether they're two separate crimes or simply two different and separate ways to commit a crime.  That's not the point.  The point is that subdivision (1) and subdivision (2) have different elements, and I think

MA4HMil1

it's confusing to try to charge them as a unitary matter.  They should be broken out.  It's much easier for the jury.  That's what we've done in our requests, and we ask the Court to do that.

MR. PODOLSKY:  We think the way the charge is written is correct and clear and avoids unnecessary language.

I think if the defense wants a reference on page 13, the first element, right now it says -- it refers to scheme or artifice to defraud.  If they would like an additional sentence or paragraph that refers back to the explanation of misrepresentations in Count One, we would have no objection to that, but we don't think that there's any need to add additional separate instructions just to confuse and lengthen this instruction.

MR. CARUSO:  It's actually to clarify.  There are two separate crimes here with different elements.  It actually clarifies matters to tell the jury that and to clearly give them, here's subdivision (1) what the government has to prove, here's subdivision (2) what the government has to prove.  I mean, that's what would be clear, not this merging.

THE COURT:  But it separates it out, right?  It says execute a scheme either (a) to defraud or (b) to obtain money by fraudulent pretenses.

MR. CARUSO:  Yes, it does, but it's a bit subtle.

THE COURT:  It's?

MR. CARUSO:  Subtle.

THE COURT:  Subtle.

MR. CARUSO:  Subtle.

It would be much more clear for the jury to recognize -- be told that there are two offenses here.  They have to consider each one separately.  They each have different elements.  I mean, we're going to ask for a unanimous verdict instruction so that we don't get a verdict of eight people think they proved subdivision (1) and four people think they proved subdivision (2).  Eight plus four is 12, so he's guilty.  I mean, to separate this out adds to the clarity.

MR. PODOLSKY:  Well, I guess we can address that now, then.

Mr. Caruso said a moment ago he doesn't want to get into the subtleties or distinctions between whether it's one crime or two means of committing the same crime, but that's exactly the question that's put before us.  In a letter filed, I think over the weekend, on Sunday, the defense argued that based on the analogy to 1344, these are two separate crimes.

We handed up yesterday to the Court and to defense *United States v. Crisci*, which is 273 F.3d 235, which rejects that argument in the context of 1344.  And so our position is that the -- there is one crime here with two means, and the way that the instruction reads now is correct.

MR. CARUSO:  *Crisci* doesn't speak to this issue.

MA4HMil1

*Crisci* speaks to the unanimous verdict question.

THE COURT:  Why don't we do it by bullet point.  First that the defendant executed a scheme and artifice either, and then two separate paragraph bullet points.  That would address the subtlety of it, I guess.

MR. CARUSO:  All right.  Well, we adhere to our view that the Court should separately instruct on 1348(1) and 1348(2) because they have different elements, and if the Court is rejecting that, then I can go to the language at page 13 and give some suggestions.

THE COURT:  OK.  Why don't we go to the language, then.

MR. CARUSO:  Right.  But I have my record on that point.

THE COURT:  Yes, absolutely.

MR. CARUSO:  Right.  So, first, the defendant executed a scheme or artifice to defraud either (a) to defraud the -- a person or (b) to obtain money or property by insert "means of," which is from the statute -- "obtain money or property by means of materially false and fraudulent pretenses, representations, or promises."

Now, here, we would ask the Court to include what we argued or requested earlier, use the formulation of "capable of confirmation or contradiction, false when made and known to be false."  We've discussed that, and we think it should be added

here as well.

MR. PODOLSKY:  We object for the same reasons we've already discussed.

THE COURT:  That application is denied.

MR. CARUSO:  All right.  We also want the Court to instruct on -- sorry.  Once again, we think on this count the Court should also instruct on opinion, puffery, our No. 15 and 16, and should also instruct on materiality as we've requested it in our No. 17, 18, 19, 20, 20.1 and 21.  The Court has already ruled on those, but I'm making my record that the same instruction should be given with respect to Title 18, securities fraud.

THE COURT:  Very well.  Your record is noted.

MR. CARUSO:  Let me just make sure I'm not --

MR. PODOLSKY:  Your Honor, we do have one suggestion as to materiality.  We noted -- this may have been in our request to charge as well -- that there's not a specific materiality portion with respect to 1348.  Because it has the same materiality standard as wire fraud, we would -- and we proposed this in the letter we filed on Sunday, October 2 -- we would propose either having a cross-reference here to the definition of materiality that you give for the wire fraud instruction or, alternatively, move that discussion of materiality here and have the cross-reference in the later wire fraud instruction.  Either one is OK for us.

MA4HMil1

MR. CARUSO:  May I just -- Mr. Podolsky, I'm looking at that letter now.  Could you just refer me to --

MR. PODOLSKY:  The bottom of page 2 of that letter.

THE COURT:  Where would you put this?

MR. PODOLSKY:  We could put it just in the first element, which I believe is how you've had it in the other -- for the other counts.  It could just be a new paragraph or a sentence at the end of that paragraph, unless you wish to move the entire materiality section forward, in which case it could just be, I think, like a bolded subsection under the first element, which, again, I think is how you have it elsewhere, that says materiality or material fact.

THE COURT:  I'll do it as a second paragraph to number one on page 13.

MR. PODOLSKY:  Thank you, your Honor.

MR. CARUSO:  Right.  And then -- well, we'll come to that later.

THE COURT:  Government document 201, the bottom of page 2.

MR. CARUSO:  Right.  Here, of course, rather than reasonable -- "hypothetical reasonable investor," we agree that the language should be "reasonable and prudent person," which I believe is in here.  So one moment while I look at our requests.

Right.  OK.  Back to text.  The second, that the

defendant knowingly and willfully participated in the scheme.

MS. ZELLER: If we could add one more thing to the first element, especially, your Honor, with respect to Section 1348, similarly as in the wire fraud counts, we would propose an instruction specifically related to money or property and incorporate what we included in our defense theory of the case instruction No. 48, which is ECF 106, at page 61, about fair market value.

MR. CARUSO: OK. But we're going to ask for that specifically. Before we get there --

MS. ZELLER: But it should also fall within Section 1348 because of subsection (2) and then also our previous arguments that the concept of money or property is incorporated within the word to "defraud" in subsection (1).

MR. PODOLSKY: I don't think we have an objection to referring to the definition of money and property, the same one that's in the wire fraud section. I think we will object to the fair market value notions that they are alluding to.

MR. CARUSO: Well, we'll come to the fair market value, Judge, because this is -- we discussed yesterday getting a theory of the case instruction, and one of the theory of the case instructions that we really want has to do with the victims paid -- got what they paid for. Mr. Hicks received fair market value. But we'll come to that.

MS. ZELLER: To be clear, the cases that establish the

money or property and fair market value, one, for example, is

*United States v. Mittelstaedt*, at 31 F.3d 1208 (2d Cir. 1994),

and also *United States v. Starr*, which is 816 F.2d 94 (2d Cir.

1987).  And the law is very clear that Section 1348 has been

modeled on wire fraud so that --

MR. CARUSO:  Can I -- when we get to that theory of

the case, please remind us that we want to have it apply to

1348 as well.  That's the logical way to do it.  Let's talk

about the theory of the case instruction, and then we can

reinsert it where we think it needs to be.  OK?  Otherwise

we're jumping ahead.

MS. ZELLER:  We just want to put a marker down that it

belongs in 1348 as well.

MR. CARUSO:  As well 1343.

THE COURT:  OK.

MR. CARUSO:  We'll come to that and then we can

backfill.  It may not confuse others, but it's confusing me.

OK.  So now, second, that the defendant knowingly,

insert "that the defendant with knowledge of its fraudulent

nature and with specific intent to defraud willfully

participated in the scheme or artifice."

THE COURT:  I'm sorry.  Are you referring now to

number two?

MR. CARUSO:  I'm referring -- I'm on page 13, at the

top of the page.  You've got first, second, third.  I'm now on

the second paragraph that starts with the word "second."

THE COURT:  We've been talking about number one.

MR. CARUSO:  Right.  I'm finished with that.

THE COURT:  So you're going back up?

MR. CARUSO:  I'm going back to your text, your draft.

THE COURT:  OK.

MR. CARUSO:  All right.  "Second, that the defendant knowingly and willfully participated in the scheme."  I'm proposing the following:  "Second, that the defendant, with knowledge of its fraudulent" -- "with knowledge of its fraudulent nature and with specific intent to defraud, willfully participated in the scheme or artifice."

THE COURT:  What I have here says that exactly and in fewer words, so I'm not going to add those.

MR. CARUSO:  All right.  Third, minor, that the scheme to defraud was in connection with rather than connected to.  We might as well use the same language throughout.

THE COURT:  Very well.  "Was in connection with."

MR. CARUSO:  Yes.  Now, then you go to the bolded language, first element, scheme or artifice to defraud:  "As I instructed you earlier, a scheme or artifice to defraud is merely a plan to accomplish a fraudulent objective."  I had suggested yesterday that we insert "pattern or course of conduct" language from the *Rigas* case, and I believe the Court agreed to insert that under Count One, so it should be the same

MA4HMil1

under Count Two.

THE COURT:  Did I agree to insert that?

MR. CARUSO:  I think you did.  I confess, I don't really remember, but I request that on Count Two.  And if the Court has rejected it, then the Court has rejected it, but it's the same request as to Count Two as to Count One.

THE COURT:  I don't have it in my draft, so I think I rejected it.

But just to come back to our earlier part of the conversation, Mr. Podolsky, when you asked to put in the paragraph from your letter at the bottom of page 2 --

MR. PODOLSKY:  Yes.

THE COURT:  -- I put it in the part that says "1. First element:  Scheme or artifice to defraud," not in the first element up top.

MR. PODOLSKY:  Thank you for clarifying, your Honor. We agree that makes sense.

MR. CARUSO:  Right.  OK.  So first element, scheme or artifice to defraud, I request that "pattern or course of conduct" language.  And if the Court's ruling was no yesterday, then I'm assuming it will be no today, and I'm made my record.

THE COURT:  Correct.

MR. CARUSO:  Right.  Now, criminal intent, once again referring to our request No. 24, we ask the Court to use the language from Sand and from the *Bryan* case in the Supreme

MA4HMil1

Court:  "A person acts willfully if he acts intentionally and purposely, with the intent to do something the law forbids, that is, with a bad purpose to disobey or disregard the law." We think that that's very straightforward under Title 18 fraud charges, and it applies and is important.

MR. PODOLSKY:  We object to it for the reasons we stated on the record earlier.  Frankly, there's additional reasons.  The required mens rea here is intent to defraud. It's not intent to break the law.

THE COURT:  Agreed.  That application is denied.

MR. CARUSO:  Now, our next point is this:  With respect to intent to defraud under 1348 and 1343, we ask the Court to instruct the jury that intent to defraud under those statutes has two parts.  The government must prove that Mr. Milton had both an intent to deceive the alleged victims of the scheme and an intent to harm the alleged victims by depriving them of money or property.  The case law is simply overwhelming that there are two aspects to this element.  Most recently being United States against Jabar, 19 F.4th 66, 76 (2d Cir. 2021):  "Because an intent to deceive alone is insufficient to sustain a wire fraud conviction, misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim."

There are two aspects to this, intent to deceive and intent to harm by depriving of money and property.  The

MA4HMil1

Court -- the jury should be so told, and we're going to make arguments based on both parts of that intent to defraud.  These are embodied in our request No. 34 and 34.1 and 34.2, which I'll turn to in a moment.

MR. PODOLSKY:  Sorry, your Honor, I'm just looking at the wire fraud portion to see where this is.

All right.  So I think this concept is covered, but we don't object to a sentence that says, in substance, he must have -- intent to defraud means the intent to deceive and to deprive a victim of money or property.

MR. CARUSO:  It's intent to deceive and intent to harm by depriving the victims of money or property.  It's "deceive and harm," and the harm is modified by depriving the victims of money or property.

MR. PODOLSKY:  Just a moment, your Honor.

THE COURT:  And this would go under number two?

MR. CARUSO:  Correct.

MR. PODOLSKY:  Frankly, your Honor, I'm having trouble remembering off the top of my head whether that "harm" language is required under the case law.  Maybe we can leave it as it is for now, and if we have any -- I think the issue here, your Honor, is that it's a potential for confusion because there is no requirement of actual harm.  The requirement is intent to cause loss.

I just want to --

MR. CARUSO:  I'm going to come to that.

MR. PODOLSKY:  OK.  What I would suggest, your Honor, on this is we don't object to this proposed instruction, but we may file tonight or this week some additional clarity if we think it's necessary, but we don't disagree with the concept here.

MR. CARUSO:  I'm going to come to that and have a suggestion.

THE COURT:  What is the actual language that you propose, that one sentence?

MR. CARUSO:  It's this.  One moment.

THE COURT:  What I have is "intent to deceive and intent to harm by depriving the victim of money or property."

MR. CARUSO:  Yes.  Here's our language, quoting -- or proposing:

"To prove specific intent to defraud, the government must prove that Mr. Milton had both an intent to deceive the alleged victims and an intent to harm the alleged victims by depriving them of money or property.  It is not required that the alleged victims were in fact deprived of money or property, but the government must, at a minimum, prove that Mr. Milton contemplated some actual deprivation of money or property."

I can read that again if it's helpful.

THE COURT:  Did you get that, Ms. Londoño?

No need.

MR. CARUSO:  All right.  Now, our next two requests follow from that one, two types of intent.  This has to do with the intent to deceive.

THE COURT:  You're going to make this even longer now?

MR. CARUSO:  I am, Judge.  I'm sorry, I am.

THE COURT:  OK.

MR. CARUSO:  That's why we canceled -- that's one of the reasons why we abandoned the interstate commerce, because I want the meat of this, not the -- these are very important to us.

THE COURT:  OK.

MR. CARUSO:  The government --

MR. ROOS:  Nothing is free.

THE COURT:  It's also now 2:30.  It was a joke earlier, but now it's --

MR. CARUSO:  I understand.

THE COURT:  -- coming to fruition.

MR. CARUSO:  "To prove intent to deceive the alleged victims, the government must prove that Mr. Milton's words and actions were reasonably calculated to deceive persons of ordinary prudence and comprehension."  That's from the Thomas case.

"Evidence that statements or actions were reasonably calculated to deceive persons of ordinary prudence and comprehension may provide some evidence that the defendant

specifically intended to deceive.  By contrast, evidence that statements or actions were not reasonably calculated to deceive persons of ordinary prudence and comprehension may provide some evidence that the defendant did not specifically intend to deceive.  The ease by which a person could have determined the facts may belie an inference that the defendant's words or actions were calculated to deceive."

This is our request 34.1.  It's squarely supported by the holdings and the language of *U.S. v. Thomas*, *U.S. v. Kaufman*, and *U.S. v. Bank of New York Mellon*, which is a district court case by Judge Kaplan, and I quoted them.

MR. PODOLSKY:  We object to this.  For one thing, it's not necessary to instruct the jury on how they should view the evidence.  What these instructions do, and do accurately, is state what the requirements are.  This is also confusing because you're separately instructing the jury as to materiality, and these instructions seem to confuse those two issues.

MR. CARUSO:  No confusion at all.  This is a direct quote from *United States v. Thomas*, and it's extremely important to our defense.  The government must prove that Mr. Milton's words and actions were reasonably calculated to deceive persons of ordinary prudence and comprehension.  That's the gist of it.  The rest of it explains to the jury why this is relevant or how this is relevant, but that "reasonably

calculated to deceive persons of ordinary prudence and comprehension" is absolutely central to our defense in this case, and it's the law directly from *Thomas*.

MR. PODOLSKY:  That may be how the law was written in *Thomas*, in a legal opinion, but the question here is how to instruct the jury, and you're providing all of these concepts in a way the jury can understand them.

THE COURT:  I agree with that.  The sentence that you provided earlier, I think, absolutely captures that concept. So I don't think that additional gloss is necessary.

MR. CARUSO:  I have my record.

Now, my other one here, our 34.2, goes to intent to harm:

"In this case, to prove that Mr. Milton contemplated or intended some actual deprivation of money or property, the government must prove that Mr. Milton believed that the alleged victims would purchase Nikola stock on the basis of his statements.  If Mr. Milton did not believe that the alleged victims would purchase Nikola stock on the basis of his statements, then Mr. Milton lacked the requisite criminal intent to harm."

This comes from, directly from, *Litvak* 808 F.3d at 179, footnote 24, where an intent to cause harm is an element of the offense, as it is here, a defendant's bona fide belief that he will not cause such harm would necessarily constitute a

MA4HMil1

defense.  Again, central to our defense.

THE COURT:  There's a good faith instruction in here, isn't there?

MR. CARUSO:  There is a good faith instruction, but this has to do with specific intent to defraud and the lack thereof and the aspect of intent, specific spent to defraud, of intent to harm.

THE COURT:  I think that instruction covers all the intent to defraud in these allegations.

MR. CARUSO:  OK.  You have my request.

THE COURT:  Yes, sir.

MR. CARUSO:  Right.  Now let's see.

Right.  I'm reiterating my requests 26, 27, 28, and 29, which have to do with the good faith as specifically applied here, considering the words and actions of others, the duty of corporate officers and directors, and the duty of the company to correct or update.  I believe the Court has rejected those, but I want the record to be clear that we're requesting these on Count Two as well.

THE COURT:  Very well.

MR. CARUSO:  OK.  "In connection with," we believe the Court should simply repeat what the Court instructed the jury with respect to Count One.  You have our position on that, that be the Court should use -- should not use the "touched upon" formulation but rather "the coincided and material to" from the

MA4HMil1

cases I previously cited.  And so the Court should -- that's our position with respect to Count Two, as it was with respect to Count One.  And I think, for clarity, whatever the Court instructs on Count Two should be the same as Count One on "in connection with."

THE COURT:  Yes.  So what we put in -- well, I'll change the second line of that instruction:  "If you find that the alleged conduct coincided with a securities transaction."  OK.

MR. CARUSO:  Yes, it should be the same on the next count.

THE COURT:  Yes, that's what I --

MR. PODOLSKY:  One option, your Honor -- we don't object to that change, but is to stay with respect to the third element, "as I instructed previously with respect to Count One," etc., etc., etc.

MR. CARUSO:  Yes, that would be fine.

THE COURT:  So "as I instructed previously with respect to Count One with respect to the third element"?

MR. PODOLSKY:  Actually, I think the "in connection with" language was included in the first element of Count One.  So I would just say, "as I instructed on Count One with respect to in connection with."

THE COURT:  I'm sorry?

MR. PODOLSKY:  I see.  You're referring to the third

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MA4HMil1

element here.

THE COURT:  Yes.

MR. PODOLSKY:  I withdraw, your Honor.  Understood.

THE COURT:  Next.

MR. CARUSO:  Yes.  So now we come to our theory of the case, and this is what Ms. Zeller was referring to earlier.

THE COURT:  Because I'm going to start sort of stepping in, because I do need to move on to other things, where is your theory of the case request?

MR. CARUSO:  No. 48.

THE COURT:  No. 48.

MR. PODOLSKY:  Is that a docket number?

MR. CARUSO:  I'll read --

THE COURT:  ECF 167.

MR. CARUSO:  ECF 167, at ECF 63, our request No. 48. Perhaps it would be easier if the Court read it rather than me read it.

THE COURT:  OK.  I'm happy to read it.  Let's see how long it is.  It's not that long.  So I'll read it.  It reads as follows:

"As I have instructed you, the government must prove the existence of a scheme to obtain money or property, that Mr. Milton executed or attempted to execute that scheme, and that he did so with the intent to deceive the alleged victims, and the intent to harm the alleged victims by depriving them of

money or property.  Therefore, to prove these elements of securities fraud, the government must prove that the alleged victims of the scheme did not pay or would not have paid fair market value for the property.

"Mr. Milton contends as follows:  The alleged victims received what they paid for, shares of Nikola stock, with no discrepancy between anticipated and actual benefits.  The alleged misstatements by Mr. Milton did not influence Nikola stock price because the public securities market considers all publicly available information, including Nikola's SEC filings, which disclose material facts regarding the matters on which Mr. Milton spoke and which added context to Mr. Milton's alleged misstatements, and the price response to all that publicly available information.  Therefore, anyone who purchased Nikola stock during the relevant period necessarily paid fair market value because Nikola stock price per share was determined by market forces operating in an efficient, well-developed market."

MR. BONDI:  Your Honor --

MR. CARUSO:  Your Honor, we would ask -- we would drop the words "operating in an efficient, well-developed market."  The rest of what the Court read, we believe, is supported by the record and particularly Ferrell's testimony, but the operating in an efficient, well developed market we now recognized is not something that Professor Ferrell developed.

So that would end with "determined by market forces," and then the "accordingly" paragraph we would request as well.  This is our theory of the case on Counts Two and Three.

THE COURT:  So to finish that paragraph: "Accordingly, if you conclude, on the evidence before you, that the alleged victims paid fair market value for the shares of Nikola stock, then you must find Mr. Milton not guilty of the securities fraud alleged in Count Two."

MR. PODOLSKY:  So we do object to this.  The defense is entitled to a theory of the case instruction as long as it is supported by the record and legally correct.  This is not legally correct.  It is not a defense to any count in this case that the victims paid fair market value.  This entire defense is that there was no victim harmed.  That is not a defense.

MR. CARUSO:  It is.  Paying fair market value is a defense to wire fraud.  That's the *Mittelstaedt* case reversing the conviction where the purchaser paid fair market value for property.  It's the essence of the money or property, lack of --

THE COURT:  So this is only a theory of the defense with respect to Count Two?

MR. CARUSO:  Counts Two and Count Three.  We have a similar one for Count Four, but it's not that the victims got what they paid for.  It's that Peter Hicks received fair market value.  We'll come to that if -- it's slightly different.  But

this one would apply to Counts Two and Three, and we have a variant, a slight variant, for Count Four.

MR. PODOLSKY:  So, again, *Mittelstaedt* is an old right-to-control case.

THE COURT:  I'm sorry.  Slow down.  *Mittelstaedt* was?

MR. PODOLSKY:  An old right-to-control case. There's -- number one, there's no right-to-control theory in this case.  We haven't included that in the instructions.

Number two -- and I've litigated this many times -- actual harm is not an element of any of these offenses.  If, in fact, any victim paid fair market value, which I'm not even sure what that means, to be honest, that is not a defense to any charge in this case.

MR. CARUSO:  Judge, it is.  That's what this *Mittelstaedt* case said.  "If the victims got what they paid for," that's the phrase that the Second Circuit uses over and over and over again.  I mean, I string cite it here on our request 48.  It's the phrase that the Second Circuit uses over and over.  If the victims got what they paid for, then that's a defense.

And it goes to two elements.  If you read the *Finazzo* case, it goes to the absence of an existence of a scheme, and it goes to the absence of an intent to harm the victim.  And *Finazzo* says sometimes our cases put it on the first element, sometimes our cases say it on the intent element, but either

MA4HMil1

way, if the victims got what they paid for, there's no fraud.

THE COURT:  Isn't there an instruction earlier here that says that victims need not have been harmed?

MR. PODOLSKY:  I think Mr. Caruso actually suggested that instruction like five or ten minutes ago.

THE COURT:  Let me stop for a second and go off the record.

(Discussion off the record)

(Recess)

THE COURT:  Let me make the following suggestion:  If you have a theory of the defense proposed instruction for Counts Two, Three, and Four, let's discuss them generally, and then -- so we can turn at least to the venue point.  Because, as I understand it, the government had no other comments on the third section of the instructions, is that right?

MR. PODOLSKY:  I think that we proposed in our letter adding the disclaimer language to the wire fraud instructions and the first element.

THE COURT:  I'm sorry.  What letter?

MR. PODOLSKY:  I'm sorry.  That was vague.  Our letter of October 2, on Sunday.  This is page 3.  And I think we made a specific recommendation to -- let's see.  Page -- the paragraph that goes from page 15 to 16, and we proposed removing a clause that suggests that reliance is an element.

THE COURT:  Yes.

MR. PODOLSKY:  Adding a clause that says "or was capable of influencing a decision," and then -- well, I think you have it, your Honor.

But you have some additional language at the end of that paragraph to refer back to sort of the requirements for half-truths or omissions and then the contractual disclaimer language that we discussed earlier today.

THE COURT:  Yes.  On those, with respect to that paragraph which is in, basically, the top third of your page 3, I am taking the first suggestion, which is to strike out the following words "in relying upon the representation or statement."  I am not including your recommendation that we put in the words "or was capable of influencing a decision" and am including the suggestion below "in a manner that makes what was said or represented misleading or deceptive."  And then on that last sentence, I will want to hear argument on that.

MR. CARUSO:  Shall we talk about that right now?

THE COURT:  Sure.

MR. CARUSO:  That is very similar to what the Court is using on Count One.  So, once again, our position is the Court should either drop that or add the language from the *Weaver* case which says that disclaimer is relevant and you may consider it on guilt.  So my position on that is the same as it was on Count One.

THE COURT:  To the fraud in Count One?

MA4HMil1

MR. CARUSO:  Yes.  It's on page -- with respect to Count One, it's on your page 9 near the top.

THE COURT:  That's material fact.

MR. CARUSO:  Yes, it goes to materiality, that's right.

THE COURT:  But here they have it -- they want to include it in connection with scheme to defraud.

MR. CARUSO:  Well, you know, that's fine.  I don't mind that, but -- I don't mind where they put it in, but I don't think the Court should give that instruction just as I suggested the Court should not give that instruction on Count One.  If the Court is going to give that instruction, then it should add the language from *Weaver* that I also asked for on Count One that the contractual disclaimers are relevant to the jury's determination of Mr. Milton's guilt.  So if the Court would rule on that.

MR. PODOLSKY:  So I don't want to rehash our argument from before.  We take the same position.  As far as your Court -- the Court's observation that we put it in the scheme to defraud as opposed to materiality, that was a matter of convenience in the letter.  We don't take a view as to whether it should go to the materiality section.  That's equally fine for the government.

MR. CARUSO:  And I have one more comment if the Court is going to include this.

MA4HMil1

THE COURT:  Go ahead.

MR. CARUSO:  Well, the basis on which the Court included this type of instruction on Count One was because it was a correct statement of the law that the disclaimers don't render any misrepresentation immaterial as a matter of law. The words "as a matter of law" are missing from what the government submits here on page 3 of their letter.  So if the Court is going to add this, it should be the same as Count One, inserting "immaterial as a matter of law."

MR. PODOLSKY:  We're absolutely fine with using verbatim the same language from Count One as your Honor drafted it.  We weren't trying to disagree with that language.

MR. CARUSO:  Yes, the language should be -- in the alternative, if the Court is going to include this language, it should be verbatim from Count Two -- same as Count One verbatim.

MR. PODOLSKY:  I agree with that.

THE COURT:  OK.

MR. CARUSO:  All right.  So now we're back where we were.

THE COURT:  I just want to make sure.  Where in Count One is this language?

MR. CARUSO:  It's on page 9 of the Court's written draft.

THE COURT:  Right.  OK.

MA4HMil1

MR. CARUSO: All right. So now we're back to page 13. We ask the Court to give our instruction No. 48 as our theory of the case. Victims paid fair market value. They were not deprived of money or property. This is squarely from the case law, including *Mittelstaedt*, and the string cite that I gave on the bottom of my request No. 48. This is central to our defense theory of the case.

MR. PODOLSKY: So to remind ourselves of *Mittelstaedt*, we looked it up, the reference to fair market value is just a discussion of the facts of the case. It is not a statement that you have to prove that the victim did not receive fair market value.

The case law on this could not be any clearer. There are many more cases than what the defense cites, but including in *Finazzo*, including in every case to address this issue -- and I happen to have litigated this recently in *United States v. Kaloyeros* -- it is crystal clear, crystal clear, that harm is not an element of the offense. And what this proposed defense instruction does is says if the victims are not harmed, there's no offense.

Now, if the defense wants to rephrase it in terms of the defendant's intent, he did not intend to deprive any one of money or property, depending on the language they propose, that may well be a valid theory of defense. But it's not a valid theory of defense to say that the defendant is not guilty

because people, in fact, received fair market value.

By the way, I'm not even getting to the point that receiving fair market value, whatever that might mean, does not mean that the victims were not harmed in this particular case.

MR. CARUSO:  Judge, the case law uses the language "they got what they paid for" without discrepancy.  That's in here.  And the idea that this goes to a lack of intent is in my No. 48:  "As I have instructed you, the government must prove the existence of a scheme to obtain money or property, that Mr. Milton executed or attempted to execute that scheme, and that he did so with the intent to deceive the alleged victims and the intent to harm the alleged victims.  Therefore, to prove these elements of securities fraud, the government must prove that the alleged victims of the scheme did not pay or would not have paid fair market value," which is just a better way of saying they got what they paid for.  But if you would like to say what the cases use, that phrase "they got what they paid for," we can use that.  But this is tied to the lack of scheme and the lack of intent to deceive.

The government doesn't have to prove that the victims were harmed, but on the other hand, if the victims got what they paid for, then that goes to the nonexistence of a scheme and the nonexistence of an intent to deceive -- intent to defraud, rather.  The cases just couldn't be clearer on this.  And *Mittelstaedt* is the case that involves fair market value.

MA4HMil1

There's no mail fraud or wire fraud because it was the town of East Hampton or Southampton paid fair market value for the land that the defendant was accused of selling fraudulently.

MR. PODOLSKY:  I agree that the cases are very clear on this.  In the first paragraph, as Mr. Caruso just read, there is a statement that the government has to prove that he did so with the intent to deceive the alleged victims in the intent to harm the alleged victims by depriving them of money or property.  Fine.  I don't think that needs to be repeated in this instruction, but fine.

There then follows a sentence which says the exact opposite, which is, "To prove these elements of securities fraud, the government must prove that the alleged victims of the scheme did not or would not have paid fair market value for the property."  The government simply does not have to prove that.

MR. CARUSO:  So change it to the alleged victims did not get what they paid for.

MR. PODOLSKY:  The government doesn't have to prove that either.

MR. CARUSO:  That's what these cases say.  We're talking about the same cases.  The Court can read the cases for himself and decide.  That's what the cases say.  If the victims got what they paid for, it's a defense.

THE COURT:  I don't think that's what the cases stand

for, and I think this goes too heavily on the Court giving an imprimatur, not just stating a defense theory of the case, but giving an imprimatur to the defense theory of the case on a factual basis.

MR. CARUSO:  Well, OK.  But then can we at least have something that says this is a theory -- this is the defense theory of the case?  I think that's what this does. "Mr. Milton contends as follows."  I mean, that's our theory of the case.  It says "we contend."  The Court is not telling the jury this is correct or accurate or has to be accepted.  This goes to the heart of our case.

MR. PODOLSKY:  Again, if the defense instruction is Mr. Milton contends that he did not intend to cause any harm, that actually is fine.  It's just not fine to say the alleged statements by Mr. Milton did not influence Nikola stock price. That's wrong on multiple levels.

MR. CARUSO:  But that's our contention.

MR. PODOLSKY:  But it has to provide a legal defense, otherwise it is not a theory of defense.

MR. CARUSO:  It's our contention and it would be a legal defense.  Mr. Ferrell, Professor Ferrell, testified that the price of Nikola stock is determined by, in his words, the market, and that's made up -- based on all of the information in the market.  And if the market set the price, then these people got what they paid for, a share of Nikola stock at a

MA4HMil1

price that the market fixed, and that's a defense.

MR. PODOLSKY:  If the defense wishes to make a theory of the case that the statements were not material, that's also a defense.  It is not a defense to say in fact the victims of this case -- in this case were not harmed.  It's not a legal defense.

MR. CARUSO:  OK.  But that's not what we're saying because, as I said here in the introductory part, this goes to the existence, or not, of a scheme to defraud and/or the existence, or not, of an intent to harm.  That's what this concept goes to.  It doesn't go to materiality, and it doesn't say that the government has to prove the victims were harmed. What it says is there's a defense if the victims got what they paid for, and that's just indisputably correct from the cases.

THE COURT:  I don't think that that's what the cases say, but why don't you provide some further --

MR. CARUSO:  Briefing?

THE COURT:  -- legal authority on it.

MR. CARUSO:  All right.

MR. BONDI:  May we brief that, then, your Honor?

MR. CARUSO:  We'll do that, Judge.  Just let me make a note.

THE COURT:  By midday Thursday.  I know some of you aren't working tomorrow, so --

MR. CARUSO:  Yeah, we'll get that to you.

MA4HMil1

THE COURT:  Or tonight at midnight, whichever.

MR. CARUSO:  No, no, we'll give it to you on Thursday. Isn't that what you just asked for?

THE COURT:  Yes, yes.

MR. CARUSO:  OK.  We'll do that.

Now, request 49, which, again, I didn't mean to have the Court read it out loud, but if the Court wants -- if everybody wants to read it to himself or herself, this is our request for unanimous verdict.  We request a specific unanimity instruction, a so-called specific unanimity instruction.

THE COURT:  By the way, I haven't gotten proposed verdict forms from you folks.

MR. CARUSO:  No, you haven't, but I had to talk to Mr. Mukasey about that because my draft didn't satisfy him.

THE COURT:  OK.

MR. CARUSO:  So as soon as I can, we'll talk about that, but if the government wants to send something over to us, maybe we can agree.

But, Judge, with respect to Count Two and with respect to Count One, we request a specific unanimity instruction. Let's just use Count Two as an example.  You've got 1348(1) and 1348(2).  Your Honor is charging these.  You're not breaking out the instructions for each section, subsection, as we requested, but your Honor is combining them.  That makes it all the more important that we have a specific unanimity

MA4HMil1

instruction so that we don't have, what I believe the cases call, a composite verdict:  Eight people think that the government proved subdivision (1), four people think the government proved subdivision two.  Eight plus four is 12, done.  Convicted.  That would be legally wrong, and we'd never be able to get behind the verdict because we wouldn't really know or be able to know what the jury decided, what the count was, what the -- how many people voted for each theory.  This is a tried and true method of avoiding that.

Now, the *Crisci* case, which the government gave me, I actually cited in the -- I submitted a letter to the Court on this on Sunday.  I rely on the *Crisci* case because the *Crisci* case holds that it was one count with seven false statements specified, and the general verdict was guilty on that count.  And the Second Circuit said, well, we can salvage that verdict.  There's no reason to reverse because the judge gave a specific unanimity instruction, and we believe that we have to assume that the jury followed that instruction.

That's all we want here because we -- I think it's critically important to avoid a composite verdict.  They should be told they have to be 12-nothing, unanimous, with respect to each of these subdivisions or regarding Count One with respect to each of these theories, misrepresentation/omission on the one hand, scheme liability on the other.

THE COURT:  OK.  Mr. Podolsky.

MR. PODOLSKY:  So a couple points on this, your Honor. One is the defense has cited no authority for the notion that the subsections of either Rule 10b-5 or Section 1348 are separate offenses rather than separate means, and that's what the important question is here.

But before we even get into that, I will actually note that on page 7 of your instructions with respect to Count One, you wrote:  It is not necessary for the government -- this is with respect to Count One -- It is not necessary for the government to establish all three types of fraudulent conduct, but to find the government has proven the first element you must unanimous as to at least one type of conduct you have -- you find to have been proven beyond a reasonable doubt.

I actually don't think that that instruction is required, but if the Court would like to include it, we're not going to object.  I will note that the unanimity instruction is actually here in the instructions already.

MR. CARUSO:  Yeah, and I'm suggesting that the Court should put a finer point on it with my 49 and my supplemental request No. 9.  That's ECF 184, at ECF 11.

And as far as the lack of authority, there is authority, and I cited it here, *United States v. Wiles*, 102 F.3d 1043, 1062.  It's a Tenth Circuit case under 10b-5 where the indictment charged both a misrepresentations/omissions theory and a scheme liability

MA4HMil1

theory.  Conviction was affirmed because the district court instructed the jury that although individual jurors need not agree on all the means or methods by which the defendants committed securities fraud, they must unanimously agree upon at least one such means or method.

Now, this tells me that the debate between whether these are means, methods, separate crimes, whatever we want to call them, they're different theories, and we want to avoid a composite verdict.  The *Wiles* case supports that.  I recognize it's from the Tenth Circuit, not our circuit, but that's on point.

My instructions cite many other cases from 1344 and 1348, I believe, or perhaps it's only 1344.  I think the Court should put a finer point on this, and it's especially important where the Court is not instructing the jury separately on 1348(1) as a crime and 1348(2) as a crime.  The Court is not instructing the jury on omissions and misrepresentation -- you got it.

THE COURT:  We can do that also on the verdict form.

MR. PODOLSKY:  I'm not sure -- we'll consider that. I'm not sure a special verdict form is necessary here, your Honor.  I want to just give that some thought before we give our position on it.

THE COURT:  All right.

MR. PODOLSKY:  Look, here's the bottom line.  Whatever

MA4HMil1

this Tenth Circuit case is, I actually think the Supreme Court and Second Circuit case law is very clear about when there needs to be unanimity, but in light of the fact that I note the Court has already included this sentence with respect to Count One, if the Court would prefer to take that route and include that sentence and a sentence that's verbatim the same thing in Count Two, we're not going to jump up and shout about that. We're fine with it.

THE COURT: OK.

MR. CARUSO: The Court has my view and my citations to my instructions. I think the Court should put a finer point on that.

THE COURT: Where in Count Two?

MR. CARUSO: Sorry, your Honor?

THE COURT: Where in Count Two?

MR. CARUSO: At the end of Count Two, the Court should give a unanimity instruction, a specific unanimity instruction at the end of the count before turning to Count Three.

THE COURT: OK.

MR. CARUSO: Now, turning to Count Three -- by the way, just to be -- also, the specific unanimity instruction on Count One should come at the end of the instructions on Count One before the Court turns to Count Two.

MR. PODOLSKY: I think the way the Court has done it in Count One, to explain the first element and then at the end

say you have to be unanimous with respect to one of these types of conduct, is sensible, it's clear, it helps the jury and could be repeated in count Two.  So it could be included in the first element portion, and it can say, really, the same thing.

THE COURT:  OK.  Moving on.

MR. CARUSO:  Yeah, moving on, page 14, Counts Three or Four, the Court has again the first, second, third, and here's my suggestion.  First, there was a scheme or artifice to defraud.  Insert either "scheme or artifice to defraud the victims of money or property," or you can say "a scheme to defraud that had as its object to deprive the victims of money or property."  This comes from --

THE COURT:  Denied.  Denied.

MR. CARUSO:  The money or property is essential to the scheme, essential to wire fraud.  That's the *Calderon* case, many, many cases.

THE COURT:  It's in there.  I don't know what you're talking about, that there was a scheme or artifice to defraud or to obtain money or property by false or fraudulent pretenses.

MR. CARUSO:  OK.  But the "or" is wrong.  It can't be "or."  It always has to be money or property as the object of the scheme.  That's *McNally*.  It's *Kelly* from last year in the Supreme Court.  The government needs to prove property fraud under the wire fraud statute.  The Court has held that the

MA4HMil1

money or property requirement limits both parts of the statute. The wire fraud statute --

THE COURT:  Stop talking.

Mr. Podolsky.

MR. PODOLSKY:  I think we already agreed to the defense's proposal to include an instruction that says there must be intent to harm by depriving someone of money or property.  I'm not sure what else we need on this question.

MR. CARUSO:  The "or" is wrong.  The mail fraud and wire fraud must be a scheme to obtain money or property. There's no "or" about it.

MR. PODOLSKY:  I just don't -- we're saying the same thing.  You're just reiterating the statute, and you explain further below.

MR. CARUSO:  Yes, but the statute has been construed to be -- to cover both.  The "or" does -- the statute does not create two offenses.  This goes back to *McNally*.  The court has held that the money or property requirement also limits the former, limits both types of scheme or artifice.  The "or" -- there's no -- obtaining money or property is not an "or."  It is not an alternative.  It's essential.

THE COURT:  That is an exact quote from the statute.

MR. CARUSO:  I know, but that's not --

THE COURT:  It's an exact quote from the statute.

MR. PODOLSKY:  I think I understand what Mr. Caruso is

getting at.  I'm just saying this is simple, and your Honor has already agreed to explain that there must be an intent to harm by depriving of money or property.

MR. CARUSO:  This doesn't go to intent to harm.  This goes to the existence of the scheme.  The scheme has to have a certain character.  It must be a scheme to obtain money or property.  It's not or to obtain money or property.

MR. PODOLSKY:  To be honest, your Honor, we actually don't care that much about this phrase.  So if it will speed things along, we have no objection to that.

MR. CARUSO:  So we're going to take out "or."

MR. BONDI:  And that also applies to 1348 as well.

MR. PODOLSKY:  No.  Sorry, let's pause.  1348 is different, so that is not applicable to this.

But, second, I don't think we should take out the "or." My understanding was the proposal was there was "a scheme or artifice to defraud to obtain money or property."

MR. CARUSO:  That would be fine, too, defraud the victims of money or property -- to obtain money or property, yes.

THE COURT:  "Defraud the victims of money or property."

MR. CARUSO:  Right.  And now, under your heading second, "that the defendant you are considering," strike "you are considering" because there's only one defendant.

And I would suggest the language "that the defendant devised the scheme knowingly and willfully."  That the defendant devised the scheme knowingly and willfully.  And I would strike "participated in the scheme or artifice to defraud" because that sounds like a conspiracy charge.

THE COURT:  I'm not changing that language.

MR. CARUSO:  All right.  Under third, again, take out the words "you are considering."

THE COURT:  OK.

MR. CARUSO:  And then I think you can take out of the rest of that sentence "or foreign wires."  There's no -- it's just confusing.  There's no evidence about foreign wires. They're all interstate.

THE COURT:  Out it comes.

MR. CARUSO:  Sorry?

THE COURT:  Yes, I've accepted that.

MR. CARUSO:  All right.  Now, next, down under first element, scheme to defraud, I would again request the "pattern or course of conduct" language there as I did on Counts One and Two.

THE COURT:  Denied.

MR. CARUSO:  Now, the next paragraph, "The wire fraud statute alternatively provides that it can be satisfied by the existence of a scheme or artifice to obtain money or property." I think the Court should strike the word "alternatively."

MA4HMil1

Money or property is an essential element of any kind of scheme under the wire fraud statute.  It's not an alternative.  It's required in every case.

MR. PODOLSKY:  But this sentence is saying something different.  This sentence is saying, alternatively, you can accomplish this by means of false or fraudulent pretenses, representations, or promises.

MR. CARUSO:  Yes.

MR. PODOLSKY:  That's the alternative.

THE COURT:  Look, I have to go, so we need to pick up at some other time.

MR. CARUSO:  Fine.

THE COURT:  I'm here at 6 o'clock tonight, and we'll go as long as we need.  I'm here Thursday morning at 7:30 in the morning.  Because I've given you more time than I've ever given any defendant in my life ever.

MR. CARUSO:  I accept that, Judge.  Thank you.

How about 9:30 on Thursday?

THE COURT:  I don't know that I'm available then.

MR. CARUSO:  You tell us, then, please.  I know you've given us a lot of time.  I appreciate that.

THE COURT:  Thursday, the 6th?

MR. CARUSO:  Yes, sir.  At what time?

THE COURT:  9:30.

MR. CARUSO:  Thank you.

MA4HMil1

MR. BONDI:  Your Honor, I don't know if you've communicated to the jury, but given the fact that there's a television show airing tonight, we would just ask if there's communication with the jury about the schedule, they're reminded not to watch or read anything related to the case or the parties.

THE COURT:  I have no intention of communicating with the jury between now and -- actually, I'm going to call them on Friday to remind them to come in on Tuesday, but not before then.

MR. CARUSO:  Thank you, Judge.  I recognize the Court is giving us an enormous amount of time.  I appreciate it.  Got a lot of legal issues in the case, and we certainly appreciate it.

MR. BONDI:  Thank you, your Honor.

THE COURT:  I considered them, and a lot of them, as I've indicated, were implicitly denied in my draft.

MR. CARUSO:  Understood.  Thank you.

MR. PODOLSKY:  Thank you, your Honor.

(Adjourned to October 6, 2022, 9:30 a.m.)