MA6HMil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                     21 Cr. 478 (ER)

TREVOR MILTON,

               Defendant.

------------------------------x

                              New York, N.Y.

                              October 6, 2022
                              9:30 a.m.

Before:

                    HON. EDGARDO RAMOS,

                           District Judge

                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  KENNETH A. CARUSO

CAHILL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

MA6HMil1

(Trial resumed; jury not present)

MR. CARUSO:  May I proceed?

THE COURT:  Yes, good morning.

MR. CARUSO:  Yes.  Good morning, Judge.

I think we left off on Counts Three and Four.  First element, scheme to defraud, and I'll pick up there if the Court is ready.

THE COURT:  Will it be just you this morning, Mr. Roos?

MR. ROOS:  I told my colleagues they're free to join. I think Mr. Podolsky may at some point, but we can get started.

THE COURT:  I'm sorry?

MR. ROOS:  We can get started.  I think if anyone joins, they'll stop in and may leave, depending how things are going.

THE COURT:  OK.  Before we get started on all of that, our point person in charge of COVID protocols wrote to Mr. -- well, to defense counsel, and indicated that with respect to the defense team, anyone who has had close contact with the attorney can only enter the courthouse in the ten days following their last exposure if they're vaccinated and, two, they test negative on day three and five following their last exposure to the attorney, with the date of exposure counting as day zero and, three, they're not symptomatic.  And at-home antigen tests are acceptable for this purpose.

MA6HMil1

However, they must wear N95 or KN95 or KN94 masks at all times while they're at the courthouse, unless they're an attorney speaking from the HEPA-filter outfitted podium.  That that means that you folks need to be masked, certainly in front of the jury.  But we can proceed.

MR. CARUSO:  OK.

THE COURT:  We left off at page 14, correct?

MR. CARUSO:  That's correct.

MR. ROOS:  Just in terms of page numbers, did your Honor want to use the original draft, the clean draft that your clerk sent, or the redline, the tracked change version?

MR. CARUSO:  I would appreciate it if we would stick with the prior draft.  That's the pagination I'm working for. I can adapt if we need to.

THE COURT:  OK.  We can do that.  Let me see.  Yes, let's use the original draft.

MR. CARUSO:  Sorry.  Let's what?

THE COURT:  Use the original draft that you were working on.

MR. CARUSO:  Yes.  Thank you.  Thank you.

THE COURT:  OK.  By the way, we have two hours --

MR. CARUSO:  Shall I proceed?

THE COURT:  -- at most.  We're going to be done, if not before then, by then.

MR. CARUSO:  Understood.

MA6HMil1

MR. ROOS:  Your Honor, also in the interest of speeding things along, given, I think, your Honor's indicated that you considered many of the things in prior submissions before proposing your instructions, we're happy to just indicate after the defense argues their point that we object, and then your Honor can let us know if you would like additional argument from us.

THE COURT:  OK.

MR. ROOS:  We really leave it to you, but if you've already sort of made the decision, we don't need to fill the transcript.

THE COURT:  The one area that I asked for specific briefing on was the defense theory instruction.  I got Mr. Caruso's letter.  I didn't get a letter from the government, but I'm happy to allow you to argue.

MR. PODOLSKY:  I did file that letter approximately an hour ago, maybe two.

THE COURT:  You filed it this morning?

MR. PODOLSKY:  Correct.

THE COURT:  OK.

MR. PODOLSKY:  We're certainly -- sorry, the defense did.  We're prepared to argue orally.

THE COURT:  I did get Mr. Caruso's letter.

Mr. Caruso.

MR. CARUSO:  Thank you, Judge.

So with respect to -- I'm on page 14 of the original draft, Count Three and Four, first element, scheme to defraud, I would request, once again, the instruction that a scheme involves the pattern or course of conduct.  The Court is giving that with respect to Count One and should -- I suggest the Court should say the same thing with respect to the rest of the counts where the scheme is -- scheme or artifice is relevant, and the Court can either repeat that "pattern or course of conduct" language or perhaps just say I've already instructed you on this definition of a scheme or artifice to defraud.

MR. ROOS:  No objection.

THE COURT:  Very well.  So I'll say that I've already instructed you.

MR. CARUSO:  That's fine.  Let me just make a note to myself that the Court can do on all the counts.

THE COURT:  OK.

MR. CARUSO:  Thank you.

All right.  The next paragraph, The wire fraud statute alternatively provides that it can be satisfied by a scheme or artifice to obtain money or property.  I ask the Court to strike the word "alternatively."  There's nothing alternative about it.  In this case the scheme, if it's to be proven, must have its object of obtaining money or property.

MR. PODOLSKY:  So I think we went over this, as I understood it, and I think we're open to -- let me make sure

we're talking the same page.

We're open to language where it says, first, that there was a scheme to or artifice to defraud, whatever language, "someone of money or property or to obtain money or property by false or fraudulent pretenses," etc.

So we have no objection to after "defraud" some language that says "to defraud someone of money or property."

THE COURT:  I'm sorry.  You need to give me specific language.  What are you talking about?

MR. PODOLSKY:  Sorry, your Honor.  I understood Mr. Caruso to be pointing out that on page 14, in the first element, it says that there was a scheme or artifice to defraud, and then it says "or to obtain money or property."

MR. CARUSO:  No, I'm not there.

MR. PODOLSKY:  You're not there?

MR. CARUSO:  I'm lower down under the heading bolded, "First Element:  Scheme to Defraud."  Then there's a paragraph where I've asked to insert "pattern or course of conduct."  And then the next paragraph is the paragraph on the original draft that spills from page 14 to 15, and it says, "The wire fraud statute alternatively provides that it can be satisfied by the existence of a scheme or artifice to defraud to obtain money or property."

All I'm asking is to take out the word "alternatively" because it's not an alternative theory in this case.  It's the

MA6HMil1

only theory.

MR. PODOLSKY:  I think the "alternatively" is fine, but I would insert -- so on the second to last line of 14, I would insert "money or property" -- well, maybe we need a slight redraft here.  Let me back up.

I think the point that Mr. Caruso is making is there's two ways in the statute to commit the offense.  One is a scheme to defraud, one is to obtain money or property by false pretenses, and so on.  I think what Mr. Caruso's pointing out, and we don't disagree, is that the scheme to defraud also needs to be a scheme to defraud someone of money or property.

So I think maybe the way to do this is to say it can be satisfied by the existence of a scheme or artifice to defraud someone of money or property or to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

MR. CARUSO:  I don't have a problem with that.  I still want the word "alternatively" stricken.  It's not an alternative theory.

THE COURT:  So take out "alternatively"?

MR. CARUSO:  Correct.  Thank you, Judge.

THE COURT:  Then it would read:  "The wire fraud statute provides that it can be satisfied by the existence of a scheme or artifice to obtain money or property by means of false or fraudulent pretenses" or what?

MR. PODOLSKY:  So I think it should say, your Honor, "can be satisfied by the existence of a scheme or artifice to obtain money or property or" -- just trying to make the syntax link up here, but -- "or by use of false or fraudulent pretenses, representations, or promises to obtain money or property."

MR. CARUSO:  Fine with us, your Honor.

THE COURT:  So now it will read:  "The wire fraud statute provides that it can be satisfied by the existence of a scheme or artifice to obtain money or property by means of false or fraudulent pretenses, representations, or promises to obtain money or property."

MR. CARUSO:  Right.

MR. PODOLSKY:  Sorry, your Honor.  I'm just reading the transcript for one moment.

So I think there should be an "or" right before "by means of."

THE COURT:  OK.  I'm happy to put that in if the parties agree, but think about what the jury's going to hear, and let me read it again.

"The wire fraud statute provides that it can be satisfied by the existence of a scheme or artifice to obtain money or property or by means of false or fraudulent pretenses, representations, or promises to obtain money or property."

Want to tell me what that means, anyone?  Next.

MR. ROOS:  Judge, on whenever our last conference was, we were discussing the elements right above this, and your Honor made an edit, which is reflected in the redline such that it would say:  "First, that there was a scheme or artifice to defraud the victims of money or property or to obtain money or property by false or fraudulent pretenses, representations, or promises."  I think you could just also alternatively use that same formulation later under the first element.

THE COURT:  I'm sorry.  Are you suggesting an alternative to this sentence?

MR. ROOS:  Correct.

THE COURT:  And it would simply state what it states at the middle of the page after the italicized "first"?

MR. ROOS:  Correct, correct.  So to put that where it is under the first element, it would say:  "The wire fraud statute provides that it can be satisfied by the existence of a scheme or artifice to defraud the victims of money or property or to obtain money or property by means of false or fraudulent pretenses, representations, or promises."

MR. BONDI:  Your Honor, we would object to that.  Wire fraud requires by means of false or fraudulent pretenses.  The formulation that the government is suggesting there removes that element, so we would object.

MR. ROOS:  The wire fraud statute has two ways of proving it, which is why the word "or," which indicates the

disjunctive, is contained in the statute.  The statute says, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. . ."

MR. CARUSO:  But the reason why that's wrong is the *McNally* case, which holds that the obtaining money or property applies to both -- to all of these schemes.  Devised or intending to devise any scheme or artifice to defraud requires a scheme or artifice to obtain money, and then the other clause also provides specifically for money or property.  *McNally* settled this.  The money or property objective applies to every aspect of this statute*, McNally* and *Kelly*.

MR. ROOS:  We agree that the object is money or property, which is why both parts -- we think the instruction is correct to have both parts say "a scheme or artifice to defraud of money or property or to obtain money or property."  The point is not we disagree with the money or property element.  The point is that there's two ways you can prove this, either it being a scheme or artifice or it being an effort to obtain money or property by false, fraudulent pretenses.

MR. CARUSO:  That -- we agree to that formulation.  That's fine.

MR. PODOLSKY:  I think that's why we agreed to the

language the last time we were here that Mr. Roos was just pointing to and why I think he's suggesting just repeating that same language.

MR. CARUSO:  That's fine.

THE COURT:  I'm terribly confused right now.  So what we're talking about is the first sentence of the second paragraph of numbered section 1 entitled "First Element: Scheme to Defraud," correct?

MR. CARUSO:  That's correct.

THE COURT:  And what do the parties suggest I say, Mr. Roos?

MR. ROOS:  So the government suggests that you revise the first sentence of the second paragraph under one, first element, to say:  "The wire fraud statute provides that it can be satisfied by the existence of a scheme or artifice to defraud the victims of money or property or to obtain money or property by means of false or fraudulent pretenses, representations, or promises."

MR. CARUSO:  That's fine, as long as both clauses have "money or property," that's what we want.

MR. ROOS:  I would just note, while we're on the subject, in the discussion of the elements right above this, the word "or" is missing under "First."  So currently the revised draft says on the first element, "First, that there was a scheme or artifice to defraud the victims of money or

MA6HMil1

property, to obtain money or property by false" -- so it's missing "or" right after "the victims of money or property," or.

THE COURT:  I'm sorry?

MR. CARUSO:  Now, the government's back on your redline draft.

MR. ROOS:  Right.

THE COURT:  I have no idea what you're talking about. So now we're back to the italicized "first"?

MR. ROOS:  Correct, your Honor.

THE COURT:  What should it say?

MR. ROOS:  Your Honor's chambers circulated a revised version that included the parties' changes from, I guess it was, Tuesday, and the revised version said:  "First" -- which is in italics, "First" -- "that there was a scheme or artifice to defraud the victims of money or property, to obtain money or property by false or fraudulent pretenses," and we are suggesting in the revised version that it should instead say: "First, that there was a scheme or artifice to defraud the victims of money or property," insert the word "or to obtain money or property by false or fraudulent pretenses."

So it's just, I think, as a result of a typo is missing the word "or."

THE COURT:  OK.

MR. CARUSO:  All right.  If the Court is ready, I'll

MA6HMil1

move on.

THE COURT:  Let's, please.

MR. CARUSO:  So the next sentence --

THE COURT:  The next sentence?

MR. CARUSO:  Yes, just one word.  "A pretense, representation, statement, or document is fraudulent if it was made falsely and with intent to deceive."  I think you should change "deceive" to "deceive and to harm," because as we've established the other day, defraud has two parts, intent to deceive and intent to harm.

MR. PODOLSKY:  Mr. Caruso's not wrong about that point, but that's why it's addressed in a separate element, which is what intent to defraud is.

MR. CARUSO:  Well, it would be accurate, then, to say "defraud" instead of "deceive," but then it's repetitive because then you're saying a scheme, a pretense, representation, etc., is fraudulent if it was made with intent to defraud.  It's just -- it's like a tautology.  It's a fraud if it's a fraud.

MR. PODOLSKY:  Right, but what's going on in this paragraph, as I understand it, it's explaining not the intent requirement, it's explaining what a false representation is.

MR. CARUSO:  As I understand --

MR. PODOLSKY:  Then the next statement, the next sentence, makes the same -- elaborates on that further saying

that when a half-truth or admission or omission is deceptive. I think here the concept is deception. We will get into the concept of intent to harm by means of -- by depriving someone of property in the intent section.

So I think it just adds confusion, and I will leave it as is.

MR. CARUSO:  In the interest of moving forward, the Court has my suggestion, my position, and the Court can rule.

THE COURT:  I'm not going to include that language.

MR. CARUSO:  Now, the next paragraph is, in my view, a statement of -- a correct statement of the law that doesn't apply to this case.

MR. PODOLSKY:  We disagree.

THE COURT:  I'm sorry.  What are you saying, Mr. Caruso?

MR. CARUSO:  The next paragraph which starts with the words "The deception need not be premised," I believe that this paragraph is an accurate statement of the law, but it doesn't apply on the facts of this case.

THE COURT:  I disagree.  Next.

MR. CARUSO:  Next paragraph, at the very end, "certain proof may be the most persuasive evidence," I would request the Court to take out the words "the most persuasive."  It's a bit of a thumb on the scale.  It's evidence of a fact.

MR. ROOS:  We're fine with removing "most persuasive."

MA6HMil1

THE COURT:  So it would read:  "Of course, proof concerning the accomplishment of the goals of the scheme may be evidence of the existence of the scheme itself."

MR. CARUSO:  Correct.

THE COURT:  OK.  Next.

MR. CARUSO:  Next paragraph, second sentence:  "A material fact is one that would reasonably be expected to be of concern."  We ask the Court in our instruction No. 55 to use the formulation "a material fact is one that would actually matter in a meaningful way to a reasonable and prudent person." That's from *United States v. Calderon*.

MR. ROOS:  Objection.

THE COURT:  I'm not going to make that change.  I am taking out "in relying upon the representation or statement." So this sentence now reads:  "A material fact is one that would reasonably be expected to be of concern to a reasonably and prudent person in making a decision."

MR. CARUSO:  Right.

THE COURT:  OK.  Next.

MR. CARUSO:  OK.  Next, at the very bottom of the page, Court has "a representation was one that a reasonable person might have considered important."  We ask the Court to use the word "would."  This is from the *Weaver* case and *United States v. Rybicki*.  In other words, a lie can support a fraud conviction only if it is material, that is, if it would affect

MA6HMil1

a reasonable person's evaluation.  That's from *Weaver* and *Corsey*.  Sorry, it's not from *Rybicki*, *Weaver* and *Corsey*.  And "would," of course, is much stronger than "might."  "Might" is a bar that's too low.

THE COURT:  Any objection?

MR. PODOLSKY:  That seems pretty marginal, your Honor.  If they want that change, we won't object.

THE COURT:  I'm sorry?

MR. PODOLSKY:  No objection.

THE COURT:  So "might" becomes "would."

MR. CARUSO:  Right.  Thank you, Judge.

Now, let me know when your Honor is ready.

THE COURT:  I'm ready.

MR. CARUSO:  Right.  Here again, for the record, we want also on this count our instructions 15 and 16 regarding opinion and puffery, our instructions 43 and 20 regarding the immateriality of facts already disclosed, and we want our instruction 21 as adapted in 44 and 58 where the Court instructs the jury about how to regard the evidence by testimony from individual investors.  I believe the Court has refused to give those on the other counts, but I'm making my record.

THE COURT:  Very well.  And I am not giving them here.

MR. CARUSO:  Moving down the page, under the second element, the second element that the government must prove

beyond a reasonable doubt under Counts Three and Four is that Mr. Milton devised.  I would ask the Court to strike "or participated in."  That is -- sounds like a conspiracy charge.

MR. ROOS:  No objection.

THE COURT:  I'm sorry.  Where are you again?

MR. CARUSO:  Page --

THE COURT:  Page 16.

MR. CARUSO:  Second element, knowing participation in scheme with intent to defraud.

THE COURT:  So take out the words "or participated in"?

MR. CARUSO:  Yes, please.

THE COURT:  So that it now reads:  Mr. Milton -- that is, "That Mr. Milton devised a scheme to defraud knowingly, willfully, and with specific intent to defraud."

MR. CARUSO:  Correct.

THE COURT:  Next.

MR. CARUSO:  The next line also says "and participated," so the Court should strike "and participated" there.

THE COURT:  Very well.

MR. CARUSO:  And then later, further down in the paragraph, the Court defines to participate.  Those two sentences should come out, I suggest.  "To participate in a scheme to defraud means to associate oneself with it with a

MA6HMil1

view toward making it succeed," strike that.  "While a mere onlooker is not a participant in a scheme to defraud, it is not necessary that a participant be someone who personally and visibly executes," I think those should come out.  Again, it sounds like conspiracy or aiding and abetting.

THE COURT:  Any objection?

MR. ROOS:  On this, your Honor, we certainly don't think we need the word "participate" if their concern is that it implies a conspiracy.  I think what your Honor's instructions, though, were trying to accomplish is to use two words, one that refers to sort of a mental planning, devising, and the other which relates to an action, undertaking or participating.

So the issue with just removing wholesale all of these sentences about participating is then we only have an instruction about concocting a plan.  Now, if they would like to change the word to -- for instance, instead of "participate," "undertake," we would be fine with that, but there needs to be a verb that relates to action.

THE COURT:  We could use "devise," to devise a scheme to defraud.

MR. CARUSO:  I think that's sufficient.  The rest of it sounds like aiding and abetting.  "Associate oneself with it with a view toward making it succeed," that's not the theory the government's running in this case.

MA6HMil1

THE COURT:  So if we take the first of those sentences and say, "To devise a scheme to defraud means to associate oneself with a view and intent toward making it succeed," that certainly would be appropriate and consistent with the theory of the case, and I think we can lose the last sentence.

MR. CARUSO:  Then would the Court read that sentence, please.

THE COURT:  "To devise a scheme to defraud means to associate oneself with it with a view and intent toward making it succeed."

MR. CARUSO:  Again, I think it was better to say, as your Honor originally did, to devise a scheme is to concoct or to plan it, or maybe you could say to concoct or plan or execute it, but that --

THE COURT:  No, this really talks to the willful nature of it, the voluntary nature of it; that he specifically engaged in this activity.  So I'll change that first sentence that you object to, and I'll take out the second.

MR. CARUSO:  OK.  You have my position on the record.

THE COURT:  Yes, sir.

MR. CARUSO:  Now, the next two paragraphs -- excuse me, the next three paragraphs, in my view, may be correct statements of the law but are inapplicable.  It sounds again -- it's not necessary for the government to establish that Mr. Milton originated the scheme.  I don't think the government

says that somebody else originated it.  Just not applicable.

Also not required that Mr. Milton participate in or had knowledge of all the operations of the scheme.  I mean, this sounds like conspiracy.  And I think those paragraphs, they're just not applicable.

MR. ROOS:  So on this one, your Honor, there have been several times on cross-examination, where defense counsel have asked things like:  Well, it wasn't Mr. Milton's idea to do X, Y, Z.  He just went along with it.  So we think an instruction along these lines is appropriate.

MR. CARUSO:  But we've never argued that anybody else engaged in fraud or started a fraud or originated a fraud.  Our position is that nobody at Nikola committed a crime or a fraud. Nobody, not Mr. Milton or anybody.  We've never argued that somebody at Nikola committed a fraud.  We argued, in fact, we cross-examined to say:  You didn't think that was a fraud, did you?  And the witnesses said no.

THE COURT:  I guess I'm thinking about, in particular, the video.

MR. CARUSO:  Which one, your Honor?

THE COURT:  The video, the in-motion video --

MR. CARUSO:  The truck rolling?

THE COURT:  -- the Phillips video, whichever one it was.

MR. CARUSO:  Yes, sir.

THE COURT:  I think there was some communications there that it wasn't Mr. Milton's idea, but it was brought to them by the Phillips people, correct?

MR. CARUSO:  Yes, that's true, as far as it goes, yes. I don't think that that would call for this charge.  Nobody's suggesting that Phillips committed a fraud.  Nobody's suggesting Phillips originated or committed a fraud.

MR. ROOS:  I think your Honor's absolutely correct about how defense counsel has effectively argued to the jury that Phillips thought of it, and similarly, Mr. Caruso on cross-examination of one of the retail investors suggested that it was Nikola's chief engineer who had the idea to use a donor vehicle for the Badger truck.  So we think there has to be some sort of instruction that makes clear that just because, as alleged, Mr. Milton did not think of it, that doesn't mean he is not undertaking a scheme to defraud.

MR. CARUSO:  I just think, on the record of this case, that paragraph is just excessive.  This is just not a joinder of a scheme case.  It just isn't.  Maybe there's a little snippet here of evidence and snippet there, but nobody's going to argue that, and it's just -- it's just confusing, misleading for the jury.

THE COURT:  I don't think so.  I'm going to leave them in.

MR. CARUSO:  And the next paragraph as well, sir, your

MA6HMil1

Honor?

THE COURT:  Yes.

MR. CARUSO:  OK.  I'm turning now to page 17.  "It's not necessary that Mr. Milton participated in a scheme from the beginning."  It's my same point.  I just think that is not applicable to this case.  It comes in at a later point with knowledge of the scheme's operation.  That's just like a conspiracy charge.  Just not applicable.

THE COURT:  I think the prior two paragraphs adequately capture this concept, so I'm going to take that out.

MR. ROOS:  The third one?

THE COURT:  Yes.

MR. CARUSO:  Thank you, Judge.

The next sentence of the next paragraph, I also ask the Court to strike "participation to a lesser degree than others."  It just doesn't apply.

MR. ROOS:  That's fine.  We can strike that one.

MR. CARUSO:  All right.  If the Court would let me know when you're ready for me to move on.

THE COURT:  OK.

MR. CARUSO:  Little bit further down page 17, "To act willfully means to act voluntarily and with wrongful purpose." As on the other counts, we ask for our instruction No. 24, which is based on *Bryan v. United States*.  And the Court has rejected that, but I want to make my record.

MA6HMil1

THE COURT:  Very well.

MR. CARUSO:  The next paragraph we come to this distinction between -- among defraud, "intent to defraud means to intent to deceive and intent to harm."  And we ask the Court here to use our instruction No. 34.1 and 34.2.  This is ECF 167 at ECF page 48 and 49.

If the Court would like to turn to that, I'll wait, or if the Court would like me to proceed, I'll proceed.

THE COURT:  Let me just hear from the government.  Do you agree?

MR. ROOS:  We think the Court's instruction here accurately captures the necessary legal components.  It notes that harm has to be contemplated for the intent element, but accurately states that you don't have to prove actual harm.

MR. CARUSO:  I'll wait until the Court's ready to hear me.

THE COURT:  I'll hear you.

MR. CARUSO:  Well, 34.1 is critically important to our defense.  The government must prove that Mr. Milton's words and actions were reasonably calculated to deceive persons of ordinary prudence and comprehension.  Evidence that statements or actions were reasonably calculated to deceive persons of ordinary prudence and comprehension may provide some evidence that a defendant specifically intended to deceive.  By contrast, evidence that statements or actions were not

MA6HMil1

reasonably calculated to deceive persons of ordinary prudence and comprehension may provide some evidence that the defendant did not specifically intend to deceive."  This is straight out of *United States v. Thomas*, which gives the definitive treatment of this "reasonably calculated to deceive" issue.  And *Thomas* holds that the negligence of the victims is not a defense.

But the issue of -- the issue goes to the defendant's intent.  Reasonably calculated to deceive goes to the defendant's intent.  And if -- we want to argue that these investors and, for that matter, Peter Hicks had easy and ready access to all the facts; that they could determine the facts for themselves.  And that bears on the defendant's intent to deceive because, in the defendant's mind, his statements were not reasonably calculated to deceive because the victims had ready access to the facts.  And I'm citing --

THE COURT:  That's two different -- two very different things.

MR. CARUSO:  I'm sorry, your Honor, I don't understand that statement.

THE COURT:  I'm sorry?

MR. CARUSO:  I didn't understand what the Court is saying.

THE COURT:  You're saying that because the victims had access to information, that means that Mr. Milton had no intent

to deceive, and those two things don't jibe.

MR. CARUSO:  Right.  But it's that Mr. Milton knew that SEC filings existed, and therefore these people had access to the facts.  This is what Judge Kaplan said on this in *United States against Bank of New York*:  "The ease by which the victims could have determined whether their trades were netted," which was the fraud, "belies an inference that the representations were calculated to deceive."

If the information is available, and here in SEC filings, and the defendant knows that the information's available in SEC filings, then the jury can find that the statements were not reasonably calculated to deceive because of the ease by which the victims could have determined the facts.  That's the case law of *Thomas* and *Bank of New York*.

MR. PODOLSKY:  So there might be fair argument in a description of the facts, but what the defense is trying to do here is have a second materiality instruction within the intent section.  These concepts are conveyed, and more accurately so, with the Court's instructions that explain what intent -- the intent requirement is and then what the materiality requirement is.

MR. CARUSO:  This does not go to materiality, your Honor, under the *Thomas* case.  It goes to the defendant's state of mind, and it's very important to us.

THE COURT:  Denied.

MA6HMil1

MR. CARUSO:  And then 34.2 goes to the intent to harm. The 34.1 went to intent to deceive.  34.2 goes into the other half, intent to harm.  To prove that Mr. Milton contemplated or intended some actual deprivation of money or property, the government must prove that Mr. Milton believed that the alleged victims would purchase Nikola stock on the basis of his statements.  If Mr. Milton did not believe that the alleged victims would purchase Nikola stock on the basis of his statements, then Mr. Milton lacked the requisite criminal intent to harm.  And we cite here the *Litvak* case at 179, note 24, which holds that where intent to cause harm is an element of the offense, as it is here, a defendant's bona fide belief that he will not cause such harm would necessarily constitute a defense.

MR. PODOLSKY:  But that's not what the instruction that they're proposing says.  What the instruction they're proposing says is to sort of subtly introduce a reliance concept into this, and we don't think there's a basis for it.

THE COURT:  A reliance on whose part?  I'm sorry.

MR. PODOLSKY:  On the part of the victims.

So what the proposed instruction is is that Mr. Milton has to believe that the alleged victims would purchase Nikola stock on the basis of his statements, but that's not what the harm requirement is.  The harm requirement is he has to intend the deprivation of money or property.

MA6HMil1

MR. CARUSO:  Yes, and this goes to undercut that intent because, as the circuit held in *Litvak*, a defendant's bona fide belief that he will not cause such harm would necessarily constitute a defense where, as here, intent to cause harm is an element.  It's nothing to do with reliance.  It's to do with the defendant's state of mind.

THE COURT:  I'm not going to include this language.

MR. CARUSO:  OK.  Just for the record, 34.1 and 34.2 are well-established black letter law, and we really need them in this case.  They apply, and the Court should give them.

THE COURT:  OK.

MR. CARUSO:  Further down in that paragraph, I would ask the Court to strike the following sentence.

THE COURT:  Where are you?

MR. CARUSO:  On page 17 of the Court's.

THE COURT:  OK.

MR. CARUSO:  Page 17 of the Court's draft:  "Actors are presumed to intend the natural and probable consequences of their actions."  I think that that goes too far.  It's just too low of a bar.

THE COURT:  It's too what?

MR. CARUSO:  Too low of a bar.

THE COURT:  It's completely logical and commonsensical.

MR. CARUSO:  In that case, perhaps the Court would

just strike that sentence and leave in the next one, which I think is more accurate and more applicable: "When the necessary result is to injure others, fraudulent intent may be inferred from the scheme itself."

I mean, I think that that sentence is preferable to "the actors are presumed to intend," and I think that charge would be more accurate and fairer if "the actors are presumed" sentence was stricken and the next sentence were left in.

MR. PODOLSKY: I'm fairly confident I've seen this in every fraud charge I've seen. It's helpful to the jury, and it's accurate, so we think it should be in.

THE COURT: I'm not taking it out.

MR. CARUSO: Now, page 18, spilling over to 19, I ask the Court to strike: "As a practical matter, then, in order to sustain the charges against the defendant you are considering, the government must establish beyond a reasonable doubt that he or she knew that his or her conduct as a participant in the scheme was calculated to deceive, and nonetheless he or she associated himself or herself with the alleged fraudulent scheme for the purpose of causing some loss to another."

I think that that is unnecessary in light of the previous or prior instructions on intent and I think tends to introduce rather extraneous element about participating in the scheme and associating with the scheme, and I think I would say it's sort of like dilutes what the Court previously said.

MA6HMil1

THE COURT:  Well, I think what I will do, consistent with our other edits, is I will take out a couple of phrases. So I will take out "the charges against" and then take out "the defendant you are considering" and put in "Mr. Milton."  That's in the first line, spilling into the second line.

MR. CARUSO:  I see it.

THE COURT:  And then continuing:  ". . . the government must prove beyond a reasonable doubt that he" -- and then take out "or she" -- "knew that his" -- take out "or her" -- "conduct" -- take out "as a participant" -- "in the scheme was calculated to deceive, and nonetheless he" -- take out "or she" -- "associated himself" -- take out "or herself -- "with the alleged fraudulent scheme for the purpose of causing some loss to another."

So the sentence now reads:

"As a practical matter, then, in order to sustain the charges against Mr. Milton, the government must establish beyond a reasonable doubt that he knew that his conduct was calculated to deceive, and nonetheless he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another."

MR. CARUSO:  I think the Court should end with "was calculated to deceive."  The "and nonetheless associated" part doesn't add anything and doesn't really apply here.  Otherwise, we would be fine with the change up to the end of "was

MA6HMil1

calculated to deceive."

MR. PODOLSKY:  I feel like we should agree with that, but, actually, I think that reduces the burden that the government has.  So we think the sentence as is should stay.

THE COURT:  Yes, I'm going to leave it as is.

MR. CARUSO:  Now, before we get off this element, your Honor, once again we ask the Court to include our -- which the Court has rejected on the other counts, but I'm going to make my record -- our Nos. 26 through 29, which are knowledge -- excuse me.  Well, it's good faith, which we're going to come to, and the duties of officers and directors and the duty to update or correct SEC filings.  I assume that's rejected.

THE COURT:  Unless the government is going to --

MR. PODOLSKY:  Objection.

THE COURT:  That will not be included.

MR. CARUSO:  Now, here, before we move on to the last element, we come to the instruction on our theory of the case about fair market value.  That involves instructions 48 and 61, and that's the subject of the letter that I submitted a couple of hours ago.  So I assume your Honor just wants to reserve on that.

THE COURT:  Does the government wish to weigh in?

MR. PODOLSKY:  We're happy to, your Honor.  I'll try to keep this brief.

Look, every single case that is cited by the defense

MA6HMil1

in this letter is a right-to-control wire fraud case.  I'm happy to get into the specifics of that theory, but the bottom line is there's not a right-to-control instruction in this case.  We're not asking for one at this point, and it's, therefore, inapplicable.  Again, I can get into the details if it's useful.

But I will also point out that, even assuming these cases were applicable, the cases cited by the defendant -- *Binday*, for example, *Finazzo* has the same language, so does *Kaloyeros* -- says there is no harm requirement.  There only has to be contemplated harm.  For the defense to have a theory that it is a defense to these charges that in fact the purchasers of the stock purchased at a fair price is not a defense.

Now, I will actually say I think the defenses proposed instruction goes even further than that.  It suggests, essentially, that while Professor Ferrell, the Harvard economist, said there's this efficient market hypothesis, and therefore, there can never be securities fraud, and that is not an acceptable defense to these charges.

MR. CARUSO:  We're not saying it can never be securities fraud.  We're saying, on the strength of that evidence, if the jury believes it, the jury can conclude that there was no intent to harm.  The cases make this very clear.  Contemplation of harm can be negated by evidence that the alleged victims received everything they paid for with no

discrepancy, or they paid fair market value to use different words.  I mean, if you look at the *Finazzo* case, the fraudulent scheme must implicate tangible economic harm.  This economic harm can be manifested directly, such as by increasing the price the victim paid for a good, or indirectly, such as by providing the victim with lower quality goods than it otherwise could have received.

On this record, if the jury believes Professor Ferrell, then the jury can find that the government has not proven the requisite tangible economic harm.  It was not manifested directly because there was no increase in the price the victims paid.  The price was fixed by the market, not by Mr. Milton or his statements, and it was not shown indirectly because the victims were not provided with lower quality goods than it otherwise would have received.  They received a share of stock which the quality or value is determined by the market.

Now, I'm not asking for the Court to rule as a matter of law.  I'm asking the Court to recognize that the record we made would permit the jury to make that finding, and therefore, we ask the Court to give this instruction as our theory of the case.  I mean, it's not sufficient on an issue like this that we can just argue it.  As the circuit has recognized, it's a value to the defendant to have the judge clearly indicate to the jury what the defendant's theory of the case is and that

that theory may justify -- if believed, would justify acquittal, and that's the *Durham* case.  And the *Roland* case, criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence regardless of the strength of that evidence.

We think that the evidence that we submitted from Professor Ferrell will permit the jury to reach that conclusion under these cases, such as *Finazzo*, such as *Mittelstaedt*, that the victims paid a fair market value because the price was set by the market and not by anything that Mr. Milton did individually.

THE COURT:  Government objects?

MR. PODOLSKY:  Sorry?

THE COURT:  The government objects?

MR. PODOLSKY:  We do, your Honor.

THE COURT:  I'm not including it.  Doesn't it fail on the law, though?  Aren't you making a legal argument as opposed to a factual argument?

MR. CARUSO:  Well, no.

THE COURT:  A legal argument that the law precludes.

MR. CARUSO:  No, no, the jury may find our way. That's all I'm asking for, and our instruction doesn't sound at all like a matter of law.  Just look at it again.

MR. PODOLSKY:  OK.

MR. CARUSO:  "If you conclude on the evidence before you that the alleged victims paid fair market value, then you must find Mr. Milton not guilty."  If you want to say "may find him not guilty," that will be fine, but it's an "if you conclude."  The Court is just giving the legal framework.  Mr. Milton contends that the victims received what they paid for with no discrepancy between actual and anticipated benefits.  That's from the case law.  Misstatements did not influence the stock price because the public securities market considers all the information available and fixes the price, the price response, that's Professor Ferrell's testimony.  If the jury chooses to credit that testimony, which it may, and therefore, if you believe all that, the investors paid fair market value.

It's just straightforward.  It's an argument that we want to make.  It's our theory of the case.  It does not fail as a matter of law.  It may succeed as a matter of fact, and we ask the Court's, as to use the word, imprimatur because it's a key theory of the case.

MR. PODOLSKY:  I don't want to keep arguing it unless it's useful to the Court.  I will just emphasize that if the defense proposes a theory that's there a legal basis for, such as it's the defense's theory of the case that Mr. Milton never intended harm to a victim because he believed they were paying the accurate or fair price of the stock, that we will not

MA6HMil1

object to.  This we object to.

THE COURT:  Yes.  If you have a different formulation for your theory, Mr. Caruso, I'm happy to consider it, but you have to get it to me today.

MR. CARUSO:  Understood.

THE COURT:  Next.

MR. CARUSO:  Let me just make a note to myself, please.

Right.  Again, your Honor, I think you rejected this -- no, I did mention this 26 to 29, good faith officers and directors duties, duty to update.  I believe I mentioned it and your Honor rejected it.

THE COURT:  I have.

MR. CARUSO:  Right.  Now, the use of the wires, we can truncate that as we did on the other elements.

MR. ROOS:  We agree.

THE COURT:  The parties agree that this element has been established?

MR. CARUSO:  Let me just look at what the Court wrote on 10b-5.  "The parties agree that this element has been met."

THE COURT:  "Element has been met," any objection?

MR. ROOS:  If your Honor intends to use the first paragraph and then --

THE COURT:  And this would be the last sentence.

MR. ROOS:  -- this would be the last sentence, that's

MA6HMil1

fine with us.

THE COURT:  So you concur?

MR. CARUSO:  Yes, sir.

THE COURT:  And the balance of that instruction is deleted?

MR. CARUSO:  Correct.

THE COURT:  Which brings us to good faith.

MR. CARUSO:  Good faith.  Just give me a moment.

Right.  The only -- one moment.  The only -- I have a couple of suggestions.  The third sentence, "An honest mistake in judgment or an honest error in management," I suggest that, in light of the evidence as it came in, that the Court remove the words "in judgment" and "in management" because that's not really what's going on here, or alleged to be going on here.

THE COURT:  Any objection to that?

MR. PODOLSKY:  Sorry.  Just one moment, your Honor. I'm making sure we understand the sentence.  So "an honest mistake"?

MR. CARUSO:  Or an honest error or even carelessness does not rise to the level of criminal conduct.

THE COURT:  I'll take those out.

MR. PODOLSKY:  Very well, your Honor.

MR. CARUSO:  And then my last request, the final paragraph under good faith is the no ultimate harm concept. Now, we said pretrial, at the final pretrial conference, that

MA6HMil1

we wouldn't be arguing no ultimate harm.  We haven't argued it. We won't argue it.  And therefore, I think this instruction is unnecessary.

MR. PODOLSKY:  So I think, your Honor, we just finished an argument that's lasted multiple days that they want to argue to the jury that if the investors ultimately got a fair price for the stock, then there's no crime.  So they absolutely intend to argue this.

MR. CARUSO:  No, no, the ultimate harm goes to the concept of a defendant committing a fraud and then thinking it's OK, like a Ponzi scheme, it's OK because eventually I'll be able to cover everybody I took money from.  Ultimately, there won't be any harm.  That doesn't apply to this case.  And the idea that the victims paid fair market value contemporaneously with the misrepresentations is very different from a "no ultimate harm."

MR. PODOLSKY:  I disagree, your Honor.  What they're saying is it would be -- certainly, the jury should not be -- there shouldn't be a risk that the jury will conclude, based on their argument, that there's no crime because, ultimately, Nikola might succeed and the stock price might be OK, and if the investors had stayed in long enough and there wasn't a short seller report, and so on, so on, they wouldn't have been harmed.  That's not a defense.

THE COURT:  And there's been a lot of

MA6HMil1

cross-examination on the fact that there were two Badger prototypes or that there was a working truck.  So I'm going to leave it in.

MR. CARUSO:  Very well.  Your Honor has my position.

THE COURT:  Very well.

MR. CARUSO:  Your Honor has my position, yes.

So venue, I think Mr. Bondi is going to rely on the letter that he submitted.

MR. BONDI:  Yes, your Honor.  We submitted this morning at ECF 205 our objections to the Court's proposed instruction on venue and our support for our proposed instruction on venue, which was ECF 203.

Your Honor, I know we've had a lot of briefing and quite a bit of argument on this issue, so I would -- I think I've made my record on venue, but if your Honor has any questions or wishes me to address any points, I will.

THE COURT:  I do have a couple of questions.  In reading your proposal, are you suggesting that in making a statement on social media, which, I suppose, necessarily goes out to all of those individuals or the universe of individuals who are part of that platform, that that's not enough; that Mr. Milton had to have intended that his message go to a particular person?  Because that's what it sounds like.

MR. BONDI:  Your Honor, what we're saying is someone cannot accidentally fall into a venue, number one.  And

number two is the mere posting of information on social media is not enough to establish venue because if it were, your Honor, venue would be proper in 94 different jurisdictions. The United States territory and Guam under the government's theory could have indicted Mr. Milton there under the theory.

Instead, your Honor, the case law, and this is *United States v. Kim*, 246 F.3d 186 (2d Cir. 2001), refers to what's known as key verbs. That's the quote, "key verbs." There has to be directionality into the district. It can't be a situation where --

THE COURT: So what does that mean?

MR. BONDI: It would mean, your Honor, that Mr. Milton was taking actual steps to say I am targeting individuals or directing this to individuals in the Southern District of New York. There's case law -- and, granted, your Honor, the case law is a bit dated given the fact that we are in the Internet world here, but saying just -- for information like in a press release or something like that, that's not enough to establish jurisdiction around the country. You have to direct communications to persons in a particular district, like a direct mailing in Ponzi schemes and fraud schemes where someone literally sends out and they're sending to people with New York addresses.

Your Honor, there has not been any evidence whatsoever in this case that Mr. Milton knew he was communicating with

someone specifically in New York or directed his communications.  If you'll notice in some of the tweets that the government put into evidence, there are things like at, you know, like that's how he directs a communication.  So he's responding to a particular person that has a question, Dear so-and-so at their Twitter handle.  That's the level of directionality that is required.  There's no evidence that there is -- that any of those persons were in New York or Mr. Milton directed it to New York.

The other problem with the --

THE COURT:  But there is, isn't there?  The government put in an exhibit that, in fact, they scraped out all of the non-New York individuals on that exhibit.

What was that?  Remind me, Mr. Podolsky.

MR. PODOLSKY:  That was a list of all the Robinhood investors just on the Robinhood platform who traded who were New Yorkers.

Look, this idea of purposefully sending it to a particular state or district is found nowhere in the case law. Here are the requirements:  The defendant has to cause an act which has -- for a wire, a wire that goes into or out of the district or, for other counts, essentially has an impact in the district, and it has to be foreseeable to the defendant that that would happen.  That's it.  There doesn't have to be purpose, and this is in every -- just about every single Second

Circuit case on this -- *Lange, Levis, Svoboda, Williams*. There's no case that says that the defendant has to intend that the venue hook actually goes into that district. They all say the opposite.

But I will also point out that it's not really an issue in this case because Mr. Milton went on national news programs. He sent out these things nationally. It is clear that a reasonable juror could find that his intent was to send it to New York, as well as every other part of the country.

Additionally, the government put in evidence that Mr. Milton directed certain communications directly to New York. One that comes to mind is when he promoted the merger by appearing live by wire in Times Square, Manhattan.

THE COURT: I agree. The converse of your objection, Mr. Bondi, that if sending a communication out by wire on a particular platform that touches upon any jurisdiction means that there's venue in every jurisdiction, the converse of that is by sending -- and no specific directionality, to use your term, the converse of that is by sending a communication by wire in a particular platform that touches on every jurisdiction means that there is no venue in any jurisdiction, and that certainly can't be the case.

But I do agree with Mr. Podolsky that if there is a line to be drawn there, the evidence in this case doesn't cross that line because, in fact, we have Mr. Milton's face on a huge

screen outdoors in Times Square.  And there's certainly an interview with NASDAQ, and regardless of where its servers are, it has a studio in Midtown Manhattan.  I don't think it's an issue here, and I think the proposed instruction sweeps too broadly in terms of what is required.  And so I will not adopt your formulation, but I'm happy to see if you have any comments on what is currently in the draft.

MR. BONDI:  Your Honor, thank you for allowing us to make these points.

Two responses, just for the record:  Number one is speaking with respect to the company going public and the merger, there is no allegation that was fraudulent or any of those communications were fraudulent.  They're not essential conduct elements of the crime.

Similarly, your Honor, trading is not an essential conduct element with respect to the charges at question, and the reason why is where courts have found that trading is an element, it's in situations where you have trading as an actual element, like insider trading.  And so trading is not an element.

So the instruction, to the extent that it references trading, we would object to that language.  For instance, your Honor, there's a section in here of the instruction -- forgive me.  I'm looking for it.  It says it could include, for example, processing or executing a securities trade within this

MA6HMil1

district.  That wouldn't be an essential conduct element of the crime, and so we would object specifically to that.

Moreover, your Honor, as Mr. Podolsky, I think, recognized, venue must be both foreseeable to the defendant and within his control.  That's the *Kim* case.  Similarly, venue "demands some sense of venue having been freely chosen by the defendant."  That's the *Kirk Tang Yuk* case.

So, your Honor, we would rest on our position here. As far as taking into consideration your Honor's instructions, the trading element there in the first full paragraph on 22 should be removed, and there should be additional language talking about foreseeable and within his control.  And that, your Honor, we think is important in light of the fact that Mr. Milton directed a wire with respect to Count Four from his bank in Utah to a bank in California.  It was, according to the government, routed through New York and New York banks, but there is an open question of whether that was foreseeable to him and within his control when he directed his Utah branch to wire the money to California.

But, your Honor, I think we've made our record, and happy to address any questions if your Honor has any.

THE COURT:  No.  But does the government object to taking out that line in the second paragraph of the venue instruction?

MR. PODOLSKY:  We're OK with -- well, let me answer

MA6HMil1

this way, your Honor:  We proposed in our letter of Sunday, October 2, some revisions to this instruction to help clarify a few matters, and one we -- among those, we had suggested keeping in the language about executing a securities trade but adding some language tailored to this case about the transmission of communications in furtherance of the scheme.

I'm happy to walk your Honor through the, I think, mostly additions or edits that we've proposed in that letter if it would be helpful.

THE COURT:  Is this document 201?  I'm trying to find it in your letter.

MR. PODOLSKY:  One moment, Your Honor, I'm getting the letter.

THE COURT:  It's on the bottom of page 3.

MR. PODOLSKY:  Correct, your Honor.  It's page 3 to 4 is the venue discussion.

THE COURT:  Right.  With respect to Count One and Two, it is sufficient?

MR. PODOLSKY:  Correct.  Just trying to divide up the venue rule for securities fraud versus wire fraud.

THE COURT:  OK.  I'll make that change.

MR. BONDI:  And for the record, your Honor, we would object to that.

THE COURT:  Very well.  The act itself need not be a criminal act.  It could include, for example, processing or

executing a securities trade within this district.  Is there evidence of that?

MR. PODOLSKY:  Sorry, your Honor, evidence of?

THE COURT:  Executing a securities trade within this district?

MR. PODOLSKY:  There's -- all the Robinhood data was going towards that fact.  To be honest, I think it should stay in.  It's accurate.  It's giving examples.  And we did offer the Robinhood data particularly for that purpose.

THE COURT:  Executing the trade, irrespective of where the servers are, if I'm in Manhattan and I have a Robinhood app on my phone and I execute the trade, the trade is -- that would be sufficient?

MR. PODOLSKY:  Yes, your Honor.  In fact, I suppose if processing -- if you want to just take out processing, because I don't think we're going to argue that the servers processed the trades in the Southern District of New York.  So if you wanted to either do executing or making or something to that extent.

MR. BONDI:  Your Honor, if I remember, from the Robinhood document that Mr. Podolsky indicated, it was the address, the home address, of the Robinhood customer.  This was, of course, during the COVID time period.  There's no evidence that any of those people were actually in the Southern District.  It just was their address on their account.

MA6HMil1

THE COURT:  But there were dozens and dozens of people on that list, and it's a fair inference that at least one of those several hundred people stayed in New York.

MR. ROOS:  Thousands was the number.  So this seems like a fact argument.  The government can argue to the jury and they could infer, based on the thousands of people, that at least one did those trades in the Southern District.  And defense, of course, can argue that because of COVID, none of them were in New York, but that's a jury argument.

MR. PODOLSKY:  I note this is a preponderance of evidence standard, your Honor.

THE COURT:  So take out the words "the act itself need not be a criminal act.  It could include, for example, executing a securities trade within the district"?

MR. PODOLSKY:  Yes, your Honor.

THE COURT:  So take out "processing or"?

MR. PODOLSKY:  Yes, your Honor that would be fine with us.

THE COURT:  OK.  "Or the transmission of a communication or wire in furtherance of the scheme into or out of the district."  We'll keep that.

With respect to Counts Three and Four, it is sufficient to satisfy the venue requirement if the defendant caused any interstate wires, such as an email, phone call, or television or Internet broadcast, to be transmitted into or out

MA6HMil1

of the district.  The wire need not itself be criminal, as long as it was transmitted or caused to be transmitted as part of the scheme.  And the act need not have been taken by Mr. Milton so long as the act was part of the crime that you find he committed."

MR. BONDI:  We object to that, your Honor.  It goes way too far.  A mere phone call or email or a vacation to the Southern District is not enough, and this suggests that it is.

THE COURT:  I don't think that it does, because it has to be connected to the scheme.

MR. PODOLSKY:  Correct, it has to be an act in furtherance.

THE COURT:  So long as it was transmitted or caused to be transmitted as part of the scheme.  So I'm adopting this language as well.

MR. PODOLSKY:  Your Honor, there was one more.  Maybe you saw it, but we proposed on the prior page, page 3, adding some additional counties or geography.  Again, just so the jury isn't confused, there was some relevant evidence about communications that went through Orange County and communications in the merger with VectoIQ, which was based in Mamaroneck, New York.

THE COURT:  What happened in Orange County?

MR. PODOLSKY:  There were a series of email communications, what we've described as the lulling conduct in

MA6HMil1

our indictment relating to Mr. Hicks.  Some of the emails in furtherance of that portion, there was a stipulation that an attorney was on those emails and received them in Orange County.

MR. BONDI:  But the government has also indicated that the scheme was over at the time of the alleged lulling.  So I'm not sure how the location of the attorney with respect to the "lulling" has anything to do with it.

MR. PODOLSKY:  So the entire point of the argument about lulling is that those communications were sent in furtherance of the scheme.  The jury, of course, could reject that argument, but that's our argument based on the facts.

THE COURT:  I will add the additional counties.  OK.

MR. BONDI:  Your Honor, if I may briefly, page 8 of your Honor's markup instructions, we noticed the edits to materiality, but, your Honor, *TSC* and *Basic*, the two Supreme Court precedent cases regarding materiality, both use the phrase "substantial likelihood."  So on your Honor's copy at page 8 where it reads:  "A material fact is one that a reasonable investor would have considered important in making his or her investment decision in light of the total mix of information publicly available," your Honor, we would -- we offer to add a material fact is one "as to which there is a substantial likelihood," and then finish the sentence that a reasonable investor, "as to which there is a substantial

MA6HMil1

likelihood."

MR. PODOLSKY:  I don't think we object, your Honor. Frankly, I think it makes it easier for the burden to be met if it's only a substantial likelihood that an investor would have considered it important, but if that's the language they want, we're OK with it.

THE COURT:  You need to be closer to the microphone, Mr. Podolsky.

MR. PODOLSKY:  Oh, I'm sorry, your Honor.  I'm just pointing out we're not going to object if that's the language they want, but as I understand it, it actually decreases the burden by saying a material fact is one where there is a substantial likelihood that a reasonable investor, and so on. The current instruction requires that a material fact be one that a reasonable investor would have considered important. We're fine with the change.  I just want to point out that I think it actually decreases the burden.

MR. BONDI:  Your Honor, we appreciate the government's diligence in pointing out its burden to prove beyond a reasonable doubt that element.  And to address that and square the circle, so to speak, with the case law dealing with substantial likelihood, I think the next sentence should reiterate that the government has the burden to prove this element beyond a reasonable doubt.

THE COURT:  That's already in there.  So I will

include -- now I'm working from the updated draft at page 8 in the section titled "Material Fact" and the sentence which begins six lines from the bottom of the page will now read: "A material fact is one as to which there is a substantial likelihood that a reasonable investor would have considered important in making his or her investment decision in light of the total mix of information publicly available." OK.

MR. BONDI: Your Honor, briefly on that, third line down under material fact, and I think the government is correct in pointing that out, the "beyond a reasonable doubt" is in there for proving a false or -- a false statement, but I don't see it in there, the government's burden of proving materiality, and that is an element that must be proven.

THE COURT: The jury's going to be told 15 or 16 or 17 different times that the government has to prove each of these elements beyond a reasonable doubt.

MR. CARUSO: If your Honor please, I just have a few more. If the Court could possibly go back to ECF 167 at ECF page 89. I'll either proceed or wait for the Court to get there.

THE COURT: Is that your pagination or ECF pagination?

MR. CARUSO: ECF pagination. ECF 167 at ECF page 89.

THE COURT: OK.

MR. CARUSO: "Large sums of money," I think this would be an appropriate case for this charge, this instruction.

MA6HMil1

MR. PODOLSKY:  Objection, your Honor.

THE COURT:  I've never seen this before or heard anything like this before.

MR. CARUSO:  That doesn't make it wrong.

THE COURT:  It doesn't, but it also doesn't make it relevant.

MR. CARUSO:  No, but I do think it's relevant.  For what it's worth, I have seen it before, but that's neither here nor there.

THE COURT:  No, I take you at your word.  I'm not going to include this.

MR. CARUSO:  All right.  In that case, my next one is -- just bear with me.  I only have a few of these.

Oh, if the Court would look at page 101, ECF page 101 of that same document, law enforcement witness.  I think your Honor will be more familiar with this one.

THE COURT:  I take it we're talking about the U.S. Attorney's Office?

MR. CARUSO:  That's correct.

THE COURT:  Any objection to this?  She wasn't -- she wasn't a fact witness.

MR. CARUSO:  Well --

THE COURT:  And she wasn't herself cross-examined as to her credibility.  She was cross-examined as to the credibility of the case, the credibility of the charts, etc.,

MA6HMil1

but I'm happy to include it.

MR. CARUSO:  Thank you, Judge.

THE COURT:  I don't know if I will include this one, but I'll include a law enforcement witness.

MR. CARUSO:  Very well.  Very well.

MR. PODOLSKY:  Your Honor, we would just -- it sounds like you were going to draft an instruction.  I think the content in the first paragraph, whether it has that language or not, but in substance is OK.  We would object to an instruction that says it's quite legitimate for the defense to take the strategy that they took.  There's already an instruction in here about evaluating credibility, and so on.  So --

THE COURT:  I'll use my standard law enforcement witness charge.

MR. PODOLSKY:  Thank you, your Honor.

MR. CARUSO:  Now, your Honor, we have requested -- if the Court is ready for me.

THE COURT:  Yes, yes.

MR. CARUSO:  We have requested specific unanimity instructions on Count One and Count Two.  Again, I believe we argued this a couple days ago, but I don't think the Court ruled.  We asked the Court to break out -- let's just stick with Count Two as an example, but it also applies to Count One -- we asked the Court to break the instruction to charge separately on 1348(1) and 1348(2).  The Court has declined to

do so and has put both of those subdivisions together in the instructions.

I think, therefore, it's especially warranted to have a unanimous verdict instruction so that we don't have a composite verdict where a jury might think that they can be eight in favor of conviction on subdivision (1) and four in favor of conviction on subdivision (2), and therefore, 8 plus 4 is 12, and they tick the guilty box.

I've put this in writing in detail at ECF 199, and it cites the two instructions that we want, one for Count One and the other for Count Two.  So that's my position, and that's our request.

MR. PODOLSKY:  I think we argued this at length.  I don't think the defense -- first of all, we don't think any of it is warranted, but the Court has already included a sentence in those counts about unanimous verdict.  The defense's request is unnecessary, lengthy, and confusing.

MR. CARUSO:  I just think there's nothing wrong --

THE COURT:  I also haven't gotten proposed verdict sheets from either side.

MR. PODOLSKY:  We did send a draft over to the defense yesterday, so we hope there will be agreement, and we can send it to the Court.

MR. CARUSO:  We will discuss that today, but we don't have a position at the moment, nevertheless.  So does that mean

that the Court will hold this request for a specific unanimity instruction in abeyance, or is the Court ruling?

THE COURT:  I've ruled.  You if you guys want to agree to some form of a verdict sheet that includes it, then that's fine, but I've ruled.

MR. CARUSO:  Understood.  I didn't understand that to be the case, but I understand it now.

Right.  So if the Court would just bear with me.

MR. ROOS:  That's not in our proposed verdict sheet, by the way.

MR. PODOLSKY:  We actually don't think a special verdict form is necessary in this case.

THE COURT:  OK.

MR. CARUSO:  Sorry, your Honor.  I believe your Honor already declined to give an instruction that the evidence of the movement of the stock price you may -- the jury -- to the jury, you may consider that as relevant to materiality.

THE COURT:  I think I've said that I will not include that.

MR. CARUSO:  I think you did.  I just wanted to be sure.

Now, if I could just turn to the redline draft that the Court circulated yesterday.  We just have a few items that we wanted to check on, and if the Court would go to page 7.

THE COURT:  Hold on.  I don't have --

MA6HMil1

MR. CARUSO:  Yes, I understand.

THE COURT:  I don't read redlines because I'm old.  So I just have the clean version.

MR. CARUSO:  You think you're old.

THE COURT:  OK.  I have the redline version.

MR. CARUSO:  Thank you, Judge.

Right near the middle of page 7, the Court has the following instruction, which I'm going to say I believe is a correct statement of the law but not applicable to this case:

"The failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional, or contractual duty to make such a disclosure, the defendant actually knew that such disclosure was required to be made, and the defendant failed to make such disclosure with the intent to defraud."

I repeat, this is not a case regarding a fiduciary duty that gives rise to a -- a fiduciary duty or similar relationship that gives rise to a duty to disclose on this theory.  There's no question about that Mr. Milton had an arm's length relationship with the -- both the public and potential public investors and with Mr. Hicks, and any duty to disclose arises on a half-truths theory, not on the basis of legal, professional, or contractual duty.  So I request that that come out.

THE COURT:  Does this necessarily involve a fiduciary

MA6HMil1

duty?  Don't SEC rules apply to this as well?

MR. PODOLSKY:  That's what we were discussing.

THE COURT:  I'm sorry?

MR. PODOLSKY:  We agree.  That's what we were just discussing.  It's legal, professional, or contractual duties.  It's not simply a fiduciary duty.

THE COURT:  And the word "fiduciary" doesn't -- is not included in here, is it?

MR. CARUSO:  No, it's not, but I don't understand how a legal, professional, or contractual duty to make disclosure can possibly arise on the facts of this case.  Certainly, Mr. Milton didn't have that duty arising out of that -- he didn't have that type of a duty to either these potential public shareholders, which is all we're talking -- we're on Count One, so he certainly had no obligation to disclose except on a half-truths theory.

THE COURT:  Yes.

MR. CARUSO:  But this goes beyond half-truths because you already said about half-truths by making statements that don't go far enough, but this case does not involve a duty or failure to disclose based on a legal, professional, or contractual duty.

MR. PODOLSKY:  I think -- so, first, I will say I doubt we're going to make an argument in closing that focuses on a legal or contractual duty.  However, we are concerned

about taking this out because the defense has, I think multiple times, put in front of the jury the notion of people's duty to have accurate SEC filings, and so on, and tried to sort of just in some way cast blame on other members of the management team, somehow suggesting that Mr. Milton wouldn't.

So we think this helps sort of clarify that type of situation can result in liability as well if the defendant intentionally omitted facts from the filings.

MR. CARUSO:  If the government is not arguing it, then that's even more reason to take this out.  It's extraneous.  It doesn't apply.

THE COURT:  Again, I don't know that it's extraneous. The theory is that there were SEC filings that were made. Mr. Milton made additional oral statements in various fora, and the theory is that those statements that he made were incomplete in material ways.  Why doesn't this instruction speak directly to that?

MR. CARUSO:  Because if the disclosures were incomplete, then his duty to disclose additional facts arises under the doctrine of half-truths.  It does not arise out of any legal, professional, or contractual duty.

THE COURT:  But didn't he have a legal duty under SEC regulations to make his statements not --

MR. CARUSO:  Well, Nikola had a duty.

THE COURT:  And he did as an agent of the company and

MA6HMil1

as CEO.  I'm not taking this out.

MR. CARUSO:  Well, would the Court at least take out "professional or contractual"?

MR. PODOLSKY:  I'm just not sure why we're taking out these concepts.  This is accurate.

MR. CARUSO:  Because they don't apply.  Anyway --

THE COURT:  I'm not taking them out.

MR. CARUSO:  Now, if the Court would go to page 9 of this same draft.

THE COURT:  The purpose, by the way, of saying this is where we are with the draft was to say this is where we are with the draft, and let's discuss what we haven't discussed. But I will hear you, Mr. Caruso.  I'll go to page 9.

MR. CARUSO:  Yes, I understand that, Judge, and I don't have anything else that was in the prior draft that I want to raise now.

But at the top of nine, the Court continues to refer to "reasonable person," whereas the Court had agreed to use the word "reasonable investor" on Count One.  So I request that the Court change "person" to "investor" on page 9.

MR. PODOLSKY:  We're indifferent to that, your Honor. We think that is fine, but if the Court would prefer "investor" here, that's OK with us too.

THE COURT:  We'll change "person" for "investor."

MR. CARUSO:  Yes, please.

MA6HMil1

THE COURT:  OK.

MR. CARUSO:  And now two more along the same line of changes that the Court agreed to make that I believe are not reflected here.

THE COURT:  OK.

MR. CARUSO:  All right.  If the Court would go to page 13, the scheme or artifice to defraud, the Court on Count One agreed to and is giving my request that a scheme to defraud is a pattern or course of conduct, etc.  That language is not inserted on Count Two, and I think should be.

Alternatively, the Court should just say I've already instructed you on Count One regarding scheme or artifice to defraud, and those instructions apply on Count Two as well.

THE COURT:  I did include that in the Count One, correct?

MR. CARUSO:  You did.  And then I believe we've also included it in Count Three based on our discussion here this morning.  So I suggest it should be in Count Two as well for consistency.

MR. ROOS:  No objection to "see above."

THE COURT:  OK.  I just want to make sure I know what you're talking about.  First element, scheme or artifice to defraud, you want to include -- I thought that's what we did when I said "as I instructed you earlier"?

MR. CARUSO:  Your Honor has inserted that language

MA6HMil1

with respect to Counts Three and Four, but I'm asking your Honor to insert that here with respect to Count Two.

THE COURT:  OK.  So we will include that same sentence.

MR. CARUSO:  Yes, please.

THE COURT:  Making it "as I instructed you earlier."

MR. CARUSO:  Right.  Now, on page 14, the "in connection with," based on the arguments that we made on Tuesday, on Count One, the Court struck the words "touched upon" and inserted the words "coincided with."

THE COURT:  Yes.

MR. CARUSO:  And I request that the Court do that here on page 14 as well for consistency between Counts Two and Count One.

THE COURT:  Very well.

MR. CARUSO:  All right.  Now, if the Court would bear with me, I think that is all I had.

Yes.  Yes, sir.  I'm finished now with respect to the charge conference.

THE COURT:  Very well.

MR. PODOLSKY:  We did have one, your Honor, which is in our Sunday letter.  We had a request for an instruction as to the presence of counsel.

THE COURT:  Yes.

MR. PODOLSKY:  There has not been an advice-of-counsel

MA6HMil1

defense made, but there has been repeated reference to Mr. Worthern and the general counsel.

MR. CARUSO:  Which page is that, Mr. Podolsky?

MR. PODOLSKY:  I believe it's the last page of our letter.

THE COURT:  The instruction, the proposed instruction, itself is at page 5 of document 201.

MR. CARUSO:  I see that.  Your Honor, we object to that because this would tend to take the legal person out of the good faith analysis.  We're not relying on -- we're not running an advice-of-counsel defense, but we are running a good faith defense.  And the statements or non- -- the things that people like Brady, Russell, and Worthen said to Mr. Milton or failed to say to Mr. Milton informed Mr. Milton's state of mind.  It is not appropriate to remove Mr. Worthern from that group because we're not relying on his legal advice, but we're relying on his statements or failures to make statements to Mr. Milton to the same extent as we're relying on people like Brady and Russell.

Worthen -- it's not as if Worthen doesn't count because he's a lawyer.  His advice or his information to Mr. Milton doesn't get extra weight because he's a lawyer, but it doesn't lose weight because he's a lawyer.  We've treated Worthen the same way we've treated all the other people who informed Mr. Milton's state of mind.  He's just like Brady and

MA6HMil1

Russell, and this instruction is inappropriate because it removes one person from the group of people who informed Mr. Milton's state of mind.  It's not appropriate to remove that person just because he's a lawyer.  His statements to Mr. Milton informed Mr. Milton's state of mind the same as any other person in the company.  Doesn't matter that he's a lawyer.  Certainly we're not running -- we're not saying it matters more because he was a lawyer.  It doesn't matter any less just because he's a lawyer.

THE COURT:  OK.

MR. PODOLSKY:  By the way, we're open to a tweak to this language if the defense has a suggestion, but the point of this language is that there is no advice-of-counsel defense. We're not saying they can't talk about Worthen.  Frankly, they talked about Worthen throughout this trial, but they emphasize that he was the general counsel, which is a sort of shadow advice-of-counsel defense.  And what this instruction is intended to do is say to the jury they can't say, well, we relied on a lawyer, and therefore he's not guilty, which is what the advice-of-counsel defense is.

MR. CARUSO:  We haven't said that.  We're not going to say that in the trial.  We're not going to say that in the summation.

THE COURT:  I understand that.  But I could be mistaken, but at some point early on Mr. Mukasey was

MA6HMil1

cross-examining, and I forget who it was, but I distinctly remember him saying the company's top lawyer, concerning Mr. Worthern, and the proposed charge doesn't take out the lawyer, it takes out legal advice.  And that, I think, is appropriate because the jurors may be misled or under a misapprehension that, hey, Mr. Milton is being charged with breaking the law.  He had a lawyer.  He spoke with the lawyer. He can't have been -- can't possibly have been guilty.  And I think it's appropriate that the jury understand that just because a lawyer was present does not absolve Mr. Milton of his intended consequences.

I will take out from the government's formulation the phrase "and cannot claim."  If you folks want to agree on some other language, I'm happy to consider it.

MR. CARUSO:  All right.

THE COURT:  But what we have now is "You have heard evidence that Nikola had lawyers.  The lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case.  The defense has not claimed the defendant's conduct was lawful because he acted in good faith on the advice of any lawyer."

I think that is an appropriate instruction -- an appropriate concept to present to the jury.

MR. CARUSO:  Just give me a moment, your Honor.

THE COURT:  Yes, sir.

MA6HMil1

MR. CARUSO:  Just jotting something down.

THE COURT:  Off the record.

(Discussion off the record)

MR. CARUSO:  Just let me read this to Mr. Bondi.

(Counsel confer)

MR. CARUSO:  Here's our suggestion.  So far, exactly with what the Court has here, "The defense has not claimed" -- striking "and cannot claim" -- "that the defendant's conduct was lawful because he acted" -- strike "in good faith" -- on the advice of a lawyer specifically."

And then I would add -- so that sentence would read, and then I'm going to add a sentence:  The defense has not claimed that the defendant's conduct was lawful because he acted in -- because he acted on the advice of a lawyer specifically.  The defense does claim, however, that a lawyer was among the persons who informed Mr. Milton's state of mind and good faith, and you may consider evidence of that.

THE COURT:  I am not going to include that language, and I am not going to include the word "specifically" at the end of the sentence.

MR. CARUSO:  Will you strike "in good faith"?

THE COURT:  Yes, I will strike "good faith."

MR. CARUSO:  How about just this, then:  "The defense claims, however, that a lawyer was among the persons who informed Mr. Milton's state of mind."

MA6HMil1

THE COURT:  That is including the concept for which this instruction was necessary.  So, no, I'm not going to include that.

MR. CARUSO:  You have our position.

THE COURT:  I do.

MR. CARUSO:  Yes.

THE COURT:  OK.

MR. CARUSO:  Now, I believe from the defense point of view we are finished with the charge conference.

THE COURT:  And from the Court's point of view.

MR. CARUSO:  Now, please, at the risk of really being a noodge and a pest, we do need to argue Rule 29 for the record.

THE COURT:  OK.

MR. CARUSO:  It will be a truncated argument because many of the Court's rulings at the charge conference would allow us simply to note our position.

THE COURT:  OK.

MR. CARUSO:  Would the Court like to hear that now?

THE COURT:  We have less than 20 minutes.

MR. CARUSO:  Let's try it.  Let's try it, because I think we just need to get it done.

So consistent with the motion I made orally at the close of the government's case, we move for entry of a judgment of acquittal under Rule 29.

MA6HMil1

First argument is -- and, again, I believe the Court already rejected this concept at the charge conference, so I'll be brief -- the SEC filings, the press releases, and the other materials in the total mix of information disclosed all the material facts regarding the matters Mr. Milton allegedly misrepresented or omitted.  Therefore, as a matter of law, his statements were not material.

The Court knows the definition of materiality, the hypothetical reasonable investor.  The total mix of information available to the hypothetical reasonable investor includes the SEC filings.  The hypothetical reasonable investor, when making an investment decision, would read the SEC filings as a matter of law.  But whether or not the investor actually read them, the point is that the filings were available to the investor, and that's all that matters.  As the Second Circuit has said in the *Sampson* case, the relevant question is whether the information was reasonably available to the investors, not whether they actually read it or took it on board.

In any event, as the Court knows, our position is that the investors are charged with knowledge of the SEC filings based on the cases we've previously cited, in particular *KeySpan* and *La Pietra*, and therefore, as a matter of law, Mr. Milton's statements were not material.  The SEC filings and the other publicly available materials already disclosed the facts, and as held in the *Honig* case, a misrepresentation or an

omission is immaterial if the information in question is already known to the market.

THE COURT:  OK.  Let's do these one at a time.

Mr. Podolsky.

MR. PODOLSKY:  Your Honor, we think the evidence adduced at trial was more than sufficient to allow a reasonable juror to find beyond a reasonable doubt that the defendant made material misstatements, engaged in a scheme to defraud.  The fact that -- well, number one, I don't think the facts support the view that all material facts, whatever that might mean, were disclosed in press releases or SEC filings.  Even if they were, that doesn't constitute a defense given the evidence that was adduced at trial.

One note on this, your Honor, because *SEC v. Honig*, which I believe was your Honor's opinion, was cited again, I would just encourage the Court in your free time to look at it. I think what the defense has repeatedly cited was actually an articulation of one of the party's arguments which was rejected.  But I'll just make that note and say we don't think that there is a basis for a Rule 29 motion on this ground.

MR. CARUSO:  All right.  The Court has my position.

THE COURT:  Yes.

MR. CARUSO:  Yes.

MA6HMil1

THE COURT:  The Rule 29 motion is denied on that ground.

MR. CARUSO:  Mr. Bondi will discuss the next element, which is "in connection with."

THE COURT:  Very well.

MR. BONDI:  Your Honor, we move for judgment of acquittal under Rule 29 because the government has not proven or provided sufficient evidence that any of the alleged misstatements or conduct was in connection with a security under 1348 or in connection with the purchase or sale of a security under 10(b) and Rule 10b-5, and that would apply to Counts, excuse me, Two and One respectively.

Your Honor, first, as to the nature of the communications, the communications were, at least with respect to the Badger, your Honor, were in connection with a product, not a security or the purchase or sale of a security. Mr. Milton and the company were promoting the sale of a pickup truck.

Secondly, with respect to all the communications at issue, the medium and media in which Mr. Milton used were not those associated with the purchase or sale of a security.  They were podcasts, Autoline podcast, TeslaCharts podcast, and the like.

With respect, most significantly, your Honor, to the timing, the third part of our argument with respect to "in

MA6HMil1

connection with," the statements at issue prior to June 4 --
there are three periods of time, your Honor, in the indictment.
Let me pause here for a moment.

Let's start with the first period of time.  Prior to
the announcement of the merger on March 3, 2020, those
statements, your Honor, are clearly not in connection with the
purchase or sale of a security because there was no security
there being offered to the public.  There's no allegations of
any private investor fraud.  So with respect to any statements
prior to March 3 or any conduct prior to March 3, it could not
by logic, by reason, by the law be in connection with the
purchase or sale of a security.  It did not coincide with or
necessarily involve, under the case law, those phrases, a
security at that point prior to March 3.

In the time period in between March 3 and June 3,
which was March 3 being the announcement of the merger and
June 3 being the merger agreement being agreed to, VectoIQ and
Nikola were two separate companies.  And as a matter of law,
those statements were not in connection with Nikola because,
again, Nikola was not a public security.  And until the merger
was approved, it wasn't even -- it was not legally a security
that someone could purchase or sell.

With respect to VectoIQ during this time period, your
Honor, there has been no evidence that Mr. Milton made any
statements that the government contends to be misstatements

MA6HMil1

about VectoIQ.  To the extent, as I understand the government's theory of the case, Mr. Milton was making statements about Nikola, again, Nikola was a separate company.

So, your Honor, we've briefed this in our December 15 motions and would incorporate by reference those arguments, which I believe I put on the record the exact ECFs at the earlier time.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Your Honor, we think there was far more than sufficient evidence adduced at trial that the fraudulent scheme -- there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities, particularly in light of the contemporaneous statements by the defendant that his conduct was designed to increase Nikola's stock price.  So we think there is a sufficient basis to send this to the jury.

THE COURT:  I agree, and the Rule 29 is denied on that ground.

MR. CARUSO:  Proceeding to the next argument, your Honor, as a matter of law, Mr. Milton lacked intent to defraud or acted in good faith.  The evidence shows that the words and the actions of others had an effect on Mr. Milton's state of mind, his thinking, his beliefs.  For example, the evidence shows that the CEO, Russell; CFO, Brady; the CLO, chief legal officer, Worthen, they all had or shared responsibility for the

MA6HMil1

accuracy of investor communications.  They were or became aware of Mr. Milton's statements.  They did not tell Mr. Milton that he was making misrepresentations.  This informed Mr. Milton's state of mind and shows his good faith.

I would just give a few examples.  You have the testimony of Fretheim who testified about her concerns regarding the so-called TeslaCharts podcasts and misrepresentations that she thought Mr. Milton had made.  She said she told Brady and Russell, and she relied on Russell to correct Mr. Milton, if necessary, and Mr. Russell didn't do that.  So I think that that, again, shows -- that lack of feedback shows Mr. Milton's good faith.  Nikola never publicly corrected any of Mr. Milton's statements, never corrected or updated its SEC filings, as it would have done if necessary. And of course, I'm cutting off the date for that argument about SEC filings.  That's September 20, the date of Mr. Milton's departure, September 20, year 2020.

Defendant's Exhibit 1497:  We need a good SEC lawyer to begin helping us for all tweets.  Public statements over and over that Mr. Milton's statements were consistent with the Nikola business model, and of course, the fact that Mr. Milton acted openly and transparently.  And I suggest that the evidence points in one direction regarding a lack of intent to defraud and good faith.

THE COURT:  Mr. Podolsky.

MR. ROOS:  I'll take this one.

So in addition to the documentary evidence establishing Mr. Milton's intent through emails and text messages, I believe the first six witnesses in the trial all testified about concerns and conversations either they had or other people had with the defendant about accuracy.  The two executives who testified, that Mr. Caruso called the Court's attention to, both testified that they literally had an intervention and threatened to resign because of his inaccuracies.  So there is more than sufficient evidence to send this to the jury.

THE COURT:  I agree, and the Rule 29 motion is denied on that basis.

MR. CARUSO:  The next point is that there's no -- as a matter of law, no scheme liability.  I already argued this in the charge conference.  I'll adopt those arguments and incorporate them by reference.

But just briefly, this theory is an invalid legal theory and fails on the evidence here because the government has to prove deceptive act, which must consist of something beyond misrepresentations and omissions.  That's the *Rio Tinto* case.  I won't go into any further argument.  I incorporate by reference what I said at the charge conference, and I would also like to incorporate by reference on this particular theory the same arguments we just -- your Honor just heard.

MA6HMil1

Statements were not material as a matter of law.  The statements were not in connection with the purchase or sale of a security.  Mr. Milton as a matter of law lacked intent to defraud or had good faith.

MR. PODOLSKY:  So on this, your Honor, we've argued it at length.  I'll just point out that the *Rio Tinto* case actually says at 41 F.4th page 49:  An actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination.  So I don't know where this deceptive acts requirement is coming from.  It's not an accurate statement of the law.  Be that as it may, there has been far more than sufficient evidence on all of the grounds that Mr. Caruso raised, whether or not he's right on the law, to send this to the jury.

THE COURT:  I agree, and the Rule 29 motion is denied on that ground.

MR. CARUSO:  Turning to Count Two, your Honor.

THE COURT:  That was just Count One?

MR. CARUSO:  That was Count One.  But the rest, we're going to argue incorporation by reference wherever we can.

THE COURT:  Very well.

MR. CARUSO:  Mr. Bondi -- with respect to Section 1348, Mr. Bondi has argued that the statute is vague and fails to give fair notice.  I don't know whether he wants to argue that further or just cite to the prior filings.

MR. BONDI:  Your Honor, we would incorporate by reference the arguments we made in ECF 50 and 51; namely, that Section 1348(1) is unconstitutional, it does not sufficiently define the prohibited conduct, it is untethered in time and fact from the alleged misconduct.  That is both on its face and as applied to the evidence in this case.  For the reasons we've set forth and argued, it lacks any instrumentality, and it encourages arbitrary, and discriminatory enforcement.  And those, again, we incorporate by reference our earlier argument.

And, your Honor, for the record, if I may, with respect to "in connection with," I now have the earlier ECF numbers.  Those were ECF 41 and 42, and we incorporate those by reference with respect to our "in connection with" argument.

THE COURT:  Very well.

MR. CARUSO:  All right.  Next point under Count Two, your Honor, as a matter of law the government has not proven specific intent to defraud.  That has two parts: intent to deceive the victims and intent to harm the victims by depriving them of money or property.

With respect to intent to deceive, the government has to prove that Mr. Milton's words and actions were reasonably calculated to deceive persons of ordinary prudence and comprehension.  That's the *Thomas* case.  And here, as a matter of law, they were not reasonably calculated to deceive persons of ordinary prudence and comprehension.  The investors had full

disclosure in the SEC filings and the other public disclosures, and the ease by which they could have determined the facts belies an inference that the representations were calculated to deceive. That's the *United States against Bank of New York Mellon.* I believe the Court has ruled on that at the charge conference.

With respect to intent to harm, again, we incorporate by reference what we said at the charge conference. There must be evidence that the defendant contemplated or intended some actual deprivation of money or property, but a bona fide belief that the defendant will not cause such harm would necessarily constitute a defense. That's *Litvak*. And in this case, the government has failed to prove Mr. Milton believed that the victims would purchase stock on the basis of his statements. On the contrary, he had every reason to believe that the investors had access to all the information in the SEC filings.

The Court, I believe, has already ruled against that argument. We incorporate by reference the "in connection with" arguments on this charged Section 1348(1).

I'll proceed to 1348(2). No materiality as a matter of law based on a reasonable and prudent person, as distinct from the hypothetical reasonable investor. I incorporate all those arguments that I made on Count One into this count.

Lack of intent to defraud, I incorporate all my prior arguments by incorporation by reference.

Lack of satisfaction of the "in connection with" or "by means of" element, we incorporate our prior argument by reference.

And the final point I want to make on this count is this is embodied in -- discussed in the letter that I submitted this morning that the investors got what they paid for because they bought a share of Nikola stock, and the -- they paid fair market value as fixed by the market price, and therefore, there's no intent to deceive.

There's no evidence that the alleged misstatement by Mr. Milton influenced Nikola stock price. The evidence is undisputed from Professor Ferrell that the NASDAQ market considers all the publicly available information. The price responds to that, and therefore, the investors necessarily paid fair market value and got what they bargained for without discrepancies.

MR. ROOS: On this one we've, I think, previously argued all the legal points already for your Honor, so we won't repeat our positions unless your Honor would like them.

And on the facts meeting each of the elements of this count, there is sufficient evidence before the jury, and we'll just leave it at that unless your Honor has any questions.

THE COURT: I don't. I agree there is sufficient evidence before the jury, and the Rule 29 is denied on that ground.

MA6HMil1

MR. CARUSO:  Count Four, and I'll be brief, again, as a matter of law, no materiality because all the facts were disclosed.  I incorporate by reference the arguments we made on Counts One, Two, and Three.

The statements to Mr. Hicks were not reasonably calculated to deceive a person of ordinary prudence and comprehension, which defeats the intent to deceive element. Clearly, Mr. Hicks had ease of access to the SEC filings.  In fact, I think he testified that his son and his lawyers actually read the SEC filings.  So there's insufficient evidence of intent to deceive.

There's also insufficient evidence of intent to harm. There's no proof that Mr. Milton contemplated harm to Mr. Hicks because Mr. Milton had every reason to believe that Mr. Hicks had access to the facts.  In fact, Mr. Milton pointed Mr. Hicks to the SEC filings.

And, finally, Mr. Hicks paid fair market value.  So there was no -- further reason why there's no intent to harm. He paid a fair market value which was 20 percent higher in June than what Hicks himself paid in March, and he knew that the options which he took could be worthless six months later. And, in fact, the options were in the money when that right matured in December.  So there's no jury question as to whether Mr. Hicks was paid fair market value and that he received everything that he should have or contemplated.

MA6HMil1

THE COURT:  OK.

MR. ROOS:  The arguments proceed from incorrect legal premises that your Honor's already ruled on, and there's sufficient evidence before the jury to send the count to the jury.

THE COURT:  I agree, and the Rule 29 is denied on that basis.

I think we're done.  In any event, I'm done.  I've got to go.

MR. CARUSO:  I think we're done.

THE COURT:  OK.  Wonderful.  We'll send around another version of the jury charge.

MR. CARUSO:  Yes, sir, please.

THE COURT:  This is just for nits, etc., obviously, Mr. Caruso, as in some of your comments, if there's something that we said we would do that we did not do, please let us know.

MR. CARUSO:  Right.  Understood.

THE COURT:  Any grammatical errors, any typos, etc., please do let us know that.

MR. CARUSO:  And I believe the one open item is my request 48 on this theory of the case fair market value, and I'm going to confer with Mr. Podolsky because I heard him say something that would be acceptable to the government, but I need to get a better understanding of that.

MA6HMil1

MR. ROOS:  I think your Honor said they should put in a letter, and we will respond by the next day if they do.

MR. CARUSO:  I put in a letter this morning.

THE COURT:  Let me know.

(Adjourned to October 11, 2022, at 9:00 a.m.)