Mad2Mil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          21 CR 478 (ER)

TREVOR MILTON,

                Defendant.

------------------------------x

                                        New York, N.Y.

                                        October 13, 2022
                                        9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                            APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
        Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHILL GORDON & REINDEL, LLP
        Attorney for Defendant
BY:  BRADLEY J. BONDI

SOUTHERN DISTRICT REPORTERS, P.C.
        (212) 805-0300

Mad2Mil1

(Trial resumed; jury not present)

THE COURT:  All right, folks.  It is 9:00.  You did not disappoint in providing something for me to do this morning.

Everyone can be seated.  Happy to see that you are all well.

As I understand it, there is a dispute concerning various exhibits that the defense wants to put in, as to a number of them.  Apparently I have already denied their admission during the course of the trial.  But, Mr. Bondi, I'm happy to hear you.

MR. BONDI:  No, your Honor.  These are new exhibits and, to be clear, we are not offering DX 212.  You did rule on that during trial.

What it boils down to, your Honor, we were able to reach an agreement with the government on a lot of different exhibits that we are planning to offer today, but there are nine outstanding and I will just read the list.  It is DX 89, 245, 246, 527, 533, 1435, 1472, 1476, and 1491.  Those nine documents, plus an issue with an audio and a confusion over a date, and I think we are close to sorting that out with the government, which was DX 77.

And then we have an additional quite a few documents, transcripts, and full audios that we need to move in as part of housekeeping that we understand the government does not have

Mad2Mil1

objections to or we have resolved those.  So the ones that are left with objections are nine documents, your Honor, and that is the subject of what we filed last night, ECF 212.  And I can track through these nine documents if your Honor would like or refer to the papers.

THE COURT:  If they fit into particular buckets, let's discuss them as smaller groups and then we will go back and forth.

MR. BONDI:  Let's start, your Honor, with DX 89, 245, and 246.  These, your Honor, are relevant to the issues in the trial.  They are not hearsay or otherwise would fall under a business record.  And let me explain.  89 is the minutes or are the minutes from Nikola's weekly leadership meeting held on October 18, 2017.  This was a regularly conducted weekly meeting.  Ms. Amzallag referenced it in her testimony and testified about these meetings happening weekly.  They are weekly leadership meetings that continued after the company went public.  At one point they were called scalability meetings.  They then were referenced as Mark Russell meetings when Mark Russell joined, and they were also referenced as stand-up meetings, weekly meetings.  These are the minutes from that meeting of DX 89.  We think it would be consistent with your Honor's prior rulings with respect to business records to admit these minutes, and the importance of the minutes are the minutes say the -- reference the Phillips commercial and the

In Motion issues in the case, namely, that there was a commercial shop with Phillips.  It references it.  It shows that the weekly leadership meeting had a discussion of that commercial.

Similarly in the same vein, your Honor, DX 245 and 246, also on the same subject, should be admitted as business records for nonhearsay purposes, that is, for the impact on Mr. Milton and goes to his good-faith defense.

DX 245 is an e-mail from Chief Legal Officer Worthen to the board of directors and Trevor Milton attaching DX 246, which are the minutes of the October 2017 board of directors meeting.  And, your Honor, as we have briefed, courts routinely in this district and in this circuit admit board of director minutes as business records.  These are regularly conducted pursuant to corporate governance issues, and these board of director minutes reference "Phillips commercial, truck moving but not under our power," putting the full board of directors, the chief legal counsel, and Mr. Milton all on notice about what was happening in that commercial for Phillips.  Again, it's for nonhearsay purposes, goes to Mr. Milton's state of mind, intent, good faith, but also would fall under the business records, so I will pause there on those three documents.

THE COURT:  Mr. Russell.

MR. ROOS:  Yes, your Honor.  Thank you.

Mad2Mil1

So this isn't the first time your Honor has seen these documents.  The defense previously tried to admit them during the government's case.  After there was a hearsay objection to them, they argued the rule of completeness which your Honor ruled against.

These are -- not only are they are hearsay documents, but they are particularly problematic.  They -- the scalability meeting minutes, to start, are -- seem to be notes of a meeting at which the defendant was not present.  Mr. Bondi referenced that these were common meetings, referencing two witnesses' testimony.  Both those witnesses, I believe, were not even working at this company at the time.  They certainly were not part of these minutes.  We have no idea who the statements on it are from.  It's being offered for the truth.  There is no indicia from the document that these are in fact the type of materials that are created in the regular course of business.

THE COURT:  Are you referring to Exhibit 89?

MR. ROOS:  That's correct, your Honor.

THE COURT:  Okay.

MR. ROOS:  Then 245 and 246, again, suffer from the same hearsay problem.  Even if board minutes generally, the fact of a board meeting, as documented by minutes, could be a business record, the underlying hearsay content within it is inadmissible here.

The issue which we outline in our letter is it's not

Mad2Mil1

clear who made the statement.  So the defense argues this puts Trevor Milton on notice of something for some reason.  It's equally plausible—in fact, probably more likely—that he is the one who is making the statement.  And so the ambiguity that's not clear from the document raises significant hearsay concerns.  There is no way to evaluate who is making the statement, what the context was of the statement, it's an out-of-court statement being offered for the truth, and so it has little probative relevance here and significant hearsay issues.

THE COURT:  I will not allow those three exhibits.

Next, Mr. Bondi.

MR. BONDI:  All right.  Exhibits 527, 1427, 1476, and 1491.

THE COURT:  Did you mean 1472?  You said 1427.

MR. BONDI:  Yes, your Honor.  Thank you.

THE COURT:  Maybe I miswrote it.

MR. BONDI:  No, you are right, your Honor, 1472.  527, 1472, 1476, and 1491.  They are a series of e-mails, your Honor.  We have laid them out in our papers.  We have copies, if your Honor would like to see them.  I printed a courtesy copy.  Can I bring them up?

THE COURT:  Sure.  Go ahead.

MR. BONDI:  So, your Honor, 14 -- excuse me, 527 is a June 26, 2020 e-mail chain between Mr. Milton, chief legal

Mad2Mil1

officer, and the chief marketing officer, and it discusses edits to a June 29, 2020 press release announcing the opening of the reservations for the Badger pickup truck.  In the e-mail Mr. Milton wrote:  Here are my changes to address Britton's concerns.  Britton is the chief legal officer.

The second page has an earlier e-mail from Mr. Caramella stating:  Britton need legal review and approval. Your Honor may recall the government has posited -- has pointed to numerous alleged misstatements by Mr. Milton regarding the status of Badger prototypes in the summer of 2020.  The e-mail chain we believe is relevant and probative of Mr. Milton state of mind because it demonstrates that the chief legal officer reviewed a press release that contained, among other things, expected issues relating to the Badger.  It demonstrates, I think, Mr. Milton's willingness to change language of a press release based on the chief legal officer's concerns.  It bears on his good faith and state of mind.  We are not offering it for the truth, but actually to show that he did an action which is reach out to the general counsel to review that.  It would also constitute a business record because it was part of the regular course of business.  Nikola maintained a process for drafting and reviewing press releases.  There is testimony in the record of that from Ms. Amzallag, and she testified that Mr. Caramella and Chief Legal Officer Worthen were involved in the process of press releases, and that's the transcript of

September 21, 2022, at 1335/line 16 through 1336/line 2.

I think it also, your Honor, it goes to disprove any state of mind that the government is trying to suggest that Mr. Milton tried to mislead investors when here he is clearing something through the chief legal officer. And we would refer your Honor to *United States v. DiMaria*, 727 F.2d 265, as support.

I will pause there if the government wants to respond.

THE COURT: Mr. Russell.

MR. ROOS: Thank you, your Honor. So each of these e-mails suffers from various hearsay issues which we outline in our letter and I can get to, but the big picture point is a relevance and 403 objection, which is that each of these e-mails is an instance in which the defendant is interfacing with Britton Worthen, who is the chief legal officer. They are all on issues, topics that have not come up in the trial and are not relevant to the trial.

So to take the first one, Defendant's Exhibit 527, these -- the e-mail at least purports to refer to what ultimately was a June 29, 2020 press release announcing that they have now opened their website to take the Badger reservations. It is not the announcement that we talked about earlier in June. It's a later press release. The press release isn't in evidence. I don't believe we have had any witnesses testify about it. The government certainly didn't

offer the press release or argue that that particular press release was in evidence.

The e-mail chain also doesn't indicate what Britton Worthen's edits were, whether the defendant accepted the edits, and it appears the purpose here is just to make it seem like the defendant has a propensity to follow legal instructions whereas when it is not in fact on a particular representation that's at issue in the case.

The same is true for each of the other documents Mr. Bondi flagged.

Defense Exhibit 1472 is a text message exchange about a *Fox Business* interview from December 2019, again, not one of the representations at issue in the case.

1476 is a ten-page e-mail about legal weighing in on the prerecorded announcement of the business accommodation, again, not a representation at issue in the case.

1491 is an e-mail in which the defendant is seeking sign-off on a tweet which he ultimately does not tweet in the form that's listed in the e-mail about the business accommodation.  Again, not an alleged misrepresentation of the case.

So these are going to confuse the jury.  They will mislead them into thinking that maybe the defendant is getting some sort of advice of counsel.  They are plainly not relevant because they don't go to the representations at issue.  It's

not simply enough that he is e-mailing with the general counsel about the Badger generally.  If this is something that goes to the good faith, there needs to be a nexus with an actual misrepresentation alleged in the case.

THE COURT:  I was concerned about how close these e-mails were to the advice-of-counsel defense.  There has been a lot of discussion about that during the course of the trial. The defense has said from the outset that there is no advice-of-counsel defense here.  So from a 403 perspective, I think they are problematic; and, in addition, because they involve statements, press releases, etc., that are not alleged to have been misstatements or efforts on the part of Mr. Milton to deceive, they are not relevant, and therefore they will not be allowed.

Next.

MR. BONDI:  Your Honor, 533 and 1435.  Defense Exhibit 533 is a July 20, 2020, e-mail from Nicole Rose to Vince Caramella telling Mr. Caramella, in response to Ms. Fretheim's e-mail, which we heard a lot about in the trial and the government introduced, that there was "more context around each of the items on this list, so in my opinion they don't come off as quite strong."  This e-mail is relevant to show Ms. Rose did not agree with Ms. Fretheim's assessment of Mr. Milton's TeslaCharts interview.

Your Honor, this e-mail chain is admissible as a

business record at a minimum of 803(6).  Mr. Milton's podcasts were reviewed in the regular course of Nikola's business. Testimony by Ms. Amzallag supports that.  She testified that Mr. Caramella was part of the team on occasion that reviewed things posted to social media, as the TeslaCharts podcast was. That's at the transcript on September 21, 2022, 1346/lines 23 to the next page at line 2.

Your Honor, moreover, I think that this is necessary to complete the story or the picture surrounding Ms. Fretheim. The government has spent quite a lot of time about Ms. Fretheim's concerns and her conveying those concerns to Ms. Rose and others.  This is Ms. Rose's reaction to those concerns.  It should come in at a minimum for completeness and to avoid confusing this jury.  Talk about confusion here, the jury now thinks that Ms. Rose somehow implicitly agreed with Ms. Fretheim, and that's not what this e-mail says.  It should come in to complete that story.

THE COURT:  I guess I don't understand what you just said, Mr. Bondi.  How is it that the jury believes that Ms. Rose agrees with Ms. Fretheim?

MR. BONDI:  Okay, because, your Honor, Ms. Fretheim testified that she raised these concerns and there is nothing in evidence that refutes that Ms. Rose did anything or said anything in response.  This is necessary, I think, to avoid the jury thinking that Ms. Rose was agreeing with Ms. Fretheim or

was silent or just went along with it.  I think it is the absence of the evidence, your Honor, that creates the misconception here to the jury with respect to 533.

Exhibit 1435 is sort of a similar issue dealing with a different podcast that the government put in on its very last day of its case in chief.  They moved it in without any witness or anything around that.

And Exhibit 1435 is an e-mail exchange between Mr. Milton and Ms. Rose, in which Ms. Rose asked Mr. Milton if he needed anything for the JMac interview which the government moved into evidence, offered into evidence and the Court accepted.  And Mr. Milton responded to:  Feel free to come up to my office and we can do it there.  It would be good to have you here in case I need anything.  And the transcript was admitted by your Honor as GX-408-T without any testimony, without any discussion about it.

This e-mail is critical because it shows I think or it goes to Mr. Milton's good-faith defense because the plain language of it demonstrates that he wasn't trying to conceal or misrepresent anything.  He was one of the member of Nikola's public relation team to be present for that interview that the government offered into evidence.  It is not hearsay because we are not offering it for the truth of the matter asserted, that is, the defense does not offer it to prove that Ms. Rose literally should feel free or would be good to be present, but

Mad2Mil1

to demonstrate that Mr. Milton did the act of saying be present for the interview.

It also, I think, in fairness, should come in under 106 because your Honor admitted the transcript of this interview. It shows the context that this wasn't Mr. Milton having this interview, you know, without anyone knowing or without anyone involved, but Ms. Rose was involved in that.

THE COURT: Mr. Roos.

MR. ROOS: I will take each of the e-mails in turn. The first one defense counsel tried to ask of a witness, we objected because the out-of-court statement of Nicole Rose as to how she views the podcast was being offered for the truth and is inadmissible hearsay. Your Honor sustained that objection.

So now the defendant is just trying to offer the e-mail. It's susceptible to the exact same objection, which is, Ms. Rose's statement that she thought there was more context around each item is a statement being offered for the truth. They obviously could have called Ms. Rose if they thought this was actually relevant, admissible testimony. They didn't. You can't back-door it through an inadmissible hearsay document.

I will also just note two other things about this e-mail. Number one, there is no evidence it went to the defendant, so it can't form a state of mind. And number two, I

Mad2Mil1

don't know why Ms. Rose's opinions made to a colleague who also was not a witness in this case about her view of the podcast is particularly probative of anything.

As for the second e-mail --

THE COURT:  Can you remind me, I believe it was the case that the CEO, whose name I always forget, Mark Russell?

MR. ROOS:  Russell.

THE COURT:  And the CFO, Kim --

A VOICE:  Brady.

THE COURT:  -- Brady did testify and were asked about this Fretheim e-mail, is that correct?

MR. ROOS:  That is correct, your Honor.  The underlining Fretheim e-mail was the subject of several witnesses, including also within the context of the TeslaCharts e-mail Stephanie Amzallag.  So the underlying e-mail came in to evidence and was the subject of I think several witnesses' testimony.  The government's objection here, of course, is not to the underlying e-mail but just to sort of the sidebar conversation between Caramella and Rose.

THE COURT:  I'm not going to allow these documents.

Well, let me start with 533 and then we can talk about 1435.  As indicated by Mr. Roos, there is an objection that was sustained to Ms. Fretheim being cross-examined about her e-mail.  And it certainly doesn't go to Mr. Milton's state of mind as he apparently didn't receive it.  And it is hearsay.

So this exhibit won't be coming in.

And as to 1435, Mr. Roos.

MR. ROOS:  Similar type objections, your Honor.  This is an initial out-of-court statement by Nicole Rose about various recordings seemingly being offered for its truth, then it's a reply by the defendant himself which is obviously his statements cannot be offered by him for the truth, it seems through Mr. Bondi's argument he was doing just that, which is, that what is written in the e-mail is in fact true that Nicole Rose sat in on this and somehow, like, supervised him.  If that was an argument they wanted to make, either the defendant or Ms. Rose would have to testify.  It's an out-of-court statement being offered for the truth.  It's not a business record.  Just because it's an e-mail doesn't make it the type of document that would be admissible under the business record exception.

THE COURT:  I agree, and I will not allow 1435 to come in either.

I do understand that there are several dozen defense exhibits that the government does not object to coming in.  Correct?

MR. ROOS:  That's right, your Honor.  They are listed at the end of our letter.  And your Honor is right; there are several dozen we have no -- we are not going to object when they offer them.

THE COURT:  Okay.  Now hopefully the jury is in and

Mad2Mil1

will soon be here, so how do the parties wish to -- I think that takes care of all of the proposed --

MR. ROOS:  There is one more which maybe is the product of misunderstanding.  So we objected to Defense Exhibit 77, which is -- the version we have is a 2022 earnings call.

THE COURT:  But I understand Mr. Bondi indicated that there was going to be agreement on that.

MR. ROOS:  So on that it sounds like the version they have is a 2020 earnings call which we would have a hearsay objection to.  However, I'm told that the transcript is -- of it is already in evidence.  I don't recall that, but it's been obviously a few weeks now.

So I guess my proposal on this would be -- I have been flipping through the transcript, but I haven't seen it yet, although it's long, so if defense counsel identifies it to us and it is in evidence, then we will -- we won't object to Defense Exhibit 77.  If it's not already in evidence, then we have a hearsay objection to Defense Exhibit 77.

MR. BONDI:  Your Honor, this is definitely the August 4, 2020 earnings call.  The transcript or a portion of it came in as DX 156.  It was produced.  DX 77, which is the audio of that earnings call from August 4, 2020, was sent to the government on September 20, 2022.  It's always been on our exhibit list as such, as the August 4, 2020 earnings call.  We have no intention of putting a 2022 earnings call in, your

Honor.  I think this is a mistaken identity situation and hopefully the government, when they look back at what they have, will agree.

MR. ROOS:  If they just give us the transcript cite where it came in, then I think we can clear this up very quickly.

THE COURT:  Very well.  I was curious about the August 2022 date.

With that, how does the defense wish to proceed once we bring the jury out?  I take it it is just a matter of putting in, on stipulation, a series of exhibits.

MR. MUKASEY:  Yeah, we will read in a bunch of the exhibits, we will rest in front of the jury, and then we can proceed with summations if that pleases the Court.

THE COURT:  Absolutely.

MR. MUKASEY:  Quick question, Judge.  Just two quick questions.

Number one, I just wanted to understand what the jury knows or doesn't know about the delay.

THE COURT:  I will tell you exactly.  The jury was told that one of the litigants in the case suffered a medical issue and that we would not be able to proceed until Tuesday, and this was what we told them when we first had to break.

When we determined not to begin until Thursday, we called the jury back and said that the medical issue had not

yet resolved and therefore, for the sake of certainty, we would be starting on today, Thursday.

And then there was a third communication just reminding them that we will be starting today at the regular time.

MR. MUKASEY:  Thank you, Judge.

And I also want to thank you on the record for indulging the health situation.  It was extremely compassionate of the Court and the government and everybody involved, so I appreciate that, the reporters.

The only other issue I want to raise is, on the Monday night we broke or the Tuesday night we broke——I'm not sure which it was——there was a documentary that was broadcast on CNBC called *American Greed*.  It was about Mr. Milton.  It was wildly unflattering.  And I just thought maybe, if it pleased the Court, when the jury came in, you could say something along the lines of, Welcome back, I trust that none of you have watched or read or seen anything, and we can proceed; and if somebody raises their hand and says, you know, something, I saw something, then we can deal with it.

THE COURT:  I'm happy to do something along those lines.  I don't know that they will necessarily respond, but I'm happy to do something along those lines.

MR. MUKASEY:  I think it would be good for the record, and I appreciate it.

Mad2Mil1

THE COURT:  Very well.

Anything from the government?

MR. ROOS:  Just one logistical question, which is, I think your Honor sort of gave a general estimate about the lengths of the summations.  I imagine if we start -- if we start with the defense case, even if it's very brief, Ms. Estes's summation will go past the first hour and a half mark, and so I was wondering when your Honor intended to break.

THE COURT:  I intend to allow Ms. Estes to finish her summation, assuming it doesn't go on and on, and then break for the usual 20 minutes, and have the defense summation.

It is my hope to get all of the summations in today. I don't think we can get to the charge, but I think we should be able to get all the summations in today.

MR. ROOS:  Yes, your Honor.  We mooted it yesterday, and it was, I think, slightly under four hours, so no problem.

THE COURT:  The jury is here, so I will go get dressed and we will get started.

(Recess)

MR. MUKASEY:  Judge, after we rest Mr. Caruso is going to renew Rule 29 very quickly.

THE COURT:  Okay.

MR. CARUSO:  It won't take long.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen of the jury, so good to see all of you again.  Welcome back.

It is always a feat of engineering when we can get three dozen or so people away from their normal lives and then try to get a trial in.  It is not infrequent that there are some bumps along the way.  I thank you on behalf of all of the parties for your patience.

As you can see, we are all here, we are all well.  We are all anxious to continue with the case and get it completed and get you back to your normal lives.

It has been a while, so I just want to make sure—I haven't been able to talk to you directly—that you have not read about the case or seen anything about the case or read anything about the case.  Hopefully you have not, and if you have, please let me know.

And with that, we will continue with the defense case.

Mr. Bondi.

MR. BONDI:  Your Honor, pursuant to stipulation, the following transcripts, subject to the agreed-upon redactions, the defense offers into evidence:

DX 489, DX 1586-T, DX 47, DX 9415-T, DX 463-T, DX 464-T, DX 478-T, DX 479-T, DX 483-T, DX 487-T, DX 492-T, DX 494-T, DX 500-T, DX 501-T, DX 502-T, DX 503-T, DX 506-T, DX 1015-T, DX 9413, DX 9417, DX 9416, DX 9410, DX 9408,

Mad2Mil1

DX 9405, DX 9404, DX 9431, DX 9430, DX 9429.  I will pause there.  I don't believe there are any objections.

MR. ROOS:  No objection.

THE COURT:  Very well.  All of those exhibits will be received.

(Defendant's Exhibits 489, 1586-T, 47, 9415-T, 463-T, 464-T, 478-T, 479-T, 483-T, 487-T, 492-T, 494-T, 500-T, 501-T, 502-T, 503-T, 506-T, 1015-T, 9413, 9417, 9416, 9410, 9408, 9405, 9404, 9431, 9430, 9429 received in evidence)

MR. BONDI:  And, your Honor, the defense offers into evidence the full audio of interviews, the following interviews:  GX 400, GX 401, GX 410, GX 413, GX 414, GX 415, GX 417, DX 496, DX 497, DX 501, DX 497 [sic], DX 494, and DX 1750.

THE COURT:  Any objection?

MR. ROOS:  Just one clarification.  Is it 497 or 479?

MR. BONDI:  I believe it is 479.

MR. ROOS:  No objection.

THE COURT:  Very well.  Those exhibits will be received.

(Government's Exhibits 400, 401, 410, 413, 414, 415, 417 received in evidence)

(Defendant's Exhibits 496, 497, 501, 479, 494, and 1750 received in evidence)

MR. BONDI:  Your Honor, pursuant to stipulation GX S6,

Mad2Mil1

the following SEC filings and press releases, we move into --

offer into evidence:  DX 77, DX 606, DX 1868, DX 1869, and

DX 1870.

And your Honor, we also have a stipulation that we

would like to read into evidence with your permission.

THE COURT:  Very well.  And those exhibits that you

just listed are pursuant to stipulation?

MR. BONDI:  They are, your Honor.

MR. ROOS:  No objection.

THE COURT:  Very well, they will be received.

(Defendant's Exhibits 77, 606, 1868, 1869, and 1870

received in evidence)

MR. BONDI:  Your Honor, the stipulation, GX S6, reads

after "the parties agree" that Nikola posts press releases

about the company to its website.  All press releases on

Nikola's website are authentic and were posted on the

publication date listed on the press release.

In addition, your Honor, it reads Nikola filed

regulatory documents with the United States Securities and

Exchange Commission (SEC) and makes copies of those SEC filings

publicly available in the investor section of Nikola's website.

The SEC filings on Nikola's website are authentic copies of the

filings Nikola makes with the SEC.

And, your Honor, I believe, in keeping with custom, we

also would offer into evidence GX S6, the actual stipulation

Mad2Mil1

itself.

THE COURT:  Any objection.

MR. ROOS:  I think it might already be in, but no objection.

THE COURT:  Very well.  That exhibit will be received.

(Government's Exhibit S6 received in evidence)

MR. BONDI:  Your Honor, as a housekeeping matter, pursuant to your Honor's ruling of October 12, 2020, yesterday, we offer the following documents into evidence:  DX 206, DX 209, DX 210, DX 1228, and DX 1412.

MR. ROOS:  No objection.

THE COURT:  They will be received.

(Defendant's Exhibits 206, 209, 210, 1228, and 1412 received in evidence)

MR. BONDI:  And your Honor, my co-counsel, Ms. Young, also has some documents to offer into evidence.

THE COURT:  Ms. Young.

MS. YOUNG:  Defense also offers, pursuant to stipulation, what has been identified as DX S1, which is summarized as follows:

It is hereby stipulated and agreed between the parties that:

Defense Exhibit 23 is an authentic copy of simulation results for the Badger dated February 7, 2020.

Defense Exhibits 1042 through 1045 are authentic

copies of computer assisted design files for the Badger dated June 26, 2020.

Defense Exhibits 1774 through 1776, 1778, 1779, 1782 through 1785, 1786, 1787, 1788, 1789, 1790, 1791 through 1796, 1798 through 1800 and 1802 through 1839 are authentic copies of photographs and video taken during the virtual inspection of the Badger prototypes on September 23, 2022.

THE COURT:  Any objection?

MR. ROOS:  No objection.

THE COURT:  They will be received.

(Defendant's Exhibits 23, 1042 through 1045, 1774 through 1776, 1778, 1779, 1782 through 1785, 1786, 1787, 1788, 1789, 1790, 1791 through 1796, 1798 through 1800 and 1802 through 1839 received in evidence)

MR. MUKASEY:  Your Honor, the defense rests and requests permission to renew a motion at sidebar.

THE COURT:  Very well.

Ladies and gentlemen, the defense has now rested. That means that all of the evidence is now before you. However, I do need to do some legal work with the lawyers.  It will take just a few moments—you don't need to move from where you are— and we will move forward with summations.

(Continued on next page)

(At the sidebar)

THE COURT:  Yes.

MR. CARUSO:  Yes, your Honor.  Under Rule 29(a), we now move for a judgment of acquittal at the close of all of the evidence, as we moved at the close of the government's case.  I renew my arguments that I previously made.  I incorporate them by reference.

MR. ROOS:  We oppose as insufficient for the reasons we previously outlined on the record.

THE COURT:  The motion is denied.

MR. CARUSO:  Thank you, Judge.

(Continued on next page)

(In open court)

THE COURT:  All right, folks.  Will the government now please present its summation.

MS. ESTES:  Yes, your Honor.

Trevor Milton is a con man.  During this trial, you heard how he lied over and over again.  He lied on Twitter.  He lied on podcasts.  He lied on TV interviews.  He lied to Peter Hicks directly.  Lie after lie after lie.

Now, his lies may have been on social media, but make no mistake, this was an old-fashioned fraud.  He lied to investors to get their money, plain and simple.

And you heard from some of those investors during this trial, from Joseph Ryan and Marc Schonberger.  They told you, they believed the defendant.  He was the head of the company, the executive chairman, so they trusted him.  They invested and they lost their money.  Joseph Ryan told you he lost over $100,000.

Now, why did the defendant do this?  Money and power.  You heard from Kim Brady, the CFO of Nikola, the defendant wanted to be in the *Forbes* Top 100 list of richest people—that is an astounding level of greed—and to get there, he needed to pump the stock to keep it sky high, completely out of line with reality.

And this fraud, it was brazen.  He completed it despite warnings from his CFO and his CEO, despite the red

light they gave him.  He ignored that.  He was the founder and executive chairman of Nikola, the largest shareholder.  He had all of the power, and he thought he could get away with it.  But not anymore.

You have sat through the trial and listened closely for weeks.  You have heard the witnesses.  You have seen the documents.  Ladies and gentlemen, you know the truth.  It is time to hold the defendant accountable for what he did for defrauding ordinary investors.

Now, this closing statement is our opportunity to help you put the evidence all together, so here's what we are going to cover:  First we will talk about the defendant's lies, each category of lies, we will go over those.  Then we will talk about the charges.  And finally we will talk about why his lies mattered and how you know that he acted intentionally with the intent to defraud.  So first let's turn to the lies.

Now, we haven't seen each other in a week, we had a little break, so let's go over a few basics.  You may recall Nikola's business was selling hydrogen trucks and hydrogen fuel.  That was the goal.  And as you heard, starting from the very first week, the defendant lied about nearly every aspect of the company's business.

So what did he lie about?  First, hydrogen.  He said they were producing it.  He said they had gotten the cost down.  He said they had electricity contracts for these hydrogen

production stations.  You heard from Dale Prows, he was the head of hydrogen infrastructure.  He told you those were all lies.  Nikola hadn't produced any hydrogen, not one molecule. And you heard that from a number of other witnesses, too.

Next were the lies about the Badger pickup truck.  He said they were building that truck from the ground up using Nikola's parts and Nikola's technology.  He made it seem like they had a prototype ready to go.  You heard that was false from Brendon Babiarz.  He was the lead designer on the pickup truck.  He testified that first week.  And you heard it from others, too.  Nikola, they were just building show cars using Ford parts and they certainly didn't have a prototype in the summer of 2020.

Next is the Nikola One.  This was the first truck they made.  You heard he said it was fully functioning in 2016 when they unveiled it.  And then he doubled down on those statements in 2020, continuing to say the truck worked when it didn't.  He even filmed that video of the truck rolling down the hill.  But you heard from Paul Lackey, that very first witness, the truck couldn't move under its own power, didn't work, and other witnesses and documents confirmed that.

Next, lies about orders.  He said they had billions and billions of dollars of signed-on-the-dotted-line orders, binding contracts.  You heard from Elizabeth Fretheim, the head of business development, and other witnesses that that was a

Mad2Mil1                      Summation – Ms. Estes

lie.  They were really just reservations, expressions of interest, and there was no guarantee of revenue.

And finally, you heard about his lies to Peter Hicks. He told Hicks many of those same lies he told to investors over the phone so Hicks would sell him that ranch in exchange for stock options.

Hicks told you he didn't want stock actually——he wanted cash——but the defendant tricked him.  He made him think the company had made a lot of progress.  So Hicks did the deal, took the stock options because of the defendant's lies.

So let's get started first on hydrogen.  Now, the defendant told a mountain of lies about hydrogen.  And remember, witnesses told you this was a really important part of the company's business model.  They were selling this bundled lease concept where you got the truck and you also got the fuel, and the whole purpose of that is because there is not a network of hydrogen fueling stations across the country.  You can't just go fill up your truck with hydrogen.  So Nikola had to create that, and it was critical for their business model to work.  People wouldn't buy the trucks if they couldn't get the fuel.

And the defendant recognized this.  This is an e-mail he sent shortly before they went public, Government Exhibit 237:  The most critical item in our business model is that we don't have stations.  So this is an area where they were weak,

where they were behind.

So what did he do? He lied about it. He said they were producing hydrogen. He said the cost to produce it was below $4 a kilogram. He said they were building stations that were $14 million each. He said electricity cost was less than 4 cents a kilowatt hour. And you remember electricity is a big component to the cost of hydrogen, so it was really important that they get that cost down. And he said they were purchasing land for hydrogen stations. These were all the lies. He made it seem like they had made real progress on hydrogen, when they hadn't.

So now we are going to walk through some of the statements here, some of his lies. I'm going to try to move through them quickly because there are a lot of them, but the defense has accused the government of cherry-picking in some of their arguments in cross-examination, so it's important for you to see the volume of lies. Not a one-off statement in a podcast, not a single tweet, it's not a slip of the tongue. There are dozens and dozens of lies about hydrogen. Everywhere he could, every chance he got, he lied about it.

All right. So let's start with the Transport Topics podcast. This is from March 2020, Government Exhibit 406. The defendant says: Up until Nikola came in the market, hydrogen was $16. Now Nikola is producing it well below $4 a kilogram.

Now this you heard was a lie from multiple witnesses.

We will go through some of the testimony here.

Dale Prows, head of hydrogen infrastructure:  Nikola was not producing hydrogen.

Mark Russell, CEO of the company:  Nikola hadn't produced any hydrogen.

Here is Elizabeth Fretheim's testimony:  Had Nikola actually produced any hydrogen?  We had not.

And Kim Brady, the CFO of the company, said the same thing:  We were not producing any hydrogen at that time.

So it's fairly undisputed that this statement right here "now Nikola is producing it well below $4 a kilogram," that statement is simply false.

Now, the defense has argued to you in their opening statement, in some of the cross-examination that these statements, statements like this, were all about Nikola's business model somehow.

And of course the defense has no burden.  Judge Ramos has told you that.  It's the government's burden beyond a reasonable doubt and we embrace that.

The defense has made arguments here in opening statements, through cross-examination, they have even put on a case, and you are entitled to scrutinize those arguments, to ask whether they make any sense whatsoever.

What about this argument, that this is all about a business model?  There is no reference to a model here.  This

isn't a statement about the future.  He uses the word "now."
it is pretty straightforward.

And then one other piece of this is he also -- he does talk about the past here.  He says "up until Nikola came in the market hydrogen was 16.  Now Nikola is producing it well below $4."

So he is making it look like Nikola has broken through, they have accomplished something, they have changed the cost.  It's 100 percent false.  They had no stations, no permits, no electricity contracts.  They had done nothing to change the cost.

In fact, this is the cost of hydrogen in 2020 to Nikola.  You can see it right here.  This is their contract with Air Liquide.  That's where they were buying the hydrogen from.  It was $14.76 a kilogram, well over the $4 the defendant was promising.  This was their actual cost.  Government Exhibit 319.  Write that one down.

All right.  So let's go to some more of his lies here. Barron's Roundtable, this is Government Exhibit 426, an interview on August 1.  And this is the question here to providing the context from the person interviewing him.  And he is pressing him on the cost of hydrogen.  He says:  Right now hydrogen which powers those cells is about four times as expensive as diesel.  How can you make this work?

And here is the defendant's response:  That was a

problem we tackled.  First time in history that it's been done. We're down below $4 a kilogram.  He is making it look like they have solved this problem, they have solved the cost problem, when they hadn't done anything.

He told these lies over and over again.  I'm going to start going through them quickly here.  Government Exhibit 410, a Yahoo! Finance video.  He says:  We can now produce it well under $4 a kilogram.  The cost now is cheaper than it was to operate per mile than diesel.  He is talking about now.  He is talking about the present.  This isn't about the future or a business model.

Here is another one:  We are now below $4 a kilogram.

And this one here—I think it is important to point out, he talks about the future here:  We plan on reducing that again.

So he is certainly somebody that is capable of distinguishing between the past and the present and the future. He does it right here in this tweet, Government Exhibit 521.

Here is another one, 553:  We currently make our own hydrogen.  False.

A podcast, Government Exhibit 412:  Today our hydrogen costs are less than $4.

There is really no ambiguity here.  These are crystal clear.  He is talking about the present, what they are doing now.

We are already under $4, Government Exhibit 525.

And 531, we are less than $4 now.

And here is another podcast, Government Exhibit 412. Here the host is asking him a question about hydrogen. He says: You make it on site? And the defendant says: We do. We make it on site. You make it on site at the station? He says: Yes.

This, ladies and gentlemen, this was an opportunity. He could have corrected the host. He could have said, actually, that's something we plan to do in the future, that's something we hope to do, but he doesn't do that here. He says: We do, we make it on site.

Just one more, 543: It's lower now, which is awesome. And this is in response to somebody saying hydrogen could be as low as gas in five years. So the context here is important. Somebody saying it is going to get there in five years, he is saying, no, no, no, we have done it now.

All right. Let's move on to some other lies about hydrogen because those about cost were just the tip of the iceberg. He also lied about the cost of stations. You heard about this from Dale Prows and Mark Russell.

And here is an example of one of those lies. This is the cost to build one of those hydrogen production fueling stations. He said: When we started, they were $40 million. Now they are down to 15 million.

Another one, TeslaCharts, Government Exhibit 422:  The stations were going to be 60 million.  Now we are down to 14 million bucks.

How do you know he is lying?  Well, in addition to the fact that they had no stations, as the testimony established, you can see here in this e-mail from Dale Prows, May 2020, Prows is telling him those stations are going to cost 27.3 million not $14 million.  This is right before he makes those statements in the podcast.  He is saying:  Actually, they are way more extensive than you think, 27.3 million.  This is Government Exhibit 240.

Now, a few more hydrogen lies here.  First electricity.  And remember that's important because it's the biggest factor in the cost of hydrogen production.  So if they had gotten electricity costs down, that would be essential for their business model.  They needed to do that.  But if it was too high in a particular location, they probably couldn't build a station there.  He repeatedly lied about this.

This is Government Exhibit 409, the June 3 podcast. He says:  When I produce hydrogen, I'm paying under 4 cents and that's the price of electricity there, everywhere I go, and that's because we're doing it behind the grid in large quantities.

Now, ladies and gentlemen, many witnesses testified that they actually had no electricity contracts that summer in

2020 because they didn't have any stations, so they certainly weren't getting it under four cents and they certainly weren't getting it behind the grid.  This was false.

Here's another one, similar here.  He says:  Sub three or four cents a kilowatt hour, and we have been able to do that in almost every one of our major locations.

That was a lie.  They hadn't done it in any location. In fact they didn't have any locations.  They didn't have any stations.

Then second lie right here, he says:  And we are gobbling up those locations.  What you heard from witnesses Dale Prows, Mark Russell, Elizabeth Fretheim, they hadn't actually purchased any land for hydrogen production stations, so this was a lie.

And again, this isn't about the model.  He is saying we've been able to do that.  He is not talking about the future here.

Now, those are just some of the lies about hydrogen that were established in the testimony.  There were just so many, so I'm not going to go through all of them right here, but I do want to remind you of one thing, and this is Elizabeth Fretheim's testimony on the TeslaCharts podcast in particular—that podcast was Government Exhibit 422—and she testified that she sent this e-mail to herself and then she sent it to others at the company because she was so worried

about all of his lies during that podcast.  And she listed them out right here.  You can see them, the hydrogen ones are highlighted in yellow here.

And look.  Look at the timing here.  This is important.  She says the lies start at minute 11 and they go all the way to minute 50.  So this isn't a single statement in a podcast she is worried about, it's not one sentence, one slip of the tongue.  She is worried about virtually every minute of this podcast.  This is Government Exhibit 263.

And one thing, I do want to point out one of the concerns here we haven't talked about, and that's the bottom one there where she says 20-year electricity contracts in major locations, that's what he had said in the podcast, and you knew that was a lie, they didn't have any electricity contracts in particular, not 20-year ones, and they had no locations.  You are going to hear about that one later because he told the same lie to Peter Hicks.

Now, on this model defense that the defense is making, one thing that's really incredible about that is that that summer the defendant was being told that the model didn't actually work.  That's what his hydrogen team was telling him.  You heard that from Dale Prows.

And let's look at that here.  This is a document, Dale Prows testified, it's Government Exhibit 250-A.  He told you this was a spreadsheet and it was presented to Trevor Milton

and other executives at Nikola because they had concerns about how they were actually modeling the hydrogen stations in the financial model. And on the left there, where it says "base station for financial model," that's what their model says. And keep in mind, their model is just the hope for the future. It's not something that's actually been accomplished. So the model is on the left; the middle, revised base station, that 868, that's what the hydrogen team, the experts, were saying the cost was actually going to be. So not less than $4 a kilogram, not parity with diesel, actually much higher, double that, 8.68. So at this point even the model, their hope for the future, was not what the defendant was promising.

The number on the right, the 4.24, because at this point they were thinking of scrapping the whole plan and moving to this entirely different thing called liquifaction because it wasn't working out, their plan to do hydrogen production on site at these fueling stations.

And here's the bottom line from that exhibit—this is 250-A—key takeaway that they gave to the executives. The hydrogen team does not believe the current base station model cost efficiency/reliability is achievable. Full stop. They are saying it's not going to work. So when he is out there saying it is less than $4, this is what his team, the experts, were saying. No, no, no, that's not possible.

Now, these lies, all of these lies about hydrogen, you

Mad2Mil1                      Summation - Ms. Estes

heard they were important.  You saw in some of the interviews, some of the tweets people were really actually pressing him on hydrogen costs.  This is because his whole company was about hydrogen and if they couldn't get the cost down, it wasn't going to work.  You heard some testimony on that.

Here's Elizabeth Fretheim's testimony right here:  Why is it important?  Hydrogen is one of the largest costs for a trucking company.  And we needed to ensure that it's at a price point that would allow us to achieve that parity, and that's parity with diesel.

And here she talks about parity with diesel and why that was so essential:  Because if Nikola's trucks cost more than diesel, customers would have a difficult time transitioning.  And how would that affect Nikola's business? It could put them out of business.

So this really mattered because you may want to help the environment, but if it's going to cost double, if it's going to cost triple to do that, people aren't going to switch to hydrogen fuel.  Trucking is a business.  It's about dollars and cents, and you have to get the cost down.  So the cost was absolutely essential.

And this is also what the investors told you.  Joseph Ryan was the first investor to testify.  And here's what he told you, that the hydrogen cost issues matter.  Because if you reduce the cost of hydrogen production by 75 percent, it would

make the economics of trucking work.  It would make people want to make the switch.

He also testified that it mattered if $4 was a target or something they had actually achieved because to him as an investor he wanted to know the difference between a goal or a wish and something tangible, a milestone that had been achieved.

Marc Schonberger, the second investor witness, told you the same thing; that it mattered if they had figured out how to make hydrogen cost effective.

Now, I want to take a minute to discuss the defense expert, Professor Ferrell, because he testified that no particular hydrogen statement moved the stock on any particular day.  Judge Ramos will instruct you on the law and what he says controls, but you will see there is no requirement that the stock price actually move for something to be material.  You heard testimony from investors that this mattered to them.  But even on the stock price point, Professor Ferrell told you that you wouldn't expect the stock to move in a case involving confirmatory misrepresentations.

So here's his testimony on that:  So if it was a statement already in the market, if a statement is confirming something that's already been said, that's been digested, it will not cause a change in the stock price, right?  He says:  I agree with that.  It has to be new information.

And that makes sense because if the market has already heard something, it's not going to affect the stock price.

So on hydrogen, defendant started telling these lies about hydrogen in January, months before the company went public.  This is Government Exhibit 503.  He says:  Hydrogen costs have plummeted.  Our costs are below $3 per kilogram.  So months before they went public, he's already said this lie to the market.  So it's no surprise that once the stock starts trading in June, it doesn't move the market, because he's already told this.  Everybody already knows it.  This lie was already baked into the stock price.

Now, members of the jury, that's it for hydrogen.  I'm going to move on.  But those statements alone, you could find that he is guilty of securities fraud and wire fraud.  That's all you need.

But there is so much more, so we are going to go through them.

Now we are going to turn to the Badger.  The defendant lied about the Badger pickup truck over and over again because he knew this was something that would get retail investors excited.  This was something they could actually buy, they could invest in the company and also buy its product.  He told all sorts of lies about the Badger, but I'm going to focus on four categories.

First, he lied and suggested they had built a working

prototype.  A truck that could drive.  He talked about it as if it was something that Nikola had accomplished, as if they had a Badger waiting to go out of a showroom 60 miles an hour in under three seconds.

Next, he made it seem like they had the first-ever pickup truck to run on hydrogen, and he played up how special this was.  He hyped it.  But they hadn't figured out how to make a hydrogen pickup truck.  Instead he made his employees build a show truck that looked like it ran on hydrogen.  But that was all really smoke and mirrors.

Third, he repeatedly said they built the Badger from the ground up, made it seem like they were building it from scratch without any help.  But that wasn't true.  You heard they secretly bought Ford F150 parts and then made changes underneath so that no one would know it was really a Ford.

And finally, he lied after the announcement about partnership with General Motors, GM.  He said when they built the Badger, GM was going to use Nikola's design and Nikola's engineering and Nikola's technology.  But that was a lie.  They were going to build the Badger using GM's design, GM's engineering, and GM's technology.

All right.  So back to the Badger, the beginning of the story here.  You heard that discussions about the Badger really started in earnest after a tweet from Elon Musk about the Tesla Cybertruck.  And the defendant tweeted this in

response——it's Government Exhibit 502——and this tweet got a lot of attention on social media.

So after that, after it got all this attention, he started talking to the other executives and saying they have to build this pickup truck.  And you heard from Mark Russell and Kim Brady.  They were totally against this, thought it was bad for the business, they need to focus on the big semi trucks.

But the defendant, he was the founder.  He was the controlling shareholder.  He got what he wanted.  And why did he want this truck?  He talks about it right here in this podcast, This Week in Startups.  He wanted it to appeal to investors.  So he says the semi truck program never touches the average consumer, so 90 percent of investors will never invest in the company.  So he wanted something the consumers would look at, something regular people would buy.  The pickup truck was for the consumer because the consumer, they are the ones on Robinhood.  They are the retail investors trading on those apps.  That's who he was going after.  That was the whole point of the Badger, to appeal to those type of investors.

So he announced the Badger in February 2020.  Now at this point Brendan Babiarz told you they had no trucks, but he didn't care.  He was focused on appealing to investors because he knew the company was about to announce they were going public.  And he started overstating their progress in the Badger right from the get-go.  So this is Government Exhibit

508, the tweet from February 12.  He says:  Production in ten vehicles will be there in September 2020.

Of course you know this wasn't true.  You heard from Brendan Babiarz and also Scott Damman——he was the GM witness who testified——they told you it takes years actually to build a new truck program.  There was no way they were going to have production and ten vehicles ready to go in September.  So the defendant lied about it.

And then, just two months after that announcement, in April, he started suggesting they actually had a truck.  You can see this here.  This is The Truck Show podcast, Government Exhibit 407.  He says:  That's why we built the Badger.  Our truck can go 700 miles in a real environment.  It will whoop a Ford F150.  Makes it seem like they have a truck here.

This is what they really had.  This is Defense Exhibit 23.  They had simulations.  They put some numbers in a computer program.  Of course there is nothing wrong with that, nothing wrong with simulations.  But he said they had a truck that would go 700 miles in a real environment.  And that, that was not true.  They didn't have a truck that could drive one mile, a pickup truck, in a real environment, certainly not a pickup truck that could go farther than an F150.

And you heard from Mark Russell that his statement on that podcast was false.  Here's his testimony from the CEO of the company:  In April 2020 did Nikola have a Badger?  No.

Was there any Badger that could go 700 miles in a real environment?  No.

Next podcast.  Government Exhibit 408.  This is an investing podcast, JMac Investing.  So this was geared towards investors.  That was his audience here.  Here he says:  It is a real real truck.  It's not just some mockup up.  This is a real real truck.  It's a fully functioning vehicle.

Now, what did they actually have here?  This is now we are end of May 2020?  Here is Brendan Babiarz's testimony:  Initial engineering.  That's all they had.

Had the vehicles been built at that point?  No.

Had Nikola built a prototype?  No.  There was no physical truck at that time.

So he says there is a real real truck.  Babiarz says, no, no physical truck.

In fact, this is what they had.  This is Defense Exhibit 1042, 1044.  They had renderings.  So exactly the opposite of a real truck, ladies and gentlemen.  These are just renderings done on a computer.  This was in fact a mockup thing, that's all they had.

And Milton knew this Government Exhibit 232, this is an e-mail sent to him in March 2020 from Michael Erickson.  You heard he worked on the Badger program with Brendan Babiarz and here he is laying out for the defendant a timeline for these trucks, 25-week timeline.  Target is running vehicles by

November/December for commissioning, testing.

So the defendant knew exactly where the trucks were, what the progress was.  He knew they weren't going to have any trucks until well later in the year.

So what happened next?  The defendant did something very deceptive, very misleading.  He announced that Nikola was going to start taking reservations for the Badger, even though they hadn't built a truck, they had no prototype, even though construction hadn't even started.  The reservation announcement made it seem like the Badger was farther along in its development, and here's his tweet on that, it's Government Exhibit 517:  Opened up Badger reservations.

And when he announced this, he certainly didn't do anything to make clear they had made no progress on this truck.

Here's another tweet, 519:  You will get to see a real operating truck, not a fake show truck.

And another tweet, 518, somebody asked him:  When will the first prototype be produced?  He says:  Already.

That's a lie there.  They had no prototype.

He even then says:  It's a secret, but it's amazing. I'll show content here soon.

And you saw what the stock did in reaction to this. It went absolutely crazy.  You could see it here with your own eyes, that huge increase circled in red.  That's what happened after the defendant announced Badger reservations.  Even the

defense expert admitted this was statistically significant, the stock price moved 103 percent that day.

Trevor Milton and his company were never worth more, right after that announcement, right after he made people think they had a truck far enough along to sell.

This was all consistent with his motive for making the Badger in the first place.  By advertising this product for consumers, he could reach out to those retail investors, people who might want to buy a Badger.  They might want to buy the stock, too.  That was the whole point.

Now, Brendan Babiarz, he testified he was very surprised by the tweet because they were still developing the truck, and that's consistent with his text messages that you saw.  This is Government Exhibit 25.  He is texting Michael Erickson, and in that first text he says they are six to eight weeks from tooling starting.  And he told you what tooling was; that's when they make the tools they need to make the truck.  So they haven't even started making those tools yet.  That's six to eight weeks away.

And then how does Michael Erickson respond?  Trevor doesn't let facts or details get in the way of a good story.

So they saw this announcement for exactly what it was.  It was deceptive.  Even though they were literally going to take reservations on June 29, that tweet misled investors into thinking the truck was farther along than it was.  It was all

smoke and mirrors, but it fooled real people.

And you heard from Joseph Ryan.  He thought they had a prototype.

So why did the defendant do this?  You know why.  To pump the stock.  Babiarz told you that's what he thought when the stock went up after the Twitter announcement and that's consistent with his text messages here.  You can see he texts Ryan May at Nikola.  Trevor may have boosted the share price with the Badger announcement.  This is Government Exhibit 27.  You can see he sends that picture of the stock price going up.

And then look at this one, this is the same exhibit, Government Exhibit 27, but this one is really important, ladies and gentlemen.  You may want to take a note of this one.  Babiarz says:  The Badger announcement is the full statement that would make people want to pump it.

Now, defense counsel said in opening that everyone at the company, everyone at Nikola, flipped on the defendant after the Hindenburg Report came out, but what these text messages tell you is that Babiarz, on June 8, right when it was happening, new exactly what was going on.  He saw this was a fraud.  He saw that the defendant was lying to pump the stock price.  He knew what was happening.

All right.  Let's look at some more of the Badger lies.  Here's an excerpt from the Raging Bull podcast, Government Exhibit 417.  He says:  They literally built this

Mad2Mil1                          Summation – Ms. Estes

truck.

He knew that was false.

Government Exhibit 418, this is an interview with *Fox Business*, and on here I have the question here for context. She says -- Maria Bartiromo says:  Buy it before you can see it.  Nikola Motor announces the $5,000 reservations for a truck with no prototype.

And then how does he respond?  He corrects her.  He says:  Actually we do have prototypes.  So this is certainly a deliberate choice he is making here.  He is lying intentionally.  He could have just agreed with her, yes, we don't have a prototype yet and we hope to do that.  Instead, he deliberately lies.

(Continued on next page)

MS. ESTES:  So, the next category of Badger lies, the hydrogen fuel cell.  He said they were making a Badger with hydrogen fuel cell because they're a hydrogen company, that was their whole thing.  Here is what he said on the July 3rd podcast, Government Exhibit 420.  We built that.  We built the most gorgeous bad-ass hydrogen pickup truck in the world and he said you can order the Badger with either hydrogen or electric.

Government Exhibit 418, he says the Badger is unique because you can get the battery electric version or hydrogen fuel cell version.

Stock Cast, Government Exhibit 424, what sets the Badger apart is that you can order it from either battery or battery fuel cell and that means hydrogen fuel cell.

And one more, Government Exhibit 421, he says we do have a hydrogen pickup truck coming out, it's a truck that can go further than a Tesla, further than a Tesla, further than a Rivian and even a Ford F-150.  They are certainly not making a hydrogen model and that go farther than an F-150.

What was the truth?  Well, before the defendant appeared on any of those interviews, this is an e-mail he sent to all the people working on that Badger truck, government Exhibit 227, and I will zoom into it so you can see it a little better.  He says we will only build those show trucks with the BEV version only -- that means battery electric, no hydrogen, it will be more simple that way.  Those were his directions to

the people working on the truck.  Scrap the hydrogen version, it is out.  Here is the rest of it.  We are building a hydrogen filling receptacle on the truck, but other than that we won't put anything hydrogen related in the truck; no fuel cells, no hydrogen thanks.

So, to be clear, what he is saying to do here is fake it.  Let's make it look like a hydrogen truck on the outside that filling receptacle that people can actually see, but on the inside we will have nothing related to hydrogen.  That's what he is saying and that's what they did.  Babiarz told you, that, you can see it in Government Exhibit 1215, that's what the Badger looked like on the outside, that's the hydrogen filling receptacle and Babiarz told you they would not be putting the hydrogen fuel cell inside, they had just the filling receptacle.

And the lies, these lies about the hydrogen truck, didn't stop there.  He then told a totally bananas lie about using the water from the hydrogen fuel cell to have a water fountain in the truck so people could drink the water.  There is tweets on that, Government Exhibit 539; what we do with all the water coming out of our trucks, we will have a drinking fountain.

And then more tweets on the same thing, Government Exhibit 550, he is talking about the water fountain again, shows pictures.  Now, how you know this was a lie, the water

fountain stuff?  Well, Babiarz told you he had never heard of this before the defendant started tweeting about it.  This is the defendant's search history, Government Exhibit 900, this is what he is Googling on his phone:  Is water from hydrogen OK to drink?  Can you drink water from a fuel cell?  And he looks at an article:  Fuel cell water safe to drink but don't try it.  So it's clear from this he hasn't consulted any of his engineers on this, he hasn't consulted the designers on this, he is just tweeting this stuff, making it up to pump the stock.  And Babiarz told you he and other employees were concerned and here his texts that are consistent with that.  He said the company should be tweeting not him, and Ryan responds:  When he has nothing to tweet he makes scrap up.  Government Exhibit 52.

Here is more, Government Exhibit 47, Babiarz says:  Plus, like I mentioned last night, we can't get caught lying about it being a hydrogen truck.  He knows this is wrong.  This is July 2nd, 2020.  Babiarz is concerned right then, in the moment, that the defendant is lying.

And just one more exchange on this consistent with his testimony.  Babiarz, on July 7th, texts Michael Erickson:  We can't lie and say one is a hydrogen.  Government Exhibit 51.  Again, he knows that summer what the defendant is doing is wrong.

The next category of Badger lies.  The defendant also lied saying they were building the Badger from the ground up.

And you heard from Babiarz what that meant and that meant building it from scratch, not using parts from a different truck program.  In this concept, the ground up concept, he introduced it right away, you can see in Government Exhibit 404 here from the February announcement.  He says we are building it from the ground up and I would say probably one of the only companies in the world besides Tesla that does everything ourselves.  So this tells you exactly why he is doing it here, you have his motivation.  They want to be like Tesla, that's why he starts saying and doing things from the ground up.  But you heard it takes years to design a truck, he was trying to get one by September 2020.  So, what do they do?  They cheat and used Ford F-150s.  You can see Babiarz' testimony right here.  This was after a meeting with Trevor Milton because he wanted it so quickly they had to use Ford F-150s as a primary donor vehicle.  Here is a photo of what they're going to use, the Ford Raptor chassis.  There is nothing wrong with using a donor vehicle, the problem is the defendant lied about it over and over again and he was trying to cover up what they were doing.  He was really careful about that.

Now, Babiarz told you there was this time when the Discovery Channel was thinking about filming the Badger in Italy and he was worried about it because that would reveal, underneath it all, it is really a Ford.  Here is some of his texts on that, consistent with his testimony, Government

MAD5mil2                        Summation - Ms. Estes

Exhibit 53.  Jace Croshaw, from marketing, saying can't they film the building of the truck and not the end product?  Babiarz says they are half Fords, that's the last thing we want people seeing.  And then he says he tried to explain to Trevor that if we get caught showing any of that it will be bad.  We would have to wait until the majority of the upper body frame is covered and that's because as that point you wouldn't be able to tell it was a Ford underneath.  Now, Babiarz told you that after he talked to Milton about that, the Discovery Channel shoot did not happen, obviously.  They had to protect what they were doing so nobody knew they were using these Fords.

Here is similar topic here, Government Exhibit 264, this is an e-mail to Brendan Babiarz to the defendant talking about the steering wheel of the vehicle.  He said everyone agrees it is way too similar to the Ford and could be damaging.  And how does the defendant respond?  It looks too similar.  We can't have it look that close.

They had to keep up the charade, they couldn't let people know they were using Ford parts.  And one more example, Government Exhibit 554, these are tweets of the defendant from August 24th and the first one there he tweets some pictures of the Badger build there, the first sighting of the Nikola Badger and you can barely tell what it is.  And somebody responds LOL no frames.  And he says no, raw frames would give away

manufacturing techniques to the other OEMs.  So he is making it seem like we are not going to do this because it might give away trade secrets, we don't want anybody to see this, but what was the truth?  What would it give away?  Brendan Babiarz told you, it would give away that the upper body, that the underside is from a Ford donor vehicle.  So, he lied on that tweet.  They didn't want people to know they were using Ford vehicles.

And by the way, on the timing of this tweet I do want to draw your attention to this.  Government Exhibit 71, these are text messages between the defendant and Mark Russell, the CEO, and you can see in the top one there the defendant is referencing a stock decline and he says we have to do something, Mark.  We can't just sit here and watch it and collapse.  He sends these on August 24 at 7:29 a.m.  What does he do at 11:34 a.m what just a few hours later?  He tweets about the Badger, he lies about why he doesn't have the frames.  He is doing this, he is doing this tweet right there to try to pump up the stock because it is declining and he is worried about that.

So let's look at -- we will go through these quickly but let's look at some of lies he said about building the Badger from the ground up, Government Exhibit 559, here is a tweet on this, that was a lie.  Government Exhibit 431, an interview, he says we actually built the Nikola Badger from the ground up ourselves, the whole thing.  That was simply false.

One more, Bloomberg:  We have already built the Badger from the ground up ourselves, that's Government Exhibit 429.  Those are all lies.

The last category of lies on the Badger, these are similar but a little bit different.  So, he lied about what portion of Nikola's technology would go into the truck after the deal with General Motors.  Scott Davis told you how the deal would work, that GM would be responsible for development, manufacturing, validation, all of the engineering work.  Nikola was responsible for the creative design.  But, even on that, General Motors' creative design team was going to be the actual sketching and the actual creative design.

And you can see from Government Exhibit 1115 the RASIC, how the deal was actually going to work.  Scott Damman told you that this is a document that laid out responsibilities, who was doing what.  So the R, the R means you are responsible, the S means support, and the A means approval.  So the R is the entity really doing the work and let's look at it here.  GM, responsible for vehicle requirements, execution, top hat features, component specification, deponent testing, vehicle immigration, and on, and on, and on.  Only one R for Nikola in the first column there for theme and decision.  And then on the second page there, GM, responsible for supplier quality, spare parts, services, accessories.  Nikola is responsible for sales and

marketing.  Here, this is the infotainment part of the RASIC. Even on this part GM is doing almost everything the screens, head unit, peripherals, the cloud, the embedded code.  All Nikola is doing are the phone apps and the look and feel.

So this is really going to be a GM truck with some sort of Nikola wrapping paper on the top, that was all this was.  But how does the defendant describe it?  Let's look at his tweets on this right now, Government Exhibit 557 there.  It will always be a Nikola truck, our design, our tech in many ours, our DNA.  And you can see it right there next to Scott Damman's testimony, no Nikola tech in the truck.  This was a lie.

Another one, Government Exhibit 558, the rest by Nikola.  Our infotainment, controls, design, interior, cab, phone apps, controls, etc.  And then what did Scott Damman say? All the components and parts are going to be from General Motors; all controls, all interior parts.  But one part -- one part -- ladies and gentlemen would be from Nikola, that was the phone apps, so that part of his tweet was true.

Another one, Government Exhibit 429 he lies again.  We do the software, we do the infotainment, we do the controls. You know that's false.

Government Exhibit 430, more, it says most of the entire core of the vehicle is our IP -- that's intellectual property.  We developed the Badger from the ground up

ourselves.  Again, you know that's a lie.

Now these lies, they mattered to investors.  You heard from two investors on that.  Here is Marc Schonberger's testimony.  He told you he owned a Tesla so he was familiar with this concept of doing everything themselves and that was important to them.  Here is what he said.  I am familiar with another electric car company that also builds from the ground up and that was important to me.  And Joseph Ryan, he told you something similar.  He said I got that the prototype was being built solely by Nikola and he said that matters because if you built it from scratch yourself, you have some intellectual property rights to it and that creates value.  And even the defense expert, here is a little bit of his testimony right here, Allen Ferrell, he said the stock price went up on the day the GM deal was announced.

Now, one more point on GM.  The defendant wanted to do this GM deal and say all of these false things to the market because he was desperate to put out an announcement to boost that stock price, but you heard from Mark Russell and Kim Brady, CEO and CFO, that they were worried this would be a huge risk to the company.  And here is an e-mail from Kim Brady that you saw on that as Government Exhibit 274.  He says the net loss could be 3.2 billion, were projecting massive losses for the company which will not be sustainable.  The company could be in insolvency.  And this was an e-mail to the defendant and

others.  He knew the deal made no sense for the company.  So, what does that tell you?  He was so desperate to increase the stock in the short-term that he was willing to risk the value of the company in the long tern all for this pickup truck that he thought would appeal to consumers, retail investors, and boost the stock price.

Now, those lies, again, those Badger lies alone are enough to convict the defendant.  He lied over and over about the Badger, he lied to retail investors, and those investors said it matters.  That's enough.  But there is still more so bear with me.  Now we are going to go to the Nikola One, the first truck you heard about.  And I think it is important to see how the defendant describes the truck so you can see what he thought of it.  He called it the holy grail of the trucking industry.  This is Government Exhibit 800.  Those are his words.  So he said this truck was a really big deal and he repeatedly lied about it for years.  I am going to go through some of the lies you have heard about.  First, in 2016, when they unveiled the truck to the world, he said it was fully functional, the first hydrogen-powered semi truck.  Then, in 2018, that's when that video came out of the truck in the desert rolling down the hill.  It was a complete mirage, the truck never worked.  In 2020 he lied and said they were the first mover in the space, the first company to have this hydrogen truck.  He got called out on that in 2020 but he

MAD5mil2                         Summation - Ms. Estes

doubled down.  He said the only reason they didn't drive it back in 2016 is because it wasn't safe.  That was a lie.  They didn't drive it because it didn't work.

So let's back up a little bit and let's talk about the defendant's lies about the company really started right away in August 2016.  This is that first press release, Government Exhibit 800.  Nikola One truck achieves zero emissions.

Now, you heard from Paul Lackey, the very first witness, this was false.  The Nikola One truck hadn't achieved zero emissions then and it never achieved them because there was no hydrogen fuel cell in the truck, it was designed to run on a natural gas turbine.  Now this press release, though, it has a little history to it and let's look at that right now, this is Government Exhibit 204, and these are e-mails you can see between Trevor Milton and Britton Worthen -- you heard he was the general counsel of the company.  This e-mail, the edits show you that right away the defendant was being warned not to lie, not to overstate, not to claim the truck would work when it didn't.  So here the defendant sent the press release to Britton Worthen, it says:  Please redline.  Worthen sends his edits and they are right here.  Look at how he tried to edit the press release in that the first headline there he adds in "plans."  Nikola One truck plans to achieve zero emissions.  If it had said that it would have been accurate.  Then, in the second line there, he deletes "working" because he knows that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

by December there is no way they're going to have a working prototype.  That's what his general counsel tried to get him to do.  And then in the first paragraph there he adds in "plans" again, trying to make it accurate, trying to make it forward looking.  And in the last paragraph he says the same thing, he adds in "plans."

Now, during this trial you have heard a lot about future tense and forward-looking statements, things like that, but you can see here the four years before the company went public the general counsel of the company is telling the defendant you have to distinguish between what you have done and what you plan to do in the future.  That distinction matters, it matters to investors.  So, what happened with this press release?  Let's look at it.  This is the final version that went out.  Worthen tried to add in "plans."  Edit rejected by the defendant.  Worthen tried to delete "working."  Edit rejected by the defendant.  He added in "plans" again in that first paragraph, the defendant again rejected that edit.  If you look at that press release, Government Exhibit 800, you won't find the word "plans" in there once.

Now, you have heard all about the unveiling of the Nikola One in December 2016.  It was a livestream event, you could watch it online, and there was a big audience.  Nikola unveiled a prototype but you heard from Paul Lackey –- the first witness –- it wasn't working, it had to be towed on the

stage, it was missing parts, the lights and screens on the truck were powered by a cord plugged into a wall.  The defendant, he could have owned all of that, he could have said this is what we have done so far, we are proud of our progress, we are hoping to do more.  But he didn't.  He started lying right away.  Here is some of what he said.  Government Exhibit 400, he said:  I don't want someone to end up driving the truck off the stage.  This thing fully functions and works.  That was a lie.  He says this is not a pusher.  You heard that was a lie, the truck didn't work.  And here is Paul Lackey's testimony on that:  Yes, we had to push it.  It was not able to function under its own power.  We pulled it up, I guess it was really a puller.  That's what Paul Lackey said.

Now I want to take a minute -- just a minute -- to address the cross-examination of Paul Lackey.  Now, you have heard he told you on direct examination that he made money from the report, he didn't hide that.  You can approve of that or not but you saw him, you heard his testimony, and you know his testimony is backed up by all the other evidence in the case.

For example, this is a text he sent in 2016, years before the company went public, years before he was a whistle-blower.  He sent this text the day after the unveiling:  Watched the show last night.  Was disappointed, but not surprised, that Trevor told the big lie.  This is Government Exhibit 1.  So the day after, right then, he knew what the

defendant was doing was wrong.  He thought the defendant was lying.

And what about the other evidence that backs up Paul Lackey's testimony?  Well, here is some, Government Exhibit 207.  These are e-mails from Stephen Scott, an engineer with Nikola One.  He says in the first one there.  I believe that HMI content in the cab is the single most important electrical item for the show.  And he says that's important because the gear boxes are empty and movement of the vehicle is not possible.  That tells you everything, ladies and gentlemen. This truck wasn't going to work so they're focused on HMI.  And you heard that means "human machine interface," those are the screens in the truck.  And here is how Trevor Milton responds. He was on that e-mail, he says:  I agree.  Not sure we will have a solution for the truck, hopefully we can plug it in there.  So he knows, he knows the truck is not going to work, it is not a secret.

And then let's look at the HMI of the truck at the actual show.  Even that they had to fake.  You can see here on Government Exhibit 1208 and 1211 these are the screens in the truck.  And what are these really?  They are just locked computer screens.  You can see that right there, that's the Windows lock screen, 7:30, Friday, December 2nd, and on the right there you can see that's the windows display screen.  So they don't even have HMI at this point, it is all fake.

Now, the big lie did not stop there. You heard that it got worse when they filmed that in-motion video and for this one you have a timeline, here it is, Government Exhibit 1006 and you heard about this from Special Agent Penland, she walked through all the e-mails and exhibits on that video.

Now, for this one you heard that Phillips, the company Phillips first reached out in July 2017 to Trevor Milton, they said they wanted to film a commercial about the Nikola One. Here is one of the early e-mails on this topic, this is from Dane Davis, he was the chief technical officer at Nikola, to Trevor Milton, and he asked, Is there a concern that an image of our truck being pushed or pulled during the commercial shoot could be leaked? He says I think commercial shoot onsite would be less tricky. This is Government Exhibit 923. You know why he says this, because he knows the truck doesn't work, it doesn't move. He doesn't want people to know that so he is suggesting maybe we should shoot this onsite at Nikola.

Now, you saw the Phillips commercial. It was an old truck, a Nikola truck, two truck drivers meet, and in that commercial that Nikola truck moved for just a few seconds. But that wasn't enough for the defendant and you can see his e-mails on that. This is Government Exhibit 925 from the defendant to Phillips. Why does this not show the truck going down the road as we talked about? That was the reason why I approved it to be used in the commercial. That was the whole

point for him.  He wanted the truck to look like it was driving, a mirage in the desert showing the truck like it actually worked.

Here is another e-mail from the defendant to Phillips: This will be the first time anyone has ever seen the Nikola truck move so it could get millions of views on your YouTube channel.  He is trying to maximize exposure and help get it viral.  You can see his motivation here, right here.  He wants to get a million views.  He is trying to blast this lie all over the Internet.

And let's look at the footage on this and, Ms. Wolfson, can you pull that up Government Exhibit 295 and 402?

(video played)

MS. ESTES:  Pause it right there.

Ladies and gentlemen, you could see there, and we will go back to a little bit more, on the left the truck is just inching down the road because it had no power, it was rolling downhill.  On the right it is going much faster.  The defense, they have called this a prosecution by distortion but there is only one distortion in this case and that's what -- actually, there is more than one, the defendant has distorted many things but this is one of the biggest ones, one of his biggest distortions is making this truck look like it actually worked when it didn't.  So let's look at this some more.

Ms. Wolfson, let's keep playing.

(video played)

MS. ESTES:  Let's pause it there.  I mean, look how much faster that truck is going, ladies and gentlemen.  He made it look like a working truck.  That's what the defendant did, a complete distortion of the truth.

Now, what has the defense said about all of this?  Nothing to see here, this didn't matter in 2020, just forget about the fact that the defendant built this company on a giant lie.  But here is the thing, ladies and gentlemen, it did matter.  It mattered that the founder and CEO of the company built his company on a lie.  And how do you know that matters?  Because in 2020 he said himself, when he took the company and went public, how important it was that they built this truck in 2016.  So let's go back and look at some of the things he said in 2020 about the Nikola One.  Here is just one example, this was a March 5, 2020 interview, Government Exhibit 405, after he is announcing the combination of VectoIQ, this video, the truck moving down the hill video is playing in the background so he is standing by the Nikola One in 2020.  And then here are statements a week later, Government Exhibit 406 he said:  When we first came out people said they're vaporware, they're fake, they're frauds, they're liars.  That was actually true, the truck didn't work.  But what he said is that we have a humongous kind of drop the mic moment for the industry.  That's

what they did back in 2016.  Here is another one:  We were very first in the zero emission semi truck world.  We beat everything including Tesla.  We unveiled our truck in 2016 and everyone followed.  Another one, Government Exhibit 424, Nikola was the first company to actually launch the zero emission semi truck in 2016.  We beat everyone to it.

What does this tell you, ladies and gentlemen?  That truck, the first truck, it wasn't some forgotten relic from the past, it mattered in 2020.  He told everybody it mattered because they were the first company to make this kind of truck.

And one other way that you know all this stuff mattered in 2020, you can see people are still watching these videos, people investing in the company are watching the videos.  This is a document that Stephanie Amzallag from the marketing department testified to.  These are the YouTube views for first the unveiling video in 2020 after the company went public.  So you can see after the March 2020 announcement there is going to be that combination with VectoIQ, you can see it there, and then the company actually goes public in June and then the views skyrocket.  So these people looking to invest in the company are all watching the video.  You can see at the bottom it was viewed over 20,000 times.

And here is another one, this is the same document, Government Exhibit 287, but this is about the in-motion video, the truck rolling down the hill.  Over 21,000 views and there

you can also see it spikes after the company goes public in June.  Investors are watching this.

Now, another reason you can't wish this Nikola One away is that in 2020 the defendant got called out on it when Paul Lackey, the whistle-blower, went to Bloomberg -- and you can see his testimony here and I think it is important to look at this -- as to why he went to Bloomberg.  Because after the company went public he said I knew that your typical, everyday investor had nothing to go on other than the public statements by the company and he said, so, I felt it was very important for them to know that the company had a history and Mr. Milton had a history of making false statements.

So he went to Bloomberg and Bloomberg listened and they published this article on the left here, this article by Ed Ludlow, and you heard this was based on an interview that the defendant did with Ed Ludlow and an excerpt from that is on the right, it is Government Exhibit 413-T.  Now, what did he say to Ed Ludlow in his interview when confronted about the Nikola One not working?  He doubled down, he lied.  He said he didn't trick anyone in 2016.  Here is what he said:  And could it have driven?  Yes, but it was not safe.

Now, you know that was a lie.  The truck had no gear boxes, it had no motors, there was way to power it and no way to drive it.  But why did he lie about it?  Because this was a big deal.  He had put out this full narrative about Nikola

being the first mover in this space, a claim that that truck, that first truck didn't work would change that substantially so he lied to cover it up and he repeated this lie over and over again.  This is Government Exhibit 532; everyone at the event knew we didn't drive it because it wasn't safe.  And another one, Government Exhibit 414; instead of taking a risk and possibly hurting or killing someone, we decided to make the truck inoperable on the stage.  It just wasn't safe.  And another one, Government Exhibit 415; we didn't feel safe driving it at that time, it could have killed someone in the audience.  Now, ladies and gentlemen, you know that was false it was a giant paper weight.  There was no way it would have killed somebody.

How do you know these are important?  You can see it in the defendant's own messages, June 17, the day of the Ed Ludlow article, Government Exhibit 38.  He texts Stephen Girsky, who is on the board at Nikola:  Did you see me rip Ed Ludlow a new one?  Share value went up after my response.

So this is important, ladies and gentlemen.  This is the defendant admitting right here that his statements mattered, that they were moving the stock price.  He is acknowledging it here.  He is bragging about it, in fact.

And let's look at the stock price right here.  This is the movement on June 17 and 18.  Now, the first yellow dot there, that's when the Bloomberg article was published and

let's look at a close up part of this here.  You can see right after it is published the stock price drops.  The second yellow dot, that's Milton's response on Twitter and you can see the stock starts going up a bit, but by the even of the day, by the end of June 18, you see the red dot on the right there, it is all the way back up to where it was before the article was published.  You can see in the stock price right here the defendant's statements mattered after he tried to refute that article, the stock went back up.  And you also know this from your common sense that these statements mattered.  People care if a company's products work.  That's pretty basic.

So, that's the Nikola One.  Another category of lies -- and we are making some progress here so bear with me -- these are lies about orders.  And you saw these lies in the In This Week in Startups broadcast, Government Exhibit 425.  The now this is when the host said letters of intent, the orders, but Milton says no, no, there are billions and billions of dollars worth of contracts.  And he said people think they're a non-committal thing but they're not, they are signed on the line, billions and billions of dollars in orders.  You heard from witnesses that was not true, these were reservations, they were really just expressions of interest.  You heard that from Fretheim, from Mark Russell, and you can see that in the defendant's own documents too.  This is one of his e-mails from Government Exhibit 202.  This is the defendant e-mailing

U.S. Xpress, one of the companies that had made those reservations, and what does he put in the subject line when he sends this purchase order?  Non-binding purchase order.  This is the very definition of a non-committal thing, non-binding. Those are his words.  And here is the purchase order there: Either party can cancel this transaction at any time for any reason without penalty.  That's pretty non-committal.

And this e-mail really illustrates exactly how meaningless these reservations were.  This is Government Exhibit 203, an e-mail from the defendant to another one of these transportation companies.  He says:  Michael, you had asked for 50 trucks, that would have been $500 for each, but since it is fully refundable I put you down for 100 at $250 but you can cancel at any time any of those.  He is just making things up.  He is doubling somebody's order without a reservation, without even being asked.  That shows you these are completely meaningless, non-binding, they're non-committal.

The filings with the SEC said the same thing, reservations for the truck are cancelable.  So you know these statements he made, they're false, they're a lie.  And they were important.  You heard that from Joseph Ryan, they mattered because they could give the company more cash.  Here is more of his company:  Binding orders means there is a really solid commitment.  Reservations people could change their mind and that makes sense, you care if there is some sort of guarantee

there.  Marc Schonberger said the same thing:  Billions of dollars in orders is revenue to the company and that's what you care about as an investor, money coming in.  And he said it makes a difference if there are reservations because those can be cancelled, orders are orders.  Orders mean sales, they're a guarantee.

So, those are reservations.  Those are the big categories of lies but now I want to turn to all the lies that defendant told Peter Hicks directly.  His fraud play book was basically the same.  You heard Peter Hicks was looking to do this land deal and he told you he wanted cash, Milton wanted to use stock because he was locked up at that point.  They ended up with a compromise where Milton paid him some cash and some options to buy Nikola stock.  Now, Hicks told you he only did this deal because of a phone call with the defendant.  Nikola was a company with no revenue so these options, they seemed pretty risky, so he went to the defendant to try to understand the company better, to make sure this investment was a sound one, but the defendant lied to him and he lied to him about things that mattered.  These lies were recorded, you heard that recorded call and saw some of them in the transcript so let's look at them now, this is Government Exhibit 1400.

Let's look at the lies, and some of these should look familiar because he is lying about the same things.  We have already gobbled up all of the excess energy on the grid so the

next person coming in is going to pay -- you know, we get 20-year contracts. This is the same lie about having 20-year electricity contracts that he told on the Tesla podcast. You heard from Elizabeth Fretheim, Kim Brady, they had no electricity contracts. And Peter Hicks, he was really trying to suss out if this was about the future or something they had already done so he asked him, point blank, Trevor this is the plan? I mean, we are not gobbling it up right now or are you? And what does the defendant say? He says we are, we have already done that, from L.A. to Phoenix we are already doing that. Anheuser-Busch has already given us their routes. He is saying it is something that the company accomplished, a milestone. For more, we have already we are already in that process right now, he is saying they have already accomplished it and you know that was a lie.

Now, I do want to call your attention to one more thing here, ladies and gentlemen, and that's the bottom line here. He tells Peter Hicks you can't go public on a hope and a dream but that's actually exactly what he was telling Peter Hicks about. They hoped to have hydrogen stations. They want to have it one day but they didn't have it then. They were hoping to get those electricity contracts. They hoped to do all of that to produce hydrogen at a decent price. That was all it was. It was a hope and a dream, it was not reality. He was lying.

Now, you heard the deal with Peter Hicks went through and let's look at this chart here as Government Exhibit 1012 to help you understand a little bit about how it worked.  Now, you heard Peter Hicks didn't get stock, he got options to buy stock and the strike price was $16.50.  You can see that is that little black line right there and you heard that anything over that he is going to make money putting aside any transaction cost.  So in June, July, and August, where the red lines are really high there, this was looking like a pretty good deal.  It closes on August 14th when the stock was about $40, still looking like a good deal then.  But then the Hindenburg report came out, you can see where that is in the chart and then the stock drops, and by December 2020 that's when the lockup ended.  So at that point Peter Hicks could actually exercise his options.  The options were basically worthless at that point.  You can see they never went back up to $40 after Hindenburg.

So, what happened next?  Peter Hicks told you he started discussing a way to resolve this dispute with the defendant, to get some compensation, and he ultimately did the deal with the defendant and made about $1.6 million, that is far less than he could have made if he exercised the options and the deal went through.  Why did that happen?  How did he get that $1.6 million?  It was basically hush money.  The defendant paid him so he wouldn't report this, so he wouldn't sue him.  It was all the same part of the scheme.

Now, defense counsel crossed Peter Hicks at length about the all the money he made off this deal. He testified he bought the ranch at one price and wanted to sell it to the defendant for higher. And that's true. He told you that. He was a real estate investor, this was his job, and he was trying to make money. He wasn't shy about it. The point is in trying to do the deal, the defendant lied to him. He sold him stock by lying to him about the progress of the company. He made him think those options were worth more than they were. Hicks entered into that deal under false pretenses all because of the defendant's lies.

So those are the lies, ladies and gentlemen. I am going to talk briefly about the charges. There are four counts, two counts of securities fraud, two counts of wire fraud. Now, on the law, Judge Ramos will instruct you on that and what he says controls but I just want to go over a few points and one of those is that you will hear that the lies or misstatements need to be about material facts. So, what does that mean? I expect Judge Ramos will instruct you that that means the fact as to which there is a substantial likelihood that a reasonable investor would have considered important in making his or her investment decision in light of the total mix of publicly available information. So it doesn't have to be the cause of their decision or the only thing they consider, it just has to be important.

Now on this, on these lies, let's start with your common sense of why they matter.  Obviously when the founder, when the top executive of the company talks about his business it is important to investors and here the defendant was talking about very basic parts of the company.  Did the trucks work, oh?  Can they produce fuel for the trucks?  Can they do it at reasonable cost?  Do they have orders coming in where they will get revenue?  These are obviously things that would matter as an investor.  And you heard from two investors here, Marc Schonberger and Joseph Ryan that told you that the statements mattered.

Now I want to talk a little bit about the cross-examination of those witnesses.  Defense counsel tried to blame them for not reading SEC filings.  According to the defense you can't be a victim even if you have been tricked by the executive of a company making false statements unless you undertake some kind of investigation, read every SEC filing, call the company.  Now, the defense of course has no burden but you know exactly why they cross-examined those retail investors like that.  They're trying to make them seem unreasonable because those victims told you flat out that what the defendant said mattered.  And they both told you, too, this investment wasn't a win for them.  They did research.  They read articles.  They watched interviews of the defendant.  That was their research because they thought they could believe him, he was

MAD5mil2                         Summation - Ms. Estes

the head of the company.  They had no reason to fact check him or dig through hundreds of pages of filings to see if he was lying.  If Jeff Bezos is out there talking about Amazon, of course you assume he is telling the truth.  You would never imagine he would be out there brazenly lying to the public.

And on the SEC filings I do think it is important to look at them so we will take a look briefly here, this is Government Exhibit 318 and this is the relevant page about the Nikola One.  You can look at the text here.  Now, if you are an investor and you have seen the truck rolling down the hill video, this doesn't tell you anything about that.  It doesn't say, OK, that truck was really rolled down the hill, it didn't work.  Nothing about this corrects the defendant's lie.  Same thing on the Badger, this is the part on the Badger.  It doesn't say we have a prototype.  It doesn't say they're not building it from the ground up.  Nothing here corrects all the lies the defendant said.  And hydrogen, too, this is a lot of text but in here you can see there is nothing about the cost of hydrogen.  Nothing in here, not a word since they haven't actually achieved $4 a kilogram.  It doesn't explicitly say they're not producing hydrogen.  So, even if the investors had read all of these it would still be reasonable for them to rely on the defendant.  There is nothing in here that corrects his lies.

Now, one more minute on the defendant's expert, I want

to talk about him briefly again, his paid expert, his hired gun. Now, Professor Ferrell told you he makes millions of dollars of year testifying for defendants and he was certainly paid handsomely here but one thing you should keep in mind and I said this earlier, is that you will see in the legal instructions there is nothing about the stock price movements, that's all a distraction. In putting that aside there is all sorts of flaws in Professor Ferrell's study. One thing he didn't do is he didn't account for fact that the defendant already told the lies in the past, the lies about the Badger being built from the ground up, those were told in February; hydrogen cost lies first told in January; Nikola One lies first told in 2016 and repeated well into 2020. So, of course, you would expect none of those repeated lies moved the stock price in any one day. That doesn't mean they didn't matter to investors, it just meant the information wasn't new.

Even on his assessment of what was statistically significant, he said some of the defendant's statements mattered like the Badger announcement. The stock price shot up after that. The GM announcement, also statistically significant. And even more importantly, he told you that after the public started reading the Hindenburg report, after that came out, the stock price dropped 20 percent over that day and the next and you can see the drop right here. And what does that tell you? It tells you the stock dropped when the truth

was revealed, when his lies were exposed.  That's when the market learned the truth, the stock dropped and it didn't recover.

One other thing about the defense expert that is really important, this is really the critical thing here, he told you he didn't talk to any real life investors.  You can see his testimony right here:  Did you speak to anyone who actually invested in Nikola in 2020?  Not to my knowledge.  He admitted that on cross-examination.

Now, he simply is not capable of testifying about what a reasonable person, investor would think because he doesn't know these people, he has never met them, he has never interviewed them.  That's why this expert, the defense expert is just a giant distraction.  He can't tell you what real people, real investors thought.

Now, one other thing I expect you will hear from Judge Ramos is that for each of the counts, the government has to prove venue in the Southern District of New York.  That just means the defendant caused some act or wire that helped the scheme happen, helped the scheme happen in the Southern District.  So, here is Government Exhibit 1009.  One of the ways you know we have venue, he took a trip to New York right as they were announcing the combination with VectoIQ.  He is filming interviews in New York City to promote the merger.  Some of these are broadcast nationally.  So you have venue from

this alone.  In particular, you will hear that on wire fraud you need interstate wire, one that goes into the Southern District.  Filming a TV program in New York that is broadcast nationally satisfies that requirement.  Another way you know we have venue:  Trading data.  This is from Robinhood.  You saw -- this is a document, Government Exhibit 1311, it is 198 pages, addresses of investors in this district, just Southern District investors 198 pages, so these people trading in the district, that gives venue, too.

Next, this is the defendant ringing the closing bell of the Nasdaq virtually, that's where Nikola's stock was traded.  If you watch the video, you can see part of it was filmed in Arizona, broadcast here in Times Square.  That's clearly an interstate wire.  This provides venue.  And finally, one more thing, you heard about the fact of VictoIQ, that was a company based in New York and Westchester County, you saw that on the SEC filings.

One more point on venue and this is for Count Four, the Peter Hicks wire fraud, you can see right here that the August wire sent from Peter Hicks goes to this account in New York, New York, JP Morgan Chase, for account of Trevor Milton. So that provides venue in the Peter Hicks wire fraud count and on that there is one other piece, there is a stipulation, S7, that says communications involving that deal that they made later where Peter Hicks made $1.6 million involved an attorney

in Orange County in the Southern District of New York so that's another way you have venue on this count.

Ladies and gentlemen, we are nearing the end so bear with me a little bit more.  The last thing I want to talk about -- and this is important -- is that the defendant did all of this intentionally with the intent to deceive.  So how do you know that?  One, he lied over and over again.  It wasn't just one podcast, it wasn't just one tweet, it was a campaign of lies over months.  Your common sense tells you, it is not an accident, that was deliberate.  And he repeated the same lies over and over again.  These are examples you saw about hydrogen being under $4, these are just a few here, Government's Exhibits 525, 541, 543, 521, he told the same lie because he wanted investors to believe he had solved the problem of hydrogen cost.  This was calculated to deceive them.  And the Badger, on that he told the same lies over and over again.  The Badger was built from the ground up.  He wanted investors to think they were like Tesla.  That was intentional, it was to trick them.

Now, another similar point, he lied about things that mattered.  That also tells you that he did this intentionally. For example, we went through lie after lie of hydrogen and you heard that was a part of their business model that was weak. Now, I expect defense counsel may talk to you about the Nikola two truck, that other hydrogen truck they had and they did have

a prototype on that and he didn't lie about that.  And that's because he didn't have to.  It's not at all surprising that where he lied is where the company was weak.  That's how you know he did it on purpose.  He lied to cover up their weaknesses.

Another reason you know he acted intentionally is that he lied when confronted.  Like the Ed Ludlow article when confronted about the Nikola One, he could have come clean, he could have said it didn't work back then but we have made progress.  He had a choice, but he lied.  This example we looked at, too, the Maria Bartiromo one where she talks to him about a truck with no prototype.  He could have accepted that and said we are hoping to get there.  He had a choice, but he lied.  He said we do have prototypes.  And the same thing on that podcast about reservations and orders.  The host said these are letters of intent?  He said:  No, no, no.  Let me correct you, they are binding orders.

That all tells you this was deliberate.

Another reason you know it was deliberate is his motive.  He wanted money and power and you can see right here in Government Exhibit 1001 how the stock price affected his wealth.  After the Badger announcement, the reservations announcement, he was worth $7.3 billion so of course he wants to keep the stock price high.

And here is Kim Brady's testimony on this.  He showed

him the Forbes 400 app which is the 400 richest people -- and to be clear, the defendant is already on it, he is number 270 so it is not like he hasn't made the list but he wants to be higher, he wants to be in the top 100. And Brady told you there was one way to get there, if the share price went up he would be higher on the list, he needed to pump the stock.

You heard about the stock sales he made in the beginning and how he was burning through the money from those stock sales like crazy. So you can see there $100 million from stock sales as the company was going public. Then look how he spent it? He spent $83 million in just a few months. This is Government Exhibit 1013. He bought an estate in the Turks & Caicos for $13 million. He bought a Gulfstream jet, $13 million. He bought an aircraft hangar, $8.5 million. And this shows you all of his spending right here, the $91 million, he went all the way down to $17 million. He was burning through all of that money. He needed to fuel the fire to keep the stock price high so that when his lockup, the stock sale lock up ended in December, he could cash out. That was his goal, keep it high until December, cash out, and keep up that fancy life style.

And how would he keep the stock price up? By retail investors. You saw that in his own e-mails, this is Government Exhibit 224, March 2nd. We also need to make sure we are getting retail investors on our side. That is what prevents

the stock short selling.

And you know from his testimony he was obsessed with the stock price and now everybody of course watches the stock price, this is not unusual.  What Mark Russell and Kim Brady told you, his level of watching the stock price was completely unhealthy and you can see text on that, this is Government Exhibit 65, Kim Brady and Mark Russell, they're talking about the defendant and they say he needs to chill.  He called this morning and wanted to know why the stock price was down.

And here is Government Exhibit 61, these are texts between Dewitt Thompson, a board member, and Mark Russell, and Thompson said:  Hope Trevor doesn't explode on short-term stock decline.  Watching him during the board meeting, he is clearly obsessed with Twitter and price.  It can't be good for him.

This tells you so much, ladies and gentlemen.  He is obsessed with Twitter and stock price because in his mind he thinks they go hand in hand, he can move the price with his tweets.  And that's what Russell told you, he was talking about his ability to communicate through social media and reach out to retail investors and how that was helping driving the stock price up.

You saw examples of that, Government Exhibit 71 and 554 when he tweeted on August 24th to try to balance the stock price back up and then his tweets about the Ludlow article, how he increased share price after he tweeted in response to that.

Now, one other reason, the last reason you know what he did was intentional is that he lied, despite warnings from all the other executives.  They told you about the times they warned him and let's look at some examples, this is Government Exhibit 212, an e-mail from 2018, before they went public, from Kim Brady, the CFO and he is warning him about another company that was sued by the SEC for a fraud related to false representations.

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

MS. ESTES:  Next you heard from Mark Russell, he told you about the warnings he gave him.  You can see his testimony on that right here.  I explained to him that as the top executive officer of the company, anything he says in public would be the equivalent of a press release or a securities filing.  And then I would remind him that we would have a very careful process about those kinds of things and that he would need to take that precaution.  And testimony, they were consistent with text message.  Here are messages between Russell and Thompson, he said, we are trying to help him understand what it means to be the executive of a public company and he advised him to get off social media -- he told him that -- or at the very least let Britton -- Britton Worthen -- pre-screen anything that he posts.  This is Government Exhibit 20.

Now, both Mark Russell and Steve Brady told you they got so worried that summer that they had an intervention, they testified about that. Here is Russell's testimony. He said the defendant, they told him, You need to change, because he was refusing to modulate and submit public statements to discipline or control. And here is Brady's testimony about this intervention. They said he needed to vet everything and social media needed to be toned down. So that was a big deal, ladies and gentlemen. These were the top officers of the company going to him saying they need to change it.

Now in the opening statements defense counsel said that nobody gave him a red line, nobody at the government stopped him, but if this intervention was not a flashing red light to the defendant I don't know what would be. Mark Russell told you he talked to him over and over again. Kim Brady told you that, too. And I expect defense counsel to argue he didn't do enough, that if it was a fraud they would have reported to the audit committee, something else like that. You heard about all the steps they took. They warned him, they confronted him together. Kim Brady also told you he had another board member go talk to him. They told you they scheduled a media training for him and he just didn't attend it and that by the end of the summer they both started talking about resigning because they were at the end of their rope and that's all they had left.

Now, why didn't he stop despite these warnings?  It is simple:  He was the boss.  He ran the show and you can see from his own podcast what he said about that.  He was the most powerful person in the whole company because he controlled the board and the CEO reported to him.  And here is some of his texts that really illustrate this in action.  This is Government Exhibit 11, text between him and Stephen Girsky, and they are talking about lawyers including a press release here and Milton says:  I don't care if they are a pain.  They will learn who runs this show.  I won't tolerate them telling me what to do when I have to deal with the aftermath.  It was a shitty press release and needed to be modified.

Now, this is the same thing you saw in action in 2016 when Britton Worthen, general counsel, tried to edit his press release.  He just rejected it all.  Milton is saying right here he is the boss, he is the one that runs the show, he is not going to listen to the lawyers.

A couple of additional examples, Government Exhibit 22, Girsky says Trevor is pretty active on Twitter regarding Badger.  Mark Russell says:  Wish he wouldn't.  Can't convince him to stop that.

Another example, Government Exhibit 61 again, at the bottom, Russell talks about trying to help him develop and keep perspective and he says he is generally not a very cooperative student.

And one more thing on this, and this one is really important, it is Government Exhibit 235, you might want to write this one down, these are e-mails about setting up media interviews.  Now you can see from the bottom one Nicole Rose from marketing, she says Mark -- that's Mark Russell -- fair game to double up.  What does the defendant say in response?  It would be easier for me to just do it alone.  I like to be solo on interviews.  What does that tell you?  He is excluding them on purpose.  And you know why, because if they were there, if they were chaperoning him at these interviews, they would tell him he needed to be accurate, he needed to use forward-looking language.  He wouldn't be able to go out there and lie.

(Continued on next page)

MS. ESTES:  Now, while we are on the subject of interviews, I want to very briefly discuss the suggestion that what Mr. Milton did was okay because the marketing team was monitoring it.  Now, it is really quite an amazing statement. The defendant in the box is saying the social media person didn't stop him.

But you heard from her, Stephanie Amzallag.  She testified.  She told you she wasn't an engineer.  She wasn't fact-checking his statements.  She was relying on him because he was the head of the company.  So the fact that Stephanie Amzallag, the marketing team, signed off on this, it doesn't mean anything because she was relying on the defendant.

And she told you, too.  Here is some of her testimony on that:  He was directing the media strategy.  She didn't have authority to direct him.  She even told you about efforts to change his passwords and change the passwords on the company accounts.  Then after that happened, he went and he asked her for the passwords.  He tried to get back in.  He wouldn't let the social media group do it alone.  And she had to give them to him because he was the founder and CEO.

All right.  Now, ladies and gentlemen, I am about to sit down.  I just want to go back to the charges here.  We talked about the defendant's lies, why they matter, and how you know he did all this on purpose with the intent to defraud. But at bottom, all of this is actually really simple.  When you

lie to investors to get their money, it is securities fraud. When you do that on podcasts, on Twitter, on TV, and over the phone, it's wire fraud.

Now, I want to talk about the retail investors one more time because they are really the heart of this case. You heard from two of them——Joseph Ryan and Mark Schonberger——but you saw that spreadsheet with 198 pages of investors, so you know there are so many more. And those were just the ones in this district. That was the tip of the iceberg.

Now, defense counsel has essentially blamed the victims here, suggested it is okay for the executive chairman of a company to lie to them because they didn't read SEC filings. That's, frankly, kind of offensive. They believed the defendant, they trusted him, and they were deceived. They are not at fault here.

Now, in his opening statement, defense counsel said this was a trial about tweets; that the defendant used social media for entertainment. He made it seem like this was all a joke. But you heard from two of those investors and you know there are more out there. They were real people, they lost real money, and this is really serious. To those investors, there is nothing entertaining about what the defendant did. It is time to hold them accountable for defrauding ordinary investors. So when you go back to the jury room, find him guilty as charged.

Mad2Mil3

THE COURT:  Thank you, Ms. Estes.

Ladies and gentlemen, I owe you an apology.  I neglected to tell you this morning before Ms. Estes began that I told the lawyers that we would not be keeping our regular 11:00, 12:40 schedule, and the same will happen with respect to the defense when they make their summation.  I will give them the opportunity to finish the entirety of their summation.  I expect that we will still be leaving by no later than 2:30 this afternoon or perhaps even earlier, but I apologize for that. We will take our break now.  It is 20 minutes, so 45 after the hour.

(Continued on next page)

(Jury not present)

THE COURT:  Everyone can be seated.  You have 20 minutes.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Everyone please be seated.

Does Mr. Milton wish to present a closing argument?

MR. MUKASEY:  We do, Judge.

THE COURT:  Mr. Mukasey.

MR. MUKASEY:  It is a distortion to say that Trevor Milton intended to commit fraud when the statements he made were about the Nikola business model.

It's a distortion to say Trevor Milton intended to commit fraud when the statements he made were supported by everyone and everything around him.

It's a distortion to say Trevor Milton intended to commit fraud when the statements he made were cheered on by the Nikola leadership team.

It's a distortion to say Trevor Milton intended to commit fraud when he got approval from the Nikola board of directors for all of the big decisions.

It's a distortion to say Trevor Milton intended to commit fraud when all of the material facts and risks about Nikola were fully disclosed.

It's a distortion to say Trevor Milton intended to commit fraud when he told people to go read the SEC filings.

It's a distortion to say Trevor Milton intended to commit fraud when the government's evidence consists of gossipy text messages between low-level employees.

Mad2Mil3                         Summation - Mr. Mukasey

It's a distortion to say Trevor Milton intended to commit fraud when the $90 million he got had absolutely nothing to do with public stock trades or retail investors.

And it's a distortion to say Trevor Milton intended to commit fraud when he voluntarily agreed to a lock-up period and couldn't sell NKLA shares during the entire period of this case.

It's a distortion to say Trevor Milton intended to commit fraud based on investors—two of them—who couldn't even remember Trevor's statements or why they were important.

It's a distortion to say Trevor Milton intended to commit fraud when virtually nothing he said was important to the Nikola stock price.

It's a distortion to say Trevor Milton intended to commit fraud when a Nikola witness called the Hindenburg Report a hit job and a hack job and a character assassination on Trevor, but then got a subpoena and changed his story.

It's a distortion to say Trevor Milton intended to commit fraud when there is no record of anybody saying, hey, Trevor, you are doing something wrong.  Stop it.  You are crossing a criminal line here.

It's a distortion to say Trevor Milton intended to commit fraud when government witnesses who took the stand stand to make millions if the government wins this case.

Members of the jury, it is the ultimate distortion to

say Trevor Milton intended to commit fraud when the people who worked with him at Nikola came in to this courtroom but not a single one of them testified that he intended to commit fraud or that he had a wrongful purpose or that he ran a scheme or that he tried to harm anyone.  Not a single person said that.

Don't you think that in a fraud case somebody would say that?  Don't you think in a fraud case someone would have testified about fraud?  Don't you think someone would have testified that Trevor intended to commit fraud or they warned him of his committing fraud or at least that they thought he was committing fraud?  But there was nothing.  You saw people had disagreements with him.  They didn't like his style, they didn't like the Badger, whatever.  Those are normal business things, not crimes.

What's critical in this case is Trevor's intent, his state of mind, whether he intended to deceive, whether he intended to commit fraud, whether he intended to harm, and not a single Nikola witness could say under oath that Trevor had a wrongful purpose.  Not a single witness was even asked about it.  That's a remarkable failure of proof.  That's an extraordinary hole in the government's case.  It's a stunning lack of evidence and it cries out for four not-guilty verdicts.

The government may have shown Trevor was focused on the stock price, they may have shown he was a little over the top when he talked about Nikola, and they may have shown that

Mad2Mil3                         Summation - Mr. Mukasey

he liked ranches and airplanes and an island, but none of that is criminal.  The government never proved fraud.  Period, end of story, full stop.  You should acquit him on all four counts for that reason alone.

But it actually gets worse for the government.  You saw Mark Russell and Kim Brady testify on that witness stand. Is there anybody in this room who thinks Mark Russell and Kim Brady, guys who had responsibilities to certify Nikola's filings to the U.S. government, guys with obligations to report misconduct, guys who were like Boy Scouts, is there anybody here who thinks for a second that Mark Russell and Kim Brady were going to stand around and watch Trevor Milton commit crimes and do nothing about it?  That's preposterous.  You saw them.  They were here.  If those guys thought Trevor Milton was committing fraud in tweets and podcasts, they would have bounced off the walls.  They would have broken the glass.  They would have rung the alarm bell.  They would have acted.  They would have done something.  They would have said something. They would have documented something.  But they didn't do anything.  Nothing.  That should tell you loud and clear that there were no crimes here and that Trevor is not guilty.

Now, I'm going to take a quick run through the evidence again because it's been a minute since we were together.  As I do, I want you to please keep three things in mind, and first is the presumption of innocence.  That means

that right now, as Trevor sits in that chair, he has to be presumed innocent and he has to be presumed innocent now and when you go back to deliberate and throughout your deliberations.

The second thing to keep in mind is that it is always their burden, it is always the government's burden to prove the case beyond a reasonable doubt.  And even though we did present some defense on behalf of Trevor, that doesn't change the picture.  It's always the government's burden.  It is never Trevor's burden to prove himself innocent.  They have to prove their charges beyond a reasonable doubt.

Third, it is not enough for the government to show tweets and podcasts, clips and interviews and say Trevor's guilty.  It's not even enough if Trevor was wrong in what he said in an interview or inaccurate.  That's not enough either.  And it's not enough if he misspoke.  It's not enough if he was inarticulate, and it's not even enough if he says something untrue.  It's still not enough to prove fraud.

Judge Ramos is going to instruct you—and don't take it from me, take it from him—that the government has to prove that Trevor acted with the specific intent to defraud investors, that he had the intent to deceive, the intent to harm by depriving people of money or property, and that he acted with a wrongful purpose.  And he is also going to instruct you that if Trevor believed in good faith that he was

Mad2Mil3                    Summation - Mr. Mukasey

acting properly, that's a complete and total defense to all the charges: good faith.

Now, let's start out by taking a step back and thinking about how we got here a month ago in the first place. It is pretty simple. We are here, right, because Trevor was tweeting, giving interviews, and talking on podcasts about Nikola. But common sense tells you that if somebody wanted to commit a fraud, they wouldn't do it that way, right? They would do it secretly, they would do it behind closed doors, they would do it behind people's backs, they would try to hide their actions and do it when nobody is looking. But Trevor was not doing that. Trevor was talking about Nikola in the most open and visible and public and transparent way possible, where anybody could fact-check anything he was saying. He wasn't operating in the dark, he wasn't operating in the shadows, he wasn't concealing, he wasn't covering up.

The government presented no evidence that you would typically see in an intentional fraud case. There is no secret meetings. There is no shredding of documents. There is no counterfeiting anything. There is no cooking the books. He didn't run off with any investor money. When an investor in this case says they lost money, that didn't go in Trevor's pocket. So Trevor's open and transparent conduct tells you right up front there was no coverup, there was no consciousness of guilt. It tells you he had nothing to hide.

If Trevor really wanted to use social media to pull a big scam, why would he use his own name and his own e-mail addresses and his own accounts on social media?  Right?  The government can track him down pretty easily that way.  Right?  Nobody who intended to commit a fraud would use their own name.  You would use pseudonymous names or fake accounts or robots or private messages that nobody else can see.  That's what someone would do if they were committing a fraud.

But Trevor did nothing to hide his name or to hide his identity or who he was or where he was coming from.  And that tells you he was acting with the good-faith belief that he wasn't doing anything wrong.  If Trevor was running a fraud, wouldn't you think he would try to hide his statements from the rest of his comrades and colleagues at Nikola?  Wouldn't you think he would try to hide what he was doing from Russell and Brady and Fleck and Amzallag and Fretheim and Prows and all the rest?  But that wasn't happening at all.  He was actually doing his public statements with the entire company there right behind him.

Remember, they wanted to put Trevor out there.  They scheduled him to be out there, and he was filming half those podcasts in the Nikola studio right down the hall from Mark Russell, Kim Brady, and the company's chief legal officer, and that tells you Trevor didn't think he was doing anything wrong and nobody at Nikola thought he was doing anything wrong.

Now, one more thing that Ms. Estes focused on.  You kept hearing throughout this trial that Trevor was focused on the stock price, Trevor was too focused on the stock price, Trevor was obsessed with the stock price.  You heard it over and over again.  But, first, there is obviously nothing wrong with a corporate executive being focused on the stock price everyone in every company is focused on the stock price. Kim Brady was focused on the stock price.  That's Kim Brady talking about the stock price.

Mark Russell was focused on the stock price:  Is it normal for executives to follow the stock price?  Yes.

Now, there is certainly nothing wrong with focusing on the stock price and certainly nothing fraudulent about it.  But here's the real point.  The whole reason you know that Trevor was focused on the stock price is because he was talking to people about being focused on the stock price.  What kind of criminal does that?  What kind of criminal goes up to the CEO, the CFO, and Steve Girsky, the chairman of the audit committee, and says:  I'm really focused on getting the stock price up. We have got to do things and then announce them.  Only an idiot criminal would walk right up to three people whose job it is to report him if he does something wrong and say:  I'm focused on the stock price.  So the fact that he wasn't hiding it from the three people who are like the Boy Scout cops in the company tells you he didn't think he was doing anything wrong.

Mad2Mil3                        Summation - Mr. Mukasey

Now, let's talk about investors for a second. What about investors that Trevor supposedly ripped off? In four weeks of this trial, not a single person came into this courtroom and said with any degree of real certainty, with any degree of confidence that they invested because of a specific Trevor Milton tweet. And not a single person came into the courtroom and said they invested because of a specific Trevor Milton podcast. And nobody came in and said they invested because of a specific Trevor Milton statement from a specific TV interview. Ryan didn't say it. Schonberger did not say it. And that's because Trevor's statements weren't significant or important in the grand scheme of things, and that's another reason that he is not guilty.

Now, since it's been a minute since we were together, let's go quickly just through the stories and the facts and some points I want to show to you. We know, number one, Trevor built Nikola from out of his basement into what it is today, and we know it is a real company that he built with real working trucks and a real business plan that was unfolding throughout the whole case in a real way. We know that Trevor surrounded himself with ethical people and with experienced people and that he looked to them and he relied on them and he got feedback from them. And the evidence showed that Trevor had a board of directors that he went to for every major decision in the company, including the ones Ms. Estes talked

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

about, truck reservations, the Badger, and buying hydrogen equipment and making hydrogen.

I think you probably got the best picture of Trevor from Mark Russell. He's the guy who knew him the best. And Trevor said to Mark Russell that one time he wanted to go on Thanksgiving and watch truckers on the highway I think in South Dakota. That ought to tell you Trevor was not your regular CEO. He wanted to know people who were using his product. He wanted to know what I think Kim Brady called the average Joes.

But Mark Russell also explained that Trevor was extraordinarily gifted, that he was a creative thinker, and he was different than other CEOs. Remember, Trevor when this company went public was new to the whole public company thing. He didn't have the background that Russell had. He didn't have the background that Steve Girsky had from Vecto. He didn't have the background that Kim Brady have.

Remember the time that Kim Brady said that Trevor called him up on a day of trading and he said: Kim, I think you've got to call the NASDAQ market. I think the market is broken. Does that sound like an intentional fraudster or does that sound like a guy who is new to the environment that he is in and trying to figure out his way through?

Now, the government wants you to believe that Trevor wanted to communicate with retail investors because he was trying to defraud them. But look at Mark Russell on

cross-examination.  Trevor was open about his belief that constant communication would build long-term value?  Yes.

And he discussed with you and others his belief that teaching people about the company through social media would create actual value?  Yes.

Long-term and short-term.  Answer, yes.

So Trevor wasn't communicating with retail investors for wrongful reasons.  That's a distortion of the evidence.  He wanted retail investors to be able to invest in Nikola just like the big fancy banks.  And he told them in a clip that you heard, where he mentioned Warren Buffet, to hold Nikola stock long-term, to give Nikola time to execute its business plan.

And Russell spoke about this, too.  Russell said it would be open to retail investors, was a brand new model. Trevor wanted to include retail investors in the foundation of Nikola, and he didn't want to just focus on the big Wall Street banks that Kim Brady only wanted to talk to.

But there is another reason Trevor communicated with retail investors, and it goes like this.  If retail investors believed in the company, believed in the plan, and invested in the company, it would help stop damage, it would help curtail the attacks from short sellers, people who were in it for the quick buck, like Hindenburg and Paul Lackey, who we will get to in a minute.

So I think there was a slide Ms. Estes had that said

something like Trevor was targeting retail investors to defraud them.  He wasn't trying to defraud them.  Trevor related to them.  That's why Trevor went to a truck stop on Thanksgiving. He wanted them to be part of Nikola.  He believed retail investors would be a part of Nikola's future.  It might be unconventional and Kim Brady might not like that, but it's not fraud.

Now, I don't know if you caught it, but Russell also said that Trevor was incredibly or extraordinarily courageous. He said:  I don't know anyone else who would have founded Nikola in their basement at that time with that business model.

And that's really important because at Nikola it was all about the business model.  It was the model, the plan, all the time.  Remember Nikola was a pre-revenue company.  They didn't have money coming in the door from sales yet.  So what they were talking about, what they were showing to investors was the model, the business plan and the future and everything they were doing to get to the plan, because at Nikola at that time the future was now, the future was the present.

So when Mark Russell spoke, he spoke about the model: I was very interested in the business model.  I felt it had tremendous potential.

When Kim Brady spoke, he spoke about the business model.  The reason the model is developed is to show investors the goals and the plans of the company in the future, correct?

You show them the model.  That's right.

And when Trevor Milton spoke, that's what he spoke about, the model.

(Video played)

MR. MUKASEY:  Now, I'm not crazy.  It is true that there were times when Trevor fell into the wrong grammatical tense.  He used the wrong tense.  Even while he was talking about the model.  But here's the point.  So did everybody else, and they are not under indictment.

Here's Kim Brady using the present tense:  Nikola is building.

Well, they weren't building at that time.

Here's Dale Prows using the present tense:  We are also building.

Well, he's using present tense and nobody is accusing him of being a liar.

Here's Mark Russell using the wrong tense.

(Video played)

MR. MUKASEY:  "Which is what we started out with when we made the hydrogen."  He is using the past tense, and they never made any hydrogen.  Nobody is putting him in handcuffs.  You know why?  Because sometimes people use the wrong tense.  It's not intentional and it's not fraudulent and it's not a crime.

Now, remember, I said the case was about distortions,

and let's start from the beginning. The indictment in this case starts in November 2019. That's a distortion. Think about what was going on that you saw in the evidence in November 2019. Not only are there no retail investors in 2019, but Trevor doesn't even know if he is going to ever go public or get any retail investors. He doesn't know if Nikola does go public if it's going to be in Norway or it's going to be in the U.S. He doesn't know if it's going to be by SPAC or if it's going to be by IPO in the U.S. He doesn't know when. And Kim Brady showed us that that was all still up in the air all the way until January 2020. They didn't even know if they could go public, so how on earth could there have been a fraud scheme in November 2019? That makes no sense.

But when the business combination with Vecto was announced in March 2020, what happens? The government wants you to believe that Trevor ran around and was on his own, telling lies about Nikola, and that the rest of the company just couldn't control him. Let's take a look because that's another distortion.

The truth of the matter is there was no problem controlling Trevor Milt. They made that up. Trevor was asked to take his father off the board, so Trevor took his father off the board. Trevor was asked not to speak with analysts, so Trevor didn't speak with analysts. Trevor was asked not to meet with institutional investors, so he didn't meet with

Mad2Mil3                         Summation - Mr. Mukasey

institutional investors.  And Trevor was asked to get board approval for things, so he got board approval for things.  Is that really consistent with somebody who can't be controlled because he is too powerful?  That's just a government distortion.

The truth is, Trevor was exactly in sync with exactly what the company wanted to do.  From the beginning, when they decided to use a SPAC, remember they were going to follow the Richard Branson, model the Virgin Galactic model.  That model said market the plan, communicate with investors, talk about the company, promote the model, get the message out, put your founder on TV.  That's how Vecto said that it was done.  The company wanted to do with Trevor exactly what Virgin Galactic did with Branson.

And remember how Kim Brady was all up in arms on the witness stand?  He was going wild about retail investors, and he acted like retail investors were toxic.  Well, Trevor didn't want to get retail investors because he was running a scheme.  Take a look at Defense Exhibit 518.  This is from one Nikola board member, Jeff Ubben, to Trevor and Steve Girsky, other board members.  Branson got a retail following.  We should aspire for Trevor to do the same.  So the whole idea that Trevor was running around targeting retail investors is bull.  It came from two directors.

Remember when the government showed you this, and I

think they showed it in their summation, this is Trevor on TV at Fox talking to I think Maria Bartiromo.  Well, the government wanted you to think that Trevor was out there on TV all alone, out of control, showing off this Nikola One, doing his thing against the views of everybody in the company.  But that was a distorted view.  Here's what they didn't show you.  Trevor was not there alone at that interview.  He was there as part of the Virgin Galactic/Branson marketing plan recommended by the board, and he was sitting there with Jeff Ubben, a Nikola board member and an investor and the guy who eventually sold -- bought some stock from Trevor.

The government completely distorted this story.  They didn't show you that Trevor was in lockstep, side by side with the company.  He was not out there running amok.  But they only show you the part of this that helped them.

Think about that kind of trickery when you go back to deliberate.  You have to ask yourself what else did the government not show us?  Just the retail investors thing?  Just the distorted video clip?  Can I trust the government's evidence when they don't show me things like this?  Did it really happen that way?  That's got to give you reasonable doubt about what you have been seeing.

Now, this business combination with Vecto wasn't finalized until June 4 and that's an important point in the case, so let me be clear about this because the government's

bent over backwards to distort it.

From March 2020 to June 2020, Nikola and Vecto were separate companies.  Brady said it.  Russell said it.  Professor Ferrell said it.  So whatever happened before June 4 had nothing to do with any retail investors.  Before June 4, there was no NKLA stock.  No such thing existed.

Now, the government showed you some tweets about Nikola and -- or NKLA and Vecto and, for me -- and I think they showed them during their summation.  They want you to draw the conclusion that Trevor believed that the merger between Nikola and Vecto was a done deal.  I suggest these show you reasonable doubt.  How come?  They say, well, it was a done deal that the merger was happening, but look at Trevor's language.  Trevor says, on the left side:  This will all happen after completion of the merger, not a done deal.

On the right-hand side, Trevor talks about the vote being planned.  Obviously there is a vote to determine whether this is going to happen.  So you can read these the government's way, you can read them our way, but if you can read them both ways, that's reasonable doubt.

Now, one more thing about the private company period of Nikola before they went public.  That's when Trevor sold some of his private stock, right?  He sold about $70 million to SPAC investors, he sold about $20 million to Jeff Ubben, and he sold $5 million to another private company or thereabouts and

he made $95 million.  Now, is that a hell of a lot of money?  Yeah.  That's a ton of money.  But you know what else?  It was also 100 percent legal, lawful, and legitimate, and it was approved by the board of Vecto and by the board of Nikola and it was disclosed to the SEC and it was announced to the rest of the world.  And most importantly, it had nothing to do with trading or NASDAQ.  The money didn't come from any retail investors, it didn't come from Schonberger.  It didn't come from Ryan.  Russell told you that.  Brady told you that.  The SEC filings tell you that.  There is no dispute.

So let me be clear.  Trevor Milton's money did not come from any fraud scheme.  Even the government agrees with that.  And the government charts that they showed you in summation and with Agent Penland that showed bazillions of dollars going up and up and up, those were arts and crafts projects that were created in the U.S. Attorney's office.  Even the agent said they did not reflect the actual cash he had.  Those were just inflated art projects.

The government's theory actually gets crazier, though, because if Trevor wanted to pump up the price like they say in the summer of 2020, it would have been ridiculous because he couldn't even sell any of his own shares.  Remember you kept hearing about the lock-up?  Trevor's shares were restricted.  He could not sell them until December 2020.  So they have distorted the terms of that lock-up.  There was no way he could

make money selling his shares.

The final terms of the lock-up are in DX 732. Couldn't sell it even if he wanted to.  So there would be no reason for him to pump up the price to try to sell stock that he couldn't sell.

By the way, even at the time he could sell it, it couldn't have really vested at least in terms of his bonuses for three years.  So it could have been a teeny tiny percentage even if he could sell or cash in his bonuses.  The government's theory about motive and money makes no sense.

Now let's get to what happens in the September part of 2020 which you know about, the Hindenburg Report, and I have got a ton to say about the Hindenburg Report and I'm going to get excited about it.

You know what happens.  The Hindenburg Report comes out.  Nikola's stock gets backed by short sellers.  They are spreading rumors.  They are spreading lies.  They drive the price down so they can make themselves rich.  That's what Paul Lackey did, which is why, by the way, why you should call his testimony nonsense.

But putting that aside, what happened when the Hindenburg Report came out?  Right?  What was the reaction inside of Nikola when the Hindenburg Report came out?  Were they, like, uh-oh, Trevor.  You know, you had it coming to you. We told you that this Hindenburg Report's going to come and the

chickens are coming home to roost and we better go call the U.S. Attorney's office because of all of your fraudulent lies? That's not even close to what happened. Nobody said anything like that. In fact, they said just the opposite.

Kim Brady stood up, went to a banking conference, and spoke the truth. He said the Hindenburg Report was a hit job and a hack job and a character assassination on Trevor Milton. They defended Milton and they stood by him.

But that's not what happened when they came into this courtroom. When the Nikola witnesses came into this courtroom they rewrote history, they changed their tune, they distorted the facts, they ran away from Trevor, and they made it sound like Trevor was off on his own and he was going against their advice and he had it coming with the Hindenburg Report.

So you need to ask yourselves why did Nikola defend Trevor when Hindenburg came out and why did they turn on him when they came into this courtroom? And the answer is perfectly obvious. It's because Nikola got a subpoena from these prosecutors and the subpoena showed that Nikola was being investigated by the government. And if you are being investigated by the government and you want them to go away, you go along with what the government wants. You say what the government wants. You cooperate the way the government wants. And that's exactly what Nikola and its employees did.

Now, am I saying that all of the Nikola witnesses are

dirty little liars?  No.  I'm not saying that.  But if you look at what they were saying and doing back in 2020, not after they got a government subpoena, but at the time, at the time they were booking Trevor for interviews, at the time they were following his tweets, at the time they were tracking his followers and his listeners, and at the time they were telling Trevor what a great job he was doing every time he went out there, every time he was on a podcast or an interview.  Great job, Trevor.  Good job, Trevor.  Nice job, Trevor.  I don't see how that could have gone better, Trevor.  Well handled, Trevor. Over and over and over again that's what Trevor is hearing from his mentors, that's what he is hearing from his advisors, that's what he is hearing from Nikola's leaders, and that's what is informing and influencing and impacting his state of mind.  He is being told he is doing great, no problems.

So at the time why is he supposed think he is doing anything wrong when they are cheering him on?  At the time that says to Trevor in a big, loud way:  You are all good, bro. It's terrific.  Keep it up.  There is nothing wrong.

Now why won't they own what they were saying at that time when they came into the courtroom?  And what are you going to believe?  What's more credible?  What they said at the time in the moment or what they said after they got a government subpoena and wanted the government to go away and please them?

Now, ladies and gentlemen, if you think there is any

doubt, and I want you to, like, sit up and look at this, because this is mind-blowing, if you think there is any doubt that the Nikola witnesses were trying to please the government, I want to take you to the testimony of Stephanie Amzallag. Stephanie Amzallag answered all the government questions on the witness stand. She recalled everything. She had a perfect memory. If you look back at her testimony, you will see she never said to the government "I don't recall" or "I don't remember."

But all of a sudden when we cross-examined her about the exact same topics, she went blank. She got amnesia. She couldn't remember anything about anything. When we questioned her, she said "I don't know" or "I don't recall" 63 times. 63 times. 63 times "I don't know," "I don't remember" when we asked her; zero times when the government spoke to her. If that's not trying to help the government and hurt Trevor, I don't know what it is.

Oh, I actually do know what is. Take a look at Dale Prows. He was even worse. Dale Prows told the government two times when they were talking to him "I don't know" or "I don't remember." When we cross-examined him, Dale Prows said "I don't know" or "I don't recall" 140 times. 140 times. That's crooked. That's just flat out crooked. See if the government can explain that away, because that tells you exactly what you need to know about how the Nikola witnesses distorted their

testimony to please the government.

And ladies and gentlemen, when witnesses change their stories, or all of a sudden they can't remember or all of a sudden they have amnesia, that should cause you major doubts about the integrity of the proof in this case.  That kind of distortion is enough for you to sweep this whole case right out the door.

Now, I want to touch on the same three topics that Ms. Estes touched on—hydrogen, truck reservations, and the Badger.  But I want to show you that everything Trevor said about those three categories was informed and influenced by everything he saw going on around him and everything he heard from the people around him, and that gave him a good-faith basis for everything he was saying.

So did Trevor have a good-faith basis for what he was saying about hydrogen?  The evidence says yes.  He was watching the business model being carried out.  He was hearing the business model being carried out.  And that gave him a good-faith basis for what he was saying.

So think about what was in Trevor's mind about hydrogen.  First, Trevor knew hydrogen was part of the big Nikola business plan since 2016.  Trevor knew Nikola had hydrogen fuel cell trucks since 2019.  He knew Dale Prows was running a department of 40 hydrogen specialists.  He knew Nikola built a hydrogen demonstration station that Mark

Russell, right, the lead Boy Scout, Mark Russell is showing off to Wall Street analysts.  Trevor knew Nikola was in communication with power suppliers about electricity prices. Trevor certainly knew that the Nikola board approved $30 million worth of electrolyzer purchases to make hydrogen at Nikola stations, and if there is anybody here who thinks Kim Brady was going to let $30 million go out the door without them really doing hydrogen, I would disagree with that.  The guy seemed like he was a pretty good steward of the money.  He wasn't going to let $30 million go out the door if they weren't really doing hydrogen.  So obviously they were.  It wasn't just thin air and nonsense talk about Trevor.

Now, what about the price of hydrogen?  You heard from government witnesses and you saw in documents that Nikola had gotten the model down around or under $4 a kilogram.  That was all over the place, and that's all what Trevor saw.  That's all what informed Trevor's state of mind.  It was in due diligence documents.  It was in analyst presentations.  It was in the quarterly earnings call that you heard.  $4 a kilogram was everywhere and it accurately reflected the model.

Here's Dale Prows saying:  Were you able to produce hydrogen in 2020?  For $2.47 a kilogram under the model.

Here's Kim Brady saying $4 a kilogram.

Here's Mark Russell saying $4 a kilogram and even lower.

Mad2Mil3                      Summation - Mr. Mukasey

And here's the company itself in an SEC filing or an analyst day presentation saying $2.47 a kilogram.

So everywhere Trevor looked, everything he read, everything he saw showed that they could do it at $4 a kilogram.  All those statements informed his knowledge, all those statements impacted his state of mind, all those statements gave him a good-faith basis for what he was saying.

(Continued on next page)

MR. MUKASEY:  Now, again, did he sometimes fall into the wrong grammar tense talking about hydrogen?  Yes.  The government played that Autoline podcast for you.  Let me tell you this.  In that Autoline podcast, he also made very clear that hydrogen stations were two years away from coming online. Listen to this.

(audio played)

MR. MUKASEY:  So, what do you think it says when on the one hand he says that we are doing it in the present and two minutes later, five minutes later he says it's not coming online for two years?  Do you think it is an intentional fraud scheme?  Do fraudsters tell the truth in the middle of an interview or do you think it is more likely, common sense, do you think human experience would tell you it was poor syntax, it is a slip of the tongue, it was miscommunication?  But no fraudster says we are doing it now but it's not going to be ready for two years.  You can't say both, have it both ways. That's reasonable doubt.

Members of the jury, there is not a shred of evidence in this record that not a single person at Nikola ever told Trevor that the way he spoke about hydrogen was wrong or false or illegal or criminal and that's why he had a good faith basis for saying what he said.

Now let's talk about the Badger because this gets really wild.  The Badger distortions started from the day

Mr. Roos stood up and gave his opening statement. The government promised in their opening statement that you would hear during this case from Nikola engineers who supposedly told Trevor some mysterious truth about the Badger. Question, ladies and gentlemen: How many Nikola engineers talking about the Badger did you hear from in this trial? The answer is zero. Not one. You heard from a Nikola pencil-drawing designer about it and you heard from the General Motors engineer but you did not hear from any Nikola engineers in this trial. Now, there is a lot of reasons why this Badger fraud scheme doesn't make sense from the get-go. First you heard Brendan Babiarz. He told you he designed a pickup truck for Trevor in 2018. So the idea that the Badger was part of some scheme that was hatched in 2019 makes no sense.

Second, think about why Trevor tweeted in the first place about the Badger. The government showed you the tweet but I ask you to take a closer look at it. The Badger tweet wasn't part of some fraud plan. The Badger tweet was because Elon Musk treated about some you dumb ugly cyber truck that he was making. And Trevor said, hey, we can make a cooler truck. Elon, if you want to use our design, go ahead. He was just ragging on Elon Musk, he was busting on Elon Musk. That's not a fraudulent intent, that's a business, competitive, promotion, entertainment intent.

Third, after they tweeted about the Badger, people on

Twitter thought it was cool.  People thought it was a sweet looking truck and Trevor was, like, hey people wanted to make a pickup truck so let's make a pickup truck.  He didn't think people wanted to make a pickup truck so let's start a fraud scheme.  That's ridiculous too.

And here is the fourth reason.  The government wants you to believe that somehow Trevor was acting alone.  They showed you all these tweets and all these e-mails and all these communications about the Badger.  Well, the company went along with the Badger.  Trevor did the Badger the right way.  He took the Badger to the board, he took the plan to each and every member of the board, they voted unanimously to approve it, they got behind it, they voted on it, they approved it, and they funded it.  The whole company was behind the Badger.  Does it matter, by the way, that Kim Brady was upset that it was going to cost a lot of money or Brendan Babiarz thought it was silly to have a water fountain in it?  Truth is, who cares.  It is a business disagreement.  He could have put a popcorn machine in there and painted it purple and only given it one wheel. That's the business decision that the board approves.  Not everybody has to agree and it is not a crime because you want to put a water fountain in a truck and make it cute.  That's just not fraud.

Now, the government claims that the Badger was just a rendering and drawing and a bunch of plans.  I want to make one

thing clear.  The plan from the very start was for Nikola to build Badger prototypes.  Prototypes.  Examples.  Like a first draft.  Like a model that you show off at a car show.  You don't go into a car show and buy a car and Nikola wasn't putting these things out on the showroom floor so everybody in the suburbs could go buy them.  They were making prototypes and the OEM that they were looking for was going to actually make the production vehicles, actually produce them, actually put them out on the assembly line and roll them out for sale. That's not what Trevor was talking about.

Now, let me say this again.  When Trevor spoke about the Badger in 2020 he was talking about prototype models.  Now, was it just a plan and a bunch of drawings?  That's a distortion.  It was not only a plan because we showed you evidence that Trevor got simulations telling him about Badger's maximum speed, Badger's performance capabilities, Badger's torque, Badger's zero to 100 miles an hour numbers.  Now, it also told you how Badger would perform in different conditions. Remember, this isn't gobbledygook on a computer because, remember, Mark Russell said software is critical, software is everything when building trucks, especially electronic trucks, so software is how these are built.  And that's what Brendan Babiarz says which I am going to get to in a second.  It wasn't only plans because they also engaged partners to work on design and engineering, technosports and e-tail design.  And it wasn't

only plans because the engineering team at Nikola flew to Italy for Badger development. It wasn't only plans because the marketing team was getting ready to show the Badger off at NikolaWorld. And it wasn't only plans because the finance team started taking Badger reservations. And even Ms. Estes said there was nothing illegal about that. It wasn't only plans because the board approved a deal with GM eventually to mass produce the Badger. So that's a whole lot more than just plans. That's what Trevor saw, that's what Trevor heard, and that's what was in Trevor's mind when he talked about the Badger. And that tweet where Trevor said when it is going to be produced and he said already, well, that's because all these things were going on, they were already producing the prototypes.

Now, the government also pays a lot of attention to grammar and word games when it comes to the Badger and they fixate on Trevor saying it was built from a clean sheet from the ground up, like those are somehow, you know, poisonous, toxic statements to say about a truck. Let's start with the world "built." Russell told you software development is a huge, huge part of building a truck. The Badger, just to be clear, was built in two ways. It was built on the computer and it eventually was built with nuts and bolts and sheet metal and glass and tires and it is actually sitting in the Nikola lobby right now, you just saw a picture of it. But if that's not

enough to cause the government's built case to go down, go back and look at the transcript and see when the government's own witness, Brendan Babiarz, he sat here and he used the term "built" in two ways. He said this. He said: Essentially this truck is all built in the computer. And then he said we built specific e-axles and motors for this truck so built can be built in the computer and built physically.

And, by the way, in terms of the timing, Badger being ready for NikolaWorld, the government didn't tell you that NikolaWorld 2020 was postponed from September to December not because of a fraud scheme, not because the trucks weren't ready -- because of COVID. And by December 2020 the trucks were ready, just like Trevor said.

Now, what about this nonsense about clean sheet ground-up? Is using those kinds of terms fraudulent? Russell and Babiarz told you that using a donor vehicle doesn't destroy something from being called clean sheet ground-up. And also that donor vehicle is not some sort of criminal act. Using donor parts is a normal part of vehicle development. There is nothing fraudulent about that. And using Ford parts by the way, if you go back and read the testimony of Babiarz, using Ford parts just to get the glass and the sheet metal, it wasn't even Trevor's idea. The testimony says it came from Ron Johnson, another Nikola engineer who, by the way, was never called to testify in this case. So, using Ford parts as donor

parts not only was not illegal, it wasn't even Trevor's idea, it was Ron Johnson's idea.

Now, it is also not like Nikola took a Ford truck, painted a big N on it and called it a Badger.  That's not what happened.  Babiarz told you that Nikola dismantled, stretched, and modified 95 percent of the Ford parts.  The Ford, as I say, was just a way to get metal and glass on a quick and cheap basis but, in the end, the Badger prototype had a totally different type of suspension, totally different type of power, it was a totally different type of design, it was a totally different type of truck, and even the GM guy said it was Nikola's DNA.

MS. ESTES:  Objection.

THE COURT:  Overruled.

MR. MUKASEY:  So, when Trevor used the term ground-up or clean sheet, it wasn't to trick anyone, those aren't magic words in the trucking industry.  Common people say I built my house from the ground up.  That doesn't mean you manufactured the dishwasher and every single pipe.  People say the Mets built their team from the ground up.  That doesn't mean the manager raised the players from nursery school.  It's a common colloquial usage.  By the way, Russell, when he testified, said something can be clean sheet even if they're using someone else's parts.  And the GM guy Damman said you can get parts from suppliers.  And Marc Schonberg, he said ground-up meant

owning the design like Tesla does, even though he is actually wrong about that. And Nikola itself, the company said ground-up in SEC filings, even when they were working with a partner they called it building it from the ground up. With assistance, we imagined the power train from the ground-up.

By the way, at the end of the day, who really gives a hoot that this is called clean sheet or ground-up? If OEM was going to manufacture the Badgers with their own parts. So, who cares about how the prototype was built.

So these are normal, regular, everyday terms. This is what Trevor was hearing, this is what Trevor was seeing, these are the plans that were happening. There is not a shred of evidence in the record that suggests that anybody at Nikola told Trevor the way he was speaking about the Badger was illegal, the way he was speaking about the Badger was wrong, he should stop talking about the Badger that way and therefore he had a good faith basis for everything he said about the Badger.

Now I'm going to go to truck reservations which is going to be pretty quick. Did Trevor speak with good faith basis on truck reservations? First of all -- and truck order and the billions in revenue? First of all, the company was all over the map in the way they called these orders. Here are the terms they used. They called them value, lease, pre-orders, revenue, backlog, hard reservations, orders, realizable value. There is a whole bunch of other ones that are in the transcript

as well.  That would be impossible for anybody in a TV interview to explain quickly.  But, if you start from the basics, pretty simple.  The company had trucks, they were taking reservations for the trucks, they were taking contracts and these are the semi trucks, by the way.  The contracts were signed by both parties.  So what is so crazy about calling them binding contracts?  Two sides sign them, they're a legal document, there is no dispute that the amount of the contracts were in the billions.

Take a look at this e-mail.  If you are concerned about revenue and what Trevor was saying about billions in revenue, look at what Trevor was seeing, look at what was impacting Trevor.  This is the chief legal officer and the CEO talking about Nikola's reservations.  Total value $14 billion.  Will result in approximately $14 billion in revenues.  So the bottom line is what Trevor was saying about revenue was consistent with what the company was saying about revenue.  It was informed by what the company was saying about revenue.  And Trevor trying to explain it in shorthand like an accountant or a legal professor or bookkeeper is holding him to a standard that's not normal in a business setting.

Now, what about Schonberger and Ryan.  They talked about revenue and orders.  But you know what?  Nothing they said changes the game.  There wasn't a single tweet about semi truck reservations.  And the one podcast clip that the

government kept playing for you from this week in startups, there was about a 60 second clip that they played for you but the full long podcast was 4,500 seconds.  That's the government's whole case on reservations, 60 seconds.  Schonberg said those 60 seconds were important to him but see if that's really believable.  That 60 seconds aired five weeks before he invested.  He couldn't even name the podcast when he heard it here in court and he bought Nikola stock on September 8, the day the GM deal was announced.  So what is more likely?  That he bought Nikola stock because of the GM deal or because of some 60 seconds of a podcast five weeks before he invested he couldn't even remember.  That's pretty simple.  He didn't buy because of anything Trevor said.

The government played that exact same 60 seconds because that's all they got for Ryan and this is what Ryan said about that podcast and reservations:  I don't recall seeing this specific clip.  I probably read in some sort of transcript or article that summarized this clip or a similar clip.  That is dripping with reasonable doubt.  You can't possibly be more vague, more unspecific, and more unsure, and you can't convict somebody on testimony like that beyond a reasonable doubt.  Because I think maybe I saw it possibly on this or something like this is all reasonable doubt.

Now, if there is any doubt in your mind that reservations are not important I want you to take a look not at

what I am saying, take a look at what Kim Brady said about reservations. Overall reservations, frankly, is not -- and this is 1601 -- go back and look at DX 1601 and that's where Kim Brady says: Overall reservations is, frankly, not an important driver of valuation. That's why there is not a shred of proof in this record that a single person at Nikola ever told Trevor that what he was saying about reservations or orders was wrong or false or criminal or illegal because Trevor spoke with a good faith basis on it. And now it's time, and I know you have been waiting for it, for the Tesla charts podcast.

The government made a huge deal about this Tesla Charts podcast. Ms. Fretheim testified about it, they talked about it in their opening, they talked about it in the summation, and it is true that Elizabeth Fretheim did write up a whole list of concerns but this whole Tesla charts thing is going to blow up right in the government's face and I'm going to show you.

Fretheim said she heard the podcast and reported her concerns up the chain of command but she never told Trevor about her concerns. She said she told Russell and relied on Russell to a take action. And when Russell testified, he said he never even bothered to raise the topic with Trevor. And Kim Brady said the same thing, he never raised it with Trevor. So, what does that tell you? Think about this. Russell and Brady

are the two highest-ranking most experienced guys at Nikola. Mark Russell is a lawyer and businessman and Kim Brady has financial licenses up the wazoo. They're sophisticated guys. They're good guys. They're the two guys that have to certify documents to the SEC. They're the two guys who have to report misconduct to regulators and they're the two guys with the most day-to-day impact on Trevor and neither one of them said a word to Trevor about the Tesla charts podcast or Fretheim's concerns. Neither one of them told Trevor that they had concerns, neither one of them told Trevor that he made statements or thought he made misstatements on the podcast, neither one of them reported his conduct to the SEC, the authority, that's for sure. Why is this so critical? It is critical because of the impact it had on Trevor's state of mind. As far as Trevor knew, Tesla Charts was all good. As far as Trevor knew, everyone understood he was talking about the business model. If nobody comes to him and relays their concerns, why is he supposed to think he was doing anything wrong? If Fretheim doesn't say anything to him and Russell doesn't say anything to him and Brady doesn't say anything to him, doesn't that send him a big message that the way he is speaking about the model is just fine? He is all good, no negative feedback. No concerns, no red lights, not even a yellow light. And if the people he relies on say nothing, that gives Trevor a 1,000 percent good faith basis to think what he

is saying is perfectly fine.  Their silence delivered a message and it was a loud and clear message:  There is no problem here at all with what you are saying.

And, by the way, the public relations team left the Tesla Charts podcast up on the company website but it gets crazier because the hydrogen team actually went to listen to the Tesla Charts podcast and said, yeah, we have to get behind Trevor's vision.  All that says to Trevor in a big, loud way is you are doing great, keep it up, there is nothing wrong.  Keep going out there and saying similar things.

There is another takeaway here, too.  You should ask yourselves when you go to deliberate why neither Russell nor Brady, nor any other person who worked at Nikola, ever went to Trevor about this podcast or any other podcast.  And it is like a blinding flash of the obvious:  They didn't go to Trevor because they didn't think what he was saying was intentional or bad or designed to cause harm.  They didn't call out any misconduct because they never saw misconduct because there was no misconduct.

And while we are on the subject of feedback affecting Trevor's state of mind, two weeks after this Tesla Charts podcast, Trevor was on Barron's Roundtable and he got this e-mail copied to Russell, copied to Brady:  Nice job Trevor. Two weeks after the Tesla Charts podcast.  The positive feedback never stopped, not even after Tesla Charts.

But now you hear the Nikola witnesses come into the courtroom.  As I said, they were so upset, they told him he shouldn't be tweeting and supposedly had a group intervention when they told him to stop.  No dates, no times, no places, no specifics at all.  Think about that compared to what you have seen in this courtroom over the last four weeks.  Everything at Nikola is documented, text messages, notes, documents, e-mails, transcripts, letters, memos, reports, and so on and so on.  Every little thing at that company was documented, everything was written down, everything was memorialized except this supposed intervention.  There is not a single record of any letter or memo or text or e-mail going to Trevor warning him about his public statements or telling him he was right violating the law.  All of a sudden the most important things, they're not written down anywhere.  The things that everyone says they were so concerned about, there is no record telling Trevor about it.  That means, ladies and gentlemen, you have to seriously doubt whether there even was any kind of intervention here.  And here is the last thing about Tesla Charts.  And the only way I can say this is it's a shock to me that the government didn't play this.  The Tesla Charts podcast, here is the beginning of the Tesla chats podcast.

(audio played)

MR. MUKASEY:  So, that's basically a clown saying this podcast is for entertainment purposes only, do your own

research.  And is he saying it in sort of a funny, lighthearted, clownish voice.  You can look at the pictures here.  That tells you everything you need to know about the Tesla Charts podcast, it was for entertainment and investors were supposed to do their own research.  And when the government hides that kind of information from you, you can be sure you are getting a distorted version of the evidence and you should reject it.

Now I want to spend a couple minutes talking about materiality.  The government has to prove, obviously, that the statements that Trevor made that he supposedly misrepresented were material -- and Judge Ramos is going to give the perfect instructions, but I can tell you that I think he is going to instruct you, you have to decide whether a reasonable investor would have considered the fact of an important decision in light of the mix of the publicly available information.  And any discussion of materiality and any discussion of the reasonable investor and the total mix of information has to start with the SEC filings -- and you are probably bored of hearing from SEC filings so let me sum them up this way.

SEC filings aren't just part of the total mix of information that an investor can go to to learn about a company.  They are, hands down, without question, no doubt the most important source of information about every public company in America.  That's why every single public company in America

has to file them, that's why they have to be true and accurate under the law, that's why any member of the public can review them for free on the SEC website with one click of a mouse, it costs nothing, and that's why Nikola's own website links to the SEC filings and that's why Robinhood and Reddit also link to the SEC filing.

So, no matter who you are, no matter what your background, no matter how much you have to invest or how little you have to invest, the SEC filings are the most accessible, most accurate, most reliable, most trustworthy place to go to learn about a company.  Reasonable investors do their homework and SEC filings are like materiality 101.  Whether you want to invest in Nikola, Nike, or Apple, or Tesla, the SEC filings make full disclosure.

The SEC filings are super important, by the way, to retail investors that you heard so much about because they level the playing field and they give retail investors the same amount and the same information that the big time investors get.  We know in this case, ad nauseam, Nikola made a ton of SEC filings, they are DX 7, 332, 34, 35, etc.  Most importantly, they laid out 30 pages of risks -- 30 pages of risks -- so there is no dispute full disclosure was made by Nikola.  So, if an investor decides not to read the SEC filings it is not on Nikola and it is not on Trevor, it is on the investor.  And this is where the government's case truly and

really unravels because when you go back to deliberate, you should ask yourselves, how could a statement for an omission of Trevor's be materially misleading when all the material information is already out there in the SEC filings?  How can there be a fraud if all the facts have already been disclosed in the filings?  All the people had to do was read them.

Now, does that mean I am saying that a CEO can run around and intentionally deceive people because the SEC filings cover his back?  Absolutely not.  But it does mean that there is certainly new intent to defraud where Trevor knows investors have access to the full disclosures.  Trevor actually pointed people to the SEC filings.  So, his knowledge and his belief that investors had access to all the facts shows that he didn't intend to commit fraud.

Now, think about whether any of Trevor's tweets or podcasts really would have mattered to anybody.  In light of all the information out there, do you seriously think that some random sentence from the Autoline after start-ups podcast or whatever it is called or some tweet that was shared zero times is really important?  Really?  Compared to the SEC filings?  That's just wrong.  The answer is that what Trevor said in some random podcast or tweet that nobody even watches or liked or saw just wasn't important.

That brings us to Ryan and Schonberger.  Look, Ryan and Schonberger seem like nice dudes but the government's case

with regard to Ryan and Schonberger gets even more mixed up.

The government asked each of them:  Would that have been important to you Mr. Ryan, Mr. Schonberger?  This factor?  That factor?  That's the wrong question.  The right question is whether any of the tweets or podcasts that they claim they saw but couldn't name or remember would have been important to them in light of the total mix of information that was out there, that was publicly available.  The government never asked Ryan and Schonberger, would this have been important to you in light of all the other information that was out there?  That's what you need to show materiality.  And without an answer to that question you can acquit, you can vote not guilty because there is no materiality shown.

And, by the way, the idea that Ryan and Schonberger were duped by the government is another crazy distortion and I want to take you back to something the government said in their opening statement -- and stay with me because I'm moving as fast as I can, I have got some other good highlights to hit and then I will sit down -- this is what the government said in their opening statement about Ryan and Schonberger:  The defendant targeted people who are new to investing.  People who are new to investing?  That's not even a distortion, that's a flat out lie.  Ryan has a degree in finance and was a professional trader.  Schonberger told you he has been investing for 35 years.  They're not beginners.  They knew

investing in a pre-revenue company was risky, they knew the SEC filings were out there, and they chose to ignore them and that's not reasonable investor behavior.

Now, the government somehow claims it was all Trevor Milton but when you look at when Ryan and Schonberger invested, how they invested and what they said about their investments, you will see that's a distortion.  Let me start with Schonberger and I will be quick.

Schonberger said he heard Trevor say it was built from the ground up and it would have been important to him to know that Nikola used a Ford for the Badger.  But, first of all, they didn't use a Ford for the Badger but the government spoon-fed that answer to him in the U.S. attorneys office in their prep session but they didn't even bother to tell him that using donor vehicles is industry standard and totally cool, or that Nikola modified the Ford platform by 95 percent, or the differences between the Badger and Ford and that production vehicles were always going to use OEM parts anyway. Schonberger didn't know any of that but he certainly was coached by the government to say it was important to him.

By the way, built from the ground up was really important to Marc Schonberger.  He probably wouldn't be driving the Tesla because he didn't know that the Tesla he bought was built on a Lotus chassis.

Now, Ryan's story is equally dubious.  Ryan was a day

trader.  Remember what a day trader is?  Somebody who is making trades all day long, in and out.  Every time they see a stock go up they sell, every time it goes down they buy.  He was a day trader and the guy talked about a day when he made a trade every four and a half minutes I think it was -- a trade every four and a half minutes.  Now, there is nothing wrong with being a day trader but don't try to tell me that making a trade every four and a half minutes is because you are talking to Trevor Milton or listening to Trevor Milton.  Right?  Milton wasn't even saying anything during that time.  But the governments says that Ryan stopped gambling as a day trader and all of a sudden started paying very close attention to statements that Trevor made that Ryan couldn't even recall.  Ryan supposedly changed his trading strategy because Trevor said some important stuff but he can't remember what stuff, remember what truck he saw or when or where or what Trevor said about the cost of hydrogen or what he said about reservations.

And the best Ryan and Schonberger could say is -- summarizing their testimony, look at it together -- they maybe might have possibly probably, somewhere in a summary potentially seen it or something similar to what the government played for them in court.  That is not proof of a convincing character, that is dripping with reasonable doubt.

Now, it actually says here in my outline talk a little bit about Professor Mayzlin.  I'm not going to talk about

MAD5mil4                         Summation – Mr. Mukasey

Professor Mayzlin because the government walked away from Professor Mayzlin. And you didn't hear anything and that's because she told you stuff spreads on the Internet. Like, my 8-year-old nephew knows that. And sometimes things go around the Internet and they go where you don't want them to go. OK? I don't think you guys needed an expert to hear that. She used a lot of memes, Professor Ferrell used math. Pick which one you think is more reliable. At the end of the day, Mayzlin didn't even connect anything Trevor said to any purchase of any stock so I think we can say thank you and good riddance to Professor Mayzlin.

Let's talk about Ferrell for a second. Professor Ferrell looked at all the trading and all of Trevor's statements during the relevant time period and conducted economic studies and talked about how the market behaved in response to his statements, and the truth is that he found that when Trevor spoke, the stock price didn't move in any statistically significant way. It might look like it moved if you zoom in and look at the ups and the downs the way the government charted it but if you zoom out and you look at how the stock price of similar companies moved and how the rest of the stock market moved, Ferrell told you there was no meaningful move in the Nikola stock price because of Trevor's statements. At the end of the day, as far as investors were concerned, Trevor's statements kind of fell on deaf ears.

Now why does it matter at all what Nikola's stock price did or what the market did? Why should you even care about it? You should care about it because Nikola's stock price in the NASDAQ reflects the consensus view of all investors. It reflects what reasonable or mainstream investors did with the information that was publicly available about Nikola. If information was important then it would move the stock price up or down. If the stock price didn't move then the information just wasn't important to the market.

Now, remember those calendars Ferrell used? Nikola's stock was available to the public on 83 days between June 3rd, 2020 and September 30th, 2020. On 72 of those days Nikola stock moved the way the rest of the market moved, either with the market generally or the market for electric vehicles which is Nikola's industry. So there were only 11 days when Nikola's stock behaved differently from the rest of the market. And you know what? On six of those days Nikola's stock actually went down. So, if the stock is going down, that doesn't seem like a real good scheme to pump the stock up. Right? And for the five days where Nikola was actually behaving differently than the market in going up, that movement, according to Ferrell, wasn't because of anything Trevor said, there worth reasons, other information that was publicly available that caused the stock to go up. There were positive forces by JP Morgan and Deutsche Bank and other analysts. There was positive news when

a GM deal was announced.

So, the stock didn't go up those days because of anything that Trevor said, because of Trevor's statements. According to Ferrell his statements at issue were not important to the market.  That conclusion alone means there is no materiality here.  That statement alone means you have to acquit because the government hasn't proven beyond a reasonable doubt materiality.

Now, even if Vecto and Nikola could be considered the same company in March 2020 his analysis didn't change.  No effect.

And there is one other point on stock price movement. You would think if Trevor was out there making a bunch of false statements that when Nikola filed its prospectus on July 17th, to 2020, the jig would have been up, right?  They would have called him out.  Everybody would have seen, uh-oh, Trevor has been out there making false statements, the stock price would have tanked.  Nothing happened.  Nothing happened.  In other words, the market didn't view the prospectus as correcting anything that Trevor has said.

Now, was anybody who bought Nikola stock harmed, did Trevor intend to deprive them of money?  Professor Ferrell also answered that question.  He said nobody was harmed because they got what they paid for.  They got shares of Nikola stock at a fair market price.  And the government hasn't shown a shred of

evidence that Nikola stock was overpriced or inflated based on Trevor's statements. To the contrary, Ferrell said that Trevor's statements didn't influence the stock price or inflate the stock price over time. Investors got what they paid for.

Before I get to the Nikola and Hicks I want to say one more thing about the concept of retail investors. Didn't you find that one of the themes that was running through the government's case was that average Joes, regular investors, retail investors are not smart enough or too lazy enough to read SEC filings? The U.S. government requires SEC filings so that people can read them and learn and so the market playing field can be level between the big guys and the retail investors. And Professor Mayzlin and Kim Brady sort of sounded like they thought Trevor shouldn't be talking to regular Joes because they were too stupid to read SEC filings. Consider, as you deliberate, whether that's an arrogant, condescending, and just sort of pompous disrespectful view of the average investor.

Now, the government loves, loves, loves talking about rolling the truck down the hill and Nikola One fully functioning so I'm going to wipe that out with a few comments.

The Nikola One was irrelevant. Not my words, Mark Russell's words. By the time you started in February 2019, Nikola One wasn't relevant? Answer, correct. By the time the company went public the Nikola One was irrelevant. Remember,

what was unveiled in 2016 was a prototype, a model, a first draft. Nobody said it was finished, nobody said it was ready for production on the showroom floor. Nobody said it was ready for sale. It did have a lot of work, parts, engineering, it did have a gear box but it was a prototype. And as for what Trevor said at the unveiling, well, the government distorted that too. They played a few minutes from a two-day-long event but in the parts we played for you, Trevor clearly explained the truck needed a complete redesign.

(video played)

MR. MUKASEY: The government left that part out and that was a marketing event, it was a promotional car show. Trevor was standing on stage in front of all these people from big companies who worked on the Nikola One, people from Meritor and Pratt & Miller, Ryder. They worked on the truck and knew about the truck and it is asinine to suggest they would have all stood there and watched and clapped while Trevor lied and committed a fraud. That makes no sense.

What about the commercial for the Nikola One? The in-motion video, it was straight up marketing and, again, it wasn't Trevor's idea. Phillips, the automotive company, came to Trevor and said, hey, we have a marketing idea. And the communications were with David Diaz, the director of marketing, and it was way before the company went public. But more importantly, the whole thing wasn't even Trevor's idea to begin

with, right?  As I said, it was Phillips' idea.  They used the outtakes, they made a commercial out of it.  By the way, it is certainly not a crime to use special effects in a commercial, otherwise the government would probably have to indict the Energizer Bunny.  The government is so righteous this whole case, so righteous about taking Trevor's words literally, right?  But if you take this testimony literally, if you take this commercial literally, the truck was in motion, it wasn't even false.

There is another reason that Nikola One couldn't be part of a scheme to defraud retail investors because there were no retail investors at the time of the unveiling or at the time of the in-motion video.  And it didn't become part of some scheme in 2020, they didn't double-down on it because by then the company advanced to Nikola two hydrogen-powered trucks.  Nikola One was irrelevant.  There were Nikola two hydrogen-powered rucks, there were videos then posted online, they were running under their own power on hydrogen, they did miles on the track, they did another video out in the desert, and they did a beer delivery in St. Louis to a hockey game for Anheuser-Busch.  So, by the time it went public, the Nikola One that the government is all hopped up about, the Nikola One was like an old typewriter or rotary telephone.  It was a historical artifact.  That's what the CEO Marc Russell said.

Now, a second about Paul Lackey, the government's

witness.  This is the guy who called himself, hiding behind some anonymous Twitter account, the Nikola insider.  Remember, he never worked for Nikola and hadn't been there for five years so he is really Nikola outsider.  Remember, this is a guy who was part of the Hindenburg group that spread lies and rumors about Trevor and Nikola and then made $600,000 when those lies and rumors drove down the price because he was a short seller.  Now he is standing outside the door of the SEC with his hand out waiting for a reward.  I suggest to you that Paul Lackey is really, like, kind of a guy who set Nikola's house on fire, then he won $600,000 on a bet that the house would burn down, and now he wants to collect a reward from the fire department for reporting the fire.  Everything that came out of Paul Lackey's mouth was about Paul Lackey, not about the truth.

And that leaves us with Peter Hicks and I was thinking of all of these ways to talk about Peter Hicks and I thought the easiest way is kind of like your high school cheer team.  I say "Peter Hicks," you say, "wants cash"  "Peter Hicks."  "Wants cash."  Peter Hicks, all he does is want cash.  So, every time I say Peter Hicks, you think:  Wants cash.

Now, did Peter Hicks come off to you like an innocent victim?  That's pretty laughable.  Peter Hicks is a multi-millionaire professional real estate investor, lawyer, who owns ski resorts, mountain ranges, and a property the size of Manhattan.  Did he seem like someone who got scammed?

Didn't he come off a little bit more like a cold, calculating, rich guy, lawyer wheeler-dealer, who just wants money?  And if he didn't seem like a victim it is because he isn't a victim and his victim testimony may have been the biggest distortion in the whole trial.

Trevor didn't intend to defraud Peter Hicks and let me give you a few reasons why.  First of all, Peter Hicks made a ton of money off Trevor Milton.  Hicks bought that Wasatch Ranch for $6.8 million and three months later he got 8.5 from Trevor for the ranch.  In other words, in three months he made $1.6 million and the government didn't even dispute that the $8.5 Trevor paid him was fair market value.  Peter Hicks' own valuation which he talked about, his valuation said his range is worth 8.4, Trevor gave him 8.5.  No fraud, no harm, just profit.  No crime.  That's not guilty on Count Four right there.  Peter Hicks won.

But, Peter Hicks also got stock options, right?  And he could exercise those options in December of 2020.  Remember, first Trevor offered him $7.5 in cash and 7.5 million in stock options.  Hicks, what did he do?  Wanted more cash.  So Trevor offered him 8.5 and he got 8.5 in stock options.  And he was winning.  Right?  All he wanted was cash.  Once he got the 8.5 he told you, he just wanted cash.  The stock options were like gravy.  They were like icing on the cake.  If they weren't anything, if they were worthless he still got the 8.5 he wanted

and still made a profit.  So, Peter wasn't defrauded by any phone call that Trevor Milton made to him about those options because nothing that Trevor said about Nikola was ever important, the cash was important to Peter Hicks.  He just wanted enough cash to make a big enough profit.

And Trevor could have said that Nikola's business was flying pink elephants to the moon and Peter Hicks wouldn't have given a darn about that, he just wanted the cash.  And when he got the options he figured, OK, maybe they expire worthless but maybe I make millions.  And remember, the price of Nikola's stock, the Nikola company wasn't important to him at all because the price was falling.  Nikola's price, according to the government's own chart, was going down from 80 to 40 during the period that Hicks was contemplating this deal so he wasn't upset about the stock price, he just wanted to make sure that his options could be exercised and he could make more money.  And he said or the government said -- I think they both said -- the options expired worthless.  Despite the fact that the options were gravy and he already got the cash he wanted, the options did not expire worthless.  Peter Hicks could have scored on those options 10 different times in December.

Remember, his strike price, the price he would pay is 16.50, so December 1, 2, 3, 4, 7, 8, 9, 10 -- he would have made about a million bucks extra had he sold on any of those days but he was too greedy, he wanted to wait, and so they

expired worthless but he still was a winner because he got 8.5 and then Trevor then sold him discounted stock and he made another 1.6 so now he is up $3.2 million on Trevor.  But, again, that still wasn't enough for Peter Hicks who wants cash.  So, he tried to sell another property to Trevor.  Hicks paid $4 million for that property, he asked Trevor buy it for $39 million -- $39 million -- or I'm going to sue you.  Trevor said no.  So Hicks filed a lawsuit in Utah against him for $45 million.

It's never enough for Peter Hicks.  And he came here to testify because he knows that if Trevor gets convicted in this case, he may win his $45 million in that case and it certainly would be easier.

So, there is no limit to what Peter Hicks wanted to score off Trevor Milton.  He won and it wasn't enough.  He won again and it wasn't enough so he tried blackmailing him and that wasn't enough.  Treating Peter Hicks as a victim is a distortion, he is actually more of a blood-sucking business bully and we should all be victims who make millions of dollars like Peter Hicks.

I have five minutes to go and this is what I want to say in my five minutes.

Mr. Milton, Chelsea, Trevor, it has been our whole team's honor to stand with you in this case and to fight for justice.  And ladies and gentlemen, it has been our honor to

stand in front of you as well.  We chose you all as jurors, every one of you, because we are confident that you are going to do your duty in accordance with the oath that you took way back in the beginning of this case to start your deliberations with the presumption that Trevor Milton is innocent.  And he is innocent as he sits here right now and he is innocent when you go back to deliberate.  And we know you will require the government to overcome that presumption and to make them prove their allegations beyond a reasonable doubt.

I told you in the opening, beyond a reasonable doubt is the highest standard we have in the law because this is the most serious kind of case we have in the law.  Every time you have heard a jury say "not guilty" it is because the government could not reach that high standard.  I can promise you that the decision you are going to make will be the most important decision that's ever going to happen to Trevor Milton in his life.  His life, his fate, his liberty, that's going to be in your hands.  His whole world is going to be in your hands.

Did Trevor Milton say some things where he used the wrong tense?  Or when he used the present instead of the future?  Yeah.  Sometimes he did.  But we are living in a day and age when everyone is on their phone and their Twitter and their Zoom and their TikTok and their Facebook 24 hours a day, so imagine the nightmare it is for Trevor at 40 years old to have his life hang in the balance because of some word choice

he made where sometimes he pressed send on his phone without making sure his grammar was on point.  Nobody wants to be judged that way because it is so easy for a prosecutor, five years later, to put it under a microscope and distort it.

Let me give you one final example of that.  Trevor tweeted 2,510 times.  2,510.  And the government only showed you 41 of them.  41, that's 1.6 percent.  That means 98.4 percent of what Trevor tweeted was perfectly fine.  And the government wants you to convict him of federal crimes because of 1.6 percent of what he tweeted?  Whether you think it is ridiculous that we are in a criminal case about tweeting, or whether you think it is horrifying that we are in a federal case about tweeting, that doesn't seem like justice.  A few seconds from a podcast or an interview where you don't know what he was asked before or what he said after?  That doesn't seem like justice either, that seems like a distortion of justice.

So you have to Judge Trevor Milton not by what flew from his fingertips on a tweet or what came out of his mouth in a podcast.  Judge him by what he was thinking in his head and what he was feeling in his heart, and if you want to know what was in Trevor's head and what was in Trevor's heart, remember what Mark Russell told you.  Mark Russell said Trevor was emotionally connected to Nikola.  Nikola was his creation, it was like his baby, it was like his child, and following the ups

and downs of your child and wanting to help your child and defending your child and bragging about your child and even exaggerating a little about your child, that's not deceiving, fraudulent; that's human and natural and a hundred percent innocent.  That's why nobody from Nikola took the stand and said Trevor Milton was mean-spirited, or nasty, or dishonest, or bad, or manipulative, or even greedy.  Nobody said it.  And I suspect they knew Trevor's words were coming from a place of emotion and connection and love for Nikola because it was like his child.  And Mark Russell said Trevor was courageous.  And isn't that what all parents are?  Courageous?  And I suspect those witnesses also knew there is no such thing as a perfect parent who says things exactly right all the time, like the parents I told you about in my opening statement who love and believe in their 5-year-old kid and he says my kid is going to Harvard.  Everybody understands that statement isn't literally true.  Everyone understands the kid isn't going to Harvard today but they love the kid, it's what they believe in good faith.  And who says something like that with fraud in their heart?  The same is true of Trevor.  The proof shows he loved Nikola.  He spoke in good faith.  And who sends an e-mail like this with fraud in their heart:  Get me a good SEC attorney to begin helping.  Who says that with fraud in their heart?  Here is Trevor Milton talking about the business model.

(audio file played)

MAD5mil4

MR. MUKASEY:  It's a distortion that Trevor Milton intended to defraud anyone.  We ask you to deliver a verdict, on all four counts, of not guilty.

THE COURT:  Thank you, Mr. Mukasey.

Ladies and gentlemen, before we get to the government's rebuttal summation we will take another 20-minute break.  Please come out prepared to begin at a quarter of 2:00.

(Continued on next page)

(Jury not present)

THE COURT:  20 minutes, folks.

MR. ROOS:  Your Honor?

THE COURT:  Yes.

MR. ROOS:  Just one thing.

There were a few things that Mr. Mukasey said that not only are legally incorrect but I think your Honor has instructions on, but we would like to ask that those instructions be given to the jury either before Mr. Podolsky closes or right after afterwards.  By tomorrow, sort of the context will have been lost.  I can tick through them.

The first was he suggested that because various executives have not been charged for tweeting, somehow the defendant is not guilty.  That's totally improper and inconsistent with the standard instruction of people not on trial.

He suggested that because the government did not call certain engineers we haven't met our burden of proof.  That's inconsistent with the law and equally available witnesses.

The instruction that he suggested to the jury on total misinformation is not what your Honor is going to instruct.  He said no harm to these people or no harm to Hicks means not guilty.  Again, that is inconsistent with the instructions.

So I think there are several things that would be appropriate to just tell the jury are not right.

MAD5mil4

MR. MUKASEY:  Judge, I told them that it's your words that control, not mine, and I was summarizing.

THE COURT:  And Mr. Podolsky can bake that into his rebuttal.  And I am hoping, Mr. Podolsky, that you will not go beyond 2:30.  You will have 45 minutes.

MR. PODOLSKY:  I think that will be fine.

THE COURT:  OK, folks.

(recess)

(Continued on next page)

THE COURT:  Ladies and gentlemen, at this point we will proceed with the government's rebuttal summation.

MR. PODOLSKY:  Thank you, your Honor, and good afternoon, everyone.

I'm glad to finally be able to speak directly to you, but this will be the last time that we speak, so let me just start by saying thank you—thank you all for returning after a 10-day hiatus, but most of all, thank you very much for paying attention over the last several weeks.  It was clear that you were paying attention to the evidence, to the witnesses, to the lawyers' arguments, and that's how we know that the parties have gotten a fair trial in this case.  That's also how we know that, despite what Mr. Mukasey said over the last couple of hours, despite efforts to distract you, to blame other people for Trevor Milton's actions, the defendant cannot and will not escape the evidence in this case—the facts and the truth about what he did.

Now, you heard Judge Ramos say throughout the trial that the defendant did not need to do anything.  He did not need to do anything.  And that is because the burden is on the government to prove the defendant guilty beyond a reasonable doubt.  That's our job.

But the defendant did not do nothing.  His lawyers made an opening statement.  They cross-examined witnesses.  They put on a witness.  They offered evidence.  They made a

closing argument.  And what that means is that you can and you must scrutinize those arguments.  You must think about whether they actually match the evidence that you heard in this case——the documents, the recordings, the testimony, everything that you sat through and that you will have in the jury room when you go back to deliberate.

Now, this rebuttal is our chance to respond to some of the arguments that the defense made.  I'm not going to speak for as long as Mr. Mukasey.  I'm not going to respond to everything that he said, as much as I would like to, and that's in part because, frankly, the defense made a lot of arguments, there were a lot of different arguments, and I'm going to go through and I'm going to talk to you about a lot of those arguments, about why they were made.

But let me say this:  They were all designed for a purpose.  They were all designed for a purpose.  And that's to point you in different directions, different directions, different directions away from what is actually very simple proof in this case, very simple proof, because you have heard it from the first witness in this trial to the last.  You heard the recordings, you heard the tweets, you watched the videos. And what you learned is that Trevor Milton lied.  He lied so that people would invest in his company.  He lied to make himself rich.  He lied to get what he wanted.  And that is fraud.

Now, I have to say, Mr. Mukasey is a very fine lawyer. Nothing I say is intended to take anything away from that. He gave a very impassioned speech for his client, as he should. That's his job. But he also said a number of things that didn't seem to relate to the trial that happened in this courtroom. Let me start with just one.

Mr. Mukasey said at the beginning of his summation and at the end a number of times that no one took the witness stand and said that Trevor Milton lied, no one said he was dishonest. That's what Mr. Mukasey told you.

You actually sat through this trial, though. There is also a transcript, by the way. And you will recall that in the first week of this trial, starting with the first witness and then every witness thereafter, each one of them said that the things that Trevor Milton did and said were lies. It's in the transcripts. Over and over again. The things that Trevor Milton did and said were lies. That was the testimony in this case.

You know, I expect that Judge Ramos will instruct you that the arguments of the attorneys, the questions, those are not evidence. The evidence is what you heard, the documents, and that's what you should rely on. And you know that the testimony in this case, the documents show a couple of very simple things. These aren't the things that Mr. Mukasey wanted to focus on, but they are simple, and that's this:  It was

false, it was completely false when the defendant claimed that the Nikola One worked.  That was not true.

It was false, it was totally false, when the defendant claimed that Nikola had billions and billions of binding contracts for its trucks.  That was false.  It was not true.

It was false, completely false, when the defendant claimed that Nikola was producing hydrogen, that it could do so cheaply, that it had stations, that it had electricity contracts, that it had permits, that it had land.  Every single one of those statements was false.  They have not contested that.  Those were not true.

And it was also false, it was completely false, when the defendant claimed that his pickup truck, his Badger project, that the prototypes were all Nikola parts and that the production vehicles——this is something that Mr. Mukasey didn't talk about——that when Mr. Mr. Milton went on television and claimed that the Nikola Badger that was going to be produced by General Motors was all Nikola technology, that was absolutely false.  It was not true.

So what has the defense said?  Well, it was a little bit of everything.  There was some talk about the defendant uses the wrong tense; he is really talking about some models; everyone else is a liar because they received a subpoena; the executives really should have stopped him, it's their fault; the investors should have figured it out, it's their fault; and

Mad2Mil5                        Rebuttal - Mr. Podolsky

on and on and on.  I'm going to go through a lot of these in a few minutes.

So when we talk about these defenses, when you go to deliberate, keep a few simple questions in mind.  Why are there so many defenses in this case?  Why does the defense keep going out of its way to point you in a different direction?  Why do they cast blame on others?  Why is it the executives' fault that Mr. Mukasey lied?  Why is it the investors' fault that he lied?

You know the answer.  The answer is, the truth is very simple.  The truth is simple.  Lies and excuses are complicated.  And there is a very simple truth that runs through this case, it makes every fact in this case make sense, it doesn't require excuses, and it is just that the defendant lied.

Let's talk about a few of those defenses.  Let's talk about the lies first, because that is the core of the case.  That is what this case is about, and let's talk about what the defense just told you about those lies.  And why don't we start with the Nikola One, start with the Nikola One.  I think that was more or less where Mr. Mukasey ended.

Now, as you know, not subject to dispute, the Nikola One truck wasn't finished.  It didn't work.  They tried to build a hydrogen powered truck -- well, I take that back.  They tried to build a gas turbine powered truck, but Mr. Milton said

that they had achieved a fully functioning hydrogen powered truck.  He stood up in front of that truck——Mr. Mukasey just showed you a still shot of that——he stood up in front of that truck and said:  This thing fully functions and works.  In front of hundreds of people.  He even put it on the Internet.  Thousands of people watched it.  And it was not true.

He then rolled this truck down a hill, down a hill.  And by the way, Mr. Mukasey calls this special effects.  I don't know how special these effects are when you roll a truck down a hill and then just speed up the video to look like it is driving.

But this isn't just a commercial.  In fact, you saw the e-mails on this.  You saw the e-mails.  They are reflected in the timeline at Government Exhibit 1006, and what they show is that what the people who were making the commercial wanted, Phillips, was just the truck, a shot of the truck.  What Mr. Milton wanted out of this, what he asked for, was footage of the truck looking like it was driving.  And he was upset because the footage in the commercial didn't show that enough.  It didn't make it look like they had actually made a working truck.  So he took the B roll footage, he had it sped up, he put some grandiose music on to it, and he blasted it on to the Internet to make it look like they had accomplished something.

Now, the defense's response to this is it's not relevant.  Mr. Mukasey said it I think two or three times.

It's just not relevant according to them.  Well, look, I think it is pretty obvious that when you build your entire company on a claim that you are the first person to invent a hydrogen powered truck, it actually matters if you did that.  But I know one person, you know one person who did think this mattered, who did think this mattered in 2020, and he is sitting right at that table.  It's Trevor Milton.  That's the person who knew this mattered.

That's why when Ed Ludlow -- when he spoke to Ed Ludlow about the fact that he had lied in 2016 about whether this truck worked, Mr. Milton didn't say, you are right, you got me, but it's not relevant.  No.  you have the recording.  You have the recording.  And you can look at the transcript.  It's Government Exhibit 413-T.  What he actually said was:  Well, we didn't drive it for safety, but the whole thing worked.  All the parts were there.  They fully functioned.

That was a lie.  That was absolutely a lie.  It was not true.

And not only that, not only that, Trevor Milton went on television, he went on television, two days later on CNN—it's Government Exhibit 414-T in your binders if you want to look when you go to deliberate—he went on television and he again said all the parts worked, everything in the truck worked.  That was also not true.  That was a good chance for him to say:  You know what?  It's not really relevant.  But

that's not what he said.

Seven days later CNBC, the transcript is Government Exhibit 415-T, and again he says it was all operable.  Again, it was a lie.

And, you know, there is one more exhibit that shows you how much Mr. Milton thought it mattered, how relevant he thought it was, which is Government Exhibit 38.  It's a text message where he brags about his response to that article increasing the stock price.

A few moments ago, Mr. Mukasey, he did something I think actually a little bit unfair.  He tried to put it on you. He said Mr. Milton's life hangs in the balance based on some accidental tweets.  That's what he said to you.

Well, okay, maybe if this case was about one or two tweets that were accidentally sent, maybe that would be something he could say to you.  But ask yourself, does anyone accidentally set up a huge unveiling when they know the truck doesn't work, climb the stage, get on the stage, and lie about the truck?  Is that an accident?  Does anyone accidentally let the truck roll down the hill, speed up the video, post it on the Internet?  Is that an accident?  And by the way, this isn't a case about a couple of tweets.  This is a case about repeated over and over again on television, on national television, on podcasts, and in these videos, lies over and over and over again.

All right.  Let's talk about what the defense has tried to tell you about hydrogen.  And this defense is a little bit different, and here's the challenge.  Because Mr. Milton told so many lies, the defense has had to come up with a different reason each lie can be accounted for.

So here's the one about hydrogen.  The one about hydrogen is that Mr. Milton wasn't really saying that Nikola had achieved its goals.  He wasn't saying that Nikola was actually producing hydrogen for $4 a kilogram.  He was talking about the model.

Look, you actually have the evidence.  They can say whatever they want.  You will be able to look at the tweets. Ms. Estes took you through them earlier today.  You will be able to read the transcripts.  You will see what Mr. Milton said.  You will see what he said.

And you know, I thought it was interesting, Mr. Mukasey put up a few -- I think there was a handful of statements by Mark Russell and Kim Brady where they were talking about the model and they were saying in the model they thought they could eventually get hydrogen down to $4.  I thought this was an incredible thing to show you because this is actually proof of the defendant's guilt.  Because you should compare the statements that Kim Brady and Mark Russell made to the statements that Mr. Milton made, and you will see a very stark difference.

One, they say:  Here's our model.  We hope one day to do this.  That's Kim Brady and Mark Russell.  But when Mr. Milton goes out there, he says something very different.  He says——this is Government Exhibit 553, just for example——we currently make our own green H2 for under $4 a kilogram.  Every single part of that sentence is false.  Every single one.  They weren't currently making hydrogen.  It wasn't green.  They didn't have it at any price, let alone under $4 a kilogram.

But actually there is one exhibit in this case that makes absolutely clear, absolutely clear, you can look at this one exhibit and know this defense is complete hot air, it doesn't work, and it's an exhibit that Mr. Mukasey did not talk about.  It's Government Exhibit 1400-T.  The recording is Government Exhibit 1400.  This is the recording of the phone call that Trevor Milton had with Peter Hicks.  We can talk about Peter Hicks in a minute, but let's talk about the recording.  You can listen to what Mr. Milton said, and I would suggest that you go to page 22 of that transcript when you have a chance, because that is where Peter Hicks actually had the foresight to ask Mr. Milton this very question, this very question.  He says:  This is the plan.  I mean, you are not gobbling it up right now, because that would be getting too far ahead of yourself, or are you?  That's it.  He said:  Is this a model, is this a plan, or are you telling me that this already happened?

So if he was talking about the plan, here it is. Here is Trevor Milton's chance to say oh, no, no, no, my tenses are wrong, I want to be clear, I'm just talking about our model. But that is not what he said. You can listen to the recording. What he said was: No, we are. We are on certain routes. We have already begun procuring power and planning stations and gobbling up the rates and taking energy from the grid and we are already in that process right now.

That's not about a model. He was asked if it was about a model, and he said no. It's a little hard to say now in this courtroom two years later, oh, this is what Trevor Milton meant when at the time he was asked the question and he said, no, that's not what I meant.

And by the way, one other note on this. I think this was mostly in the hydrogen section of Mr. Mukasey's closing. Did you notice he kept kind of slipping in there, well, okay, Trevor Milton wasn't quite accurate on all of these; okay, it wasn't quite right? That's a tell. That's a tell. The reason he is saying that is because he knows that you have the evidence. He knows that when you go back there and look at the transcripts, when you look at the tweets, you are going to look at it and say this is false, it's not true.

Now, there is a closely related defense that Mr. Mukasey mentioned. This is sort of the tense -- tense defense. It's similar to the model defense, but it's kind of

like, okay, you might read all of these tweets and transcripts and listen to the videos, and you might be saying we have already done it, but somehow in his mind he is talking about the future. It's a very peculiar thing, only afflicts Mr. Milton. And, look, you will look at the evidence. You will see how ridiculous this is.

But I will just say this. You wouldn't accept this kind of excuse from a child. You would not accept this kind of excuse from a child. Imagine you have a kid and it's a new school year. The kid comes in and says: Great news, great news. I was struggling last year, but I got an A on my test. I got an A on my test. Great. That's terrific.

But the teacher calls a week later and says, listen, I'm sorry to be the bearer of bad news, I'm sorry to blow the whistle on your kid, but he hasn't finished any of the assignments, he didn't finish the test, I had to fail him on his first test.

And then you might say to your kid, well, I'm disappointed you didn't get an A, but I can't believe you lied to me. And then the kid said, oh, well, no, no, it wasn't a lie, it's I had a plan to get an A. I was going to get an A.

What do you think? Is that a good excuse that you would accept from someone? It doesn't work for children and it's not going to work for Trevor Milton.

By the way, one other comment about this tense

argument. It's inserted here in this hydrogen piece by Mr. Mukasey, but it doesn't quite explain anything else, does it? It doesn't quite explain how it is that Mr. Milton claimed that the Nikola One worked. It doesn't quite explain how Mr. Milton made a fake video of a truck rolling down the hill. It doesn't quite explain how he went around claiming that Nikola's technology is what was inside the Badger.

Let's talk about the Badger, then. Mr. Mukasey had a bit of a scattershot on this one, sort of talking around the issues with the Badger. He said, well, it can't be a lie because the board approved the Badger project. And then he sort of took aim at one part of the Badger, one issue. And what he focused on was, well, the truck, the prototype trucks, when he said that they were built, he was really talking about these, like, simulations and computer work and so on. And look, I mean, you can look at the statements and see if that matches reality, but it actually doesn't really matter. This is a type of argument called a straw man, and what he is doing here is he is focusing you on one part that he thinks he has a better answer to and asking you to ignore, to ignore, the actual lies, the actual fraud here.

Why do I say that? Well, here is the most fundamental misleading and fraudulent thing that Trevor Milton did with the Badger. In order to keep retail investor interest high, you have heard that was his focus from numerous witnesses with the

Badger.  He went out and he told the world that Nikola had invented a pickup truck , a hydrogen powered or battery electric powered pickup truck.  He said it was Nikola technology, revolutionary technology that was applied to a pickup truck.  He had his friends at Ital Design make two supposed prototypes to show the world that Nikola had accomplished this.  It's really kind of a page from his old playbook with the Nikola One.  He uses these mockups to prove that Nikola had invented something, but actually this was a trick, and here's how.

What Trevor Milton actually had were two show cars. They were adopted Ford F150s.  You have heard about that.  But what they were not, what they were not, what they were not was the truck that was going to be produced.  It was a mockup.  It was a mockup.  But what did Mr. Mukasey call them?  He called them production intent vehicles.  He suggested that these were the vehicles that were ultimately going to be produced.

And here's the real payoff, here's what happened.  He went -- he did a deal with GM, and GM was going to actually manufacture this pickup truck called the Badger.  And you heard from Scott Damman, you saw the RASICs and the documents, and you saw that this was a GM truck.  It was a GM Humvee.  It just had a Nikola N on the top and it had a Nikola siding.

And when that deal was announced, Trevor Milton went out on television and he said—Ms. Estes showed you these—he

said this is Nikola technology, it is Nikola engineering, it is Nikola tech. And that was false. It was not true. You heard from Scott Damman that the entire technology in that truck was GM. It was GM. It was a GM truck that had already been built, just made to look like it was Nikola. And Mr. Mukasey didn't say anything about that. He didn't say anything about that because there is not an answer to it. Those statements were false.

Last category here is orders. This is another bit of misdirection. You will recall that Mr. Milton claimed, he claimed on TV——that's Government Exhibit 425-T——that there were billions of dollars in sign-on-the-dotted-line contract binding orders for the trucks. He actually said something similar to Peter Hicks, you might recall. Peter Hicks told you about this. It was at the beginning of his conversation, he claimed to Peter Hicks that he, Trevor Milton, could turn 80 percent of Nikola's orders to be binding contracts if he wanted to, if he chose to. Okay. Well, that wasn't true. There were no binding contracts. There is no dispute about that. There were no contracts.

What did Mr. Mukasey say about it? Well, he kind of pointed you to something else. What he said was that the billions and billions of dollars, if they did have contracts, that, that part was accurate, that their reservations would add up to billions of dollars.

But that's not the issue, that's not the issue.  The issue—and you can look at the transcript 425-T—is that Milton, when asked if they were merely reservations, letters of interest, he said, no, these are binding contracts, and that's an important difference.  It's important for an obvious reason.  People saying, "oh, well, I don't know, maybe I'll buy one" doesn't mean much.  But people actually putting money down and committing to buy, that's a future stream of revenue.

And actually it was interesting on this point because Mr. Mukasey pointed you to I believe it was Defense Exhibit 1601, and that's where Kim Brady -- there is some -- Kim Brady testified about this.  It says the reservations were not a driver of value at Nikola.  Well, that's not proof of innocence.  That's proof of guilt.  Because what Kim Brady was saying there is the reservations weren't meaningful to Nikola because they were just nonbinding reservations.  But when Trevor Milton goes out and lies and says they are binding, sign-on-the-dotted-line contracts, well, that communicates something else to an investor, which is that it is an important part of Nikola's business model.

All right.  Those are the lies.  Those are the lies.  Let's talk about a few other things that the defense has pointed to.  And why don't we talk about how this case is a conspiracy.

According to Mr. Mukasey, every witness that you saw

give testimony here lied.  That's what he told you in his opening.  That's what he told you again today.  This is one where you might step back and think about these people—people who are up there on the stand, subject to the penalties of perjury, being berated with questions for hours—and ask yourself, does that remotely make sense in real life that every single one of these people got up there and lied?

Why would they do that?  Why would they do that?  Here's the defense's answer on that.  The defense's answer is because Nikola got a subpoena, because their employer got a request for documents, these people live their own lives, have their own jobs, get up there and take the stand and lied to you.  That's their claim.  That's their claim.

You know, it is not even obvious what the defense is even saying they are lying about.  The defense has not contested the facts, the facts about the things that Mr. Milton said.  They have not actually contested that the Nikola One didn't work, that Nikola wasn't making any hydrogen because there were no contracts, so what are they saying these people were lying about?

And by the way, it's everyone in this trial apparently.  It's Paul Lackey.  It is Elizabeth Fretheim.  It's Brendan Babiarz.  It is Dale Prows.  It is Mark Russell.  It is Kim Brady.  I guess it's Scott Damman, who works at GM.  It's Stephanie Amzallag.  All of these people took it upon

themselves to come into this courtroom and lie.  About what?  It's not clear.  But according to the defense, they have lied to you and committed perjury.

I thought this was especially interesting because Mr. Mukasey I think also referred to these people, at least the executives, as Boy Scouts, and so apparently when it was helpful to Mr. Milton to say that these people are Boy Scouts in 2020, they are Boy Scouts, but they are also the type of people who would start lying and perjuring themselves on the stand just because they received a subpoena.  I'm not sure you can have it both ways.

Now, Mr. Mukasey, I think, suggested a couple of particular lies and I'm going to address those.  They actually have nothing to do with whether the defendant committed fraud in this case, but because Mr. Mukasey brought them up, I'm going to address them.

Mr. Mukasey told you, he told you that when the Hindenburg Report came out, everyone at the company, the executives, rallied around Trevor Milton and defended him and it is only now in this courtroom that they are saying he was a liar.

By the way, I did note that it was interesting, Mr. Mukasey said what they did contemporaneously is more important.  Well, I agree with that.  You should take a look at the incredible number of text messages and e-mails sent at the

time where all of these people said Trevor Milton is lying. Brendan Babiarz is saying it's a false statement that pumps the stock. Kim Brady sending e-mail after e-mail to Trevor Milton to warn him not to lie, going back all the way to 2018. That's Government Exhibit 212.

But Mr. Mukasey nonetheless said that they rallied around Trevor Milton. It was only later, some later time recently that they came in here and lied.

Well, here's the thing. The fact is, this is in the record, there has been a lot of testimony about this, that just days after the Hindenburg Report came out, the executives—Mark Russell, Kim Brady, Britton Worthen—they went into a board meeting and they said if Trevor Milton is not out of this company, we are quitting, we are quitting. And Trevor Milton was kicked out of the company just a few days after the Hindenburg Report came out. So candidly, it's not at all clear what Mr. Mukasey is talking about.

Now, I want to address one other thing. Mr. Mukasey put up a slide about Stephanie Amzallag. You recall, she was the sort of youngish social media director, and Dale Prows who dealt with hydrogen, and he put up a slide and he had apparently counted how many times she said "I don't know" for the government versus for the defense.

Mr. Mukasey said dare the government how to explain this. So here it is. I'm going to explain it.

This is a defense technique, and here's what the defense lawyers did in this case to get that slide.  For each one of those witnesses, they put up e-mail communications that the witnesses hadn't seen in years, hadn't seen in years, and then asked them if they remember it.

Quick, think about this.  What are the top five e-mails that you received three years ago?  Can you recount them?  Do you recall what they were about?  Can you spit out the transcript of them to me right now?  Or if I showed them to you, might you say actually:  I don't remember that?

And actually that's not all they did.  They also put in front of those witnesses e-mails and documents those witnesses had never seen, that they weren't even on, and then asked them about those.  Now, that might be an explanation for why a witness would say:  I don't remember this.

All right.  Let's go to another defense here, which is the "no one told him not to lie" defense.  This is the one that Mr. Mukasey spoke about at great length.  How could Trevor Milton, how could he have known that it was wrong to lie if no one came and told him that?

All right.  Well, first, and this is another one that we will just look at the evidence.  You have heard from almost every witness, certainly from Mark Russell, Kim Brady, you saw it in Government Exhibit 212 that I just mentioned, you saw it in text messages, you saw that actually people warned him over

and over again not to lie, that he was not accurate, that he needed to use forward-looking language if he was going to say these things, that he shouldn't be focused on pumping the stock price. They warned him again and again and again. That's what the evidence in this courtroom showed.

You know, the ask, I mean, Mr. Mukasey brought up red lights again in his closing like he did in his opening. Ask what a red light looks like in a company. You have got people going to the founder, the largest shareholder, and saying, hey, stop lying, do not do this, to the point where they are having an intervention, an intervention, and telling him: You have to stop being a liar.

Do you think that happens commonly when people are not lying? Do you think it's a common occurrence for there to be multiple whistleblowers coming forward and saying this person is lying?

You have got Paul Lackey going to multiple reporters saying this guy who is out there getting money is lying.

You have got Elizabeth Fretheim. Imagine how hard it is to be Elizabeth Fretheim. You are doing your job in this company, you happen to hear a podcast where the defendant, where your boss is lying over and over again. It would be pretty easy to say, you know what, he is a big shot. I don't know. I'm going to keep my head down. But she didn't. She elevated her concerns because he lied on that podcast. And she

even came in here and took the stand and testified under oath and explained it to you.  And that's because the defendant was lying.

And you know, this idea that someone has to warn you that it's a bad thing to lie or else you can't have committed fraud, I mean, it's unbelievable.  You wouldn't accept that in your everyday life.  It's not a defense here.

Here is what it basically is.  This is the robber blaming the guard for not stopping him.  This is a guy who goes into a bank with a shotgun, robs the bank, takes the money --

MR. MUKASEY:  Objection.

THE COURT:  -- leaves the bank --

MR. MUKASEY:  Objection.

THE COURT:  Overruled.

MR. PODOLSKY:  -- leaves the bank, and when he is caught and apprehended, they say, We got you, and he says, It's not my fault.  The guard didn't tell me I shouldn't do this.  It's his fault.

Now, I will go through a couple more things here, make sure to address.  Let's talk about Peter Hicks for a moment.  I actually don't think we need to spend a lot of time on this, and that's because here's what the defense is on this.

Peter Hicks, from what they are telling you, he is kind of a wealthy businessman, so therefore Trevor Milton is not guilty of fraud.  That's the defense.  That is the entire

defense.

Well, I've got to tell you, I don't think that Judge Ramos is going to instruct you that when you cheat somebody who is doing business, who is trying to make a profit that means that you don't commit a crime.

Now, the evidence on this count is actually very, very, very, very simple. It's recorded. I mentioned it before. It's Government Exhibit 1400 and 1400-T. The defense doesn't want to talk about the actual recording. What they want to do is cast aspersions on Mr. Hicks. I'm not going to take up our time talking about whether you should or shouldn't like Mr. Hicks. It doesn't really matter. What matters is that the defendant did the following things: He lied to Peter Hicks about his business so that Peter Hicks would accept his offer of the stock options. That's it. That's it. You are not going to have to decide whether Peter Hicks was a good businessman, a bad businessman, whether he should have gotten more for his property, less for his property. You don't have to decide any of that. All you have to decide is whether what Mr. Milton said on that recorded call was false. That's what the case is about.

It really was, though, incredible. Mr. Mukasey got up here and basically told you how dare, how dare Peter Hicks say that Mr. Milton cheated him, that Trevor Milton cheated him. After all, Peter Hicks is doing fine. That's basically what he

told you.  How dare he do that?

I have to tell you, that's pretty rich.  That's pretty rich.  Because the guy on the other end of the transaction is the one who is not satisfied with being only 270th richest person in the world.  This is a guy who wants to make sure that he can buy a ranch the size of Lower Manhattan, and he wants to do it based on the stock where he has pumped up the value.

All right.  Materiality.  So let's talk about materiality for a few minutes.  It is actually a pretty simple concept, and this is one really pay attention to what Judge Ramos tells you.  Because the defense suggested throughout its summation that there is like a bunch of requirements to materiality that don't exist.  Mr. Mukasey kept telling you, he kept telling you, well, the retail investors couldn't remember with precision which precise tweet caused them to buy.

And I'm going to tell you, you should listen to Judge Ramos, but Judge Ramos is not going to tell you that any investor had to rely on any particular statement or on anything at all.  That's not what materiality is about.  That's just not a requirement.  You can throw that out right now.

Here is what materiality is about.  Materiality is simple.  The question is this:  Did the defendant lie about the types of things that matter to investors when deciding whether to buy or sell a stock?  It is the type of thing that matters

to a person when making a decision. That's it. That's the whole inquiry. It's not complicated. And there is really no rational dispute about this.

I mean, ask yourselves, did Trevor Milton go on TV and lie about a bunch of unimportant things for no reason? Of course not. Of course not. He lied about all of the most important parts of his business, the parts that Nikola had not succeeded in when it went public.

You know, when the head of a company that says it invents trucks lies about whether it actually invented the trucks, that is the kind of thing that might matter to someone.

When the head of a company that sells trucks lies about whether they actually have contracts to sell those trucks, that's also the kind of thing that might matter to someone.

That's it. That's all there is to materiality.

Now, the defense has tried to distract you nonetheless with a few things about materiality. I'm going to do them quickly so that we can try to get out of here on time.

Here is the first. The defense talked to you. Their sole witness, their paid witness, Professor Allen Ferrell, I'm not going to go through why a lot of what he said was completely flawed about how he disagreed with basic concepts of economics until he learned that he had actually written those statements. What I'm going to focus on is what he claimed to

you, what he claimed to you.  And this is basically what he said.

He said based on a study that he did, and he decided to start it on June 3, and which he decided to do only by looking at the closing price, he doesn't look at anything in between, looking at the closing price, there were only five days in the summer of 2020 where the price went up more than -- I think his benchmark was 10 percent.  That's the big argument, that during the summer—when, by the way, as you know, Milton had already for months been lying about the trucks, about the hydrogen—that on no particular day did one of Milton's podcasts or tweets move the stock price more than 10 percent.  So what?

Listen to Judge Ramos.  There is no requirement that any particular tweet, any particular podcast move the stock price one cent.  That's not what the case is about, and certainly not 10 percent.

What the case is about is did Milton lie to people about things that mattered?  And the incredible thing about Professor Ferrell's testimony was that he actually pointed to five days where the stock price went up more than 10 percent—he called it statistically significant—and those were days when Milton did lie.  Ms. Estes went through this a little bit in her summation.

He pointed to a day where Milton opened the

reservations for the Badger——the truck that he claimed Nikola had invented but that was not true——and the stock price dropped.  It dropped significantly when the Hindenburg Report came out and told people that Trevor Milton had been lying.

At the end of the day, though, I will say this, you don't have to contend with Professor Ferrell's theories, with his methods, with his statistics.  You really can put that to the side and you can do it for a very simple reason, which is, it doesn't actually tell you anything about any element that you are going to have to find.  The only thing you are going to have to decide is whether the statements that Mr. Milton made were the type of statements that would matter to someone.

Now, there is another kind of materiality defense here.  This is the sort of like an SEC filings defense, and here's how it goes.  Mr. Mukasey kept saying that all material statements were disclosed in the SEC filings, investors should have read them all, and therefore nothing Mr. Milton said mattered.

Look.  Okay.  There is something a little bit cynical about this because you actually have the SEC filings.  You can look at them.  You can read them.  And you can see that, sure, the SEC filings said things about Nikola, but what they didn't say is that things Trevor Milton was saying were false.  Both things can exist.  There can be an SEC filing that talks about Nikola's business plan and someone else out there saying we

have already accomplished it.

Now, even if, even if, even if the defense were right, even if the defense were right that somehow these SEC filings were in conflict, they disclosed something about what Trevor Milton said, let's assume that for a moment, think about what this plan is really, this defense is really, excuse me, it's that the people who listened to Trevor Milton, Trevor Milton decided to go out on TV and talk to investors, to go on CNBC, to go on Fox, but the people who listened to him, it was incumbent on them to disbelieve him. What they had to do was conduct their own little investigation. What they were supposed to do is go out, go to the SEC website, read -- download the SEC filings, compare them to the statements, see if they were really in tension or not and decide which one was more up to date or more accurate.

And this is not the only thing that the defense said that investors were supposed to do. You will remember the questioning of Joseph Ryan and Marc Schonberger -- and, by the way, I do have to pause here because the defense made a suggestion that the government, the government was being arrogant about retail investors, that's what they told you. Well, again, I'm going to suggest that you think back to how the cross-examination of these retail investors went, if you can recall, and the kinds of questions they got and ask where the condescension came from.

You might recall defense counsel asking Marc Schonberger, suggesting to him that the reason he didn't read SEC filings was because they were too long, they were too long, they weren't simple enough for him.

Or remember when defense counsel——I think it was Mr. Mukasey——questioned Joseph Ryan and basically made fun of him for reading StockTwits.  Mr. Mukasey said, well, that's not exactly Harvard educated people, is it?  Okay?

And the suggestion, the reason they were doing that, the reason they were doing that is because they wanted to suggest to you that these investors were too unsophisticated, too simple, too stupid to have done what they should have done, according to the defense, which is go and investigate the defendant, go figure out if the things that he said on TV were lies.

You will recall the questions.  They suggested that they should have read the SEC filings.  They suggested that these investors should have contacted investor relations at Nikola.  I guess the idea is, like, you call up Nikola and say, excuse me, is your CEO or your chief executive lying?

And they even had this one.  This one, you might remember, is from early in the trial.  They asked questions of Dale Prows about how the hydrogen stations, if they had been built, would be really big and not covered by some kind of like blanket or something, and I think the suggestion was that,

like, an investor could have searched across the country and tried to find the stations, and when they couldn't find them they would know that Trevor Milton was lying. So it's really their fault for not, like, getting in some kind of, like, low-flying aircraft and crisscrossing the country and looking for these stations and stupidly believing the chief executive and founder of the company who said we are producing hydrogen and we have permits and stations.

So the defense here is something like, okay, maybe he lied, maybe he lied, but free pass because the investors, they should have figured it all out. And I expect that you will hear from Judge Ramos that that is no defense at all. It doesn't matter if the investors were gullible or unsophisticated.

And you met these people. They were right here. They weren't stupid. They weren't unsophisticated. But it wouldn't matter if they were, because it's not a defense. The only question is whether Trevor Milton lied about things that would matter to somebody looking at the company.

All right. Just about done here. I am keeping you over a couple minutes, and I am sorry for that. Let me wrap up with a couple comments.

Mr. Mukasey said that Nikola was Trevor Milton's baby. That was his comment. It was his baby. So look, I'm not going to comment on whether it's good parenting to go out on the

Internet and hype up your baby, say a bunch of lies about your kid, like the kid is ten feet tall and has an eighth grade reading level and can do calculus; but I will say this, believing that Nikola is your baby is not a defense to fraud. You know, if you, like, hand your kid a cheat sheet before they take a test and the kid goes in and cheats, are you any less a cheater because you loved your kid?  Of course not.  It doesn't really matter if Milton loved, hated, felt lukewarm, whatever his feelings toward Nikola were do not matter because what he did was he lied to investors to get them to invest.

So I am going to sit down in a moment or two.  In the morning I expect Judge Ramos will tell you about the law for you to apply in this case, and please listen carefully.  I expect that Judge Ramos will tell you that for each of the counts in this case, there are three elements.  They are not that complicated.  They are did he engage in a scheme to defraud, a pattern of lying?  That's one.  Did he do it intentionally?  That's two.  And depending on the count, did he use a wire or facility of interstate commerce?  And I think Judge Ramos is going to tell you that part isn't even in dispute.  It's those first two.  Did he engage in a scheme to defraud?  Did he do it intentionally?

So I'm going to make a suggestion.  When you finally get to deliberate tomorrow, when you sit down and finally get to talk about the case, start by asking a very, very simple

question:  Was what Trevor Milton said true?  Were the things he said true?  Did the truck work?  Was it actually driving?  Was Nikola making hydrogen?  Was it really making hydrogen at those prices?  Did it really build the Badger from the ground up with its own technology?  Did it really have billions of dollars in binding contracts?  And if the answer to any of those questions is no, if the answer to any of those questions is no, that wasn't accurate, it wasn't true—and by now you know they weren't—then ask yourself another very simple question:  Why did he say those?  Why did he go on TV, on podcasts, and Twitter and say things that were not accurate, that were not true?  Why did he do that?  And if the answer is even just in part, even in part that he did it because he wanted to convince people to buy Nikola stock, he wanted to convince people to keep buying Nikola stock, he wanted Mr. Hicks to take the stock options, then I would suggest to you that's it.  Your job is done.

MR. MUKASEY:  Objection.  Misstates the law.

THE COURT:  Overruled.

MR. PODOLSKY:  Because as you will learn tomorrow morning, when Judge Ramos instructs you on the law, that is fraud.  That is fraud.  Lying to people to convince them to part with their money or property or buy stock.

But at the end of the day, you have heard all sorts of defenses in this case, but you have also heard the evidence,

and the evidence from day one has been very, very simple:  The defendant lied.  He lied to get people to invest in his company.  And that is why he is guilty.

THE COURT:  Thank you, Mr. Podolsky.

Ladies and gentlemen, that concludes our day.  Let me give you a little bit of a preview about what's going to happen tomorrow.

Tomorrow morning I will instruct you on the law.  That process should take about an hour or so, and then you will begin your deliberations.  Once you begin your deliberations, the schedule is in your hands.  So you can continue to work until 2:30 and decide to break if you have not reached a verdict by that time or you can work as late as you want.  It will be entirely up to you.

We also will have a different food offering, so there will be like a breakfast in the morning and then you will be given a lunch menu to choose of the lunch that you want.  I don't know how extensive that choice will be, but it will be slightly different.  Okay?

So we will see you again tomorrow morning.  Please do endeavor to be in the jury room no later than 9:15 or so.  Do not discuss the case, read anything about the case, or look at anything about the case.  Have a wonderful evening.  Get home safely.

(Continued on next page)

(Jury not present)

THE COURT:  I ask this with some temerity, any issues to raise?

MR. BONDI:  Briefly, your Honor.  When I was moving the long litany of documents into evidence, I stated DX 497 twice and Mr. Roos correctly said:  You mean DX 479?  And I said yes.  I actually mean, your Honor, both DX 497 and 479.  I just read 497 twice.  Mr. Roos said:  Do you mean 479, and I said yes.  I think we cleared it up, and I don't think Mr. Roos has any objections.

MR. ROOS:  I'm tempted that we should exchange dueling letters in the middle of the night, but we can short circuit and say we have no objection.

THE COURT:  Okay.  And by the way, once the jury starts deliberating, we will provide them with the exhibits or some way to access the exhibits, so please make sure that there is agreement as to all of the exhibits that are in.  And to the extent any exhibits have been redacted——I know that at least a couple were throughout the course of the trial——please make sure that those are provided to the jury in a redacted manner.

MR. MUKASEY:  Judge, do you have any rules about hanging out in the courtroom or in the building or within cell phone distance?

THE COURT:  I do, actually.  What I will tell the jury is that, you know, once they start deliberating I do give the

Mad2Mil5                        Rebuttal - Mr. Podolsky

lawyers an hour for lunch, and during that hour it may take a little longer for us to get back to them if there is any note. That is a lie, and what I mean by that is if I get a note from the jury, you should all be within five minutes so we can address it right away. Okay? Okay. Anything else? Okay. We will see you tomorrow.

(Adjourned to Friday, October 14, 2022, at 9:00 a.m.)

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

400, 401, 410, 413, 414, . . . . . . . . . .3021

        415,   417

S6   . . . . . . . . . . . . . . . . . . . .3023

DEFENDANT EXHIBITS

Exhibit No.                                        Received

489, 1586-T, 47, 9415-T, . . . . . . . . . .3021

        463-T, 464-T, 478-T, 479-T,

        483-T, 487-T, 492-T, 494-T,

        500-T, 501-T, 502-T, 503-T,

        506-T, 1015-T, 9413, 9417,

        9416, 9410, 9408, 9405, 9404,

        9431, 9430, 9429

496, 497, 501, 479, 494, and . . . . . . . .3021

        1750

77, 606, 1868, 1869, and . . . . . . . . . .3022

        1870

Mad2Mil5                    Rebuttal – Mr. Podolsky

206, 209, 210, 1228, and  . . . . . . . . . .3023
          1412

23, 1042 through 1045, 1774 . . . . . . . . .3024
          through 1776, 1778, 1779, 1782
          through 1785, 1786, 1787,
          1788, 1789, 1790, 1791 through
          1796, 1798 through 1800 and
          1802 through 1839