UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                              :          S1 21 Cr. 478 (ER)

TREVOR MILTON,                              :

                Defendant.                 :

---------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
Southern District of New York

- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.    The Defendant's Conduct ....................................................................... 2

        A.    The Retail Investor Scheme ......................................................... 2

        B.    The Wasatch Creeks Ranch Scheme ........................................... 8

    II.    The Advisory Guidelines Range ............................................................ 9

    III.    The Probation Office's Recommendation .............................................. 10

DISCUSSION ........................................................................................................ 10

    I.    The Applicable Guidelines Range Is Sixty Years' Imprisonment ............ 10

        A.    Applicable Law ......................................................................... 11

        B.    The Total Loss to Retail Investors in Nikola Based on a Per-Share Inflation Calculation Exceeded $550 Million ............................. 12

        C.    The Defendant's Loss Calculation Arguments Are Meritless ................. 15

        D.    The Court Can Use the Change in Market Capitalization as an Alternative Measure .................................................................. 20

    II.    A Very Substantial Term of Imprisonment Is Necessary ........................ 21

        A.    The Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and to Provide Just Punishment for the Offense ................. 22

        B.    The History and Characteristics of the Defendant ..................... 26

        C.    General and Specific Deterrence ............................................... 28

        D.    The Kinds of Sentence and Sentencing Range Established ................. 31

        E.    The Need to Avoid Unwarranted Sentencing Disparities .................. 35

    III.    The Court Should Impose a Fine and Order Restitution and Forfeiture .................. 38

CONCLUSION ....................................................................................................... 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA        :

   -v.-                            :       S1 21 Cr. 478 (ER)

TREVOR MILTON,              :

                  Defendant.     :

-----------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in advance of the sentencing of defendant Trevor Milton, and in response to the defendant's sentencing memorandum dated November 14, 2023 (Dkt. No. 299) ("Def. Mem.").

## PRELIMINARY STATEMENT

Trevor Milton, an entrepreneur and media personality, engaged in a sustained scheme to take advantage of individual, non-professional investors, repeatedly misleading investors both in public and in person in order to inflate the stock price of his company, Nikola, and ultimately with the goal of enriching himself. The conduct not only distorted the market—at one time driving Nikola's market capitalization higher than that of Ford's, despite Nikola never having produced a vehicle for sale at the time—it brought real harm to investors who were misled as to the risks of their investments, which, for those who held onto their stock at the encouragement of Milton, became effectively worthless once the truth became known.

The defendant's United States Sentencing Guidelines ("Guidelines") range reflects the seriousness of this conduct. As set forth below, Milton faces an advisory Guidelines sentence of 60 years' imprisonment. In the Presentence Investigation Report ("PSR"), the United States

Probation Office ("Probation Office") calculated the applicable Guidelines range as 210 to 262 months' imprisonment, using a lower loss amount than called for by the Guidelines, and recommends a sentence of 132 months' imprisonment. While the Government agrees with the Probation Office that a below-Guidelines sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing, the Government submits that a very substantial sentence, in line with the recommendation of the Probation Office of 132 months' imprisonment, would be sufficient but not greater than necessary to comply with the purposes of sentencing.

## **BACKGROUND**

### I.      **The Defendant's Conduct**

As described in greater detail in the PSR, in Indictments 21 Cr. 478 and S1 21 Cr.478—and as proven at trial—Trevor Milton engaged in two overlapping criminal schemes, one to defraud retail investors in the stock of Nikola, the company Milton founded, led, and in substantial part owned, and the other specifically to defraud the seller of a large property, both accomplished through false, misleading, and fraudulent statements relating to Nikola's business. (*See* PSR ¶¶ 9-10).[1]

### A.      **The Retail Investor Scheme**

Milton engaged in a scheme to induce investors—particularly individual, non-professional or "retail" investors—to purchase Nikola stock based on false, misleading, and fraudulent statements made and disseminated by Milton directly to the investing public through social media and television, print, and podcast interviews. Milton made false and misleading statements

---

[1]      Because the Court presided over the trial, the Government will not describe all aspects of the scheme or cite all relevant evidence in this memorandum.

regarding nearly all aspects of Nikola's business, which was to design and manufacture zero-emission battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen station infrastructure. These misrepresentations included the following:

- false and misleading statements that Nikola had early success in creating a "fully functioning" semi-truck prototype known as the "Nikola One";

- false and misleading statements that Nikola had engineered and built an electric- and hydrogen-powered pickup truck known as "the Badger" from the "ground up" using Nikola's parts and technology;

- false and misleading statements that Nikola was producing hydrogen and was doing so at a reduced cost; and

- false and misleading claims that reservations made for the future delivery of Nikola's semi-trucks were binding orders representing billions in revenue.

(*See* PSR ¶ 11).

This scheme followed a long history of dishonesty and accusation by others of false and fraudulent business practices undertaken by Milton. To take but a few examples:

- Although Milton occasionally claimed that he dropped out of college as part of his entrepreneurial character (*see* GX 1600), in fact, as he admitted to Peter Hicks, Milton was expelled from college for hiring others to complete his work for him (GX 1400-T at 7).

- In or around 2009, several years before starting Nikola, Milton created a company called uPillar, which purported to be a website like Craig's List where individuals could buy and sell items and services through online classified ads. Milton claimed publicly that uPillar "actually beat Amazon at what we were doing" and that he invented the world's first online shopping cart (GX 419), and asserted both publicly and later to Peter Hicks that he had to shut down uPillar because "we had too much growth" (GX 1400-T at 2). Of course, these claims were false (the online shopping cart was invented in 1994 and by 2009 Amazon had approximately $24.5 billion in revenue).

- After uPillar, and prior to creating Nikola, Milton created dHybrid, a company purported to be in the business of modifying commercial vehicles to make them run on compressed natural gas. dHybrid entered into a $16 million contract with Swift Transportation. Swift subsequently sued dHybrid for failing to deliver on the contract and for misappropriating its upfront payment. dHybrid was also sued by an investor—sPower—for material misrepresentations about the state of his technology. And Milton

was later accused by the inventor of the CNG system, who was a founder of dHybrid, of cheating him out of his profits when Milton sold the company to Worthington Industries.

- Milton formed what would later become Nikola in 2012, then calling it Bluegentech. He later claimed to investors that he "reserved the name" Nikola years before Elon Musk founded Tesla. Like many others, this claim was false (Tesla was founded in 2003).

Milton's tactics were no different when he turned his sights on the electric vehicle market.[2] Perhaps most notably, on December 1 and 2, 2016, Milton promoted his business through the spectacle of an event unveiling his prototype hydrogen-powered semi-truck (the Nikola One), which was also filmed and broadcast on the internet. During that event, Milton boasted about Nikola's success in creating an operable, hydrogen-powered vehicle, specifically claiming that the truck and its constituent parts were fully functional, all the way down to the truck's infotainment screens—representations that echoed claims that Milton had made during individuals tours of Nikola's facility and its prototype. (PSR ¶ 12; Trial Tr. 100-01; GX 400-T). These representations were false. Nikola had not succeeded in engineering a functioning, hydrogen-powered vehicle— in fact, the Nikola One was neither functioning nor even designed to be hydrogen-powered and was missing critical parts. (PSR ¶ 13; Trial Tr. 104-25; GX 207). The infotainment screens that Milton bragged about were nothing more than static mockups saved to laptop lock screens. (PSR ¶ 13; Trial Tr. 133-38; GX 1208, 1211).

The following year, a separate multinational corporation (Phillips) asked to use the Nikola One in the filming of a commercial celebrating engineering. (PSR ¶ 14; GX 1006). In order to make it appear that the Nikola One was driving, when it was not in fact functioning at all, during the shoot, the vehicle was brought to the top of an incline and rolled down a hill. (PSR ¶ 14; GX

---

[2]     In the early days of Nikola's development, Milton freely admitted of his goals, "I don't give a shit about the environment. I just want to make money." (Trial Tr. 90-91).

923, 1006). When Milton saw an initial version of the commercial that Phillips had created and intended to air, he became irate that the commercial did not make it appear as if the Nikola One was "going down the road as we talked about," which, he wrote, "was the reason why I approved it to be used in the commercial." (GX 925). According to Milton, "[t]his will be the first time anyone has seen the Nikola truck move" (even though the viewer would not know that the truck could not move on its own power and was simply rolling down a hill), "so it could get millions of views on our youtube channel." (GX 929). Milton asked whether Phillips had additional footage of the Nikola One "driving," and Phillips provided him with extended video of the Nikola One rolling down the rill, as well as raw drone footage. (GX 1006). Milton then directed a Nikola employee to use the footage to create a video of what appeared to be the Nikola One driving under its own power (the so-called "In Motion Video"), which the defendant then had publicly posted on Nikola's Twitter, YouTube, and Facebook pages. (PSR ¶ 15; GX 1006).

When Nikola became publicly listed by merging with VectoIQ—a special purpose acquisition company—Milton was presented with the opportunity to capitalize substantially on his ownership of Nikola stock. As Milton made clear to John Lackey earlier in Nikola's history, *see* supra n.2, Milton was focused on expanded his wealth. Milton also told his Chief Financial Officer, Kim Brady, after Nikola went public, that "one of [Milton's] goal[s] was to be in the top 100" of Forbes's list of the wealthiest people in the United States, and that Milton would achieve that goal by increasing Nikola's stock price. (Trial Tr. 1770). In fact, during the course of his scheme to inflate the value of Nikola's stock, the value of Milton's holdings (the driver of Milton's net worth) rose from approximately $1.099 billion in March 2020 to a peak of approximately $7.303 billion in June 2020. (GX 1001).

But Milton's interest in money was more concrete as well. In connection with and in the lead up to the consummation of Nikola's merger with VectoIQ, Milton was able to sell, in May and June 2020, a portion of his holdings of Nikola stock for a total of approximately $100 million. (GX 1013). By September 2020, Milton had already spent approximately $83.5 million, including on luxuries like an airplane and hangar and an estate in Turks & Caicos. (GX 1013). Perhaps not surprisingly, Milton was "strongly opposed to any type of lockup" (that is, restriction on his selling of stock as an executive of Nikola for a period of time after the merger was completed), "even though it was quite standard." (Trial Tr. 1734). Ultimately, Milton agreed to a six-month lockup after being permitted to sell a small portion of his holdings, the vast majority of the proceeds of which he had already spent by approximately three months after the completion of the merger. (Trial Tr. 1734-35).

In an effort to drive and keep up Nikola's stock price, Milton misled individual, largely non-professional investors about the status and success of Nikola's business and technology repeatedly and frequently. As both Kim Brady and Mark Russell testified, and as is evident from numerous contemporaneous messages, Milton's obsession with the stock price was profound and concerning. (*See, e.g.*, Trial Tr. 1091, 1757-59; GX 61, 65). And Milton made clear that he believed he could increase the stock price by encouraging retail investors to buy Nikola stock. (*See, e.g.*, Trial Tr. 1716-17, 1758, 1767, 1769; GX 38, 71, 554).

And so, Milton over and over again exaggerated or outright lied about Nikola's success in a way that misled investors about the risks and likely returns of their investments. For example, Milton continued to misrepresent the functionality of the Nikola One prototype after Nikola went public in 2020, touting—falsely—that Nikola had created a fully functioning prototype back in 2016. (GX 405-T, 406-T, 423-T, 424-T). And Milton persisted—in an explicit effort to protect the

stock price—in his lies when confronted by a reporter about the true state of the Nikola One in 2016. (GX 38, 413-T, 414-T, 415-T, 532). Milton made similar misrepresentations about Nikola's planned pickup truck, the Badger, falsely claiming, among other things, that Nikola had engineered the vehicle from the ground up, when in fact the prototypes were reworked Ford trucks and the planned production vehicles would in truth be GM trucks with Nikola branding. (*See, e.g.*, PSR ¶¶ 16-18; Trial Tr. 535-36, 1483, 1506; GX 53, 264, 404-T, 429-T, 430-T, 431-T, 556, 557, 559, 1115).

In addition to misleading investors about Nikola's vehicles, Milton misled them about its purported hydrogen business and order book. For example, Milton claimed that Nikola was producing hydrogen to fuel its vehicles, when it was not; that Nikola had driven the cost of producing hydrogen below $4 per kilogram (which was critical to the viability of its business model), when it had not; that Nikola had reduced the cost of building a hydrogen station to below $14 million, when it had not; and that Nikola had contracts to purchase electricity for less than 4 cents per kilowatt-hour (also critical for its business plan), which it had not. (*See, e.g.*, PSR ¶¶ 19-23; Trial Tr. 316, 754, 1069, 1801; GX 240, 263, 406-T, 409-T, 410-T, 412-T, 422-T, 426-T, 521, 525, 531, 543, 553). Finally, Milton claimed that Nikola had firm contracts worth billions of dollars with customers who had committed to purchasing Nikola's vehicles. (PSR ¶ 28; GX 425-T). That too was false. (*See, e.g.*, PSR ¶¶ 27-28; Trial Tr. 1825-26; GX 202).

Notably, Milton lied even when interviewers confronted him with inconsistencies or offered the chance to clarify his claims. (*See* GX 413-T, 418-T, 425-T, 1400-T). And Milton was warned over and over again by his executive team not to mischaracterize Nikola's business and technology and that he needed to be accurate in what he said about Nikola. Nonetheless, Milton

7

persisted in making the very claims he was warned against. (*See, e.g.*, Trial Tr. 949-60, 1127, 1789, 1827; GX 20, 212).

**B.      The Wasatch Creeks Ranch Scheme**

As part of an effort to use his Nikola stock to make purchases, even when he was subject to a lockup and so could not yet sell his stock, Milton made false and misleading statements about Nikola's business and technology to an individual named Peter Hicks. Milton did so in order to induce Hicks to accept options to purchase Nikola stock (the value of which had already been inflated by Milton's scheme to defraud retail investors) in lieu of cash for the purchase of a substantial ranch, known, at least at certain times, as Wasatch Creeks Ranch, in Utah. (PSR ¶ 31).

Hicks was hesitant to accept stock options, particularly in a pre-revenue company,  as payment for real property, and so Milton arranged for a call on or about April 10, 2020, with Hicks, which Milton's broker and Hicks's son joined, in order to convince Hicks that he should accept the Nikola stock options. (PSR ¶¶ 33-34). During the call, Milton made a number of false and misleading statements regarding Nikola's business, all generally consistent with the exaggerations and falsehoods Milton had been making to the investing public to inflate the stock price. (PSR ¶ 34). For example, Milton falsely claimed that he could, at his election, immediately convert 80% of reservations for Nikola trucks into "hard orders." (PSR ¶ 34; GX 1400-T). Milton also made false and misleading claims regarding the status and progress of Nikola's hydrogen production and fueling program, claiming that Nikola had already begun procuring power on long-term contracts at rates that permitted hydrogen to be produced profitably along particular routes where, according to Milton, Nikola had already obtained a monopoly and begun to purchase land. (PSR ¶ 34; GX 1400-T).

Ultimately, Hicks agreed to sell the ranch for (1) $8.5 million in cash, and (2) stock options valued then, based on prevailing market price for the stock, at $8.5 million. (PSR ¶ 35). By the

time Hicks could exercise his options, however, the stock had decreased substantially in value, due to the revelation of certain of Milton's lies by a report published by a short seller (Hindenburg Research), and the options later became effectively worthless.

## II.    The Advisory Guidelines Range

With the exception of the calculation of the loss amount under U.S.S.G. § 2B1.1(b)(1), the PSR correctly calculates the applicable Guidelines, as follows:

- Pursuant to U.S.S.G § 3D1.2(d), Counts One, Three, and Four are treated as a single group, and, pursuant to U.S.S.G. § 3D1.3(a), because Count One produces the highest offense level, it is used to determine the guidelines for the group. (PSR ¶¶ 44-45).

- The applicable guidelines are found in U.S.S.G. § 2B1.1, and, because the offenses of conviction have statutory maximum terms of imprisonment of 20 years, the base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1). (PSR ¶ 46).

- Pursuant to U.S.S.G. § 2B1.1(b)(1), the offense level is increased based on the amount of loss involved. The PSR used a loss number of $125 million, which was predicated on the settlement figure in *S.E.C. v. Nikola Corporation*. (PSR ¶ 47 n.23). Using the PSR's loss number, the offense level is increased by 24 pursuant to U.S.S.G. § 2B1.1(b)(1)(M). (PSR ¶ 47). However, as discussed further below, the total loss to retail investors who purchased stock at inflated prices was between $660.8 million and $673.6 million, and therefore pursuant to U.S.S.G. § 2B1.1(b)(1)(P), the offense level is increased by 30.

- Because the offense involved more than 10 victims—indeed, thousands—an increase of 2 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i). (PSR ¶ 48).

- Because the offense involved a violation of the securities laws, and at the time of the offense the defendant was an officer or a director of Nikola, which was publicly traded, an increase of 4 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(i). (PSR ¶ 50).

- Accordingly, the applicable Guidelines offense level is 43.[3]

---

[3]    The PSR calculates a total offense level of 37. The difference between the Government's calculation and the PSR's calculation is attributable to the 6-level difference in calculating the amount of loss involved.

The defendant has no known prior convictions, and his Criminal History Category is I. (PSR ¶¶ 58-61). Based upon the calculations set forth above, the Guidelines sentence applicable to the defendant's offenses would be life imprisonment. However, because life imprisonment is greater than the statutorily authorized maximum sentence, pursuant to U.S.S.G. §§ 5G1.1(a) & 5G1.2(d), applicable Guidelines sentence is the statutorily authorized maximum sentence of 60 years' imprisonment.

### III.   The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's age and background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Office recommends a sentence of 132 months' imprisonment. (PSR pp. 32-34).

<b><u>DISCUSSION</u></b>

### I.   The Applicable Guidelines Range Is Sixty Years' Imprisonment

With a total offense level of 43 and a Criminal History Category of I, the applicable advisory sentence under the United States Sentencing Guidelines is the statutorily authorized maximum sentence of 60 years' imprisonment. The Government's calculation of the applicable sentence mirrors the calculation in the PSR with one exception: the calculation of loss resulting from the offense under U.S.S.G. § 2B1.1(b)(1). Recognizing that the Government was still calculating the loss sustained by retail investors, the PSR used the amount of the SEC's settlement with Nikola—$125 million—as the loss amount for purposes of the Guidelines calculation.[4] But the actual loss to retail investors was considerably larger—between $660.8 million and $673.6

---

[4]   The defendant objects to the use of the value of Nikola's settlement with the SEC as the loss about under § 2B1.1. The Government is not advocating for the use of the settlement figure as a proxy for the loss about under the Guidelines.

million—and therefore under U.S.S.G. § 2B1.1(b)(1) an increase of 30 levels from the base offense level is required. That figure represents a reasonable estimate of the loss involved in the offense based on a reliable measure of per-share inflation, which was extrapolated out based on the estimated number of victim shareholders that were affected by the offense.

Milton, on the other hand, takes the untenable position that investors suffered no losses and that there were no victims of the offenses. And Milton further argues that a downward departure is warranted because, according to the defendant, the offense guidelines determined by U.S.S.G. § 2B1.1 generally overstate the seriousness of the offense. Those arguments, addressed below, are incorrect, and the Court should sentence the defendant based on a calculation of the applicable Guidelines sentence as the statutorily authorized maximum sentence of 60 years' imprisonment.

### A.    Applicable Law

In determining the amount of loss involved under U.S.S.G. § 2B1.1(b)(1), a court "'need only make a *reasonable estimate* of the loss' resulting from the defendant's crime." *United States v. Abiodun*, 536 F.3d 162, 167 (2d Cir. 2008) (quoting U.S.S.G. § 2B1.1, cmt. n. 3(C)) (emphasis in *Abiodun*). The Government does not need to "establish the loss with precision." *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009). Rather, a "district court may make a reasonable estimate 'by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown.'" *Id.* (quoting *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997) (per curiam)); *see also United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) ("A court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence . . . ."). Similarly, the Guidelines commentary instructs that "[t]he estimate of the loss shall be based on available information, . . . such as . . . "[t]he approximate number of victims multiplied by the average loss to each victim" or "[t]he reduction

11

that resulted from the offense in the value of equity securities or other corporate assets." U.S.S.G. § 2B1.1, cmt. n. 3(c).

In cases such as this one "involving the fraudulent inflation . . . in the value of a publicly traded security . . . , the court in determining loss may use any method that is appropriate and practicable under the circumstances," such as by "calculating the difference between the average price of the security . . . during the period that the fraud occurred and the average price of the security . . . during the 90-day period after the fraud was disclosed to the market, and . . . multiplying the difference in average price by the number of shares outstanding." *Id.* § 2B1.1, cmt. n. 3(F)(ix); *see also United States v. Gushlak*, 728 F.3d 184, 196-97 (2d Cir. 2013) ("an investor's actual losses are equal to the artificial inflation when the shares were purchased minus the artificial inflation when the shares were sold," and "[t]o quantify investor losses in this manner, one needs to determine what the aggregate price of the investor's shares would have been on a given date but for the fraud . . . subtracted from the actual market price of the shares on that date").

   **B.   The Total Loss to Retail Investors in Nikola Based on a Per-Share Inflation Calculation Exceeded $550 Million**

In advance of sentencing, the Government commissioned an analysis by the economic consulting firm Compass Lexecon to determine a reasonable estimate of losses sustained by retail investors in Nikola stock based on an inflation per-share calculation. That analysis determined an amount that each share of Nikola stock was inflated as a result of the defendant's fraud, and then multiplied that figure by the total number of shares affected, which yielded a total loss to retail investors that ranged from $660.8 million to $673.6 million, depending on assumptions employed in the model. That estimate was calculated as follows.

First, the amount of inflation per share was calculated using the amount the price declined on certain dates that corrective disclosures were made to the public (i.e., dates on which the

defendant's fraud began to be revealed). Those dates were September 10 and 11, 2020, when the firm Hindenburg Research published a report detailing evidence of the defendant's fraud, and September 21, 2020, which was the day the defendant's resignation from Nikola was announced. While there were other points in time after September 2020 where additional corrective information was released resulting in further decline in Nikola's share price, the Government's analysis was conservative by limiting the corrective disclosure dates to those in September 2020. Had the Government's analysis included later corrective disclosure dates—such as the disclosure of changes to the General Motors deal in late 2020, the company's corrective disclosure in February 2021, the filing of the Indictment, and the defendant's conviction at trial—the amount of loss attributable to the defendant's fraud would have been greater.

Second, in order to determine how much the shares were inflated, the Government measured the price decline on September 10, 11, and 21 by using the residual share price decline calculated by the defendant's expert, Professor Allen Ferrell. Professor Ferrell found that the residual share price decline on September 10, 2020, was -$3.14; on September 11, 2020, it was -$5.12; and on September 21, 2020, it was -$4.89. Professor Ferrell's model showed that the cumulative residual decline over September 10 and 11, the residual decline on September 21, and the cumulative residual decline over all three dates was statistically significant. Therefore, the Government calculated a per-share inflation metric of $13.15 for share purchases on or before September 9, 2020; and a per-share inflation metric of $4.89 for share purchases from September 11 through September 20, 2020. Those calculations did not assume any inflation for share purchases on and after September 21, 2020, although based on how the share price responded to subsequent news, it is a near certainty that the share price on September 21 continued to be inflated as a result of the defendant's fraud.

13

Third, in order to determine the amount of loss sustained per share, the Government calculated the inflation on the purchase date minus the inflation on the sale date, using the inflation metric described above, and then capped the inflation loss by the out-of-pocket loss per share, *i.e.*, the purchase price minus the sale price. Losses were recognized either when shares were sold before the corrective disclosure dates, or when shares were retained on the final corrective disclosure date. For shares retained on the final corrective disclosure date but sold afterward, the loss per share due to inflation was capped by the actual purchase price and the rolling average close price on the sale date.

The Government calculated actual per share losses for retail customers who traded through TD Ameritrade, Charles Schwab, and Robinhood, using transaction-level brokerage data obtained from those firms. At those three brokerages alone, the total combined loss was approximately $267.7 million. The chart below prepared by the Government's experts shows the investor losses at Robinhood, TD Ameritrade, and Charles Schwab.[5]

| Total Losses of Retail Investors at Robinhood, TD Ameritrade, Charles Schwab | | |
|---|---|---|
| *Broker* | *Affected Shares* | *Total Losses* |
| Robinhood | 6.1 million | $54.5 million |
| TD Ameritrade | 14.8 million | $127.8 million |
| Charles Schwab | 9.1 million | $85.4 million |
| *Total* | 29.4 million | $267.7 million |

Using the loss totals associated with investors at those brokerages, the Government was able to calculate a reasonable estimate of all retail investor losses "by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *Uddin*, 551 F.3d at 180. Specifically, the Government's experts were able to determine what percentage of overall market volume was traded at Robinhood, TD Ameritrade,

---

[5]     For each broker, the Government analyzed transactions in Nikola common stock, but excluded short sale, cover, voided, and duplicate transactions.

and Charles Schwab, and then extrapolated the amount of loss from those three brokerages to determine total retail investor losses. Using two different methodologies, the Government's experts determined that the losses at the three brokerages needed to be multiplied by a scale-up factor between 2.47 and 2.52 in order to determine total investor losses.[6] Those scale-up factors result in the following estimated total retail investor losses.

| Scaled Up Total Retail Investor Losses | | | | |
|---|---|---|---|---|
| Scale-up Factor | Brokerage Affected Shares | Total Brokerage Losses | Scaled Up Shares Affected | Scales Up Retail Investor Losses |
| 2.47x | 29.4 million | $267.7 million | 72.6 million | $660.8 million |
| 2.52x | 29.4 million | $267.7 million | 74 million | $673.6 million |

As the chart demonstrates, depending on which scale-up ratio is used, the total loss ranges from $660.8 million to $673.6 million. Because under either model the estimated loss amount exceeds $550 million, the offense level is increased by 30 pursuant to U.S.S.G. § 2B1.1(b)(1)(P), resulting, as set forth above, in total offense level of 43. That offense level, in turn, would yield an advisory Guidelines sentence of life imprisonment, but for the fact that the statutorily authorized maximum sentence in this case is 60 years' imprisonment, which, pursuant to U.S.S.G. §§ 5G1.1(a) & 5G1.2(d), is therefore the applicable Guidelines sentence.

### C.    The Defendant's Loss Calculation Arguments Are Meritless

Relying on a report from Jonathan Arnold, the defendant claims—contrary to the trial record—that the total loss to investors was zero, and that the Government's calculation is flawed. Mr. Arnold's arguments are themselves flawed and not a basis to reject the Government's

---

[6]    The Government's experts used two approaches to calculate the scale-up factor. First, because Nikola common stock is traded on the Nasdaq, they took the total trading volume and then reduced it by 50% to account for market maker activity. The average daily ratio of the adjusted market volume to the three brokerage's trading volume was 2.47. Second, as an alternative method, the experts applied the ratio of the market volume to the sum of the retail investor aggregate purchases and sales relative to total volume, which yielded a scale-up factor of 2.52.

reasonable estimate of the total losses to investors. Indeed, it appears that Mr. Arnold either did not review, or chose to disregard several of the concessions that the defendant's now-abandoned trial expert, Allen Ferrell, made when he testified.

First, the defendant argues that two of the three corrective disclosure dates, September 11 and September 21, should not have been included in the analysis. (Def. Mem. 10; Arnold Report 2, 17). Both dates were properly included. September 11 was the day after the Hindenburg report was released, and it is properly included because news about the short seller's report continued to be disseminated into the public (and the share price) over a 48-hour window. Mr. Arnold did not conduct an economic analysis indicating that news of the Hindenburg report information had been fully absorbed into the share price within the first 24 hours. Seemingly without any review of news or analyst reports (as the defendant's prior expert said would be appropriate), Mr. Arnold also ignored that market participants continued to assess the information in the Hindenburg report on September 11. In fact, Mr. Arnold admits later in his report that on September 11, 2020, Nikola responded to the report by issuing a press release. (Arnold Report 48-49). The absence of a specific, detailed refutation in Nikola's response confirmed in part the truth of the Hindenburg report's allegations, making the press release itself a corrective disclosure. *See, e.g.*, David Welch, Edward Ludlow, and Stefan Nicola, *Nikola Slumps After No-Details Denial of Short-Seller Report*, Bᴌᴏᴏᴍʙᴇʀɢ, Sept. 11, 2020 ("Nikola Corp. shares dropped 15% after the company issued a blanket denial of allegations made in a short-seller report without offering any specifics to refute allegations that it lied about its technology and staged events."); Wayne Duggan, *Nikola Sell-Off Accelerates Following Milton's Response to Hindenburg Report*, Bᴇɴᴢɪɴɢᴀ, Sept. 11, 2020 ("Nikola Corporation shares were falling again Friday after founder Trevor Milton's response to Thursday's short seller report from Hindenburg Research left investors disappointed."). Therefore,

Nikola's press release, coupled with additional reporting on the Hindenburg report, makes September 11 an appropriate corrective disclosure date.

Similarly, Mr. Arnold asserts that the defendant's resignation was not a corrective disclosure about the fraud and instead was "hindsight bias." But again, Mr. Arnold's assertion is untethered to the actual reporting at the time. The press and analysts linked the defendant's resignation to the fraud allegations. *See, e.g.*, Claudia Assis, *Here's What Wall Street Is Saying About Nikola Founder's 'Shocking' Departure*, MARKETWATCH, Sept. 21, 2020 ("[s]hares of Nikola Corp. added to earlier losses on Monday as Wall Street faulted founder Trevor Milton for his 'missteps' in the wake of his resignation"); *Trevor's Resignation Could Be Clearing Event*, DEUTSCHE BANK RESEARCH, Sept. 21, 2020 ("Nikola announced this morning that founder Trevor Milton has resigned … [t]his comes on the back of a short-seller report alleging multiple past instances of untruthful statements by Trevor Milton … [t]his latest development is clearly another negative development for the company").

Moreover, the model is not only a reasonable estimate of investor losses but a conservative one, because while it included September 11 and September 21, it excluded other corrective disclosure dates, such as February 25, 2021, when the company released a 10-K filing acknowledging the defendant's misrepresentations and the share price dropped. Thus, by including the September dates but excluding all later corrective disclosure dates, the Government's model is a reasonable and conservative estimate.

Second, the defendant argues that it was wrong for the Government to use a two-day window for assessing the price impact of the Hindenburg report. But the defendant's prior expert admitted that it can be appropriate to use a multi-day event study window when news trickles out over a series of days, as it did with the Hindenburg report. (Trial Tr. 2723-27). And Mr. Arnold

17

ignored that the defendant's trial expert produced two-day (and three-day) cumulative returns for each of his four models. The defendant also asserts that it was inconsistent to use a two-day window for the Hindenburg report, but a one-day window for the defendant's resignation. (Def. Mem. 10-11). But the difference is explained by the further dissemination of information on September 11, and the new information on that date in the form of the company's press release.

Third, the defendant argues that the changes to Nikola's share price on corrective disclosure dates were not statistically significant. (Def. Mem. 11-12). But the defendant and Mr. Arnold ignore that all of the models for the defendant's prior expert, Professor Ferrell, show statistical significance of the price movement at the 10% level for September 11 and September 21, and also for the two-day cumulative return on September 10 and 11. Mr. Arnold also ignores that the three-day residual return for September 10, 11, and 21 is statistically significant at the 5% level across all of Professor Ferrell's models. In other words, under the models of the defendant's prior expert, to which he testified under oath, the stock price changes on the corrective disclosure dates were statistically significant.

The arguments that the defendant advances now to undermine the statistical significance of the corrective disclosure dates are at odds with the defendant's prior expert analysis and the literature cited by Mr. Arnold. For instance, in order to discredit Professor Ferrell's finding of statistical significance at the 10% level, Mr. Arnold selected a threshold of 5% statistical significance, which is arbitrarily restrictive in light of the fact that the literature Mr. Arnold cites to in footnote 7 of his report uses both a 5% and 10% level of statistical significance. As further evidence of how arbitrary the 5% cutoff is here, the cumulative residual returns for September 10 and 11 have p-values of 0.053, 0.054, and 0.058 for three of the four models Professor Ferrell created—i.e., only slightly above the highly restrictive threshold imposed by Mr. Arnold. The

defendant previously attempted to make similar arguments to the jury about materiality, noting that none of the corrective disclosures were material based on this arbitrarily restrictive threshold for significance, and apparently rejected by the jury. There is no reason to entertain them yet again.

Fourth, the defendant takes issue with the scaling up of the calculated losses as an estimate for all retail investor losses. (Def. Mem. 12). The defendant argues that the Government has no basis to support a volume reduction of 50% to account for retail investors only. This argument is a red herring. Mr. Arnold provides no evidence that the volume reduction should be larger than 50%, and according to the Government's expert, the use of a 50% reduction is common in private securities lawsuits to account for market maker activity. If anything, the Government's estimate is conservative and under-inclusive because (a) the trial testimony established that Nikola's stock was largely moved by retail investor activity and therefore retail investor activity likely comprised more of the trading in Nikola, and (b) arguably institutional investors were also harmed by the defendant's fraud on retail investors. To the extent the defendant and Mr. Arnold are arguing that there should not be a volume reduction, the resulting losses would he significantly larger, not smaller. The defendant and his expert also argue that the three brokerages' data analyzed by the Government cannot reliably be scaled up. But the argument that trading is not consistent across the whole market does not imply that losses are overstated. Quite the opposite, the scale-up factor places the most weight on the TD Ameritrade data, which has the highest volume but the lowest percentage of harmed investors, thereby potentially understanding losses for the overall retail investors.

Finally, the defendant claims that there were zero losses as a result of his fraud. (Arnold Report 37).  For that to be true, as the defendant has claimed, then the Court would have to decide that (1) September 10, 2020, was the only corrective disclosure date, meaning all information about

the defendant's fraud was revealed on that date, (2) statistical significance of the stock price movement should be calculated based on a single day, and (3) the stock price movement on that single date was not statistically significant. But Mr. Arnold's own report concedes that the September 10 disclosure did "not contain any claims concerning the Nikola Badger despite the fact that many alleged misstatements presented by the Government at trial concerned the Badger." (Arnold Report 16). And therefore, it cannot be said that September 10 alone fully corrective for the inflation to the share price that resulted from the defendant's fraud. As a fall back, Mr. Arnold notes that if only September 10 and September 21 were used as corrective disclosure dates, then under two of Professor Ferrell's four models the losses attributable to the defendant exceeded $100 million. (Arnold Report 37). Mr. Arnold has no opinion on which of Professor Ferrell's four models should be used, so were the Court to use either of Professor Ferrell's two models that yielded a loss only for those two corrective disclosure dates, it would still require an offense level increase of 24 levels since the amount of the loss exceeded $100 million.

In sum, the defendant's methodological objections are not a basis to find that the Government's experts' calculations are not a reasonable estimate of losses under section 2B1.1 of the Guidelines, and therefore the Court should find that the offense level should be increased 30 levels based on a loss exceeding $550 million.

### D.     The Court Can Use the Change in Market Capitalization as an Alternative Measure

As an alternative to calculating the loss based on the per-share inflation multiplied by the total amount of shares affected, the Court could determine loss based on the change in Nikola's market capitalization following the disclosure of the fraud in the Hindenburg report. "While losses from causes other than the fraud must be excluded from the loss calculation, courts frequently calculate loss in securities fraud cases by relying on the change of market capitalization as a result

of the disclosure of the fraud, in order to prevent perpetrators of the fraud from getting a windfall." *United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010) (internal brackets, quotation marks, and citations omitted); *see also United States v. Ebbers*, 458 F.3d 110, 126-27 (2d Cir. 2006) (discussing loss calculated based on market capitalization decline); *United States v. Moskowitz*, 215 F.3d 265 (2d Cir. 2000) (loss calculated based on decline in market capitalization upon disclosure of fraud), *abrogated on other grounds by Crawford v. Washington,* 541 U.S. 36 (2004).

Nikola's market capitalization was $16 billion on September 9, 2020. On September 10, 2020, the day the Hindenburg report was released, its market capitalization fell to $14.19 billion. By September 11, 2020, it was $12.13 billion. While there is overwhelming evidence that the decline in Nikola's share price and market capitalization was caused by the release of the Hindenburg report, as discussed above, even if some of the decline in the market capitalization were attributable to something besides the Hindenburg report, the decline in the market capitalization would still be in excess of $550 million. Therefore, under this alternative approach, the offense level should be increased 30 levels based on a loss exceeding $550 million.

## II.    A Very Substantial Term of Imprisonment Is Necessary

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of his offenses, the need to avoid unwarranted sentencing disparities, and the importance of general deterrence, a very substantial but below-Guidelines sentence, in line with the recommendation of the Probation Office of 132 months' imprisonment, would be sufficient but not greater than necessary to satisfy the purposes of sentencing. A sentence of probation as requested by Milton—which would represent, in effect, a 100% variance below the Guidelines sentence of 60 years' imprisonment—would be woefully inadequate to satisfy the purposes of sentencing, and send the wrong message to the defendant, to others considering committing fraud, to victims, and to society at large.

21

### A.     The Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The nature and seriousness of the offenses and the need to provide just punishment warrant a very substantial sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Milton's conduct—lying repeatedly and consistently about Nikola to foment investor fervor by non-professional investors and to encourage those investors to buy stock based on a false and misleading portrayal of the risks they were assuming—was serious and far-reaching. Milton claims in his own submission that his focus on retail investors merely reflects his business philosophy (*see, e.g.*, Def. Mem. 7),[7] but the facts established at trial—including through contemporaneous text messages written by Milton and the testimony of his top executives—show that Milton targeted retail investors based on the belief that he could encourage their buying to support and inflate Nikola's stock prices. That Milton repeatedly lied to this audience to drive their interest in investing in Nikola makes plain that Milton took advantage of these investors. Milton's use of social media and other newer methods of communicating directly with this segment of the investing population to sell investors on a false vision of Nikola and to subject untold numbers of investors to risks for which they did not bargain only further underscores the scope and seriousness of the offense.

But Milton's conduct was not only carried out in this impersonal way. Milton also made misrepresentations directly to Peter Hicks and his son in order to obtain property from them using Nikola stock—which Milton well knew was inflated in value—as currency. On their call with Milton, Hicks and his son asked precisely the types of questions smart but non-professional investors might ask, inquiring about the status of Nikola's business, for example, asking Milton specifically about whether Nikola had already obtained contracts for power at the favorable rates

---

[7]      At times, Milton portrays himself as something of a babe-in-the-woods in the business world, while at others as someone with a revolutionary business model and visionary theory of social media and market valuation. (*See, e.g.*, Def. Mem. 3, 7).

Milton claimed and had obtained exclusive rights to particular freight routes. (*See* GX 1400-T). Rather than clarify that these were merely goals, Milton lied directly and clearly, telling Hicks and his son that "we've already begun procuring power and planning stations and gobbling up the rates and taking energy from the grid." (GX 1400-T at 22). None of these claims were true.

Nor were Milton's lies, as he contends, the product of "enthusiasm," "optimism," "spontaneity," or some kind of "'deep emotional connection' to Nikola," nor of being "untrained" or a "novice" or even "'an ambitious dreamer.'" (Def. Mem. 3-4). Rather, Milton's exaggerations and falsehoods were deliberate and manipulative. As noted above, Milton lied repeatedly and consistently about core aspects of Nikola's business, for example misrepresenting time and again that Nikola was producing hydrogen and doing so at specific, favorable prices resulting from contracts for electricity at specific, favorable prices—all central to an investor's view of Nikola's likelihood of profitability, all complex and specific factual claims, and all false.

Milton was also repeatedly offered—by Hicks, by Ed Ludlow, and by others—the opportunity to clarify his public statements, to explain, much as he seeks to do now in advance of his sentencing, that his words were the product of excitement or inadvertence and to clarify the true status of development at Nikola. (*See* GX 413-T, 418-T, 425-T, 1400-T). Milton did not once take the chance to tell the truth. Instead, he continued to prevaricate and deceive—telling Hicks that Nikola was already taking of electricity off the grid, or Ludlow that the Nikola One was fully functional but that Nikola chose not to operate it, to take but two examples. And Milton was warned repeatedly by his executives about his conduct and the importance of telling the truth about Nikola's business. Indeed, one can only assume that Milton was one of few corporate executives for whom an intervention was necessary to stop him from misleading investors with his public statements, and for whom such an intervention was ineffective. Nor does Milton confront two

central, brazen acts of fraud—an unveiling in which he claimed that he had created a fully functioning hydrogen-powered semi-truck and a video of a truck coasting down a hill edited and titled to suggest that it was driving under its own power. Neither of these premeditated, elaborate deception was the result of "enthusiasm," "optimism," or "spontaneity." Perhaps most importantly, though, even the most "untrained . . . corporate executive[s]," even those who are "novice[s] . . . to public markets and finance," who "kn[ow] nothing of securities laws or regulation," and those who are optimistic, spontaneous, and ambitious (Def. Mem. 7) understand that it is wrong and against the law to lie, dissemble, and deceive to obtain investments, and when someone nonetheless persists in that conduct—particularly at the scale of Milton's offenses—the nature and circumstances of such a crime, and the need to promote respect for the law and provide just punishment demand serious repercussions.

Milton's lack of remorse and failure to accept any form of responsibility for his actions only emphasize the need for just punishment in this case. Although Milton carefully avoids disputing the falsity of his many representations in his own sentencing submission, he also expresses no remorse or empathy for investors who were misled nor does he take any genuine responsibility for his conduct. Instead, Milton deflects, suggest others may be at fault, and offer excuses for his behavior. For example, Milton—much as his attorneys argued at trial—claims that "Nikola fully and accurately disclosed all the material facts about its plan, products and finances on its own website and in its SEC filings" and that "[t]hose disclosures made equally clear all the risks of investing in such a company." (Def. Mem. 2 (bolding omitted)). In other words, it was at their own peril and folly that investors chose to purchase shares of Nikola. But while investors may well have received an accurate depiction of the risks of Nikola's business had they been informed only by Nikola's SEC filings, what matters here is that Milton decided to supplement

24

these disclosures with his own claims about Nikola that were false and misleading and that deceived investors about what they were receiving in exchange for their investment in Nikola.

In addition to portraying himself as naïve and unsophisticated, Milton suggests that he was put up to making the claims he did to investors, claiming that "[p]utting Trevor out in public to promote Nikola was a strategy conceived and endorsed by two of the most sophisticated and esteemed members of the company's board, Jeff Ubben and Steve Girsky." (Def. Mem. 3-4). As an initial matter, the notion that it was someone else who pushed for Milton to speak publicly through social media and television is utterly belied by the evidence at trial. But even if it were true that Mr. Ubben or Mr. Girsky encouraged Milton to speak publicly about Nikola, it was Milton who was responsible for what he chose to say.

Finally, in an effort to draw attention away from what he did do, Milton seeks to focus on various things that were not a part of his particular fraud, like lying to auditors or filing false documents with the SEC. For example, Milton asserts that he "never did anything to hide what he was doing or saying." (Def. Mem. 4 (bolding omitted)). Of course, Milton did not "hide what he was doing or saying" (Def. Mem. 4)—the very essence of his fraud was that he lied publicly to promote his company's stock. And although there may be a sense in which it is true, as Milton claims, that "[h]e did not create phony documents" (Def. Mem. 4), that is only a fair characterization if one excludes the many misleading press releases, inaccurate tweets, and deceptive technology demonstrations and videos created and disseminated by the defendant.

Milton further asserts that "there is not a shred of evidence from trial or from Trevor's personal life that he was ever motivated by spite, nastiness, ill will, or cruelty." (Def. Mem. 4). But rarely would one expect a fraud like Milton's to undertaken for those reasons. Rather, Milton's offenses, like so many other white-collar crimes, were the result of greed, selfishness, and lack of

concern for the potential impact on others. Milton suggests that there was "no evidence" that he intended to profit from his crimes by selling his stock. (Def. Mem. 7). But, as set forth above, the record was otherwise. Not only did Milton prioritize the status of being a wealthy entrepreneur, but he spent nearly all of the cash he had from Nikola going public on airplanes and lavish properties well before his lockup expired, and he made clear both at the time of the SPAC merger and later that he wished to be free to sell his shares.

In sum, Milton committed fraud on a scope permitted only by his easy access to means of mass communication and to a large number of victims who were vulnerable to his deception. He did so selfishly and he did so knowingly. A substantial term of imprisonment is made necessary by the nature and seriousness of this conduct, the need to promote respect for the law, and to provide just punishment.

## B.    The History and Characteristics of the Defendant

The history and characteristics of the defendant, while mitigating in some respects, support a substantial sentence in this case. *See* 18 U.S.C. § 3553(a)(1). In support of his request for a sentence of probation, Milton focuses primarily on his own circumstances, including his upbringing, relationship with his wife and family, and various good deeds. (Def. Mem. 21-37). While the Court can and should take note of these facts, and must fashion a sentence that considers the history and characteristics of the defendant, the facts proffered by the defendant do not counsel against a substantial sentence in this case, much less justify Milton entirely escaping the consequences of his actions, as a sentence of probation would permit him to do.

Milton points to hardship he endured as a child, including the death of his mother, as well his during his marriage and adult family life. (Def. Mem. 21-26, 34-37). While these circumstances are regrettable and deserve sympathy, they do not justify the defendant's conduct or place Milton outside of the mainstream with respect to the many difficulties people experience. There is no

reason to doubt that Milton is a loving husband, and Milton's admirable qualities should be taken into account. But that Milton cares deeply for the ones he loves and the friends that are close to him, while showing no care for the many that he misled and whose money he put at risk through his offenses, does not call into question the need for serious and just punishment for that conduct.

Milton also points to various forms of charitable giving he has undertaken. (Def. Mem. 28-30). While these acts may be admirable, many of them must also be contextualized by the extreme wealth the defendant has accrued, much of it as a result of the conduct for which he has been convicted. Prior charitable works, however commendable and extensive, by professionally successful defendants rarely, if ever, are materially mitigating factors at sentencing because courts recognize that it is not extraordinary for such defendants to be involved in charities and to have strong professional and personal relationships. *See, e.g.*, *United States v. Barbera*, No. 02 Cr. 1268 (RWS), 2005 WL 2709112, at *12-13 (S.D.N.Y. Oct. 21, 2005); *see also United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) (a defendant's "good name and good works" should not serve as "the human shield he raises to seek immunity or dramatic mitigation of punishment when he is caught"). Indeed, many defendants do not have the resources—in time, money, or social standing—to perform such deeds, and so the law is reticent to show leniency to the few defendants who are fortunate enough to have such options. *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir.

27

1998) (prominent community member's public service and charitable activities provided no basis for departure, because although "laudable," they were "neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand."). None of this is to say that the Court cannot or should not consider actions of the defendant that speak to his good character in considering the necessary sentence in this case, but these good acts cannot be taken to justify the actions the defendant has taken to accumulate his wealth, including actions undermine the good works that the defendant now emphasizes as evidence of his character.

Moreover, the portrait that Milton paints of himself does not include a long history of questionable and dishonest business practices even predating the extensive fraud in this case. As noted above, Milton has repeatedly come into conflict with business partners over his conduct and has lengthy history of exaggerated and misleading claims about his business ventures. This history counsels in favor of a substantial sentence of imprisonment.

## C.    General and Specific Deterrence

A significant sentence of imprisonment is also necessary in this case to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white collar cases because the decision to commit fraud is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for

general deterrence." (quotation marks and citation omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). For those reasons, it is important here to impose a significant sentence to deter future similar fraudulent conduct. Indeed, the specific context of Milton's fraud underscores the need for deterrence. Too often startup founders have turned to misrepresentations about the status of their technology or their ability to generate revenue in order to boost their nascent companies and obtain new investments. A significant sentence for Milton would send the message to like founders and would-be defendants that there are significant costs associated with fraudulent misrepresentations, beyond just having a startup fold.

Milton, however, argues that the negative publicity from the prosecution is an adequate deterrence. (Def. Mem. 40). Not so. The Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less

> deterrent effect the sentence will have on others contemplating
> similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

If anything, the publicity this case has received if anything weighs in favor of a substantial sentence. This case presents an appropriate opportunity for the Court to send a strong signal to market participants, and, especially in light of the publicity to which the defendant points, an unjustifiably lenient sentence would encourage others who might be tempted to engage in investor fraud that the rewards of such wrongful activity may be worth the price. *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

Lastly, while a significant prison sentence is necessary for general deterrence, it also plays an important role in specific deterrence. The defendant argues there is "not a risk" that he will commit future crimes. (Def. Mem. 41). While that may well ultimately be the case, there are many examples of first time fraudsters in this district who become recidivists. *See, e.g.*, *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme). Were the Court to impose the sentence requested by the defendant, he would be in his early 40s and would be fully capable of starting a new company and

30

repeating his past conduct without fear of significant jail time. For that reason, a significant sentence is also necessary for specific deterrence.

### D.     The Kinds of Sentence and Sentencing Range Established

The Court must also consider "the kinds of sentence and the sentencing range established" in the Guidelines. 18 U.S.C. § 3553(a)(4). As set out above, the Guidelines sentence for the defendant calls for a sentence at the combined statutory maximum of his offenses of conviction. Thus, this factor plainly weighs in favor of a very significant sentence, although, as explained further below, the Government does not insist that Milton receive a Guidelines sentence.

Milton argues that the fraud Guidelines are not based on empirical evidence and "substantially overstate the seriousness of the offense." (Def. Mem. 14). This argument is misguided for several reasons: the current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission, and is based on sound policy choices, and even if the fraud Guidelines were overly reliant on loss—a point the Government does not concede—the Government is not seeking a Guidelines sentence and the defendant's conduct warrants a significant sentence.

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *Fishman*, 631 F. Supp. 2d at 403. Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC2210-40,

62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained the resulting amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

In 2002, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act, and in response the Commission amended the modified the loss-amount enhancement in Section 2B1.1 for high-loss cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909.  Thus, to the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See Ebbers*, 458 F.3d at 129 ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white collar] crimes."). The few district court opinions cited by Milton seem not to have considered the

Commission and legislative history. *See, e.g.*, *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (cited by Milton for the incorrect proposition that "as far as [that] court can tell" the loss guidelines were not the "result from any reasoned determination").

Milton's argument otherwise draws on language from the district court's decision in *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), and Judge Underhill's concurrence in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013), which quotes from *Adelson*. Both of those cases involved extreme sentencing guidelines for defendants who personally had no participation in causing any actual loss. "Adelson was not the originator of the fraud, and, as the jury found in effect, Adelson did not participate in the fraudulent conspiracy until its final months," during which time the company's "stock was not further inflated." *Adelson,* 441 F. Supp. 2d at 513. In other word, "Adelson was closer (though not identical) to an accessory after the fact." *Id.* As a result, Judge Rakoff recognized that the Guidelines range of 85 years in prison could not account for the nuanced way in which the defendant participated in the scheme and resulted in a patently unjust sentence. *Id.* Even after taking that factor into account, though, the district court noted the importance of considering general deterrence in financial-fraud cases and imposed a three-and-a-half-year sentence: "notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence." *Id.* at 514. *Adelson* thus advocates implementing a meaningful custodial sentence in fraud cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary." *Id.* at 513.

*Corsey* presented a similarly abnormal situation warranting a variance. In *Corsey*, the defendants were prosecuted for trying to carry out an outlandish scheme against, what turned out

to be, an FBI informant. "This was a clumsy, almost comical, conspiracy to defraud a nonexistent investor of three billion dollars. That scheme never came close to fruition." *Corsey*, 723 F.3d at 378. "This scheme amounted to a series of absurd lies piled on top of even more absurd lies." *Id.* at 379. However, the defendants in *Corsey* immediately faced a guidelines calculation that was above the statutory maximum of 20 years and close to life in prison. It is in this context that Judge Underhill found the guidelines to be of "low marginal value" for the case at hand. However, he did not say the guidelines were always of such little import. In fact, Underhill quoted *Adelson* in holding that in other instances, the guidelines are "of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable." *Id.* at 380.

In this case, by contrast, the loss amount is derived from the amount that the defendant himself caused investors to overpay in buying Nikola stock. Notably, while generally criticizing the fraud Guidelines, Milton does not make any argument as to why they are ill-suited for this particular case or the facts proven at trial.  This is not a case where, as in *Adelson*, the Guidelines range is based upon numbers drawn from the actions of others or factors beyond the defendant's control. Rather, Milton—in aiming to hit certain share price targets by making false statements— fixed his own Guidelines range. The direct relationship between Milton's actions and the loss amount distinguishes the Guidelines calculations in *Adelson*, *Corsey*, and the other cases cited in his brief from the present case.

Milton also argues that the enhancement for being a director of a public company results in Guidelines that overstate the seriousness of the offense. (Def. Mem. 17). That enhancement is not only plainly applicable, it also is appropriate under the circumstances. While Nikola was only publicly traded for a matter of months while Milton was at the company, he used his position as the chief executive at the company in order to disseminate false information about Nikola to boost

the share price.  Thus, his role as a public officer and director was instrumental in furtherance of his fraud.

Accordingly, no downward departure is warranted based on Application Note 21(C) to Section 2B1.1. The applicable Guidelines range correctly indicates the need for a significant sentence here.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

Finally, the Court must consider the need to avoid unwarranted sentencing disparities. Comparing Milton's conduct to that of other similar white collar defendants in this Circuit and throughout the United States reveals that a sentence of eleven years imprisonment is sufficient but not greater than necessary to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Sentencing data from the last five years shows that defendants with similar Guidelines ranges often receive sentences the same or greater than the sentence the Probation Office and Government advocate here. According to data from the United States Sentencing Commission's Judiciary Sentencing Information database ("JSIN"), during the last five years there have been 29 defendants (excluding cooperating witnesses) whose primary guideline was § 2B1.1 with a total offense level of 43 and no prior criminal history. *See* JSIN (2023), available at: https://jsin.ussc.gov/analytics/saw.dll?Dashboard. All 29 of those defendants received sentences of imprisonment. *Id.* The average length of imprisonment was 195 months imprisonment, and the median length of imprisonment was 156 months. *Id.*  As a result, the sentence advocated for by the Probation Office and the Government (132 months) would be below the average and median length of imprisonment imposed on similarly situated defendants. As discussed above, the PSR calculated the total offense level as 37. There were also 29 defendants (excluding cooperating witnesses) in the last five years whose primary guideline was § 2B1.1 with a total offense level of

37 and no prior criminal history. *Id.* The average sentence length for those defendants was 132 months imprisonment—the length the Probation Office and Government argue for here—and the median was 120 months imprisonment. *Id.*

Focusing on defendants that committed offenses similar to Milton, who went to trial, and whose conduct resulted in a Guidelines range similar to the applicable Guidelines range here, courts impose sentences around or above the range advocated for here by the Government. Indeed, as the chart below indicates, in other frauds on investors of public and privately traded company, corporate officers that were involved in making misrepresentations were sentenced to terms of imprisonment above the sentence recommended here.

| Case | Loss Amount | Guidelines | Sentence |
|------|-------------|------------|----------|
| *United States v. John Surgent*, 04 Cr. 364 (JG) (EDNY) (pump and dump scheme) | $6 million in gains | 168-210 months | 168 months |
| *United States v. Patrick Bennett*, 97 Cr. 639 (JSM) (SDNY) (Bennett Funding Group fraud) | $100 million in losses | 188-235 months | 264 months |
| *United States v. Bernard Ebbers*, 02 Cr. 1144 (BSJ) (WorldCom fraud) | Over $100 million in losses | 360 months to life | 300 months |
| *United States v. John Rigas*, 02 Cr. 1236 (LBS) (SDNY) (Adelphia fraud) | Over $200 million in losses | | 180 months |
| *United States v. Timothy Rigas*, 02 Cr. 1236 (LBS) (SDNY) (Adelphia fraud) | Over $200 million in losses | | 240 months |
| *United States v. Jeffrey Skilling*, 04 Cr. 25 (SL) (SDTX) (Enron fraud) | Over $1 billion in losses | 292 to 365 months | 292 months |
| *United States v. Walter Forbes*, 02 Cr. 264 (AHN) (D. Conn.) (Cendant fraud) | $14 billion in losses | 112 to 149 months | 120 months |
| *United States v. Richard Adelson*, 05 Cr. 325 (JSR) (SDNY) (Impath fraud) | $100 million in intended losses | Life | 42 months |
| *United States v. Elizabeth Holmes*, 18 Cr. 258 (EJD) (NDCA) (Theranos fraud) | Over $550 million | Life (capped at 80 years) | 135 months |

In particular, the sentenced imposed in *United States v. Elizabeth Holmes*—135 months imprisonment—is a clear precedent for an appropriate sentence here. There, the defendant made misrepresentations to potential investors about Theranos's financial condition and future prospects, including about the operability of the company's technology and its expected revenue.

Here, Milton made numerous misrepresentations about multiple aspects of Nikola's technology and future prospects. Just as Holmes lied about Theranos-manufactured blood analyzers, Milton lied about the operability of the Nikola One semitruck. Just as Holmes used third party, commercially available blood analyzers to trick investors into believing Theranos had an operating production, Milton used Ford pickup trucks to make show Badger trucks. And just as Holmes exaggerated Theranos's revenue projections, Milton lied about the prices at which Nikola could obtain electricity and produce hydrogen, as well as lying about the revenue that Nikola could expect from reservations. Holmes like Milton was a first time offender, who had been described as a visionary and had launched a company based on a good idea, even though she was largely a novice within the health care industry.

Appreciating the clear parallels with Theranos, Milton attempts to distinguish the *Holmes* case based on several immaterial facts. (Def. Mem. 46). He argues that Nikola is still a real business, while Theranos is not. But that fact says little about the two defendants' respective culpability. And the fact that Nikola was more established and publicly traded, while Theranos was not, is an aggravating factor that, at a minimum, is a reason to give Milton a sentence comparable to the sentence imposed on Holmes, if not a greater one. Milton also highlights that Holmes "duped her own board of directors," but again, this is arguably an aggravating, not mitigating, factor for Milton: he was repeatedly confronted by Nikola's senior leadership and warned not lie publicly, and yet he continued to make material misstatements up to the time the Hindenburg report was released.

There are additional facts that weigh in favor of Milton getting a longer sentence that Holmes. Nikola was publicly traded, the victim investors were not able to do due diligence in the same way Theranos's investors could, and the number of victims involved is significantly greater.

Milton was older at the time he committed the offense, he was the clear leader of the business (while Holmes argued that some of the key decisions were pushed by Sunny Balwani), and as discussed above, he had a history of lies and dishonesty in business.

Accordingly, in order to avoid unwarranted sentencing disparities, the Court should sentence Milton to a very substantial sentence, in line with the recommendation of the Probation Office, which is consistent with the average sentence for similarly situated defendants, including Holmes.

### III.   The Court Should Impose a Fine and Order Restitution and Forfeiture

The Court should order financial penalties and relief for victims in this case.

First, the Government agrees with the Probation Office that the Court should impose a $5,000,000 fine. (PSR ¶¶ 106-08; *id.* at pp. 38). In light of the defendant's profit from the operation of Nikola and his ability to pay, a significant fine is warranted.

Second, the Court should order the forfeiture of the specific property known as the Wasatch Creeks Ranch in Utah. As described above, the defendant obtained the property as a result of the fraud he was convicted of in Count Four of the Indictment. The Government will submit a proposed order of forfeiture in advance of sentencing.

Third, the Court should order restitution for investors in Nikola stock as well as for Peter Hicks. Because the restitution order and the plan for distribution of funds may be affected by the Court's determination of loss under the Guidelines, the Government respectfully requests that the Court defer the determination of the restitution award until at least 90 days after sentencing so that the parties may offer further briefing on the issue and a plan for administration. *See* 18 U.S.C. § 3664(d)(5) (permitting the Court to resolve restitution within 90 days following sentencing); *see also Dolan v. United States*, 560 U.S. 605, 611 (2010).

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully requests that, consistent with the provisions of 18 U.S.C. § 3553(a), the Court impose a very substantial sentence, in line with the recommendation of the Probation Office, impose a fine of $5,000,000, and order restitution and forfeiture.

Dated:  New York, New York
   December 11, 2023

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

   By:    s/
        Matthew Podolsky
        Nicolas Roos
        Assistant United States Attorneys
        (212) 637-1947/2421