UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          21 CR 478 (ER)

TREVOR MILTON,

                    Defendant.              Sentence
------------------------------x

                                            New York, N.Y.
                                            December 18, 2023
                                            11:00 a.m.


Before:

                        HON. EDGARDO RAMOS,

                                            District Judge

                            APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  MATTHEW D. PODOLSKY
     NICOLAS ROOS
     Assistant United States Attorneys

MUKASEY FRENCHMAN LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG
     -and-
PAUL HASTINGS LLP
BY:  BRADLEY J. BONDI
     -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO

(Case called)

MR. PODOLSKY:  Good morning, your Honor, Matthew Podolsky and Nicholas Roos for the government.

MR. MUKASEY:  Good morning, Judge, Marc Mukasey, along with Alexandra Shapiro, Brad Bondi, Ken Caruso, and Torrey Young and the defendant, Trevor Milton, who is seated to my right.

THE COURT:  Good morning to you all.  This matter is on for sentencing.

In preparation for today's proceeding, I have reviewed the following:  I have reviewed the presentence report, last revised on April 21, 2023, by U.S. Probation Officer Jana Neiman, which includes a recommendation.  I have also reviewed the sentencing submissions submitted by Mr. Milton's legal team, dated November 14, 2023, which includes an expert report prepared by Jonathan Arnold concerning the retail investor loss provided by the government, and approximately three dozen letters submitted by Mr. Milton's family and friends, a letter provided by one of Mrs. Milton's doctors, and there is also an acknowledgement by Mr. Milton's church of the donation of 1.5 million shares of Nikola stock on December 30, 2020.

I have reviewed the government's submission, dated December 12, 2023, and I subsequently received various letters, including one on behalf of Mr. Milton, dated December 15, 2023, challenging, among other things, the government's loss

calculation, a letter from the government, also dated December 15, 2023, attaching several victim impact statements, including that of Mr. Hicks, the individual who sold a property to Mr. Milton for cash and Nikola stock options. I also received from the government several victim-impact statements.

Were there any other victim-impact statements that I should have received, Mr. Podolsky?

MR. PODOLSKY: I don't believe so.

THE COURT: Is there anything else I should have received or have reviewed in connection with the sentencing, Mr. Podolsky?

MR. PODOLSKY: Your Honor, we did file late last night a letter responding to the objections that the defense submitted Friday afternoon to the PSR. We are also prepared to discuss them today, should the Court want to address any of them specifically.

THE COURT: I should have mentioned that. I did receive your letter, it's document 318 which was filed yesterday, and I did review it.

Mr. Mukasey, have you received the PSR and discussed it with your client?

MR. MUKASEY: Yes, Judge.

THE COURT: Mr. Milton, have you received a copy of the PSR and discussed it with your attorneys?

THE DEFENDANT: Yes, your Honor.

THE COURT:  It appears that there are a number of disputes that remain, primarily affecting the loss calculation.

Just so we are all starting from the same point, the defense tells me that the loss is zero and the government tells me that the loss is at least 660 million.  Where do I go with that?

Let me begin with Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

Maybe before we talk about loss, if it's all right, I want to raise one other guidelines issue that was not in the submissions.

In preparation for sentencing today, we reviewed the guidelines calculation and realized that there was an oversight which I think was occasioned by the fact that the presentence investigation report was dated much earlier this year.

As you know, there is an adjustment for zero-point offenders under Section 4C1.1 now.  I would say that there is an exception to that adjustment for circumstances when the defendant has personally caused substantial financial hardship. I do think we likely could establish that exception.  But at this point, on this record, we think that 4C1.1 would apply, and we are not prepared to go to a *Fatico* on this because ultimately we don't think it's material to the sentence your Honor will impose under 3553(a).

What we would recommend, your Honor, and apologies

that we are doing it on the fly, a two-point reduction to the government's calculation of an offense level of 43, would result in an offense level 41, and a guidelines range of 324 to 405 months, which we do submit is the applicable guidelines range here.

THE COURT:  I know one of the parties did discuss that in their submissions, and I was going to raise that.

Mr. Mukasey, I take it you don't have any objection to the two-level rejection?

MR. MUKASEY:  No, Judge.

MR. PODOLSKY:  Thank you, your Honor.

Let me address your question about loss.  I will make a few more comments.  If we get more technical, I may ask Mr. Roos to bail me out.

Let me start with a common-sense point.  There was a loss in this case.  It's not reasonable.  There is no argument that a preponderance of the evidence -- no reasonable argument that a preponderance of the evidence would show that Mr. Milton did not cause a loss to investors in this case.

We can point to a number of things, including the increase in Nikola's stock price during the course of Mr. Milton's scheme and the corresponding decline after Mr. Milton's scheme was revealed and as it continued to be revealed over a number of what I would refer to as disclosure dates, beginning with the publication of the Hindenburg

Research report.

THE COURT:  As I understand it, on December 9, Nikola's market capitalization was $16 billion.

MR. PODOLSKY:  I think that's right, your Honor.

THE COURT:  In the subsequent days it went down to something under $13 billion, like in the two subsequent days.

MR. PODOLSKY:  I think that's correct.  There was a significant decline on those days, and we focused on those days, but just to focus on the fact that there was a loss to investors, the stock price continued to decline precipitously, frankly, as more and more information came out:  Mr. Milton's resignation, Nikola's 8-K confirming the fact that Mr. Milton had misrepresented -- made misrepresentations about Nikola as this case progressed.

THE COURT:  Can we just set a baseline, lest I will need Mr. Roos to bail me out as well.

A loss of approximately 10 percent from one day to the next on a $16 billion company, that seems to me to be significant even if not scientifically significant.

MR. PODOLSKY:  I absolute agree, your Honor.

I don't think the law requires, when considering whether there was a loss, there to be any particular threshold, 1 percent, 2 percent, 5 percent, 10 percent.  But a 10 percent loss of market capitalization of $16 billion is extremely significant.

I will note that the evidence at trial confirmed that Mr. Milton understood that his misrepresentations were inflating the price of Nikola's stock.  I mean, we don't have to go through the whole trial record.  I know your Honor is familiar with it.

But, for example, text messages that he wrote about his response to Ed Ludlow's article and the way that it sort of prevented stock price decline based on the truth coming out.

I think just on the question of was there a loss, the idea that there was a zero loss in this case is frankly preposterous.  Your Honor should certainly find by a preponderance of the evidence that Mr. Milton's scheme caused a loss to investors in this case.

The question then becomes, what is a reasonable estimate of that loss?  We know that we are not going to be able to determine with absolute metaphysical certainty what that loss was.  That kind of evidence doesn't exist.  That's why the law doesn't require it.  The law requires your Honor to make a reasonable estimate of the loss.

So what the government has put forward is an analysis based in large part of what Mr. Ferrell himself said at trial and focusing conservatively on the loss just caused shortly after the publication of the Hindenburg Research report.

We can argue for a loss that comes up all the way up to the trial or even close to today, where the loss would be

something like 99 percent of the stock price, but we haven't done that because we have tried to come up with a reasonable and fair estimate. That's how we came up with the approximately $660 million loss, which we believe your Honor should find is a reasonable estimate by a preponderance of the evidence.

THE COURT: Mr. Mukasey.

MR. MUKASEY: Judge, I am going to give you an anecdotal answer. If you want to get more technical, I am going to punt to Mr. Bondi to speak to the methodology, including the market-cap analysis that your Honor asked about.

I will note that our papers show several models by Professor Arnold that note several models that yield a zero loss number. If you want to get into the specifics of those models, I am sure Brad Bondi can do it better than I can.

The anecdotal point that I want to make is that the government wants Trevor to answer for millions of retail shareholders, some of whom suffered a loss, some of whom didn't, regardless of whether they heard a podcast, regardless of whether they saw a tweet, regardless of whether they knew who Trevor Milton was, regardless of whether they heard an interview, regardless of whether they even knew that Trevor Milton was talking to the public.

In that regard, this case is very unlike cases cited by the government, like *Rigas* and *WorldCom*, *Adelphia*. Those

cases involved misstatements in SEC filings, misstatements of accounting issues, misrepresentations that were embedded in the financial statements of the company, which is not the case here.  And in those cases, where you see hundreds of millions of dollars of loss, hundreds of millions of dollars among all the shareholders in the market, that's because those kinds of frauds affected every shareholder.  Those kinds of frauds were embedded in the information in the market.

Trevor was speaking to a class of people who have never been identified.  We don't know who they are.  We don't know how many.  We don't know what they traded.  We don't know how much they traded.

As to the economic approach, I'll let Mr. Bondi speak to it, but from an anecdotal point of view it does seem unjust to tag him with the losses of the entire market when his statements were made to relatively few people.

THE COURT:  Isn't one of the baseline assumptions that I have to make is that we are working in an efficient market, and in an efficient market people know what the information is concerning a company that is out there, and Mr. Milton certainly was very active in advocating on behalf of his company and the status of the company at various points in time.

Even if the government can't point to every victim and pin a victim to a particular statement on social media that

Mr. Milton made, the loss will still be the loss involving all of those victims, right?

MR. MUKASEY:  I think there is a limit to how much credit you should give an economic analysis.  At the end of the day, we are talking about human beings.  In the end of the day, we are talking about something that is I think a mistake to approach simply as a math problem or an economic theory.

Now, if you want to approach it as an economic theory, Mr. Bondi is prepared right now to tell you why the government's theory is wrong.  I am approaching it more from an anecdotal human perspective.

THE COURT:  You can go ahead, Mr. Mukasey.

MR. MUKASEY:  I'm passing the baton.

THE COURT:  Mr. Bondi.

MR. BONDI:  Your Honor, Brad Bondi.  May it please the Court.

Your Honor, I'm not an economist, but neither is Mr. Podolsky and Mr. Roos, but we have presented an economic analysis from Dr. Jonathan Arnold which is consistent to with the testimony of Dr. Allen Ferrell at trial showing that there was no loss attributed to Mr. Milton's statements.

What I have trouble with, your Honor, is, we have two economists here that have come forward and have put up reports here, and yet the government has referred to a Compass Lexecon outside consultant, but where is the signed report from their

so-called economist who is the so-called economist?

And the reason why I think, your Honor, they probably have not put up a real economist in their arguments here is because, to your point here, it doesn't fly under an efficient market hypothesis. You know it. You just brought it up, your Honor. An efficient market says that the stock reacts almost instantaneous to information, yet the government has used a flawed methodology using a two-day window to try to say, well, information sort of trickled out here.

Then they do one better, your Honor, in terms of flaws. They take the widely accepted 5 percent standard threshold that is used to measure statistical significance. It's used -- in every case, your Honor, that I have ever seen, Compass Lexecon appear, their so-called consultants. It has been used in every case, as long as I've been practicing, for 26 years, 5 percent.

Now the government uses 10 percent. Why do they use 10 percent? Because that's how they are able to put up their big damages number.

That 5 percent would be *Daubert*'d now in a civil case before your Honor. It should not be used and relied upon in a criminal case, where the man's liberty is at stake, to rely on something that flawed.

THE COURT: Didn't Professor Ferrell also use a multi-window analysis?

MR. BONDI: Your Honor, he used a one-day window which he called, if you remember when he testified on the stand, he called it multiple times because at one point your Honor kind of cautioned me and said, I got at the gold standard, if you remember. The gold standard, as he said, and your Honor remembers it, one day, 5 percent and one day, 5 percent no movement.

Dr. Arnold separately and independently analyzed the loss analysis and said, there is no loss attributed to anything that Mr. Milton did, period.

We have to keep in mind, your Honor, that stocks move, and your Honor knows this, for a number of host of reasons. And if you look at the life cycles of any spaks, and that was Nikola was, it looks like a roller coaster. It goes up, it goes down. There is all sorts of things that cause movement in a stock price. There are insiders being able to sell because of warrants. There is news. There is all sorts of things.

And we cannot just look at it and say, stock moves, stock went up, stock went down, therefore it's Mr. Milton's fault. That's not science, that's not economics, and that's not reliable. At best, your Honor, they cannot show a loss attributed to Mr. Milton. At best, they cannot show that.

And I want to come back to something they keep relying on, your Honor just focused on, which was the Hindenburg report. If you remember, that was a big deal about whether

that Hindenburg report comes into trial.  Your Honor recognized that the Hindenburg report had a whole lot of other stuff not even related to Mr. Milton and a lot of stuff that wasn't charged in this case.  There was all sorts of things.

There were even allegations about other individuals in the Hindenburg report, like Trevor Milton's brother, Travis, was mentioned in the Hindenburg report.  There were all sorts of things that didn't make its way into this trial.  Not to mention, your Honor, what happens when somebody does a short report is, they short, and it creates movement in the stock price.

For your Honor to rely on upon a part that your Honor himself recognized was not admissible in this case and now to rely upon it as part of the loss calculation, your Honor, respectfully, is in error.

Your Honor, looking at this, they have not presented anything that you and this Court can rely upon.  If your Honor accepts the fact that there were losses, it will accept a threshold of 10 percent that, as far as I know, no other court in this district has accepted a 10 percent threshold.

THE COURT:  I think in the government's papers they mentioned that Mr. Ferrell also talked about a 10 percent threshold.

MR. BONDI:  Your Honor, he presented multiple examples, but he said on the witness stand, under oath, that

the gold standard was one day and 5 percent.  Your Honor, he did not say 10 percent was the appropriate methodology.  He did not.  And neither did Dr. Arnold.  And no economist that I have seen from their own economic consulting, Compass Lexecon, has ever testified to 10 percent that I know of.  That's probably why they have not even presented a signed report from Compass Lexecon.  That's the travesty here.

THE COURT:  That's a fair point, that I have not seen a report from Travis lexicon or whatever the name is.

MR. BONDI:  Compas Lexecon, your Honor.

THE COURT:  Compass Lexecon.

I go back to one of my original points.  On September 9, the company was worth $16 billion.  After the report, it was worth 14 and change.  And the day after, when Nikola issued a press release, it went down even further.  That's a significant, in my view, and I'm not an expert, I'm not an economist, but it's a significant diminution in market capitalization for a $16 billion company, and to suggest that no loss resulted seems untenable.  And, by the way, that's what the jury concluded, right?  Because Mr. Ferrell presented his findings to the jury.  He said there was no loss.  And the jury clearly, as they were entitled to, determined that there was a loss.

MR. BONDI:  Respectfully, your Honor, Dr. Ferrell did not testify to loss.  He testified with respect to the concept

of materiality.

THE COURT:  I believe he testified that anything that Mr. Milton said had no effect on the stock price of Nikola, correct?

MR. BONDI:  That's correct.  That it was not statistically significant that his -- none of the statements statistically moved the stock price.

Going back to that September 9, September 10 time frame, your Honor, two points on that.

Number one, your Honor, looking at a 5 percent threshold with one day, which is what an efficient market -- your Honor just mentioned efficient market.  An efficient market is a one-day window.  On a one-day window, that Hindenburg report did not create a statistically significant window here in terms of a loss.

Your Honor, let's go back to it, though, because that same report was the report that included all sorts of conduct related to the company and other individuals at the company, other uncharged conduct, all sorts of things about that.

So to take that Hindenburg report and say, somehow that's 100 percent attributed to Mr. Milton would run afoul of your's own ruling in the case saying that it wasn't admissible because it had a lot of irrelevant information in it.  That was not relevant to the prosecution.

The challenge here, your Honor, is, to look at a

short-seller report and hanging the Court's hat on that short-seller report and say, that movement in the stock is all attributed to Mr. Milton, fails to consider what that short-seller report actually said, and it fails to actually look at the economics behind it.

THE COURT:  Let me ask you this.  Dr. Arnold in his report at page 37, table 1 has a graph in which he indicates appropriately applying the event-study methodology.  Then there is four different specifications.  Under two of the specifications, the losses would be more than $108 million. Why can't I just rely on your expert and determine that one of these loss amounts applies?

MR. BONDI:  Your Honor, Dr. Arnold also goes on to say that that would be -- even using the government's flawed methodology, you get to that amount.  You don't even get to 650 million.

Your Honor, that is not even the amount that Dr. Arnold says.  Dr. Arnold says, look, you cannot calculate the loss amount at best, or it's either zero.  Because applying the 5 percent threshold and a one-day window, you can't attribute any of this loss to Mr. Milton, period, full stop, from an economics standpoint.

But if you start playing with the numbers and playing with the goalposts here, at most you're talking about what Dr. Arnold was saying in that chart, but he is saying that's

not the methodology you should or would use in this case.

Using a proper methodology, the loss is zero.  At best, your Honor, it's not calculable, and you can't rely upon a number that the government has put out.

THE COURT:  If it's not calculable, then I have other options, correct?

MR. BONDI:  Excuse me.

THE COURT:  If it's not calculable, then I have other options, assuming for the sake of argument that I believe there was a loss.

MR. BONDI:  Your Honor, if you can't reasonably calculate the loss, you can't attribute a loss to the defendant, full stop.  Either you can attribute a loss to him or you can't attribute a loss to him.  And if you can't attribute a loss to him, there should be no enhancement for a loss.

THE COURT:  You didn't hear the last part of my question.  Assuming for the sake of argument that I believe there was a loss.

MR. BONDI:  If you believe there is a loss, your Honor, there has to be a way to calculate it.  And if you can't calculate it, there is no loss.  That's the point, your Honor.

MR. MUKASEY:  Judge, I think where you're going is, there is an alternative method.

THE COURT:  There are.  But at least a couple of

alternative methods, sure.

MR. MUKASEY:  One of them is gain, obviously, and I think we lay out in our papers, and we will rest on that, as to why gain is inappropriate and the gain in this case was largely paper gain.

THE COURT:  Mr. Podolsky, you want to respond?

MR. PODOLSKY:  I am not sure that paper gain is somehow excluded from the Court's consideration.  I think that's one method.

Another method is, the Court could consider an upward departure or variance if the Court determines that the loss is not reasonably calculable, but the Court thinks that there was a significant magnitude of loss in this case.

I do want to go back just for a moment to something, and this was part of your colloquy with Mr. Mukasey.  Mr. Mukasey said that we shouldn't rely simply on a math calculation.  We should think about anecdotally what happened here.

I think your Honor's question about efficient markets was exactly right, because not only were the thousands of people who received Trevor Milton's misrepresentations and misstatements victims, but so too were anyone who was trading at an artificially inflated price during this time period.

The goal of this scheme was to inflate the stock price of Nikola and cause people to trade at that stock price.

Therefore, the harm to somebody who traded at 60, 70, 80, $90 a day, based on the fact that the information in the market was misleading, even if they didn't hear the misrepresentations themselves, their loss was a direct and proximate harm and foreseeable harm of Mr. Milton's scheme.

I think Mr. Mukasey's analogy or attempt to distinguish this case from disclosure cases and SEC filings actually makes our argument for us.  It is true that disclosures were not in an SEC filing, but they were disclosures broadly to the market.  It's exactly the same phenomenon of false information being put out into the market and causing people to trade on it.

I actually agree with Mr. Mukasey.  An anecdotal approach is important here because the evidence at trial absolutely showed that thousands and thousands and thousands of people sufficient to drive the stock price up to make Nikola's market capitalization higher than fours at one point or, at the end, $16 billion, enough people traded as a result of Mr. Milton's scheme to inflate the stock price, and those people, those who weren't lucky enough to cash out, fortunately before the scheme was revealed -- and, by the way, those gains are not included in the government's loss calculation, but thousands and thousands of people who weren't lucky enough to cash out lost their investment and it was an investment that they thought was worth something that it wasn't.

I actually agree with Mr. Mukasey that there is an anecdotal approach that's important here because it is absolutely reasonable and, by a preponderance of the evidence, the evidence at trial has shown that there was a loss here, that it was extremely significant, whether you look at our experts' numbers of 650 million, or if you simply take the sort of anecdotal approach-of-the-market capitalization, it is far more than the $550 million threshold that the guideline sets for the loss enhancement that we think applies.

THE COURT:  Why should I not use the approach taken by the probation department and use the amount that Nikola settled with the SEC?

MR. PODOLSKY:  Your Honor, I think, as a sort of atmospheric point, the 125 million is -- does at least move in the right direction of recognizing the harm here, but I think in terms of what a preponderance of the evidence shows, I think that negotiated amount is actually significantly less than what -- than the loss caused by the defendant.  Here again, I point to our expert's calculations, as well as the loss in market cap.

I think although certainly your Honor could have that number in mind when thinking about the magnitude of the harm here, I think the evidence demonstrates a significantly higher loss amount in this case.

THE COURT:  Mr. Mukasey, why shouldn't I use that

amount?

MR. MUKASEY:  As between 660 and 125, I am going with 125.  I will say that, as we point out in our papers, the reason Nikola settled had nothing to do with Trevor Milton's conduct, misstatements, effect on the market, or any individual investor or the market as a whole.  Nikola settled for Nikola's reasons, and Nikola is coming after Trevor for that.

I think that we stand by Professor Arnold's, at least the majority of his analyses and, at worst, his two analyses that sort of credit the government's approach as even less than the 125.  As Mr. Bondi said, we stand by the notion that the government's economic analysis is flawed and that the loss is zero.

THE COURT:  I think that there is agreement that calculating the loss here is difficult.  There are any number of ways that I can arrive at a loss figure.

Let me just indicate that from my perspective that the concept that there was no loss here is difficult to reconcile with the evidence that I saw at trial and the evidence that I have received since, including some of the victim-impact statements.  There was real loss to real people who listened to Mr. Milton and invested in Nikola because of what they heard from him based on their due diligence, such as it was.  And obviously not all of them, so all of the various appearances that Mr. Milton made, but they discuss what they heard from

him.  And the fact that you went from one day to the next and a loss in excess of 10 percent of Nikola's market capitalization.

We could talk about the Hindenburg report all you want and how it discussed various different things.  But what we were talking about in that moment was the fact that that report told the markets that Nikola was not as it appeared, that what was being said about its capacity in the moment was not true.  To make believe that that had no effect on the market the next day and two I think is unreasonable.

I have read the papers, and I believe that the government's approach, as set forth in their memorandum at pages 12 through 20, is a reasonable one.

MR. MUKASEY:  Judge, I'm sorry to interrupt.  May I just ask that you indulge me for one second since you mentioned victim-impact statements.

THE COURT:  Sure.

MR. MUKASEY:  I'm sorry for jumping in front of the train.

We have ten victim-impact statements that were submitted Friday night by the government with no backup documentation, no trading records, no detail, no clarity.  And at least one of them is from a guy who invested $500,000 and came out with 4 million, it appears to me.

I want to suggest to you that these 11th-hour victim-impact statements are -- query whether there are

victims, query whether there is impact at all.

But in the 3500 material in this case, I just want to give you -- this is further to my point about kind of the real-world impact here.

THE COURT:  Sure.

MR. MUKASEY:  Further to the anecdotal point, we got some statements which the government furnished to us from folks that they interviewed, potential victims that they were looking to call at trial.  If you'll indulge me for 30 seconds, I would actually to read a couple of those quote/unquote statements.

This is from GX-3647-142.

Just to give you background, the government's investigators called a bunch of victims to see who would testify at trial.

I'll keep the person's name anonymous, but this is what this person said.  In 2020, he, this person, was a compulsive gambler and was treating investing in stocks like a casino.  He heard a lot of buzz about Nikola, so he bought and sold stock.  He doesn't have a lot of detail.  He didn't do any research.  Everything from that time is a blur.  That's a victim supposedly.

At Government Exhibit 3647-130, again, I'll keep the person's name anonymous.  He heard from a friend the concept of the electric truck, bought it on a whim.

3647-80, keep the person's name anonymous.  Friend

told him to invest in company.  He used to work with the friend.  Friend's name was Andre, not sure of his last name. Didn't look on social media about the company.  Doesn't remember why he sold.

There is many more of these.

I offer this simply to show that a sweeping tagging of Trevor Milton for all these losses seems to fly in the face of the real human conduct here.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  I'm frankly at a loss as to what the point here is.  There were people that we interviewed in the course of our investigation, some of whom we did not call at trial who couldn't remember or did not have relevant testimony.

On the other hand, there were two investor victims called to trial.  There were ten victim-impact statements submitted last week.  And, frankly, there is documentary evidence of the many, many, many thousands of people who purchased stock during the time period that Mr. Milton was making these misrepresentations.

I am not really sure how the fact that the government's interview of some person who said he couldn't really remember why he bought the stock has any bearing on the fact that there were many victims in this case.

THE COURT:  From my perspective, it's not unusual for me to receive victim-impact statements and it's not unusual for

victims to appear at sentencings and speak. We generally don't subject those victims to cross-examination, or at least I have never seen a victim subjected to cross-examination when they appear at proceedings such as this.

My approach is that I take what is in the victim-impact statements and, Mr. Mukasey, I take what is in those 3500 reports that you received, that there are people who gambled, who bought on a whim, who didn't give it a lot of thought. Then there are others who have chosen to submit impact statements about what their experiences were. That is where I come down on that.

As I indicated, I do believe that the government's approach is reasonable, and I therefore accept it, again with the caveat that the calculation of the applicable guidelines range is simply the beginning of the process.

With that, Mr. Milton was found guilty on three counts, one count of securities fraud and two counts of wire fraud. The counts are grouped. The base offense level is 7 because the most serious count had a maximum term of imprisonment of 20 years. Thirty levels are added because the loss was more than 550 million. Four levels are added because Mr. Milton was an officer and this involved a securities violation. Two levels are added because the offense involved ten or more victims and/or involved the use of mass media. Two levels are deducted because Mr. Milton has zero criminal

history points, yielding a total offense level of 41, and that offense level has an applicable guidelines range of 324 to 405 months.

With that, Mr. Podolsky, does the government wish to be heard prior to the imposition of sentence?

MR. PODOLSKY:  Yes, your Honor.

Just to be clear, just in terms of your process, do you want to address any of the defense particular objections to the PSR first or just hear about sentencing?

THE COURT:  Any other objections to the PSR, actually? Good point.

MR. MUKASEY:  Not any more than we submitted in our letter of December 15.

To be clear, we submitted that because, obviously, our client is looking at a substantial amount of time in prison, at least by the numbers, potential financial ruin, at least by the numbers, and the PSR and its facts are often used by the Bureau of Prisons to determine designation.  So we want to be belt and suspenders in terms of making sure that all our objections are part of the record.

THE COURT:  Absolutely.  I appreciate that.  I did read the government's response, and the government consented or agreed that the two changes could be made to the PSR.  I agreed with the government that otherwise the PSR was accurate. Remind me what they are.  I'm at page 4 of your letter from

last night.

MR. PODOLSKY: Yes, your Honor. As an initial matter, we have no objection to changing the defendant's place of residence or home address. That was on page 1. On page 4, let me find the correct place.

THE COURT: Paragraph 33.

MR. PODOLSKY: Thank you, your Honor.

We had no objection to modifying the sentence within paragraph 33 regarding the time. I think we suggested to change it to "by April 2021" rather than "in April 2021" the merger had been announced and so forth.

Following that, we had no objection to removing the sentence about what Mr. Milton's broker had conveyed to Mr. Hicks.

THE COURT: What paragraph is that?

MR. PODOLSKY: I believe that's also at paragraph 33. I believe that's at the end of that paragraph.

THE COURT: OK. Very well.

MR. BONDI: Your Honor, briefly, if your Honor is in fact relying on the Hindenburg report and what came out, your Honor was correct in focusing on the amounts that were at page 37 of Dr. Arnold's report, which was using the government's methodology getting to the 108 and 110.

In other words, your Honor, respectfully, I don't see how it can get north of 550 and reach that 30th base level if

your Honor is looking and relying upon that Hindenburg and that movement from the 9th through the 21st.  That is, as your Honor pointed out on page 37 of Dr. Arnold's report, 108 and 110.  That's not north of 550, your Honor, in the loss calculation.

THE COURT:  OK.  You have made your record.

Mr. Podolsky.

MR. PODOLSKY:  Thank you, your Honor.

Maybe just to pick up, we have just spent some time obviously calculating the applicable guidelines range, which of course your Honor is required to do under law, and also I think it's important as it's instructive as to the severity of the crime in the view of the sentencing submission.

As your Honor knows, however, we are not recommending a guidelines sentence in this case.  It's a guidelines sentence in this case of I think approximately 27 to 33 and three-quarters years.  We would agree with the defense that it is unduly harsh and not necessary.

With that said, we do think, as we put in our submission, that the gravity of this crime, the nature and circumstances of the crime, the history and characteristics of the defendant, and the need for deterrence really mandate a significant prison sentence in this case.

I know that your Honor has spent a great deal of time on this case, both presiding over the trial and with the lengthy submissions of both parties, so I don't intend to go

through all of them, but I do want to emphasize maybe a couple of points.

The first is that this was a very serious crime.  I think in some ways this is not deeply addressed in the defendant's submission, but I think this is really where your Honor's consideration should start, because we are talking about a very serious crime with an impact on a lot of people.

One way in which it's serious, I think we conveyed this in our sentencing submission, but I will focus on it for a moment, is that the defendant really cultivated a following on social media.  He cultivated a group of people to follow him, to listen to what he said about Nikola.  And what that really means is cultivating trust in a large number of people that the defendant didn't know.

I think his use of social media is important to focus on for a moment because it allowed him to connect in a way that seemed personal.  It was actually videos, pictures, statements of the defendant in a way that seemed personal to a very large number of people in this country and likely across the world, and by making that connection he was able to get a huge number of people to trust him and trust what he said about this company and believed that what they were buying was what the defendant said.

I raise this point because I think this is not a guidelines point.  It's a 3553(a) point.  But I think there is

a real element of abuse of trust here which is, the founder, CEO, executive chairman of a company making a connection to a large number of people and misleading them about what they were buying.

I think this comes up a little bit in the defendant's sentencing submission where he objects, or at least says your Honor shouldn't give great weight to the sentencing enhancement for the number of victims or for the mass marketing.

I noted that because I think the argument was something like, well, any crime that involves a publicly traded stock will end up getting an enhancement under this portion of the sentencing guidelines.

What I think that ignores is what the defendant did in this case is exactly what the guidelines provides an enhancement for, which is, he solicited a large number of people over the Internet to invest for financial profit.  He was able to use a means of communication to get a very large number of people to trust him.

I focus on this again not because ultimately the guidelines number is what we think should dictate the sentence, but because in the judgment of the sentencing commission, and we think your Honor should agree, the circumstances of this offense were very serious.  They are the kind of offense that gets an enhancement under the guidelines because of the way that the defendant operated the scheme.

We think that this is a very serious crime, a crime that affected a very large number of people, and a crime that had a very significant impact on a large number of people.  We also think that Mr. Milton has deep culpability here.

That's sort of the second point I want to touch on is the culpability.  Just to make a few points, I know these are discussed in various ways in the submissions, but Mr. Milton in his submission claims in various ways that he never intended to harm anyone.  But I think that really doesn't contend with the fact that he did harm people.  He harmed a large number of people.  There are a number of people how the there who put their money, people who probably didn't have very much of it, into Nikola's stock and lost that money.  A few did submit victim-impact statements.

I think the argument that the defendant didn't mean to harm anyone is sort of besides the point.  I am sure it's true, I am sure it's true that Mr. Milton hoped that one day, after having gotten -- boosted the stock price, Nikola would one day be successful at all the things that he claimed it already was.  I am sure he would have been thrilled if there was a Badger in every garage and a hydrogen station at every corner, and everyone would walk off into the sunset wealthy.  I'm sure that would have been a great result in his view.

The point here is that those facts aren't true now and they weren't true then.  And he subjected his victims to a

risk, to a risk of loss, which is exactly what materialized.

The point I'm really searching for here is that maybe Mr. Milton didn't want his investors to lose, but he certainly didn't really ultimately care.  He was going to put that risk on his investors in order to inflate the price of his company and inflate his own value.

The other thing I wanted to focus on today is this suggestion throughout defendant's papers that Mr. Milton was sort of like naive or a babe in the woods, untrained in the ways of public companies.  It shows up in a few ways.  He says this on page 3 of his submission.  He says -- he argues against an enhancement for being a director of a public company on a view that he had only been a director for three months.

It also shows up in the sentencing submission in a sort of what I would say is not a very subtle suggestion that somehow he's like a western rancher, a genuine and truthful rancher caught up with these like coastal elites who are somehow ensnaring him in something unfair.

On page 33 of the sentencing submission it says: Perhaps in New York City, and other urban parts of the northeast, these would be atypical examples of philanthropy, generosity, and care for others.  In the west they are heroic and vital acts of selflessness.

Frankly, I don't really understand the point that's being made there other than there is some idea that Mr. Milton

out in the west is just engaged in some genuine heroic acts and somehow this prosecution is unfair, I think is the subtle suggestion here.

What I want to focus on is some of the facts that have come out in this trial about Mr. Milton that really, I think, undermine all of these arguments.

First of all, Mr. Milton is a serial entrepreneur. He has started a number of companies, and he started a number of companies to make money. That's OK. That's OK. But to suggest that he's some person out there who is not seeking to make a profit, who is not trying to gain some advantage is just not right.

THE COURT: He has some college, but he doesn't have an MBA, etc. That's certainly all true, isn't it?

MR. PODOLSKY: Your Honor, you are right, that is true, but I don't think it's really an accurate vision to suggest that Mr. Milton is somehow naive. He has gone through a number of businesses. He built this business. And as he repeatedly argued during trial -- I think this is actually relevant and makes our point -- as he repeatedly argued during trial, he brought in all of these great partners. He brought in all of these executives. He asked for SEC lawyers.

And all of these people, all of these people advised him that you have to be truthful in your disclosures to the public. The idea that he did not know what he was doing or

somehow got into something he didn't understand is just not true.

And it's not true for a very important and fundamental reason, which is the crime here is not something that you have to be a sophisticate to understand. The crime here was, he did not tell the truth. He lied. He lied repeatedly. When people challenged him and asked him, is this the truth, he doubled down and he lied.

So this is not a crime of, I didn't understand the disclosure rules. I didn't understand the technicalities of the SEC forms. I didn't understand exactly what Sarbanes Oxley is. That's not this crime.

What this crime is is that Mr. Milton lied. He lied to people. And he lied so that they would spend their money without understanding the facts. That's why I think it's really quite misleading as to the defendant's culpability to suggest that he didn't understand the way things work.

The final thing I'll say, your Honor, is just, very quickly, I think this is a case where deterrence is of particular importance. We have talked a little bit about specific deterrence in our papers, but I really want to emphasize the importance of general deterrence in this case.

This case obviously does have a large number of victims, has had some notoriety in the press, but the real reason that this case really cries out for a sufficient

sentence to send a message as to general deterrence is, we do have a market where individual investors are able to access and buy stock. And they, as we saw in this case, consume information, look for information about a company, listen to founders, executives, read interviews, listen to podcasts and so on.

And in order to have integrity in our markets to safeguard people's investments, there has to be a message that whether you're an entrepreneur, a startup, a founder, a corporate executive, when you go out there and talk about your company, you must be honest. And you cannot mislead investors and trick them, frankly, into taking a risk that they didn't argue for. I think this case in particular, among the many cases we see, cries out for a just sentence that will send a general deterrence message to other people who would be in Mr. Milton's shoes.

Of course, your Honor, I am happy to answer any questions you have, but those are the points that we wanted to emphasize today.

THE COURT: Thank you.

Mr. Mukasey, did you wish to be heard?

MR. MUKASEY: Thank you, Judge.

I hope you'll indulge me just for a bit longer than Mr. Podolsky because I'm holding somebody's life in my hands here, and I take that responsibility, as I think we all do,

very seriously.

I want to preface my remarks by saying that I don't want anything that I say here or anybody says here to be taken as disrespect for the jury's verdict. We disagree with the verdict. We will appeal the verdict. But nothing we say here should be taken as denigrating or disrespectful of the jury's work.

I also want to say that it's not our intention here, it's not my intention here to relitigate the case or the Rule 29 motions. To the extent that I touch on the facts, it's simply towards the 3553 factors so that your Honor appreciates the human person, the human, the man that's sitting next to me.

I want to start out, Judge, by talking about the nature and the seriousness of the offense, which the government spends a long time talking about, both today and in their papers.

The Second Circuit, Judge, as I'm sure you know, has recognized that even after you give weight to the large financial impact or the small financial impact of a conviction, there is a wide variety of culpability among defendants that are convicted of fraud crimes. Not everybody is the same, obviously.

And Judge Gleason, former Judge Gleason, in a case called *U.S. v. Ovid*, said that: Fraud cases present a wide spectrum of culpability, and the careful application of 3553 to

these kinds of defendants may properly result in the imposition of a sentence that is well below the advisory guideline range.

Along those lines, I submit that Trevor Milton, for the reasons I am going to lay out today, falls on the bottom end or the lowest level of the culpability spectrum because of what I would say is the complete absence of malice attendant to his conduct.

Let me give you some examples of what I mean. First of all, the government's narrative that Trevor targeted or took advantage of retail investors because they were unsophisticated or they were vulnerable is wrong.

The proof at trial showed that Trevor was open with executives, with his colleagues about a real belief, a true belief that communicating with the public, along the lines of the way Mr. Podolsky laid it out, would really bring long-term value to Nikola rather than short-term gain to himself.

Mark Russell actually testified, at pages 1085 and 1086 of the transcript:  Trevor believed that we were seeing was a major change in capital market structure, and it was a good thing, and it would be the democratization of the capital markets.  Individuals could themselves directly.  They wouldn't have to go through fund managers or intermediaries to do so. That is a real belief.  There wasn't a calculated premeditated attack on retail investors.

THE COURT:  I don't know that the government's point

is that he nefariously targeted retail investors or that he purposely targeted retail investors, even for good reasons.

MR. MUKASEY: I am not sure I would use the word target, and I think I would say he wanted to include retail investors.

I think the government is much more aggressive and nefarious in tone about it. You certainly don't see the government saying anywhere that Mr. Milton was harming institutional investors.

Speaking of what the government is saying, I need to put an end to this notion that this was some kind of pump-and-dump scheme and that there was some secret plan to dump Trevor's shares, and as soon as his lockup ended he would dump everything.

As we sit here today, as I understand it, Trevor is still the largest individual shareholder in Nikola. And the concepts that this was all a plan to -- and this is raised in one of the government's letters submitted Friday night. The concept that he was going to inflate the stock and then dump it to get rich is a false, embellished overcriminalization of what happened here.

The notion that he acted out of greed or lack of concern for others, which is also permeating the government's papers, is also a canard.

I think your Honor sentenced somebody named Carl

Sebastian Greenwood recently. I understand different circumstances. But that guy conceived of a company from day one that was a fraud and a guy who referred to his victims as idiots.

This record makes clear that Trevor was the same person. Whether he was speaking on Instagram or YouTube, whether he was talking to Peter Hicks or a board member or a trucker, Trevor spoke the same way to everybody and it was sort of as we said at trial, Trevor being Trevor. It was not a nefarious attempt to take advantage of people.

He also spoke in the same way that other people in the industry spoke, by using terms like clean sheet and ground up, GM uses that. You will hear Musk use these types of terms. It wasn't trained on or aimed at particular victims and certainly not retail investors. That's why really nobody in the record other than the government has said anything about Trevor's nefarious obsession with retail investors.

Now, I suspect, by the way, that's why the management of Nikola, rather than calling the cops or firing him or correcting public statements, they tried to educate him, it's true. They did try to educate him about what it means to be an executive of a public company and the importance of telling the truth.

But I think it also says their lack of action -- and I'm not blaming anyone. I am just saying how this reflects

Trevor's intent and Trevor's lack of malice.  I think it says, whatever they thought about Trevor, whether they thought he was culpable or not, they certainly didn't think he was out there trying to hurt people.  They certainly didn't think that he was out there hurting people.  They certainly didn't think he was out there endangering innocent people.

That's why, as I think Mr. Bondi referred to, after the Hindenburg report came out, Nikola's leadership stood up and defended him.  They stood up and defended him.  And they attacked the Hindenburg report and it was only when the grand jury subpoena arrived and they hired Kirkland & Ellis and executives knew they were under criminal investigation that they turned on Trevor.

THE COURT:  When was that?

MR. MUKASEY:  That was right after Hindenburg, September 12, 14, something like that, in that neighborhood.

THE COURT:  Within two weeks.

MR. MUKASEY:  I am not sure, but something in my head is saying September 14 is when Brady came out and said the Hindenburg report is an assassination attempt at Trevor Milton and a head shop.

My point, Judge, is that it speaks to the lack of culpability, the relative lack of culpability on the Gleason spectrum, that up to that time nobody felt that Trevor was acting in a criminal way or an evil way or a wicked way.

Was he impulsive?  Yes.  Was he undisciplined?  Yes. Was he probably unprepared to live life in the fish bowl?  Yes. Did he not appreciate all the public-company requirements, regulatory requirements, and how to deal with short sellers? Yeah, probably.  Those things are true.  But it is not true that on the spectrum of fraud defendants he falls on the more malicious side.

THE COURT:  I appreciate the spectrum construct, but there was testimony at the trial concerning Mr. Milton's desire, for example, to be on the Forbes list and to be able to monetize his options as soon as possible so they can begin to acquire things, which in fact he began to acquire.  So there is an intention, not necessarily a nefarious intention, to hurt people, but an intention to make as much money as he could as soon as he could.

MR. MUKASEY:  It's my intention to get on the Forbes 400 list as well, and it is my intention to make as much money as I can as fast as I can, theoretically, within limits and ethics, etc.  So there is nothing criminal about that.

I will say this.

By the way, those were Peter Hicks' intentions as well, not the Forbes 400, but to exercise his options and make the most money possible.  I don't think that that speaks one way or the other about -- every businessman wants to make money.  I don't think that speaks one way or the other to where

on the fraud spectrum he falls.

I actually think that it says something about the nature of his conduct and his relative culpability that multiple jurors gave interviews after the trial, as your Honor well knows, and they said they didn't think he had the intent to defraud. Whether they were right or wrong as a matter of law is for an appellate court. Your Honor has made your opinion known on that.

But multiple jurors said: We didn't think he intended to harm anyone. We thought he did it in good faith. He wanted to be loved and praised like Elon. That's should resonate when you consider where he lies on the spectrum of culpability. If it's possible to be found guilty, even if you have a decent and pure heart, that's Trevor. That's what the record says about Trevor.

I'll just finish up on this sort of seriousness-of-the-offense portion by saying that what I'd like you to take away about the nature and seriousness of the offense is that the portrayal of Milton, some by the government, some by the media, some by the ignorant as a financial serial killer or a man who was so greedy that he set out to annihilate investors, that's wrong. Yes, there were three convictions; yes, people crossed the line. But there was nothing here. When you evaluate the seriousness of the culpability, the seriousness of the crime, there was nothing

here that was predatory or rapacious or venal or mercenary or exploitative about Trevor's conduct.

I want to take a moment, and you tell me if you want to hear this or not, but I think it speaks directly to where your Honor may land today in your decision about the need to avoid unwarranted sentencing disparities.

The government put a chart in their submission that talked about folks that they think are comparable defendants, and they spoke about the judicial sentencing information database. I want to offer a few thoughts on that.

First of all, the government comes out with 195 months as the average for someone convicted of a crime whose primary guideline is 2B1.1 and is at a level of 43 -- I am not sure what it is at 41, but it's around there -- and a criminal history category of I. That's a nationwide, as I understand it, survey of all the defendants who fall within those parameters, but there is a filter on that database that allows you to search by geography. So I searched by the Second Circuit.

And when you filter for cases in the Second Circuit, where I think the overwhelming majority of serious fraud cases get filed, when you filter for cases in the Second Circuit and you search primary guideline of 2B1.1, criminal history category of I, you can't search the offense level, but I searched everybody in zone D, which is obviously the highest

zone. In that case, the average sentence is 24 months and the median is 16 months. Again, you're including people in zone D who are much lower, in the 20s of offense level up through 40.

But if you look at the Second Circuit, the average defendant meeting Trevor Milton's characteristics seems to get sentenced way, way lower, and I would suggest that that's because the judges in this district are the most discerning in the country about how to handle serious fraud cases and where real sentences are deserved on the spectrum of culpability and where lighter sentences are deserved.

I am not going to go through everybody the government put on their list as comparable defendants. I will say that they are all readily distinguishable. One of them is pre-guidelines, one of them is the WorldCom fraud that at the time was the largest in history. One of them is the Cendant fraud that was the largest accounting fraud of the '90s. It went on for ten years. One of them is a pre-*Booker*. The judge's hand is tied. That's the *Bennett* case. And one of them, this is John Surgent, a twice-convicted recidivist and disbarred attorney at the time of his sentence.

That leaves Elizabeth Holmes and Theranos, and that seems to be the benchmark against which people seem to measure Trevor Milton and that's the sentence -- she got 11 years -- which is around where the government thinks Mr. Milton should land.

And I want to take a minute just to distinguish this case from that case because they are falsely compared, in my view, and improperly compared as two people who founded startups and who made a ton of money and who crashed and burned, and nothing could be further from the truth as respects to Trevor Milton.

Let's compare. Elizabeth Holmes' fraud lasted for ten years. Trevor was the executive chairman of Nikola for three months. Elizabeth Holmes had the privilege of going to Stanford. Trevor Milton barely got through high school. Elizabeth Holmes' company was left behind in the dust bin of history when the fraud was exposed because there was nothing without defraud.

Nikola has been and still is today a really company with real technology, real products, real value. The company that Trevor created is running today, has hundreds of employees, is in production and is rolling out the trucks that Trevor created.

With the beginning of production, Nikola is clearly in the driver's seat of the future of transportation and commerce. Those are not my words. Those are the words of the governor of Arizona speaking about Nikola after Trevor was charged.

THE COURT: Can I ask you, are there any actual Nikola trucks on the road?

MR. MUKASEY: My understanding is that there are. You

saw certainly saw track-tested ones on video.

THE COURT:  Have they sold a truck that's being used on highways?

MR. MUKASEY:  I'm hearing from the crowd that the answer is yes.

MR. PODOLSKY:  Your Honor, my understanding, and this is largely based on public reporting, is that electric versions of the truck, not hydrogen, those were never ultimately developed, had been sold, although there have been a number of recalls for various issues, such as battery fires and other seat belt -- I don't know if there are any actually on the road today, because there have been a number of recalls over the past year.

MR. MUKASEY:  I am not going to hold recalls about seat belts against Mr. Milton, I'm sure.

The point is, nobody is saying about Elizabeth Holmes and Theranos, whose company dropped dead the day she was indicted, nobody can say that about Trevor Milton.  This is real and he created something of lasting value.  And I think that that speaks to a wild difference between the sentence she got and the sentence he may get.

The government in Elizabeth's Holmes' case took the position that her conduct created a significant risk of death or serious injury.  During that scheme, women received inaccurate tests about their pregnancies, Theranos generated

incorrect results for cancer tests, and one victim was led to believe she had the virus that causes AIDS.  That's why she is doing 11 years.

Trevor never endangered anybody in any way close to that level of depravity or heartlessness.  Holmes and her coconspirator, there was testimony at that trial, bragged about their ability to run circles around the FDA, their regulator. Undisputed in this case that Nikola was truthful with its regulators, truthful in its filings.

I am going to get to this a little more later, but Elizabeth Holmes did not have the responsibility, as far as I know, of a spouse at home with a medical history of Lyme disease, immunodeficiency syndrome, diabetes, and multiple miscarriages.

She is doing 11 years for all these reasons that I just mentioned, and Trevor's case is not at all comparable.  I submit her conduct was more protracted, more devious, more dangerous, and more blameworthy.

The next point I want to make, Judge, is to speak to this concept of general deterrence and specific deterrence that Mr. Podolsky raised.

The government has presented no evidence that a sentence of 11 years is necessary to achieve general deterrence.  Judge Rakoff has noted that there is considerable evidence that even relatively short sentences can have a strong

deterrent effect on white-collar defendants and prospective white-collar defendants.

And the goals of general deterrence and just punishment are served by the fact that the offenses have had a ruinous impact on Mr. Milton, as announced in basically every periodical in the country today, and he is also going to be subject to what may amount to a financial death sentence.

If your Honor is considering a sentence of incarceration, I would simply point out that any prison time is a serious amount of prison time, and the world tunes into that. In fact there is an article, it's posted on the HHS website for a while. It says: Prison is painful. An incarcerated person suffers long-term consequences from having been subjected to pain, deprivation, and extremely atypical patterns and norms of living. Any amount of prison time serves as a general deterrent. The world knows that. A decade in prison is unnecessary.

As to specific deterrence, as I mentioned, he is going to be financially crippled after this. He is staring down the barrel of numerous private lawsuits, additional sanctions in an SEC enforcement proceeding. He is never going to work in the public markets again, that's for sure, and he is likely to have a difficult time finding any employment after this. For Trevor the truth is, not being able to work is like not being able to breathe, because work was, I would submit, his oxygen.

I would submit, Judge, that specific deterrence and incapacitation will be achieved with your Honor's sentence.

I also want to just quickly note that, according to the JSIN and my anecdotal research, when an enormous amount of restitution is imposed, if that's what happens here, generally a fine is not imposed. That's my reading of the statistics gathered by the judicial sentencing information folks at the commission, so I would ask your Honor not to impose any fine, because I think that that's excessive and gratuitous.

Now I want to finish up by talking about Trevor Milton, the person. For people that don't know Trevor and who just watched the trial or the TV shows or followed the media, it's got to be very difficult to see Trevor as anything other than what the government wants you to see, a convicted felon and a guy who lied to get money because he's greedy or bad.

I thought a lot about how to combat that, how to respond to that. I happened on a lecture by a Nigerian writer, whose name is Chimamanda Ngozi Adichie. I will spell that for the reporter later. But she is a woman from Nigeria who gave a talk a few years ago called the Danger of a Single Story. You can find it online. And it was about what happens when a very complicated human being is reduced to a single narrative. And her point was that each individual life contains an assortment, a compilation of stories and situations. If you reduce a person to one story, you take away their humanity.

When it comes to Trevor, I think the government and the media has always been prone to what she calls single story-ism. That's reducing a complex person to one story. Trevor is bad. He preyed on vulnerable investors. He was greedy. He wanted to get rich. He committed crimes.

What I want to talk about with the rest of my time, Judge, is why that would be a gross distortion of who Trevor Milton actually is, really is. I submit that that kind of single story-ism would take away his humanity because there is really a hell of a lot more to Trevor Milton than what we heard in the trial and what you have read in the papers.

I will start with the people that really know Trevor, many of whom you can see over my back are here today: His wife, his dad, his siblings, his extended family, his work colleagues, and a bunch of his friends. These are people who

traveled across the country to be here to demonstrate their belief in him and their support of him. The people who aren't here sent letters, as you know, Judge, and the letters are extraordinary, I think.

And the reason I say that is, we have all seen cases where defendants submit letters from fancy people and senators and congressmen and celebrities and CEOs. Trevor's letters are not like that. They are not sort of hollow trophy letters. They are letters from real salt-of-the-earth, hard-working people, people who have grown up with him, people who have worked with him, people who have lived with him, from family and friends and neighbors and Nikola colleagues and from a police officer and a veteran and a baker and a doctor, and I could go on.

And the people who are here today, Judge, and the letters that were written, I think are a testament to the qualities that need to be factored in in a major way to negate that single story-ism, and that really do define Trevor as a human being. I am talking about Trevor's love, talking about his generosity, his compassion, his empathy, his faith, his work ethic, his commitment, his kindness, his friendship and his character, and the tremendous and, I would say, irrepressible love that's in Trevor Milton's heart. This isn't just some sentencing nonsense. I read every one of those letters. I have spoken to his family. I have spoken to him.

I have spoken to his friends.

If there is one word that could properly accurately perfectly be used to describe the full Trevor Milton, it's heart.  It only takes about five minutes around Trevor to recognize that he is all heart.  Whatever else can be said about him, whatever else you think about him, everyone who knows him describes him as a man with a huge heart.

It's a heart that was full of curiosity and big dreams when he was a little kid and it's a heart that got broken when he lost his mom and his stepmom and broke again when his wife had a miscarriage, and walking away from Nikola broke his heart.

But it's also, Judge, a heart that has been defined by service to other people.  It's a heart to led him on a mission to Brazil to teach English.  It's a heart that guided him into dangerous and remote and freezing areas of the mountains of Wyoming to help a complete stranger search for his missing father.  It's a heart that drove the monumental effort that led to the founding of Nikola and what it is today.  It's a heart that pushed him on when people told him to give up and critics told him to stop and that building the company was a foolish pipe dream.  It's the heart with the faith to mortgage his home, to keep Nikola going in the early days.  He didn't try to get people to invest in something that he wasn't willing to risk everything he had for.

As we have discussed, it was his heart that told him the foundation of Nikola could be retail investors that he related to, not heartless hedge funds and banks and corporations that were distant to him and coldhearted. To be honest, it's a heart that probably helped but also hurt Trevor.

I suspect that his heart sometimes got out in front of his head when he was talking about Nikola. His dad's letter says it the best, I think. His dad said: Trevor sometimes got a little ahead of himself. The more excited he gets, the more prone he is to imprecision. I think instead of thinking through whether what he was about to say was a good idea and what the consequences might be, he got up a head of steam, he believed what he was saying, and, if he was pressed, he stuck to his guns with all his heart, and that can get you into trouble.

I think the people who know him best, including his dad, might say it was something Trevor couldn't even control. So it may be right, it may be wrong, but it was from the heart. To paraphrase a famous artist, sometimes you put your heart and your soul into your work, and you lose a little bit of your mind in the process. Having a big heart might be the worst part of Trevor and the best part of Trevor.

It's probably accurate to say that this case demonstrated that Trevor can be very hardheaded about things, but he has never become hardhearted.

The jurors said it after trial.  We thought he did it in good faith.  We thought he was trying to get rich and build a valuation and bring everyone wealth at the same time.  That shows that even the jurors thought that although Trevor's words may have been wrong, in many ways his heart was right.

Even today, Judge, despite losing his company, many of his friends, standing to lose all his money and perhaps his liberty, his heart has not hardened.  His heart is still huge, as he sits here before you.  It's still a heart that's full of love for his family, for friends and for strangers.

Like that hiker that was missing in the wilderness in Wyoming, his son wrote this after Trevor went on a search-and-rescue mission looking for the missing hiker.  I am sure you've read it, but I think it's worth raising again.  He wrote:  Trevor's greatest concern is for his wife and employees, not for himself.  He talked of his wife as the greatest gift God ever gave him and how his employees were like family, often at the dinner table with him and his wife.

Just like hovering over trees at 11,000 feet with 25-mile-an-hour winds, very little margin of error, he didn't think of himself.  He thought of others and their pain.  He thinks through how to relieve others' pain, not his.

I was shocked he was so open and honest with me and willing to wear that pain on his sleeves.  The real, raw Trevor was coming out, and it is opposite of everything I had read in

the press.  Trevor served me a stranger, a nobody, to him.

I hope you can open your heart and stand up for Trevor, like he stood up for so many others in his life.  It takes courage to do that, and I'm asking you to do that for him.  I'm writing this letter to ask for mercy.  He has been an incredible blessing to my family and to me personally --

THE COURT:  Slow down, please.

MR. MUKASEY:  -- helping me to find closure in the search for my dad.

I offered to write this letter for him.  He did not request it.  That's a remarkable statement from a stranger about Trevor's heart.

But really any discussion of Trevor's heart has to end with Chelsea his wife, who truly, more than anybody, needs his warm heart as a caregiver.  Her doctor's letter describes her medical condition as needing intense management.  So Trevor researches her medications, he bathes her, and he dresses her, and he takes care of her, and Trevor's heart beats for her, and without him it's possible that her heart won't be able to bear it.

The past three years have been unspeakably difficult for Trevor.  He feels pain in his heart for any trouble he has caused to anybody, investor or otherwise.  I suspect, Judge, that in time people will forget what Trevor said, and they may even forget what he did at Nikola, but people will never forget

that he was always driven by his heart, he was always giving from his heart, he was always emptying his heart for others, and he was always lifting other people's hearts.

Judge, we ask that you consider today in imposing sentence how productive Trevor has been in the past and how productive he can be in the future. We ask you consider how much service Trevor has given in the past and how much service he can give in the future. We ask you to consider how much heart he has given in the past and how much heart he can give to the world in the future.

I think in a minute you'll hear an emotional and meaningful statement that comes from Trevor's heart, and it comes so deeply from Trevor's heart that we have not heard it. It's his own.

We hope, Judge, that one can't be as kindhearted to others as Trevor has been without receiving kindheartedness in return. I respectfully submit that incarceration is not necessary to achieve the purposes of sentencing here because of who this man is, and we ask that you sentence Trevor today, Judge, with an open mind, and a compassionate heart.

Thank you.

THE COURT:  Thank you, Mr. Mukasey.

Mr. Milton, you have an absolute right to address the Court before I impose sentence. Is there anything that you wanted me to know?

THE DEFENDANT:  I want to be clear up front.  Sorry for my voice.  I've been speaking to my family a lot and it's kind of going out on me.

I want to be clear up front that I obviously feel awful for all the resources and time this has caused everybody.  I don't think you can -- I don't think you can -- I am going to get through this.  I don't think you can be human without feeling terrible for everyone involved.

Your Honor, I have amazing parents who taught me right from wrong.  I would like to give you some detailed examples of who I really am and how I made my decisions in life.

I want to give you some detailed examples of who I am and how I made my decisions in life.  It will help me understand why I made those comments.

I ask you to open your heart, which is what Mr. Mukasey was talking about.  In first Samuel chapter 16:7 of the Bible it says:  God looks at the heart.  I hope you can take a look at my heart and listen until the end before making any decisions that you have possibly made prior.

As I reflect on my family and my heritage -- just give me a second.  Sorry.  As I reflect on my family and my heritage, it made me think about the most influential person in my life.  That was undoubtedly -- I'm sorry, your Honor.  I just never had to talk about these things before.  It is undoubtedly my mother and her life story.

My grandmother is 100 percent pure Cherokee, and my mother is 50 percent, and I am one-quarter Cherokee.  My grandmother was not a kind woman.  How can you blame her.  Her family was driven through the ethnic cleansing that happened here in the United States known as the Trail of Tears, when the United States drove 80,000 families and Indians from their homes because they wanted to eradicate my ancestors from the lands and take their gold.

THE COURT:  Mr. Milton, can I just ask you to slow down, please, so we can all understand what you're saying and the court reporter --

THE DEFENDANT:  I am really sorry.

They then drove the Cherokee, Choctaw, and other tribes to Oklahoma.

The pain and anger from that generation was taken out on their children, and my mother was no exception.  That trauma is visible today on nearly all reservations throughout the United States.

The pain my mother suffered as a child somehow drove her to raise us children with incredible love.  The generational trauma caused by the ethnic cleansing ended with my mother.  She refused to pass it down to us children and be a victim.  She gave birth and raised five children with incredible love.

From the time I was very young, I had an unusually

tender heart.  I believe that sensitivity came from seeing and hearing what my mother had gone through.  She experienced unspeakable acts of betrayal as a child that haunted her until her death.  But it did not ruin her heart.

In the third grade I recall watching a movie in school called *Where The Red Fern Grows*.  It's about a movie about some hunting dogs that ultimately died.  I sat in the back of the room, and I cried as I watched these dogs die on a movie screen.  When the movie was over, the other classmates laughed at me for crying.  I could tell at a young age I would never be understood by other people.  I went home and told my mother about what had happened.  She pleaded with me to stay kind and have a loving heart.

A few years later I watched as the most tenderhearted person I knew start to die.  The first symptoms I saw in my mother going through were extreme pain and hair loss.  As time went on, her body became more fragile.  She required heavy doses of morphine that dripped from bags just three feet over her head.  The morphine was injected to manage the pain from cancer that was eating her bones from the inside out.  I watched as the doctors removed my mother's breasts, taking away some of the last visible traits of a womanhood she had.

My mother was bald due to chemotherapy they pumped into her on a daily basis.  Her arms were the size of my fingers.  And I can see her skeleton pushing through her tiny

80-pound, frail body that was smaller than most bodies of a ten-year-old child.

At the time we lived very humbly, but I had no idea the sacrifice my family was making.  Our insurance company dropped my mother and refused to pay any medical bills.  Those insurance companies are disgusting.  They prosper by refusing claims, knowing families don't have the money to litigate them. We were no exception.  We were broken financially.

My father sold everything our family had, including our homes, vehicle, retirement accounts, and savings to pay for the doctors.  Our garage was empty.  Our house was empty.  My father had to work five hours away from our rental home while our family tried to survive.

Contrary to the hundreds of fake articles written by the media, I was the further thing away from a spoonfed, entitled person you could be.

I would spend hours each day talking to my mother about life.  While sitting on the left side of her bed one night, I had no idea those were going to be the last few hours I ever got to spend with her.  She asked me questions about school, life, and my friends.  She then continued to tell me about some experiences she had as I sat next to her.

I cherish those moments, and I want to share a few of those with you, as they had a profound impact on my decisions in life, and many of them I have never even told my family

about.

My mother, she told me she was at the end of her journey and how beautiful heaven is.  I had no idea she was about to die that night right after I went to bed.  She told me she got to visit heaven a few times.  She described it in detail to me.  It is important for you to understand why I made my decisions.

My mother went on to explain that there are colors in heaven that don't exist on this earth and what those colors mean.  Those colors are attached to us like clothing worn by us on this earth.

She detailed how our life and our decisions were on display for everyone to see on the other side.  Your purity is broadcast through colors which are visible to everyone.  She warned me about those colors and that they can't be easily changed on the other side.  She told me how it was impossible to hide anything when you arrived to be judged by God and that not a single person ever gets to escape that process.

For the first time in my life -- for the first time in your life, your true intentions are on display, the pure of heart are cheered by the relatives and their ancestors when they arrive.  The purer the person you are, the brighter your spirit shines.  Those colors you radiate are crafted through trials in this earth, much like the earth pressures a diamond into a flawless gemstone.  In heaven, if you are not pure and

flawless, you are nothing more than wasted matter with little value, discarded.

The people who made poor decisions in this life, who sought the destruction of others, or who did not stand up for what was right, wore darkness and it was displayed as filth. That darkness would never be removed until they fixed the damage that they did to each person they have hurt on this earth.

That process of repentance can take thousands of years on the other side, and it is known as hell.  It prevents you from living with your family.  It can be painful.  God's judgment displays our entire life on a screen the size of this earth.  Each day of your life it is broadcasted for everyone to see.  Each decision you make is broadcasted along with your intent.  It is seen by billions of God's creations.  That process only takes a few minutes in heaven, as my mother described it, because our ability to absorb information is almost infinite.  Our growth begins there.

My mother told me I had to make sure I never passed anyone up in this life that needed help, to keep my heart pure in all my decisions, help those who have no hope, and treat others with love and compassion.  If I did that, I would arrive pure, wearing pure colors, with her waiting to greet me.  As a 14-year-old boy, that was the most impressionable moments I had in my life.

From that point on, your Honor, I can remember every single thing I've done wrong in my life. My important decisions haunt me, and the good decisions I have made make me happy. Those decisions are on display in my mind, and they will one day be broadcast in heaven for everyone to see, a gift we don't get in this life.

Today I testify in front of God, my mother, my family, in this court that I did not intend to harm anyone, and I did not commit these crimes levied against me. I'm not disputing the jury's verdict. I'm letting you know I did not do them. I was referring to the business model, and I meant no harm. I use the present tense often.

It is easy to misunderstand people, especially with social media and 160 characters on Twitter, but someone's life story usually helps you weed through the intentions and whether somebody did something on accident or purpose. I hope you are able to weed out the words taken out of context and see who I really am.

Our justice system is not perfect. It can have good outcomes. It can help a lot of people. Unfortunately, it can have bad outcomes too.

Rubin Carter, one of the greatest African-American boxers, was convicted of triple homicide and framed for a crime he did not commit. I am not saying I was framed. I am saying that he was found guilty by a jury and spent 20 years in

prison, only later to be released.  That conviction destroyed his life.

In 1995, black and Latino teenagers were framed for a crime they did not commit right here in New York City.  They were convicted by a New York jury, yet they were not guilty.  They allegedly raped a woman and fractured her skull in Central Park.  The prison sentence destroyed their family and reputations.  After 11 years of hell, they were exonerated by DNA, proving without a shadow of a doubt that another man, Matias Reyes, was the true culprit.  That case is well known as the Central Park Five.

You see, your Honor, it's not hard to find an innocent person guilty or even to frame five innocent people.  It happens on a regular basis in our justice system.  There is an estimated 20,000 innocent people in prison today.  I am not using this or explaining this to you in any type of way to diminish the sincerity or the importance of what is going on here.

I'm somewhat of a religious person.  In my best moments I have tried to live like the scriptures tell us to.  Sometimes I pulled it off, but sometimes I failed.  Regardless of which belief someone has, most people believe that being a good person here results in a better outcome after this life.  That is my belief.

When I was in my late teens, I left for Brazil on a

service mission to help others.  I left the United States not knowing how to speak Portuguese and very little about the Brazilian culture.  In Brazil, knowing English is more valuable than any college degree, more valuable than a Ph.D.  Knowing English is the single most important aspect of lifting a family out of poverty.  I spent two years helping others learn English and teaching them about God.  I was lucky to learn how to speak Portuguese fluently as well.  I got to think and learn in a second language, which was incredible.

I lived in one of the poorest areas in the world.  It was known as a city called Diadema.  We had dirt floors, unstable electricity, and very little plumbing or sanitations. It is one of the most dangerous cities in the world.  I witnessed people get stabbed, and I saw extreme crime daily. Crime was part of that poverty, and the only way to get families out of poverty was through learning English.  They could never afford English lessons, so we gave them happily for free.

While in Brazil my arm cut off by a broken glass door, severing most of my tendons and veins.  I nearly died from that accident.  My stomach stopped digesting food correctly due to malnourishment from living in the favelas.

I'm not complaining.  I'm letting your Honor know that I am blessed.  That is how I see life.  I see the good in all things, the ability to help and fix problems wherever I go.  My

mind doesn't have the ability to think about how to hurt others or take from someone else.  It is contrary to every fiber in my DNA and how I was raised.  No more could I strip your Honor's heritage from you than you could find thoughts in my head about hurting others or taking from them.

I didn't grow up going to fancy private schools.  I grew up moving irrigation lines on a small farm.  I didn't have private tutors as a child.  I had animals to feed and cows to milk each morning.  While other teenagers were partying and enjoying activities, like polo and traveling, I was serving others in the favelas of Brazil.  I did not go to Harvard or Yale Law School.  I went to the favelas for free.

It is true, I am not very intelligent in the ways the world would judge.  My SAT and ACT scores would be at the bottom range if I ever took them.  My LSAT store would certainly be lower than anyone else in this courtroom.

But my compassion for love for others would score more than acceptable to God, and that is my calling on this earth. I believe God when he said in Matthew 7-23:  Depart for me.  I never knew you.  God won't accept many people who claim to have served him.  That is because they only thought of him.  They never served him.

It takes actions that are unpopular to society.  It takes standing up for what is right, regardless of the outcome. It is difficult to get into heaven.  It takes extreme acts of

courage and sometimes your life.

Your Honor, I did not commit those crimes. It breaks my heart to see people suffer. It is impossible for me to purposely hurt others. It is impossible for me to take something that belongs to others.

You read the letters from my family. You will see not one person ever -- would ever say I had a dishonest bone in my body. They all testify I have spent my life helping others and not taking from them. I choose to give in this life, not take.

When I came back from Brazil, I moved to a couple of small towns in Puerto Rico called Rincon and Ponce. It was the beginnings of my twenties, and I wanted to learn Spanish and more about the Puerto Rican culture.

Shortly after, I enrolled in a small college town to build some social skills. Being one-quarter Cherokee, I could have received college for free from the government for my heritage. I chose not to. I chose to work day and night and pay for my own college. It is not the trait of someone with intent to take advantage.

Throughout my life I have been presented with opportunities to do the wrong thing in business, but I did not do them. I chose to do what was right because I knew the moment I passed from this life to the next, my decisions would be broadcast for everyone to see.

I have been an entrepreneur for most of my adult life.

I know right from wrong. I had a few success stories and a few failures. After one of my first companies I started failed, I later went back and helped those investors who believed in me. There is nothing wrong with failing in business, as it allows you to learn from your mistakes, but it can be very painful for everyone involved, not just myself.

For years I worked hard to dig out of debt and save some money. I saved up a few million dollars after I paid taxes. I then went to help those families who suffered the most from my failures. I gave back millions of dollars to those investors. Some of whom hated me for closing the company down. Think about that. I helped people who hated me for a failure of mine. I helped those families instead of buying a fancy house or a car. It is who I am. It is the opposite of intent to harm.

I started Nikola because I wanted to leave this earth a cleaner place, and I found it. Semi trucks contribute more emissions than just about any vehicle on the road. I singlehandedly changed the trucking industry. Now all manufacturers have pushed towards zero emission because of Nikola.

Nikola has both the electric and the hydrogen trucks in full production right now. Even the CEO of Daimler, the largest trucking manufacturer in the world, mocked me on stage for explaining to others that hydrogen was real. Now Daimler

swears by it, and their dumping tens of billions of dollars into it.

Imagine what was in my head.  I had the largest trucking manufacturer and one of the most well-known CEOs in the world telling others how hydrogen was a fraud when it was not.  I had to explain the business plan to everyone I could so they would understand how to make the hydrogen business work.  Hence why I always spoke in the present tense.  I was not doing anything intentionally.  I tried my best.

The truth is, I funded the company when no one else would.  I took out hard-money loans on my house when no one else would invest in my company.  Those are actions of someone who believes in the company and their products.

The short sellers lied and made hundreds of millions of dollars off my destruction.  That is OK.  That's their right to do.  I was not a very seasoned CEO.  I did not know how to take it.

Your Honor got to see my friends and family come to support me at trial.  You got to look at them in their eyes and you will see, many are here supporting me today.  They missed work and used their time off to support me.  They traveled 3,000 miles away every week during trial to show this Court they believed in my heart and my intentions.

Your Honor has seen in this court system, families almost always tell the truth even if it hurts the person that's

going through it.

My family has never said a negative thing about me.  I have near three generations here along with extended family, none of which will testify I had a mean or corrupt bone in my body.

I gave 70 percent of everything I owned away prior to going public.  Evil men keep control and power, no matter the cost.  They don't give it away like I did.  Evil people are greedy.  They love loving people -- evil people are greedy.  They take from others and steal from them or bear false witness against them.  Loving people help others and die on the cross for the truth.

I gave tens of millions of shares to Nikola employees, totaling $1.8 billion, allowing hundreds of employees to pay off debt, pay for their homes, send their kids to college.  I gave 40 million shares to executives, totaling $3.6 billion.

Why would I give 70 percent of everything I own, billions of dollars, help every person that came in my path my entire life, only to commit fraud for no gain?  Especially when I was locked up from selling stock.  I gave that money and stock away prior to going public and before any government investigations began.

So why did I step down?  I had never spoken about this publicly, and I'm almost done, your Honor.

I stepped down because my wife was on the verge of

dying.  She was having health issues that caused her to seek medical help.  During this time she experienced medical malpractice.  A doctor injected someone else's blood plasma into her by mistake.  That doctor gave the wrong person's blood plasma bag, during the procedure, to my wife.  Once that other person's plasma hit my wife's blood stream, it set off a chain of events that nearly killed her.  She now deals with multiple autoimmune diseases and chronic infection.  When we went public, my wife's health was deteriorating, and I could not focus on her and the company at the same time.

I did not step down from Nikola because I was a fraud or something or the fake short-sale report or that I was guilty.  I stepped down because my wife was dying, and she needed my help.  The truth matters, your Honor.  I chose my wife rather than wealth.  I chose my wife over power.  I chose my wife over control of the company.  I still do today.

During my time in Nikola and during the indictment period, I was only asked to clarify my statements maybe once or twice that I can ever remember.

Just a couple of weeks after going public, around June 2020, a reporter reached out to me and asked the following question via direct message.

Matt said I doubled down and lied.  He's a great prosecutor.  He's actually really, really good.  In one of the questions -- by the way, I don't hate him for that.  He is

doing a job. I understand that his sole job is to work as hard as he can for the government.

In one of the questions this reporter asked me, she said: Trevor, "OK. So for the record, you're currently producing no hydrogen." I answered in writing and said -- this is a written response. "We spent the last year building the largest hydrogen station. Now we will spend the next five months installing the hydrogen production."

I stated as clear as I possibly could to a reporter, where no one could misunderstand me, that we were still five months out on hydrogen production. I made sure she knew we were planning to produce hydrogen and that we had not done it yet.

I then continued to double down but not with lies; with the truth. I continued to tell her that our first stations are planned and what type of hydrogen we will use in our future, once again clarifying that we did not have a hydrogen station producing hydrogen. I was telling the truth to the public markets and investors.

This reporter also asked about the Badger and when it would be in production. This question was at the heart of my indictment. I am not asking you to retry the case here, your Honor. Here was my written response to her: "The badger is scheduled for deliveries in 2022. We don't know yet, but we are expected to enter production sometime in 2022." This was

just one week after we went public.  I don't know how I could have been more clear about the Badger not being in production.  I told the truth.

This interview was supposed to be published by a reporter shortly after that conversation.  I didn't find it until later.  I didn't know until just recently that she died of cancer shortly after that interview.  I am not sure if they ever got published.  I don't know if my written statements ever even made it into the prosecutor's desk to review.  I can't imagine they would have indicted me if they saw those statements.

But these written statements are kind of like video surveillance, coming out proving I was not the bank robber after being convicted of robbing a bank.

I'm obviously playing off the words, the prosecutors' words, at trial, since they compared me to an armed bank robber during jury, but I hope your Honor knows I'm not a bank robber.  These written responses to the media were given prior to knowing anything about the government investigation.

So for sentencing I believe this question is important.  Was I referring to the business model in misspeaking, or was I trying to hurt people intentionally?

Before you sentence me, your Honor, I would like to point out these last couple of things.  They do not diminish the situation we are in now.  I think they are very important

to understand.

I don't have a formal Ivy League education or college degree. I didn't even graduate high school until later in my life when I went back and got my GED. I grew up in a farm town, moving irrigation lines and milking cows by hand before school. Matt Podolsky was correct when he says he didn't understand. It's very easy not to understand someone who comes from the country.

I use the wrong verb tense in Portuguese, Spanish, and English almost daily. As a matter of fact, most people laugh at me when I speak those languages. But I don't do it on purpose.

I gave millions of dollars back to others when my company failed because I could not see them suffer. I served the poor and those who were in need, not just on weekends, but for years without stop in the favelas of Brazil.

Before, during, or after going public with Nikola, there was never a single dollar missing. There was never a single dollar stolen, embezzled, or misappropriated in Nikola. There was never money used improperly. There was no documents destroyed or covered up by me. There was never obstruction of justice on my end. There was no perjury. There was no insider trading. All my taxes were paid on time. I did not hide money from the government. I had no Bitcoin hiding money. I have no history of criminal or violence in my life. There is no

missing computers.  There is no missing files.  There was never an admission to any crimes or guilt in any messages I sent.  There was no forged documents.  There was never a request for the CFO or auditors to cover up my statements.  There was no conspiracy.  Not a single filing with the SEC that was alleged to be wrong.

I clarified to a journalist during my indictment period that we were not producing hydrogen yet.  I didn't believe I needed to clarify every time I ever spoke.  It was a mistake on my end.  These statements show and prove, without a shadow of a doubt, that my intent was not to harm others.

Your Honor, I had those statements with me, but they took my phone away from me during the security line.  I was planning on showing them.

I never violated any posttrial restrictions.  I have respected this Court through the entire process.  I have respected your Honor and tried to be understanding, even when you ruled against me.  It is OK.  You must be a good loser when you lose, and I believe I have done that with grace.

After hearing who I really am and seeing those written responses and hearing from my mouth for the first time ever, I held nothing back from you.  I never had to speak about those discussions before or my childhood.  Those tears were real, and they have come out for the first time in 40 years.

Your Honor, allow me to have probation.  Let me be

with my wife as she struggles to find the healing she needs.
If you grant me that request, I'll make your Honor a promise, I
will do good in this life.  I will go through this life with a
pure heart.  I will make sure my colors shine pure in the next
life.  In James, Chapter 2, verse 13, God says:  Mercy triumphs
over judgment.  I hope your mercy triumphs over judgment today
with me, your Honor, with a contrite heart and understanding
why I'm here, and I ask your Honor to hand down probation to me
and let me stay with my wife.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Milton.

We have been going for two hours.  Let me just confer
with the court reporter.

We are going to take ten minutes.

(Recess)

THE COURT:  Briefly, before we get to sentencing,
Mr. Podolsky, on restitution, I understand that the government
will get to me by -- certainly within 90 days, as you are
allowed, a restitution figure.  Is the government seeking
forfeiture in this case?

MR. PODOLSKY:  We are, your Honor.  I believe this was
in our submission.

There is just one item for forfeiture and it is the
ranch, Wastach Creeks Ranch that Mr. Milton purchased from
Mr. Hicks as proceeds of that offense.

So what we request is that your Honor orally order forfeiture, and we will then provide a proposed preliminary order that will actually have the specifics of the ranch property and what the premises are.

THE COURT:  Mr. Mukasey, did you want to be heard on that?

MR. MUKASEY:  Yeah.

We oppose that, Judge.  We understood generally there may be some forfeiture, but we believe the government has not complied with Rule 32.2(d).  There has been no specific statute identified.  There has been no compliance with 32.2 in the sense that we are supposed to get an opportunity to review and suggest modifications.  That's what the rule contemplates.

There was no preliminary order of forfeiture which was supposed to be done -- I believe the rule says or suggests as soon as possible after conviction.

We also are going to have an Eighth Amendment argument about excessive fines because of the piece of property that the government seeks, the Wasatch Creeks Ranch, which I would note parenthetically is part of the bail in this case.  Pieces of the Wasatch Creeks Ranch are part of the bail.  The government already has an effective lien on it.  It's not going anywhere.

THE COURT:  It's not going anywhere anyhow.

MR. MUKASEY:  I understand that.

But Mr. Hicks also is seeking -- Mr. Hicks, by the

way, who should not be classified as a victim here, but we can fight that out later, is seeking something like $45 million in restitution related to the ranch. I'm not sure that the government could show that it was properly the subject of forfeiture. But, in any event, there has been no compliance with 32.2. It is simply submitting an order that we don't have an opportunity to review or object to.

THE COURT: I take it that any order on forfeiture is also subject to subsequent determination.

MR. PODOLSKY: Correct, your Honor.

Let's be a little more organized about this. We submitted in our sentencing submission, which was filed a week ago, that we were seeking to forfeit this ranch. There has not been any objection or response to that. As far as notice, there is notice in the indictment about the applicable forfeiture statutes. As far as whether this is proceeds and whether Mr. Hicks is a victim, although that's really a separate question, the jury convicted Mr. Milton of this crime at trial, so I don't really understand the point about notice.

As far as the preliminary order of forfeiture, we will submit a proposed order. If they wish to lodge some objection, that's fine, but that will only begin a process whereby others could try to claim some bona fide interest in that property or object to forfeiture processing in that way.

MR. MUKASEY: First of all, we had nothing to object

to because we didn't have a preliminary order of forfeiture, which is required.  Second of all --

THE COURT:  Is it required today?

MR. PODOLSKY:  Not to my understanding, your Honor.  I believe you can orally direct forfeiture, and we will then submit an order.

MR. MUKASEY:  Judge, give me a moment.

There is a Supreme Court case pending called *McIntosh v. United States* which reflects a split in the circuits as to whether the requirements of 32.2(b) are time related or mandatory.  I don't think there has been compliance with 32.2(b) here.  I'll read 32.2(b) to you in a moment.

The forfeiture determination, as soon as practical after a verdict or finding of guilty or after a plea, etc. on any count, the Court must make -- the Court must determine what property is subject to forfeiture under the applicable statute.

If the government seeks forfeiture of specific property, the Court must determine whether the government has established the requisite nexus between the property and the offense.  I'm moving now to subsection B.  The Court's determination may be based on evidence in the record, etc.  If the forfeiture is contested, the Court must conduct a hearing after the verdict or finding of guilty.

Now, in terms of the timing, the courts must enter the preliminary order sufficiently in advance of sentencing to

allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under 32.2(b)(4).

We have not seen any preliminary order. We haven't made any suggestions of revisions or modifications, and we think it may be subject to an Eighth Amendment analysis under the circumstances of this case.

THE COURT: Because of the amount, you mean, because of the amount that the property is worth?

MR. MUKASEY: Because of the cash value.

Mr. Hicks got a profit of approximately $1.6 million when he received the land. He later -- when he sold the land.

Later, when he chose not to exercise his options, which could have been exercised for a substantial profit, Mr. Milton sold him discounted stock, and he made another $1.6 million. I am not sure the basis on which this is forfeitable or whether the cash profit that he made twice to the tune of $3.2 million --

THE COURT: That may speak to any restitution to which Mr. Hicks is entitled. But on the facts before me, it seems very straightforward, there was a count in the indictment that indicated a wire fraud count that charged Mr. Milton with obtaining that property on the basis of fraudulent misrepresentations, and he was convicted of that. If that's the case, then the proceeds of that fraud are clearly forfeitable.

MR. MUKASEY:  But if the order has to be entered at the time of sentencing and that assumes that we have had an opportunity to review and modify and suggest revisions, how can that happen?  I have never seen that.  We are at the time of sentencing.

THE COURT:  As Mr. Podolsky reminded me, they indicated in their submission that they were seeking forfeiture of the property.

MR. MUKASEY:  Under what statute and which part of the property?

THE COURT:  Which part of the statute, I don't know.  Under the statute.

MR. MUKASEY:  I don't either.

MR. PODOLSKY:  I'm trying to pull up the citation.  There was notice, as I said, in the indictment.  Notice was also provided to the defendant further ago by conversations with defense counsel, but in our sentencing submission.  Yet no objection has been raised until halfway through the sentencing proceeding today.

The question about the preliminary order of forfeiture is frankly like a canard, to use Mr. Mukasey's word, because a preliminary order of forfeiture hasn't been entered yet.  It hasn't been entered.  We will propose one.  If Mr. Mukasey wishes to lodge some objection, he will have an opportunity.

But he had an opportunity to object to forfeiture.

They had notice that the government was seeking.  They had notice of the relevant statutes.  No objection was made.

And as your Honor points out, Mr. Hicks' profits frankly have no relevance to any issue in this case, but it certainly has no relevance to the question of whether the property were proceeds of the crime for which Mr. Milton was convicted.

The statute is 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, which says that:  All property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses and so on is forfeitable.  This was in the PSR as well, I should point out.  Not the specific property, but the notice of the forfeiture provision.

MR. MUKASEY:  But if the property was paid for with money that was lawfully given to Mr. Milton or lawfully obtained by Mr. Milton, I don't even think the government disputes that.

How is it forfeitable property?

THE COURT:  I will let the government speak, but I believe the theory is that he purchased it in part with stock or stock options that were inflated, and therefore he misrepresented to Mr. Hicks the amount of money that he was paying for it at the time that he paid for it.

MR. MUKASEY:  If the cash value exceeds the fair

market value and what he paid for it and the money was lawful, how is it forfeitable?

Just to go to the Supreme Court point, I haven't read the cert. petitions, but, as I understand it, there is a split in the circuits between whether compliance with 32.2 is a directive and sort of procedural or mandatory.

And so if it hasn't been done at the time of sentencing, how can you order forfeiture.

MS. SHAPIRO:  Your Honor, I have not studied those briefs in detail, but my understanding is that the Supreme Court granted certiorari out of a case out of the Second Circuit in which the claim which the Second Circuit had rejected was that these directives in 32.2 that Mr. Mukasey referred to earlier are mandatory.

I don't understand how the Court can contemplate ordering forfeiture without giving us a chance to see the preliminary order of forfeiture and put in our objections. There was nothing to object to.  All the government put in its sentencing submission was one sentence that cited nothing.

We do have substantial objections on a number of grounds, including the Eighth Amendment and a question about whether these are even proceeds to make.

THE COURT:  I think the issue of proceeds is likely not a difficult one.

In any event, I don't know what the answer is, as I

sit here.

One thing we could do is put this over and give the government an opportunity to put in a preliminary order of forfeiture, if that's what they wish to do, or we can go forward, finish sentencing now, the government can put in its preliminary order even later today.  I don't know if they are in a position to do that.  We can argue about whether that's sufficient later.

MR. PODOLSKY:  According to 32.2, the Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at the sentencing.  The Court must also include the forfeiture order directly or by reference in the judgment.

I don't understand, frankly, what has been violated about Rule 32.2 in the defense's theory.  I think it is clear that the defendant has to forfeit the proceeds of his crime.  An element of the wire fraud charge was obtaining money or property.  The property in this case was the ranch.

Now, I believe it is correct that the sentencing won't be final, that is, the judgment won't be entered until there is an order.  If the defense after today wishes to make objections to the specifics of the order, that's one thing.  But to claim that the defense hasn't had an opportunity to lodge some objection to forfeiture on the basis of the Eighth Amendment or say that they intended to contest that is wrong.  The

government has been very clear that it is intending to forfeit this property.

MR. MUKASEY:  It's not wrong.  We don't have to lodge objections.  We indeed can't lodge objections until there a preliminary order for us to object to.

MR. PODOLSKY:  The preliminary order is not a brief that gives legal argument.  The preliminary order of forfeiture will describe the premises that are going to be seized.  The government has made clear its theory of forfeiture, and the defense has had an opportunity to object.

MR. MUKASEY:  And they blew the timing.

MR. PODOLSKY:  I still don't understand the basis.

MR. MUKASEY:  The Court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before it becomes final.

MR. PODOLSKY:  Again, there will still be an opportunity to lodge objections to the preliminary order.  The defense has had plenty of opportunity to claim that there is an Eighth Amendment violation.

THE COURT:  Like I said, we can proceed in one of two ways, or maybe three.

Because one thing I can do is I can enter an order of forfeiture indicating that the property to be forfeited is the Wasatch Ranch.  I don't have longitude and latitude of what

that specifically is, but presumably it is the very piece of property, the precise piece of property that Mr. Milton purchased from Mr. Hicks, and then we can fight about it later. But if the parties wish, we can put this over because I do believe that it is -- putting aside an Eighth Amendment argument, I do believe that it is the appropriate thing to do in this case. I will ask you what it is you want to do.

MR. PODOLSKY: Judge, we are willing to proceed however you prefer, but our proposal would be to complete the purposes that we are present for today, and, before final judgment is entered, we can have it out on what the exact contours of the premises are and so on.

THE COURT: By the way, to be sure, the reason I raise this issue is because it affects whether there is a fine and, if so, how much the fine will be, whether there is restitution and forfeitable property. That's why I raised it. So I will want to know whether the government has any sense as we sit here what the restitution amount will be.

MR. PODOLSKY: That's a fair question, your Honor. It's a difficult one to answer in part based on, as you saw, our back and forth over the precise loss amount already this morning. This is something we hope in the interim to have a reasonable discussion with defense counsel about so maybe there is a way we can jointly come up with a number.

Just to fully explain what the government intends to

do with the time after today on restitution, we are also working on a system, assuming your Honor does order some restitution, a fair system to get the money to victims.  So part of what we are working on is where the restitution money should be, where it should go, just to explain.

To your Honor's question, our view is obviously there should be a substantial amount of restitution, but it's hard to say with certainty what that number will be.  In part, we would like to discuss it with defense counsel with the benefit of today's proceeding.

MR. MUKASEY:  May we have 45 seconds to confer amongst ourselves, Judge?

THE COURT:  Absolutely.

MR. MUKASEY:  Judge, I think we have come to some agreement.

Without conceding the propriety or the procedural or substantive regularity of the way the government has proceeded, if your Honor wants to make an order regarding forfeiture today and then the government will put in a preliminary order after this proceeding, we will put in a letter immediately thereafter, which is actually prepared in large part, which will take issue with the forfeiture from a number of angles, procedurally and substantively.  We are prepared to go forward in that way.  Then I think Ms. Shapiro will make some arguments about how to proceed after today, after you impose sentence.

THE COURT:  At some future time.

MR. MUKASEY:  No.  I think today.

THE COURT:  Today.

MR. MUKASEY:  Yeah.  We are going to talk about what is going to happen after sentence is imposed and the question of continued bail.

THE COURT:  I should proceed.

MR. MUKASEY:  Yes.  If you will accept a letter from us this afternoon once we receive a preliminary order.

THE COURT:  I don't know that you are going to get a preliminary order today.

MR. PODOLSKY:  I'm hoping it will be today.  Certainly in the next 24 hours.  Maybe today.

THE COURT:  Thank you.

In deciding what sentence to impose, in addition to the sentencing guidelines, I have considered all of the factors set forth at Section 3553(a) of Title 18 of the United States Code, including, as most relevant to Mr. Milton, the nature and circumstances of the offense and his history and characteristics.

I have considered the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to provide Mr. Milton with needed

educational and vocational training or medical care in the most effective manner.

I have considered the need to avoid unwarranted sentence disparities among similarly situated defendants and the need to provide restitution to any victims of the offense.

Having considered these factors, it is my intention to impose a sentence of 48 months on each count, each to be served concurrently. That will be followed by three years of supervised release on each count, also to be served concurrently.

I will impose a fine of $1 million, and I will also impose a mandatory special assessment of $100 on each count of conviction, as I must, for a total of $300.

I will today announce that I intend to impose forfeiture of the property that was the subject of, I believe Count Four, of the indictment, the Wasatch ranch, which Mr. Milton purchased from Mr. Hicks. And I will also impose an order of restitution upon receiving information from the government no later than 90 days from today.

I believe that this sentence is sufficient but not greater than necessary to comply with the purposes of sentencing set forth at Section 3553(a)(2) for the following reasons:

Let me begin by noting that obviously the guideline calculation is a major part of the presentence report. It was

a major part of the parties' submission and, for good reason, the numbers are quite large.

But I have to say, whether the loss amount is $600 million, as the government has requested me to so find, or $125 million, as the probation department determined to apply, or $108 million, as the defense's expert so found using the government's purportedly faulty information, the sentence was not driven primarily or even largely by that amount because, as Mr. Mukasey discussed in discussing his spectrum construct, which I agree with, there is a lot of intellectual and academic debate about whether or not the guidelines even -- or the fraud guidelines even comport with the rationale that the sentencing guidelines were instituted to address, which is to say, to impose a uniform system of sentencing across the entire country, taking into account the judiciary's experience in sentencing similar defendants based on similar crimes. And the fraud guidelines are like a lot of the other guidelines, they are a proxy. They are a proxy for culpability.

In thinking about the fraud guidelines, I break culpability up into two factors. There is criminal culpability. It's a proxy for that. It's a better proxy for criminal culpability than not in certain situations. It's quite useful in others not so much.

There is also moral culpability. With respect to moral culpability, the amount of the fraud, whether it's a

million dollars or under a million dollars or a hundred million dollars, doesn't always or frequently doesn't get at what is important for people like myself to consider in imposing sentence.

A lot was discussed about Ms. Holmes from California, Elizabeth Holmes. Let me just begin by saying that I know nothing about Elizabeth Holmes or the case against her other than what I have read in the press. I know nothing about what the loss amount was there. I know a little bit about the technology that she purportedly invented and was marketing, but I do not find that Mr. Milton's offense is similar to hers for the following reason, which was highlighted by Mr. Mukasey.

She was marketing a technology which affected people's health and their very livelihood, their very life, and she put it out into the world, apparently knowing that it didn't work, and it was used in very real-life circumstances and resulted in very real-life harm to any number of people. That's not what Mr. Milton did, in my view.

Also, in terms of calculating the guidelines, as I determine, I do find that the government met the standard by a preponderance of establishing the loss.

Mr. Bondi kept bringing me back to the Hindenburg report. I didn't create the Hindenburg report, and I didn't select September 10 as the date that would be used for the event study, so I'm not relying on the Hindenburg report at

all.  I am relying on the testimony that was provided during the trial, and I'm relying on the incontrovertible fact that on September 9, the company was worth one figure and on September 10, it was worth a much lower figure.

Again, in determining the appropriate guideline range, that is largely a mechanical process that the courts have to begin with, and we have to get it right to the best of our ability.  I believe I have done that, but it doesn't drive necessarily the sentence that I intend to impose.

With respect to the sentence, I sat through the trial, and I saw and heard all the evidence.

So let me begin by stating clearly, as difficult as it may be for you, Mr. Milton, and for your family to hear, I believe the jury got it right.  Over the course of many months, leading up to the time that Nikola went public on the NASDAQ exchange, you used your considerable social media talents to tout your company in ways that were materially false, whether it was the then current status of the development of the technology that would power your trucks or the number of binding orders or the state of your requisition for rights to build hydrogen generating facilities.

What you said over and over in different media outlets was wrong and it was materially wrong, and you knowingly said those things.  A lot of letters were written in support that emphasized a number of aspects of your character, but there was

a theme to a large number of these letters, and two aspects in particular that many of your family members and friends wrote about was the fact that you are a visionary and that you have an enthusiasm and an optimism for your ideas that sometimes causes you to get a bit ahead of yourself in their telling.

While I don't doubt the sincerity or accuracy of their observations, the underlying message appeared to me to be that you did not intend to say anything that was untrue, and in fact in your statements to me today, that was your message.  Again, you never intended to harm anyone, that you just got a little overly enthusiastic at times, and you didn't even say that.  You said you didn't say anything wrong, you didn't intend anything to hurt anyone, and that everything you said was accurate and true.

As you know, the jury found otherwise.  But whether it is accurate or not, I don't have to determine here why you said the things you said.  The law does not grant a pass for good intentions, and it is decidedly the obligation of business executives who are seeking to have the public purchase their stock to speak the truth about their company when they speak, when they choose to speak.

And so whether you believed what you said when you said it or whether you believed it would ultimately be true is of no moment because the harm is the same and there was a lot of discussion during the trial, as I recall, that you were

particularly focused on retail investors for whatever reason.

And as we have discussed, earlier I recently received victim-impact statements, including statements from retail investors, and I'll read just a couple of excerpts from a couple of the letters which buttress the government's theory that the people who purchased and who were hurt by your statements were relatively unsophisticated people who listened to you and who believed you and who believed in your message and believed in your company and were hurt when the truth about your company came out.

The first is a letter dated December 2, 2023. It is statement 1 in the government's submission. I'll read just in part: Sometime during the beginning of the summer of 2020, I began reading about Mr. Milton and Nikola Corp. after seeing him on various television shows on CNBC.

As a truck driver I was intrigued by the promise of hydrogen technology being able to power semi trucks. I watched a video of a Nikola truck appearing to drive effortlessly. I read of Nikola's partnership with GM to build a Tre tuck.

I learned that Nikola purported to have a found a way to produce hydrogen inexpensively. After doing what I thought a significant amount of due diligence, I made a decision to invest $21,650 in Nikola Corp. on September 9, 2020. Hindenburg Research released their devastating report the very next day.

At first, I did not want to believe what was outlined in the report. I bought into the lie that its authors were short sellers who were just trying to tank the stock price. I did not want to face the truth that I had been so easily conned by Mr. Milton. By the time that the truth became apparent to me, I had lost well over 90 percent of my initial investment. I still own the original shares today. They are worth less than $500.

I'll read next from statement 7 in the government's submission. It's a letter submitted on October 24, 2023. When I came across Nikola and looked at the research and forward-looking purchase orders, I was excited about this company and the future of EV vehicles/trucks.

When I watched on the Internet and the company's website seeing the EV semi truck being driven on the road, it led me to believe that this was a great time to invest in the EV market and it appeared Nikola was the leader in the industry.

I purchased 500 shares, which is a lot for me to do with being a county employee at the time. To date I have lost $16,461.97 with this fraudulent company. This has impacted my retirement plans, not to mention the stress and embarrassment that this has caused me.

Finally, I'll read from statement number 8 of the government's submission, a letter dated August 22, 2023.

Again, I'm just reading excerpts.

When Mr. Trevor presented the prototype of the semi truck, he assured us of its operational status. I was led to believe that we were on the cusp of witnessing revolutionary technology that could change the face of the transport industry. Imagine the depth of betrayal when it was revealed that the spectacle of a truck driving was nothing more than a ruse, with it being towed to the top of a hill and merely allowed to coast down. Such revelations don't just shatter trust. They undermine faith in genuine innovation and tarnish the image of genuine entrepreneurs who were diligently to bring their visions to life.

Furthermore, based on Mr. Trevor's assurances and representations, I invested a significant amount of money into Nikola.

Mr. Trevor did not limit his deceit to a controlled group of stakeholders. By choosing to appear on television, social media, and other public platforms, he not only amplified his lies, but also positioned himself as a representative of the industry's future. Such actions don't just harm direct victims like me, but erode public trust and technological advancement.

Now, I understand, Mr. Milton, that this is just another bump in the road as you continue this journey. I understand that you are going to be appealing this verdict and

this sentence.  But I want you to know that in the spectrum of the fraud guidelines, there are people that I myself have sentenced that I've sentenced pursuant to these guidelines whose offenses were substantially less than, name the figure, 107 or $108 million, but who looked their victims in the eye as they took the last dollar from their pocket.

I want you to know, I don't believe that that's who you are.  I don't believe that you belong at that end of the spectrum.  But there was still real people that were hurt by your actions.

With respect to specific deterrence, I think frankly that you and Mr. Mukasey have the better of the argument.  I don't believe -- I can't imagine that you will do anything to break the law, having gone through this experience.  I also believe that it is clear to me.

I did read the letters that were submitted by your friends and family.  I did notice them throughout the trial.  I certainly see them here.  It's clear to me that you have a very strong support network that will be by your side and will be with you throughout and that will serve as a buffer to make sure that you don't engage in this type of activity in the future.  I don't believe specific deterrence is particularly important in this case.

As far as general deterrence, I think the government has the better of the argument here.  Although you may not

personally have had the type of background, educational, etc., as other executives, you were incredibly privileged in the sense that you were able to build, in large part through your own effort, a very powerful company and were able to demand a lot of power in that way by virtue of the relationships that you established, the company that you built, the employees that you had.

As Mr. Podolsky indicated, this is a matter that has received some press and although, in my experience, general deterrence sometimes doesn't mean a lot because in the moment of sentence there is no one in the courtroom other than the defendant and his or her lawyer and the prosecutor and the court reporter, and no one knows who was sentenced or why or what they did.  But in this case there will be a story that will be told about someone who engaged in wrongdoing and was punished for it, and I believe that that will have an effect on individuals going forward.

With respect to the amount of time, everyone in this room understands and agrees that even though, as I have determined, that the loss amount is immense, that it would be ludicrous for you to be sentenced in accordance with those guidelines, and everyone I think agrees that it is appropriate that you be sentenced below that guideline range.

The probation department has recommended 11 years, and the government does not object to that.  In fact I believe they

join in that recommendation. But I do not believe that a sentence even at that level is necessary in order to carry out the purposes of sentencing in this case for the reasons that I have stated. I believe that it is a significant sentence, and I believe it is a significant sentence is necessary for the reasons stated, but I don't believe that it needs to go beyond what I've indicated.

With that, are there any additional legal issues to raise, Mr. Podolsky?

MR. PODOLSKY: No, your Honor.

THE COURT: Mr. Mukasey.

MR. MUKASEY: Ms. Shapiro.

MS. SHAPIRO: Your Honor, not as to the sentence, but we have an application for bail pending want -- we don't have any objections, any further objections regarding the sentencing, but if your Honor is OK with it, we'd like to make an application for bail pending appeal.

THE COURT: Is there an objection?

MR. PODOLSKY: Yes, your Honor. We have no objection to the defendant having a surrender date. We are not seeking his remand today, but we don't think bail pending appeal would be appropriate in this case because we don't think that there is a substantial question for the circuit to address in this case.

THE COURT: I am going to grant bail pending appeal.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  I thought I did an OK job in presiding over the trial, but I've been wrong before.

Seriously, there are substantial issues that were raised throughout this case, both on the facts and on the law. There was substantial expert testimony that was provided.  I have come to learn, to my chagrin, that experts are frequently challenged and experts are sometimes wrong.  And just because an expert says something doesn't mean that a jury has to accept it certainly.  But expert testimony can sometimes affect and frequently does affect the weight of the evidence.

I believe that substantial issues can be raised on appeal in this case and, in any event, I don't believe that Mr. Milton is in any way a flight risk.  He is certainly not a danger to the community.  I have not been told that he has been in any way noncompliant with the conditions of release thus far, and there is no need, I believe, to give him a surrender date.  I will allow him to remain free pending appeal.

No additional objections from the defense, correct?

MR. MUKASEY:  Correct.

THE COURT:  In that event, it is the judgment of the Court that Mr. Milton be sentenced to 48 months on each count to be served concurrently.  That will be followed by three years of supervised release on each count, also to be served concurrently.

The standard conditions of probation will apply. They are set forth at pages 35 and 36 of the PSR and are included in their entirety in this judgment. The mandatory conditions are applied. They are set forth at page 35 of the PSR and are included in the judgment in their entirety, and they are that you must not commit another federal, state, or local crime, and you must not unlawfully possess a controlled substance, and must cooperate with the collection of DNA as directed by the probation officer. I am not going to impose the controlled substance testing, as there is nothing before me to indicate that Mr. Milton is in danger of abusing narcotics drugs. In fact, I have been told that he has never used drugs or alcohol.

Then the following special conditions apply. They are set forth at page 37 of the PSR and are included in their entirety herein. You shall submit your person and any property, residence, vehicle, papers, computer, electronic communications and data-storage devices to a search by any U.S. Probation officer and, if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning a violation of a condition of supervision or unlawful conduct by Mr. Milton. Failure to submit to a search may be grounds for revocation of release.

There is a special condition listed in the PSR which I will not apply. It concerns whether or not Mr. Milton, there was a risk that he might harm another person. I do not believe

that that is appropriate in this case.

The other special conditions are that you must provide the probation officer with access to any requested financial information, must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule. If you do not live in the Southern District of New York during your period of supervision, it is recommended that you be supervised by the district of your residence.

You are ordered to pay the mandatory special assessment of $300, which shall be due immediately. I will impose a fine in the amount of $1 million. The forfeiture issue we have discussed. But for purposes of completion, I find that the Wasatch Ranch, which was the subject of Count Four of the indictment, will be forfeited, and I am speaking about the precise property that Mr. Milton purchased from Mr. Hicks at that time. I understand that there will be motion practice likely after today.

And I will also enter a restitution order, after I receive from the government and after the defense has had an opportunity to review, an amount of restitution that will be done within 90 days.

That constitutes the sentence of the Court.

Mr. Milton, as you have probably been told by your

attorneys, you have a right to appeal both the conviction and the sentence. That appeal doesn't have to be filed prior to the filing of the judgment, which apparently will take a month or more or two. But once the judgment is filed, there is a small amount of time that you will have before you will have to file the appeal.

So, Mr. Mukasey, will you assure me that you will promptly and thoroughly discuss with Mr. Milton his appellate rights?

MR. MUKASEY: I shall.

THE COURT: Any other applications?

MR. PODOLSKY: Yes, your Honor.

At this time the government would move to dismiss any open counts. There is an underlying indictment in this case, to dismiss that indictment as well.

THE COURT: That application is granted.

Anything else, Mr. Podolsky?

MR. PODOLSKY: No, your Honor.

THE COURT: Mr. Mukasey.

MR. MUKASEY: Is Mr. Milton required to report to probation today? Do you know, Judge?

THE COURT: I frankly do not know.

MR. MUKASEY: We will figure it out.

Nothing further.

THE COURT: In that event, we are adjourned.