

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 14, 2025

**BY ECF**

The Honorable Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Trevor Milton*, **S1 21 Cr. 478 (ER)**

Dear Judge Ramos:

      The defendant was previously convicted of securities and wire fraud, following a jury trial, and on December 18, 2023, was sentenced to a term of forty-eight months of imprisonment. (Dkt. Nos. 322, 327). As part of the Court's sentence, it imposed an order of restitution, but deferred determining an amount until after receiving additional information from the parties. (Dkt. No. 322 at 89; Dkt. No. 327 at 6). The parties attempted to negotiate a resolution of the restitution issue, but were unable to reach an agreement. For the reasons set forth below, the Court should order the defendant to pay restitution in the amount of $660,800,000 to shareholders of Nikola, which is the approximate amount of damages to investors in this case, and is the amount the Court determined the defendant caused in "loss" at sentencing. (Dkt. No. 322). Additionally, the Court should order the defendant to pay $15,174,698.70 in restitution to Peter Hicks, the victim of the wire fraud alleged in the fourth count of the Indictment.

      **I.**    **Background**

      Following a jury trial, Trevor Milton was convicted on one count of securities fraud and two counts of wire fraud. The securities fraud count and one of the wire fraud counts related to Milton's fraud on shareholders of Nikola, an electric- and hydrogen-powered vehicle and energy company. In capsule form, from approximately November 2019 to September 2020, Milton induced investors to purchase shares of Nikola by making false and misleading statements about the company's product and technology development. (Dkt. No. 273 at ¶ 9). The effect of Milton's fraud was to inflate the value of Nikola's stock considerably, causing investors to pay higher prices for equity in the company. Those investors suffered significant losses when Milton's fraud was revealed by in September 2020. (Dkt. No. 273 at ¶ 36).

      Relatedly, Milton lied to Peter Hicks about Nikola's business in order to convince Hicks to sell Milton a ranch in exchange for Nikola stock options and cash. (Dkt. No. 273 at ¶ 31; GX 1400-T). Specifically, in early June 2020, the defendant and Hicks agreed to the purchase of the

ranch for $8.5 million in cash and Nikola stock options valued then at $8.5 million. (Dkt. No. 273 at ¶ 35; Trial Tr. 2069-70.) At the time the deal closed, the stock options, if exercisable then, would have netted Hicks $15,174,698.70—a value that Hicks believed was real based on the representations made by Milton directly to Hicks and publicly in the media. (Trial Tr. 2091-92.) Hicks was restricted from exercising his options for an extended period, and was unable to do so before Milton's fraud was revealed. By December 1, 2020, the value of the stock options granted to Hicks had decreased to approximately $973,473, making it economically unwise for Hicks to exercise the options. (Dkt. No. 273 at ¶ 36).

In advance of sentencing, the parties litigated the amount of "loss" involved in the offense, as defined in section 2B1.1(b) of the United States Sentencing Guidelines. The Government argued that the total loss to retail investors in Nikola was at least $660.8 million based on a per-share inflation calculation conducted by the economic consulting firm Compass Lexecon. (Dkt. No. 315 at 10). Specifically, Compass Lexecon quantified the portion of the share price that would not have been paid but for the fraud as follows:

- First, Compass Lexecon calculated the amount of inflation per share using the amount the price declined on certain dates that corrective disclosures were made to the public (i.e., dates on which the defendant's fraud began to be revealed). Those dates were September 10 and 11, 2020, when the firm Hindenburg Research published a report detailing evidence of the defendant's fraud, and September 21, 2020, which was the day the defendant's resignation from Nikola was announced.

- Second, in order to determine how much the shares were inflated, Compass Lexecon measured the price decline on September 10, 11, and 21 by using the residual share price decline calculated by the defendant's expert, Allen Ferrell. Professor Ferrell found that the residual share price decline on September 10, 2020, was -$3.14; on September 11, 2020, it was -$5.12; and on September 21, 2020, it was -$4.89. Professor Ferrell's model showed that the cumulative residual decline over September 10 and 11, the residual decline on September 21, and the cumulative residual decline over all three dates was statistically significant. Therefore, Compass Lexecon calculated a per-share inflation metric of $13.15 for share purchases on or before September 9, 2020; and a per-share inflation metric of $4.89 for share purchases from September 11 through September 20, 2020. Those calculations did not assume any inflation for share purchases on and after September 21, 2020.

- Third, in order to determine the amount of loss sustained per share, Compass Lexecon calculated the inflation on the purchase date minus the inflation on the sale date, using the inflation metric described above, and then capped the inflation loss by the out-of-pocket loss per share, i.e., the purchase price minus the sale price. Losses were recognized either when shares were sold before the corrective disclosure dates, or when shares were retained on the final corrective disclosure date. For shares retained on the final corrective disclosure date but sold afterward, the loss per share due to inflation was capped by the actual purchase price and the rolling average close price on the sale date.

- Fourth, Compass Lexecon calculated actual per share losses for retail customers who traded through TD Ameritrade, Charles Schwab, and Robinhood, using transaction-level brokerage data obtained from those firms. At those three brokerages alone, the total combined loss was approximately $267.7 million. Using the loss totals associated with investors at those brokerages, Compass Lexecon was able to calculate a reasonable estimate of all retail investor losses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown. Specifically, Compass Lexecon was able to determine what percentage of overall market volume was traded at Robinhood, TD Ameritrade, and Charles Schwab, and then extrapolated the amount of loss from those three brokerages to determine total retail investor losses. Using two different methodologies, the Government's experts determined that the losses at the three brokerages needed to be multiplied by a scale-up factor between 2.47 and 2.52 in order to determine total investor losses. Those scale-up factors result in estimated total retail investor losses of $660.8 million to $673.6 million.

(*Id.* at 12-15). The defendant objected to the loss amount calculation, asserting that the loss amount was zero. (Dkt. No. 316).

Sentencing was held in this case on December 18, 2023. (Dkt. No. 322). During oral argument on the loss amount calculation, the Court correctly observed that after the defendant's fraud was disclosed in the Hindenburg report, Nikola had "[a] loss of approximately 10 percent" on its market capitalization of $16 billion, and within two days that figure was below $13 billion. (*Id.* at 6). The Court concluded that "the concept that there was no loss … [was] difficult to reconcile with the evidence … at trial and the evidence that [the Court had] received since." (*Id.* at 21). The Court then adopted the Government's loss calculation of $660.8 million or more. (*Id.* at 22, 25).

In imposing a sentence, the Court ordered that the defendant be imprisoned for forty-eight months, to be followed by a term of supervised release of three years. (*Id.* at 89). The Court also imposed a $1 million fine, ordered the forfeiture of the Wasatch Creek Ranch, and imposed an order of restitution in an amount to be determined following the sentence. (*Id.*). The Court issued its judgment on January 17, 2024. (Dkt. No. 327). The Court issued a final forfeiture order, overruling defense objections, on February 26, 2024. (Dkt. No. 334). The Court also extended the time for the Government to submit a proposed restitution amount so that the parties could attempt to reach an agreement on an amount and a plan for payment. (Dkt. Nos. 337, 341, 343, 352). When those efforts were unsuccessful, the Court ordered a briefing schedule to determine the appropriate amount of restitution. (Dkt. No. 360).[1]

---

[1] Where a specific restitution amount has not been ordered at sentencing, the court must set a date for the final determination of the victim's losses, which statute provides must occur no later than 90 days after sentencing. 18 U.S.C. § 3664. However, the Supreme Court has held that "a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount." *Dolan v. United States*, 560 U.S. 605, 608 (2010); *see also Gushlak*, 728 F.3d at 192 (affirming

## II.  Discussion

a. <u>Legal Standard</u>

The Mandatory Victim Restitution Act requires a court to order "the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). As a result, a restitution award must reflect "the amount of losses directly and proximately caused by the defendant's conduct." *United States v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir. 2013). In a case like this one, where investors paid inflated purchase prices for stocks, the amount of losses directly and proximately caused by the defendant's conduct are "the portion of the price paid that would not have been paid but for the fraud." *Id.* at 196-197. In other words, "[t]o quantify investor losses … one needs to determine what the aggregate price of the investor's shares would have been on a given date but for the fraud; this value can then be subtracted from the actual market price of the shares on that date." *Id.* at 197. Where "the fraudulent conduct at issue was revealed all at once … the market's immediate response to a disclosure" can be used "in order to quantify victims' losses." *Id.* at 198 (citing *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007)).

It is the Government's burden to establish the amount of restitution, and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." *United States v. Bahel*, 662 F.3d 610, 647 (2d Cir. 2011) (quoting 18 U.S.C. § 3664(e)). That said, "[t]he 'calculation of these losses need not be mathematically precise,'" and "[t]he district court need make only a 'reasonable estimate' of the loss 'based on the evidence before it.'" *United States v. Rainford*, 110 F.4th 455, 490 (2d Cir. 2024) (quoting *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016), and *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007)). It is appropriate in determining restitution to extrapolate from known losses to unknown losses. *See, e.g., United States v. Uddin,* 551 F.3d 176, 180-81 (2d Cir. 2009) (in food stamp fraud case, sentencing court was permitted to estimate loss by extrapolating from known data average amount of loss per fraudulent transaction and applying average loss to transactions where exact amount of loss was unknown).

Finally, interest is properly included as restitution. *United States v. Qurashi,* 634 F.3d 699, 704 (2d Cir. 2011) (holding that "MVRA allows a sentencing court to award prejudgment interest in a criminal restitution order to ensure compensation "in the full amount of each victim's losses"). The rate of prejudgment interest "is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *United States v. Gordon*, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004).

---

restitution order issued eighteen-months after sentencing absent evidence of prejudice to defendant).

      b. <u>A Restitution Award of $660.8 Million is Appropriate to Compensate Retail Investors' Actual Losses</u>

The Court should order the defendant to pay $660.8 million in restitution, which is the loss amount the Court calculated at the defendant's sentencing. While "an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution"—for example, when the calculation is based on "intended loss" (which was not the case here)—where the "amount-of-loss calculation … was supported by the evidence and was based on actual losses to victims, [a defendant's] challenge to the loss calculation for the restitution award must fail." *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998). Indeed, it is well settled that where a "loss" amount finding is based upon an estimate of victims' actual losses, a restitution order in the same amount is appropriate. *See, e.g.*, *United States v. Sullivan*, 118 F.4th 170, 228 n.35 (2d Cir. 2024) ("Where … the district court's Guidelines loss calculation was 'supported by the evidence and was [limited to] actual losses to the victims,' and thus was equivalent to the losses subject to restitution, a defendant's challenge to the restitution order 'must fail.'" (citation omitted)); *United States v. Glenn*, 794 F. App'x 19, 21 (2d Cir. 2019) (where "the evidence allowed the District Court to achieve a 'reasonable approximation' of the 'actual loss' suffered by the victims … there was no error in the restitution calculation"); *Gushlak*, 728 F.3d at 195-96 (same).

Here, the Government retained Compass Lexecon, which conducted a careful analysis based on evidence of victims' actual losses. The analysis, applying conservative assumptions, determined that retail investors of $660.8 million to $673.6 million. The defendant had extensive opportunities to contest those findings, including through the retention of his own expert and the filing of objections in advance of sentencing, and the Court ultimately determined the Government's "actual loss" calculation was appropriate. That finding dictates the outcome here: because the Court found that the Government's loss calculation of $660.8 million or more was based on the evidence "at trial and the evidence that [the Court had] received since," Dkt. No. 322, any challenge to that amount of restitution "must fail" under the Circuit's precedents, *see Germosen*, 139 F.3d at 130.[2]

The current state of the defendant's assets or his ability to pay are irrelevant to the Court's restitution determination. The Second Circuit has held that under the Mandatory Victims Repayment Act, imposition of full restitution for all victims is mandatory and is to be ordered "irrespective of [the defendant's] ability to pay." 18 U.S.C. § 3663A(c)(1)(A)(ii); *United States v. Boyd*, 239 F.3d 471 (2d Cir. 2001); *Warner v. United States*, 21 F. App'x 43, 46 (2d Cir. 2001). In the event the defendant makes specific ability-to-pay argument based on representations about the state of his assets, the Government will seek leave to file an additional brief with the Court regarding the defendant's financial condition and what additional fact finding is necessary.

---

[2] While $660.8 million is the appropriate restitution figure, as the Court observed at sentencing, even the defendant's expert conceded that losses were at least $108 million. (Dkt. No. 322 at 90).

       c.   <u>A Restitution Award of $15,174,698.70 to Peter Hicks is Appropriate</u>

Hicks suffered losses of $15,174,698.70, calculated as the value of the fraudulent option on the date of the closing of the transaction, which then expired unexercised when the truth regarding the defendant's fraud was revealed. As Hicks would never have entered into a transaction with Milton had he known of Milton's fraud, or that the options would be rendered effectively worthless, Hicks is entitled to restitution for the full amount of the now worthless option on the date of the closing. *See United States v. Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) (holding that victims were entitled to the "nominal value" of their stolen funds "plus the subsequent investment gains lost as a result" of the fraud). Hicks is also entitled to prejudgment interest on this amount for the period August 14, 2020 to the date of the restitution judgment.[3]

       d.   <u>Implementation of the Payment of Restitution to Victims</u>

Upon the entry of an order of restitution, the Government will propose a plan to the Court for the orderly distribution of restitution payments to victims. Based on past experiences, the Government anticipates that the Department of Justice will either appoint an administrator to distribute the funds, or will work with the Securities and Exchange Commission to distribute the funds through the SEC Fair Fund program, which allows the SEC to combine civil penalties and disgorgements into a fund to compensate investors who suffered losses due to securities violations. The SEC is already setting up a Fair Fund in connection with the agency's settlement with Nikola.

\* \* \*

For the foregoing reasons, the Government respectfully submits that the Court should order the defendant to pay (1) $660.8 million in restitution to retail investors; (2) $15,174,698.70 to Hicks; and (3) prejudgment interest to all victims in connection with those restitution awards.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

by: /s/ Nicolas Roos
     Nicolas Roos
     Assistant United States Attorney
     (212) 637-2421

cc: Counsel of Record (by ECF)

---

[3] Hicks and his son also seek restitution in the form of legal fees incurred in relation to this criminal action. The total fees that were incurred and paid by Hicks were $138,584.39, allocated as follows: Seyfarth Shaw - $36,904; Jackson Lewis - $24,578.64; Fabian VanCott - $3,718; and McDermott Will - $73,383.75.